**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————
                                                    )
In re:                                              )        CIVIL ACTION NO. 05-11177-DPW
                                                    )        (LEAD CASE)
M3POWER RAZOR SYSTEM                                 )
MARKETING & SALES PRACTICES                          )        MDL Docket No. 1704
LITIGATION                                           )
———————————————————)
                                                    )
THIS DOCUMENT RELATES TO:                            )
**ALL CASES**                                        )
———————————————————)

## CASE MANAGEMENT ORDER NO. 2

**1.      Organization of Plaintiffs' Counsel**

        Primary responsibility for managing this litigation will rest with an Executive Committee
of Plaintiffs' Counsel (the "Executive Committee").  The Executive Committee shall be made up
of five (5) individual attorneys and their respective firms.

        **a.      Membership**

        The Court designates the five (5) individual attorneys and their respective firms listed on
Exhibit A hereto to serve as members of the Executive Committee:

                1.      Allan Kanner, Kanner & Whiteley, LLC

                2.      Olen Kenneth Dodd, The Dodd Law Firm

                3.      Donald Amamgbo, Amamgbo & Associates

                4.      _____

                5.      _____.

Each Executive Committee counsel shall have equal voting powers, consistent with Executive
Committee by-laws as may be adopted thereby.

        **b.      Responsibilities of the Executive Committee.**

        **Order Determining Plaintiffs' Organizational Structure**

(1)    To organize itself and agree on a plan for conducting the litigation on behalf of the Class consistent with the terms of this Order and all subsequent orders.  Such plan may, in the discretion of the Executive Committee, include adopting a set of by-laws or rules for the operation of the Executive Committee;

(2)    To coordinate and supervise the efforts of Plaintiffs' Counsel to ensure that pre-trial, trial and post-trial preparation is conducted effectively, efficiently and economically and that unnecessary or duplicative work and expenditures are avoided;

(3)    To make all work assignments, including the organization and formation of subcommittees if needed (e.g., Discovery and Expert, Briefing, Pretrial Proceedings and Trial) of Plaintiffs' Counsel, in such a manner as to promote the orderly and efficient conduct of the litigation and avoid the performance of redundant or duplicative work by any Plaintiffs' Counsel, including work on any subcommittees that may be created, provided that all Plaintiffs' Counsel shall be given an equal opportunity for work assignments;

(4)    To ensure that work assignment to all Plaintiffs' Counsel are made in the best interest of the plaintiffs' and the proposed class and are made on the basis of the qualifications and expertise of the persons assigned particular tasks or responsibilities, counsel's knowledge of the facts and issues, efficiency and cost-effectiveness.

(5)    To be ultimately responsible for the preparation of all notices, motions, opposing memoranda, pleadings and other documents for all plaintiffs and make assignments among Plaintiffs' Counsel accordingly;

(6)    To argue motions on behalf of all plaintiffs;

(7)    To collect time, lodestar and expense report from each Plaintiffs' Counsel, including paralegals and other staff members, on a bi-monthly basis and to circulate a compilation of such time and expense report to all Plaintiffs' Counsel on a bi-monthly basis;

(8)    To conduct all pre-trial, trial and post-trial proceedings;

(9)    To negotiate stipulations and other pretrial and trial cooperation with the defendant;

(10)    To consult with and employ experts;

(11)    To advance all costs necessary for proof of all plaintiffs' claims generally, including but not limited to proof of liability and damages;

(12)    To brief and argue motions for the plaintiffs and to file opposing briefs in proceedings initiated by other parties;

**Order Determining Plaintiffs' Organizational Structure**

(13)    To call meetings of Plaintiffs' Counsel when appropriate to update counsel on relevant litigation issues and to accommodate their concerns.  In no event shall such meetings be less than on a quarterly basis, unless agreed to by a majority of Plaintiffs' Counsel;

(14)    To confer with Plaintiffs' Counsel regularly by conference call.  In no event shall such conference calls be less than on a monthly basis, unless agreed to by a majority of Plaintiffs' Counsel;

(15)    To regularly update and confer with Plaintiffs' Counsel by e-mail on an ongoing basis.  In no event shall such e-mails be less than on a weekly basis, unless agreed to by a majority of Plaintiffs' Counsel;

(16)    To forward to Plaintiffs' Counsel by electronic mail copies of all written communications between the Executive Committee and the defendant;

(17)    To negotiate and authorize settlements subject to Court approval;

(18)    To give all members of Plaintiffs' Counsel at least 10 days prior notice to the execution of any proposed settlement agreement by the Executive Committee and the defendant. Said notice is to be in writing, and should be transmitted by the fastest available means. In that notice, the relevant terms of the proposed settlement are to be set out in detail, and all written communications between the Executive Committee, as well as a summary of verbal communications, are to be provided in PDF format. In no case shall any proposed settlement agreement be submitted to the Court, unless a copy of the final version of the submission is transmitted to all Plaintiffs' Counsel by electronic mail at least 5 days prior to its submission for final review;

(19)    In the event of a settlement, to propose a Plan of Allocation to the Court and/or a Special Master appointed thereby;

(20)    To assess members of the Executive Committee and other Plaintiffs' counsel for reasonable cost contributions for common benefit costs.  Such costs may, by way of example, include expenses for consultants and expert witnesses as to common issues; outside copying services; and deposition transcripts for defense witnesses and/or plaintiffs named in a Master Complaint. The Executive Committee will determine the amounts of contributions to the fund and agree upon the use of the fund;

(21)    To perform such other duties and undertake such other responsibilities as they deem necessary or desirable.

Members of the Executive Committee shall take such action on behalf of plaintiffs as may be directed by a majority of the Executive Committee, except that approval of any settlement must be by agreement of a super-majority of the Executive Committee, and shall not take any action inconsistent with the direction of the Executive Committee.  No individual member of the Executive

**Order Determining Plaintiffs' Organizational Structure**

Committee shall have authority to act or communicate unilaterally on behalf of the Class.

**c.**    **Lead Class Counsel**

The court designates Allan Kanner of Kanner & Whiteley, LLC to serve as Lead Class Counsel with the power to lead and convene Executive Committee meetings. Lead Class Counsel of the Executive Committee shall have the overall responsibility for coordinating the efforts of Executive Committee, to establish and maintain a document depository and to maintain an up-to-date comprehensive Plaintiffs' service List;

**d.**    **Work Product of the Executive Committee**

The Executive Committee shall make assignments and organize counsel in subcommittees, as necessary, to make efficient use of each counsel's skills and avoid duplication of efforts. All Plaintiffs' Counsel may have reasonable access to the work product of the Committees and Subcommittees upon request of the Executive Committee, and the agreement to any Confidentiality Order that may be entered, if confidential documents are requested. All counsel shall protect the work product of Plaintiffs' Counsel and should not disclose such work product without the express, written consent of the Executive Committee. Only the Executive Committee, whether intentional or inadvertent, waive the work product of Plaintiffs' Counsel.

**e.**    **Compensation of the Executive Committee**

In the event of a resolution of this matter either through settlement or trial, members of Executive Committee shall submit a petition for attorney fees on behalf of all counsel in this matter and shall not seek or be entitled to a preferential multiplier, to the extent that a multiplier is approved by this court, such multiplier shall apply across to the board to all Plaintiffs' Counsel.

**f.**    **Settlement**

In the event that this matter is resolved through a negotiated settlement, plaintiffs' Executive Committee shall submit the proposed settlement to all Plaintiffs' Counsel and shall in good faith attempt to secure the approval or consent of other Plaintiffs' Counsel, this is without prejudice to the Court's responsibility regarding approval of any settlement. Any member of Plaintiffs' Counsel retains the right to object to any such settlement.

**Order Determining Plaintiffs' Organizational Structure**

      **g.**     **Removal of Counsel from the Executive Committee.**

            For good cause shown, the Court, on its own motion or on the motion of any party, may remove any Executive Committee member from that position.

**2.**      **Miscellaneous Provisions**

      **a.**     **Notices of Adoption of Model Complaint.**

            For all subsequently filed cases, plaintiffs's class representative, through counsel, shall file and serve a pleading styled <u>Notice of Adoption</u> adopting the Model or Master Complaint and shall, upon filing, be treated as the filing of a joinder in the Model or Master Complaint. Defendants hereinafter shall be deemed to have responded to all subsequently filed actions through their previously filed master Answer.  New charging allegations may be included in a <u>Notice of Adoption</u> only by Court order upon a noticed motion and a showing of good cause

      **b.**     **Later Filed Cases.**

            The terms of this Order, including pretrial coordination and consolidation, shall apply to actions later instituted in, removed to, or transferred to this Court (including "add-on" cases) that involve related claims.  Objections to such consolidation or other terms of this Order shall promptly be filed, with a copy served on Lead Counsel and defendant.  The terms of all orders, rulings and/or decisions with respect to any allegations contained in the Model Complaint (including determinations on motions for summary adjudication) shall be applied to all later actions instituted herein, except on a showing of good cause.

      **c.**     **Modification.**

            Any party may petition the Court through noticed motion, for amendments to or modifications of this or any additional orders subsequent to implementation.

Date:_____          _____

                                Woodlock, D.J.

**Order Determining Plaintiffs' Organizational Structure**

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,     :
ET AL                           :
    Plaintiffs              :
                                :     CIVIL ACTION NO.
v.                              :     3-05-cv-174 (JCH)
                                :
THE GILLETTE COMPANY            :     MAY 31, 2005
    Defendant               :

**RULING RE: MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 7],
MOTION FOR LEAVE TO AMEND [DKT. NO. 103], and
VARIOUS MOTIONS IN LIMINE [DKT. NOS. 104, 105, and 111]**

    The plaintiff, Schick Manufacturing Company ("Schick"), seeks a preliminary

injunction enjoining the defendant, The Gillette Company ("Gillette"), from making

certain claims about its M3 Power razor system ("M3 Power").  Schick contends that

Gillette has made various false claims in violation of section 43(a) of the Lanham Act,

15 U.S.C. §1125(a) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.

Gen. Stat. § 42-110a, <u>et seq.</u>

    As a preliminary matter, Schick has filed a Motion for Leave to File and

Amended Complaint [Dkt. No. 103].  Leave to amend "shall be freely given when justice

so requires."  Fed.R.Civ.P. 15(a).  The Second Circuit has held that "'considerations of

undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a

district court's discretionary authority to deny leave to amend.'"  <u>Krumme v. WestPoint</u>

<u>Stevens Inc.</u>, 143 F.3d 71, 88 (2nd Cir. 1998) (quoting <u>Barrows v. Forest Laboratories</u>,

742 F.2d 54, 58 (2d Cir. 1984)).  Having considered these factors, as well as the scope

of Schick's proposed amendments, the court concludes that leave to amend is

appropriate.

The court must also address three pending motions in limine. With regard to Plaintiff's Exhibits Nos. 111, 112, 131, the objections of Gillette are overruled. PX 131 is received for the limited purpose offered, to establish the date the Dutch action was filed. With regard to Schick's Motion in Limine to Exclude Untimely Expert Testimony [Dkt. No. 104], the Motion is denied, except with regard to the alternative relief sought. DX 124(d) and (e) are for identification only. They were received on that basis. The Motion is denied to the extent it seeks to strike them as demonstrative evidence. The Motion is also denied to the extent it seeks to strike Dr. Salinger's testimony. However, the court grants Schick's alternative request to file a supplemental Affidavit of Dr. Thornton, which the court has now reviewed. Finally, the Motion to exclude DX 133 and DX 134, Declarations of Dr. Grupen and Dr. Clarke, is denied. With regard to Schick's Motion in Limine to Exclude Third Declaration of Dr. Philpott, it is denied.

The standard regarding the grant of a prohibitory preliminary injunction in the Second Circuit is clear.[1] "To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004). If Schick proves that irreparable injury may result, the court will then consider the merits of Schick's claim.

The Lanham Act creates a cause of action against any person who,

---

[1]Gillette suggests the relief sought is a mandatory injunction; this court does not agree. Schick seeks to prohibit allegedly false advertising, not to mandate action by Gillette. See Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997) (an injunction is mandatory where "its terms would alter, rather than preserve, the status quo by commanding some positive act").

2

> in connection with any goods or services, or any container for goods, uses
> in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which . . .
> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another
> person's goods, services, or commercial activities

by "any person who believe he or she is or is likely to be damaged by such act." 15

U.S.C. § 1125(a).

In order to succeed on its false advertising claim, Schick must prove five

elements of this claim. Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d

226, 255 (D.Conn. 1998) (citing various treatises and cases). These are the following:

(1)  The defendant has made a false or misleading statement of fact. The

statement must be (a) literally false as a factual matter or (b) likely to deceive or

confuse. S.C. Johnson & Son, Inc. v. Clorox Company, 241 F.3d 232, 238 (2d

Cir. 2001).

(2)  The statement must result in actual deception or capacity for deception

"Where the advertising claim is shown to be literally false, the court may enjoin

the use of the claim without reference to the advertisement's impact on the

buying public." Id. (internal quotations omitted).

(3)  The deception must be material. "[I]n addition to proving falsity, the plaintiff

must also show that the defendants misrepresented an inherent quality or

characteristic of the product." Id. (internal quotations omitted).

(4)  Schick must demonstrate that it has been injured because of potential

decline in sales. Where parties are head-to-head competitors, the fact that the

defendant's advertising is misleading presumptively injures the plaintiff. Coca-

3

Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982)

(abrogated on other grounds by statute as noted in Johnson & Johnson v. GAC

Int'l, Inc., 862 F.2d 975, 979 (2d Cir.1988)).

(5)  The advertised goods must travel in interstate commerce.

**FACTS**

The court held a scheduling conference on the preliminary injunction motion on

March 2, 2005.  The court allowed the parties to conduct limited discovery prior to

conducting a hearing on Schick's motion for a preliminary injunction.  The hearing on

the motion was conducted over four days: April 12, 13, 22, and May 2, 2005.  During

the hearing, Schick called five witnesses: Adel Mekhail, Schick's Director of Marketing;

Peter M. Clay, Gillette's Vice-President for Premium Systems; Dr. David J. Leffell,

Professor of Dermatology; Christopher Kohler, Schick Research Technician; and John

Thornton, statistical consultant. Gillette also called five witnesses during the hearing:

Dr. Kevin L. Powell, Gillette's Director of the Advanced Technology Centre; Dr. Michael

A. Salinger, Professor of Economics; Peter M. Clay, Gillette's Vice-President for

Premium Systems; Dr. Ian Saker, Gillette Group Leader at the Advanced Technology

Centre and Dr. Michael P. Philpott, Professor of Cutaneous Biology.

The men's systems razor and blade market is worth about $1.1 billion per year in

the United States.  Gillette holds about 90% of the dollar share of that market, while

Schick holds about 10%.  The parties are engaged in head-to-head competition and the

court credits testimony that growth in the razor systems market results not from volume

increases but "with the introduction of high price, new premium items."  Hr'g Tr. 39:20-

21.

4

Schick launched its Quattro razor system in September of 2003 and expended many millions of dollars in marketing the product. Although Schick had projected $100 million in annual sales for the Quattro, its actual sales fell short by approximately $20 million. From May 2004 to December 2004, Quattro's market share fell from 21% of dollar sales to 13.9% of dollar sales.

Gillette launched the M3 Power in the United States on May 24, 2004. In preparation for that launch, it began advertising that product on May 17, 2004. The M3 Power is sold throughout the United States. The M3 Power includes a number of components including a handle, a cartridge, guard bar, a lubricating strip, three blades, and a battery-powered feature which causes the razor to oscillate. The market share of the M3 Power, launched in May 2004, was 42% of total dollar sales in December 2004.

Gillette's original advertising for the M3 Power centered on the claim that "micro-pulses raise hair up and away from skin," thus allowing a consumer to achieve a closer shave. This "hair-raising" or hair extension claim was advertised in various media, including the internet, television, print media, point of sale materials, and product packaging. For example, Gillette's website asserted that, in order to combat the problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses raise hair up and away from skin . . ." PX 2, Hr'g Tr. 33:25-34:22. Of Gillette's expenditures on advertising, 85% is spent on television advertising. At the time of the launch, the television advertising stated, "turn on the first micro-power shaving system from Gillette and turn on the amazing new power-glide blades. Micro-pulses raise the hair, so you shave closer in one power stroke." PX 14.2(C). The advertisement also included a 1.8 second-long animated dramatization of hairs growing. In the animated

5

cartoon, the oscillation produced by the M3 Power is shown as green waves moving over hairs. In response, the hairs shown extended in length in the direction of growth and changed angle towards a more vertical position.

The court notes that eight months passed between the launch of the M3 Power and the date Schick initiated the instant suit. Schick maintains that there are two factors that excuse this delay. First, Schick invested time in developing a stroke machine and test protocol that would allow it to test the M3 Power with some degree of confidence and effectiveness.[2] Specifically, the development of a machine that would deliver a stroke of consistent pressure to a test subject's face took time. Second, after completing its first tests of Gillette's claims that the M3 Power raises hair in October, Schick chose to pursue its claims in Germany. In November of 2004, Schick sued Gillette in Germany to enjoin it from making claims that the M3 Power raised hairs. In late December of 2004, the Hamburg Regional Court affirmed the lower court's order enjoining Gillette from making such claims in Germany.

While the court finds that it may have been possible to develop testing protocols in a quicker fashion, the court finds the M3 Power was a new product with a feature (the use of battery power) that had never before been present in wet shavers. The court finds the time Schick took to develop testing of and to test the M3 Power is excusable. The court has been presented with no evidence of bad faith or strategic maneuvering behind the timing of the instant lawsuit.

In late January of 2005, Gillette revised its television commercials for the M3

---

[2]The court also notes that time spent by Schick testing Gillette's "angle-change" claim, which claim Gillette abandoned in January of 2005.

Power in the United States. It chose to do so based on both the German litigation as well as conversations between the parties about Schick's discomfort with certain claims made in the advertising. The animated product demonstration in the television commercials was revised so that the hairs in the demonstration no longer changed angle, and some of the hairs are shown to remain static. The voice-over was changed to say, "Turn it on and micropulses raise the hair so the blades can shave closer." PX 14.10C. The product demonstration in the revised advertisements depicts the oscillations to lengthen many hairs significantly. The depiction in the revised advertisements of how much the hair lengthens--the magnitude of the extension--is not consistent with Gillette's own studies regarding the effect of micropulses on hair. The animated product demonstration depicts many hairs extending, in many instances, multiple times the original length. Gillette began broadcasting the revised television commercials on or about January 31, 2005. Schick provided credible evidence, however, that the prior version of the advertisement is still featured on the Internet and on product packaging.

Television advertisements aim to provide consumers a "reason to believe," that is, the reason consumers should buy the advertised product. Because of the expense of television advertising, companies have a very short period of time in which to create a "reason to believe" and are generally forced to pitch only the key qualities and characteristics of the product advertised.

Gillette conceded during the hearing that the M3 Power's oscillations do not cause hair to change angle on the face. Its original advertisements depicting such an angle change are both unsubstantiated and inaccurate. Gillette also concedes that the

animated portion of its television advertisement is not physiologically exact insofar as

the hairs and skin do not appear as they would at such a level of magnification and the

hair extension effect is "somewhat exaggerated." Gillette Co.'s Prop. Findings of Fact

[Dkt. No. 114] ¶ 33. The court finds that the hair "extension" in the commercial is

greatly exaggerated. Gillette does contend, however, that the M3 Power's oscillations

cause beard hairs to be raised out of the skin. Gillette contends that the animated

product demonstration showing hair extension in its revised commercials is predicated

on its testing showing that oscillations cause "trapped" facial hairs to lengthen from the

follicle so that more of these hairs' length is exposed. Gillette propounds two alternative

physiological bases for its "hair extension" theory. First, Gillette hypothesizes that a

facial hair becomes "bound" within the follicle due to an accumulation of sebum and

corneocytes (dead skin cells). Gillette contends that the oscillations could free such a

"bound" hair. Second, Gillette hypothesizes that hairs may deviate from their normal

paths in the follicle and become "trapped" outside the path until vibrations from the M3

Power restore them to their proper path.

 Schick's expert witness, Dr. David Leffell, Professor of Dermatology and Chief of

Dermatologic Surgery at the Yale School of Medicine, testified that, based on his

clinical and dermatological expertise, he is aware of no scientific basis for the claim that

the oscillations of the M3 Power would result in hair extension, as Gillette contends. Dr.

Leffell stated that Gillette's "hair extension" theory is inconsistent with his 20 years of

experience in dermatology. He testified that he has never seen a hair trapped in a sub-

clinical manner, as hypothesized by Gillette. Dr. Leffell testified that, in certain

circumstances, trapped hairs will result in clinical symptoms, such as infection or

8

inflammation. With respect to Gillette's hypothesis that the interaction between sebum and corneocytes trap hairs, however, Dr. Leffell stated, and the court credits, that in non-clinical circumstances, sebum and corneocytes do not accumulate sufficiently to inhibit hair growth. Moreover, everyday activities such as washing or shaving remove accumulations of sebum and corneocytes.

Gillette's expert hair biologist, Dr. Michael Philpott, has studied hair biology for almost twenty years. He testified that, prior to his retention as an expert by Gillette, he had never seen a hair trapped in the manner posited by Gillette. Only after being retained by Gillette did Dr. Philpott first claim to have encountered this hair extension theory. Dr. Philpott acknowledged that neither of Gillette's two hypothesis of hair extension have any support in medical or scientific literature. With regard to Gillette's theory that hair could become bound in the follicle by sebum and corneocytes, Dr. Philpott admitted that no evidence supports that theory. Dr. Leffell testified that erector pili muscles, which cause hairs to stand up in response to various stimuli, as is commonly seen in the case of goosebumps, may also provide a biologicial mechanism for hair extension. Neither Dr. Leffell nor Dr. Philpott, however, testified on the relationship between the application of mechanical energy and the erector pili muscles, and neither party has contended that these muscles play a role in Gillette's hair extension theory.

In addition to positing biological mechanisms that might support the claim that the M3 Power's oscillations raise hairs, Gillette introduced evidence of experiments and testing to support those claims. Gillette provided summaries of said testing which were not prepared contemporaneously with the testing, conducted in the early 1990's, they

purport to memorialize. Instead, they were prepared in anticipation of litigation in late 2004.

Gillette performed experiments using oscillating razors in 1990, 1991 and 2003. In 1990 and 1991, Gillette performed studies using prototype oscillating razor handles fitted with razor systems other than the M3 Power, the Atra Plus and Sensor razor cartridge, two other Gillette products. In each of these initial experiments, a circle was drawn on a test subject's face. Twenty beard hairs within the circled region were measured with an imaging stereomicroscope manufactured by the Leica Company. That instrument measures hairs three-dimensionally to a resolution of three to four microns. The test subject then stroked the area using an oscillating razor with blunted blades. Then, twenty beard hairs within the circled region were again measured with a stereomicroscope. The same protocol was followed using a non-oscillating razor with blunted blades, and the changes in hair measurement were compared.

The Atra Plus study was performed in 1990 and included 10 test subjects. The study results show that the panelists' average hair length increased by 83.3 microns after five strokes with the oscillating razor versus 6.3 microns with the non-oscillating razor. The Sensor study was performed from 1990 to 1991 and also involved 10 test subjects. The subjects' mean hair length increased by 27.9 microns versus 12.9 microns with the non-oscillating razor. While both tests provided some evidence of a hair extension effect and the magnitude of that effect, neither test indicated what percentage of hairs were lengthened.

Notably, while Gillette found that use of both the oscillating Atra Plus and Sensor razors resulted in an increase in beard hair length, there was significant difference

between the average increase caused by the Atra Plus and that caused by the Sensor.

Furthermore, no evidence was presented to the court regarding similarities or

differences between the M3 Power razor and the Atra Plus or Sensor. The sample

size, ten test subjects per study, was small. The twenty beard hairs measured prior to

stroking were not necessarily the same hairs measured after stroking. The test

included no efforts to keep constant the variables of pressure on the razor or speed of

the shaving stroke. In addition, Gillette's chief scientist, Kevin Powell, testified that the

pressure or load applied by consumers co-varies to a statistically significant degree with

whether a razor oscillates. All these deficiencies cause this court not to credit the

studies' finding that oscillations cause hair lengthening.[3]

In 2003, Gillette performed a study using a prototype of the M3 Power. In the fall

of 2003, Gillette tested a Mach 3 cartridge fitted with an oscillating handle. That

prototype was called the "Swan." The Swan prototype's motor, handle, and cartridge

differ from those features of the actually-marketed M3 Power. Four test subjects were

used.[4] The test protocol was identical to that used in 1990 and 1991 except that,

instead of using blunted blades, Gillette removed the blades from the razor. The study

results suggest that the oscillating-Swan-prototype produced an average increase in

hair length of between 32 and 40 microns while the non-oscillating prototype yielded no

---

[3]In Gillette's testing, no effort was made to control for variables, such as pressure on, or speed of, the razor. Failure to control for variable makes Gillette's "results" unscientific and not supportive of any conclusion.

[4]The sample size of four was chosen because the 2003 study, according to Gillette, was merely "confirmatory." Because the court finds the earlier tests deficient, the 2003 study cannot be "confirmatory."

average increase.  That 32 to 40 micron increase represented an average of eight to ten percent increase in hair length.  The test does not indicate what percentage of hairs experience any lengthening as a result of oscillations.  The court does not credit Dr. Powell's opinion that the differences between the model used in the test and the marketed product has no impact on the testing.  Failure to use the marketed product is critical.  The court cites the varied results Gillette reports between the Atra Plus, Sensor, and "Swan" tests as only one reason to conclude that failure to use the market product undercuts the 2003 testing.  Further, the test protocol and sample size cause the court to question the validity of these study findings.

In addition to testing oscillating battery-powered razors, Gillette conducted what has been called the Microwatcher study.  The Microwatcher is a commercially available product consisting of a miniature camera with an illumination system that channels light into an orifice at the tip of a transparent hemispherical dome.  The device allows the user to impart mechanical energy into the top and underlying layers of the skin, which, according to Gillette, replicates the mechanical energy imparted by the oscillating razor.[5]  The recorded video images introduced into evidence show individual hairs releasing from just below the skin surface.  Gillette did not introduce evidence to describe what the various elements of the photo were.  When asked by the court to identify the various elements appearing in the video were, Dr. Philpott could not identify

---

[5]Despite conducting the study on eighteen subjects, Gillette submitted only three short video clips and does not indicate that they are representative of the study results.  Further, there is no indication of the length of the manipulation, the amount of pressure applied, or shave preparation.  Without more information, the study cannot support the conclusion that the M3 Power extends hair.

or explain important skin features. For example, the court pointed to an area surrounding the individual hair, of darker hue than the rest of the skin, on the video, but Dr. Philpott could not explain what that area was or what might explain its coloration. The court further finds that Gillette provides no evidence to suggest the relationship between the amount of mechanical energy imparted by the Microwatcher and that imparted by the M3 Power.

Schick performed its own study which it contends proves the falsity of Gillette's advertising with respect to claims regarding hair extension.[6] Schick's study took place over three days and included 37 test subjects. With respect to each test subject, twenty hairs were measured before and after strokes with an M3 Power razor with blunted blades in both the power-on and power-off modes. The strokes were taken using an automated shaving device developed specially by Schick for the purposes of testing the M3 Power razor and Gillette's claims with respect to it. Images of the hairs were taken before and after the razor strokes using a camera with a plate that flattened hair onto the face. The images were then downloaded to a computer and hair lengths were assessed using ImagePro software. An independent statistician evaluated the data for all three days. Schick argues that its data indicates that there was no statistically significant difference between the change in hair length with power off and the change in hair length with power on.

Again, however, the court finds the test protocol lacking and results questionable. Schick's testing shows that some hairs shrunk even in the absence of

---

[6]Schick first performed tests to determine whether the M3 Power changes the angle of beard hairs.

the use of water, which Gillette's testing has found to result in hair shrinkage. Schick's expert testified that this may have been the result of measurement error, and the court agrees.[7] Furthermore, Gillette provided expert testimony that the glass plate used to flatten hairs so that they could be measured would likely result in distortion, making it difficult to accurately measure hair lengths. Such flaws in Schick's testing cause the court to be skeptical of Schick's test results and the suggestion that these results demonstrate that the M3 Power does not cause hairs to extend.

The flaws in testing conducted by both parties prevent the court from concluding whether, as a matter of fact, the M3 Power raises beard hairs.

## II.    ANALYSIS

### A.    Irreparable Harm

Schick argues that the M3 Power advertising is causing it irreparable harm. Sales of its premiere razor, the Quattro, have decreased precipitously since Gillette's release of the M3 Power. It is far from clear that all of the decline in Quattro sales is attributable to the allegedly false statements made in the course of M3 Power advertising. It is this difficulty, however, in determining what portion of the decline is so attributable that makes Schick's harm irreparable. "It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement. Too many market variables enter into the advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is

---

[7]It may also result from the application of a glass plate meant to flatten the hairs so that they could be measured in two dimensions.

attributable to factors other than a competitor's false advertising." <u>Coca-Cola Co. v.</u>

<u>Tropicana Products, Inc.</u>, 690 F.2d 312, 316 (2d Cir. 1982).

     Gillette argues that Schick's delay in seeking relief, as a factual matter, militates

against a finding of irreparable harm.  "Delay is typically relevant to both irreparable

harm and to laches, although the latter doctrine relates only to permanent relief."  <u>Tom</u>

<u>Doherty, Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 39 (2d Cir. 1995) (considering

delay in seeking preliminary injunction in the context of a contract dispute).  Depending

on the facts of a particular case, delay may be relevant for other purposes as well.  <u>Id.</u>

In a trademark case, where a "high probability of confusion" normally gives rise to a

presumption of irreparable harm for the purposes of obtaining a preliminary injunction,

that presumption is "inoperative if the plaintiff has delayed either bringing suit or in

moving for preliminary injunctive relief."  <u>Tough Traveler, Ltd. v. Outbound Products</u>, 60

F.3d 964, 967-68 (2d Cir. 1995).  It is important to remember, however, that a finding of

irreparable harm may still be made on the basis of other relevant factors; the

inexcusable delay affects only the <u>presumption</u> of irreparable harm.  <u>Id.</u> at 969.  In the

instant context, the court considers delay as one of several factors to be considered in

determining whether Schick has established irreparable harm.

     There is no presumption of irreparable harm in this case as such a presumption

arises in the false advertising context only when the challenged advertising mentions a

competitor by name.  <u>Castrol, Inc. v. Quaker State Corp.</u>, 977 F.2d 57, 62 (2d Cir.

1992).  Furthermore, in the instant case, the reasons for Schick's delay ought to guide

the court's consideration of whether that delay is probative with respect to the question

of irreparable harm.  In the trademark context, a delay is excused where "the plaintiff

15

does not know how severe the [trademark] infringement is" or where it is caused by a plaintiff's "good faith efforts to investigate an infringement." Id. A delay is inexcusable where a party was aware of the action it now wishes to enjoin, but the delay evidences that the party determined that the action did not violate its rights. Tom Doherty, Inc., 60 F.3d at 39.

Schick provides two excuses for the time lag between the initial airing of the allegedly-false Gillette advertising. The first is that it needed time to subject the claims made in the contested advertising to scientific testing. While the advertising began to air publicly in late May 2004, Schick did not complete its testing until October 2004. While the testing could have proceeded more quickly, see supra at 5, there are reasons the testing took five months and that period, to the extent that it is deemed "delay," is excused. Schick was engaged in a good faith investigation of its competitor's claims.

The second excuse for delay involves the three month period after Schick's initial testing had been completed. Schick claims that the expense of pursuing litigation in a United States forum led it to test Gillette's claims in other fora in November 2004, before initiating the instant lawsuit. Therefore, upon completing its testing, it initiated lawsuits abroad, prior to initiating the instant suit in late January 2005. Schick argues that its attempts to resolve the issue in alternative fora excuse its delay. The cases it cites, however, either address delay in the context of patent litigation, Whistler Corp. v. Dynascan Corp., 1988 WL 142216, *2 (N.D.Ill. Dec. 28, 1988) (excusing period of delay where plaintiff in patent infringement suit first "adjudicated another lawsuit that would establish a reasonable likelihood of success on the issue of infringement in the pending case"); Amicus, Inc. v. Post-Tension of Texas, Inc., 686 F.Supp. 583, 589 (S.D. Tex.

16

1987) (same), or address arbitration or settlement attempts, not forum-shopping in

foreign jurisdictions, see Millennium Imp. Co. v. Sidney Frank Importing Co., 2004

USDistLexis 11871, *33-*34 (Jun. 11, 2004) (refusing to find that delay barred

preliminary injunction of false advertising where parties had pursued alternative dispute

resolution before the National Advertising Division of the Council of Better Business

Bureaus prior to plaintiff filing suit); Novartis Consumer Health, Inc. v. Johnson &

Johnson-Merck Consumer Pharmaceuticals Co., 129 F.Supp.2d 351 (D.N.J. 2000)

(finding of irreparable harm in false advertising context not undermined by seven

month-delay where plaintiff "notified J & J of its objections, promptly challenged the

advertisements with the major networks, obtained the results of [a consumer survey],"

and shortly thereafter initiated litigation); Tonka Corp. v. Rose Art Industries, Inc., 836

F.Supp. 200, 219 (D.N.J. 1983) (alleged delay did not support an acquiescence

defense where plaintiff had filed an objection to defendant's trademark registration).

The process of alternative dispute resolution of a false advertising claim is

distinguishable from bringing litigation in a foreign jurisdiction.  The parties could not

have resolved, in Germany or Australia, a dispute regarding advertising within the

United States.  The cases that allow pursuit of remedies (through alternative dispute

mechanisms) to constitute excusable delay do so because such mechanisms may

have, with less expense and consumption of time, achieved a remedy substantially

similar to that sought in court, an injunction.  The same is not true of Schick's legal

actions in foreign jurisdictions, which, even if successful, had no effect on Schick's legal

rights in the United States.

Schick argues that the case law on delay is motivated by the need to notice

17

parties that a claim for false advertising may lie against them.  This purpose, according to Schick, was served by the German litigation as well as non-judicial interactions between the parties prior to initiation of any litigation.  However, Schick misunderstands the import of inexcusable delay in the context of an application for a preliminary injunction.  As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering.  The litigation in Germany and Australia had no legal effect on advertising in the United States and, for the purposes of the instant lawsuit, it is advertising in the United States that, according to Schick, is causing it to suffer irreparable harm.

    The court concludes that the three months during which Schick pursued foreign litigation is not inexcusable.  See Tom Doherty, Inc., 60 F.3d at 39.  Clearly Schick did not think Gillette's advertisements were not violating Schick's rights.

    The court, therefore, considers Schick's delay in seeking relief alongside other evidence going to the factual question of irreparable injury.  The court concludes that Schick's initiation of testing in May 2004 suggests that Schick believed it was being harmed from the day the M3 Power was launched.  The severe decline in Quattro sales supports a finding of harm as does the fact that the parties are head-to-head competitors.  Furthermore, the difficulty of determining what percentage of sales is attributable to Gillette's allegedly false advertising, and, therefore, the difficulty of accurately determining what monetary damages will compensate Schick for its harm, support a finding that any such harm is, indeed, irreparable.

    **B.    False Advertising**

18

**1. Literal Falsity.** "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). "A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement." Castrol, Inc., 977 F.2d at 63. The Second Circuit has found that where an advertisement alleges that tests have established a product's superiority, a plaintiff must demonstrate that the tests or studies did not prove such superiority. "[A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior." Id. In addition, "[i]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden." Id.

Where, however, as here, the accused advertising does not allege that tests or clinical studies have proven a particular fact, the plaintiff's burden to come forward with affirmative evidence of falsity is qualitatively different. "To prove that an advertising claim is literally false, a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." Mc-Neil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991). The plaintiff must prove falsity by a preponderance of the evidence, either using its own scientific testing or that of the defendant. If a plaintiff is to prevail by relying on the defendant's own studies, it cannot do so simply by criticizing the defendant's studies. It must prove either that "such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made" or that the defendant's studies establish that the

19

defendant's claims are false. Id. at 1549-50.

The challenged advertising consists of two basic components: an animated representation of the effect of the M3 Power razor on hair and skin and a voice-over that describes that effect. The animation, which lasts approximately 1.8 seconds, shows many hairs growing at a significant rate, many by as much as four times the original length. During the animation, the voice-over states the following: "Turn it on and micropulses raise the hair so the blades can shave closer." Schick asserts that this M3 Power advertising is false in three ways: first, it asserts the razor changes the angle of beard hairs; second, it portrays a false amount of extension; and third, it asserts that the razor raises or extends the beard hair.

With regard to the first claim of falsity, if the voiceover means that the razor changes the angle of hairs on the face, the claim is false. Although Gillette removed the "angle changing" claim from its television advertisements, it is unclear whether it has completely removed all material asserting this angle-change claim. The court concludes that the current advertising claim of "raising" hair does not unambiguously mean to changes angles.[8] See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 298 F.3d 578, 587 (3d Cir. 2002) ("only an unambiguous message can be literally false"). Thus, the revised advertising is not literally false on this basis.

With regard to the second asserted basis of falsity, the animation, Gillette concedes that the animation exaggerates the effect that the razor's vibration has on

---

[8]It is the words "up and away" when combined with "raises" that suggest both extension and angle change.

20

hair. Its own tests show hairs extending approximately 10% on average, when the

animation shows a significantly greater extension. The animation is not even a

"reasonable approximation," which Gillette claims is the legal standard for non-falsity.

See Gillette's Prop. Conclusions of Law at ¶ 32, 37-38 [Dkt. No. 114]. Here, Schick can

point to Gillette's own studies to prove that the animation is false. See Mc-Neil-P.C.C.,

Inc. , 938 F.2d at 1549.

　　　Gillette argues that such exaggeration does not constitute falsity. However, case

law in this circuit indicates that a defendant cannot argue that a television

advertisement is "approximately" correct or, alternatively, simply a representation in

order to excuse a television ad or segment thereof that is literally false. S.C. Johnson &

Son, Inc., 241 F.3d at 239-40 (finding that depiction of leaking plastic bag was false

where rate at which bag leaked in advertisement was faster than rate tests indicated);

Coca-Cola Co., 690 F.2d at 318 (finding that advertisement that displaced fresh-

squeezed orange juice being poured into a Tropicana carton was false). Indeed, "[the

Court of Appeals has] explicitly looked to the visual images in a commercial to assess

whether it is literally false." S.C. Johnson, 241 F.3d at 238.[9]

　　　Gillette's argument that the animated portion of its advertisement need not be

exact is wrong as a matter of law. Clearly, a cartoon will not exactly depict a real-life

situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug.

However, a party may not distort an inherent quality of its product in either graphics or

_____

　　　[9] At least one other circuit has held that picture depictions can constitute false
advertising. Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002) (finding that while
ambiguous graphic on packaging did not constitute literally false advertising, an unambiguous
graphic could do so).

animation. Gillette acknowledges that the magnitude of beard hair extension in the animation is false. The court finds, therefore, that any claims with respect to changes in angle and the animated portion of Gillette's current advertisement are literally false.

The court does not make such a finding with respect to Schick's third falsity ground, Gillette's hair extension theory generally. Gillette claims that the razor's vibrations raise some hairs trapped under the skin to come out of the skin. While its own studies are insufficient to establish the truth of this claim, the burden is on Schick to prove falsity. Neither Schick's nor Gillette's testing can support a finding of falsity.

While there can be no finding of literal falsity with respect to Gillette's hair extension claim at this stage in the instant litigation, the court expresses doubt about that claim. As described earlier, Gillette's own testing is suspect. Furthermore, Schick introduced expert testimony and elicited evidence from Gillette's expert regarding the lack of scientific foundation for any biological mechanism that would explain the effect described by Gillette in its advertising. Gillette's own expert, Dr. Philpott, testified that no scientific foundation exists to support Gillette's hypothesis that beard hairs might be trapped under the skin by sebum and corneocytes and that the application of mechanical energy might release such hairs. While Dr. Philpott put forward another hypothesis--that a hair's curliness might cause it to be trapped--he also conceded that, prior to his engagement as an expert on Gillette's behalf, in twenty years of studying hair, he had never come across such a phenomenon. The court credits the testimony of Schick's expert, Dr. Leffell, that while certain clinical conditions are characterized by hairs trapped under the surface of the skin, there is no such non-clinical phenomenon.

Nevertheless, putting forth credible evidence that there is no known biological

22

mechanism to support Gillette's contention that the M3Power raises hairs is insufficient to meet Schick's burden. Such evidence is not affirmative evidence of falsity. Further, while Schick successfully attacked Gillette's testing, that attack did not result in evidence of falsity. Unlike in McNeil, here Gillette's own tests do not prove hair extension does not occur. Schick merely proved that Gillette's testing is inadequate to prove it does occur.

       **2. Actual Deception.** Schick need not prove actual deception if Gilette's advertising is determined to be literally false. Mc-Neil-P.C.C., Inc., 938 F.2d at 1549 ("Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." (internal quotation marks and citations omitted)). Because the court finds that claims regarding angle change and the magnitude and frequency of hair extension portrayed in the animated portion of Gillette's television advertisement are both literally false, it presumes that these claims result in actual deception.

       **3. Materiality.** "It is also well-settled that, in addition to proving falsity, the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product. This requirement is essentially one of materiality, a term explicitly used in other circuits." S.C. Johnson & Son, Inc., 241 F.3d at 238 (internal quotation marks and citations omitted). In determining that certain allegedly false statements were not material, the Second Circuit considered the relevance of the statements and the fact that "[t]he inaccuracy in the statements would not influence customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

It is clear that whether the M3 Power raises hairs is material. Gillette's employees testified that television advertising time is too valuable to include things that are "unimportant". Furthermore, in this case, hair extension is the "reason to believe" that the M3 Power is a worthwhile product. The magnitude and frequency of that effect are also, therefore, material. Whether a material element of a product's performance happens very often and how often that element happens are, in themselves, material.

**4. Injury.** The court finds that, in light of the advertisement's literal falsity, the fact that the parties are head-to-head competitors, and recent declines in the sale of Schick's premiere wet shave system injury will be presumed. Coca-Cola Co., 690 F.2d at 316-317. While Schick has not submitted consumer surveys or market research, the fact that the parties are head-to-head competitors supports an inference of causation.

**5. Interstate Commerce.** The parties do not dispute that this element of the claim has been established.

Accordingly, the court finds that Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false. The court finds that Schick has failed to establish a likelihood of success, or even serious questions going to the merits, on the claim of hair "extension."

**BOND**

Gillette has requested a bond of $49,579,248. It contends that this amount represents estimated lost profits on future M3 Power sales, over a twelve-month period, if later found to have been wrongfully enjoined. Schick submits that a bond of $50,000

24

to $100,000 is appropriate.

Gillette's calculations assume a precipitous drop in sales as a result of a mandate to correct two admitted falsities in its advertisement.[10] The court is skeptical that this calculation represents an appropriate bond amount.[11] Instead, the court imposes a bond of $200,000 on Schick. Absent a record created by Gillette, the court concludes this amount, generally in the range for false advertising cases, is sufficient to protect Gillette. Gillette may move to increase the bond amount upon a showing of likely injury.

**CONCLUSION**

For the reasons stated above the Motion for Preliminary Injunction [Dkt. No. 7] is GRANTED in part and DENIED in part. The injunction is entered as stated in the accompanying order. Schick's Motion for Leave to Amend [Dkt. No. 103] is GRANTED.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[10]While Gillette contends that the animated portion of its advertisement is not literally false as a matter of law, it has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect.

[11]Does it claim that it cannot sell one M3 Power razor without making false claims regarding angle change or the magnitude of hair extension? When it ceased television and print advertising with the "angle change," did its sales drop precipitously?

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC., | : | |
| ET AL | : | |
|     Plaintiffs | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-05-cv-174 (JCH) |
| | : | |
| THE GILLETTE COMPANY | : | JUNE 20, 2005 |
|     Defendant | : | |

**RULING RE: MOTION FOR CLARIFICATION OF INJUNCTION AND
ADJUSTMENT OF BOND AMOUNT [DKT. NO. 122]**

The defendant, the Gillette Company ("Gillette"), moves for clarification of this court's Order of May 31, 2005, wherein the court granted in part the plaintiffs' motion for a preliminary injunction. [Dkt. No. 121]. "It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" Paramount Pictures Corp. v. Carol Publishing Group, 25 F.Supp.2d 372, 374 (S.D.N.Y. 1998) (quoting Regal Knitwear Co. v. Nat'l Labor Relations Board, 324 U.S. 9, 15 (1945)).

Gillette asks that the court limit its May 31, 2005 Order such that it does not apply to certain language used by Gillette on packaging. The May 31 Order specifically prohibited use of any language that states, indirectly or directly, "the M3 Power razor or its micro-pulses or oscillations change the angle of hair in relation to the skin." Order [Dkt. No. 121] at 1. It further specifies that any claims made on packaging that "state or otherwise communicate that the M3 Power razor or its micro-pulses or oscillations: (a) change the angle of hair in relation to the skin" must be removed. Id. at 2. Gillette's

1

current packaging asserts that, "Gentle micro-pulses stimulate hair up and away from the skin." It claims that the Order does not prohibit use of such language.

The court does not agree. The use of the term "up and away" in conjunction with the term "stimulates" is literally false as it connotes an angle change.[1] "Stimulates" with "up" alone or "away" alone would not, but together state a message that is more than mere extension. The May 31, 2005 Order, as Schick indicates, applies to all forms of Gillette advertising, such as in television and radio, mailings, the internet, and packaging. Therefore, Gillette must remove such language ("up and away") from packaging of the M3 Power. It must also provide retailers and non-party distributors with stickers with which to re-sticker inventory that is not in Gillette's possession. This requirement imposes very minor hardship on any non-parties. See, e.g., Ladas v. Potpoourri Press, Inc., 846 F.Supp. 221 (E.D.N.Y. 1994) (requiring distribution of labels to retailers); compare Paramount Pictures Corp., 25 F. Supp. 2d at 375 (considering and rejecting proposed injunction prohibiting sale of good by nonparty distributors).

The court's Order was meant to cover packaging. Thus, the "stimulates up and away" wording on the M3 Power packaging in Gillette's possession must be re-stickered. In addition, the court's Order was meant to require Gillette to take all reasonable steps to sticker such language on packaging in the possession and control of third parties, including but not limited to seeking consent from such third parties to

---

[1]The court specifically addressed "raises up and away" as literally false in its May 31, 2005 Ruling, at p. 20, n. 5. The word "stimulates" does not alter the meaning when used in conjunction with "up and away." Assuming the two words are not redundant, together they must mean more than extension of the hair, but also a change in relation to the face, as an angle change.

2

restickering, to provide stickers, to offer to sticker the packaging, and to reimburse third parties for their restickering.

The defendant's Motion to Clarify the court's May 31, 2005 Order [Dkt. No. 122] so as to limit its applicability to claims including the word "raise" is DENIED. The motion for adjustment of bond amount [Dkt. No. 122] is GRANTED in part and DENIED in part without prejudice to renew. The court increases the bond amount to $400,000. Plaintiffs shall file with the Clerk a bond in the amount of $400,000, with good and sufficient surety, and conditioned as required by Rule 65 of the Federal Rules of Civil Procedure. However, the court does not accept that it has been demonstrated that distribution of sufficient stickers to cover and the process of covering packaging in retail outlets will cost $1.2 million, as requested by Gillette. Gillette may within a week of this Order provide additional support in connection with the restickering of packaging in the control of third parties.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 20th day of June, 2005.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge

3

1

## PROOF OF SERVICE

2

3        I am employed by the Kick Law Firm, APC, in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 660 South Figueroa Street, Suite 1800, Los Angeles, California 90017.

4

5        On January 13, 2006, I served the foregoing document described as **PLAINTIFFS CORRALES' AND ADOURE'S PROPOSED JOINT SCHEDULING REPORT AND JOINT DISCOVERY PLAN** on the interested parties identified below by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

6

7

                                SEE ATTACHED SERVICE LIST

8

9    \_\_\_\_   **BY PERSONAL SERVICE** – I delivered such envelope by hand delivery to the parties list listed on the attached service list.

10

11    \_\_\_\_   **BY FEDERAL EXPRESS - NEXT DAY DELIVERY** -- I deposited the sealed envelope in a box or other facility regularly maintained by the express service carrier Federal Express in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be serve.

12

13    \_\_\_\_   **FACSIMILE** – I transmitted it to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person on any document which he or she has filed in the cause and served on the party making the service, as indicated below. The facsimile was transmitted from my business address, using the fax machine whose number is 213-624-1589, at \_\_\_\_ approximately  . The document was transmitted by facsimile transmission and that the transmission was reported as complete and without error.

14

15

16

17    \_X\_   **BY UNITED STATES MAIL** – I deposited the sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California.

18

19        I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed this January 13, 2006.

20

21    Manuel García

22

23

24

25

26

27

28

## PROOF OF SERVICE

## SERVICE LIST

### In re M3Power Razor System Marketing & Sales Practices Litigation

### MDL No. 1704;  Master File No. 05-cv-11177-DPW

| Attorney - Firm | Represented Party(s) |
|---|---|
| Harvey J. Wolkoff, Esq.<br>Ropes & Gray LLP<br>One International Place<br>Boston, MA 02110-2624<br>Telephone: (617) 951-7522<br>Facsimile: (617) 951-7050 | The Gillette Company |
| James M. Spears, Esq.<br>Peter M. Brody, Esq.<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street, N.W.<br>Washington, D.C. 20005<br>Telephone: (617) 951-7000<br>Facsimile: (617) 951-7050 | The Gillette Company |
| Kent R. Raygor, Esq.<br>Sheppard Mullin Richter & Hampton LLP<br>1901 Avenue of the Stars, Suite 1600<br>Los Angeles, CA 90067-6017<br>Telephone: (310) 228-3700<br>Facsimile: (310) 228-3701 | The Gillette Company |
| Robert E. Bauts, Esq.<br>Dillion, Bitae, & Luther, LLC<br>P.O. Box 398<br>53 Maple Ave.<br>Morristown, NJ 07963-0398<br>Telephone: (973) 539-3100 | The Gillette Company |
| Thomas M. Sobol, Esq.<br>Edward Notargiacomo, Esq.<br>Hagens Berman Sobol Shapiro LLP<br>One Main Street, 4th Floor<br>Cambridge, Massachusetts 02142<br>Telephone: (617) 482-3700<br>Facsimile: (617) 482-3003 | Kevin Windom |

C. Brooks Cutter, Esq.                          Kevin Windom
Mark J. Tamblyn, Esq.
Kershaw, Cutter & Ratinoff, LLP
980 9th Street, 19th Floor
Sacramento, CA 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Kenneth A. Wexler, Esq.                         Kevin Windom
Edward A. Wallace, Esq.
The Wexler Firm LLP
One North LaSalle St., Suite 2000
Chicago, Illinois 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Charles A. McCallum, Esq.                       Kevin Windom
R. Brent Irby, Esq.
McCallum, Hoaglund, Cook & Irby, LLP
2062 Columbiana Road
Vestavia Hills, Alabama 35216
Telephone: (205) 842-7767
Facsimile: (205) 824-7768

Wayne S. Kreger, Esq.                           David Atkins
Lee Jackson, Esq.
Gillian Wade, Esq.
Verboon, Milstein & Peter, LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Telephone: (310) 396-9600
Facsimile: (310) 396-9635

Samuel H. Rudman, Esq.                          Mark Dearman and
Robert M. Rothman, Esq.                         Anthony Debiseglia
Lerach Coughlin Stoia Geller Rudman & Robbins,
LLP
200 Broadhollow Road
Suite 406
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Thomas G. Shapiro, Esq.                         Mark Dearman,
Theodore M. Hess-Mahan, Esq.                    Anthony Debiseglia,
Shapiro Haber & Urmy LLP                        Javier Tuñón, and
53 State Street                                 Adam Kline
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Cory Holzer, Esq.
Michael I. Fistel, Esq.
Holzer & Holzer, LLC
1117 Perimeter Center West
Suite E-107
Atlanta, Georgia, 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

Javier Tuñón and
Adam Kline

Jason B. Bud, Esq.
Jon A. York, Esq.
Brandon O. Gibson, Esq.
Pentecost, Glenn & Rudd, PLLC
106 Stonebridge Blvd.
Jackson, Tennessee 38305
Telephone: (731) 668-5995
Facsimile: (731) 668-7163

Holly Moore and
Grant W. Jackson

Frank L. Watson, Esq.
William F. Burns, Esq.
Waston Burns, PLLC
One Commerce Square, Suite 2600
Memphis, TN 38103
Telephone: (901) 578-3528
Facsimile: (901) 578-2649

Tracy Gorea and
Mark Adkinson

Arthur Horne, Esq.
Murray Wells, Esq.
Horne & Wells, PLLC
81 Monroe Ave., Suite 400
Memphis, TN 38103
Telephone: (901) 507-2520
Facsimile: (901) 507-2524

Tracy Gorea

Russell Allen Wood, Esq.
Skelton, Clark & Wood
414 East Parkway
Russellville, AR 72801
Telephone: (479) 967-9986
Fax: (479) 967-9987

Mark Adkinson

David Pastor, Esq.
Gilman and Pastor, LLP
60 State Street, 37th Floor
Boston, MA 02109
Telephone: (617) 742-9700
Facsimile: (617) 9701

Kristopher Kenessky,
Steven Meyers,
Bradley Saunders,
Bruce Fisher,
Brad Fellersen, and
Richard Herbstman

Jason L. Brodsky, Esq.
Evan J. Smith, Esq.
Marc L. Ackerman, Esq.
Brodsky & Smith LLC
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Facsimile: (610) 667-9029

Kristopher Kenessky,
Steven Meyers,
Bradley Saunders,
Bruce Fisher,
Brad Fellersen, and
Richard Herbstman

Joseph J. DePalma, Esq.
Susan D. Pontoriero, Esq.
Lite, DePalma, Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000

Patrick Coleman

Mark C. Gardy, Esq.
Henry Young, Esq.
Abbey Gardy, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

Patrick Coleman

Kenneth D. Quat, Esq.
Law Office of Kenneth Quat
9 Damonmill Square, Suite 4A-4
Concord, MA 01742
Telephone: (978) 366-0848

Collin L. McGeary

Lance A. Harke, Esq.
Harke & Clasby LLP
155 South Miami Ave, Suite 600
Miami, FL 33130
Telephone: (305) 536-8220

Collin L. McGeary

Michel Henri Kalcheim, Esq.
Kacheim/Salah
2049 Century Park East, Suite 2150
Los Angeles, California 90067
Telephone: (310) 461-1200
Facsimile: (310) 461-1201

David Lipper

Lionel Z. Glancy, Esq.
Michael Goldberg, Esq.
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Matthew Marr

| | |
|---|---|
| Stephen M. Sohmer, Esq.<br>The Sohmer Law Firm, LLC<br>One Passaic Avenue<br>Fairfield, NJ 07004<br>Telephone: (973) 227-7080 | David Delre and<br>Joshua Vereb |
| Nadeem Faruqi, Esq.<br>Anthony Vozzolo, Esq.<br>Faruqi & Faruqi, LLP<br>320 East 39th Street<br>New York, NY 10016<br>Telephone: (212) 983-9330 | David Delre and<br>Joshua Vereb |
| Ben Barnow, Esq.<br>Sharon Harris, Esq.<br>Barnow and Associates, P.C.<br>One North LaSalle Street, Suite 460<br>Chicago, IL 60602<br>Telephone: (312) 621-2000 | Greg Besinger and<br>David Zavala |
| Larry D. Drury, Esq.<br>Larry D. Drury, Ltd.<br>Two N. LaSalle Street, Suite 700<br>Chicago, IL 60602<br>Telephone: (312) 346-7950 | Greg Besinger and<br>David Zavala |
| John H. Alexander, Esq.<br>John H. Alexander & Associates, LLC<br>100 W. Monroe Street, Suite 2100<br>Chicago, IL 60603<br>Telephone: (312) 263-7731 | Greg Besinger and<br>David Zavala |
| John S. Steward, Esq.<br>The Burstein Law Firm, P.C.<br>225 South Meramec, Suite 925<br>St. Louis, MO 63105<br>Telephone: (314) 725-6060 | Greg Besinger,<br>David Zavala, and<br>Elvis Huskic |
| Joseph V. Neill, Esq.<br>5201 Hampton Avenue<br>St. Louis, MO 63109<br>Telephone: (314) 353-1001 | Elvis Huskic |
| Thomas R. Carnes, Esq.<br>The Carnes Law Firm<br>5201 Hampton Avenue<br>St. Louis, MO 63109<br>Telephone: (314) 353-1001 | Elvis Huskic |

Clifford H. Pearson, Esq.
Gary S. Soter, Esq.
Daniel L. Warshaw, Esq.
C. Scott Marshall, Esq.
Wasserman, Comden, Casselman & Pearson,
L.L.P.
5567 Reseda Boulevard, Suite 330
Post Office Box 7033
Tarzana, CA 91357
Telephone: (818) 705-6800

Dean L. Smith, Jr.

Robert C. Baker, Esq.
Phillip A. Baker, Esq.
Baker, Keener & Nahra LLP
633 West Fifth Street, 54th Floor
Los Angeles, CA 90071-2005
Telephone: (213) 241-0900

Dean L. Smith, Jr.

Harold M. Hewell, Esq.
1901 First Avenue, Second Floor
San Diego, CA 92101
Telephone: (619) 235-6854

Luis Gonzalez

Alan L. Kovacs, Esq.
Law Office of Alan L. Kovacs
2001 Becon Street, Suite 106
Boston, MA 02135
Telephone: (617) 964-1177

Marcell Johnson,
Neil Hirsch, and
Jeffrey L. Friedman

Steven A. Kanner, Esq.
Douglas A. Millen, Esq.
Robert J. Wozniak, Jr., Esq.
Much Shelist Freed Denenberg Ament &
Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606-1615
Telephone: (312) 521-2000

Marcell Johnson,
Neil Hirsch, and
Jeffrey L. Friedman

Harry Shulman, Esq.
The Mills Law Firm
145 Marina Blvd.
San Rafael, CA 94901
Telephone: (415) 455-1326

Marcell Johnson,
Neil Hirsch, and
Jeffrey L. Friedman

Daniel R. Karon, Esq.
Goldman Scarlato & Karon, P.C.
55 Public Square, Suite 1500
Cleveland, OH 44113

Marcell Johnson,
Neil Hirsch, and
Jeffrey L. Friedman

Steven J. Greenfogel, Esq.
Meredith Cohen Greenfogel & Skirnick, P.C.
117 S. 17th Street, 22nd Floor
Philadelphia, PA 19103
Telephone: (215) 564-5182

Marcell Johnson,
Neil Hirsch, and
Jeffrey L. Friendman

Reginald Terrell, Esq.                          Michael Pruitt
The Terrell Law Group
223 25th Street
Richmond, CA 94804
Telephone: (510) 237-9700

Donald Amamgbo, Esq.                            Michael Pruitt
Amamgbo & Associates
1940 Embarcadero
Oakland, CA 94606
Telephone: (510) 434-7800

Karen Marcus, Esq.                              Evan Rosenthal and
Mila F. Bartos, Esq.                            Steve McGlynn
Finkelstein, Thompson & Loughran
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8090

Steven A. Schwartz, Esq.                        Steve McGlynn
Chimicles & Tikellis LLP
361 West Lancaster Ave.
Haverford, PA 19041
Telephone: (610) 642-8500

Edward W. Cochran, Esq.                         Robert Falkner
20030 Marchmont Road
Shaker Heights, OH 44122

Taras Kick, Esq.                                Carlos Corrales and
G. James Strenio, Esq.                          Kasem Adoure
Thomas G. Martin, Esq.
The Kick Law Firm, APC
660 South Figueroa St. Suite 1800
Los Angeles, CA 90017

Allan Kanner, Esq.                              Carlos Corrales and
ALLAN KANNER & ASSOCIATES, PLLC                 Kasem Adoure
701 Camp Street
New Orleans, LA 70130

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                        )
In re:                                  )        CIVIL ACTION NO. 05-11177-DPW
                                        )        (LEAD CASE)
M3POWER RAZOR SYSTEM                     )
MARKETING & SALES PRACTICES             )        MDL Docket No. 1704
LITIGATION                              )
_____)
                                        )
THIS DOCUMENT RELATES TO:               )
ALL CASES                               )
_____)
```

**AFFIDAVIT OF ALLAN KANNER**

1.      My name is Allan Kanner.  I am the founding partner of Kanner & Whiteley, LLC

(f/k/a/ Allan Kanner & Associates, P.L.L.C.).  Along with The Kick Law Firm, I represent plaintiffs

Carlos Corrales and Kasem Adoure.

2.      I submit this affidavit in support of the *Atkins* group's Application regarding

Plaintiffs' Organizational Structure.

3.      Members of the *Atkins* group include myself and my firm, The Kick Law Firm,

Milstein, Adelman & Kreger, Amamgbo & Associates, The Terrell Law Group, The Dodd Law

Firm, The Hewell Law Firm, Howard M. Rubinstein Attorney at Law, Sharp & Barnes, and Edward

W. Cochran.

4.      Other than those who are co-counsel on a particular case, none of the members of the

*Atkins* group are or have previously been co-counsel in this case or any other.

5.      Following the January 23, 2006 scheduling conference, the members of the

1

*Atkins* group attempted to confer in good faith with various other plaintiffs' counsel regarding the appropriate structure for the organization of all plaintiffs' counsel.

6.      It became apparent that the cases and associated counsel generally split into two groups. One group, referred to herein as the *Dearman* group, is lead by Tom Shapiro of Shapiro Haber & Urmy and his co-counsel Sam Rudman of Lerach Coughlin Stoia Geller Rudman & Robbins, and the second group, referred to herein as the *Besinger* group, is lead by Ben Barnow of Barnow & Associates and his co-counsel Lance Harke of Harke & Clasby.

7.      After lengthy discussions with members of both of these groups, the members of the *Atkins* group decided that neither of the primary groups had the same ideals, strategy and goals for this litigation and the organizational structure that we shared. Important disagreements concerned the fact that the members of the *Atkins* group wanted to pursue both litigation and settlement tracks and wanted all counsel to have an opportunity to review any settlement proposal prior to preliminary approval. Therefore, we banded together to form a third group, referred to as the *Atkins* group.

8.      Resumes of the firms comprising the *Atkins* group are attached hereto as Exhibit 1. These resumes demonstrate the skill and experience of the members of the *Atkins* group with respect to class actions and complex litigation.

Signed under the penalty of perjury this 10th day of February, 2006.

/s/ Allan Kanner
Allan Kanner

**EXHIBIT 1**

# KANNER & WHITELEY, L.L.C.
**701 Camp Street**
**New Orleans, Louisiana 70130**
(504) 524-5777
FAX: (504) 524-5763

## FIRM BIOGRAPHY

Kanner & Whiteley, L.L.C. ("K&W")(f/k/a Allan Kanner & Associates, P.L.L.C.), founded in 1981, is an AV-rated national trial firm that excels in handling complex and novel matters. The firm has been especially successful in commercial fraud, environmental and toxic tort litigation, long term care insurance fraud, and in pioneering new legal theories in areas as diverse as environmental law, toxic torts, genetically engineered crops, the due process rights of farm borrowers, and the property rights of workers in their jobs.

## TRIAL AND APPELLATE EXPERIENCE

K&W has an excellent trial and appellate reputation. We have substantial jury trial experience with a number of multi-million-dollar verdicts, including three successful class action trials. We have successfully litigated civil RICO, environmental, toxic tort, antitrust, fiduciary duty, and other cases. The firm has also been retained to successfully defend complex matters, including an antitrust class action. The firm has served as lead counsel in a number of recent cases, including *Lemmings v. Second Chance Body Armor, et al.*, No. CJ-2004-64 (Mayes County District Court, OK) (2/19/05) (certification of class of bullet proof vest purchasers/users) (9/23/05 Order Approving $38.4 million national class settlement); *Milkman v. American Travellers Life Insurance Co.,* No. 3775, (Ct. Common Pleas, First Judicial District, June Term 2000) (4/01/02) (Multi-million dollar national class settlement on behalf of Long Term Care and Home Health Care policyholders; final approval granted 4/01/02); *Talalai v. Cooper Tire & Rubber Co.,* MID-L-8839-OOMT, Mass Tort 259, (Law Div. Middlesex Cty.) (Multi-million dollar national class settlement on behalf of Cooper Tire purchasers; final approval granted on 9/13/02);[1] *Hanson v. Acceleration Life Ins. Co.*, Civ. No. 3:97-152 (D.N.D. 1999) ($14.7 million settlement on behalf of Long Term Care policyholders); *Wallace v. American Agrisurance*, No. LR-C-99-669 (E.D.AR) ($3.7 million settlement on behalf of rice growers holding CRC Plus policies); *Thomas v. Schwab*, No. 66,700 (10th Jud. Dist. Ct., Natchitoches, La) *aff'd*, 683 So.2d 734 (La. App. 3 Cir. 1996) (Certification of national class action); *Dumont v. Charles Schwab & Co. Inc.*, Civ. Act. No. 99-2840 c/w 99-2841 (settlement of certified national class of Schwab customers July 21, 2000, 2000 WL 1023231); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140 (8th Cir. 1999)(settlement of certified pollution property class action affirmed on appeal); *Tompkins v. BASF*, No. 96-59 (Traill County, N.D.) (Multi-million dollar settlement on behalf of agricultural product purchasers); *Clark v. Household Finance Corp.*, No. 97-2-22420

---

[1]This case also involved a federal MDL in which K&W was lead counsel. *In re Cooper Tire Products Liability Litigation,* MDL No. 1393 (S.D.Ohio, Holschue, J.) (successfully resolved in under a year). The firm's management of this case was the subject of a law review analysis. Jesse Tiko Smallwood, *Nationwide, State Law Class Actions and the Beauty of Federalism,* 53 DUKE L.J.1137, 1139 (2003). *See also*, Manhattan Institute Conference Series (October 24, 2002) (comments of Professor McGovern).

(King County, WA, 12/29/97) (certification and settlement of statewide class for defrauded employees). We have served as co-lead counsel in *In re Synthroid Marketing Litigation*, MDL 1182, 264 F.3d 712 (7th Cir. 2001) ($89 million nationwide class action settlement granted final approval and affirmed on appeal); *Jorgenson, et al. v. Agway, Inc.,* Civ. No. A3-00-59 (D.N.D. 2002) ($3.2 million settlement on behalf of sunflower growers); and *Bonilla v. Trebol Motors*, No. 92-1795 (D. P.R.) ($129.5 million class action verdict affirmed in part and reversed in part on appeal; settled as to all parties).

Courts have consistently acknowledged the firm's expertise in complex and class action litigation:

> *Hanson v. Acceleration Life Ins. Co.*, Civ. No. A3:97-152 (D.N.D. Mar. 18, 1999) (certifying class, rejecting filed rate doctrine and denying summary judgment): Order of December 11, 1999 (approving final settlement of $14.7 million), pp.8-9: ("*This litigation was hard fought* throughout its two year pendency and required thousands of hours of counsel's time and hundreds of thousands of dollars advanced for expenses, with significant risk of no compensation. Both local counsel and national *class counsel are commended for their willingness to take on this cause when there were virtually no precedents to assure them of likely success.* They are all highly skilled and well-experienced attorneys who appreciate the risky nature of this litigation, yet their desire to correct a perceived injustice suffered by a vulnerable group of people led them to take this risk. *Counsel's considerable skill, both in the substantive areas of this case as well as in discovery and class action procedure, together with their degrees of preparation were primary factors leading to the favorable settlement for the class. Of equal note is the fact that counsel unquestionably put the interests of the class far ahead of their own interest.*") (emphasis added). This case involved a North Dakota class action certified against Acceleration Life Insurance and Commonwealth Life Insurance Company for fraud in connection with multiple premium increases of up to 700% between 1989 and 1997 on "guaranteed renewable" Long-Term Care insurance policies. Shortly before trial a national class action settlement, supervised and approved by the federal magistrate, was entered into which brought over $7.7 million in cash payouts to numerous elderly policyholders and their families and an addition $4 million in insurance benefits tailored to the specific needs of each class member.
>
> *Talalai v. Cooper Tire & Rubber Co.*, MID-L-8839-00MT, Mass Tort 249, (Law Div. Middlesex Cty.) (11/1/01 Opinion and Order Certifying National Class and Preliminarily Approving Settlement)

("The attorneys of Allan Kanner & Associates, P.C. have substantial jury trial experience with a number of multi-million-dollar verdicts, including a number of successful class action trials. The firm is known for its willingness to try class actions to verdicts and has done so on at least three occasions, winning every time"); Opinion of September 13, 2002 (Approving Certification and Final Settlement of National Class), p.5: ("The Stipulation was the result of extensive and intensive arm's length negotiations among highly experienced counsel, with the benefit of extensive discovery and full knowledge of the risks inherent in this litigation.")

*Milkman v. American Travellers Life Insurance Co.*, No. 3775, (Ct. Cm. Pleas, First Judicial District, June Term 2000) (Preliminary Approval of National Class: 11/26/01) ("As demonstrated by the credentials set forth in the Motion, the Plaintiff's attorneys are more than capable of representing the interests of the Class and there do not appear to be any conflicts of interest between the Plaintiff and the Class."). (Final Approval of National Class:

4/1/02), p. 47 ("Again, the quality of the legal representation provided by Class Counsel is exceptional. The extensive experience of each of the firms and individual attorneys serving the Class is set forth in Kanner Affidavit Paragraphs 54 through 68. Moreover, the Court can attest to Class Counsel's professionalism and skill, as demonstrated by the extensive memoranda of law and the first-class oral arguments delivered on behalf of the Class.").

*Bonilla, et al. v. Trebol Motors Corporation, et al.*, No. 92-1795 (JP) (D.P.R.) ($129,000,000 jury verdict in civil RICO class action against Volvo and local distributor) (describing the firm's abilities on March 27, 1997, as follows: *"We have no trouble concluding that the experience and resources of Allan Kanner & Associates was a major reason that the plaintiffs' class was able to so successfully present its case to the jury and achieve such an estimable result. Mr. Kanner, who served as lead counsel at trial, has perhaps as much experience litigating complex class action suits as any attorney in the United States*. He has authored, chaired, consulted on, contributed to, and given articles, symposiums, classes, books, practice guides, etc. More importantly, his resume is replete with instances in which he served as counsel in complex class action suits. His experience was essential to the success realized by the plaintiffs in this action.") (emphasis added).

*Glass, Molders, Pottery Plastics, and Allied Workers International Union, et al. v. Wickes Companies, Inc.,* No. L-06023-88 (Sup.Ct., Camden Cty., February 24, 1992) (certifying national class of

3

workers who lost jobs as a result of tortious conduct occurring in the context of hostile corporate raid) (describing the firm's abilities to represent the class as follows: "Plaintiffs' attorneys have extensive professional experience representing plaintiffs in class actions. Additionally, the attorneys representing the plaintiffs are equipped with the staff and resources to adequately handle a technical and complex class action. *In short, I am satisfied that plaintiffs' attorneys are committed to the class and competent to advocate its interest.");* (emphasis added) Order Approving Counsel Fees of December 16, 1993 ("This Court finds that the Kanner firm, [and co-counsel] have all *provided outstanding service to the class* and faithfully executed their fiduciary duties in connection with this litigation.") (emphasis added).

*Local 7-515, Oil Chemical and Atomic Workers International Union (OCAWIU), et al v. American Home Products, et al.,* Civ. No. 92-1238 (JP) (D.P.R.) (Order of April 13, 1992, certifying national class of workers who lost jobs as a result of fraudulent job transfers to Puerto Rico under civil RICO theory), *Oil Chemical and Atomic Workers International Union v. American Home Products, et al.,* Civil No. 91-1093 consol. with Civil No. 92-1238 (Order of September 17, 1992, approving $24 million settlement); p. 38 of transcript: "Indeed, the Court affirmatively finds that Mr. Kanner and [co-counsel] have in all matters handled this case and conducted themselves, in relation to their co-counsel, with *the highest degree of professionalism, integrity and ability.* There is no doubt in the Court's mind, based on his intimate familiarity with the record, that *but for the outstanding efforts of Mr. Kanner and [co-counsel] there would not have been such a significant and landmark result in this case,* and I have been telling you all this long before this moment." (emphasis added).

*The Board of Commissioners of the New Orleans Exhibition Hall Authority v. Missouri Pacific Railroad Company, et al.,* No. 92-4155 (Judgment of February 15, 1996) "It must be said that both firms and all attorneys involved in this protracted litigation exemplified *the highest standard of trial experience and skill* which was brought to bear on *this novel and difficult matter* in a specialized area of the law.") (emphasis added).

As a result, Allan Kanner is regularly asked to lecture and write on presenting the plaintiff's case for trial. The firm is especially well known for its ability to communicate novel theories effectively. *See, Business Week* (June 18, 1990); *American Bar Association Journal* articles in July 1989 and July 1990 issues.

## ATTORNEYS

**ALLAN KANNER** (B.A., University of Pennsylvania; J.D., Harvard Law School), founding member, handles significant environmental, toxic tort, commercial and consumer fraud cases. In 1996, he was recognized for winning one of the year's largest verdicts, a $129,500,000 judgment in a civil RICO class action. Allan Kanner is also an Adjunct Professor at Tulane Law School, and Visiting Senior Lecturer at Duke University. He has also taught as a Visiting Lecturer in Law at Yale Law School (Fall 2002), Visiting Professor at the University of Texas Law School (Spring 2001) and is the author of ENVIRONMENTAL AND TOXIC TORT TRIALS (Lexis-Nexis) (2d ed.), as well as over 50 articles in the diverse fields of torts, trial practice, civil discovery, civil RICO, environmental law, toxic torts, class actions, and business and consumer fraud. Most recently he has published *Exploding the Blackmail Myth: A New Perspective on Class Action Settlements*, 57 BAYLOR L.REV. 681 (Fall 2005), and he has a forthcoming article on *Interpreting The Class Actions Fairness Act In A Truly Fair Manner*, in the Tulane Law Review. He has lectured before bar groups nationally. During 1998 and 1999 he was one of the principal authors of the LOUISIANA JUDGES' COMPLEX LITIGATION BENCH BOOK, and has taught at the Louisiana Judicial College. He is a member of the bars of California, District of Columbia, Louisiana, New Jersey, Pennsylvania, and Puerto Rico (Federal) and has successfully handled matters throughout the United States. He is on the Editorial Boards of CLASS ACTION REPORTER (BNA), TOXIC LAW REPORTER (BNA) and ENVIRONMENTAL FORENSICS. He is a founding Board Member of the Ogden Museum of Southern Art.

**CONLEE S. WHITELEY**, managing member, joined Kanner & Whiteley, L.L.C. in 1994. Ms. Whiteley practices in the fields of complex litigation and class actions, including consumer fraud, securities, RICO, agricultural product and commercial litigation. Before joining Allan Kanner & Associates, she worked for the Louisiana State Law Institute in the areas of the Louisiana Code of Civil Procedure and the Louisiana Children's Code. Ms. Whiteley is admitted to practice before Louisiana State Courts and the United States District Courts for the Eastern and Western Districts of Louisiana, the District of North Dakota and the United States Court of Appeals, First and Fifth Circuits. She has also been admitted to practice *Pro Hac Vice* in the United States District Court for the District of Puerto Rico, state courts of California, Florida, Illinois, North Dakota, Pennsylvania, Texas and Washington. She graduated in 1989 from Louisiana State University where she obtained a Bachelor of Arts degree in History with a minor in Political Science. In 1993, she obtained a Juris Doctor degree from the Paul M. Hebert Law Center at Louisiana State University.

**ELIZABETH B. COWEN**, member, joined Kanner & Whiteley, L.L.C. in 1996. Ms. Cowen practices in the fields of environmental law, complex litigation and class actions, including consumer fraud and environmental property damage litigation. Prior to joining Kanner & Whiteley, she practiced in the areas of civil and maritime litigation. She is admitted to practice before the United States District Court for the Eastern and Western Districts of Louisiana and before Louisiana State Courts. She has also been admitted to practice *Pro Hac Vice* in the United States District Courts for the Western District of Missouri; the District of Puerto Rico, the Southern District of Texas; the Northern District of Illinois, and before the Circuit Court of Escambia County, Florida.

Ms. Cowen graduated in 1992 with a Bachelor of Arts degree in English from the University of California at Berkeley. In 1995, she obtained a Juris Doctor and Certificate of Environmental Law from Tulane University School of Law.

**CYNTHIA S. GREEN** joined Kanner & Whiteley, L.L.C. in 1998 as an associate in the litigation section where she practices general, civil, commercial, consumer fraud, class action and environmental law. Before joining Kanner & Whiteley, L.L.C., she worked at the Louisiana Supreme Court, clerking for Justices Lemmon and Bleich and serving as a staff attorney in the Court's Civil Staff Division. Ms. Green is a member of both the Louisiana and Texas bars and is admitted to practice before Louisiana State and Federal Courts, Texas State Courts and the Fifth Circuit Court of Appeal. She graduated with a Bachelor of Science degree in Business Administration from Louisiana Tech University in 1993. In 1996, she obtained a Juris Doctor degree from the Paul M. Hebert Law Center at Louisiana State University.

**KELLI M. LEGER** joined Kanner & Whiteley, L.L.C. in 2003 as an associate in the litigation section where she practices general, civil, commercial, consumer fraud, class action, and environmental law, including toxic torts. Before becoming an associate, she worked as a law clerk at the firm, beginning in 2002. She is admitted to practice in all Louisiana State Courts, and the United States District Court for the Eastern District of Louisiana. She has also been admitted to practice *Pro Hac Vice* in the United States District Court for the Northern District of Oklahoma, the Circuit Court of Wayne County, Michigan, and the Superior Court of New Jersey, Cumberland County. Ms. Leger graduated in 2000 with a Bachelor of Science degree in Science-Business from the University of Notre Dame. In 2003, she received her Juris Doctor and Certificate of Environmental Law from Tulane University School of Law, where she was a student attorney for the Tulane Environmental Law Clinic.

**AYLIN R. AÇIKALIN MAKLANSKY** joined Kanner & Whiteley, L.L.C. in 2006 as an associate attorney in the litigation section where she practices general, civil, commercial, consumer fraud, class action, and environmental law, including toxic torts. Ms. Maklansky earned her bachelor of arts degree in International Affairs and Central Asian Studies from The George Washington University and her juris doctorate from Tulane Law School with a Certificate of Environmental Law. Prior to law school, Ms. Maklansky was Deputy Chief of Staff for Senator Mary L. Landrieu and interned at the Department of Defense. During law school, Ms. Açikalin Maklansky was a student attorney at the Tulane Environmental Law Clinic. She also was a summer law clerk for the Honorable Terri Love, Louisiana Fourth Circuit Court of Appeals and Jobard Chemla and Associates in Paris. Before becoming an associate attorney with Kanner & Whiteley, Ms. Açikalin Maklansky worked as a judicial law clerk to the Honorable Nadine M. Ramsey, Civil District Court for the Parish of Orleans. She is admitted to practice in all Louisiana State Courts. Ms. Maklansky is on the Board of the New Orleans Bar Association Young Lawyers Section.

6

## The Kick Law Firm, APC

### FIRM PROFILE

The Kick Law Firm almost exclusively represents plaintiffs in complex civil litigation matters, primarily class actions, but also sophisticated business litigation and product liability, and, on information and belief, has achieved over $100 million in judgments and settlements for its clients.

Some class actions currently being prosecuted by the firm on behalf of consumers include actions against automobile manufacturers for false advertising, actions against telecommunications company for false advertising and breach of contract, and actions against manufacturers of certain herbal supplements for false advertising.

The background of the attorneys at the firm who are working on this case, includes the following:

**Taras P. Kick** is a 1986 graduate of Swarthmore College, and a 1989 graduate of the University of Pennsylvania Law School, and has been practicing civil litigation in California for 15 years, since being admitted to the California State Bar in November 1989, including as a member of plaintiffs' executive committees on national class actions.

**G. James Strenio** is a 1993 graduate of University of Michigan Law School. He received a Bachelor of Business Administration in Finance,

Marketing, and International Business and a Bachelor of Arts in Economics from the University of Texas in 1990.  Mr. Strenio has over 10 years experience in complex commercial litigation, including consumer fraud, employee, and securities class actions, complex bankruptcy litigation, and complex business litigation, including lender liability disputes, in state and federal courts, as well as extensive appellate experience.

**Thomas G. Martin**  is a 1997 graduate of UCLA School of Law, and received a Bachelor of Arts in philosophy from Yale University in 1993.  Mr. Martin has been published in nationally recognized law journals and served as a judicial extern to the Honorable Stephen Reinhardt.  Mr. Martin has several years of experience in complex civil litigation, including consumer fraud, employment, class actions, toxic torts, and environmental law.

# The Dodd Law Firm

P.O. Box 3504, Beaumont, Texas 77704
Phone: (409) 832-2580
Fax: (409) 832-2156
Email: OlenDodd@TheDoddLawFirm.Com

**Resume:**  Olen Kenneth Dodd

## Admitted to practice:

- State Bar of Texas since 1984.
- United States District Court for the Eastern District of Texas since 1985.
- United States Court of Appeals for the Fifth Circuit since 1987.

## Educational Background:

- South Texas College of Law, Houston, Texas. Juris Doctor – 1984
- University of South Florida, Tampa, Florida: Bachelor of Arts – 1980

## Professional Background:

- Private Practice: June 2000 to present.
- Assistant United States Attorney for the Eastern District of Texas: August 1987 to June 2000.
- Associate at Renad, Morgan & Quinn: Associate June 1984 – July 1987.
- Class counsel in administration of national class settlement in Shaw v. Toshiba America Information Systems, Inc., et al., 199 WL 1486295.

## Current Major Areas of Practice:

- Class Action litigation
- Commercial litigation
- Federal Qui tam litigation
- Appellate practice

## Selected Honors:

- Department of Interior, Minerals Management Service Award in Recognition of Outstanding Achievement in U.S. ex rel. Johnson v. Shell Oil Co., et al.: July 2000.
- Department of Health and Human Services Inspector General's Integrity Award: 1994.
- Mark Gallinghouse Memorial Award for Excellence in Financial Litigation: 1993

## Selected Sample of Reported Cases:

- Compaq Computer v. Hal LaPray et al, 135 SW3d 657 (Tex, 2004)
- United States v. Boutte, No. 1-94-CV-102, United States District Court for the Eastern District of Texas, Beaumont Division, 900 F. Supp. 49; 1995 U.S. Dist. Lexis 14985.
- Fontenot v. United States, No. 95-40390, United States Court of Appeals for the Fifth Circuit, 89 F.3d 205, 1996 U.S. App. Lexis 16693.
- United States ex rel. Johnson v. Shell Oil Co., Civil Action No. 9-96 CV 66, United States District Court for the Eastern District of Texas, Lufkin Division, 33 F. Supp. 2d 528; 1999 U.S. Dist. Lexis 509.
- Saraw Partnership v. United States, No. 94-41204, United States Court of Appeals for the Fifth Circuit, 67 F.3d 567; 1995 U.S. App. Lexis 30970.

- Henderson v. United States, No. 94-40697, Summary Calendar., United States Court of Appeals for the Fifth Circuit, 51 F.3d 574; 1995 U.S. App. Lexis 10450.
- Temple-Inland Forest Products Corp. v. United States, No. 92-4394, United States court of Appeals for the Fifth Circuit, 988 F.2d 1418, 1993 U.S. App. Lexis 8025.
- United States v. Valley, No. 89-4921, United States Court of Appeals for the Fifth Circuit, 928 F.2d 130; 1991 U.S. App. Lexis 4441
- Simon v. United States, No. 88-2141, United States Court of Appeals for the Fifth Circuit, 891 F.2d 1154, 1990 U.S. App. Lexis 422.

## Selected National Class Actions:

- Alvis v. Hewlett-Packard Co. A164,880 in the 58th Judicial District Court, Jefferson County, Texas.
- Packard v. eMachines, Inc., E165,366 in the 172nd Judicial District Court, Jefferson County, Texas.
- Hal LaPray, et al. v. Compaq Computer Corporation., A-162,152 in the 60th Judicial District Court, Jefferson County, Texas.
- Michael Albanese, et al. v. Compaq Computer Corporation, D-164,939 in the 60th Judicial District Court, Jefferson County, Texas.
- Kiley Stroud, et al. v. eMachines, Inc., CJ03-968L in the District Court of Cleveland County, Oklahoma.
- Barrett, et al. v. Hewlett-Packard Co., LS-03-967 in the District Court of Cleveland County, Oklahoma.
- Grider, et al v. Compaq Computer Corporation, in the District Court of Cleveland County, Oklahoma.

## Miscellaneous:

- Founding Member of the Department of Justice Affirmative Litigation Working Group/Steering Committee: 1992 to 2000
- Instructor: Attorney General's Advocacy Institute, Office of Legal Education, Advocacy Course Washington, D.C. 1991
- Instructor: The Legal Education Institute, United States Department of Justice, Washington, D.C., Advocacy Skills and Examination Techniques 1991
- Instructor: Lamar University, Beaumont, Texas 1992-1994

**L. DeWayne Layfield** was born in Beaumont, Texas on November 18, 1963. He graduated from The University of Texas School of Law with Honors and was admitted to the Texas Bar in 1990. Thereafter, he clerked for the Honorable Thomas Gibbs Gee, Circuit Judge United States Court of Appeals for the Fifth Circuit. At the conclusion of the clerkship, he joined Vinson & Elkins LLP in their Houston, Texas office. In 1995, Mr. Layfield joined Bridgestone/Firestone, Inc. as senior litigation counsel. In 1997, Mr. Layfield returned to private practice. Mr. Layfield's practice has involved class and non-class mass tort litigation, the nationwide coordination of tort litigation as well as commercial, contract, and environmental litigation. Mr. Layfield has assisted with the prosecution or defense of thousands of individual claims and class litigation involving tens of thousands of individuals. Mr. Layfield has been appointed class counsel in the following matters:

(1) Cause No. 1:99cv0120, *Ethan Shaw, et al. v. Toshiba America Information Systems, et al.*; In the United States District Court for the Eastern District of Texas;
(2) Cause No. A-162,152; *Hal LaPray, et al. v. Compaq Computer Corporation*; In the 60th Judicial District Court, Jefferson County, Texas;
(3) Cause No. A-164,880; *Musette Alvis, et al. v. Hewlett-Packard Company*; In the 58th Judicial District Court, Jefferson County, Texas;
(4) Cause No. D-164,939; *Michael Albanese, et al. v. Compaq Computer Corporation*; In the 136th Judicial District Court, Jefferson County, Texas;
(5) Cause No. E-165,336; *David Packard, et al. v. eMachines, Inc., et al.*; In the 172nd Judicial District Court, Jefferson County, Texas;
(6) Cause No. E-167,872; *Sandra Geter, et al. v. Farmers Group, Inc., et al.*; In the 172nd Judicial District Court, Jefferson County, Texas; and
(7) Cause No. 8725; *Anderson Brothers Partnership, et al. v. EnerMart Energy Services Trust, et al.*; In the 287th Judicial District Court, Parmer County, Texas

To date, Mr. Layfield has helped to recover over $750 Million in cash and over $1 Billion in combined cash and non-cash benefits on behalf of the members of these classes.

Mr. Layfield graduated *summa cum laude* with a B.S. in Chemical Engineering from Lamar University in 1987. Prior to graduation from Lamar, Mr. Layfield was the owner of a consulting company that developed engineering and process control software for corporate clients such as DuPont. Throughout his education and legal career, Mr. Layfield has studied and gained hands-on experience with computer-related technology. He has lectured and written on the use of technology in the practice of law. He has served on various technology-related groups and committees at The University of Texas School of Law, Vinson & Elkins LLP, and Bridgestone/Firestone, Inc.

Mr. Layfield is admitted to practice before the courts of Texas as well as the Federal Courts for the Eastern and Southern Districts of Texas and the United States Court of Appeals for the Fifth Circuit. He is a member of the American Bar Association, and a Fellow of the Texas Bar Foundation. Mr. Layfield has performed pro bono service on death penalty cases both while at Vinson & Elkins LLP and since returning to private practice. Mr. Layfield has also performed *pro bono* service through the Houston Volunteer Lawyers Project.

While at The University of Texas School of Law, Mr. Layfield served as Editor in Chief of the *Texas Law Review* and was a member of Chancellors and the Order of the Coif. Mr. Layfield also published a Note in the *Texas Law Review* regarding CERCLA and the federal common law. While at Lamar University, Mr. Layfield was elected to Tau Beta Pi and Omega Chi Epsilon as well as other honorary societies. In addition, he was recognized as the highest-ranking graduate in the class of 1987.

HAROLD M. HEWELL
HEWELL LAW FIRM, A.P.C.
1901 FIRST AVENUE, SECOND FLOOR
SAN DIEGO, CALIFORNIA 92101
TEL: (619) 235-6854 FAX: (619) 235-9122

**General Experience:**
Attorney experienced in consumer and business litigation in both Federal and Superior Court.

**Member of the State Bar of California**
Admitted to practice in all courts of California and the United States District Court, Southern District.

**Education:**   University of Virginia, Charlottesville, Va.: B.A., English
University of South Carolina, Columbia, S.C.: M.A. Journalism
California Western School of Law, San Diego, Ca., J.D.

**Notable Cases:**

*Stephanie Collins v. Mazda American Credit*, San Diego Superior Court, Case No. GIN006106:
Primus Automotive Financial Services, Inc., agreed to an $8.7 million class action settlement that affected 1,200 California consumers who entered into lease contracts that were purchased by Primus. The lawsuit alleged consumers were sent notices of post-repossession rights that didn't comply with California's Vehicle Leasing Act.

*Rutledge v. Triad Financial Corporation*, San Diego Superior Court, Case No. GIE013575:
Triad Financial Corporation agreed to a class action settlement that affected California consumers who had received notices that plaintiff contended were defective under California's Rees-Levering Act. The settlement resulted in waiver of certain deficiency balances.

*Thies v. Wyman*, 969 F. Supp. 604 (S.D. Calif. 1997):
Mr. Hewell's successful opposition to a motion to dismiss resulted in this published decision, which was the first in a series that held that homeowners' association dues are a "consumer debt" covered by the federal Fair Debt Collection Practices Act.

Mr. Hewell also is involved in pro bono work including annual "Law Day" Programs during which volunteer lawyers spend the day offering pro bono legal advice to members of the community. He also has spoken to attorneys on such matters as consumer law.

# HOWARD M. RUBINSTEIN
## ATTORNEY AT LAW

**OFFICES:**
2601 South Bayshore Dr., Suite 600, Miami, Florida 33133
305-859-7700

3407 Houston Ave
Houston, TX 77009

**EDUCATION:**
South Texas College Of Law 1978

**PRACTICE AREA:**
Private law practice in Civil Litigation with an emphasis on Class Action
and Mass Tort practice.

Texas case emphasis:
1. Phen-Phen litigation
2. Rezlin litigation
3. Asbestos litigation
4. Underpayment of oil and gas royalty litigation in 50 counties

Florida case emphasis:
1. Asbestos litigation
2. Maritime litigation

Washington D.C. case emphasis:
1. Guatemala v. Philip Morris, et al. 1996-2000
2. Qui tam litigation- Wright, et al v. AGIP, et al., 5:03-cv-00264-DF

**PROFESSIONAL:**
Licensed in Texas
Licensed in Florida
Admitted to the United States district court of Washington D.C.
Admitted to The United States District Courts, Southern and Western
Districts of Texas

**OTHER NOTABLE CASES:**
Zuckerman v. AT&T Corp., et al.
Case No. BC246532
Los Angeles Superior Court

Thomas Singer, a/k/a Tom Singer. In his own right and on behalf of all
persons similarly situated v. Toyota Motor Sales, U.S.A., Inc. and
Bridgestone/Firestone North America Tire, L.L.C.
Case No. 02-30957 CA 04
Circuit Court, Miami, Dade County

Jeter v. AT&T
Case no. 6:02CV187
U. S. District Court – Texas

Hidalgo County v. Shell
Represented county for underpayment of taxes for underpayment of
royalties.

Jack D. Stirman and Beth Blakemore Hunter v.
Exxon Corporation

## SHARP & BARNES LLP

*James E. Sharp*

Mr. Sharp is an attorney and member of the law firm of Sharp & Barnes LLP. He has over 35 years of experience as a trial lawyer, in both the public and private sector. His practice is varied, but the majority of his time is spent assisting individuals and corporations involved with government investigations or inquires. Mr. Sharp also devotes a substantial amount of time representing entities involved in complex civil litigation. Over the years Mr. Sharp has had the privilege of representing, among others, Jeb Stuart Magruder, in Watergate; Bebe Rebozo, a close personal friend and confidant of President Richard Nixon; Clifford Irving, the biographer of Howard Hughes; Fabian Ver, the former Philippine Army Commanding General; Gaith Pharaon, in the BCCI scandal; and Henry Kearns, head of the Import-Export Bank. Mr. Sharp is a Fellow of the American College of Trial Lawyers. Mr. Sharp is admitted to practice in Oklahoma and the District of Columbia.

*Ben F. Barnes*

Mr. Barnes is a member of the law firm of Sharp & Barnes LLP. Mr. Barnes provides a range of consulting services including strategic planning and advocacy around state and federal legislation, regulatory matters and other public policy issues. Mr. Barnes was both the youngest Speaker of the House and the youngest Lieutenant Governor in Texas state history. Mr. Barnes is also the President and CEO of the Ben Barnes Group, which represents a number of Fortune 500 companies and trade associations that advocate for both public and private interests.

*Kent A. Caperton*

Mr. Caperton is an attorney and member of the law firm of Sharp & Barnes LLP. Mr. Caperton is a former Texas State Senator and Municipal Judge. Mr. Caperton specializes in major civil litigation involving complex issues and multiple parties, and in legislative and governmental matters. He is Board Certified as Civil Trial Law Specialist by the Texas Board of Legal Specialization. Mr. Caperton is admitted to practice in the State and Federal Courts in Texas, as well as the U.S. Court of Appeals for the Fifth Circuit.

*William F. Boyer*

Mr. Boyer is an attorney and member of the law firm of Sharp & Barnes LLP. Mr. Boyer specializes in white collar criminal defense, securities litigation, and complex civil litigation. Representative clients include the former Chairman of the Audit Committee & Board member at WorldCom, Inc.; the president of an international labor union; and a successful developer in the gaming & entertainment industry. Mr. Boyer is admitted to practice in the State and Federal Courts in North Carolina and the District of Columbia, as well as the U.S. Court of Appeals for the Third Circuit.

Law offices of
# AMAMGBO & ASSOCIATES
A PROFESSIONAL LAW CORPORATION
Attorneys at law
1940 Embarcadero
Oakland, California 94606
Telephone: (510) 434-7800
Facsimile: (510) 434-7804
Email:Info@BayAreaAdvocates.com
Website: www.BayAreaAdvocates.com

Amamgbo & Associates is a four attorney firm that has a comprehensive and diverse practice that is unique among law firms that represent only plaintiffs. Our cases typically involve employment discrimination, consumer fraud and false advertising, employment discrimination and unlawful employment practices, environmental damage and toxic exposures, antitrust and ERISA violations and the abuse of human and civil rights. We represent plaintiffs in class and group actions and in individual lawsuits in cases of serious personal injury or death. Amamgbo & Associates possesses sophisticated legal skills and the financial resources necessary for the handling of large, complex cases. We take great pride in our innovative approach to the practice of law and our firm's leadership role in cases. Amamgbo and Associates is well-capitalized, allowing it to dedicate considerable resources and to advance expenses in contingent class action cases to the fullest extent necessary to achieve the best possible result for class members. The firm has grown internally through years of success and reinvestment.

As part of our long standing objective of advancing consumer rights, we are spearheading efforts intended to halt alleged illegal and deceptive business practices -- often targeted at persons of low income or having poor credit histories -- by several of the nation's top credit card and mortgage loan servicing companies. We represented a group of individuals who have sued Fairbanks Capital Corporation ("Fairbanks") and its largest investor, PMI Mortgage Insurance Co. ("PMI") in a class action lawsuit on behalf of themselves and others similarly situated. This lawsuit has been consolidated with others like it across the country in the case Curry v. Fairbanks Capital Corp. pending in federal court in Boston, Massachusetts. The Plaintiffs in these consolidated cases allege, among other things, that Fairbanks violated various state and federal laws, as well as breached contracts, in servicing borrowers' loans. Similar result was achieved in the Norman Thomason v. Household International Inc., et al (United State Dist. Ct. Northern Div. C 02-2529 CW). In which despite a $500 million settlement between the 50 States Attorney Generals and defendant, California claimants was able to reach additional multi million dollar settlement with defendants which also required defendant to change its business practices.

Recently, a settlement was reached in the consolidated class action. This settlement would resolve the nationwide class action lawsuit, as well as investigations by the Federal Trade Commission and the Department of Housing and Urban Development. Amamgbo & Associates, PLC has, in association with other plaintiffs' firm, successfully represented thousands of plaintiffs in over 30 complex litigations involving toxic torts and Unfair Business Practices. These efforts have resulted in recoveries hundreds of millions of dollars for plaintiffs. A brief sample of some of Amamgbo & Associates cases include;

Norman Thomason v. Household International Inc., et al (United State Dist. Ct. Northern Div. C 02-2529 CW). Amamgbo & Associates and several other law firms nationwide are presently prosecuting a very complex class action against defendants alleging violation of HOEPA 15 U.S. §1639 and/or HELCPA 15 U.S. 15 §1637 (a), predatory lending practices in violation of Real Estate Settlement Procedure Act, 12 U.S.C. §2601 *et seq*, 15 U.S.C. §1637a (a, b & e), California Unfair Competition Act, Bus. & Prof. Code §17200 *et seq*., and Consumer fraud in violation of California Consumer Legal Remedies Act §1770. This case settled for $500 million.

In Re Wireless Telephone Federal Cost Recovery Fees Litigation 4:30 MD 01559 United States District of Missouri. Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

Automobile Antitrust Cases JCCP Nos. 4298 & 4303 Los Angeles, Amamgbo & Associates is part of a team of lawyers prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

Carbon Black Cases JCCP No. 4323 San Francisco, Amamgbo & Associates Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*.

Credit/debit Card Typing Cases JCCP No 4335 San Francisco, Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

In re Fairbanks Capital Case 1 & 11 JCCP Nos 4282 & 4284 Contra Costa County, Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*. Recently, a nationwide settlement has been reached with defendants in this case. This Case settled for $50 million.

Insurance Companies Cases JCCP No 4249 Los Angeles, Amamgbo & Associates is part of a team of lawyers prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

William Hearn V Ocwen Financial Services Inc, Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

In Re: Western States Wholesale Natural Gas Antitrust Litigation, MDL Docket No. 1566 (ALL CASES). These class actions before Hon. Philip M. Pro, Federal Court, Las Vegas allege that Defendants manipulated the market for natural gas in California by (1) engaging in false reporting to the trade press of the prices and volumes of natural gas sales on unregulated "spot" markets; (2) sharing daily

price information for natural gas through various computer software programs and Internet websites, and/or (3) entering into "wash" sales in which Defendants and their co-conspirators simultaneously bought and sold natural gas to each other for the same price on the same day, causing the market to believe that there was a greater demand for natural gas than actually existed, thus artificially inflating the price of natural gas.

Urethane Cases: JCCP 4367. (antitrust class action on behalf of all California indirect purchasers of Urethane); Amamgbo & Associates in association with other firms is prosecuting this case on behalf of the class.

Fred Williams  v. WFS Financial Case No. RG 03109601 Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq,* California Unruh Act, Civ. Code §§ 51 and 52. Some of the acts complained of against defendant include; maintaining a policy in which WFS approved dealers impose a standard less subjectively determined finance charge markup, discriminatory finance charge markups.

Crystal DeFrantz v. Visa USA, Inc. Amamgbo & Associates has filed  a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq* this case is in the process of being coordinated with other similar cases filed by various firms across California.

Finance Markup Cases; JCCP No. 4346. Amamgbo & Associates is a member of Plaintiffs' Counsel Committee of charged with prosecuting the above a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq,* California Unruh Act, Civ. Code §§ 51 and 52. Some of the acts complained of against defendant include; maintaining a policy in which WFS approved dealers impose a standard less subjectively determined finance charge markup, discriminatory finance charge markups. This case has settled for approximately $290 million.

Sutter Health Uninsured Pricing Cases: JCCP 4388. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq*.

Tenet Healthcare Cases 11 JCCP 4289 Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation California unfair competition law and  violations of Consumer legal Remedies etc. This case has settled for approximately $250 million.

Christopher Rovere v. Shering Plough Corporation Case No. RG 120726. Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above class action case against defendants for violation California Business and Professional Code Sections 17500 and 17200 *et seq,* this case is in the process of being coordinated with other similar cases filed by various firms across California.

Polyester Staple Cases JCCP No 4278. Amamgbo & Associates in conjunction with 37 other law firms are involved in the a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq*.

Romney Darkin vs Debeers Centenary: RG 04174299. (antitrust class action on behalf of all California indirect purchasers of Diamond); Amamgbo & Associates is a member of Plaintiffs' Counsel Committee charged with prosecuting the above case against defendants for violation. This case has settled for $250 million.

Michael Pruitt vs The Gillette Company: C05-2883-JCS. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq.*

In Re Sunscreen Cases: JCCP 4352. Amamgbo & Associates is part of a team of lawyers prosecuting the above class action which alleges that defendants violated California Business and Professional Code Sections 16720 and 17200 *et seq*

In Re GCC Richmond Works Cases (J.C.C.P Case No.2906). On July 26,1993, General Chemical Corporation based in Richmond, California released toxic chemicals and pollutants such as Hydrogen Sulphide, Sulphur Dioxide into the ambient air affecting over 40,000 residents of Richmond and the surrounding cities. Amamgbo & Ezeife represented over 3,000 plaintiffs from 1993 to 1995. Several class actions were co-ordinated and after over two years of litigation, a class was certified for settlement purposes following a $180 million settlement with defendants.

In Re: ATM Fee Antitrust Litigation C04-2676 VRW. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq.*

In Re Unocal Refinery Litigation (Contra Costa County Sup. Ct. Case No. C94-04141). Following a 16 day release of chemical compounds such as CATACARB, Amamgbo & Ezeife filed a class action on behalf of plaintiffs for injuries due to exposure to dangerous chemical compounds. Following consolidation and intense litigation the matter was settled for $80 million.

In Re IDT Corp Calling Card Litigation: MDL 1550. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq.* This case has settled for $25 million.

In Re Tosco SFR litigation (Contra Costa County Sup. Ct. Case No. C97-01637). On April 16, 1997 and again on January 7, 1998, Tosco Refinery released several thousand pounds of hydrogen sulphide and sulphur dioxide into the ambient air. The release affected such communities as Rodeo, San Pablo, Benicia amongst others. Amamgbo & Associates, filed a class action against Tosco. As trial counsel and member of plaintiffs' executive committee, Amamgbo & Associates actively participated in the management and litigation of the case. The case was settled one week before trial for $2.5 million. Currently, Amamgbo & Associates is responsible for the management of all funds disbursements to plaintiffs.

Silva Kieta vs Apple Computers Inc: RG 04164628. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq.* This case has settled for over $60 million.

In Re Westley Tire Fire Litigation (Santa Clara County Sup. Ct. Case No. CV801282).  On September 22, 1999, 7 million tires illegally stored in Westley, California burst into flames following a lightening strike.  The fire burned for over five weeks releasing  smoke and carcinogens into the atmosphere.  Several surrounding communities were affected by the release. Amamgbo & Associates filed a class action against multiple defendants and that case was consolidated with several other class actions.  Presently, Amamgbo & Associate has been appointed by the court as a member of plaintiffs' trial and management team.  After several months of extensive litigation and two mediation sessions before Justice Panelli (Rtd), CMS, one of the named defendants,  reached a settlement with the plaintiffs for $9 million pending approval.  Amamgbo & Associates is part of plaintiffs' trial team gearing up for trial in October 2004 against remaining defendants.  The rest of the defendants settled on the eve of trial.

African Watch vs International Paper Co Case No: CGC 04-433178. Amamgbo & Associates in association with other firms is prosecuting a class action case against defendants for violation of California Business and Professional Code Sections 16720 and 17200 *et seq*.

Van Tonder, et al v. Chevron Corp. (J.C.C.P. No. 4103).  On March 25, 1999 an explosion occurred at Chevron Refinery, Richmond, California that resulted in the spewing of toxic chemical into the atmosphere of the surrounding communities.  The conflagration lasted for several days resulting in complaints of injuries by area residents who were ordered to shelter in place as a result of the fire and chemical release.  Amamgbo & Associates filed the first class action and represents the named class representative Van Tonder in the said lawsuit which has since been consolidated with other similar lawsuits before Judge Bea of San Francisco Superior Court.  Amamgbo & Associates serves as a member of the team managing the litigation of this complex case set tentatively for phase one trial in December 2004.

Treanannette Pierson -Novarao et al v. General Chemical Corporation (Alameda County Sup. Ct. Case No. 2002-056513).  On May 1, 2001 November 29, 2001 and November 30, 2001 following a power outage in the General Chemical Plant, a failure caused by the defective design in the power backup system caused an explosion in the plant resulting in the release of thousand of pounds of such toxic compounds as hydrogen sulphide, sulphur dioxide and sulphur trioxide. The toxic cloud resulted in complaints of injuries by area residents who were ordered to shelter in place by government officials as a result of the release.  On May 01, 2002, Amamgbo & Associates, filed a lawsuit designated as complex, on behalf of over four thousand plaintiffs.  A team of over 30 experienced lawyers voted to have Amamgbo & Associates lead the prosecution of this very complicated and complex case. This case has settled for $6.25 million

## MILSTEIN, ADELMAN, AND KREGER

Milstein, Adelman, and Kreger is one of California's leading law firms dedicated to advocating the rights of plaintiffs and consumers in direct and class actions in the areas of consumer fraud, product defects, mass construction defect, employment litigation, and insurance bad faith.

Milstein, Adelman, and Kreger is dedicated to the zealous representation of consumer rights and takes pride in providing the highest quality legal counsel and service. The firm's attorneys are aggressive and steadfast in their pursuit to protect the rights of their clients. Admitted to practice before several states' courts and federal courts in California and across the country, our attorneys have successfully represented thousands of clients in a wide array of cases achieving over $250 million in settlements in the last five years.

Participating Attorneys
In re: M3Power Razor System Marketing & Sales Practices Litigation

**William A. Baird**, specializes in consumer class actions, employment litigation, and insurance bad faith litigation. Mr. Baird has resolved numerous class actions that provided significant benefits to the class members and has lectured on the topics of bad faith and consumer actions. In addition to his other trials, he was a member of the legal team that obtained the largest verdict of its type in a case where a child was blinded as a result of improper neonatal care. Mr. Baird is admitted to practice in California state courts and the United States District Courts for the Eastern, Central, and Southern districts of California. He obtained his Juris Doctor Degree from Pepperdine University School of Law in 1997, graduating *cum laude*. He graduated from Pepperdine University in 1994, *cum laude*, with a Bachelor of Arts degree in History. Examples of cases where Mr. Baird has served as counsel or co-counsel for Plaintiffs include:

*Evans et al. v. Coca-Cola* (California class action seeking overtime compensation on behalf of approximately 1240 Account Managers resulting in a $20.2 million recovery.)

*Green v. PNS Stores, Inc.* (California class action seeking overtime compensation on behalf of Assistant Managers resulting in a $10 million recovery.)

*Kimbell v. Abercrombie & Fitch Stores, Inc.* (California class action seeking overtime compensation on behalf of Store Managers. Final Order approving $2,000,000 settlement entered January 12, 2006.)

*Moreno v. Miller Brewing* (California class action seeking overtime compensation on behalf of route salesmen, resulting in settlement of $1.3 million dollars.)
*Griffin, et al. v. Seven-Up* (related to *Estrada, et al. v. Dr. Pepper/Seven-Up*) (California class action seeking overtime compensation on behalf of Account Managers.

Final Order approving $10 million settlement entered May 9, 2005.)

*Moore v. IKEA* (pending California class action seeking overtime compensation on behalf of a variety of low level managers, class certification motion not yet filed. Preliminary settlement negotiated through mediation.)

**Gillian Wade's** litigation practice focuses on products liability and consumer class actions arising under the CLRA and B&P Code section 17200. Prior to joining Milstein, Adelman, and Kreger, Gillian was an associate in the Orange County office of Jones Day where she represented corporations involved in contract, partnership, real estate, ERISA, consumer credit class actions and managed care disputes. Gillian played an active role in winning summary judgment for a client in a contract dispute involving claims of fraud and misrepresentation with claims totaling over $1 billion. She was also actively involved in the successful representation of Tenet Healthcare Corporation in managed care disputes, including two major settlements. She also led the successful defense of Tenet on a smaller matter, resulting in the dismissal of the entire action at the pleadings stage. Gillian received her undergraduate degree in Political Science at University of California, San Diego in 1999, and her Juris Doctorate, *magna cum laude*, at Pepperdine University School of Law, where she was a staff writer for the Pepperdine Law Review and the recipient of the John Purfield Memorial Scholarship.

Gillian is admitted to the State Bar of California and all U.S. District Courts. She is a member of the Los Angeles County Bar Association, Orange County Bar Association, and the Association of Business Trial Lawyers.

## EDWARD W. COCHRAN
**20030 Marchmont Road**
**Shaker Heights, Ohio  44122**
**216.751.5546 voice * 216.751.6630 facsimile**
**edwardcochran@adelphia.net**

Mr. Cochran received his Bachelor's Degree in 1971 from Harvard University, where he was named a Harvard National Scholar.  He then graduated from Columbia Law School in 1975.  He has been practicing law exclusively as a litigator for over 30 years. During that time, he has appeared in over 100 class actions, including acting as co-lead or lead counsel.  Presently, he is involved as counsel for Plaintiffs in approximately a half dozen class actions.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
In re:                                  )        CIVIL ACTION NO. 05-11177-DPW
                                        )        (LEAD CASE)
M3POWER RAZOR SYSTEM                     )
MARKETING & SALES PRACTICES             )        MDL Docket No. 1704
LITIGATION                              )
_____)
                                        )
THIS DOCUMENT RELATES TO:               )
**ALL CASES**                           )
_____)

<u>**THE *ATKINS* GROUP'S APPLICATION REGARDING**</u>
<u>**PLAINTIFFS' ORGANIZATIONAL STRUCTURE**</u>

## I.    INTRODUCTION

The undersigned counsel, representing Plaintiffs in five cases (*Atkins, Corrales* and *Adoure,*

*Pruitt, Gonzalez* and *Falkner*) (collectively referred to herein as the "*Atkins*" group) took seriously

this Courts instruction to make new friends with some success.  The firms involved in these wholly

unrelated cases were able to agree on basic organizational principles and leadership structure.

Essentially, the *Atkins* group recommends an organizational structure comprised of a single Lead

Counsel with a diverse five person Executive Committee, including Lead Counsel, that will ensure

some limited oversight on fundamental issues, such as case settlement.

The *Atkins* group attempted to work with other counsel to arrive at a suitable organizational

structure.[1]  However, two groups of counsel were absolutely unwilling to work with each other or

_____

[1]The cases in this MDL essentially breakdown into three groups - the *Dearman* group, the
*McGeary* group, and the *Atkins* group, which consists of counsel who did not agree with the
leadership structure and/or litigation strategy of the other two groups.  The breakdown of cases
within the three groups is attached hereto as Exhibit B.

**The Atkins Group's Application re Plaintiffs' Organizational Structure**
1

with the *Atkins* group to create a structure in which everyone is fairly represented.  First, the *Dearman* group, representing nine cases insisted that a members of its group be the sole lead counsel, retaining all authority and decision-making rights with no representation for other counsel.  Second, the two cases represented by the *McGeary* group filings insist that there be four lead counsel positions with members of that group having two of those positions.[2]

It is important to understand the reasons for this shortfall which ultimately led to the formation of the *Atkins* group, which had no prior relationship among themselves.  Groups that filed together, tend to stay together.  Further, defendant Gillette has made a settlement offer, and the *Dearman* and *McGeary* groups have been falling over each other to close separate deals.  This may explain why all counsel have not come together, as is more typically the case in MDL matters.  Although the undersigned counsel are interested in expeditiously resolving this matter, they remain committed to arms-length litigation relating to both merits and settlement possibilities, including the need for expedited discovery relative to any settlement.  Scrambling to settle without a credible threat of litigation simply is not viable.  The adversarial nature of our jurisprudence requires it and the putative classes and our clients demand it and are certainly entitled to it.  As a result, Gillette has chosen not to discuss settlement with any of these firms, individually or collectively.[3]

---

[2]The *McGeary* group propose two co-lead class counsel in its brief, but its proposed Case Management Order No. 2 requests four co-lead counsel.

[3]As noted during the January 23, 2006 scheduling conference, Gillette is separately discussing settlement with various counsel and has refused to share financial information relating to settlement with all counsel. *See* <u>Transcript (1/23/06)</u>, pp.36:9-37:6.

**The Atkins Group's Application re Plaintiffs' Organizational Structure**

2

II.     **PLAINTIFFS' ORGANIZATIONAL STRUCTURE SHOULD TAKE THE FORM OF A FIVE-MEMBER EXECUTIVE COMMITTEE WITH ONE LEAD COUNSEL.**

Plaintiffs' organizational structure should take the form of a five-member Executive Committee with one Lead Counsel, with the Executive Committee and Lead Counsel having the rights and obligations set forth in Exhibit A hereto.

The *Atkins* group's proposed structure is specifically designed for this unique case to ensure that this litigation is prosecuted in the best interests of the putative class members. Most notably, the *Atkins* group's proposed plaintiffs' organizational structure is designed to prevent the disfavored reverse auction situation by providing that:

- "Members of the Executive Committee shall take such action on behalf of plaintiffs as may be directed by a majority of the Executive Committee, except that *approval of any settlement must be by agreement of a super-majority of the Executive Committee*, and shall not take any action inconsistent with the direction of the Executive Committee. No individual member of the Executive Committee shall have authority to act or communicate unilaterally on behalf of the Class." (Case Management Order No. 2, ¶ 1.b., attached hereto as Exhibit A (emphasis added).)

- "In the event that this matter is resolved through a negotiated settlement, plaintiffs' Executive Committee shall submit the proposed settlement to all Plaintiffs' Counsel and *shall in good faith attempt to secure the approval or consent of other Plaintiffs' Counsel*, this is without prejudice to the Court's responsibility regarding approval of any settlement. *Any member of Plaintiffs' Counsel retains the right to object to any such settlement*." (Case Management Order No. 2, ¶ 1.f., attached hereto as Exhibit A (emphasis added).)

- "[The Executive Committee's responsibilities include to] give all members of Plaintiffs' Counsel at least 10 days prior notice to the execution of any proposed settlement agreement by the Executive Committee and the defendant. Said notice is to be in writing, and should be transmitted by the fastest available means. *In that notice, the relevant terms of the proposed settlement are to be set out in detail, and all written communications between the Executive Committee and Defendant, as well as a summary of all prior verbal and written communications relating to settlement with the defendant, are to be included in PDF format.* In no case shall any proposed settlement agreement be submitted to the Court, unless a copy of the final version of the submission is transmitted to all Plaintiffs'

Counsel by electronic mail at least 5 days prior to its submission for final review." (Case Management Order No. 2, ¶ 1.b.(18), attached hereto as Exhibit A (emphasis added).)

In addition to containing procedural safeguards to ensure that the litigation is prosecuted effectively and efficiently, the *Atkins* group's proposed structure provides important provisions to protect the rights of and promote cooperation among Plaintiffs' counsel, by providing, among other things, that:

- all Plaintiffs' Counsel shall be given an equal opportunity for work assignments (Case Management Order No.2, ¶ 1.b.(3), attached hereto as Exhibit A);

- all Plaintiffs' Counsel are kept timely informed of the proceedings: *e.g.*, calling meetings of Plaintiffs' Counsel when appropriate to update counsel on relevant litigation issues and to accommodate their concerns, with such meetings being no less than on a quarterly basis, unless agreed to by a majority of Plaintiffs' Counsel; conferring with Plaintiffs' Counsel regularly by conference call, with such conference calls being no less than on a monthly basis, unless agreed to by a majority of Plaintiffs' Counsel; regularly updating and conferring with Plaintiffs' Counsel by e-mail on an ongoing basis, with such e-mails being no less than on a weekly basis, unless agreed to by a majority of Plaintiffs' Counsel; and forwarding to Plaintiffs' Counsel by electronic mail copies of all written communications between the Executive Committee and the defendant (Case Management Order No.2, ¶ 1.b.(13)-(16), attached hereto as Exhibit A);

- all Plaintiffs' Counsel may have reasonable access to the work product of the Committees and Subcommittees upon request of the Executive Committee, and the agreement to any Confidentiality Order that may be entered, if confidential documents are requested (Case Management Order No.2, ¶ 1.d., attached hereto as Exhibit A); and

- the Executive Committee members shall not seek or be entitled to a preferential multiplier; to the extent that a multiplier is approved by this Court, such multiplier shall apply across to the board to all Plaintiffs' Counsel (Case Management Order No.2, ¶ 1.e., attached hereto as Exhibit A).

**The Atkins Group's Application re Plaintiffs' Organizational Structure**

4

III.    **THIS COURT SHOULD APPOINT ALLAN KANNER, OLEN KENNETH DODD AND DONALD AMAMGBO TO BE MEMBERS OF THE EXECUTIVE COMMITTEE AND SHOULD APPOINT ALLAN KANNER AS LEAD COUNSEL.**

The *Atkins* group, comprised of independent firms with no prior relationship, seek appointment to three of the five seats for the Plaintiffs' Executive Committee.  All counsel in the *Atkins* group are experienced in class action and complex litigation and are qualified to sit on the Executive Committee.  The resumes of the firms in the *Atkins* group are attached as Exhibit 1 to the Affidavit of Allan Kanner, attached hereto as Exhibit C.

Counsel for the *Atkins* group ask that this Court appoint Allan Kanner, of Kanner & Whiteley, LLC, Olen Kenneth Dodd, of the Dodd Law Firm, and Donald Amamgbo, of Amamgbo & Associates to be members of the Executive Committee, with the remaining positions to be filled by counsel from the other groups.

Finally, the *Atkins* group believes the Court should appoint Allan Kanner as Lead Counsel. Mr. Kanner has significant experience in class action and complex litigation, particularly with respect to consumer fraud class action.  Additionally, Mr. Kanner has been involved in other MDL cases.  Courts have consistently acknowledged Mr. Kanner's and his firm's expertise in complex and class action litigation:

> *Hanson v. Acceleration Life Ins. Co.*, Civ. No. A3:97-152 (D.N.D. Mar. 18, 1999) (certifying class, rejecting filed rate doctrine and denying summary judgment): Order of December 11, 1999 (approving final settlement of $14.7 million), pp.8-9: ("*This litigation was hard fought* throughout its two year pendency and required thousands of hours of counsel's time and hundreds of thousands of dollars advanced for expenses, with significant risk of no compensation.  Both local counsel and national *class counsel are commended for their willingness to take on this cause when there were virtually no precedents to assure them of likely success.*  They

are all highly skilled and well-experienced attorneys who appreciate the risky nature of this litigation, yet their desire to correct a perceived injustice suffered by a vulnerable group of people led them to take this risk. *Counsel's considerable skill, both in the substantive areas of this case as well as in discovery and class action procedure, together with their degrees of preparation were primary factors leading to the favorable settlement for the class. Of equal note is the fact that counsel unquestionably put the interests of the class far ahead of their own interest."*) (emphasis added). This case involved a North Dakota class action certified against Acceleration Life Insurance and Commonwealth Life Insurance Company for fraud in connection with multiple premium increases of up to 700% between 1989 and 1997 on "guaranteed renewable" Long-Term Care insurance policies. Shortly before trial a national class action settlement, supervised and approved by the federal magistrate, was entered into which brought over $7.7 million in cash payouts to numerous elderly policyholders and their families and an addition $4 million in insurance benefits tailored to the specific needs of each class member.

*Talalai v. Cooper Tire & Rubber Co.*, MID-L-8839-00MT, Mass Tort 249, (Law Div. Middlesex Cty.) (11/1/01 Opinion and Order Certifying National Class and Preliminarily Approving Settlement) ("The attorneys of Allan Kanner & Associates, P.C. have substantial jury trial experience with a number of multi-million-dollar verdicts, including a number of successful class action trials. The firm is known for its willingness to try class actions to verdicts and has done so on at least three occasions, winning every time"); Opinion of September 13, 2002 (Approving Certification and Final Settlement of National Class), p.5: ("The Stipulation was the result of extensive and intensive arm's length negotiations among highly experienced counsel, with the benefit of extensive discovery and full knowledge of the risks inherent in this litigation.")

*Bonilla, et al. v. Trebol Motors Corporation, et al.*, No. 92-1795 (JP) (D.P.R.) ($129,000,000 jury verdict in civil RICO class action against Volvo and local distributor) (describing the firm's abilities on March 27, 1997, as follows: *"We have no trouble concluding that the experience and resources of Allan Kanner & Associates was a major reason that the plaintiffs' class was able to so successfully present its case to the jury and achieve such an estimable result. Mr. Kanner, who served as lead counsel at trial, has perhaps as much experience litigating complex class action suits as any attorney in the United*

**The Atkins Group's Application re Plaintiffs' Organizational Structure**

*States*. He has authored, chaired, consulted on, contributed to, and given articles, symposiums, classes, books, practice guides, etc. More importantly, his resume is replete with instances in which he served as counsel in complex class action suits. His experience was essential to the success realized by the plaintiffs in this action.") (emphasis added).

Further qualifications of Mr. Kanner can be found in his resume, attached as Exhibit 1 to the

Affidavit of Allan Kanner, attached hereto as Exhibit C.

## VI.    CONCLUSION

The *Atkins* group respectfully request that this Court adopt the organizational structure set

forth in Exhibit A. The *Atkins* group further request that this Court appoint Allan Kanner, of Kanner

& Whiteley, LLC, Olen Kenneth Dodd, of the Dodd Law Firm, Donald Amamgbo, of Amamgbo &

Associates, and two other counsel for Plaintiffs to be members of the Executive Committee, with

Allan Kanner appointed as Lead Counsel.


Dated: February 10, 2006          Respectfully submitted,

                    By:    /s/ Taras P. Kick
                           Taras P. Kick
                           G. James Strenio
                           Thomas G. Martin
                           THE KICK LAW FIRM, APC
                           660 South Figueroa Street, Suite 1800
                           Los Angeles, California 90017
                           (213) 624-1588
                           taras@kicklawfirm.com
                           james@kicklawfirm.com
                           tom@kicklawfirm.com
                           Counsel for Plaintiffs
                           CARLOS CORRALES and KASEM ADOURE

                           KANNER & WHITELEY, LLC
                           Allan Kanner

**The Atkins Group's Application re Plaintiffs' Organizational Structure**

701 Camp Street
New Orleans, LA 70130
(504) 524-5777
A.Kanner@kanner-law.com
Counsel for Plaintiffs
CARLOS CORRALES and KASEM ADOURE

MILSTEIN, ADELMAN & KREGER, LLP
Gillian L. Wade
William A. Baird
Lee Jackson
Wayne S. Kreger
2800 Donald Douglas Loop North
Santa Monica, CA 90405
(310) 396-9600
gwade@maklawyers.com
tbaird@maklawyers.com
Counsel for Plaintiff
DAVID ATKINS

AMAMGBO & ASSOCIATES
C. Donald Amamgbo
Daniel Etoh
Alana Grice
Nick Agbo
A Professional Law Corporation
1940 Embarcadero
Oakland, CA 94606
(510) 434-7800
DonaldAmamgbo@Citycom.com
Counsel for Plaintiff
MICHAEL PRUITT

THE TERRELL LAW GROUP
Reginald Terrell
223 25th Street
Richmond, CA 94804
(510) 237-9700
ReggieT2@aol.com
Counsel for Plaintiff
MICHAEL PRUITT

**The Atkins Group's Application re Plaintiffs' Organizational Structure**

THE DODD LAW FIRM
Olen Kenneth Dodd
909 Laurel Street
Beaumont, Texas 77701
(409) 832-2589
olendodd@earthlink.net
Counsel for Plaintiff
LUIS GONZALEZ

THE HEWELL LAW FIRM
Harold M. Hewell,
1901 First Avenue, Second Floor
San Diego, California 92101
(619) 235-6854
hewell@aol.com
Counsel for Plaintiff
LUIS GONZALEZ

HOWARD M. RUBINSTEIN, ATTORNEY AT LAW
Howard M. Rubinstein
2601 South Bayshore Dr., Suite 600
Miami, Florida 33133
(305) 859-7700
Counsel for Plaintiff
LUIS GONZALEZ

SHARP & BARNES LLP
James E. Sharp
Ben F. Barnes
Kent A. Caperton
William F. Boyer
Counsel for Plaintiff
LUIS GONZALEZ

EDWARD W. COCHRAN
Edward W. Cochran
20030 Marchmont Road
Shaker Heights, Ohio 44122
(216) 751-5546
edwardcochran@adelphia.net
Counsel for Plaintiff
ROBERT FALKNER

**The Atkins Group's Application re Plaintiffs' Organizational Structure**