# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____ )
In re:                                  )     CIVIL ACTION NO. 05-11177-DPW
                                        )     (LEAD CASE)
M3POWER RAZOR SYSTEM                     )
MARKETING & SALES PRACTICES             )     MDL Docket No. 1704
LITIGATION                              )
_____ )
                                        )
THIS DOCUMENT RELATES TO:               )
**ALL CASES**                           )
_____ )

### ATKINS GROUP'S RESPONSE TO DEARMAN GROUP'S APPLICATION FOR APPOINTMENT AS CLASS COUNSEL AND MCGEARY GROUP'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL WITH SUGGESTIONS AS TO LIAISON COUNSEL AND ORGANIZATIONAL STRUCTURE

The plaintiffs comprising the Atkins Group by and through their respective counsel, respectfully submit this memorandum in opposition to the Motions filed by the Dearman Group and the McGeary Group for appointment as Class Counsel in these lawsuits.

## I.    INTRODUCTION

At the last hearing, this Court instructed all plaintiffs' counsel to "make new friends" in an effort to work together to develop a positive plan for the organization of plaintiffs' counsel in this litigation.  As the individual members of the Atkins Group participated in meetings and calls with other plaintiffs' counsel to try to reach some agreement, several principles surfaced as being significant to a fair and efficient organizational structure, which bound these independent counsel together.  Among these important issues are (1) the ability to have input on any settlement prior to its execution, (2) being kept informed of the status of the litigation so they can adequately assess its impact on their respective cases, (3) being given an equal opportunity for work assignments in the matter, (4) the avoidance of duplication and waste and (5) no multipliers for counsel in lead roles.

Each of these issues spring from a real and present threat in this litigation.   For example, as discussed in more detail below, Gillette has made the strategic move of putting a settlement on the table.  Both the Dearman and McGeary Groups are jockeying for position in order to be the group to make a deal with Gillette.  The members of the Atkins Group are leery of any settlement at this point, since little discovery has been done to adequately assess the proposed settlement and there does not appear to be any real threat of litigation from the Dearman Group or the McGeary Group to push for a better settlement.  Likewise, since the MDL is effectively replacing counsel of various plaintiffs' choosing with a court-designated counsel to lead the litigation and make strategic pre-trial decisions that will ultimately effect the outcome of each case in this MDL, it is important that

1

plaintiffs' counsel that are not in leadership roles be kept informed of the proceedings in order to protect interests of their clients that may not be adequately protected by the leadership. Additionally, it is typical for counsel to vie for leadership positions because of an increased fee potential. Further, counsel in leadership positions tend to favor their own co-counsel or friends in the distribution of assignments, while leaving other qualified counsel with no ability to work on the case and potentially earn a fee. Members of the Atkins Group believe that all counsel should be given an equal opportunity to do work assignments and that these assignments should be handed out based on expertise and qualifications, not on who you know. Further, the Atkins Group believes that any multiplier on attorney fees should be the same for all counsel, regardless of who is in the leadership position(s).

As discussions among counsel progressed, it became apparent that the Dearman Group and the McGeary Group did not want to commit to these issues that were important to members of the Atkins Group. Thus, the Atkins Group was born, comprised of counsel with no prior history together, but bound by common ideals and principles, based on their vast expertise in consumer fraud class actions. The Atkins Group proposed an organizational structure that satisfied its members that the leadership of this MDL matter would be fairly and efficiently handled.

## II.     FACTUAL BACKGROUND

Each of the cases in this MDL proceeding were commenced on the heels of the well-publicized preliminary injunction ruling of the Honorable Janet C. Hall in *Schick, et al. v. Gillette*, 3:05-CV-174 (JCH) (D. Conn. May 31, 2005). The first of these actions to be filed were the *Atkins* and the *Moore* actions, on June 3, 2005. Most of the other cases were filed the following week.

On June 8, 2005, Plaintiff Corrales, by and through his counsel, and pursuant to California

2

Civil Code Section 1782(a) of the California Consumers Legal Remedies Act (the "CLRA"), sent Gillette a letter by certified mail - return receipt requested, demanding, on behalf of himself and all others similarly situated, that Gillette compensate Corrales and all others similarly situated for their resulting losses or otherwise make them whole. This CLRA demand was a prerequisite to Plaintiff Corrales being able to allege compensatory and punitive damages under the CLRA. (*See* Cal. Civ. Code § 1782(b) and (d).)

On the last day to respond to Corrales' CLRA demand letter, *i.e.*, on July 8, 2005,[1] Gillette sent Corrales (as well as all the plaintiffs in the other pending actions) a letter making a settlement offer. The offer, however, fell far short of Corrales' CLRA demand.

Nonetheless, the leaders of the Dearman Group and the McGeary Group bit at the settlement offer, battling each other to be the first to reach a settlement with Gillette. After discussions with both the Dearman Group and the McGeary Group, Gillette decided to continue discussions with the Dearman Group because it had the lowest counter-offer. However, because both the Dearman Group and the McGeary Group were racing toward settlement discussions with Gillette, without the approval of the remaining plaintiffs' counsel, the concerns regarding a reverse auction exists with respect to both groups.

In contrast, the members of the Atkins Group have refused to engage in premature settlement discussions with Gillette. The Atkins Group has remained steadfast in its principles, refusing to succumb to Gillette's temptations.

---

[1] California Civil Code Section 1782(b) provides that, "[e]xcept as provided in subdivision (c), no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice." (Emphasis added.)

For example, on August 9, 2005, when counsel for Plaintiff Corrales attempted to engage in a meet and confer with respect to his motion for class certification, Gillette's counsel asked Corrales' counsel whether or not they were "afraid of ostracizing []ourselves" from settlement discussions by actively prosecuting the case on behalf of Corrales and the putative class.  Gillette's counsel stated that, if Corrales dropped his class certification motion, he could be included in the settlement discussions. Declaration of Taras Kick ("Kick Decl."), ¶3, attached hereto as Exhibit 1.  Corrales, believing that the best interests of the class was to continue litigating the case instead of engaging in premature settlement discussions, refused Gillette's offer.  Corrales instead filed the motion for class certification on August 19, 2005.

Following the JPML's motion to transfer and consolidate these actions in this Court, on November 7, 2005, Thomas Shapiro of the Dearman Group, on behalf of his firm and "several other firms with whom [he has] been working," invited the attorneys in the actions to a meeting in Boston to be held barely one week later, on November 16, 2005.[2]  Kick Decl., ¶ 4 and Exh. A thereto.  On November 14, 2006, Mr. Shapiro informed the attorneys that the meeting would be held at the Omni Parker House in the Longfellow Room.  Kick Decl., ¶ 4 and Exh. B thereto.  Mr. Shapiro failed to provide any opportunity for attorneys who could not attend physically to attend telephonically. Instead, Mr. Shapiro and his office falsely informed those attorneys, including counsel for Plaintiffs Corrales and Adoure, that the hotel did not have teleconferencing capabilities.  Kick Decl., ¶ 5 and Exh. C thereto; *see also*, Declaration of Reginald Terrell ("Terrell Decl."), ¶4, attached hereto as Exhibit 2.

---

[2]  In the letter, Mr. Shapiro falsely represented that the JPML ordered that all the cases be transferred to Boston "for consolidated proceedings," when, in actuality, the JPML only ordered that all the cases be transferred to Boston "for coordinated or consolidated pretrial proceedings."

At the Boston meeting, it became readily apparent that the counsel meeting was a predetermined coronation of the Dearman Group. <u>Terrell Decl.</u>, ¶5. It never was a dialogue involving skillful persuasion and negotiation designed to produce a fair and equitable compromise position. Instead, the Dearman Group insisted upon a self-anointed 4-person co-lead counsel, with a neutered steering or "settlement" committee that was powerless other than to rubber-stamp any decision made by the lead counsel. <u>Terrell Decl.</u> ¶¶6-7. In fact, the Dearman Group failed to inform the "settlement" committee of its settlement discussions with Gillette. <u>Terrell Decl.</u>, ¶6.

Following the initial scheduling conference on January 23, 2006, the members of the Atkins Group attempted to make "new friends" with the Dearman Group and the McGeary Group.

The Dearman Group, lead by Thomas Shapiro, however, continued to convey the unmistakable impression that their appointment as lead counsel was a *fait accompli*. The Dearman Group conveyed this message of steadfast inflexibility at the in-person meeting held in Boston after the January 23, 2006 conference and in subsequent telephone conversations. The Dearman Group also rejected the Atkins Group's request that it commit to the principles that the Atkins Group believes important in this MDL proceeding, discussed above.

The McGeary Group was not much different. Lead by Ben Barnow, the McGeary Group proposed a structure of a 4-person lead counsel, headed by two members of the McGeary Group (Ben Barnow and Lance Harke) and two members of the Shapiro Group. The McGeary Group, like the Dearman Group, made it clear that no different lead counsel would be considered. Instead, the McGeary Group attempted to curry favor with plaintiffs' counsel by adding a multiple committee structure and designating certain plaintiffs' counsel to those committees if they would support or in the hopes that they would support the McGeary Group's bid for lead counsel position. Despite the

numerous committees, the McGeary Group's proposed structure provided that all control and power would remain in the hands of lead counsel.

Thus, the various plaintiffs counsel now fall into essentially three groups – the Dearman Group, arguing for leadership vesting solely within its group; the McGeary group, arguing for a super-structure of committees, but with real control remaining with its own group; and the Atkins group, arguing for leadership through a representative Plaintiffs' Executive Committee.

## II.    ARGUMENT

### A.    The Dearman Group's Proposed Leadership Structure Is Neither Equitable Nor Fair and The Dearman Group's Proposed Lead and Liaison Counsel Are Not Adequate Representatives of The Putative Class(es)

The organizational structure proposed by the Dearman Group vests complete control of these actions with the leaders of the Dearman Group, Shapiro Haber & Urmy LLP ("Shapiro") and Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach"). Their proposal was clearly the result of a deal among some counsel with a history of working together. It is unfair, autocratic and is absolutely devoid of the traditional checks and balances typical in multi-district litigations such as the present one. The very early enticement of a quick settlement by Gillette and the real or perceived preference of Gillette, a Bostonian Corporation, to deal with a particular local firm may perhaps explain some of the unwillingness of some counsel in this case to "make new friends." The leadership structure sought by the Dearman Group to the exclusion of the majority of counsel in this case may have the effect of ramming through a quick and hasty settlement with Gillette.

### 1.    The cloud of reverse auction allegations against the Dearman Group disqualifies them from consideration for a leadership position

History, which runs the risk of repeating itself here, shows that in a case such as this, where

a settlement offer is already on the table, lead counsel with absolute unchecked powers may feel compelled to settle the case rather than continue to litigate it on a perceived diminishing percentage basis for each subsequent hour worked thereon – thereby running the risk of accepting an inadequate settlement offer that a more efficiently-structured leadership group could or would reject.

The hastily filed motion for lead counsel by the Dearman Group is an expedient politically-predicated amalgam of attorneys with a track record of co-counseling in cases around the country. The Dearman Group, who pursuant to the Boston meeting claims to unofficially represent the class during settlement negotiations, may be under strong pressure to conform to the defendant's wishes. *See Ace Heating & Plumbing Co. v. Crane Company,* 453 F.2d 30, 33 (3rd Cir. 1971) ("Appellants point out that a person who unofficially represents the class during settlement negotiations may be under strong pressure to conform to the defendants' wishes. This is so because such an individual, lacking official status, knows that a negotiating defendant may not like his 'attitude' and may try to reach a settlement with another member of the class. That is exactly what happened here."); *Breswick & Co v. Briggs,* 135 F. Supp. 397, 405 (S.D. N.Y. 1955)("it is highly important that defendants not have the power to choose...the one with whom they will deal... ."). Indeed, Gillette is on record as indicating a preference for dealing with Tom Shapiro because the McGeary Group "wants the moon and the stars." The majority of the counsel in this case firmly believe that the leadership structure sought by the Dearman Group to the exclusion of the majority of counsel in this case is designed to ensure that the appropriate leadership is in place to ram through a quick and hasty settlement with Gillette. There is a clear and present danger of real harm to the classes if a more representative and balanced leadership structure is not put in place to protect the myriad interests of the putative class.

The Dearman Group support their proposal of Shapiro and Lerach as co-lead counsel, stating

that they "will zealously, efficiently and competently *litigate* this matter in the best interests of the members of the class...", <u>Dearman Memorandum</u>, pp.5-6 (emphasis added); however, the actions to date by the Dearman Group demonstrate no interest in litigation, but merely settlement. Absent sufficient discovery, the Atkins Group does not believe a settlement can be adequately assessed; however, in the proposed organizational structure of the Dearman Group, members of the Atkins Group and others have no way to challenge a quick settlement that does not appear to be in the best interests of their clients. As noted previously, although the Dearman Group designated a settlement committee during meeting in Boston, the Dearman Group has not subsequently consulted the settlement committee on settlement issues or any other issues.[3] *See* <u>Terrell Decl.</u>, ¶6.

### 2.    Shapiro and Lerach are not adequate representatives for the classes and should not be co-lead counsel[4]

The Dearman Group seek the appointment of Shapiro and Lerach as co-lead counsel in this MDL. The leadership structure proposed by the Dearman Group in light of most counsel's recent experience, will not be in the best interest of the class. Generally, lead counsel must be aware, of the limitation on their authority to act on behalf of the group on such matters as settlement, as well

---

[3]The consistent lack of communication or failure to communicate with other counsel also concerns the Atkins Group. The many attempts by the Atkins Group to reach out to the Dearman Group to reach an amicable solution to the structure disagreements were mostly ignored. This raises doubts as to the sincerity of the Dearman Group's statement that "they will work together and with other plaintiffs' counsel to bring this litigation to a successful resolution." <u>Dearman Memorandum</u>, p.2.

[4]Both the Dearman Group and the McGeary Group seek appointment of Class Counsel citing to Rule 23(g) of the Federal Rules of Civil Procedure. Rule 23(g) is not a tool for the organization of plaintiffs counsel in an MDL proceeding. Rather, Rule 23(g) sets forth the manner in which the Court should supervise the appointment of counsel to represent a class. Here, there are multiple putative class actions pending, and there has been no motion for class certification filed in any of them in the MDL. Thus, the invocation of Rule 23(g) is premature. *See also* <u>Plaintiff Corrales' Response to the Dearman Group's Application for Appointment of Class Counsel and Plaintiff Corrales' Request for a Schedule for Submittal of Applications for Appointment of Plaintiffs' Steering Committee</u>, filed on January 20, 2006. Nevertheless, out of an abundance of caution, the Atkins Group will discuss the arguments of the other groups with respect to Rule 23(g).

as the potential for conflict between the interests of their own clients and those of other parties in the group, and should not attempt to enter into binding settlements without specific authority. Up to this moment this is a lesson that has been lost on the Dearman Group. An all too powerful lead counsel without the counter balancing weight of an executive committee may likely result in the type of frenzied rush to settlement with Gillette without the benefit of any disclosures or discovery.

Further, although counsel for Shapiro and Lerach have experience in complex litigation, their areas of expertise appear to be related to securities cases, rather than consumer class actions. As discussed in more detail below, members of the Atkins Group are much more experienced in consumer fraud class actions, such as the present case, and are thus, more qualified to have a leadership role in these cases.

The fact that the Dearman Group filed the first action in this Court is irrelevant and does not give the Dearman Group any unique leadership position. First, as admitted in the Affidavit of Thomas G. Shapiro ("Shapiro Affidavit"), other cases in this MDL were filed before the Dearman Group cases. Shapiro Affidavit, ¶16. Indeed, the *Atkins* case was the earliest case filed of those cases in the MDL. Thus, even if the first case filed is a factor for consideration, the Dearman Group loses this race. However, the Atkins Group submits that the first to file is not relevant to the appointment of lead counsel. *See Dresdner v. Goldman Sachs Trading Corp.*, 240 A.D. 242, 249 (NY App. 2nd 1934)("We believe that there is not much virtue in the claim that the one who first brings suit is by that alone in such an advantageous position that all others must give way... ."); *see also Bank of Am Assn v. Cohen,* 69 P.2d 875 (Cal. App. 2nd 1937). Since the majority of cases in this MDL were filed within a very short time period, there should not be any consideration for the appointment of lead counsel as to what case was filed first.

9

Likewise, the fact that Shapiro and Lerach are in Boston or in the proximity of Boston carries little weight in the current electronic age. Pleadings are filed with the Court electronically, so proximity to the Court is irrelevant. Further, a majority of the clients Shapiro and Lerach represent are from states other than Massachusetts.

As discussed previously, Shapiro's actions to date have demonstrated an unwillingness to work with counsel outside of his group or to even communicate with other counsel. In all litigation, but more so in multi-district case dealing with coordinated or consolidated cases, any counsel selected for a position of leadership has an affirmative obligation to maintain appropriate and regular communication with other attorneys in the group, periodically informing them of the pertinent progress in the litigation and consulting with them when major decision affecting their clients must be made. *See, e.g., In re General Motors Corp Motor Interchange Litigation* 594 F.2d 1106 (7th Cir.), *cert denied*, 444 U.S. 870 (1979) (reversing an approval of a class settlement because counsel cannot negotiate without full and adequate disclosure to all interested parties). A leadership role likewise requires communication skills and the ability to bring a divergent group of counsel representing clients with divergent interests together. The Dearman Group's chosen leaders have proven they do not possess such skills, and the experience of most of the plaintiffs' in this case is that Dearman Group has refused and/or failed to communicate with other counsel in this matter of its discussions with Gillette following the Boston meeting of November 16, 2005.

**B.    McGeary Group's Proposed Leadership Structure is Inadequate and Inefficient and The McGeary Group's Proposed Lead Counsel Are Not Adequate Representatives of The Putative Class(es)**

At the outset, the Atkins Group notes that it is difficult to ascertain precisely what type of organizational structure the McGeary Group advocates, other than to have at least one of its

members, Ben Barnow, in a leadership role. The McGeary Group argues that Mr. Barnow should be appointed as the or one of the Interim Counsel[5], and at one point, the McGeary Group suggests Mr. Barnow and Mr. Shapiro of the Dearman Group should be Co-Interim Counsel. However, Exhibit A to the McGeary Group submission, their proposed CMO #2, has a different structure, with Mr. Barnow and Lance Harke of the McGeary Group and Mr. Shapiro and Mr. Rudman of the Dearman Group as Co-Lead Counsel. Each of these pose significant problems, making none of the McGeary Group's proposals an efficient or appropriate organizational structure.

First, as discussed above, it has been readily established that Messrs. Barnow and Shapiro are unable to work together. Indeed, the inability of Mr. Barnow and Mr. Shapiro to work together is what led to the initial splintering into groups of plaintiffs' counsel. Part of their inability to work together may be attributable to their race with each other to reach a settlement with Gillette first. While this is a good thing for Gillette, this as a terrible thing for plaintiffs and the putative classes in these cases. Any leadership structure which requires Mr. Barnow and Mr. Shapiro to be the decision makers for the plaintiffs and the classes would be a disaster.

Second, just as was the case with the Dearman Group, the Barnow Group has also been eagerly chasing Gillette for a settlement of these cases. Therefore, the concerns of a reverse auction situation discussed above, also apply to the McGeary Group's submission.

Next, the McGeary Group's proposal contains numerous committees, with committee appointments for anyone willing to join their group. On its face, McGeary Group's proposal seems to be inclusive of all counsel, as opposed to the Dearman Group's sole leadership proposal.

---

[5]Again, the Atkins Group believes the designation of "Interim Counsel" pursuant to Rule 23(g) is misplaced, as no motion for class certification, pursuant to Rule 23, has been filed in any of these MDL cases. *See* footnote 2, *supra*.

However, a careful review of the proposal reveals that, despite the many committees and apparent inclusion of all counsel, the control of the cases remains with lead counsel. This presents the same problems for the Atkins Group as the Dearman Group's proposal. The risk of a quick non-arm's length settlement, without sufficient discovery or a real threat of litigation, is a real risk with the leadership of the McGeary Group.

Additionally, the overall structure proposed by the McGeary Group, comprised of multiple lead counsel and numerous committees, is an over-populated and inefficient structure.[6] In appointing a class counsel structure, courts traditionally and for the most part without exception consider whether the proposed class counsel or structure will "act fairly, efficiently, and economically in the interest of all parties and parties' counsel." *See In re Cardinal Health, Inc. ERISA Litg.*, 225 F.R.D. 553, 555 (S.D. Ohio 2005); *see In re Linerboard Antitrust Litg.*, 292 F. Supp. 2d 644, 653-56 (E.D. Pa. 2003); *In re Auction Houses Antitrust Litg.*, 197 F.R.D. 71, 75 (S.D.N.Y. 2000). The oft cited and relied upon Manual for Complex Litigation, specifically warned against the McGeary Group's "unwieldy and superfluous leadership structures", emphasizing that "[c]ommittees of counsel can sometimes lead to substantially increased costs, and...unnecessary duplication of efforts." *See* MANUAL FOR COMPLEX LITIGATION, § 10.221 (4th ed. 2005). The Manual further states that "[w]hile it may be appropriate and possibly beneficial for several firms to divide work among themselves, such an arrangement should be necessary, not simply the result of a bargain among the attorneys." *See* MANUAL, § 10.224.

Viewed from the judicially sanctioned prism of fairness, economy and efficiency, the clear

---

[6] Remarkably, the McGeary Group in their moving paper concede that their proposal is a "broad and inclusive counsel structure." McGeary Memorandum, p.1.

refracted image that emerges from the McGeary Group's proposal is an inefficient and an uneconomical super-structure that is designed more to assuage a bunch of lawyers rather than the class. Whilst the McGeary group might argue fairness[7] because it practically has a soothing title and a committee for everyone, the proposed super-structure is impractical, inefficient and completely unwieldy. The McGeary Group's proposal is almost reminiscent of a typical Washingtonian political wheeling and dealing, wherein committee chairmanship and memberships are rewards for loyalty or switching of allegiance, regardless of whether such appointment is beneficial and regardless of whether the appointees are the most qualified to act.

There is no rational reason to burden the Plaintiffs' Class with additional counsel fees, delay and/or confusion which would inevitably result from the entrenchment of the mega structure proposed by the McGeary Group. Unlike the behemoth organization being proposed by the McGeary Group, the Atkins Group's proposed Case Management Order is fair, representative, efficient, nimble and agile. Indeed, it is important to members of the Atkins Group that all counsel who want to participate in the litigation of these cases be given the opportunity to work on them by whatever leadership is put in place. However, the Atkins Group believes this can be achieved without the necessity of pre-determined, court-designated committees.

### C. The Proposed Structure by the Atkins Group Is the Most Appropriate Under the Circumstances.

"Judges should tailor case-management procedures to the needs of the particular litigation

---

[7] In their moving paper for the appointment of their Group, the McGeary Group argues that the distinguishing factor in their proposal is not efficiency, economy but rather the fact that their group "comprises a group of plaintiffs and law firms encompassing a geographically broad-based coalition of class members" that is simply not a criteria for appointment of class counsel or structure.

and to the resources available from the parties and the judicial system." MANUAL FOR COMPLEX LITIGATION §10.11 (4th ed. 2005).  The Atkins Group believes that the posture and factual circumstances surrounding this MDL proceeding require a small leadership committee that represents the interests of all plaintiffs, with a lead counsel serving as part of that committee.

> **1.  The overwhelming trend in multi-district litigation is the adoption of a leadership structure that includes a lead counsel and a small and focused executive committee.**

Where possible, responsibility for common decisions should be reposed in representative steering committees rather than in an individual. *See West Virginia v. Chas. Pfizer & Co*, 314 F. Supp. 710, 726, 730 (S.D. N.Y. 1970) *aff'd*, 440 F.2d 1079 (2nd Cir.), *cert denied*, 404 U.S. 871 (1971); *Seiden v. Nicholson*, 72 F.R.D. 201, 203 (N.D. Ill. 1976) (plaintiffs may organize lead counsel into an executive committee to administer the class action on behalf of plaintiffs); *see also* NEWBERG ON CLASS ACTIONS §9.35 at 9-97 (3rd ed).

Where there are, as is here, a number of different parties in related actions being coordinated for pretrial purposes in a single district, efficient administration of the litigation mandates the appointment of lead counsel for the plaintiffs and a steering committee.  The importance of maximizing the use of such management coordination technique was stressed by the Judicial Panel on Multidistrict Litigation in *In re Nissan Motor Corp Antitrust Litigation* 385 F. Supp. 1253 (JPML 1974).  The court approved organization of plaintiff's counsel, especially one with a small steering committee such as that being proposed by the Atkins Group, in addition to facilitating efficiency and orderliness in multiparty litigation, serves the important objectives of curtailing potential abuses especially in connection with settlement issues by an all powerful sole lead counsel unaccountable to other co-counsel with differing claims.  Further, when parties on one side of a litigation such as

14

is the case here, have divergent interests or theories of liability, the court may appoint liaison counsel for each different group of parties. *See*, e.g., *In re General Motors Corp Engine Exchange Litigation*, 594 F2d 1106 (7th Cir. 1979), *cert. denied*, 444 U.S. 870 (the district court approved a committee of six attorneys to represent the plaintiffs in all pretrial proceedings).

The proposal by the Atkins Group places leadership and control of the cases with a five person Executive Committee inclusive of lead counsel, with each person on the Executive Committee having equal voting power.[8] Further, the goal of the Atkins Group's proposal is to have representation of all groups on the Executive Committee. Accordingly, firms with multiple cases are only entitled to one seat on the Executive Committee, and any firm that is co-counsel with a firm already on the Executive Committee is not eligible for another seat on the Executive Committee.

The Atkins Group's proposed Executive Committee has the responsibilities, powers and duties set forth in their proposed Case Management Order No. 2. Among these are the requirements that all counsel are given an equal opportunity for work assignments, that all assignments are made with the best interest of the plaintiffs and proposed classes in mind and are made on the basis of the qualifications and expertise and mindful of efficiencies and the avoidance of duplication, that all counsel must be given regular updates or otherwise kept informed of the progression of the litigation, that all counsel be given at least 10 days prior notice of any proposed settlement, and that, with respect to an application for attorney fees following a successful resolution of the cases, members of the Executive Committee will not seek or be entitled to a multiplier on their time higher than that

---

[8]The Atkins Group proposal is essentially the proposal which, according to the Dearman Group, was agreed to in Boston - a steering committee structure. However, during and after the referenced Boston gathering, when most counsel objected to populating the steering committee with essentially the same firms since most of them are co-counseled with each other on the numerous complaint they filed across the country against Gillette, the Dearman Group subsequently determined that a two firm co-lead structure was better. Thus, it appears that the Dearman Group is not opposed to the steering committee format, only its composition.

of any other counsel. These requirements are of particular importance to members of the Atkins Group and are requirements that the other groups refused to include in their respective proposals. Also of great importance to the Atkins Group is the requirement that all actions by the Executive Committee be by a majority vote, except that any approval of a settlement must be agreed upon by a super-majority of the Executive Committee.

> 2.    **The Atkins Group's proposed structure is both efficient and equitable.**

The Atkins Group's proposal with an Executive Committee made up of representatives from all groups will insure that the interests of all classes are protected and will insure that all counsel who wish to be involved in the matter have that opportunity, regardless of what group he/she is in or who their co-counsel is. Since representatives from each group are to be on the Executive Committee, the Committee will be able to better assess the expertise and skills of all counsel and make efficient and appropriate work assignments. Further, the danger perceived by the Atkins Group of a quick settlement is erased and replaced with the real threat of litigation, with the possibility of an informed and arm's length settlement discussions.

Whilst both the Dearman Group and the McGeary Group have indicated an intent or a willingness to enter into a quick settlement, the Atkins Group has consistently taken the position that any settlement has to be an informed one. The Atkins Group has made enemies by insisting that the best way to obtain a truly fair settlement is through a credible threat of litigation. Abandoning a sound litigation strategy and plan in place of an expedient settlement simply is not in the interest of the class. No counsel should, without authorization of the Court, allow settlement discussions to interfere with their responsibility to see that the litigation proceeds on schedule through the pretrial proceedings towards trial. *See* MANUAL FOR COMPLEX LITIGATION §20.222 (2nd ed. 1985).

16

The only group that has advanced or moved the litigation ball is the Atkins Group. From the start, members of the Atkins Group are the only counsel in this matter that have uncompromisingly attempted to pursue discovery. For example, despite the deficiencies in Gillette's proposed scheduling order in regards to discovery–it delays initial disclosures nearly three months, attempts to further delay disclosures by making them contingent upon a protective order, does not include discovery produced by persons other than Gillette in the *Shick* actions (such as Shick and third parties), limits disclosure to only discovery in the *Shick* actions in Connecticut, Germany and Australia, does not include a privilege log and does not incorporate the Court's ruling that class certification discovery and merits discovery will not be bifurcated–the Atkins Group are the only group who objected to it. *See* Plaintiffs' Objections to Defendant's Proposed Scheduling Order, filed February 10, 2006. In fact, at the January 23, 2006 scheduling conference, Mr. Shapiro asked the Court to hold off on ordering Gillette to produce *any* discovery until after interim counsel is appointed. (Transcript at 18:8-17 ("MR. SHAPIRO: But from my perspective, in negotiating the joint scheduling plan with Gillette and for going ahead moving for the appointment of interim counsel is to try to get some control over the cases...And if you have discovery go ahead before there is any structure created for plaintiffs' counsel, any other discovery being produced to 40 law firms, 40 law firms spending time going through the same documents, it's a very inefficient way.")). Further, it was only after Mr. Strenio and Mr. Kanner of the Atkins Group asked for the *Schick* discovery was it specifically included in Gillette's initial disclosures.

Indeed, where class plaintiffs do not meaningfully pursue discovery, yet at the same time seek early settlement, indications of unfairness and collusion arise. In *In re Lupron*, the court, in considering whether the class settlement at issue was the result of a reverse auction or collusiveness

17

stated, "*storm warnings indicative of collusion are a 'lack of significant discovery and [an] extremely expedited settlement of questionable value accompanied by an enormous legal fee.'*" *In re Lupron*, 228 F.R.D. 75, 93-94 (Dist. Mass 2005) (emphasis added); *see also Reynolds v. Beneficial National Bank, et al.*, 260 F. Supp. 2d 680, 689-90 (N.D. Ill. 2003) (determining that questionable meetings by plaintiff and defense counsel, the amount of the settlement, the short time it took to reach a settlement, and the lack of discovery weighed against the fairness of the class settlement.)  The Atkins Group's assertive pursuit of discovery demonstrates these plaintiffs are ready and willing to litigate this case in a manner that best serves the interests of the putative class–especially when compared to the Dearman and McGeary groups' indifference toward discovery (and enthusiasm toward settlement).[9]

It is clear from the various submittals and approaches to this issue that the counsel in the Atkins Group are prepared to litigate these case and have been working towards that goal, while members of the Dearman and McGeary Groups have been jockeying for position in a quick settlement attempt.

### 3.    Counsel in the Atkins Group are experienced in consumer class action litigation such that they are adequate representatives of the classes

The counsel comprising the Atkins Group had no prior working relationship, other than with their specific co-counsel.  They came together to form the Atkins Groups independently and by default, due to dissatisfaction with the other two groups.  The Atkins Group has no agenda, other than to achieve the best result for their clients and the putative class members they represent.  Most

---

[9]Further, prior to its transfer to this Court, Atkins Group members who are counsel in the *Corrales* case filed their Motion for Class Certification.  As far as they are aware, this is the only motion for class certification that has been filed in all of these putative class actions.  This further demonstrates a desire to litigate these cases, rather than accepting a quick and inadequate settlement.

importantly, the members of the Atkins Group are imminently experienced in class action and consumer litigation.

### Kanner & Whiteley, LLC; Amamgbo & Associates; and The Dodd Law Firm

The Atkins Group have proposed that the law firm of Kanner & Whiteley, LLC ("K&W") serve on the five member Executive Committee, and they further propose that the firm serve as Lead Counsel of the Executive Committee. K&W is a national trial firm with expertise in complex litigation and class actions, particularly consumer fraud actions. K&W routinely serves as lead counsel in the prosecution of class actions, managing multiple co-counsel in such litigation. K&W has also served as lead counsel and/or co-lead counsel in several MDL proceedings, *e.g.*, *In re Cooper Tire Products Liability Litigation*, MDL No. 1393 (S.D. Ohio); *In re Synthroid Marketing Litigation*, MDL No. 1182 (N.D. Ill.).

The Atkins Group have proposed Donald Amamgbo of Amamgbo & Associates ("A&A") as a member of the Executive Committee. A&A likewise has significant consumer fraud and class action experience by virtue of its representation of consumers in class action litigation addressing unfair business practices such as false and misleading advertising and unfair or deceptive business acts or practices. Unlike many "generalists," who practice within multiple areas of the law, A&A focuses primarily on serving and protecting the rights of consumers. In the ongoing efforts to vigilantly protect the rights of consumers through focused litigation against errant companies, A&A, has served in various leadership positions as a member of numerous Plaintiffs' Executive Committees.[10]

---

[10] For examples, please see Amamgbo & Associates firm resume attached to the Atkins Group's original filing.

The Atkins Group also proposed Olen Kenneth Dodd of the Dodd Law Firm ("DLF") to be a member of the Executive Committee. DLF has been involved in numerous national class actions and has significant experience in class actions, consumer class actions and complex commercial litigation.[11] The firm resumes of each member of the Atkins Group are included in the Atkins Group's original submission.[12] The members of the Atkins Group have more experience and expertise in litigation of this type of consumer fraud class actions than do the members of the other groups. Their experience and expertise should be utilized to the benefit of the plaintiffs and putative class members and to the detriment of Gillette.

## III.    CONCLUSION

For the reasons set forth above, the undersigned counsel respectfully request that the Court reject the applications of the Dearman Group and the McGeary Group and approve the organizational structure proposed by the Atkins Group.

---

[11]Other members of the Atkins Group also have expertise in consumer fraud class action. The Kick Law Firm almost exclusively represents plaintiffs in complex civil litigation matters, primarily in class actions. Milstein, Adelman & Kreger, LLP ("MAK") has served as class counsel in numerous consumer fraud actions, including multi million dollar insurance fraud cases and several products liability actions. MAK is currently appointed as class counsel for millions of consumers in actions involving unfair business practices and consumer fraud. The Terrell Law Group also focuses its practice in the area of complex consumer protection, class actions and mass torts. The Hewell Law Firm is experienced in consumer litigation and has participated in various class actions, including consumer class actions. The Law Offices of L. DeWayne Layfield, is highly experienced in the area of consumer class action, and complex commercial litigation. Mr.Layfield has been involved in both class and non-class mass tort litigation and nationwide coordination of that litigation. He has assisted with the prosecution or defense of class litigation involving from thousands to millions of class members. Mr. Layfield has successfully recovered over $750 million in cash and over $1 billion in combined cash and non-cash benefits on behalf of class members in class action litigation. Howard M. Rubenstein's practice focuses on class actions and mass torts, many of which are products and consumer cases. In just he last four years, Mr. Rubinstein has been involved in cases from California, to Texas, in Federal and in State courts, seeking and receiving injunctive relief for more than one million consumers, as well as negotiating for hundreds of millions of dollars in recovery and refunds in class litigation. The lawyers of Sharp & Barnes also are experienced in complex civil litigation, including class actions. Edward W. Cochran is an experienced litigator, having appeared in over 100 class actions and having served as lead counsel or co-lead counsel in many of them.

[12]The summary biography of the Terrell Law Group was inadvertently omitted from the Atkins Group's original submission. Accordingly, it is attached hereto as Exhibit 3.

Dated: February 24, 2006          Respectfully submitted,

                                  By:     /s/ Taras P. Kick
                                          Taras P. Kick
                                          G. James Strenio
                                          Thomas G. Martin
                                          THE KICK LAW FIRM, APC
                                          660 South Figueroa Street, Suite 1800
                                          Los Angeles, California 90017
                                          (213) 624-1588
                                          taras@kicklawfirm.com
                                          james@kicklawfirm.com
                                          tom@kicklawfirm.com
                                          Counsel for Plaintiffs
                                          CARLOS CORRALES and KASEM ADOURE

                                          KANNER & WHITELEY, LLC
                                          Allan Kanner
                                          701 Camp Street
                                          New Orleans, LA 70130
                                          (504) 524-5777
                                          A.Kanner@kanner-law.com
                                          Counsel for Plaintiffs
                                          CARLOS CORRALES and KASEM ADOURE

                                          MILSTEIN, ADELMAN & KREGER, LLP
                                          Gillian L. Wade
                                          William A. Baird
                                          Lee Jackson
                                          Wayne S. Kreger
                                          2800 Donald Douglas Loop North
                                          Santa Monica, CA 90405
                                          (310) 396-9600
                                          gwade@maklawyers.com
                                          tbaird@maklawyers.com
                                          Counsel for Plaintiff
                                          DAVID ATKINS

                                          AMAMGBO & ASSOCIATES
                                          C. Donald Amamgbo
                                          Daniel Etoh
                                          Alana Grice

21

Nick Agbo
A Professional Law Corporation
1940 Embarcadero
Oakland, CA 94606
(510) 434-7800
DonaldAmamgbo@Citycom.com
Counsel for Plaintiff
MICHAEL PRUITT

THE TERRELL LAW GROUP
Reginald Terrell
223 25th Street
Richmond, CA 94804
(510) 237-9700
ReggieT2@aol.com
Counsel for Plaintiff
MICHAEL PRUITT

THE DODD LAW FIRM
Olen Kenneth Dodd
P.O. Box 3504
Beaumont, Texas 77704
(409) 832-2589
olendodd@earthlink.net
Counsel for Plaintiff
LUIS GONZALEZ

THE HEWELL LAW FIRM
Harold M. Hewell,
1901 First Avenue, Second Floor
San Diego, California 92101
(619) 235-6854
hewell@aol.com
Counsel for Plaintiff
LUIS GONZALEZ

HOWARD M. RUBINSTEIN, ATTORNEY AT
LAW
Howard M. Rubinstein
2601 South Bayshore Dr., Suite 600
Miami, Florida 33133
(305) 859-7700
Counsel for Plaintiff

LUIS GONZALEZ

SHARP & BARNES LLP
James E. Sharp
Ben F. Barnes
Kent A. Caperton
William F. Boyer
1215 19 Street, NW
Washington, DC 20036
Phone: 202-467-1620
dpage@benbarnesgroup.com

Counsel for Plaintiff
LUIS GONZALEZ

EDWARD W. COCHRAN
Edward W. Cochran
20030 Marchmont Road
Shaker Heights, Ohio 44122
(216) 751-5546
edwardcochran@adelphia.net
Counsel for Plaintiff
ROBERT FALKNER

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
|  | ) | (LEAD CASE) |
| M3POWER RAZOR SYSTEM | ) |  |
| MARKETING & SALES PRACTICES | ) | MDL Docket No. 1704 |
| LITIGATION | ) |  |
|  | ) |  |
| THIS DOCUMENT RELATES TO: | ) |  |
| **ALL CASES** | ) |  |
|  | ) |  |

## <u>DECLARATION OF REGINALD TERRELL IN SUPPORT OF THE ATKINS GROUP'S RESPONSE TO DEARMAN GROUP'S APPLICATION FOR APPOINTMENT AS CLASS COUNSEL AND MCGEARY GROUP'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL</u>

I, Reginald Terrell, make the following declaration, based on my own personal knowledge, as follows:

1.      I am an attorney in good standing duly licensed to practice law in the state of California and am one of the attorneys of record for Michael Pruitt.  The testimony set forth in this declaration is based on first hand knowledge, about which I would and could testify competently in open court if called upon to do so.

2.      This declaration is made in support of the Atkins Group's opposition to the Dearman Group's application for appointment as class counsel and the McGeary group's motion for appointment as interim counsel.

3.      This Court charged all plaintiffs' counsel present at the last hearing to "make new friends" - a subtle judicial nudge to plaintiffs' counsel to work together and develop a positive plan

1

for the conduct of this litigation.

4.    Prior to the Court's nudge, in an effort to organize a coherent plaintiff litigation team, I and approximately fifteen other plaintiffs attorneys attended a meeting in Boston. The meeting was held in an Omni hotel conference room without internet or teleconference features. I inquired from Tom Shapiro's secretary if I could attend telephonically and was informed that the hotel had no such features. I have since learned that several counsel who wanted to participate telephonically could not do so thereby limiting the number people who participated in the meeting.

5.    This meeting consisted of attorneys from the Shapiro Group, the McGeary Group and the Atkins Group. However, it became readily apparent that the meeting was a predetermined coronation of the Dearman Group. There never was any substantive dialogue involving skillful persuasion and negotiation designed to produce a fair, equitable and inclusive compromise of position.

6.    During the Boston meeting there were two flash points during the discussion, first, was the issue of who would be lead counsel and second was the composition of a Steering/Settlement committee and its role. Several very qualified individuals indicated an interest in being lead counsel, however, the Dearman Group conveyed the impression the appointment of Shapiro firm, the Lerach firm, and the firms of Abby Gardy LLP, and The Wexler Firm LLP as lead counsel was a *fait accompli*. Whilst the Boston meeting attendees agreed to set up a Steering/Settlement committee, the disagreement was chiefly over its make up and its role. Even though I was nominated as a member of the steering/settlement committee, I felt that the Dearman Group insisted on populating the Steering/Settlement committee with their friends and co-counsel. It was agreed in principle that the Steering/Settlement committee must be appraised of and

2

participate in all settlement discussions with Gillette. I was never contacted or consulted by the Dearman Group or its purported leaders about settlement discussions or otherwise following the Boston meeting.

7. I as well as other counsel at the Boston gathering did not deem this fit or fair and continued to demand a fair, equitable and empowered Steering/Settlement committee. It was my impression the Dearman Group wanted a neutered Steering/Settlement committee with essentially no role. It is my believe that the inflexibility of the counsel in the Dearman Group, most of whom are co-counsel on the same complaint, was the one issue that frustrated and ultimately caused the formation of the Atkins and McGeary groups. In light of the inflexibility of the Dearman Group on the key issues, most counsel started coalescing around different ideas.

8. The next group to form was the McGeary Group, led by Ben Barrow, which opted for a can-we-all-get-along super-structure with a title for anyone who switched camps. After it became clear the Dearman Group was unwilling to compromise their leadership position, I met with members of the McGeary Group. However, I was not confident or comfortable with their approach of giving anyone opposed to the Dearman Group and vowed loyalty to the McGeary Group a seat in a committee and or a chairmanship. Based on my experience I found this approach neither credible with the courts or beneficial to the class. Equally important, was the fact that the group's free for all approach was not consistent with my experience in other MDL proceedings. I had initial preliminary discussions with the McGeary Group and were indeed given positions on several committees.

9. However, after mature reflection, I decided that the McGeary super-structure was not tenable, and a decision was made to find a centrist proposal, hence the formation of the Atkins

3

Group. The various plaintiffs counsel now fall into essentially three groups – the Dearman Group, arguing for leadership vesting solely within its group, the McGeary group, arguing for a super-structure of committees, but with real control remaining with its own group, and the Atkins group, arguing for leadership through a representative Plaintiffs' Executive Committee.

10.    The organizational structure proposed by the Dearman Group vests complete control of these actions with the leaders of the Dearman Group, Shapiro Haber & Urmy LLP ("Shapiro") and Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach"). I am concerned the leadership structure sought by the Dearman Group to the exclusion of the majority of counsel in this case may have the effect of ramming through a quick and hasty settlement with Gillette.

11.    During the Boston meeting, there was an extensive discussion about whether the proposed settlement offer was fair, reasonable and adequate under the circumstances of this case. Rather than fight with the Dearman Group and the McGeary Group over leadership to effectuate a quick settlement with Gillette, I wanted to obtain necessary discovery to further evaluate any settlement offers, while at the same time, push forward with the litigation of these cases. The latter is something the Dearman Group seems unwilling to do. Absent sufficient discovery, I do not believe a settlement can be adequately assessed.

12.    In the proposed organizational structure of the Dearman Group, members of the Atkins Group and others have no way to challenge a quick settlement that does not appear to be in the best interests of their clients. As noted previously, although the Dearman Group designated a steering/settlement committee during meeting in Boston, the Dearman Group has failed and/or refused to consult the steering/settlement committee on settlement issues or any other issues.

13.    It is my understanding that in all litigation, but more so in Multi-district case dealing

4

with coordinated or consolidated cases, any counsel selected for a position of leadership either *de facto* prior to judicial approval or *de jure* has an affirmative obligation to maintain appropriate and regular communication with other attorneys in the group, periodically informing them of the pertinent progress in the litigation and consulting with them when major decision affecting their clients must be made. My experience in this case is that Dearman Group has refused and/or failed to communicate with Mr. Amamgbo or I of its discussions with Gillette following the Boston meeting of November 16, 2005.

14.    A leadership role likewise requires communication skills and the ability to bring a divergent group of counsel representing clients with divergent interests together. The Dearman Group's chosen leaders have proven they do not possess such skills. More troubling is Shapiro's and Lerach's chosen agenda, which is to self-anoint themselves as leaders and then rush into settlement discussions without the benefit of discovery. The rush to settlement, coupled with their failure to communicate with other counsel, present a real danger of a settlement that is not at arm's length, not in good faith, not fair, reasonable and adequate and not in the best interest of the classes.

15.    The McGeary Group's proposal contains numerous committees, with committee appointments for anyone willing to join their group. On its face, McGeary Group's proposal seems to be inclusive of all counsel, as opposed to the Dearman Group's sole leadership proposal. However, a careful review of the proposal reveals that, despite the many committees and apparent inclusion of all counsel, the control of the cases remains with lead counsel.

5

I declare under penalty of perjury pursuant to the laws of the United States of America that the above is true and correct and that this declaration was prepared and executed at Oakland, California on February 24, 2006.

REGINALD TERRELL

THE TERRELL LAW GROUP

SUMMARY OF BACKGROUND & EXPERIENCE

REGINALD TERRELL

Mr. Terrell is a principal in the Terrell Law Group.  He is a former associate attorney in the Law Offices of John L. Burris, 1987 through May 2003.  His experience consist of conducting civil litigation through trial.

He attended Saint Mary's College of California  B.A. (1981) and the University of California, Davis School of Law (King Hall) J.D. and is a member of the Law Review (1984).  Terrell was admitted to the California State Bar in February 1987 and is admitted to United States District Court  for the Northern and Eastern Districts of California and the Ninth Circuit Court of Appeals.

Terrell is a member of the ATLA.  Since becoming a member of the State Bar of California, he has practiced in the areas of personal injury, mass tort and commercial class action litigation, representing plaintiffs in complex consumer protection and antitrust cases.