**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>M3 POWER RAZOR SYSTEM<br>MARKETING & SALES PRACTICES<br>LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | MASTER DOCKET<br>Civil Action No. 05-11177<br>(Lead Case)<br><br>Jury Trial Demanded |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Mark Dearman, Anthony DeBiseglia, Matthew Marr, Adam Kline, Greg Besinger, Collin L. McGeary and Javier Tunon bring this action on behalf of themselves and all other persons and entities similarly situated, and allege upon information and belief, formed after an inquiry reasonable under the circumstances, except as to those allegations which pertain to the named Plaintiffs (which are alleged on personal knowledge), as follows:

**NATURE OF THE ACTION**

1.   This class action is brought against Defendant The Gillette Company ("Gillette") to recover for the harm caused by Gillette's false and misleading advertising campaign for its M3 Power razor system (the "M3P" or "M3 Power"). Gillette's actions constitute unfair trade practices under Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws ch. 93A, as well as similar deceptive trade practices statutes, deceptive advertising statutes and consumer protection statutes in effect in other states nationwide (collectively, the "Unfair Trade Practices Statutes").

2.   Gillette engaged in deceptive acts and practices and defrauded Plaintiffs and other purchasers and consumers of M3P (the "Class") through its integrated advertising campaign for the M3P. While utilizing virtually every form of media, Gillette claimed that the M3P delivered "micro-

pulses" to the shaving cartridge that stimulate hair "up and away from skin". Gillette claimed that these micro-pulses resulted in closer shaves. Independent testing and numerous court decisions from around the world (including a United States District Court), however, demonstrate that Gillette's claims regarding the M3P are baseless.

3. As a basis for sales and revenue growth, razor companies depend largely on consumers "trading up" from older razors to newer models. Gillette uses advertising as its principal method for influencing or persuading customers to upgrade to its newer and purportedly "better" razor models.

4. Plaintiffs and members of the Class were persuaded by these false claims to purchase the M3P.

5. Plaintiffs seek restitutionary and injunctive relief, including: (a) compensatory and punitive damages; (b) an injunction ordering Defendant, through corrective advertising, to make disclosures regarding the true capacity and value of the M3P; (c) an injunction enjoining Defendant from selling the M3P absent adequate disclosures; and (d) disgorgement and restitution.

## JURISDICTION AND VENUE

6. The Court has original jurisdiction over this matter, pursuant to 28 U.S.C.S. §1332(d), in that the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action of more than 100 potential Class members in which Plaintiffs are citizens of Florida, New York, California, Massachusetts and Illinois, while Gillette is a citizen of Massachusetts.

7. Venue properly lies in this district pursuant to 28 U.S.C. §1391(a), because Defendant resides in this district of Massachusetts, as it conducts business in this district within the meaning of 28 U.S.C. §1391(a) as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in this district of Massachusetts.

**PARTIES**

8.      Plaintiff Mark Dearman ("Dearman") is a resident of the State of Florida. Dearman purchased the M3P after viewing Gillette's false and misleading advertisements.

9.      Plaintiff Anthony DeBiseglia ("DeBiseglia") is a resident of the State of New York. DeBiseglia purchased the M3P after viewing Gillette's false and misleading advertisements.

10.     Plaintiff Mathew Marr ("Marr") is a resident of the State of California. Marr purchased the M3P after viewing Gillette's false and misleading advertisements.

11.     Plaintiff Adam Kline ("Kline") is a resident of the Commonwealth of Massachusetts. Kline purchased the M3P after viewing Gillette's false and misleading advertisements.

12.     Plaintiff Greg Besinger ("Besinger") is a resident of the State of Illinois. Besinger purchased the M3P after viewing Gillette's false and misleading advertisements.

13.     Plaintiff Collin L. McGeary ("McGeary") is a resident of the Commonwealth of Massachusetts. McGeary purchased the M3P after viewing Gillette's false and misleading advertisements.

14.     Plaintiff Javier Tunon ("Tunon") is a resident of the State of Georgia. Tunon purchased the M3P after viewing Gillette's false and misleading advertisements.

15.     Upon information and belief, Defendant Gillette is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Boston, Massachusetts. Gillette is the world's market-share leader in wet shave razors. Wet shave razors are among the fastest growing market segments of the consumer products industry.

**SUBSTANTIVE ALLEGATIONS**

**Background Facts**

16.     Gillette launched the M3P in North America in May 2004 and the razor is sold in commerce and advertised throughout the United States.

17. The vast majority of razors sold in the United States fall within two categories. The first category, known as "razor systems," provides consumers with a permanent razor handle and separate refillable blades. The second category consists of disposable razors, which are discarded in their entirety when they are worn out. In the United States, consumers purchase more than $1 Billion of razor systems and accompanying blades each year. Gillette controls approximately 90% of that market.

18. In an effort to grow its market share, Gillette attempts to convince consumers to abandon their current razor systems and switch to what Gillette claims are technologically advanced shaving products.

19. One recently introduced razor system is Gillette's M3P, which is sold in the premium end of the market and, at the time in question, commanded the market's highest price point.

20. In many respects, the M3P has the same components as other Gillette razor systems. However, unlike other razor systems, the M3P has a battery powered feature which causes the M3P to oscillate, creating what Gillette describes as "micro-pulses." In its advertising, Gillette claimed that micro-pulses raise hair up and away from the skin and lengthened the hair on the face which resulted in a closer shave (the "Micro-Pulse Claims"). Gillette went so far as to call the M3P "revolutionary."

21. These Micro-Pulse Claims were the cornerstone of Gillette's marketing for the M3P in each of the media in which Gillette advertises.

22. For example, on its website, Gillette asserted that the M3P's "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more thoroughly in one easy power stroke." Gillette's website further claims that the M3P's "pulsing action stimulates hair upward and away from the skin, making it dramatically easier to shave more thoroughly in one easy power stroke."

23.     Similar claims were made by Gillette on retail packages and print advertisements for the M3P. These materials advised consumers that "[g]entle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can get a closer and more thorough shave. So thorough, there is less need to reshave, which means less irritation."

24.     In addition, Gillette repeated these Micro-Pulse Claims in its television commercials, which Gillette broadcasted on a nationwide scale. For example, in the television commercial that Gillette aired at the time when it introduced the M3P, an announcer claimed that "micro pulses raise the hair, so you shave closer in one power stroke." While the announcer was making this claim, the commercial displayed an animated product demonstration that showed the hairs changing angle away from the person's face in response to the micropulses of the M3P.

25.     However, Gillette knew at the time that it introduced the M3P that its advertising campaign was deceptive. Indeed, Gillette's chief scientist advised Gillette's in-house legal counsel and other high level Gillette employees that the marketing campaign was inaccurate.

26.     Gillette's competitor, Schick, sued Gillette in Germany as a result of the false Micro-Pulse Claims.

27.     In support of its request for an injunction, Schick submitted the affidavit of David J. Leffell, a renowned dermatologist of the Yale School of Medicine. Based on his investigation and testing of the M3P, Dr. Leffell declared that "there is no physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising . . . It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud." Dr. Leffell stated that his "conclusion, therefore, as a scientist and based on my personal observations, is that the claims in [Gillette's] advertising

relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair."

28. Due to their deceptive nature of Gillette's advertising, a German court enjoined Gillette from making any Micro-Pulse Claims in that country.

29. Although Gillette slightly modified its television commercials in the United States following the decision by the German court, Gillette continued to claim that the M3P's "micropulses raise the hairs so that the blade can shave closer." In addition, Gillette's modified television commercials contained an animated product demonstration that showed that the M3P's micropulses lengthen numerous hairs on the animated face.

30. Once again, however, Gillette knew that its advertisements were false and misleading. Indeed, testing confirmed that Gillette's claims concerning the M3P were unsubstantiated.

31. On May 31, 2005, the United States District Court in the District of Connecticut, in the matter of *Schick Manufacturing, Inc. v. The Gillette Company* (Civil Action No. 3-05-cv-174 (JCH)), issued a preliminary injunction barring Gillette from making Micro-Pulse Claims. In the Court's Ruling Re Preliminary Injunction, U.S. District Judge Janet C. Hall found that "Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false" and thereby also "resulted in actual deception." In reaching the determination that these claims were material, Judge Hall found: "It is clear that whether the M3 Power raises hairs is material. Gillette's employees testified that television advertising time is too valuable to include things that are 'unimportant.' Furthermore, in this case, hair extension is the 'reason to believe' that the M3 Power is a worthwhile product."

32. Gillette's false advertising campaign achieved its desired result. Indeed, as a result of Gillette's deceptive marketing, by the end of 2004, the M3P attained a market share of 42% of the total dollar sales of men's system razors in the United States.

33. Gillette knew or recklessly disregarded the fact that the intentional representations about the M3P in its sales and marketing communications with purchasers of the M3P are false and misleading, and thus Defendant has acted willfully and in bad faith.

34. The value of the M3P represented in Gillette's advertising is greater than the value of the M3P actually received by Plaintiffs. Had Plaintiffs known that the Micro-Pulse Claims were false, they would not have purchased the M3P or would have paid substantially less for the M3P.

35. Gillette's false statements and misrepresentations were material. These widespread communications and advertisements were directed at those persons who may purchase the M3P. Plaintiffs' and members of the Class' decision in selecting a certain razor were and are influenced by advertising campaigns used by Gillette.

36. Plaintiffs and members of the Class have likely relied on Gillette's false and misleading statements about the capacity of M3P's razor system.

37. Plaintiffs and members of the Class were likely misled as to the capacity of the M3P that they purchased.

38. Gillette's intentional misrepresentations harmed Plaintiffs and the Class who were deceived into purchasing the M3P based on Gillette's false and misleading claims in its advertising.

39. Indeed, Gillette has since admitted that the M3P's micro pulses did not cause hair to change angle on the face, and that its ads depicting such angle change are both unsubstantiated and inaccurate.

40. A preliminary injunction prohibiting Gillette from making false Micro-Pulse Claims will likely be insufficient to protect consumers. Instead, Gillette should be required to undertake corrective advertising. The basis for this requirement is that consumers recollect previous advertising. In some cases, most notably for products of major companies, the impact and influence of advertising can last years. In addition, consumers often will see or hear advertisements about the particular product through various publications well after the company's advertising campaign had ceased.

41. Corrective advertising becomes necessary here as consumers, unavoidably, will continue to make their purchasing decisions – and continue to purchase the M3 Power razor system – based on the forged impression generated by Gillette's past false advertising. Without corrective advertising, Gillette will continue to improperly profit from the effects of its false and misleading advertising.

42. Further, the more time that passes before corrective advertising is made, the less likely the corrective advertising will cure consumers of the false impression. The greater the delay, the more embedded Gillette's false impressions become in the consumer's minds. Also, the more time that elapses before corrective advertising is made, the longer consumers will continue to make their purchasing decisions and purchase the M3P based on the impression created by the Micro-Pulse Claims in Gillette's past advertising. A delay will thereby require a more extensive and expensive corrective advertising campaign in order to adequately cure consumers' false impression.

## CLASS ACTION ALLEGATIONS

43. This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

44. Plaintiffs Dearman, DeBiseglia, Marr, Kline, Besinger, McGeary and Tunon bring this action both in their individual capacities and as a class action against Defendant on behalf of:

> All persons or entities who have purchased the M3P and were damaged thereby. Excluded from the Class are Defendant, any entity in which the Defendant has a controlling interest or which has a controlling interest of Defendant; Defendant's legal representatives, assigns and successors; any Judge or Special Master assigned to hear any aspect of this case, any member of their immediate families and to the extent the class certifications order permits exclusion, all people who submit timely and otherwise proper requests for exclusion from the Class.

45. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

46. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the members of the Class have been damaged by the same wrongful conduct committed by Defendant, as alleged herein. Moreover, Plaintiffs' claims are typical because Plaintiffs and all members of the Class have purchased the M3P and have not received the benefits promised by the representations made in the advertisement and promotion of the M3P.

47. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in the prosecution of complex class action litigation. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether, by engaging in unfair methods of competition and practicing deceptive acts in advertising the M3P, Defendant violated Unfair Trade Practices Statutes;

(b) whether Defendant's engaging in unfair methods of competition and practicing deceptive acts as alleged herein should be enjoined;

(c)   whether Defendant was unjustly enriched by its improper conduct;

(d)   whether Defendant negligently or intentionally misrepresented the capabilities of the M3P to Plaintiffs and the Class;

(e)   whether Defendant breached express and implied warranties by failing to provide a product that was or is capable to perform in the manner in which Defendant advertised or described the M3P to Plaintiffs and the Class; and

(f)   whether Plaintiffs and the members of the Class have sustained damages and, if so, what is the proper measure of those damages.

49.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Negligent Misrepresentation

50.   Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

51.   Starting in May 2004, Defendant Gillette misrepresented to Plaintiff and the Class that the M3P causes hair to stand up and away from the skin, thereby providing a closer and smoother shave. Gillette delivered this message in multiple advertising mediums, using a variety of worded claims intended to persuade consumers that the M3P causes hair to stand up.

52.   The Micro-Pulse Claims by Gillette concerning the M3P are false and misleading because they misrepresent the nature or qualities of Gillette's product.

53.     At the time Gillette made and publicized the Micro-Pulse Claims, Gillette had no reasonable grounds for believing that the representations were true.

54.     At the time that these representations were made and publicized, Plaintiffs and the Class were unaware that the Micro-Pulse Claims were false.

55.     Upon information and belief, the Micro-Pulse Claims were likely to deceive or confuse a substantial portion of the Class and Gillette's potential customers and, in fact, have actually deceived or confused a substantial portion of the buying public and the Class. The referenced claims have also influenced or are likely to influence future purchasing decisions of the buying public. Plaintiffs and the Class reasonably acted in reliance upon the truth of the representations made by Gillette regarding the M3P.

56.     As a direct and proximate result of the Plaintiffs' and the Class' reliance upon the representations of Gillette, as described above, Plaintiffs and the Class have sustained damages.

## COUNT II

### Intentional Misrepresentation

57.     Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

58.     Starting in May 2004, Defendant represented to the public, including Plaintiffs and the Class, that the M3P had certain capabilities, including, for example, the Micro-Pulse Claims.

59.     Defendant's representations were false and misleading.

60.     At the time Defendant made the Micro-Pulse Claims, Defendant knew the representations were false.

61.     Defendant made the misrepresentations alleged herein with the intention of inducing and persuading Plaintiffs and the Class to purchase the M3P.

62. As a direct or proximate result of Defendant's intentional misrepresentations, Plaintiffs and members of the Class were induced to pay for Gillette's M3P, in an amount to be determined at trial.

63. Defendant knew that the M3P did not have the capabilities, including the Micro-Pulse Claims, advertised by Gillette and, with the advantage of this knowledge, intended for its customers and the general public to rely on its representations. Plaintiffs and members of the Class, by purchasing and using the M3P, relied on Defendant's false representations.

64. Plaintiffs and members of the Class were damaged through their purchase and use of the M3P.

65. Plaintiffs' and the Class' apparent reliance on Gillette's advertising and representations of the use and characteristics of the M3P was reasonable.

66. Based upon the allegations stated herein, Defendant was and is guilty of malice, oppression, and fraud, and Plaintiffs and the Class are thereby entitled to recover exemplary or punitive damages.

## COUNT III

### Breach of Express Warranty

67. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

68. Starting in 2004, Gillette represented, in writing and otherwise, that the M3P was an advanced razor – including the Micro-Pulse Claims. Those promises and assurances became part of the basis of the bargain between Gillette and Plaintiffs (and the Class) and thereby constituted an express warranty.

69. Defendant then sold the M3P to Plaintiffs and members of the Class. By the same token, Plaintiffs and members of the Class purchased Defendant's product, the M3P.

70. Defendant, however, breached the express warranty in that the Micro-Pulse Claims were false. As a result of the stated breach, Plaintiffs and the members of the Class did not, in fact, receive goods as warranted by Defendant.

71. As a direct or proximate result of this breach of warranty by Defendant, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## COUNT IV

### Breach of Implied Warranty of Fitness of Purpose

72. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

73. Starting in 2004, Plaintiffs and members of the Class sought for a razor with qualities that Gillette claimed were held by the M3P. Plaintiffs and the Class relied on Defendant's skill, expertise and judgment to furnish suitable goods for the stated purpose. When Defendant sold the M3P – directly or indirectly – to Plaintiffs and members of the Class, Plaintiffs and the Class bought these goods from Defendant in reliance on Gillette's skill and judgment.

74. At the time of advertising and sale, Defendant had reason to know the particular purpose for which the goods were required. Defendant knew that Plaintiffs and members of the Class were relying on Defendant's skill and judgment to select and furnish suitable goods, thereby creating and confirming an implied warranty that the goods were fit for its stated and advertised purpose.

75. Defendant, however, breached the implied warranty. Plaintiffs and members of the Class did not receive suitable goods in the form of M3Ps. The M3P was not fit for the particular purpose for which it was sought, purchased and required in that it did not have the capabilities claimed by Gillette – including, for example, the Micro-Pulse Claims.

76.     As a direct or proximate result of this breach of implied warranty by Defendant, Plaintiff and the Class have been damaged in an amount to be determined at trial.

## COUNT V

### Unjust Enrichment

77.     Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

78.     By means of its material misrepresentations and misconduct, as set forth above, Defendant induced Plaintiffs and the Class to purchase the M3P.  As a consequence of such misrepresentations and misconduct, Plaintiffs and the members of the Class purchased a razor that they would not have otherwise purchased or paid more than they otherwise would have paid absent the misrepresentations and misconduct.

79.     By virtue of the foregoing, Gillette has been unjustly enriched in an amount yet to be determined with respect to the Class members, to the extent that Gillette received and kept revenues attained from the sale of the M3P from Plaintiffs and the Class that it would not have received absent Gillette's improper conduct.

## COUNT VI

### Violations of States' Deceptive Trade Practices Statutes, Deceptive Advertising Statutes, and Consumer Fraud Statutes

80.     Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

81.     Gillette advertised and represented the worth and usefulness of the M3P in violation of Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws ch. 93A and other similar statutes in effect in other states nationwide.

82. Gillette disseminated deceptive advertisements concerning the M3P on a national scale. Gillette's methods of advertising constitute a repeated pattern of commercial conduct. Representations made by Gillette in the course of their advertising of M3Ps were made in violation of MCPA and other similar statutes in effect in other states nationwide.

83. The advertisements by Gillette concerning the M3P contained false information regarding the ability of the M3P to raise hair away from skin, as well as the ability of the M3P to extend hair.

84. Gillette's misleading and false advertisements constituted affirmative conduct by Gillette that deceived consumers.

85. Gillette's misleading and false advertisements affected a substantial portion of the purchasing public and the deceptive conduct is an issue of public interest. Starting in May 2004, thousands of consumers throughout the United States saw Gillette's deceptive advertisements for the M3P and, based upon those advertisements, purchased the M3Power.

86. The claim that the M3P could raise hair and/or extend hair were material elements of Gillette's advertising campaign.

87. Gillette's deceptive advertisements for the M3P were material to Gillette's success in selling the M3P.

88. Consumers – Plaintiffs and members of the Class – have been damaged as a result of the false advertising related to the M3P, because they have purchased the M3P without obtaining or experiencing the type of performance from the razor that Gillette advertised it would provide.

89. Plaintiffs and members of the Class further seek to enjoin such unlawful deceptive acts as and practices as described above. Each of the Class members will be harmed unless the unlawful actions of Defendant are enjoined in that Defendant will continue to sell its product without

adequate disclosure of the true nature thereof.  Toward that end, Plaintiffs and the Class request an order granting them injunctive relief as follows: (i) ordering that Defendant make disclosures to alert the Class, through corrective advertising, of the true nature concerning the usage of the M3P; and (ii) enjoining Defendant from selling the M3P until the proper disclosures set forth above are incorporated in its advertising and sales materials. Absent injunctive relief, Defendant will continue to sell its products to consumers and fail to make the required disclosures as detailed above. Plaintiffs have not previously asked for such injunctive relief.

90.     Pursuant to the requirements of Massachusetts's Consumer Protection Act and certain other Unfair Trade Practices Statutes, Plaintiffs provided Defendant with adequate and timely notice of this suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant for themselves and the members of the Class as follows:

(a)     An order determining that this action is a proper class action and certifying Plaintiffs as representative of the Classes;

(b)     An order awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An order declaring the Defendant's practices to be unlawful, unfair and/or deceptive and requiring the Defendant to provide refunds to consumers;

(d)     A temporary, preliminary or permanent injunction (i) ordering that Defendant make disclosures, through corrective advertising, to alert the public of the true nature concerning the capacity of the M3P; and (ii) enjoining Defendant from selling its product until the proper disclosures set forth above are incorporated in its advertising and sales materials;

      (e)      Disgorgement and restitution;

      (f)      An order awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (g)      Such other and further relief as the Court may deem just and proper.

DATED: April 18, 2006

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO (BBO #454680)
THEODORE M. HESS-MAHAN (BBO #557109)

/s/Thomas G. Shapiro
THOMAS G. SHAPIRO

53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)

*Liaison Counsel*

LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW
One North LaSalle Street
Suite 4600
Telephone: 312/621/2000
312/641/5504 (fax)

*Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as nonregistered participants on the 18th day of April, 2006.

/s/Thomas G. Shapiro
THOMAS G. SHAPIRO