UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
| | ) | (LEAD CASE) |
| M3POWER RAZOR SYSTEM | ) | |
| MARKETING & SALES PRACTICES | ) | MDL Docket No. 1704 |
| LITIGATION | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| **ALL CASES** | ) | |
| | ) | |

## MOTION TO COMPEL LEAD AND LIAISON COUNSEL TO PROVIDE PLAINTIFF CARLOS CORRALES WITH INFORMATION AND MATERIALS REGARDING PROPOSED SETTLEMENT OF MDL PROCEEDING

Plaintiff Carlos Corrales ("Plaintiff") hereby moves this Court for an order compelling Lead and Liaison Counsel to provide Plaintiff information and materials regrading the Proposed Settlement of this action. Plaintiff has already requested this information and materials from Lead and Liaison counsel, but they have failed to honor the request. The need for its immediate production has become even more compelling given the recent announcement by Lead and Liaison Counsel of a proposed global settlement of this matter.

## REQUEST FOR ORAL ARGUMENT

Pursuant to LR 7.1(d). Plaintiff, believing that oral argument may assist the Court and wishing to be heard, requests oral argument on this motion. Plaintiff respectfully proposes that a hearing and oral argument on this motion take place on **October 18, 2006 at 2:30 p.m.** (the date the Court has set for oral argument on other pending motions in this case) or as soon as the Court deems practical.

1

## MEMORANDUM OF REASONS

### I.    INTRODUCTION / FACTUAL BACKGROUND

Despite the Court's strong admonition at the July 7, 2006 hearing that Lead/Liaison Counsel should be forthright in providing case information to Plaintiff's counsel, Lead/Liaison Counsel has ignored requests for basic information on the Proposed Settlement and the negotiations and damage analysis upon which it was based. As a result, Plaintiff is once again forced to bring a motion to the Court seeking information and material from parties who are supposed to be representing his interest, and who should not be ignoring his requests. [1]

---

[1] On June 7, 2006 Plaintiff was forced to bring a motion to compel - against its own liaison counsel - simply to obtain copies of the initial disclosure documents produced by Gillette. In granting Plaintiff's request the Court clarified the role of Lead and Liaison Counsel:

> MR. SHAPIRO: This is the only group that is asking
> for this.
> THE COURT: Okay. So?
> MR. SHAPIRO: But our view of it was that if discovery
> should be made available to every plaintiff's --
> THE COURT: Why shouldn't it?
> MR. SHAPIRO: -- counsel --
> THE COURT: Why on God's green earth shouldn't it?
> You are functioning as liaison counsel representing other
> people. Now, if it's a problem of, you know, they're knocking
> at our door at six in the morning and they're showing up at ten
> at night and we have to pay for stamps, that's a different
> issue. Those are practical issues. But the fundamental issue
> is you are here as their fiduciary; unhappy about who your --
> the beneficiaries of your trust are, but you're here as their
> fiduciaries.

Transcript of hearing, July 7, 2006.

Despite his well stated and continuing concerns regarding the rights of California consumers, Plaintiff was not informed of the proposed settlement nor given the chance to provide any input while it was being negotiated. As a result, on August 16, 2006 Plaintiff's counsel wrote Liaison counsel inquiring as to the basic framework of the proposed settlement.[2]

By way of a August 23, 2006 letter, Lead Counsel refused to provide any responsive information regarding the settlement, brushing off Plaintiff's request with the suggestion that anyone having the temerity to question the settlement was operating in a "negative" fashion.

> "Unfortunately, much of your letter continues to assume matters in a negative manner and then seeks responses as if those assumptions were true. You apparently feel that Co-Lead Counsel is required to answer questions that are generated from those negative assumptions. Your letter demonstrates a desire to continue to set yourself ahead of the process and all others, most importantly the Court."[3]

This statement by Lead Counsel is disturbing. First, Co-Lead Counsel can not seriously believe they are only required to respond to "positive" requests from other counsel in the case. Moreover, the statement implies that the Court has already approved the settlement and will simply rubber stamp it. Lead Counsel suggests the Court will not want to be bothered by the details of the settlement. That is surely not the case.

---

[2] A copy of the letter is attached as Exhibit A.

[3] A copy of the letter is attached as Exhibit B.

Accordingly, on September 10, 2006, Plaintiff's Counsel wrote a detailed letter to Lead Counsel requesting the economic and damage information obtained in order to negotiate the proposed settlement. Specifically, Plaintiff requested the following very fundamental information necessary to evaluate the settlement:

1.     Confirmation from Lead Counsel that all discovery propounded by Lead Counsel and all discovery responses produced by Gillette in the litigation had indeed been turned over to Plaintiff as previously ordered by the Court.

2.     Confirmation from Lead Counsel that all informal discovery produced by Gillette in the litigation also had been turned over to Plaintiff as previously ordered by the Court. Plaintiff's concern here, as explained in the letter to Lead Counsel, largely centered on the need for revenue, and/or retail pricing information from Gillette.

3.      Any sales, revenue, and retail pricing information obtained for specific regions or states.

4.     Expert analysis upon which the settlement was based, if any exists.[4]

On September 27, 2006, the same day it was scheduled to file its motion seeking preliminary approval of the proposed settlement, Lead Counsel responded to Plaintiff's letter, indicating that although no discovery had been propounded on Gillette, Lead Counsel had been provided a briefing regarding Gillette sales, revenue, and retail pricing.[5] Lead Counsel has not provided this information to Plaintiff.

---

[4] A copy of the letter is attached as Exhibit C.

[5] A copy of the letter is attached as Exhibit D.

## II.    ARGUMENT - PLAINTIFF HAS A RIGHT TO RECEIVE SETTLEMENT INFORMATION IN ORDER TO MAKE AN INFORMED DECISION AS TO WHETHER OR NOT A SETTLEMENT PROPOSED BY LEAD COUNSEL IS FAIR, REASONABLE, AND ADEQUATE.

This Court has already ruled that the class Plaintiffs have a right to receive a copy of the discovery produced by Gillette in this MDL. In response to the Court's directive from the July 7 hearing, Lead/Liaison counsel did provide Plaintiff copies of Gillette's initial disclosure materials, but almost nothing else.

Whatever formal or informal discovery was obtained for the purpose of negotiating the proposed settlement should be provided to Plaintiff in order to make an informed decision as to whether or not it is fair, reasonable, and adequate. To the extent the information has been deemed confidential, Plaintiff is willing to abide by any applicable protective order.

In addition to helping the Plaintiff properly assess the settlement, having well-informed parties opine on a proposed settlement also helps the fairness of the process and assists the Court in fulfilling its Rule 23 duties. Chief Judge Young of this District has recognized the "critical" role the Court serves in evaluating a settlement and the need for presentation of differing opinions:

> "To determine whether a proposed settlement is fair, reasonable, and adequate, the court must examine whether the interests of the class are better served by the settlement than by further litigation. Judicial review must be exacting and thorough. The task is demanding because the adversariness of litigation is often lost after the agreement to settle. The settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks. If objectors do not emerge, there may be no lawyers or litigants criticizing the settlement or seeking to expose the flaws or abuses. Even if objectors are present, they may simply seek to be treated differently than the class as a whole, rather than advocating for class-wide interests."

In Re Relafen Antitrust Litigation, 231 F.R.D. 52, 58 (quoting Manual for Complex Litigation, Fourth § 13.41 at 171)(D.Mass. 2005); See also, In re Lupron Mktg and Sales Practices Litig..

228 F.R.D. 75 (D.Mass. 2005).

Here Plaintiff simply seeks to examine the discovery and information that was used to support the proposed settlement. Lead/Liaison Counsel can not ignore the request of a class representative for information, particularly on as important a topic as a proposed settlement. As explained by the 2nd Circuit :

> "The Manual [For Complex Litigation] notes that lead counsel are likely to be in the best position to conduct settlement discussions for the class, while underscoring the fact that when matters critical to the litigation are on the line, lead counsel must, where possible, attempt to work through consensus. MCL 2d § 20.222. . . . Of course, authority to negotiate for all classes carries with it responsibilities. *Lead counsel is expected in the ordinary course to keep other counsel for subclasses or members of the classes informed about negotiations and to consult with them regarding appropriate settlement terms*. These duties flow naturally from lead counsel's broad authority, the nature of the negotiation of class action settlements, and the requirements of Rule 23(e). *A failure to fulfill these duties may thwart approval of the settlement by the district court or reaching a settlement itself*. First, the failure to communicate and consult with other plaintiffs' counsel is grounds for rejection of the settlement under Rule 23. *See* In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1124-33 (7th Cir.), cert. denied, 444 U.S. 870, 62 L. Ed. 2d 95, 100 S. Ct. 146 (1979). *Indeed, we believe that it would even be grounds for the district court to decline to give notice to the classes of the settlement under Rule 23(e) and to order further negotiations*. Second, widespread dissatisfaction with the terms of the settlement among the classes and subclasses, which might well result from a lack of communication and consultation, will obviously increase the chance that the district court will reject it under Rule 23(e). Third, the willingness of defendants to settle may depend upon lead counsel's ability to dissuade members of the classes from objecting to the settlement or opting out. Fourth, and most important, a failure to communicate and consult may result in a settlement that is unfair to some members of the classes. . . . The authority of lead counsel to propose a settlement thus largely depends upon the district court's view of whether lead counsel has been vested with the responsibility to negotiate and has fulfilled the described responsibilities."

In re Ivan Boesky Sec. Litig., 948 F.2d 1538, 1365-1366 (2nd Cir. 1991); *see also* Pigford v. Veneman, 307 F.Supp.2d 43, 49 (D.C. 2004) ("the courts of appeal do acknowledge that lead counsel have the responsibility to keep other counsel apprised of negotiations and to consult with them about settlement terms. See, In Re General Motors Corporation Engine Interchange Litigation, 594 F.2d 1106, 1124-33 (7th Cir. 1979)").

Moreover, in recent years, courts have rejected proposed class action settlements when there is a lack of formal discovery and counsel proposing the settlement tries to keep other counsel in the dark. In the In Re Hyundai Horsepower Litigation, No. B-168,410, District Court, Jefferson County, Texas (2003), the Court initially granted preliminary approval to a proposed settlement, but then vacated its order after counsel for other class representatives raised significant concerns regarding the fairness of the settlement. The deficiencies listed by the Court included:

1.  The incipient stage of the litigation at which the settlement was reached;
2.  The absence of formal discovery preceding the settlement negotiations;
3.  The settling parties' attempt to prevent other litigants from taking discovery that might threaten to undermine the settlement by requesting an immediate stay of proceedings in related actions;
4.  The fact that [defendant] chose to enter into settlement negotiations with [Lead Counsel] by virtue of their willingness to settle quickly and without discovery, raising serious doubts as to the adequacy or representation afforded members of the proposed class;
5.  The failure of counsel to evaluate the extent to which the laws of other jurisdictions, particularly California, may offer more favorable prospects for recovery than those of Texas.

Id. at 3-5. [6]

Similar issues are at least initially present in this case. If Lead/Liaison Counsel provides the requested information to Plaintiff, some of these issues could possibly be obviated.

Additionally, the Hyundai Court also stressed it was important to consider questions raised by the counsel for other class representatives:

> "The Manual for Complex Litigation recommends that in considering whether to grant preliminary approval the Court 'may want to hear not only from counsel but from the named plaintiffs, from other parties and from attorneys who did not participate in the negotiations.' The views of the other class representatives are therefore properly considered by the Court."

Id.

---

[6] A copy of the opinion is attached as Exhibit E.

After considering issues raised by the other class representatives, the Court vacated its order granting preliminary approval to the proposed settlement.

Likewise, Plaintiff here believes a review of the requested materials will not only help Plaintiff evaluate the fairness of the proposed settlement, but it may also assist the Court in its determination as to the fairness of the settlement being proposed to the Court.

In <u>Moore v. Halliburton Company</u>, 2004 U.S. Dist. 18187 (N.D. Texas 2004),[7] the Court denied a motion for final approval in a situation in which certain lead counsel had quickly negotiated a settlement without serving any formal discovery and without informing other lead counsel that settlement discussions were even underway. After negotiating the quick settlement the parties conducted what they called "confirmatory discovery".

In rejecting the proposed settlement, the Court first held that by taking plaintiffs out of the decision making loop, the Class lost "the substantial benefits of joint decision making." <u>Id.</u> at 12, (quoting <u>Pirelli Armstrong Tire Corp.v.LaBranche & Co., Inc.</u>, No 03 Civ. 8264 RWS, 2004 WL 1179311 at *22 [S.D. N.Y., May 27, 2004]). "The Court is dismayed that Lead Counsel here felt at liberty to exclude any of the lead plaintiffs from significant involvement in material activities in the case. which settlement surely is." In addition, the Court recognized the lack of discovery was also a substantial factor for rejecting the settlement:

> "In this case, no discovery occurred prior to negotiations. After a settlement was reached, confirmatory discovery was performed. The results of the confirmatory discovery have been made available to only three of the four Lead Plaintiffs. Confirmatory discovery, by its very nature, is not adversarial. In contrast, 'pretrial negotiations and discovery must be sufficiently adversarial so that they are not designed to justify a settlement ..[but are] an aggressive effort to ferret out facts helpful to prosecution of the suit."

<u>Haliburton</u>, at p 15 (quoting <u>Martens v Smith Barney, Inc.</u>,181 F.R.D.,243,263 (S.D.N.Y.1998).

---

[7] A copy of the opinion is attached as Exhibit F.

Haliburton, at p 15 (quoting Martens v Smith Barney, Inc..181 F.R.D.,243,263 (S.D.N.Y.1998).

Plaintiff is properly seeking to determine what discovery, either formal or informal, was obtained from Gillette prior to, or in connection with, the proposed settlement. An analysis of the scope of this discovery is directly related to assessing whether the proposed settlement is fair, reasonable and adequate. Accordingly, Plaintiff's Motion should be granted.

Dated: September 27, 2006                     Respectfully submitted

                                      By:    /s/ Taras Kick
                                             THE KICK LAW FIRM, APC
                                             Taras Kick
                                             James Strenio
                                             900 Wilshire Boulevard, Suite 230
                                             Los Angeles, CA 90017
                                             (213) 624-1588
                                             taras@kicklawfirm.com
                                             james@kicklawfirm.com
                                             Counsel for Plaintiff
                                             CARLOS CORRALES


                                             KANNER & WHITELEY, LLC
                                             Allan Kanner
                                             Cynthia G. St.Amant
                                             701 Camp Street
                                             New Orleans, LA 70130
                                             (504) 524-5777
                                             a.kanner@kanner-law.com
                                             c.stamant@kanner-law.com
                                             Counsel for Plaintiff
                                             CARLOS CORRALES

THE KICK LAW FIRM
A PROFESSIONAL CORPORATION



660 SOUTH FIGUEROA STREET, SUITE 1800
LOS ANGELES, CALIFORNIA 90017
213 624 1588 / FAX 213 624 1589

August 16, 2006

*Via Facsimile (617) 439-0134*
Thomas G. Shapiro, Esquire
Shapiro Haber & Urmy LLP
Exchange Place
Boston, MA 02109

Re: *In re M3 Power Razor System Marketing & Sales Practices Litigation*,
Civil Action No. 05-11177-DPW

Dear Tom:

I am writing to you in your capacity as liaison counsel to please communicate with lead counsel regarding the recent filing with the Court of the document styled "Non-Binding Memorandum of Understanding" which indicates that the parties have reached a possible settlement of the matter.

As a preliminary matter, while I acknowledge that lead counsel is designated to pursue negotiation of settlements pursuant to the Case Management Order No. 2, I believe the pendency of a possible settlement should have been communicated to fellow plaintiffs' counsel before it was publically filed.  This both would have been in keeping with duties of liaison counsel, and a simple professional courtesy to fellow attorneys involved in this matter.

Regardless, at this time, I would appreciate being briefed on the specifics of the proposed settlement, including how it was arrived at, why lead counsel believe it adequately compensates consumers, why are Canadian consumers being included, what, if anything, was done to address the superior rights held by California consumers, as well as several other questions.

To be candid with you, because this case involves literally hundreds of millions of dollars obtained by Gillette from the unfair practices at issue, at least based on the terms set forth in the filed Memorandum, we do not believe that even the entirety of the proposed national amount comes close to adequately compensating California consumers, yet alone a pro rata share of that national amount being adequate for California consumers.

Thomas G. Shapiro, Esquire                                                          2
Re: *In re M3 Power Razor System Marketing*
*& Sales Practices Litigation*, Civil Action No. 05-11177-DPW
August 16, 2006


        However, before concluding this definitively, we certainly want to provide lead counsel
an opportunity to explain to us why they might believe otherwise. Alternatively, consistent with
Case Management Order No. 2, if lead counsel prefers not to have such a discussion with us, we
request permission from lead-counsel to directly open negotiations with defense counsel
regarding settlement of claims on behalf of California consumers only, the only putative class
which we seek to represent.

        Thank you for your attention. If you can have an answer by Monday, August 21, 2006,
that would be much appreciated, as we do need to make some decisions relatively soon on how
to proceed in the face of the filing of that Memorandum.


                                        Very truly yours,


                                        Taras Kick


cc:     Robert Rothman, Esquire
        Ben Barnow, Esquire
        Allan Kanner, Esquire

BARNOW **AND** ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

COPY

BEN BARNOW *
SHARON HARRIS

*\* also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

Telephone: 312-621-2000
Facsimile: 312-641-5504

August 23, 2006

<u>Via Facsimile and U.S. Mail</u>

Taras Kick, Esq.
The Kick Law Firm, P.C.
660 S. Figueroa Street, Suite 1800
Los Angeles, California 90017

Re:     *In re M3Power Razor System Marketing & Sales Practices Litigation,*
        Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Taras:

This is in response to your letter of August 16, 2006, to Tom Shapiro, who is on vacation until the end of the month. I write on behalf of Co-Lead Counsel.

We appreciate your acknowledgment of the Court's Case Management Order No. 2 ("CMO"). As you know, in the CMO, the Court appointed a plaintiffs' steering committee comprised of members selected by each "group" that had formed in the leadership determination process. One of the members is C. Donald Amamgbo, your group's selected representative. In accordance with the terms of the CMO, he, and each of the other committee members, were kept advised and their comments and views regarding the terms of the settlement were solicited. Mr. Amamgbo and each of the other members of the committee were provided with a copy of the memorandum of understanding prior to its execution. All of the committee members, including your group's representative, enthusiastically supported the terms of the proposed settlement and agreed with Co-Lead Counsel's conclusion that the settlement is an excellent one for the Class and its members.

Unfortunately, much of your letter continues to assume matters in a negative manner and then seeks responses as if those assumptions were true. You apparently feel that Co-Lead Counsel is required to answer questions that are generated from those negative assumptions. Your letter demonstrates a desire to continue to set yourself ahead of the process and all others, most importantly the Court.

Please accept that Co-Lead Counsel, Liaison Counsel, and the members of the Plaintiffs' Steering Committee, including the representative selected by your group, are experienced in class actions and knowledgeable with regard to the applicable laws, rules and regulations. There is no legitimate basis to suggest that anything other than careful consideration of the relevant legal framework and proper analysis of the facts was undertaken in connection with the settlement

BARNOW ☒ ASSOCIATES

Taras Kick, Esq.
August 23, 2006
Page 2

negotiations.

The fourth paragraph of your letter indicates that you have already determined, as you have attempted throughout these proceedings, on behalf of a class of California plaintiffs whom you do not represent, that the settlement is not adequate and that even if all of its benefits were directed to California alone, it "would not come close to adequately compensating California consumers..." Others, including your group's unanimously selected representative, who himself is an attorney practicing in California, as well as one of Co-Lead Counsel's firms, with more than 170 attorneys in California alone who concentrate their practice in class action litigation, disagree with you.

We respectfully request that you follow the Court's Case Management Orders and the procedures that will no doubt be employed by the Court pursuant to clear and established law under which class members have the opportunity to accept, object to or opt-out of a settlement.

Very truly yours,

Ben Barnow

BB/sh

cc:    Robert M. Rothman, Esq.
       Thomas G. Shapiro, Esq.

THE KICK LAW FIRM

A PROFESSIONAL CORPORATION

660 South Figueroa Street, Suite 1800
Los Angeles, California 90017
213 624 1588 / Fax 213 624 1589



September 10, 2006

<u>Via U.S. Mail and Facsimile To: (312) 641-5504</u>
Ben Barnow, Esquire
Law Office of Ben Barnow
One North LaSalle Street
Chicago, IL  60602

Re:    In re *M3 Power Razor System Marketing & Sales Practice Litigation*,
       Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Ben:

We are in receipt of your letter of August 23, 2006, which responded to my letter of August 16, 2006, seeking information on the Non-Binding Memorandum of Understanding ("MOU") that you apparently entered into with Gillette on July 25, 2006.

You spend some time in your letter on *ad hominem* attacks. I will not respond to those, and instead follow the suggestion of Judge Woodlock that we engage in substantive and professional exchanges when communicating with one another. In that regard, it is our very real concern that you appear to be attempting to settle an extremely strong case that California consumers have for far less than it is worth, a case in which California consumers can likely prevail on summary judgement. Bearing this concern in mind, so that we may have full information in electing how to proceed on behalf of California consumers, I request that you please answer the following.

First, it appears that plaintiffs propounded no discovery on Gillette at all in this matter. Is this correct? If so, why? If not, please provide us with whatever discovery plaintiffs did propound, and Gillette's responses to that discovery, as previously ordered by Judge Woodlock.

Second, we note that it appears that what materials were produced by Gillette to plaintiffs in this matter are only from Gillette's initial disclosure, and, further, are only documents which Gillette already had produced in the Schick litigation. Is this correct?  Has Gillette produced anything else to you, perhaps informally?  If so, please provide us with all such documents or information. If not, please let us know.

Third, interestingly, the initial disclosure material from Gillette that Mr. Shaprio provided to us did not include any information from Gillette regarding sales, revenue, or retail pricing on a national basis. We find this surprising since Special Interrogatory No. 13 propounded by Schick to Gillette in the Connecticut Schick action requested that Gillette: "State, for each month, or if not available, for each quarter from January 1, 2003 to present :(a) Gillette's actual marketing,

Ben Barnow, Esquire                                                                                                    2
Re: In re *M3 Power Razor System Marketing & Sales Practice Litigation.*
Civil Action No. 05-11177-DPW, MDL No. 1704
September 10, 2006

advertising and promotional expenses for M3 Power in the United States; (b) Gillette's market
share for M3 Power in the United States; (c) Gillette's sales of M3 Power in United States; and
(d) Gillette's profits for M3 Power in the United States." See GMPC 17-18. In response,
Gillette identified an extensive list of documents that would provide this information, but these
documents do not appear to have been provided to us. Did you obtain these documents from
Gillette? If so, please provide those documents to us. If not, please let us know why not.

Next, and very important to our California case, have you received any information from Gillette
regarding sales, revenue, and retail pricing on a regional or state basis, and if so, have you
received any such information specifically for California? If you have, please let us know when
you requested this information and when we may expect to receive it. If you have not, please let
us know why not.

With respect to discovery relating to damages, I also note that the initial disclosure material
provided by Gillette provided very limited information regarding Gillette's market share in the
United States, and the information provided was already used by this law firm in its Motion For
Preliminary Injunction filed in Los Angeles County more than a year ago on behalf of California
consumers.   This includes the testimony of Schick Director of Marketing Adel Mekhail (GMPC
603-606), an exhibit referenced by Mr. Mekhail (PX 202, GMPC002557), and the Declaration of
Michelle Streams, Schick's Brand Director for Men's Systems.  Is there anything else? If not, it
appears that in a way you are actually relying on our work done in Los Angeles for your proposed
settlement. Please let me know if that is not correct. Also, we would caution you that although
we felt our motion was very strong and certainly caused Gillette a great deal of concern, we were
not finished with our work in Los Angeles at the time we filed that motion.

Finally, if you have consulted with any experts about this matter, please provide us with such
communications, including reports or draft reports on the issue of liability or damages. If you
have not consulted with any experts, simply let us know. As you know from reading this firm's
filings in this matter, we have consulted with experts, and would be more than happy to share
this information with you if you like.

In reviewing this letter and these straightforward requests, please do recall the Court's reminder
at the last hearing to lead and liaison counsel of their duties towards the other counsel in this
MDL proceeding.  Please be so kind as to provide the information requested in this letter as soon
as possible since we would like the benefit of this information in more fully evaluating the
proposed MOU and settlement. We genuinely do not want to have to bring a motion regarding
these issues, and much prefer to cooperate with you in resolving something which should not
have to require the time of a federal judge to resolve.

Ben Barnow, Esquire                                                                                    3
Re: In re *M3 Power Razor System Marketing & Sales Practice Litigation*,
Civil Action No. 05-11177-DPW, MDL No. 1704
September 10, 2006

Thank you for your attention.   We look forward to hearing from you.

Very truly yours,

Taras Kick

cc:    Allan Kanner, Esquire
       Donald Amamgbo, Esquire
       Thomas Shapiro, Esquire
       Robert Rothman, Esquire

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Todd S. Heyman
Theodore M. Hess-Mahan
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion



*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

September 27, 2006

**VIA FACSIMILE**

Taras P. Kick, Esq.
The Kick Law Firm, APC
660 South Figueroa Street, Suite 1800
Los Angeles, CA 90017

      Re:   *Gillette*

Dear Taras:

      I am writing in response to your letter of September 10, 2006.

      Plaintiffs did not propound written discovery requests to Gillette separate and apart from the request, and the Court's Order, with respect to Gillette's initial disclosures. I produced to you what was received from Gillette, and I would rather not characterize what was or was not in the production, as you have a copy yourself. Subsequently, we have received two additional boxes of materials, consisting of the transcript of the preliminary injunction hearing in the Connecticut case and accompanying exhibits, and also a copy of the transcript and accompanying exhibits from the hearing in Australia. Please let me know if you want copies of these materials. In that connection, I note that you have not reimbursed my firm for the costs of copying and sending you discovery materials previously. Please send me a check for those expenses.

      Gillette's counsel has provided a briefing regarding its sales, revenue and retail pricing for the M3Power razor system. This was done subject to strict agreement on confidentiality. There was no special presentation for California.

      We do not have an expert report on the issue of liability or damages. As to what your work was in Los Angeles and whether we used it, we think you know we have not relied on it.

SEP-27-2006  11:38       SHAPIRO HABER & URMY        6174390134    P.003/003

## SHAPIRO HABER & URMY LLP

Taras P. Kick, Esq.
September 27, 2006
Page 2

I am not responding to your editorial comments and the like. Please do not interpret the lack of a response as any agreement to anything you said. I think it is better to eliminate such rhetoric and posturing.

Sincerely yours,

Thomas G. Shapiro

TGS:sg
cc:    Ben Barnow, Esq. (via facsimile)
       Robert M. Rothman, Esq. (via facsimile)

AUG 2 6 2003

No. B-168,410

| | | |
|---|---|---|
| IN RE: HYUNDAI HORSEPOWER LITIGATION | § § § § § | IN THE DISTRICT COURT OF JEFFERSON COUNTY, TEXAS 60TH JUDICIAL DISTRICT |

## ORDER GRANTING MOTION TO VACATE PRELIMINARY APPROVAL ORDER

On March 5, 2003, this Court entered a Preliminary Approval Order certifying a class of owners of Hyundai vehicles with incorrect horsepower ratings, preliminarily approving a proposed settlement of their claims, directing the mailing of notice, setting a schedule for considering whether to finally approve the proposed settlement and staying all related litigation. On March 12, 2003, counsel for the class representatives in related class actions ("Intervenors") pending in eight states, including California, where Hyundai's United States operations are headquartered, intervened to request that the Court vacate the preliminary approval order, or alternatively, stay the mailing of notice and authorize discovery into the circumstances surrounding Hyundai's incorrect horsepower ratings and the adequacy of the proposed settlement.

On March 18, 2003, this Court entered an Order granting Intervenors' plea in intervention, allowing Intervenors to conduct discovery, staying the mailing of notice of the proposed settlement and setting a status conference for June 19, 2003. On April 21, 2003, the Court entered an Order appointing Lead and Liaison Counsel for Intervenors and authorizing the filing of a consolidated petition setting forth Intervenors' claims. Intervenors' consolidated petition was filed on May 29, 2003, and added as a defendant Hyundai Motor Corporation ("HMC"), the parent coporation of Hyundai Motor

America, Inc. ("HMA") (together "Hyundai").

The parties agreed to reschedule the June 19 conference, and on August 20, 2003, the Court heard oral argument on Intervenors' motion to vacate the order preliminarily approving the proposed settlement. Intervenors submitted a 75-page memorandum in support of their motion, together with numerous deposition transcripts, internal Hyundai documents and other business records. Intervenors' submissions are based upon depositions of Hyundai executives and technical and marketing personnel taken in the United States and In Korea where Hyundai is headquartered and the review and inspection by Intervenors' Counsel of approximately 80,000 documents produced by HMA, HMC and various non-parties. In response, Hyundai submitted a 105-page memorandum with voluminous supporting documentation. Hermie Bundick, the class representative, submitted a 15-page memorandum, with an accompanying affidavit of Bundick's counsel and the affidavit of an expert on engine performance enhancement.

In evaluating a class action settlement for preliminary approval, the Court determines whether the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the Class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval. The Court has reviewed the terms of the proposed settlement in light of the arguments presented by Intervenors. The Court has also considered the Manual for Complex Litigation 3rd, § 30.42 (discussing the role of the Court in class action settlement proceedings), and Texas authorities. While ordinarily a presumption of fairness, adequacy and reasonableness may attach to a Class settlement reached through arms-length negotiations between experienced,

2

capable counsel after *meaningful discovery*, in this case, the absence of meaningful discovery — or any discovery — and the limited nature of the informal fact finding undertaken by Bundick's counsel precludes any presumption in favor of the proposed settlement.

In support of their motion to vacate the preliminary approval order, Intervenors contend that the following considerations raise serious doubts about the fairness of the proposed settlement and the adequacy of the proceedings surrounding the settlement negotiations:

i. The incipient stage in the litigation at which the settlement was reached.

ii. The absence of formal discovery preceding the settlement negotiations.

iii. The settling parties' attempt to prevent other litigants from taking discovery that might threaten to undermine the settlement (rather than preserve the status quo) by requesting an immediate stay of proceedings in the related actions.

iv. The fact that the class representative, Hermie Bundick is not a Hyundai purchaser in any meaningful sense, as he admits he played no role in deciding to purchase a Hyundai vehicle, paid no money to acquire the vehicle, has driven the vehicle less than twelve times, is not responsible for maintaining or insuring the vehicle, and has no economic interest in receiving any relief under the terms of the proposed settlement, thereby rendering his claims

3

atypical for the purposes of this litigation.

v.   The fact that Hyundai chose to enter into settlement negotiations
     with Bundick's counsel by virtue of their willingness to settle quickly
     and without discovery, raising serious doubts as to the adequacy of
     the representation afforded the members of the proposed Class by
     Bundick's counsel.

vi.  The failure of Bundick's counsel to evaluate the extent to which the
     laws of other jurisdictions, particularly California, where Hyundai
     maintains its United States headquarters, may offer more favorable
     prospects for recovery than those of Texas.

vii. The hostility expressed by Bundick, the class representative, to the
     claims asserted on behalf of Hyundai owners in the litigation.

viii. Bundick's failure to consider the relative merits of the claims
     asserted and the extent of Hyundai's wrongdoing, if any, in
     evaluating the fairness of the proposed settlement.

ix.  The attempt of the settlement proponents to release HMC without
     any settlement consideration being furnished by HMC;

x.   The fact that Bundick's counsel, in an attempt to defend the
     settlement, has asserted a joint defense privilege with Hyundai and
     developed proof for the purpose of undermining the claims of the
     proposed class, suggesting Bundick's counsel lacks an adequate
     understanding of his fiduciary obligations.

xi.  The terms of the proposed settlement, which provide for the

4

issuance of coupons for rebates on the purchase of new Hyundai

vehicles or In some cases, for free oil changes at Hyundai service

centers. Intervenors contend that coupon settlements, while not

unacceptable *per se*, are disfavored. They contend the settlement

proponents have not and cannot adequately explained why it Is

necessary to distribute the relief in the form of coupons.

xii,    Intervenors contend the attorneys' fees Hyundai has agreed to pay

Bundick's counsel are grossly excessive in relation to the uncertain

value of the benefits conferred under the proposed settlement.

    The Manual for Complex Litigation recommends that in considering whether to grant preliminary approval, the "Court may want to hear not only from counsel but also from the named plaintiffs, from other parties, and from attorneys who did not participate in the negotiations." The views of the class representatives in the other pending class actions against Hyundai in other states are therefore properly considered by the Court. With the exception of Bundick's attorneys, who negotiated the settlement and stand to receive $2 million if it is approved, none of the other class members or counsel with pending actions against Hyundai supports the proposed settlement. While the Court recognizes that attorneys who do not stand to benefit from the approval of the settlement may be inclined to view the settlement unfavorably, the uniform and concerted opposition to the settlement expressed by the Intervenors, who are represented by reputable and experienced local and class action counsel, weighs heavily in favor of rejection of the settlement.

    While the Court expresses no opinion concerning the merits of the claims

5

asserted, or the strength of Hyundai's defenses, the Court notes that while the settlement proponents have characterized Hyundai's horsepower misstatements in benign terms, the Intervenors have submitted evidence that the horsepower ratings at issue in this litigation were approved by high-level decision makers at Hyundai, and that Hyundai's actions may have been influenced by a desire to enhance its competitive standing in the marketplace. These considerations, if proven, may warrant settlement on more favorable terms than those negotiated by Bundick's attorneys.

In summary, while the Court recognizes that a settlement that provides a modest or even a minimal recovery may under appropriate circumstances nevertheless qualify as fair, reasonable and adequate, in this case, the Court concludes that sufficient doubts about the fairness of the proposed settlement have been raised to require that the Court reconsider its determination that the proposed settlement merits preliminary approval. Having considered the terms of the proposed settlement in light of the factual submissions and legal authorities presented by Intervenors, and in the exercise of its sound discretion, this Court hereby **VACATES** in its entirety the Preliminary Approval Order.

**ORDER**

IT IS, THEREFORE, ORDERED that Intervenors' motion to vacate the order preliminarily approving the proposed settlement is GRANTED.

IT IS FURTHER ORDERED this Court's orders dated March 5, March 14 and March 18, 2003 are vacated, and preliminary approval of the proposed settlement

6

between Hyundai Motor America and Plaintiff Bundick is withdrawn. Paragraph 6 of the

Court's order of April 21, 2003 shall govern any further proceedings had on behalf of the

members of the proposed class. Liaison Counsel will confer with Timothy Ferguson,

local counsel for Hermie Bundick, to minimize duplication of effort and coordinate further

proceedings in this Court.

Signed this 26th the day of August, 2003.

The Hon. Gary Sanderson, Presiding Judge

Issued at the request of:

Jon Burmeister
MOORE, LANDREY, GARTH, et al
390 Park Street, Suite 500
Beaumont, Texas 77701

Mitchell A. Toups (SBT No. 20151600)
WELLER, GREEN, TOUPS, TERRELL, L.L.P.
Post Office Box 350
Beaumont, Texas 77704
(409) 838-0101/Fax: (409) 832-8577

### INTERVENORS LIAISON COUNSEL

Daniel C. Girard
Eric H. Gibbs
GIRARD GIBBS & DE BARTOLOMEO
601 California Street, Suite 1400
San Francisco, CA 94108-2805
(415) 981-4800/Fax: (415) 981-4846

Michael A. Caddell (SBT No. 03576700)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010-3027
(713) 751-0400/Fax: (713) 751-0906

7



**●RIGINAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

SEP - 9 2004

CLERK, U.S. DISTRICT COURT
By _____
                        Deputy

RICHARD MOORE, *et al.*,          §
              Plaintiffs,          §
v.                                 §          3:02-CV-1152-M
                                   §
                                   §
HALLIBURTON COMPANY, *et al.*,     §
              Defendants.          §
                                   §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's "Motion for Final Approval of Class Action Settlement and

Plan of Allocation," filed August 19, 2004.  On August 26, 2004, the Court held a hearing to

determine whether to approve the settlement proposed by three of the four Lead Plaintiffs

appointed by the Court on December 6, 2002, and opposed by the fourth Lead Plaintiff,

Archdiocese of Milwaukee Supporting Fund ("AMSF").[1]  For the reasons stated below, the Court

**DENIES** the Motion for Final Approval.

## I. BACKGROUND

On June 3, 2002, a Complaint was filed against Halliburton Company ("Halliburton") and

certain of its former officers and directors (collectively "Defendants").  The Complaint asserted a

---

[1]  Appearing at the hearing were Lead Counsel Schiffrin & Barroway, as well as Liaison
Counsel for the Lead Plaintiffs; counsel for Objector Patricia Magruder; counsel for Lead
Plaintiff AMSF; Paula John, representative of AMSF; counsel for Defendant David Lesar;
counsel for Defendant Gary Morris; counsel for Defendant Halliburton Company; counsel for
Lead Plaintiff Gabriel T. Forrest; counsel for Defendant Charles Muchmore; counsel for
Defendant Douglas Foshee; counsel for Objector William Hoffman; and Brian Felgoise,
Plaintiffs' counsel in the Friedberg Derivative Action.

1

"Contracts Claim," alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78 *et seq.,* and Rule 10b-5. The suit was purportedly brought on behalf of a class of investors who purchased common stock of Halliburton on the open market at allegedly artificially inflated prices, and who were damaged as a result. Specifically, it was contended that Defendants knowingly or recklessly failed to disclose that in the fourth quarter of 1998 Halliburton changed its accounting methodology for unapproved claims for cost overruns on long-term, fixed-price, design, engineering, procurement, and construction projects, in order to record revenue on those claims when liability for them was only probable, and when the expected recovery could not reliably be estimated. Plaintiffs allege that Defendants knew, or recklessly disregarded, that Halliburton's reported revenue was overstated, due to the improper inclusion of unapproved cost overrun revenue. Eighteen lawsuits were filed and on August 12, 2002, the suits were consolidated into this case.

On August 2, 2002, AMSF and Paul J. Benec filed separate applications to be appointed Lead Plaintiff, and moved to have their selection of Lead Counsel approved. On August 5, 2002, Private Asset Management Group ("PAM") filed an application to be appointed Lead Plaintiff and to have its selection of Lead Counsel approved by the Court. On December 6, 2002, pursuant to a stipulation between the movants, the Court appointed PAM, Gabriel T. Forrest, Paul J. Benec, and AMSF as Lead Plaintiffs, Schiffrin & Barroway as Lead Counsel, Federman & Sherwood and Emerson and Poynter as Co-Liaison Counsel, and Stull, Stull & Brody, Scott + Scott, and Wolf Haldenstein Adler Freeman & Herz as members of an Executive Committee formed to oversee the litigation.

On February 6, 2003, only two months after Lead Plaintiffs and Schriffrin & Barroway

2

("Lead Counsel") were appointed, and before any formal discovery could be taken, Richard

Schiffrin, of Schiffrin & Barroway, commenced settlement negotiations with counsel for the

Defendants, in Houston, Texas. These discussions continued through March and April and an

agreement in principle was reached in April 2003. On April 9, 2003, this agreement was

presented to some of the members of the Executive Committee. A Memorandum of

Understanding ("MOU") was signed on May 29, 2003, by counsel for PAM, Gabriel T. Forrest,

and Paul J. Benec (collectively "Pro-Settlement Plaintiffs") and by counsel for the Defendants.

As acknowledged by Mr. Schiffrin at the fairness hearing, despite the fact that AMSF was a Lead

Plaintiff appointed by the Court, Lead Counsel did not seek its approval to institute settlement

discussions, nor was AMSF even advised that settlement discussions were underway. It learned

of the settlement negotiations in April 2003, from another member of the Executive Committee,

not from Lead Counsel. It refused to approve the MOU.

Upon learning of the proposed settlement, AMSF moved to have Schiffrin & Barroway

removed from its position as Lead Counsel. AMSF correctly contended that Schiffrin &

Barroway had not kept Scott + Scott, counsel for AMSF, informed of the settlement negotiations

until an agreement was reached in principle. Further, AMSF alleged that in the settlement

negotiations, Schiffrin & Barroway had underestimated the value of the lawsuit. After a hearing,

AMSF's motion to remove Lead Counsel was denied without prejudice by the judge then

presiding, who indicated that the issues raised in the Motion to Remove Lead Counsel could be

raised at a later hearing to determine whether the settlement should be approved.

On June 2, 2003, as required by the MOU, the Pro-Settlement Plaintiffs moved for leave

to amend the complaint to add the "Asbestos Claim." This claim alleges that (1) the Defendants

3

failed to perform adequate due diligence in connection with Halliburton's 1998 merger with

Dresser Industries, Inc. ("Dresser"); (2) due to this failure, Halliburton acquired substantial

potential and actual asbestos liability; (3) until June 28, 2001, Defendants knowingly or

recklessly failed to disclose the true nature and scope of Halliburton's acquired asbestos liability

exposure; and (4) Defendants improperly accounted for the Dresser merger by knowingly or

recklessly overstating and failing to write-down the value of assets acquired from Dresser.  Leave

was granted on January 28, 2004.  In August 2003, Scott + Scott filed a new Complaint, *Kimble*

*v. Halliburton et al.*, asserting the Asbestos Claims. This Complaint was consolidated into this

suit on March 30, 2004.

After execution of the MOU, the Pro-Settlement Plaintiffs, their counsel, and all or some

of defense counsel then engaged in a process which they described as "confirmatory discovery."

AMSF and their counsel were not privy to the information furnished during this process.[2]

Schiffrin & Barroway, along with counsel for some of the individual Lead Plaintiffs, and

Plaintiffs's counsel in the *Friedberg* derivative action, met with Bert Cornelison, General

Counsel of Halliburton, and Defendant Robert Charles Muchmore, Jr., the Controller of

Halliburton, and were given access to documents produced, and depositions given, in an SEC

enforcement action brought against Halliburton, Muchmore, and Gary Morris.[3]  That action was

---

[2]  Scott + Scott was not permitted to participate because its client, Lead Plaintiff AMSF, would not agree to conditions required of AMSF by counsel for the other Lead Plaintiffs and Defendants.

[3]  During the fairness hearing, the parties were not able to respond to the Court's inquiry as to whose depositions and what documents were provided during "confirmatory discovery," nor was any information given to the Court as to the time spent by Lead Counsel on review of such documents and depositions.  A list of those depositions and documents was furnished to the Court after the hearing.

partially resolved on August 3, 2004, for a $7.5 million penalty against Halliburton and a

$50,000 penalty against Muchmore, and the entry of a Cease and Desist Order against

Halliburton and Muchmore.[4]   The enforcement action continues as to Gary Morris.

The settlement talks and confirmatory discovery culminated in a proposed settlement

preliminarily approved by this Court on June 7, 2004.  This proposed settlement, which is

contested by AMSF, is now before the Court for final approval.

## II. FAIRNESS, REASONABLENESS AND ADEQUACY OF THE PROPOSED SETTLEMENT TERMS

It is the Court's task to determine whether the settlement proposed should be approved.

The Court must protect the interests of the absent class members who would be bound by a

settlement in this matter.  As such, the Court "owes a fiduciary duty to the class to ensure that the

interests of every member of the class are adequately represented." *In re Quintus Securities*

*Litigation,* 148 F.Supp.2d 967, 970 (N.D. Cal. 2001).  That duty becomes even more compelling

when the Court has concern, as it does here, that Lead Counsel may not be acting as carefully as

Lead Counsel should in also assuring that protection.  The Court takes its role as protector of the

right of absent class members very seriously.  For obvious reasons, the hearing to determine

---

[4]  The Cease and Desist Order found, among other things, that "the amounts attributable to Halliburton's undisclosed change in accounting were material to the Company's income as reported in its 1998 and 1999 Commission filings," and that "Halliburton's ultimate disclosure of its accounting change was misleading."

In its press release announcing the settlement of the SEC enforcement action against Halliburton and Muchmore, the SEC concluded that the undisclosed accounting change had an $87.9 million impact on Haliburton's 1998 10-K and a more than $40 million impact in the first three quarters of 1999.

whether approval will be given is called a "fairness hearing." Evaluating the fairness of a proposed class action settlement does not and cannot involve a trial on the merits. *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir. 1981). Instead, the Court examines the arguments and evidence submitted by the Pro-Settlement Plaintiffs, who have the burden of proving a proposed settlement to be fair, adequate, and reasonable to the class members who will be bound by it. *Foster v. Boise-Cascade, Inc.,* 420 F.Supp. 674, 680 (S.D.Tex. 1976) ("[t]he burden should be placed on the parties, especially the class representative, to prove to the district court and class members that the recommended compromise and all of its components are fair, reasonable and adequate"), *aff'd,* 577 F.2d 335 (5th Cir. 1978).

At the fairness hearing, Mr. Schiffrin advocated on behalf of the Pro-Settlement Plaintiffs. According to Mr. Schiffrin, none of the Plaintiffs' claims are likely to succeed. Without presenting any evidence at the hearing, but rather resting on an Declaration submitted by Marc Willner, an associate in his firm who has been practicing law for seven years, Mr. Schiffrin argued that the Contract Claim would be difficult, if not impossible, to prove, and that the Asbestos Claim was likely time-barred. In response to the Court's question about whether the Asbestos Claim could relate back to the original filing for limitations purposes, Mr. Schiffrin contended that the Plaintiffs would not have the benefit of relation back for the Asbestos Claim, but if Lead Counsel did substantial research on that issue, it did not so communicate to the Court.

None of the Pro-Settlement Plaintiffs appeared at the hearing to articulate their own views as to why settlement was advisable for the members of the class preliminarily certified. This was despite the fact that "[a] lead plaintiff in a class action owes a fiduciary duty to the

6

class." *In re Quintus Securities Litigation,* 148 F.Supp.2d 970, 969 (N.D. Cal. 2001). As fiduciaries to the absent class members, the Pro-Settlement Plaintiffs should have either appeared at the fairness hearing or expressed themselves in affidavits or declarations to assure that the interests of the absent class members were properly represented, and to explain why they believed that the settlement was in the best interests of the class. Only the opposing Lead Plaintiff, AMSF, expended the effort to appear at the hearing, through its representative, Paula John.

The most animated and vigorous argument against the tenability of the Plaintiffs' claims came from the Defendants. Ron Stevens, counsel for Halliburton, presented arguments and documents which he urged show the insupportability of the claims asserted in the Moore Complaint, the Kimble Complaint, and in the Murphey Complaint, which Scott + Scott seeks permission to file. In summary, Mr. Stevens argues that the Contract Claim will not succeed, because Halliburton previously accounted for such overruns in exactly the same manner as it did in 1998 and 1999. *Compare* SEC Cease and Desist Order. Further, he contends that the Asbestos Claim is untenable because Halliburton properly disclosed its contingent asbestos liability, because Halliburton's actual asbestos liabilities were actually revealed to the public by various reporting services and, in any case, the Asbestos Claim is time-barred. Mr. Stevens was a very effective advocate at the fairness hearing, however, it is not surprising that the Defendants think little of the Plaintiffs' case, think positively about their potential defenses, nor that they advocate a settlement which would extinguish all potential claims against the Defendants arising during a four-year period, for what could be less than $1 per affected share.

AMSF, through Scott + Scott, declined to call any witnesses to support its contention that

7

the Plaintiffs' claims are meritorious and that the proposed settlement is inadequate. Instead of proof or persuasive argument that the case was actually worth more than the settlement proposed, AMSF relied on what it claimed were deficiencies in Mr. Schiffrin's presentation.

Virtually no evidence, other than conclusory declarations, was presented to the Court by the Pro-Settlement Plaintiffs. Although they have the burden of proof, they did not provide the Court with sufficient information to fairly evaluate their likelihood of success on the merits. The Court cannot and does not accept "mere boiler-plate [advocacy] phrased in appropriate language but unsupported by evaluation of facts or analysis of the law." *In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212.

Lead Counsel and the Pro-Settlement Plaintiffs advocate settlement for a gross amount of $6,000,000, less costs of administration and attorneys fees. In response to questions from the Court at the fairness hearing, Lead Counsel advised that the cost of administration is expected to amount to $1,400,000. In documents submitted to the Court after the hearing, that figure has risen to $1,500,000. Attorney's fees in the amount of $1,500,000,[5] and expenses of $117,238.92, are also requested to be deducted from the proposed settlement fund. The net recovery to the class if the Court approves the settlement, and claimed attorney's fees and expenses, will thus be less than $3,000,000, and more than 800,000 persons are potential claimants.

Lead Counsel offered no analysis of the likely recovery to any individual class member pursuant to the settlement. Mr. Schiffrin alluded to a determination that recovery of damages is unlikely, which he says was made by his damages expert, who he identified only by the name of

---

[5] As structured, another $100,000 for attorney's fees incurred by Plaintiffs' counsel in the derivative suit was also to come out of the class action settlement fund.

8

that person's firm, Financial Economics, Inc., and from whom he presented no report or testimony. In response to a question from the Court as to how much time the expert spent on this matter, Mr. Schiffrin estimated that the expert spent twenty hours working on the case.

At the fairness hearing, the Court attempted to determine the approximate dollar amount that an individual class member might recover, by asking Mr. Schiffrin what his original client, Lead Plaintiff PAM, might recover if this settlement were approved. Mr. Schiffrin replied that there were too many variables present to allow for a definitive answer, but he accepted the Court's guess that PAM would recover no more than $1,000 on its asserted loss of approximately $870,000.

According to documents submitted to the Court, 485,276,561 shares of Halliburton were traded during the class period. The Court calculates that if none of the class members were to opt-out of this settlement (and some 134 class members have done so) and all class members were to submit proper claims to the settlement fund, the Court calculates that a class member with 100 affected shares would recover approximately $.62 from the net settlement fund. At the hearing, Mr. Schiffrin opined that holders of anywhere between 5% and 50% of the affected shares could be expected to make claims. If 50% did so, a holder of 100 affected shares would receive approximately $1.24, and if only 5% did so, that shareholder would receive approximately $12.36. The Court recognizes that a variety of factors could impact the recovery, but believes this analysis to be reasonably accurate for the purposes of the consideration of the proposed settlement.

Lead Counsel asserts that the proposed settlement confers a substantial benefit upon the class. The Pro-Settlement Plaintiffs allege damage to the class in the amount of $117,010,994.

9

No evidence was presented at the hearing as to how that figure was determined. If this damages

estimate is correct, the settlement would award the class a net recovery of approximately 2.56%

of the damages suffered by the class members. Lead Counsel argued that in continued litigation,

the class members would be able to recover little, if anything, for their claims because the causal

link between the Defendants' alleged conduct and Plaintiffs' injury is tenuous.

In its objection to the proposed settlement, AMSF estimates that the proper range for a

settlement in this case is between $799 million and $4.036 billion. As part of its objections,

AMSF submitted to the Court the Declaration of its damages expert, Dr. Scott Hakala. AMSF's

counsel declined to call Dr. Hakala to testify at the fairness hearing, even though he was present

in Court. AMSF stands by Dr. Hakala's Declaration as a "conservative estimate" of the value of

the class claims. This damages estimate is contested by Defendants and Pro-Settlement

Plaintiffs, who argue that the premises and assumptions of Dr. Hakala's analysis are wrong.

If it could do so, the Court would assess whether the class recovery from the proposed

settlement is within a range of acceptable settlements by measuring it against the potential

recovery for what is alleged in the Complaint. "One method of assessing the possible range of

recovery is to juxtapose the relief sought in the complaint realistically against that provided by

the settlement". *Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 361-62 (S.D.Miss.

2003); *see also, Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). Here, however, the

Court is not satisfied that the damage analyses before it are sufficient to permit it to conduct this

analysis.

Had the proof before it been adequate, the Court would also conduct a full analysis of

other factors in determining whether to approve the settlement: (1) whether the settlement was a

10

product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of proceedings and the amount of discovery completed; and (4) the opinions of the participants, including class counsel, class representatives, and the absent class members. *See generally, In re Corrugated Container Antitrust Litigation,* 643 F.2d at 212; *Lelsz v. Kavanagh,* 783 F.Supp. 286, 294 (N.D.Tex. 1991). To the extent the Court has sufficient information to address these factors, the Court will comment on them.

1. WHETHER THE SETTLEMENT WAS A PRODUCT OF FRAUD OR COLLUSION

The Court does not have evidence that this settlement was the product of fraud. However, the Court is not satisfied that the way in which the settlement negotiations were conducted assured a fair, reasonable, and adequate recovery to the class. Although the Court does not conclude that this conduct constitutes "collusion," its deficiencies certainly raise questions. "[I]n reviewing a proposed settlement the district court should always consider the possibility that an agreement reached by the class attorney is not in the best interests of the class. This is particularly true where . . . the class attorney settles the case without the participation or consent of the active class members." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978).

Shortly after being appointed, Lead Counsel entered into settlement negotiations and held secret meetings with defense counsel, without the knowledge of all the Lead Plaintiffs or the Executive Committee.[6]  The Private Securities Litigation Reform Act of 1995 was enacted "to

---

[6] AMSF's counsel, Scott + Scott, was a member of the Executive Committee, but it had no prior or simultaneous notice that settlement talks had commenced in February 2003 and continued into March and April of 2003. The structure for handling the litigation was so lacking that the Executive Committee did not have its first meeting until May of 2003, a month after

11

empower investors so that they, not their lawyers, control securities litigation." S. Rep. No. 104-98, at 6 (1995). It was Congress's expectation "that the lead plaintiff – not lawyers – should drive the litigation." *Id.* at 10; *see also, Gluck v. CellStar Corp.*, 976 F.Supp. 542, 544 (N.D.Tex.1997) ("Specifically, Congress intended "to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel.").

Lead Plaintiffs appointed by the Court are expected to exercise that control over the litigation. Taking AMSF, one of the Lead Plaintiffs, out of the decision-making loop deprived the class of the benefits of multiple Lead Plaintiffs. In particular, the class lost "the substantial benefits of joint decision-making." *Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.*, No. 03 Civ.8264 RWS, 2004 WL 1179311, at *22 (S.D.N.Y. May 27, 2004). The Court is dismayed that Lead Counsel here felt at liberty to exclude any of the Lead Plaintiffs from significant involvement in material activities in the case, which settlement surely is. No one can know how active involvement of AMSF in the negotiations might have affected the outcome of the negotiations.

In addition to its concerns about the secret manner in which the negotiations commenced and proceeded, the Court is concerned about two of the terms of the negotiated settlement, both of which disadvantaged the class and for which Lead Counsel gave no explanation. First, the settlement as presented to the Court for approval provided for Plaintiffs' counsel in the derivative

---

Lead Counsel and the Defendants had reached a settlement in principle.

12

action to be paid from the $6 million settlement of the class action lawsuit. When questioned by the Court at the fairness hearing, counsel for the derivative Plaintiffs was unaware that the settlement of the class action was the source of his fees. When the Court expressed concern over that fact, defense counsel immediately offered to have the Defendants directly pay those attorney's fees. This singular inquiry added $100,000 to the amount available to the class members from the settlement fund. This result certainly suggests that Lead Counsel might have obtained this concession from the Defendants if Lead Counsel had insisted upon it, and raises a question as to how vigorously the interests of the class were advocated in the settlement by Lead Counsel.

Second, the Court is similarly concerned with the negotiation for the Release required of the class members who make claims to the settlement fund. The Release in the Stipulation and Agreement of Settlement, which is attached to the Willner Declaration filed on August 19, 2004, is extremely broad. It would extinguish "any and all Claims ... arising out of or relating in any way to any transaction, fact, occurrence, conduct, act, event, representation, statement or omission *alleged or that could have been alleged*....".[7](emphasis added) No explanation was given at the fairness hearing as to why Schiffrin & Barroway had agreed to a settlement with such a broad form of release, which releases all claims of any class member against Halliburton and the other Defendants for any of their conduct during the class period, as well as any claims of class members against Lead Counsel for their activities in the settlement negotiations and

---

[7] At the hearing, Mr. Stevens took strong issue with the Court's expressed concern over the breadth of the Release, to which AMSF, through Scott + Scott, had objected. At the Court's direction, Mr. Stevens read the Release and then expressed surprise as to the scope of the Release, and a willingness to modify it to limit it to the issues raised in this litigation.

13

litigation of this case.

"[A] federal district court may not approve a class-action settlement that seeks to release claims that are inadequately represented by the named plaintiffs." *International Union of Electronic, Electrical., Salaried, Mach, and Furniture Workers, AFL-CIO v. Unisys Corp.*, 155 F.R.D. 41, 48 (E.D.N.Y. 1994). In this case, the Release would extinguish claims that have not even been alleged and that do not relate to the claims in the suit. There is no basis for this Court to determine that the Lead Plaintiffs and Lead Counsel are adequate representatives for claims that have not been alleged. Again, the failure of Lead Counsel to resist an expected effort by Halliburton and the other Defendants to obtain a release of all conceivable claims arising during the class period naturally causes the Court to question the vigor of Lead Counsel's settlement advocacy.

2. THE COMPLEXITY, EXPENSE, AND LIKELY DURATION OF THE LITIGATION:

By all accounts, this is a complex and intricate securities lawsuit. If this case were to continue on to trial a considerable amount of time and expense would be incurred by all parties to the litigation. The Plaintiffs' attorneys' fees are contingent, and the class members will not have to pay fees or expenses unless there is a recovery. The Plaintiffs' case may not withstand Motions to Dismiss, Motions for Summary Judgment, or Motions for Class Certification. These factors suggest that a resolution of this lawsuit by settlement could be in the best interests of the class, but it must be a fair, reasonable, and adequate settlement.

14

3. THE STAGE OF PROCEEDINGS AND THE AMOUNT OF DISCOVERY COMPLETED

"This factor 'captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" *In re Cendant Corp. Litigation*, 264 F.3d 201, 235 (3d Cir. 2001) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 813 (3d Cir. 1995)). In this case, no discovery occurred prior to negotiations. After a settlement was reached, confirmatory discovery was performed. The results of the confirmatory discovery have been made available to only three of the four Lead Plaintiffs. Confirmatory discovery, by its very nature, is not adversarial. In contrast, "pretrial negotiations and discovery must be sufficiently adversarial so that they are not 'designed to justify a settlement ... [but are] an aggressive effort to ferret out facts helpful to prosecution of the suit.'" *Martens v. Smith Barney, Inc.* 181 F.R.D. 243, 263 (S.D.N.Y. 1998) (quoting *Saylor v. Lindsley,* 456 F.2d 896, 899 (2d Cir. 1972)). The absence of any adversarial discovery is a negative factor in persuading the Court of the wisdom of settlement, at this time, on these terms, although the Court notes that formal discovery cannot be undertaken at the early stages of the litigation under the PSLRA.

4. OPINION OF CLASS COUNSEL, LEAD PLAINTIFFS, AND THE ABSENT CLASS MEMBERS

Finally, the Court considers the opinions of those affected by this proposed settlement. Lead Counsel and the Pro-Settlement Plaintiffs are of the opinion that this is a fair, reasonable and adequate settlement. Approximately 860,000 notices were sent out to potential class

15

members, and only 134 opted out. Only six filed objections (and several of those were not in accordance with the requirements set out in the Notice sent to class members.) The Pro-Settlement Plaintiffs contend that these facts demonstrate that the settlement is acceptable to the class. However, "a low level of vociferous objection is not necessarily synonymous with jubilant support. In many class actions, the vast majority of class members lack the resources either to object to the settlement or to opt out of the class and litigate their individual cases." *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 217-18. This is true of the case at bar. The Court will not construe the absence of a chorus of objections as equivalent to a symphony of support, particularly in light of the vigorous objection of Lead Plaintiff AMSF. The Court will, however, consider the number of objections and opt outs for what it demonstrates – few class members have expressed opposition to the proposed settlement.

### III. CONCLUSION

The record is "[in]adequate to [allow the Court to] reach an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated and form an educated estimate of the complexity, expense and likely duration of such litigation, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Scardelletti v. Debarr*, 265 F.3d 195, 204 (4th Cir. 2001). Since the Court is not satisfied that the settlement proposed is fair, reasonable, and adequate, and since the Court has concerns both about the manner in which settlement was reached, and the terms of the proposed settlement, the Court will not approve it at this time.

However, because a fair, reasonable and adequate settlement may still be achievable, the

16

Court stays this case through December 3, 2004, for all but the following activities:

1.    On or before September 28, 2004, Counsel for the Defendants and Schiffrin & Barroway are to make available to Scott + Scott any and all documents and depositions made available to Schiffrin & Barroway as "confirmatory discovery." As for any oral interviews conducted by Schiffrin & Barroway, they shall provide to Scott + Scott any and all recordings made of such interviews, or, if they are not available, counsel's notes of such interviews, which Scott + Scott may share with no one other than their clients, Kimble, Murphey, and AMSF.

2.    On or before October 8, 2004, Scott + Scott and, if he wishes, Craig Walker, as counsel for Patricia Magruder, shall meet with counsel for Halliburton, and any other defense counsel who wish to participate, to discuss the claims contained in the Moore and Kimble Complaints, and in the proposed Murphey Complaint, as well as the issues raised in Ms. Magruder's Objections, so that counsel may exchange views on why such claims and objections are tenable or untenable. If they choose to do so, Lead Plaintiffs, including AMSF, Ms. Magruder, and the Defendants may attend any such meeting(s).

3.    On or before November 1, 2004, all of the Lead Plaintiffs, Schiffrin & Barroway, and, if they wish, the members of the Executive Committee, shall meet in person to engage in a mediation, with a mediator to be appointed by the Court. If by September 24, 2004, all of the Lead Plaintiffs and the Defendants reach agreement

17

on selection of a mediator, and advise the Court in writing as to their agreement, the Court will appoint that person. Otherwise, the Court will select the mediator. The Court will also appoint a guardian *ad litem* to represent the preliminarily certified class at the mediation, to advise the Court as to the fairness, reasonableness and adequacy of any settlement proposal reached in that mediation[8]. The parties are all directed to cooperate fully with the guardian *ad litem* so he or she may be prepared to participate in the mediation. The fees of the mediator and the guardian *ad litem*, will be paid one-half by the Defendants and one-half from any fees approved by the Court as attorney's fees for Plaintiffs' counsel.

4.     No later than December 1, 2004, Schiffrin & Barroway, Scott + Scott, and counsel for the Defendants shall advise the Court in writing as to whether Defendants and Schiffrin & Barroway, with or without Scott + Scott, recommend a different settlement and if so, its terms. The Court will then advise the parties as to how it will handle any such proposal.

---

[8]   In order to facilitate the protection of absent class members, the Court may appoint a guardian *ad litem*. *See, e.g., Ahearn v. Fibreboard Corp.,*162 F.R.D. 505 (E.D. Tex. 1995) *aff'd sub nom. In re Asbestos Litigation,* 90 F. 3d 963 (5th Cir. 1996) *rev'd on other grounds sub nom. Ortiz et al. v. Fibreboard Corp.,* 527 U.S. 815 (1999). "The function of the guardian *ad litem* is to review the settlement from the point of view of members of the class and thereby to afford the class additional assurance that their interest will be adequately protected." *In re Asbestos Litigation*, 90 F. 3d at 972. This is especially appropriate in cases such as this, where the record supporting settlement is "sparse." *Manual for Complex Litigation,* § 21.644 (4th ed. 2004). The Court finds that the appointment of a guardian *ad litem* is not only appropriate, but also necessary for the protection of the more than 860,000 class members who would be bound by a settlement in this case.

5.    Because the activities in this case during the period of the stay relate to the

potential for settlement, and the members of the preliminarily certified class

already received notice of potential settlement pursuant to the Order Preliminarily

Approving the Settlement, no new notice to the class is required.

6.    If the case is not resolved by December 3, 2004, the Court will consider whether

the appointment and terms of appointment of Lead Plaintiffs and Lead Counsel

should be modified, and will otherwise establish a schedule for determining other

matters pending or to be resolved.

SO ORDERED this _9th_ day of September, 2004.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

19