UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | CIVIL ACTION NO. 05-11177-DPW |
| M3POWER RAZOR SYSTEM | (LEAD CASE) |
| MARKETING & SALES PRACTICES | |
| LITIGATION | MDL Docket No. 1704 |
| | |
| THIS DOCUMENT RELATES TO: | |
| **ALL CASES** | |

## THE GILLETTE COMPANY'S SUBMISSION IN SUPPORT OF
## PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT

The Gillette Company ("Gillette") makes this submission pursuant to the Court's October 18, 2006 order, in support of preliminary approval of the Settlement Agreement filed with the Court on October 8, 2006. As set forth more fully below, the proposed settlement is fair, reasonable, and adequate. Therefore, Gillette respectfully requests that the Court preliminarily approve the settlement, certify the Settlement Class for settlement purposes only, and approve the proposed notice.

## Summary of Factual and Procedural Background

On May 24, 2004, Gillette launched its then-latest model razor, the M3Power. The M3Power is a battery-powered razor with an oscillating head. Prior to the launch of the M3Power, Gillette's consumer testing showed that consumers substantially preferred the M3Power, 3 to 1 over Schick's then-latest product, the Quattro razor, and 2 to 1 over Gillette's own MACH3 Turbo razor. *See* Ex. A at ¶¶ 2-6; 16; 20-23; 33; 37-40; 50. In these "double-blind" consumer tests, done *prior to* any advertising of the M3Power, consumers confirmed that they preferred the M3Power both overall and in terms of specific performance attributes such as

smoothness and closeness of shave.  *See id.*  The tests established the superiority of the M3Power shave and supported Gillette's launch of the M3Power as a premium product.

Several months after the launch of the M3Power, Gillette's competitor in the world-wide wet-shave razor market, Schick, commenced a series of lawsuits against Gillette in several foreign jurisdictions, challenging the accuracy of Gillette's advertising for the M3Power Razor. *See* Ex. B at GMPC001949-58; Ex. C at GMPC001960-77; Ex. D at GMPC002516-23; Ex. E at GMPC002578-83.  In particular, Schick challenged a portion of the copy in Gillette's print and television advertising stating that the oscillation of the M3Power's cartridge raised facial hair "up and away" from the skin.  In addition, Schick challenged a relatively brief (1.5 seconds) cartoon animation in Gillette's television commercials showing facial hairs changing angle or extending from the skin during the M3Power's use.  In France, Belgium, and the Netherlands, courts rejected Schick's efforts to enjoin the advertising, noting that "the action mechanism of the M3 POWER appears reasonably well founded" (France) and "plausible" (Netherlands), and that Schick's claim was "groundless" (Belgium).  *See* Ex. F at GMPC002087; Ex. E at GMPC002582; Ex. G at GLTE000022.  In Germany and Australia, the courts ruled in Schick's favor but only preliminarily, with the actions proceeding into further litigation of the claims.  *See* Ex. B at GMPC001949-58; Ex. C at GMPC001960-77.

In or about January 2005, after the first of these foreign litigations was underway, Gillette on its own initiative modified the cartoon animation in its North American television advertisements, limiting the animation to facial hairs "extending away" from the skin.  *See* Ex. H at GMPC001358-59.  At about the same time, Schick asserted essentially the same claim in the United States District Court for the District of Connecticut, alleging that Gillette's advertisements violated the Lanham Act, and seeking a preliminary injunction against the

continued running of the advertisements. *See* Compl., Docket No. 1, *Schick Mfg, Inc. v. Gillette Co.*, No. 05-00174-JCH (D. Conn. Jan. 28, 2005), 2005 WL 413522. After expedited discovery had been completed, a preliminary injunction hearing was held over the course of four days before the Honorable Janet Hall. On May 31, 2005, Judge Hall issued a preliminary injunction, requiring Gillette to remove the cartoon animation in its television ads, and remove the "up and away" language from its advertising generally. *See* Prelim. Inj. Order, Docket No. 121, *Schick Mfg., Inc. v. Gillette Co.*, No. 05-00174-JCH (D. Conn. May 31, 2005). Gillette and Schick then turned their efforts to fully litigating the Connecticut case, and proceeding toward an eventual trial on the merits. In particular, Gillette and Schick engaged in extensive discovery, in which Gillette produced over 100,000 pages of documents relating to both liability and damages. After document discovery had concluded, Gillette and Schick, in early 2006, reached a settlement of their dispute as to the M3Power advertising worldwide, pursuant to which all litigations, including the action in the District of Connecticut, were dismissed by agreement. *See* Stipulation of Dismissal, Docket No. 153, *Schick Mfg., Inc. v. Gillette Co.*, No. 05-00174-JCH (D. Conn. Feb. 14, 2006).

In the meantime, the preliminary injunction issued in the Connecticut action had garnered substantial nationwide press, leading to the filing of consumer class actions in over fifteen jurisdictions in the United States and Canada. In the United States, all actions filed in state court were removed to federal court and all of the actions were ultimately transferred for pre-trial purposes by the Judicial Panel on Multidistrict Litigation to this Court. By March of 2006, the actions were consolidated and Co-Lead Counsel were appointed. As discovery commenced, Gillette produced to Plaintiffs the discovery it had produced to Schick, as well as hearing transcripts and exhibits. Gillette proceeded to depose two of the eight Representative Plaintiffs.

During the course of this litigation, Gillette initiated settlement overtures with plaintiffs' counsel. While Gillette believes the claims to be without merit and has been fully prepared to litigate the consolidated cases if necessary, Gillette has at the same time diligently explored the prospects for bringing these class actions to a fair and acceptable non-litigated outcome, without undue delay. Thus, in response to demand letters under Mass. Gen. Laws ch. 93A, Gillette made a "reasonable tender of settlement" offering to extend a refund to any class member who wanted one and was willing to return his razor. *See* Ex. I hereto. Substantial progress toward a potential settlement then took place after the appointment of Co-Lead Counsel, who, under the Court's case management orders, were authorized to conduct such discussions on behalf of all of the consolidated cases. Following lengthy and extended negotiations, as described more fully below, the parties executed a Settlement Agreement on October 6, 2006.

<u>**The Proposed Settlement**</u>

The Settlement Agreement provides for the establishment of a Settlement Fund of $7.5 million for the distribution of cash and other benefits to the Settlement Class.[1] *See* Settlement Agreement ¶ 2.1. Significantly, the settlement is designed specifically to afford putative class members the ability to select a benefit that responds directly to their purported injury:

- Class members who do not like their M3Power Razor may send it back for a $13 refund (or more, if supported by a receipt), *plus* $2 for postage; or

- Class members who wish to retain, or who no longer have, their M3Power Razor may obtain rebates – up to $10 – on the purchase of M3Power blades or Fusion manual or power razors, even if purchased before announcement of the settlement.

---

[1] Unless otherwise indicated, terms used herein have the same meaning as in the Settlement Agreement.

Three other features of the proposed settlement also ensure its fairness, reasonableness, and adequacy. First, the proposed settlement calls for a broad notice plan, but caps at $2.45 million the amount of the Settlement Fund that can be used for costs of notice and Claims Administration.[2] Second, the proposed settlement ensures that Gillette receives no reverter. In the event the refund and rebate claims do not exhaust the Settlement Fund, Gillette will distribute a "Settlement Razor" (*i.e.,* a Fusion manual razor with a cartridge blade) in various waves – first to prior claimants, then to those who file claims via a website link, and finally to a group selected by Gillette and Co-Lead Counsel, until the Settlement Fund is exhausted.

Finally, under the proposed settlement, Gillette has agreed to pay – on top of the $7.5 million Settlement Fund – Plaintiffs' reasonable attorneys' fees, costs, and expenses up to $1.85 million, as well as specific plaintiff incentive awards, in the maximum amount of approximately $21,000. Gillette's payment of Plaintiffs' attorneys' fees, costs, and expenses provides benefits to the class *without diminishing* the $7.5 million Settlement Fund, and brings the full settlement value up to approximately $9.35 million.[3]

## A.    Refunds And Rebates

The proposed settlement contemplates the distribution of benefits in stages. During the "Initial Claim Period," defined as the "six months from the date of the first publication of notice of the Final Fairness Hearing," Settlement Agreement ¶ 1.9, Settlement Class Members can elect to submit claims for either refunds or rebates.

---

[2] Any such costs in excess of $2.45 million will be separately and additionally borne by Gillette. *See* Settlement Agreement ¶¶ 2.5, 3.2. Andrew Novak estimates that the cost of notice in the United States and Canada is likely to be in the range of $2.4 to $2.5 million, depending on when the notices are published. *See* Ex. J hereto.

[3] Attorneys' fees, costs, and expenses and plaintiff incentive awards were discussed for the first time only *after* the parties had reached agreement on the substantive terms of the settlement.

Under the refund option, a Settlement Class Member must send in, along with his claim form, his M3Power Razor.[4]  In return, he will receive a refund check for $13 in U.S. dollars if the razor was purchased in the United States, or $16.25 in Canadian dollars if the razor was purchased in Canada, plus $2 for postage.[5]  A Settlement Class Member whose M3Power Razor cost more than $13 in U.S. dollars or $16.25 in Canadian dollars can receive a refund check in the amount of the actual price paid if he also submits a receipt reflecting the higher price.[6]  *See* Settlement Agreement ¶ 2.1(b)(i).

Under the rebate option, a Settlement Class Member can choose to receive up to two $5 rebate checks on purchases of M3Power blades or Fusion razors (manual or battery powered) made during the period beginning May 1, 2004 through the end of the Initial Claim Period.[7]  *See id.* 2.1(b)(ii).

---

[4] The Claims Administrator will maintain any such packages in the condition in which they are received and will not open them for processing until after final approval of the settlement is granted.  In the event the settlement is not finally approved, the Court will decide what is to be done with the razors.  *See* Settlement Agreement, Ex. E (Proposed Long Form of Notice) at Question 13.

[5] $13 in U.S. dollars equals $16.25 in Canadian dollars at the average prevailing commercial exchange rate (approximately 0.8) over the period May 1, 2004 through October 31, 2005.  For postage, Settlement Class Members living in Canada will receive the Canadian dollar equivalent of $2 at the prevailing commercial exchange rate in effect at the time of distribution. *See* Settlement Agreement ¶ 2.1(b)(i).

[6] All credits against the Settlement Fund will be calculated in U.S. dollars, and, for payments in Canadian dollars, will be calculated at the prevailing commercial exchange rate in effect at the time of distribution.  *See* Settlement Agreement ¶ 2.1(b)(iii).

[7] To receive the rebates, a Settlement Class Member must provide proof of purchase, in the form of either a UPC code from the package of M3Power blades and/or any Fusion razor, or a receipt showing that such package of M3Power blades or Fusion razor was purchased during the period beginning May 1, 2004 through the end of the Initial Claim Period.  Rebate checks to Settlement Class Members living in Canada will be issued in the Canadian dollar equivalent at the prevailing commercial exchange rate in effect at the time of distribution.  *See* Settlement Agreement ¶ 2.1(b)(ii).

In the event valid claims for refunds and rebates exceed the Settlement Fund, after accounting for the costs of notice and Claims Administration up to $2.45 million, the benefits to Settlement Class Members will be reduced *pro rata*. *See id.* ¶ 2.2. However, if valid claims for refunds and rebates do not exhaust the Settlement Fund, Settlement Razors will be distributed to all, or a statistically random sample, of Settlement Class Members who submitted valid claims, depending on amounts.[8] *See id.* ¶ 2.3(a). With each Settlement Razor, a Settlement Class Member also will receive $4 in coupons on Gillette shaving-related products, which are in addition to the Settlement Fund.[9] *See id.* ¶ 2.3(d).

**B.    Web Site Distribution Of Settlement Razors**

If any unclaimed balance remains in the Settlement Fund after the Initial Claim Period, the next stage of the proposed settlement (the "Residual Claim Period") will go into effect. During the Residual Claim Period, Gillette will establish a link at its M3Power Razor webpage, inviting those Settlement Class Members who did not previously submit claims for refunds or rebates to obtain a Settlement Razor. Settlement Class Members who opt for this benefit will only need to certify that they (i) purchased or otherwise acquired an M3Power Razor during the Settlement Class Period; and (ii) have not previously submitted a claim under the settlement. Benefits under this stage of the proposed settlement will remain available to Settlement Class Members for 90 days, or until the credits exhaust the balance of the Settlement Fund, whichever occurs first. *See id.* ¶ 2.3(b).

---

[8] The credit against the Settlement Fund for each such Settlement Razor will be $6.25, *see* Decl. of Kevin McNamara, Ex. A at GLTE000014 (identifying information providing basis for $6.25 credit), plus $0.75 for Gillette's postage, packaging, and administrative costs, for a total credit of $7.00 per Settlement Razor. *See* Settlement Agreement ¶ 2.3(a).

[9] Gillette has further agreed that no future promotions will be reduced to reimburse Gillette for any distribution of refunds, rebates, or razors under the proposed settlement. *See* Settlement Agreement ¶ 2.4.

### C.    Fluid Recovery

If after the close of the Residual Claim Period there remains an unclaimed balance in the Settlement Fund, Gillette will distribute the unclaimed balance by sending Settlement Razors to a group to be selected by Gillette and Settlement Class Counsel, or in the event they cannot agree, by the Court.  Such a distribution will be made proportionally to the populations of the various states and Canada, to the extent reasonable and practicable.  During this last phase of the proposed settlement, the number of Settlement Razors distributed will be sufficient to exhaust the Settlement Fund.  *See id.* ¶ 2.3(c).

### D.    Settlement Class Period

The advertising challenged by Plaintiffs stopped running in both the United States and Canada in the summer of 2005.  At or about the same time, Gillette also began a stickering program in the United States to cover the "offending" language on the product packaging.  *See Keates Decl., Docket No. 138-3, Schick Mfg., Inc. v. Gillette Co.*, No. 05-00174-JCH (D. Conn. Aug. 31, 2005).  This program was largely completed by September 2005, *see id.*; hence, the class period in the United States runs through September 30, 2005.  In Canada, stickering did not occur, but by October 2005, product being shipped into Canadian distribution centers no longer included the "offending" language on its packaging.  Accordingly, the class period in Canada runs through October 31, 2005.

### E.    Release

In return for the benefits provided under the proposed settlement, Settlement Class Members will release all of their claims (the "Released Claims") against Gillette and its Related

Parties arising out of the allegations, facts, or circumstances alleged in the Litigation.[10]  *See* Settlement Agreement ¶¶ 1.15, 1.16, 6.1.

## I.     THE SETTLEMENT IS PRESUMPTIVELY FAIR BECAUSE THE REQUISITE INDICIA OF PROCEDURAL FAIRNESS ARE PRESENT IN THIS CASE.

The proposed settlement should be preliminarily approved because the procedural indicators of fairness are satisfied here:  (1) Settlement Class Counsel is experienced in representing and litigating consumer class actions; (2) there has been sufficient discovery to allow the parties to assess the strengths and weaknesses of their respective cases; and (3) the settlement agreement was negotiated at arm's length.  *In re Lupron Mktg. & Sales Practices Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004).  Accordingly, the settlement is presumptively fair.  *City P'Ship Co.*, 100 F.3d at 1043 ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement.").

### A.     Discovery Has Been Substantial And More Than Sufficient.

The underlying actions in these consolidated proceedings were commenced based primarily upon the Schick preliminary injunction proceedings against Gillette in the District of Connecticut (indeed, multiple complaints attached Judge Hall's preliminary injunction order as an exhibit).  Not a single complaint in these consolidated proceedings was filed prior to the preliminary injunction order entered in that case.  In effect, Plaintiffs have treated these consumer class actions as an extension of the Schick action, even pressing for, and obtaining, the discovery that Gillette produced in the Connecticut action.  The Schick preliminary injunction

---

[10] *See City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) (noting that it is "well-settled" that a settlement can include the release of a "claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action") (internal quotation marks and citations omitted).  The definition of "Released Claims," however, excludes alleged bodily injury claims, if any, of any Settlement Class Member arising from the purported use of an M3Power Razor.  Settlement Agreement ¶ 1.16.

proceedings and resulting memorandum and order by Judge Hall, albeit preliminary, provided

Plaintiffs with a substantial articulation of the issues and evidence relating to the advertising in

dispute.

Against this backdrop, while the *period* for discovery in these consolidated proceedings

has been relatively brief, the *amount* of discovery provided by Gillette to Plaintiffs has been

substantial. In particular, Gillette has produced the extensive documentary record – in excess of

100,000 pages – relating to liability and damages issues which was produced to Schick after the

preliminary injunction hearing. Gillette also has produced deposition discovery and the

testimony of the five Gillette witnesses and the five Schick witnesses at the Connecticut

preliminary injunction hearing (along with the exhibits introduced at the hearing). This sizable

record quickly put the parties in a position to discuss settlement in earnest. *See, e.g.*, *In re*

*Prudential Ins. Co. Sales Practices Litig.*, 148 F.3d 283, 319 (3d Cir. 1998) (noting that what

matters is whether the parties to a proposed settlement had an "adequate appreciation of the

merits of the case before negotiating") (internal quotation marks and citation omitted); *Lipuma v.*

*Am. Express Co.*, 406 F. Supp. 2d 1298, 1325 (S.D. Fla. 2005) (approving early settlement and

noting that class counsel was familiar with the practices at issue based on previous related

litigation).[11] In addition, Gillette provided Co-Lead Counsel with financial information relating

---

[11] *See also In re Vitamins Antitrust Litig.*, No. 99-197-TFH, 2000 WL 1737867, at *3 (D.D.C. Mar. 31, 2000) ("'Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements – especially in complex class action cases – should be done.'" (quoting *In re M.D.C. Holdings Sec. Litig.*, No. 89-0090, 1990 WL 454747, at *7 (S.D. Cal. Aug. 30, 1990)); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (refusing to invalidate proposed settlement on the grounds of insufficient discovery, noting that despite minimal formal discovery, "plaintiff's negotiators had access to a plethora of information regarding the facts of their case"; *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (approving a class action settlement that was reached after "very little formal discovery," because plaintiffs otherwise had access to information); *San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999)

to their assessments of alleged damages, and, as part of confirmatory discovery, supporting

information for various financial components of the proposed settlement.  Among other things,

Gillette produced data on:

- monthly M3Power Razor average retail prices and retail sales in the United States and Canada over the class period; [12]

- average retail prices for M3Power blades in the United States and Canada over the class period;

- profits on the number of M3Power Razors and blades sold at retail in the United States and Canada over the class period;

- the average retail price of the MACH3 Turbo razors and blades in the United States and Canada over the class period;

- average wholesale prices of the M3Power Razor and MACH3 Turbo razor in the United States and Canada over the class period;

- the average retail price of manual Fusion razors; and

- historical media data.

Also in the context of confirmatory discovery, Co-Lead Counsel deposed a representative of

Gillette familiar with the financial information that Gillette had previously disclosed.  For its

part, Gillette deposed two of the Representative Plaintiffs, Collin McGeary and Adam Kline.

## B.    The Settlement Negotiations Were At Arm's Length.

In July 2005, soon after the commencement of these cases, Gillette made a reasonable

tender of settlement in response to not only pre-suit demand letters issued under state consumer

protection statutes, including ch. 93A, but to all named plaintiffs who had filed an action as of

that time.  Gillette initially offered to provide a refund, in the amount of $12, or the actual price

paid if proof of purchase were provided, to any consumer who purchased an M3Power Razor on

---

(noting that "a court may consider information available to the parties which was developed in prior or related proceedings").

[12] Gillette does not maintain retail sales figures in the United States on a state-by-state basis.

or before July 1, 2005, and who returned such razor. The offer was limited to two razors per household address. In addition, Gillette offered to reimburse consumers for their actual postage costs and to provide them with a $1 coupon toward the future purchase of any Gillette brand product. *See* Ex. I hereto.

After its original settlement offer, Gillette had occasional conversations about the possibility of settlement with plaintiffs' counsel in various of the underlying actions. By order dated March 17, 2006, the Court appointed Co-Lead Counsel, vesting them with full authority to "[c]onduct settlement negotiations and receive all settlement communications as the exclusive representatives on behalf of all Plaintiffs and the putative class."[13] Case Management Order No. 2, ¶ 2a(ii). As of the time Co-Lead counsel were appointed, Co-Lead Counsel and Gillette's counsel had not reached any agreement regarding the fact or terms of settlement. Only *after* Gillette made its initial disclosures did Co-Lead Counsel and Gillette's counsel meet face-to-face regarding settlement. Since that time, Co-Lead Counsel and Gillette's counsel have had extensive, arm's length negotiations, including another face-to-face meeting in early July 2006, and numerous telephone meetings. The parties ultimately entered into a non-binding memorandum of understanding in late July 2006. After that time, Co-Lead Counsel and Gillette's counsel continued to negotiate the substantive terms of a final settlement agreement for a period of more than two months. Only after they reached final agreement on the substantive terms of the settlement did the parties begin to negotiate attorneys' fees and plaintiff incentive awards.

---

[13] The Court's order further authorized Co-Lead counsel to "[a]dvise the Plaintiff Steering Committee of settlement proposals and obtain the Plaintiff Steering Committee's input and comments regarding same." Case Management Order No. 2, ¶ 2(a)(xii).

The significant value that the settlement provides to Settlement Class Members beyond the terms of the original settlement offer that Gillette made in July 2005 demonstrates that the negotiations between Co-Lead Counsel and Gillette's counsel have been conducted at arm's length.  In particular, the negotiations of the settlement terms led to the following additional benefits for Settlement Class Members:

- A guaranteed settlement fund of $7.5 million, with no reverter, as opposed to no floor on Gillette's payout;

- An extension of the Settlement Class Period from July 1, 2005 to September 30 and October 31, 2005;

- An increase in the refund amount from $12 to $13;

- An increased reimbursement rate for postage from actual postage to a flat $2;

- The extension of settlement benefits to Settlement Class Members who do not return razors, who were not included within the scope of Gillette's original offer;

- An increase in the number of permitted claims per household from two to three;

- In addition to refunds and rebates, the distribution of Settlement Razors to Settlement Class Members who submit valid claims (assuming the Settlement Fund is not exhausted);

- The distribution of Settlement Razors to Settlement Class Members who do not submit claims during the Initial Claim Period (assuming the Settlement Fund is not exhausted);

- Fluid recovery (assuming the Settlement Fund is not exhausted); and

- Agreement to a notice plan with an 80 percent reach, plus a cap on the amount that can be deducted from the Settlement Fund for the costs of notice and Claims Administration.[14]

## II.     THE PROPOSED SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR, REASONABLE, AND ADEQUATE.

In addition to satisfying concerns about procedural fairness, the terms of the proposed settlement are substantively fair.  The proposed settlement provides substantial benefits to Settlement Class Members.  Indeed, the principal benefits under the proposed settlement are cash

---

[14] Gillette's counsel has recently learned that Gillette appears able to provide direct notice by mail to approximately 1,700 consumers, constituting those who previously requested and received a complete refund.  This is significantly less than 0.1% of the several million razors sold during this time.  *See* Decl. of Kevin McNamara, Ex. A at GLTE000002.  In any event, Gillette has retained these consumers' addresses, and thus can provide them with notice by mail.

payments in the forms of refunds and rebates, without limit, up to the full amount available for benefits in the Settlement Fund. To the extent the Settlement Fund is not exhausted by claims for refunds and rebates, Settlement Class Members will receive additional tangible benefits that provide real value to them. Also, Plaintiffs have been provided financial information concerning Gillette's sales and profits on the M3Power Razor during the class period, which amply demonstrate the fairness of the Settlement Fund.

### A.    The Amounts Of The Refunds And Rebates Are Fair And Reasonable.

The overall average retail price of an M3Power Razor in the United States and Canada over the Settlement Class Period was less than the refund provided for under the proposed settlement. *See* Decl. of Kevin McNamara, Ex. A at GLTE000002. As a result, a $13 refund (or its equivalent in Canadian dollars, $16.25) more than makes Settlement Class Members whole. The rebate option similarly provides substantial value to Settlement Class Members who select this form of relief. Moreover, a Settlement Class Member need not make any *new* purchase of a Gillette product to receive a rebate. Rather, the rebate is available on *past* purchases of M3Power blades and Fusion razors, as well as purchases made after notice of the proposed settlement.

### B.    It Is Entirely Fair And Reasonable To Require Settlement Class Members To Submit Proof Of Their Eligibility To Receive Refunds And Rebates.

That Settlement Class Members must send in their M3Power Razors, UPC codes, or receipts to establish their eligibility for the cash payments provided for under the proposed settlement is entirely fair and reasonable for several reasons. Retail distributors sold several million M3Power Razors in the United States and Canada during the Settlement Class Period. *See* Decl. of Kevin McNamara, Ex. A at GLTE000002. Gillette cannot identify the consumers who made these purchases for the simple reason that Gillette does not sell directly to consumers.

Nor, given the nature of the product, was there any reason to record the identity of the purchaser at the time of sale. As a result, Settlement Class Members necessarily must self-identify by submitting claims. In turn, to protect Gillette and legitimate Settlement Class Members against fraudulent claims, some mechanism is necessary to establish membership in the Settlement Class. The requirement that Settlement Class Members send in their razors to receive a refund is the least onerous such requirement (among the available options, such as requiring UPC codes or receipts in all cases), and thus the most likely to encourage participation in the settlement. The proposed settlement also maximizes the opportunity for participation by Settlement Class Members who either no longer have or would prefer to retain their M3Power Razors, through the availability of cash rebates on either past or future purchases of M3Power blades or Gillette's latest razor, the Fusion (manual or battery-powered).

**C.    The Amount Of The Settlement Fund Falls Well Within The Range Of Reasonableness.**

The $7.5 million Settlement Fund is well within the range of reasonableness. Indeed, Plaintiffs' chances of success on the merits in this case, both with respect to liability and damages, are highly uncertain to say the least.[15] Gillette has a number of strong defenses to the claims asserted in the Amended Consolidated Class Action Complaint ("Amended Complaint") that pose a significant risk to Plaintiffs' recovery of *any* amount.

---

[15] If this case were to proceed, Gillette would litigate the issue of liability. Judge Hall's preliminary injunction order issued in the District of Connecticut action would not be entitled to preclusive effect here. *See, e.g.*, *Aaron Basha Corp. v. Felix B. Vollman, Inc.*, 88 F. Supp. 2d 226, 230 (S.D.N.Y. 2000) (observing that preliminary injunctions rarely have preclusive effect); *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 754 (S.D.N.Y. 1990) (same).

1.    Plaintiffs Would Be Unable to Prove that Gillette Misrepresented the
       Shave that Consumers Received.

Gillette submits that Plaintiffs would be unable to prove their claims at trial.  Schick was

unable to prove at the evidentiary hearing on its application for a preliminary injunction that the

claim in Gillette's advertising that the M3Power "raises the hairs" by causing them to extend

away from the skin was false, and indeed the court explicitly noted that it was "skeptical" of

Schick's tests to the contrary, and thus was prevented from "concluding whether, as a matter of

fact, the M3Power raises beard hairs."  *Schick Mfg., Inc. v. Gillette Co.*, 372 F. Supp. 2d 273,

282 (D. Conn. 2005).  As for the cartoon animation, Gillette would be able to demonstrate that

such advertising is not to be taken literally and thus is not actionable.  Moreover, as discussed

above at pages 1-2, Gillette's tests showed that consumers significantly preferred the M3Power

over Schick's Quattro razor and the MACH3 Turbo.  Gillette submits that its evidence would

show, when distilled, that the M3Power Razor is a superior razor that provides consumers with

the quality shave that they paid for, and thus Gillette would prevail on any trial on the merits of

the Amended Complaint.  *See* Ex. A at ¶¶ 16-17; 33-34; 50-51; *see also* GMP070302;

GMP071149.

2.    Plaintiffs Also Would Have to Prove Reliance or Causation Which They
       Could Not Do.

Plaintiffs would have to prove reliance or causation to prevail on a number of their claims

against Gillette, which they simply would be unable to do.  Under their common law claim for

misrepresentation or under certain state consumer protection statutes, Plaintiffs would have to

prove that they decided to purchase an M3Power Razor *as a result of* the allegedly false "rising

up and away" claim.  *See, e.g.*, *Laster v. T-Mobile USA, Inc.*,  407 F. Supp. 2d 1181, 1194 (S.D.

Cal. 2005) ("Because Plaintiffs fail to allege they actually relied on false or misleading

advertisements, they fail to adequately allege causation as required by Proposition 64.  Thus,

under §§ 17203 and 17204, Plaintiffs lack standing to bring their UCL and FAL claims.");

*Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1145 (N.D. Cal. 2005) ("Relief under the

[California Consumer Legal Remedies Act] is specifically limited to those who suffer damage,

making causation a necessary element of proof.") (internal quotation marks and citation

omitted); *Hershenow v. Enter. Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 791 (2006)

(noting that "proving a causal connection between a deceptive act and a loss to the consumer is

an essential predicate for recovery under [Mass. Gen. Laws ch. 93A]); *Aspinall v. Phillip Morris

Cos., Inc.*, 442 Mass. 381, 401 (2004) (noting that causation is a required element of a claim

under Mass. Gen. Laws ch. 93A).  *But see Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133,

1137 (C.D. Cal. 2005) (holding that even following passage of Proposition 64, reliance is not an

element of claim under UCL and FAL).[16]

Whether framed in terms of reliance or causation, Plaintiffs would not be able to prove at

trial that most class members purchased their M3Power Razors as a result of Gillette's

advertising generally, or the challenged "raising up and away" claim in particular.  Rather,

Gillette conducted a number of studies during the year after the launch of the M3Power,

demonstrating that only about one-third of consumers purchased the M3Power Razor because of

"the advertising," GMP070291, and only about 12% of those who saw the advertisements

recalled the statements concerning "raising up and away."  GMP070285.  In light of the fact that

several million M3Power Razors were sold during the Settlement Class Period, *see* Decl. of

---

[16] In contrast, a subsequent decision of a California appellate court, which itself was recently taken up for review by the California Supreme Court and therefore can no longer be cited as support under California's rules, *Pfizer, Inc. v. Superior Court*, 45 Cal. Rptr. 3d 840, 845 (Ct. App. 2006), *review granted Pfizer, Inc. v. Superior Court*, No. S145775 (Cal. Nov. 1, 2006), declined to follow the holding in *Anunziato*, explaining that "it would appear the court [in *Anunziato*] substituted its judgment for that of the voters and based its decision on the perceived ill effects a 'reliance' requirement would have in hypothetical fact situations." *Pfizer*, 45 Cal. Rptr. 3d at 852.

Kevin McNamara, Ex. A at GLTE000002, and that the heart of Plaintiffs' case is that the

M3Power was no better than the MACH3 Turbo but cost a few dollars more, *see id.*, Ex. A at

GLTE000002, GLTE000009, and accounting for the only 12% who recalled the phrasing at

issue, the $7.5 million Settlement Fund is well within the range of a likely recovery in this case.

This is particularly so given the significant problems of proof facing Plaintiffs at a trial on the

merits.

3.    <u>Plaintiffs Would Have to Prove Actual Injury and Damages.</u>

A further, and significant, obstacle to Plaintiffs' likelihood of success in this matter is

their burden to prove injury and damages. *See, e.g.*, *Hershenow*, 445 Mass. at 798 (holding that

under ch. 93A, plaintiffs "must demonstrate that even a *per se* deception caused a loss"); *Dabush*

*v. Mercedes Benz USA, LLC*, 874 A.2d 1110, 1121 (N.J. Sup. Ct. App. Div. 2005) (holding that

plaintiffs failed to establish an ascertainable loss as a result of the alleged failure of an onboard

navigation system to function as advertised); *see also Brown v. Bank of Am., N.A.*, – F. Supp. 2d.

– , 2006 WL 2989031, at *5 (D. Mass. Oct. 17, 2006) (Saris, J.) (citing *Hershenow* and noting

that "[b]oth the Massachusetts and California statutes require loss causation"). *But cf. Aspinall*,

442 Mass. at 394 (suggesting in a health and safety case that deceptive advertising may

constitute an injury in itself).[17]

---

[17] Moreover, Plaintiffs would not be able to recover the statutory minimum damages ($25) under ch. 93A, because, as in *Hershenow*, Plaintiffs could not establish the predicate for an award of statutory damages, *i.e.*, loss causation. *See Hershenow*, 445 Mass. at 799 n.18 ("The statutory damage provision does not supplant the requirement to prove causation under § 9. It merely eliminates the need to quantify an amount of actual damages if the plaintiff can establish cognizable loss caused by a deceptive act."). To the extent Plaintiffs would have sought to rely on *Aspinall* to claim statutory damages in the absence of proof of actual damages, Gillette would have argued that *Aspinall* is inapposite. The allegedly falsely advertised product at issue in *Aspinall* was tobacco, which raised serious health and safety concerns. No such similar concerns exist here; Plaintiffs claim only to have suffered economic injury.

Here, Plaintiffs allege in the Amended Complaint that they have been injured because "[t]he value of the M3P represented in Gillette's advertising is greater than the value of the M3P actually received by plaintiffs." Am. Compl. ¶ 35. To support their entitlement to a remedy, either in the form of damages or restitution, Plaintiffs would have to prove that the alleged difference in value is quantifiable and supported by evidence. *See, e.g.*, *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 63 (Ct. App. 2006) (reversing restitution award under California's consumer protection statutes as not supported by "[s]ubstantial evidence," where plaintiffs presented only evidence "concerning the market value, or retail price of [the defendant's] tools, and the market price of similar tools that were made in China");[18] *Dabush*, 874 A.2d at 1121 (noting that plaintiffs failed to "present any evidence, expert or otherwise, from which an estimate of the value of the navigation system as delivered compared to the value of the navigation system as allegedly promised could be calculated within a reasonable degree of certainty"); *Aspinall*, 442 Mass. at 399 (recognizing viability of "benefit of bargain" measure of damages if proved with "reasonable certainty").

It is highly unlikely that Plaintiffs would be able to demonstrate that the product that they purchased is worth less, on an objective basis, than the product as advertised. In any event, Gillette would vigorously litigate this issue, pointing to such things as the attributes and features beyond its battery-powered operation that the M3Power has, but other razors do not. For example, as compared to Gillette's MACH3 Turbo razor, the M3Power Razor has an improved

---

[18] Contrary to the representation by one of the class action attorneys, the California consumer protection statute does *not* set a statutory minimum recovery of $1,000 per plaintiff, whether in a class action or individual action. For example, because the plaintiffs in *Colgan* could not prove their actual damages with the requisite degree of certainty, the trial court limited the total recovery for the *class* under the California Civil Legal Remedies Act, Cal. Civ. Code § 1780(a)(1), to the statutory minimum, $1,000. *Colgan*, 38 Cal. Rptr. 3d at 43.

coating on its blades and, as evidenced by consumer testing, a handle that provides a superior grip even when wet. GMP030214; GMP005317.

Gillette's survey evidence also would preclude Plaintiffs from arguing successfully that the M3Power Razor is no different from the MACH3 Turbo razor, and further that the proper measure of damages would be the difference between the average retail prices of the M3Power Razor and the MACH3 Turbo razor over the class period. Gillette would be able to adduce at trial consumer testing showing that consumers significantly preferred the M3Power Razor to the MACH3 Turbo razor as well as other razors. *See, e.g.*, GMP024210; GMP003307. These studies demonstrated that consumers were overwhelmingly satisfied with the quality of the shave that they received with the M3Power. For example, more than 80% of survey respondents preferred the M3Power Razor to their prior razor, GMP071147, and of those respondents, 85% indicated that they did so because of the quality of the shave provided by the M3Power Razor. GMP071149.

> **D.** **Variations In State Law Do Not Preclude The Certification Of A National Settlement Class.**

While the Court must assess whether the Settlement Class satisfies the requirements of Rule 23 even at the settlement stage, it need not inquire whether these cases, if tried "would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Because litigation manageability is removed from the certification equation in the settlement context, differences among, and variations in, state laws do not preclude the certification of a national settlement class. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004) (certifying a national settlement class where plaintiffs asserted claims under various state consumer protection statutes, antitrust statutes, and common law); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at

315 (certifying a national settlement class and noting that variations in the laws of the fifty states did not defeat certification in the settlement context); *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp. 2d 59, 71, 73 (D. Mass. 1999) (rejecting argument concerning certification of national settlement class notwithstanding differences in state law).[19]

Similarly, variations in state law do not defeat a finding of predominance under Rule 23(b)(3). *See In re Lupron Mktg. & Sales Practice Litig.*, 228 F.R.D. 75, 92 n.33 (D. Mass. 2005) ("[The] differences in the state consumer protection laws plead [sic] by various members of the class . . . do not pose a serious obstacle to certification."); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 231-32 (D.N.J. 2005) (certifying a national settlement class and holding that since the case was not being certified for litigation purposes, predominance was not defeated by differences in the laws of the fifty states); *Bussie*, 50 F. Supp. 2d 59, 71 (D. Mass. 1999) ("Potential choice of law issues do not preclude a predominance finding."); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) ("Insofar as the class members assert claims for fraud or misrepresentation under various state laws, the differences

---

[19] Even if the Court were to take into account any differences in state law in deciding whether to certify the putative class for settlement purposes only, such differences still would not preclude certification of a national settlement class. For example, in *In re Relafen Antitrust Litigation*, Judge Young ultimately certified a national settlement class, although he did require the settling parties to establish sub-classes that reflected variations in state law; the allocation of the settlement fund varied by sub-group. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 75-76 (D. Mass. 2005). In *Relafen*, the differences in state law were stark – certain states recognized claims on behalf of indirect purchasers whereas others did not. *See id.* at 75. Those class members with weaker – or potentially non-existent – claims were entitled to a smaller recovery, but were not excluded from the class. As Judge Young recognized, "[t]he decision to cut them a slice of the pie at all is borne out of SmithKline's unwillingness to bargain for less than a global settlement nationwide as well as the inherent vicissitudes of litigation." *Id.* at 76. Here, because there are no similarly stark differences among state law – all putative class members have a potential claim under some theory – there is no need to create sub-groups and/or treat certain class members differently.

among these laws do not appear to be so great as to undermine the predominance of the common

questions of law or fact.").[20]

The absence of a class action mechanism under certain states' procedural rules or

consumer protection statutes is among the types of differences in state law that do not impede

certification of a national settlement class.  As a threshold matter, because these consolidated

proceedings are pending in federal court, not state court, Fed. R. Civ. P. 23 dictates whether

these proceedings can be brought on a class basis.  *See Hanna v. Plumer,* 380 U.S. 460, 471

(1965); *see also Gil de Rebollo v. Miami Heat Ass'ns, Inc.,* 137 F.3d 56, 65-67 (1st Cir. 1998)

(applying federal rule where there was a conflict between Fed. R. Civ. P. 68 and Rule 35.1 of the

Puerto Rico Rules of Civil Procedure, and noting that "[i]n most cases where a conflict exists,

the Federal Rule will be applied because the Federal Rules are presumptively valid"); *McIntosh*

*v. Antonino,* 71 F.3d 29, 36-37 (1st Cir. 1995) (noting that "when federal and state procedural

rules collide, the federal rule necessarily trumps the state rule in a federal forum"); *Kristiansen v.*

*John Mullins & Sons,* 59 F.R.D. 99, 108-10 (E.D.N.Y. 1999) (holding that claim could proceed

as a class action because the Federal Truth-in-Lending Act, as well as Fed. R. Civ. P. 23,

controlled where state law barred class action under state truth-in-lending claim).

For example, Virginia's rules of civil procedure do not include an analog to Fed. R. Civ.

P. 23, so class actions are not generally available for actions commenced in state court.

Notwithstanding this procedural limitation on actions brought in Virginia *state* court, class

actions asserting common law claims or claims under Virginia's consumer protection statute may

---

[20] *See also O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 291 (E.D. Pa. 2003);
*In re Metro. Life Ins. Co. Sales Practices Litig.*, No. 96-179, MDL 1091, 1999 WL 33957871, at
*23 (W.D. Pa. Dec. 28, 1999); *Manners v. Am. Gen. Life Ins. Co.*, No. 3-98-0266, 1999 WL
33581944, at *17 (M.D. Tenn. Aug. 11, 1999); *Elkins v. Equitable Life Ins. Co. of Iowa*, No. 96-
296, 1998 WL 133741, at *17-18 (M.D. Fla. Jan. 27, 1998).

be brought in *federal* court if federal jurisdiction and the requirements of Fed. R. Civ. P. 23 are otherwise met. *See, e.g.*, *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 569 (E.D. Va. 2000) (denying motion to decertify class asserting claims under, among other things, the Virginia Consumer Protection Act and common law conspiracy to commit fraud); *Cosgrove v. First & Merchants Nat'l Bank*, 68 F.R.D. 555, 558-59 (E.D. Va. 1975) (allowing class action involving alleged violations of Virginia usury laws to proceed pursuant to Fed. R. Civ. P. 23); Va. Prac. Prods. Liab. § 12:7 (West 2006) ("Virginia state courts are without power to certify class actions. The United States district courts, however, have authority under Rule 23 of the Federal Rules of Civil Procedure to certify class actions."). For the same reason, that Alabama's Deceptive Trade Practices Statute, Ala. Code § 8-19-10(f), does not provide for class actions poses no bar to a national settlement class because such claims are pending in federal, not state court. That is, because Alabama's state statute conflicts with the applicable federal rule, Fed. R. Civ. P. 23 controls.[21]

Moreover, even putative class members in states with consumer protection statutes that do not create a private right of action (*e.g.*, Iowa), can be included within the Settlement Class, since such putative class members have common law claims against Gillette which can be brought as a class action. Indeed, both federal and state courts in Iowa have certified class actions asserting claims under Iowa common law. *See, e.g.*, *Grove v. Principal Mut. Life Ins.*

---

[21] In contrast, in *In re Relafen Antitrust Litigation*, Judge Young found that because the New York state antitrust statute (the Donnelly Act) included a treble damages provision, which had been deemed a penalty provision, claims thereunder could not be brought as a class action because C.P.L.R. 901(b) precluded the imposition of penalties in class actions. Judge Young reasoned that C.P.L.R. 901(b) addressed the issue of remedies, not procedure, and therefore was not in conflict with Fed. R. Civ. P. 23. As a result, state law controlled, thereby barring the class claims of the New York plaintiffs under the Donnelly Act. *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 285-86 (D. Mass. 2004). *In re Relafen* is distinguishable, however, because the conflict that exists here is between an applicable Federal Rule of Civil Procedure, Rule 23, and a state procedural rule regarding how an action can be brought.

*Co.*, 200 F.R.D. 434 (S.D. Iowa 2001) (granting class certification and approving settlement in a

fraud action); *Luttenegger v. Conseco Fin. Servicing Corp.*, 671 N.W.2d 425 (Iowa 2003)

(granting class action certification in action alleging unjust enrichment); *Kramersmeier v. R.G.*

*Dickinson & Co.*, 440 N.W.2d 873 (Iowa 1989) (granting class action certification in action

alleging misrepresentation); *Slater v. Terril Tel. Co.*, No. 02-0813, 2003 WL 183809 (Iowa Ct.

App. Jan. 29, 2003) (granting class action certification in action alleging fraud).[22]

     In any event, the only objection to a national settlement class has been raised by one set

of lawyers, purportedly on behalf of California consumers, who claim that California law

provides them with superior rights and remedies.[23]  The scope of protections afforded by

California's consumer protection statutes is unsettled at best, and, to the extent it is settled,

California law is no more favorable than the law of any other state.

     For example, Proposition 64, which was passed by California voters in November 2004,

introduced into the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (the "UCL"), and

---

[22] Similarly, Alabama class members face no bar to bringing common law claims on a
class basis.  *See, e.g.*, *Cheminova Am. Corp. v. Corker*, 779 So. 2d 1175, 1183 (Ala. 2000)
("While § 8-19-10(f) makes no provision for a class action under the Act, the Act specifically
states that consumers are not prohibited from seeking redress under the common law or under
other statutes for conduct that could be redressed under the Act. *See* § 8-19-15.").

[23] The cases upon which Corrales relies in no way support the proposition that California
consumers necessarily are entitled to different (*i.e.*, preferential) treatment under the terms of any
settlement because of the existence of certain potential remedies available under California law.
Indeed, in *In re BankAmerica Corp. Securities Litigation*, 210 F.R.D. 694 (E.D. Mo. 2002), the
court expressly rejected that argument.  *See id.* at 709 ("The Court therefore rejects the Desmond
objectors' argument that a $156.8 million settlement for the BankAmerica plaintiffs is somehow
inadequate due to the existence of the California claims.").  Similarly, *In re Heritage Bond
Litigation*, No. 02-ML-1475-DT, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005), and *In re
Oracle Securities Litigation*, No. C-90-0931-VRW, 1994 WL 502054, at *2 (N.D. Cal. June 18,
1994), do not support such a proposition.  Those cases observed that plaintiffs whose claims *on
the merits* are stronger might be entitled to different treatment under a potential settlement, but
do not stand for the proposition that class members who allegedly have stronger *remedies*
potentially available to them have any entitlement to preferential recovery under the terms of any
nationwide settlement.

False Advertising Law, Cal. Bus. & Prof. Code § 17500 (the "FAL"), an injury in fact

requirement.[24]  Several recent cases addressing the impact of Proposition 64 on the UCL and

FAL have been taken up for review by the California Supreme Court (and therefore can no

longer be cited under California's rules).  *See, e.g.*, *Pfizer, Inc.*, 45 Cal. Rptr. at 853 (observing

that Proposition 64, "which was promoted as adding a standing requirement to the UCL and

FAL, has had the effect of *dramatically restricting* these consumer protection measures")

(emphasis added).  The California Supreme Court has deferred briefing in *Pfizer* pending a

decision in another matter which raises such issues as (i) whether the UCL, as amended by

Proposition 64, requires "every member of the proposed class [to] have suffered 'injury in fact,'"

or whether "it is sufficient that the class representative comply with that requirement;" and (ii)

whether "[i]n a class action based on a manufacturer's alleged misrepresentation of a product,"

every member of the class must have "actually relied on the manufacturer's representations."

http://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_id=435784

&doc_no=S145775.

Whatever showing of injury or reliance is determined now to be required under the UCL

and FAL, it is well settled that the remedies afforded to Californians under the UCL and FAL are

limited to injunctive relief and restitution, including restitutionary disgorgement, whereas

damages and non-restitutionary disgorgement are not available remedies thereunder.[25]

---

[24] Specifically, Proposition 64 amended the relevant portions of the UCL and FAL – Cal. Bus. & Prof. Code § 17204 and § 17535, respectively – to include a standing requirement, *i.e.*, a plaintiff must have "suffered injury in fact" and "lost money or property" as a result of the prohibited conduct.

[25] Non-restitutionary disgorgement has been defined to "include orders to compel the surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice."  *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1126-27 (N.D. Cal. 2005) (internal quotation marks omitted).

*Feitelberg v. Credit Suisse First Boston, LLC*, 36 Cal. Rptr. 3d 592, 605-06 (Ct. App. 2005); *Madrid v. Perot Sys. Corp.*, 30 Cal. Rptr. 3d 210, 219, 224-25 (Ct. App. 2005); *see also Matoff v. Brinker Rest. Corp.*, 439 F. Supp. 2d 1035, 1038-39 (C.D. Cal. 2006).  Plaintiffs would be highly unlikely to obtain injunctive relief on the facts presented here, however, because Gillette ceased its disputed advertising more than one year ago and there is no threat of the advertisements running again in the future.  *See Feitelberg*, 36 Cal. Rptr. 3d at 601-02; *Madrid*, 30 Cal. Rptr. 3d at 227-28.  Moreover, an award of restitution is discretionary, not mandated, and any such award must be measurable and supported by evidence.  *See Colgan*, 38 Cal. Rptr. 3d at 63 (noting that the trial court rejected as "inequitable" use of the defendant's "gross profits as an appropriate measure of either the unlawful benefit to Leatherman or the amount necessary to restore consumers to the position in which they would have been but for the unlawful conduct") (internal quotation marks omitted).  There is no reason to believe that Californians would be more likely or better able than any other class member to adduce evidence establishing the value of an award of restitution.

The CLRA is similarly unlikely to provide Californians with any better remedies in this case.  As a threshold matter, the CLRA, as discussed *supra*, requires proof of actual injury and causation.  *See Chamberlan*, 369 F. Supp. 2d at 1145.  Moreover, while the CLRA does permit the recovery of actual damages, among other things, it does not provide a statutory minimum award as to *each* member of the class.  Rather, the CLRA sets a minimum statutory recovery for the *entire* class.  Under Cal. Civ. Code § 1780(a)(1), "[a]ny consumer who suffers any damage as a result" of any of the acts declared unlawful by Section 1770, may bring an action for "[a]ctual damages, but in no case shall the *total* award of damages in class action be less than one thousand dollars ($1,000)."  Cal. Civ. Code § 1780(a)(1) (emphasis added).  Furthermore, while

punitive damages are an available remedy under the CLRA, nothing in the record begins to suggest that such a remedy is warranted here.

### E.    The Proposed Short Form Of Notice Conforms With The Rules And Provides Adequate Notice Of The Proposed Settlement To The Class.

The proposed short form of notice is more than adequate and complete because it conforms with applicable law.  The proposed short form of notice includes all of the elements required by Fed. R. Civ. P. 23(c)(2)(B):  (i) a description of the nature of this action; (ii) the definition of the Settlement Class; (iii) a description of the claims asserted by the class; (iv) information regarding a class member's right to enter an appearance through counsel; (v) information regarding when and how class members can opt out of the Settlement Class; and (vi) a description of the binding effect of the settlement.  The short form of notice – consistent with its purpose, *i.e.*, to provide a *summary* of the proposed settlement – does not include each detail of the settlement.  Rather, the details of the proposed settlement are set forth in the proposed *long* form of notice.  In at least four separate places, the short form of notice refers class members to the long form and further explains how class members can obtain a copy of it.  As a result, class members can consult the response to Question 8 in the long form of notice to learn that costs of notice and Claims Administration up to $2.45 million will be deducted from the Settlement Fund; Question 18 to learn the amount of the proposed award of attorneys' fees, costs, and expenses; Question 2 for a description of the parties' respective positions; and finally Question 19 to understand the meaning of objecting to the settlement and the procedure for doing so.[26]

---

[26] There is no merit to the argument that the notice is deficient because certain incidental materials, such as the settlement press release, are not included in the papers.  Such materials are commonly prepared after the fact using the same or substantially similar language as is otherwise agreed upon in the long and short forms of notice, as will occur here.

**F.    The Proposed Award Of Attorneys' Fees, Costs, And Expenses Is Fair And Reasonable.**

When applying the percentage of recovery method of calculating attorneys' fees, courts include the cost of notice and any award of attorneys' fees, even where such award is paid outside of the common fund, in the package of settlement benefits against which the reasonableness of the attorneys' fees is measured.[27]  *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) (affirming trial court's decision to "include[] the cost incurred by Boeing for providing notices to the class . . . as part of the putative fund against which the reasonableness of the fees was measured"); *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("The award to the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001) ("Courts in other jurisdictions have recognized that in constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, that the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund.").  Here, the "fund," or package of benefits, that Settlement Class Members will receive under the proposed settlement includes the $7.5 million Settlement Fund as well as the maximum award of attorneys' fees, costs, and expenses, $1.85

---

[27] Courts often prefer the percentage of recovery method for calculating attorneys' fees because it tends to encourage efficiency and early settlement.  *See, e.g.*, *In re Thirteen Appeals*, 56 F.3d 295, 370 (1st Cir. 1995) (noting that "using the [percentage of the fund] method in a common fund case enhances efficiency, or put in the reverse, using the lodestar method in such a case encourages inefficiency").

million, that Gillette has agreed to pay.  Assessed against this $9.3 million package of settlement benefits, the proposed maximum attorneys' fees award represents approximately 20% thereof. [28]

An attorneys' fee award in the range of 20-25% is entirely consistent with such awards generally and within the First Circuit.  In particular, "[t]he normal percentage awarded by federal courts is 20-30% of the value of the settlement, with 25% being a 'benchmark.'" *Mazola v. The May Dep't Stores*, No. 97-10872, 1999 WL 1261312, at *4 (D. Mass Jan. 27, 1999) (Gertner, J.).  Based on her review of cases, Judge Gertner concluded that, in the First Circuit, "percentage fee awards range from 20% to 35% of the fund." *Id.*

<u>**Conclusion**</u>

For the foregoing reasons, Gillette respectfully requests that the Court preliminarily approve the Settlement Agreement, certify the Settlement Class for settlement purposes only, and approve the proposed notice and authorize that notice of the proposed settlement be given to the Settlement Class.

Respectfully submitted,

THE GILLETTE COMPANY
By its attorneys

/s/ Harvey J. Wolkoff
/s/ Mark P. Szpak
Harvey J. Wolkoff (BBO #532880)
Mark P. Szpak (BBO #546261)
Emily C. Shanahan (BBO #643456)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated:  November 6, 2006

---

[28] If attorneys' fees are not included, the proposed maximum award of attorneys' fees represents approximately 25% of the $7.5 million Settlement Fund.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document, filed through the ECF system, will be served electronically through the ECF System on the registered participants as identified on the Notice of Electronic Filing ("NEF"), and that paper copies of the above document will be sent via first class mail to those identified as non-registered participants on the NEF on November 6, 2006.

/s/ Harvey J. Wolkoff
Harvey J. Wolkoff

# EXHIBIT A

# Part 1 of 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING INC.,<br>EVEREADY BATTERY COMPANY,<br>INC., and ENERGIZER BATTERY,<br>INC.,<br><br>       Plaintiffs,<br><br>       v.<br><br>THE GILLETTE COMPANY,<br><br>       Defendant. | CIVIL NO. 05-cv-00174 (JCH) |

## DECLARATION OF DIANE PARUS

I, the undersigned, Diane Parus, submit this declaration in support of Gillette's opposition to Schick's motion for preliminary injunction. I have personal knowledge of the following facts and, if called upon to do so, would and could testify competently thereto.

**Professional and Educational Background**

1.  I am a Senior Vice President for Research Perspectives Int'l ("RPI"). I am principally responsible for conducting consumer market research, including large scale consumer use testing for clients of RPI. I received a Bachelor of Arts in Mathematics and English from Ladycliff College in 1971 and subsequently completed some coursework towards a Ph.D in Statistics. I have been working in market research since 1973. I have been employed by RPI, formerly Lieberman Research Suburban, since 1992.

2.  The Gillette Company ("Gillette"), Prudential Tower, Boston, Massachusetts, USA 02199 is a client of RPI and has been a client of RPI since 1978. I have worked on

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 3 of 21
02/22/2005  18:40    9145945444    AMBROSINI RESEARCH    PAGE    03
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 2 of 20

Gillette projects since 1992. Over the years, RPI has conducted and reported the results of a number of large-scale consumer use tests on behalf of Gillette, including large-scale consumer tests involving Gillette's blades and razors.

**M3 Power prototype ("307") vs. Quattro Consumer Use Test**

3. In October 2003, RPI was asked by Gillette to conduct and report the results of a large-scale consumer use test involving the M3 Power prototype shaving system (then referred to as "307") and the Schick Quattro shaving system (the M3 Power prototype ("307") vs. Quattro Consumer Use Test ("CUT")).

4. In administering the 307 vs. Quattro CUT, RPI relied upon a number of experienced consumer product testing organizations to administer the test in a number of geographically dispersed markets within the United States. The test was conducted as a "double-blind" consumer use test so that neither the test respondents nor the test interviewers who came in contact with the respondents were informed that Gillette was the sponsor of the test.

5. In January 2004, RPI prepared and delivered a copy of the "topline" results of the test to Gillette in a PowerPoint format entitled "307 vs. Quattro Consumer Use Test," attached hereto as Exhibit 1.

6. The results of the test demonstrate that a randomly selected and demographically diverse group of adult male wet-shavers ("respondents") preferred Gillette's M3 Power prototype shaving system as an overall superior product to the Schick Quattro shaving system. The respondents significantly preferred the M3 Power prototype as a superior product in terms of shave closeness, smoothness, and comfort. In fact, the M3 Power prototype was

Case 1:05-cv-11177-DPW     Document 100-2     Filed 11/06/2006     Page 4 of 21
02/22/2005  18:48   9146945444        AMBROSINO RESEARCH              PAGE   04
Case 3:05-cv-00174-JCH      Document 32    Filed 02/23/2005     Page 3 of 20

preferred by respondents, at a statistically significant 95% confidence level, against

Quattro on all performance attributes.

*Test Procedures and Methodologies*

7.   The test was a one cell, blind, proto-monadic, in-home, consumer use test with a high

security screen to compare the performance of the Schick Quattro shaving system with

the Gillette M3 Power prototype shaving system.  The test was conducted using 295

random respondents, all of whom were male wet-shavers who normally use either a

system or disposable wet-shave razor.

8.   The 295 random respondents selected to participate in the consumer use test were

recruited between October 15 and October 27, 2003, using reverse telephone directories

in 10 geographically dispersed markets in the United States.  To qualify for inclusion in

the test, the candidates must have wet shaved at least 4 times in the 7 days prior to the

date they were contacted.  The respondents ultimately included in the test were equally

balanced (approximately 50/50) between:  younger (18-34) and older (35-54) shavers;

and shavers who normally use disposable razors and those who use shaving systems.

9.   Once the 295 respondents were identified and qualified, they were divided into two test

groups.  The two test groups were panel-balanced using several criteria, including:

geography; age; income; education; frequency of shaving; the type and brand of razor

normally used; the characteristics of the razor normally used (such as the number of

blades, presence/absence of a lubrastrip, presence/absence of rubber on the razor handle

and presence/absence of a pivot/swivel razor head); respondents' facial characteristics

(such as skin sensitivity, beard toughness and the presence and type of facial hair); type

Case 1:05-cv-11177-DPW   Document 100-2   Filed 11/06/2006   Page 5 of 21
02/22/2005  18:48   9146945444              AMBROSINO RESEARCH              PAGE  05
Case 3:05-cv-00174-JCH   Document 32   Filed 02/23/2005   Page 4 of 20

and brand of shave preparation normally used; and the quality of the respondents' last shave.

10. To avoid bias, one test group was given the Schick Quattro to shave with first and the other test group was given the Gillette M3 Power prototype to shave with first. As an additional precaution against bias, the products given to the respondents were all unbranded – that is, the brand names were physically removed from the test razors, dispensers and cartridges and the test razors were presented to respondents in unmarked boxes. Each test kit given to a respondent contained an unmarked test razor with a live cartridge, two additional cartridges and a cartridge dispenser, an unmarked razor tray and a set of unmarked and unbranded product instructions.

11. The initial product placement was made by interviewers who conducted home visits with each respondent. Before placing the product, the interviewer verified the information the respondent reported during the recruiting process relating to brand usage and characteristics of the razor normally used by the respondent. Each respondent was then handed one of the test kits and was asked to shave, as he would normally shave, using only the test razor for a three-week period.

12. At the end of the initial three-week period, the interviewers returned to the home of each respondent to collect information about the razor tested. Specifically, the interviewers collected information about the respondents: use of the test razor; purchase interest; overall rating of the test razor; comparison of the first test razor to the razor with which the respondent usually shaves; likes and dislikes about the first test razor; ratings of the first test razor against select attributes; and usage of the first test razor. At the conclusion of the interview, the first test kit was retrieved and each respondent was given the second

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 6 of 21
02/22/2005  18:48    9146945444    AMBROSINI RESEARCH    PAGE  06
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 5 of 20

test kit containing the second test razor to use for another three-week period. Those

respondents who had received Quattro initially were given the M3 Power prototype and

vice versa. As with the first test kit, the contents of the second test kit were unbranded

and unmarked and the respondents were asked to shave with the second test razor as they

would normally shave.

13. If a respondent did not surrender the first test razor, he did not participate in the second

phase of the study. Only one test razor was allowed in a respondent's home during each

evaluation period. This was done to reduce the possibility that there would be confusion

as to which test razor was being evaluated during the second test period.

14. At the end of the second three-week period, the interviewers again called upon each

respondent to retrieve the second test kit and to collect information relating to the

respondents' experience with the second test razor. During this second interview, the

interviewers collected information relating to each respondent's: overall preference;

attribute preference; feature evaluations; usage of the second test razor; and pricing.

15. At the conclusion of both sets of respondent interviews, the individual respondent

interview reports were gathered and tabulated by RPI and a summary was made available

to Gillette for further review and analysis.

*Test Results and Findings*

16. The tabulated test results showed that respondents preferred the M3 Power prototype

shaving system over the Quattro shaving system. Among all respondents, the M3 Power

prototype was preferred by 73%, Quattro was preferred by 20%, and 7% of the

respondents registered no preference between the two shaving systems. Among the total

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 7 of 21
02/22/2005  18:40   9145945444        AMBROSINO RESEARCH              PAGE   07
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 6 of 20

sample, the M3 Power prototype was preferred to Quattro on all performance attributes.
Further, the M3 Power prototype was preferred significantly by all subgroups, including
ages 18-34; ages 35-54; typical systems razor users; typical disposable razor users;
current Gillette users and current non-Gillette users.

17.    In terms of all efficacy attributes which consider the "closeness", "smoothness", and
efficiency of the shave produced by each razor, the M3 Power prototype was preferred
over Quattro at a statistically significant 95% confidence level.  Specifically, the M3
Power prototype was preferred over Quattro at a statistically significant 95% confidence
level in terms of:

(a)    "smoothness of the shave" (67% v 19%);

(b)    "giving a close shave" (68% v 20%);

(c)    "leaving your skin feeling soft and smooth" (65% v 19%);

(d)    "giving the closest shave with less irritation" (68% v 20%);

(e)    "giving a fast shave" (63% v 18%)

(f)    "number of shaves per blade" (57% v 19%)

(g)    "giving the closest shave with less irritation even when shaving against the grain"
       (67% v 19%);

(h)    "removing more of each hair on each stroke" (62% v 21%)

(i)    "shaving stubborn hairs" (65% v 19%)

(j)    "reducing the need to re-shave parts of your face to get a close shave" (65% v
       20%)

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 8 of 21
02/22/2005  18:40   9146945444    AMBROSINO RESEARCH    PAGE  08
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 7 of 20

    (k)    "giving a close shave in fewer strokes" (66% v 21%)

    (l)    "not missing spots or hairs" (63% v 17%)

    (m)    "length of time the shave lasts" (60% v 18%)

    (n)    "providing moisture to your skin while shaving" (61% v 15%)

    (o)    "leaving your skin feeling smoother longer" (62% v 19%)

18.    In terms of all five safety/irritation attributes, the M3 Power prototype was preferred by respondents over Quattro at a statistically significant 95% confidence level. Specifically, the M3 Power prototype was preferred to Quattro at a statistically significant 95% confidence level in terms of :

    (a)    "leaving you free from nicks and cuts" (58% v 18%)

    (b)    "not pulling or tugging at your beard" (68% v 17%)

    (c)    "giving a safe shave" (61% v 17%)

    (d)    "leaving you free from skin irritation" (67% v 17%)

    (e)    "shaving against the grain with less irritation" (65% v 19%)

19.    In terms of both comfort attributes, the M3 Power prototype was preferred by respondents over Quattro at a statistically significant 95% confidence level. Specifically, the M3 Power prototype was preferred to Quattro at a statistically significant 95% confidence level in terms of:

    (a)    "comfort of your face while shaving" (74% v 15%)

    (b)    "comfort of your face after shaving" (68% v 18%)

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 9 of 21
02/22/2005  19:40    9146945444    AMBROSINO RESEARCH    PAGE  09
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 8 of 20

**M3 Power prototype ("307") vs. MACH3 Turbo Consumer Use Test**

20.  In August 2003, RPI was asked by Gillette to conduct and report the results of a large-scale consumer use test involving the M3 Power prototype shaving system (then referred to as "307") and the MACH3 Turbo shaving system (the M3 Power prototype ("307") vs. MACH3 Turbo Consumer Use Test ("CUT")).

21.  In administering the 307 vs. MACH3 Turbo CUT, RPI relied upon a number of experienced consumer product testing organizations to administer the test in a number of geographically dispersed markets within the United States.  The test was conducted as a "double-blind" consumer use test so that neither the test respondents nor the test interviewers who came in contact with the respondents were informed that Gillette was the sponsor of the test.

22.  In January 2004, RPI prepared and delivered a copy of the "topline" results of the test to Gillette in a PowerPoint format entitled "307 vs. MACH3 Turbo Consumer Use Test," attached hereto as Exhibit 2.

23.  The results of the test demonstrate that a randomly selected and demographically diverse group of adult male wet-shavers ("respondents") preferred Gillette's M3 Power prototype shaving system as an overall superior product to the MACH3 Turbo Shaving System. The respondents significantly preferred the M3 Power prototype as a superior product in terms of shave closeness, smoothness, and comfort.  In fact, the M3 Power prototype was preferred by respondents, at a statistically significant 95% confidence level, against MACH3 Turbo on most performance attributes.

*Test Procedures and Methodologies*

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 10 of 21
02/22/2005  18:40  9146945444    AMBROSINO RESEARCH    PAGE  10
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 9 of 20

24.     The test was a one cell, blind, proto-monadic, in-home, consumer use test with a high
         security screen to compare the performance of the MACH3 Turbo shaving system with
         the Gillette M3 Power prototype shaving system. The test was conducted using 297
         random respondents, all of whom were male wet-shavers who normally use either a
         system or disposable wet-shave razor.

25.     The 297 random respondents selected to participate in the consumer use test were
         recruited between September 22 and September 30, 2003, using reverse telephone
         directories in 10 geographically dispersed markets in the United States. To qualify for
         inclusion in the test, the candidates must have wet shaved at least 4 times in the 7 days
         prior to the date they were contacted. The respondents ultimately included in the test
         were equally balanced (approximately 50/50) between:  younger (18-34) and older (35-
         54) shavers; and shavers who normally use disposable razors and those who use shaving
         systems.

26.     Once the 297 respondents were identified and qualified, they were divided into two test
         groups. The two test groups were panel-balanced using several criteria, including:
         geography; age; income; education; frequency of shaving; the type and brand of razor
         normally used; the characteristics of the razor normally used (such as the number of
         blades, presence/absence of a lubrastrip, presence/absence of rubber on the razor handle
         and presence/absence of a pivot/swivel razor head); respondents' facial characteristics
         (such as skin sensitivity, beard toughness and the presence and type of facial hair); type
         and brand of shave preparation normally used; and the quality of the respondents' last
         shave.

Case 1:05-cv-11177-DPW     Document 100-2     Filed 11/06/2006     Page 11 of 21
02/22/2005  18:48    9145945444            AMBROSINO RESEARCH                PAGE   11
Case 3:05-cv-00174-JCH     Document 32     Filed 02/23/2005     Page 10 of 20

27.    To avoid bias, one test group was given the MACH3 Turbo to shave with first and the
       other test group was given the Gillette M3 Power prototype to shave with first. As an
       additional precaution against bias, the products given to the respondents were all
       unbranded – that is, the brand names were physically removed from the test razors,
       dispensers and cartridges and the test razors were presented to respondents in unmarked
       boxes. Each test kit given to a respondent contained an unmarked test razor with a live
       cartridge, two additional cartridges and a cartridge dispenser, an unmarked razor tray and
       a set of unmarked and unbranded product instructions.

28.    The initial product placement was made by interviewers who conducted home visits with
       each respondent. Before placing the product, the interviewer verified the information the
       respondent reported during the recruiting process relating to brand usage and
       characteristics of the razor normally used by the respondent. Each respondent was then
       handed one of the test kits and was asked to shave, as he would normally shave, using
       only the test razor for a three-week period.

29.    At the end of the initial three-week period, the interviewers returned to the home of each
       respondent to collect information about the razor tested. Specifically, the interviewers
       collected information about the respondents: use of the test razor; purchase interest,
       overall rating of the test razor; comparison of the first test razor to the razor with which
       the respondent usually shaves; likes and dislikes about the first test razor; ratings of the
       first test razor against select attributes; and usage of the first test razor. At the conclusion
       of the interview, the first test kit was retrieved and each respondent was given the second
       test kit containing the second test razor to use for another three-week period. Those
       respondents who had received MACH3 Turbo initially were given the M3 Power

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 12 of 21
02/22/2005  18:40   9146946444        AMBROSINO RESEARCH          PAGE  12
    Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 11 of 20

prototype and vice versa. As with the first test kit, the contents of the second test kit were

unbranded and unmarked and the respondents were asked to shave with the second test

razor as they would normally shave.

30.    If a respondent did not surrender the first test razor, he did not participate in the second

phase of the study. Only one test razor was allowed in a respondent's home during each

evaluation period. This was done to reduce the possibility that there would be confusion

as to which test razor was being evaluated during the second test period.

31.    At the end of the second three-week period, the interviewers again called upon each

respondent to retrieve the second test kit and to collect information relating to the

respondents' experience with the second test razor. During this second interview, the

interviewers collected information relating to each respondent's:  overall preference;

attribute preference; feature evaluations; usage of the second test razor; and pricing.

32.    At the conclusion of both sets of respondent interviews, the individual respondent

interview reports were gathered and tabulated by RPI and a summary was made available

to Gillette for further review and analysis.

*Test Results and Findings*

33.    The tabulated test results showed that respondents preferred the M3 Power prototype

shaving system over the MACH3 Turbo shaving system. Among all respondents, the M3

Power prototype was preferred by 55%, MACH3 Turbo was preferred by 34%, and 11%

of the respondents registered no preference between the two shaving systems. Among the

total sample, the M3 Power prototype was preferred to MACH3 Turbo on all but three

performance attributes. Further, the M3 Power prototype was preferred significantly by

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 13 of 21
02/22/2005  18:48    9146946444    AMBROSINO RESEARCH    PAGE  13
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 12 of 20

almost all key subgroups, including ages 18-34; ages 35-54; current Gillette users and current non-Gillette users.

34.    In terms of all efficacy attributes which consider the "closeness", "smoothness", and efficiency of the shave produced by each razor, the M3 Power prototype was preferred over MACH3 Turbo at a statistically significant 95% confidence level.  Specifically, the M3 Power prototype was preferred over MACH3 Turbo at a statistically significant 95% confidence level in terms of:

(a)    "smoothness of the shave" (49% v 29%);

(b)    "giving a close shave" (49% v 30%);

(c)    "leaving your skin feeling soft and smooth" (46% v 26%);

(d)    "giving the closest shave with less irritation" (49% v 31%);

(e)    "giving a fast shave" (44% v 25%)

(f)    "number of shaves per blade" (39% v 27%)

(g)    "giving the closest shave with less irritation even when shaving against the grain" (49% v 27%);

(h)    "removing more of each hair on each stroke" (46% v 25%)

(i)    "shaving stubborn hairs" (46% v 28%)

(j)    "reducing the need to re-shave parts of your face to get a close shave" (43% v 28%)

(k)    "giving a close shave in fewer strokes" (48% v 28%)

     (l)      "not missing spots or hairs" (43% v 27%)

     (m)    "length of time the shave lasts" (39% v 25%)

     (n)    "providing moisture to your skin while shaving" (42% v 24%)

     (o)    "leaving your face feeling smoother longer" (47% v 27%)

35.    In terms of all five safety/irritation attributes, the M3 Power prototype was preferred by respondents over MACH3 Turbo at a statistically significant 95% confidence level. Specifically, the M3 Power prototype was preferred to MACH3 Turbo at a statistically significant 95% confidence level in terms of :

     (a)    "leaving you free from nicks and cuts" (40% v 27%)

     (b)    "not pulling or tugging at your beard" (45% v 27%)

     (c)    "giving a safe shave" (40% v 28%)

     (d)    "leaving you free from skin irritation" (44% v 28%)

     (e)    "shaving against the grain with less irritation" (46% v 28%)

36.    In terms of both comfort attributes, the M3 Power prototype was preferred by respondents over MACH3 Turbo at a statistically significant 95% confidence level. Specifically, the M3 Power prototype was preferred to MACH3 Turbo at a statistically significant 95% confidence level in terms of:

     (a)    "comfort of your face while shaving" (50% v 28%)

     (b)    "comfort of your face after shaving" (46% v 30%)

**MACH3 Turbo vs. M3Power Consumer Use Test**

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 15 of 21    15
02/22/2005  18:40    9145945444    AMBROSINO RESEARCH    PAGE
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 14 of 20

37.    In December 2003, RPI was asked by Gillette to conduct and report the results of a large-scale consumer test involving the MACH3 Turbo shaving system and the M3Power shaving system (the MACH3 Turbo vs. M3Power Consumer Use Test ("CUT")).

38.    In administering the MACH3 Turbo vs. M3Power CUT, RPI relied upon a number of experienced consumer product testing organisations to administer the test in a number of geographically dispersed markets within the United States. The test was conducted as a "double blind" consumer use test so that neither the test respondents nor the test interviewers who came in contact with the respondents were informed that Gillette was the sponsor of the test.

39.    In April 2004, RPI prepared and delivered a copy of the "topline" results of the test to Gillette in a Powerpoint format entitled "M3Power vs Mach3 Turbo Final Consumer Use Test Preference Data Topline," attached hereto as Exhibit 3.

40.    The results of the test demonstrate that a randomly selected and demographically diverse group of adult male wet shavers ("respondents") preferred Gillette's M3Power shaving system as an overall superior product to Gillette's MACH3 Turbo shaving system. The respondents significantly preferred M3Power as a superior product in terms of shave closeness, smoothness and comfort. In fact, M3Power was preferred by respondents at a statistically significant 95% confidence level, against the MACH3 Turbo on all performance attributes.

*Test Procedures and Methodologies*

41.    The test was a one cell, blind, proto-monadic, in-home, consumer use test with a high security screen to compare the performance of the Gillette MACH3 Turbo shaving

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 16 of 21
02/22/2005  10:40    9146946444    AMBROSINI RESEARCH    PAGE    16
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 15 of 20

system with the Gillette M3Power shaving system. The test was conducted using 389 random respondents, all of whom were male wet shavers who normally use either a system or disposable wet-shave razor.

42.    The 389 random respondents selected to participate in the consumer use test were recruited between December 29, 2003 and January 12, 2004, using reverse telephone directories in 15 geographically dispersed markets in the United States. I note in passing that Exhibit 2 refers to 10 geographically dispersed markets. This was a typographical error. To qualify for inclusion in the test, the candidates must have wet shaved at least 4 times in the 7 days prior to the date they were contacted. The respondents ultimately included in the test were equally balanced (approximately 50/50) between: younger (18-34) and older (35-54) shavers; and shavers who normally use disposable razors and those who use shaving systems.

43.    Once the 389 respondents were identified and qualified, they were divided into two test groups. The two test groups were panel-balanced using several criteria, including: geography; age; income; education; frequency of shaving; the type and brand of razor normally used; the characteristics of the razor normally used (such as the number of blades, presence/absence of a lubrastrip, presence/absence of rubber on the razor handle and presence/absence of a pivot/swivel razor head); respondents' facial characteristics (such as skin sensitivity, beard toughness and the presence and type of facial hair); type and brand of shave preparation normally used; and the quality of the respondent's last shave.

44.    To avoid bias, one test group was given the Gillette MACH3 Turbo to shave with first and the other test group was given the Gillette M3Power to shave with first. As an

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 17 of 21
02/22/2005  19:40    9145966444    AMBROSINO RESEARCH    PAGE  17
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 16 of 20

additional precaution against bias, the products given to the respondents were all unbranded – that is, the brand names were physically removed from the test razors, dispensers and cartridges and the test razors were presented to respondents in unmarked boxes. Each test kit given to a respondent contained an unmarked test razor with a live cartridge, two additional cartridges and a cartridge dispenser, an unmarked razor tray and a set of unmarked and unbranded product instructions.

45.     The initial product placement was made by interviewers who conducted home visits with each respondent. Before placing the product, the interviewer verified the information the respondent reported during the recruiting process relating to brand usage and characteristics of the razor normally used by the respondent. Each respondent was then handed one of the test kits and was asked to shave, as he would normally shave, using only the test razor for a three week period.

46.     At the end of the initial three week period, the interviewers returned to the home of each respondent to collect information about the razor tested. Specifically, the interviewers collected information about the respondent's use of the test razor, purchase interest, overall rating of the test razor, comparison of the first test razor to the razor with which the respondent usually shaves, likes and dislikes about the first test razor, ratings of the first test razor against select attributes, and usage of the first test razor. At the conclusion of the interview, the first test kit was retrieved and each respondent was given the second test kit containing the second test razor to use for another three week period. Those respondents who had received the MACH3 Turbo initially were given the M3Power and vice versa. As with the first test kit, the contents of the second test kit were unbranded

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 18 of 21
02/22/2005  19:40    9145946444    AMBROS INC RESEARCH    PAGE  18
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 17 of 20

and unmarked and the respondents were asked to shave with the second test razor as they would normally shave.

47.   If a respondent did not surrender the first test razor, he did not participate in the second phase of the study.  Only one test razor was allowed in a respondent's home during each evaluation period.  This was done to reduce the possibility that there would be confusion as to which test razor was being evaluated during the second test period.

48.   At the end of the second three week period, the interviewers again called upon each respondent to retrieve the second test kit and to collect information relating to the respondents' experience with the second test razor.  During this second interview, the interviewers collected information relating to each respondent's overall preference, attribute preference, feature evaluations, usage of the second test razor and pricing.

49.   At the conclusion of both sets of respondent interviews, the individual respondent interview reports were gathered and tabulated by RPI and a summary was made available to Gillette for further review and analysis.

*Test Results and Findings*

50.   The tabulated test results showed that respondents preferred the M3Power shaving system over the MACH3 Turbo shaving system.  Among all respondents, M3Power was preferred by 64%, MACH3 Turbo was preferred by 27% and 9% of the respondents registered no preference between the two shaving systems.  Among the total sample, M3Power was preferred to MACH3 Turbo on all performance attributes.  Further, M3Power was preferred significantly by almost all subgroups, including ages 18-34; ages

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 19 of 21

02/22/2005   18:48    9145956444              AMBROSINI RESEARCH           PAGE    19
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 18 of 20

35-54; typical systems razor users; typical disposable razor users; current Gillette users and current non-Gillette users.

51.    In terms of "efficacy" attributes which consider the "closeness", "smoothness" and efficiency of the shave produced by each razor, M3Power was preferred over MACH3 Turbo at a statistically significant 95% confidence level. Specifically, M3Power was preferred over MACH3 Turbo at a statistically significant 95% confidence level in terms of:

(a)    "'smoothness of the shave" (60% v 22%);

(b)    "giving a close shave" (58% v 24%);

(c)    "leaving your skin feeling soft and smooth" (56% v 22%);

(d)    "giving the closest shave with less irritation" (59% v 24%);

(e)    "giving the closest shave with less irritation even when shaving against the grain" (56% v 24%);

(f)    "removing more of each hair on each stroke" (54% v 21%);

(g)    "shaving stubborn hairs" (50% v 22%);

(h)    "reducing the need to re-shave parts of your face to get a close shave" (54% v 22%);

(i)    "giving a close shave in fewer strokes" (58% v 22%);

(j)    "not missing spots or hairs" (50% v 21%);

(k)    "length of time the shave lasts" (51% v 21%);

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 20 of 21
02/22/2005  18:40    9146946444    AMBROSINI RESEARCH    PAGE  20
Case 3:05-cv-00174-JCH    Document 32    Filed 02/23/2005    Page 19 of 20

(l)    "providing moisture to your skin while shaving" (50% v 20%);

(m)    "leaving your skin feeling smoother longer" (56% v 22%).

52.    In terms of all five "safety/irritation" attributes, M3Power was preferred by respondents

over MACH3 Turbo at a statistically significant 95% confidence level. Specifically,

M3Power was preferred to MACH3 Turbo at a statistically significant 95% confidence

level in terms of:

(a)    "leaving you free from nicks and cuts" (47% v 21%);

(b)    "not pulling or tugging at your beard" (53% v 23%);

(c)    "giving a safe shave" (46% v 22%);

(d)    "leaving you free from skin irritation" (51% v 21%);

(e)    "shaving against the grain with less irritation" (56% v 21%).

53.    In terms of both "comfort" attributes, M3Power was preferred by respondents over

MACH3 Turbo at a statistically significant 95% confidence level. Specifically, M3Power

was preferred to MACH3 Turbo at a statistically significant 95% confidence level in

terms of:

(a)    "comfort of your face while shaving"  (58% v 24%);

(b)    "comfort of your face after shaving" (56% v 22%).

**Conclusion**

54.    In conclusion, RPI conducted three large scale consumer use tests on behalf of Gillette in

late 2003 and early 2004 that showed a randomly selected and representative group of

adult male wet-shavers between the ages of 18 and 54 preferred the M3 Power prototype

Case 1:05-cv-11177-DPW    Document 100-2    Filed 11/06/2006    Page 21 of 21
02/22/2005   18:48    9145945444              AMBROS INC RESEARCH              PAGE   21
Case 3:05-cv-00174-JCH      Document 32      Filed 02/23/2005    Page 20 of 20

over Quattro, the M3Power prototype over MACH3 Turbo, and M3Power over MACH 3

Turbo.  In addition, the M3 Power prototype and/or M3 Power were preferred as being

superior to Quattro and MACH3 Turbo in terms of closeness, smoothness, and comfort

by statistically significant margins.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on February 22, 2005, in White Plains, New York.

_Diane Marie Parus_
Diane Parus

# EXHIBIT A

# Part 2 of 4

Gillette Grooming Products

# 307 vs. Quattro
## Consumer Use Test
### Confidential

January, 2004





DEFENDANT'S
EXHIBIT
15

Confidential

GSR00102527

CONFIDENTIAL    GMPC001389

# Preference Results



Confidential

GSR00102528

CONFIDENTIAL    GMPC001390

# Overall Preference - 307 Vs. Quattro



Total Sample

MACH3 Family Users

- Prefer 307
- Prefer Quattro
- No Preference

Confidential

2

GSR00102529

CONFIDENTIAL    GMPC001391

# Overall Preference *(By Subgroup)*

|  | (Base) | 307<br>-A- | Quattro<br>-B- |
|---|---|---|---|
| Total | (295) | 73$^B$ | 20 |
| **Age** | | | |
| 18-34 | (152) | 70$^B$ | 22 |
| 35-54 | (143) | 77$^B$ | 19 |
| **Razor Type** | | | |
| Systems | (145) | 75$^B$ | 19 |
| Disposables | (150) | 71$^B$ | 22 |
| **Brand Usage** | | | |
| Gillette | (174) | 74$^B$ | 20 |
| Non-Gillette | (121) | 73$^B$ | 21 |
| MACH3 Family* | (158) | 77$^B$ | 15 |
| Non-MACH3 | (208) | 71$^B$ | 23 |
| **Presence of Facial Hair** | | | |
| Facial Hair | (131) | 72$^B$ | 20 |
| Clean Shaven | (163) | 74$^B$ | 21 |

*Includes Random and Augments.

**Gillette grooming products**



3

Confidential

GSR00102530

CONFIDENTIAL    GMPC001392

# Overall Preference -- 307 Vs. Quattro



Total Sample

| | |
|---|---|
| 20 | 7 |
| | 73 |

■ Prefer 307
▨ Prefer Quattro
■ No Preference

◆ **Significant performance preference wins for 307 on:**
  • All attributes

◆ **Directional performance preference wins for 307 on:**
  • None

◆ **Significant razor preference wins for 307 on:**
  • All attributes

◆ **Directional razor preference wins for 307 on:**
  • None



Gillette Grooming Products

4

Confidential

GSR00102531

CONFIDENTIAL    GMPC001393

# Product Attribute Preferences - 307 Vs. Quattro (Among General Sample)

Base: Total Product Triers

| | Prefer | | No Preference (295) % | Point Diff. ±% |
|---|---|---|---|---|
| | 307 (295) % -A- | Quattro (295) % -B- | | |
| **EFFICACY** | | | | |
| Smoothness of the shave | 67$^B$ | 19 | 14 | +48 |
| Giving a close shave | 68$^B$ | 20 | 12 | +48 |
| Leaving your skin feeling soft and smooth | 65$^B$ | 19 | 16 | +46 |
| Giving the closest shave with less irritation | 68$^B$ | 20 | 12 | +48 |
| Giving a fast shave | 63$^B$ | 18 | 19 | +45 |
| Number of shaves per blade | 57$^B$ | 19 | 24 | +38 |
| Giving the closest shave with less irritation even when shaving against the grain | 67$^B$ | 19 | 14 | +48 |
| Removing more of each hair on each stroke | 62$^B$ | 21 | 17 | +41 |
| Shaving stubborn hairs | 65$^B$ | 19 | 16 | +46 |
| Reducing the need to re-shave parts of your face to get a close shave | 65$^B$ | 20 | 15 | +45 |
| Giving a close shave in fewer strokes | 66$^B$ | 21 | 13 | +45 |
| Not missing spots or hairs | 63$^B$ | 17 | 20 | +46 |
| Length of time the shave lasts | 60$^B$ | 18 | 22 | +42 |
| Providing moisture to your skin while shaving | 61$^B$ | 15 | 24 | +46 |
| Leaving face feeling smoother longer | 62$^B$ | 19 | 19 | +43 |

Gillette Proudly Products

5

GSR00102532

CONFIDENTIAL    GMPC001394

# Product Attribute Preferences - 307 Vs. Quattro (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | No Preference (295) % | Point Diff ±% |
|---|---|---|---|---|
| | 307 (295) % -A- | Quattro (295) % -B- | | |
| **SAFETY/IRRITATION** | | | | |
| Leaving you free from nicks and cuts | 58B | 18 | 24 | +40 |
| Not pulling or tugging at your beard | 68B | 17 | 15 | +51 |
| Giving a safe shave | 61B | 17 | 22 | +44 |
| Leaving you free from skin irritation | 67B | 16 | 16 | +50 |
| Shaving against the grain with less irritation | 65B | 19 | 16 | +46 |
| **MANEUVERABILITY** | | | | |
| Gliding comfortably over your skin | 71B | 18 | 11 | +53 |
| Maneuverability of the razor | 68B | 18 | 14 | +50 |
| Adjusting to the shape of face/neck | 65B | 19 | 16 | +46 |
| Ease of shaving hard-to-get-at places | 64B | 20 | 16 | +44 |
| **COMFORT** | | | | |
| Comfort of your face while shaving | 74B | 15 | 11 | +59 |
| Comfort of your face after shaving | 68B | 18 | 14 | +50 |

Gillette Grooming Products

6

GSR00102533

CONFIDENTIAL    GMPC001395

# Product Attribute Preferences - 307 Vs. Quattro (Among General Sample) - Cont'd

Base: Total Product Triers

|  | 307 (295) % -A- | Prefer Quattro (295) % -B- | No Preference (295) % | Point Diff ±% |
|---|---|---|---|---|
| **EASE OF USE** | | | | |
| Ease of use | 64[B] | 17 | 19 | +47 |
| Ability to control the razor while shaving | 62[B] | 21 | 17 | +41 |
| Ease of getting a straight line for sideburns | 59[B] | 17 | 24 | +42 |
| Ease of trimming facial hair | 62[B] | 16 | 22 | +46 |
| Ease of shaping/sculpting facial hair | 62[B] | 18 | 20 | +44 |
| Ease of shaving under the nose | 59[B] | 17 | 24 | +42 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 62[B] | 19 | 19 | +43 |
| Having blades of consistently high quality | 62[B] | 18 | 20 | +44 |
| Making you feel confident while shaving | 65[B] | 18 | 17 | +47 |
| Worth paying more for | 69[B] | 17 | 14 | +52 |

Gillette Scouting Report

7

GSR00102534

CONFIDENTIAL    GMPC001396

Base: Total Product Triers

| | Prefer 307 (295) % -A- | Prefer Quattro (295) % -B- | No Preference (295) % | Point Diff. ±% |
|---|---|---|---|---|
| **APPEARANCE** | | | | |
| The color of the razor | 52[B] | 21 | 27 | +31 |
| Appearance of the razor | 62[B] | 19 | 19 | +43 |
| Being modern or high tech | 70[B] | 13 | 17 | +57 |
| Appearance of the cartridge | 54[B] | 14 | 32 | +40 |
| The razor tray overall | 50[B] | 11 | 39 | +39 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 54[B] | 20 | 26 | +34 |
| Pivoting action of the razor head | 64[B] | 18 | 18 | +46 |
| Being comfortable to hold | 61[B] | 18 | 21 | +43 |
| Easy to change the way you hold the razor from one position to another | 60[B] | 16 | 24 | +44 |
| **HANDLE** | | | | |
| Shape of the handle | 60[B] | 19 | 21 | +41 |
| The feel of rubber on the razor handle | 33[B] | 15 | 52 | +18 |
| Thickness of the handle | 45[B] | 17 | 38 | +28 |
| Length of the handle | 28[B] | 7 | 65 | +21 |
| Size of the handle | 36[B] | 14 | 50 | +22 |
| Texture of the handle | 56[B] | 18 | 26 | +38 |
| The amount of rubber on the razor handle | 27[B] | 13 | 60 | +14 |
| The location of rubber on the razor handle | 55[B] | 18 | 27 | +37 |

*Gillette Grooming Products*

8

CONFIDENTIAL    GMPC001397

# Physical Attribute Preferences - 307 Vs. Quattro (*Among General Sample*) - Cont'd

Base: Total Product Triers

|  | Prefer 307 (295) % -A- | Prefer Quattro (295) % -B- | No Preference (295) % | Point Diff. ±% |
|---|---|---|---|---|
| **DESIGN** | | | | |
| Weight of the razor | 51 B | 17 | 32 | +34 |
| Sturdiness or durability of the razor | 54 B | 18 | 28 | +36 |
| Overall design of the razor | 69 B | 19 | 12 | +50 |
| Balance of the razor | 62 B | 15 | 23 | +47 |
| Having an ergonomic design | 61 B | 15 | 24 | +46 |
| Overall design of the cartridge | 61 B | 15 | 24 | +46 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 55 B | 13 | 32 | +42 |
| Ease of keeping the razor handle clean | 48 B | 13 | 39 | +35 |
| Ability of dispenser to keep unused blades clean | 49 B | 11 | 40 | +38 |

Gillette Grooming Products

9

GSR00102536

CONFIDENTIAL    GMPC001398

# Physical Attribute Preferences - 307 Vs. Quattro *(Among General Sample) ~ Cont'd*

Base: Total Product Triers

| | Prefer | | No Preference (295) % | Point Diff. ±% |
|---|---|---|---|---|
| | 307 (295) % -A- | Quattro (295) % -B- | | |
| **VIBRATION** | | | | |
| The ease of operating the razor | 61[B] | 17 | 22 | +44 |
| The vibrating action of the razor | 73[B] | 11 | 16 | +62 |
| Feel of the vibration in the handle | 70[B] | 11 | 19 | +59 |
| Ease of turning razor on and off | 72[B] | 9 | 19 | +63 |
| The massaging action of the razor | 74[B] | 10 | 16 | +64 |
| Sound of the vibration | 72[B] | 9 | 19 | +63 |
| **MISCELLANEOUS** | | | | |
| Ease of changing the cartridge | 52[B] | 13 | 35 | +39 |
| Having blades last a long time | 55[B] | 18 | 27 | +37 |
| Size of the razor head | 60[B] | 15 | 25 | +45 |
| Being technologically advanced | 70[B] | 11 | 19 | +59 |

*Gillette Grooming Products*

10

Confidential

GSR00102537

CONFIDENTIAL    GMPC001399

# Overall Preference -- 307 Vs. Quattro



### MACH3 Family Users

- ◆ <u>Significant performance preference wins for 307 on:</u>
  - All attributes

- ◆ <u>Directional performance preference wins for 307 on:</u>
  - None

- ◆ <u>Significant razor preference wins for 307 on:</u>
  - All attributes

- ◆ <u>Directional razor preference wins for 307 on:</u>
  - None

■ Prefer 307
▨ Prefer Quattro
■ No Preference

_Gillette Grooming Products_



11

GSR00102538

CONFIDENTIAL    GMPC001400

# Product Attribute Preferences - 307 Vs. Quattro (Among MACH3 Family Users)

Base: Total Product Triers

| | Prefer 307 (158) % -A- | Prefer Quattro (158) % -B- | No Preference (158) % | Point Diff. ±% |
|---|---|---|---|---|
| **EFFICACY** | | | | |
| Smoothness of the shave | 74[B] | 17 | 9 | +57 |
| Giving a close shave | 73[B] | 18 | 9 | +55 |
| Leaving your skin feeling soft and smooth | 72[B] | 15 | 13 | +57 |
| Giving the closest shave with less irritation | 72[B] | 19 | 9 | +53 |
| Giving a fast shave | 67[B] | 18 | 15 | +49 |
| Number of shaves per blade | 59[B] | 20 | 21 | +39 |
| Giving the closest shave with less irritation even when shaving against the grain | 75[B] | 18 | 7 | +57 |
| Removing more of each hair on each stroke | 70[B] | 18 | 12 | +52 |
| Shaving stubborn hairs | 68[B] | 17 | 15 | +51 |
| Reducing the need to re-shave parts of your face to get a close shave | 72[B] | 16 | 12 | +56 |
| Giving a close shave in fewer strokes | 70[B] | 19 | 11 | +51 |
| Leaving face feeling smoother longer | 68[B] | 19 | 13 | +49 |
| Not missing spots or hairs | 70[B] | 14 | 16 | +56 |
| Length of time the shave lasts | 58[B] | 18 | 24 | +40 |
| Providing moisture to your skin while shaving | 67[B] | 10 | 23 | +57 |

*Gillette Grooming Products*

Confidential

GSR00102539

CONFIDENTIAL    GMPC001401

# Product Attribute Preferences - 307 Vs. Quattro (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (158) % -A- | Prefer Quattro (158) % -B- | No Preference (158) % | Point Diff. ±% |
|---|---|---|---|---|
| **SAFETY/IRRITATION** | | | | |
| Leaving you free from nicks and cuts | 66$^B$ | 18 | 16 | +48 |
| Not pulling or tugging at your beard | 74$^B$ | 18 | 8 | +56 |
| Giving a safe shave | 67$^B$ | 16 | 17 | +51 |
| Leaving you free from skin irritation | 75$^B$ | 15 | 10 | +60 |
| Shaving against the grain with less irritation | 71$^B$ | 18 | 11 | +53 |
| **MANEUVERABILITY** | | | | |
| Gliding comfortably over your skin | 75$^B$ | 15 | 10 | +60 |
| Maneuverability of the razor | 73$^B$ | 14 | 13 | +59 |
| Adjusting to the shape of face/neck | 72$^B$ | 15 | 13 | +57 |
| Ease of shaving hard-to-get-at places | 71$^B$ | 16 | 13 | +55 |
| **COMFORT** | | | | |
| Comfort of your face while shaving | 77$^B$ | 15 | 8 | +62 |
| Comfort of your face after shaving | 71$^B$ | 16 | 13 | +55 |

13

GSR00102540

CONFIDENTIAL    GMPC001402

GSR00102541

GMPC001403

# Product Attribute Preferences - 307 Vs. Quattro (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (158) % -A- | Prefer Quattro (158) % -B- | No Preference (158) % | Point Diff. ±% |
|---|---|---|---|---|
| **EASE OF USE** | | | | |
| Ease of use | 71^B | 16 | 13 | +55 |
| Ability to control the razor while shaving | 68^B | 15 | 17 | +53 |
| Ease of getting a straight line for sideburns | 61^B | 16 | 23 | +45 |
| Ease of trimming facial hair | 68^B | 15 | 17 | +53 |
| Ease of shaping/sculpting facial hair | 68^B | 15 | 17 | +53 |
| Ease of shaving under the nose | 63^B | 18 | 19 | +45 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 65^B | 19 | 16 | +46 |
| Having blades of consistently high quality | 65^B | 17 | 18 | +48 |
| Making you feel confident while shaving | 72^B | 13 | 15 | +59 |
| Worth paying more for | 75^B | 13 | 12 | +62 |



14

Confidential

Gillette Grooming Products

**CONFIDENTIAL**

# Physical Attribute Preferences - 307 Vs. Quattro (Among *MACH3 Family Users*)

Base: Total Product Triers

| | Prefer 307 (158) % -A- | Prefer Quattro (158) % -B- | No Preference (158) % | Point Diff. ±% |
|---|---|---|---|---|
| **APPEARANCE** | | | | |
| The color of the razor | 54B | 20 | 26 | +34 |
| Appearance of the razor | 66B | 16 | 18 | +50 |
| Being modern or high tech | 73B | 9 | 18 | +64 |
| Appearance of the cartridge | 54B | 11 | 35 | +43 |
| The razor tray overall | 53B | 12 | 35 | +41 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 60B | 13 | 27 | +47 |
| Pivoting action of the razor head | 68B | 14 | 18 | +54 |
| Being comfortable to hold | 65B | 16 | 19 | +49 |
| Easy to change the way you hold the razor from one position to another | 61B | 13 | 26 | +48 |
| **HANDLE** | | | | |
| Shape of the handle | 64B | 15 | 21 | +49 |
| The feel of rubber on the razor handle | 41B | 10 | 49 | +31 |
| Thickness of the handle | 47B | 15 | 38 | +32 |
| Length of the handle | 25B | 8 | 67 | +17 |
| Size of the handle | 35B | 11 | 54 | +24 |
| Texture of the handle | 65B | 13 | 22 | +52 |
| The amount of rubber on the razor handle | 28B | 10 | 62 | +18 |
| The location of rubber on the razor handle | 59B | 13 | 28 | +46 |

*Gillette Grooming Products*

15

Confidential

GSR00102542

CONFIDENTIAL

GMPC001404

# Physical Attribute Preferences - 307 Vs. Quattro (*Among MACH3 Family Users*) - *Cont'd*

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (158) % -A- | Quattro (158) % -B- | No Preference (158) % | Point Diff. ±% |
| **DESIGN** | | | | |
| Weight of the razor | 54[B] | 13 | 33 | +41 |
| Sturdiness or durability of the razor | 61[B] | 15 | 24 | +46 |
| Overall design of the razor | 70[B] | 15 | 15 | +55 |
| Balance of the razor | 65[B] | 15 | 20 | +50 |
| Having an ergonomic design | 63[B] | 13 | 24 | +50 |
| Overall design of the cartridge | 64[B] | 12 | 24 | +52 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 61[B] | 10 | 29 | +51 |
| Ease of keeping the razor handle clean | 52[B] | 12 | 36 | +40 |
| Ability of dispenser to keep unused blades clean | 49[B] | 8 | 43 | +41 |

Gillette Consumer Products

16

Confidential

GSR00102543

CONFIDENTIAL

GMPC001405

Gillette

Gillette Company Product

# 307 Vs. MACH3Turbo
## Consumer Use Test
### Confidential

January, 2004





DEFENDANT'S
EXHIBIT
16

Confidential

CONFIDENTIAL

GSR00102311

GMPC001408

Gillette Grooming Products

# Preference Results



Confidential

# Overall Preference - 307 Vs. MACH3Turbo



## Total Sample

34  11  55

## MACH3 Family Users

33  13  54

■ Prefer 307  ▦ Prefer MACH3Turbo  ▨ No Preference

*Gillette Grooming Results*

2

Confidential

# Overall Preference *(By Subgroup)*

|  | (Base) | 307<br>-A- | MACH3<br>Turbo<br>-B- |
|---|---|---|---|
| **Total** | (297) | <u>55</u>[B] | <u>34</u> |
| **Age** | | | |
| 18-34 | (149) | 54[B] | 38 |
| 35-54 | (148) | 55[B] | 30 |
| **Brand Usage** | | | |
| Gillette | (177) | 54[B] | 35 |
| Non-Gillette | (120) | 56[B] | 32 |
| MACH3 Family | (153) | 54[B] | 33 |
| Non-MACH3 | (215) | 57[B] | 33 |

Gillette Grooming Products

Confidential

GSR00102314

CONFIDENTIAL

GMPC001411

# Overall Preference (By Subgroup) - Cont'd



|  | (Base) | MACH3 Turbo |  |
|---|---|---|---|
|  |  | -A-<br>307 | -B-<br>34 |
| **Total** | (297) | <u>55</u>$^B$ | <u>34</u> |
| **Presence Of Facial Hair** |  |  |  |
| Have facial hair | (129) | 64$^B$ | 26 |
| Clean shaven | (167) | 48 | 40 |
| **Type Of Facial Hair** |  |  |  |
| Chin/fringe beard | (61) | 62$^B$ | 26 |
| Moustache only | (50) | 64$^B$ | 30 |
| Other* | (27)@ | 59$^b$ | 30 |

@ = Caution: Small base size.
* Includes sideburns and stubble.



Confidential

CONFIDENTIAL

4

GSR00102315

GMPC001412

# Overall Preference (By Subgroup) - Cont'd

**Gillette Grooming Products**



| | (Base) | 307<br>-A-<br>__55__^B | MACH3<br>Turbo<br>-B-<br>__34__ |
|---|---|---|---|
| Total | (297) | 55^B | 34 |
| **Beard Toughness** | | | |
| Tough | (134) | 57^B | 31 |
| Not tough | (163) | 52^B | 37 |
| **Frequency Of Shaving** | | | |
| 4-6 times a week | (204) | 54^B | 33 |
| 7+ times a week | (93) | 56^B | 35 |
| **Quality Of Last Shave** | | | |
| Excellent/very good | (175) | 53^B | 34 |
| Good/fair/poor | (121) | 58^B | 34 |
| **Skin Sensitivity** | | | |
| Sensitive | (100) | 56^B | 31 |
| Not sensitive | (197) | 54^B | 35 |

Confidential

CONFIDENTIAL

GSR00102316

GMPC001413

# Overall Preference -- 307 Vs. MACH3Turbo




**Total Sample**

- 34
- 11
- 55

| | |
|---|---|
| ■ | Prefer 307 |
| ▨ | Prefer MACH3Turbo |
| ■ | No Preference |

**Significant performance preference wins for 307 on:**
- All efficacy attributes
- All safety/irritation attributes
- All maneuverability attributes
- All comfort attributes
- Ease of use
- Ease of trimming facial hair
- Ease of shaving under the nose
- All miscellaneous attributes

**Directional performance preference wins for 307 on:**
- Ease of getting a straight line for sideburns
- Ease of shaping/sculpting facial hair

**Significant razor preference wins for 307 on:**
- All appearance attributes
- Providing a secure grip even wet
- Pivoting action of razor head
- All handle attributes
- Sturdiness of durability of the razor
- Overall design of the razor
- Having an ergonomic design
- Overall design of the cartridge
- All cleanliness attributes
- All vibration attributes except ease of operating the razor
- All miscellaneous attributes

**Directional razor preference wins for 307 on:**
- None

*Gillette Grooming Products*

9

Confidential

GSR00102317

CONFIDENTIAL          GMPC001414

# Product Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample)

Base: Total Product Triers

| | Prefer | | No Preference | ±% |
| --- | --- | --- | --- | --- |
| | 307 (297) % | MACH3 Turbo (297) % | (297) % | Point Diff. |
| | -A- | -B- | | |
| **EFFICACY** | | | | |
| Smoothness of the shave | 49[B] | 29 | 22 | +20 |
| Giving a close shave | 49[B] | 30 | 21 | +19 |
| Leaving your skin feeling soft and smooth | 46[B] | 26 | 28 | +20 |
| Giving the closest shave with less irritation | 49[B] | 31 | 20 | +18 |
| Giving a fast shave | 44[B] | 25 | 31 | +19 |
| Number of shaves per blade | 39[B] | 27 | 34 | +12 |
| Giving the closest shave with less irritation even when shaving against the grain | 49[B] | 27 | 24 | +22 |
| Removing more of each hair on each stroke | 46[B] | 25 | 29 | +21 |
| Shaving stubborn hairs | 46[B] | 28 | 26 | +18 |
| Reducing the need to re-shave parts of your face to get a close shave | 43[B] | 28 | 29 | +15 |
| Giving a close shave in fewer strokes | 48[B] | 28 | 24 | +20 |
| Not missing spots or hairs | 43[B] | 27 | 30 | +16 |
| Length of time the shave lasts | 39[B] | 25 | 36 | +14 |
| Providing moisture to your skin while shaving | 42[B] | 24 | 34 | +18 |
| Leaving face feeling smoother longer | 47[B] | 27 | 26 | +20 |

Gillette Grooming Products

7

Confidential

GSR00102318

CONFIDENTIAL    GMPC001415

# Product Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | | Prefer | | | |
|---|---|---|---|---|---|
| | | **307** (297) | **MACH3 Turbo** (297) | **No Preference** (297) | **Point Diff.** |
| | | **-A-** | **-B-** | | |
| | | % | % | % | ±% |
| **SAFETY/IRRITATION** | | | | | |
| Leaving you free from nicks and cuts | | 40[B] | 27 | 33 | +13 |
| Not pulling or tugging at your beard | | 45[B] | 27 | 28 | +18 |
| Giving a safe shave | | 40[B] | 28 | 32 | +12 |
| Leaving you free from skin irritation | | 44[B] | 28 | 28 | +16 |
| Shaving against the grain with less irritation | | 46[B] | 28 | 26 | +18 |
| **MANEUVERABILITY** | | | | | |
| Gliding comfortably over your skin | | 49[B] | 29 | 22 | +20 |
| Maneuverability of the razor | | 39[B] | 28 | 33 | +11 |
| Adjusting to the shape of face/neck | | 37[B] | 27 | 36 | +10 |
| Ease of shaving hard-to-get-at places | | 40[B] | 27 | 33 | +13 |
| **COMFORT** | | | | | |
| Comfort of your face while shaving | | 50[B] | 28 | 22 | +22 |
| Comfort of your face after shaving | | 46[B] | 30 | 24 | +16 |

8

Confidential

CONFIDENTIAL

GSR00102319

GMPC001416

# Product Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (297) % -A- | MACH3 Turbo (297) % -B- | No Preference (297) % | Point Diff ±% |
| **EASE OF USE** | | | | |
| Ease of use | 40ᴮ | 27 | 33 | +13 |
| Ability to control the razor while shaving | 38 | 32 | 30 | +6 |
| Ease of getting a straight line for sideburns | 33ᵇ | 25 | 42 | +8 |
| Ease of trimming facial hair | 35ᴮ | 24 | 41 | +11 |
| Ease of shaping/sculpting facial hair | 32ᵇ | 25 | 43 | +7 |
| Ease of shaving under the nose | 36ᴮ | 26 | 38 | +10 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 44ᴮ | 28 | 28 | +16 |
| Having blades of consistently high quality | 42ᴮ | 26 | 32 | +16 |
| Making you feel confident while shaving | 46ᴮ | 27 | 27 | +19 |
| Worth paying more for | 48ᴮ | 30 | 22 | +18 |

Gillette Grooming Products

9

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample)

Base: Total Product Triers

| | Prefer 307 (297) % -A- | Prefer MACH3 Turbo (297) % -B- | No Preference (297) % | Point Diff ±% |
|---|---|---|---|---|
| **APPEARANCE** | | | | |
| The color of the razor | 42$^B$ | 20 | 38 | +22 |
| Appearance of the razor | 48$^B$ | 21 | 31 | +27 |
| Being modern or high tech | 65$^B$ | 14 | 21 | +51 |
| Appearance of the cartridge | 32$^B$ | 15 | 53 | +17 |
| The razor tray overall | 27$^B$ | 14 | 59 | +13 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 36$^B$ | 21 | 43 | +15 |
| Pivoting action of the razor head | 34$^b$ | 19 | 47 | +15 |
| Being comfortable to hold | 34$^b$ | 25 | 41 | +9 |
| Easy to change the way you hold the razor from one position to another | 31$^b$ | 24 | 45 | +7 |
| **HANDLE** | | | | |
| Shape of the handle | 36$^B$ | 20 | 44 | +16 |
| The feel of rubber on the razor handle | 19$^B$ | 13 | 68 | +6 |
| Thickness of the handle | 28$^B$ | 19 | 53 | +9 |
| Length of the handle | 17$^B$ | 10 | 73 | +7 |
| Size of the handle | 23$^B$ | 15 | 62 | +8 |
| Texture of the handle | 35$^B$ | 24 | 41 | +11 |
| The amount of rubber on the razor handle | 19$^B$ | 9 | 72 | +10 |
| The location of rubber on the razor handle | 35$^B$ | 18 | 47 | +17 |

Confidential

GSR00102321

CONFIDENTIAL

GMPC001418

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | | |
| --- | --- | --- | --- | --- |
| | 307 (297) % -A- | MACH3 Turbo (297) % -B- | No Preference (297) % | Point Diff. ±% |
| **DESIGN** | | | | |
| Weight of the razor | 25 | 23 | 52 | +2 |
| Sturdiness or durability of the razor | 33[B] | 22 | 45 | +11 |
| Overall design of the razor | 48[B] | 23 | 29 | +25 |
| Balance of the razor | 34[b] | 26 | 40 | +8 |
| Having an ergonomic design | 42[B] | 13 | 45 | +29 |
| Overall design of the cartridge | 34[B] | 15 | 51 | +19 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 27[B] | 14 | 59 | +13 |
| Ease of keeping the razor handle clean | 29[B] | 13 | 58 | +16 |
| Ability of dispenser to keep unused blades clean | 29[B] | 11 | 60 | +18 |

Gillette Proprietary Product

Confidential

GSR00102322

CONFIDENTIAL    GMPC001419

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample) - Cont'd



Base: Total Product Triers

|  | Prefer | | No Preference | Point Diff. |
|  | 307 (297) % -A- | MACH3 Turbo (297) % -B- | (297) % | ±% |
|---|---|---|---|---|
| **VIBRATION** | | | | |
| The ease of operating the razor | 32 | 27 | 41 | +5 |
| The vibrating action of the razor | 65<sup>B</sup> | 17 | 18 | +48 |
| Feel of the vibration in the handle | 65<sup>B</sup> | 16 | 19 | +49 |
| Ease of turning razor on and off | 66<sup>B</sup> | 14 | 20 | +52 |
| The massaging action of the razor | 64<sup>B</sup> | 15 | 21 | +49 |
| Sound of the vibration | 66<sup>B</sup> | 13 | 21 | +53 |
| **MISCELLANEOUS** | | | | |
| Ease of changing the cartridge | 28<sup>B</sup> | 11 | 61 | +17 |
| Having blades last a long time | 37<sup>B</sup> | 21 | 42 | +16 |
| Size of the razor head | 27<sup>B</sup> | 16 | 57 | +11 |
| Being technologically advanced | 65<sup>B</sup> | 13 | 22 | +52 |

Confidential

GSR00102323

CONFIDENTIAL

GMPC001420

# Overall Preference -- 307 Vs. MACH3Turbo



## MACH3 Family Users

- **Significant performance preference wins for 307 on:**
  - All efficacy attributes except number of shaves per blade
  - All safety/irritation attributes except ease of shaving hard-to-get-at places
  - All comfort attributes
  - Gliding comfortably over skin
  - Maneuverability of razor
  - Adjusting to the shape of face/neck
  - Ease of use
  - All miscellaneous attributes

- **Directional performance preference wins for 307 on:**
  - Ease of shaving hard-to-get-at places

- **Significant razor preference wins for 307 on:**
  - All appearance attributes
  - Providing a secure grip even when wet
  - Pivoting action of razor head
  - Thickness of the handle
  - Location of rubber on the razor handle
  - Sturdiness or durability of razor
  - Overall design of the razor
  - Having an ergonomic design
  - Overall design of the cartridge
  - All cleanliness attributes
  - All vibration attributes except ease of operating the razor

- **Directional razor preference wins for 307 on:**
  - Length of the handle

Prefer 307
Prefer MACH3Turbo
No Preference

Pie chart values: 13, 33, 54

Gillette Grooming Products

13

Confidential

GSR00102324

CONFIDENTIAL    GMPC001421

# Product Attribute Preferences - 307 Vs. MACH3Turbo (Among MACH3 Family Users)

*Gillette Grooming Products*

Base: Total Product Triers

| | Prefer 307 (153) % -A- | Prefer MACH3 Turbo (153) % -B- | No Preference (153) % | ±% Point Diff. |
|---|---|---|---|---|
| **EFFICACY** | | | | |
| Smoothness of the shave | 48[B] | 30 | 22 | +18 |
| Giving a close shave | 50[B] | 31 | 19 | +19 |
| Leaving your skin feeling soft and smooth | 48[B] | 26 | 26 | +22 |
| Giving the closest shave with less irritation | 52[B] | 31 | 17 | +21 |
| Giving a fast shave | 46[B] | 25 | 29 | +21 |
| Number of shaves per blade | 35 | 27 | 38 | +8 |
| Giving the closest shave with less irritation even when shaving against the grain | 52[B] | 26 | 22 | +26 |
| Removing more of each hair on each stroke | 48[B] | 25 | 27 | +23 |
| Shaving stubborn hairs | 46[B] | 29 | 25 | +17 |
| Reducing the need to re-shave parts of your face to get a close shave | 45[B] | 30 | 25 | +15 |
| Giving a close shave in fewer strokes | 51[B] | 24 | 25 | +27 |
| Leaving face feeling smoother longer | 48[B] | 28 | 24 | +20 |
| Not missing spots or hairs | 44[B] | 26 | 30 | +18 |
| Length of time the shave lasts | 39[B] | 23 | 38 | +16 |
| Providing moisture to your skin while shaving | 42[B] | 22 | 36 | +20 |

Confidential

CONFIDENTIAL

GSR00102325

GMPC001422

# Product Attribute Preferences - 307 Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (153) % -A- | Prefer MACH3 Turbo (153) % -B- | No Preference (153) % | Point Diff. ±% |
|---|---|---|---|---|
| **SAFETY/IRRITATION** | | | | |
| Leaving you free from nicks and cuts | 45B | 25 | 30 | +20 |
| Not pulling or tugging at your beard | 47B | 29 | 24 | +18 |
| Giving a safe shave | 43B | 28 | 29 | +15 |
| Leaving you free from skin Irritation | 46B | 26 | 28 | +20 |
| Shaving against the grain with less irritation | 49B | 29 | 22 | +20 |
| **MANEUVERABILITY** | | | | |
| Gliding comfortably over your skin | 52B | 31 | 17 | +21 |
| Maneuverability of the razor | 43B | 26 | 31 | +17 |
| Adjusting to the shape of face/neck | 38B | 25 | 37 | +13 |
| Ease of shaving hard-to-get-at places | 40b | 28 | 32 | +12 |
| **COMFORT** | | | | |
| Comfort of your face while shaving | 52B | 28 | 20 | +24 |
| Comfort of your face after shaving | 49B | 28 | 23 | +21 |

Confidential

GSR00102326

CONFIDENTIAL    GMPC001423

# Product Attribute Preferences - 307 Vs. MACH3Turbo *(Among MACH3 Family Users)* - Cont'd

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (153) % -A- | MACH3 Turbo (153) % -B- | No Preference (153) % | Point Diff. ±% |
| **EASE OF USE** | | | | |
| Ease of use | 40[B] | 28 | 32 | +12 |
| Ability to control the razor while shaving | 39 | 32 | 29 | +7 |
| Ease of getting a straight line for sideburns | 32 | 26 | 42 | +6 |
| Ease of trimming facial hair | 34 | 27 | 39 | +7 |
| Ease of shaping/sculpting facial hair | 30 | 29 | 41 | +1 |
| Ease of shaving under the nose | 34 | 27 | 39 | +7 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 44[B] | 24 | 32 | +20 |
| Having blades of consistently high quality | 44[B] | 24 | 32 | +20 |
| Making you feel confident while shaving | 44[B] | 25 | 31 | +19 |
| Worth paying more for | 50[B] | 28 | 22 | +22 |

16

GSR00102327

CONFIDENTIAL    GMPC001424

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among MACH3 Family Users)

Base: Total Product Triers

| | Prefer | | | |
| --- | --- | --- | --- | --- |
| | 307 (153) % -A- | MACH3 Turbo (153) % -B- | No Preference (153) % | Point Diff. ±% |
| **APPEARANCE** | | | | |
| The color of the razor | 42 B | 19 | 39 | +23 |
| Appearance of the razor | 53 B | 20 | 27 | +33 |
| Being modern or high tech | 69 B | 11 | 20 | +58 |
| Appearance of the cartridge | 39 B | 15 | 46 | +24 |
| The razor tray overall | 29 B | 14 | 57 | +15 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 37 B | 20 | 43 | +17 |
| Pivoting action of the razor head | 37 B | 18 | 45 | +19 |
| Being comfortable to hold | 32 | 28 | 40 | +4 |
| Easy to change the way you hold the razor from one position to another | 31 | 25 | 44 | +6 |
| **HANDLE** | | | | |
| Shape of the handle | 33 | 25 | 42 | +8 |
| The feel of rubber on the razor handle | 16 | 16 | 68 | +0 |
| Thickness of the handle | 32 B | 20 | 48 | +12 |
| Length of the handle | 20 b | 11 | 69 | +8 |
| Size of the handle | 25 | 17 | 58 | +8 |
| Texture of the handle | 33 | 26 | 41 | +7 |
| The amount of rubber on the razor handle | 18 | 11 | 71 | +7 |
| The location of rubber on the razor handle | 35 B | 17 | 48 | +18 |

*Gillette Grooming Products*

Confidential

GSR00102328

CONFIDENTIAL   GMPC001425

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among MACH3 Family Users) ~ Cont'd



Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | **307**<br>(153)<br>%<br>-A- | **MACH3<br>Turbo**<br>(153)<br>%<br>-B- | **No<br>Preference**<br>(153)<br>% | **Point<br>Diff.**<br>±% |
| **DESIGN** | | | | |
| Weight of the razor | 30 | 25 | 45 | +5 |
| Sturdiness or durability of the razor | 37 B | 19 | 44 | +18 |
| Overall design of the razor | 49 B | 23 | 28 | +26 |
| Balance of the razor | 35 | 28 | 37 | +7 |
| Having an ergonomic design | 46 B | 15 | 39 | +31 |
| Overall design of the cartridge | 37 B | 17 | 46 | +20 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 27 B | 14 | 59 | +13 |
| Ease of keeping the razor handle clean | 33 B | 12 | 55 | +21 |
| Ability of dispenser to keep unused blades clean | 31 B | 12 | 57 | +19 |

Confidential

GSR00102329

CONFIDENTIAL    GMPC001426

# Physical Attribute Preferences - 307 Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer | | |
| --- | --- | --- | --- |
| | 307 (153) % -A- | MACH3 Turbo (153) % -B- | No Preference (153) % | Point Diff. ±% |
| **VIBRATION** | | | | |
| The ease of operating the razor | 33 | 28 | 39 | +5 |
| The vibrating action of the razor | 67 B | 14 | 19 | +53 |
| Feel of the vibration in the handle | 65 B | 14 | 21 | +51 |
| Ease of turning razor on and off | 67 B | 11 | 22 | +56 |
| The massaging action of the razor | 63 B | 12 | 25 | +51 |
| Sound of the vibration | 65 B | 9 | 26 | +56 |
| **MISCELLANEOUS** | | | | |
| Ease of changing the cartridge | 29 B | 12 | 59 | +17 |
| Having blades last a long time | 39 B | 21 | 40 | +18 |
| Size of the razor head | 28 B | 17 | 55 | +11 |
| Being technologically advanced | 64 B | 11 | 25 | +53 |

19

Confidential

GSR00102330

CONFIDENTIAL    GMPC001427

# EXHIBIT A

# Part 3 of 4

# M3Power vs. MACH3Turbo Final Consumer Use Test Preference Data Topline

Gillette Grooming Products

April, 2004

**CONFIDENTIAL**

Confidential

DEFENDANT'S
EXHIBIT
17

GSR00013265

# Background and Objectives

◆ **ER-307 is being launched on May 24, 2004**

◆ **The objective of this study is to compare 307 in final form versus MACH3Turbo**

  • Specifications outlining how the final 307 product is different from the CUT product that was tested last Fall are outlined on the next page

◆ **This report includes topline preference results only. The full report will be issued the end of April**

◆ **Significance Testing**

  • Solid box/uppercase - significantly higher at 95% confidence level
  • Dotted box/lowercase - directionally higher at 90% confidence level

*Gillette Grooming Products*

1

GSR00013266

CONFIDENTIAL    GMPC001430

# Technical Differences in 307 Product Previous vs. Final CUT

Gillette Grooming Products

**CARTRIDGE**

| | 307 Product in Final 307 vs. M3T CUT |
|---|---|
| Hood | same as M3T |
| Housing and Guard | same as M3T (but green) |
| Blades | 316 (TUT) |
| Insert | production run |

**HANDLE**

| | |
|---|---|
| On-Off Button | |
| Ejection Button | |
| TPE Grips | lighter green metal |
| Battery Shell | M3T color, M3 shape |
| Head | full pyramid |
| Plating | coarse texture knurl pattern |
| | production quality |
| Frequency (rpm) | 7514 |
| Amplitude | 0..22 |
| Other | Production quality |

Confidential          *REDACTED*     GSR00013267

CONFIDENTIAL     GMPC001431

# General Methodology

◆ **A one-cell, blind, proto-monadic home use test among 389 male wet shavers (general sample)**

- High security screen
- 10 geographically dispersed markets
- Wet shaved at least 4 times in the past 7 days
- ½ younger (18-34); ½ older (35-54)
- ½ systems users; ½ disposables users
- ½ clean shaven; ½ with facial hair (no full beards)
- Recruiting done between December 29, 2003 - January 14, 2004

◆ **An augment of MACH3 Family users was also interviewed, resulting in a total ending sample of 221 MACH3/MACH3Turbo users**



3

GSR00013268

CONFIDENTIAL    GMPC001432

# General Methodology

- ◆ Respondents were divided into two groups (to rotate the order of product usage) and were panel-balanced on the following criteria:

  - Geography
  - Rubber on razor handle
  - Pivot/swivel of razor head
  - Type of razor
  - Brand of razor
  - # of blades
  - Age
  - Frequency of shaving
  - Lubrastrip usage

  - Type and brand of shave prep used
  - Skin sensitivity
  - Quality of last shave
  - Income
  - Education
  - Presence of facial hair
  - Type of facial hair (excluding full beards)
  - Beard toughness

- ◆ To eliminate bias, half of the respondents were placed with MACH3Turbo first, and the other half were placed with 307 first

Gillette Security Products

4

Confidential

GSR00013269

CONFIDENTIAL

GMPC001433

# General Methodology

◆ **During the first home visit...**

- Interviewers verified information about current razor features

- Respondents were placed with one razor product and asked to use it for three weeks

- Each razor set contained a razor with live cartridge, two additional cartridges in dispenser, a razor tray, and instructions for use

◆ **After three weeks...**

- Interviewers contacted respondents to retrieve the first razor product

- Interviewers collected information regarding usage of that product

- Respondents were asked questions covering...

  - Purchase interest and reasons

  - Overall product rating and likes/dislikes

  - Delivery vs. current product

  - Attribute ratings

  - Usage behavior

*Gillette Grooming Products*



5

Confidential

CONFIDENTIAL

GSR00013270

GMPC001434

# General Methodology

◆ **At the conclusion of this monadic interview...**

- Respondents were placed with the second product and asked to use it for three weeks

◆ **After the second three week usage period...**

- The second razor product was retrieved
- A second interview was conducted focusing on usage and...
  - Overall product preference and reasons
  - Attribute preference
  - Feature evaluation
  - Pricing

◆ **Additional in-depth questions regarding usage were asked:**

- Initial reactions or concerns when introduced to the product
- Adjustment time
- Descriptions about specific features, particularly vibration
- Use and comprehension of product instructions

Gillette Quality Razors

9

GSR00013271

CONFIDENTIAL    GMPC001435

Gillette Business Strategy

# Executive Summary



Confidential

# Executive Summary

## Overall Preference

- ◆ **307 is significantly preferred over MACH3Turbo among the general sample and all key subgroups**

  - This includes clean shaven men, who were at parity in the prior CUT

- ◆ **The degree that 307 is preferred over MACH3Turbo is stronger in this CUT than in the prior CUT. Among the general sample, 64% prefer 307, 27% prefer MACH3Turbo and 9% have no preference in the current study...**

  - While 56% preferred 307, 34% MACH3Turbo and 11% had no preference in the previous test



Gillette Grooming Products

Confidential

GSR00013273

CONFIDENTIAL    GMPC001437

# Executive Summary

## Attribute Preference

◆ **Among the general sample, 307 is significantly preferred on all 36 performance and 36 physical attributes**

  • The magnitude of preference for 307 on the attributes is also stronger than in the prior CUT

◆ **Among MACH3 Family users, 307 is significantly preferred on 69 of the total 72 attributes. The exceptions are:**

  • Amount of rubber on the handle (directional preference for 307)
  • Ability to control the razor while shaving (parity)
  • Feel of the rubber on the handle (parity)

◆ **Among clean shaven men, 307 is also significantly preferred on all 72 attributes**



Gillette Grooming Products

6

Confidential

GSR00013274

CONFIDENTIAL    GMPC001438

# Executive Summary

## Attribute Preference (continued)

- ◆ **Among men with facial hair, 307 is significantly preferred on 35 of the 36 performance attributes**
  - With a parity result on ability to control the razor while shaving

- **and 30 of the 36 physical attributes**
  - With a directional win for 307 on:
    - feel of the rubber on the handle
    - thickness of the handle
    - amount of rubber on the razor handle
    - weight of the razor
  - And a parity result on:
    - comfortable to hold
    - being easy to change the way you hold the razor from one position to another

Gillette Grooming Products

Confidential

GSR00013275

CONFIDENTIAL    GMPC001439

# Preference Results



Confidential

GSR00013276

CONFIDENTIAL    GMPC001440

# Overall Preference - 307 Vs. MACH3Turbo

## Total Sample



27

9

64

## MACH3 Family Users



29

10

61

■ Prefer 307    ■ Prefer MACH3Turbo    ■ No Preference

12

Confidential

GSR00013277

CONFIDENTIAL    GMPC001441

# Overall Preference - 307 vs. MACH3Turbo

## Current CUT

### Total Sample



27
9
64

### MACH3 Family Users



29
10
61

- ■ Prefer 307
- ■ Prefer MACH3Turbo
- ■ No Preference

13

Confidential

*REDACTED*    GSR00013278

CONFIDENTIAL    GMPC001442

# Overall Preference *(By Subgroup)*

| | (Base) | 307<br>-A-<br><u>64</u><sup>B</sup> | MACH3<br>Turbo<br>-B-<br><u>27</u> |
|---|---|---|---|
| <u>Total</u> | (389) | <u>64</u><sup>B</sup> | <u>27</u> |
| <u>Age</u> | | | |
| 18-34 | (190) | 65<sup>B</sup> | 25 |
| 35-54 | (199) | 62<sup>B</sup> | 29 |
| <u>Razor Type</u> | | | |
| Systems | (201) | 62<sup>B</sup> | 26 |
| Disposables | (188) | 65<sup>B</sup> | 27 |
| <u>Brand Usage</u> | | | |
| Gillette | (241) | 64<sup>B</sup> | 26 |
| Non-Gillette | (148) | 63<sup>B</sup> | 28 |
| MACH3 Family | (221) | 61<sup>B</sup> | 29 |
| Non-MACH3 | (268) | 64<sup>B</sup> | 27 |

Gillette Grooming Products



14

Confidential

GSR00013279

CONFIDENTIAL    GMPC001443

# Overall Preference *(By Subgroup) - Cont'd*

| | | MACH3 Turbo | |
|---|---|---|---|
| | | **307** -A- | **27** -B- |
| **Total** | (Base) | **64**[B] | **27** |
| | | | |
| **Presence Of Facial Hair** | | | |
| Have facial hair | (166) | 64[B] | 27 |
| Clean shaven | (222) | 63[B] | 27 |
| | | | |
| **Type Of Facial Hair** | | | |
| Chin/fringe beard | (86) | 70[B] | 19 |
| Moustache only | (48)@ | 54 | 40 |
| Other* | (32)@ | 63[b] | 31 |

@ = Caution: Small base size.
* Includes sideburns and stubble.



Gillette Grooming Products

15

Confidential

GSR00013280

CONFIDENTIAL    GMPC001444

# Overall Preference *(By Subgroup) - Cont'd*

|  | (Base) | 307 -A- | MACH3 Turbo -B- |
|---|---|---|---|
| **Total** | (389) | **64**$^B$ | **27** |
| **Beard Toughness** | | | |
| Tough | (159) | 61$^B$ | 29 |
| Not tough | (230) | 66$^B$ | 25 |
| **Frequency Of Shaving** | | | |
| 4-6 times a week | (243) | 65$^B$ | 24 |
| 7+ times a week | (146) | 61$^B$ | 32 |
| **Quality Of Last Shave** | | | |
| Excellent/very good | (198) | 62$^B$ | 28 |
| Good/fair/poor | (190) | 66$^B$ | 26 |
| **Skin Sensitivity** | | | |
| Sensitive | (172) | 64$^B$ | 30 |
| Not sensitive | (217) | 64$^B$ | 24 |



Gillette Grooming Products

Confidential

GSR00013281

CONFIDENTIAL    GMPC001445

# Overall Preference (By Subgroup) - Cont'd

|  | (Base) | MACH3 -A- | Turbo -B- |
|---|---|---|---|
| **Total** | (389) | <u>64</u>$^B$ | <u>27</u> |
| **Ever Used an Electric Razor** | | | |
| Yes | (228) | 60$^B$ | 32 |
| No | (158) | 69$^B$ | 20 |
| **Used the Vibrating Feature** | | | |
| Yes | (383) | 64$^B$ | 27 |

(Base) 307 -A-

® = Caution: Small base size.
* Includes sideburns and stubble.

*Gillette Grooming Products*



GSR00013282

CONFIDENTIAL    GMPC001446

# Overall Preference -- 307 Vs. MACH3Turbo



**Total Sample**

- Prefer 307
- Prefer MACH3Turbo
- No Preference

**Significant performance preference wins for 307 on:**
- All efficacy attributes
- All safety/irritation attributes
- All maneuverability attributes
- All comfort attributes
- All ease of use attributes
- All miscellaneous attributes

**Directional performance preference wins for 307 on:**
- None

**Significant physical preference wins for 307 on:**
- All appearance attributes
- All handling attributes
- All handle attributes
- All design attributes
- All cleanliness attributes
- All vibration attributes
- All miscellaneous attributes

**Directional physical preference wins for 307 on:**
- None

*Gillette Quality Products*

18

GSR00013283

CONFIDENTIAL    GMPC001447

# Performance Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample)

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (389) % -A- | MACH3 Turbo (389) % -B- | No Preference (389) % | Point Diff. ±% |
| **EFFICACY** | | | | |
| Smoothness of the shave | 60B | 22 | 18 | +38 |
| Giving a close shave | 58B | 24 | 18 | +34 |
| Leaving your skin feeling soft and smooth | 56B | 22 | 22 | +34 |
| Giving the closest shave with less irritation | 59B | 24 | 17 | +35 |
| Giving a fast shave | 55B | 23 | 22 | +32 |
| Number of shaves per blade | 49B | 21 | 30 | +28 |
| Giving the closest shave with less irritation even when shaving against the grain | 56B | 24 | 20 | +32 |
| Removing more of each hair on each stroke | 54B | 21 | 25 | +33 |
| Shaving stubborn hairs | 50B | 22 | 28 | +28 |
| Reducing the need to re-shave parts of your face to get a close shave | 54B | 22 | 24 | +32 |
| Giving a close shave in fewer strokes | 58B | 22 | 20 | +36 |
| Not missing spots or hairs | 50B | 21 | 29 | +29 |
| Length of time the shave lasts | 51B | 21 | 28 | +30 |
| Providing moisture to your skin while shaving | 50B | 20 | 30 | +30 |
| Leaving your skin feeling smoother longer | 56B | 22 | 22 | +34 |

19

GSR00013284

CONFIDENTIAL    GMPC001448

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (389) % -A- | MACH3 Turbo (389) % -B- | No Preference (389) % | Point Diff. ±% |
| **SAFETY/IRRITATION** | | | | |
| Leaving you free from nicks and cuts | 47[B] | 21 | 32 | +26 |
| Not pulling or tugging at your beard | 53[B] | 23 | 24 | +30 |
| Giving a safe shave | 46[B] | 22 | 32 | +24 |
| Leaving you free from skin irritation | 51[B] | 21 | 28 | +30 |
| Shaving against the grain with less irritation | 56[B] | 21 | 23 | +35 |
| **MANEUVERABILITY** | | | | |
| Gliding comfortably over your skin | 54[B] | 24 | 22 | +30 |
| Maneuverability of the razor | 47[B] | 25 | 28 | +22 |
| Adjusting to the shape of face/neck | 46[B] | 21 | 33 | +25 |
| Ease of shaving hard-to-get-at places | 47[B] | 23 | 30 | +24 |
| **COMFORT** | | | | |
| Comfort of your face while shaving | 58[B] | 24 | 18 | +34 |
| Comfort of your face after shaving | 56[B] | 22 | 22 | +34 |

*Gillette Grooming Products*

20

Confidential

GSR00013285

CONFIDENTIAL

GMPC001449

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | No Preference (389) | Point Diff. |
| --- | --- | --- | --- | --- |
| | 307 (389) % -A- | MACH3 Turbo (389) % -B- | % | ±% |
| **EASE OF USE** | | | | |
| Ease of use | 44B | 27 | 29 | +17 |
| Ability to control the razor while shaving | 42B | 29 | 29 | +13 |
| Ease of getting a straight line for sideburns | 42B | 22 | 36 | +20 |
| Ease of trimming facial hair | 41B | 23 | 36 | +18 |
| Ease of shaping/sculpting facial hair | 43B | 20 | 37 | +23 |
| Ease of shaving under the nose | 41B | 21 | 38 | +20 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 52B | 23 | 25 | +29 |
| Having blades of consistently high quality | 49B | 19 | 32 | +30 |
| Making you feel confident while shaving | 50B | 24 | 26 | +26 |
| Worth paying more for | 54B | 22 | 24 | +32 |

Gillette Grooming Products

Confidential

GSR00013286

CONFIDENTIAL     GMPC001450

# Physical Attribute Preferences - 307

## Vs. MACH3Turbo (Among General Sample)

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (389) % -A- | MACH3 Turbo (389) % -B- | No Preference (389) % | Point Diff. ±% |
| **APPEARANCE** | | | | |
| The color of the razor | 46[B] | 17 | 37 | +29 |
| Appearance of the razor | 49[B] | 15 | 36 | +34 |
| Being modern or high tech | 63[B] | 11 | 26 | +52 |
| Appearance of the cartridge | 37[B] | 12 | 51 | +25 |
| The razor tray overall | 28[B] | 11 | 61 | +17 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 36[B] | 18 | 46 | +18 |
| Pivoting action of the razor head | 40[B] | 17 | 43 | +23 |
| Being comfortable to hold | 35[B] | 22 | 43 | +13 |
| Being easy to change the way you hold the razor from one position to another | 31[B] | 21 | 48 | +10 |
| **HANDLE** | | | | |
| Shape of the handle | 42[B] | 18 | 40 | +24 |
| The feel of rubber on the razor handle | 23[B] | 13 | 66 | +10 |
| Thickness of the handle | 32[B] | 16 | 52 | +16 |
| Length of the handle | 22[B] | 8 | 70 | +14 |
| Size of the handle | 27[B] | 13 | 60 | +14 |
| Texture of the handle | 40[B] | 19 | 41 | +21 |
| The amount of rubber on the razor handle | 22[B] | 11 | 67 | +11 |
| The location of rubber on the razor handle | 40[B] | 17 | 43 | +23 |

Confidential

GSR00013287

CONFIDENTIAL    GMPC001451

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer | | No Preference | Point Diff. |
|---|---|---|---|---|
| | 307 (389) %  -A- | MACH3 Turbo (389) %  -B- | (389) % | ±% |
| **DESIGN** | | | | |
| Weight of the razor | 35[B] | 20 | 45 | +15 |
| Sturdiness or durability of the razor | 36[B] | 19 | 45 | +17 |
| Overall design of the razor | 48[B] | 18 | 34 | +30 |
| Balance of the razor | 39[B] | 19 | 42 | +20 |
| Having an ergonomic design | 44[B] | 14 | 42 | +30 |
| Overall design of the cartridge | 38[B] | 15 | 47 | +23 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 35[B] | 13 | 52 | +22 |
| Ease of keeping the razor handle clean | 33[B] | 14 | 53 | +19 |
| Ability of dispenser to keep unused blades clean | 35[B] | 10 | 55 | +25 |



Gillette Grooming Products

23

Confidential

GSR00013288

CONFIDENTIAL    GMPC001452

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Prefer 307 (389) % -A- | Prefer MACH3 Turbo (389) % -B- | No Preference (389) % | Point Diff. ±% |
|---|---|---|---|---|
| **VIBRATION** | | | | |
| The ease of operating the razor | 39[B] | 22 | 39 | +17 |
| The vibrating action of the razor | 67[B] | 12 | 21 | +55 |
| Feel of the vibration in the handle | 63[B] | 13 | 24 | +50 |
| Ease of turning razor on and off | 65[B] | 13 | 22 | +52 |
| The massaging action of the razor | 64[B] | 13 | 23 | +51 |
| Sound of the vibration | 60[B] | 13 | 27 | +47 |
| **MISCELLANEOUS** | | | | |
| Ease of changing the cartridge | 31[B] | 12 | 57 | +19 |
| Having blades last a long time | 43[B] | 15 | 42 | +28 |
| Size of the razor head | 34[B] | 14 | 52 | +20 |
| Being technologically advanced | 65[B] | 12 | 23 | +53 |



24

Confidential

GSR00013289

CONFIDENTIAL     GMPC001453

# Performance Attribute Preferences - 307 Vs. MACH3Turbo (Among General Sample)

Base: Total Product Triers

**EFFICACY**

| | Point Difference Current CUT ±% | Prior CUT ±% |
|---|---|---|
| Smoothness of the shave | +38 | +20 |
| Giving a close shave | +34 | +19 |
| Leaving your skin feeling soft and smooth | +34 | +20 |
| Giving the closest shave with less irritation | +35 | +18 |
| Giving a fast shave | +32 | +19 |
| Number of shaves per blade | +28 | +12 |
| Giving the closest shave with less irritation even when shaving against the grain | +32 | +22 |
| Removing more of each hair on each stroke | +33 | +21 |
| Shaving stubborn hairs | +28 | +18 |
| Reducing the need to re-shave parts of your face to get a close shave | +32 | +15 |
| Giving a close shave in fewer strokes | +36 | +20 |
| Not missing spots or hairs | +29 | +16 |
| Length of time the shave lasts | +30 | +14 |
| Providing moisture to your skin while shaving | +30 | +18 |
| Leaving your skin feeling smoother longer | +34 | +20 |

Gillette Quality Module

25

GSR00013290

CONFIDENTIAL    GMPC001454

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Point Difference | |
| --- | --- | --- |
| | Current CUT ±% | Prior CUT ±% |
| **SAFETY/IRRITATION** | | |
| Leaving you free from nicks and cuts | +26 | +13 |
| Not pulling or tugging at your beard | +30 | +18 |
| Giving a safe shave | +24 | +12 |
| Leaving you free from skin irritation | +30 | +16 |
| Shaving against the grain with less irritation | +35 | +18 |
| **MANEUVERABILITY** | | |
| Gliding comfortably over your skin | +30 | +20 |
| Maneuverability of the razor | +22 | +11 |
| Adjusting to the shape of face/neck | +25 | +10 |
| Ease of shaving hard-to-get-at places | +24 | +13 |
| **COMFORT** | | |
| Comfort of your face while shaving | +34 | +22 |
| Comfort of your face after shaving | +34 | +16 |

Gillette Consumer Products

26

Confidential

GSR00013291

CONFIDENTIAL    GMPC001455

# EXHIBIT A

# Part 4 of 4

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

| | Point Difference | |
| --- | --- | --- |
| | Current CUT | Prior CUT |
| | ±% | ±% |
| **EASE OF USE** | | |
| Ease of use | +17 | +13 |
| Ability to control the razor while shaving | +13 | +6 |
| Ease of getting a straight line for sideburns | +20 | +8 |
| Ease of trimming facial hair | +18 | +11 |
| Ease of shaping/sculpting facial hair | +23 | +7 |
| Ease of shaving under the nose | +20 | +10 |
| **MISCELLANEOUS** | | |
| Blades shaving as close on the last shave as on the first shave | +29 | +16 |
| Having blades of consistently high quality | +30 | +16 |
| Making you feel confident while shaving | +26 | +19 |
| Worth paying more for | +32 | +18 |

Gillette Grooming Products

27

GSR00013292

CONFIDENTIAL    GMPC001456

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample)

Base: Total Product Tiers

| | Point Difference | |
|---|---|---|
| | Current CUT ±% | Prior CUT ±% |

**APPEARANCE**

| | Current CUT ±% | Prior CUT ±% |
|---|---|---|
| The color of the razor | +29 | +22 |
| Appearance of the razor | +34 | +27 |
| Being modern or high tech | +52 | +51 |
| Appearance of the cartridge | +25 | +17 |
| The razor tray overall | +17 | +13 |

**HANDLING**

| | Current CUT ±% | Prior CUT ±% |
|---|---|---|
| Providing a secure grip even when wet | +18 | +15 |
| Pivoting action of the razor head | +23 | +15 |
| Being comfortable to hold | +13 | +9 |
| Being easy to change the way you hold the razor from one position to another | +10 | +7 |

**HANDLE**

| | Current CUT ±% | Prior CUT ±% |
|---|---|---|
| Shape of the handle | +24 | +16 |
| The feel of rubber on the razor handle | +10 | +6 |
| Thickness of the handle | +16 | +9 |
| Length of the handle | +14 | +7 |
| Size of the handle | +14 | +8 |
| Texture of the handle | +21 | +11 |
| The amount of rubber on the razor handle | +11 | +11 |
| The location of rubber on the razor handle | +23 | +17 |

Confidential   GSR00013293   CONFIDENTIAL   GMPC001457

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

|  | Point Difference | |
|---|---|---|
|  | Current CUT | Prior CUT |
|  | ±% | ±% |
| **DESIGN** | | |
| Weight of the razor | +15 | +2 |
| Sturdiness or durability of the razor | +17 | +11 |
| Overall design of the razor | +30 | +25 |
| Balance of the razor | +20 | +8 |
| Having an ergonomic design | +30 | +29 |
| Overall design of the cartridge | +23 | +19 |
| **CLEANLINESS** | | |
| Ease of rinsing and cleaning the blades | +22 | +13 |
| Ease of keeping the razor handle clean | +19 | +16 |
| Ability of dispenser to keep unused blades clean | +25 | +18 |

Gillette Grooming Products

29

GSR00013294

CONFIDENTIAL    GMPC001458

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among General Sample) - Cont'd

Base: Total Product Triers

|  | Point Difference | |
|---|---|---|
|  | **Current CUT** | **Prior CUT** |
|  | ±% | ±% |

**VIBRATION**

| | | |
|---|---|---|
| The ease of operating the razor | +17 | +5 |
| The vibrating action of the razor | +55 | +48 |
| Feel of the vibration in the handle | +50 | +49 |
| Ease of turning razor on and off | +52 | +52 |
| The massaging action of the razor | +51 | +49 |
| Sound of the vibration | +47 | +53 |

**MISCELLANEOUS**

| | | |
|---|---|---|
| Ease of changing the cartridge | +19 | +17 |
| Having blades last a long time | +28 | +16 |
| Size of the razor head | +20 | +11 |
| Being technologically advanced | +53 | +52 |

30

Confidential

GSR00013295

**CONFIDENTIAL**   **GMPC001459**

# Overall Preference -- 307 Vs. MACH3Turbo

## MACH3 Family Users



- No Preference
- Prefer MACH3Turbo
- Prefer 307(H/C)

**Significant performance preference wins for 307 on:**
- All efficacy attributes
- All safety/irritation attributes
- All maneuverability attributes
- All comfort attributes
- All ease of use attributes except ability to control razor while shaving
- All miscellaneous attributes

**Parity performance preference on:**
- Ability to control razor while shaving

**Significant physical preference wins for 307 on:**
- All appearance attributes
- All handling attributes
- Shape of handle
- Thickness of the handle
- Length of the handle
- Size of the handle
- Texture of the handle
- Location of rubber on the razor handle
- All design attributes
- All cleanliness attributes
- All vibration attributes
- All miscellaneous attributes

**Directional physical preference win for 307 on:**
- Amount of rubber on handle

**Parity physical preference on:**
- Feel of rubber on handle



Confidential

GSR00013296

CONFIDENTIAL     GMPC001460

# Performance Attribute Preferences - 307

## Vs. MACH3Turbo (Among MACH3 Family Users)

Base: Total Product Triers

| | Prefer 307 (221) % -A- | Prefer MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff. ±% |
|---|---|---|---|---|
| **EFFICACY** | | | | |
| Smoothness of the shave | 55 B | 25 | 20 | +30 |
| Giving a close shave | 59 B | 26 | 15 | +33 |
| Leaving your skin feeling soft and smooth | 51 B | 25 | 24 | +26 |
| Giving the closest shave with less irritation | 55 B | 27 | 18 | +28 |
| Giving a fast shave | 50 B | 25 | 25 | +25 |
| Number of shaves per blade | 44 B | 26 | 30 | +18 |
| Giving the closest shave with less irritation even when shaving against the grain | 51 B | 26 | 23 | +25 |
| Removing more of each hair on each stroke | 49 B | 23 | 28 | +26 |
| Shaving stubborn hairs | 50 B | 26 | 24 | +24 |
| Reducing the need to re-shave parts of your face to get a close shave | 51 B | 26 | 23 | +25 |
| Giving a close shave in fewer strokes | 53 B | 26 | 21 | +27 |
| Not missing spots or hairs | 47 B | 25 | 28 | +22 |
| Length of time the shave lasts | 47 B | 26 | 27 | +21 |
| Providing moisture to your skin while shaving | 44 B | 24 | 32 | +20 |
| Leaving your skin feeling smoother longer | 52 B | 25 | 23 | +27 |

Confidential

GSR00013297

CONFIDENTIAL    GMPC001461

# Performance Attribute Preferences - 307

## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer | | | |
|---|---|---|---|---|
| | 307 (221) % -A- | MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff. ±% |
| **SAFETY/IRRITATION** | | | | |
| Leaving you free from nicks and cuts | 46 [B] | 29 | 25 | +17 |
| Not pulling or tugging at your beard | 48 [B] | 25 | 27 | +23 |
| Giving a safe shave | 41 [B] | 26 | 33 | +15 |
| Leaving you free from skin irritation | 47 [B] | 23 | 30 | +24 |
| Shaving against the grain with less irritation | 51 [B] | 24 | 25 | +27 |
| **MANEUVERABILITY** | | | | |
| Gliding comfortably over your skin | 51 [B] | 27 | 22 | +24 |
| Maneuverability of the razor | 44 [B] | 29 | 27 | +15 |
| Adjusting to the shape of face/neck | 45 [B] | 23 | 32 | +22 |
| Ease of shaving hard-to-get-at places | 46 [B] | 26 | 28 | +20 |
| **COMFORT** | | | | |
| Comfort of your face while shaving | 56 [B] | 25 | 19 | +31 |
| Comfort of your face after shaving | 54 [B] | 24 | 22 | +30 |

Gillette Grooming Products

33

GSR00013298

CONFIDENTIAL    GMPC001462

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (221) % -A- | Prefer MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff. ±% |
|---|---|---|---|---|
| **EASE OF USE** | | | | |
| Ease of use | 43B | 29 | 28 | +14 |
| Ability to control the razor while shaving | 39 | 33 | 28 | +6 |
| Ease of getting a straight line for sideburns | 40B | 26 | 34 | +14 |
| Ease of trimming facial hair | 43B | 24 | 33 | +19 |
| Ease of shaping/sculpting facial hair | 42B | 24 | 34 | +18 |
| Ease of shaving under the nose | 38B | 26 | 36 | +12 |
| **MISCELLANEOUS** | | | | |
| Blades shaving as close on the last shave as on the first shave | 47B | 26 | 27 | +21 |
| Having blades of consistently high quality | 46B | 23 | 31 | +23 |
| Making you feel confident while shaving | 46B | 27 | 27 | +19 |
| Worth paying more for | 55B | 25 | 20 | +30 |

34

Confidential

GSR00013299

CONFIDENTIAL

GMPC001463

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users)

Base: Total Product Triers

| | Prefer 307 (221) % -A- | Prefer MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff. ±% |
|---|---|---|---|---|
| **APPEARANCE** | | | | |
| The color of the razor | 51B | 15 | 34 | +36 |
| Appearance of the razor | 51B | 16 | 33 | +35 |
| Being modern or high tech | 64B | 11 | 25 | +53 |
| Appearance of the cartridge | 37B | 15 | 48 | +22 |
| The razor tray overall | 30B | 14 | 56 | +16 |
| **HANDLING** | | | | |
| Providing a secure grip even when wet | 33B | 21 | 46 | +12 |
| Pivoting action of the razor head | 37B | 20 | 43 | +17 |
| Being comfortable to hold | 37B | 20 | 43 | +17 |
| Being easy to change the way you hold the razor from one position to another | 32B | 22 | 46 | +10 |
| **HANDLE** | | | | |
| Shape of the handle | 39B | 20 | 41 | +19 |
| The feel of rubber on the razor handle | 21 | 15 | 64 | +6 |
| Thickness of the handle | 32B | 16 | 52 | +16 |
| Length of the handle | 20B | 10 | 70 | +10 |
| Size of the handle | 28B | 15 | 57 | +13 |
| Texture of the handle | 37B | 22 | 41 | +15 |
| The amount of rubber on the razor handle | 21B | 14 | 65 | +7 |
| The location of rubber on the razor handle | 37B | 20 | 43 | +17 |

35

Confidential

GSR00013300

CONFIDENTIAL    GMPC001464

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (221) % -A- | Prefer MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff ±% |
|---|---|---|---|---|
| **DESIGN** | | | | |
| Weight of the razor | 35[B] | 21 | 44 | +14 |
| Sturdiness or durability of the razor | 33[B] | 21 | 46 | +12 |
| Overall design of the razor | 51[B] | 20 | 29 | +31 |
| Balance of the razor | 40[B] | 20 | 40 | +20 |
| Having an ergonomic design | 45[B] | 14 | 41 | +31 |
| Overall design of the cartridge | 37[B] | 16 | 47 | +21 |
| **CLEANLINESS** | | | | |
| Ease of rinsing and cleaning the blades | 34[B] | 13 | 53 | +21 |
| Ease of keeping the razor handle clean | 33[B] | 14 | 53 | +19 |
| Ability of dispenser to keep unused blades clean | 33[B] | 11 | 56 | +22 |

Confidential

GSR00013301

CONFIDENTIAL    GMPC001465

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Prefer 307 (221) % -A- | Prefer MACH3 Turbo (221) % -B- | No Preference (221) % | Point Diff. ±% |
|---|---|---|---|---|
| **VIBRATION** | | | | |
| The ease of operating the razor | 37[B] | 25 | 38 | +22 |
| The vibrating action of the razor | 67[B] | 12 | 21 | +55 |
| Feel of the vibration in the handle | 61[B] | 14 | 25 | +47 |
| Ease of turning razor on and off | 64[B] | 12 | 24 | +52 |
| The massaging action of the razor | 66[B] | 12 | 22 | +54 |
| Sound of the vibration | 62[B] | 12 | 26 | +50 |
| **MISCELLANEOUS** | | | | |
| Ease of changing the cartridge | 28[B] | 13 | 59 | +15 |
| Having blades last a long time | 40[B] | 18 | 42 | +22 |
| Size of the razor head | 32[B] | 15 | 53 | +17 |
| Being technologically advanced | 63[B] | 14 | 23 | +49 |

Gillette Grooming Products

Confidential

GSR00013302

CONFIDENTIAL    GMPC001466

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users)

Base: Total Product Triers

**EFFICACY**

| Attribute | Point Difference Current CUT ±% | Point Difference Prior CUT ±% |
|---|---|---|
| Smoothness of the shave | +30 | +18 |
| Giving a close shave | +33 | +19 |
| Leaving your skin feeling soft and smooth | +26 | +22 |
| Giving the closest shave with less irritation | +28 | +21 |
| Giving a fast shave | +25 | +21 |
| Number of shaves per blade | +18 | +8 |
| Giving the closest shave with less irritation even when shaving against the grain | +25 | +26 |
| Removing more of each hair on each stroke | +26 | +23 |
| Shaving stubborn hairs | +24 | +17 |
| Reducing the need to re-shave parts of your face to get a close shave | +25 | +15 |
| Giving a close shave in fewer strokes | +27 | +27 |
| Leaving your skin feeling smoother longer | +22 | +20 |
| Not missing spots or hairs | +22 | +18 |
| Length of time the shave lasts | +21 | +16 |
| Providing moisture to your skin while shaving | +20 | +20 |

Gillette Grooming Products

38

Confidential

GSR00013303

CONFIDENTIAL    GMPC001467

# Performance Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | **Current CUT** | **Prior CUT** |
| | ±% | ±% |

### SAFETY/IRRITATION

| | Current CUT | Prior CUT |
|---|---|---|
| Leaving you free from nicks and cuts | +17 | +21 |
| Not pulling or tugging at your beard | +23 | +18 |
| Giving a safe shave | +15 | +15 |
| Leaving you free from skin irritation | +24 | +20 |
| Shaving against the grain with less irritation | +27 | +20 |

### MANEUVERABILITY

| | Current CUT | Prior CUT |
|---|---|---|
| Gliding comfortably over your skin | +24 | +21 |
| Maneuverability of the razor | +15 | +17 |
| Adjusting to the shape of face/neck | +22 | +13 |
| Ease of shaving hard-to-get-at places | +20 | +12 |

### COMFORT

| | Current CUT | Prior CUT |
|---|---|---|
| Comfort of your face while shaving | +31 | +24 |
| Comfort of your face after shaving | +30 | +21 |

*Gillette Quality Razors*

39

Confidential

GSR00013304

CONFIDENTIAL    GMPC001468

# Performance Attribute Preferences - 307

## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

|  | Point Difference | |
|---|---|---|
|  | Current CUT | Prior CUT |
|  | ±% | ±% |

### EASE OF USE
Ease of use

| Ability to control the razor while shaving | +14 | +12 |
|---|---|---|
| Ease of getting a straight line for sideburns | +6 | +7 |
| Ease of trimming facial hair | +14 | +6 |
| Ease of shaping/sculpting facial hair | +19 | +7 |
| Ease of shaving under the nose | +18 | +1 |
|  | +12 | +7 |

### MISCELLANEOUS

| Blades shaving as close on the last shave as on the first shave | +21 | +20 |
|---|---|---|
| Having blades of consistently high quality | +23 | +20 |
| Making you feel confident while shaving | +19 | +19 |
| Worth paying more for | +30 | +22 |

*Gillette Grooming Products*

40

Confidential

GSR00013305

CONFIDENTIAL    GMPC001469

# Physical Attribute Preferences - 307
## vs. MACH3Turbo (Among MACH3 Family Users)

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Current CUT ±% | Prior CUT ±% |
| **APPEARANCE** | | |
| The color of the razor | +36 | +23 |
| Appearance of the razor | +35 | +33 |
| Being modern or high tech | +53 | +58 |
| Appearance of the cartridge | +22 | +24 |
| The razor tray overall | +16 | +15 |
| **HANDLING** | | |
| Providing a secure grip even when wet | +12 | +17 |
| Pivoting action of the razor head | +17 | +19 |
| Being comfortable to hold | +17 | +4 |
| Being easy to change the way you hold the razor from one position to another | +10 | +6 |
| **HANDLE** | | |
| Shape of the handle | +19 | +8 |
| The feel of rubber on the razor handle | +6 | +0 |
| Thickness of the handle | +16 | +12 |
| Length of the handle | +10 | +9 |
| Size of the handle | +13 | +8 |
| Texture of the handle | +15 | +7 |
| The amount of rubber on the razor handle | +7 | +7 |
| The location of rubber on the razor handle | +17 | +18 |

Gillette Grooming Products

41

GSR00013306

CONFIDENTIAL

GMPC001470

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Current CUT | Prior CUT |
| | ±% | ±% |
| **DESIGN** | | |
| Weight of the razor | +14 | +5 |
| Sturdiness or durability of the razor | +12 | +18 |
| Overall design of the razor | +31 | +26 |
| Balance of the razor | +20 | +7 |
| Having an ergonomic design | +31 | +31 |
| Overall design of the cartridge | +21 | +20 |
| **CLEANLINESS** | | |
| Ease of rinsing and cleaning the blades | +21 | +13 |
| Ease of keeping the razor handle clean | +19 | +21 |
| Ability of dispenser to keep unused blades clean | +22 | +19 |

Gillette Grooming Products

Confidential

GSR00013307

CONFIDENTIAL    GMPC001471

# Physical Attribute Preferences - 307
## Vs. MACH3Turbo (Among MACH3 Family Users) - Cont'd

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Current CUT | Prior CUT |
| | ±% | ±% |

**VIBRATION**

| | | |
|---|---|---|
| The ease of operating the razor | +22 | +5 |
| The vibrating action of the razor | +53 | +53 |
| Feel of the vibration in the handle | +47 | +51 |
| Ease of turning razor on and off | +52 | +56 |
| The massaging action of the razor | +54 | +51 |
| Sound of the vibration | +50 | +56 |

**MISCELLANEOUS**

| | | |
|---|---|---|
| Ease of changing the cartridge | +15 | +17 |
| Having blades last a long time | +22 | +18 |
| Size of the razor head | +17 | +11 |
| Being technologically advanced | +49 | +53 |

*Gillette Grooming Products*

43

Confidential

GSR00013308

CONFIDENTIAL    GMPC001472

# Overall Preference -- 307 Vs. MACH3Turbo



## Clean Shaven

- **Directional performance preference wins for 307 on:**
  - None

- **Significant performance preference wins for 307 on:**
  - All efficacy attributes
  - All safety/irritation attributes
  - All maneuverability attributes
  - All comfort attributes
  - All ease of use attributes
  - All miscellaneous attributes

- **Significant physical preference wins for 307 on:**
  - All appearance attributes
  - All handling attributes
  - All handle attributes
  - All design attributes
  - All cleanliness attributes
  - All vibration attributes
  - All miscellaneous attributes

- **Directional physical preference wins for 307 on:**
  - None

| | |
|---|---|
| ■■ | Prefer 307(H/C) |
| ▨ | Prefer MACH3Turbo |
| ■ | No Preference |

Pie chart values: 27, 10, 63

Gillette Grooming Products

44

Confidential

GSR00013309

CONFIDENTIAL    GMPC001473

# Overall Preference -- 307 Vs. MACH3Turbo

Facial Hair

- ■ Prefer 307(H/C)
- ▨ Prefer MACH3Turbo◆
- ■ No Preference

**Significant performance preference wins for 307 on:**
- All efficacy attributes
- All safety/irritation attributes
- All maneuverability attributes
- All comfort attributes
- All ease of use attributes <u>except</u> ability to control razor while shaving
- All miscellaneous attributes

**Parity performance preference on:**
- Ability to control the razor while shaving

**Significant physical preference wins for 307 on:**
- All appearance attributes
- Providing a secure grip even when wet
- Pivoting action of razor head
- Shape of the handle
- Length of the handle
- Size of the handle
- Texture of the handle
- The location of rubber on the razor handle
- All design attributes <u>except</u> weight of the razor
- All cleanliness attributes
- All vibration attributes
- All miscellaneous attributes

**Directional physical preference wins for 307 on:**
- The feel of rubber on the razor handle
- Thickness of the handle
- The amount of rubber on the razor handle
- Weight of the razor

**Parity physical preference on:**
- Being comfortable to hold
- Easy to change the way you hold the razor from one position to another



Confidential

GSR00013310

CONFIDENTIAL    GMPC001474

# Performance Attribute Preferences - 307

## Vs. MACH3Turbo (Among Clean Shaven vs. Facial Hair)

Base: Total Product Triers

**EFFICACY**

| Attribute | Point Difference Clean Shaven ±% | Point Difference Facial Hair ±% |
|---|---|---|
| Smoothness of the shave | +37 | +41 |
| Giving a close shave | +33 | +33 |
| Leaving your skin feeling soft and smooth | +36 | +33 |
| Giving the closest shave with less irritation | +32 | +37 |
| Giving a fast shave | +30 | +35 |
| Number of shaves per blade | +25 | +33 |
| Giving the closest shave with less irritation even when shaving against the grain | +31 | +33 |
| Removing more of each hair on each stroke | +36 | +36 |
| Shaving stubborn hairs | +31 | +33 |
| Reducing the need to re-shave parts of your face to get a close shave | +24 | +34 |
| Giving a close shave in fewer strokes | +28 | +34 |
| Not missing spots or hairs | +35 | +37 |
| Length of time the shave lasts | +25 | +34 |
| Providing moisture to your skin while shaving | +29 | +32 |
| Leaving your skin feeling smoother longer | +31 | +35 |



Gillette Grooming Products

46

GSR00013311

CONFIDENTIAL     GMPC001475

# Performance Attribute Preferences - 307 vs.
## MACH3Turbo (Among Clean Shaven vs. Facial Hair) - Cont'd

Base: Total Product Triers

|  | Point Difference | |
|---|---|---|
|  | Clean Shaven ±% | Facial Hair ±% |
| **SAFETY/IRRITATION** | | |
| Leaving you free from nicks and cuts | +20 | +34 |
| Not pulling or tugging at your beard | +29 | +33 |
| Giving a safe shave | +28 | +18 |
| Leaving you free from skin irritation | +31 | +29 |
| Shaving against the grain with less irritation | +33 | +37 |
| **MANEUVERABILITY** | | |
| Gliding comfortably over your skin | +32 | +29 |
| Maneuverability of the razor | +24 | +19 |
| Adjusting to the shape of face/neck | +26 | +22 |
| Ease of shaving hard-to-get-at places | +20 | +30 |
| **COMFORT** | | |
| Comfort of your face while shaving | +29 | +38 |
| Comfort of your face after shaving | +34 | +33 |

Gillette Grooming Products

47

Confidential

GSR00013312

CONFIDENTIAL    GMPC001476

# Performance Attribute Preferences - 307 Vs.
## MACH3Turbo (Among Clean Shaven vs. Facial Hair) - Cont'd

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Clean Shaven ±% | Facial Hair ±% |

### EASE OF USE

| | Clean Shaven ±% | Facial Hair ±% |
|---|---|---|
| Ease of use | +18 | +16 |
| Ability to control the razor while shaving | +16 | +9 |
| Ease of getting a straight line for sideburns | +20 | +22 |
| Ease of trimming facial hair | +17 | +19 |
| Ease of shaping/sculpting facial hair | +22 | +23 |
| Ease of shaving under the nose | +21 | +16 |

### MISCELLANEOUS

| | Clean Shaven ±% | Facial Hair ±% |
|---|---|---|
| Blades shaving as close on the last shave as on the first shave | +25 | +32 |
| Having blades of consistently high quality | +31 | +27 |
| Making you feel confident while shaving | +26 | +25 |
| Worth paying more for | +29 | +35 |

*Gillette Grooming Products*

48

GSR00013313

CONFIDENTIAL    GMPC001477

# Physical Attribute Preferences ~ 307 Vs.

## MACH3Turbo (Among Clean Shaven vs. Facial Hair)

*Gillette Grooming Products*

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Clean Shaven ±% | Facial Hair ±% |
| **APPEARANCE** | | |
| The color of the razor | +26 | +35 |
| Appearance of the razor | +37 | +29 |
| Being modern or high tech | +49 | +55 |
| Appearance of the cartridge | +26 | +21 |
| The razor tray overall | +19 | +17 |
| **HANDLING** | | |
| Providing a secure grip even when wet | +19 | +15 |
| Pivoting action of the razor head | +25 | +19 |
| Being comfortable to hold | +16 | +10 |
| Being easy to change the way you hold the razor from one position to another | +34 | +4 |
| **HANDLE** | | |
| Shape of the handle | +25 | +23 |
| The feel of rubber on the razor handle | +11 | +8 |
| Thickness of the handle | +20 | +10 |
| Length of the handle | +13 | +14 |
| Size of the handle | +14 | +12 |
| Texture of the handle | +23 | +16 |
| The amount of rubber on the razor handle | +12 | +8 |
| The location of rubber on the razor handle | +25 | +20 |

Confidential

GSR00013314

CONFIDENTIAL    GMPC001478

# Physical Attribute Preferences - 307 vs.
## MACH3Turbo *(Among Clean Shaven vs. Facial Hair) - Cont'd*

Base: Total Product Triers

| | Point Difference | |
|---|---|---|
| | Clean Shaven ±% | Facial Hair ±% |

### DESIGN

| | Clean Shaven ±% | Facial Hair ±% |
|---|---|---|
| Weight of the razor | +20 | +11 |
| Sturdiness or durability of the razor | +19 | +12 |
| Overall design of the razor | +32 | +27 |
| Balance of the razor | +26 | +14 |
| Having an ergonomic design | +28 | +32 |
| Overall design of the cartridge | +25 | +23 |

### CLEANLINESS

| | Clean Shaven ±% | Facial Hair ±% |
|---|---|---|
| Ease of rinsing and cleaning the blades | +24 | +21 |
| Ease of keeping the razor handle clean | +15 | +21 |
| Ability of dispenser to keep unused blades clean | +23 | +27 |

*Gillette Grooming Products*

Confidential

GSR00013315

CONFIDENTIAL    GMPC001479

# Physical Attribute Preferences - 307 Vs.
## MACH3Turbo (Among Clean Shaven vs. Facial Hair) - Cont'd

Base: Total Product Triers

|  | Point Difference | |
|---|---|---|
|  | Clean Shaven | Facial Hair |
|  | ±% | ±% |
| **VIBRATION** | | |
| The ease of operating the razor | +19 | +13 |
| The vibrating action of the razor | +48 | +65 |
| Feel of the vibration in the handle | +46 | +56 |
| Ease of turning razor on and off | +47 | +59 |
| The massaging action of the razor | +45 | +57 |
| Sound of the vibration | +43 | +55 |
| **MISCELLANEOUS** | | |
| Ease of changing the cartridge | +19 | +19 |
| Having blades last a long time | +31 | +26 |
| Size of the razor head | +23 | +18 |
| Being technologically advanced | +51 | +54 |

Gillette Grooming Products

51

GSR00013316

CONFIDENTIAL    GMPC001480

# EXHIBIT B

[coat-of-arms]

[Stamped seals:]
*Landgericht* [Regional Court] of Hamburg

[Rubber-stamp:]
Received
79098 Freiburg
[initials]
10 January 2005
Count von Westphalen
Bappert & Modest

*Landgericht* [Regional Court] of Hamburg

J U D G M E N T

In the Name of the People

Case No:
312 O 1037/04

Published on
17 December 2004

Cisse, Court Officer
Documents Officer of the Court

In the Matter of

Wilkinson Sword GmbH,
represented by its managers,
Thomas Heinen and Wolfgang Althaus,
Schützenstrasse 110, 42659 Solingen

– Petitioner –

represented herein by

Count von Westphalen & Partners,
Attorneys at Law,
Kaiser-Joseph-Strasse 284,
79098 Freiburg,
Ref. No.: 2043/04 RNH/Mbw,

against

Gillette Deutschland GmbH & Co. oHG,
represented by its managing member partner,
Gilette [sic] Berlin Holding GmbH, in turn represented by
its managers, Ross McMullin and Helmut Heidrich,
Frankfurter Strasse 145, 61476 Kronberg/Taunus

– Respondent –



PLAINTIFF'S
EXHIBIT
11
ALL-STATE LEGAL®

CONFIDENTIAL

GMPC001949

represented herein by

Mayer & Partners,
Attorneys at Law,
Bochenheimer Landstrasse 98-100,
60323 Frankfurt am Main,
Ref. No. 01086-03,

the Regional Court of Hamburg, Civil Section 12,
after oral hearing on 17 December 2004 by
Regional Court Judge Sievers, Presiding,
Regional Court Judge Dr. Kagelmacher,
Regional Court Judge Böttcher,

CONFIDENTIAL

GMPC001950

2

<u>ruled</u>:

The interlocutory injunction dated 16 November 2004 is affirmed.

The respondent must also bear the additional costs of the proceeding.

<u>Statement of Facts</u>:

The parties are competitors in the marketing of wet shavers.

On 17 September 2004, the respondent introduced its new "M3 Power" Peak Shaver (cf. Exhibit Ast 2) on the German market. This shaver has a small, battery-operated motor, which creates gentle vibrations that are transmitted to the skin during shaving.

According to the respondent's advertising for the "M3 Power Shaver," its micro-pulses lift the facial hairs and thereby ensure a closer shave. For details of the respondent's advertising, reference is made to Exhibits Ast 2 to 5.

In the grounds set forth in its petition and in its pleadings dated 15 September 2004, the petitioner maintains that this advertising is inaccurate and deceptive. As evidence thereof, the petitioner produces the video clips, visible in Exhibit Ast 10, of a test commissioned by the petitioner. In the opinion of the petitioner, this test shows that shaving with the "M3 Power Shaver" does not create a situation in which the facial hairs would be lifted by micro-pulses and in this way a closer shave could consequently be achieved.

CONFIDENTIAL

GMPC001951

3

On 16 November 2004 the petitioner obtained a decision, with abstention from the policing measures provided by law, enjoining the respondent from taking the following actions, subject to the penalties provided by law:

1.1. Claiming for purposes of trade competition that during shaving with the M3 Power wet shaver, micro-pulses lift the facial hairs, thereby ensuring a closer shave, particularly if such claims make use of the following wording:

"The revolutionary new feature of the Gillette M3 Power Shaver: The handle of the high tech shaver contains a small motor that causes the blades to pulse gently. The skin is stimulated, and the hairs stand up better than they did with the predecessor MACH3Turbo model. So the blades can grip the hairs closer to the root -- and the hairs are removed close down,"

and/or

"The new Power Shaver. So fantastic, so irresistible, that you simply have to have it. New now: the Gillette M3 Power Shaver. The first battery-operated Gillette shaving system with the revolutionary new PowerGlide blades. Switch it on. Micro-pulses lift the hairs to make the Gillette shave even more thorough. Feel the power of the best Gillette shave. For maximum power,"

and/or

"The first Gillette Micro-Power shaving system. Switch on the battery-operated motor. Micro-pulses lift the facial hairs so that the PowerGlide blades can shave even closer,"

CONFIDENTIAL

GMPC001952

4

and/or

"The first micro-operated Gillette wet shaver: A small motor built into the handle and powered by a Duracell AAA battery creates gentle micro-pulses that stimulate the skin and lift the hairs,"

and/or

"Micro-Power
Gentle micro-pulses lift the hairs. For a thorough and careful shave in a single power application. So thorough that you need less post-shave touch-up. Result: less skin irritation";

1.2. Using for purposes of trade competition for the M3Power wet shaver advertising images showing initially flat beard stubble being lifted by vibrations produced by the shaver, particularly as shown in the advertising spot for the M3 Power shaver seen by the Court on CD-Rom.

In its defense the respondent contended in particular that the content of the contested advertising is appropriate and therefore not objectionable. According to the respondent, the micro-pulses created by the M3 Power Shaver lift the hairs by mechanical action; prior to shaving, the freedom of movement of the hairs was impeded by deposits of sebum and skin cells on the surface of the skin; during the growth process of the hair, this layer of skin cells and sebum

CONFIDENTIAL

GMPC001953

5

creates an upward tension in the hair, since the hair is unable to project freely from the sub-cutaneous layers; if the layer of skin cells and sebum is removed or broken open, the hairs break through and project by approximately 80 micrometers, whereupon the now freely mobile hair can be cut better and definitely shorter; this effect can generally be achieved by mechanical actions, for example by rubbing with a hand towel (the "toweling effect"); with the "M3 Power Shaver" the micro-pulses ensure that the hair is released from the above-described adhesive situation and can stand up straight, which leads to a definitely closer shave. In the opinion of the respondent, the test carried out by the petitioner is not conclusive, one reason being that the set-up of the experiment anticipates the toweling effect created by rubbing the face with a warm hand towel.

The respondent prays
for overturning of the decision dated 16 November 2004 and for denial of the application dated 11 November 2004 for issuance of an interlocutory injunction.

The petitioner prays
for affirmation of the interlocutory injunction.

In addition to the allegations of the parties, reference is made to their pleadings together with the exhibits.

Grounds for the decision:

The objection is admissible and is without merit.

CONFIDENTIAL

GMPC001954

6

Even after due consideration of the allegations of the parties, the issuance of the interlocutory injunction proves to have been correct.

The subject of the injunction issued by the court is the advertising claims reproduced in paragraph 1.1 of the decision dated 16 November 2004 and the advertising images described in paragraph 1.2. They are unfair and deceptive, because they claim that shaving with the M3 Power Shaver lifts the facial hairs by means of micro-pulses created by said shaver, which has a positive effect on shaving. This statement is deceptive, because shaving with the M3 Power Shaver as instructed does not cause the facial hairs to stand up straight. This can in any case be determined, based on the following circumstances, with the overwhelming probability necessary for an interlocutory injunction proceeding: The M3 Power Shaver is a wet shaver, and according to the instructions its use requires a preparatory application of shaving cream. This shaving cream is customarily applied more or less thoroughly with a shaving brush to the beard area of the face, and is massaged in gently. The intensity of the mechanical effect on the skin may vary depending on the application of the shaving cream. The form in which the shaving cream is available can be particularly significant for this purpose. Independent thereof, however, in normal circumstances wet shaving is prefaced by a preparatory application of shaving cream, which has a mechanical effect on the face, but the intensity of which is not more limited than the intensity of the mechanical micro-pulses of the M3 Power Shaver. In addition, the shaving cream also acts chemically on the sebaceous layer coating the skin surface, according to the generally known cleansing effect of soap. If the layer of sebum and skin cells lying on the surface prior to shaving

CONFIDENTIAL

GMPC001955

7

actually leads to a situation in which the hairs do not project as far above the skin as they would in the absence of this layer, dissolution of this layer and projection of the hairs do not require the micro-pulses of the M3 Power Shaver. In a normal situation this effect would already be created instead by the chemical and mechanical action on the skin connected with the customary preparatory application of shaving cream.

Aside from this fact, however, even the advertised relevance for shaving quality of the lifting of the hairs does not exist with overwhelming probability in the case of the shavers in question herein. The use of multiple blades leads to a situation in which the first of the multiple blades positioned one behind the other draws the hair slightly out of the hair channel while cutting it, so that the second blade following behind the first can cut the hair closer while again drawing it out a little farther, so that the hair is cut a third time if a third blade is present, as is the case in the products of the parties. This hysteresis effect is most probably not significantly impeded by the sebum and skin-cell layer described by the respondent, so that contrary to what is stated above this layer would not have to be already removed or broken open in connection with the customary preparation for shaving.

The accuracy of the respondent's advertising claims is also not supported by the test conducted by the Stiftung Warentest [Product Testing Foundation], produced by the respondent as Exhibit AG 1. In the context of this test, the M3 Power Shaver was subjected to further testing, and achieved the best result, albeit "out of competition". Whether this was due to the micro–pulses, however,

**CONFIDENTIAL**

**GMPC001956**

8

was expressly left unstated by the Stiftung Warentest. In addition, the test is based solely on the subjective evaluation by the tester, and the Stiftung Warentest generally expressly takes a placebo effect into account for this test (Exhibit AG 1, page 21, bottom right). Obviously this could also have led to the outstanding rating assigned by the tester to the M3 Power Shaver, since many testers experienced the gentle vibrations as pleasant to the skin (Exhibit AG 1, page 23, top right), and since the micro-pulses can also be objectively advantageous with respect to shaving comfort and particularly for the prevent of skin irritations.

The decision as to costs is based on §91 of the Civil Procedure Code.

Sievers                        Dr. Kagelmacher                        Böttcher


Copy issued.
[signature]
Court Officer
Documents Officer of the Court

[Stamped seal:] Regional Court of Hamburg

CONFIDENTIAL

GMPC001957



**ERIKSEN**

ERIKSENINC.COM

TEL 718-802-9010

FAX 718-802-0041

# CERTIFICATE
## OF ACCURACY

STATE OF NEW YORK)

COUNTY OF KINGS)  SS:

This is to certify that the translation of the attached document:

**Judgment in the Matter of Wilkinson Sword GmbH, Petitioner, v. Gillette
Deutschland GmbH & Co. oHG, Respondent**

is, to the best of my knowledge and belief, a true, complete and accurate
translation from German into English.

*Camila Santos*

Camila Santos

Sworn to and subscribed before me

this 13th day of January 2005

*Leah G. Ruggiero*

Notary Public

LEAH G. RUGGIERO
Notary Public, State Of New York
No.01RU6013115
Qualified In Kings County
Commission Expires September 08, 200__

CONFIDENTIAL

GMPC001958

# EXHIBIT C

# FEDERAL COURT OF AUSTRALIA

Energizer Australia Pty Ltd v Gillette Australia Pty Ltd [2005] FCA 148

*Trade Practices Act 1974* (Cth) s 52(1)

*Ingersoll-Rand (Aust) Ltd v Industrial Rollformers Pty Ltd* [2000] NSWSC 177
*Thomas A Edison Ltd v Bullock* (1912) 15 CLR 679

ENERGIZER AUSTRALIA PTY LTD v GILLETTE AUSTRALIA PTY LTD
NSD 167 OF 2005

HELY J
25 FEBRUARY 2005
SYDNEY



PLAINTIFF'S
EXHIBIT
ALL-STATE LEGAL®
13

CONFIDENTIAL

GMPC001960

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA
NEW SOUTH WALES DISTRICT REGISTRY                 NSD 167 OF 2005

BETWEEN:        ENERGIZER AUSTRALIA PTY LTD
                APPLICANT

AND:            GILLETTE AUSTRALIA PTY LTD
                RESPONDENT


JUDGE:          HELY J
DATE OF ORDER:  25 FEBRUARY 2005
WHERE MADE:     SYDNEY

THE COURT ORDERS THAT:

1.    The injunction granted on 8 February 2005 be continued until the hearing of these
      proceedings or further order.

2.    The hearing of these proceedings be expedited.

3.    The matter be returned to the Registry for the purpose of allocation to a docket.

4.    Costs be costs in the cause.

5.    These orders be entered by the Registry forthwith.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

CONFIDENTIAL

GMPC001961

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA
NEW SOUTH WALES DISTRICT REGISTRY

NSD 167 OF 2005

BETWEEN:        ENERGIZER AUSTRALIA PTY LTD
                APPLICANT

AND:            GILLETTE AUSTRALIA PTY LTD
                RESPONDENT


JUDGE:          HELY J
DATE:           25 FEBRUARY 2005
PLACE:          SYDNEY


REASONS FOR JUDGMENT

1        Gillette (a term used to describe both the respondent and its overseas affiliates) is the
world's leading manufacturer of shaving products.  It dominates the wet shaving product
market both in Australia and internationally.  Energizer (a term used to describe both the
applicant and its overseas affiliates) distributes Schick branded blades and razors, and is
Gillette's main competitor in Australia.


2        Gillette manufactures a product called the Mach 3 Turbo.  In May 2004 Gillette
launched a new shaver in the United States of America called the 'M3 Power'.  The M3
Power is the first battery operated shaving system marketed by Gillette.  The principal
difference between the Mach 3 Turbo, and the M3 Power, is the battery operated mechanism.
In the second half of 2004 the M3 Power was launched in the United Kingdom, Europe and
Japan.  The M3 Power razor was launched on the German market on 17 September 2004.
Advertising conducted by Gillette in association with that launch claimed that the razor's
micro-pulses lifted the facial hair thereby giving a closer shave.


3        Dr Leffell, a professor of dermatology and Director of Dermatological Surgery at
Yale University was asked to express an opinion as to whether there was any scientific basis
for the claim that the M3 Power razor has the capacity to 'raise the hair' on a man's face, or
that the razor emits micro-pulses which have the effect of causing the facial hairs to stand up

**CONFIDENTIAL**

**GMPC001962**

- 2 -

('the hair raising claims'). On 8 October 2004 Dr Leffell observed a study conducted by Energizer. The key elements of the study may be summarised as follows:

(a)    five male subjects were selected for the study. Each subject was instructed to prepare for shaving by dabbing a moist warm towellette on the area of his face which had to be shaved. Shaving cream was not used so that the effect of the razor on the facial hair could be observed clearly;

(b)    each subject was positioned and stabilised using a Canfield Scientific head brace, adjacent to which was mounted a high speed video camera and associated lighting. Between the camera and the brace, an M3 Power razor was positioned, coupled to a pneumatically operated mechanical slide. This set up allowed a fully automated and controlled shaving stroke to be performed on the subject's face with the M3 Power razor, and for this to be recorded on the video camera; and

(c)    using a mechanically operated slide, two shaving strokes were performed on each subject and recorded by the video camera. The first stroke was a control stroke and was done with the razor turned off (so it did not vibrate) and the razor blades dulled (so the hair was not cut). The second stroke, referred to as the active stroke, was done with the razor turned on and the razor blades at their normal sharpness.

4    Dr Leffell's conclusions may be summarised as follows:

(a)    he observed no hair raising or hair directional change effect in either the case of the control stroke or the active stroke;

(b)    neither 'micro-pulses' nor any other mechanical or electrical action of the razor has the effect of causing facial hair to stand up; and

(c)    there is no physiologic or other scientific basis for the claim that the razor can cause facial hair to stand up proud in the manner described in Gillette's advertising.

5    Energizer applied to the Hamburg Regional Court in Germany for interlocutory relief in relation to Gillette's hair raising claim. Dr Leffell gave evidence in support of that application. On 17 December 2004 the Court restrained Gillette from claiming commercially that when shaving with the M3 Power razor, micro-pulses cause the facial hairs to stand up, giving an even closer shave. Gillette then changed its advertising for the M3 Power shaver so

CONFIDENTIAL

GMPC001963

- 3 -

as to omit reference to the lifting of the facial hairs. However, the new advertisement explicitly suggested that there was a causality between the vibrations ('gentle micro-power') and the special closeness of the shave resulting from the use of the M3 Power razor. On 28 December 2004 the Hamburg Regional Court granted an ex parte injunction restraining that form of promotion of the razor. These decisions are the subject of an appeal which has not yet been determined.

6          In about June 2004 Gillette began to make preparations for the launch of the M3 Power razor in Australia. Between October and December 2004 Gillette conducted trade presentations in preparation for the launch. These presentations included the use of semi-trailers bearing the slogan 'Feel the Power' which were parked outside 15 retailers' headquarters for a period of about four hours at a time.

7          On the evidence so far before me, I find that whilst Energizer executives expected in 2004 that Gillette would launch the M3 Power razor in Australia, and that the launch would probably occur in about March 2005, they had no firm intelligence to this effect until about the end of January 2005, nor did they know until about the end of January 2005 what claims would be made by Gillette for the product, particularly in the light of the opinions which had been expressed by Dr Leffell, and the judgments of the Hamburg Regional Court. As late as 12 January 2005 (Exhibit B) an internal email from Energizer's Business Manager for Blades in Australia and New Zealand (Mr Nuich) noted that Energizer was preparing its legal position in preparation for the M3 launch, and that whilst there was a possibility of a 'pre-emptive move' more information was required regarding the launch before any such move could be undertaken.

8          On 28 January 2005 Gillette commenced distribution of the M3 Power razor to distributors and retailers in Australia. Also on 28 January 2005 a motion for preliminary injunction and complaint for injunctive relief was made by Energizer in the United States District Court for Connecticut. On the evidence so far called, I accept that it was not until about this time that Energizer came to learn that Gillette intended to make the hair raising claim in relation to the Australian launch.

9          On 3 February 2005 Mr Nuich received an M3 Power retail pamphlet from Woolworths. That pamphlet had been distributed by Gillette in connection with the launch of

CONFIDENTIAL

GMPC001964

- 4 -

the M3 Power razor and asserted that the launch would be supported with 'an unprecedented $10M media spend and a truly innovative PR campaign'. Among the product benefits listed for the M3 Power razor was the following:

> '... a tiny motor in the handle pulses vibration to the blades, lifting hair to provide a closer cut.'

10    On 4 February 2005 a letter of demand was sent from Energizer's Australian solicitors to Gillette. On 5 February 2005 the M3 Power razor became available in retail stores in Australia. On 8 February 2005 Gillette's Australian solicitors responded to the letter of demand. That letter included the following:

> 'We have been instructed that our client has scientific evidence that establishes that the oscillation of the M3 Power emits a vibration which has the effect of extending the hair up and away from the skin.'

11    On 8 February 2005 I heard an application by Energizer for ex parte injunctive relief. The orders which I made on that occasion included:

> '2.    Up to and including 18 February 2005, the respondent:
>     (a)    whether by itself, its directors, servants or agents or otherwise be restrained from:
>         (i)    further distributing to retail outlets the M3 Power razor packaged in the form of Exhibit A ("the M3 Power razor"); or
>         (ii)    further promotion or advertising of the M3 Power razor to the extent that such conduct would involve the making of any of the representations set out in paragraph 1 of the application;
>     (b)    use its best endeavours to:
>         (i)    withdraw any advertising or other promotional material for the M3 Power razor to the extent that such advertising or other promotional material makes any of the representations set out in paragraph 1 of the application other than instore and point of sale material already distributed to retailers and used for the storage and display of the M3 Power razor or M3 Power razor stock which has already been supplied by the respondent to third party distributors or retailers in Australia.
>
> 3.    It is not the intent of order 2 that the respondent be in contempt for conduct occurring prior to the date of these orders.'

CONFIDENTIAL

GMPC001965

- 5 -

12      Paragraph 1 of the application seeks a declaration that in making the representations described in pars 1(a) to (k) of the application, the respondent has engaged in conduct, in trade or commerce, which is misleading or deceptive or likely to mislead or deceive in contravention of s 52(1) of the *Trade Practices Act 1974* (Cth) ('the TPA').    The representations referred to in pars (a) and (b) are:

> '(a)    *by means other than the cutting action of its blades, the M3 Power Razor (the Razor) stimulates, raises or lifts facial hair up and away from the skin;*
>
> (b)    *the Razor emits "micro-pulses" or vibrations or has a pulsing action which stimulates, raises or lifts facial hair up and away from the skin.'*

The representations in pars (c) to (j) consist of various claims made in relation to the razor (such as, for example, that it gives a closer and/or more thorough shave than all other men's system razors) either because of the matters represented in par (a) or because the razor emits 'micro-pulses' or vibrations or has a pulsing action.    The representation in par (k) is a representation that the respondent had reasonable grounds for making each of the representations set out in pars 1(a) to (j) of the application.

13      On 17, 18 and 21 February I heard an application for a continuation and expansion of the injunctions granted on 8 February.    The expansion sought is that Gillette should use its best endeavours to withdraw all M3 Power razor stock and all point of sale material containing the representations from third party distributors and retailers.

14      Gillette ceased shipping the M3 Power razor pack containing the representations complained of on 8 February 2005 following the making of the interim orders.    Very substantial quantities of the product were shipped prior to that date, and substantial amounts of product that were due to have been shipped since that date have been stopped.

**The advertising campaign**

15      The packing in which the M3 Power razor is distributed states, inter alia, that:

> '*Gentle micro-pulses stimulate hair up and away from the skin.    In just one power stroke, you get a remarkably close and more thorough shave.'*

Variants on that theme are to be found in point of sale material, retail pamphlets, a booklet which has been distributed to the trade and on the Gillette website.

**CONFIDENTIAL**

**GMPC001966**

- 6 -

16      The central representation, which Energizer submits is false, is that the razor emits 'micro-pulses' or vibrations or has a pulsing action that stimulates, raises or lifts facial hair up and away from the skin giving a closer and/or more thorough shave than all other men's system razors. In some instances the benefit is not said to be a closer and/or more thorough shave, but (for example) the best shave ever.

17      Gillette has announced an 'unprecedented' proposed media expenditure of $10 million in connection with the launch of the product. The proposed television and print advertising will make the representations which Energizer claims are false. On the materials before me I accept Energizer's submission that looming on the horizon in Australia is a massive media blitz promoting the M3 Power razor, the focus of which will be the representation that Energizer alleges to be false.

18      Consumer research conducted in the USA demonstrates that the message that the M3 Power razor 'raises hair higher to cut', is one which is conveyed by Gillette's advertising, and is one which resonates with consumers.

**Hair raising claims**

19      As already indicated, Dr Leffell's brief was to provide an opinion as to whether there was any scientific basis for the hair raising claims made in relation to the M3 Power razor. The study conducted on 8 October 2004 was designed to demonstrate whether an oscillating razor could by virtue of its impact on the skin, cause hair to stand up. Shortly stated, Dr Leffell's evidence in these proceedings, as it was in the Hamburg proceedings, is that there is no physiologic or other scientific basis for the claim that an oscillating razor can cause facial hair to stand up proud in the manner shown in Gillette's advertising in Germany and the USA. As a scientist and skin specialist of many years, Dr Leffell was of the opinion that the mild vibrative effect of the razor applied to the skin would not have any effect on the hairs such as to cause them to be raised up, or stand proud. The study clearly showed that the application of the razor to the skin did not cause the facial hairs to be raised up or to stand proud of the skin.

20      Dr Leffell was cross-examined and the methodology of the study which he observed was criticised, in particular by Dr Saker, an engineer and research scientist employed by Gillette. Dr Saker's ultimate conclusion was that the study conducted by Energizer does not

**CONFIDENTIAL**

**GMPC001967**

- 7 -

'exhibit the requisite rigour or expertise necessary to determine whether the hair extension effect produced by an oscillating razor that my colleagues and I have recorded at Advanced Technology Centre does not, in fact, occur' (emphasis added). Whether the criticisms levied by Dr Saker are made out, and if so with what result, is a matter for determination at the final hearing.

### Hair extension effect

21      But more needs to be said about Gillette's claimed 'hair extension effect', if only because Mr Kohler, who responded to Dr Saker's affidavit, has confirmed that Energizer's tests were designed to observe hair raising, not hair extension. Dr Leffell confirmed that this was so. To Dr Leffell there is a significant difference between the notion of hair 'raising up' or 'lifting' away from the face, and the notion of hair 'extending'. The lifting or raising of hair involves a move of the hair towards a vertical position, with a change in the angle between the hair and the face. Whilst 'hair extension' is not a term with which Dr Leffell is familiar, he understands the term to refer to the hair moving in and out of its follicle, but maintaining the same angle against the face, rather than moving towards a vertical position.

22      In essence the 'hair extension effect' is an alleged increase in the observable length of beard hairs which is said to be triggered by micro-pulses produced by an oscillating razor, such as the M3 Power razor. Dr Powell, an engineer by training who joined Gillette in January 1995 and who is now the Laboratory Director of Gillette Advanced Technology Centre, explained the hair extension effect, and the reason for its occurrence, as follows:

> 'Based upon their examination of this hair extension effect, Gillette scientists have concluded that the extension effect occurs because many facial beard hairs are subtly bound within the hair follicle due to deposits of sebum within the follicle and on the surface of the hair shaft and a build-up of surface level corneocytes which have a tendency to adhere together through a process known as "interdigitation". The growing hair, bound to the sebum deposits and corneocytes, is "bound" within the follicle so that it does not fully release above the skin surface. The hair agitation and surface skin stress produced by an oscillating razor disperses and unbinds the sebum deposits and corneocytes, which allows the hair to move freely within the hair follicle and to reach its full extension above the skin surface... .'

23      Dr Powell has no medical training. He agreed in cross-examination that this expression of opinion is one which requires dermatological expertise which he does not have, but he said that it is 'within the boundaries of my team members'.

**CONFIDENTIAL**

GMPC001968

- 8 -

24    Many of the studies relied upon by Gillette to sustain the claims made in relation to the M3P razor were conducted before Dr Powell joined Gillette. None of the studies involved the use of the M3 Power razor, although two studies involved the use of a prototype. The studies were conducted by Gillette personnel and are unpublished. There was no peer review. The following table summarises the results of these tests.

| DATE | TEST | RESULT |
|------|------|--------|
| 1990/1991 | KLP1 | An oscillating razor produced an increase in observable hair length. |
| 1990 | KLP2 | Neither the agitation associated with the application of shave preparations, nor any chemical or surfactant effects incidental to preparing the face for shaving triggered the hair extension effect. |
| 1992 | KLP3 | Physical agitation of hair and skin produced a hair extension effect. Once the hairs were extended, the hairs did not appreciably retract afterwards. |
| 2003 | KLP4 | An oscillating cartridge of a M3 Power prototype produced statistically significant hair extension effects comparable to those observed in earlier tests. The observed differential translates into approximately 3 hours of beard hair growth. |
| 2001/2002 | KLP6 | 10 per cent more of the observable hairs were removed with a single stroke of an oscillating razor (the M3 Power prototype) than in the case of the M3 Power prototype in non-oscillating mode. |
| 1991 | KLP8 | Application of a transparent hemispherical dome to the skin and face near a hair revealed individual hairs releasing and extending from the hair follicles in a manner consistent with Gillette's research. |
| 2003 | KLP10 | An oscillating M3 Power razor produced stress waves in the skin surface. |

25    These studies are relied upon by Dr Powell as supporting the notion that hairs otherwise bound to the skin will 'pop up' above the skin level. If that occurs, the tip of the

CONFIDENTIAL

GMPC001969

- 9 -

hair will be at a greater height by virtue of its having 'popped up' or extended, than it was beforehand.

26    The conclusion which Dr Powell draws from these studies is expressed in his affidavit as follows:

'38.    *For the reasons set forth above, I believe that Gillette has demonstrated, to a reasonable degree of scientific certainty, the following:*

(a)    *that the hair extension effect occurs;*

(b)    *that the micro-pulses produced by an oscillating razor and, in particular, the M3 Power, are sufficient to trigger this effect;*

(c)    *that the mechanical and chemical processes attendant to the casual application of shave preparation or pre-shave face washing are not sufficient to trigger this effect;*

(d)    *that as a result of this effect, M3 Power delivers a shave that is superior in terms of single stroke closeness efficiency;*

(e)    *that average consumers can and have appreciated its superior closeness.'*

27    Paragraph (e) appears to be based upon consumer research conducted in the USA in early 2004 which found that randomly selected and geographically diverse groups of adult male wet shavers:

(a)    preferred the M3 Power razor as an overall superior product to the Mach 3 Turbo shaving system;

(b)    perceived the M3 Power razor to be superior to the Mach 3 Turbo shaving system in terms of shave closeness, smoothness and comfort by a statistically significant margin;

(c)    preferred the M3 Power razor as an overall superior product to the Schick Quattro shaving system; and

(d)    perceived the M3 Power razor to be superior to the Schick Quattro shaving system in terms of shave closeness, smoothness and comfort by a statistically significant margin.

28    Dr Powell does not suggest that any of the studies support the suggestion that the effect of the oscillating razor is to cause the hair to raise itself from the skin at an angle. The studies do not demonstrate any change in hair angle. All they show is hair extension.

**CONFIDENTIAL**

**GMPC001970**

- 10 -

29      Evidence has been filed by an expert statistician, Dr Jarrett, which is critical of the Gillette tests, and dismisses them as being more in the nature of preliminary studies, rather than independent scientific studies.  Dr Leffell also asserts that the Gillette tests do not provide any significant level of support for Dr Powell's views.  Again, the validity and effect of these criticisms is not capable of resolution at the level of an application for an interlocutory injunction.

### Energizer response to 'hair extension effect'

30      Dr Leffell says that in his clinical and teaching experience as a dermatologist he has not encountered the concept of 'hair extension' as presented by Gillette.  He is not aware of any scientific basis for Dr Powell's assertion (par 22 above) that facial hair becomes 'bound' within the hair follicle by sebum deposits and corneocytes adhering together, so that it does not fully release above the skin surface.  Dr Leffell also states that Dr Powell's assertion is inconsistent with his own observations of facial hair structure and function during more than 20 years of experience.  Dr Leffell gives reasons why the claim made by Dr Powell as set out in par 22 above is without scientific merit, and inconsistent with his experience as a dermatologist.  Even if that effect did occur, in Dr Leffell's opinion the oscillating action of the M3 Power razor would not have the effect attributed to it by Dr Powell because washing or shaving the face (even with a non-oscillating razor) would be likely to remove the build up of corneocytes.

31      Both Dr Leffell and Mr Kohler have sworn that whilst they were not retained by Energizer to consider whether the M3 Power razor had a 'hair extension' effect, if there were such an effect, and if it were of practical significance, they would have expected to observe it during the course of the study (unless, in the case of Mr Kohler, the hairs were standing at or around 90 degrees to the skin's surface), but did not do so.

32      However, the study of 8 October 2004 did not involve measurements, and Dr Leffell accepted in cross-examination that measurement (as opposed to optics) is the only true way to determine whether hair extension is occurring.

CONFIDENTIAL

GMPC001971

- 11 -

### An undisclosed fact

33        Energizer is in the course of developing, or at least investigating the development of, its own battery powered oscillating razor to compete with the M3 Power razor. Depending upon the precise facts, that might lead to an inference that Energizer believes that such a razor will provide enhanced shaving performance to users of such a product, although no particular inference can be drawn as to the claims which Energizer would make in relation to that product should it proceed to the stage of commercialisation.

34        This matter was not disclosed on the application for an ex parte injunction: It should have been disclosed: *Thomas A Edison Ltd v Bullock* (1912) 15 CLR 679 at 681-682. It is, however, profitless to consider whether the ex parte order should be set aside on that account, because even if set aside, Energizer could nonetheless move for interlocutory relief as to the future, which in substance, is what has occurred.

### A serious question to be tried?

35        Energizer has not sought to make out a case in these proceedings that use of the M3 Power razor does not produce a closer shave, but the evidence referred to above establishes at least a prima facie case that micro-pulses do not cause facial hair to stand up, in the sense of moving to a vertical position, with a change in the angle between hair and face. Dr Powell does not suggest that his studies establish that an oscillating razor will produce this effect.

36        Some of the television advertisements used overseas (for example, Exhibit IN5: 'A Power so Awesome') show what appears to be an electronic wave moving over hairs on the face, with the hairs immediately standing up as a result. Whilst the television images are fleeting, they do appear to show facial hairs moving to a vertical position with a distinct change in the angle between hair and face. But another television advertisement used overseas (Exhibit IN5: "M3 Power') appears to be different. As the male voice over states: 'Turn it on and the micro-pulses raise the hair so the blades can shave closer' an image is shown depicting hairs extending at an angle (as if they are growing). The hairs do not appear to be bending towards a perpendicular position but rather continue their extension at the same angle at which they started at the beginning of the image.

CONFIDENTIAL

GMPC001972

- 12 -

37        I was shown three versions of Gillette's proposed Australian television commercial (Confidential Exhibit CJB7). A 15 second version does not display any image of the claimed hair raising effect. My impression of the two 30 second versions is that they depict hairs extending at an angle (as if they are growing) and then bending towards a perpendicular position with the skin.

38        However, my focus in the present application is not on any particular advertisement, but on the more general question of whether Energizer has established that the claims referred to in the application particularly paragraphs 1(a) and (b), are misleading and deceptive, which, in the context, necessarily involves a consideration of whether an oscillating razor produces a hair extension effect, and if so, whether that effect is sufficient to sustain the claims in question.

39        According to Dr Powell, 'hair extension' raises the tip of the hair up and further away from the surface of the skin, leaving more hair available to be cut. The micro-pulses produced by the M3 Power razor are sufficient to trigger this effect. Gillette contends that this is sufficient to sustain the claim that micro-pulses emitted by the M3 Power razor stimulates, raises or lifts facial hair up and away from the skin.

40        However, the evidence of Mr Kohler and Dr Leffell denies that any hair extension effect arises from the use of the M3 Power razor. I do not agree with Gillette's submission that this evidence does not constitute expert evidence of any utility because it fails to set out the reasoning process on which the opinion is based. Dr Leffell relies upon the following matters as justifying his opinion that the vibrations from the M3 Power razor do not produce a hair extension effect:

    (a)    in his clinical and teaching experience as a dermatologist, he has not encountered the concept of hair extension as presented by Gillette;

    (b)    the studies relied upon by Dr Powell as supporting his contrary opinion, either do not support or do not provide any significant level of support for Dr Powell's views when account is taken of the detailed criticisms which Dr Leffell makes of those studies;

    (c)    the theory advanced by Dr Powell as explaining the reason for the hair extension effect (see paragraph 22 above) is without any scientific merit for reasons which Dr Leffell explains, and is inconsistent with Dr Leffell's

CONFIDENTIAL

GMPC001973

- 13 -

observations of facial hair structure and function during his 20 years experience as a dermatologist; and

(d)    Dr Leffell did not observe the claimed effect during the tests which he attended, and although his brief was the examination of hair raising claims, he expects that if there were a hair extension effect and it was of practical significance, he would have observed it.

41      There is thus a serious question to be tried as to whether the vibrations from the M3 Power razor do produce a hair extension effect. If that issue were resolved favourably to Gillette, a further issue would or may arise as to whether a particular advertisement conveys that the M3 Power razor causes hairs to stand up or stand proud of the skin. On the evidence as it currently stands, there is at least a serious question to be tried as to whether such a claim would be sustained by reference to the hair extension effect, if that effect were established.

42      Contrary to the submission put on behalf of Gillette, in my view, it does not matter that Energizer's evidence as to the absence of a hair extension effect arose only in reply. That is simply a reflection of the way in which the application unfolded. Energizer contended that Gillette was making hair raising claims for its product; Gillette responded by denying that it was making those claims and set up the hair extension effect as supporting its product claims; Energizer's riposte was that the micro-pulses emitted by the M3 Power razor do not produce that effect.

43      Both parties made detailed criticisms in final submissions of the other's evidence including assertions of ineffectual cross-examination and failure to cross-examine, which it is not appropriate or necessary for me to deal with in detail at this stage of the proceedings. It is sufficient for present purposes for me to say that on the materials before me there is a serious question to be tried, and Energizer's case cannot be dismissed as a weak one.

Balance of convenience

44      The M3 Power razor is a new product on the Australian market, and the matters of which Energizer complain in these proceedings are to be at the heart of an imminent nationwide advertising campaign of unprecedented scope to launch the product. If the representations are false, then consumers will be mislead into buying a much more expensive product than the Mach 3 Turbo on a false premise. The fact that a study undertaken in the

CONFIDENTIAL

GMPC001974

- 14 -

USA has shown consumer satisfaction with the M3 Power razor in terms of shave closeness, smoothness and comfort is not really to the point if it be shown that the claims which Gillette makes about the new product of which Energizer complains are unfounded. There is evidence from Mr Nuich of Energizer, which I accept, that innovations in razor technology are a strong driver for commercial sales, and may enable a premium price to be charged for the product.

45      Gillette's preparations to launch the product on the Australian market began before the Hamburg proceedings. The evidence does not establish the date upon which Gillette became practically committed to continue with the launch. However, to the extent that Gillette persevered with its launch plans after the Hamburg proceedings, it did so with its 'eyes wide open' to the possibility that Energizer would institute proceedings for injunctive relief in this country as well: *Ingersoll-Rand (Aust) Ltd v Industrial Rollformers Pty Ltd* [2000] NSWSC 177 at [11]. When Gillette commenced the distribution of the M3 Power razor to distributors and retailers in Australia on 28 January 2005, it was aware of the judgments in the Hamburg proceedings. Gillette did not undertake any further testing of the M3 Power razor to support its claims, or give Energizer any notice of its intention to launch in this country.

46      The launch of the M3 Power razor in the United Kingdom, supported by representations similar to those the subject of these proceedings, was highly successful, with the new razor securing a very significant section of the market in a matter of months. A similar result can be expected to occur here if Gillette launches the product in association with its projected media campaign. I accept Energizer's evidence that a similar performance in Australia would have a very serious effect on Energizer's business, and that this effect may well endure even if the advertising ceases as a result of a final hearing. I also accept Energizer's evidence that it is likely to be very difficult, if not impossible, for Energizer to calculate its actual loss if the M3 Power razor is launched using the claims the subject of these proceedings in its advertising campaign.

47      The continuation of the interim injunctions will cause considerable harm to Gillette's commercial interests in terms of wasted expenditure on advertising and promotional material for the M3 Power razor which contains the representations complained of by Energizer. However, the harm which Gillette will suffer in this respect is likely to be quantifiable, and is

CONFIDENTIAL

GMPC001975

- 15 -

covered by Energizer's undertaking as to damages. I also accept Gillette's evidence that a likely consequence of the continuation of the injunction is that the launch may have to be cancelled, and the product re-launched in about three months by which time television advertisement and packaging omitting the matters of which Energizer complains are likely to be available. Again, the harm is likely to be capable of estimation. This is one of those cases in which significant financial loss will be sustained by one party or the other in consequence of either the grant or refusal of interlocutory relief. There may also be some reputation damage to Gillette if interlocutory relief is granted.

48        But, in my view, Energizer has not been guilty of any delay in instituting the proceedings. It moved for an ex parte injunction as soon as it learnt that the M3 Power razor was to be launched in Australia in conjunction with the claim that micro-pulses emitted by the razor stimulate hair up and away from the skin, that being the same claim as was restrained in the Hamburg proceedings. Mr Bruce, Gillette's Business Manager for Grooming conceded in cross-examination that it was feasible for Gillette to have removed the hair raising claims from its advertising materials in late 2004 prior to the Australian launch until the propriety of making these claims had been adjudicated upon by the Hamburg Court. He also agreed that if the claim is in fact false it would be extremely damaging in his opinion for Gillette to continue to make that claim.

49        I do not accept Gillette's contention that harm to consumers is not demonstrated if the matters of which Energizer complains are untrue. The argument that consumers will suffer no harm even if those claims are wrong because (for whatever reason) the razor in fact shaves closer assumes that to be the case. There is no evidence that the M3 Power razor in fact shaves closer than other razors, hence the argument cannot be sustained. In any event, it overlooks the evidence that claimed innovations in shaving technology are a strong driver for commercial sales, and at a premium price.

50        The balance of convenience favours the continuation of the interlocutory injunction until the hearing of these proceedings or further order. The hearing of the proceedings should be expedited. I decline to extend the operation of that injunction in the manner which Energizer seeks because I accept Mr Bruce's evidence as to the time and cost which would be involved in complying with the order as extended, and the likelihood that it would not be productive of material practical benefit.

CONFIDENTIAL

GMPC001976

- 16 -

Conclusion

51          I order that:

1.    The injunction granted on 8 February 2005 be continued until the hearing of these
      proceedings or further order.

2.    The hearing of these proceedings be expedited.

3.    The matter be returned to the Registry for the purpose of allocation to a docket.

4.    Costs be costs in the cause.

5.    These orders be entered by the Registry forthwith.


I certify that the preceding fifty-one
(51) numbered paragraphs are a true
copy of the Reasons for Judgment
herein of the Honourable Justice
Hely.


Associate:      *[signature]*

Dated:          25 February 2005


Counsel for the Applicant:      F M Douglas QC, M J Darke

Solicitor for the Applicant:    Gilbert & Tobin

Counsel for the Respondent:     A J L Bannon SC, C Dimitriadis

Solicitor for the Respondent:   Allens Arthur Robinson

Date of Hearing:                17, 18, 21 February 2005

Date of Judgment:               25 February 2005


CONFIDENTIAL

GMPC001977

# EXHIBIT D

**Hamburg Regional Court**
12th Civil Division

Sievekingplatz 1
20355 Hamburg
Tel.: +49 (0)40 42843 2526
Fax: +49 (0)40 42843 3935
Fax for time-critical submissions:
+49 (0)40 42843 4318 or -19

312 O 1143/04

## ORDER

dated 28 December 2004

In the matter of

**Wilkinson Sword GmbH,**
represented by its managing directors
Thomas Heinen and Wolfgang Althaus,
Schützenstrasse 110, 42659 Solingen

- Applicant -

Counsel:

Law firm of Graf von Westphalen pp.,
Kaiser-Joseph-Strasse 284,
79098 Freiburg
Ref: 2593/04 RNH/MBW

versus

**Gillette Deutschland GmbH & Co. oHG,**
represented by its managing partner
Gillette Berlin Holding GmbH, in turn represented
by its managing directors Ross McMullin and Helmut Heidrich,
Frankfurter Strasse 145, 61476 Kronberg/Taunus

- Respondent -

the **Hamburg Regional Court, 12th Civil Division**, through

Presiding Judge at the Regional Court Sievers

Judge at the Regional Court Dr. Kagelmacher

Judge at the Regional Court Böttcher

has issued the following order.

GMPC002516



PLAINTIFF'S EXHIBIT
116
ALL-STATE LEGAL®

CONFIDENTIAL

I.    By way of an interim injunction – granted without a full hearing owing to the great urgency of the matter – the respondent is

prohibited

from promoting its M3Power wet shaver commercially for the purposes of competition as follows:

"Turn on the power.
Gentle micro-power stimulates the skin.
Your Gillette shave is now even closer.
Feel the power of the best ever Gillette shave.
The new M3Power from Gillette."

II.   The respondent will be liable to pay an administrative fine for each instance of violation pursuant to I and, in the event that this cannot be collected, will be liable to imprisonment, or a term of imprisonment of up to six months (fine not exceeding €500,000.00 in an individual case, term of imprisonment maximum two years in total).

III.  The respondent is ordered to pay the costs of the proceedings.

IV.   The value of the litigation is set at €350,000.00.

**Grounds:**

In the prior interim injunction proceedings (312 O 1037/04), the court criticised the respondent's advertising claims for its new M3Power product for being misleading. In the grounds for the judgment dated 17 December 2004, the court stated that the respondent's advertising contained the claim that the micro-pulses generated when shaving with the M3 Power caused the facial hairs to stand up, which had a positive effect on the shave. It went on to say that:

GMPC002517

CONFIDENTIAL

"This advertising is misleading because when the device is used as directed, shaving with the M3 Power does not cause the facial hairs to stand up. This can be established - at least with the overriding probability required for interim injunction proceedings - from the following facts: the M3 Power is a wet razor and when used as directed, the shave is preceded by the application of shaving lather. This lather is usually spread across the part of the face on which beard hair grows, using a shaving brush, and lightly worked in. The thoroughness with which the lather is spread varies, and it is therefore entirely possible that the intensity of the mechanical effect on the facial skin achieved through the application of the shaving lather will vary. In particular, the form of shaving lather used may well be of significance in this respect. Regardless of that, however, a wet shave is normally preceded by the application of the shaving lather, which necessarily entails application of mechanical force to the facial skin. The intensity of this mechanical force is not less than that of the mechanical micro-pulses of the M3 Power."

The respondent's advertising was amended as a result of the court prohibition, but the new advertising is also to be regarded as misleading. It still contains the claim that the pulses generated by the battery and described in the TV advert as "gentle micro-power" are the reason why the shave delivered by the new M3Power is even closer.

At the beginning of the TV advert, mention is made of the patented M3Power glide blades. However, these are specifically associated with "less skin irritation". The sequence that follows, which is contained in the operative part of the judgment, then deals with the innovative aspect of the M3Power, the small battery-powered motor which produces gentle vibrations. The statements "Gentle micro-power stimulates the skin. Your Gillette shave is now even closer." assert that the stimulation of the skin is the reason for the improved closeness. It seems obvious that the respondent's advert will be understood this way – namely an explicit causality between the vibrations and the special closeness – because of the lingering impact of the respondent's extensive advertising campaign, whose original message was that the special closeness is a result of the lifting of the facial hair

Accordingly, the latest application for an interim injunction is allowed. The decision as to costs ensues from section 91 ZPO (German Code of Civil Procedure).

      Sievers            Kagelmacher            Böttcher

[stamp]

Engrossed

Clerk of the court

GMPC002518

CONFIDENTIAL



Language Solutions

## CERTIFICATE

I, Rachel Louise Arnold, professional translator to LingServe of 43 Queens Road, Aldershot, Hants

GU11 3JE, being competent to translate from German to English hereby certify that the annexed

translation in the English language, executed by me is, to the best of my professional knowledge and

skill, a true and accurate translation of the German version likewise hereunto annexed.



Date: January 21, 2005

Encl.
1) Beschluss v. d. LG Hamburg 312 O 1143/04
2) Order by Hamburg Regional Court 312 O 1143/04

LingServe Limited, Registered in England & Wales, No. 4843437 Registered office: 43 Queens Road, Aldershot, Hants GU11 3JE
Tel: 01252 336 082    Fax: 01252 330 253    Email: service@lingserve.co.uk
VAT Reg. No.: 689 0765 81

GMPC002519

CONFIDENTIAL

# EXHIBIT E

COPY

**DISTRICT COURT OF THE HAGUE**
Civil Law Sector- Judge for Provisional Measures

Judgment in the summary proceeding of April 7, 2005,
pronounced in the case with docket number KG 05/128 of:

the closed corporation with limited liability
**Wilkinson-Sword B.V.,**
with registered office in Maarssen and its principal place of business in Houten,
claimant,
procurator P. J. M. von Schmidt of Altenstadt, Esq.,
attorneys W. J. H. Leppink, Esq., and H. A. J. van Aalst-Pors, Esq., in Rotterdam,

versus:

the closed corporation with limited liability
**Gillette Groep Nederland B.V.,**
with registered office in Rijswijk (South Holland),
respondent,
procurator T. Cohen Jehoram, Esq.,
attorneys T. Cohen Jehoram, Esq., and M. E. Santman, Esq., in The Hague.

The parties are hereinafter also called "Wilkinson" and "Gillette." The respective international groups of companies to which the parties belong (with as parent companies Energizer Holdings, Inc., and The Gillette Company, respectively) shall hereinafter also be called "the Energizer group" and "the Gillette group."

<u>1. The facts</u>

On the grounds of the documents and the proceedings at the session of March 24, 2005, the following are the assumptions in the summary proceeding.

1.1. The Energizer group brings to the market, among other things, razors and holders therefor (hereinafter together also "shaving systems"), as well as batteries. The shaving systems are brought to the market in the United States, among others, under the brand name "Schick" and in Europe under the brand name "Wilkinson Sword." In the Netherlands market for shaving systems, Wilkinson has a market share of approximately 15%. In 2004, Wilkinson brought its top model to the market in The Netherlands, being the "Quattro," a shaving system with four blades.

1.2. The Gillette group also brings, among other things, shaving systems and batteries to the market in various countries. In the Dutch market for shaving systems, Gillette has a market share of approximately 80%. Until recently, the top model of Gillette was the "Mach3Turbo," a shaving system with three blades.

1.3. In the meantime, the Gillette group has a new top model, i.e. the "M3Power," a shaving system with three blades and a battery-driven electric motor that generates vibrations. The M3Power was introduced in May 2004 in the United States and then in various other countries. Since the introduction of the M3Power, the Energizer group has had actions brought against the Gillette group in various countries.

1.4. In January 2005, Gillette introduced the M3Power in The Netherlands. That introduction was coupled with a large-scale advertising campaign, in which, among other things, the following announcements were made:

**GMPC002578**

**CONFIDENTIAL**

KG 05/128                                                                                          2

a. on the packaging of the M3Power now in stores:

*"[...] The first Micro-Powered Shaving System from Gillette, for a totally new shaving experience and the best shaving results from Gillette[...]*
*Pleasant micro-pulsations stimulate the hair to stand up. In one single Power shaving motion, you get a remarkably smooth and thorough shaving result. So thorough that you need fewer shaving motions, which leads to less skin irritation [...]"*

b. in a television ad:

*"[...] The first battery-driven shaving system from Gillette. It has new M3PowerGlide blades with a patented comfort coating for less skin irritation. Micro-vibrations ensure that hairs come up for a yet smoother shaving result. A battery-drive shaving system with our most advanced blades gives you Gillette's best shaving result. [...]"*

1.5. The M3Power is more expensive to purchase than the Mach3 Turbo.

1.6. The Energizer group and the Gillette group, also because of the various proceedings in, among others, Germany and Australia, have had various studies performed, including:
a. studies which were performed in the period 1990 through 2005 primarily by the Gillette group itself and which were discussed in a statement by Mr. K. Powell, Ph.D. (hereinafter also "Powell"), and employee of the Gillette group;
b. a study that was performed on October 8, 2004 at the request of the Energizer group by Mr. D. J. Leffell, M.D. (hereinafter also "Leffell"), Professor of Dermatology at the Yale School of Medicine;
c. a study performed at the request of the Energizer group with the name "Hair Length Measurement Testing," that is discussed in a statement by Leffell of March 22, 2005.

1.7. In a December 2004 article in "Test," a journal of a German consumer organization, various shaving systems from, among others, the Energizer group and the Gillette group are compared to each other. The M3Power was on the market too late to be included in the regular comparison, but is discussed separately. Among other things, the following was remarked about the M3Power:

*"[...] We later tested the device with the recommended M3Power blades and were convinced: shave and skin comfort were rated "excellent" throughout. The M3Power would be one of the leaders of the tested devices. Whether this is due to the micropulses may be left open. Many testers described the light vibrations on the skin as a pleasant sensation [...]"*

1.8. The Energizer group is now making preparations for bringing a "vibrating" shaving system to the market in due time.

2. The demands, the grounds therefor and the defense

2.1 Wilkins demands, abbreviated and stated concisely:
a. that Gillette be ordered to refrain from illegal actions, including among others the use of expressions as named in the summons as well as (other) expressions that (can) give the impression that the so-called micro-pulsations cause beard hairs to stand up or that they lead to a better shaving result and/or less skin irritation;

GMPC002579

CONFIDENTIAL

KG 05/128                                                                                      3

b. to order Gillette to recall all packaging of the product M3Power now in stores and to remove the printed illegal expressions thereon or render them invisible;

c. to order Gillette to ensure a rectification—as included in the summons—containing among other things the announcement that they previously incorrectly alleged that the micro-pulsations cause beard hairs to stand up, in which the rectification (1) must be placed in the newspapers, magazines and other publications named in the summons, (2) must be broadcast on all television channels and (3) must be placed on, among other things, Gillette's homepage;

all this under penalty of (various) fines.

2.2. For that purpose, Wilkinson argues the following—abbreviated and stated concisely.

a. The allegation of Gillette that the vibrations of the M3Power cause the beard hairs to stand up is incorrect, as shown among other things by Leffell's study mentioned under 1.6. subparagraph b.

b. Also Gillette's allegation that the beard hairs "come up" out of the hair follicles is incorrect, which is shown among other things by the said study under 1.6 subparagraph c.

c. Since these allegations of Gillette are incorrect, there is a question of misleading advertising as referred to in Article 6:194 of the Civil Code, which is among other things wrongful with respect to Wilkinson.

d. The burden of proof with respect to the (claimed) correctness of these allegations of Gillette, on the basis of the provisions of Article 6:195 of the Civil Code, rests upon Gillette. Until now, however, they have not proven that correctness, which is also shown from the judgments in proceedings in Germany and Australia.

e. Wilkinson has suffered damage from these incorrect allegations of Gillette. The consumer is, after all, moved to buy Gillette's products instead of Wilkinson's on the basis of false information.

f. A weighing of the interests of the parties also entails the fact that the claims should be allowed. It is particularly of importance that Gillette intentionally began a large-scale advertising campaign while they could have known that Wilkinson (also in The Netherlands) would contest the correctness of their allegations.

2.3. Gillette presented a reasoned defense that, insofar as necessary will be discussed below.

3. Adjudication of the dispute

3.1. Gillette argued first of all that the burden of proof of the correctness of its allegations about the operation of the M3Power does not rest on Gillette, because the precise effect that the M3Power has on skin and beard hairs is not an essential purchase factor for the consumer. Also, if the allegations weren't true, according to Gillette, there is no question of misleading advertising as referred to in Article 6:194 of the Civil Code. The consumer, after all, only attaches importance to the best shaving result and it is certain that the shaving result of the M3Power is better than that of the Mach3Turbo and Gillette's other shaving systems. The reversal of the burden of proof that follows from Articles 6:194 and 195 of the Civil Code is not under discussion. It is therefore Wilkinson who must prove its statement that Gillette's allegations are not correct.

3.2. This argument of Gillette is rejected. Also because the M3Power is the first "manual" shaving system with an electric motor and in view of the relatively high price of the M3Power, it is fair to assume that the consumer will not be convinced

GMPC002580

CONFIDENTIAL

KG 05/128                                                                                    4

by the sole (correct or not) allegation that the M3Power is better than the Mach3Turbo. Exactly the scientific-appearing foundation of that allegation will give the consumer confidence and influence his purchase decision. It is further plausible that exactly for that reason Gillette gave (and gives) in its advertising expressions and on the packaging such a foundation. There is therefore indeed a question of an announcement as referred to in Article 6:194 of the Civil Code and therefore it is incumbent on Gillette to make plausible in this summary proceeding that its allegations about the operation of the M3Power are correct.

3.3. Gillette further argued that it has in the meantime formulated its advertisements differently in the sense that it—to prevent misunderstanding—no longer states that the beard hairs "stand up" but that they "come up." With that, Gillette has argued that the vibrations of the M3Power (indeed) do not cause the angle between the beard hairs and the skin to change, but that those vibrations cause the beard hairs to rise out of the follicles.

3.4. Now that Gillette recognizes that the vibrations of the M3Power do not cause the angle between the beard hairs and the skin to change, the conclusion must be that its allegation that the beard hairs "stand up" is misleading. It is fair to assume, after all, that the consumer will imagine on the basis of that allegation that the vibrations do change that angle. This entails the fact that Gillette, in its advertisements and advertising expressions in the past, has made misleading statements and that that misleading statement is (still) printed on the current packaging of the M3Power.

3.5. The foregoing, however, is insufficient reason to order Gillette now to recall that packaging or to publicize rectifications as supported by Wilkinson. In this, heed is taken of (1) the back and forth of interests in the proceeding, (2) the circumstance that Gillette adapted its advertisements and other advertising expressions fairly quickly after the beginning of the large-scale campaign and (3) the circumstance that the challenged statement now only appears on the packaging in very small letters and it has been uncontestedly stated by Gillette that packaging with a new text will be available in the course of 2005. All of this does not justify such far-reaching measures as demanded by Wilkinson.

3.6. Then must be judged whether the correctness of Gillette's (current) allegation that the vibrations of the M3Power cause the beard hairs to come up out of the hair follicles (hereinafter also "the claim regarding coming up") is now sufficiently plausible. The demands of Wilkinson will be reasonably interpreted in the sense that they also relate to that allegation.

3.7. In this connection, Gillette invoked, among other things, the statement of Powell referred to under 1.6 subparagraph a with the accompanying attachments, including a CD-ROM with three short films. These films—whose authenticity Wilkinson has not disputed—show the following.
a. The film "Hair Emergence" shows a number of very much enlarged beard hairs which are initially "locked up" in or under the skin but then "come loose," apparently as a result of vibrations.
b. The film "Free Hair Movement" shows beard hairs that are not "locked up, move up and down in the follicles apparently as the result of vibrations, so that they come out above the skin farther and less far, respectively.

GMPC002581

CONFIDENTIAL

KG 05/128                                                                                                  5

c. The film "Energy Wave" shows that the switched-on M3Power causes the skin to vibrate.
These films make the claim regarding coming up—in any case at first glance—plausible. Apparently
vibrations can "liberate" "locked-up" beard hairs and ensure that "free" beard hairs come farther up.

3.8. Against this, Wilkinson has argued that:
a. the statement that beard hairs could be "locked up" in the skin is not correct, which is shown among
other things from a (supplementary) statement of February 16, 2005 by Leffell that "locked up" only occurs
with acne, but that is a pathological condition;
b. if it were so that beard hairs were "locked up" in the skin, they would already be "liberated" by (1) the
normal preparation for a "wet" shave (such as washing the skin and applying and working in shaving
foam), or (2) by the use of a shaving system with multiple blades (the so-called hysteresis effect(, or (3) by
the lubricating strips on the blades.
c. the study mentioned under 1.6 subparagraph c with the name "Hair Length Measurement Testing" shows
that the vibrations of the M3Power do not lead to "hair lengthening."

3.9. That beard hairs are only locked in in case of acne is for the moment insufficiently fair to assume,
particularly also because of the various preparations which are (according to both parties) necessary for a
thorough shave and because of provisions such as shaving systems with multiple blades and lubricated
strips. The question of the extent to which the vibrations of the M3Power can have an added value above
those preparations and those provisions, because there is no place for providing further evidence within the
limited framework of this summary proceeding, cannot now be answered with certainty. However, given
that which was considered in 3.7 above and also in view of the article mentioned under 1.7 in "test," as well
as the circumstance that the vibrations of the M3Power for the only (essential) difference between the
M3Power and the Mach3Turbo, it is for the moment considered that those vibrations actually have (a
certain) added value, in the sense that those vibrations cause the beard hairs to come up (farther) out of the
follicles.
That which was stated concerning the study mentioned under 1.6 subparagraph c now justifies no other
conclusion. From the Wilkinson Exhibits 33 through 35 relating to that study—including the statement of
Leffell mentioned under 1.6 subparagraph c, which primarily refers to documents which were not
submitted in this summary proceeding—it is insufficiently shown how that study was performed and what
the precise findings were thereof. This study now therefore lays insufficient weight on the scale.

3.10. The foregoing leads to the conclusion that the demands shall be rejected. Wilkinson shall, as the
(predominantly) unsuccessful party, be ordered to pay the costs of this proceeding.

<u>4. The decision</u>

The Judge for Provisional Measures:

rejects the demands;

**GMPC002582**

**CONFIDENTIAL**

**KG 05/128**                                                                                           6

orders Wilkinson to pay the costs of this proceeding, estimated thus far on Gillette's side at EUR 1,060.00, of which EUR 816.00 as procurator salary and EUR 244.00 as court costs;

This judgment was delivered by E. A. G. M. van Rens, Esq., and pronounced in public session of April 7, 2005 in the presence of the Clerk of the Court.

jwo

[signature]                           [signature]

**GMPC002583**

**CONFIDENTIAL**

# EXHIBIT F

ATTORNEY DE HAAS
ATTORNEY SUSINI

BP-PAGE 1

### COMMERCIAL COURT OF PARIS

### SUMMARY ORDER ISSUED ON MARCH 1, 2005

### BY MR. RENAULT-SABLONIERE, PRESIDING JUDGE

### ASSISTED BY MR. LOFF, COURT CLERK

DOCKET 2005008693
FEBRUARY 16, 2005
G

(19)

**IN THE MATTER OF:** SAS WILKINSON SWORD, 6 Rue Emile Pathé, 78400 Chatou
VERSAILLES TRADE REG.: B 447 779 216
**PLAINTIFF** represented by Attorney De Hass of SELARL Gilbey De Hass, Attorneys at Law
(L112)

**V.:** SAS GROUPE GILLETTE FRANCE, 9 Place Marie Jeanne Bassot, 92300 Levallois Perret
NANTERRE TRADE REG.: B 325 420 131
**DEFENDANT** represented by Attorney Susini of SELARL Reinhart Marville Torre, Attorneys at
Law (K30)

　　　　For the reasons stated in its original writ of summons dated February 3, 2005, to which it
is advisable to refer as needed, SAS Wilkinson Sword petitioned us to:
　　　　- order a prohibition from distributing any advertising for the M3 Power Razor containing
the following words, in any form whatsoever: "Micropulses raise the hair up and away from the
skin" or "Micropulses stimulate hair upward. In one stroke, you shave closer, more efficiently,
and with less irritation," subject to a 2,000.00 euro fine per violation and a 10,000.00 euro daily
late penalty from the date of notification of the decision until the date of infraction.
　　　　- order  SAS Groupe Gilette France to pay the sum of 300,000 euros as an advance on its
debt for damages to be awarded in the final ruling on the merits.
　　　　- order said group to pay all costs.

　　　　In a brief, the defendant petitioned us to:

[initials]

PRINTED MARCH 8, 2005-09:00:51



PLAINTIFF'S
EXHIBIT
26
ALL-STATE LEGAL®

CONFIDENTIAL



**ERIKSEN** TRANSLATIONS INC / 32 COURT STREET, BROOKLYN, NY 11201 / TEL 718-802-9010 / WWW.ERIKSENINC.COM

COMMERCIAL COURT OF PARIS
SUMMARY ORDER OF MARCH 1, 2005
2005008693

BP-PAGE 2
DOCKET

    - find that the documents produced by SAS Wilkinson Sword in support of its claims are irrelevant, unscientific, and contradictory.

    - find that SAS Groupe Gilette France has demonstrated the reality of the effects of the M3 Power Razor cited in the disputed advertisements.

    Consequently,

    - dismiss all petitions, pleadings, and arguments by SAS Wilkinson Sword.

    - find that the summary proceedings are wrongful.

    Consequently:

    - order SAS Wilkinson Sword to pay it the sum of 100,000 euros in damages.

    - order SAS Wilkinson Sword to pay it the sum of 20,000 euros pursuant to the provisions of Article 700 of the New Code of Civil Procedure.

    - order SAS Wilkinson Sword to pay the costs.

    SAS Wilkinson Sword filed a response brief petitioning us to:

    - find that all petitions, pleadings, and arguments by SAS Groupe Gillette France are inadmissible and groundless and, *a fortiori*, assign SAS Wilkinson Sword the full benefit of its original writ of summons.

    We have postponed the delivery of our order until March 1.

*          *

*

**On the petition for prohibition:**

    We find that SAS Wilkinson Sword in no way substantiates the manifestly illicit disturbance that it is claiming to suffer, particularly – which it does not deny – in the context of its upcoming launch of the same type of razor;

    Furthermore, on thoroughly examining the evidence and documents produced by the parties, we find that the false and deceptive advertising alleged by SAS Wilkinson Sword has not, in this case, been established.

    In fact, particularly with respect to the recommended use of the razor, with or without beard preparation, which, contrary to

[initials]

PRINTED MARCH 8, 2005-09:00:51

**CONFIDENTIAL**

 **ERIKSEN** TRANSLATIONS INC. / 32 COURT STREET, BROOKLYN, NY 11201 / TEL 718-802-9010 / WWW.ERIKSENINC.COM

**GMPC002086**

COMMERCIAL COURT OF PARIS                                   BP-PAGE 3
SUMMARY ORDER OF MARCH 1, 2005                              DOCKET
2005008693

the assertions of SAS Wilkinson Sword, is not systematic, we find that the stated claims for the action mechanism of the M3 Power Razor seem reasonably well founded;

We find that, in this case, the arguments by SAS Wilkinson Sword do not appear to be sufficiently convincing for such a measure to be ordered in these proceedings;

Consequently, we dismiss the petition by SAS Wilkinson Sword.

**With respect to the respective petitions for damages:**
We find that, based on the foregoing, the petition by SAS Wilkinson Sword should be denied;

We find that SAS Groupe Gillette France has in no way demonstrated the wrongful nature of the petition by SAS Wilkinson Sword.

**WITH RESPECT TO ARTICLE 700 OF THE NEW CODE OF CIVIL PROCEDURE**
Since Gillette has incurred expenses in its defense, we allow it the sum of 5,000 euros pursuant to the provisions of Article 700 of the New Code of Civil Procedure.

<u>NOW THEREFORE</u>

After hearing BOTH PARTIES, we order as follows in a ruling SUBJECT TO APPEAL,

We dismiss all petitions by SAS Wilkinson Sword,

We dismiss the petition for damages by SAS Groupe Gillette France,

We order SAS Wilkinson Sword to pay SAS Groupe Gillette France the sum of 5,000 euros pursuant to the provisions of Article 700 of the New Code of Civil Procedure, and dismiss the additional amount;

We order SAS Wilkinson Sword to pay the costs, including those to be collected by the Court Registry, which are assessed at the sum of 18.65 euros including tax (VAT: 2.74).

This decision shall automatically enter into effect and shall be provisionally enforceable pursuant to the provisions of Article 489 of the New Code of Civil Procedure.

The original order was signed by Mr. Renault-Sabloniere, Presiding Judge, and Mr. Loff, Court Clerk.

[initials]

PRINTED MARCH 8, 2005-09:00:51

**CONFIDENTIAL**



**ERIKSEN** TRANSLATIONS INC / 32 COURT STREET, BROOKLYN, NY 11201 / TEL 718-802-9010 / WWW.ERIKSENINC.COM

**GMPC002087**

COMMERCIAL COURT OF PARIS
SUMMARY ORDER OF MARCH 1, 2005
2005008693

BP-PAGE 4
DOCKET

[initials]

PRINTED MARCH 8, 2005-09:00:51

**CONFIDENTIAL**



COMMERCIAL COURT OF PARIS
SUMMARY ORDER OF MARCH 1, 2005
2005008693

      BP-PAGE 5
      DOCKET

       Certified true copy,
Issued without writ of enforcement.

[signature]  [inked seal:] COMMERCIAL COURT OF PARIS

Copy issued March 8, 2005

[initials]

PRINTED MARCH 8, 2005-09:00:51

**CONFIDENTIAL**

 **ERIKSEN** TRANSLATIONS INC  / 32 COURT STREET, BROOKLYN, NY 11201 / TEL 718-802-9010 / WWW.ERIKSENINC.COM

**GMPC002089**



**ERIKSEN**

ERIKSENINC.COM
TEL 718-802-9010
FAX 718-802-0041

# CERTIFICATE
## O F   A C C U R A C Y

STATE OF NEW YORK)

                  SS:

COUNTY OF KINGS)

This is to certify that the translation of the attached document:

**Summary order issued by Mr. Renault- Sabloniere, presiding judge, on March 1, 2005, in the matter of: SAS WILKINSON SWORD v. SAS GROUPE GILLETTE FRANCE**

is, to the best of my knowledge and belief, a true, complete and accurate translation from French into English.

Camila Santos
———————————
Camila Santos

Sworn to and subscribed before me

this 23rd day of March 2005

Leah G. Ruggiero
———————————
Notary Public

LEAH G. RUGGIERO
Notary Public, State Of New York
No.01RU6013115
Qualified In Kings County
Commission Expires September 08, 2006

**CONFIDENTIAL**

ERIKSEN TRANSLATIONS INC., 32 COURT STREET, 20TH FLOOR, BROOKLYN, NEW YORK 11201

**GMPC002090**

# EXHIBIT G

A/05/00631

*1*

Date: May 25, 2005
Record no. 2180

[stamp:]    COPY NOT SIGNED art. 792 C.J.
Exemption from official copy fee
Art. 280-2 of the code on
registration fees

**CESSATION**

## THE COMMERCIAL COURT OF NIVELLES HAS RENDERED THE FOLLOWING RULING:

**IN THE CASE:** A/05/00631

The **WILKINSON SWORD** corporation, whose registered office is established at 2800 Mechelen Office Park, Bedrijvenlaan, registered in the Banque Carrefour des Entreprises [Crossroads Bank for Enterprises] under number 0417.111.183

Plaintiff in the main claim,
Defendant in the counterclaim,

Represented by Mr. Philippe Péters, attorney in 1170 Brussels, chaussée de la Hulpe, 117/6

**VERSUS:**

The **GILLETTE GROUP BELGIUM** corporation, whose registered office is established at 1831 Diegem, Park Hill, Mommaertslaan, 18 A, registered in the Banque Carrefour des Entreprises under number 0403.122.991

Defendant in the main claim,
Plaintiff in the counterclaim,

Represented by Mr. Jean-Christophe Troussel, attorney in 1000 Brussels (Belgium), rue Brederode 13

*1*st **page**
[initials]

1

GLTE 000015

A/05/00631

In view of:

- the recorded subpoena, served on February 11, 2005;
- the mutually agreed schedule of proceedings submitted at the February 16, 2005 hearing and the adjournment in the presence of both parties of the case to the March 30, 2005 hearing;
- at this hearing, the adjournment in the presence of both parties of the case to the April 13, 2005 hearing;
- the defendant's pleading brief, the plaintiff's pleading brief, and the defendant's additional summary pleading brief;
- the provisions of the Act of June 15, 1935 on the use of languages in legal matters.

Having heard the parties' counsels at the April 13, 2005 hearing.


## PURPOSE OF THE CLAIM

The claim aims to hear the following:
⇒ to pronounce that, in asserting that the "micro-pulses" produced by the "Gillette M3 Power" razor stimulate facial hair to stand up, the defendant is guilty of misleading advertising;
⇒ to order the defendant to cease any advertising, communication, or assertion in which the following is said or written:
- the "Gillette M3 Power" razor stimulates facial hair to stand up;
- the "Gillette M3 Power" razor has another effect on the skin or on facial hair, such as lengthening it, thereby producing a better shave;
⇒ to couple this judgment with a fine of €50,000 per advertisement (that is to say, per advertising medium) that would still be disseminated or distributed effective from the notification of the ruling to be entered and of €1,000 per advertisement (that is to say, per medium) which would still be found on the market 15 days after the notification of the ruling to be entered, unless the defendant is able to establish proof that it has done everything in its power to recall the products and the advertisements still found on the market to cease any advertising;
⇒ to order the publication in full of the ruling to be entered in four periodicals of the plaintiff's choice at the expense of the defendant, the expenses being recoverable upon the simple presentation of invoices;
⇒ to order the defendant to pay legal costs.


2ⁿᵈ page
[initials]

2

GLTE 000016

A/05/00631

The defendant contests the grounds of the claim.

The defendant has filed a counterclaim aiming to order the defendant in the counterclaim to pay a fixed sum of €15,000 *ex aequo et bono* as compensation for the cost of technical and legal counsel incurred as a result of the present proceeding.

Secondarily, the defendant has asked that an expert be designated in order to clarify for the Court the proven or false character of its advertising and the issue of determining whether the disputed representations relating to stimulating the hair to stand up are, in the overall context of Gillette's advertising, likely to influence the behavior of the consumers in question.

Very secondarily, the defendant has asked that it be granted a period of three months in order to allow it to comply with the prohibition measure, that the products that have already been placed on the market be excluded from the prohibition measure, and that the amount of the fines be limited and a maximum total amount established.

**THE FACTS**

Gillette has manufactured razors since 1901.  It is the leader in the mechanical shaving market and markets brands such as "Mach 3," "Sensor Excel," "Sensor," "Contour," and "Contour Plus."  It devotes a substantial budget to the research and development of its products.

Gillette Belgium (hereinafter referred to as Gillette) distributes the brand's razors and blades in Belgium.

The plaintiff, Wilkinson Sword SA (hereinafter referred to as Wilkinson), distributes Wilkinson brand razors and blades in Belgium.  Wilkinson is a subsidiary of Energizer.

Wilkinson is Gillette's main competitor.

In January 2005, Gillette launched a new mechanical razor called the "Gillette M3 Power" on the Belgian market. The handle contains a motor (powered by a battery) that makes the razor vibrate.

Wilkinson, which is also working to develop a vibrating razor, does not contest the qualities of the "Gillette M3 Power" shave, but it believes that the assertion, according to which the razor stimulates the hair to stand up or lengthen, is totally inaccurate.

3rd page
[initials]

3

GLTE 000017

A/05/00631

## DISCUSSION

Wilkinson takes exception to the following:
⇒ Gillette focuses its advertising on the assertion – totally inaccurate in its estimation – according to which micro-pulses cause the beard hairs to stand up, which ensures a better shave.
⇒ Gillette illustrates this assertion using a very enlarged animated drawing in which we see the hairs standing up on the skin due to the effect of the micro-pulses.

Wilkinson cites various rulings already rendered in other countries and emphasizes that Gillette's advertising for the M3 Power was prohibited in Germany and Australia, and that if the advertising was not prohibited in France, it was after very limited argument.

The rulings rendered by foreign courts, which are based on their own legislation and on the basis of advertisements that are not necessarily identical to those broadcast or distributed in Belgium, have no effect on assessing the elements of the dispute.

Gillette indicates in its pleading brief that the contested animated drawing is no longer distributed in Belgium and will not be distributed there in the future. It submitted to the arguments a new drawing in which we see the beard hairs lengthening.

Wilkinson submits that Gillette still fails to establish, with the help of objective technical supporting reports, the truth of the assertion according to which micro-pulses stimulate the hair to stand up.

Article 24 § 1 of the LPCC [the Act of July 14, 1991 on trade practices and consumer information and protection in Belgium] requires the advertiser to provide the burden of proof of the accuracy of certain measurable and identifiable factual elements (identity of the product or service, quantity, composition, price, origin, date of manufacture or expiration, conditions of sale, rental, service delivery, or product or service guarantee that are the subject of the advertisement, possible uses, availability, and existence of the products or services presented) in the case of an action initiated by the Minister pursuant to Article 101 of the LPCC.

When the action is initiated by a competitor, an association, etc., Article 24 § 2 of the LPCC only places the burden of proof of the elements referred to above on the advertiser insofar as the President of the Commercial Court deems that such a requirement is appropriate in light of the circumstances of the case.

In the case at hand, the elements of the advertising message that Wilkinson criticizes do not fall within the list of measurable and verifiable factual elements set out in Article 24 § 1 of the LPCC.

4th page
[initials]

4

GLTE 000018

A/05/00631

There are therefore no grounds to depart from the rules of evidence stipulated in Articles 1315 of the Civil Code and 870 of the Judicial Code.

The burden is therefore on Wilkinson, which claims that Gillette's advertising is misleading, to present evidence of this misleading nature.

One advertisement that appears in the press is presented in the following manner:

"THE REVOLUTIONARY MICRO-POWER $^{TM}$

*Gillette*
*M$^3$ POWER*
  *A MACH3*
  *INNOVATION*

**GILLETTE'S FIRST RAZOR**
**WITH MICRO-PULSES**

M3 Power combines the entirely new technology of Gillette's shaving systems and blades with **MACH3®** expertise. Some 62 patents are integrated in it!

**POWERGLIDE BLADES $^{TM}$**

The 3 blades are equipped with a new, patented comfort coating for an even more comfortable shave, from the first to the last stroke. As for the entire **MACH3®** product line, the 3 blades are individually spring-mounted and progressively aligned.

**MICRO-POWER $^{TM}$**

Gillette's M3 Power is the first shaving system that uses Micro-Power $^{TM}$ technology. Micro-pulses gently stimulate the hair to stand up. In a single stroke, you get an ultra close shave with less irritation. Gillette M3 Power can also be used in the shower.

**FEEL THE POWER**
**OF GILLETTE'S BEST SHAVE**

5th page
[initials]

5

GLTE 000019

A/05/00631

The advertisement printed on the packaging of the M3 Power indicates the following:

*"Gillette's first shaving system with micro-pulses: a totally*
*new sensation for the best Gillette shaves*
**Micro-Power** ™
*Micro-pulses gently stimulate the hair to stand up. In a single*
*stroke, you get a very close, even more thorough shave. So thorough that it*
*requires fewer strokes so it causes less irritation.*
*New "**PowerGlide**" blades. The smoothest Gillette blades, thanks to an*
*exclusive coating process, for incredible glide and comfort.*
***Indicator® lubricating strip*** *with Vitamin E and Aloe*

Wilkinson submits that a study conducted in England demonstrates that 80% of the male consumers asked about the content of the M3 Power advertising considered that the most important message was the one that emphasizes the hair standing up and that 92% of the people asked would feel deceived if this message were not accurate.

The study results that Wilkinson submits are from an analysis that was conducted at its request. In addition, the questionnaire submitted to the people interviewed is not provided in the arguments. Yet, the type of questions asked and the manner of questioning are likely to have a decisive influence on the responses given.

Furthermore, it appears that although 80% of the people questioned finished by admitting that the message relating to the hair standing up was the most important, 49% of them did not arrive at this conclusion spontaneously, without having been questioned more specifically on this point.

The results of this study therefore are not significant.

Upon reading Gillette's advertising messages, we note the following:
⇒ although they emphasize the micro-pulses that stimulate the hair to stand up,
⇒ they also emphasize the new blades with which the razor is equipped, the exclusive lubricating coating that makes them smoother, and the comfort of the shave,
⇒ the message that is emphasized and in bold lettering is systematically the following: the shaving system with micro-pulses produces a new sensation.

The principle of micro-pulses that stimulate the hair to stand up is therefore only one element of the overall message addressed to consumers.

The average consumer is subject to a constant saturation campaign in printed and audiovisual media. He is aware that advertising is, by definition, intended to promote a product and that, as such, it contains a certain number of exaggerations as to the merits of the touted product.

6ᵗʰ page
[initials]                                                          6

GLTE 000020

A/05/00631

The micro-pulses with which the razor is powered constitute an incontestable fact and an innovation that necessarily attracts the attention of the potential consumer.

Consequently, the reasonably well-informed consumer will take away from the advertisement that the M3 Power razor produces a new sensation and that it shaves better, more quickly, and with less irritation.

This is confirmed in the comparative study of the various mechanical razors conducted by STIWA, a German consumer protection organization, which indicates the following with regard to the M3 Power:
*Wir haben das Gerät mit den empfohlenen M3-Power-Klingen nachgetestet und wurden überzeugt: Rasur und Hautschonung sind durchweg "sehr gut." Der M3 Power läge im Testfeld Ganz vorn,* which can be translated as:
*We tested the razor with the recommended M3 Power blades and are believers: the shave and comfort scored 'very good' without exception. The M3 Power would have topped the field in our test.*

The assumption that the average consumer perceives the essential message of the advertisement to be the stimulation of the hair standing up, as Wilkinson claims, is not established. We should also note that Wilkinson does not submit evidence that this message is misleading.

◄    Wilkinson defines the term "to stand up" as: "to place in an upright position, to place vertically."

Nevertheless, we must not lose touch with the fact that an advertisement is not a purely scientific definition but a message that is more or less accurate and intended to attract the public's attention to the characteristics of a product or service.

Wilkinson submits that the tests that it had conducted itself and that were monitored by a renowned US dermatologist, Dr. David Lefell, concluded that the micro-pulses do not make the hair stand up and do not move it away from the skin. Dr. Lefell's conclusions are as follows:
*"On the basis of my observations, I conclude that the "micro-pulses" (as a scientist and clinician, the exact meaning of this term is not clear to me) which the defendant claims are emitted by the device, do not make the hair stand up and don't move it away from the skin. In fact, the hair stays in its normal position, lying down in its usual direction before applying the M3 Power razor (of course only up until the moment when the hairs are cut by the M3 Power razor)."*

Gillette indicates, with good reason, that Dr. Lefell is an eminent dermatologist but not a specialist in the area of body hair (he specializes in the treatment of skin cancer) and that the tests conducted by Wilkinson do not make it possible to determine whether the hair extends or stands up, insofar as the following is noted:

7th page
[initials]

7

GLTE 000021

A/05/00631

⇒ a first stroke of the razor on the skin is made without blades and without activating the device, so there is no phenomenon of vibrations on the skin and therefore no possibility to monitor the possible effect of these vibrations;

⇒ the second stroke is made with blades and after activating the device; so, in this case, there are vibrations, but the hair is immediately cut in such a way that we cannot monitor the possible reaction of the hair before being cut;

⇒ no test was conducted with vibrations but with no blades, such that there was no test intended to establish whether the vibrations have an effect on the hair's behavior;

⇒ the videos of the tests are blurred and the magnification level is insufficient.

Gillette submits the results of tests that its researchers conducted during the 1990's. These tests indicate that the stroke of a vibrating razor ("Sensor" and "Contour Plus") on the skin results in an average increase in the length of the beard hair of several microns.

Other tests conducted by Gillette on the M3 Power prototype indicate an increase in the length of the hair of 32 to 40 microns, depending on the number strokes of the razor, and removal of 56.5% of the hairs in a single stroke, versus 49% if the razor's power is not activated.

All of these analyses, conducted by Gillette in the context of the design work for its new concept of a mechanical razor, and therefore "*in tempore non suspecto*," aim to indicate that the vibrations may in fact have an influence on the behavior of the beard hair.

Furthermore, Gillette contributes to the arguments a CD (Hair Emergence) that uses significant magnification and time-lapse photography to clearly show the movement and lengthening of the hairs subject to the razor's vibrations. The CD shows the release and movement on the skin's surface of hairs whose progression had been impeded by a mixture of sebum and surface keratinocytes present on the skin and eliminated by the vibrations.

The result of all of these elements is that Wilkinson fails to demonstrate as far as necessary that the assertions contained in Gillette's advertising are misleading and deceitful.

The claim, therefore, is groundless.

Gillette filed a counterclaim aimed to grant it a sum of €30,000 to compensate for the expense of technical and legal counsel following the Court of Cassation's decision of February 9, 2004 (T.B.B.R., 2004, pg. 461). This decision focuses on the matter of contractual liability. It does not currently appear that the restitution of attorneys' fees and expenses for technical counsel can be extended to matters other than negligent and contractual liability.

8th page
[initials]

8

GLTE 000022

A/05/00631

**FOR THESE REASONS,**

We, Dominique Collard Bovy, Judge of the Commercial Court of Nivelles, acting in the capacity of presiding member, the incumbent being lawfully unable to attend, conducting an ordinary public hearing of the urgent application of May 25, 2005, assisted by Marie-Paule Leleux, Court Registrar,

Ruling in the presence of both parties,

Hear the claims and declare them groundless; and

Leave the parties to their costs.

◄        [signature]                                    [signature]
M.P. Leleux                                    D. Collard Bovy

9th page [illegible handwriting]
[initials]

[stamp:] Certified true photocopy
The Court Registrar [crossed out by hand:] in chief [initials]

[circular seal:]
Commercial Court of Nivelles

Brabant Wallon

9

GLTE 000023

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING INC., ) <br> EVEREADY BATTERY COMPANY, ) <br> INC., and ENERGIZER BATTERY, ) <br> INC., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE GILLETTE COMPANY, ) <br> ) <br> Defendant. ) | CIVIL NO. 05-cv-00174 (JCH) |

## DECLARATION OF PETER M. CLAY

I, the undersigned, Peter M. Clay, submit this declaration in support of Gillette's opposition to
Schick's motion for preliminary injunction. I have personal knowledge of the following facts
and, if called upon to do so, would and could testify competently thereto.

*Professional and Educational Background*

1.     I am the Vice-President for Premium Systems in the Global Business Management
/Grooming of the Gillette Company, Boston, Massachusetts, a position I have held since
August 2001. In this role I am responsible for developing advertising and advertising
concepts for the premium shaving systems sold by the Gillette Company. Prior to
assuming this role, I served as Group Director for Commercial Operations for Gillette
Europe and, since joining the Gillette Company in 1986, I have served in a number of
positions in both Europe and North America in which I was involved in the advertising
and marketing of Gillette blade and razor and toiletries products.



CONFIDENTIAL

GMPC001354

2.     I received my education at the Tufts University in Medford, Massachusetts where I received a Bachelors Degree in Economics in 1979 and was awarded a Masters Degree in Business Administration at the Amos Tuck School of Business Administration at Dartmouth University in 1983.

3.     In my present position, I work closely with our advertising agency to develop advertising and advertising campaigns to support Gillette premium shaving systems. In this regard, I have been substantially involved in developing and executing the advertising that Gillette has used to support the M3Power shaving system since its launch in the United States in May 2004.

*Background on Advertising Supporting M3Power*

3.     As part of the process of developing national television advertising to support new products, consumer product companies like The Gillette Company submit claim packages to the television networks that summarize the claims to be made and provide substantiation for the principal claims made. I have attached a copy of the claims package that was submitted by the Gillette Company through its advertising agency via e-mail to CBS on May 7, 2004 as Exhibit 1. This package is representative of the claims materials that Gillette provided to the other television networks through its advertising agency at that time for M3Power.

4.     The claims package pertains to the thirty-second television advertisement entitled "Supernova" which is attached in .mpeg format as Exhibit 2, "GSMP-4023" on the CD-ROM labeled "Peter Chy Video Exhibits." "Supernova" was the television commercial used to support the launch of M3Power and variations of that commercial have been used

CONFIDENTIAL

GMPC001355

to support M3Power in the United States since product launch and in other international markets.

5.    Pertinent to the present dispute, the script for "Supernova" included the claim "Micro-pulses raise the hair so you shave closer in one power stroke." (See Exhibit 1, page 2). The claims package observed that studies conducted by The Gillette Company revealed a "mechanism by which oscillating razors in contact with the skin .... release and extend beard hairs prior to cutting." (See Exhibit 1, page 3). The claims package went on to show still photographs from Gillette's "Microwatcher" experiments which showed a "before" photo in which beard hair is trapped in the follicle by "adhesion, sebum and dry skin cells" prior to the skin being physically stressed and an "after" photo that shows the same beard hair released from the follicle following the physical stressing of the skin. (See Exhibit 1, pages 4-5).

6.    The claims package further explained that other experiments conducted by The Gillette Company using oscillating razors fitted with blunted blades showed that the physical mechanism captured photographically in the "Microwatcher" experiments also occurred when beard hairs and the surrounding skin were agitated using the physical energy generated by a prototype M3Power oscillating razor and that the result of this effect is "an immediately longer hair being presented for cutting." (See Exhibit 1, page 5). The claims package also noted that large-scale consumer use tests conducted by The Gillette Company comparing the performance of M3Power to Mach3 Turbo further confirmed M3Power's superiority in terms of delivering a closer shave, removing more hair per stroke, reducing the need to reshave areas, providing a close shave in fewer strokes and not missing spots or hairs. (See Exhibit 1, page 5).

**CONFIDENTIAL**

**GMPC001356**

*Summary of Advertising History for M3Power (2004)*

7.    These claims packages were reviewed by the television networks and the claims were approved based upon that submission. National advertising for M3Power commenced on May 17, 2004 with the pre-launch version of Supernova (See Exhibit 3, "GSMP-4033"). This commercial was followed by the launch version of "Supernova" (Exhibit 2, "GSMP-4023") on May 23, 2004. Variations of "Supernova" were aired throughout the summer and fall of 2004 and included a fifteen-second spot (Exhibit 4, "GSMP-4015"); an African-American version of the launch spot (Exhibit 5, "GSMP- 4103"); a version featuring the battery (Exhibit 6, "GSMP 4113"); and a battery version featuring enhanced branding (Exhibit 7, "GSMP 4233").

*Gillette's Use of Animated Demonstrations in Television Commercials*

8.    Each of the 30-second "Supernova" spots featured a short animated demonstration that sought to capture the hair extension effect that was described in the network claims packages and which had been identified in Gillette's product testing. Over the years, Gillette has used this sort of simplified animation to illustrate how Gillette blades and razors interact with skin and hair to deliver a superior shave. A comparable animation was used in the early 1970's to demonstrate the "hysteresis effect" produced by Gillette's first multi-blade razor, the Trac II (Exhibit 8, Trac II) and again, in the late 1990's, to show the hysteresis effect as produced by Mach3, Gillette's first three-bladed shaving system. (Exhibit 9, Breakthrough).

CONFIDENTIAL

GMPC001357

*2005 Revisions to the Animated Demonstration*

9.    In December 2004, Schick Manufacturing initiated litigation in the Federal Republic of

Germany that challenged the claim that the micro-pulses produced by M3Power "raise

the hair so that you shave closer in one power stroke" and took exception to the animated

demonstration that had been used in Germany that was identical to that employed in the

30-second U.S. spots noted above. While the precise nature of Schick's complaint was

not clear, a principal source of Schick's concerns appeared to be that in "raising" up, the

angle of a few of the hairs in the animated demonstration actually shifted towards a more

perpendicular angle to the skin surface in response to the animated micro-pulses.

10.    While I believed that consumers would understand that the original animated

demonstration was nothing more than a very simplified representation of how the

extension effect occurred and that the principal claim being illustrated – that in response

to the micro-pulses, the end of individual hair shafts would extend to a point higher above

the skin surface which would increase their likelihood of being engaged by the razor –

was accurate, we sought to determine, in response to the Schick complaint and mindful of

Gillette's commitment to communicating accurately with its customers, whether it would

be possible to rework the animated demonstration in order to eliminate any ambiguity in

terms of the depiction of the precise mechanism of action as it was understood by Gillette

researchers.

11.    In January 2005, following consultations with Gillette's technical team, I became

convinced that some relatively minor modifications could be made to the animated

demonstration that would make that demonstration more consistent with the mechanism

of action understood by Gillette's researchers.  Those modifications included: (1)

**CONFIDENTIAL**

**GMPC001358**

maintaining the angle of individual hair shafts vis-à-vis the skin surface as hairs were extended; (2) showing that some hairs were not trapped and were thus unaffected by the micro-pulses; (3) showing that some of the trapped hairs were trapped at the skin surface while others were trapped with some length of hair extending beyond the skin surface; and, (4) showing other trapped hairs not responding to the micro-pulse stimuli.

12.  In addition to revising the animated demonstration, the voice-over was also slightly revised to further remove any ambiguity as to the nature and substance of the claims. Instead of saying that the micro-pulses "raise the hair so you shave closer in one power stroke," a revised voice-over was prepared that states that the micro-pulses "raise the hair so the blades can shave closer."

13.  Consequently, I directed our advertising agency to make these changes to the animated demonstration and voice-over for a new series of television advertisements. These revisions were first aired in the United States on January 31, 2005 in a reworked version of the Supernova 30-second commercial (Exhibit 10, "GSMP-5283") and in a comparable 15-second spot (Exhibit 11, "GSMP-5195").

14.  These revisions were also captured in Gillette's new "Morning" series of M3Power commercials which began running on February 9, 2005 which feature 30-second, 15-second and 30-second African American spots.   (See: Exhibit 12, "GSMP-5293"; Exhibit 13, "GSMP-5215"; and, Exhibit 14, "GSMP-5303").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February ___, 2005.

Peter M. Clay — 2/25/05

Peter M. Clay

**CONFIDENTIAL**

**GMPC001359**

VIA E-MAIL &
MESSENGER

May 7, 2004


Ms. Brie Allio
Editor
Broadcast Standards & Practices
CBS
51 West 52nd Street
New York, NY 10019

Re:    Gillette® M3Power™ shaving system "Supernova" :30

Dear Brie:

I am writing in response to your Clearance Report dated 4/6/04 requesting support for the
following claims:

- "The world's first micro power shaving system" and
- "Micro-pulses raise the hair making it easier to shave closer in one power stroke"

You also requested the national introduction date for the Gillette® M3Power shaving
system and product sampling and labeling.

### 1.    National launch date/product sampling and labeling

The national launch date for the Gillette® M3Power shaving system is May 24, 2004 and
I understand that a product sample and labeling was forwarded to you by Liz under
separate cover. Please let me know if you have not received the product sample and
labeling.

**HIGHLY CONFIDENTIAL**

HIGHLY CONFIDENTIAL



GMPC001361

2.    Revised script/claims

Attached please find a revised script for your review and approval which now includes the following claims:

- "Introducing Gillette M3 Power. Turn on the first micro power shaving system from Gillette";
- "Micro-pulses raise the hair so you shave closer in one power stroke" and
- "World's best shave"

3.    General product overview/description

The new Gillette® M3Power shaving system is a major new innovation.  It is a totally new shaving experience and Gillette's first micro-powered wet razor ever: the unique Micro-Power™ shaving system.  In addition to the technological advances in the razor, M3Power also boasts our best performing new blade cartridge ever, featuring PowerGlide™ blades.

(a)    New Gillette® M3Power™ Razor Handle

Although the new M3Power razor handle may resemble its predecessors in overall size and shape, there are big differences inside the handle.  These include a powerful miniature motor, a AAA Duracell battery and a centrally-located green button power switch.

Turn on M3Power and the motor generates hundreds of gentle micro-pulses.  The micro-pulses travel up the handle to the blade to raise hair up and away from skin, making it easier for the new PowerGlide™ blades to shave more hair closer in one power stroke. Under normal use the battery will last three to six months.

(b)    New PowerGlide™ Blades

The blade edge in the new M3Power cartridge represents the latest Gillette innovation in edge technology.  It is an improved version of the blade edge used in the highly successful and superior performing MACH3Turbo system, which was itself an improvement over the edge used in the original MACH3 system.

However, the M3Power edge differs from the MACH3Turbo edge in a very impactful respect: the relatively thick and variable telomer layer on MACH3Turbo (800Å – 5000Å) has been replaced with a Thin Uniform Telomer (TUT) layer that has a uniform thickness of less than 800Å on both the finish and gruff bevels of the edge.

TUT telomer films have unparalleled uniformity both from bevel to bevel on the blade edge and from blade to blade.  Atomic force microscopy (AFM) data confirms that TUT film thickness along a single bevel ranges between 200-800Å, which is relatively uniform when compared to thickness ranges in excess of 5,000Å for the MACH3Turbo edge.

HIGHLY CONFIDENTIAL

2

HIGHLY CONFIDENTIAL

GMPC001362

Furthermore, TUT films are consistently uniform, exhibiting exceptional bevel-to-bevel and blade-to-blade uniformity as indicated by Fourier Transform Infrared Spectroscopy (FTIR) data. The film thickness variation measured by FTIR on multiple blades is comparable to that observed by AFM on individual blades.

Objective cutting force tests clearly demonstrate that the M3Power edges have a lower cutting force than MACH3Turbo non-TUT edges.

The M3Power blade cartridge also features an Indicator Lubrastrip® infused with Vitamin E and aloe.

4.    **M3Power Performance Claims**

The "Supernova" storyboard features several product and performance claims. The specific claims and the reasonable substantiation supporting these claims are set forth below.

(a)    **The First Micro Power Shaving System from Gillette**

Gillette has never before marketed a powered wet shaving product that contains a powerful micro motor, a micro-sized AAA battery that lasts for months and a functional and convenient micro switch in a fully-portable normal-sized razor handle. This is the essence of our unique Micro-Power™ shaving system.

(b)    **The Amazing New PowerGlide™ Blades**

The new PowerGlide™ blades incorporated in the M3Power Shaving System are more fully described above. They utilize a new thin uniform telomer coating and have been shown in objective cutting force tests to require a lower cutting force to cut test fibers.

(c)    **Micro-pulses Raise the Hair so You Shave Closer in One Power Stroke**

Gillette has tested a wide variety of powered and manual experimental wet razors for more than twenty years. One consistent feature of numerous such tests is that when identical razors were shaved in both powered and manual versions, the powered versions outperformed the manual versions.

Some more easily perceived benefits of using an oscillating razor include 1) reduced discomfort via a vibration masking phenomenon, 2) reduced drag forces as the razor is moved over the face and 3) increased movement of the pivoting cartridge. However, careful laboratory studies have revealed a less obvious mechanism that also plays a significant role in the enhanced ability of powered oscillating wet razors to shave closely.

These studies show that within the physiology of skin and hair there is a mechanism by which oscillating razors in contact with the skin can actually release and extend beard hairs prior to cutting.

HIGHLY CONFIDENTIAL

3

HIGHLY CONFIDENTIAL

GMPC001363

A marked example of the phenomenon is shown in the "before" stage in the first microphotograph video still shown below. Here, a beard hair is trapped at and below skin level by natural skin processes (adhesion of the hair shaft to the inner surface of the hair follicle or cavity and the build-up of sheets of 'dry skin' cells over the top of the hair).



Figure 1(a) Hair shaft trapped before the skin is stressed.

The degree to which individual beard hairs get stuck to the sides of their follicles or trapped beneath sheets of dead skin cells varies. The one above appears to be fully below the skin surface and is the worst case. Others erupt completely or are limited at some point in between by adhesion, sebum and dry skin cells.

This image and the one below were made using the Microwatcher optical device, which consists of a miniature CCD camera with a lens and an optical illumination system that channels light into an orifice at the end of a transparent hemispherical dome.

When the dome is pressed onto the skin surface it induces movement, freeing the hair shaft as shown in the "after" stage in the second microphotograph below.

HIGHLY CONFIDENTIAL

4

HIGHLY CONFIDENTIAL

GMPC001364



Figure 1(b) Hair shaft released after the skin was stressed.

Additional studies using oscillating razors with blunted blades have confirmed that the hair release phenomenon, which results in an immediately longer hair being presented for shaving, can be demonstrated using other microscopic measurement methods. (The laboratory tests must use blunted blades or the extended hairs would be immediately shaved off and would not therefore be measurable.)

The new M3Power system was recently compared to the current best wet shaving system in the world (Gillette MACH3Turbo) in a large scale consumer use test whose rigorous protocol is well-known to and accepted by the major television networks, the NAD and even federal courts. It was a one-cell, blind, proto-monadic home use test among a balanced general sample of 389 male wet shavers. The test demonstrated that M3Power is significantly preferred on all 36 performance attributes and on all 36 physical attributes. Performance attributes relevant to "shaving closer in one power stroke" include:

| Test Measure (Base 389) | Prefer M3Power % | Prefer MACH3T % | No Preference % |
|---|---|---|---|
| Giving a close shave | 58* | 24 | 18 |
| Removing more hair per stroke | 54* | 21 | 25 |
| Reducing need to re-shave areas | 54* | 22 | 24 |
| Close shave in fewer strokes | 58* | 22 | 20 |
| Not missing spots or hairs | 50* | 21 | 29 |

*Results statistically significant at/above the 95% confidence level.

HIGHLY CONFIDENTIAL

5

HIGHLY CONFIDENTIAL

GMPC001365

5.    The World's Best Shave

This same consumer use test also provides the substantiation for the claim of "world's best shave," again, a distinction currently held by the MACH3Turbo razor. M3Power wins in all 72 performance and physical razor attributes were noted above. Overall preference and key performance attribute scores were:

| Test Measure (Base 389) | Prefer M3Power % | Prefer MACH3T % | No Preference % |
|---|---|---|---|
| Overall preference | 64* | 27 | 9 |
| Giving a close shave | 58* | 24 | 18 |
| Smoothness | 60* | 22 | 18 |
| Comfort while shaving | 58* | 24 | 18 |
| Comfort after shaving | 56* | 22 | 22 |

*Results statistically significant at/above the 95% confidence level.

I have legally approved the board based upon the above and there is no doubt that the above provides us with more than "a reasonable basis" to make the claims contained in the board.

I hope that you can now approve the board based upon this letter. However, if you feel you need any additional information to approve advertising claims for this great product, please let me know as soon as possible, since the airdate is May 17, 2004.

Thank you, as always, for your cooperation in this matter.

Sincerely,

cc: J. Gatlin, Esq. (Gillette), P. Geary, B. Schweig

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

6

GMPC001366

# EXHIBIT I



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

July 7, 2005

Harvey J. Wolkoff
(617) 951-7522
harvey.wolkoff@ropesgray.com

**BY FACSIMILE & REGULAR MAIL**

Thomas G. Shapiro, Esq.
Shapiro Haber & Urmy LLP
Exchange Place
53 State Street
Boston, MA 02109

Re: Chapter 93A Demand Letter of Adam Kline

Dear Mr. Shapiro:

We are the attorneys for The Gillette Company ("Gillette"). This letter responds to your letter dated June 8, 2005, in which you make a demand pursuant to Mass. Gen. Laws ch. 93A on behalf of Adam Kline and "a class of all persons who purchased Gillette M3P razors in Massachusetts" ("demand letter").

After careful review of your demand letter, Gillette believes that your purported claim lacks merit and that your demand letter fails to meet the requirements of ch. 93A, §9(3). Notwithstanding such deficiencies, and without admitting any liability or conceding the merits of your claim or waiving any defenses, Gillette is prepared to make a "reasonable tender of settlement," as set forth more fully below, in response to your demand letter. Nothing in this response, or in any subsequent communications relating to the "reasonable tender of settlement," is intended or should be construed as an admission of liability for any purpose and in any respect.

We note that the particular advertising to which your letter is directed is currently suspended, and that Gillette has taken steps to cause removal of the advertising from current public display. As a "reasonable tender of settlement," Gillette proposes to offer refunds to those consumers who purchased an M3Power razor prior to the date on which Gillette recently launched a nationally available money-back guarantee program. In particular, Gillette will offer this refund program to *any* member of the class that your client purports to represent, even those consumers who cannot submit proof of purchase. Putative class members simply would need to return the M3Power razor to Gillette; even those who lack any proof of purchase would be entitled to receive a refund in the amount of the average national retail price of the product from May 2004 through May 2005 (approximately $12.00). If a putative class member is able to submit proof of purchase and such proof of purchase demonstrates that he paid more than $12.00 for an M3Power razor, Gillette would refund that higher price for that particular consumer. The refund will be available

9766602_1

Thomas G. Shapiro, Esq.                    - 2 -                    July 7, 2005

for up to two razors per household address. Furthermore, Gillette would cooperate in disseminating notice of this offer in a fashion similar to notice provided in class actions generally. Putative class members responding to the notice would also receive an amount to fully reimburse them for the costs of postage, as well as a coupon for $1.00 off the future purchase of any Gillette brand product. This would be in full settlement of the case.

Please let me have your response as soon as possible.

Very truly yours,

Harvey J. Wolkoff

cc:    Deborah Marson, Esq.

# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | MASTER DOCKET |
| | ) | Civil Action No. 05-11177 |
| M3POWER RAZOR SYSTEM | ) | (Lead Case) |
| MARKETING & SALES PRACTICES | ) | |
| LITIGATION | ) | MDL Docket No. 1704 |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

**DECLARATION OF ANDREW J. NOVAK**
**ESTIMATING COSTS OF NOTICE PLAN**

I, Andrew J. Novak, declare as follows:

1.    I am Vice President of Kinsella/Novak Communications, Ltd. ("KNC"), an advertising and notification consulting firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs.  My business address is 2120 L Street, NW, Suite 205, Washington, D.C. 20037.  My telephone number is (202) 686-4111.

2.    I was retained through the claims administrator (Complete Claim Solutions ("CCS")) as the media consultant to implement a notice program in connection with the proposed settlement in *In re M3Power Razor System Marketing & Sales Practices Litigation*, No. 05-11177 DPW (Lead Case) MDL 1704 (D. Mass.).

3.    I previously submitted the *Declaration of Andrew Novak in Support of Notice Plan*, which outlined my experience as a nationally recognized specialist in the design,

1

development and implementation of notification programs and detailed the elements of the Notice Plan.

4.     I submit this Declaration to outline the estimated costs to implement the Notice Plan previously submitted to this Court for Preliminary Approval.

5.     The estimated cost to implement the Notice Plan is between $2.4 and $2.5 million US dollars, depending upon when the summary Publication Notice appears in the various print publications that are included in the Notice Plan. Typically, print advertising rates increase each year beginning with January editions and KNC does not have the specific rate increases for all publications at this time.

I declare under penalty of perjury under the laws of the Commonwealth of Massachusetts that the foregoing is true and correct. Executed at Washington, DC this 18th day of October, 2006.

_____
Andrew J. Novak

2