UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re M3 POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | ) ) ) |
| | ) ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Civil Action No. 05-11177-DPW

MDL Docket No. 1704

<u>CLASS ACTION</u>

PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND PUBLISHING OF NOTICE, AND SETTING OF A FINAL FAIRNESS HEARING

**DOCUMENT CONTAINS REDACTIONS**

**UN-REDACTED VERSION FILED UNDER SEAL**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   INTRODUCTION ...................................................................................................1

III.  ARGUMENT...........................................................................................................1

    A.    Summary of Plaintiffs' Claims and the Terms of the Settlement ...........................1

    B.    The $7,500,000 Settlement Fund Provides Fair, Adequate and Reasonable
       Relief to the Class. ................................................................................................4

        1.    The Settlement Fund Provides Fair, Reasonable and Adequate
            Consideration Based on Gillette's Profits from the Sale of the
            M3Power Razors and Blades. ...................................................................4

        2.    The Settlement Fund Provides Fair, Reasonable and Adequate
            Consideration Based on Class Members' Out-of-Pocket Losses. ...............5

    C.    The Notice Plan and Long and Short Form of Notice Provide Class
       Members with All Required Information Concerning the Settlement....................7

    D.    The Settlement Is Not a Marketing Plan for Gillette and the Procedure for
       Submitting a Claim is Not Cumbersome ...............................................................8

    E.    The Settlement Class Meets All of the Requirements for Certification of a
       Nationwide Class Under Rule 23...........................................................................9

        1.    Plaintiffs have sufficiently established the requirements of
            predominance, typicality, and adequacy.....................................................9

        2.    Corrales Incorrectly Construes Legal Authority.......................................12

        3.    Corrales' Proposition that Other Courts Have Been Willing to
            Account for the "Greater Rights" of Particular States Is Without
            Merit, or Legal Support, and Is Inapplicable to this Case ........................13

    F.    The Strong Support for the Settlement Justifies Preliminary Approval. ..............14

    G.    The Requested Attorney's Fees Are Reasonable...................................................15

        1.    Fees Should Be Awarded as a Percentage of the Fund..............................15

        2.    The Requested Fee is a Fair and Reasonable Percentage and is
            Consistent with Fee Awards in this District .............................................17

Page

3.   The Proposed Fee is Reasonable in Relation to Counsels' Lodestar.........17

H.   The Requested Incentive Awards to Plaintiffs are Reasonable ............................19

IV.   CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

Page

**CASES**

*Ahearn v. Credit Suisse First Boston LLC,*
    No. 03-10956-JLT (D. Mass. June 7, 2006) .............................................................17, 19

*Amchem Prod's, Inc. v. Windsor,*
    521 U.S. 591 (1997).............................................................................................................11

*Avis Rent a Car Sys., Inc. v. Heilman,*
    876 So. 2d 1111 (2003).......................................................................................................12

*Blum v. Stenson,*
    465 U.S. 886 (1984)............................................................................................................16

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)............................................................................................................16

*Camden I Condo. Ass'n. v. Dunkle,*
    946 F.2d 768 (11th Cir. 1991) ...........................................................................................16

*Combs v. Microsoft Corp.,*
    696 N.W.2d 318 (Iowa 2005) ............................................................................................13

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    989 F. Supp. 375 (D. Mass. 1997)......................................................................................16

*Dunk v. Ford Motor Co.,*
    48 Cal. App. 4th 1794 (1996) ............................................................................................10

*EEOC v. Hiram Walker & Sons, Inc.,*
    768 F.2d 884 (7th Cir. 1985) .............................................................................................10

*Freedman v. Air Line Stewards & Stewardesses Ass'n,*
    730 F.2d 514-15 (7th Cir. 1984) .......................................................................................10

*Furtado v. Bishop,*
    635 F.2d 915 (1st Cir. 1980)..............................................................................................17

*General Motors Corp.,*
    55 F.3d 768 (3rd Cir. 1995) ...............................................................................................17

- iii -

Page

*Giusti-Bravo v. U.S. Veterans Admin.*,
    853 F. Supp. 34 (D. Puerto Rico 1993)..............................................................................14

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ..........................................................................................16

*Granada Invs., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) ........................................................................................11

*Grendel's Den, Inc. v. Larkin*,
    749 F.2d 945 (1st Cir. 1984)...........................................................................................18

*In re Aspen Technology, Inc. Sec. Litig.*,
    No. 04-12375-JLT (D. Mass. Mar. 6, 2006) ..................................................................19

*In re Bankamerica Corp. Secs. Litig.*,
    210 F.R.D. 694 (E.D. Mo. 2002) ...................................................................................14

*In re Boston & Maine Corp.*,
    778 F.2d 890 (1st Cir. 1985)...........................................................................................19

*In re CVS Corp Sec. Litig.*,
    No. 01-11464-JLT (D. Mass. Sept. 7, 2005) ..................................................................19

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003) .........................................................................................8

*In re Cont'l. Illinois Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ..........................................................................................16

*In re Fleet/Norstar Sec. Litig.*,
    935 F. Supp. 99 (D.R.I. 1996).........................................................................................14

*In re Heritage Bond Litig.*,
    02-6512, 2005 WL 1594403
    (C.D. Cal. 2005)..............................................................................................................13

*In re Lupron Mktg. and Sales Practices Litig.*,
    No. 01-CV-10861-RGS, 2005 WL 2006833
    (D. Mass. Aug. 17, 2005)................................................................................................19

**Page**

*In re Oracle Secs. Litig.,*
No. C-90-0931, 1994 WL 502054
(N.D. Cal. 1994)....................................................................................13

*In re Relafen Antitrust Litig.,*
No. 01-12239-WGY, 2005 WL 2386119
(D. Mass. Sept. 28, 2005) ...............................................................11, 19

*In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294 (3d Cir. 2005)................................................................16

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,*
56 F.3d 295 (1st Cir. 1995)...........................................................16, 17

*In re Vitamins Antitrust Litig.,*
No. Misc. 99-197 (TFH), 2001 WL 34312839
(D.D.C. July 16, 2001)........................................................................17

*Johnston v. Comerica Mortg. Corp.,*
83 F.3d 241 (8th Cir. 1996) .........................................................16, 17

*Lutz v. Int'l Ass'n of Machinists and Aerospace Workers,*
196 F.R.D. 447 (E.D. Va. 2000) ...........................................................12

*Missouri v. Jenkins,*
491 U.S. 274 (1989)...........................................................................17

*Phillips Petroleum Co. v. Shutts,*
472 U.S. 797 (1985)...........................................................................10

*Pitt v. City of Portsmouth,*
221 F.R.D. 438 (E.D. Va. 2004) ...........................................................12

*Rawlings v. Prudential-Bache Props., Inc.,*
9 F.3d 513 (6th Cir. 1993) ................................................................16

*Six Mexican Workers v. Arizona Citrus Growers,*
904 F.2d 1301 (9th Cir. 1990) ...........................................................16

*Strougo v. Bassini,*
258 F. Supp. 2d 254 (S.D.N.Y. 2003)..................................................10

**Page**

*Swack v. Credit Suisse First Boston,*
    C.A. No. 02-11943-DPW (July 26, 2006) .......................................................................17

*Swedish Hosp. Corp. v. Shalala,*
    1 F.3d 1261 (D.C. Cir. 1993) ........................................................................................16

*Wershba v. Apple Computer, Inc.,*
    91 Cal. App. 4th 224 (2001) .........................................................................................10

## STATUTES, RULES AND REGULATIONS

California Business & Professions Code

§§17200.................................................................................................................................9

Federal Rules of Civil Procedure

Rule 23 ...........................................................................................................*passim*

## I.    PRELIMINARY STATEMENT

Plaintiffs Mark Dearman, Anthony DeBiseglia, Matthew Marr, Adam Kline, Greg Besinger, Collin L. McGeary, Javier Tunon, and Jean-Sebastien Elie (the "Representative Plaintiffs"), individually and on behalf of the Settlement Class, by and through Settlement Class Counsel, respectfully submit this Supplemental Memorandum.

## II.    INTRODUCTION

The proposed settlement readily meets the requirements for preliminary approval. The basic principles regarding approval have been set forth in the settling parties' previously filed papers. This filing supplements that submission and responds to Plaintiff Corrales' opposition to the motion. The financial information supplied herewith leaves no doubt as to the fairness, reasonableness and adequacy of the settlement. Moreover, the Corrales' opposition sets forth no valid reason why preliminary approval should not be granted. Indeed, Corrales' attempted preemptive filing, in fact, supports both preliminary and final approval.

## III.    ARGUMENT

### A.    Summary of Plaintiffs' Claims and the Terms of the Settlement

Plaintiffs contend that Gillette's print advertisements and television commercials misleadingly claimed that the M3Power Razor "raises or stimulates hair up and away from skin." Gillette's advertisements included animations in its television commercials that showed hair on the face to change angle or to be extended by an exaggerated amount.

Representative Plaintiffs have negotiated a comprehensive settlement of the claims that Gillette's advertising and marketing of the M3Power Razor were false and misleading. Specifically, pursuant to the terms of the Settlement Agreement, Gillette has agreed to make $7,500,000 in cash and other benefits available as a Settlement Fund to resolve this class action. This is not a claims made settlement and there is no reverter to Gillette. Rather, the entire settlement fund ("Settlement Fund")

Page Contains Redactions

will be distributed for the benefit of the Class.[1]

The Settlement Agreement provides Class Members with a number of ways in which they can receive in excess of their actual damages caused by Gillette's advertising. First, Class Members who no longer want their M3Power Razors are able to obtain a full refund of the purchase price. Those Class Members must simply send their razor to the Claims Administrator. The Class Members are entitled to keep the accompanying Duracell battery (which can be used in a host of electronic products) and the M3Power blade (which can be used in any razor in Gillette's Mach3 family). In return, Gillette will send those Class Members whose M3Power Razors were purchased in the United States a check in the amount of $13, plus $2 for postage and handling,[2] for a check in the total amount of $15. Gillette shall send Class Members who purchased their M3Power Razors in Canada a check in the amount of $16.25 in Canadian dollars, plus, for postage and handling, the Canadian dollar equivalent of $2 in US dollars. This amount, which will be provided without proof of purchase, exceeds the average retail price of $▮ paid by consumers during the Class Period.[3] However, if a Class Member can demonstrate that they paid more than the amounts listed above, Gillette will pay that greater amount, plus the $2 for postage and handling.

Class Members who wish to retain their M3Power Razors are also able to recover under the Settlement Agreement. Because there is no dispute that the M3Power Razor provides consumers with a shave that is at least as good as the shave provided by Gillette's non-powered 3 blade razor, the Mach3 Turbo Razor, one way to compute that overpayment is to compare the average price paid during the

---

[1] The costs to provide notice and administration of Class Members' claims will be paid out of the Settlement Fund (those costs will not exceed $2,450,000; amounts over $2,450,000 will be borne separately and additionally by Gillette).

[2] The actual postage expense for mailing the razor to the Settlement Administrator is 39¢.

[3] Deposition Transcript of Kevin McNamara dated November 3, 2006 ("McNamara Tr.") at page ("P") 22, line ("L") 5-8 and GLTE 000001-000002, attached to the Affidavit of Ben Barnow ("Barnow Aff.") dated November 6, 2006, as Exhibits 2 and 1, respectively. All references herein to Ex. shall be Exhibits to the Barnow Aff.

Page Contains Redactions

Class Period for the M3Power Razor of $███ to the average price paid during the Class Period for the

Mach3 Turbo Razor of $███. McNamara Tr. at P44, L16-19, GLTE000033. That difference in price is

$███. The settlement provides for Gillette sending those Class Members a check in an amount of up to

$10. Class Members can submit claims based on purchases already made or on future purchases of

qualifying Gillette's products.

If the $7.5 million fund is not exhausted by the submission of claims, Gillette will send its newly

introduced 6 blade Fusion Razor to every Settlement Class Member who submitted a claim. If the

amount remaining for proposed settlement benefits is not enough to send a Settlement Razor to every

Settlement Class Member, Gillette will send Fusion Razors to a statistically random sample of those

Settlement Class Members, until the amount remaining in the $7.5 million settlement fund is fully

distributed. After this distribution of Fusion Razors, if any of the $7.5 million settlement fund remains,

then Gillette will place a link on its M3Power Razor website inviting Settlement Class Members to

submit a claim electronically to receive a Fusion razor. If the amount remaining for proposed

settlement benefits is still not fully distributed, Defendant will distribute Fusion Razors to a group to be

chosen by Gillette and Settlement Class Counsel, and in the event they cannot agree, by the Court, until

the $7.5 million settlement fund is fully depleted.

Accordingly, any Settlement Class Members who no longer want the razors for which they had

purchased, are eligible to receive $15 plus a Gillette Fusion razor valued at $███, for a total recovery of

$████. This is ██% of the average amount they paid for the M3Power Razor. Alternatively,

Settlement Class Members who choose to keep their razors are eligible to receive a $10 check plus a

Gillette Fusion razor valued at $███, for a total recovery of $███, or ██% of the $███ difference

between the purchase price of the M3Power and Mach3 Turbo Razors.

- 3 -

Page Contains Redactions

**B.     The $7,500,000 Settlement Fund Provides Fair, Adequate and Reasonable Relief to the Class.**

Pursuant to the terms of the Settlement Agreement, Gillette has agreed to make $7,500,000 in cash and other benefits available as a Settlement Fund to resolve this class action. After calculating damages under a variety of theories, Settlement Class Counsel believe that this amount will provide fair, adequate and reasonable relief to Class Members.

**1.     The Settlement Fund Provides Fair, Reasonable and Adequate Consideration Based on Gillette's Profits from the Sale of the M3Power Razors and Blades.**

Class Members purchased ▮▮▮▮▮▮ M3Power Razors in the USA and Canada during the class periods. *See* McNamara Dep. at P.22, L.1-4 and GLTE000002. According to information obtained from Gillette's accounting systems, Gillette ▮▮ $▮▮▮▮▮▮▮ from the sale of these razors. *See* McNamara Dep. at P.41, L.11-14 and GLTE000007. However, according to McNamara, "▮▮▮▮▮▮s ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮." *See* McNamara Dep. at P.32, L.21-24. Accordingly, rather than simply accept that Gillette lost money on the M3Power Razors sold during the Class Period, Settlement Class Counsel demanded and received information concerning Gillette's profits or losses from the sale of M3Power Razors and blades. That information revealed that Gillette showed a ▮▮▮ of $▮▮▮▮▮▮ on the sale of M3Power Razors and blades combined. *See* GLTE000007.[4] The $7,500,000 Settlement Fund represents more than ▮% of all of the money that Gillette reports to have ▮▮▮▮ on the sale to consumers of M3Power Razors and blades during the Class Period.[5]

---

[4] During a July presentation Gillette had previously provided substantially higher profit numbers of approximately $▮▮▮▮▮ ($▮▮▮▮▮ U.S. and $▮▮▮▮▮ Canadian). However, as part of confirmatory discovery, those numbers proved to be in error. *See* McNamara Dep. at P.36, L.9.

[5] Prior to the filing of Plaintiffs' motion for preliminary approval, the financial information set forth herein was disclosed to each member of the Plaintiffs' Steering Committee (who were free to share it with each of their groups' membership), Canadian counsel, and Mr. Corrales' counsel directly.

Page Contains Redactions

However, Gillette has strenuously argued that the $████████ does not reflect "what it ████," as a large portion of all M3Power sales that occurred were at the direct expense of sales of its other razors and blades. *See* McNamara Dep. at P.10, L.11-21. As a result, the $7,500,000 actually represents a much larger portion of Gillette's ████ net of such an offset.

> ### 2. The Settlement Fund Provides Fair, Reasonable and Adequate Consideration Based on Class Members' Out-of-Pocket Losses.

Settlement Class Counsel also determined Gillette's liability based on Class Members' out-of-pocket losses and Gillette's resulting unjust enrichment. Specifically, Settlement Class Counsel compared what Class Members were promised, *i.e.*, a razor that stimulated whiskers up and away from the skin, to what Class Members received, *i.e.*, a three blade razor that did not lift the hair on the face. The difference in price between the M3Power and Mach3 Turbo is one measure of damage.

Gillette's accounting records demonstrate that, during the Class Period, the average retail price of the M3Power Razor which was supposed to raise hair up and away from the face was $███. *See* McNamara Dep. at P.22, L.5-8 and GLTE000001-2. During the Class Period, the average retail price of the Gillette's three blade razor which did not claim to lift hair from the face (the Mach3 Turbo) was $███. McNamara Tr. at P.44, L.16-19, GLTE00033. The difference in price between the two razors is $███. However, with the purchase of the M3Power Razors, consumers also received two M3Power blades. These blades are different than the blades that come with the Mach3 Turbo in that the M3Power blades are coated with a substance called Telomar, which causes the blades "█████████████████ ███████████." McNamara Dep. at P.46, L.3-13. Based on financial information provided by Gillette, Settlement Class Counsel determined that each of these blades would cost consumers an extra ██¢ over the cost of the Mach3 Turbo blade. *See* GLTE000008, 34. This ██¢ of extra value that consumers received should be used to reduce the $██, resulting in an out-of-pocket loss of $██ for each razor purchased during the Class Period. With ████ purchased during the Class Period, this

- 5 -

Page Contains Redactions

results in a total out-of-pocket loss of $███████. The $7,500,000 settlement fund represents more than ██% of the damages under this theory.

Of course, other calculations were made by Settlement Class Counsel. For example, during settlement negotiations, Settlement Class Counsel took the position that all of the revenues taken in by Gillette and all of the funds expended by consumers for the M3Power Razors and blades should be returned. However, Gillette argued and provided documentary support for its contention that no matter whether it was through a lifting of the hair or something else, the M3Power Razor still provided consumers with the best shave on the market.

When viewed against the risk of continued litigation on issues such as liability and class certification, which Gillette has indicated they would strenuously contest, the proposed settlement is fair and adequate.[6] The class' access to an ultimate judgment would likely require a claim process, such as the one proposed here, the main difference of which would be that it would follow years of trial and appeal.

It is against those facts and relevant law that Settlement Class Counsel and Liaison Counsel, joined by the vast majority of the plaintiffs and lawyers who have a pending case in these MDL proceeding, submitted the settlement to the Court for preliminary approval. The proposed settlement delivers to the consumer choice and value. Any reasonable analysis regarding the prices, sales and facts of this case reveals that consumers have access to a remedy that is reasonably seen as providing them with more than they lost.

---

[6] Gillette does have expert reports supporting its position regarding the complained of conduct    (that Gillette's advertisements claiming that the M3Power Razor "raises or stimulates hair up and away from the skin" were false and misleading). At trial, this would likely result in a battle of experts. Three countries, Belgium, France and the Netherlands have dismissed similar actions against Gillette while initial rulings favoring plaintiffs have occurred in the United States, Australia, and Germany.

C.    **The Notice Plan and Long and Short Form of Notice Provide Class Members with All Required Information Concerning the Settlement.**

The Notice Plan and supporting affidavit were previously publicly filed with the Court. The Notice Plan was created by a quality firm highly experienced in the discipline of class action notices. *See* Declaration of Andrew J. Novack ("Novack Dec.") at ¶¶5-6. The Notice Plan is comprehensive and provides the best practicable notice under the circumstances. In that regard, the notice will reach at least eighty (80%) percent of the Class in both the U.S. and Canada through broad publication of the short form notice through the use of paid media, including newspapers, newspaper supplements and consumer magazines. *Id.* at ¶¶19-25. In addition, the notice will be published through a press release sent to broadcast, print and electronic outlets in the United States and Canada. *Id.* at ¶19(c). The notice also will be available through a dedicated website, to which Class Members will be directed by Internet search engine sponsored-link advertising through keyword searches. *Id.* at ¶19(d). Moreover, Class Members who request a more detailed notice will be provided with the long form notice directly by first-class mail. *Id.* at ¶19(b).

The notices, short and long form, comport with common practice and are proper in all respects. There simply is no requirement that the Short Form Notice contain the information suggested by Corrales, who provides no legal support for his argument. Indeed, the Long Form Notice specifically advises Class Members that: (a) up to $2.45 million of the settlement fund may be used to fund the cost of notice and administration, which are benefits to the Class; (b) Settlement Class Counsel will seek legal fees and expenses in the amount of $1,850,000; and (c) they may object to the settlement and provides detailed instructions about how to do so.[7] *See* Long Form Notice at Questions 8, 18, 19. These are the very matters that Corrales complains are not included in the notice. Requiring all of this

---

[7] There is no basis whatsoever for Corrales' contention that the Notice must advise Class Members that Gillette ceased publishing the advertisements due to a court ordered injunction.

information also to be included in the Short Form Notice would defeat the purpose of having a "short"

form notice. *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 204 (D.

Me. 2003) (noting that the amount of attorneys' fees does not need to be included in a short form

notice).

**D.    The Settlement Is Not a Marketing Plan for Gillette and the Procedure for Submitting a Claim is Not Cumbersome**

Under the settlement, Gillette is required to establish the settlement fund which could provide

Class Members with far in excess of what they paid for their M3Power Razors. It is baseless for

Corrales to claim that this settlement, which requires Gillette to make cash payments to any Class

Member who wants one, is a marketing plan for Gillette.

In addition, it is just plain silly to attempt to denigrate the settlement by saying that consumers

have to send in "wet razors." As in any case, there must be some mechanism to ensure that people who

are submitting claims are members of the Class. Requiring submission of the razor is far less

cumbersome than requiring a Class Member to locate a drug store receipt for a purchase made more

than a year ago. In addition, the only people who are required to send in a razor are those who want

Gillette to return the full purchase price. It makes perfect sense that, as part of rescinding the purchase

of the razor, Class Members are required to give back what they received, and Gillette is paying those

Class Members an extra $2 as postage and handling for their efforts.

Any Class Member who wants to keep their razor or does not want to go through the process of

returning it can request that Gillette provide them with up to a $10 check for purchases that they already

made; consumers are not required to make any new purchases. Receiving more than the full price you

paid for a product, after you have used it for a long period of time, and which may be replaced by a

more advanced model, is an excellent settlement of a disputed claim. It is not a marketing plan for

Gillette any more than consumers are required to send their razors back in wet condition. This

- 8 -

settlement provides real value, a real remedy and a real resolution to the class, its members, and the judicial system.

### E.  The Settlement Class Meets All of the Requirements for Certification of a Nationwide Class Under Rule 23.

#### 1.  Plaintiffs have sufficiently established the requirements of predominance, typicality, and adequacy.

Notwithstanding Corrales' claim to the contrary, the proposed settlement class fully comports with class certification standards established under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). In particular, the current settlement of Class members' claims against Gillette satisfies the typicality and adequacy requirements of Rule 23(a) and the predominance requirements of Rule 23(b).[8]

Plaintiff Corrales' objection to certification boils down to his contention that California law trumps the laws of all other states. Corrales bases this contention on his belief that California law offers heightened protection of consumers. Corrales' belief is unfounded. Plaintiff Corrales fails to note that all of the California state court cases he relies upon were decided prior to the passage by California voters of Proposition 64 on November 2, 2004, which significantly limited private enforcement of California's consumer protection and false advertising laws (Cal. Bus. & Prof. Code §§17200 and 17500)). Subsequent to its passage, only individuals who have suffered "injury in fact" and have lost "money or property" as a result of the challenged conduct will be able to successfully bring private causes of action pursuant to California's consumer protection laws. Consequently, Proposition 64 heightens the bar that California plaintiffs must meet to state claims under said laws. Indeed, a California state appellate court has recently held that, under California's consumer protection law, as modified by Proposition 64, each and every class member must demonstrate actual injury in fact and

---

[8] Plaintiff Corrales implicitly concedes that this action satisfies Rule 23's superiority, numerosity, and commonality requirements.

reliance. *Pfizer v. Superior Court*, 45 Cal. Rptr. 3d 840, 852-853 (2006).[9]

Corrales' contention that the California Legal Remedies Act affords consumers each minimum damages of $1,000 (Corrales Opp. at 12) is patently false. That statute provides for minimum damages of $1,000 for the *entire class*, Cal. Civil Code § 1780, (providing "in no event shall the *total award of damages in a class action* be less than one thousand dollars ($1,000)." (Emphasis added.)

Were this case to be fully litigated in a trial setting, choice-of-law principles might very well play a role in deciding which state's laws apply to Gillette's alleged fraudulent conduct. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985) (holding that, where case had been litigated to final judgment, choice of Kansas law was arbitrary and unfair). However, where the class sought to be certified is for settlement purposes only, and standards of due process have been met, there is no need to apply the substantive laws of any particular state, for the parties have voluntarily agreed to forego the boundless uncertainties of litigation and proceed to settle contested claims. In fact, the case law relied upon by Corrales flies in the face of his arguments against this principle. *See* Corrales Br. at 12; *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 244 (2001) ("because the case was settling, protracted determinations of other states' laws were unnecessary") (citing *Dunk v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1806 (1996)).

Regardless of how favorable any particular state's consumer protection laws may be, the mere fact that greater relief may be available through protracted litigation does not mean that a settlement should not be approved, because settlements usually provide less than all the relief that could potentially be available to a given plaintiff. *See EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (citing *Freedman v. Air Line Stewards & Stewardesses Ass'n*, 730 F.2d 514–15 (7th Cir, 1984)); *see also Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("even the possibility that the

---

[9] This decision is currently on appeal before the California Supreme Court and is only being cited to illustrate the unsettled nature of California law.

class 'might have received more if the case had been fully litigated is no reason not to approve the settlement'") (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992)).

The predominance factor is satisfied in this case. As the United States Supreme Court has held, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem Prod's, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Plaintiffs' entire suit hinges on the allegedly fraudulent and misleading conduct engaged in by Gillette against consumers across the nation. The issue of whether Gillette's advertisements were false or misleading predominates this litigation.

With "settlement-only class certification, a district court need not inquire whether the case, if tried, would create intractable management problems . . . for the proposal is that there be no trial." *Id.* at 620. Nevertheless, given the commonality of the questions of fact and law afflicting all class members across the nation, such management problems would likely be few in any event.

As for typicality, "the focus is less on the strengths of the named and unnamed plaintiffs' case than on the similarity of the legal and remedial theories behind their claims. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 69 (D. Mass. 2005). Further, to establish such typicality, "[a] sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or practice and are based on the same legal theory." *Id.* Here, where the claims of all Class members are similarly analogous, and are all solely premised on the allegedly fraudulent conduct of Gillette, typicality has been met. Further, in response to Corrales' assertion that greater recoveries are available under California law as opposed to Massachusetts law (which, it bears noting, is not even being substantively applied to Plaintiffs' claims) even though Plaintiffs "may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared." *In re Lupron Mktg. and Sales Practices Litig.*, 228 F.R.D. 75, 89 (D. Mass. 2005).

- 11 -

Finally, the Representative Class Members adequately represent the Settlement Class. While Corrales purports to object to said adequacy, his lack of any support whatsoever for such a claim evidences that it is entirely devoid of any merit.

### 2.    Corrales Incorrectly Construes Legal Authority.

Corrales contends that this settlement should not be preliminarily approved on a nationwide basis because class actions are not allowed in Alabama or Virginia. This argument is a red herring.

It is black letter law that a Federal Court should apply the Federal Rules of Civil Procedure. "These rules govern the procedure in the United States district court in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty . . ." Fed R. Civ. P. 1. Thus, regardless of whether a particular state, such as Virginia, permits a class action under that state's rules of civil procedure, because the requirements of Rule 23 are met, this Court should certify a class. *See Pitt v. City of Portsmouth*, 221 F.R.D. 438 (E.D. Va. 2004) (certifying a class action); *Lutz v. Int'l Ass'n of Machinists and Aerospace Workers*, 196 F.R.D. 447 (E.D. Va. 2000) (holding that the requirements of class certification have been met).

While it is true that an Alabama plaintiff may not bring a class action under the state's Consumer Protection Act (ALA. CODE 1975 §8-19-10(f)), the act does allow for a private right of action. *See* ALA. CODE 1975 §8-19-10 (titled "Private Right of Action"). Class Members from Alabama are properly included in the proposed settlement because they are releasing, among other things, this private right of action. Additionally, Alabama plaintiffs can still bring class actions under any of the common law rights of action, or in Federal Court. *Avis Rent a Car Sys., Inc. v. Heilman*, 876 So. 2d 1111 (2003) (certifying an action as a class action under Alabama state law). Thus, the limitation is only a matter of procedure. Indeed, with the enactment of the Class Action Fairness Act of 2005 ("CAFA"), which applies to this case and provides federal district courts with original jurisdiction

over multi-state class actions, such as this one, it has become even easier for Alabama residents to become involved in class action litigation.

While Iowa's consumer protection statutes do not provide for a private right of action, class members from Iowa have private rights of action under the common law claims alleged in the Amended Consolidated Class Action Complaint. Those claims include negligent misrepresentation, intentional misrepresentation, breach of express warranty, breach of implied warranty, and unjust enrichment. Iowa consumers regularly bring and participate in class action lawsuits. *See, e.g., Combs v. Microsoft Corp.*, 696 N.W.2d 318 (Iowa 2005) (certifying a class action brought in Iowa by a "[g]roup of computer consumers"); IA. R. CIV. PROC. 1.261 (noting the requirements for a commencement of a class action under Iowa law). Indeed, Rule 23 does not require that parties all allege identical causes of action, especially when, as in this action, plaintiffs have alleged multiple grounds for recovery.

Altogether, the inapplicability of Corrales' argument is exemplified by the fact that Plaintiffs' counsel can find no national class action which excludes consumers from Virginia, Iowa, and Alabama from a settlement because of their state laws.

### 3.  Corrales' Proposition that Other Courts Have Been Willing to Account for the "Greater Rights" of Particular States Is Without Merit, or Legal Support, and Is Inapplicable to this Case

Corrales drastically misstates the law in asserting that settlement is not reasonable or adequate because it "fails to account and provide for the greater rights afforded by California law." Corrales Opp. at 14. In doing so, he twists the court's language from *In re Heritage Bond Litig.*, 02-6512, 2005 WL 1594403 (C.D. Cal. 2005) and *In re Oracle Secs. Litig.*, No. C-90-0931, 1994 WL 502054 (N.D. Cal. 1994), both of which, in reality, stand for the simple proposition that it is reasonable for a plan of allocation to reimburse class members based on either the extent of their injuries or the merit of their claim. *Heritage*, 2005 WL 1594403, at *11; *Oracle*, 1994 WL 502054, at *1. Neither of these cases

- 13 -

comes close to supporting the proposition that Plaintiffs from certain states should be afforded greater rights than those from others.

Additionally, Corrales alters the holding of *In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002), by contending that: 1) the court denied settlement approval in that action because the settlement failed to allot for the strength of the class members claims under California law; and 2) that the case supports the proposition that courts should account for the "greater rights" afforded by California law. Corrales Opp. at 14. These contentions are both patently incorrect. In *Bankamerica*, the court refused to approve the proposed settlement because it arbitrarily failed to provide any recovery to certain claimants which the plaintiffs admitted had strong claims, on the basis that they had held their stock past a certain date. *Bankamerica*, 210 F.R.D. at 712. Additionally, all plaintiffs in *Bankamerica* brought claims under California's Corporations Code, thus, the court was not accounting for the greater rights afforded by California law as Corrales suggests. Rather, in stating that "any proposed settlement must reflect both the strength of [the class members'] claims under California law . . . and the strength of their 10(b) and 10b-5 claims," the court was simply reiterating the premise that the settlement must reflect the strength of all plaintiffs' claims with respect to all causes of action, and that all class members with strong claims must be compensated. Thus, Corrales has misstated the law, as no case he relies upon holds that a nationwide settlement must provide greater rights for any particular state.

**F.    The Strong Support for the Settlement Justifies Preliminary Approval.**

One of the purposes of notifying the class of a proposed class action settlement is to determine the class members' reaction to the settlement. *See In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 107 (D.R.I. 1996) (approving settlement as "fair, reasonable, and adequate" due in part to "the insignificant number of objections to the proposed settlement"); *Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 40 (D. Puerto Rico 1993) (an "indication of the fairness of a class action settlement is the lack of, or small number of, objections"). It is that information that addresses and responds to the second *Grinnell*

- 14 -

factor. It is now clear that the overwhelming majority of plaintiffs and their attorneys in this case support the proposed settlement.

It appears that there are 34 named plaintiffs in the 23 cases before the Court in this MDL proceeding. Attorneys in each pending case were sent copies of the Settlement Agreement. Their clients were given the opportunity to join in the settlement. Of the member cases believed to be pending in the MDL proceeding, 18 cases (which includes 28 named plaintiffs and their attorneys) have joined the settlement. All of the Plaintiffs' Steering Committee members, and their clients, have joined in the Settlement Agreement. *See* Exhibit 3. Only the plaintiffs represented by the Kick Law Firm, Kanner and Whiteley, and the Hewell Law Firm have not.[10] All known California named plaintiffs, other than the two California citizens (Adoure and Coralles) represented by Messrs. Kick and Kanner and the one (Gonzales) represented by Mr. Hewell, have endorsed it. Those are Mr. Matthew Marr, represented by the Law Offices of Lionel Z. Glancy, Mr. David Atkins, represented by Milstein, Adelman & Kreger, Mr. David Lipper, represented by the firm of Kalcheim Salah, and Mr. Michael Pruitt, represented by Plaintiffs' Steering Committee member C. Donald Amamgbo, each of whom has expressly joined in the settlement. *Id.*. The plaintiff in the sole pending Canadian action, and his counsel, have also endorsed and joined in the settlement. *See* Settlement Agreement at ¶9.5.

This represents a very strong endorsement of the settlement by known members of the class, as well as the many experienced lawyers who represent them.

**G.    The Requested Attorney's Fees Are Reasonable.**

    **1.    Fees Should Be Awarded as a Percentage of the Fund.**

Courts have long recognized that when a party maintains a suit that results in the creation of a fund for the benefit of a class, the costs of the litigation, including an award of reasonable attorneys'

---

[10] That position stands against their group's Plaintiff Steering Committee member's position, and against that of the other California named plaintiffs.

fees, should be recovered from the fund created by the litigation. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995).

Since *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), when the Supreme Court observed that in common fund cases "a reasonable fee is based on a percentage of the fund bestowed on the class," courts in the First Circuit have followed the trend in favor of awarding attorneys' fees from a common fund on a percentage of the fund (or "POF") basis. *See Thirteen Appeals*, 56 F.3d at 307; *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997).[11]

In *Thirteen Appeals*, 56 F.3d at 307, the Court affirmed a fee award of 31% of a $220 million common fund, holding that "use of the POF method in common fund cases is the prevailing praxis" based upon the "distinct advantages that the POF method can bring to bear in such cases." The *Thirteen Appeals* Court stressed that the POF method is far less burdensome to administer than the lodestar method in that it does not "forc[e] the judge to review the time records of a multitude of attorneys in order to determine the necessity and reasonableness of every hour expended," and in that it "lessens the possibility of collateral disputes that might transform the fee proceeding into a second major litigation." *Id.* The *Thirteen Appeals* Court also noted that, unlike the lodestar method, the POF method does not create "a monetary incentive to spend as many hours as possible" on the case, or conversely, a "disincentive to early settlement," thereby more closely aligning plaintiffs' counsel's interests with the interests of the class. *Id.* Finally, because the POF method is "result-oriented rather than process-

---

[11] Nine other Circuits have also endorsed or required the POF method for awarding counsel fees. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *Gottlieb v. Barry*, 43 F.3d 474, 484 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993); *In re Cont'l. Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992); *Camden I Condo. Ass'n. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

- 16 -

oriented," the *Thirteen Appeals* Court noted that the POF method "better approximates the workings of the marketplace." *Id.*

### 2.    The Requested Fee is a Fair and Reasonable Percentage and is Consistent with Fee Awards in this District

In selecting an appropriate percentage award, both the United States Supreme Court and the First Circuit have recognized that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989); *Thirteen Appeals*, 56 F.3d at 307. The ordinary contingency fee arrangement is for one-third of the recovery. *See Furtado v. Bishop*, 635 F.2d 915, 917 (1st Cir. 1980).

The requested fee and expense award of $1,850,000, is 25% of the $7,500,000 settlement. It represents just 20% of the total amount being paid by Gillette – $9,350,000.[12] This percentage compares favorably with recent attorneys' fee awards in other class actions in this district. *See, e.g., Swack v. Credit Suisse First Boston*, C.A. No. 02-11943-DPW (July 26, 2006) (33%); *Ahearn v. Credit Suisse First Boston LLC*, C.A. No. 03-10956 JLT (June 7, 2006) (33%). The requested fee and expense award is eminently fair and reasonable. At a minimum, the settlement should be preliminarily approved to allow Class Members to provide their views on the fees if they so choose.

### 3.    The Proposed Fee is Reasonable in Relation to Counsels' Lodestar.

While the percentage method is the preferred method of awarding attorneys' fees in this Circuit, and the requested fee should be approved under that method, the fee request is also reasonable when

---

[12] $7,500,000 plus $1,850,000 equals $9,350,000. The court in *In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001), held that the most appropriate valuation of a common fund is to include the amount of attorneys' fees where the fees are borne by defendants and not plaintiffs. The court observed:

> Courts in other jurisdictions have recognized that in constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, that the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund.

2001 WL at *9 (citing *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996), and *In re General Motors Corp.*, 55 F.3d 768, 802 (3rd Cir. 1995)). Thus, it is appropriate to include the amount of fees paid by defendant in the total value of the settlement.

- 17 -

analyzed under the lodestar/multiplier method. To calculate attorneys' fees under the lodestar method, the Court must first determine the base amount of the fee, based on the number of hours counsel productively expended on the case at counsel's hourly rate. *See Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950-51 (1st Cir. 1984). After the basic lodestar figure is calculated, the court may consider whether an adjustment should be made in the form of a multiplier to reflect the contingent nature of any fee, the delay in payment, the quality of representation, and the results obtained. *See Id*. at 951.

Because this case has not yet been concluded, and Plaintiffs at this time are seeking preliminary approval of the proposed settlement and not a ruling on an application for fees, it is premature to decide what multiplier, if any, would be appropriate. In any event, the proposed fee would represent, at most, a multiplier that is reasonable in relation to other fee awards in this district.

The total lodestar for Settlement Class Counsel and Liaison Counsel alone is approximately $840,000 for work done to date. Exhibit 4. The total lodestar for all firms that have reported their time to lead counsel (including Settlement Class Counsel and Liaison Counsel) is in excess of $2,000,000.[13] *See* Exhibit 7 for summary of all counsel who have submitted their time. Settlement Class Counsel and Liaison Counsel have not fully reviewed the detail time records or evaluated for either completeness or finality the reasonableness of time submitted by other firms.[14] However, even taking into account the time and expenses of Settlement Class Counsel and Liaison Counsel alone, the proposed fee represents a multiplier of 2.2. Indeed, a much lower multiplier would result if even a fraction of other supporting

---

[13] Several firms have not submitted their time and expenses. Some firms have submitted only total time and expenses without furnishing detailed time records.

[14] Settlement Class Counsel sent letters to all known firms participating in this litigation asking that they provide "detailed time, cost and expense reports for work they believe was reasonably incurred in advancing the litigation." Total time received for firms (excluding Settlement Class Counsel and Liaison Counsel) who support this action is $1,105,200.58, and is listed in Exhibit 5. Total time, costs and expenses received from firms that do not support this settlement, The Kick Law Firm, APC, Kanner and Whiteley, L.L.C., and The Hewell Law Firm, is $697,159.16, $86,394.26 and $70,727.20, respectively, and is listed in Exhibit 6.

counsels' time is considered, and a negative multiplier in relation to the total time reported to date.[15] A

multiplier of 2.2 is reasonable in relation to numerous fees awarded in this district and elsewhere.[16]

### H.    The Requested Incentive Awards to Plaintiffs are Reasonable

Just as the "common fund" doctrine warrants an award of attorneys' fees from the fund created

for the benefit of the class as a whole, the representative party has provided a benefit to the Class and is

entitled to compensation for services out of the common fund.

In a recent case, Judge Stearns approved incentive awards, noting that such awards serve an

important function in promoting class actions.

> Incentive awards serve an important function in promoting class action settlements, particularly
> where, as here, the named plaintiffs participated actively in the litigation. *Denny v. Jenkins &*
> *Gilchrist*, 2005 WL 388562, at *31 (S.D.N.Y. Feb. 18, 2005). Courts "routinely approve
> incentive awards to compensate named plaintiffs for the service they provided and the risks they
> incurred during the course of the class action litigation." *In re Lorazepam & Clorazepate*
> *Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2000). "Because a named plaintiff is an essential
> ingredient of any class action, an incentive award can be appropriate to encourage or induce an
> individual to participate in the suit." *In re Compact Disc*, 292 F.Supp. 2d at 189

*In re Lupron Mktg. and Sales Practices Litig.*, No. 01-CV-10861-RGS, 2005 WL 2006833, at *7

(D. Mass. Aug. 17, 2005).

Accordingly, it is appropriate to approve the proposed settlement preliminarily and to authorize

a notice to class members that apprises them, among other things, that incentive awards for the

representative plaintiffs will be requested.[17]

---

[15] Co-lead counsel do not mean to suggest at this time that all or any particular portion of the lodestar reported by other firms should, or should not be, considered.

[16] *See, e.g., Ahearn v. Credit Suisse First Boston LLC*, No. 03-10956-JLT (D. Mass. June 7, 2006) (multiplier of 2.8); *In re Aspen Technology, Inc. Sec. Litig.*, No. 04-12375-JLT (D. Mass. Mar. 6, 2006) (multiplier of 6); *In re CVS Corp Sec. Litig.*, No. 01-11464-JLT (D. Mass. Sept. 7, 2005) (multiplier of 3.2); *In re Relafen Antitrust Litig.*, No. 01-12239-WGY, 2005 WL 2386119 at 28 (D. Mass. Sept. 28, 2005) (multiplier of 2.02); *In re Boston & Maine Corp.*, 778 F.2d 890, 894 (1st Cir. 1985) (multiplier of 6).

[17] Counsel are proposing incentive awards of up to $1000 for each representative plaintiff who was deposed, up to $750 for each other proposed class representative in the Consolidated Class Action Complaint, and up to $500 for each named plaintiff in any class complaint filed in this consolidated proceeding.

- 19 -

IV.    **CONCLUSION**

In conclusion, Representative Plaintiffs, individually and on behalf of the proposed Settlement

Class, pray that this Honorable Court enter an order:

(a)    provisionally granting class certification of a Settlement Class as requested herein;

(b)    appointing Ben Barnow and Robert M. Rothman as Settlement Class Counsel and appointing plaintiffs Mark Dearman, Anthony DeBiseglia, Matthew Marr, Adam Kline, Greg Besinger, Collin L. McGeary, Javier Tunon, and Jean-Sebastien Elie as Representative Plaintiffs;

(c)    preliminarily finding that the Settlement Agreement is fair, reasonable, and adequate, and in the best interest of the Class;

(d)    authorizing the Notice of class certification and preliminary approval of settlement to the Settlement Class in the manner set forth in the Settlement Agreement and in the forms attached as Exhibits D and E to the Settlement Agreement;

(e)    appointing Complete Claims Solutions, LLC, as the Claims Administrator;

(f)    setting a date for the Final Fairness Hearing to consider entry of a final order approving the Settlement Agreement and the request for attorneys' fees, costs, and expenses and incentive awards; and

(g)    granting such other and additional relief as the Court may deem just and appropriate.

DATED:  November 6, 2006                Respectfully submitted,

                                        BARNOW AND ASSOCIATES, P.C.
                                        BEN BARNOW


                                        _____/s/ Ben Barnow_____
                                        BEN BARNOW

                                        One North LaSalle Street
                                        Suite 4600
                                        Chicago, IL  60602
                                        Telephone:  312/621-2000

                                        LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN
                                        ROBERT M. ROTHMAN
                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        *Co-Lead Counsel*

- 20 -

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO (BBO #454680)
53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)

*Liaison Counsel*