**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
| | ) | (LEAD CASE) |
| M3POWER RAZOR SYSTEM | ) | |
| MARKETING & SALES PRACTICES | ) | MDL Docket No. 1704 |
| LITIGATION | ) | |
| _____) | | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| **ALL CASES** | ) | |
| _____) | | |

## DECLARATION OF G. JAMES STRENIO IN SUPPORT OF PLAINTIFF CARLOS CORRALES' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC., ET AL | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-05-cv-174 (JCH) |
| | : | |
| THE GILLETTE COMPANY | : | MAY 31, 2005 |
| Defendant | : | |

**RULING RE: MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 7],
MOTION FOR LEAVE TO AMEND [DKT. NO. 103], and
VARIOUS MOTIONS IN LIMINE [DKT. NOS. 104, 105, and 111]**

The plaintiff, Schick Manufacturing Company ("Schick"), seeks a preliminary injunction enjoining the defendant, The Gillette Company ("Gillette"), from making certain claims about its M3 Power razor system ("M3 Power"). Schick contends that Gillette has made various false claims in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

As a preliminary matter, Schick has filed a Motion for Leave to File and Amended Complaint [Dkt. No. 103]. Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The Second Circuit has held that "'considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend.'" Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2nd Cir. 1998) (quoting Barrows v. Forest Laboratories, 742 F.2d 54, 58 (2d Cir. 1984)). Having considered these factors, as well as the scope of Schick's proposed amendments, the court concludes that leave to amend is appropriate.

The court must also address three pending motions in limine. With regard to Plaintiff's Exhibits Nos. 111, 112, 131, the objections of Gillette are overruled. PX 131 is received for the limited purpose offered, to establish the date the Dutch action was filed. With regard to Schick's Motion in Limine to Exclude Untimely Expert Testimony [Dkt. No. 104], the Motion is denied, except with regard to the alternative relief sought. DX 124(d) and (e) are for identification only. They were received on that basis. The Motion is denied to the extent it seeks to strike them as demonstrative evidence. The Motion is also denied to the extent it seeks to strike Dr. Salinger's testimony. However, the court grants Schick's alternative request to file a supplemental Affidavit of Dr. Thornton, which the court has now reviewed. Finally, the Motion to exclude DX 133 and DX 134, Declarations of Dr. Grupen and Dr. Clarke, is denied. With regard to Schick's Motion in Limine to Exclude Third Declaration of Dr. Philpott, it is denied.

The standard regarding the grant of a prohibitory preliminary injunction in the Second Circuit is clear.[1] "To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004). If Schick proves that irreparable injury may result, the court will then consider the merits of Schick's claim.

The Lanham Act creates a cause of action against any person who,

---

[1] Gillette suggests the relief sought is a mandatory injunction; this court does not agree. Schick seeks to prohibit allegedly false advertising, not to mandate action by Gillette. See Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997) (an injunction is mandatory where "its terms would alter, rather than preserve, the status quo by commanding some positive act").

2

in connection with any goods or services, or any container for goods, uses
in commerce any word, term, name, symbol, or device, or any
combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which . . .
(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another
person's goods, services, or commercial activities

by "any person who believe he or she is or is likely to be damaged by such act." 15

U.S.C. § 1125(a).

In order to succeed on its false advertising claim, Schick must prove five

elements of this claim. Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d

226, 255 (D.Conn. 1998) (citing various treatises and cases). These are the following:

(1) The defendant has made a false or misleading statement of fact. The

statement must be (a) literally false as a factual matter or (b) likely to deceive or

confuse. S.C. Johnson & Son, Inc. v. Clorox Company, 241 F.3d 232, 238 (2d

Cir. 2001).

(2) The statement must result in actual deception or capacity for deception

"Where the advertising claim is shown to be literally false, the court may enjoin

the use of the claim without reference to the advertisement's impact on the

buying public." Id. (internal quotations omitted).

(3) The deception must be material. "[I]n addition to proving falsity, the plaintiff

must also show that the defendants misrepresented an inherent quality or

characteristic of the product." Id. (internal quotations omitted).

(4) Schick must demonstrate that it has been injured because of potential

decline in sales. Where parties are head-to-head competitors, the fact that the

defendant's advertising is misleading presumptively injures the plaintiff. Coca-

Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982)

(abrogated on other grounds by statute as noted in Johnson & Johnson v. GAC

Int'l, Inc., 862 F.2d 975, 979 (2d Cir.1988)).

    (5)  The advertised goods must travel in interstate commerce.

**FACTS**

    The court held a scheduling conference on the preliminary injunction motion on

March 2, 2005.  The court allowed the parties to conduct limited discovery prior to

conducting a hearing on Schick's motion for a preliminary injunction.  The hearing on

the motion was conducted over four days: April 12, 13, 22, and May 2, 2005.  During

the hearing, Schick called five witnesses: Adel Mekhail, Schick's Director of Marketing;

Peter M. Clay, Gillette's Vice-President for Premium Systems; Dr. David J. Leffell,

Professor of Dermatology; Christopher Kohler, Schick Research Technician; and John

Thornton, statistical consultant. Gillette also called five witnesses during the hearing:

Dr. Kevin L. Powell, Gillette's Director of the Advanced Technology Centre; Dr. Michael

A. Salinger, Professor of Economics; Peter M. Clay, Gillette's Vice-President for

Premium Systems; Dr. Ian Saker, Gillette Group Leader at the Advanced Technology

Centre and Dr. Michael P. Philpott, Professor of Cutaneous Biology.

    The men's systems razor and blade market is worth about $1.1 billion per year in

the United States.  Gillette holds about 90% of the dollar share of that market, while

Schick holds about 10%.  The parties are engaged in head-to-head competition and the

court credits testimony that growth in the razor systems market results not from volume

increases but "with the introduction of high price, new premium items." Hr'g Tr. 39:20-

21.

B
92

Schick launched its Quattro razor system in September of 2003 and expended many millions of dollars in marketing the product. Although Schick had projected $100 million in annual sales for the Quattro, its actual sales fell short by approximately $20 million. From May 2004 to December 2004, Quattro's market share fell from 21% of dollar sales to 13.9% of dollar sales.

Gillette launched the M3 Power in the United States on May 24, 2004. In preparation for that launch, it began advertising that product on May 17, 2004. The M3 Power is sold throughout the United States. The M3 Power includes a number of components including a handle, a cartridge, guard bar, a lubricating strip, three blades, and a battery-powered feature which causes the razor to oscillate. The market share of the M3 Power, launched in May 2004, was 42% of total dollar sales in December 2004.

Gillette's original advertising for the M3 Power centered on the claim that "micro-pulses raise hair up and away from skin," thus allowing a consumer to achieve a closer shave. This "hair-raising" or hair extension claim was advertised in various media, including the internet, television, print media, point of sale materials, and product packaging. For example, Gillette's website asserted that, in order to combat the problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses raise hair up and away from skin . . ." PX 2, Hr'g Tr. 33:25-34:22. Of Gillette's expenditures on advertising, 85% is spent on television advertising. At the time of the launch, the television advertising stated, "turn on the first micro-power shaving system from Gillette and turn on the amazing new power-glide blades. Micro-pulses raise the hair, so you shave closer in one power stroke." PX 14.2(C). The advertisement also included a 1.8 second-long animated dramatization of hairs growing. In the animated

5

B
93

cartoon, the oscillation produced by the M3 Power is shown as green waves moving over hairs. In response, the hairs shown extended in length in the direction of growth and changed angle towards a more vertical position.

The court notes that eight months passed between the launch of the M3 Power and the date Schick initiated the instant suit. Schick maintains that there are two factors that excuse this delay. First, Schick invested time in developing a stroke machine and test protocol that would allow it to test the M3 Power with some degree of confidence and effectiveness.[2] Specifically, the development of a machine that would deliver a stroke of consistent pressure to a test subject's face took time. Second, after completing its first tests of Gillette's claims that the M3 Power raises hair in October, Schick chose to pursue its claims in Germany. In November of 2004, Schick sued Gillette in Germany to enjoin it from making claims that the M3 Power raised hairs. In late December of 2004, the Hamburg Regional Court affirmed the lower court's order enjoining Gillette from making such claims in Germany.

While the court finds that it may have been possible to develop testing protocols in a quicker fashion, the court finds the M3 Power was a new product with a feature (the use of battery power) that had never before been present in wet shavers. The court finds the time Schick took to develop testing of and to test the M3 Power is excusable. The court has been presented with no evidence of bad faith or strategic maneuvering behind the timing of the instant lawsuit.

In late January of 2005, Gillette revised its television commercials for the M3

---

[2]The court also notes that time spent by Schick testing Gillette's "angle-change" claim, which claim Gillette abandoned in January of 2005.

B
99

Power in the United States. It chose to do so based on both the German litigation as well as conversations between the parties about Schick's discomfort with certain claims made in the advertising. The animated product demonstration in the television commercials was revised so that the hairs in the demonstration no longer changed angle, and some of the hairs are shown to remain static. The voice-over was changed to say, "Turn it on and micropulses raise the hair so the blades can shave closer." PX 14.10C. The product demonstration in the revised advertisements depicts the oscillations to lengthen many hairs significantly. The depiction in the revised advertisements of how much the hair lengthens--the magnitude of the extension--is not consistent with Gillette's own studies regarding the effect of micropulses on hair. The animated product demonstration depicts many hairs extending, in many instances, multiple times the original length. Gillette began broadcasting the revised television commercials on or about January 31, 2005. Schick provided credible evidence, however, that the prior version of the advertisement is still featured on the Internet and on product packaging.

Television advertisements aim to provide consumers a "reason to believe," that is, the reason consumers should buy the advertised product. Because of the expense of television advertising, companies have a very short period of time in which to create a "reason to believe" and are generally forced to pitch only the key qualities and characteristics of the product advertised.

Gillette conceded during the hearing that the M3 Power's oscillations do not cause hair to change angle on the face. Its original advertisements depicting such an angle change are both unsubstantiated and inaccurate. Gillette also concedes that the

B
95

animated portion of its television advertisement is not physiologically exact insofar as the hairs and skin do not appear as they would at such a level of magnification and the hair extension effect is "somewhat exaggerated." Gillette Co.'s Prop. Findings of Fact [Dkt. No. 114] ¶ 33. The court finds that the hair "extension" in the commercial is greatly exaggerated. Gillette does contend, however, that the M3 Power's oscillations cause beard hairs to be raised out of the skin. Gillette contends that the animated product demonstration showing hair extension in its revised commercials is predicated on its testing showing that oscillations cause "trapped" facial hairs to lengthen from the follicle so that more of these hairs' length is exposed. Gillette propounds two alternative physiological bases for its "hair extension" theory. First, Gillette hypothesizes that a facial hair becomes "bound" within the follicle due to an accumulation of sebum and corneocytes (dead skin cells). Gillette contends that the oscillations could free such a "bound" hair. Second, Gillette hypothesizes that hairs may deviate from their normal paths in the follicle and become "trapped" outside the path until vibrations from the M3 Power restore them to their proper path.

Schick's expert witness, Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine, testified that, based on his clinical and dermatological expertise, he is aware of no scientific basis for the claim that the oscillations of the M3 Power would result in hair extension, as Gillette contends. Dr. Leffell stated that Gillette's "hair extension" theory is inconsistent with his 20 years of experience in dermatology. He testified that he has never seen a hair trapped in a sub-clinical manner, as hypothesized by Gillette. Dr. Leffell testified that, in certain circumstances, trapped hairs will result in clinical symptoms, such as infection or

inflammation. With respect to Gillette's hypothesis that the interaction between sebum and corneocytes trap hairs, however, Dr. Leffell stated, and the court credits, that in non-clinical circumstances, sebum and corneocytes do not accumulate sufficiently to inhibit hair growth. Moreover, everyday activities such as washing or shaving remove accumulations of sebum and corneocytes.

Gillette's expert hair biologist, Dr. Michael Philpott, has studied hair biology for almost twenty years. He testified that, prior to his retention as an expert by Gillette, he had never seen a hair trapped in the manner posited by Gillette. Only after being retained by Gillette did Dr. Philpott first claim to have encountered this hair extension theory. Dr. Philpott acknowledged that neither of Gillette's two hypothesis of hair extension have any support in medical or scientific literature. With regard to Gillette's theory that hair could become bound in the follicle by sebum and corneocytes, Dr. Philpott admitted that no evidence supports that theory. Dr. Leffell testified that erector pili muscles, which cause hairs to stand up in response to various stimuli, as is commonly seen in the case of goosebumps, may also provide a biologicial mechanism for hair extension. Neither Dr. Leffell nor Dr. Philpott, however, testified on the relationship between the application of mechanical energy and the erector pili muscles, and neither party has contended that these muscles play a role in Gillette's hair extension theory.

In addition to positing biological mechanisms that might support the claim that the M3 Power's oscillations raise hairs, Gillette introduced evidence of experiments and testing to support those claims. Gillette provided summaries of said testing which were not prepared contemporaneously with the testing, conducted in the early 1990's, they

9

B
97

purport to memorialize.  Instead, they were prepared in anticipation of litigation in late 2004.

Gillette performed experiments using oscillating razors in 1990, 1991 and 2003. In 1990 and 1991, Gillette performed studies using prototype oscillating razor handles fitted with razor systems other than the M3 Power, the Atra Plus and Sensor razor cartridge, two other Gillette products.  In each of these initial experiments, a circle was drawn on a test subject's face.  Twenty beard hairs within the circled region were measured with an imaging stereomicroscope manufactured by the Leica Company. That instrument measures hairs three-dimensionally to a resolution of three to four microns.  The test subject then stroked the area using an oscillating razor with blunted blades.  Then, twenty beard hairs within the circled region were again measured with a stereomicroscope.  The same protocol was followed using a non-oscillating razor with blunted blades, and the changes in hair measurement were compared.

The Atra Plus study was performed in 1990 and included 10 test subjects.  The study results show that the panelists' average hair length increased by 83.3 microns after five strokes with the oscillating razor versus 6.3 microns with the non-oscillating razor.  The Sensor study was performed from 1990 to 1991 and also involved 10 test subjects.  The subjects' mean hair length increased by 27.9 microns versus 12.9 microns with the non-oscillating razor.  While both tests provided some evidence of a hair extension effect and the magnitude of that effect, neither test indicated what percentage of hairs were lengthened.

Notably, while Gillette found that use of both the oscillating Atra Plus and Sensor razors resulted in an increase in beard hair length, there was significant difference

10

between the average increase caused by the Atra Plus and that caused by the Sensor. Furthermore, no evidence was presented to the court regarding similarities or differences between the M3 Power razor and the Atra Plus or Sensor. The sample size, ten test subjects per study, was small. The twenty beard hairs measured prior to stroking were not necessarily the same hairs measured after stroking. The test included no efforts to keep constant the variables of pressure on the razor or speed of the shaving stroke. In addition, Gillette's chief scientist, Kevin Powell, testified that the pressure or load applied by consumers co-varies to a statistically significant degree with whether a razor oscillates. All these deficiencies cause this court not to credit the studies' finding that oscillations cause hair lengthening.[3]

In 2003, Gillette performed a study using a prototype of the M3 Power. In the fall of 2003, Gillette tested a Mach 3 cartridge fitted with an oscillating handle. That prototype was called the "Swan." The Swan prototype's motor, handle, and cartridge differ from those features of the actually-marketed M3 Power. Four test subjects were used.[4] The test protocol was identical to that used in 1990 and 1991 except that, instead of using blunted blades, Gillette removed the blades from the razor. The study results suggest that the oscillating-Swan-prototype produced an average increase in hair length of between 32 and 40 microns while the non-oscillating prototype yielded no

---

[3]In Gillette's testing, no effort was made to control for variables, such as pressure on, or speed of, the razor. Failure to control for variable makes Gillette's "results" unscientific and not supportive of any conclusion.

[4]The sample size of four was chosen because the 2003 study, according to Gillette, was merely "confirmatory." Because the court finds the earlier tests deficient, the 2003 study cannot be "confirmatory."

11

average increase. That 32 to 40 micron increase represented an average of eight to

ten percent increase in hair length. The test does not indicate what percentage of hairs

experience any lengthening as a result of oscillations. The court does not credit Dr.

Powell's opinion that the differences between the model used in the test and the

marketed product has no impact on the testing. Failure to use the marketed product is

critical. The court cites the varied results Gillette reports between the Atra Plus,

Sensor, and "Swan" tests as only one reason to conclude that failure to use the market

product undercuts the 2003 testing. Further, the test protocol and sample size cause

the court to question the validity of these study findings.

In addition to testing oscillating battery-powered razors, Gillette conducted what

has been called the Microwatcher study. The Microwatcher is a commercially available

product consisting of a miniature camera with an illumination system that channels light

into an orifice at the tip of a transparent hemispherical dome. The device allows the

user to impart mechanical energy into the top and underlying layers of the skin, which,

according to Gillette, replicates the mechanical energy imparted by the oscillating

razor.[5] The recorded video images introduced into evidence show individual hairs

releasing from just below the skin surface. Gillette did not introduce evidence to

describe what the various elements of the photo were. When asked by the court to

identify the various elements appearing in the video were, Dr. Philpott could not identify

---

[5]Despite conducting the study on eighteen subjects, Gillette submitted only three short
video clips and does not indicate that they are representative of the study results. Further,
there is no indication of the length of the manipulation, the amount of pressure applied, or
shave preparation. Without more information, the study cannot support the conclusion that the
M3 Power extends hair.

B
100

or explain important skin features.  For example, the court pointed to an area

surrounding the individual hair, of darker hue than the rest of the skin, on the video, but

Dr. Philpott could not explain what that area was or what might explain its coloration.

The court further finds that Gillette provides no evidence to suggest the relationship

between the amount of mechanical energy imparted by the Microwatcher and that

imparted by the M3 Power.

Schick performed its own study which it contends proves the falsity of Gillette's

advertising with respect to claims regarding hair extension.[6]  Schick's study took place

over three days and included 37 test subjects.  With respect to each test subject, twenty

hairs were measured before and after strokes with an M3 Power razor with blunted

blades in both the power-on and power-off modes.  The strokes were taken using an

automated shaving device developed specially by Schick for the purposes of testing the

M3 Power razor and Gillette's claims with respect to it.  Images of the hairs were taken

before and after the razor strokes using a camera with a plate that flattened hair onto

the face.  The images were then downloaded to a computer and hair lengths were

assessed using ImagePro software.  An independent statistician evaluated the data for

all three days.  Schick argues that its data indicates that there was no statistically

significant difference between the change in hair length with power off and the change

in hair length with power on.

Again, however, the court finds the test protocol lacking and results

questionable.  Schick's testing shows that some hairs shrunk even in the absence of

_____

[6]Schick first performed tests to determine whether the M3 Power changes the angle of
beard hairs.

13

$\mathcal{B}$

101

the use of water, which Gillette's testing has found to result in hair shrinkage. Schick's expert testified that this may have been the result of measurement error, and the court agrees.[7] Furthermore, Gillette provided expert testimony that the glass plate used to flatten hairs so that they could be measured would likely result in distortion, making it difficult to accurately measure hair lengths. Such flaws in Schick's testing cause the court to be skeptical of Schick's test results and the suggestion that these results demonstrate that the M3 Power does not cause hairs to extend.

The flaws in testing conducted by both parties prevent the court from concluding whether, as a matter of fact, the M3 Power raises beard hairs.

## II.    ANALYSIS

### A.    Irreparable Harm

Schick argues that the M3 Power advertising is causing it irreparable harm. Sales of its premiere razor, the Quattro, have decreased precipitously since Gillette's release of the M3 Power. It is far from clear that all of the decline in Quattro sales is attributable to the allegedly false statements made in the course of M3 Power advertising. It is this difficulty, however, in determining what portion of the decline is so attributable that makes Schick's harm irreparable. "It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement. Too many market variables enter into the advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is

---

[7]It may also result from the application of a glass plate meant to flatten the hairs so that they could be measured in two dimensions.

attributable to factors other than a competitor's false advertising." Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982).

Gillette argues that Schick's delay in seeking relief, as a factual matter, militates against a finding of irreparable harm. "Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief." Tom Doherty, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995) (considering delay in seeking preliminary injunction in the context of a contract dispute). Depending on the facts of a particular case, delay may be relevant for other purposes as well. Id. In a trademark case, where a "high probability of confusion" normally gives rise to a presumption of irreparable harm for the purposes of obtaining a preliminary injunction, that presumption is "inoperative if the plaintiff has delayed either bringing suit or in moving for preliminary injunctive relief." Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 967-68 (2d Cir. 1995). It is important to remember, however, that a finding of irreparable harm may still be made on the basis of other relevant factors; the inexcusable delay affects only the presumption of irreparable harm. Id. at 969. In the instant context, the court considers delay as one of several factors to be considered in determining whether Schick has established irreparable harm.

There is no presumption of irreparable harm in this case as such a presumption arises in the false advertising context only when the challenged advertising mentions a competitor by name. Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992). Furthermore, in the instant case, the reasons for Schick's delay ought to guide the court's consideration of whether that delay is probative with respect to the question of irreparable harm. In the trademark context, a delay is excused where "the plaintiff

15

does not know how severe the [trademark] infringement is" or where it is caused by a plaintiff's "good faith efforts to investigate an infringement." Id. A delay is inexcusable where a party was aware of the action it now wishes to enjoin, but the delay evidences that the party determined that the action did not violate its rights. Tom Doherty, Inc., 60 F.3d at 39.

Schick provides two excuses for the time lag between the initial airing of the allegedly-false Gillette advertising. The first is that it needed time to subject the claims made in the contested advertising to scientific testing. While the advertising began to air publicly in late May 2004, Schick did not complete its testing until October 2004. While the testing could have proceeded more quickly, see supra at 5, there are reasons the testing took five months and that period, to the extent that it is deemed "delay," is excused. Schick was engaged in a good faith investigation of its competitor's claims.

The second excuse for delay involves the three month period after Schick's initial testing had been completed. Schick claims that the expense of pursuing litigation in a United States forum led it to test Gillette's claims in other fora in November 2004, before initiating the instant lawsuit. Therefore, upon completing its testing, it initiated lawsuits abroad, prior to initiating the instant suit in late January 2005. Schick argues that its attempts to resolve the issue in alternative fora excuse its delay. The cases it cites, however, either address delay in the context of patent litigation, Whistler Corp. v. Dynascan Corp., 1988 WL 142216, *2 (N.D.Ill. Dec. 28, 1988) (excusing period of delay where plaintiff in patent infringement suit first "adjudicated another lawsuit that would establish a reasonable likelihood of success on the issue of infringement in the pending case"); Amicus, Inc. v. Post-Tension of Texas, Inc., 686 F.Supp. 583, 589 (S.D. Tex.

16

1987) (same), or address arbitration or settlement attempts, not forum-shopping in foreign jurisdictions, see Millennium Imp. Co. v. Sidney Frank Importing Co., 2004 USDistLexis 11871, *33-*34 (Jun. 11, 2004) (refusing to find that delay barred preliminary injunction of false advertising where parties had pursued alternative dispute resolution before the National Advertising Division of the Council of Better Business Bureaus prior to plaintiff filing suit); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F.Supp.2d 351 (D.N.J. 2000) (finding of irreparable harm in false advertising context not undermined by seven month-delay where plaintiff "notified J & J of its objections, promptly challenged the advertisements with the major networks, obtained the results of [a consumer survey]," and shortly thereafter initiated litigation); Tonka Corp. v. Rose Art Industries, Inc., 836 F.Supp. 200, 219 (D.N.J. 1983) (alleged delay did not support an acquiescence defense where plaintiff had filed an objection to defendant's trademark registration). The process of alternative dispute resolution of a false advertising claim is distinguishable from bringing litigation in a foreign jurisdiction. The parties could not have resolved, in Germany or Australia, a dispute regarding advertising within the United States. The cases that allow pursuit of remedies (through alternative dispute mechanisms) to constitute excusable delay do so because such mechanisms may have, with less expense and consumption of time, achieved a remedy substantially similar to that sought in court, an injunction. The same is not true of Schick's legal actions in foreign jurisdictions, which, even if successful, had no effect on Schick's legal rights in the United States.

Schick argues that the case law on delay is motivated by the need to notice

parties that a claim for false advertising may lie against them. This purpose, according to Schick, was served by the German litigation as well as non-judicial interactions between the parties prior to initiation of any litigation. However, Schick misunderstands the import of inexcusable delay in the context of an application for a preliminary injunction. As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering. The litigation in Germany and Australia had no legal effect on advertising in the United States and, for the purposes of the instant lawsuit, it is advertising in the United States that, according to Schick, is causing it to suffer irreparable harm.

The court concludes that the three months during which Schick pursued foreign litigation is not inexcusable. See Tom Doherty, Inc., 60 F.3d at 39. Clearly Schick did not think Gillette's advertisements were not violating Schick's rights.

The court, therefore, considers Schick's delay in seeking relief alongside other evidence going to the factual question of irreparable injury. The court concludes that Schick's initiation of testing in May 2004 suggests that Schick believed it was being harmed from the day the M3 Power was launched. The severe decline in Quattro sales supports a finding of harm as does the fact that the parties are head-to-head competitors. Furthermore, the difficulty of determining what percentage of sales is attributable to Gillette's allegedly false advertising, and, therefore, the difficulty of accurately determining what monetary damages will compensate Schick for its harm, support a finding that any such harm is, indeed, irreparable.

**B.    False Advertising**

18

B
106

**1. Literal Falsity.** "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). "A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement." Castrol, Inc., 977 F.2d at 63. The Second Circuit has found that where an advertisement alleges that tests have established a product's superiority, a plaintiff must demonstrate that the tests or studies did not prove such superiority. "[A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior." Id. In addition, "[i]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden." Id.

Where, however, as here, the accused advertising does not allege that tests or clinical studies have proven a particular fact, the plaintiff's burden to come forward with affirmative evidence of falsity is qualitatively different. "To prove that an advertising claim is literally false, a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." Mc-Neil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991). The plaintiff must prove falsity by a preponderance of the evidence, either using its own scientific testing or that of the defendant. If a plaintiff is to prevail by relying on the defendant's own studies, it cannot do so simply by criticizing the defendant's studies. It must prove either that "such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made" or that the defendant's studies establish that the

B
107

defendant's claims are false. Id. at 1549-50.

The challenged advertising consists of two basic components: an animated representation of the effect of the M3 Power razor on hair and skin and a voice-over that describes that effect. The animation, which lasts approximately 1.8 seconds, shows many hairs growing at a significant rate, many by as much as four times the original length. During the animation, the voice-over states the following: "Turn it on and micropulses raise the hair so the blades can shave closer." Schick asserts that this M3 Power advertising is false in three ways: first, it asserts the razor changes the angle of beard hairs; second, it portrays a false amount of extension; and third, it asserts that the razor raises or extends the beard hair.

With regard to the first claim of falsity, if the voiceover means that the razor changes the angle of hairs on the face, the claim is false. Although Gillette removed the "angle changing" claim from its television advertisements, it is unclear whether it has completely removed all material asserting this angle-change claim. The court concludes that the current advertising claim of "raising" hair does not unambiguously mean to changes angles.[8] See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 298 F.3d 578, 587 (3d Cir. 2002) ("only an unambiguous message can be literally false"). Thus, the revised advertising is not literally false on this basis.

With regard to the second asserted basis of falsity, the animation, Gillette concedes that the animation exaggerates the effect that the razor's vibration has on

---

[8]It is the words "up and away" when combined with "raises" that suggest both extension and angle change.

20

hair. Its own tests show hairs extending approximately 10% on average, when the

animation shows a significantly greater extension. The animation is not even a

"reasonable approximation," which Gillette claims is the legal standard for non-falsity.

See Gillette's Prop. Conclusions of Law at ¶ 32, 37-38 [Dkt. No. 114]. Here, Schick can

point to Gillette's own studies to prove that the animation is false. See Mc-Neil-P.C.C.,

Inc., 938 F.2d at 1549.

Gillette argues that such exaggeration does not constitute falsity. However, case

law in this circuit indicates that a defendant cannot argue that a television

advertisement is "approximately" correct or, alternatively, simply a representation in

order to excuse a television ad or segment thereof that is literally false. S.C. Johnson &

Son, Inc., 241 F.3d at 239-40 (finding that depiction of leaking plastic bag was false

where rate at which bag leaked in advertisement was faster than rate tests indicated);

Coca-Cola Co., 690 F.2d at 318 (finding that advertisement that displaced fresh-

squeezed orange juice being poured into a Tropicana carton was false). Indeed, "[the

Court of Appeals has] explicitly looked to the visual images in a commercial to assess

whether it is literally false." S.C. Johnson, 241 F.3d at 238.[9]

Gillette's argument that the animated portion of its advertisement need not be

exact is wrong as a matter of law. Clearly, a cartoon will not exactly depict a real-life

situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug.

However, a party may not distort an inherent quality of its product in either graphics or

---

[9] At least one other circuit has held that picture depictions can constitute false advertising. Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002) (finding that while ambiguous graphic on packaging did not constitute literally false advertising, an unambiguous graphic could do so).

21

3
104

animation.  Gillette acknowledges that the magnitude of beard hair extension in the animation is false.  The court finds, therefore, that any claims with respect to changes in angle and the animated portion of Gillette's current advertisement are literally false.

The court does not make such a finding with respect to Schick's third falsity ground, Gillette's hair extension theory generally.  Gillette claims that the razor's vibrations raise some hairs trapped under the skin to come out of the skin.  While its own studies are insufficient to establish the truth of this claim, the burden is on Schick to prove falsity.  Neither Schick's nor Gillette's testing can support a finding of falsity.

While there can be no finding of literal falsity with respect to Gillette's hair extension claim at this stage in the instant litigation, the court expresses doubt about that claim.  As described earlier, Gillette's own testing is suspect.  Furthermore, Schick introduced expert testimony and elicited evidence from Gillette's expert regarding the lack of scientific foundation for any biological mechanism that would explain the effect described by Gillette in its advertising.  Gillette's own expert, Dr. Philpott, testified that no scientific foundation exists to support Gillette's hypothesis that beard hairs might be trapped under the skin by sebum and corneocytes and that the application of mechanical energy might release such hairs.  While Dr. Philpott put forward another hypothesis--that a hair's curliness might cause it to be trapped--he also conceded that, prior to his engagement as an expert on Gillette's behalf, in twenty years of studying hair, he had never come across such a phenomenon.  The court credits the testimony of Schick's expert, Dr. Leffell, that while certain clinical conditions are characterized by hairs trapped under the surface of the skin, there is no such non-clinical phenomenon.

Nevertheless, putting forth credible evidence that there is no known biological

22

mechanism to support Gillette's contention that the M3Power raises hairs is insufficient

to meet Schick's burden. Such evidence is not affirmative evidence of falsity. Further,

while Schick successfully attacked Gillette's testing, that attack did not result in

evidence of falsity. Unlike in McNeil, here Gillette's own tests do not prove hair

extension does not occur. Schick merely proved that Gillette's testing is inadequate to

prove it does occur.

> 2. **Actual Deception.** Schick need not prove actual deception if Gilette's
advertising is determined to be literally false. Mc-Neil-P.C.C., Inc., 938 F.2d at 1549
("Where the advertising claim is shown to be literally false, the court may enjoin the use
of the claim without reference to the advertisement's impact on the buying public."
(internal quotation marks and citations omitted)). Because the court finds that claims
regarding angle change and the magnitude and frequency of hair extension portrayed in
the animated portion of Gillette's television advertisement are both literally false, it
presumes that these claims result in actual deception.

> 3. **Materiality.** "It is also well-settled that, in addition to proving falsity,
the plaintiff must also show that the defendants misrepresented an inherent quality or
characteristic of the product. This requirement is essentially one of materiality, a term
explicitly used in other circuits." S.C. Johnson & Son, Inc., 241 F.3d at 238 (internal
quotation marks and citations omitted). In determining that certain allegedly false
statements were not material, the Second Circuit considered the relevance of the
statements and the fact that "[t]he inaccuracy in the statements would not influence
customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

B
ι ι ι

It is clear that whether the M3 Power raises hairs is material. Gillette's employees testified that television advertising time is too valuable to include things that are "unimportant". Furthermore, in this case, hair extension is the "reason to believe" that the M3 Power is a worthwhile product. The magnitude and frequency of that effect are also, therefore, material. Whether a material element of a product's performance happens very often and how often that element happens are, in themselves, material.

**4. Injury.** The court finds that, in light of the advertisement's literal falsity, the fact that the parties are head-to-head competitors, and recent declines in the sale of Schick's premiere wet shave system injury will be presumed. Coca-Cola Co., 690 F.2d at 316-317. While Schick has not submitted consumer surveys or market research, the fact that the parties are head-to-head competitors supports an inference of causation.

**5. Interstate Commerce.** The parties do not dispute that this element of the claim has been established.

Accordingly, the court finds that Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false. The court finds that Schick has failed to establish a likelihood of success, or even serious questions going to the merits, on the claim of hair "extension."

**BOND**

Gillette has requested a bond of $49,579,248. It contends that this amount represents estimated lost profits on future M3 Power sales, over a twelve-month period, if later found to have been wrongfully enjoined. Schick submits that a bond of $50,000

24

B
112

to $100,000 is appropriate.

Gillette's calculations assume a precipitous drop in sales as a result of a mandate to correct two admitted falsities in its advertisement.[10] The court is skeptical that this calculation represents an appropriate bond amount.[11] Instead, the court imposes a bond of $200,000 on Schick. Absent a record created by Gillette, the court concludes this amount, generally in the range for false advertising cases, is sufficient to protect Gillette. Gillette may move to increase the bond amount upon a showing of likely injury.

**CONCLUSION**

For the reasons stated above the Motion for Preliminary Injunction [Dkt. No. 7] is GRANTED in part and DENIED in part. The injunction is entered as stated in the accompanying order. Schick's Motion for Leave to Amend [Dkt. No. 103] is GRANTED.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[10]While Gillette contends that the animated portion of its advertisement is not literally false as a matter of law, it has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect.

[11]Does it claim that it cannot sell one M3 Power razor without making false claims regarding angle change or the magnitude of hair extension? When it ceased television and print advertising with the "angle change," did its sales drop precipitously?

25

B
113

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *

IN RE:

    MP3 POWER RAZOR SYSTEM

    MARKETING & SALES PRACTICES

    LITIGATION                 CA-05-11177-DPW


* * * * * * * * * * * * * * * *


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

UNITED STATES DISTRICT COURT JUDGE

SETTLEMENT CONFERENCE

OCTOBER 18, 2006


APPEARANCES:

        THOMAS G. SHAPIRO, ESQ., Shapiro, Haber & Urmy,LLP,
        53 State Street, Boston, Massachusetts  02109, on
        behalf of Mark Dearman, Anthony Debiseglia,

        ALAN L. KOVACS, ESQ., 2001 Beacon Street, Suite 105,
        Boston, Massachusetts  02135, on behalf of Plaintiffs

        G. JAMES STRENIO, ESQ., The Kick Law Firm, APC,
        660 South Figueroa Street, Suite 1800, Los Angeles,
        California  90017, on behalf of Kasem Adoure & Carlos
        Coralles, Plaintiffs

        ROBERT M. ROTHMAN, ESQ., Lerach, Coughlin, Stoia,
        Geller, Rudman, & Robbins, LLP, 58 South Service
        Road, Suite 200, Melville, New York  11747, on
        behalf of Plaintiffs

(APPEARANCES CONTINUED NEXT PAGE)

## Page 2

APPEARANCES (CON'D.):
ELLEN GUSIKOFF STEWART, ESQ., Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, 655 West Broadway, Suite 1900, San Diego, California 92101-3301, on behalf of Plaintiffs

BEN BARNOW, ESQ., Barnow & Associates, One North LaSalle Street, Suite 4600, Chicago, Illinois 60602, on behalf of Greg Besinger, Plaintiff

REGINALD VON TERRELL, ESQ., The Terrell Law Group, 223 25th Street, Richmond, California 94804, on behalf of Michael Pruitt, Plaintiff

LANCE A. HARKE, P.A., Harke & Clasby, LLP, 155 South Miami Avenue, Suite 600, Miami, Florida 33130, on behalf of Plaintiffs

HARVEY J. WOLKOFF, ESQ., MARK P. SZPAK, ESQ. AND EMILY C. SHANAHAN, ESQ., Ropes & Gray, One International Place, Boston, Massachusetts 02110, on behalf of Gillette Company, Defendant

Courtroom No. 1 - 3rd Floor
1 Courthouse Way
Boston, Massachusetts 02210
2:30 P.M. - 3:35 P.M.

Pamela R. Owens - Official Court Reporter
John Joseph Moakley District Courthouse
1 Courthouse Way - Suite 3200
Boston, Massachusetts 02210

## Page 3

THE COURT: Well, I have the motion for preliminary approval and I have got an opposition from Mr. Corrales. Is that the sum of materials that have been submitted both in support and in opposition?

MR. BARNOW: Ben Barnow on behalf of the plaintiffs. I'm sorry, Your Honor. I apologize. Ben Barnow on behalf of the plaintiffs. And I believe that's the case, Your Honor.

THE COURT: All right. What is the story with the Adoure plaintiff? Mr. Strenio, is it?

MR. STRENIO: Yes. Thank you, Your Honor. We were waiting actually for the Court's ruling as to whether or not we would be able to proceed with the appeal. That was dependent and waiting on the Court's ruling on our motion for voluntary dismissal which to date we are not aware that the Court has --

THE COURT: No, I didn't because there was a request for a stay and there was no opposition to the stay, so I simply stayed everything. I haven't acted on it. So, is it your intention to proceed then with dismissal at this point?

MR. STRENIO: Yes, Your Honor. We had read the application for a stay to be a stay of the actual proceedings, not of the part of the case that was still proceeding, not with our portion of the matter which we were expecting the Court's ruling from for some time now.

THE COURT: Okay. So, as far as you're concerned,

## Page 4

you want out?

MR. STRENIO: Yes. With respect to Mr. Adoure, that's correct, Your Honor.

THE COURT: Okay. Now, are you here on behalf Mr. Corrales, also?

MR. STRENIO: Yes, Your Honor.

THE COURT: Okay. I guess -- I'm going to talk to Mr. Barnow for a minute. Mr. Barnow, I don't understand why I should be ruling on a preliminary approval when you still haven't done your confirmatory discovery.

MR. BARNOW: Your Honor, it's routine in a class action -- and I'm sure the Court is aware -- that one generally does do discovery in conjunction with the litigation in chief when we have as we set forth in our --

THE COURT: But what I have is what I would call a contingent motion for settlement in which you can withdraw your approval of the settlement if you're not satisfied by, I guess, November 6th. Isn't that what the settlement agreement provides?

MR. BARNOW: Yes, sir, it does. And --

THE COURT: So you're not sufficiently secure with that, that you want me to -- no holds barred, you want approval? What you want is approval of the right to withdraw your support with the approval that I'm supposed to give in response to your motion?

## Page 5

MR. BARNOW: Your Honor, what it generally is and the way I have done it in the past -- which of course doesn't mean this Court has to do that and I understand that and I respect that -- is because the nature of discovery in a litigated class action once you turn and work on the issue of resolution has a lot of informality in it. And, of course, the manuals all instruct that that is a proper course. And you necessarily believe in and believe the statements from officers of the court. We have no reason to doubt any of those. However, we did receive certain oral information. Some of it, we have thousands of pages from the other proceedings and then, of course, initial disclosures which were not oral. But for a better phraseology is the safeguard. And I put it in every case. That does not mean, however, nor has it ever meant that I come to this court or any other court with a half heart or a half mind regarding the settlement. It's --

THE COURT: But why shouldn't I wait until you've come to rest on this? There's 30 days that you say you need --

MR. BARNOW: Your Honor --

THE COURT: -- before you make that determination. I just don't understand why I should not wait to see whether or not what you do not foresee turns out to have been something that you should have foreseen or could have foreseen.

MR. BARNOW: Your Honor, I think it's not so much a case of what we did not foresee, but rather a verification of

Page 6

1  that which we have seen.
2      One of the reasons would be that, of course,
3  people have prepared and we are here. But it's the Court's
4  disposition and view of it all that matters most to every
5  lawyer in this room. I think that we have prepared
6  sufficiently.
7      I think another reason would be is that while it is
8  only a matter of a few weeks, if that, it does theoretically
9  slow down the process with regard to notice. I have no
10  reasonable belief -- I have no belief -- put it that way. I
11  have no belief that this settlement will --
12      THE COURT: So, are you prepared to strike that out
13  of the settlement agreement?
14      MR. BARNOW: No. Because first of all, I have a
15  commitment to Mr. Kick that the oral presentation, which we had
16  as part of our confirmatory discovery which has already
17  started, they are going to provide the written documentation
18  from that presentation. And I'm going to provide that to
19  Mr. Kick and others. We did relay the information orally to
20  all the Plaintiff Steering Committee members prior to the
21  signing of the Memorandum of Understanding. And of course,
22  it's all embodied in the settlement agreement. That was back
23  in, I believe, July.
24      But having said that, if there was any -- I guess I
25  would call it -- even outside risk or anything that rose to any

Page 7

1  kind of a single number of percentage, I would perhaps speak
2  differently. But it's so remote that I don't believe that the
3  interference with the potential progress of the publication
4  dates is worth waiting for.
5      THE COURT: Well, I guess I don't understand this
6  question of progress in quite the same way. I was asked, I
7  guess in July, to stay matters, which I did. And given the
8  series of dates that kept getting longer and longer, going on
9  longer and longer, I set a date for this hearing in reliance
10  upon representations that it was almost there. The materials
11  were received, as Mr. Corrales' counsel indicated, in a time
12  shorter than is customary for the approval for a motion hearing
13  and an opportunity to respond although I do have a more than
14  preliminary, but less than final response by Mr. Corrales.
15  And, so, I'm not sure why the parties, having waited, I should
16  hurry up.
17      MR. BARNOW: Your Honor, I don't mean to suggest
18  that. The Court's schedule is our schedule. What I guess I am
19  trying to say is that the plaintiffs' counsel feel they have
20  achieved what they need to achieve in order to get to this
21  point. The confirmatory discovery, I just have to be careful
22  of the kind of -- I don't know -- following of our previous
23  patents. It's something I've pretty much put in all my
24  settlements and it's something you do to button down the oral
25  representations. I never meant it to imply in either of those

Page 8

1  cases or this case that we don't feel that we have that
2  adequate documentation because we believe we do. As I stated,
3  that one presentation was oral. I did commit.
4      THE COURT: But the short of it is if you don't
5  want to strike this provision, that's fine. But I'm not going
6  to act on it until the time for the plaintiffs' counsel to back
7  away from this settlement has passed. It hasn't passed yet.
8  If this were not in a settlement, it would be different, I
9  suppose, although I'm still faced with the problem of
10  belated -- I shouldn't say belated, but out of sequence filing
11  that did not provide the customary amount of time that is
12  necessary. And this is, of course, an area in which there is
13  an obligation on the part of the Court to provide fairly
14  extensive scrutiny.
15      Certain of the suggestions made by Mr. Corrales'
16  counsel have some apparent force here. I want to have the
17  benefit of their fully developed views on this before I move on
18  to deciding whether or not to accept this in the sense of
19  providing preliminary approval.
20      So, let me then understand from Mr. Corrales'
21  counsel. What do you want in terms of timing?
22      MR. STRENIO: Your Honor, I think it would be
23  prudent in light of the Court's fiduciary obligations and in
24  light of our rights to a full briefing scheduling and an
25  opportunity to provide the Court with all the information that

Page 9

1  we can obtain. What we would like to see is also to receive
2  the quote, unquote, "confirmatory discovery" and then to be
3  able to assess it and frankly also to have additional time to
4  review and digest all of the subtleties of the settlement as
5  well as the contentions made in the moving papers. We are at
6  somewhat of a disadvantage, too, and the Court would be as well
7  in light of the lack of any evidence, supporting declarations
8  whatsoever in support of the motion other than simply a
9  declaration regarding the notes. We don't have information.
10      THE COURT: I asked what do you want.
11      MR. STRENIO: So we would request that the Court
12  continue the hearing on the pending motion for preliminary
13  approval until such time as --
14      THE COURT: I guess I should have said when, not
15  what.
16      MR. STRENIO: Well, as we understand it, their
17  right expires approximately November 5th or 10th. I'm not
18  sure. My memory doesn't serve me.
19      THE COURT: I think it's October 6th that it's
20  executed -- the as of date that it's executed. That would make
21  it --
22      MR. WOLKOFF: October 5th, Your Honor, I believe.
23      THE COURT: October 5th?
24      MR. WOLKOFF: Thirty days runs from October 5th.
25      MR. STRENIO: From October 6th.

Page 10

1    THE COURT: So the Monday is November 6th. That's
2  when the time period runs.
3    MR. STRENIO: Yes. So we would ask for time, a
4  week thereafter --
5    THE COURT: Okay.
6    MR. STRENIO: -- and reconvene here. And at that
7  time, we would be in a position having additional time.
8    THE COURT: Well, I want briefing on this --
9    MR. STRENIO: Yes, Your Honor.
10    THE COURT: -- a real briefing, not a stream of
11  consciousness briefing.
12    MR. STRENIO: Thank you, Your Honor.
13    THE COURT: So, what I will do is say that those
14  who wish to comment on the settlement proposal may do so with
15  full briefing by November 13: the proponents of the settlement
16  can file further memorandum by November 20: and we'll have
17  further hearing on the motion for preliminary approval on
18  November 29 at 2:30.
19    Now, is there an issue with respect to the filing
20  of the amended consolidated complaint? And I guess one of the
21  issues that I guess I have -- I just haven't had an opportunity
22  to review it. But it's a point made in the Corrales opposition
23  that Alabama and Virginia don't allow for class actions in this
24  context for these statutes that are alleged here and that Iowa
25  doesn't provide for a private cause of action. Mr. Barnow?

Page 11

1    MR. BARNOW: Your Honor, my view is that I'm
2  familiar with Virginia. I do not agree with the statement that
3  the other states do not have class actions available.
4    THE COURT: Does Virginia?
5    MR. BARNOW: Virginia, I believe, does not. The
6  last time I dealt with the AOL case, it did not.
7    THE COURT: So, how can you make a determination
8  with respect to fairness and reasonableness of a claim based on
9  a theory that doesn't permit class actions?
10    MR. BARNOW: Well, because the class action has to
11  do with the individual covered by the class action. And of
12  course, those people can sue here in Massachusetts where
13  Gillette is located. But importantly, each of those people
14  have individual rights. And the individual rights could still
15  be accessed by private litigation. I know of no class action
16  national settlement, not that that binds Your Honor. I'm not
17  saying it's specific authority here today that has carved out
18  Virginia or any other state for that reason. And I believe the
19  reason why is the fact that the individuals still have a cause
20  of action.
21    THE COURT: Well, but it's not asserted as an
22  individual cause of action.
23    MR. BARNOW: No, it is not, but they would be class
24  members.
25    THE COURT: Well, if they can't be class members

Page 12

1  under the Virginia statute, then I guess I have to think in
2  terms of whether or not I evaluate separately, at least to some
3  degree, the claims of the various sub-classes here, don't I?
4    MR. BARNOW: Your Honor, I don't think they rise to
5  the level of sub-classes. Every difference between a class
6  member or group of class members does not necessarily rise to
7  the level where --
8    THE COURT: Well, let's assume -- I take it neither
9  one of us is prepared finally to talk about Iowa, but I'm told
10  about Iowa.
11    MR. BARNOW: I could say something about Iowa,
12  Your Honor.
13    THE COURT: Okay. The problem of dealing specially
14  with Iowa -- and I'll put it in this context -- they say that
15  it doesn't allow a private cause of action. Now, someone who
16  doesn't have a private cause of action gets the same settlement
17  as someone who does have a private cause of action.
18    MR. BARNOW: Well, I think with the --
19    THE COURT: I don't know what -- you know, I don't
20  know how I can say that that's a fair balancing, except that
21  it's short money, anyway. But that's -- or I should say short
22  coupons, anyway.
23    MR. BARNOW: Refunds and rebates, Your Honor.
24  Well, first of all, I think what they do, if I recall, with
25  regard to certainly Iowa and I think Alabama -- but I'm not

Page 13

1  certain as I stand here -- is that they limit their comments to
2  a particular statute. But it doesn't mean that there are other
3  causes of action.
4    THE COURT: Well, but I started this by saying is
5  there any objection to my allowing the amended consolidated
6  complaint which, at least it is alleged in some particulars,
7  fails to state a cause of action. I mean, Gillette may be
8  happy to resolve all of these cases in this particular way, but
9  I see some potential issues that are raised by this.
10    The second issue that is raised, I don't know what
11  the answer is. Apparently, the view is that everything costs
12  more in California and, consequently, that sending back a
13  razor from California is a much more valuable commodity than,
14  say, sending back a razor from Massachusetts. Now whether
15  that's true or not, I don't really know. But if I'm supposed
16  to be evaluating the fairness of this resolution as a
17  nationwide resolution, if there are real disparities among the
18  claims of persons from various jurisdictions, I have some
19  issues, I suppose, I have to address.
20    MR. BARNOW: I don't disagree with that, Your
21  Honor. And I will tell you that our discovery to date has
22  looked at those. That's one of the reasons you see adjustments
23  with regard to the Canadian. We did not have that kind of
24  information available nor do we believe it was available
25  because we asked with regard to it.

Page 14

1    But back to these causes of action, I do know that
2 class actions are available in Iowa and I can tell you there's
3 a case coming up for trial on November 13th.
4    THE COURT: Consumer class actions under this
5 statute?
6    MR. BARNOW: Well, that's where I have to scratch
7 my noggin here, Judge. I apologize. It's Microsoft's civil
8 case where the issue was whether or not -- and it's not in the
9 case, but I know something about the area and I apologize for
10 my generalities. I think that originally Iowa was not
11 necessarily seen as an indirect purchaser state. And I may be
12 speaking incorrectly and I know I have to be --
13    THE COURT: Well, I guess both of us have
14 illustrated the value of looking a little bit more deeply at
15 this because it is a factor that I will take into
16 consideration. They raise it on horseback, but they have a
17 justification for doing that. That is that the time is too
18 short for them to comply, even with our ordinary rule, and this
19 is timely response. And this is a case or a setting in which
20 the Court has some more substantial responsibilities, I think,
21 of review. And, so, it's something that I guess I would like
22 to have looked at.
23    Now, that brings me back to the amended complaint.
24 Is there some particular reason I should or should not enter
25 the amended complaint at this point apart from the fact that it

Page 15

1 brings in the Canadian class?
2    MR. BARNOW: Well, obviously or maybe that is why
3 we think it should be in. We have filed it. And we also point
4 out to the Court respectfully that we raise common law issues,
5 which is negligent misrepresentation, et cetera. We believe
6 it's an appropriate filing and we would ask that the Court
7 allow it.
8    THE COURT: Okay. Is there any objection by any of
9 the parties to my doing that? I hear none.
10    MR. WOLKOFF: No objection from Gillette, Your
11 Honor.
12    THE COURT: All right.
13    MR. STRENIO: Your Honor, we would object on the
14 grounds that the Court identifies -- we believe that --
15    THE COURT: Well, I have anticipated. And the
16 short of it is maybe someone will come in with standing to
17 object to the assertion of claims you say are without merit.
18 But at this stage, if that's what they want to do to frame the
19 case, I'll let them frame the case in that way.
20    MR. STRENIO: We do also have questions as to this
21 Court's jurisdiction as an MDL proceeding over Canada. I don't
22 know and frankly haven't had enough time to investigate that
23 issue. It appears to me that this Court has jurisdiction of
24 cases filed in Federal Court in this country and that are
25 transferred through the MDL processing roles. And, so, I don't

Page 16

1 see how we can have that Canadian case as part of these
2 proceedings.
3    THE COURT: Why can't a Canadian representative
4 party bring suit in the District of Massachusetts against
5 Gillette?
6    MR. STRENIO: Well, they haven't brought suit
7 here. Frankly, like I said, Your Honor. that's one issue that
8 I have to investigate and I don't have the advantage of the
9 time I need to investigate that issue. It's one I will explore
10 in the additional time that the Court has afforded us and I
11 thank the Court for that.
12    MR. WOLKOFF: Your Honor, I would just point out
13 that in the amended complaint, indeed a Canadian has joined in
14 as a plaintiff.
15    THE COURT: Right. No, I understand that. And my
16 assumption is that if a Canadian wants to come to Boston to sue
17 Gillette, they can do that. It doesn't happen with great
18 frequency, but it happens. So, that doesn't seem so
19 problematic. More problematic is just a laundry list or a roll
20 of states in which some of the states don't look forward to the
21 statutory remedy to class members or private persons. Again, I
22 don't know whether that's true or not, but it's something that
23 I will look at. I think that the plaintiff is the principal
24 proponent here, but obviously the defendant as well. I will
25 look very carefully at the several suggested shortcomings that

Page 17

1 have been raised by the Corrales defendant or plaintiff here,
2 because I will be asking for responses with respect to them.
3    As to the question of discovery, I don't know what
4 I can say in the face of simply a memorandum. I don't have
5 even a speaking affidavit with respect to the circumstances of
6 this case. All I know is that there was an injunction in
7 Connecticut and that the counsel have looked into these
8 matters. But I'm not sure I understand how I'm -- in any
9 fashion that I will feel comfortable with -- able to make
10 judgments about the relative potential for either a successful
11 judgment or the dangers of litigation apart from the cost of
12 litigation in this setting.
13    I also am concerned about the size of the
14 attorney's fees here. But that's principally because most of
15 what has gone on in this case has been outside of my radar
16 screen, so I don't now what's gone on. But I think I have to
17 have some explanation of why -- apart from the fact that
18 Gillette is willing to swallow it -- I should attach some
19 figure like that to a party to be preliminarily at least fair
20 and reasonable in these circumstances.
21    The short of it is there is a lot missing. And I
22 think it has to be provided in some sort of supportable way and
23 probably by affidavit.
24    REPORTER'S NOTE: (Cell. phone ringing in
25 courtroom).

Page 18

1    THE COURT: One of the costs that have just been
2  imposed here is that will be $300. That's the standing rate.
3  It goes up.
4    MR. KOVACS: I apologize, Your Honor.
5    THE COURT: Yes. Well, the apology is welcomed,
6  but the $300 will be paid to the Clerk of the Court.
7    Now, I don't know whether it is appropriate to set
8  up some additional filing on behalf of the proponents of the
9  settlement or not to address this kind of issue. There has
10  been discussion back and forth. I understand. I have read the
11  kind of unseemly communications that arose out of the motion to
12  compel discovery. But I need to be given a substantial basis
13  to accept this proposed settlement and it has to be factual, I
14  think. So, Mr. Barnow, what do you propose?
15    MR. BARNOW: Your Honor, I propose to satisfy the
16  Court. As we went through this, I guess there is no issue but
17  that obviously the Court said so and we see it. In terms of
18  background information, I'd like to explain a couple of things
19  to the Court if I could. One of the dilemmas that we faced in
20  this settlement and we have faced in others is when a defendant
21  produces information which it deems to be confidential -- or
22  "highly confidential" has been the watch word or new phrase for
23  the last few years. And one of the things I would hope to
24  defend or would have considered -- and I think would or will --
25  would be to have perhaps an in-camera presentation to the Court

Page 19

1  so we could get into the numbers that we do have and that we
2  did obtain. Another fashion would be to file under seal a
3  backup for the financial numbers. What I can assure the Court
4  is that not only through the oral presentation on May 25th, but
5  through other efforts, that we did obtain financial information
6  that is background that I think the Court is referencing. And
7  I hear the Court. And it was a dilemma for us. And what I was
8  hoping and will continue to hope is that one of those two
9  avenues will be something that the Court would accept because
10  of the difficulty in getting a defendant to release what it
11  considers to be confidential information shouldn't be put in
12  the way of a good settlement.
13    With regard to attorney's fees, to the extent that
14  there is, quote, a "shortfall" later, close quote, I would
15  agree with the Court that there isn't enough information in
16  this particular paper to make that decision. But I believe
17  there is a reason for it, at least in my alleged mind and
18  perhaps my colleagues. And that is that we did not need to tee
19  that up at this time. I know the Court knows what I'm about to
20  say. But the standard is different. It's within the range.
21  What I generally do in cases that I have been in -- I'm not
22  saying it's the only way to do it -- is that that aspect is
23  dealt with in a petition for attorney's fees and costs.
24    THE COURT: But the class has to be notified, I
25  think, of what it is that may be involved in this case.

Page 20

1    MR. BARNOW: I would agree, Your Honor.
2    THE COURT: And that being so and particularly kind
3  of looking at this, as I said, from the perspective of someone
4  who has not been privy to all that has gone on between the
5  parties, I cannot, I think, recur to my experience in, say,
6  securities cases of knowing what the going rate might be for
7  dealing with the case, dealing with attorney's fees in this
8  general way. It's not, I think, that I'm stingy about
9  attorney's fees. On the other hand, I have an obligation with
10  respect to them, too, in making a determination about
11  preliminary approval where the attorney's fees are at what is
12  essentially the onset of the case. And there is no formal
13  discovery that has been conducted or if there is, there has
14  been very little. To be talking about what is essentially --
15  they say 36 percent of the cost that are going to be -- or the
16  monies that are going to be returned to the -- potentially
17  returned to the plaintiffs, putting to one side the potential
18  cost for notice and so on, it's a lot of money. And I want to
19  be sure that I'm not participating in lulling the class into
20  the belief that -- in acquiescence in the absence of objection
21  to that level.
22    MR. BARNOW: Your Honor, I hear the Court. And
23  just briefly, that is why I hope and I think and I would
24  call -- leave it at that -- that this language and every other
25  one I've done says that the plaintiffs' attorneys can seek up

Page 21

1  to. And sometimes there is language -- probably in here --
2  that the defendant will not object up to that amount.
3    THE COURT: Right.
4    MR. BARNOW: But it's the Court's view as to how
5  its office is used for the public and I respect that. Because
6  I may see it a little different based upon their language, it
7  doesn't matter.
8    With regard to the 36 percent, people can play with
9  percentages, I guess. And I don't think we have -- by that, I
10  mean the plaintiffs' counsel. And just because Mr. Corrales
11  has a different view, he's entitled to a different view. But
12  the reality is that most of the cases -- I understand I'm in
13  this courtroom and it's Your Honor's thinking that counts. And
14  most of the cases include the notice as to benefits of the
15  class because it is. They include the payment of attorney's
16  fees.
17    THE COURT: I agree with all of that.
18    MR. BARNOW: And, so, the percentage is not --
19    THE COURT: But I'm looking at a rather intensive
20  notice. And one of the extensive and intensive notice --
21  which, of course, is a response to the diffuse character of the
22  class, but one of the things that gives me a little bit of
23  pause and did about preliminary approval at this stage or at
24  this time -- is the potential for having to renotice the class
25  in some fashion.

Page 22

1    MR. BARNOW: If I could --
2    THE COURT: All of those things just tell me that I
3  want more information.
4    MR. BARNOW: And Your Honor, I'm confident --
5  surely I respect that. If I didn't, it wouldn't matter, but I
6  do really. Obviously I do. But with --
7    THE COURT: I don't know how much of this is truly
8  in need of protection, anyway, by way of discovery. I'm
9  increasingly of the view that parties in litigation view their
10  assertion of confidentiality to be a badge of their own
11  significance that's unrelated to any particular commercial need
12  except some elevated self-regard by the executives of the
13  company. But I'll look at stuff that's submitted in camera and
14  decide whether or not to continue to keep it under seal.
15  But there's got to be some justification, apart from the
16  assertions of counsel. I'm certain counsel wouldn't make
17  misrepresentations, but I've got to make my own determination
18  on these things.
19    MR. BARNOW: I hear you, Your Honor.
20    THE COURT: So that goes, I guess, to the question
21  of timing here. I had set it up for objectors or commentary or
22  those who wish to comment on November 6th. Is there any reason
23  why that material can't be prepared before then?
24    MR. BARNOW: Your Honor, I apologize.
25    THE COURT: I'm sorry. November 13th.

Page 23

1    MR. BARNOW: 13th.
2    THE COURT: So, is there any reason why it can't be
3  November 6th that a filing of factual --
4    MR. BARNOW: That's fine with me. That's fine.
5    THE COURT: -- materials to support a position that
6  you're taking?
7    MR. BARNOW: I think that's fine, Your Honor.
8    THE COURT: And perhaps I've been -- well, not
9  perhaps. I've been arch in my reference to the defendant's
10  claims of confidentiality, but I want it to be understood that
11  I will look at what I receive and may ask questions about
12  whether or not there is any reason for this to continue to be
13  kept confidential once I take a look the it. But things happen
14  fast in the marketplace and I have a feeling that some of this
15  information is pretty stale at this point for those kinds of
16  protections.
17    Now, I was concerned a bit with the issue of the
18  return of the razors before the final settlement hearing. And
19  maybe you want to talk to it. I'm not sure I know what the
20  alternative is under these circumstances. It's a kind of way
21  of identifying someone as having been a purchaser during the
22  period of time when I suspect that most purchasers don't keep
23  their CVS slips. Consequently, they can't show that they
24  purchased one of these things.
25    MR. BARNOW: I think the Court has analyzed it and

Page 24

1  I think the Court recognizes the problem. You have to do
2  something for security. And to say that people, in order to
3  access what is fundamentally a full recovery number, have to
4  come up with their number or their receipt, it's probably more
5  difficult than just sending it back in. Now, with regard to
6  sending it back in, I think we're all mindful of the fact that
7  the people that are sending it back in are the ones that feel
8  damaged and have disputes with regard to the value of it. If
9  somebody can come up with a better thing that flies in terms of
10  all of those issues, Judge, we try hard and we want to have as
11  little as possible. But when you have up to three claims per
12  household at 15 bucks apiece or more who actually have the
13  receipts and you paid more, it's a rational approach. People
14  are basically giving back something they're saying they didn't
15  want or they felt cheated on it. And, so, that's how we wound
16  up at it. It was the best course we could determine.
17    MR. SHAPIRO: Let me speak, Your Honor. The
18  question is sending in the razor before final approval. And
19  that's an issue we gave a lot of thought to and had a lot of
20  discussion with Gillette. And the idea was the exposure of
21  having a second notice after final approval saying "now finally
22  approved, send in your razors." And I think we felt that the
23  cost of the second notice and the delays and potential
24  confusion of the class members really counseled against that
25  course. And I would say especially where Your Honor intends to

Page 25

1  give careful scrutiny to this settlement at preliminary
2  approval, I would hope that there's a very high likelihood that
3  final approval would be granted if we pass Your Honor's
4  scrutiny on preliminary approval. And therefore --
5    THE COURT: Well, I just -- the only thing that I'm
6  wondering about is somebody who is put to the awkward choice of
7  shaving or becoming a claimant. I suspect that people who
8  still have their razors are actually using them. And they are
9  going to kind to wonder what they -- or their family members
10  will wonder about why they are getting hairier.
11    MR. BARNOW: Well, not necessarily so, Your Honor,
12  because we have the rebate provision. So, if they want to keep
13  their razor --
14    THE COURT: Well, then they still don't -- yes.
15  The rebate is -- in terms of dollar figures -- a little less
16  valuable than returning it. I look at it. I'm not exactly
17  sure what the proper response is to it. I tend to think it may
18  be just one of those kind of class action claims equivalent to
19  original sin, too bad there's nothing we can do about it. It
20  bothers me a little bit and I'm sure the parties will think
21  about it a little bit more here, but you're entitled to hear me
22  talk about things that I find particularly bothersome here.
23    MR. BARNOW: Yes, Your Honor.
24    THE COURT: Now, are there other issues that we
25  might usefully ventilate at this point? Do any of the other

Page 26

1  parties or any party want to be heard? Mr. Strenio?
2      MR. STRENIO: Yes, Your Honor. What I found
3  particularly offensive in the structure of the settlement is a
4  provision in there that attempts, at least in my reading, to
5  silence other named plaintiffs who aren't lead counsel. And
6  the way I read it as doing so is a provision in the settlement
7  that says those people who will receive attorney's fees are
8  those who represent clients who consent to the settlement.
9  Now, that to me seems designed -- and it has only one
10 purpose -- of silencing critique by others. I mean, we stand
11 before the Court as the only ones who are saying "hold on."
12     THE COURT: Well, but how does that work? I guess
13 it really is in the -- if someone signs off on the settlement
14 in the sense that they don't opt out --
15     MR. STRENIO: No, if they affirm.
16     THE COURT: Why don't you point me to the provision
17 that you're particularly concerned about so I can understand
18 it.
19     MR. STRENIO: It is the part dealing with incentive
20 awards.
21     MR. WOLKOFF: Paragraph 7.3, Your Honor, of the
22 settlement agreement.
23     MR. STRENIO: 7.3, if you turn to page 20. And it
24 says that in subparagraph (c), five hundred dollar incentive
25 award to each of the other named plaintiffs who has, through

Page 27

1  his counsel, acknowledged his consent to the settlement
2  agreement. There are others -- such as Mr. Corrales -- who has
3  incurred a lot expenses, who has devoted a lot of attention to
4  this matter, and he would be deprived of that five hundred
5  dollars because I stand here to this Court not giving my
6  consent.
7      THE COURT: Well, I'm not sure I understand how
8  this is going to work. I mean, one way to talk about it is to
9  say that acknowledging consent is evidenced by not opting out.
10 Another is to say that you have got to stand tall during the
11 conversations about preliminary approval. And I guess I want
12 to know how you read that.
13     Then put to one side -- it's not that I've had a
14 lot of time to think about this incentive, but I just recently
15 did with Mr. Shapiro in the context of the PLSRA. And I'm not
16 sure, on reflection, I'm a big fan of incentive payments,
17 anyway, certainly not incentive payments that are simply for
18 lending one's name to the venture.
19     MR. WOLKOFF: Well, Your Honor, as a factual
20 matter, under the settlement agreement, paragraph 1.11 would
21 define a named plaintiff.
22     THE COURT: Right. But let's assume a named
23 plaintiff comes in here and strenuously objects to the
24 settlement agreement and says, "Your Honor, you should not
25 accept this preliminary agreement." I accept the preliminary

Page 28

1  agreement and they don't opt out. Are they entitled under your
2  reading of this to the 7.3(c) payment?
3      MR. WOLKOFF: Yes, Your Honor.
4      THE COURT: So the proof of the pudding, I guess,
5  Mr. Strenio, under this is you opt in or you opt out. If you
6  opt out, it seems to me that you're not really entitled.
7      MR. STRENIO: Your Honor, if we opt out, that's one
8  thing. But it says we only get it if we consent -- we
9  acknowledge our consent to the settlement. It doesn't say --
10     THE COURT: We just had a -- not a dramatic
11 reading, but a definitive reading of what that means. And it
12 means that the moment of truth for your clients are are they in
13 or are they not?
14     MR. STRENIO: No, because you can stay in and
15 object. If we stay in and we object, we don't get the five
16 hundred.
17     THE COURT: Well, I guess I understood -- I'm not
18 sure you get the five hundred, anyway. I'm not sure anybody is
19 getting five hundred dollars out of this, but that's a
20 different issue.
21     MR. STRENIO: But it also corresponds to the issue
22 of attorney's fees because we have the same thing there. The
23 way they define those attorneys who are allowed to receive
24 attorney's fees are only those who acknowledge consent to the
25 settlement. So, the settlement gives Mr. Barnow and

Page 29

1  Mr. Rothman sole discretion to decide who gets what amount, but
2  the settlement says only those attorneys whose clients
3  acknowledge consent can get paid.
4      THE COURT: Where do I see this? I just want to
5  read the language in context.
6      MR. STRENIO: Well, part of it starts off at
7  paragraph 1.1.4 defining who plaintiffs' counsel is, defining
8  plaintiffs' counsel as "Lead counsel and all other attorneys
9  who represent parties who have joined in the settlement." And
10 then I'm trying to look for the settlement -- I mean, the
11 attorney's fee provision.
12     THE COURT: Well, it looks to me like it's 7.2
13 which leaves it to settlement counsel to allocate and
14 distribute.
15     MR. STRENIO: Right, but among plaintiffs' counsel.
16     THE COURT: Right.
17     MR. STRENIO: The plaintiffs' counsel is defined
18 as only those whose client consented.
19     THE COURT: Well, if we treat consent as not opting
20 out --
21     MR. STRENIO: But it says consent to the settlement
22 agreement.
23     THE COURT: I know it is. I mean, I know the
24 language that's used.
25     MR. STRENIO: Right.

Page 30

1    THE COURT: And one can say "no" with your lips,
2  but "yes" with your eyes.
3    MR. STRENIO: I can only go by the settlement
4  agreement, Your Honor, and that's why I bring it to the Court's
5  attention.
6    THE COURT: Well, no. But perhaps we can settle
7  this part of the settlement agreement.
8    Mr. Barnow, is there any disagreement with the way
9  in which I -- with Mr. Wolkoff's assistance -- explained this
10  or tried to put a gloss on this particular language?
11    MR. BARNOW: No disagreement, Your Honor, but if I
12  could add a couple of comments to it.
13    THE COURT: Sure.
14    MR. BARNOW: First of all, it says to be exercised
15  reasonably; and, secondly, anybody can file a fee petition.
16  But the moral of the story is I don't disagree with what the
17  Court is saying.
18    THE COURT: When you say anybody can file a fee
19  petition, you mean under the various statutes, there's
20  available --
21    MR. BARNOW: No, no. Well, probably it would be.
22  But what I'm saying is in a particular case, if somebody felt
23  their class counsel wasn't fair to them or whatever, they can
24  bring it to the Court's attention.
25    THE COURT: How could they do that when it says "in

Page 31

1  your sole discretion."
2    MR. BARNOW: To be exercised reasonably.
3    THE COURT: Right. So, you mean that if someone
4  challenges the reasonableness of your allocation, it comes
5  here?
6    MR. BARNOW: Your Honor --
7    THE COURT: I think your co-counsel is feeling
8  quite uncomfortable at the direction this is going.
9    MR. BARNOW: I'm not sure. He just wanted to point
10  out to me and ask Your Honor if the Court retains jurisdiction
11  for any disputes.
12    THE COURT: I do. But the question is: Are you
13  telling me that if someone says it's not reasonable, I make
14  that determination?
15    MR. BARNOW: I would say yes. I don't think there
16  is any issue about that. This is the Court's class, Your
17  Honor, and we serve the Court and the class in the end. So, I
18  don't have an issue with that. That's why the order provides
19  the Court retain jurisdiction. That was surely our intent.
20    THE COURT: All right. So, Mr. Strenio?
21    MR. STRENIO: Well, if we read the language --
22    THE COURT: Well, how I read this is as follows.
23  but perhaps it needs to be clarified and perhaps it needs to be
24  modified a bit to be clear. But what I read this as is that
25  someone is entitled -- or not entitled. Someone is eligible

Page 32

1  for incentive if they don't opt out. That is what it means to
2  consent to the settlement agreement.
3    Unless I hear some objection, then that's the
4  construction that I'm going to give to this. Maybe it needs to
5  be clarified. So you can -- they can drag you kicking and
6  screaming. But so long as you consent -- so long as you don't
7  opt out, then you're within the target area of the persons who
8  are entitled to -- or your clients are within the target area
9  of persons who are entitled to this incentive amount.
10    With respect to plaintiffs' counsel, I think that
11  plaintiffs' counsel have to be representing somebody who has
12  opted in or has chosen not to opt out in this case. You
13  can't -- you have got to be either inside the tent or outside
14  the tent. If you're outside the tent, you don't get the warmth
15  of the tent.
16    MR. STRENIO: Thank you for that clarification.
17  Your Honor. I would appreciate if lead counsel makes that
18  clarification to other plaintiffs' attorneys because I think
19  that might influence whether I have anyone standing by my side
20  at the next hearing, Your Honor.
21    THE COURT: Okay. Well, I think it might be useful
22  to have an addendum or something like that to clarify that.
23    MR. WOLKOFF: We can do that, Your Honor.
24    MR. BARNOW: Your Honor --
25    THE COURT: Mr. Wolkoff is on his feet. You have

Page 33

1  the Northern District of Illinois by the seat of your pants
2  approach to --
3    MR. BARNOW: I apologize.
4    MR. WOLKOFF: I apologize, Your Honor, if we
5  haven't left that issue. I just wanted to -- Your Honor asked
6  if there was anything additional anybody wanted to say. I just
7  have a couple.
8    THE COURT: I just want to be sure there's nothing
9  else on it because I think Mr. Barnow has something else on
10  this particular issue.
11    MR. BARNOW: Yes, Your Honor, I do.
12    THE COURT: Okay.
13    MR. BARNOW: Very briefly, Your Honor, on page
14  eight, the end of paragraph 14 of Exhibit A to the settlement
15  agreement --
16    THE COURT: Hold on just a second. Paragraph 14 of
17  the final judgment?
18    MR. BARNOW: Yes, sir. Proposed Judgment, correct,
19  which carries over on page eight. The very last sentence after
20  deals with the allocation. "Any dispute in certain set
21  allocations shall be under the jurisdiction of this court."
22    THE COURT: I see.
23    MR. BARNOW: I just wanted to clarify to the Court
24  that it wasn't just by my memory and my wish.
25    THE COURT: Right.

1  MR. BARNOW: Thank you.
2  THE COURT: Okay. Mr. Wolkoff?
3  MR. WOLKOFF: Yes, Your Honor. Three brief points
4  which I think will be dealt with more fully certainly at the
5  preliminary fairness hearing. but I just wanted to raise.
6  With regard to the issue of the return of the
7  razors and the necessity of doing that, actually, Your Honor.
8  the way that we had the schedule going -- and I just wanted to
9  point this out -- the final fairness hearing would occur two or
10  three months into the time period for sending the razors back.
11  So, there would be a full three months or maybe a little bit
12  more than three months where consumers would know whether or
13  not the settlement has been approved or not approved before
14  having to send it back in order to meet the time period. So
15  we're talking about less than half of the time period.
16  THE COURT: Right. But let me just ask this: This
17  is a claims made settlement. I assume that whoever is doing
18  the economics of this for you has thought through what the
19  likelihood is of returns. And I'm not sure I fully understand
20  what happens if you have fewer returns and fewer claims than
21  the settlement. There's a reverter, right?
22  MR. WOLKOFF: No, Your Honor.
23  MR. ROTHMAN: No. There's absolutely -- sorry.
24  THE COURT: Okay. Then what happens?
25  MR. WOLKOFF: There is no reverter, Your Honor.

1  What happens is we go on to the next step, assuming that an
2  insufficient number of razors have been sent in, together with
3  the up to $10 rebates. Then we go to the next step and we mail
4  a settlement razor, the Fusion razor, to each and every person
5  who has made a claim. If we still haven't used up the $7-1/2
6  million dollars minus the up to 2.4 or -.5 million dollars for
7  the notice, then we post it on the website. And we allow
8  anyone who hasn't made a claim up to that point to put in a
9  claim for a free Fusion razor to be sent to them.
10  THE COURT: And do they -- what do they have to
11  show to get that claim?
12  MR. WOLKOFF: They have to certify, Your Honor,
13  that they had purchased the razor or otherwise acquired the
14  razor during the time period that this --
15  THE COURT: First come first serve?
16  MR. WOLKOFF: Yes, it is, Your Honor. It's open
17  for a period of time, a significant period of time, 90 days, or
18  until the entire $7-1/2 million dollars minus the cost of
19  notice is used up.
20  THE COURT: How are you attaching value to these or
21  calculating value to these various opportunities? Is the $5
22  rebate the cost in the store or is it your wholesale cost?
23  MR. WOLKOFF: It's neither, Your Honor. The way
24  that we attach amounts to this is based upon the average retail
25  price. But the $5 rebate, in particular, up to two, so up to

1  $10, was a negotiated amount.
2  THE COURT: But what you do is you redeem it at the
3  store at whatever the store is asking for it.
4  MR. WOLKOFF: No. your Honor.
5  THE COURT: Tell me how it works.
6  MR. WOLKOFF: If you had made a purchase of one of
7  the MP3 Power Razors during the settlement period or -- I'm
8  sorry -- during the class period or you make a purchase during
9  the settlement period, the six months, then you can send in
10  either UPC code or a receipt. For each purchase, you can get a
11  $5 check sent to you.
12  THE COURT: Oh, a $5 check?
13  MR. WOLKOFF: Yes. Your Honor.
14  THE COURT: I'm sorry. I misunderstood that.
15  Now, with respect to the Fusion opportunity, the
16  value of that is --
17  MR. WOLKOFF: $6.25 plus 75 cents per razor for
18  handling.
19  THE COURT: Is that what the going rate is for a
20  Fusion razor?
21  MR. WOLKOFF: Yes, Your Honor. The way we arrived
22  at that was it's the going rate average retail price for a
23  Fusion razor together with an extra blade in the package. Here
24  this would be a so-called sample razor which doesn't include
25  the extra blade, so we backed out the difference between the

1  average retail price and the average cost of a blade and we
2  arrived at the --
3  THE COURT: So what they get is an object that
4  won't shave people's faces, but something else?
5  MR. WOLKOFF: No, Your Honor. It has a blade in
6  it, but it doesn't have a -- I left out the word "extra," an
7  extra blade. In the store, you get an extra blade with it. A
8  sample razor at Gillette just contains a blade in the razor
9  itself without an extra one. So we backed out the price or
10  value of the extra blade and that came to $6.25. The 75 cents
11  is the actual cost that Gillette would incur in connection with
12  postage and the handling of the return -- of the sending out of
13  the sample razors. So that's how we arrived at that number.
14  THE COURT: Okay.
15  MR. WOLKOFF: But the original point that I was
16  making, Your Honor, was that, first of all, a number of
17  consumers won't have sent their razor in by the time hopefully
18  this settlement will be finally approved because there will
19  still be a good deal of that six-month time period. So, many
20  of the consumers won't even have sent in their razors yet and
21  will still have the opportunity to do so. And anybody who has
22  sent in their razors, the settlement agreement provides that
23  the Claims Administrator will retain those razors pristine,
24  retain them in their original packaging.
25  THE COURT: How does "pristine" as an adjective

Page 38

```
 1  compare to "wet" --
 2       MR. WOLKOFF: Well, --
 3       THE COURT: -- which is the other adjective that
 4  I've seen attached to it?
 5       MR. WOLKOFF: Well, I think, Your Honor, if the
 6  razor is wet when sent in, it probably will likely dry by the
 7  time all of this completes itself unfortunately.
 8       THE COURT: Right.
 9       MR. WOLKOFF: But what I mean by that is that the
10  Claims Administrator is going to keep the razor in the package
11  that it was sent in. And in the event that the settlement, for
12  whatever reason, does not consummate -- we would expect it to.
13  But if it does not, then the long form of notice informs
14  consumers that there will be another matter raised before the
15  Court. Your Honor will decide -- and perhaps we would be able
16  to agree -- with regard to what happens to those razors. Are
17  they returned to the consumers, does the litigation continue,
18  or is there something different that's done with regard to a
19  settlement, et cetera? So the razors are there. And it is
20  true that we haven't been able to address the problem for those
21  consumers during the first two months or so before the fairness
22  hearing is decided, what do they do for a razor, that that much
23  is true other than become a hirsute. We felt that this was
24  the -- both sides did -- that this was necessary in order to
25  prevent fraud. And we have some evidence of the fact that
```

Page 39

```
 1  someone had purchased the razor and it was better than
 2  requiring the UPC code or a receipt.
 3       Your Honor, very briefly, with regard to the
 4  attorney's fees -- and I don't mean to co-op an issue that
 5  maybe more concerns the plaintiffs than Gillette. But we
 6  reviewed a number of the cases in this district and in this
 7  circuit with regard to consumer class actions. And what we
 8  learned was that courts typically start, as Your Honor is
 9  aware, with approximately 25 percent of the recovery including
10  notice. This is approximately, I believe, around 20 percent.
11  And we also read the case law to indicate that --
12       THE COURT: Well, I have not read the case law as
13  carefully as I'm sure you have. But are we talking about case
14  law that -- a case that is at a very early stage?
15       MR. WOLKOFF: Well, Your Honor, with regard to
16  that, our reading of the case law is that lawyers are not to be
17  penalized. Plaintiffs' lawyers are not to be penalized for
18  having taken the initiative and rather than have protracted
19  things and raised their fees through motion practice, et
20  cetera, and discovery, to have tried to make a good faith
21  attempt to resolve the matter on a fair basis at the initial
22  stage.
23       THE COURT: Well, that's certainly true. But
24  attaching as percentage fees -- which is generally not how I'm
25  likely to do this -- or at least I'm going to check it against
```

Page 40

```
 1  lodestar fairly carefully -- calibrating the incentive
 2  structure for this is the devil in the details, I think.
 3       MR. WOLKOFF: Yes.
 4       THE COURT: I certainly don't want to discourage
 5  people from an efficient running of their case. On the other
 6  hand, there are hydraulic pressures on plaintiffs' counsel in
 7  cases to get in and get out fast just as a kind of business
 8  model. And, so, I raise it because it looks like a lot of
 9  money to me.
10       MR. WOLKOFF: I understand, Your Honor. I just
11  wanted to make a point that we looked at percentages in other
12  cases and we looked at the fact that the cases say that
13  plaintiffs' lawyers should not be penalized. We view this as a
14  very fair settlement where anybody who wants their money back
15  for their razor can get their money back for their razor.
16  And, so, under those circumstances, at least Gillette viewed
17  the attorney's fees -- and I know that this is not even a
18  preliminary or a fairness hearing. But that's -- I just wanted
19  to give Your Honor some --
20       THE COURT: It's a penultimate preliminary fairness
21  hearing.
22       MR. WOLKOFF: I'm sorry, Your Honor?
23       THE COURT: It's a penultimate preliminary fairness
24  hearing.
25       MR. WOLKOFF: Penultimate, yes.
```

Page 41

```
 1       And then finally, Your Honor, with regard to --
 2  very briefly, with regard to the information that Gillette is
 3  saying it needs to be held in strict confidence, I don't think
 4  that this is a case, Your Honor, where an executive of a
 5  company has just felt self-important and said this is
 6  information that we don't want getting out. As Your Honor is
 7  aware, there's a very, very competitive area. And at least one
 8  of the competitors -- in fact, the most direct competitor of
 9  Gillette -- has already sued Gillette and there has been very
10  intensive litigation not only with regard to the MP3 Power
11  Razor, but over the years there initially between Schick and
12  Gillette. So, it's in that context that Gillette says that its
13  sales information, unit sales information, both in the United
14  States and Canada, its profit information for both its razors
15  and blades. When you're talking about information, it isn't
16  that stale. Admittedly, it's not the current information, but
17  it is information as of and through October 31st of 2005.
18       THE COURT: All I can say is I understand the
19  argument. There needs to be a justification for it. Because
20  without pointing directly at this case, there has been a
21  tsunami of sealed filings in this Court and most of it seems to
22  be froth rather than actual wave.
23       MR. WOLKOFF: We understand that, Your Honor. I
24  think in this case, Your Honor will see once you get the
25  information that it is justified. But obviously, we stand by
```

Page 42

1  whatever decision the Court will make about them.
2  Thank you very much.
3  THE COURT: Okay. So, is there anything else?
4  Mr. Shapiro, did you have something?
5  MR. SHAPIRO: Your Honor, I guess as liaison
6  counsel, I'd just like to clarify some of the housekeeping,
7  Your Honor.
8  THE COURT: Right.
9  MR. SHAPIRO: You would like briefs by the
10  proponents by November 6th.
11  THE COURT: Yes. What I would like from the
12  proponents is supporting material with respect to those things
13  that are essentially fact finding that I have to make about the
14  risks and potential rewards of this litigation and related to
15  that that says, on the one hand. we have got these kinds of
16  dangers that we face in this litigation. On the other hand, we
17  have these kinds of prospects. And on balance, we think this
18  is the best way to resolve it.
19  But what I have is you say so. And that's, of
20  course, interesting and sometimes compelling. But it's not the
21  foundation on which I think I can make that determination.
22  Similarly, with respect to attorney's fees, some
23  kind of idea that what I'm talking about in attorney's fees
24  that is something other than saying it's not 36, it's actually
25  25 because you used the cost of the notice as a numerator and

Page 43

1  denominator. I guess I do want to know what I'm really talking
2  about in terms of making comparison to the lodestar. I
3  understand, I think, the comparatives that I'll have to use in
4  this area. But I would feel a good deal more comfortable if I
5  had some lodestar-type numbers here that include what's
6  anticipated in the future here.
7  MR. SHAPIRO: Will you want that preliminary
8  approval rather than final approval when we submit --
9  THE COURT: I do because of the amount of money at
10  the early stage of this case. Yes.
11  MR. SHAPIRO: And then as I understand it, any
12  opposition papers would be filed by November 13th?
13  THE COURT: Opposition or comment.
14  MR. SHAPIRO: And proponents can file a reply by
15  November 20th?
16  THE COURT: Right. And then we'll have the
17  hearing, I think, on the 29th at 2:30.
18  MR. SHAPIRO: And could we have the Court's consent
19  or approval now to file papers under seal subject to Your Honor
20  reviewing it and telling us --
21  THE COURT: Yes.
22  MR. SHAPIRO: -- that they should not be under
23  seal?
24  THE COURT: Yes. But the seal should have the
25  papers submitted under seal and it may be that the defendant

Page 44

1  who is going to be doing this providing a justification for
2  maintaining them under seal or such portions as are necessary.
3  I would urge that there be two forms of the filing, one sealed
4  and one redacted.
5  MR. SHAPIRO: Yes. I was just going to suggest
6  that. Okay. Thank you.
7  THE COURT: Mr. Strenio?
8  MR. STRENIO: Yes, Your Honor.
9  To address a point that the Court raised at the
10  beginning with respect to Mr. Adoure, I'd like to ask that the
11  stay be lifted with respect to that issue so that the Court
12  may --
13  THE COURT: Right. I do want to write something
14  about it and I'll try to get something done. I just saw a
15  stay. And like lawyers whose favorite motion is the motion to
16  continue, that's the one that's most gratifying when it's
17  granted. For a Judge, stay of complex proceedings is one of
18  the most gratifying things to see come in the mail. And
19  perhaps I read it more broadly than I should have. But I do
20  want to write something in respect of the Adoure matter, but I
21  will assume that the Adoure matter -- that Mr. Adoure has made
22  the choice that he wishes to take advantage of what I think is
23  the First Circuit's mechanism for this kind of appeal.
24  MR. STRENIO: Yes. Thank you, Your Honor. I
25  appreciate it.

Page 45

1  THE COURT: Okay. All right. If there's nothing
2  else, we'll be in recess. Thank you.
3  RECESSED AT 3:35 P.M.
4
5
6  CERTIFICATION
7  I certify that the foregoing is a correct
8  transcript of the record of proceedings in the above-entitled
9  matter to the best of my skill and ability.
10
11  _____    _____
12  Pamela R. Owens                    Date
13  Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                         )
IN RE:                   )
                         )
M3POWER RAZOR SYSTEM     )   CIVIL ACTION NO.
MARKETING & SALES        )   05-11177-DPW
PRACTICES LITIGATION     )   (LEAD CASE)
                         )
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

United States District Court
John J. Moakley U.S. Courthouse
One Courthouse Way
Boston, Massachusetts  02210
July 7, 2006
2:35 p.m.

\* \* \* \* \* \*

MARCIA G. PATRISSO, CSR, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse

One Courthouse Way

Boston, Massachusetts  02210

(617) 737-8728

## Page 2

APPEARANCES:

On behalf of Plaintiff Carlos Corrales:

    The Kick Law Firm, APC
    660 South Figueroa Street - Suite 1800
    Los Angeles, California 90017
    By: Taras Kick, Esq.
       James Strenio, Esq. (Appearing telephonically)

On behalf of Plaintiffs Mark Dearman and Anthony Debiseglia:

    Shapiro, Haber & Urmy, LLP
    53 State Street
    Boston, Massachusetts 02109
    By: Thomas G. Shapiro, Esq.

On behalf of Plaintiffs/Co-Lead Counsel:

    Barnow & Associates
    One North LaSalle Street - Suite 4600
    Chicago, Illinois 60602
    By: Ben Barnow, Esq.

    Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP
    58 South Service Road - Suite 200
    Melville, New York 11748
    By: Robert M. Rothman, Esq.

On behalf of Plaintiffs:

    Law Offices of Alan L. Kovacs
    2001 Beacon Street - Suite 106
    Boston, Massachusetts 02135
    By: Alan L. Kovacs, Esq.

On behalf of Plaintiff Luis Gonzalez:

    The Dodd Law Firm
    P.O. Box 3504
    Beaumont, Texas 77704
    By: Olen Kenneth Dodd, Esq.

## Page 3

On behalf of Plaintiff Michael Pruitt:

    The Terrell Law Group
    223 25th Street
    Richmond, California 94804
    By: Reginald Terrell, Esq.

On behalf of Defendant Gillette Company:

    Ropes & Gray, LLP
    One International Place
    Boston, Massachusetts 02110-2624
    By: Harvey J. Wolkoff, Esq.
       Mark Szpak, Esq.
       Emily C. Shanahan, Esq.

## Page 4

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Douglas P. Woodlock, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Boston, Massachusetts, on July 7, 2006.)

THE CLERK: All rise. This Honorable Court is now in session. Please be seated. Calling the case In Re M3Power Razor System Marketing and Sales Practices Litigation, Civil Action No. 05-11177.

THE COURT: Well, I think I want to start with the request to opt out. And I'm not altogether certain what it is that is really being asked for except to send the case back to California. So Mr. Kick, I guess?

MR. KICK: Good afternoon, your Honor. Taras Kick. That is the relief that's being sought --

THE COURT: Well, let me ask you -- all right. Then let me ask you: Isn't it a little bit premature in the sense that we have class certification coming up this fall? That's the point at which these kinds of concerns will be crystallized.

MR. KICK: I think candidly, your Honor, the answer would be yes, that typically it would be premature to consider that or move for that sort of relief. But I would suggest to the Court that what we have currently, for better or for worse,

## Page 5

is not the typical situation.

As our papers indicate, at some level this Court at the hearing at which it was decided that there wouldn't be any complaint indicated that all of the causes of action should go forward in that complaint. In fact, the Court at one point in the transcript -- I was not present, but I did read the transcript -- indicated that it was -- that this complaint was more like looking under your proverbial Christmas tree because it was going to have so many causes of action.

THE COURT: Let me just stop you for a minute. Going through the complaint, it's fairly bare bones but does not exclude reference to the California claims. I mean, I understand that there are different names on the marquee, but the basic setting is -- comprehends all of the claims in the case, doesn't it?

MR. KICK: It does not, your Honor. And I want to address that. But for starters, perhaps a simple problem to look at, is if you would just look at the Court's docket sheet in an entry dated April 18, 2006, and May 17, 2006. On April 18th this Court entered the fact that the amended complaint was filed, using the word "amended." Amended is --

THE COURT: Please. If you're having problems with the semantics, that's something that I suppose we can --

MR. KICK: Well --

THE COURT: Just a moment. That's something that we

Page 6

1  can clear up. I used it as a vehicle to uphold the entire case
2  together as best I could. Or gave that direction. At this
3  stage I don't know that someone is being left out. I look at
4  it and it seems to comprehend everything.
5        MR. KICK: Okay.
6        THE COURT: Now, if you're going to say, "Well, it
7  says 'amended' and it should have said 'consolidated' and there
8  was a dismissal in the docket of the court," that's just
9  foolishness.
10       MR. KICK: If it's semantics, we accept that.
11       THE COURT: It is.
12       MR. KICK: But, your Honor, the first we heard that
13  was in the opposing papers from counsel.
14       THE COURT: No, you didn't. Well, you didn't. You
15  weren't here. But it was abundantly clear to anybody present
16  in the courtroom that that's precisely what I was talking
17  about.
18       MR. KICK: Okay. I'd agree, then, your Honor, that
19  the concern we had about some sort of legal effect of the
20  amended complaint displacing the original complaint is
21  alleviated if that's just a matter of verbiage. But
22  substantively speaking, and I did read the Court's transcript,
23  the complaint as filed does not come close to the spirit of
24  what the Court indicated it was anticipating. And more
25  importantly, from our perspective we're the only case in the

Page 7

1  country that filed exclusively on behalf of California citizens
2  a California-only class. That's what our primary concern is to
3  protect.
4        As such, we were very careful in drafting our
5  complaint, our causes of action, to lay out the specific
6  elements of those causes of action under both the Consumer
7  Legal Remedies Act --
8        THE COURT: So what's the problem? I mean, are you
9  afraid that they're going to move to dismiss for failure to
10  provide adequate pleading?
11       MR. KICK: No. The problem is that we need to prepare
12  a case for trial. We would be --
13       THE COURT: But what's going on now that is being
14  interfered with? Is there any kind of discovery going on now
15  that impedes or distorts the California case?
16       MR. KICK: I would love to be able to answer that
17  question. But one of our motions today is, we've been denied
18  access to even see what discovery --
19       THE COURT: I understand that. But we're in the
20  middle of dealing with the question of class discovery.
21       MR. KICK: Right. So there very well could be, would
22  be my best answer, because --
23       THE COURT: And so this is an anxious apprehension of
24  what may happen in the future.
25       MR. KICK: I would not agree with that, your Honor. I

Page 8

1  would agree that this is consistent with the purpose of
2  judicial economy and efficiency, to conduct the discovery in
3  one swoop on behalf of all of the complainants; and
4  therefore -- and again, I know this is a separate motion, but
5  really they do interrelate, if I'm denied access to even
6  though --
7        THE COURT: Well, I am going to get to that, but -- if
8  I may --
9        MR. KICK: And then --
10       THE COURT: "If I may" means I'm going to talk now.
11       MR. KICK: I'm sorry.
12       THE COURT: All right. Are you prepared to let me
13  talk?
14       MR. KICK: Of course, your Honor.
15       THE COURT: Okay. Thank you. My view in this case is
16  to try to ensure that all of the pretrial that any of the
17  affected parties want is going to be done. I get this motion
18  that says, "I want to opt out before there's even a class," but
19  I try to get some sense of what it's about.
20       Now, insofar as the discovery is concerned, what is
21  unique to California, or that California claims in the
22  discovery in this case, that won't be covered in some fashion
23  by -- what reasonably one might expect to be the discovery in
24  the case?
25       MR. KICK: Our research indicates that California may

Page 9

1  be the only state in which corrective advertising has been
2  allowed by the appellate courts.
3        THE COURT: What do you need by way of discovery to
4  get to that?
5        MR. KICK: Well, at a minimum you would need to know
6  the added gross dollar amount of advertising done in the state
7  of California by Gillette related to the --
8        THE COURT: Why is that relevant?
9        MR. KICK: Because a corrective advertising program's
10  goal is to address the effects of the advertising that
11  occurred.
12       THE COURT: So the California courts say it should be
13  the same amount of advertising by dollar?
14       MR. KICK: They don't say it is to be the same amount;
15  they give the judges discretion in what the amount ought to be.
16  But certainly a judge addressing the issue would need to know
17  the amount of advertising that was done. Whether it was done
18  in the magnitude of $50 million or $50,000 would certainly go
19  to the magnitude of the corrective program.
20       THE COURT: All right. What else? What other aspects
21  of the discovery would be unique to the California case?
22       MR. KICK: Other unique discovery would include the
23  fact that -- I'll have to disclose some insight into our work
24  product.
25       THE COURT: I'm sorry?

Page 10

```
 1      MR. KICK: I'm going to disclose some insight into our
 2  work product with the hope that there's no waiver. But the
 3  average cost per unit in California exceeds almost every other
 4  state.
 5      THE COURT: Cost per unit of what?
 6      MR. KICK: Of the profit, which is the subject of this
 7  suit. So in Arkansas or elsewhere, it's going to cost a lot
 8  less than it does in California. So we would want to know that
 9  the -- in discovery, also, what was the average cost of the
10  product sold to California consumers. That goes to the
11  elements of damages in our causes of action.
12      THE COURT: The average cost? You mean the cost of
13  producing the good?
14      MR. KICK: No; the cost to the consumer of purchasing
15  it.
16      THE COURT: I see.
17      MR. KICK: So that --
18      THE COURT: What else?
19      MR. KICK: That would be a second material piece of
20  discovery.
21      THE COURT: What else?
22      MR. KICK: We would like to do discovery for the
23  purpose of affirmatively moving, if we were only in California,
24  for summary judgment which would include discovery, as I
25  mentioned earlier, related to the elements of our UCL, Unfair
```

Page 11

```
 1  Competition Law, and Consumer Legal Remedies Act cause of
 2  action.
 3      THE COURT: But that just says what you want to get
 4  to. I'm asking now what kind of discovery you need.
 5      MR. KICK: Well, specifically, Gillette's contentions,
 6  if any, on their affirmative defenses on those causes of
 7  action. We believe that this is one of the few cases where
 8  plaintiffs' class action can actually affirmatively move for
 9  summary judgment based on the evidentiary record developed in
10  large part --
11      THE COURT: Why is that likely to be the case solely
12  for California?
13      MR. KICK: I can address why it is likely to be so in
14  California and not in most other states, and that's because
15  California's consumer protection statutes are recognized to be
16  amongst the most liberal consumer-protective in the nation.
17      THE COURT: That's a label.
18      MR. KICK: Well --
19      THE COURT: That's a label. I just want to understand
20  how it works here.
21      MR. KICK: Fair enough. One of the facts underneath
22  the label is that you have presumptions on certain important
23  elements which you don't have in other jurisdictions; for
24  example --
25      THE COURT: Like?
```

Page 12

```
 1      MR. KICK: -- on reliance we have a presumption. For
 2  example --
 3      THE COURT: Under the Massachusetts Consumer
 4  Protection there is no obligation to prove reliance.
 5      MR. KICK: I believe Massachusetts is very favorable
 6  for consumers in that regard.
 7      THE COURT: Right.
 8      MR. KICK: But many states are not. And again,
 9  whether discovery was done on that, we don't know. Number
10  two --
11      THE COURT: I think it's a little early for that
12  discovery to have been done under the scheduling order.
13      MR. KICK: Well, I think we have class cert. discovery
14  cutoffs which were recently extended, and the rest of discovery
15  still can occur.
16      THE COURT: Right.
17      MR. KICK: On the issues of damages, we have different
18  damages allowed in California including that in Massachusetts.
19      THE COURT: Like what?
20      MR. KICK: Well, in California you are allowed, on
21  your CLRA claim, punitive damages; under the Massachusetts
22  Consumer Protection statute, your Honor, I believe you're not
23  allowed punitive damages.
24      THE COURT: Well, they call it statutory damages.
25  It's a form of punitive damage that involves treble damage.
```

Page 13

```
 1      MR. KICK: Which the Court then has the discretion to
 2  level as double damages.
 3      THE COURT: Uh-huh. Is California's punitive damages
 4  without a cap?
 5      MR. KICK: Well, the cap would probably be the United
 6  States Supreme Court's Campbell v. --
 7      THE COURT: So it's without a cap, then?
 8      MR. KICK: Right.
 9      THE COURT: Right. Okay.
10      MR. KICK: Beyond that, your Honor, we also have a
11  presumption with regard to the False Advertising law which is
12  found in Business & Professions Code Section 17500 where the
13  advertising itself need not have been literally false if it was
14  of a nature intended to deceive. And then we have a
15  presumption on the deception as well. So these are some of the
16  facts underlying the label, and these are areas in which
17  discovery needs to be pursued.
18      THE COURT: Well, I'm not sure how the discovery
19  differs there. So you have that presumption. Then that's a
20  legal standard that you deploy on the basis of pre-existing
21  discovery.
22      But let me understand for a moment -- I don't know
23  who's going to speak to this --
24      MR. SHAPIRO: I will, your Honor.
25      THE COURT: All right. Why didn't you include it
```

4 (Pages 10 to 13)

1  specifically?

2      MR. SHAPIRO: We thought that as a vehicle for

3  consolidating the case for administrative purposes that this

4  was the most streamlined way of doing it rather than having a

5  complaint that goes on and on and on and detailing every consumer

6  protection statute.

7      THE COURT: Okay. All right. So you have one

8  particular group of plaintiffs who have a particular interest

9  in this particular set of statutes being applied. So what's

10  the problem with changing it? Modifying it?

11      MR. SHAPIRO: There's no major problem. If the Court

12  wants it done that way, we can do it that way.

13      THE COURT: All right.

14      MR. SHAPIRO: I must say that in Gillette's opposition

15  papers, I mean, they acknowledge that the California claims are

16  not distinguished, are not prejudiced --

17      THE COURT: Well, my concern is this: To be sure that

18  there has been adequate notice and that there's been full

19  discovery conducted here.

20      MR. SHAPIRO: Right.

21      THE COURT: Now, Mr. Kick is concerned that to some

22  degree it hasn't been teased out enough to permit knowledge of

23  what kind of affirmative defenses Gillette is going to respond

24  with. So there's a problem on a pretrial discovery, I suppose,

25  that's presented by that.

1      But that brings me on to the discovery question.

2  What's the problem with letting him have access to the

3  discovery? I mean, apart from bad blood which is spilled all

4  across these papers, what's the problem with letting him have

5  discovery?

6      MR. SHAPIRO: It's our understanding, your Honor -- we

7  thought your Honor agreed with our approach at the last

8  conference that --

9      THE COURT: Not in the slightest.

10      MR. SHAPIRO: Then we misunderstood.

11      THE COURT: You did. And so now I have to have

12  Pretrial Order No. 3 to establish some form of discovery bank

13  when reasonable people working together could have worked it

14  out. I don't understand why anybody who is in the position of

15  liaison counsel isn't telling anybody who wants to know what

16  the discovery is who's part of the group.

17      MR. SHAPIRO: Well, I think the fact is that there's,

18  like, 25 cases and that many more law firms.

19      THE COURT: And are they all asking for this?

20      MR. SHAPIRO: This is the only group that is asking

21  for this.

22      THE COURT: Okay. So?

23      MR. SHAPIRO: But our view of it was that if discovery

24  should be made available to every plaintiff's --

25      THE COURT: Why shouldn't it?

1      MR. SHAPIRO: -- counsel --

2      THE COURT: Why on God's green earth shouldn't it?

3  You are functioning as liaison counsel representing other

4  people. Now, if it's a problem of, you know, they're knocking

5  at our door at six in the morning and they're showing up at ten

6  at night and we have to pay for stamps, that's a different

7  issue. Those are practical issues. But the fundamental issue

8  is you are here as their fiduciary, unhappy about who your --

9  the beneficiaries of your trust are, but you're here as their

10  fiduciaries.

11      MR. SHAPIRO: No; with all respect I am not at all

12  unhappy. There was a California plaintiff who was named in the

13  consolidated complaint. We understood, and I apologize if we

14  misinterpreted, that there was a discussion at the last hearing

15  as to when the initial disclosures should be made. And I

16  suggested to your Honor at that time that the initial

17  disclosures should follow the Court's appointment of the

18  organizational structure so that we didn't have -- and those

19  were my exact words at that time, I believe -- you know, 25 to

20  30 plaintiffs' firms all seeking discovery from Gillette.

21      THE COURT: That's not the case. We haven't gotten to

22  that. All we're talking about here is they want to look at

23  what you've got --

24      MR. SHAPIRO: Okay.

25      THE COURT: -- and what you're getting.

1      And presumably they'll have some helpful suggestions

2  about this. But the short of it is that they're entitled to

3  look at it. And so, you know, I think that there ought to be,

4  drafted up, a provision if you're going to rely upon

5  provisions, because you seem to in your briefing, the existence

6  of a specific provision that is manageable for doing that.

7  That doesn't mean that there's going to be a constant kind of

8  conflict over this. But, you know, within reason I'm

9  permitting -- would permit any plaintiff to take a look at

10  this.

11      MR. SHAPIRO: If that's your Honor's wish, we

12  certainly will do it.

13      THE COURT: All right. It is, so you will. All

14  right? So you have access to the discovery.

15      MR. KICK: Thank you, your Honor.

16      THE COURT: So what else do you need? I mean, what's

17  the -- what else is needed under these circumstances? If

18  you're concerned about them focusing the California class and

19  the discovery for the California class, I suppose you can make

20  proposals with respect to that.

21      MR. KICK: Yes, your Honor. And we recognize that we

22  don't have the power under the existing CMO to just serve

23  discovery off on our own; we would first make the suggestion

24  through liaison counsel to lead counsel of what we would like

25  to see propounded. If they disagreed with us and we still felt

1  strongly about it, we would move this Court for permission to
2  serve that discovery, which is typically done.
3        THE COURT: Right.
4        MR. KICK: The problem is, we've only been given the
5  discovery and we had --
6        THE COURT: That was before; this is now. So you got
7  the -- some form of opportunity to be provided with the
8  discovery. That isn't to impose an additional burden on the
9  defendant. It does impose a cost on the consolidated parties
10 here. But if you want to look at it and provide suggestions,
11 so on, that's fine.
12       So you'll work out and provide to me within a week a
13 case management order that defines in a way that's satisfactory
14 the mechanism for providing all parties and their counsel with
15 discovery when requested.
16       MR. SHAPIRO: Well, I wonder if it would satisfy the
17 Court if we provided one copy to Mr. Kick, and he could provide
18 copies to his co-counsel or other members in his group if he so
19 chooses.
20       THE COURT: I have no view about it.
21       MR. SHAPIRO: We'll work it out.
22       THE COURT: That seems reasonable. There only seem to
23 be about -- although it's still early, there only seem to be
24 two of the underlying cases that are problematic.
25       MR. SHAPIRO: Well, Mr. Dodd is here from Texas and

1  Mr. Terrell is here, and there are a lot of other cases.
2        THE COURT: There are, but nobody else is asking for
3  this.
4        MR. SHAPIRO: But I expect they will.
5        THE COURT: Well, then maybe the way to do it is to
6  say they can come look at some document depository.
7        MR. DODD: Along that point, your Honor --
8        THE COURT: Yes?
9        MR. DODD: -- since several of us are here from
10 California today, or otherwise out of state, and since I assume
11 Mr. Shapiro has a collection of documents right now a few
12 blocks from here, would it be possible for us to have access to
13 them while we're physically here, at least to take a quick
14 look? I don't want to --
15       THE COURT: Any problem with that?
16       MR. SHAPIRO: I do have a problem with that, your
17 Honor. Just physically it's Friday afternoon in the summer and
18 I have a child I have to get -- to take care of this
19 afternoon --
20       THE COURT: So the answer is, They've got a problem
21 with it.
22       MR. SHAPIRO: Monday would not be a problem.
23       THE COURT: All right. Well, I think it's going to
24 be -- if it proliferates, there is a single depository, it is
25 here, and those parties can, with reasonable notice, come and

1  review them.
2        MR. DODD: Your Honor. if I may, the only reason that
3  I was suggesting that if someone could have an opportunity to
4  take a look at it today -- and it doesn't have to be me; it
5  could be Mr. Kick, if he has the time -- it would inform our
6  position as to how we're going to set up a mechanism. If it's
7  very voluminous, obviously we may need to have a depository and
8  not necessarily rely on a lot of copies; if it's not very big,
9  we may -- it may be easily facilitated to make copies and send
10 it to whoever wants them.
11       We physically don't know what exists at this point,
12 and if we have --
13       THE COURT: Just a moment. Just a moment. Can you
14 describe it in a general sense?
15       MR. SHAPIRO: Yes. The bulk of the documents are
16 stored electronically. The paper volume is not enormous.
17 It's --
18       THE COURT: Okay. So in preparing an electronic
19 medium --
20       MR. SHAPIRO: Yes.
21       THE COURT: -- and making it available is not a
22 particularly -- an overwhelming problem?
23       MR. SHAPIRO: Correct.
24       THE COURT: Okay. So it seems to me that, you know,
25 you work it out in some practical sort of way. I don't want

1  you to spend a lot of money on this --
2        MR. KICK: We don't either.
3        THE COURT: -- on the other hand, I want to make sure
4  that you've got a chance to take a look at it and see what you
5  have to say.
6        MR. KICK: Thank you, your Honor.
7        THE COURT: Okay? So this goes back, then, to this
8  opt-out issue. And maybe it's necessary for me to take up this
9  question of voluntary dismissal in the Adoure case.
10       Are you going to be speaking to that too, Mr. Kick,
11 or --
12       MR. KICK: Yes, your Honor.
13       THE COURT: All right. Let me just understand how
14 you're being prejudiced, because there is a needed significant
15 prejudice. The prejudice, as near I can find out at this
16 stage, is you'd rather be somewhere else than here, but if
17 there is the opportunity to develop the discovery that you need
18 in this proceeding, sooner or later you may say, "We're going
19 to opt out." "We're going to" -- or more accurately, your
20 client will. And then the case goes back to the transferee
21 court.
22       But I don't understand what prejudice is of the level
23 or the character that the First Circuit is willing to correct
24 this type of quasi-interlocutory review.
25       MR. KICK: Your Honor, respectfully, I think that --

Page 22

1   THE COURT: It always is respectfully.
2   MR. KICK: This time especially since -- because of
3 what I'm about to say.
4   THE COURT: Right.
5   MR. KICK: I think that that question which your Honor
6 identifies is exactly the question for the First Circuit, not
7 for this Court; in other words, when they take up the appeal,
8 they will be looking to the question of prejudice. And we
9 filed, I think, a one-page motion. We were surprised to catch
10 an opposition because we're not even sure we were required to
11 do that. There are a lot of cases in the First Circuit that
12 say if you request -- with a dismissal with prejudice for
13 appeal purposes, you'd better indicate it on the document. So
14 out of an overabundance of caution we indicated that.
15   THE COURT: But you see, there's a second -- I'm not
16 just a weigh station, you know, in all of this. I have an
17 obligation under Rule 41 to make a determination under these
18 circumstances whether or not I'm going to do it. Whether or
19 not -- I function as a gatekeeper, to some degree. And I'm not
20 certain that I ought to be doing that in this context when
21 there are no claims being precluded, as near as I can figure at
22 this stage, but what's happening is that the sequencing of --
23 or the travel of the case is going to be along tracks you
24 wouldn't prefer and perhaps not at the pace that you would
25 prefer. But I don't understand what other prejudice there is.

Page 23

1   MR. KICK: Your Honor, with regard to Rule 41 which
2 the opposition interjected into this issue --
3   THE COURT: Not interjected. That's the rule under
4 which you moved to dismiss, isn't it?
5   MR. KICK: It is the dismissal under Rule 41 that
6 would be without prejudice if ordered by the Court.
7   THE COURT: Right.
8   MR. KICK: Here we're doing something different: We
9 have an absolute right to dismiss with prejudice, and we just
10 didn't want to run afoul of the cases in the First Circuit
11 that, when we filed that dismissal with prejudice, we would
12 somehow then find an argument from Defendant Gillette that
13 we're not allowed to take our appeal because we're dismissed
14 with prejudice. But it says, "Unless otherwise specified in
15 the order, a dismissal under this paragraph is without
16 prejudice."
17   THE COURT: Right. Who makes the order?
18   MR. KICK: Well, clearly your Honor does. This Court
19 does.
20   THE COURT: So I have some responsibility to review
21 this, under the circumstances, right?
22   MR. KICK: But what's contemplated -- all I'm
23 suggesting to your Honor is what's contemplated by Rule 41 is a
24 situation in which the dismissal is made without prejudice, not
25 a dismissal with prejudice.

Page 24

1   THE COURT: Right.
2   MR. KICK: And we're moving to dismiss with prejudice.
3 And very importantly, I think, it wasn't mentioned in our
4 moving papers, perhaps there should have been a reply filed on
5 it, but if we look at the 41(a)(1), it even states that we can
6 dismiss as a matter of right if there was no answer yet filed
7 or motion for summary judgment filed.
8   We moved to dismiss with prejudice, your Honor, on May
9 5th; the answer was filed on May the 17th. So under 41(a)(1)
10 we would have, your Honor, in our view, an absolute right to
11 dismiss with prejudice at that point.
12   THE COURT: I looked at the timing issue on that.
13 You'll agree, however, that if the time period takes it outside
14 of Rule 41(a)(1), I have some responsibility in this area?
15   MR. KICK: This Court always has that responsibility.
16 We're just suggesting that we were able to find no case that
17 would prohibit this, and the one time we were able to find it -
18 the First Circuit looked at it in a situation that involved a
19 motion for remand - the case was indeed dismissed. And that,
20 your Honor, is --
21   THE COURT: Well, that's BIW.
22   MR. KICK: Right.
23   THE COURT: But the problem is that -- what was
24 happening was that people were just losing their -- losing what
25 they thought were appropriate state claims, and there was no

Page 25

1 way that that was going to be dealt with at that stage. And as
2 a consequence, the First Circuit was willing to permit that
3 kind of review. That isn't this case. This case is one in
4 which you would like to be out of the consolidation faster and
5 you think that remand is the way to do that.
6   MR. KICK: That's essentially correct. I mean,
7 we're --
8   THE COURT: All right. So --
9   MR. KICK: Except that it's jurisdictional, I would
10 just again reiterate.
11   THE COURT: It's jurisdictional? What do you mean?
12   MR. KICK: We're saying that ours is a state-only
13 cause of action in Adoure.
14   THE COURT: All right.
15   MR. KICK: And that we're allowed to go forward under
16 California law with it as such. So I --
17   THE COURT: But if it's a diverse -- if we have
18 diversity, which is really what I found here, I don't know --
19 and the jurisdictional amount -- I don't really understand what
20 the jurisdiction is at all. What you are attempting to impose
21 through this litigation is in excess of $75,000 worth of costs
22 on the defendant, right?
23   MR. KICK: We're confident that the costs would exceed
24 that. But under California -- under California law, the Ninth
25 Circuit, the analysis is such that it is allowed to stay in

Page 26

1  state court.
2      THE COURT: But it's not the Ninth Circuit that is
3  going to be making -- being -- evaluating this; it is the First
4  Circuit that is going to be evaluating it. And the calculation
5  in terms of what constitutes the amount in controversy is, I
6  think -- although I'm not fully up to speed on Ninth Circuit
7  law -- somewhat more complex in the First Circuit including,
8  and from my perspective, whenever a plaintiff seeks to impose
9  upon the defendant a cost in excess of $75,000, which is really
10  what's going on here. And we all -- you're confident, and I
11  expect that if there is corrective advertising that is ordered
12  in this case, it will cost out-of-pocket the defendant more
13  than $75,000.
14      So we have the jurisdictional amount, I believe. We
15  certainly have diversity. And it seems to me borderline
16  frivolous to raise the remand issue in this context. Now,
17  maybe your case is simply -- you're prepared to have your case
18  disappear, the Adoure case disappear here. I don't know. But
19  I have this immediate sense that I have some responsibility
20  apart from the 41(a)(1) issue to address this and make a
21  gatekeeper kind of judgment.
22      MR. KICK: Apart from the 41(a)(1) issue, your Honor,
23  I don't think anyone is arguing that we wouldn't have a right
24  to take this appeal at the conclusion of all the litigation.
25      THE COURT: Absolutely.

Page 27

1      MR. KICK: So if the Court is performing any sort of a
2  balancing, that work in opposing our appellate briefing would
3  need to be done by Gillette regardless because we have a right
4  to do that.
5      THE COURT: Well, they may or may not. The real issue
6  is, Do we impose on the First Circuit the obligation to take up
7  on an interlocutory basis a frivolous matter? Now, you went to
8  the First Circuit already under the Class Action Fairness Act,
9  the assumption of which is that you had a class action. Of
10  course you've already heard that you didn't have a class
11  action. And the First Circuit said, "No, you can't have it
12  under the unique circumstances of the Class Action Fairness Act
13  interlocutory review."
14      So now you want to take another run at it. And the
15  question for me, I think -- and maybe you're right; maybe it's
16  something that the First Circuit can protect themselves, they
17  don't need my help -- is to ask whether or not this is --
18  you're significantly prejudiced in this court. And I'm trying
19  to identify what that prejudice is.
20      It's not the prejudice of BIW, because in BIW it meant
21  that they didn't get to pursue state claims that they wanted to
22  pursue. You do. You get the chance to pursue those claims.
23  Or at least they're being pursued on your behalf under the
24  consolidation that the MDL requires -- or has directed. So I
25  don't see anything else other than the preference for forum.

Page 28

1      MR. KICK: Well, pragmatically speaking, the elephant
2  in the room that no one is talking about is the fact that if I
3  wait to appeal until all the other actions have concluded here,
4  we're going to have an extremely difficult, if not impossible,
5  time going forward seeking compensation that's already been
6  redressed. In other words, it goes from a potential
7  multimillion dollar program to an argument over a $20 razor.
8  So that's the pragmatic reality in performing this analysis
9  when --
10      THE COURT: And that, of course, is what the MDL was
11  supposed to synthesize in some fashion. To say, you know,
12  there can be a variety of these kinds of claims, let's get them
13  all together so that we don't have a series of outliers
14  resolving this case by the exercise of leverage.
15      Now, one of the things that was raised here and was
16  sought early on in Adoure, I guess in the central district, was
17  preliminary injunction to obtain your corrective advertising.
18  That hasn't been renewed here. And so the passage of the time
19  is, you know, the litigation choice that's been made by the
20  Adoure plaintiff on the question of do you get lots of
21  corrective advertising or do you get a coupon for another
22  razor.
23      MR. KICK: Well, I --
24      THE COURT: You know, if you want to seek corrective
25  advertising - corrective advertising is time-sensitive, I would

Page 29

1  think - then you could have. Still can move the Court for
2  preliminary injunctive relief. That's the traditional forum of
3  interlocutory relief, and it's one as to which there's
4  immediate appeal.
5      MR. KICK: Right.
6      THE COURT: But you haven't. And what you're choosing
7  is -- is a route that is even more scenic than the classic
8  Class Action Fairness route that you sought before.
9      MR. KICK: Well, with the price of gas, I try to avoid
10  scenic routes.
11      THE COURT: Right. But I think you're consuming a
12  great deal of energy in these efforts.
13      MR. KICK: I actually -- if I may, I brought a copy of
14  our preliminary injunction papers, and your Honor reminded me
15  by mentioning them. The truth is, we first filed for a
16  temporary restraining order -- in Los Angeles you're required
17  to contemporaneously apply for a preliminary injunction as
18  well -- on August 25th of last year in state court. We then
19  were served with a notice of removal that took us into the
20  district court in Los Angeles, and again tried to get it heard
21  there but couldn't get it heard. So I think that --
22      THE COURT: Well, I think you got it heard. I think
23  that simply the judge said, "I'm staying this thing until the
24  MDL deals with it."
25      MR. KICK: Right. And then we moved to the judicial

## Page 30

1  panel on Multidistrict Litigation in North Carolina and spent
2  several more months waiting on that, and a decision there, and
3  then we --
4       THE COURT: When you say "North Carolina," were they
5  holding hearings in this case?
6       MR. KICK: In Asheville.
7       THE COURT: That's where they were sitting for that --
8  the bimonthly meeting?
9       MR. KICK: And so we argued then, and so there were
10 more months of delay. We then arrived at this court and tried
11 to come to an agreement on lead counsel who's going to be
12 deciding what's filed, as this Court is well aware, and that's
13 what the focus was.
14      THE COURT: Okay. Well, that's all well and good, but
15 I'm sitting here being told that there's a time dimension to
16 this that's very important, and nobody ever asked me for a
17 preliminary injunction. Now, that's not saying you're going to
18 get one, but if you want a resolution on the preliminary
19 injunction, you file for a preliminary injunction. I mean,
20 nobody -- you don't have to ask me ahead of time to do that.
21 Once you're in this court, for good or ill -- I've been a
22 member of the clean plate club. It's served up on my plate and
23 I try to consume it. But nobody served me with a motion of
24 preliminary injunction. So if that's the issue, well, that's a
25 different kind of issue.

## Page 31

1       Now, you're right. Time's passed. The salience of
2  the need for corrective advertising -- effective corrective
3  advertising -- has been blunted, I suppose, by the passage of
4  time. But, you know --
5       Do you want to enter this conversation at this point?
6       MR. WOLKOFF: With some trepidation, your Honor. I
7  was simply going to mention that this is not your first
8  invitation to this particular plaintiff with regard to filing a
9  preliminary injunction motion. As I recollect, it was very
10 cold sometime maybe in January/February when your Honor first
11 raised it, and now it's very warm and your Honor's raising it
12 again. I'm not inviting a PI motion by any means, but
13 certainly this particular plaintiff has had the full
14 opportunity to do that if he wanted to.
15      THE COURT: Right. Well, that's -- as I said, that's
16 a choice and timing is, in litigation, like everything else.
17      But let me talk about the 41(a)(1). Does he have to
18 even ask me?
19      MR. WOLKOFF: Yes, your Honor. Because he's placing a
20 condition with regard to the dismissal, and the condition is
21 that he be permitted to appeal. On page 2 of our --
22      THE COURT: Well. I don't understand that to be a
23 condition here. He's -- he has a right of appeal. The First
24 Circuit has recognized the right of appeal in the most limited
25 sorts of ways. And what this notice is, is what the First

## Page 32

1  Circuit seems to call for in this what I would call proto-quasi
2  Section 1292 -- I guess that's the one -- that provides
3  interlocutory review.
4       But, you know, they created this procedural mechanism
5  outside of the statute to do it, but all they ask is, make sure
6  that people know that what you're doing is, you're going to
7  appeal. But they're dead as a doornail if they're unsuccessful
8  on this motion for remand. The case just disappears.
9       MR. WOLKOFF: Well, my understanding, your Honor, is
10 that ordinarily if they simply dismiss their action, they would
11 not have a right to appeal.
12      THE COURT: Well, but how do they get the right to
13 appeal? I mean, I function as a gatekeeper at all points?
14      MR. WOLKOFF: This is, your Honor, in essence asking
15 your Honor to appeal. They say to your Honor, "We" --
16      THE COURT: Where do I find that in the First Circuit
17 law? I find it -- I find it in Rule 41 generally that I can
18 condition things any way I want. But that's after 48 --
19 41(a)(1).
20      MR. WOLKOFF: Well, in the Cashmere case, your Honor,
21 that we cite and quote on page 2 of our brief, we talk about
22 that ordinarily a plaintiff who voluntarily dismisses his
23 action cannot appeal --
24      THE COURT: Right.
25      MR. WOLKOFF: -- because there's no voluntary or

## Page 33

1  adverse judgment against them.
2       So if the plaintiffs -- if Adoure were simply to
3  dismiss their action, they would not be able to appeal your
4  Honor's decision with regard to the remand.
5       THE COURT: I understand that. But the First Circuit
6  has said you could do it under certain circumstances. There's
7  a funny little wrinkle that I think was designed -- my own
8  view -- was designed to address the peculiar circumstances of
9  BIW. But it doesn't seem to rest on that. And I, you know, go
10 back to Cashmere & Camel Hair. And I'm just trying to see
11 whether the trial -- whether the trial judge did anything in
12 that case.
13      MR. WOLKOFF: I thought that Judge Lindsay had granted
14 the motion to dismiss.
15      THE COURT: No; he partially granted summary judgment.
16      MR. WOLKOFF: He did that, your Honor.
17      THE COURT: But it was partial; it wasn't complete.
18      MR. WOLKOFF: That's correct.
19      THE COURT: And so did he do anything after the notice
20 of voluntary dismissal was entered? It doesn't appear that he
21 did. Now, I tend to think that if I've got any responsibility,
22 I'd exercise it, but I'm not sure that I have any
23 responsibility here.
24      MR. WOLKOFF: I don't think you can tell from the
25 case, your Honor, whether Judge Lindsay did anything further.

1    THE COURT: No, I can't. I haven't looked at the
2  docket to see if he did. But I think if it were set in
3  anything other than 41(a)(1), I would be -- I would exercise
4  some authority, and I think I would try and mirror what seems
5  to be the standard for these kinds of cases, which is
6  significant detriment to the plaintiff -- or injury to the
7  plaintiff -- and that they'll be dead as a doornail if they
8  don't succeed.
9    They will be dead as a doornail if they don't succeed
10  on the remand issue. The question of significant prejudice is
11  one I find a little more problematic, but maybe that's simply a
12  gratuitous observation on my part that I'm not -- I'm sure that
13  finding it congenial you would deny that, but in point of fact,
14  I'm not sure what I should do with that under 41(a)(1).
15    Okay. Let me put it this way: This was raised. I
16  hadn't looked at it, I should have looked at it more carefully,
17  the 41(a)(1) issue. And I'll permit seven days -- or next
18  Friday -- for the parties to submit something here. My view is
19  that if I have some responsibility in this area, it should be
20  to be sure that any condition is consistent with the conditions
21  that the First Circuit puts on this kind of interlocutory
22  review. But I think that's where I am on this one.
23    You know, Mr. Adoure may find himself a hostage to
24  fortune, thrown over the side in this heedless search for the
25  opportunity to return to the Central District of California and

1  then to the Superior Court. But counsel has his obligations to
2  Mr. Adoure: I just decide things.
3    MR. KICK: Thank you, your Honor. Seven days?
4    THE COURT: Pardon me?
5    MR. KICK: Seven days?
6    THE COURT: Seven days. All right?
7    Now, attorneys' fees: I suppose in Victorian times
8  you never talked about money or sex or politics. Nowadays we
9  just don't talk about money. Is that it? So what's the
10  problem? Sooner or later they're going to know, I'm going to
11  know. Why not let them look at it?
12    MR. SHAPIRO: As we said in our papers, anything the
13  Court wants to know, we're happy to tell you. This came amidst
14  a barrage of demands. And your Honor said there was bad blood.
15  We had no bad blood toward them until they started accusing of
16  dereliction of duty and breach of fiduciary duty and sitting on
17  our Boston perch and abandoning California consumers, none of
18  which we believe had any basis whatsoever.
19    You know, they also demanded that I give them a list
20  of every case in which I've been a liaison counsel. And this
21  is in one of the letters attached to the pleadings. And I gave
22  them a list of all counsel --
23    THE COURT: I shouldn't --
24    MR. SHAPIRO: So when I give them --
25    THE COURT: Let me just say I feel your pain, okay?

1    Now, that having been said, there's a particular request for a
2  particular kind of material that is generally available at some
3  point, in part at least, prior to settlement. And the cases
4  that you presented to me were post-settlement cases on not
5  turning over attorneys' fees.
6    Well, you can give them to me, that's fine, but
7  they've asked for it. They ought to have a chance to look at
8  it, I think. So I don't know any reason why I shouldn't permit
9  that.
10    MR. SHAPIRO: Well, I'm happy to tell the Court that
11  there are no fee agreements. I have no fee agreements.
12    THE COURT: If that's the representation, that's the
13  representation.
14    MR. SHAPIRO: Yes.
15    THE COURT: I think you should put it in writing --
16    MR. SHAPIRO: Okay.
17    THE COURT: -- and file it with the Court. And that
18  responds, I think, to your request, doesn't it, Mr. Kick?
19    MR. KICK: I think that in our papers what we asked
20  for was a representation that there is no agreement, nor was
21  there one in place prior to this hearing today.
22    THE COURT: Well, I understand that the --
23    MR. SHAPIRO: I'm not being cute. I'm not saying that
24  I had an agreement but I took it back because they asked to see
25  it. No, I have no agreements.

1    THE COURT: Okay. There are now and have not been any
2  agreements; is that correct?
3    MR. SHAPIRO: Yes, your Honor.
4    MR. KICK: And that applies to all lead counsel and
5  liaison counsel?
6    THE COURT: I feel like I'm --
7    MR. SHAPIRO: The motion to --
8    THE COURT: I date myself, I'm sure, but I feel like
9  Charlie McCarthy and you're Edgar Bergen. Do you know the --
10  this is Candice Bergen's father. And he had a little, was it a
11  marionette or a puppet, or what do you call those guys? In any
12  event, he was a ventriloquist. And that's what I feel like
13  when you say, "And furthermore, they asked for -- did they do
14  this?" And then I say, "And furthermore, did you do this?"
15    MR. KICK: The plaintiff could use you on some other
16  cases.
17    THE COURT: Perhaps. Think again.
18    But the short of it is, if there's a representation
19  that there are not now in place any agreements in respect of
20  fees by and between and among liaison counsel and lead counsel
21  in this case, I think that does it, all right?
22    MR. SHAPIRO: That's correct. I have no agreements
23  with lead counsel or any other counsel.
24    THE COURT: And nor are there any among them?
25    MR. SHAPIRO: Among who?

Page 38

1    THE COURT: Among lead counsel.
2    MR. SHAPIRO: Well, the motion asks for an order
3  compelling disclosure of any fee arrangements and discussions
4  of fee arrangements between liaison counsel and any other firm
5  or firms in this matter. The answer to that question is --
6    THE COURT: Liaison counsel. Does that apply to lead
7  counsel as well? Let's just get that one out.
8    MR. SHAPIRO: I can only speak for myself, your Honor.
9    MR. BARNOW: If I might, your Honor, Ben Barnow, I
10 have no agreement with the Lerach firm. I have had discussions
11 with other people that I would consider when this -- before
12 this case was MDL. It's not reduced to writing. I often have
13 those discussions. But I have no agreement with Mr. Shapiro
14 nor Mr. Rothman nor his firm.
15    THE COURT: All right.
16    MR. KICK: I accept those representations.
17    THE COURT: I think it would be useful to just have
18 them recite in the language of the -- and I want it for the
19 lead counsel as well as liaison counsel, simply respond to the
20 request that they've made. With respect to discussions
21 about -- discussions are not included, as far as I'm concerned.
22 It's only if they've been realized in some fashion, some
23 agreements.
24    MR. SHAPIRO: By letter or by plea? How do you --
25 like filing --

Page 39

1    THE COURT: Just notice of response.
2    MR. SHAPIRO: Notice of response.
3    MR. BARNOW: I want to be clear, your Honor. I may
4  have an agreement with one of the other firms that's not a lead
5  counsel, or two. Or others. But I know for purposes of this
6  discussion I do have one firm; I probably do others --
7    THE COURT: Then I think it has to be disclosed.
8    MR. BARNOW: Okay. But my point is that it was before
9  the matter was MDL and it was never reduced to writing.
10    THE COURT: Okay. But was it operative?
11    MR. BARNOW: I'll disclose it.
12    THE COURT: Okay. If there is an operative
13 agreement -- no big surprise to me that lawyers would have
14 discussions about this. They're kind of dicey discussions if
15 we get into fee-sharing, particularly in Massachusetts. But
16 all I want to know is -- all they want to know, and I'm
17 entitled to know, and sooner or later it's going to come out,
18 if there are operative agreements in respect to fees here by
19 liaison counsel or lead counsel.
20    MR. SHAPIRO: I don't want to speak for Mr. Barnow
21 here, but could that be filed under seal, your Honor?
22    THE COURT: Well, it has to be served on counsel.
23    MR. SHAPIRO: We'll serve it on counsel.
24    THE COURT: I think you have to serve it on all
25 counsel in this case. Not merely Mr. Kick, but all counsel.

Page 40

1    MR. SHAPIRO: Yes.
2    THE COURT: And file it with me.
3    MR. SHAPIRO: This is a matter of precedent: We'd
4  rather not have it in the public record.
5    THE COURT: Sure. But at some point it may become a
6  public matter and it would --
7    MR. SHAPIRO: Can we file it under application or
8  something?
9    THE COURT: -- at the time of settlement become a
10 public matter.
11    MR. SHAPIRO: Okay.
12    THE COURT: Because, you know, I shouldn't say I've
13 lost interest in how attorneys get paid, but it's none of my
14 business, for the most part, except when it comes to class
15 actions where the peculiarities of the dynamics require that I
16 at least give some consideration to what's going on.
17    MR. SHAPIRO: We could file it with a motion to seal?
18    THE COURT: A motion to seal.
19    MR. SHAPIRO: With a certificate of service showing
20 service?
21    THE COURT: Right. Right. And at this stage it's
22 sealed.
23    MR. BARNOW: If I may, your Honor?
24    THE COURT: Yes.
25    MR. BARNOW: I hurt my knee, so I apologize, but I can

Page 41

1  stand. It's really a case of forgetting to stand, but it does
2  hurt.
3    In any event, I'm wondering if Mr. Kick and Mr. Kanner
4  or any of his people in his group have any written agreements
5  on fees, et cetera --
6    THE COURT: So do I, but what relevance is it?
7    MR. BARNOW: Fair enough, Judge.
8    THE COURT: I'm as curious as the next guy. And I
9  particularly, as a culinary matter, like sauce for the gander
10 as well, but this is not one of those occasions in which I can
11 whittle it out.
12    MR. SHAPIRO: I think it's as relevant as their
13 request for disclosure by our side.
14    THE COURT: Why?
15    MR. SHAPIRO: For the same reason that they're
16 requesting any agreements on our side --
17    THE COURT: Well, no, they have, but I don't know why
18 it would be relevant. It's relevant on your side because the
19 question is whether or not the hydraulics of your financial
20 arrangements are in some way driving the decisions in respect
21 to settlement.
22    MR. SHAPIRO: Okay.
23    THE COURT: That's not immediately applicable to them,
24 or at least it's not something that I will -- I'm required to
25 look at, right?

Page 42

1    So going through -- I think that's all of the matters.
2 We have, obviously, this October, is it, that the motion for
3 class certification is on here?
4    I think -- well, let me just see if there's something
5 I should do about the California pleadings. You say that --
6 you understand you're responding to a -- this is to the
7 defendant, that you understand you're responding to these
8 California claims that are found in Adoure -- and I'm sorry, I
9 forget the name of the other.
10    MR. KICK: Corrales.
11    MR. WOLKOFF: Corrales. Yes, your Honor. In fact,
12 one of the named plaintiffs in the consolidated complaint,
13 Matthew Marr, is a California resident. Mr. Kick misspoke
14 before when he said his was the only California-only class
15 action. But in fact, there's at least one other by the name of
16 Lipper. Mr. Kick claimed that he was being prejudiced because
17 he wasn't receiving --
18    THE COURT: Well, let me put it in a way that becomes
19 more -- most problematic at the pleading stage, and that's
20 this: Have you asserted all of the affirmative actions --
21 affirmative defenses that you would assert to the California
22 claim?
23    MR. WOLKOFF: Yes, your Honor.
24    THE COURT: Okay. So I'm not going to make any
25 special order that the -- regarding the consolidated complaint.

Page 43

1 If it has to be tidied up or cleaned up, and it may well have
2 to at the time of class certification, I'll consider it at that
3 point. But right now I don't understand that, A, there's been
4 a sub silentio dismissal either by the court or by the lead
5 counsel team of the California claims here. They may not be
6 pled with a particular area that you are familiar with, but I
7 have representations that they are in the case. Now, if you
8 want to have it more specifically -- or if at the time of class
9 certification motions that have to be done, then I'll consider
10 it at that point, all right?
11    So I'm going to deny the motion to -- so-called motion
12 to opt out in this case; I am going to review further the
13 motion for voluntary dismissal with prejudice subject to the
14 receipt of additional materials here by next Friday. I am
15 allowing the motion to compel disclosure of fee arrangements,
16 and that disclosure can be met by the submission of a notice of
17 response to the motion, as we've discussed earlier, and I am
18 going to allow the motion to have access to discovery for the
19 plaintiffs -- for other plaintiffs outside of the lead and
20 liaison group. And I will look to receiving a proposed Case
21 Management Order No. 3 that would embody the understanding of
22 that and, to the degree necessary, provide the practical
23 incidence of that.
24    I understand from listening to this that most of this
25 material is in electronic form that probably can be transferred

Page 44

1 easily to the defendant at a very little -- to the other
2 plaintiffs at very little cost. And so I date myself, I
3 suppose, by talking about document repositories here, but I
4 don't want to get into it any deeper. I assume that you can
5 work that part of it out.
6    MR. SHAPIRO: Would you want to leave it to counsel to
7 try to work it out, and if we can't, submit something to the
8 Court by way of a proposed case management order or judgment?
9    THE COURT: Mr. Kick, what do you want?
10    MR. KICK: I'm confident we should be able to work
11 that out.
12    THE COURT: So I think my -- we can just leave this as
13 part of how -- of the case as opposed to the law of the case,
14 lure being my ruminations at a hearing.
15    MR. SHAPIRO: Whatever arrangements might change over
16 time --
17    THE COURT: Yeah. I don't want to straitjacket
18 everybody on this. So if you can't work it out, you know where
19 I am, okay? All right. Anything else?
20    MR. KICK: Just for clarification, your Honor, on the
21 first motion we dealt with which the Court has -- which is
22 called the opt-out motion, denied without prejudice as opposed
23 to with prejudice. Denied --
24    THE COURT: Yeah, I guess in the sense that virtually
25 everything is always denied without prejudice, but I think

Page 45

1 you've got an understanding of what it is that I think is going
2 to be critical on the question of opt-out. The MDL sent it
3 over to me. I think my obligation is to try to get it moving
4 along as fairly as possible understanding that your present
5 intention is to go back to the transferee court. But the
6 pretrial is here, and that's where I'm going to try to deal
7 with it unless there's some special reason I can't.
8    MR. KICK: And the other clarification on that motion,
9 your Honor: At one point the Court might have seemed inclined
10 to, not let us opt out, but add a California cause of action
11 into it, but then a representation from counsel for Gillette
12 that all of their affirmative defenses have been pled and that
13 there would be no additional affirmative defenses.
14    THE COURT: That's what I understand to be the case
15 here. There is no need at this point to raise that. If --
16    MR. KICK: I just want to make clear that we will be
17 pursuing under California's UCL's false advertising law CLRA,
18 and there are no affirmative defenses that would have been pled
19 by Gillette that don't exist.
20    THE COURT: That's my understanding at this time.
21 People may have agonizing reprisals, but they'd better act
22 promptly to raise affirmative defenses.
23    MR. KICK: Finally, on the unnamed plaintiffs. Again,
24 their cases have not in any way, as the Court indicated --
25    THE COURT: No. I think I said at the time, and if I

Page 46

1  wasn't clear enough, I think I've been clear enough now, I have
2  whatever I have, 26 cases, 23 cases, whatever. I've put them,
3  for ease of docketing in this court, under a consolidated case
4  and ask for a consolidated complaint just so we're all playing
5  with the same deck of cards rather than 26 different card games
6  going on. But that card game includes you -- or at least the
7  claims that you have.
8      MR. KICK: Thank you, your Honor.
9      MR. SHAPIRO: If I could just make it clear for the
10  record, there was never any intention to abandon the California
11  claims. It has been our view from the outset that they're
12  alleged adequately in the consolidated complaint given the
13  procedural posture of this case. And this is something we're
14  doing in response to anything that they do.
15      THE COURT: Okay. I try to, although I'm not always
16  successful, not to decide or make observations about things
17  that aren't really before me. The history of this is not
18  really before me. All I'm dealing with is the actual state of
19  the pleadings, and they seem adequate presently, but maybe
20  somebody will want to tidy them up when we get to the question
21  of class certification, if there are separate classes both
22  nationwide and state classes that are asserted.
23      Yes, sir?
24      MR. DODD: I may be over-salting this potato, your
25  Honor, but you earlier had said to Mr. Shapiro, "Why not add

C E R T I F I C A T E

1
2
3      I, Marcia G. Patrisso, do hereby certify that the
4  foregoing transcript is a true and accurate transcription of
5  the within proceedings, to the best of my knowledge, skill,
6  ability and belief.
7
8
                MARCIA G. PATRISSO, CSR, RPR, CRR
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 47

1  them specifically?" He said based on the case management order
2  he thought that this was the most efficient mechanism for doing
3  it. I got the impression that you said that he had agreed to
4  modify the amended complaint.
5      THE COURT: Well, I think the statement was, he said
6  he would do whatever I wanted, which was, I think, an
7  appropriate stance to take. But I don't think -- on
8  reflection, I don't think he needs to do anything more.
9      MR. DODD: Okay. But -- so at this point, though,
10  we're considering what has been filed not as an amended
11  complaint but as a consolidated complaint.
12      THE COURT: Yeah. It's a consolidated complaint which
13  is here a litigation artifact, the purpose of which is to let
14  us all gather around the same general allegations.
15      MR. DODD: Thank you, your Honor.
16      THE COURT: And then we'll sort through it a little
17  more precisely as time goes on. All right. Anything else we
18  need to take up? Okay. We'll be in recess.
19      THE CLERK: All rise.
20      (The proceedings adjourned at 3:40 p.m.)
21              * * *
22
23
24
25

HT - March 6 2006 (Notepad Version)

1

| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF MASSACHUSETTS |

3    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

4    MARK DEARMAN, ET AL
                        Plaintiffs
5
         VERSUS                          CA-05-11177-DPW
6
     GILLETTE COMPANY
7
                        Defendant
8    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

9

10              BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

11                UNITED STATES DISTRICT COURT JUDGE

12                            HEARING

13                         MARCH 6, 2006

14   APPEARANCES:

15       THOMAS G. SHAPIRO, ESQ., Shapiro, Haber & Urmy, LLP,
         53 State Street, Boston, Massachusetts  02109, on
16       behalf of Mark Dearman, Anthony Debiseglia

17       ALLAN KANNER, ESQ. AND CYNTHIA GREEN, ESQ., Kanner &
         Whiteley, 701 Camp Street, New Orleans, Louisiana
18       70130, on behalf of Carlos Corrales & Kasem Adoure,

         Plaintiffs
19
         BEN BARNOW, ESQ., Barnow & Associates, One North
20       LaSalle Street, Suite 4600, Chicago, Illinois  60602,
         on behalf of Greg Besinger, Plaintiff
21
         WILLIAM A. BAIRD, ESQ. AND GILLIAN L. WADE, ESQ.,
22       Milstein, Adelman & Kreger, LLP, 2800 Donald Douglas
         Loop North, Santa Monica, California  90405, on behalf
23       of David Atkins, Plaintiff

24       OLEN KENNETH DODD, ESQ., The Dodd Law Firm, P.O. Box
         3504, Beaumont, Texas  77704, on behalf of Plaintiffs
25

☐                                                              2

1
     APPEARANCES (Con'd.):
2
         REGINALD VON TERRELL, ESQ., The Terrell Law Group,
3        223 25th Street, Richmond, California  94804, on
         behalf of Michael Pruitt, Plaintiff
                            Page 1

HT - March 6 2006 (Notepad Version)

4

5    C. DONALD AMAMGBO, ESQ., Amamgbo & Associates, PLC,
      1940 Embarcadero, Oakland, California 94606, on behalf
      of Michael Pruitt, Plaintiff

6

7    KENNETH D. QUAT, ESQ., 9 Damonmill Square, Suite 4A-4,
      Concord, Massachusetts  01742, on behalf of Plaintiffs

8    LANCE A. HARKE, ESQ., Harke & Clasby, LLP, 155 South
      Miami Avenue, Suite 600, Miami, Florida  33130, on
9    behalf of Collin McGeary, Plaintiff

10   JAMES J. NOTIS, ESQ., Abbey, Gardy, LLP, 212 East 39th
      Street, New York, New York  10016, on behalf of
11   Plaintiffs

12   HARVEY J. WOLKOFF, ESQ., MARK P. SZPAK, ESQ. AND
      EMILY C. SHANAHAN, ESQ., Ropes & Gray, One International
13   Place, Boston, Massachusetts  02110, on behalf of
      Gillette Company, Defendant

14

15   ANDRAE P. RENEAU, ESQ., The Wexler Firm, One North
      LaSalle Street, Suite 2000, Chicago, Illinois  60602,
      on behalf of

16

17   DAVID PASTOR, ESQ., Gilman and Pastor, LLP, 60 State
      Street, 37th Floor, Boston, Massachusetts  02109,
      on behalf of

18

19                            Courtroom No. 1 - 3rd Floor
                              1 Courthouse Way
20                            Boston, Massachusetts  02210
                              2:30 P.M. - 3:45 P.M.
21

22

23        Pamela R. Owens - Official Court Reporter
           John Joseph Moakley District Courthouse
              1 Courthouse Way - Suite 3200
24            Boston, Massachusetts  02210

25


□                                                              3

1                       CA-05-11177-DPW

2                        MARCH 6, 2006

3            THE COURT:  Well, I want to start perhaps by

4    exploring the suggestion that there was as least at some point

5    a discussion about the use of a steering committee here by the

6    Dearman group.  And Mr. Shapiro, maybe you can explain that a

7    little bit to me.

8            MR. SHAPIRO:  Yes, Your Honor.  I had proposed at

HT - March 6 2006 (Notepad Version)
9   various times the concept of a steering committee and it was

10   not accepted by either Mr. Barnow or Mr. Harke who insisted on

11   having a co-lead position.  And I explained to them why the

12   majority of firms that joined together -- now called the

13   Dearman group -- could not agree to that.  I also proposed the

14   idea of a steering committee both to Mr. Kick and to

15   Mr. Kanner.

16          THE COURT:  Well, what was the format that your

17   steering committee would take or to the degree it was --

18          MR. SHAPIRO:  The format was that there would be

19   co-lead counsel -- the Lerach, Coughlin firm and my firm -- and

20   that there would be a steering committee to be consulted and

21   involved in the case going forward, but we did not agree to the

22   concept of the steering committee being able to overrule

23   co-lead counsel.  I think the feeling was, Your Honor, that the

24   original proposal that had been made was that there be a four-

25   firm steering committee consisting of the Abbey, Gardy firm in

                                                                      4

1   New York; the Wexler firm in Chicago; the Lerach, Coughlin firm

2   in New York; and my firm here in Boston.  And there was an

3   organizational meeting that I requested and this proposal was

4   made at the organizational meeting.  And a number of firms --

5   virtually every firm there -- objected to the concept of there

6   being a four-person steering committee.  They thought it was

7   top heavy, unnecessarily inefficient.  And in response to those

8   comments, we proposed simply a two co-lead structure.

9          THE COURT:  Let me ask why you need two co-lead --

10   to take your current proposal, why you need two co-lead

11   counsel?

12          MR. SHAPIRO:  I think it's a substantial case, Your

13   Honor.  A lot of resources will go into the case and I think

HT - March 6 2006 (Notepad Version)

14    it's better litigated with two. There's no magic to it. We

15    just felt that that was the best way to go.

16              THE COURT: Assuming as I do there seems to be some

17    perhaps overstated, but differences of opinion at this stage on

18    where this case is going to go, how do I -- from your

19    perspective -- adequately ensure that the voices of the

20    litigants who seem to have a different perspective on this are

21    adequately heard?

22              MR. SHAPIRO: I think that people would have the

23    right to come in and object to anything that is done, I

24    suppose. I would emphasize that there are 25 cases that have

25    been filed and 15 of the cases are supportive of the group

                                                                5

1    proposals.

2              THE COURT: Well, I know that. I guess, looking a

3    little bit behind that amicus surface of this case, it appears

4    that at least some substantial settlement discussions were

5    conducted by the Dearman group, or at least portions of it, and

6    that I guess what they keep calling themselves, the Atkins

7    Group --

8              MR. KANNER: Atkins, yes.

9              THE COURT: -- professes a different view on this.

10    Now, I keep thinking of President Johnson's observation about

11    the importance of having the camel inside the tent pointed

12    outside rather than outside the tent pointed inside. And the

13    question is how to do that.

14              MR. SHAPIRO: Well, we've explored at some length

15    and we've not been able to come to any agreement. The Atkins

16    group, Your Honor, is really sort of riding two horses. They

17    opposed the MDL proceedings initially. They're the only

18    plaintiff's counsel that opposed it saying that they wanted the

HT - March 6 2006 (Notepad Version)
19    California cases to be kept separate.  The last time we were

20    here, they argued the motion to remand the California state

21    court case.

22              THE COURT:   I don't think they thought it was much

23    of an argument.

24              MR. SHAPIRO:  Well, they tried to.  And they've now

25    filed a notice of appeal from Your Honor's denial of the motion

                                                                    6

1     to remand.

2              THE COURT:   I guess I wasn't aware of that.  But

3     has that been filed in the First Circuit?

4              MR. SHAPIRO:  That's my understanding.  Yes, Your

5     Honor.  So they're trying to maintain a separate California

6     claim.

7              THE COURT:   Just a moment.  There seems to be some

8     puzzle.  Make it's puzzlement or maybe it's just indigestion.

9     But Mr. Wolkoff, has a notice of appeal been filed?

10             MR. WOLKOFF:  It has been filed, Your Honor.  Yes.

11             THE COURT:   In the First Circuit?

12             MR. WOLKOFF:  In the First Circuit.

13             THE COURT:   And in the Ioude (sic) case?

14             MR. WOLKOFF:  It's in the Adoure case, Your Honor.

15             THE COURT:   Adoure.  It's dyslexia on my part.

16             MR. WOLKOFF:  And my understanding is under the

17    particular procedure that they filed under, which is Kaffa

18    (sic), the First Circuit has to accept the appeal.  And there

19    is about another 25 days or so for the First Circuit to decide

20    whether to accept the appeal or not.  If they don't accept it,

21    they don't say anything, it's a pocket veto.  And if they do

22    accept it, then we'll have an argument on the merits.

23             THE COURT:   Is that why I didn't see a notice of

                                Page 5

HT - March 6 2006 (Notepad Version)
24    appeal here filed?  So, was it filed directly with the Court of
25    Appeals; is that it?

                                                                    7

1         MR. WOLKOFF:  I think the thing was filed directly
2    with the Court of Appeals.
3         THE COURT:  Right.  So it's not reflected in the
4    record.  That's why I wasn't aware of it.  But go ahead.
5         MR. SHAPIRO:  So --
6         THE COURT:  So they have a different point of view
7    about it.  I'm assuming that this is going to chug along in a
8    consolidated fashion without the remand.  At least that's my
9    view at this stage until I am told otherwise.  So, there we
10    are.  We have them with expressed concerns, perhaps over-
11    dramatically expressed, but expressed concerns.
12        MR. SHAPIRO:  Well, I have given them every
13    assurance that we would listen to their point of view and try
14    to be as inclusive as we could and having everyone have input
15    in the decisions that ultimately need to be made.  And they
16    can't be made by, you know, a tribe of Indians.  You need a
17    chief or chiefs.  And there are other firms that, for the sake
18    of efficiency and focusing the litigation agree not to be
19    seeking a lead counsel position here.  The Wexler firm agreed
20    to step back.  The Abbey, Gardy firm agreed to step back.  And
21    then, you know, Mr. Kanner, who we heard from long after
22    discussions had taken place, long after the meeting that we had
23    in November and originally just wanted to have his voice heard
24    and we assured him his voice would be heard, and then he
25    ultimately rejected the idea of a steering committee without

                                                                    8

1    having some veto power or the majority of the steering
2    committee over lead counsel.  And we felt that there were a
                              Page 6

HT - March 6 2006 (Notepad Version)

3    number of firms and not everyone's voice can be the decisive
4    voice.  And that's how we got to this decision.

5              And the same thing with Mr. Barnow and Mr. Harke,
6    Your Honor.  We were discussing it with a number of firms who
7    wanted to be lead counsel.  We felt it was justification for
8    agreeing to join forces with them versus other firms that we
9    have been discussing with and they have been working with.  And
10   they say 15 out of the 25 cases believe this is the best way to
11   proceed.  We believe that our firms have the best resources and
12   can best advance the objectives of the class.  And I don't know
13   that there is really any -- you know, this isn't really a
14   situation, apart from this corrective advertising claim in
15   California and the California law that you have -- in some
16   situations, you may have subgroups or subclasses with different
17   interests.  There really are no different interests and the law
18   is pretty much the same all over the country.  Everybody's
19   clients pretty much have the same interests.  So, different
20   points of view.  It seems to me it's more jockeying for
21   position than having genuine differences of opinion about what
22   their client's interests are in the case.

23             THE COURT:  All right.  Do you want to speak as
24   well to Mr. Barnow and Mr. Harke's proposal -- the McGeary
25   group, I guess they call themselves -- proposal beyond what

0                                                                9

1    you've said?

2              MR. SHAPIRO:  Yes, Your Honor.  I think it's a
3    similar situation where a number of cases were filed early on
4    here in Massachusetts.  The firms started talking to each
5    other.  The allegation that we were a group and that we had
6    everything pre-arranged is not true.  The Wexler firm, for
7    example, Ken Wexler, I've never talked to Mr. Wexler in my life

Page 7

HT - March 6 2006 (Notepad Version)

8    before this Gillette case came about.  The Abbey, Gardy firm in

9    New York, I know them.  I haven't worked on a case with them in

10   quite some time personally, years probably, although one of my

11   partners currently has been working on one case with them.

12   They filed in New Jersey totally independently from us.  And we

13   began to see what cases were filed.  We began talking to people

14   and discussions ensued and developed in that fashion.  So

15   there's no preexisting groups.  And then the purpose of the

16   organizational meeting was to let everyone come in one room and

17   talk about it and make proposals.  And the people who did come

18   -- there were about 15 lawyers there, I think -- no one

19   proposed anyone else to be a lead counsel.  The settlement

20   really was there should be fewer than four in this case.

21           There has been a very substantial settlement offer

22   made by Gillette which we think may well lead to an early

23   settlement in the case.  It was a very forthcoming offer and we

24   responded to it and made a counter-offer.  The parties were

25   quite far apart on some issues.  There were some issues we

                                                              10

1    really hadn't even discussed with them because it was premature

2    and then we called a halt to these discussions when it became

3    clear subsequent to the November meeting that we thought we had

4    an agreement, that there were objections here and there and

5    differences of opinion about how the plaintiffs' group should

6    be organized.  So we just stopped having any such settlement

7    discussions because we didn't feel we did have authority to

8    speak for the case.

9           But we think the case does need to be organized.

10   Someone does have to have the authority to speak for the class

11   and that the differences -- there are no different interests

12   among the various clients in all the 25 cases.  They all

                        Page 8

HT - March 6 2006 (Notepad Version)

13    raise -- are all identically situated in terms of what their
14    claims are.  It's not like a securities case where you have a
15    bond purchaser and this kind of stock purchaser or that kind of
16    stock purchaser or antitrust case where you have got --
17                THE COURT:  So, what's your answer to the different
18    views?  They just opt out, is that it?
19                MR. SHAPIRO:  They can opt out or they can file an
20    objection before Your Honor if the settlement is reached as
21    they propose.  They can work with us and work collegially and
22    try to come up with a consensus opinion.  But I think to have,
23    you know, these superstructures as has been proposed with the
24    numbers of different lawyers from all over the country is a
25    very inefficient and unnecessary way to proceed in this case.

                                                                    11
1                 THE COURT:  All right.  Mr. Barnow?
2                 MR. SHAPIRO:  We feel that no one -- we don't feel
3     we take a second seat to anyone in terms of the resources that
4     our firms bring to bear on the case, in terms of our track
5     record of litigating cases vigorously, of trying cases that
6     need to be tried and therefore the case -- the class would be
7     very well represented.
8                 THE COURT:  Mr. Barnow, I guess the problem I have
9     with your proposal is it kind of reminds me of the Government
10    of Iraq.  It seems quite top heavy, I guess.
11                MR. BARNOW:  Your Honor, I'm also standing.
12                MR. DODD:  Your Honor, my name is Olen Dodd and I
13    was one of the lawyers that was at this meeting that
14    Mr. Shapiro and his group called.
15                THE COURT:  And you're going to dispute what he had
16    to say about that?
17                MR. DODD:  Absolutely.
                              Page 9

HT - March 6 2006 (Notepad Version)

18          THE COURT:  Okay.  Then I'll hear that at an
19  appropriate time.

20          MR. DODD:  Okay.

21          MR. BARNOW:  Your Honor, first of all, we tried
22  hard to organize the matter and bring people together.  And,
23  frankly, that is something I believe most of the lawyers in
24  this case, if not all, that are seeking leadership roles in
25  this case have done before.  I didn't turn to really anything

☐                                                                    12

1  new or novel because this is tried and true.  It has worked in
2  our system before.  And while it may be difficult to instill
3  the democratic process in a society that is apparently adverse
4  to it for different reasons, I don't think that the
5  divisiveness that exists between the mental attitudes, if you
6  will, in Iraq is the type of divisiveness that should exist --

7          THE COURT:  No.  But what you have here are what
8  are portrayed as three separate groups.  And there is this
9  smorgasboard of committees to try and give everyone a chance at
10  participatory democracy.

11          MR. BARNOW:  Well, ironically, Your Honor, since I
12  guess I'm going to have to go behind the scenes a little bit,
13  some of these committees actually came with regard to people
14  talking about how it could be put together.  I had a request,
15  for instance, to have a state law committee which came from
16  Mr. Baird and Ms. Wade that was endorsed by Mr. Kanner.  We
17  were all -- believe it or not -- working together while this
18  all fell apart.  People were asked to be on the so and so
19  committee.  So we did that because these are things that not
20  only have been traditional, but actually do work.  I have
21  listed -- and I don't want to go through them unless the Court
22  wants me to -- a number of cases that I have been in, most

HT - March 6 2006 (Notepad Version)

23    recently the Cheryl Motiva case before Judge Lamell.  And there

24    were about the same number of law firms.

25              THE COURT:  I have seen it.  But this case doesn't

☐                                                                    13

1     seem to be able to bear that kind of burden.

2              MR. BARNOW:  Well, I'm not sure.  If you listen to

3     the Atkins group, they think there is.  One of the things we

4     did in our prayer for relief is actually slightly different

5     than the idea that this is necessarily a mandated form.  What

6     we did, Your Honor, and perhaps on papers that weren't as clear

7     as they should have been -- I hope they were -- is we

8     circulated with proposed names on a "for comment" basis an item

9     that would incorporate and bring in and give everybody the type

10    of access that the Atkins group now says they want.  I mean,

11    it's better to have them in an organized structure than a pile

12    on a football field, everybody grabbing for the football.  So,

13    since everybody wants to be involved, why not turn to that

14    which works?  Your Honor, I would reference --

15             THE COURT:  Well, I guess for the cost purposes.

16    That's really what's on my mind.

17             MR. BARNOW:  Well, the cost is actually more

18    efficient because --

19             THE COURT:  I'm not -- my experience with

20    committees is it's not, that it requires a substantial amount

21    of time and effort in working your way through the committee

22    process and up the chain of command with costs imposed in the

23    course of doing so that wouldn't otherwise be imposed.  So, in

24    my mind, there's some balance and sense of proportion that has

25    to be identified with respect to efficiency and participation.

☐                                                                    14

HT - March 6 2006 (Notepad Version)
1          MR. BARNOW:  And I agree with that view.

2     Respectfully, what we ask for in our prayer for relief is the

3     appointment of two -- Mr. Shapiro and myself -- as lead counsel

4     and then with an order from Your Honor for a date, short and

5     certain, to bring back an order with various committees and

6     participation from other counsel.  I looked at this list this

7     morning.  I think you have round numbers, but please don't hold

8     me to it.  I think it's about eight committees.  Obviously,

9     this can be truncated and put together and organized versus

10    state law issues can go under class certification.  You have

11    got the documentation committee or it can go into the discovery

12    committee, et cetera.  So there can be some definitional

13    organization that way.  What I would assure the Court is that I

14    don't recall any case that I have been in -- I'm not saying I'm

15    trying to substitute my limited experience for this Court's

16    wisdom or experience where inefficiency has been an issue.  And

17    we would stand by that and I would respectfully tell the Court

18    that if the Court found any inefficiency to the extent I was

19    entitled to any fees, you could take it off mine.  I take great

20    pride in the ability to organize a matter.  And in this case, I

21    wouldn't be alone.  We have other good counsel.  So, it may

22    well be that the Court decides that there would be two lead

23    counsel, liaison.  An order directing an organizational order

24    in short order, the Court could see that a more contrite

25    presentation along with the named --

                                                              15

1               THE COURT:  Is contrite the word you mean --

2     contrite or --

3               MR. BARNOW:  Short or concise.

4               THE COURT:  Concise.

5               MR. BARNOW:  Concise.

                        Page 12

HT - March 6 2006 (Notepad Version)
6         THE COURT:  I rarely see contrition.

7         MR. BARNOW:  Well, Your Honor, we didn't have a
8    reply.  So, my brain has slipped over to the reply.  In that
9    regard, Your Honor, I think some of the issues that the reply
10   got into, obviously we disagree with them.  Unless the Court
11   has questions, I don't want to get into that.  I don't think
12   lawyers should.  But people see things differently.  What I do
13   believe is that a lot of good lawyers have pushed this matter
14   forward.  I do believe that Mr. Shapiro's group has advanced
15   the matter.  I believe my group has.  I think Mr. Kanner has.
16   And that doesn't exclude anybody else.  But in terms of how you
17   make disparate groups work together is entering an order that
18   says they should.  I think all of this lawyer stuff drops to
19   the wayside once you have an appropriate organizational order.
20   Mr. Kanner is from New Orleans.  He knows that there's a lot of
21   proud and effective attorneys down there and I would hope,
22   since he knows most of them, that he would agree that their
23   agreeing and working in harmony under a similar order speaks
24   well for what could happen here.  Frankly, I thought that we
25   were close to all coming together here.  And  when I really

□                                                                16

1    read the Atkins papers, I see and I believe that our approach
2    and the organizational order we put forth really does deal with
3    that.  For instance, we have a paragraph where the plaintiff's
4    steering committee has to advise -- excuse me.  The lead
5    counsel has to advise the plaintiff's steering committee of all
6    seven proposals and obtained the plaintiff's steering
7    committee's input and comments regarding same.  In sub-part
8    (i), I apologize.  My copy doesn't have the pages marked.  But
9    it's a tried and true order.  It's not the first time it has
10   been used, the little subpart at the bottom of the page.

HT - March 6 2006 (Notepad Version)
11    That's the kind of stuff people want in an order.  It's what

12    they say they want and better through a structure, Your Honor,

13    than just who is going to call whom without any written

14    obligation.  I dare say that once there's a court order that

15    says people have to act this way, any desire to act otherwise

16    would fall by the wayside.

17              THE COURT:  No doubt.  But the question for me is

18    to try to formulate the best possible order.  If I understand,

19    though, correctly, you're in the same boat as Mr. Shapiro with

20    respect to the steering committee?

21              MR. BARNOW:  Well --

22              THE COURT:  That is to say, they have input, but

23    not veto.

24              MR. BARNOW:  Well, here's my problem with that.

25    Quite frankly, since people are choosing to go behind the

▯                                                                  17

1     scenes, I think one of the reasons over the years I have been

2     able to -- I would respectfully state -- effectively organize

3     and lead counsel is that I am inclusive.  And it came up on a

4     conference call as to certain percentages of people having the

5     right to veto a settlement proposal.  And I will tell the Court

6     what I said.  You can't do that because every class counsel

7     lawyer has an obligation, even if you don't agree with it, to

8     report the settlement to the Court, settlement proposal,

9     assuming it's within the realm or range of reasonableness.

10    That's for the Court to decide.  And that's what I said.  And

11    the veto power is for the Court, Your Honor, and not for the

12    lawyers to sit there and say, "wait a minute, we have three

13    California cases in charge of a plaintiff's steering committee"

14    -- which is what they're proposing -- "which have advocated

15    from class action to class action that because California laws

HT - March 6 2006 (Notepad Version)
16   are different, California people have to get $500 apiece more
17   or so and so apiece more, on and on and on.  And while these
18   are viable considerations in the provence of a litigation, to
19   single out people who have set forth, quote, the "visceral,"
20   close quote, interest as a means of stopping a settlement is
21   quite frankly -- and I'll say it here -- subject to ethical
22   considerations.  What about the other lawyers?  Plus I've never
23   been in a case -- I'm sure they happen, but I surely don't know
24   about them -- where lawyers confronted with a settlement
25   process get together and three say "yes" and two say "no" and

                                                                18

1    you don't present it.  In fact, most of mine, I think -- well,
2    I've had a couple where I think I had one member years ago
3    step off an executive committee and he went and objected.  And
4    God bless him.  He raised that issue.  But that's how you do
5    it.  You don't deprive the Court or other lawyers under an
6    obligation --
7              THE COURT:  But I just want to be clear.  Yours is
8    not suggesting any kind of veto power by the steering
9    committee?
10             MR. BARNOW:  I'm sorry, Your Honor?
11             THE COURT:  Not proposing any kind of veto power on
12   the part of the committee -- they're consultative?
13             MR. BARNOW:  The plaintiff's steering committee?
14             THE COURT:  Yes.
15             MR. BARNOW:  I don't see it that way.  I think on
16   veto power, absolutely correct.  We do not give veto power to
17   plaintiff's steering committee.  My view is you cannot, that it
18   would be unethical.
19             THE COURT:  So, ultimately it's then the four
20   people that you propose for co-lead counsel?
                         Page 15

HT - March 6 2006 (Notepad Version)
21          MR. BARNOW:  Actually, I think we proposed two.
22   What we sent around was a proposed one for Mr. Shapiro to get
23   dialogue going.  With regard to the Court, my motion at the end
24   suggests Mr. Shapiro and myself.  I think at first, I think I
25   said myself if there is one or Mr. Shapiro and I if there's

                                                                    19
1    two, and then a plaintiff's steering committee which includes,
2    I think, just about most of the lawyers in the room here
3    today.  And by the way, Your Honor, that was sent around.  When
4    it was sent around, many of those positions, such as -- well, I
5    forget the names, but that are now sitting over here had
6    requested to be on committees, et cetera.  So it was quite a
7    bit of a consensus to this process.  Now, I know they have a
8    right to change their mind, but it was moving along pretty
9    far.  And respectfully, I think it sets forth a structure to
10   accomplish what everybody wants in this case.  If there was an
11   issue, Judge, if the Court felt -- and the only reason I did it
12   this way is because of my concern about the ethical
13   considerations of any lawyer representing a client.  A lawyer
14   can always come and say, Your Honor, "I was at this meeting.  I
15   disagree with the settlement."  I think that's great because
16   they're all going along the road to get the best result.  But
17   to put an impediment to that at the beginning -- let's say two
18   guys say "I don't like it," the others, "I love it."  Two guys
19   say, "well, we don't" or vice versa, you mean the other two
20   lawyers' clients can't speak up?  I don't think so.
21                THE COURT:  Okay.  I think I understand.
22                MR. BARNOW:  All right.
23                THE COURT:  I understand your perspective on that.
24   Mr. Kanner?
25                MR. KANNER:  Thank you, Your Honor.  I'm having a
                              Page 16

HT - March 6 2006 (Notepad Version)

☐                                                                        20

1    little trouble hearing you.  If you can --

2              THE COURT:  Well, I think my voice is frequently

3    too low, so I'll try to speak up.

4              MR. KANNER:  I think that we can solve this problem

5    today.  The people who make up the Atkins group are a very

6    diverse group of people.  I filed the Adoure case.  Nobody else

7    filed the Adoure case.

8              The only thing that we all agree on is the

9    following.  Whereas the other two groups seem to be insistent

10   on certain individuals serving in roles -- and that's

11   non-negotiable -- the only thing that we've held is

12   non-negotiable are certain principles that we think would

13   achieve fairness in addition to litigation.  We'd like to have

14   a steering committee instead of a strong lead or a lead that

15   can do whatever it wants.  We think you only need one lead

16   counsel.  You don't need two leads because then they're just

17   going to talk to each other.  And I think there are a lot of

18   people in this room who could be lead counsel and do a good job

19   of lead counsel, all right, other than myself.  I think I would

20   do a good job, but I think there are other people who could be

21   lead and I think that should be an individual.  I don't think

22   you need -- in this day of electronic filing, I don't know that

23   we necessarily need a liaison.  I think that's wasteful.  And a

24   lot of the MDLs are now using their law computer services or

25   right now we have electronic filing.  Everybody has been

☐                                                                        21

1    admitted to this court.  What our group -- what you know of our

2    group -- and it's true that members of our group attended

3    meetings with Mr. Shapiro, Mr. Barnow and all, what we wanted

4    was a couple of basic principles.  One, there shouldn't be any

Page 17

HT - March 6 2006 (Notepad Version)

5   premium multipliers for anybody.  Everybody with legitimate
6   time should be treated the same at the end of the case.  Okay.
7   So it's not people are competing with each other based on
8   time.  That's just the fairness and equality issue.
9   Secondly --

10              THE COURT:  I guess I don't understand what that
11   means.  I mean, at the end of the game, I'm going to be
12   deciding whether or not people get fees based on a variety of
13   factors of which one is what kind of work they did and what
14   kind of hours they put in there.  But some people do a better
15   job than other people.  You mean to say I don't get a chance to
16   reflect that?  And some people don't do a very good job at
17   all.  And I don't get a chance to reflect that either?

18              MR. KANNER:  We're not taking away the decision-
19   making from the Court.  But at least as among our group, we're
20   not taking the position that -- the lead counsel is not going
21   to come forward in this case and recommend for himself and for
22   his cronies a higher multiplier than anybody else.  This in no
23   way affects the Court's decision --

24              THE COURT:  So, why don't I deal with that at the
25   end of the day?  I mean, it seems to me that this is really a

□                                                                        22

1   variety of things.  But one of the things it's about is what
2   seems to be work distribution.

3              MR. KANNER:  Correct.  One of the things -- one of
4   the other principles that we had was that people who wanted to
5   work should have an opportunity to work.  There shouldn't be
6   side deals about work, that certain groups would get
7   preferential treatment.  On the other hand --

8              THE COURT:  How do I enforce that?

9              MR. KANNER:  What?

                        Page 18

HT - March 6 2006 (Notepad Version)

10          THE COURT:  How do I enforce that?  I mean, you
11   know, some people are viewed as being better than other people
12   on various kinds of things.  Now you may call that cronyism and
13   maybe it is sometimes, but I'm not sure that this is an
14   enforceable kind of provision.

15          MR. KANNER:  I don't think the Court needs to
16   enforce all of this.  If counsel want to make -- one of our
17   frustrations was you sit down across the table from somebody
18   who maybe you've never worked with before.  You know that
19   they've worked with other people, so obviously they have
20   favorable impressions about them.  Then you say, "look, as to
21   Marcel, let's try to agree to principles that will keep things
22   fair.  Everybody has got cases filed all over the country.
23   We'll have an opportunity to participate equally, that there
24   isn't a self-annointed lead with a self-annointed committee in
25   some way that freezes people out."  Now that's something --

                                                              23

1    it's not your job to work through that.  I think one of the
2    reasons you're now confronted with three groups is we -- I
3    think the various members of this group didn't go to any
4    meeting and insist on any position or anything like that.  All
5    we wanted was to be sure that people got treated fairly in a
6    way that also focused on moving the cases along, some of the
7    other issues we talked about.  We wanted a super majority for
8    settlement.  It's clear that at least two of the groups --
9          THE COURT:  Well, what happens if there's a
10   settlement offer here that some portion of the steering
11   committee wants, but not a super majority?  It doesn't get
12   presented to the Court?
13          MR. KANNER:  No, it doesn't.  Because all you're
14   really going to -- under Mr. Shapiro's view, come in and
                          Page 19

HT - March 6 2006 (Notepad Version)

15    object.  I think that a better course would necessarily be if
16    there is an offer, the Court may get it even if the super
17    majority doesn't approve.  But at least you're not going to --
18              THE COURT:  How do I get it under your proposal?
19              MR. KANNER:  Well, I think as a practical matter if
20    the super majority of the plaintiff's steering committee is
21    represented and they don't approve the settlement, I think the
22    odds are you're not going to approve the settlement, anyway.
23              THE COURT:  Well, but do I give proportionate
24    voting?  The super majority is who you represent.  If you
25    represent 15 plaintiffs, then you get 15 votes out of 25?

□                                                                    24

1              MR. KANNER:  If you think that those are really 15
2     different cases as opposed to people piling on multiple cases.
3              THE COURT:  Well, I'm not sure what the presence of
4     -- what the principle is for the franchise here in the super
5     majority.
6              MR. KANNER:  Well, we're asking -- we're only
7     asking for a super majority of the plaintiff's steering
8     committee of five that Your Honor would appoint.  We're not
9     saying the super majority of all claims.
10             THE COURT:  Well, but I mean how do I make the
11    determination of who the five are going to be?  I do it on the
12    basis of the number of cases; is that it?  The potential class
13    members; is that it?  I mean, so now you're asking me to make
14    some judgments about apportionment.
15             MR. KANNER:  I'm not asking you to make judgments
16    about apportionment.  We submitted the resumes' of all the
17    attorneys.  The Court can pick whomever the Court may pick.
18    We've made certain recommendations.  We haven't necessarily
19    ruled out anybody from service on the committee.  But at the

HT - March 6 2006 (Notepad Version)

20    end of the day when lawyers don't agree, I guess you do have to

21    put the committee together. I think it becomes less --

22              THE COURT: Well, but I mean you did propose three

23    out of the five members.

24              MR. KANNER: Yes, we did.

25              THE COURT: Is that the super majority?

                                                                        25

1              MR. KANNER: No, that's not. Four would be the

2    super majority. By the way, Your Honor, the proposed order, we

3    say on settlement, if I can just read, "in the event that this

4    matter is resolved through negotiated settlement, the

5    plaintiff's executive committee" --

6              THE COURT: Just a little slower. While Ms. Owens

7    is from Louisiana, she's lost some of the touch for getting

8    that speed.

9              MR. KANNER: I'm Allan Kanner for the plaintiffs.

10    I'll talk to you later.

11              We say counsel shall in good faith attempt to

12    secure the approval or consent of other plaintiff's counsel.

13    This is without prejudice to the Court's responsibility

14    regarding approval of any settlement. Any member of

15    plaintiff's counsel retains the right to object to any such

16    settlement. And the executive committee can certainly say,

17    even though we don't recommend it, it ought to be presented to

18    the Court.

19              THE COURT: What if they say we don't?

20              MR. KANNER: We don't recommend it?

21              THE COURT: Right. Then it shouldn't be

22    represented to the Court.

23              MR. KANNER: I would think that the executive

24    committee -- if I were a member of the executive committee and

                                    Page 21

HT - March 6 2006 (Notepad Version)

25    there were a good faith offer made, even if I thought that

☐                                                                    26

1    there was a better offer and I opposed that offer, I think I

2    have a duty to report that to the Court at some point, but to

3    say that we disagree with it.

4                THE COURT:  Why doesn't the proposal that you

5    simply object deal with this?

6                MR. KANNER:  Well, there's a couple of problems

7    with that.  The first thing is I think as a Judge, you don't

8    necessarily want people coming in here without notice to

9    others, give you something for preliminary approval, and then

10   start the whole mechanism of notice and objection.  I think it

11   is much better if people try to work out those differences

12   before it gets to court or raise those issues before they get

13   to court.  I mean, you know, once you go through the expense

14   and time of national notice, a couple of things happen.  One,

15   litigation generally stops while people are waiting to see what

16   happens; and, two, there is a lot of expense.  And I think it's

17   hard to be -- it's much harder to be an objector as opposed to

18   somebody who is shaping it.  And given that at least two of the

19   groups have been actively trying to solicit a settlement

20   without talking to most of the counsel or a lot of the counsel

21   involved, I think it's important that the attorneys speak to

22   each other before anybody comes to court.  I think that only

23   helps the Court make a better decision at the end of the day.

24                THE COURT:  Well, the issue -- I'm not saying

25   anything surprising -- is really what the proper representation

☐                                                                    27

1    or mechanism for representation should be.

2                MR. KANNER:  Well, one of the things that we said

Page 22

HT - March 6 2006 (Notepad Version)
3   also that was important is that we think that with respect to
4   the five seats on the steering committee or executive
5   committee, that to the extent you're co-counsel with anybody,
6   you shouldn't have two people who are co-counsel. Not to pick
7   on Mr. Shapiro and Mr. Rudman, they've got three cases
8   together. Yes, Mr. Shapiro is a separate case, but how truly
9   independent are people like that. I think that you can appoint
10  one person certainly and say "let's look at some other lawyers
11  who aren't tied in with other groups in certain ways." I think
12  that that would give you more diverse representation without
13  affecting the quality of the representation. I mean, I don't
14  think anybody -- nothing that I've read from any of the
15  attorneys says that somebody is incompetent or unable lawyer,
16  at least not on the versions that I got. So, I think that's
17  one way of picking the five, is to make sure that people are
18  truly independent and different. I don't think there's
19  anything wrong -- for instance, Mr. Shapiro suggested there was
20  something wrong with having lawyers from California, Texas,
21  Louisiana. Well, this is a national MDL. Obviously, you
22  shouldn't just have Boston and New York lawyers on the case
23  exclusively. I mean, certainly everybody should have a role.
24  We're in favor of that, but --
25              THE COURT:  Let me be clear on this from your

⧠                                                                    28

1   perspective. Do you want lead counsel or not?
2              MR. KANNER:  If you were -- and I know you're a
3   little skeptical of some of the principles that I have set
4   forth.
5              THE COURT:  No, I'm not skeptical of principles.
6   I wonder about their incorporation in a document with the
7   implicit suggestion that in some fashion (a) I'm restricted in

HT - March 6 2006 (Notepad Version)
8      the way in which I allocate attorney's fee at the end of the

9      day if it comes to that. You say I'm not. But then why do we

10     have it in there, except as in furtherance of the second

11     principle, which is to ensure equality of treatment, that the

12     lawyers are like the children in Lake Wobegon, all above

13     average, everyone gets lots of work to do. Well, frequently

14     that doesn't happen in cases. You know, the process of dealing

15     efficiently runs the other way. And certainly I'm not policing

16     a process of ensuring that everybody gets to do 12

17     interrogatories or 15 hours of deposition each, whatever that

18     means. So, I don't put things in orders that I'm not going to

19     be enforcing.

20              MR. KANNER: One of the things that's been

21     frustrating has been an inability to at least get agreements

22     with other counsel that we will work on the basis of certain

23     shared principles, agreements that are (a) perfectly

24     appropriate; and (b) don't have to involve judicial policing.

25     You asked me a question. I think if we could agree to these

D                                                                      29

1      principles and there was fairness, I don't need to be lead

2      counsel. I think I'm more than qualified to be lead counsel.

3      I've been lead counsel in two MDLs, both involving national

4      classes, and also involving state by state approaches. But I

5      don't need to do that. I have worked with Ken, Donald, Tony.

6      They are all outstanding lawyers. Other lawyers could be lead

7      counsel outside the group so long as we had the principles put

8      together. I met with Mr. Barnow before we went to court when

9      you told us let's try to make friends. I met with Mr. Shapiro

10     after court the last time and I said, "Look, if you could just

11     work out these principles and make sure everybody is treated

12     fairly and it's not just a group -- a self-annointed group --

HT - March 6 2006 (Notepad Version)
13    running away with the case," I can live with that.  And to be

14    honest, Mr. Shapiro never called me back about that.  We've

15    tried to reach out to him.  And ultimately he said, "No.  If

16    you've got a problem, come in and object."  So, if that's his

17    attitude, that's Mr. Barnow's attitude, then, yes, I want to be

18    lead counsel.  But if you construct your set of rules that will

19    protect everybody and encourage them to participate, I think

20    that would be a good thing, Your Honor.

21              THE COURT:  Okay.  Mr. Dodd -- no, I cut Mr. Dodd

22    off earlier, so I want to hear him.

23              MR. DODD:  Your Honor, I apologize for interjecting

24    here.  But frankly, I got a little heated listening to

25    Mr. Shapiro.  I considered him a friend.  I went to the first

                                                              30

1     meeting in Boston that he and his group called.  We wanted to

2     participate.  We went at some expense -- me and another lawyer

3     at very short notice -- to this meeting.  And we were told

4     basically "This is the group.  If you don't like it, you can

5     object."  They were willing to drop it from four to two and put

6     us on --

7              THE COURT:  Drop it?  I'm sorry.

8              MR. DODD:  Their group to two lead lawyers still

9     within their group and put us on a steering committee which we

10    thought, well, maybe that will work.  The fact of the matter is

11    we never got E-mailed, we never got consulted when we asked to

12    participate and get access to documents that they had.  No, no.

13    Nothing.  Okay.  And that's been consistently throughout this.

14    Things will be said.  "We want you on the steering committee,

15    we want you to participate.  We want you to agree with us."

16    But they are not going to be willing to obligate themselves to

17    do anything other than what they want to do.  And that has been

                              Page 25

18    made abundantly clear.  I had started out agreeing to support

19    their group.  They forced us to look at something else in order

20    to protect the interest of our case.  I looked at Mr. Barnow.

21    I think Mr. Barnow is good-hearted in ways, but he was not able

22    to work with Mr. Shapiro.  And Mr. Shapiro told anybody that I

23    heard and me personally that he was not going to work with

24    Mr. Barnow.  So, this group formed out of more in sadness than

25    in anger.  We did not want to have to form a third group.  We

□                                                                        31

1    formed this third group as an opportunity to try to salvage

2    some equity amongst all the lawyers so that everybody could

3    work together in some sort of fair and reasonable way to do the

4    best we could for the class.  And if they had been willing to

5    do the kinds of things they say they are willing to do here in

6    this courtroom today, I don't know that we would have had these

7    discussions with three groups.  But the fact of the matter is

8    they were not willing to work together before we had the last

9    hearing; they were not willing to work together after the last

10    hearing; and they have not been willing to work together at any

11    point following that to this day.  And that's the fact on the

12    ground.  That's what we're dealing with.

13                And I frankly got a little heated listening to

14    Mr. Shapiro talk like he couldn't understand why we had formed

15    this other group.  The fact of the matter is we were forced to

16    do it.  After this hearing the last time when you said "make

17    friends," we went out there and we sat and we talked and we

18    talked.  And at the end of the day, it was still "we're going

19    to make the decisions, you can be on a steering committee or

20    settlement committee."  They didn't care what they called it

21    because it had no power, no authority.  They were going to tell

22    it whatever they wanted to tell it.

23          THE COURT:  Well, let me just ask you the same

24    question I've been asking Mr. Kanner, which is what do you

25    really propose as an alternative to that, that the steering

                                                                    32

1     committee or whatever the committee is called has veto power

2     over decisions made by lead counsel?

3               MR. DODD:  If there was a -- if we could think of

4     another way of doing it without a veto or super majority, we

5     would.  We looked at trying to come up with a smaller committee

6     or some other alternative to do it.  But frankly, we're afraid

7     that if we had a three-person group and Mr. Barnow is

8     represented, Mr. Shapiro was represented, they make the

9     decision and we're cut out.  If --

10              THE COURT:  You just did two people.

11              MR. DODD:  Well, it would be essentially two people

12    making a decision to settle this case before discovery is

13    done.  We need to proceed with this litigation and get it going

14    and we're wanting to do that.

15              I'm way over what I was supposed to be saying.  I

16    just wanted to express to the Court that some of the statements

17    that have been made earlier as to your inquiry to Mr. Shapiro,

18    I contested and do not feel were appropriate.  I was there at

19    that meeting.  And we were basically told "it's our way to the

20    highway, but if you don't want the highway, you can be on the

21    steering committee."  And we were hopeful that that would be of

22    some benefit or use and we were basically cut out.

23              THE COURT:  All right.

24              MR. SHAPIRO:  If I could respond briefly, Your

25    Honor?

                                                                    33

1               THE COURT:  Yes.

HT - March 6 2006 (Notepad Version)

2          MR. SHAPIRO:  First of all, the allegation that we

3    have not communicated with people was made in the affidavit

4    that Mr. Terrell filed and that's why I filed the supplemental

5    affidavit last Thursday or Friday.  There was a motion for

6    leave to file that, which I don't believe has been acted on,

7    but in detail with the exhibits attached to the affidavit.

8          THE COURT:  I have read it.

9          MR. SHAPIRO:  Okay.  So every step of the way, we

10    communicated.  There was no "our way to the highway" at this

11    meeting.  A proposal was made at the meeting and there were

12    comments that were made about better ways to organize the

13    case.  And we acceded to those comments and accepted them and

14    reduced from four to two the number of the lead counsel in the

15    case.  As I've said before and I'll say it again, proposals

16    were made to both Mr. Kanner and Mr. Harke and Mr. Barnow to

17    have a steering committee so that everyone's views could be

18    consulted.  And we made it very clear that we wanted to and

19    would consult with everyone and take everyone's point of view

20    into account.  But at some point, someone has to make a

21    decision.  And in this case, Your Honor, a clear majority, an

22    overwhelming majority, 15 of the 25 cases that are filed have

23    supported the four proposals that were originally announced at

24    the meeting and then since this, a co-lead counsel from the

25    Lerach firm and my firm.  And because there were few dissents,

⬚                                                                    34

1    to leapfrog over all of the firms for the sake of collegiality,

2    for the sake of not having this unpleasant fight before the

3    Court agreed to support it because everyone can't be a lead

4    counsel.  Mr. Wexler very graciously agreed not to be a lead

5    counsel to support this, too.  The Abbey, Gardy firm very

6    graciously agreed.  Mr. Pastor, who is a Boston lawyer who is

HT - March 6 2006 (Notepad Version)

7      here in the courtroom -- and I'm sure Your Honor knows he has

8      got tremendous experience in class actions -- he very

9      graciously agreed to have unanimity among plaintiffs' lawyers.

10     Alan Kovacs, who unfortunately is on a long-planned vacation

11     out west with relatives, could not be here.  He's very

12     experienced, Your Honor.  He's an expert in 93A.  He wanted to

13     be a lead counsel.  His co-counsel has a large firm in Chicago,

14     a very well-established plaintiff's firm.  They agreed to

15     support this structure.

16                 So, to leapfrog over all of these firms because

17     there are other firms who dissent and are not willing to go

18     along really encourages dissention among plaintiff's counsel.

19     It encourages everyone in every case to dissent if they don't

20     get a leadership position to come in and object in the hope

21     that the Court would appoint them as lead.  If the Court felt

22     that there needed to be a larger group of firms with decision-

23     making power, not consultative, but decision-making power,

24     which I think is inefficient, I think it creates tremendous

25     problems in the case, then I think Your Honor should consider

☐                                                                              35

1      all of the firms, not just the ones who come in here as

2      dissenters and being the squeaky wheel trying to get the

3      attention of the Court.  I think you throw it open to everyone

4      and then say, "okay, I'm going to decide there should be so

5      many firms on the executive steering committee and let every

6      firm make an application, and I'll decide which of the 25 or

7      probably 40 plaintiff's lawyers in this case should be on the

8      steering committee, not the ones who come in and make

9      objections because they feel that their fees are not being

10     protected.

11                 When Mr. Kanner says I did not return his calls, we
                                        Page 29

HT - March 6 2006 (Notepad Version)

12    had a lengthy meeting here in the courthouse after our last
13    conference.  Subsequent to that meeting, I had two very long
14    conversations with Mr. Kick who seemed to have taken over the
15    role for Mr. Kanner.  And where we broke down was this
16    executive committee having veto power over the co-lead counsel
17    and their insistence that everyone, at least among the
18    plaintiff's firms, that everyone's time get treated the same,
19    that there will be no premium multipliers.  And I told him that
20    we could not agree to that because we had no control over
21    anyone's time and the conduct of your group has caused us great
22    concern.  You see how many lawyers there are in the room
23    today.  There are seven lawyers here from the so-called Atkins
24    group, seven.  Mr. Kanner is here with an associate.  His
25    associate was here with him last time.  His co-counsel from the

□                                                                          36

1     Kick firm was here.  They had three lawyers here for an
2     ordinary scheduling conference, you know, a routine event in a
3     case.  Mr. Amamgbo and Mr. Terrell, co-counsel for one
4     plaintiff in one case, they are both here today.  They were
5     both here last time.  I'm happy to see them.  I'm happy to have
6     them here.  But to give them a guarantee that the time they
7     spend on a case is going to be treated the same as everyone
8     else's time is just financial suicide because we have no
9     control over how much time they put in the case.  And frankly I
10    told Mr. Kick that.  I said "we have no control over how much
11    time.  And the way that you're staffing the case so far causes
12    us great concern."  I mean, they've gone out and they've hired
13    a marketing consultant before they're even appointed as class
14    counsel in the case.  I have no idea what financial commitments
15    they have made to a marketing consultant and how much work
16    they've done working with a marketing consultant.  So that is
                                  Page 30

HT - March 6 2006 (Notepad Version)

17    why, Your Honor, I stressed to everyone that we would treat
18    everyone fairly. We would consult. When there's work to be
19    done, we would try to hand out work fairly and include people.
20    We would try to treat everyone fairly when it comes to fee
21    time. But I'm not going to make -- Mr. Rudman and I are not
22    going to make any iron-clad commitments. It's like buying a
23    pig in a poke. So that's why we have come to this situation,
24    not because we weren't willing to be inclusive, not because we
25    weren't willing to be communicative. But we've communicated

□                                                                    37

1    with counsel in 25 cases. In 15 of the cases, many of these
2    are counsel I have never met before. Still to this day, I've
3    never met him in person. I don't believe Mr. Rudman knows him.
4    They've all agreed to support an efficient structure to
5    represent with consultation all of the plaintiffs. And some
6    people were unhappy that they either weren't named to lead
7    counsel or they weren't given other kinds of guarantees and
8    they've come in and objected. And I don't think it's right or
9    conducive as a practical matter in terms of precedent and the
10   way cases are organized to say any lawyer who comes in and
11   objects, I will make you -- give you a leadership position and
12   ignore all of the firms who have worked collectively and have
13   worked collegially to come together and support one
14   organization.
15                THE COURT: All right. Mr. Wolkoff, I'm going to
16   ask you a question that past experience in this area suggests
17   that I should, although it's traditional not to have defense
18   counsel involved in this selection process. But do you know
19   now of any reason that any of the proposed counsel would
20   provide inadequate representation? And you understand why I'm
21   asking the question, because I don't want to face it when it
                                    Page 31

HT - March 6 2006 (Notepad Version)

22    comes time for certifying the class.

23              MR. WOLKOFF:  My response to that would be, Your
24    Honor, not with respect to the Dearman group, not with respect
25    to Mr. Barnow's group.  But with respect to the Atkins group,

                                                                    38

1     we would submit that there's an inherent conflict with regard
2     to purporting to represent a single individual and fighting to
3     keep representation of that single individual who at the same
4     time is also a member of several of the classes being
5     represented at the same time by the same lawyer and also by the
6     plaintiff's group.

7               THE COURT:  I don't understand what you're saying.
8               MR. WOLKOFF:  We would submit, Your Honor, with
9     respect to adequacy of representation, that there is an attempt
10    by Mr. Kanner to represent both Adoure as an individual in his
11    individual capacity on behalf of a class in the state court and
12    break off from this litigation at the same time that he would
13    be a member of a steering committee or --

14              THE COURT:  Isn't that true of everyone here?
15              MR. WOLKOFF:  No, Your Honor.  The Adoure case, I
16    believe, is the only case right now which would purport to be a
17    state court action to be brought in the state courts.
18    Mr. Kanner and others in this group have fought the MDL
19    proceeding.  They fought the stay before the California courts
20    in the Coralles case.  When the Judge granted the stay in the
21    Coralles case, they filed the Adoure case.  They insist on
22    proceeding with the Adoure case on behalf of a single
23    individual, as I say, and yet at the same time would purport to
24    represent the class.  And we see that as an inherent conflict.
25    So, we would submit, Your Honor, with respect to Atkins --

HT - March 6 2006 (Notepad Version)

1           THE COURT:   What is the nature of that conflict?
2   You say conflict.   I asked adequacy, but you may be conflating
3   the two terms.

4           MR. WOLKOFF:   Well, I may be, Your Honor.   But we
5   see that when one is trying to get into a different forum, the
6   state court in California in a sense, and purporting to
7   represent an individual and to have that case go on a different
8   track, make different arguments -- for example, Your Honor, the
9   argument that Mr. Kanner strenuously has made with regard to
10  corrective advertising, which he sees as a role in California,
11  but he also sees the necessity of bringing that to the entire
12  class action on a national basis, we argue with regard to
13  whether or not, even in California, there is any kind of a rule
14  concerning corrective advertising.

15          THE COURT:   Well, but isn't that going to be part
16  of this case, the question of corrective advertising, as
17  strenuously as you argue against it either in California, the
18  state courts or here, it's part of the case, isn't it, --

19          MR. WOLKOFF:   I don't think it's --

20          THE COURT:   -- until I get a chance to deal with
21  it?

22          MR. WOLKOFF:   Well, it's not a significant part of
23  the case.   It's not a sine qua non, Your Honor, of any
24  settlement offer of any proceeding with regard to attempting to
25  resolve this matter the way Mr. Kanner says.   But the point,

1   circling back, is that in representing an individual, he is
2   saying that that absolutely is a condition of that particular
3   state court action if it ever gets back to the state court.
4   And he would bring the same views with regard to being

HT - March 6 2006 (Notepad Version)

5   co-counsel here on behalf of the national class and we would

6   submit that there's an inherent conflict certainly as regards

7   the other plaintiffs' counsel.

8           THE COURT:  All right.

9           MR. WOLKOFF:  That's the only thing I can think of,

10  Your Honor.

11          THE COURT:  All right.  Well, you are speaking as

12  of now.  But you're going to have to justify at some later

13  point if you challenge the adequacy of representation why you

14  couldn't think now of the things that you think of then.

15          MR. WOLKOFF:  That's correct, Your Honor.  We have

16  not had -- obviously Your Honor is asking me as of now, do I

17  know as of now?  We haven't had any kind of a class discovery

18  and I haven't had much of an opportunity to focus on that

19  question.  But that's what comes to mind right now, Your Honor.

20          THE COURT:  Okay.  Well, --

21          MR. AMAMGBO:  Your Honor, may I --

22          THE COURT:  Sure.

23          MR. AMAMGBO:  Donald Amagbo, Your Honor.

24          It seems to me listening to Mr. Shapiro, he's

25  constantly saying to the Court that he has no objection.  If

                                                                     41

1   you take a look at the papers he filed, I don't think there is

2   any reference to it.  What we are trying to propose is

3   representation small enough to be manageable, but not too large

4   that we can't get him to talk.  Now, each who becomes lead or

5   co-lead, I think that's something the Court has to look at from

6   all the paperwork -- presented papers to the Court.  But I

7   think the structure -- i.e., putting together a small group of

8   lawyers who in this MDL cannot at least help should shift the

9   direction of the case.  How can a steering committee that is

HT - March 6 2006 (Notepad Version)
10    populated by one group as opposed to another, at least from
11    this understanding we have in here, say the co-actors and
12    principals at issue here starting from -- regardless of who the
13    lead is, the Court can also then decide what policy to use for
14    that steering committee because I think that's where we seem to
15    have some disagreement, what powers to give to the steering
16    committee. So, my suggestion to the Court is a listening
17    principle. I recommend to the Court we have a steering
18    committee and a lead counsel and then the Court can in its
19    wisdom decide what power the steering committee should have.
20              I wanted to comment on something that Mr. Kanner
21    said. I don't think our proposal forecloses the Court from
22    getting a settlement offer or a settlement agreement if we send
23    that to the class. We have an obligation to present it to the
24    Court whether or not it's by super majority or by simple
25    majority. I think the reason we put that in there is to give

☐                                                                    42

1    us as much a consensus as possible among all the counsel so
2    that we can present a united front. But if there is an offer
3    on the table, if there is an agreement, I think we have an
4    obligation to present it to the Court. I don't think that
5    should take away from the structure that we propose, which is
6    to have a small steering committee. I don't think we need 10
7    or 20 to deal with all of the issues that's going to arise in
8    this case. I think a focus committee of five or three can
9    effectively litigate the case. What Mr. Shapiro proposes is
10    two people running the case with a promise to the Court that he
11    will be fair. And we ask that at least that be in the
12    structure that the Court approves so that we know who are the
13    people responsible for running the case.
14                   THE COURT: All right.

HT - March 6 2006 (Notepad Version)
15          MR. AMAMGBO:   Thank you.

16          THE COURT:   Thank you.  Well, I think what I'm

17     going to do may require a little bit more drafting by you.  But

18     I think the structure is clear enough in my mind.  It needs a

19     bit of carrying out.

20          I will appoint Mr. Shapiro as liaison counsel

21     here.  I will appoint both Mr. Rudman and Mr. Barnow as co-lead

22     counsel in this case.  I want to have a steering committee, but

23     the steering committee will be consultative.  It will not be

24     with the power to exercise or otherwise undercut the role of

25     co-lead counsel in making determinations.

□                                                                     43

1          My view is that it would be premature of me to set

2     a number of people for the steering committee.  My expectation

3     is that it is likely to be no less than four, no more than

4     seven, and there is a degree of proportionality that I would

5     expect here.  That is to say, from the Dearman group, I would

6     expect at least two; from the Atkins group, I would expect at

7     least one; from the McGeary group, I would expect at least

8     one.  Now, if there are others who intend to get involved, that

9     is a subject, as far as I'm concerned, for negotiation among

10    the parties.  But I mean to have these voices heard, but not to

11    have them determinative.  I share Mr. Barnow's view that

12    concepts of professional responsibility would require counsel

13    to bring to my attention various matters that affect

14    settlement.  And in fact, people may peel off.  I don't make a

15    judgment one way or the other about that.  But I want some

16    degree of efficiency here.  By the same token, I want to be

17    sure that a variety of voices are heard.  I'm not a fan of

18    these proliferation of committees here.  They strike me as

19    opportunities for spinning wheels, but I'm not going to get

HT - March 6 2006 (Notepad Version)
20    deeply involved in that either at this stage.

21              I will say that I'm going to look very carefully at

22    the fee requests at all stages of this case.  Mr. Shapiro's

23    order has the customary -- or at least I consider it to be

24    customary -- quarterly submission of filing.  And to the degree

25    that parties are spending time without real benefit to the

☐                                                                          44

1     potential class or their individual clients, they cannot expect

2     to be compensated for it.  I don't know whether I'm going to

3     have some kind of premium billing here for somebody else, one

4     of the parties.  It's unclear to me at this stage.  I'm

5     moderately concerned about the degree of contentiousness here.

6     But that can be dealt with, I think, with a recognition that

7     contentiousness may be its own reward.  It may not find a

8     financial reward at the end of this case.

9              So, what I've suggested is an amalgam, I think, of

10    the various submissions.  I would like from counsel within

11    seven days a proposed final order with respect to it.

12              But having triggered -- with the appointment of

13    Mr. Shapiro as liaison counsel here -- the process of

14    developing the scheduling order that was submitted to me, I

15    want to go through that scheduling order now because I want to

16    get things moving along if I can.  I think my -- and I'm taking

17    out now the proposed scheduling order that I think was

18    submitted by defendant's counsel on February 7th.

19              With respect to paragraph (1,) that was included, I

20    think, in the Clerk's Notes.  In any event, the time has run

21    for that.

22              Turning to the filing of the consolidated amended

23    complaint, what I'm going to do is -- because it's a little bit

24    of time before the final or the case management order that

Page 37

25    reflects the appointment of co-lead counsel and the structure

☐                                                                           45

1    of plaintiffs governs -- I'm going to say that the consolidated

2    complaint must be filed by April 17; the answer or responsive

3    pleading by March 17; the disclosures called for by Rule 26A(1)

4    then become due April 28th.  I am going to limit it, as

5    indicated, to the material that Gillette has previously

6    produced and then shift litigations in the District of

7    Connecticut, Germany and Australia on the assumption that there

8    will be an appropriate protective order and the parties shall

9    submit to me no later than seven days from today a proposed

10   protective order to deal with that.  That's coincident with the

11   submission of the final governance proposal.  The class

12   certification discovery will proceed or begin on April 28 and

13   run through June 30.  The fact discovery is going to commence

14   at the same time, but it will run through November 3.  The

15   expert reports for a party bearing the burden concerning the

16   proof of the issue will be provided by January 5; the opposing

17   expert reports by February 16; any so-called rebuttal experts

18   by March 30th; the close of expert discovery, which I assume

19   will be by deposition -- at least the parties will have the

20   opportunity to depose until May 11th.  The motion for class

21   certification shall be filed by July 31st; oppositions by

22   August 31st; and any reply brief by September 22nd.  And you

23   can anticipate that it will be heard in October.  The motions

24   for summary judgment to be filed by May -- I'm sorry, June 29,

25   2007; the oppositions to be filed by July 27th; any replies by

☐                                                                           46

1    August 10; and you can anticipate that a motion will be heard

2    in the end of August, motion for summary judgment.

3                MR. SHAPIRO:  May I ask one question?
                              Page 38

HT - March 6 2006 (Notepad Version)

4                    THE COURT:  Sure.

5                    MR. SHAPIRO:  The dates for the class certification

6       briefs, did you mean that to be 2006?

7                    THE COURT:  Yes, yes.  I probably -- I've been

8       going through a calender next to me.  And, of course, Ms. Rynne

9       will be issuing a scheduling order that reflects this.  But

10      we're talking about April 17th, 2006, for the filing of the

11      consolidated complaint; May 17th, 2006, for the response to the

12      consolidated complaint; April 28th, 2006, for the disclosure

13      called for by Rule 26A(1).  The class certification discovery

14      is completed by June 30, 2006.  The fact discovery is completed

15      by November 3, 2006.  The expert disclosure or initial expert

16      disclosure is January 5th, 2007; the expert disclosure and

17      response by February 16th, 2007; any rebuttal experts by March

18      30, 2007; and the conclusion of the expert discovery by May

19      11th, 2007; class certification briefing for the plaintiff by

20      June 31st, 2006; and defendant's response, April 30th, 2006.

21      I'm sorry?

22                   MR. SHAPIRO:  You said July 31 for the class --

23                   THE COURT:  For the plaintiffs, July 31st; and the

24      defendants, August 31st; and any reply, September 22nd, 2006.

25      The dispositive motions are filed June 29th, 2007; opposition,

&                                                                       47

1       July 27th, 2007; any replies, August 10th, 2007.  And as I

2       said, my expectation is it will be heard at the end of August.

3       All right.  So, I expect to see a revised standard edition of

4       the proposed -- what we will call case management order number

5       two since Ms. Rynne has already issued case management order

6       number one and the order for consolidation.

7                    Now, is there anything else that we need to -- I'll

8       expect to see that within seven days here.

                                Page 39

HT - March 6 2006 (Notepad Version)

9       MR. SHAPIRO:  If we have ten days to try to work
10   something out among counsel, we might need some time.  There
11   are a lot of people.
12       THE COURT:  Okay.  I'll see it on March 15th.
13       MR. BARNOW:  Your Honor, whatever pleases the
14   Court, seven days or ten.
15       THE COURT:  Pardon me?
16       MR. BARNOW:  Whatever pleases the Court, either
17   seven days or --
18       THE COURT:  Right.  March 15 is what I'll --
19       MR. BARNOW:  That's fine.
20       THE COURT:  Oh, I'm sorry.
21       MR. BARNOW:  Is that for the protective order as
22   well, Your Honor?
23       THE COURT:  Yes, it is.  But let's see.  That's ten
24   days, isn't it?  Well, nine.  March 15th, close of business.
25   Let's just get it done.  I think now is the time to move on and

                                                                48

1   get the case moving along here.  None of the other dates, I
2   think, should change.
3       Now, is there anything else that we need to talk
4   about here?
5       [No response from counsel]
6       THE COURT:  Okay.  We'll be in recess.
7               RECESSED AT 3:45 P.M.
8               - - - - - - -
9
10              CERTIFICATION
11       I certify that the foregoing is a correct
12   transcript of the record of proceedings in the above-entitled
13   matter to the best of my skill and ability.
                        Page 40

HT – March 6 2006 (Notepad Version)

14

15    _____    _____

16    Pamela R. Owens                    Date

17    Official Court Reporter

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MARK DEARMAN, ET AL
                    Plaintiffs

        VERSUS                              CA-05-11177-DPW

GILLETTE COMPANY

                    Defendant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

        UNITED STATES DISTRICT COURT JUDGE

                SCHEDULING CONFERENCE

                JANUARY 23, 2006

APPEARANCES:

        THOMAS G. SHAPIRO, ESQ., Shapiro, Haber & Urmy, LLP,
        53 State Street, Boston, Massachusetts  02109, on
        behalf of Mark Dearman, Anthony Debiseglia,

        ALAN L. KOVACS, ESQ., 2001 Beacon Street, Suite 105,
        Boston, Massachusetts  02135, on behalf of Plaintiffs

        ALLAN KANNER, ESQ. AND CYNTHIA GREEN, ESQ., 701 Camp
        Street, New Orleans, Louisiana  70130, on behalf of
        Carlos Corrales & Kasem Adoure, Plaintiffs

        G. JAMES STRENIO, ESQ., The Kick Law Firm, APC,
        660 South Figueroa Street, Suite 1800, Los Angeles,
        California  90017, on behalf of Kasem Adoure & Carlos
        Coralles, Plaintiffs

        PATRICK A. KLINGMAN, ESQ., Shepherd, Finkelman, Miller &
        Shah, LLC, 65 Main Street, Chester, Connecticut  06412,
        on behalf of Lisa Geis, Plaintiff

Page 2

1
2    JAMES J. NOTIS, ESQ., Abbey, Gardy, LLP, 212 East
      39th Street, New York, New York 10016, on behalf
3    Of Plaintiffs
4    EDWARD NOTARGIACOMO, ESQ., Hagens, Berman, LLP,
      One Main Street, 4th Floor, Cambridge, Massachusetts
5    02142, on behalf of Kevin Windom, Plaintiff
6    ROBERT M. ROTHMAN, ESQ., Lerach, Coughlin, Stoia,
      Geller, Rudman, & Robbins, LLP, 58 South Service
7    Road, Suite 200, Melville, New York 11747, on
      behalf of Plaintiffs
8
      BEN BARNOW, ESQ., Barnow & Associates, One North
9    LaSalle Street, Suite 4600, Chicago, Illinois 60602,
      on behalf of Greg Besinger, Plaintiff
10
      WILLIAM A. BAIRD, ESQ. AND GILLIAN L. WADE, ESQ.,
11   Milstein, Adelman & Kreger, LLP, 2800 Donald Douglas
      Loop North, Santa Monica, California 90405, on behalf
12   of David Atkins, Plaintiff
13   OLEN KENNETH DODD, ESQ., The Dodd Law Firm, P.O. Box
      3504, Beaumont, Texas 77704, on behalf of Plaintiffs
14
      REGINALD VON TERRELL, ESQ., The Terrell Law Group,
15   223 25th Street, Richmond, California 94804, on
      behalf of Michael Pruitt, Plaintiff
16
      C. DONALD AMAMGBO, ESQ., Amamgbo & Associates, PLC,
17   1940 Embarcadero, Oakland, California 94606, on behalf
      of Michael Pruitt, Plaintiff
18
      KENNETH D. QUAT, ESQ., 9 Damonmill Square, Suite 4A-4,
19   Concord, Massachusetts 01742, on behalf of Plaintiffs
20   HOWARD BUSHMAN, ESQ., Florida
      (By telephone), on behalf of Collin McGeary, Plaintiff
21
      HARVEY J. WOLKOFF, ESQ., MARK P. SZPAK, ESQ. AND
22   EMILY C. SHANAHAN, ESQ., Ropes & Gray, One International
      Place, Boston, Massachusetts 02110, on behalf of
23   Gillette Company, Defendant
24
25

Page 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18              Courtroom No. 1 - 3rd Floor
                   1 Courthouse Way
19              Boston, Massachusetts 02210
                   2:30 P.M. - 3:15 P.M.
20
21
         Pamela R. Owens - Official Court Reporter
22      John Joseph Moakley District Courthouse
            1 Courthouse Way - Suite 3200
23           Boston, Massachusetts 02210
24
25

Page 4

1
2         THE CLERK: Civil Action 05-11177, In Re: MP3
3    Power Razor System Marketing and Sales Practices Litigation.
4         THE COURT: Well, I realize there are some things
5    that I rescheduled. I did want to at least get the beginnings
6    of trying to put this in order as an MDL case.
7         Let me just deal with one motion that I know I can
8    deal with promptly. That's the Adoure -- if I pronounce it
9    correctly -- motion to remand. I'm going to deny that motion
10   here. I believe a fair reading of the amount in controversy
11   element of diversity jurisdiction in a practical reading of it
12   is that we have more than $75,000 in controversy. And the
13   characterization or recharacterization that Mr. Adoure has
14   represented, but not of a class, seems to me to be not
15   particularly helpful in thinking about what this case is
16   about. So that is denied.
17        MR. STRENIO: Your Honor --
18        THE COURT: Yes.
19        MR. STRENIO: -- this is James Strenio from the
20   Kick Law Firm on behalf of plaintiff Adoure. May we be heard
21   on that?
22        THE COURT: You have. You filed papers. I read
23   them.
24        MR. STRENIO: Thank you.
25        THE COURT: Now, with reference to the question of

Page 5

1    appointment of counsel or class counsel. I have the filings of
2    several of the plaintiffs here suggesting there just hasn't
3    been enough time to get this straightened away to file an
4    adequate response and that there may be different ways of
5    looking at this. And under those circumstances, I'm loathe to
6    try to identify class counsel or interim liaison counsel,
7    however you want to characterize it. The question is how we
8    get from these anxious concerns that are expressed in the
9    motion to set schedule for filing applications to some sort of
10   resolution of what the lead liaison class counsel on an interim
11   basis issue requires of me and requires of you.
12        So, let me understand. I guess the drafter of this
13   is Mr. Harke or Mr. Steward. Who is the --
14        MR. BARNOW: Your Honor, if I might, my name is Ben
15   Barnow. I'm one of the attorneys on that paper.
16        THE COURT: Okay.
17        MR. BARNOW: And I am Mr. Harke's colleague. In
18   any event, first, my apologies to the Court on behalf of
19   Mr. Harke and myself. He unfortunately is, I believe, still in
20   the air about to land with a three-hour delay on his flight or
21   he would have been here and still intends.
22        THE COURT: That's the delay I had driving in, so I
23   understand.
24        MR. BARNOW: I recognize sympathy from the bench
25   and I thank you for it.

Page 6

1 His colleague and associate, Howard Bushman, I
2 believe, because of a courtesy of your staff and the Court
3 itself, is on the phone.
4 THE COURT: Yes.
5 MR. BARNOW: But I am prepared to answer whatever
6 questions the Court has.
7 THE COURT: Well, what do you want to do? I mean,
8 you say 10 days to file it. Let's talk in terms of text and
9 pretext. First, the text?
10 MR. BARNOW: First of all, I think every lawyer in
11 this room, every plaintiffs' lawyer, would like to see all
12 plaintiffs' counsel come together. That's the routine and that
13 is the practice that's customary. Every once in a while
14 there's a bump in the road for whatever reason where, you know,
15 great minds don't always think alike. I would say that people
16 have worked towards that goal. There have been multiple
17 talks. And what the people who signed onto this paper, which
18 is a significant group -- I believe it's 10 cases -- probably
19 more attorneys, which is far more than the eight by the other
20 paper, but somewhat. In any event, it's our belief that with
21 the words of the Court, that within a short period of time,
22 that those efforts to bring people together and have an
23 appropriate interim plaintiffs' steering committee with
24 appropriate leadership as needed might be more effective than
25 we have been to date. If not, we could file papers. Each

Page 7

1 group, I think, basically breaks into three or four groups, if
2 that, maybe two for the Court's consideration. I would like to
3 have another go at it, as I'm sure other people in the room
4 would, to see if lawyers can come together as they probably
5 should. And if we have differences, we can put them to the
6 Court. It will be fully briefed. People can put in their own
7 credentials and ideas and then the right guy to decide will
8 decide it. And that would be you. But I don't think it would
9 be burdensome for the Court.
10 THE COURT: In terms of timing, you talk about 10
11 days. I don't know if that was a desire to make it highly
12 suggestive.
13 MR. BARNOW: Your Honor, the 10 days, I think I was
14 traveling at the time it was written. I seem to recall a
15 desire for 20 days. And I'm looking not for this --
16 THE COURT: That's a typographical error; is that
17 it?
18 MR. BARNOW: Pardon me?
19 THE COURT: That's a typographical error?
20 MR. BARNOW: No. I couldn't say that, Your Honor.
21 You will see, Your Honor, sometimes people differ --
22 THE COURT: I'm sorry.
23 MR. BARNOW: -- and they prevail. The papers said
24 the original filing that was an addendum, that talked in terms
25 of 10 days. I seem to recall, in having looked at this, that

Page 8

1 we may have changed it to 20.
2 THE COURT: Yes, I think you did.
3 MR. BARNOW: But whatever serves the Court's
4 purposes, I think the Court can set it. I think 20 days might
5 allow more talk time for better phraseology and I think the
6 papers could be short. They don't have to be long.
7 THE COURT: Any reason why I shouldn't do that,
8 Mr. Shapiro?
9 MR. SHAPIRO: I can't resist saying that it was
10 Mr. Harke's motion that asked for a conference. One of the
11 items to be addressed was interim counsel. And Your Honor
12 scheduled this conference by order of December 1st. It's been
13 almost two months. That's why we filed our motion when we
14 did. Now I can't -- I'm sure the Court wants to hear all
15 counsel and I really can't oppose that.
16 THE COURT: I do. I mean, if there's going to be
17 some dispute about this or if the discussions haven't ripened
18 sufficiently --
19 MR. SHAPIRO: I think it would be on the point of
20 discussions, Your Honor, that efforts were made to reach a
21 resolution with Mr. Barnow and Mr. Harke. Proposals were made.
22 They were not agreed to and I think that we really do have
23 irreconcilable differences.
24 THE COURT: Well, I think, then, what I'd like to
25 do is still use the 20-day period.

Page 9

1 MR. SHAPIRO: That's fine.
2 THE COURT: You file your memorandum. If you want
3 to file a supplement to it, you can at the end of the 20 days
4 if it's not fruitful. But anybody who wants to be heard on
5 this question essentially of an organization of plaintiffs,
6 however we style it, as interim class counsel or lead or
7 liaison counsel, because of the Adoure -- if I pronounce it
8 correctly -- case, I think we've got an issue about class
9 counsel. But what I would then ask is if you haven't been able
10 to reason together by February 10th, that there be filings in
11 support of the respective parties' views about how there should
12 be organization of plaintiffs' counsel; responses by February
13 24th; and we'll try and set it, if we can, down for further
14 conference, Michelle. Monday, March the 6th at 2:30, we'll
15 have a further conference to deal with that question of
16 organization.
17 But I do want to move this along in various sorts
18 of ways today in light of the scheduling report that the
19 parties have submitted and the various addenda and alternative
20 proposals.
21 Let me understand. But maybe this is counsel from
22 Adoure and Corrales. I understand that there are a variety of
23 different kinds of claims addressing a variety of different
24 classes under -- pressing under various consumer protection
25 statutes in various states. But what difference is it going to

1  make, at least at the earlier stages of discovery and so on,
2  the organization part of this case? Anything -- I mean,
3  anything that's visible to the human eye, I guess, is what I'm
4  asking.
5        MR. KANNER: Your Honor, Allan Kanner for the
6  plaintiffs Adoure and Corrales. Yes, I think there's going to
7  be some differences and we attempted during our meeting to
8  confer to work on those. For example, in the California cases,
9  we're going to be looking at marketing issues as they occurred
10 in California, at least with respect for a curative advertising
11 claim or a false advertising claim.
12       THE COURT: Well, what I guess I'm getting at is
13 what difference does it make in the way in which I would
14 structure the discovery here? There's always a danger of
15 entropy in one of these kinds of cases and I want to avoid
16 that. And, so, I just want to be sure that I'm not missing
17 something.
18       MR. KANNER: There are a couple of issues. I mean,
19 I think all of us, when we think about strategies or case
20 management, try to look a couple of steps ahead which is what
21 Your Honor is doing. And I follow that and I agree. I mean,
22 for example, the proposal that was given to us was, "well,
23 let's have a consolidated amended complaint. Let's create
24 something new that didn't previously exist and bury out the
25 real cases.

1        THE COURT: Why bury it out? Why wouldn't the
2  obligation of lead or liaison counsel, whoever it is, bear the
3  responsibility for preparing such a document, include it as
4  Count 57, a California or consumer claim?
5        MR. KANNER: As a practical matter, two things in
6  this case: One, the Adoure case, which is now here before Your
7  Honor, that injunctive action is now put on hold after the
8  class action issues are heard.
9        THE COURT: Well, that may be so, maybe not.
10       MR. KANNER: That was one of my differences.
11       THE COURT: Well, but I'm not sure that I really
12 think that that's necessarily the case, that it's put on hold.
13 I mean, you're here. You want to raise that -- or I guess it's
14 the gentleman from the Kick firm --
15       MR. KANNER: We're co-counsel.
16       THE COURT: -- right, although I have to say I'm a
17 bit of the view that the Schick case provides the kind of
18 interlocutory relief that's necessary at this point, but it
19 doesn't rule it out.
20       MR. KANNER: Schick was a very useful case for us,
21 Your Honor. Schick stopped the advertising going forward.
22 That is --
23       THE COURT: I understand the difference between
24 corrective and prospective. The difference, I guess, is this:
25 That ordinarily you think of a preliminary injunction as

1  attempting to deal prospectively with matters. Corrective
2  advertising is, by definition, a retrospective undertaking.
3  But I'm not averse to the idea of dealing with a preliminary
4  injunction in the context of this case if you want to press it
5  there. I mean, if you're really pressing it for purposes of
6  interlocutory relief during this time period and if that
7  requires some sort of discovery or separate discovery, one
8  would tailor that. But that's the only one I guess I can see
9  in this. I don't see anything else.
10       MR. KANNER: Okay. That's part of it. Part of the
11 difference is -- and maybe because I was gearing up and
12 focusing on trying the injunctive case without the class issues
13 -- my request to counsel for Gillette and also to my co-counsel
14 in trying to put together a united front was, well, let's take
15 advantage of the Schick discovery. Why put that on hold?
16       THE COURT: I mean, that I understand. I'll get to
17 that in a minute.
18       MR. KANNER: Okay.
19       THE COURT: I'm really -- what I'm trying to deal
20 with here is this suggestion that consolidation, at least for
21 purposes of an MDL, is improvident.
22       MR. KANNER: I think some Judges, not all MDL
23 Judges, sitting in your position, that some Judges who have sat
24 in your position have said, "I don't know that consolidated
25 complaint is always a plus. Sometimes it is a plus. Sometimes

1  it's not." Currently, you have a number of cases in front of
2  you. Under, for example, Lexicon, you're only going to try
3  cases that started here.
4        THE COURT: Right.
5        MR. KANNER: A number of these issues, such as the
6  California issue, you may decide that you're not going to rule
7  on the class issue. You may decide that there is no national
8  consumer class. You may decide to go forward on just
9  expediting discovery as efficiently as possible for all the
10 parties.
11       THE COURT: Well, I understand all of that or I
12 think I do.
13       MR. KANNER: Okay.
14       THE COURT: But the issue for me that I'm raising
15 with you is as an instrumentality, why don't we move ahead on
16 this basis? You've got a particular issue that you thought you
17 had teed up in the Superior Court in California and all of a
18 sudden kind of moved on to another golf course. And if you
19 really want to press it, there I am to deal with it. I'm not
20 suggesting that you're going to be successful on it. I'm just
21 simply suggesting that that can be accommodated.
22       The question of consolidated complaint is a way of
23 ensuring some form of coordination here. It may or may not
24 work ultimately. It may be a document so long that it looks
25 like a Christmas tree at the end. But it's one way of getting

Page 14

1  a handle around this case and understanding it.
2       MR. KANNER: It is one way. I'm just saying that
3  in this case when I review the complaints that are in front of
4  Your Honor, I look at the work product that's already been done
5  in the Schick case, I say is it necessarily better to stop
6  discovery, right, create a new document, arguably create
7  jurisdiction here by creating a new action of some type on a
8  national class action, go through the proceedings on the motion
9  to dismiss, then stay merits discovery again, get our Rule 26.
10      THE COURT: That's a different issue I will get
11 to. But I just want to understand what it is that you think is
12 the problem. Part of it is a unique opportunity under
13 California law for a particular remedy that has not yet been
14 provided on an interlocutory basis.
15      The second is the unwieldiness, I guess. But if I
16 move forward on discovery in this case, as I assume I will,
17 what's it to you?
18      MR. KANNER: I think that the reason we're all
19 here -- and I'm not opposing the entry of a pretrial order. We
20 go through it paragraph by paragraph and we're never saying no
21 discovery.
22      THE COURT: Right.
23      MR. KANNER: We just have a slightly different
24 point of view. I think you ought to enter an order early on
25 and I think we ought to start the job of discovery. I mean,

Page 15

1  if we keep -- in my opinion, if we keep our eye on the ball,
2  it's to create an efficient vehicle for discovery. We're ready
3  to go forward with discovery and we look at an order that says,
4  "no, no, no, let's just stop."
5       THE COURT: Okay. I think I understand that part
6  of it.
7       MR. KANNER: I mean, we spend --
8       THE COURT: Maybe it is better for me to walk
9  through the scheduling report and see where the more specific
10 problems are.
11      Let me just start with the one that you raise,
12 which is the -- I'm sorry. Did you --
13      MR. SHAPIRO: I did want to speak to those issues
14 briefly, if I could, Your Honor.
15      THE COURT: Well, I wonder if I haven't ventilated
16 it enough to know that it's an issue. And the better way to
17 deal with it is just march through this.
18      But let me understand from the defendant's point of
19 view: Is there a problem with turning over the Schick
20 discovery?
21      MR. WOLKOFF: Harvey Wolkoff, Your Honor, on behalf
22 of Gillette. The Schick case, Your Honor, is a different kind
23 of case in some respects. It's a Lanham Act case. And as a
24 result, there are a number of issues in this case which don't
25 pertain to this matter which is a consumer action. You have

Page 16

1  all kinds of issues there with regard to --
2       THE COURT: Well, then the plaintiffs will
3  disregard that.
4       MR. WOLKOFF: But, Your Honor, the issue is that
5  the materials, the new-fangled way of producing materials is on
6  CDs. The materials are all interspersed. So Your Honor asked
7  me --
8       THE COURT: No. They asked for it. Why not give
9  it to them?
10      MR. WOLKOFF: Well, there are all kinds of document
11 discovery under a confidentiality agreement that are particular
12 to Schick that relate to Schick, that relate to market share
13 issues.
14      THE COURT: Why are there confidentiality
15 arrangements particular to Schick? Schick gets to look at this
16 stuff under the protective order because you're concerned about
17 trade secrets being disseminated. Why doesn't the same
18 protective order apply to these plaintiffs?
19      MR. WOLKOFF: Well, frankly, Your Honor, there are
20 documents that are highly proprietary and have no bearing
21 whatsoever on this case relating to Schick's market share,
22 Gillette's market share, competitive posturing vis-a-vis each
23 other. Other products are on --
24      THE COURT: Okay. So, make a motion for privilege
25 -- to privilege certain of these documents if that's what they

Page 17

1  are. Presumably, the ones that are covered by a protective
2  order have already been preliminarily identified.
3       MR. WOLKOFF: They've been put onto CDs, but it's
4  not -- I just wanted to bring to Your Honor's attention there
5  were many documents that relate to other products, other issues
6  that aren't germane here and it's not just a matter of burning
7  some CDs, as Mr. Kanner would suggest, and entering in a
8  confidentiality agreement and providing it.
9       THE COURT: Well, it may not be just that. But on
10 the other hand, it's not World War III either.
11      MR. WOLKOFF: It's not World War III.
12      THE COURT: So, finding someplace in-between, you
13 can turn over the documents that are related to this case while
14 we're working our way through class certification. What's the
15 problem with that? I mean, you identified the class that you
16 say is irrelevant to this case, and that's why -- you know,
17 that's a beginning. But let them chew on some stuff.
18      MR. WOLKOFF: I'm sure, Your Honor, we could work
19 it out. We had things worked out keyed off the appointment of
20 the lead counsel.
21      THE COURT: I understand that, but we're not doing
22 that today. I want you to start thinking about this because I
23 will expect that that's going to be turned immediately -- that
24 is, the Schick discovery that is relevant to this case.
25      MR. WOLKOFF: Well, Your Honor, we would need 30

Page 18

1  days to be able to review the CDs and pull out anything that is
2  privileged.
3       THE COURT: Right. And that more or less coincides
4  with our next hearing. So, I would expect that it would be
5  turned over within 30 days from now to the parties -- that is,
6  the CDs will be available to them.
7       MR. SHAPIRO: Well, we don't agree with the
8  defendant on any point, Your Honor. But from my perspective,
9  in negotiating the joint scheduling plan with Gillette and for
10  going ahead moving for the appointment of interim counsel is to
11  try to get some control over the cases. There are 26 cases
12  pending that I have counted up. There are probably about 40
13  law firms. And if you have discovery go ahead before there is
14  any structure created for plaintiffs' counsel, any other
15  discovery being produced to 40 law firms, 40 law firms spending
16  time going through the same documents, it's a very inefficient
17  way.
18       THE COURT: No. I don't think I'm thinking about
19  that. I really am thinking about the production of this
20  material being more or less coincident with the identification
21  of lead counsel here. What I don't want to have is -- I think
22  there's some force to the argument that the staging of this
23  means that merits discovery is avoided for a period of time
24  when there is available merits discovery that's already been
25  created.

Page 19

1       MR. SHAPIRO: That was never our position. And I
2  noticed when Mr. Kanner talks about bifurcating discovery, as I
3  understand the joint scheduling plan, this was the one point
4  that was the biggest point of contention between us in terms of
5  the timing. And that is there is no provision in there that
6  merits discovery, the production of initial disclosure by
7  Gillette, and I would assume initial disclosure would include
8  the Schick discovery. It is not postponed pending class
9  discovery or class certification.
10       THE COURT: All right. So --
11       MR. SHAPIRO: It's 10 days after the filing of the
12  consolidated complaint. Very early on is our intent and
13  purpose.
14       THE COURT: Okay. I think I understand that as
15  well in its refinement. But I guess I want to bite off -- at
16  least stick my teeth into -- what seems to be a large portion
17  of discovery that's out there and available to get that put
18  into the initial disclosure context.
19       MR. SHAPIRO: I'm totally in agreement with that.
20  I think that this can be most effectively prosecuted if there
21  is a leadership structure for these 40 firms and that we have
22  appointed a discovery committee or handful of firms to have
23  that assignment.
24       THE COURT: What I don't want to have happen, I
25  guess, is this -- because everybody is very busy -- say "now we

Page 20

1  have created a leadership structure, we need 30 days to pull
2  together the Schick discovery." It's clear to me that the
3  Schick discovery in some sub-set is going to be made available
4  almost immediately or it should be.
5       MR. SHAPIRO: It should be. I agree with that
6  totally.
7       THE COURT: And, so, we'll refine this a bit as I
8  go along. But the idea is to get that Schick discovery.
9       MR. SHAPIRO: It's certainly one of the things we
10  pushed for is its early disclosure.
11       THE COURT: Okay. All right. So -- I'm sorry?
12       MR. DODD: Your Honor, my name is Olen Dodd and I'm
13  an attorney from Texas on the Gonzalez case.
14       And we had initially, even though I don't think we
15  signed onto the pleading of Mr. Shapiro, we were initially
16  supportive of their position to try to get a leadership
17  structure appointed. And I just wanted to comment briefly
18  before we get too far afield on that. I don't believe that
19  these parties are going to be able to agree amongst themselves
20  on their own in the next 30 days absent some sort of
21  intervention or instruction from the Court because I have been
22  involved in discussions back and forth between the parties.
23  And I hate to lose the benefit of this next 30 days and have us
24  come back here and tell the Judge we still can't agree. And I
25  was hoping -- after 12-13 years of being an Assistant U.S.

Page 21

1  Attorney, I found that sometimes if I ask the Judge what kind
2  of structure do you think you would like to see in this case,
3  that sometimes the Court can shed some light on what would work
4  best in this case for you.
5       THE COURT: Well, let me respond to that in two
6  ways. The first is I'm more optimistic than you. The second
7  is I'm more modest than other Judges. And, so --
8       MR. DODD: I can tell that already.
9       THE COURT: -- you try yourself first and see what
10  you can do. If push comes to shove -- and it may -- I'll show
11  you.
12       MR. DODD: All right.
13       THE COURT: But, you know, this is not rocket
14  science either. This is making new friends. I guess, is what
15  this is about. And you will work it out among yourselves first
16  and then I'll get involved if I have to.
17       MR. DODD: Well, I hope I'm proven wrong and I like
18  the idea of getting that discovery up front, Your Honor.
19       THE COURT: Okay. All right. So, let me go back
20  to this. We have talked a little bit about -- I've been
21  working off the joint scheduling report although, as I said, I
22  realize that there is some more addenda here, particularly from
23  the Corrales and the Adoure case inapplicable. But starting
24  with (a), I've got some idea what the claims are and all of
25  that and the potential existence of a variety of sub-classes or

Page 22

1  at least alternative classes.
2      That having been said, I'm of the view that I'm
3  likely to say let's start working on this through a
4  consolidated complaint.
5      With respect to the submissions under 23(g), I have
6  set a time period for it.
7      As to early settlement, I'm not going to get
8  involved in that yet. Nobody seems to want alternative dispute
9  resolution yet.
10     As to the motions to remand, I assume that the
11 Adoure case is the only one that's got a right to that. Is
12 there anybody else?
13     MR. WOLKOFF: Actually, Your Honor, the Huskie case
14 out of Missouri raises that issue as well. I don't know if
15 counsel for Huskie is here today.
16     MR. BARNOW: If I might again, Your Honor, Ben
17 Barnow for the record. I'm also affiliated with Mr. Steward
18 and I'm aware of his case. Unfortunately, he also is caught in
19 the snowflakes and is trying to get here. In discussions with
20 him, it is my belief -- I don't want to commit him finally.
21 But it's my belief that he will not be challenging remand and
22 will be pleased to stay in this court. But I have to confirm
23 that with him. I'll say I'm 99 percent sure on that.
24     THE COURT: All right. So, what I think I will do,
25 then, is set the 20-day period as well for that -- for all

Page 23

1  motions for remand so that will give Mr. -- I'm sorry. I don't
2  know the fellow's name, but in the Huskie case.
3      MR. BARNOW: Mr. Steward, yes. And should I get
4  ahold of him, I will advise the Court and my learned colleague
5  that that's the case and nobody will waste any time.
6      THE COURT: Okay.
7      MR. BARLOW: Thank you.
8      MR. STRENIO: Your Honor, just to conclude with the
9  Adoure remand --
10     THE COURT: I think we have concluded it.
11     MR. STRENIO: -- with this Court, that is -- shall
12 we expect to receive a ruling and an order --
13     THE COURT: You just did.
14     MR. STRENIO: -- a written order?
15     THE COURT: You just did. And it will be reflected
16 in the document of the court.
17     Now, so let me just tighten up the time for any
18 other remand orders, if people start to think this through and
19 think that they might have some opportunity to remand. Any
20 such motions are to be filed by February 6th. And I appreciate
21 being advised as quickly as possible concerning that, at least
22 with the Huskie case to see if we have to get worked up about
23 that.
24     I am going to use consolidation here. It's really
25 more to make sure that we've got the papers being received in a

Page 24

1  way that doesn't tie down the Clerk's Office. I view
2  consolidation as being highly flexible. What I'm going to be
3  doing is consolidating all of the cases under the Dearman case
4  simply because I think that's the first filed of the cases.
5      To the degree that the parties want to separately
6  file some matter arising out of their case, they will file
7  under the MDL and the lead case number, which is 05-11177, and
8  they will identify their separate case and we can keep track of
9  it. But I want everything to be filed really in the MDL case.
10     And, so, there will be a consolidation. What you will see is
11 that all the cases except Dearman are going to be terminated,
12 but that's an issue for docketing. It's not that the cases are
13 going away. But there will be that form of dealing with that.
14     With respect to the New Jersey cases, do you expect
15 them to be refiled, Mr. Wolkoff? Do you know what's going to
16 happen?
17     MR. WOLKOFF: The present status, Your Honor, is
18 that they have been refiled pending a Judge's determination on
19 whether or not he's going to permit them. They have been
20 served. And now the issue is joined before the court.
21     THE COURT: They have been served?
22     MR. WOLKOFF: The two cases -- the complaints have
23 now been properly served, I believe, upon Gillette. And the
24 issue now before the Judge in the New Jersey Superior Court,
25 Your Honor, is whether or not he will allow the case to go

Page 25

1  forward. And then there will be an issue as to whether or not
2  Gillette removes the cases again to the federal court.
3      THE COURT: What's your intention if it's permitted
4  to go forward? I just want to understand who else is coming to
5  dinner.
6      MR. WOLKOFF: Right now, Harvey Wolkoff's
7  intention, Your Honor, on behalf of Gillette is to probably try
8  to remove and try to get those cases transferred.
9      THE COURT: Is the time period simply dependent on
10 the willingness of the Bergen County Court to permit the case
11 to go forward in light of the alleged untimeliness of the
12 service?
13     MR. WOLKOFF: It's dependent upon the Bergen County
14 Court's decision on whether or not to allow the case to go
15 forward. Yes.
16     THE COURT: Okay. So, is there something unusual
17 about those cases, unusual in the sense of something different,
18 some new addition to the mix.
19     MR. WOLKOFF: Apart from the fact that they are in
20 New Jersey, no, Your Honor. That's it. I think they state the
21 same type of claim about raising hair up and away from the
22 face. I think that's asserted here and it's on behalf of --
23 and my colleague, Mr. Szpak, reminds me that actually we're
24 checking to make sure that the service is proper. I stated
25 before that it was. We think it was, but we are checking.

7 (Pages 22 to 25)

Page 26

1    THE COURT: All right. Well, they're welcome if
2  they ever get here, I guess is the way I look at it. I
3  appreciate being advised of it.
4        Turning to the question of -- let me be sure that
5  I'm -- because I know there are more specific matters in the
6  Adoure and Corrales cases. You will stop me if I haven't
7  addressed your issues here.
8        MR. STRENIO: Your Honor, just for the record, we
9  do object to consolidation.
10       THE COURT: All right. Okay. I think I have
11  spoken to the idea that I'm presently of the view that there
12  will be a consolidated complaint in this case. The timing of
13  that consolidated complaint is probably going to be within 30
14  days of the determination of lead liaison interim class counsel
15  here. And 30 days to respond seems to me to be appropriate.
16       Now, we have this time period that I've had further
17  insight concerning the initial disclosure, which I
18  understand, Mr. Shapiro, in any event, your view was that that
19  would incorporate the Schick materials; is that right?
20       MR. SHAPIRO: I would think so, Your Honor.
21       THE COURT: Okay. And I do, too. Is there an
22  issue about that that we haven't discussed so far?
23       MR. WOLKOFF: We have no issue with regard to that,
24  Your Honor, subject to a motion that there are privileged
25  materials that --

Page 27

1        THE COURT: Right. And I'm not looking forward to
2  the opportunity to do shadow motion practice, discovery motion
3  practice for the District of Connecticut. I will assume that
4  you have got a pretty clear idea of what it is that you need to
5  turn over here. If you're withholding things for purposes of
6  -- that are relevant for initial disclosure, broadly conceived,
7  that deal with the question of privilege, you will have a
8  privilege log.
9        MR. WOLKOFF: Yes, Your Honor.
10       THE COURT: And here, we're now, at the minimum,
11  dealing with 40 days out from the day of the next conference in
12  this case which I anticipate will resolve the question of
13  interim counsel.
14       There has been this talk about -- that I see in the
15  Adoure responses about timing for class certification
16  discovery. What really is the problem here? Is there
17  anything? I mean, 60 days seems okay. You have got this other
18  stuff going on. You've got your initial disclosure and all of
19  that. But --
20       MR. KANNER: Right. We had suggested, one, that
21  disclosure should not wait on the consolidation -- in the event
22  that you asked for a consolidated complaint --
23       THE COURT: I have and it will. So, now what
24  else?
25       MR. KANNER: Oh, you did ask for it. And at that

Page 28

1  point, I don't have a problem with class discovery, except to
2  the extent that the defendants are going to say that that in
3  some sense stays or prioritizes or shuts down merits
4  discovery.
5        THE COURT: I don't read this proposal in that
6  fashion. What I read it to say is that these are keyed off of
7  the time period from initial disclosure; that within 60 days,
8  there will be completion of the class certification disclosure;
9  within six months, there will be completion of the fact
10  discovery.
11       MR. KANNER: As long as we all share that
12  understanding, I'm fine.
13       THE COURT: Is there any dispute about that?
14       MR. WOLKOFF: Not that I know of, Your Honor.
15       THE COURT: Okay. So we all do.
16       MR. BARNOW: Your Honor, respectfully, the people
17  that we discussed it with felt that 90 days would be more
18  realistic.
19       THE COURT: Ninety days for class discovery?
20       MR. BARNOW: Yes.
21       THE COURT: Why?
22       MR. BARNOW: Well, just based upon other cases and
23  the frankness objections, et cetera. We can live with the 60
24  if the Court tells us it's appropriate  We just raise the issue
25  of 90 days for the Court's consideration.

Page 29

1        THE COURT: Is there something about this case that
2  says that 90 days is something that we should be doing?
3        MR. BARNOW: That's a hard question to answer. I
4  mean, obviously a lot of consumer cases are very similar to
5  this degree. What is it about this case, obviously, is they
6  have very qualified defense counsel -- and I say that in a
7  complimentary sense -- and there's a lot of stuff that can be
8  thrown in the wave of plaintiffs' resolve. Obviously, if --
9        THE COURT: In the way of -- thrown in the way of
10  plaintiffs' resolve; is that what you say?
11       MR. BARNOW: Yes, in motions, whether or not
12  privilege or not privileged. But obviously those can be dealt
13  with in terms of further motions.
14       THE COURT: If that rises, I'll deal with it.
15       MR. BARNOW: I agree. And we only suggest the 90
16  days for the Court's consideration.
17       THE COURT: I think I'd just like to start chugging
18  along.
19       MR. BARNOW: No. We agree. And the 90 days was
20  not suggested contrary to that. Frankly, in view of the
21  Court's other comments here today, we think that 60 days fits
22  that pattern and we could sign on with that.
23       THE COURT: I think the parties should understand
24  that the high point in my life is not motion practice, at least
25  non-dispositive motion practice. And whenever I encounter it,

Page 30

1 I'm always surprised and then find that there really isn't very
2 much to it. So, adult lawyers, I think, are able to decide
3 what things are really important to pursue by means of
4 practice. The first mistake in this regard will be mine. The
5 second will be counsel's.
6       So, you will, I think, organize yourselves around a
7 meaningful way of approaching discovery that doesn't require
8 intervention of the Court.
9       MR. BARNOW: Your Honor, not only have I heard
10 these words here, but I heard the Court's earlier words. And I
11 believe that they went a long way to resolving my concerns that
12 motions that would have to be brought in front of you might
13 come about -- I now feel -- will not be brought about. So, 60
14 days is fine for that.
15       THE COURT: Okay. So we're going to be talking
16 about 60 days for class discovery and six months from the date
17 of initial disclosure for fact discovery.
18       With respect to experts, you know, I see the
19 concern, I think, expressed here about simultaneous exchange.
20 But my own view on this is that the best way to deal with this
21 is that the parties who bear the burden as to any matter as to
22 which there is expert disclosure should be the parties that go
23 first and then the response of a rebuttal expert report can be
24 filed thereafter. And, so, I'm likely to use that 45-day
25 period, but not plaintiff/defendant, but more along the lines

Page 31

1 of who bears the burden of that. And, so, these outlines seem
2 to me to be okay.
3       The class certification briefing, that is 30 days
4 after the close of class certification.
5       Discovery seems right. Why 45 days for responses
6 from the defendants?
7       MR. WOLKOFF: Frankly, Your Honor, we were
8 contemplating that it would be Gillette that would be filing
9 the motion for summary judgment.
10       THE COURT: No, no. This is class certification.
11       MR. WOLKOFF: Oh, class certification. I'm sorry.
12       THE COURT: They file no later than 30 days after
13 the conclusion of class certification, which is three months
14 in. And then you said you wanted 45 days. I just --
15       MR. WOLKOFF: Well, we can do it in 30, Your
16 Honor. I don't know. I can't recollect honestly why we put
17 45.
18       THE COURT: Yes. I mean, the standard under our
19 rules is 14, but --
20       MR. WOLKOFF: We'd be agreeable to 30, Your Honor.
21       THE COURT: Okay. So it's likely to be 30 days
22 there and any reply, assuming that a reply is necessary -- let
23 me just mention that the purpose of a reply is to deal with
24 something that could not reasonably have been anticipated in
25 the initial briefing. There is a phrase that the late Paul

Page 32

1 Freund used to use to describe those lawyers most feared by
2 Judges. And it is the lawyer who knows how to spell "banana"
3 but doesn't know when to stop. If the reply brief is just more
4 of the same, then I don't want to see it. So, I just raise it.
5       MR. SHAPIRO: If I could speak to that, I'm sure
6 Your Honor has seen it in some of the class cases I have had
7 before Your Honor. We think there's pretty much a prima facie
8 case for class certification in a case like this. And the
9 opening brief usually does sort of address the requirements of
10 the rule in a formal sense. And typically, if there's a real
11 issue on class certification, it's raised by defendants
12 challenging a particular plaintiff. But coming up with novel
13 theories, that's why the reply is usually more substantive.
14       THE COURT: I'm leaving the reply in there.
15       MR. SHAPIRO: Okay.
16       THE COURT: But I'm going to say 15 days for the
17 reply and I'm encouraging the idea that it should be something
18 that could not reasonably have been anticipated in a motion and
19 memoranda for class classification.
20       MR. SHAPIRO: And the reason for the 20 days is
21 that usually the issue is raised for the first time by the
22 defendants in their opposition.
23       THE COURT: All right. But I think that 15 days is
24 enough to get to it. That way, it conduces to brevity, I
25 think.

Page 33

1       MR. SHAPIRO: Except if we're going to have
2 combined briefs, we may be dealing with class certification
3 under 50 different states and 50 different issues will have to
4 be raised.
5       THE COURT: Maybe. And then you can ask for an
6 extension.
7       MR. SHAPIRO: Okay.
8       THE COURT: But with realistic ideal with prospects
9 of success.
10       Now, back to dispositive motions, those are 30 days
11 after expert discovery. Do we have to have it 30 days after
12 expert discovery? Why do we wait for expert discovery? I
13 don't even know what expert discovery is here. What is it
14 likely to be?
15       MR. SHAPIRO: That's defendant's issue, Your
16 Honor. That's what they asked for and we agreed to it for
17 purposes of --
18       THE COURT: What's the expert discovery likely to
19 be?
20       MR. WOLKOFF: Well, the expert discovery, Your
21 Honor, is going to be in support of the advertisements, whether
22 or not the M3 Power Razor does raise the hair up and away, at
23 least does it raise the hair away from the face, perhaps maybe
24 not up and away, but raise it away. There might be some expert
25 discovery on -- there's a consumer case. It's one of the

Page 34

1  reasons why it's different from the Schick Lanham Act case.
2  If, in fact, the razor doesn't -- we believe it does.
3         THE COURT: So this is a follicle expert; is that
4  what --
5         MR. WOLKOFF: It could be, Your Honor. It could
6  also be someone who testified about a market survey, for
7  example, that whether the razor does raise the hair up and
8  away, it does give the best shave, it gives a satisfactory
9  shave, it gives consumers what they are looking for.
10        THE COURT: So I guess I understand that. So, 30
11 days after the close of expert discovery seems ripe for summary
12 judgment motions.
13        Here again, opposing summary judgment motions by
14 the parties, I want 30 days for that.
15        MR. KANNER: Your Honor --
16        THE COURT: Yes.
17        MR. KANNER: -- if we feel we have a dispositive
18 motion that we want to file before the completion of expert
19 discovery, may we do that?
20        THE COURT: Yes. But let me outline my structure
21 for you. When I say dispositive motion, it really has to be
22 something that drives a stake in the heart of the case. You
23 know, something that rips off a part of a finger doesn't do it
24 for me unless it makes some difference in the way in which the
25 case develops. I really would like to keep dispositive motion

Page 35

1  practice focused on the end of the case. But if there is
2  something there that somebody thinks can really do a number on
3  changing the balance of advantage substantially as opposed to
4  just diverting people to deal with one aspect of something that
5  was going to be taken up in any event at the end, then you file
6  it. I'm just suggesting that this is the way -- this is the
7  structure that we're going to deal with. And I'll look very
8  carefully at a dispositive motion like that to see whether it
9  makes very much difference. And if I don't think it makes very
10 much difference, it may well be denied without prejudice to
11 being refiled at a later point. It may be you want to file
12 things twice. Maybe you don't.
13        MR. KANNER: Thank you very much. That's an
14 example of we're agreeing we're going to have an addition to
15 Adoure that's a little different.
16        THE COURT: I'm sorry. An addition to Adoure?
17        MR. KANNER: Yes.
18        MR. STRENIO: And, Your Honor, if I may, also, with
19 respect to the issue of expert discovery, since we mentioned
20 the initial disclosure of all the discovery that's been done in
21 Schick, that disclosure and that discovery has included expert
22 testimony, expert depositions not only in the Schick case, but
23 also in previous cases in Germany, Australia. That expert
24 discovery should be disclosed to us initially now.
25        THE COURT: I mean, what I said is anything that's

Page 36

1  relevant to this case.
2         MR. STRENIO: Thank you.
3         THE COURT: I mean, if it's some peculiarity in
4  Australia or Germany, I suspect it won't be disclosed to you.
5         MR. STRENIO: Their experts, as Gillette's counsel
6  has stated, discussing the issue of whether or not the M3 Power
7  Razor raises the hair away from the skin, that that expert
8  discovery should be produced now.
9         THE COURT: Okay.
10        MR. KANNER: Your Honor, relating to discovery and
11 maybe hopping back to settlement for a second, the defendant --
12 it's my understanding -- has shared some financial marketing
13 information with some plaintiffs, but not all plaintiffs. We
14 requested access to that information as well. And we would
15 just ask that anything that is being shared with one of the
16 counsel or two or three of the counsel be shared with everybody
17 under the same terms and conditions in the interim.
18        THE COURT: Any objection to that?
19        MR. WOLKOFF: Well, the only reason why it hasn't
20 been shared yet is, Your Honor, we were going through
21 variations on the confidentiality agreement with different
22 parties. And, so, what we wound up saying was, "look, we're
23 going to have a conference in a short time." "Lead counsel" --
24 we thought the motion would be on today -- "will be appointed
25 and we'll produce it promptly thereafter." So, it really was

Page 37

1  dependent upon the --
2         THE COURT: Okay. Well, I think in terms of just
3  orderliness in this, I think it does have to wait until lead
4  counsel. If they are making special arrangements with one or
5  another of the parties or this plays into settlement, that's
6  their business. It will get organized with the identification
7  of lead counsel for this kind of thing.
8         Now, turning to the question of reply here for
9  dispositive motions, I see you have got 20 days. And I guess
10 showing my generosity of the spirit, I'll make it 20 days for
11 class certification, again having in mind sometimes it's not
12 necessary to have a reply brief. Frequently, it's not
13 necessary.
14        Pretrial conference, I'll deal with at a later
15 point.
16        This question of simply being a member of the
17 highest court of the state, there was some reference to MDL
18 practice in this. Is there an MDL rule on that? The reason I
19 ask is it's not too much to ask that somebody who appears pro
20 hac vice be familiar with the rules of this Court. And, so, I
21 don't know why I have to have a special rule regarding counsel
22 in this case. Is there some reason?
23        (No response from counsel)
24        THE COURT: Okay. So I'm not going to make some
25 special rule. If you want to be pro hac vice, you have got to

## Page 38

1 comply with our rules with respect to pro hac vice lawyers.
2 Similarly, obviously, this is an electronic case filing matter.
3       MR. KANNER: Your Honor, there is a panel rule,
4 1.4, that says attorneys should be admitted as a matter of
5 course.
6       THE COURT: And the course, I think, is to satisfy
7 me that you know the rules of this Court and you pay the fee.
8 So, I don't see any reason why there should be any departure
9 from that. That seems to be in due course unless there's
10 something I'm missing.
11       MR. STRENIO: Your Honor, the rule actually says
12 any attorney that's admitted in the original jurisdiction and
13 transferred to your jurisdiction is deemed automatically
14 admitted in the transferree jurisdiction. We have paid our
15 fees, but the fees aren't contingent. I mean, payment of
16 fees -- that's in the rule -- isn't a contingency to us being
17 deemed automatically admitted.
18       THE COURT: But, you know, the only other thing You
19 have to do is say that you know the rules of this court.
20       MR. STRENIO: We do.
21       THE COURT: Oh, well then that will be easy for
22 you. So the short of it is that unless there's some real
23 reason for me to say that I am going to suspend the rule of
24 this Court, which in the ordinary course permits lawyers from
25 any jurisdiction to appear who meet some minimum competence

## Page 39

1 level or simply assert that they've met the competence level.
2 I don't test you, at least initially, on your familiarity with
3 the rules of this court. Then I'm likely to impose that. It
4 also ties into -- as Ms. Rynne reminds me, this also ties into
5 the CM/ECF system, because the allowance of a formal motion is
6 what triggers giving you passwords and that sort of thing. And
7 I simply -- unless you've got something else that's bothersome
8 to you about that, I really want to hold to that. All right.
9       Now, are there any other matters that we need to
10 speak to in this case?
11       MR. DODD: Your Honor, on this pro hac vice issue
12 and MDL -- and I may need retraining on the ignorance of local
13 rules. But usually there's a requirement that local counsel
14 sign on when you're applying for pro hac vice. And I think
15 that's why the MDL rules provide that if you're in another case
16 that is being consolidated for multi-district litigation, that
17 you're automatically in it. I guess you still have to pay the
18 fee, submit an application, but you don't necessarily have to
19 have a local counsel sign onto your application.
20       THE COURT: Well, you're testing my recollection.
21 I know we had some discussion about this when we were
22 redrafting the rules to try to minimize the problem of that --
23 that is, requiring somebody to have jurisdiction. And I'm just
24 trying to quickly --
25       MR. WOLKOFF: I could be mistaken, Your Honor, but

## Page 40

1 I don't think our local rules require local counsel.
2       THE COURT: They do.
3       MR. SHAPIRO: The local rules --
4       THE COURT: This is the first test, by the way, of
5 familiarity with local rules.
6       MR. SHAPIRO: I believe the local rules do require
7 local counsel. Now whether MDL is different, I don't know,
8 Your Honor.
9       THE COURT: Right. Well, again, as an act of
10 grace, you don't have to have local counsel.
11       MR. DODD: Thank you, Your Honor.
12       THE COURT: But you do have to be familiar with the
13 local rules.
14       MR. DODD: Well, we'll pay our 50 bucks.
15       THE COURT: Okay. Certainly that as well.
16       MR. STRENIO: Your Honor, to the extent that we've
17 had any filings before the Court has indicated that we must
18 file the fees, although we have, is our pro hac vice deemed
19 nunc pro tunc to the date that we filed our first papers in
20 this Court?
21       THE COURT: Sure, if it's allowed.
22       MR. STRENIO: Thank you.
23       THE COURT: All right. Okay. Are there other
24 things that we need to take up now?
25       (No response from counsel)

## Page 41

1       THE COURT: All right. So we've got a schedule. I
2 think as a kind of first order of business that the structure
3 that I have given to this order can be submitted. You know
4 what's happening. It should be part of the first pretrial
5 order submitted by the parties. When we come here the next
6 time, we will fill in the blanks regarding that. But at least
7 there ought to be sufficient cooperation to do that much in
8 this case to get you going.
9       MR. SHAPIRO: I'm sorry. You said you'd like us to
10 prepare an order reflecting what happened today?
11       THE COURT: Yes. All of the parties can do that.
12 And that's the beginning of your pretrial order because that's
13 the first thing that I'm going to want to enter apart from
14 identification of interim liaison lead counsel.
15       MR. WOLKOFF: We can take the lead on preparing
16 that, Your Honor --
17       THE COURT: Yes.
18       MR. WOLKOFF: -- certainly amongst the other side.
19       THE COURT: Okay. All right. So if there is
20 nothing further, then I'll see you, I guess, on the 6th.
21       MR. SHAPIRO: Yes.
22       THE COURT: Thank you very much.
23
24       RECESSED AT 3:30 P.M.
25

Page 42

1
2
3          CERTIFICATION
4
5          I certify that the foregoing is a correct
6     transcript of the record of proceedings in the above-entitled
7     matter to the best of my skill and ability.
8
9
10
11    _____    _____
12    Pamela R. Owens                    Date
13    Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25

Page 43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## THE KICK LAW FIRM
A PROFESSIONAL CORPORATION

900 WILSHIRE BOULEVARD, SUITE 230
LOS ANGELES, CALIFORNIA 90017
213 624 1588 / FAX 213 624 1589

November 8, 2006

***Via Facsimile (312) 641-5504***
Ben Barnow, Esquire
Barnow and Associates
One North LaSalle Street
Suite 4600
Chicago, IL   60602

Re:    In re *M3 Power Razor System Marketing & Sales Practice Litigation,*
       Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Counsel:

We have reviewed the public filings of November 6, 2006, the additional documents filed under seal that we received yesterday from you via fedex, and the additional documents filed under seal that we received yesterday afternoon from you via facsimile.

Please immediately provide us with a copy of the following:

1.    All documents showing compliance with the applicable notice requirements of each of the consumer protection laws alleged in the amended consolidated complaint, including the date the notice was sent to Gillette.

2.    Any and all back-up documents for the information stated in GLTE 000001-4, 33-35.

3.    All detailed time entries for Lead Counsel, Liaison Counsel, and all other attorneys who have provided such entries to you.  You requested that everyone submit the detailed records to you, but you only submitted the summaries to the Court.

4.    All confirmatory discovery that has not already been provided to us.

5.    All other discovery (formal or informal) that has not been provided to us.  For example, mention is made in the briefing filed on November 6, 2006 to the depositions of Collin McGeary and Adam Kline.  Please provide us with a copy of the transcript of these depositions and any and all exhibits to the depositions.  Also, you have provided us on November 7, 2006 with the ruling in the Belgium

Ben Barnow, Esquire                                                                          2
Re: In re *M3 Power Razor System Marketing & Sales Practice Litigation,*
Civil Action No. 05-11177-DPW, MDL No. 1704
November 8, 2006

    case, but please provide us with all documents you have obtained relating to the
    cases in Belgium, France, and the Netherlands.

Thank you for your attention.

            Very truly yours,

            G. James Strenio

TRANSMISSION VERIFICATION REPORT

```
                                    TIME  : 11/06/2006 09:39
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROJ2J700633
```

```
DATE,TIME                  11/06  09:38
FAX NO./NAME               13126415504
DURATION                   00:00:37
PAGE(S)                    02
RESULT                     OK
MODE                       STANDARD
                           ECM
```

## THE KICK LAW FIRM
900 Wilshire Blvd.
Suite 230
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

**NUMBER OF PAGES:** ___3___ (including cover sheet)

**DATE:**              November 8, 2006

**FAX NUMBER:**        (312) 641-5504

**PHONE NUMBER:**      (312) 621-2000

**TO:**                Barnow and Associates

**ATTENTION:**         Ben Barnow, Esq.

**FROM:**              G. James Strenio

**SUBJECT:**           *In re M3 Power Razor System Marketing & Sales Litigation*,
                       Civil Action No. 05-11177-DPW (lead case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

# THE KICK LAW FIRM
900 Wilshire Blvd.
Suite 230
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

### NUMBER OF PAGES:    ___3___  (including cover sheet)

**DATE:**                November 8, 2006

**FAX NUMBER:**          (312) 641-5504

**PHONE NUMBER:**        (312) 621-2000

**TO:**                  Barnow and Associates

**ATTENTION:**           **Ben Barnow, Esq.**

**FROM:**                G. James Strenio

**SUBJECT:**             *In re M3 Power Razor System Marketing & Sales Litigation ,*
                         Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm.

BARNOW ☯ ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: 312-621-2000*
*Facsimile: 312-641-5504*

November 13, 2006

**Via Facsimile**

G. James Strenio, Esq.
The Kick Law Firm
900 Wilshire Boulevard
Suite 230
Los Angeles, CA 90017

Re:    *In re M3Power Razor System Marketing & Sales Practices Litigation,*
       Civil Action No. 05-11177-DPW, MDL No. 1704

Dear James:

In response to your letters of November 8, 2006, it is my belief that you have been provided with all of the documents that you have requested which are in our possession as production from Gillette. A copy of the unredacted Plaintiffs' Supplemental Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing was sent to you via FedEx Priority Overnight to ensure prompt receipt by you. Hopefully, it was received by you in that manner. In addition, a copy of the McGeary deposition transcript was forwarded to you, along with copies of the exhibits from the Kline deposition; a copy of the Klein deposition transcript should be PDF'd to you later today from Mr. Shapiro's office.

This matter is under the jurisdiction of the Court. The Court has established a protocol for ruling on the motion for preliminary approval of the proposed settlement in an orderly fashion. We believe our filings comply with the Court's directive.

Very truly yours,

*Ben Barnow*

Ben Barnow

BB/bas

cc:    Robert M. Rothman, Esq.
       Thomas G. Shapiro, Esq.

Case 1:05-cv-11177-DPW    Document 105-9    Filed 11/13/2006    Page 1 of 2

# BARNOW AND ASSOCIATES

*a professional corporation*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

ATTORNEYS AT LAW

Telephone: *(312) 621-2000*
Facsimile: *(312) 641-5504*

## FACSIMILE COVER SHEET

| | | | |
|---|---|---|---|
| TO: | G. James Strenio | FACSIMILE NUMBER: | (213) 624-1589 |
| CC: | Robert M. Rothman | | (631) 367-1173 |
| | Thomas G. Shapiro | | (617) 439-0134 |
| DATE: | November 13, 2006 | Number of pages *(including cover sheet):* 2 | |
| FROM: | Ben Barnow | RE: | *In re: M3Power Razor System Marketing & Sales Practices Litigation,* MDL Docket No. 1704 |

MESSAGE:   Please see accompanying.

## CONFIDENTIALITY NOTICE

The information transmitted in this facsimile message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney/client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any retention, review,use, dissemination, distribution, or copying of this facsimile message and the information contained therein is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the above address via first class mail. We will reimburse postage. Thank you.

# BARNOW ⊕ ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: 312-621-2000*
*Facsimile: 312-641-5504*

November 18, 2005

## Via Facsimile and U.S. Mail

Harvey J. Wolkoff, Esq.
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Re: Gillette Litigation

Dear Harvey:

This letter confirms our conversation of earlier today regarding the above-captioned litigation. During the conversation, you stated that our written proposal was transmitted to your client, Gillette. You stated that Gillette would not be making a counter-proposal to our written proposal or further negotiate with us as we were seeking the moon and the stars. You also said that there were two groups with whom Gillette has been negotiating and that my group's proposal was way too high. You stated that Gillette went to the other group, the proposal from which was lower.

If any of the above does not comport with your recollection, please so advise.

Very truly yours,

Ben Barnow

BB/gt

cc:    Larry D. Drury, Esq.
       Lance A Harke, Esq.
       John S. Steward, Esq.
       Kenneth D. Quat, Esq.

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re:<br><br>GILLETTE M3POWER RAZOR<br>SYSTEM ADVERTISING LITIGATION | MDL Docket No. _____ |

**PLAINTIFF KEVIN WINDOM'S MOTION FOR TRANSFER AND**
**COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407**

C. Brooks Cutter
Mark J. Tamblyn
**KERSHAW, CUTTER & RATINOFF, LLP**
980 9th Street, 19th Floor
Sacramento, California 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

[Additional Counsel Listed on Signature Page]

Attorneys for Individual and Representative
Plaintiff,
*Kevin Windom*

-1-

Plaintiff in the action listed below, by his attorneys, moves the Panel pursuant to 28 U.S.C. § 1407 to transfer the pending cases identified in the schedule filed concurrently herewith to the United States District Court for the District of Massachusetts, and to consolidate them for pretrial purposes before the Honorable Rya W. Zobel.

As set forth below and in the accompanying Memorandum, Movant believes the actions listed on the accompanying Schedule of Actions satisfy the requirements for consolidation and coordination because they concern common questions of fact and law and consolidation or coordination will serve the interests of efficiency and convenience.

In support of this Motion, Movant states as follows:

1.    Movant is the plaintiff in the following case:

**_Kevin Windom v. The Gillette Company_**
United State District Court for the District of Massachusetts
Case No. 05-11207 RWZ.

2.    The *Windom Action* is a class action brought on behalf of all purchasers of The Gillette Company's ("Gillette") M3Power razor systems in the United States.

3.    Specifically, the *Windom Action* alleges that Gillette falsely advertised that its M3Power razor systems are capable of raising hair up and away from a user's skin.

4.    The *Windom Action* seeks declaratory and injunctive relief prohibiting Gillette from any further false, deceptive or misleading advertising of the M3Power razor system.

5.    The factual allegations in the related actions, filed in the District of Massachusetts and the Central District of California, contain identical allegations

Motion for Transfer and Coordination or Consolidation

*A*

*14*

concerning the misleading nature of Gillette's claims that its M3Power razor can raise a user's facial hair to achieve a closer shave. (See Complaints attached hereto as Exhibits A (*Windom*), B (*Atkins*) and C (*Dearman*).) The cases are all similar with respect to the legal theories supporting their claims. All of the plaintiffs assert claims for equitable and injunctive relief, claims under state unfair and deceptive acts statutes, as well as common law claims, arising out of the Gillette's conduct. Moreover each of the related actions is a class action and seeks relief on behalf of the same class of persons – all persons who purchased the M3Power razor systems. In each case, the district court will be asked to determine the following factual and legal issues raised against Gillette:

    a) Whether Gillette's advertising claims in print and television media, product packaging and online is false, deceptive or misleading in violation of state consumer protection statutes;

    b) Whether Gillette's internal testing and studies concerning its M3Power technology have validity or scientific merit;

    c) Whether Gillette has been unjustly enriched through sales of M3Power razor systems, including by charging consumers a premium for the M3Power razors and blades;

    d) Whether the plaintiffs and the class are entitled to class-wide relief;

    e) Whether Gillette engaged in unfair competition in the course of advertising, promoting and selling its M3Power razor systems; and

    f) Whether the plaintiffs and the Class are entitled to injunctive relief prohibiting the challenged practices and enjoining such practices in the future.

    6.    Discovery conducted in each of the actions proposed for consolidation will be substantially similar, and will involve the same or similar

-3-

A

15

documents and witnesses, since each case arises from virtually identical operative facts relating to the Gillette's conduct.

7.      Absent transfer of all of these cases to a single forum for coordinated and consolidated pretrial proceedings, there is a substantial risk of inconsistent and conflicting pretrial rulings on discovery and other key issues, such as class certification.

8.      There has been no discovery in any of the actions and no initial disclosures have been made. Since all actions are in the beginning stage of litigation, no prejudice or inconvenience will result from transfer, coordination, and/or consolidation.

9.      Efficiency in the administration of justice will be served by consolidation, because one judge rather than three judges can supervise all pretrial proceedings and render rulings that are consistent for all plaintiffs on common issues.

10.     For the reasons stated in this Motion and the Memorandum of Law submitted herewith, Movant respectfully request that all cases listed in the attached schedule be transferred to the United States District Court for the District of Massachusetts to be consolidated for pretrial purposes before the Honorable Rya W. Zobel.

Dated: June 9, 2005            **KERSHAW, CUTTER & RATINOFF, LLP**


By: _____
         MARK J. TAMBLYN

C. Brooks Cutter                                Thomas M. Sobol
**KERHAW, CUTTER & RATINOFF LLP**    Edward Notargiacomo
980 9th Street, 19th Floor              **HAGENS BERMAN SOBOL**
Sacramento, California 95814            **SHAPIRO LLP**
Telephone: (916) 448-9800              One Main Street, 4th Floor
Facsimile: (916) 669-4499              Cambridge, Massachusetts 02142
                                       Telephone:  (617) 482-3700
                                       Facsimile:  (617) 482-3003

Motion for Transfer and Coordination or Consolidation

A

16

BEFORE THE JUDICIAL PANEL ON

MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re:<br><br>GILLETTE M3POWER RAZOR<br>SYSTEM ADVERTISING LITIGATION | MDL Docket No. _____ |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TRANSFER AND COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407

C. Brooks Cutter
Mark J. Tamblyn
**KERSHAW, CUTTER & RATINOFF, LLP**
980 9th Street, 19th Floor
Sacramento, California 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

[Additional Counsel Listed on Signature Page]

Attorneys for Individual and Representative Plaintiff,
Kevin Windom

-1-

A
17

Movant, Kevin Windom, on behalf of himself and all others similarly situated, ("Movant") seeks transfer and coordination or consolidation under 28 U.S.C. § 1407 of all related "GILLETTE M3POWER RAZOR ADVERTISING LITIGATION" filed in the federal courts. Plaintiff seeks to have all cases identified in the accompanying schedule transferred to the United States District Court for the District of Massachusetts.

## I.    INTRODUCTION

There are currently three federal actions of which Movant is aware ("the pending cases"), that seek relief for purchasers of The Gillette Company's ("Gillette") M3Power razor systems. Specifically, the pending cases allege that Gillette's advertising of the M3Power razors, which require the use of a AAA battery to give the razor a vibrating charge, is false, misleading and deceptive in violation of state consumer protection statutes. The complaints allege that Gillette's representations to the effect that the M3Power razor system is able to lift hair up and away from skin are false and misleading, and the razor system simply does not provide the advertised benefits. The federal courts have original diversity jurisdiction over these state and common law based actions pursuant to The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

All of the pending cases seek to certify a class of Gillette M3Power razor system purchasers and seek to both compensate them and enjoin Gillette from continuing false and misleading advertising and acts of unfair competition.

None of the three pending cases is advanced and no discovery has been conducted. Two of the actions are venued in the District of Massachusetts and the other in the Central District of California. Each arises from identical conduct involving the same defendant, and from common questions of law and fact. Prompt coordination and judicial action under the federal court's broad powers should be invoked to promote the efficient prosecution of the pending actions.

Memo of Law in Support of Motion for Transfer and Coordination or Consolidation

*A*

18

## II.   ARGUMENT

### A.   Transfer To One District For Coordinated Or Consolidated Pretrial Proceedings Will Promote § 1407's Goals Of Ensuring The Just And Efficient Conduct Of The Actions, And Avoiding Inconsistent Or Conflicting Substantive And Procedural Determinations.

The purpose of 28 U.S.C. § 1407 is to provide centralized management, under a single court's supervision, of pretrial proceedings of litigation arising in various districts to ensure the just, efficient and consistent conduct and adjudication of such actions. *In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 50 (2d Cir. 1978).

The transfer of actions to a single forum under § 1407 is appropriate where, as here, it will prevent duplication of discovery, and, most importantly in the instant case, it will eliminate the possibility of overlapping or inconsistent pleading and class action determinations by courts of coordinate jurisdiction. *In re Litig. Arising from Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F. Supp. 287, 290 (J.P.M.L. 1976); *In re LTV Corp. Sec. Litig.*, 470 F. Supp. 859, 862 (J.P.M.L. 1979); *In re Exterior Siding and Aluminum Coil Litig.*, 538 F. Supp. 45, 47 (D.C. Minn. 1982); *In re "Agent Orange" Prod. Liability Litig.*, 597 F. Supp. 740, 752 (E.D.N.Y. 1984), *affirmed*, 818 F.2d 145 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988), *on remand*, 689 F.Supp. 1250 (E.D.N.Y. 1988).

As noted above, such transfer and coordination is particularly appropriate at this time because formal discovery is in its infancy in each of the actions. Thus, coordination and transfer will effectuate an obvious savings of time and resources.

The litmus test of transferability and coordination under § 1407 is the presence of common questions of fact. *In re Fed. Election Campaign Act Litig.*, 511 F. Supp. 821, 823 (J.P.M.L. 1979). Each of the pending actions is a class action arising from directly and explicitly Gillette's specific advertising claims regarding the capabilities of the M3Power razor system. Proof in the pending actions will plainly involve identical factual issues.

Memo of Law in Support of Motion for Transfer and Coordination or Consolidation

*A*
19

Furthermore, since each of the pending cases is brought as a class action, consistent and efficient rulings on class certification issues are critical. *See, e.g., In Re: Piper Aircraft Distribution Sys. Antitrust Litig.*, 405 F.Supp. 1402, 1403-04 (J.P.M.L. 1970); *In Re: Baldwin-United Corporation Litig.*, 581 F.Supp. 739 (J.P.M.L. 1984); *In Corporation Litig.*, 581 F.Supp. 739 (J.P.M.L. 1984).

### B. The Convenience of the Parties Will Be Served By Transfer to the District of Massachusetts.

Transfer will serve the convenience of the parties by drawing the lawsuits to one central location. Lawsuits have now been filed in Massachusetts and the Central and Districts of California. Movant respectfully submits that the District of Massachusetts, the headquarters of Gillette, would be a particularly suitable forum for the just and prompt handling of pretrial proceedings as it offers a convenient location, a skilled and experienced trial judge, an efficiently managed and speedy docket, and a strong interest in the resolution of these claims.

Beyond the fact that two of the related actions have been filed in the District of Massachusetts favor transfer to a single judge in that forum, the fact that Gillette is headquartered in Boston also heavily favors transfer of all related, and future potential tag-along actions, to the District of Massachusetts. The Panel has repeatedly recognized the significance of the location of the defendant, given the likely location of documents and witnesses. *See In re Foundry Resins Antitrust Litig.*, 342 F.Supp.2d 1346, 1347 (J.P.M.L. 2004); *In re Cotton Yarn Antitrust Litig.*, 336 F.Supp. 2d 1383, 1384 (J.P.M.L. 2004); *In re UICI "Association Group" Insurance Litig.*, 305 F.Supp.2d 1360, 1362 (J.P.M.L. 2004).

Further, as the situs of one of the nation's busiest airports, the District of Massachusetts, located in downtown Boston, would be easily accessible to all parties, counsel and other participants in the pretrial process.

*A*

*тО*

Furthermore, since each of the pending cases is brought as a class action, consistent and efficient rulings on class certification issues are critical. *See, e.g., In Re: Piper Aircraft Distribution Sys. Antitrust Litig.*, 405 F.Supp. 1402, 1403-04 (J.P.M.L. 1970); *In Re: Baldwin-United Corporation Litig.*, 581 F.Supp. 739 (J.P.M.L. 1984); *In Corporation Litig.*, 581 F.Supp. 739 (J.P.M.L. 1984).

**B.    The Convenience of the Parties Will Be Served By Transfer to the District of Massachusetts.**

Transfer will serve the convenience of the parties by drawing the lawsuits to one central location. Lawsuits have now been filed in Massachusetts and the Central and Districts of California. Movant respectfully submits that the District of Massachusetts, the headquarters of Gillette, would be a particularly suitable forum for the just and prompt handling of pretrial proceedings as it offers a convenient location, a skilled and experienced trial judge, an efficiently managed and speedy docket, and a strong interest in the resolution of these claims.

Beyond the fact that two of the related actions have been filed in the District of Massachusetts favor transfer to a single judge in that forum, the fact that Gillette is headquartered in Boston also heavily favors transfer of all related, and future potential tag-along actions, to the District of Massachusetts. The Panel has repeatedly recognized the significance of the location of the defendant, given the likely location of documents and witnesses. *See In re Foundry Resins Antitrust Litig.*, 342 F.Supp.2d 1346, 1347 (J.P.M.L. 2004); *In re Cotton Yarn Antitrust Litig.*, 336 F.Supp. 2d 1383, 1384 (J.P.M.L. 2004); *In re UICI "Association Group" Insurance Litig.*, 305 F.Supp.2d 1360, 1362 (J.P.M.L. 2004).

Further, as the situs of one of the nation's busiest airports, the District of Massachusetts, located in downtown Boston, would be easily accessible to all parties, counsel and other participants in the pretrial process.

Memo of Law in Support of Motion for Transfer and Coordination or Consolidation

*A*

*to*

Finally, the Honorable Rya W. Zobel, to whom Movant *Windom's* case is assigned, has substantial experience with class actions and complex commercial litigation developed during her 26 years in the federal judiciary. Judge Zobel's depth of experience and reputation for efficiently handling complex cases makes her an exceptional candidate to manage these complex cases.

C.      **The Need For Transfer and Coordination in the Class Action Context.**

Of central concern to Plaintiff is the potential for disruption, confusion and prejudice created by the pendency of at least three actions seeking class-wide relief in at least two different districts. The Panel has consistently held that when the risk of overlapping or inconsistent class determinations exists, transfer of actions to a single district for coordinated or consolidated pretrial proceedings is necessary in order to eliminate the possibility of inconsistent pretrial rulings, especially concerning class issues. *In re Bristol Bay, Salmon Fishery Antitrust Litig.*, 424 F.Supp. 504, 506 (J.P.M.L. 1976); *In re Litig. Arising from Termination of Retirement Plan for Employees of Fireman's Fund Ins. Co.*, 422 F. Supp. At 290 (J.P.M.L. 1976); *In re Nat'l Airlines, Inc., etc.*, 399 F.Supp. 1405, 1407 (J.P.M.L. 1975); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F.Supp. 612, 613 (J.P.M.L. 1974). This is true even when only two actions are involved. *In re First Nat'l Bank, etc.*, 451 F.Supp. 995, 997 (J.P.M.L. 1978).

The potential for inconvenience to some parties may be properly ameliorated by the transferee judge, who is authorized to arrange for the conduct of depositions, for example, in other districts. *In re JBM Peripheral EDP Devices Antitrust Litig.*, 411 F.Supp. 791 (J.P.M.L. 1976). However, given the fact that Gillette is headquartered in Boston, and likely need to examine documents and depose witnesses in Boston, the District of Massachusetts is a particularly appropriate transferee forum.

Memo of Law in Support of Motion for Transfer and Coordination or Consolidation

4

기

## III.    CONCLUSION

For the foregoing reasons, and for those stated in the accompanying *Motion*, Plaintiff respectfully requests that the three pending "GILLETTE M3POWER RAZOR SYSTEM ADVERTISING LITIGATION" actions be transferred and coordinated and/or consolidated in the District of Massachusetts under 28 U.S.C. § 1407, and that all related individual or class actions be transferred thereto as "tag along actions."

Dated:  June 9, 2005          **KERSHAW, CUTTER & RATINOFF, LLP**

By: _____
          MARK J. TAMBLYN

C. Brooks Cutter
**KERHAW, CUTTER & RATINOFF, LLP**
980 9th Street, 19th Floor
Sacramento, California 95814
Telephone: (916) 448-9800
Facsimile: (916) 669-4499

Kenneth A. Wexler
Edward A. Wallace
**THE WEXLER FIRM LLP**
One North LaSalle St., Suite 2000
Chicago, Illinois  60602
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

Thomas M. Sobol
Edward Notargiacomo
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Main Street, 4th Floor
Cambridge, Massachusetts 02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003

Charles A. McCallum
R. Brent Irby
**McCALLUM, HOAGLUND, COOK & IRBY, LLP**
2062 Columbiana Road
Vestavia Hills, Alabama 35216
Telephone:  (205) 824-7767
Facsimile:  (205) 824-7768

Attorneys for *Plaintiff/Petitioner*

-6-

A
22

**EXHIBIT B**

# BEFORE THE JUDICIAL PANEL ON

# MULTIDISTRICT LITIGATION

In re:

MDL Docket No. 1704

GILLETTE M3POWER RAZOR SYSTEM
ADVERTISING LITIGATION

## INTERESTED PARTY CARLOS CORRALES' RESPONSE
## TO MOTION FOR TRANSFER AND COORDINATION
## OR CONSOLIDATION UNDER 28 U.S.C. § 1407

Taras P. Kick
G. James Strenio
Thomas G. Martin
**THE KICK LAW FIRM, APC**
660 South Figueroa Street, Suite 1800
Los Angeles, California 90017
Telephone: (213) 624-1588
Facsimile: (213) 624-1589

Attorneys for Plaintiff and Interested Party
Carlos Corrales

---

Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

B
23

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The genesis of these putative consumer state-law class actions is the *Schick* action in Connecticut, where substantial discovery has already occurred on the core factual issues resulting in a preliminary injunction. . . . . . . . 1

    B.    Most of the eleven actions are pending *outside* the District of Massachusetts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    All the eleven actions allege only <u>*state-law*</u> claims and almost all the actions allege only <u>*state-wide*</u> classes. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.    Certification is unlikely for a national class based on unjust enrichment or a multi-state class based on consumer protection statutes, because, *inter alia*, significant variations exist among each of the states' laws; likewise, any attempted settlement that fails to account for Californians' greater consumer protection rights and remedies will fail to be fair, reasonable, and adequate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Coordination or consolidation for purposes of discovery will not further the interests of efficiency and economy. . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    Coordination or consolidation for purposes of pretrial proceedings, such as motions to dismiss, motions for summary judgment, and motions for class certification, will subvert, not further, the interests of efficiency and economy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    Transfer and coordination or consolidation will not further, but instead subvert, the convenience of the parties and witnesses. . . . . . . . . . . . . . . . . . . . 14

    D.    Transfer and coordination or consolidation will not further, but instead subvert, the interests of "just" conduct and adjudication. . . . . . . . . . . . . . . . . . 16

    E.    This Court should (and indeed must) deny Atkins' request to dismiss the *Corrales* action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B
z 4

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Amchem Products, Inc. v. Windsor,
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

BancOhio Corp. v. Fox,
    516 F.2d 29 (6th Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Carnegie v. Household Int'l, Inc.,
    220 F.R.D. 542 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Cedars-Sinai Medical Center v. Shalala,
    125 F.3d 765 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Clay v. Am. Tobacco Co.,
    188 F.R.D. 483 (S.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

Clement v. American Honda Fin. Corp.,
    176 F.R.D. 15 (D. Conn. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cuisinart Food Processor Antitrust Litig.,
    506 F.Supp. 651 (JPML 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

Corbett v. Superior Court,
    101 Cal.App.4th 649 (Cal. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Florida v. Liquid Air Corp.(In re Carbon Dioxide Indus. Antitrust Litig.),
    299 F.3d 1321 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gulf Oil Corp. v.Gilbert,
    303 U.S. 501 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

In re "Agent Orange" Prod. Liab. Litig.,
    597 F.Supp. 740 (E.D. N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

In re Air Crash Disaster at Florida Everglades,
    368 F.Supp. 812 (JPML 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

In re Air West, Inc. Sec. Litig.,
    384 F.Supp. 609 (JPML 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Antibiotic Antitrust Actions,
    333 F.Supp. 299 (S.D. N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

In re Baldwin United Corp. Litig.,
    581 F.Supp. 739 (JPML 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

In re Bally Total Fitness Holding Corp. Sec. Litig.,
    360 F.Supp.2d 1359 (JPML 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Bank One Shareholders Class Actions,
  96 F. Supp. 2d 780, 789 n. 12 (N.D. Ill. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

In re Bankamerica Corp. Secs. Litig.,
  210 F.R.D. 694 (E.D. Mo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,
  288 F.3d 1012 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,
  333 F.3d 763 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.,
  424 F.Supp. 504 (JPML 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13, 15

In re California Armored Car Antitrust Litig.,
  476 F.Supp. 452 (JPML 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Cement and Concrete Antitrust Litig.,
  437 F.Supp. 750 (JPML 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Chiropractic Antitrust Litig.,
  483 F.Supp. 811 (JPML 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Cigarette Antitrust Litig.,
  2000 U.S.Dist.LEXIS 8209 (JPML 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Cotton Yard Antitrust Litig.,
  336 F.Supp.2d 1383 (JPML 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

In re Eli Lilly and Company (Cephalexin Monohydrate) Patent Litigation,
  446 F.Supp. 242 (JPML 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Exterior Siding and Aluminum Coil Litig.,
  583 F.Supp. 45 (D. Minn. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Federal Election Campaign Act Litig.,
  511 F.Supp. 821 (JPML 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

In re FedEX Ground Package System, Inc., Employment Practices Litig.,
  366 F.Supp.2d 1381 (JPML 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re First Nat'l Bank (First Mortgage Revenue Bonds) Sec. Litig.,
  451 F.Supp. 995 (JPML 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

In re Foundry Resins Antitrust Litig.,
  342 F.Supp.2d 1346 (JPML 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

In re Gas Meter Antitrust Litig.,
  464 F.Supp. 391 (JPML 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

In re Goodyear Tire & Rubber Co. ERISA Litig.,
  2004 U.S.Dist.LEXIS 26706 (N.D. Ohio 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

B
26

In re Grand Funk Railroad Trademark Litig.,
    371 F.Supp. 1084 (JPML 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Heritage Bond Litig.,
    2005 U.S.Dist.LEXIS 13555 (C.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re IBM Peripheral EDP Devices Antitrust Litig.,
    411 F.Supp. 791 (JPML 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re IKON Office Solutions, Inc. Sec. Litig.,
    1999 U.S.Dist. LEXIS 19077 (JPML 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Ill. Mun. Ret. Fund v. Citigroup, Inc.,
    391 F.3d 844 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re LifeUSA Holding Inc.,
    242 F.3d 136 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

In re Litig. Arising from the Termination of the Retirement Plan for Employees of Fireman's
Fund Ins. Co.,
    422 F.Supp. 287 (JPML 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

In re LTV Corp. Sec. Litig.,
    470 F.Supp. 859 (JPML 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Master Settlement Agreement Antitrust Litig.,
    2005 U.S.Dist.LEXIS 12449 (JPML June 16, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Multidistrict Private Civil Treble Damage Litig.,
    302 F.Supp. 795 (JPML 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Nabumetone Patent Litig.,
    1998 U.S.Dist.LEXIS 13735 (JPML 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re National Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Reduction
Plan,
    399 F.Supp. 1405 (JPML 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

In re National Park Service Winter Use Management Litig.,
    2005 U.S.Dist.LEXIS 12451 (JPML June 16, 2005) . . . . . . . . . . . . . . . . . . . . . 8-9, 10

In re New York City Mun. Sec. Litig.,
    572 F.2d 49 (2nd Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Nicaraguan Contraban/Narcotics Trafficking Litig.,
    2000 U.S.Dist.LEXIS 1564 (JPML 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Oracle Sec. Litig.,
    1994 U.S.Dist.LEXIS 21593 (N.D. Cal. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Orthopedic Bone Screw Prods. Liab. Litig.,
    1997 U.S.Dist.LEXIS 2743 (E.D. Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

B
z7

In re Parcel Service, Inc. Excess Value Ins. Coverage Litig.,
    2000 U.S.Dist.LEXIS 5100 (JPML 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Phenylpropanolamine Prods. Liab. Litig.,
    2004 U.S. Dist. LEXIS 18937 (W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re Piper Aircraft Distribution System Antitrust Litig.,
    405 F.Supp. 1402 (JPML 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

In re Pullen & Associates, LLC,
    366 F.Supp.2d 1383 (JPML 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Raymond Lee Org. Inc. Sec. Litig.,
    446 F.Supp. 1266 (JPML 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Relafen Antitrust Litig.,
    221 F.R.D. 260 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Resource Exploration, Inc. Sec. Litig.,
    483 F.Supp. 817 (JPML 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Roadway Express, Inc. Employment Practices Litig.,
    384 F.Supp. 612 (JPML 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

In re Royal American Industries, Inc. Securities Litig.,
    407 F.Supp. 242 (JPML 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Scotch Whiskey,
    299 F.Supp. 543 (JPML 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Seale v. Nissan Motor Acceptance Corp.,
    1996 U.S.Dist.LEXIS 21945 (S.D. Ala. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Southeast Hotel Properties Ltd. Partnership Inv. Litig.,
    796 F.Supp. 538 (JPML 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Sprint Corp. PCS Network Contract Litigation,
    303 F.Supp.2d 1376 (JPML 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re St. Jude Medical, Inc., Silzone Heart Valves Prods. Liab. Litig.,
    2001 U.S.Dist.LEXIS 5226 (JPML 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Stock Exchs. Options Trading Antitrust Litig.,
    1999 U.S.Dist.LEXIS 8605 (JPML 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Sugar Industry Antitrust Litig.,
    395 F.Supp. 1271 (JPML 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

In re Sunbeam Corp. Sec. Litig.,
    1999 U.S.Dist.LEXIS 15870 (JPML 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,
    844 F.Supp. 1553 (JPML 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re The Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.,
   81 F.R.D. 482 (E.D. Mich. 1979) ............................................. 10

In re UICI "Association Group" Ins. Litig.,
   305 F.Supp.2d 1360 (JPML 2004) ........................................ 12-13

Janik v. Rudy, Exelrod & Zieff,
   199 Cal.App.4th 930 (Cal. App. 2004) ........................................ 6

Johnson v. Micron Tech., Inc.,
   354 F.Supp.2d 736 (E.D. Mich. 2005) ...................................... 16

Kohl v. American Home Prods. Corp.,
   78 F.Supp.2d 885 (W.D. Ark. 1999) ........................................ 11

Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,
   523 U.S. 26 (1998) ........................................................ 14

Lilly v. Ford Motor Co.,
   2002 U.S.Dist.LEXIS 5698 (N.D. Ill. 2002) ................................ 4, 5

Menowitz v. Brown,
   991 F.2d 36 (2nd Cir. 1993) ............................................... 13

People v. First Federal Credit Corp.,
   104 Cal.App.4th 721 (2002) ............................................... 14

Prata v. Superior Court,
   91 Cal.App.4th 1128 (Cal. App. 2001) .................................... 5-6

Stipelcovich v. DirecTV, Inc.,
   129 F.Supp.2d 989 (E.D. Tex. 2001) ........................................ 5

Strook Strook & Lavan v. Valley Sys.,
   1996 U.S.Dist.LEXIS 182 (S.D. N.Y. 1996) ................................. 18

Tylka v. Geber Prods. Co.,
   178 F.R.D. 493 (N.D. Ill. 1998) ............................................. 5

Zapa v. Coca-Cola Co.,
   2000 U.S.Dist.LEXIS 16552 (N.D. Ill. 2000) ................................. 5

Wershba v. Apple Computer,
   91 Cal.App.4th 224 (Cal. App. 2000) ....................................... 5

## STATUTES

28 U.S.C. §1407 ..................................................... *passim*

Cal. Bus. & Prof. Code §§17200 ....................................... 1, 2, 6

Cal. Bus. & Prof. Code §17500 ............................................ 1

Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

B
29

Cal. Civil Code §§1750 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 6

Cal. Civ. Code § 1780 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Class Action Fairness Act of 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. Proc. Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. Proc. Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. Proc. Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## TREATISES

*Manual for Complex Litigation* (rev. ed. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Manual for Complex Litigation* (4th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Manual for Complex Litigation* (4th ed. Ann. 2005) . . . . . . . . . . . . . . . . . . . . . 1, 9, 10, 14, 17

Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

*B*
*30*

Carlos Corrales, the plaintiff in *Corrales v. The Gillette Company*, Case No. CV 05-4116

DDP (FMOx), filed in the Untied States District Court of California on June 8, 2005, a "potential

tag along action" within the meaning of Rule 1.1 of the Rules of Procedure of the Judicial Panel

on Multidistrict Litigation, hereby <u>opposes</u> Plaintiff Kevin Windom's Motion For Transfer And

Coordination Or Consolidation Under 28 U.S.C. § 1407 (the "Motion"), <u>opposes</u> Plaintiff David

Atkins' request for dismissal of the *Corrales* action, and submits this interested party brief.

## PRELIMINARY STATEMENT

Corrales' choice of a California forum is entitled to "substantial deference" (<u>Manual for</u>

<u>Complex Litig.</u> (4th ed. Ann. 2005) at 20.12, p. 242 (citing <u>Gulf Oil Corp. v. Gilbert</u>, 303 U.S.

501, 508 (1947)), especially given that he seeks only a ***California-wide class*** action based on

***California's consumer protection statutes***: California's Unfair Competition Law (*Cal. Bus. &*

*Prof. Code* §§ 17200 *et seq.*) ("UCL"), California's Consumers Legal Remedies Act (*Cal. Civ.*

*Code* §§ 1750 *et seq.*) ("CLRA"), and California's False Advertising Statute (*Cal. Bus. & Prof.*

*Code* §17500).

The only reason that the *Corrales* and other ten pending putative class actions are in

federal court at all is the passage of the Class Action Fairness Act of 2005 ("CAFA").

The actions should <u>not</u> now, under the auspices of 28 U.S.C. § 1407, be transferred, let

alone transferred to Gillette's hometown. The requirements for transfer and coordination or

consolidation are not present in this case. This is especially true given that the actions all involve

varying state law claims, and given that substantial discovery of the core factual issues has

already occurred in the *Schick* action in Connecticut resulting in a preliminary injunction.

> **A.    The genesis of these putative consumer state-law class actions is the *Schick* action in Connecticut, where substantial discovery has already occurred on the core factual issues resulting in a preliminary injunction.**

Conspicuously absent from the Motion is any mention of the action that is the genesis of

the eleven pending putative state-law consumer class actions, namely *Schick Manufacturing, Inc.*

*v. The Gillette Company*, Case No. 05-CV-174 (JCH) ("*Schick*"), commenced on January 28,

---

2005 in the District of *Connecticut*, U.S. District Court Judge Janet C. Hall presiding. (A true and correct copy of the docket of the *Schick* action is attached to the accompanying separately-bound exhibits as Exhibit A.)

All of the pending putative class actions are tag-along cases of the Connecticut *Schick* action. That action – alleging violations of Connecticut's Unfair Trade Practices Act and the Lanham Act – is based on Gillette's "false and misleading advertising and promotion. . . designed to stimulate sales of its newest and highest-priced razor system, the M3 Power (the 'M3P') . . .. [Gillette's claim that the M3 Power makes hair stand 'up and away from skin' so that a closer shave results], along with slight variations of it that are made by Gillette in a variety of media , are deceptive." (*Schick* Complaint, Exhibit B, ¶¶ 1 and 5.) The putative class actions have taken this same factual allegation from the *Schick* action and added class action allegations.

Also conspicuously absent from the Motion is any mention of the fact that – *after months of intense discovery, including the production of voluminous documentary evidence, as well as percipient and expert witness depositions, resulting in a well-developed evidentiary record –* Judge Hall, on May 31, 2005, issued a preliminary injunction barring Gillette from making hair raising claims in its advertising.

In the 25-page Ruling, Judge Hall found that "Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false" and thereby also "result in actual deception." (Ruling Re Preliminary Injunction, Exhibit C, at 23-24.)

On the heels of this well-publicized preliminary injunction, the pending consumer putative class actions were all commenced, the first on Friday, June 3, 2005 in California.

**B.    Most of the eleven actions are pending *outside* the District of Massachusetts.**

These eleven actions have been commenced in only five (5) federal district courts. (Third Amended Rule 7.2(a)(ii) Schedule of Actions.) The majority (six of eleven) have been commenced *outside* the District of Massachusetts: specifically, two in the Central District of

California (the *Atkins* and *Corrales* actions), two in the Western District of Tennessee (the *Moore* and *Gorea* actions), one in the Northern District of Texas (the *Jackson* action), and one in the District of New Jersey (the *Coleman* action).

C.  **All the eleven actions allege only _state-law_ claims and almost all the actions allege only _state-wide_ classes.**

All the eleven actions allege claims based on *state law*, not federal law. The state law claims include the different state consumer protection laws, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment.

And, almost all the actions are brought as *state-wide* putative class actions, not national putative class actions. For example, the *Dearman/Debiseglia* action (represented by Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP, no stranger to national class actions) seeks only a *New York* class and a *Florida* class. The *Corrales* action seeks only a *California* class. The *Jackson* action seeks only a *Texas* class, alleging violations of the Texas Deceptive Trade Practices Act, fraudulent misrepresentation, and negligent misrepresentation. The *Tuñón/Kline* action seeks only a *Georgia* class and a *Massachusetts* class, alleging only unjust enrichment. The *Kenessky/Meyers* action (commenced on June 17, 2005) seeks a *New Jersey* and *California* class, alleging only unjust enrichment, violations of the New Jersey Consumer Fraud Act, and violations of the UCL (not alleging violations of the CLRA). And, both the *Moore* and *Gorea* actions seek, according to their respective counsel, only a *Tennessee* class.

D.  **Certification is unlikely for a national class based on unjust enrichment or a multi-state class based on consumer protection statutes, because, _inter alia_, significant variations exist among each of the states' laws; likewise, any attempted settlement that fails to account for Californians' greater consumer protection rights and remedies will fail to be fair, reasonable, and adequate.**

The only actions not alleging only a state-wide class are: (i) the *Windom* action (commenced on June 8, 2005 in the District of Massachusetts by only a Wisconsin resident), seeking a national class on the single legal theory of unjust enrichment; (ii) the *McGeary* action (commenced on June 23, 2005 in the District of Massachusetts by only a Massachusetts resident), also seeking a national class on the single legal theory of unjust enrichment; and

(iii) the *Atkins* action (commenced on June 3, 2005 in the Central District of California by only a California resident), also seeking a national class (actually a 48 state class) on the single legal theory of unjust enrichment, as well as a 29 state sub-class for violation of each of the state's respective consumer fraud statutes, a 29 state sub-class for violation of each of the state's unfair competition statutes, and a subclass of California residents on legal theories of violations of California's consumer protection statutes.

These three actions, alleging a putative national class based on the legal theory of unjust enrichment (*Windom*, *McGeary*, and *Atkins*) and the one action alleging a multi-state action (two 29-state classes) based on violations of state consumer protection laws including California (*Atkins*),[1] pose no potential overlap with the *Corrales* action, which alleges only a California class action based on claims for violations of California's consumer protection statutes.

First, these three national/multi-state putative class actions are unlikely to be certified given the varying laws of the states. This is true with respect to the unjust enrichment claims.[2]

_____

[1] The *Coleman* action (commenced on June 20, 2005 in the District of New Jersey by only a New Jersey resident) seeks a multi-state class (17 states and the District of Columbia), ***exclusive of California***, alleging violations of each of those states' respective consumer protection laws.

[2] See, e.g., Carnegie v. Household Int'l, Inc., 220 F.R.D. 542, 549 (N.D. Ill. 2004) (denying motion to certify national class based on unjust enrichment claim); Lilly v. Ford Motor Co., 2002 U.S.Dist.LEXIS 5698, *5-6 (N.D. Ill. 2002) ("Even if the law of consumer fraud or unjust enrichment is similar in all fifty-one jurisdictions, a class action is not the superior method of adjudicating these claims. Class certification of Plaintiffs' claim of unjust enrichment would still be unmanageable. ***The laws of unjust enrichment vary from state to state and require individualized proof of causation.*** Unjust enrichment is an equitable doctrine. There would be individual questions as to whether a particular class member is subject to equitable defenses. Moreover, ***variances exist in state common laws of unjust enrichment. The actual definition of `unjust enrichment' varies from state to state.*** Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. ... Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. ... ***The variations in state common laws of unjust enrichment demonstrate that class certification of such a claim would be unmanageable***") (citation and internal quotation marks omitted; all emphasis added unless otherwise stated); Clay v. Am. Tobacco Co., 188 F.R.D. 483, 500-01 (S.D. Ill. 1999) ("***The laws of unjust enrichment vary from state to state and require individualized proof of causation.*** ... `Unjust enrichment is an equitable doctrine that ... ***depends upon the analysis of each individual situation.' Unjust***

This is also true with respect to the clams for violation of each of the states' consumer protection statutes.[3]

Second, and more fundamentally, a national class based on only unjust enrichment could not be certified, without, at a minimum, excluding California residents. Otherwise, the requirements of typicality, adequacy, and commonality would not be satisfied.

"California's consumer protection laws are among the strongest in the country." Wershba v. Apple Computer, 91 Cal.App.4th 224, 242 (Cal. App. 2000). For example, the UCL is a strict liability statute where the plaintiff need show only that the public is likely to be deceived, even if the representation is true; a plaintiff does not need to show individualized proof of deception,

---

*enrichment requires individualized determinations* similar to those required under the theory of civil conspiracy. The plaintiffs have not presented evidence to establish that the question of liability is uniform among all members of the proposed class. ... Thus, *the defendants' liability for unjust enrichment to a particular plaintiff depends on the factual circumstances of the particular purchase at issue.* This individual inquiry presents more than a simple question of whether a particular plaintiff can prove damages. Rather, it bears directly on the question of the defendants' liability for unjust enrichment to a particular plaintiff").

[3] See, e.g., Carnegie, 220 F.R.D. at 549; Lilly, 2002 U.S.Dist.LEXIS 5698, *5-6 ("Similarly, class certification of Plaintiffs' claim for violation of consumer fraud is unmanageable. As this Court has noted in [*Zapka v. Coca-Cola Co.*, 2000 U.S. Dist. LEXIS 16552 (N.D. Ill. 2000):] `The differences in the required proofs of the states (sic) [consumer fraud] statutes demonstrate that a nationwide certification would not be manageable because of the *multiple and different variables* that would have to be proved as to each class member'"); Stipelcovich v. DirectTV, Inc., 129 F.Supp.2d 989, 994 (E.D. Tex. 2001); Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 498 (N.D. Ill. 1998) ("Here, Plaintiffs fail to meet their burden and demonstrate that the nuances of 50 consumer fraud statutes and 50 common laws are manageable. Although the Plaintiffs repeatedly state in conclusory fashion that the `consumer fraud laws reduce to general and manageable patterns,' no sincere effort is made by Plaintiffs to create such an amalgam. ... [Plaintiffs' proffer of four subclasses] seems overly simplistic in light of the nuances and differences presented by the consumer fraud statutes. Indeed, *a brief review of the applicable statutes reveals not only nuances, but differing standards of proof, procedure, substance, and remedies.* In short, the court is not satisfied that Plaintiffs' have met their burden under Rule 23(b)(3). Therefore, individual issues of law predominate which preclude certification of a nationwide class seeking redress under the various states' consumer fraud statutes") (certifying instead an Illinois class); see also In re LifeUSA Holding Inc., 242 F.3d 136, 148 (3d Cir. 2001) (adjudication involving individual determinations of, *inter alia*, state law "would not only be inordinately time consuming and difficult, but it would impermissibly transgress upon the required standards of fairness and efficiency").

reliance, or injury. <u>Prata v. Superior Court</u>, 91 Cal.App.4th 1128, 1137, 1144 (Cal. App. 2001).
The UCL affords remedies of restitution, disgorgement, as well as fluid recovery to ensure that
the illicit profits are not retained by the defendant. <u>Corbett v. Superior Court</u>, 101 Cal.App.4th
649, 655 (Cal. App. 2002). And, the CLRA includes the remedies of actual damages, statutory
damages, restitution, punitive damages, and attorneys' fees. <u>Cal. Civil Code</u> §1780.

  Californians' rights under these consumer protection laws may not be sacrificed through
certification of a national class based on the legal theory of only unjust enrichment. <u>See, e.g.,</u>
<u>In re Relafen Antitrust Litig.</u>, 221 F.R.D. 260, 280 and 286 (D. Mass. 2004) (holding that a
contrary approach would violate adequacy and superiority; "'Indeed, named plaintiffs who
would intentionally waive or abandon potential claims of absentee plaintiffs have interests
antagonistic to those of the class'"); <u>Clement v. American Honda Fin. Corp.</u>, 176 F.R.D. 15,
23-24 (D. Conn. 1997) (denying certification where, as a condition of class treatment, members
were forced to forego their claims for unfair trade practices and statutory damages); <u>see also</u>
<u>Janik v. Rudy, Exelrod & Zieff</u>, 199 Cal.App.4th 930 (Cal. App. 2004) (holding that plaintiff
stated a claim against class counsel for legal malpractice for omitting a consumer statute claim).

  Likewise, any attempt at a global settlement that fails to account and provide for these
greater rights afforded by California law will fail because it would not be approved as fair,
reasonable, and adequate. <u>See, e.g.,</u> <u>In re Heritage Bond Litig.</u>, 2005 U.S.Dist.LEXIS 13555,
*37-38 (C.D. Cal. 2005) (reasonableness of settlement depends on whether it allocates "more of
the settlement to class members with stronger claims on the merits"); <u>In re Bankamerica Corp.</u>
<u>Secs. Litig.</u>, 210 F.R.D. 694, 712 (E.D. Mo. 2002) (denying settlement approval because the plan
of allocation fails to account for "the strength of [class members'] claims under California law");
<u>In re Oracle Sec. Litig.</u>, 1994 U.S.Dist.LEXIS 21593, *3-4 (N.D. Cal. 1994) (reasonable to
allocate more of the settlement to class members with stronger claims).

  This is especially so because, not only do Californians have greater consumer protection
rights than citizens of many of the other states, California is the most populous state in the

Union.  As of January 1, 2005, California has over 36.8 million residents, approximately 12.5%

of the United States population (one out of every eight persons).[4]  California is the country's

largest state economy and the world's fifth largest economy, generating 14% of the total GDP in

the U.S.  The next largest state economy, New York, is 60% the size of California.[5]  California

naturally boasts the largest consumer market in the country.

## ARGUMENT

In light of the foregoing accounting of the history and nature of these putative class

actions, a more detailed accounting than that offered by Windom, the Motion should be denied.

The requirements of 28 U.S.C. § 1407 are not present in this case, as discussed below.

See generally 28 U.S.C. § 1407 ("transfers shall be made by the [panel] authorized by this section

upon its determination that transfers for such proceedings will be for the convenience of parties

and witnesses and will promote the just and efficient conduct of such actions").

> **A.     Coordination or consolidation for purposes of discovery will not further the interests of efficiency and economy.**

*First*, substantial discovery on the core factual issues of these pending putative class

actions, including voluminous document production and even expert witness depositions, has

already occurred in the *Schick* action pending in Connecticut.

It is quite disingenuous therefore for Windom to state that "[t]here has been no discovery

in any of the actions and no initial disclosures have been made" (Motion ¶ 8) and "formal

discovery is in its infancy" (Memo at 3).  Also, given the extensive findings and preliminary

injunction order already issued by Judge Hall, it is also disingenuous for Windom to state that

"all actions are in the beginning stage of litigation . . .." (Motion ¶ 8.)  Similarly, it is

disingenuous for Plaintiffs Tuñón and Kline to suggest that this case "is particularly well suited

---

[4] California Department of Finance, press release dated May 2, 2005, "State Population Tops 36.8 Million;  Annual Growth More Than 50,000 For Sixth Year In A Row."

[5] California Legislative Analyst's Office, Cal Facts 2002, http://www.lao.ca.gov /2002/ cal facts/econ.html.

for [1407 transfer] especially so where all the actions have only recently been filed and there has been no discovery or other proceedings in them." (Response Of Plaintiffs Javier Tuñón And Adam Kline To Plaintiff Kevin Windom's Motion For Transfer And Coordination Or Consolidation Under 28 U.S.C. § 1407, at 2.)

Given the fact that the plaintiff in the *Schick* action has already obtained substantial discovery and thereby a successful, albeit preliminary, result with that discovery, Windom fails to show a need for a multidistrict proceeding to coordinate the same discovery. See also In re Grand Funk Railroad Trademark Litig., 371 F.Supp. 1084, 1085 (JPML 1974) (transfer would be denied where discovery on issue in question was almost complete).

Indeed, for Windom to champion transfer to Massachusetts ostensibly to avoid duplicative discovery is ironic when substantial discovery has already occurred in the *Schick* action in *Connecticut*, and this substantial discovery is on file in the court file there. As this Panel, in Cuisinart Food Processor Antitrust Litig., 506 F.Supp. 651, 653-56 (JPML 1981), explained in transferring the case to Connecticut:

> "This litigation was spawned by the indictment of [the defendant] by a federal grand jury sitting in [C]onnecticut. . . . The Government subsequently filed in the District of Connecticut a civil action which tracks the allegations of the criminal indictment. . . . [T]he complaints in all the private actions parallel the indictment and the Government civil complaint . . . . [T]he documents and transcripts of testimony on which the grand jury relied in returning its indictment are likely to be sought by the litigants in the eight actions presently before us, and those materials are located in the District of Connecticut. . . . This coordination can more easily be accomplished by selecting as transferee district the same district in which the grand jury sat. See In re California Armored Car Antitrust Litig., 476 F.Supp. 452, 454 (JPML 1979)."

*Second*, the discovery in this case will not involve unusually complex questions of fact. The putative class actions are consumer fraud actions, where the most complex questions of fact (*i.e.*, whether Gillette's hair raising claims are false) have already been subject to extensive discovery in the *Schick* action, including expert witness depositions and extensive discovery regarding Gillette's testing of the M3P. (See Ruling re Preliminary Injunction, Ex. C, at 4, 7-14.)

Accordingly, transfer is not needed to further the interests of economy and efficiency with respect to discovery in this matter. See In Re National Park Service Winter Use Management

Litig., 2005 U.S.Dist.LEXIS 12451, *2 (JPML June 16, 2005) ("Movants have failed to persuade us that any remaining, unresolved common questions of fact and law are sufficiently complex and/or numerous to justify Section 1407 transfer"); In re Scotch Whiskey, 299 F.Supp. 543, 544 (J.P.M.L.1969); Manual for Complex Litigation at 20.14, p. 253 ("The Panel remains ready to deny transfer where little would be accomplished by centralization. *See, e.g., In re Sprint Corp. PCS Network Contract Litigation*, 303 F.Supp.2d 1376 (J.P.M.L. 2004) (transfer denied where proponents failed to show that common issues were complex enough to require transfer)").

*Third*, given the varying elements and remedies of the state law claims, proof and therefore the discovery needs of each of the actions will necessarily vary among the actions. Contrary to Windom's representation, proof in the pending actions will therefore *not* "plainly involve identical factual issues." (Memo at 3.)

Accordingly, any follow-up discovery in this litigation can be done more efficiently on a *state-by-state* basis to focus on the different needs for each of the individual state claims. See also In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288 F.3d 1012, 1019-1020 (7th Cir. 2002) (a decentralized approach is more likely to produce greater information).[6]

--------

[6] The Seventh Circuit Court of Appeal, in Bridgestone/Firestone, reasoned that coordination or consolidation of various class actions before one district court would not necessarily promote just and efficient prosecution of the litigation: "Efficiency is a vital goal in any legal system – but the vision of "efficiency" underlying this class certification is the model of the central planner. ... [T]he benefits [of consolidation] are elusive. The central planning model – one case, one court, one set of rules, one settlement price for all involved – suppresses information that is vital to accurate resolution. What is the law of Michigan, or Arkansas, or Guam, as applied to this problem? Judges and lawyers will have to guess, because the central planning model keeps the litigation far away from state courts. ... And if the law were clear, how would the facts (and thus the damages per plaintiff) be ascertained? One suit is an all-or-none affair, with high risk even if the parties supply all the information at their disposal. ... Markets instead use diversified decisionmaking to supply and evaluate information. ... This method looks "inefficient" from the planner's perspective, but it produces more information, more accurate prices, and a vibrant, growing economy. [Citation omitted.] When courts think of efficiency, they should think of market models rather than central-planning models. ... No matter what one makes of the decentralized approach as an original matter, it is hard to adopt the central-planner model without violence not only to Rule 23 but also to principles of federalism. Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear

*Fourth*, viable and efficient alternatives exist to avoid duplicative discovery. Consultation and cooperation among the parties in the pending actions may be more effective than coordination or consolidation ever could be. As this Panel, in denying transfer in In re Chiropractic Antitrust Litigation, 483 F.Supp. 811, 813-814 (JPML 1980), observed:

> "[S]uitable alternatives to Section 1407 transfer are available in order to minimize the possibility of duplicative discovery. For example, the parties may request from the appropriate district courts that discovery completed in any action and relevant to one or more of the other actions be made applicable to those actions; or the parties could seek to agree upon a stipulation that any discovery relevant to more than one action may be used in all those actions. [See also *In re The Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*, 81 F.R.D. 482 (E.D.Mich.1979); *Manual for Complex Litig.*, Parts I and II, § 3.11 (rev. ed. 1977).] Also, consultation and cooperation among the four concerned district courts, if deemed appropriate by those courts, coupled with the cooperation of the parties, would minimize the possibility of conflicting pretrial rulings. [See *In re Raymond Lee Org. Inc. Sec. Litig.*, 446 F.Supp. 1266, 1268 (JPML1978).]"[7]

---

the queue in court. [Citations]. Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected. [*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997).]" 288 F.3d at 1019-1020.

[7] See National Park Service, 2005 U.S.Dist.LEXIS 12451, * 3 ("alternatives to transfer exist that can continue to minimize whatever possibilities there might be of duplicative discovery and/or inconsistent pretrial rulings. *See, e.g., In re Eli Lilly and Company (Cephalexin Monohydrate) Patent Litigation*, 446 F.Supp. 242, 244 (J.P.M.L. 1978). *See also Manual for Complex Litigation*, Fourth, § 20.14 (2004)"); In re Master Settlement Agreement Antitrust Litig., 2005 U.S.Dist.LEXIS 12449 (JPML June 16, 2005) (same); In re Pullen & Associates, LLC, 366 F.Supp.2d 1383 (JPML 2005) (same); In re FedEx Ground Package System, Inc., Employment Practices Litig., 366 F.Supp. 2d 1381, 1382 (JPML 2005) (same); In re Bally Total Fitness Holding Corp. Sec. Litig., 360 F.Supp. 2d 1359 (JPML 2005) (same); In re Royal American Industries, Inc. Securities Litig., 407 F.Supp. 242 (JPML 1976) (cooperation among judges to whom constituent actions are assigned must be evaluated as alternative); Manual for Complex Litig., at 20.14, p. 249 ("Filing or cross-filing deposition notices, interrogatories, and requests for production in related cases will make the product of discovery usable in all cases and avoid duplicative activity. Relevant discovery already completed should ordinarily be made available to litigants in the other cases") and p. 253 ("Another reason to deny transfer, is that there are alternatives to transfer that will nonetheless permit the cases to be managed effectively"); contrast Bristol Bay, 424 F.Supp. at 506 (where the suggestion that voluntary coordination can avoid duplicative discovery was belied by the fact that the defendants were already subjected to duplicative discovery requests).

---

B.    **Coordination or consolidation for purposes of pretrial proceedings, such as motions to dismiss, motions for summary judgment, and motions for class certification, will subvert, not further, the interests of efficiency and economy.**

Windom's ostensible concern for the avoidance of inconsistent rulings rings hollow. All the cases involve, not only *state law as opposed to federal law*, but *different state laws*.[8] Accordingly, "inconsistent" rulings will be the natural and expected result of differences among the different consumer protection statutes of each of the states and the different unjust enrichment laws of each of the states.[9]

These cases are therefore not candidates for coordination or consolidation for pretrial proceedings, such as motions to dismiss, motions for summary judgment, motions for class certification, and motions for approval of a settlement. See, e.g., Kohl v. American Home Prods. Corp., 78 F.Supp.2d 885, 887 (W.D. Ark. 1999) ("The issues raised in the motion to remand turn on an interpretation of state law. As such, uniformity in the handling of the diet drug cases will not be compromised by deciding a unique question wholly dependent on (state law)").

Windom's contrary contention – *i.e.*, that transfer is appropriate "most importantly in the instant case [because] it will eliminate the possibility of overlapping or inconsistent pleading and class action determinations by courts of coordinate jurisdiction" (Memo at 3) – is a conclusory assertion unsupported by any analysis of the disparate state-law nature of the pending actions.

_____

[8] Tuñón/Kline's assertion that the actions involve "common questions of law" (Response at 2) must be an inadvertent carry over from a cut-and-paste from an earlier motion for transfer or response in support of a motion for transfer. Not even Windom makes such a bold assertion that is plainly belied by simply a cursory review of the complaints in the pending putative class actions.

[9] For example, following the Seventh Circuit's reversal of the certification of a national class in the *Bridgestone/Firestone* MDL proceedings, where the Seventh Circuit held that "[a] need to apply multiple states' laws was among the considerations that rendered certification of nationwide classes improvident" because "different rules of law govern different members of the class" (In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig., 333 F.3d 763, 765 (7th Cir. 2003)), multiple state-wide class actions were filed involving the Ford Explorer. The court in the California action thereafter certified a class action based on California's consumer protection laws (Ex. D), while the court in the Florida action denied certification of a class action based on unjust enrichment (Ex E).

_____

These putative class actions do not involve the same legal theories, in stark contrast to the cases cited by Windom where the courts granted a motion to transfer. Not surprisingly, those cases involved only *a claim under federal law*, such as a claim for violation of federal securities laws,[10] ERISA, federal antitrust laws,[11] federal election laws,[12] or Title VII of the Civil Rights Act of 1964,[13] or such a single federal claim combined with a claim pursuant to the Declaratory Judgment Act.[14, 15]

---

[10] In re New York City Mun. Sec. Litig., 572 F.2d 49 (2nd Cir. 1978) (only remaining claim was for violation of the federal securities laws); In re LTV Corp. Sec. Litig., 470 F.Supp. 859 (JPML 1979); In re First Nat'l Bank (First Mortgage Revenue Bonds) Sec. Litig., 451 F.Supp. 995 (JPML 1978) (both actions were filed in the same state, and both actions were brought by the same plaintiff); In re Air West, Inc. Sec. Litig., 384 F.Supp. 609 (JPML 1974).

[11] In re Foundry Resins Antitrust Litig., 342 F.Supp.2d 1346 (JPML 2004) ( no party opposed the transfer motion; "All responding parties agree that 1407 transfer is warranted"); In re Cotton Yard Antitrust Litig., 336 F.Supp.2d 1383 (JPML 2004) ( no party opposed the transfer motion and all the actions were filed in the same state); In re Exterior Siding and Aluminum Coil Litig., 583 F.Supp. 45 (D. Minn. 1982); In re Cement and Concrete Antitrust Litig., 437 F.Supp. 750, 751 (JPML 1977) (all plaintiffs favored transfer); Bristol Bay, 424 F.Supp. at 506 ("As is often true in multidistrict antitrust actions, questions concerning th existence, scope and effect of the alleged conspiracy among the several defendants necessitate transfer"); In re IBM Peripheral EDP Devices Antitrust Litig., 411 F.Supp. 791 (JPML 1976); In re Piper Aircraft Distribution System Antitrust Litig., 405 F.Supp. 1402 (JPML 1975) (no party opposed the transfer motion).

[12] In re Federal Election Campaign Act Litig., 511 F.Supp. 821, 822 (JPML 1979) (the actions involved the "same substantive violations of federal election law").

[13] In re National Airlines, Inc. Maternity Leave Practices and Flight Attendant Weight Reduction Plan, 399 F.Supp. 1405 (JPML 1975); In re Roadway Express, Inc. Employment Practices Litig., 384 F.Supp. 612 (JPML 1974) (all the actions were filed in the same state).

[14] In re Litig. Arising from the Termination of the Retirement Plan for Employees of Fireman's Fund Ins. Co., 422 F.Supp. 287, 289 (JPML 1976) (ERISA and Declaratory Judgment Act, where the only opponent of the transfer was the person appointed as the class representative by the court in the New Jersey action, even though that person was a former general counsel, vice-president, and director of the company).

[15] The only two exceptions are In re UICI "Association Group" Ins. Litig., 305 F.Supp.2d 1360 (JPML 2004), probably involving state law claims, and In re Baldwin United Corp. Litig., 581 F.Supp. 739 (JPML 1984), involving insurance litigation and federal and state law securities claims among others. Both are readily distinguishable. In UICI, this Panel strongly hinted that the

---

More specifically, in the cases relied upon by Windom, to support his ostensible concern for inconsistent rulings, the concern was due to the fact that the actions involved claims for violation of the *identical federal law*.[16] See Menowitz v. Brown, 991 F.2d 36, 40 (2nd Cir. 1993) ("federal law (unlike state law) is supposed to be unitary").

In contrast, the instant cases, involving state law claims, do not require uniformity of decisions for resolution of identical federal law claims or resolution of issues of subject matter jurisdiction. And, with all due respect to Judge Zobel, it must be conceded that the judges in the District Courts in California, Texas, Tennessee, and New Jersey are *more familiar* with the different laws in their respective States than a judge for the District of Massachusetts.

Moreover, even were this Court to order 1407 transfer (which it should not), Judge Zobel respectfully would still ***not*** be the ***trial*** judge, for at least the *Corrales* action.[17] Although the

---

California cases would be remanded to state court: "We emphasize that the motion to remand to state court pending in one Central District of California action, as well as similar motions pending in other actions, can be presented to and decided by the transferee court." 305 F.Supp. at 1362. In fact, two actions, one in Oklahoma and one in Texas, had already been remanded to state court. Id. at 1361 n.1. In Baldwin, all the responding parties either supported or did not oppose 1407 transfer, including the plaintiffs in 34 actions and two state's commissions of insurance, except plaintiffs from Tennessee whose "main concern appears to be that they would be burdened by costs and delays associated with Section 1407 transfer." Id. at 740. This Panel deferred the issue of coordination / consolidation for pretrial proceedings to avoid inconsistent rulings to the transferee court.

[16] See, e.g., Federal Election, 511 F.Supp. at 824; Bristol Bay, 424 F.Supp. 504; Termination of Retirement Plan, 422 F.Supp. 287; Piper Aircraft, 405 F.Supp. 1409; National Airlines, 399 F.Supp. 1405; In re Sugar Industry Antitrust Litig., 395 F.Supp. 1271 (JPML 1975); Roadway Express, 384 F.Supp. 612; In re Multidistrict Private Civil Treble Damage Litig., 302 F.Supp. 795 (JPML 1969); see also In re Nicaraguan Contraban/Narcotics Trafficking Litig., 2000 U.S.Dist.LEXIS 1564 (JPML 2000) (all parties favored transfer); In re Stock Exchs. Options Trading Antitrust Litig., 1999 U.S.Dist.LEXIS 8605, *1 (JPML 1999) ("[a]ll responding parties agree upon centralization"); In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig., 844 F.Supp. 1553 (JPML 1994) (all plaintiffs supported centralization); In re Resource Exploration, Inc. Sec. Litig., 483 F.Supp. 817 (JPML 1980) (every complaint alleged violation of federal securities laws).

[17] See 28 U.S.C. § 1407(a); contrast Florida v. Liquid Air Corp.(In re Carbon Dioxide Indus. Antitrust Litig.), 299 F.3d 1321 (11th Cir. 2000) (where the plaintiffs stipulated to trial in the transferee court).

---

normal practice of transferee courts prior to 1998 was to invoke 28 U.S.C. § 1404(a) to assign a transferred case to itself for trial even over the plaintiff's objection,[18] the Unites States Supreme Court's decision, in <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26, 28 (1998), prohibits that practice.

This relatively new development, post-dating almost all the cases relied upon by Windom, strongly counsels that the transferor (trial) court should retain the case for all pretrial purposes in the interests of efficiency and economy. This is especially true in the *Corrales* action, where a *bench trial* is required for the claim under the UCL claim (<u>People v. First Federal Credit Corp.</u>, 104 Cal.App.4th 721 (2002)), and where Corrales, in his fiduciary capacity as a class representative, will not stipulate to a trial on his claim under the CLRA being venued and a *jury* drawn from Gillette's hometown.

### C.    Transfer and coordination or consolidation will not further, but instead subvert, the convenience of the parties and witnesses.

Transfer and coordination will not further, but instead subvert, the convenience of the parties and witnesses.

*First*, the most advanced action is the *Schick* action in the District of Connecticut. If Windom were truly interested in the convenience of the parties and witnesses, he would be moving to transfer the case to Connecticut, where substantial discovery of the core factual issues has already occurred. See <u>Cuisinart</u>, 506 F.Supp. at 655-56; <u>Foundry Resins</u>, 342 F.Supp.2d at 1347 (government investigation and federal grand jury were pending in the transferee court); <u>In re Gas Meter Antitrust Litig.</u>, 464 F.Supp. 391 (JPML 1979) (same); <u>Sugar Industry</u>, 395 F.Supp. at 1273 ("We have frequently held that the pendency of a related government action in a particular district is an important factor in selecting the transferee forum").

---

[18] <u>Manual for Complex Litigation</u> at 20.133, p. 246 ("Until 1998, actions based on section 1407 proceedings and not settled or otherwise dismissed in the transferee districts during their pretrial stages often remained in the transferee districts for trial. Transferee judges entered orders effecting transfer for trial") and p. 250 ("The self transfer practice became, as a matter of practice, nearly a presumption, and the Panel enshrined it in its own rules").

---

B
44

*Second*, given that substantial discovery has already occurred in the *Schick* action and is on file in the court in the District of Connecticut, this Panel may presume that if that discovery showed that the majority of witnesses were located in Massachusetts, Windom would have pointed to specific discovery in the *Schick* action to substantiate such an assertion.

*Third*, a large amount of the remaining discovery will involve depositions of persons outside Massachusetts, such as the plaintiffs, and most of the remaining discovery will focus on follow-up discovery to prove each of the varying elements of the state law claims. And, again, it should be noted that a majority of the pending putative class actions are *outside* Massachusetts.[19]

*Fourth*, many of the cases relied upon by Windom date back to an era before the modern advances in technology, such as electronic repositories, alleviated discovery inconveniences.

*Fifth*, prior to CAFA, most consumer class actions were prosecuted in multiple states. The courts did not transfer those actions to the defendant's hometown for the convenience of the defendant, but instead recognized that any inconvenience to the defendant was tolerable given that the defendant availed itself of the privilege of doing business in each of the states.

---

[19] Contrast First National Bank, 451 F.Supp. 995 (both actions (100%) filed in same state, and both actions filed by same plaintiff); Roadway Express, 384 F.Supp. 612 (100% of actions filed in same state); In re Sunbeam Corp. Sec. Litig., 1999 U.S.Dist.LEXIS 15870 (JPML 1999) (21 of 22 actions pending in transferee court); In re IKON Office Solutions, Inc. Sec. Litig., 1999 U.S.Dist. LEXIS 19077 (JPML 1999) (14 of 16 actions pending in transferee court, where discovery has proceeded "apace" and the judge "has already developed a familiarity with the issues in the litigation"); Cotton Yarn, 336 F.Supp.2d 1383 (6 of 7 actions pending in transferee court, and all 7 actions filed in same state); Bristol Bay, 424 F.Supp. 504 (3 of 4 actions pending in transferee court); National Airlines, 399 F.Supp. 1405 (3 of 4 actions in transferee court); see also In re Southeast Hotel Properties Ltd. Partnership Inv. Litig., 796 F.Supp. 538 (JPML 1992) (2 of 4 actions and two defendants' bankruptcy proceedings pending in transferee court); In re Parcel Service, Inc. Excess Value Ins. Coverage Litig., 2000 U.S.Dist.LEXIS 5100 (JPML 2000) (all responding parties supported centralization); In re Cigarette Antitrust Litig., 2000 U.S.Dist.LEXIS 8209 (JPML 2000) ("[a]ll responding parties agree that centralization is appropriate"); Gas Meter, 464 F.Supp. at 392 (all class actions filed in transferee court, which had already certified a class); In re St. Jude Medical, Inc., Silzone Heart Valves Prods. Liab. Litig., 2001 U.S.Dist.LEXIS 5226 (JPML 2001) (all plaintiffs supported centralization; Minnesota was geographically central with general caseload); In re Nabumetone Patent Litig., 1998 U.S.Dist. LEXIS 13735 (JPML 1998) (the defendants that opposed transfer were already defendants in actions pending in transferee court).

---

*Sixth*, coordination or consolidation for pretrial proceedings – for purposes of resolving, for each of the eleven cases, motions to dismiss, motions for summary judgment, and motions for class certification, each such motion permeated with issues of varying state law – would inevitably result in *delay* for all.  See In re Phenylpropanolamine Prods. Liab. Litig., 2004 U.S. Dist. LEXIS 18937, *10-12 (W.D. Wash. 2004) ("making such case-specific rulings [*e.g.*, Rule 12(b)(6) motions involving state law claims] are neither the purpose, nor the *forte*, of a court presiding over a multi-district litigation"; "a case-specific analysis is not appropriate for an MDL court"); In re Orthopedic Bone Screw Prods. Liab. Litig., 1997 U.S.Dist.LEXIS 2743 (E.D. Pa. 1997) (adjudication of summary judgment motions pertaining to state law claims would slow down the MDL process, thereby deferring state law dispositive motions to the transferor courts).

*Seventh*, if the *Corrales* action should be terminated short of trial by a California class settlement, the interests and convenience of the California class members to participate in the fairness hearing counsels against 1407 transfer to Massachusetts.

**D.    Transfer and coordination or consolidation will not further, but instead subvert, the interests of "just" conduct and adjudication.**

Transfer and coordination or consolidation will not further, but instead subvert, the interests of "just" conduct and adjudication.  See generally Ill. Mun. Ret. Fund v. Citigroup, Inc., 391 F.3d 844, 852 (7th Cir. 2004) ("among the statute's stated goals are the . . . 'just . . . conduct of such actions'") (quoting 28 U.S.C. § 1407(a)) (second ellipses in original).

These consumer putative class actions – all of which allege *only state law claims* – are pending in federal court because, and only because, of the CAFA.  Without the passage of the CAFA, these cases would have been filed in state court, as opposed to federal court.  Not surprisingly, all the cases relied upon by Windom, where the motions to transfer were granted, involve actions where the federal courts had subject matter jurisdiction prior to CAFA.  See generally Johnson v. Micron Tech., Inc. (E.D. Mich. 2005) 354 F.Supp.2d 736, 738 ("A transfer can be made by the Judicial Panel on Multidistrict Litigation if the transferor district court has subject matter jurisdiction of the case"); BancOhio Corp. v. Fox, 516 F.2d 29, 32 (6th Cir.1975)

("a transfer [under Section 1407] cannot be made unless the district court properly has jurisdiction of the subject matter of the case. Here there is no such jurisdiction").

Now, pursuant to Section 1407, counsel for certain of the plaintiffs – without any complaint by Gillette and perhaps with its blessing – are seeking to have these consumer putative class actions roped into not only federal court, *but the federal court in Gillette's hometown*.

This certainly makes the "Fairness" in the Class Action Fairness Act smack of Orwellian double-speak. After all, the purpose of the CAFA was to avoid the situation where a putative national class action against a foreign corporation was litigated in a state court because the state court might be more favorably inclined to one of the parties to the action. Now, through Section 1407, Windom is seeking transfer of the putative class actions, most of which involve only state-wide class actions, to Gillette's hometown.

Where is the "Fairness" in this for the plaintiffs seeking state-wide class actions, such as Corrales? Gillette's hometown is certainly not the forum of Corrales' own choosing, and Corrales questions the motives of Windom to transfer the actions to that forum that is undoubtedly favorable to Gillette, especially when viable alternatives exist to address the interests of efficiency and economy with respect to discovery.

Of course, Windom ostensibly seeks to transfer these actions to Gillette's hometown for only pretrial purposes, and the statute mandates remand to the transferor courts for trial. Nonetheless, a transferee court still "may terminate actions by ruling on motions to dismiss, for summary judgment, or pursuant to settlement." Manual for Complex Litigation at 20.132, pp. 245-46 ("Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court"); In re "Agent Orange" Prod. Liab. Litig., 597 F.Supp. 740, 752 (E.D. N.Y. 1984) ("Most actions are terminated in the transferee court, often by settlement"). And, of course, a transferee court may also deny a motion for class certification, which is a *de facto* termination of a consumer fraud class action.

E. **This Court should (and indeed must) deny Atkins' request to dismiss the *Corrales* action.**

Plaintiff David Atkins, in responding to the motion to transfer and coordination or consolidation, states his non-opposition. (Response at 2.) However, he does not stop there.

Instead, Atkins brazenly attempts to breach the bounds of this Panel's authority, the bounds of Section 1407, and the bounds of the first-to-file rule to request dismissal of the *Corrales* action. He falls flat. The request should, and indeed must, be denied.

*First*, and foremost, Atkins reveals a fundamental misunderstanding of this Panels' authority. This Panel is not empowered to dismiss a pending action. This Panel's authority is instead limited to issues involving transfer of cases to a district court.[20]

*Second*, revealing a fundamental misunderstanding of the first-to-file rule itself, Atkins ignores the dictate that the court to decide whether the rule applies is the court in which the first-filed case was brought. Strook Strook & Lavan v. Valley Sys., 1996 U.S.Dist.LEXIS 182, * 14 (S.D. N.Y. 1996). That court, of course, is the Central District of California.[21]

*Third*, Atkins' request for dismissal on the grounds of the first-to-file rule – made in his response of non-opposition to the motion to transfer the actions to Massachusetts – is internally contradictory (besides improperly seeking affirmative relief in a response instead of a motion). The purpose of the rule is to transfer the second-filed case to the forum of the first-filed case, *i.e.*, California. Yet, Atkins is not opposing the transfer of all the pending actions to Massachusetts, even though California is the forum of the first-filed action and the *Corrales* action.

---

[20] See 28 U.S.C. § 1407; In re Antibiotic Antitrust Actions, 333 F.Supp. 299, 302 ("Section 1407 created the [Panel] and defined and **limited *its* jurisdiction**") (emphasis in original); In re Air Crash Disaster at Florida Everglades, 368 F.Supp. 812, 813 n. 1 (JPML 1973) *(per curiam)*. (Section 1407 does not empower the Panel to decide questions of the jurisdiction or the merits of a case).

[21] Of course, Atkins – by stating that "if these cases were not subject to Windom's transfer motion, the Corrales action would be subject to dismissal" (Response at 4) – again reveals a misunderstanding of the rules. "[T]he pendency of a motion ... before the Panel concerning transfer ... does not affect or suspend ... pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court." R. P. JPML 1.5.

*Fourth*, the first-to-file rule, by definition, simply does not apply. First, the rule is a *venue-selection* rule that applies only when the two actions have been filed in different district courts. In this case, both the *Atkins* and *Corrales* actions are pending in the same court (the Central District of California) and, as of July 6, before the *same judge*, Judge Dean D. Pederson. (Ex. F.) Second, the rule applies only when the two actions involve the same parties. <u>Cedars-Sinai Medical Center v. Shalala</u>, 125 F.3d 765, 769 (9th Cir. 1997). Here, however, the *Atkins* and *Corrales* actions, while involving the same defendant, involve *different plaintiffs*. Atkins – arguing to the contrary, by stating that "the Plaintiffs described in the <u>Corrales</u> complaint, including Corrales himself, are class members as the class is defined in the <u>Atkins</u> Complaint (Response at 4) – reveals a fundamental misunderstanding of class actions. Filing a complaint alleging a class action does not create a class action. The *Atkins* action is merely a *putative* class action. The *Atkins* action has *not* been certified as a class action.

Moreover, winning the race to the courthouse, fortunately, does not qualify the plaintiff as an adequate class representative nor his counsel as adequate class counsel. <u>See, e.g., In re Goodyear Tire & Rubber Co. ERISA Litig.</u>, 2004 U.S.Dist.LEXIS 26706, * 15 (S.D. N.Y. 1991) (not a proper test for choosing lead counsel); <u>see also In re Bank One Shareholders Class Actions</u> 96 F. Supp. 2d 780, 789 n. 12 (N.D. Ill. 2000) ("the winner in a race to the courthouse is not entitled to any special consideration"). Such a proposition is anathema to class action principles and sound judicial administration. Adequacy of representation instead depends on factual issues to be tested by discovery and the actions of the plaintiff and his counsel.[22]

At bottom, one should ask why Atkins would attack Corrales when Corrales would remain a class representative in the event that Atkins or his counsel are found inadequate? Atkins should appreciate Corrales stepping forward to champion the rights of Californians, especially when Atkins' priority is seeking a national class.

---

[22] Parenthetically, it may be noted that *the Corrales action is more advanced than the Atkins action*. In the *Corrales* action, Gillette's answer is due July 22, 2005; while, in the *Atkins* action, Gillette's answer is not due until July 28, 2005 (Ex. G).

---

B
49

Courts have repeatedly found inadequacy of representation where the plaintiff exhibited self-interest and breaches of fiduciary duty, for example, where the plaintiff omitted consumer protection statute claims (Relapfen, 221 F.R.D. at 280, 286; Clement, 176 F.R.D. at 23-24) or where the plaintiff waived claims for damages in excess of the federal jurisdiction amount (Seale v. Nissan Motor Acceptance Corp., 1996 U.S.Dist.LEXIS 21945 (S.D. Ala. 1996). In short, if any action should be dismissed, it is the *Atkins* action.

## CONCLUSION

In conclusion, this Panel should deny the Motion. These actions do not warrant transfer and coordination or consolidation for pretrial proceedings under Section 1407. If this Panel were to grant the Motion (which it should not), then this Panel should exclude the *Corrales* action from the transfer and coordination or consolidation.


Respectfully submitted,

Dated: July 11, 2005                                THE KICK LAW FIRM, APC

                                        By:    _____
                                               Taras P. Kick
                                               G. James Strenio
                                               Thomas Martin

## CERTIFICATE OF SERVICE

I, Ed Dominguez, employed by The Kick Law Firm, APC, do hereby state under penalty of perjury that:

1.      On July 11, 2005, I caused to be served the following papers: **INTERESTED PARTY CARLOS CORRALES' RESPONSE TO MOTION FOR TRANSFER AND COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407**

2.      On July 11, 2005, I caused those papers to be served by Federal Express mail upon:

> Michael J. Beck
> Clerk of the Panel
> One Columbus Circle, NE
> Thurgood Marshall Federal
> Judicial Building
> Room G-225, North Lobby
> Washington, D.C. 20002-8004

3.      On July 11, 2005, I caused those papers to be served via First Class Mail upon

   **SEE ATTACHED SERVICE LIST.**

Executed on July 11, 2005, at Los Angeles, California.

_____
Ed Dominguez

# SERVICE LIST

**MDL 1704 - In re M3Power Razor System Marketing & Sales Practices Litigation**

| **Attorney - Firm** | **Represented Party(s)** |
|---|---|
| Harvey J. Wolkoff<br>Ropes & Gray LLP<br>One International Place<br>Boston, MA 02110-2624<br>Telephone: (617) 951-7522<br>Facsimile: (617) 951-7050 | The Gillette Company |
| James M. Spears<br>Peter M. Brody<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street, N.W.<br>Washington, D.C. 20005<br>Telephone: (617) 951-7000<br>Facsimile: (617) 951-7050 | The Gillette Company |
| Kent R. Raygor<br>Sheppard Mullin Richter & Hampton LLP<br>1901 Avenue of the Stars, Suite 1600<br>Los Angeles, CA 90067-6017<br>Telephone: (310) 228-3700<br>Facsimile: (310) 228-3701 | The Gillette Company |
| Thomas M. Sobol<br>Edward Notargiacomo<br>Hagens Berman Sobol Shapiro LLP<br>One Main Street, 4th Floor<br>Cambridge, Massachusetts 02142<br>Telephone: (617) 482-3700<br>Facsimile: (617) 482-3003 | Kevin Windom |
| C. Brooks Cutter<br>Mark J. Tamblyn<br>Kershaw, Cutter & Ratinoff, LLP<br>980 9th Street, 19th Floor<br>Sacramento, CA 95814<br>Telephone: (916) 448-9800<br>Facsimile: (916) 669-4499 | Kevin Windom |

B
52

Kenneth A. Wexler                                    Kevin Windom
Edward A. Wallace
The Wexler Firm LLP
One North LaSalle St., Suite 2000
Chicago, Illinois 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Charles A. McCallum                                  Kevin Windom
R. Brent Irby
McCallum, Hoaglund, Cook & Irby, LLP
2062 Columbiana Road
Vestavia Hills, Alabama 35216
Telephone: (205) 842-7767
Facsimile: (205) 824-7768

Wayne S. Kreger                                      David Atkins
Lee Jackson
Gillian Wade
Verboon, Milstein & Peter LLP
2800 Donald Douglas Loop North
Santa Monica, CA 90405
Telephone: (310) 396-9600
Facsimile: (310) 396-9635

Samuel H. Rudman                                     Mark Dearman and Anthony
Robert M. Rothman                                    Debiseglia,
Lerach Coughlin Stoia Geller Rudman & Robbins,
LLP
200 Broadhollow Road
Suite 406
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Thomas G. Shapiro                                    Javier Tuñón and Adam Kline
Theodore M. Hess-Mahan
Shapiro Harber & Urmy LLP
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

Cory Holzer                                          Javier Tuñón and Adam Kline
Michael I. Fistel
Holzer & Holzer, LLC
1117 Perimeter Center West
Suite E-107
Atlanta, Georgia, 30338
Telephone: (770) 32-0090
Facsimile: (770) 392-0029

---

Certificate of Service

B
53

Jason B. Bud
Jon A. York
Brandon O. Gibson
Pentecost, Glenn & Rudd, PLLC
106 Stonebridge Blvd.
Jackson, Tennessee 38305
Telephone: (731) 668-5995
Facsimile: (731) 668-7163

Holly Moore and Grant W.
Jackson

Frank Watson
William F. Burns
Waston Burns, PLLC
One Commerce Square, Suite 2600
Memphis, TN 38103
Telephone: (901) 578-3528
Facsimile: (901) 578-2649

Tracy Gorea

Arthut Horne
Murry Wells
Horne & Wells, PLLC
81 Monroe Ave., Suite 400
Memphis, TN 38103
Telephone: (901) 507-2520
Facsimile: (901) 507-2524

Tracy Gorea

David Pastor
Gilman and Pastor, LLP
60 State Street, 37th Floor
Boston, MA 02109
Telephone: (617) 742-9700
Facsimile: (617) 9701

Kristopher Kenessky and
Steven Meyers

Jason L. Broadsky
Evan J. Smith
Marc L. Ackerman
Brodsky & Smith LLC
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004
Telephone: (610) 667-6200
Facsimile: (610) 667-9029

Kristopher Kenessky and
Steven Meyers

Joseph J. DePalma
Susan D. Pontoriero
Lite, DePalma, Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000

Patrick Coleman

Mark C. Gardy
Henry Young
Abbey Gardy, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

Patrick Coleman

---

Certificate of Service

3
54

Kenneth D. Quat
Law Office of Kenneth Quat
9 Damonmill Square, Suite 4A-4
Concord, MA 01742
Telephone: (978) 396-0848

Lance A. Harke
Harke & Clasby LLP
155 South Miami Ave, Suite 600
Miami, FL 33130
Telephone: (305) 536-8220

Collin L. McGeary


Collin L. McGeary

Certificate of Service.

B
55

# BEFORE THE JUDICIAL PANEL ON

# MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: | MDL Docket No. 1704 |
| GILLETTE M3POWER RAZOR SYSTEM ADVERTISING LITIGATION | |

## EXHIBITS TO INTERESTED PARTY CARLOS CORRALES' RESPONSE TO MOTION FOR TRANSFER AND COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407

Taras Kick
G. James Strenio
Thomas G. Martin
**THE KICK LAW FIRM, APC**
660 South Figueroa Street, Suite 1800
Los Angeles, California 90017
Telephone: (213) 624-1588
Facsimile:  (213) 624-1589

Attorneys for Plaintiff and Interested Party,
Carlos Corrales

---

Exhibits to Interested Party Carlos Corrales' Response to Motion for Transfer and Coordination or Consolidation

B
56

B
57

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
|  | ) | (LEAD CASE) |
| M3POWER RAZOR SYSTEM | ) |  |
| MARKETING & SALES PRACTICES | ) | MDL Docket No. 1704 |
| LITIGATION | ) |  |
|  | ) |  |
| THIS DOCUMENT RELATES TO: | ) |  |
| **ALL CASES** | ) |  |
|  | ) |  |

## DECLARATION OF TARAS P. KICK IN SUPPORT OF THE ATKINS GROUP'S RESPONSE TO DEARMAN GROUP'S APPLICATION FOR APPOINTMENT AS CLASS COUNSEL AND MCGEARY GROUP'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL

I, Taras Kick, hereby declare as follows:

1.     I am an attorney licensed to practice in the State of California, and admitted to

practice before the Central District of California.  I am a shareholder in The Kick Law Firm,

A.P.C., co-counsel of record with Kanner & Whiteley, LLC, counsel for Plaintiff Carlos Corrales

(in Case No. 05-cv-12332-DPW) and Plaintiff Kasem Adoure  (in Case No. 05-cv-12336-DPW)

in this MDL proceeding (MDL No. 1704, Master File No. 05-cv-11177-DPW).  I make this

declaration in support of the Atkins Group's Response To Dearman's Group's Application For

Appointment As Class Counsel And McGeary Group's Motion For Appointment Of Interim

Counsel With Suggestions As To Liaison Counsel And Organizational Structure.  I make this

declaration of my own personal knowledge, and would and could testify completely to the

contents thereof if necessary to do so.

1

2.     On July 20, 2005, I requested Gillette's counsel to meet and confer regarding a motion for class certification that Plaintiff Carlos Corrales intended to file. On August 9, 2005, Gillette's counsel, represented by Kent Raygor and Jade Zike of Sheppard Mullin Richter & Hampton LLP, met in the conference room of The Kick Law Firm, APC, with Plaintiff Carlos Corrales' counsel, represented by myself, G. James Strenio, and Thomas G. Martin of The Kick Law Firm, APC.

3.     At this meeting, Mr. Raygor asked us whether or not we were "afraid of ostracizing []ourselves" from settlement discussions with Gillette by actively prosecuting the case on behalf of Mr. Corrales and the putative class. Mr. Raygor stated that if plaintiffs stopped litigating the case in the affirmative manner that they were, including dropping the motion for class certification, Mr. Raygor would recommend to Gillette's Boston counsel that this firm be made a part of the settlement negotiations that were ongoing between Gillette and certain other plaintiffs' firms. Mr. Raygor further stated that if we insisted on continuing to prosecute the action as we were, we would never be invited into these settlement discussions. Believing that the best interests of the class was to continue litigating the case instead of engaging in premature settlement discussions, we rejected Gillette's offer. And, on August 19, 2005, Plaintiff Carlos Corrales filed his motion for class certification.

4.     On November 7, 2005, Thomas Shapiro of the Dearman Group, on behalf of his firm and "several other firms with whom [he has] been working," invited the attorneys in the actions to a meeting in Boston to be held barely one week later, on November 16, 2005. [A true and correct copy of the letter dated November 7, 2005 from Mr. Shapiro received by me is attached hereto as Exhibit A.] On November 14, 2006, Mr. Shapiro informed the attorneys that

the meeting would be held at the Omni Parker House in the Longfellow Room. [A true and

correct copy of the letter dated November 14, 2005 from Mr. Shapiro received by me is attached

hereto as Exhibit B.]

     5.    Mr. Shapiro failed to provide any opportunity for attorneys who could not attend

physically to attend telephonically. When G. James Strenio of my office called on the morning

of November 16, 2005, asking for the telephone call-in information for the Boston meeting, Mr.

Shapiro's office told him that there was no telephone call-in information. Later, Mr. Shapiro

stated that there was no telephone call-in information because the hotel where the meeting took

place did not have the capability of handling a conference call. Because this statement seemed a

little unusual to me, I took the liberty of calling the Omni Parker House on January 4, 2006 to

investigate. I spoke with Stan Pendrak, the catering manager of the Omni Parker House located

at 60 State Street. I asked him whether the Longfellow Conference room at the hotel can

accommodate a speaker phone for a conference call. He said of course, and sounded a little

surprised that I would ask that question. He said the charge for the Longfellow room itself would

be $350, and the charge for the phone line rental would be $100, and there would be an

additional $100 charge for a speaker that the hotel would set up set up to go along with the phone

line. He sounded like he might be willing to lower the prices because he asked me whether I also

am speaking with other hotels. I informed Mr. Shapiro of the results of this investigation by

/ / /

/ / /

/ / /

/ / /

sending him an email on January 4, 2006, a true and correct copy of which is attached hereto as

Exhibit C.

I declare under penalty of perjury, pursuant to the laws of California and the United States

of America, that the above is true and correct and that this declaration was executed at Los

Angeles, California on February 24, 2006.

TARAS P. KICK

4

**EXHIBIT A**

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

November 7, 2005

**VIA FACSIMILE OR**
**UNITED STATES MAIL**

Re:    *In re M3Power Razor Systems Marketing & Sales Practices Litigation*
        *MDL No: 1704*

Dear Plaintiffs' Counsel:

As you are aware, the Judicial Panel on Multidistrict Litigation has ordered that all of the pending Gillette cases involving the M3P Razor be transferred to Boston for consolidated proceedings. My firm and several other firms with whom we have been working would like to host a meeting in Boston to discuss the prosecution of the case by plaintiffs. We will hold a meeting on November 16 at 10:00 a.m. The meeting will be held either in my office or in a meeting room at a nearby hotel, depending upon the number of persons who plan to attend.

Please let me know who, if anyone, will be attending from your firm. I look forward to meeting you.

Sincerely yours,

Thomas G. Shapiro

TGS:sg

SHAPIRO HABER & URMY LLP

## UNITED STATES MAIL SERVICE LIST

Stephen M. Sohmer
The Sohmer Law Firm, LLC
One Passaic Ave.
Fairfield, NJ 07004

Ben Barrow
Sharon Harris
Barnow and Associates, P.C.
One North LaSalle St., Suite 460
Chicago, IL 60602

Larry D.Drury
Larry D. Drury, Ltd.
Two North LaSalle St., Suite 700
Chicago, IL 60602

Harry Shulman
The Mills Law Firm
145 Marina Blvd.
San Rafael, CA 94901

Daniel R. Karon
Goldman Scarlato & Karon
55 Public Square, Suite 1500
Cleveland, OH 44113

Edward W. Cochrane
20030 Marchmont Rd.
Shaker Heights, OH 44122

Case 1:05-cv-11177-DPW    Document 105-13    Filed 11/13/2006    Page 8 of 18

NOV-07-2005 18:06  Case 1:05-cv-11177-DPW  SHAPIRO HABER & URMY  Document 43    Filed 02/24/2006  6174390134  Page 8 of 18  P.001/005

# SHAPIRO HABER & URMY LLP

## Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

## FACSIMILE COVER SHEET

NUMBER OF PAGES TRANSMITTED INCLUDING THIS PAGE: _5_

From:    Thomas G. Shapiro

Re:    Gillette

Date:    November 7, 2005

COMMENTS:

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, AND IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY AT (617) 439-3939 AND RETURN THE ORIGINAL TO US BY UNITED STATES MAIL. IF THE TRANSMISSION IS INCOMPLETE OR ILLEGIBLE, PLEASE CALL US AT THE ABOVE NUMBER.  THANK YOU FOR YOUR COOPERATION.

Exchange Place · 53 State Street · Boston, Massachusetts 02109 · (617) 439-3939 · Fax (617) 439-0134

Fax Service List

| To: | Fax Number: |
|---|---|
| Thomas Sobol<br>Edward Notargiacomo | (617) 482-3003 |
| Kenneth Wexler<br>Edward Wallace | (312) 346-0022 |
| Charles A. McCallum<br>R. Brent Irby | (205) 824-7768 |
| Samuel Rudman<br>Robert Rothman | (631) 367-1173 |
| Corey Holzer<br>Michael Fistel | (770) 392-0029 |
| Wayne S. Kreger<br>Lee Jackson<br>Gillian Wade | (310) 396-9635 |
| Jason B. Rudd<br>Jon A. York | (731) 668-7163 |
| Brandon O. Gibson | (731) 668-7163 |
| Frank L. Watson, III<br>William F. Burns | (901) 578-2649 |
| Arthur Horne<br>Murray Wells | (901) 507-2524 |
| Taras P. Kick        Anthony E. Chavez<br>G. James Stenio    Thomas G. Martin | (213) 624-1589 |
| David Pastor | (617) 742-9701 |
| Jason L. Brodsky<br>Evan J. Smith<br>Marc L. Ackerman | (610) 667-9029 |
| Russell Allen Wood | (901) 521-0940 |
| Lance A. Harke | (305) 536-8229 |
| Joseph DePalma<br>Susan Pontoriero | (973) 623-0211 |

| To: | Fax Number: |
|---|---|
| Mark Gardy<br>Henry Young | (212) 684-5191 |
| Mitch Kalcheim | (213) 444-7093 |
| Lionel Z. Glancy<br>Michael Goldberg | (310) 201-9160 |
| Nadeem Faruqi | (212) 983-9331 |
| John H. Alexander | (312) 263-7752 |
| John S. Steward | (314) 862-9895 |
| Joseph V. Neill<br>Thomas R. Carnes | (314) 353-0180 |
| Clifford Pearson      Gary S. Soter<br>Daniel Warshaw      C. Scott Marshall | (818) 345-0162 |
| Robert C. Baker<br>Phillip A. Baker | (213) 241-0990 |
| Harold Hewell | (619) 235-9122 |
| Alan L. Kovacs | (617) 332-1223 |
| Steven A. Kanner    Douglas A. Millen<br>Robert J. Wozniak, Jr. | (312) 521-2100 |
| Steven J. Greenfogel | (215) 569-0958 |
| Reginald Terrell | (510) 237-4616 |
| Donald Amamgbo | (510) 434-7804 |
| Karen Marcus<br>Mila F. Bartos | (202) 337-8090 |
| Steven Schwartz | (610) 649-3633 |
| Allan Kanner | (504) 524-5763 |
| James E. Miller      Karen M. Leser<br>Patrick A. Kligman | (860) 526-1120 |
| C. Brooks Cutter<br>Mark J. Tamblyn | (916) 669-4499 |
| Kenneth D. Quat | (978) 371-2296 |

**EXHIBIT B**

Case 1:05-cv-11177-DPW    Document 105-13    Filed 11/13/2006    Page 12 of 18
NOV-14-2005  16:09      SHAPIRO HABER & URMY    6674390494      P.001/004
Case 1:05-cv-11177-DPW    Document 43    Filed 02/24/2006    Page 12 of 18

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

## FACSIMILE COVER SHEET

NUMBER OF PAGES TRANSMITTED INCLUDING THIS PAGE: ___4___


From:     Thomas G. Shapiro

Re:       Gillette

Date:     November 14, 2005


COMMENTS:

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, AND IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY AT (617) 439-3939 AND RETURN THE ORIGINAL TO US BY UNITED STATES MAIL. IF THE TRANSMISSION IS INCOMPLETE OR ILLEGIBLE, PLEASE CALL US AT THE ABOVE NUMBER. THANK YOU FOR YOUR COOPERATION.

Exchange Place · 53 State Street · Boston, Massachusetts 02109 · (617) 439-3939 · Fax (617) 439-0134

Case 1:05-cv-11177-DPW    Document 105-13    Filed 11/13/2006    Page 13 of 18

NOV-14-2005  16:59    SHAPIRO HABER & URMY    6174390134  P.002/004
Case 1:05-cv-11177-DPW    Document 43    Filed 02/24/2006    Page 13 of 18

Fax Service List

| To: | Fax Number: |
|-----|-------------|
| Thomas Sobol<br>Edward Notargiacomo | (617) 482-3003 |
| Kenneth Wexler<br>Edward Wallace | (312) 346-0022 |
| Charles A. McCallum<br>R. Brent Irby | (205) 824-7768 |
| Samuel Rudman<br>Robert Rothman | (631) 367-1173 |
| Corey Holzer<br>Michael Fistel | (770) 392-0029 |
| Wayne S. Kreger<br>Lee Jackson<br>Gillian Wade | (310) 396-9635 |
| Jason B. Rudd<br>Jon A. York | (731) 668-7163 |
| Brandon O. Gibson | (731) 668-7163 |
| Frank L. Watson, III<br>William F. Burns | (901) 578-2649 |
| Arthur Horne<br>Murray Wells | (901) 507-2524 |
| Taras P. Kick        Anthony E. Chavez<br>G. James Stenio    Thomas G. Martin | (213) 624-1589 |
| David Pastor | (617) 742-9701 |
| Jason L. Brodsky<br>Evan J. Smith<br>Marc L. Ackerman | (610) 667-9029 |
| Russell Allen Wood | (901) 521-0940 |
| Lance A. Harke | (305) 536-8229 |
| Joseph DePalma<br>Susan Pontoriero | (973) 623-0211 |

| To: | Fax Number: |
|---|---|
| Mark Gardy<br>Henry Young | (212) 684-5191 |
| Mitch Kalcheim | (213) 444-7093 |
| Lionel Z. Glancy<br>Michael Goldberg | (310) 201-9160 |
| Nadeem Faruqi | (212) 983-9331 |
| John H. Alexander | (312) 263-7752 |
| John S. Steward | (314) 862-9895 |
| Joseph V. Neill<br>Thomas R. Carnes | (314) 353-0181 |
| Clifford Pearson     Gary S. Soter<br>Daniel Warshaw     C. Scott Marshall | (818) 345-0162 |
| Robert C. Baker<br>Phillip A. Baker | (213) 241-0990 |
| Harold Hewell | (619) 235-9122 |
| Alan L. Kovacs | (617) 332-1223 |
| Steven A. Kanner     Douglas A. Millen<br>Robert J. Wozniak, Jr. | (312) 521-2100 |
| Steven J. Greenfogel | (215) 569-0958 |
| Reginald Terrell | (510) 237-4616 |
| Donald Amamgbo | (510) 434-7804 |
| Karen Marcus<br>Mila F. Bartos | (202) 337-8090 |
| Steven Schwartz | (610) 649-3633 |
| Allan Kanner | (504) 524-5763 |
| James E. Miller     Karen M. Leser<br>Patrick A. Kligman | (860) 526-1120 |
| C. Brooks Cutter<br>Mark J. Tamblyn | (916) 669-4499 |
| Kenneth D. Quat | (978) 371-2296 |

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

November 14, 2005

**VIA FACSIMILE**

Re:    *In re M3Power Razor Systems Marketing & Sales Practices Litigation*
        *MDL No: 1704*

Dear Plaintiffs' Counsel:

The meeting scheduled for November 16 at 10:00 a.m. will be held at the Omni Parker House, 60 School Street, Boston, MA 02108 in the Longfellow Room.

I look forward to meeting you.

Sincerely yours,

Thomas G. Shapiro

TGS:sg

Exchange Place · 53 State Street · Boston, Massachusetts 02109 · (617) 439-3939 · Fax (617) 439-0134

**EXHIBIT C**

**James Strenio**

| | |
|---|---|
| **From:** | Taras Kick |
| **Sent:** | Wednesday, January 04, 2006 1:31 PM |
| **To:** | James Strenio |
| **Subject:** | FW: Gillette |

Taras Kick
The Kick Law Firm, APC
660 S. Figueroa Street, Suite 1800
Los Angeles, CA 90017
Phone: (213)624-1588
Fax: (213)624-1589

-----Original Message-----
From: Taras Kick
Sent: Wednesday, January 04, 2006 1:08 PM
To: 'Tom Shapiro'
Subject: RE: Gillette

Tom, I do appreciate you reaching out to me by email today.  However, your statement that
a hotel meeting room was incapable of handling a conference call seemed a little unusual
to me, so I took the liberty of calling the Omni Parker House just now to investigate.
Specifically, I just hung up the phone with Stan Pendrak, the catering manager of the Omni
Parker House located at 60 State Street.  His direct telephone number at the hotel is
(617)725-1665.  I asked him whether the Longfellow Conference room at the hotel (which is
where we were informed the meeting was scheduled to take place) can accommodate a speaker
phone for a conference call.  He said of course, and sounded a little surprised that I
would ask that question.  He said the charge for the Longfellow room itself would be $350,
and the charge for the phone line rental would be $100, and there would be an additional
$100 charge for a speaker that the hotel would set up set up to go along with the phone
line.  He sounded like he might be willing to lower the prices because he asked me whether
I also am speaking with other hotels.  Nonetheless, I am willing to put this incident
behind us, and move forward.  As an aside, I think it makes sense for us to have a meeting
on January 22, the day before the hearing.  What do you think?  Regards, Taras.

Taras Kick
The Kick Law Firm, APC
660 S. Figueroa Street, Suite 1800
Los Angeles, CA 90017
Phone: (213)624-1588
Fax: (213)624-1589

-----Original Message-----
From: Tom Shapiro [mailto:TSHAPIRO@shulaw.com]
Sent: Wednesday, January 04, 2006 8:00 AM
To: Taras Kick
Subject: RE: Gillette

Dear Taras:
I explained to the person who called that the meeting was in a hotel meeting room and I
could't arrange a conference call from there.  It was not a question of not being allowed.


Thomas G. Shapiro
Shapiro Haber & Urmy LLP
Exchange Place
53 State St.
Boston MA 02109
(617) 439-3939
(617) 439-0134 (facsimile)
tshapiro@shulaw.com

1

CONFIDENTIALITY NOTE: This e-mail message contains information belonging to the law firm
of Shapiro Haber & Urmy LLP, which may be privileged, confidential and/or protected from
disclosure. The information is intended only for the use of the addressee(s) named above.
If you think that you have received this message in error, please e-mail the sender. If
you are not the intended recipient, any use, dissemination, distribution or copying is
strictly prohibited.

-----Original Message-----
From: Taras Kick [mailto:taras@kicklawfirm.com]
Sent: Tuesday, December 20, 2005 5:20 PM
To: A Kanner; hyoung@abbeygardy.com; Jnotis@abbeygardy.com; Adroblaw@aol.com;
alxfen@aol.com; Ldrurylaw@aol.com; ReggieT2@aol.com; esmith@brodsky-smith.com;
mackerman@brodsky-smith.com; DonaldAmamgbo@citycom.com; olendodd@earthlink.net;
dpastor@gilmanpastor.com; Tom@hbsslaw.com; Bcutter@kcrlegal.com; mtamblyn@kcrylaw.com;
James Strenio; rrothman@lerachlaw.com; dmillen@muchshelist.com; skanner@muchshelist.com;
Tom Shapiro; ken@quatlaw.com; alankovacs@yahoo.com; herman_cowanjr@yahoo.com; Lance Harke
; b.barnow@barnowlaw.com; avozzolo@faruqilaw.com; hbushman@harkeclasby.com;
kwexler@wexlerfirm.com
Subject: RE: Gillette

We told organizers of the meeting we would participate by phone, but were told we would
not be allowed.  When asked why not, were not given a reason.

Taras Kick
The Kick Law Firm, APC
660 S. Figueroa Street, Suite 1800
Los Angeles, CA 90017
Phone: (213)624-1588
Fax: (213)624-1589

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

November 7, 2005

**VIA FACSIMILE OR**
**UNITED STATES MAIL**

Re:  *In re M3Power Razor Systems Marketing & Sales Practices Litigation*
*MDL No: 1704*

Dear Plaintiffs' Counsel:

As you are aware, the Judicial Panel on Multidistrict Litigation has ordered that all of the pending Gillette cases involving the M3P Razor be transferred to Boston for consolidated proceedings. My firm and several other firms with whom we have been working would like to host a meeting in Boston to discuss the prosecution of the case by plaintiffs. We will hold a meeting on November 16 at 10:00 a.m. The meeting will be held either in my office or in a meeting room at a nearby hotel, depending upon the number of persons who plan to attend.

Please let me know who, if anyone, will be attending from your firm. I look forward to meeting you.

Sincerely yours,

Thomas G. Shapiro

TGS:sg

# SHAPIRO HABER & URMY LLP

## UNITED STATES MAIL SERVICE LIST

Stephen M. Sohmer
The Sohmer Law Firm, LLC
One Passaic Ave.
Fairfield, NJ 07004

Ben Barrow
Sharon Harris
Barnow and Associates, P.C.
One North LaSalle St., Suite 460
Chicago, IL 60602

Larry D.Drury
Larry D. Drury, Ltd.
Two North LaSalle St., Suite 700
Chicago, IL 60602

Harry Shulman
The Mills Law Firm
145 Marina Blvd.
San Rafael, CA 94901

Daniel R. Karon
Goldman Scarlato & Karon
55 Public Square, Suite 1500
Cleveland, OH 44113

Edward W. Cochrane
20030 Marchmont Rd.
Shaker Heights, OH 44122

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Theodore M. Hess-Mahan
Todd S. Heyman
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

## FACSIMILE COVER SHEET

NUMBER OF PAGES TRANSMITTED INCLUDING THIS PAGE:  5

From:      Thomas G. Shapiro

Re:        Gillette

Date:      November 7, 2005

COMMENTS:

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, AND IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING IS STRICTLY PROHIBITED.   IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE IMMEDIATELY AT (617) 439-3939 AND RETURN THE ORIGINAL TO US BY UNITED STATES MAIL. IF THE TRANSMISSION IS INCOMPLETE OR ILLEGIBLE, PLEASE CALL US AT THE ABOVE NUMBER. THANK YOU FOR YOUR COOPERATION.

Exchange Place · 53 State Street · Boston, Massachusetts 02109 · (617) 439-3939 · Fax (617) 439-0134

Fax Service List

| To: | Fax Number: |
|---|---|
| Thomas Sobol<br>Edward Notargiacomo | (617) 482-3003 |
| Kenneth Wexler<br>Edward Wallace | (312) 346-0022 |
| Charles A. McCallum<br>R. Brent Irby | (205) 824-7768 |
| Samuel Rudman<br>Robert Rothman | (631) 367-1173 |
| Corey Holzer<br>Michael Fistel | (770) 392-0029 |
| Wayne S. Kreger<br>Lee Jackson<br>Gillian Wade | (310) 396-9635 |
| Jason B. Rudd<br>Jon A. York | (731) 668-7163 |
| Brandon O. Gibson | (731) 668-7163 |
| Frank L. Watson, III<br>William F. Burns | (901) 578-2649 |
| Arthur Horne<br>Murray Wells | (901) 507-2524 |
| Taras P. Kick        Anthony E. Chavez<br>G. James Stenio    Thomas G. Martin | (213) 624-1589 |
| David Pastor | (617) 742-9701 |
| Jason L. Brodsky<br>Evan J. Smith<br>Marc L. Ackerman | (610) 667-9029 |
| Russell Allen Wood | (901) 521-0940 |
| Lance A. Harke | (305) 536-8229 |
| Joseph DePalma<br>Susan Pontoriero | (973) 623-0211 |

| To: | Fax Number: |
|---|---|
| Mark Gardy<br>Henry Young | (212) 684-5191 |
| Mitch Kalcheim | (213) 444-7093 |
| Lionel Z. Glancy<br>Michael Goldberg | (310) 201-9160 |
| Nadeem Faruqi | (212) 983-9331 |
| John H. Alexander | (312) 263-7752 |
| John S. Steward | (314) 862-9895 |
| Joseph V. Neill<br>Thomas R. Carnes | (314) 353-0180 |
| Clifford Pearson Gary S. Soter<br>Daniel Warshaw C. Scott Marshall | (818) 345-0162 |
| Robert C. Baker<br>Phillip A. Baker | (213) 241-0990 |
| Harold Hewell | (619) 235-9122 |
| Alan L. Kovacs | (617) 332-1223 |
| Steven A. Kanner Douglas A. Millen<br>Robert J. Wozniak, Jr. | (312) 521-2100 |
| Steven J. Greenfogel | (215) 569-0958 |
| Reginald Terrell | (510) 237-4616 |
| Donald Amamgbo | (510) 434-7804 |
| Karen Marcus<br>Mila F. Bartos | (202) 337-8090 |
| Steven Schwartz | (610) 649-3633 |
| Allan Kanner | (504) 524-5763 |
| James E. Miller Karen M. Leser<br>Patrick A. Kligman | (860) 526-1120 |
| C. Brooks Cutter<br>Mark J. Tamblyn | (916) 669-4499 |
| Kenneth D. Quat | (978) 371-2296 |

Case 1:05-cv-11177-DPW    Document 42    Filed 02/24/2006    Page 1 of 6

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re: | CIVIL ACTION NO. 05-11177-DPW (LEAD CASE) |
| M3POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | MDL Docket No. 1704 |
| THIS DOCUMENT RELATES TO: **ALL CASES** | |

## DECLARATION OF REGINALD TERRELL IN SUPPORT OF THE ATKINS GROUP'S RESPONSE TO DEARMAN GROUP'S APPLICATION FOR APPOINTMENT AS CLASS COUNSEL AND MCGEARY GROUP'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL

I, Reginald Terrell, make the following declaration, based on my own personal knowledge, as follows:

1.      I am an attorney in good standing duly licensed to practice law in the state of California and am one of the attorneys of record for Michael Pruitt. The testimony set forth in this declaration is based on first hand knowledge, about which I would and could testify competently in open court if called upon to do so.

2.      This declaration is made in support of the Atkins Group's opposition to the Dearman Group's application for appointment as class counsel and the McGeary group's motion for appointment as interim counsel.

3.      This Court charged all plaintiffs' counsel present at the last hearing to "make new friends" - a subtle judicial nudge to plaintiffs' counsel to work together and develop a positive plan

for the conduct of this litigation.

4.    Prior to the Court's nudge, in an effort to organize a coherent plaintiff litigation team, I and approximately fifteen other plaintiffs attorneys attended a meeting in Boston. The meeting was held in an Omni hotel conference room without internet or teleconference features. I inquired from Tom Shapiro's secretary if I could attend telephonically and was informed that the hotel had no such features. I have since learned that several counsel who wanted to participate telephonically could not do so thereby limiting the number people who participated in the meeting.

5.    This meeting consisted of attorneys from the Shapiro Group, the McGeary Group and the Atkins Group. However, it became readily apparent that the meeting was a predetermined coronation of the Dearman Group. There never was any substantive dialogue involving skillful persuasion and negotiation designed to produce a fair, equitable and inclusive compromise of position.

6.    During the Boston meeting there were two flash points during the discussion, first, was the issue of who would be lead counsel and second was the composition of a Steering/Settlement committee and its role. Several very qualified individuals indicated an interest in being lead counsel, however, the Dearman Group conveyed the impression the appointment of Shapiro firm, the Lerach firm, and the firms of Abby Gardy LLP, and The Wexler Firm LLP as lead counsel was a *fait accompli*. Whilst the Boston meeting attendees agreed to set up a Steering/Settlement committee, the disagreement was chiefly over its make up and its role. Even though I was nominated as a member of the steering/settlement committee, I felt that the Dearman Group insisted on populating the Steering/Settlement committee with their friends and co-counsel. It was agreed in principle that the Steering/Settlement committee must be appraised of and

2

participate in all settlement discussions with Gillette. I was never contacted or consulted by the

Dearman Group or its purported leaders about settlement discussions or otherwise following the

Boston meeting.

7.      I as well as other counsel at the Boston gathering did not deem this fit or fair and

continued to demand a fair, equitable and empowered Steering/Settlement committee. It was my

impression the Dearman Group wanted a neutered Steering/Settlement committee with essentially

no role. It is my believe that the inflexibility of the counsel in the Dearman Group, most of whom

are co-counsel on the same complaint, was the one issue that frustrated and ultimately caused the

formation of the Atkins and McGeary groups. In light of the inflexibility of the Dearman Group on

the key issues, most counsel started coalescing around different ideas.

8.      The next group to form was the McGeary Group, led by Ben Barrow, which opted

for a can-we-all-get-along super-structure with a title for anyone who switched camps. After it

became clear the Dearman Group was unwilling to compromise their leadership position, I met with

members of the McGeary Group. However, I was not confident or comfortable with their approach

of giving anyone opposed to the Dearman Group and vowed loyalty to the McGeary Group a seat

in a committee and or a chairmanship. Based on my experience I found this approach neither

credible with the courts or beneficial to the class. Equally important, was the fact that the group's

free for all approach was not consistent with my experience in other MDL proceedings. I had initial

preliminary discussions with the McGeary Group and were indeed given positions on several

committees.

9.      However, after mature reflection, I decided that the McGeary super-structure was not

tenable, and a decision was made to find a centrist proposal, hence the formation of the Atkins

3

Group. The various plaintiffs counsel now fall into essentially three groups – the Dearman Group, arguing for leadership vesting solely within its group, the McGeary group, arguing for a super-structure of committees, but with real control remaining with its own group, and the Atkins group, arguing for leadership through a representative Plaintiffs' Executive Committee.

10.    The organizational structure proposed by the Dearman Group vests complete control of these actions with the leaders of the Dearman Group, Shapiro Haber & Urmy LLP ("Shapiro") and Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach"). I am concerned the leadership structure sought by the Dearman Group to the exclusion of the majority of counsel in this case may have the effect of ramming through a quick and hasty settlement with Gillette.

11.    During the Boston meeting, there was an extensive discussion about whether the proposed settlement offer was fair, reasonable and adequate under the circumstances of this case. Rather than fight with the Dearman Group and the McGeary Group over leadership to effectuate a quick settlement with Gillette, I wanted to obtain necessary discovery to further evaluate any settlement offers, while at the same time, push forward with the litigation of these cases. The latter is something the Dearman Group seems unwilling to do. Absent sufficient discovery, I do not believe a settlement can be adequately assessed.

12.    In the proposed organizational structure of the Dearman Group, members of the Atkins Group and others have no way to challenge a quick settlement that does not appear to be in the best interests of their clients. As noted previously, although the Dearman Group designated a steering/settlement committee during meeting in Boston, the Dearman Group has failed and/or refused to consult the steering/settlement committee on settlement issues or any other issues.

13.    It is my understanding that in all litigation, but more so in Multi-district case dealing

4

with coordinated or consolidated cases, any counsel selected for a position of leadership either *de facto* prior to judicial approval or *de jure* has an affirmative obligation to maintain appropriate and regular communication with other attorneys in the group, periodically informing them of the pertinent progress in the litigation and consulting with them when major decision affecting their clients must be made. My experience in this case is that Dearman Group has refused and/or failed to communicate with Mr. Amamgbo or I of its discussions with Gillette following the Boston meeting of November 16, 2005.

14.    A leadership role likewise requires communication skills and the ability to bring a divergent group of counsel representing clients with divergent interests together. The Dearman Group's chosen leaders have proven they do not possess such skills. More troubling is Shapiro's and Lerach's chosen agenda, which is to self-anoint themselves as leaders and then rush into settlement discussions without the benefit of discovery. The rush to settlement, coupled with their failure to communicate with other counsel, present a real danger of a settlement that is not at arm's length, not in good faith, not fair, reasonable and adequate and not in the best interest of the classes.

15.    The McGeary Group's proposal contains numerous committees, with committee appointments for anyone willing to join their group. On its face, McGeary Group's proposal seems to be inclusive of all counsel, as opposed to the Dearman Group's sole leadership proposal. However, a careful review of the proposal reveals that, despite the many committees and apparent inclusion of all counsel, the control of the cases remains with lead counsel.

I declare under penalty of perjury pursuant to the laws of the United States of America that

the above is true and correct and that this declaration was prepared and executed at Oakland,

California on February 24, 2006.

REGINALD TERRELL

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177 DPW |
| M3POWER RAZOR SYSTEM | ) | (LEAD CASE) |
| MARKETING & SALES PRACTICES | ) | |
| LITIGATION | ) | MDL Docket No. 1704 |
| THIS DOCUMENT RELATES TO: | ) | |
| **ALL CASES** | ) | |

### CASE MANAGEMENT ORDER #2

WHEREAS, this Court in its Case Management Order and Order for

Consolidation, dated January 26, 2006, ordered that all motions for appointment of

Lead/Liaison counsel be filed by February 10, 2006, and any oppositions thereto be filed

by February 24, 2006;

WHEREAS; three applications for appointment of Lead/Liaison counsel have

been filed;

WHEREAS, the Court heard oral argument on said motions on March 6, 2006;

IT IS HEREBY ORDERED as follows:

1.    **Organization of Plaintiffs' Counsel.**

    a.    **Plaintiffs' Co-Lead Counsel**

The Court hereby appoints as Plaintiffs' Co-Lead Counsel:  Ben Barnow

of the law firm of Barnow and Associates, P.C. and Robert Rothman of

the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP.

**b.** **Plaintiffs' Liaison Counsel**

The Court hereby appoints as Plaintiffs' Liaison Counsel: Thomas G.

Shapiro of the law firm of Shapiro Haber & Urmy LLP.

**c.** **Plaintiffs' Steering Committee**

The Court hereby designates as the Plaintiffs' Steering Committee the

following attorneys:

1. Lance A. Harke of the law firm of Harke & Clasby LLP.

2. Donald Amamgbo of the law firm of Amamgbo & Associates.

3. Alan Kovacs of Law Office of Alan Kovacs.

4. Kenneth Wexler of The Wexler Firm LLP.

2. **Plaintiffs' Co-Lead Counsel's Powers and Responsibilities.**

a. Plaintiffs' Co-Lead Counsel shall be responsible for initiating,

coordinating and supervising the efforts of all Plaintiffs' counsel in

such tasks as Co-Lead Counsel may assign in such a manner as to

ensure that pre-trial and trial proceedings are conducted

effectively, efficiently and economically and shall:

(i) Organize and develop a litigation plan on behalf of

all Plaintiffs;

(ii) Conduct settlement negotiations and receive all

settlement communications as the exclusive

representatives on behalf of all Plaintiffs and the

putative class;

2

(iii)   Prepare and finalize all pleadings, briefs, motions and other papers and argue motions on behalf of all Plaintiffs, except that nothing shall foreclose other Plaintiff's counsel, upon motion for leave to do so granted by the Court, to file motions or argue matters the Court determines may be presented separately by other Plaintiff's counsel;

(iv)   Determine the scope of, initiate, and conduct discovery on behalf of Plaintiffs, including the preparation of interrogatories, requests and subpoenas for production of documents, and the examination of witnesses in depositions;

(v)   Delegate and oversee specific tasks to Plaintiffs' counsel in a manner to assure that pre-trial preparation for the Plaintiffs is conducted effectively, efficiently, and economically;

(vi)   Consult with and retain consultants and experts;

(vii)   Act as spokespersons at pre-trial conferences and mediations;

(viii)   Enter into stipulations with opposing counsel reasonable and necessary for the conduct of the litigation;

3

(ix)    Preside over meetings of the Plaintiffs' Steering
Committee and provide status reports as they deem
appropriate, either orally or in writing, to Plaintiffs'
Steering Committee;

(x)    Maintain adequate time and expense records
covering services of all Plaintiffs' counsel;

(xi)    Monitor the activities of all Plaintiffs' counsel to
assure that schedules are met and unnecessary
expenditures of time and funds are avoided;

(xii)    Advise the Plaintiff Steering Committee of
settlement proposals and obtain the Plaintiff
Steering Committee's input and comments
regarding same; and

(xiii)    Perform such other duties as may be incidental to
proper coordination of Plaintiffs' pre-trial and trial
activities, or as otherwise authorized by further
order of the Court.

Notwithstanding the foregoing, Plaintiffs' Co-Lead Counsel may authorize
other Plaintiffs' counsel to perform any of the responsibilities set forth in
Paragraphs 2(a)(iii), (iv), (vii), and (viii). An agreement reached with
Plaintiffs' Co-Lead Counsel shall be binding on all other Plaintiffs' counsel
and the Plaintiffs' Steering Committee.

3. **Plaintiffs' Liaison Counsel's Powers and Responsibilities.**

    a.    Plaintiffs' Liaison Counsel shall:

        (i)    File with the Court and serve all pleadings, briefs, motions or other papers presented or to be presented on behalf of plaintiffs;

        (ii)    Serve as liaison counsel with the Court and the Clerk's Office on behalf of plaintiffs;

        (iii)    Coordinate and monitor all activities pertaining to the Protective Order entered herein;

        (iv)    Present to the Court such motions as Co-Lead Counsel may from time to time ask him to present and generally make himself available to facilitate the orderly and efficient handling of the litigation;

        (v)    Maintain an up-to-date service list; and

        (vi)    Maintain a complete file of documents served by or upon each party, except such documents as may be available at a document depository.

4. **Plaintiffs' Steering Committee's Powers and Responsibilities.**

The Plaintiffs' Steering Committee is consultative to Plaintiffs' Co-Lead Counsel. Its members shall perform work assignments, along with other Plaintiffs' counsel who, from time to time receive assignments, as designated by Plaintiffs' Co-Lead Counsel.

5

5.    **Electronic Filing and Service**

All submissions shall be filed with the Court electronically as provided in

Local Rule 5.4(A). All counsel who have appeared or hereafter choose to appear

shall register for electronic case filing and service unless otherwise ordered by the

Court.

SO ORDERED.

_____
Douglas P. Woodlock
United States District Judge

Dated: _March 17, 2006_____

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re M3 POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | ) ) ) | Civil Action No. 05-11177-DPW |
| | ) ) | MDL Docket No. 1704 |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

**ANSWERS AND OBJECTIONS OF PLAINTIFF MATTHEW MARR
TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Plaintiff Matthew Marr ("Plaintiff" or "Marr"), who resides at 4753 Oakwood Avenue, Los Angeles, California, 90004, by his undersigned counsel, hereby answers The Gillette Company's ("Defendant" or "Gillette") First Set of Interrogatories to Plaintiff Marr.

## GENERAL OBJECTIONS

Plaintiff makes the following general objections to Interrogatories in their entirety, including each of Defendant's definitions, instructions and individual requests contained therein:

1.     Marr objects to these interrogatories to the extent they seek privileged or confidential information, including information encompassed by the attorney-client privilege, the joint defense privilege, the work-product doctrine, the trade secret or proprietary information privilege, or any other judicially recognized privilege or protection. Privileged or protected information that may be responsive to a particular interrogatory is not provided in these responses and will not be provided in future responses. Marr does not waive or intend to waive, but rather intends to preserve and is preserving, the attorney-client privilege, the attorney work-product doctrine, the joint defense privilege, and every other judicially recognized protection and privilege with respect to all information and documents subject thereto. To the extent any information which is properly the subject of any such privilege or protection is inadvertently produced in response to these interrogatories, such production is not intended as, and should not be construed as, a waiver of any such privilege or protection.

2.     Marr's responses are and will be based upon information and belief after a reasonable and diligent investigation, including but not limited to a diligent search of records considered reasonably likely to contain information responsive to these interrogatories. Marr, however, has not searched, and will not search, each and every record in its possession, custody, and control, and has not interviewed and will not interview all of its current and former employees, as such an investigation would be unreasonable and unduly burdensome, harassing, and oppressive under the

- 1 -

circumstances. To the extent these interrogatories purport to require the responding party to conduct more than a reasonable and diligent investigation, Marr objects that they are overbroad, burdensome, harassing, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.

3.    Marr objects to each interrogatory to the extent it seeks to impose burdens and obligations exceeding those imposed by the Federal Rules of Civil Procedure. Marr will respond to these interrogatories in accordance with the requirements of the Federal Rules of Civil Procedure, subject to all applicable objections and protections.

4.    Marr objects to each interrogatory to the extent it is overbroad, burdensome, harassing, oppressive, and/or seeks information neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

5.    Marr objects to each interrogatory to the extent it purports to cover persons or entities which are not parties to this action, or seeks information which is not reasonably available to Marr or within its possession, custody, or control.

6.    Marr objects to each interrogatory to the extent it seeks legal contentions and supporting facts which are not reasonably ascertainable or available at this stage of the litigation, is premature, or calls for a contention.

7.    Marr objects to each interrogatory to the extent it requests information that would violate any constitutional, statutory, or common law privacy interest of any current or former employee or representative of Marr or of any current or former policyholder of Marr or of any other person or entity.

8.    Marr objects to and will not produce information in response to any interrogatory to the extent it calls for the production of documents equally available to or within the control of defendant or defendant's counsel.

- 2 -

9.    Marr construes each interrogatory to not seek the identification or contents of, or to require a privilege log for, documents and communications prepared after the commencement of this action and any related litigation and objects on relevance and privilege grounds to any such interrogatory.

10.    Each response herein which states that certain information or documents will be provided or produced is not, and should not be construed as, an admission or representation that such information or documents in fact exist.

11.    In providing these responses, Marr does not waive or intend to waive, but rather intends to preserve and is preserving, each of the following: (a) all objections as to competency, relevancy, materiality, authenticity, and admissibility of any information or documents, including but not limited to all information and documents identified herein; (b) all rights to object on any ground to the use in any subsequent proceedings, including trial of this or any other action, of any information or documents, including but not limited to information or documents provided herein; and (c) all rights to object on any ground to any further interrogatories or other discovery demands.

12.    Marr has not completed its investigation with respect to the subject matter of this litigation. Marr therefore reserves the right to amend or supplement these objections and responses at a later date or present additional evidence or information at any time.

## ANSWERS AND SPECIFIC OBJECTIONS

Subject to and without waiving the foregoing General Objections, plaintiff answers the Interrogatories as follows:

INTERROGATORY NO. 1:

State the number of M3Power razors that have been purchased by you or an any member of your immediate family, and for each such razor identify:

a.    The date of purchase;

- 3 -

b.      The name, age, and relationship to you of the person who purchased the razor;

c.      The name and location of the retailer from which the razor was purchased;

d.      The amount that was paid for the razor at the time of purchase;

e.      Whether any discount on the purchase price of the razor was used, received, or redeemed, including, but not limited to, a coupon, a rebate at the time of purchase, a mail-in rebate, or other form of discount;

f.      Whether you (or the family member) ever used such razor, and, if so, starting when, how frequently, for how long, and whether another razor or razors also were used during all or any part of the same period.

RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to this Interrogatory to the extent it requests information outside of his possession and on the grounds that such information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, Plaintiff states that he purchased one M3Power razor; and

a.      Plaintiff does not recall precisely when the M3Power razor was purchased, but believes it was at least 2 years ago.

b.      Plaintiff purchased the M3Power razor on his own.

c.      Plaintiff does not recall the name of the retailer where he purchased the M3Power razor, except that it was purchased in Los Angeles, California.

d.      Plaintiff does not recall the exact amount paid for the M3Power razor.

e.      Plaintiff does not recall whether he received a discount, in any form, in connection with his purchase of the M3Power razor.

- 4 -

f.      Plaintiff cannot recall exactly when he began using the M3Power razor or precisely how many times he used it. Plaintiff states that he used the razor for approximately one month.

INTERROGATORY NO. 2:

State whether you or any member of your immediate family have ever received an M3Power razor either as a gift or as a free promotion, or otherwise without paying, and if so, identify for each such razor:

a.      The date of receipt;

b.      The name, age, and relationship to you of the person who received the razor;

c.      Whether the razor was a gift, free promotion, or otherwise received without payment, and if so, how;

d.      Whether you (or the family member) ever used such razor, and if so, starting when, how frequently, for how long, and whether another razor or razors also were used during all or any part of the same period.

RESPONSE TO INTERROGATORY NO. 2:

Plaintiff objects to this Interrogatory to the extent it requests information outside of his possession and on the grounds that such information is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, Plaintiff states that he did not receive a M3Power razor as a gift or as a free promotion or in any other method that did not require payment by him.

INTERROGATORY NO. 3:

Describe in detail the terms of any oral engagement agreement, retainer agreement, retention agreement, or any written or oral agreement or understanding regarding the terms and scope of your participation in the Action or your lawyer's representation of you in the Action.

- 5 -

RESPONSE TO INTERROGATORY NO. 3:

Plaintiff objects to this Interrogatory to the extent it requests information outside of his possession and on the grounds that such information is not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege. Subject to and without waiving any objections, Plaintiff did not enter into any formal agreement with his attorneys in this case.

Plaintiff is being represented in this action on a contingency fee basis. Plaintiff will not be individually responsible for the legal fees incurred by attorneys representing him and/or the class members. In the event that Plaintiff prevails in this action, Plaintiff's counsel will make an application to the Court for an award of attorneys' fees in an amount that Plaintiff believes is reasonable.

INTERROGATORY NO. 4:

State whether you have acted as a named plaintiff or lead plaintiff in any putative or certified class action other than the Action, describing in detail:

    a.    The caption, court, and docket number of any such action;

    b.    The nature of the claims asserted in any such action;

    c.    Whether any such action is still pending;

    d.    The resolution or disposition, if any, of any such action, and the date thereof.

RESPONSE TO INTERROGATORY NO. 4:

Plaintiff states that he has not acted as a lead or named plaintiff in a purported class action other than the instant action.

INTERROGATORY NO. 5:

Describe in detail the terms of all oral engagement agreements, retainer agreements, retention agreements, or written or oral agreements or understandings regarding the terms and scope of a lawyer's representation of you in, or your participation in, any putative or certified class action other than the Action in which you were a named plaintiff or lead plaintiff, identifying for each such action, among other things, the caption, court, and docket number of the action, and the name and address of the lawyer(s) and/or law firm(s) representing you.

RESPONSE TO INTERROGATORY NO. 5:

Plaintiff objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence.

INTERROGATORY NO. 6:

State whether you have been paid, will be paid, may be paid, or have been promised to be paid any compensation or fee, or thing of value of any kind or nature, for acting as a named plaintiff in the Action, and, if so, identify the amount of any such compensation or fee, the actual or expected date of payment, and any terms, contingencies, or conditions imposed on your receipt of any such compensation or fee.

RESPONSE TO INTERROGATORY NO. 6:

Plaintiff has not been paid and has not been promised to be paid any compensation or fee, or thing of value of any kind or nature, for acting as a named plaintiff in the action. Plaintiff expects to receive only his pro-rata share of any recovery in this action, the same as any other class member.

INTERROGATORY NO. 7:

State whether you were paid, will be paid, may be paid, or have been promised to be paid any compensation or fee, or thing of value of any kind or nature, for acting as a named plaintiff or lead

plaintiff in any putative or certified class action other than the Action, identifying in detail the amount of any such compensation or fee, the actual or expected date of payment, and any terms, contingencies, or conditions imposed on your receipt of any such compensation or fee.

RESPONSE TO INTERROGATORY NO. 7:

Plaintiff has not been paid or been promised to be paid any compensation or fee, or thing of value of any kind or nature, for acting as a named plaintiff or lead plaintiff in this or any other putative or certified class action.

INTERROGATORY NO. 8:

Describe in detail your employment history, education background, and any criminal record.

RESPONSE TO INTERROGATORY NO. 8:

Plaintiff graduated from Lone Grove High School, in Lone Grove, Oklahoma. He received a Bachelor of Music from the University of North Texas in 2002.

Plaintiff is currently employed by Glancy Binkow & Goldberg LLP. Between June 2004 and January 2006, Plaintiff was employed by Sephora USA, Inc. During the summers of 2002, 2003 and 2005, Plaintiff worked at Belvoir Terrace Performing Arts Camp, Lenox, MA. Between September 2003 and January 2004, Plaintiff was employed by Macy's. Between September 2002 and June 2003, Plaintiff worked at Dillard's. Between June 1999 and September 2002, Plaintiff was employed by The Gap, Inc. Between June 1997 and August 1997, Plaintiff worked at Interurban Restaurant.

Plaintiff has no criminal record.

INTERROGATORY NO. 9:

State your Social Security number.

RESPONSE TO INTERROGATORY NO. 9:

Plaintiff objects to providing my Social Security number on grounds of privacy and on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence.

INTERROGATORY NO. 10:

Describe in detail how it came to be that you are a named plaintiff in the Action.

RESPONSE TO INTERROGATORY NO. 10:

Plaintiff objects to this Interrogatory to the extent that answering it will divulge attorney-client privileged communications. Subject to and without revealing any attorney-client privileged information, Plaintiff responds that he overheard a conversation by Mike Goldberg, an attorney with Glancy Binkow & Goldberg regarding the Gillette Corporation. Plaintiff told Mr. Goldberg that he purchased the Gillette razor based on the belief that it would work better than other razors. Plaintiff told Mr. Goldberg that he was not happy with the results of the razor. Following privileged communications, Plaintiff filed the instant litigation.

INTERROGATORY NO. 11:

Describe in detail any complaints by you concerning or regarding the M3Power razor, or the quality or any other aspect of the M3Power razor, identifying for each such complaint:

      a.       The substance of the complaint;

      b.       To whom the complaint was made or communicated;

      c.       When the complaint was made;

      d.       How the complaint was communicated;

      e.       Any response to the complaint that you received.

RESPONSE TO INTERROGATORY NO. 11:

Plaintiff objects to this Interrogatory to the extent that it is vague and ambiguous as to the identity of the party to whom complaints were made. To the extent this Interrogatory refers to complaints made to Gillette, and subject to this interpretation, Plaintiff responds that he filed a complaint on or about June 8, 2005, in the Central District of California. Plaintiff respectfully refers Gillette to the pleadings in this litigation for the substance of the Complaint and Gillette's response.

INTERROGATORY NO. 12:

Identify any individual whom you expect to offer as an expert witness to testify on your behalf and/or the behalf of the putative Class, and for each such individual identified:

     a.     state the name and address of each such individual;

     b.     identify the occupation or profession of each such individual;

     c.     identify the area of expertise and/or discipline of each such individual;

     d.     identify the subject matter on which each such individual is expected to testify;

     e.     describe in detail the substance of the facts to which each such individual is expected to testify;

     f.     describe in detail the opinions to which each such individual is expected to testify; and

     g.     describe in detail the grounds for each such opinion.

RESPONSE TO INTERROGATORY NO. 12:

Plaintiff objects to this Interrogatory to the extent that it is premature. Plaintiff and his attorneys have not yet made a determination as to whom they expect to offer as an expert witness.

Signed under the pains and penalties of perjury this $2\6$ day of June, 2006.

_____
MATTHEW MARR

Signed as to objections

SHAPIRO HABER & URMY LLP
THOMAS G. SHAPIRO (BBO #454680)
THEODORE M. HESS-MAHAN (BBO #557109)

_____
THOMAS G. SHAPIRO

53 State Street
Boston, MA  02109
Telephone:  617/439-3939
617/439-0134 (fax)

*Liaison Counsel*

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN

_____
ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

- 11 -

(RZx), DISCOVERY

# U.S. District Court
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:05-cv-05024-FMC-RZ

Matthew Marr v. Gillette Company et al
Assigned to: Honorable Florence-Marie Cooper
Referred to: Magistrate Judge Ralph Zarefsky
Case in other court: Los Angeles County Superior Court,
      BC334672
Cause: 28:1441 Notice of Removal

Date Filed: 07/08/2005
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Matthew Marr**
*individually and on behalf of all others*
*similarly situated*

represented by **Lionel Z Glancy**
Glancy Binkow and Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
310-201-9150
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael M Goldberg**
Glancy Binkow and Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
310-201-9150
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Gillette Company**

represented by **Fred R Puglisi**
Sheppard Mullin Richter and Hampton
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067-6017
310-228-3700
Email: fpuglisi@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kent R Raygor**
Sheppard Mullin Richter & Hampton
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067-6017
310-228-3700
Email: kraygor@sheppardmullin.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 - 100 inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2005 | 1 | NOTICE OF REMOVAL from Los Angeles County Superior Court, Central District of California, case number BC334672 with copy of summons and conformed copy of complaint. Case assigned to Judge Florence-Marie Cooper and referred to Discovery Ralph Zarefsky. (Filing fee $ 250.00 Paid), filed by defendant Gillette Company. (jp, ) (Entered: 07/14/2005) |
| 07/08/2005 | 2 | NOTICE of Interested Parties filed by Defendant Gillette Company. (jp, ) (Entered: 07/14/2005) |
| 07/08/2005 | | FAX number for Attorneys Lionel Z Glancy, Michael M Goldberg is 310-201-9160. (jp, ) (Entered: 07/14/2005) |
| 07/08/2005 | | FAX number for Attorneys Fred R Puglisi, Kent R Raygor is 310-228-3701. (jp, ) (Entered: 07/14/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/14/2005 09:36:56 | | |
| **PACER Login:** rg0009 | **Client Code:** gsr-668 | |
| **Description:** Docket Report | **Search Criteria:** 2:05-cv-05024-FMC-RZ | |
| **Billable Pages:** 1 | **Cost:** 0.08 | |

# THE KICK LAW FIRM

### A PROFESSIONAL CORPORATION

660 SOUTH FIGUEROA STREET, SUITE 1800
LOS ANGELES, CALIFORNIA 90017
213 624 1588 / FAX 213 624 1589

August 16, 2006

*Via Facsimile (617) 439-0134*
Thomas G. Shapiro, Esquire
Shapiro Haber & Urmy LLP
Exchange Place
Boston, MA 02109

Re: *In re M3 Power Razor System Marketing & Sales Practices Litigation*,
Civil Action No. 05-11177-DPW

Dear Tom:

I am writing to you in your capacity as liaison counsel to please communicate with lead counsel regarding the recent filing with the Court of the document styled "Non-Binding Memorandum of Understanding" which indicates that the parties have reached a possible settlement of the matter.

As a preliminary matter, while I acknowledge that lead counsel is designated to pursue negotiation of settlements pursuant to the Case Management Order No. 2, I believe the pendency of a possible settlement should have been communicated to fellow plaintiffs' counsel before it was publically filed.   This both would have been in keeping with duties of liaison counsel, and a simple professional courtesy to fellow attorneys involved in this matter.

Regardless, at this time, I would appreciate being briefed on the specifics of the proposed settlement, including how it was arrived at, why lead counsel believe it adequately compensates consumers, why are Canadian consumers being included, what, if anything, was done to address the superior rights held by California consumers, as well as several other questions.

To be candid with you, because this case involves literally hundreds of millions of dollars obtained by Gillette from the unfair practices at issue, at least based on the terms set forth in the filed Memorandum, we do not believe that even the entirety of the proposed national amount comes close to adequately compensating California consumers, yet alone a pro rata share of that national amount being adequate for California consumers.

Thomas G. Shapiro, Esquire                                                        2
Re: *In re M3 Power Razor System Marketing
& Sales Practices Litigation*, Civil Action No. 05-11177-DPW
August 16, 2006


However, before concluding this definitively, we certainly want to provide lead counsel an opportunity to explain to us why they might believe otherwise. Alternatively, consistent with Case Management Order No. 2, if lead counsel prefers not to have such a discussion with us, we request permission from lead counsel to directly open negotiations with defense counsel regarding settlement of claims on behalf of California consumers only, the only putative class which we seek to represent.

Thank you for your attention. If you can have an answer by Monday, August 21, 2006, that would be much appreciated, as we do need to make some decisions relatively soon on how to proceed in the face of the filing of that Memorandum.


Very truly yours,

Taras Kick /TAS

Taras Kick


cc:    Robert Rothman, Esquire
       Ben Barnow, Esquire
       Allan Kanner, Esquire

# THE KICK LAW FIRM
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 3  (including cover sheet)

**DATE:**              August 16, 2006

**FAX NUMBER:**        (617) 439-0134

**PHONE NUMBER:**      (617) 439-3939

**TO:**                SHAPIRO HABER & URMY LLP

**ATTENTION:**         Thomas G. Shapiro, Esq.

**FROM:**              Taras Kick

**SUBJECT:**           *In re M3 Power Razor System Marketing & Sales Litigation ,*
                       Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm.

```
┌─────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT    │
└─────────────────────────────────────┘
                        TIME  : 08/16/2006 10:55
                        NAME  :
                        FAX   :
                        TEL   :
                        SER.# : BROJ2J700633
```

```
DATE,TIME            08/16  10:54
FAX NO./NAME         16174390134
DURATION             00:00:28
PAGE(S)              03
RESULT               OK
MODE                 STANDARD
                     ECM
```

## THE KICK LAW FIRM
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 3 (including cover sheet)

**DATE:**            August 16, 2006

**FAX NUMBER:**      (617) 439-0134

**PHONE NUMBER:**    (617) 439-3939

**TO:**              SHAPIRO HABER & URMY LLP

**ATTENTION:**       Thomas G. Shapiro, Esq.

**FROM:**            Taras Kick

**SUBJECT:**         *In re M3 Power Razor System Marketing & Sales Litigation*,
                     Civil Action No. 05-11177-DPW (lead case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

```
┌────────────────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT               │
│                                                 │
└────────────────────────────────────────────────┘

                              TIME  : 08/16/2006 11:06
                              NAME  :
                              FAX   :
                              TEL   :
                              SER.# : BROJ2J700633
```

```
┌──────────────────────────────────────────────────────────────────────┐
│                                                                        │
│   DATE,TIME              08/16  11:06                                   │
│   FAX NO./NAME           16313671173                                   │
│   DURATION               00:00:27                                      │
│   PAGE(S)                03                                            │
│   RESULT                 OK                                            │
│   MODE                   STANDARD                                      │
│                          ECM                                           │
│                                                                        │
└──────────────────────────────────────────────────────────────────────┘
```

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017

## Phone: (213) 624-1588  Fax: (213) 624-1589

### FACSIMILE TRANSMITTAL COVER SHEET

### NUMBER OF PAGES:  3 (including cover sheet)

**DATE:**              August 16, 2006

**FAX NUMBER:**        (631) 367-1173

**PHONE NUMBER:**

**TO:**                Robert Rothman

**ATTENTION:**         Robert Rothman

**FROM:**              Taras Kick

**SUBJECT:**           *In re M3 Power Razor System Marketing & Sales Litigation*,
                       Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017

## Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 3   (including cover sheet)

**DATE:**                August 16, 2006

**FAX NUMBER:**          (504) 524-5763

**PHONE NUMBER:**        (504) 524-5777

**TO:**                  ALLAN KANNER & ASSOCIATES, P.L.L.C.

**ATTENTION:**           Allan Kanner

**FROM:**                Taras Kick

**SUBJECT:**             *Corrales v. The Gillette Company, et al.*
                         USDC-CD Case No. CV05-4116

## COMMENTS/INSTRUCTIONS:

Plaintiffs Request for Oral Argument.

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

```
TRANSMISSION VERIFICATION REPORT
```

```
                                    TIME  : 08/16/2006 11:00
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROJ2J700633
```

```
    DATE,TIME             08/16  10:59
    FAX NO./NAME          15045245763
    DURATION              00:00:29
    PAGE(S)               03
    RESULT                OK
    MODE                  STANDARD
                          ECM
```

# THE KICK LAW FIRM, APC
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 3   (including cover sheet)

**DATE:**            August 16, 2006

**FAX NUMBER:**      (504) 524-5763

**PHONE NUMBER:**    (504) 524-5777

**TO:**              ALLAN KANNER & ASSOCIATES, P.L.L.C.

**ATTENTION:**       Allan Kanner

**FROM:**            Taras Kick

**SUBJECT:**         *Corrales v. The Gillette Company, et al.*
                     USDC-CD Case No. CV05-4116

**COMMENTS/INSTRUCTIONS:**

Plaintiffs Request for Oral Argument.

# THE KICK LAW FIRM
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES:  3  (including cover sheet)

**DATE:**  August 16, 2006

**FAX NUMBER:**  (312) 641-5504

**PHONE NUMBER:**

**TO:**  Ben Barnow

**ATTENTION:**

**FROM:**  Taras Kick

**SUBJECT:**  *In re M3 Power Razor System Marketing & Sales Litigation* ,
Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege.  If you are not the intended recipient, please deliver this transmission immediately to its intended recipient.  If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm.

```
                    TRANSMISSION VERIFICATION REPORT

                                      TIME  : 08/16/2006 10:59
                                      NAME  :
                                      FAX   :
                                      TEL   :
                                      SER.# : BROJ2J700633
```

```
   DATE,TIME                08/16  10:58
   FAX NO./NAME             13126415504
   DURATION                 00:00:42
   PAGE(S)                  03
   RESULT                   OK
   MODE                     STANDARD
                            ECM
```

## THE KICK LAW FIRM
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

### NUMBER OF PAGES:  3  (including cover sheet)

**DATE:**               August 16, 2006

**FAX NUMBER:**         (312) 641-5504

**PHONE NUMBER:**

**TO:**                 Ben Barnow

**ATTENTION:**

**FROM:**               Taras Kick

**SUBJECT:**            *In re M3 Power Razor System Marketing & Sales Litigation*,
                        Civil Action No. 05-11177-DPW (lead case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
## Phone: (213) 624-1588  Fax: (213) 624-1589


## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES:  3 (including cover sheet)

**DATE:**              August 16, 2006

**FAX NUMBER:**        (631) 367-1173

**PHONE NUMBER:**

**TO:**                Robert Rothman

**ATTENTION:**         Robert Rothman

**FROM:**              Taras Kick

**SUBJECT:**           *In re M3 Power Razor System Marketing & Sales Litigation ,*
                       Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

## COMMENTS/INSTRUCTIONS:

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

BARNOW **AND** ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

Telephone: 312-621-2000
Facsimile: 312-641-5504

August 23, 2006

**Via Facsimile and U.S. Mail**

Taras Kick, Esq.
The Kick Law Firm, P.C.
660 S. Figueroa Street, Suite 1800
Los Angeles, California 90017

Re:     *In re M3Power Razor System Marketing & Sales Practices Litigation.*
        Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Taras:

This is in response to your letter of August 16, 2006, to Tom Shapiro, who is on vacation until the end of the month. I write on behalf of Co-Lead Counsel.

We appreciate your acknowledgment of the Court's Case Management Order No. 2 ("CMO"). As you know, in the CMO, the Court appointed a plaintiffs' steering committee comprised of members selected by each "group" that had formed in the leadership determination process. One of the members is C. Donald Amamgbo, your group's selected representative. In accordance with the terms of the CMO, he, and each of the other committee members, were kept advised and their comments and views regarding the terms of the settlement were solicited. Mr. Amamgbo and each of the other members of the committee were provided with a copy of the memorandum of understanding prior to its execution. All of the committee members, including your group's representative, enthusiastically supported the terms of the proposed settlement and agreed with Co-Lead Counsel's conclusion that the settlement is an excellent one for the Class and its members.

Unfortunately, much of your letter continues to assume matters in a negative manner and then seeks responses as if those assumptions were true. You apparently feel that Co-Lead Counsel is required to answer questions that are generated from those negative assumptions. Your letter demonstrates a desire to continue to set yourself ahead of the process and all others, most importantly the Court.

Please accept that Co-Lead Counsel, Liaison Counsel, and the members of the Plaintiffs' Steering Committee, including the representative selected by your group, are experienced in class actions and knowledgeable with regard to the applicable laws, rules and regulations. There is no legitimate basis to suggest that anything other than careful consideration of the relevant legal framework and proper analysis of the facts was undertaken in connection with the settlement

BARNOW 🔵 ASSOCIATES

Taras Kick, Esq.
August 23, 2006
Page 2

negotiations.

   The fourth paragraph of your letter indicates that you have already determined, as you have attempted throughout these proceedings, on behalf of a class of California plaintiffs whom you do not represent, that the settlement is not adequate and that even if all of its benefits were directed to California alone, it "would not come close to adequately compensating California consumers..." Others, including your group's unanimously selected representative, who himself is an attorney practicing in California, as well as one of Co-Lead Counsel's firms, with more than 170 attorneys in California alone who concentrate their practice in class action litigation, disagree with you.

   We respectfully request that you follow the Court's Case Management Orders and the procedures that will no doubt be employed by the Court pursuant to clear and established law under which class members have the opportunity to accept, object to or opt-out of a settlement.

                              Very truly yours,

                              Ben Barnow

                              Ben Barnow

BB/sh

cc:   Robert M. Rothman, Esq.
      Thomas G. Shapiro, Esq.

**THE KICK LAW FIRM**

A PROFESSIONAL CORPORATION

660 SOUTH FIGUEROA STREET, SUITE 1800
LOS ANGELES, CALIFORNIA 90017
213 624 1588 / FAX 213 624 1589

August 23, 2006

**_Via Facsimile (510) 434-7804_**
Donald Amamgbo, Esquire
Amamgbo & Associates
1940 Embarcadero
Oakland, CA 94606

> Re: *In re M3 Power Razor System Marketing & Sales Practices Litigation*,
> Civil Action No. 05-11177-DPW

Dear Counsel:

I am working with Taras Kick on the above matter and he asked me to fax you a copy of a letter we received today from lead counsel regarding the Memorandum of Understanding that has apparently been agreed to.

As a primary matter, could you please forward us a copy of the Memorandum of Understanding and any other settlement documents you have, so that we can be apprised of the specifics of the agreement.

Taras would also like to discuss the matter with you on Friday August 25, if you are available. If you are not available, please let me know of your availability between now and Friday.

I know this request is on short order, as such I do appreciate in advance your professional courtesy and cooperation.

Sincerely,

Graig Woodburn

CC: Alan Kanner

THE KICK LAW FIRM

A PROFESSIONAL CORPORATION

660 SOUTH FIGUEROA STREET, SUITE 1800
LOS ANGELES, CALIFORNIA 90017
213 624 1588 / FAX 213 624 1589


September 10, 2006


**Via U.S. Mail and Facsimile To: (312) 641-5504**
Ben Barnow, Esquire
Law Office of Ben Barnow
One North LaSalle Street
Chicago, IL  60602

Re:    In re *M3 Power Razor System Marketing & Sales Practice Litigation*,
       Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Ben:

We are in receipt of your letter of August 23, 2006, which responded to my letter of August 16, 2006, seeking information on the Non-Binding Memorandum of Understanding ("MOU") that you apparently entered into with Gillette on July 25, 2006.

You spend some time in your letter on *ad hominem* attacks. I will not respond to those, and instead follow the suggestion of Judge Woodlock that we engage in substantive and professional exchanges when communicating with one another. In that regard, it is our very real concern that you appear to be attempting to settle an extremely strong case that California consumers have for far less than it is worth, a case in which California consumers can likely prevail on summary judgement. Bearing this concern in mind, so that we may have full information in electing how to proceed on behalf of California consumers, I request that you please answer the following.

First, it appears that plaintiffs propounded no discovery on Gillette at all in this matter. Is this correct? If so, why? If not, please provide us with whatever discovery plaintiffs did propound, and Gillette's responses to that discovery, as previously ordered by Judge Woodlock.

Second, we note that it appears that what materials were produced by Gillette to plaintiffs in this matter are only from Gillette's initial disclosure, and, further, are only documents which Gillette already had produced in the Schick litigation. Is this correct? Has Gillette produced anything else to you, perhaps informally? If so, please provide us with all such documents or information. If not, please let us know.

Third, interestingly, the initial disclosure material from Gillette that Mr. Shaprio provided to us did not include any information from Gillette regarding sales, revenue, or retail pricing on a national basis. We find this surprising since Special Interrogatory No. 13 propounded by Schick to Gillette in the Connecticut Schick action requested that Gillette: "State, for each month, or if not available, for each quarter from January 1, 2003 to present :(a) Gillette's actual marketing,

Ben Barnow, Esquire                                                                                          2
Re: In re *M3 Power Razor System Marketing & Sales Practice Litigation.*
Civil Action No. 05-11177-DPW, MDL No. 1704
September 10, 2006

advertising and promotional expenses for M3 Power in the United States; (b) Gillette's market
share for M3 Power in the United States; (c) Gillette's sales of M3 Power in United States; and
(d) Gillette's profits for M3 Power in the United States." See GMPC 17-18. In response,
Gillette identified an extensive list of documents that would provide this information, but these
documents do not appear to have been provided to us. Did you obtain these documents from
Gillette? If so, please provide those documents to us. If not, please let us know why not.

Next, and very important to our California case, have you received any information from Gillette
regarding sales, revenue, and retail pricing on a regional or state basis, and if so, have you
received any such information specifically for California? If you have, please let us know when
you requested this information and when we may expect to receive it. If you have not, please let
us know why not.

With respect to discovery relating to damages, I also note that the initial disclosure material
provided by Gillette provided very limited information regarding Gillette's market share in the
United States, and the information provided was already used by this law firm in its Motion For
Preliminary Injunction filed in Los Angeles County more than a year ago on behalf of California
consumers.  This includes the testimony of Schick Director of Marketing Adel Mekhail (GMPC
603-606), an exhibit referenced by Mr. Mekhail (PX 202, GMPC002557), and the Declaration of
Michelle Streams, Schick's Brand Director for Men's Systems. Is there anything else? If not, it
appears that in a way you are actually relying on our work done in Los Angeles for your proposed
settlement. Please let me know if that is not correct. Also, we would caution you that although
we felt our motion was very strong and certainly caused Gillette a great deal of concern, we were
not finished with our work in Los Angeles at the time we filed that motion.

Finally, if you have consulted with any experts about this matter, please provide us with such
communications, including reports or draft reports on the issue of liability or damages. If you
have not consulted with any experts, simply let us know. As you know from reading this firm's
filings in this matter, we have consulted with experts, and would be more than happy to share
this information with you if you like.

In reviewing this letter and these straightforward requests, please do recall the Court's reminder
at the last hearing to lead and liaison counsel of their duties towards the other counsel in this
MDL proceeding.  Please be so kind as to provide the information requested in this letter as soon
as possible since we would like the benefit of this information in more fully evaluating the
proposed MOU and settlement. We genuinely do not want to have to bring a motion regarding
these issues, and much prefer to cooperate with you in resolving something which should not
have to require the time of a federal judge to resolve.

Ben Barnow, Esquire                                                                              3
Re: In re *M3 Power Razor System Marketing & Sales Practice Litigation,*
Civil Action No. 05-11177-DPW, MDL No. 1704
September 10, 2006

Thank you for your attention.   We look forward to hearing from you.

Very truly yours,

Taras Kick

cc:     Allan Kanner, Esquire
        Donald Amamgbo, Esquire
        Thomas Shapiro, Esquire
        Robert Rothman, Esquire

Dear Ben:

We are in receipt of your letter of August 23, 2006, which responded to my letter of August 16, 2006, seeking information on the Non-Binding Memorandum of Understanding ("MOU") that you apparently entered into with Gillette on July 25, 2006.

You spend some time in your letter on *ad hominem* attacks. I will not respond to those, and instead follow the suggestion of Judge Woodlock that we engage in substantive and professional exchanges when communicating with one another. In that regard, it is our very real concern that you appear to be attempting to settle an extremely strong case that California consumers have for far less than it is worth, a case in which California consumers can likely prevail on summary judgement. Bearing this concern in mind, so that we may have full information in electing how to proceed on behalf of California consumers, I request that you please answer the following.

First, it appears that plaintiffs propounded no discovery on Gillette at all in this matter. Is this correct? If so, why? If not, please provide us with whatever discovery plaintiffs did propound, and Gillette's responses to that discovery, as previously ordered by Judge Woodlock.

Second, we note that it appears that what materials were produced by Gillette to plaintiffs in this matter are only from Gillette's initial disclosure, and, further, are only documents which Gillette already had produced in the Schick litigation. Is this correct? Has Gillette produced anything else to you, perhaps informally? If so, please provide us with all such documents or information. If not, please let us know.

Third, interestingly, the initial disclosure material from Gillette that Mr. Shaprio provided to us did not include any information from Gillette regarding sales, revenue, or retail pricing on a national basis. We find this surprising since Special Interrogatory No. 13 propounded by Schick to Gillette in the Connecticut Schick action requested that Gillette: "State, for each month, or if not available, for each quarter from January 1, 2003 to present :(a) Gillette's actual marketing,

| DATE,TIME       | 09/11  18:05  |
| FAX NO./NAME    | 13126415504   |
| DURATION        | 00:00:52      |
| PAGE(S)         | 03            |
| RESULT          | OK            |
| MODE            | STANDARD      |
|                 | ECM           |

TIME : 09/11/2006 18:06
NAME :
FAX :
TEL :
SER.# : BROJ2J700633

TRANSMISSION VERIFICATION REPORT

(310) 615-0000

**TO:** Amamgbo & Associates, PLC

**ATTENTION:** Donald Amamgbo, Esquire

**FROM:** Taras Kick

**SUBJECT:** *In re M3 Power Razor System Marketing & Sales Litigation* ,
Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

TRANSMISSION VERIFICATION REPORT

TIME : 09/11/2006 18:14
NAME :
FAX :
TEL :
SER.# : BROJ2J700633

| | |
|---|---|
| DATE, TIME | 09/11 18:13 |
| FAX NO./NAME | 15106156025 |
| DURATION | 00:01:10 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
## Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 4   (including cover sheet)

**DATE:**            September 11, 2006

**FAX NUMBER:**      (510) 615-6025

**PHONE NUMBER:**    (510) 615-6000

**TO:**              Amamgbo & Associates, PLC

**ATTENTION:**       Donald Amamgbo, Esquire

**FROM:**            Taras Kick

**SUBJECT:**         *In re M3 Power Razor System Marketing & Sales Litigation ,*
                     Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege.  If you are not the intended recipient, please deliver this transmission immediately to its intended recipient.  If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

TRANSMISSION VERIFICATION REPORT

TIME : 09/11/2006 18:10
NAME :
FAX :
TEL :
SER.# : BROJ2J700633

| | |
|---|---|
| DATE,TIME | 09/11 18:10 |
| FAX NO./NAME | 16174390134 |
| DURATION | 00:00:38 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

**PHONE NUMBER:** (617) 439-3939

**TO:** SHAPIRO HABER & URMY LLP

**ATTENTION:** Thomas G. Shapiro, Esq.

**FROM:** Taras Kick

**SUBJECT:** *In re M3 Power Razor System Marketing & Sales Litigation* , Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm.

# THE KICK LAW FIRM
660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588 Fax: (213) 624-1589


## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 4  (including cover sheet)

**DATE:**                September 11, 2006

**FAX NUMBER:**          (617) 439-0134

**PHONE NUMBER:**        (617) 439-3939

**TO:**                  SHAPIRO HABER & URMY LLP

**ATTENTION:**           Thomas G. Shapiro, Esq.

**FROM:**                Taras Kick

**SUBJECT:**             *In re M3 Power Razor System Marketing & Sales Litigation* ,
                         Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm.

TRANSMISSION VERIFICATION REPORT

TIME : 09/11/2006 18:08
NAME :
FAX :
TEL :
SER.# : BROJ2J700633

| | |
|---|---|
| DATE,TIME | 09/11 18:08 |
| FAX NO./NAME | 16313671173 |
| DURATION | 00:00:37 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

**TO:** Robert Rothman

**ATTENTION:** Robert Rothman

**FROM:** Taras Kick

**SUBJECT:** *In re M3 Power Razor System Marketing & Sales Litigation* , Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017

## Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES:   4 (including cover sheet)

**DATE:**                September 11, 2006

**FAX NUMBER:**          (631) 367-1173

**PHONE NUMBER:**

**TO:**                  Robert Rothman

**ATTENTION:**           Robert Rothman

**FROM:**                Taras Kick

**SUBJECT:**             *In re M3 Power Razor System Marketing & Sales Litigation* ,
                         Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege.  If you are not the intended recipient, please deliver this transmission immediately to its intended recipient.  If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

TRANSMISSION VERIFICATION REPORT

TIME : 09/11/2006 18:03
NAME :
FAX :
TEL :
SER.# : BROJ2J700633

| | |
|---|---|
| DATE,TIME | 09/11 18:03 |
| FAX NO./NAME | 15045245763 |
| DURATION | 00:00:40 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD<br>ECM |

**PHONE NUMBER:** (504) 524-5777

**TO:** ALLAN KANNER & ASSOCIATES, P.L.L.C.

**ATTENTION:** Allan Kanner

**FROM:** Taras Kick

**SUBJECT:** *In re M3 Power Razor System Marketing & Sales Litigation*, Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

**COMMENTS/INSTRUCTIONS:**

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

# THE KICK LAW FIRM, APC

660 South Figueroa Street
Suite 1800
Los Angeles, California 90017
Phone: (213) 624-1588  Fax: (213) 624-1589

## FACSIMILE TRANSMITTAL COVER SHEET

## NUMBER OF PAGES: 4    (including cover sheet)

**DATE:**             September 11, 2006

**FAX NUMBER:**       (504) 524-5763

**PHONE NUMBER:**     (504) 524-5777

**TO:**               ALLAN KANNER & ASSOCIATES, P.L.L.C.

**ATTENTION:**        Allan Kanner

**FROM:**             Taras Kick

**SUBJECT:**          *In re M3 Power Razor System Marketing & Sales Litigation* ,
                      Civil Action No. 05-11177-DPW (lead Case), MDL Docket No. 1704

## COMMENTS/INSTRUCTIONS:

The information contained in this facsimile transmission may be confidential, attorney work product, and protected by the attorney-client privilege. If you are not the intended recipient, please deliver this transmission immediately to its intended recipient. If you have received this facsimile transmission in error, please call the telephone number listed at the top of this page, collect, to arrange for return of the transmission to The Kick Law Firm, APC.

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Todd S. Heyman
Theodore M. Hess-Mahan
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

September 27, 2006

**VIA FACSIMILE**

Taras P. Kick, Esq.
The Kick Law Firm, APC
660 South Figueroa Street, Suite 1800
Los Angeles, CA 90017

> Re:    *Gillette*

Dear Taras:

I am writing in response to your letter of September 10, 2006.

Plaintiffs did not propound written discovery requests to Gillette separate and apart from the request, and the Court's Order, with respect to Gillette's initial disclosures. I produced to you what was received from Gillette, and I would rather not characterize what was or was not in the production, as you have a copy yourself. Subsequently, we have received two additional boxes of materials, consisting of the transcript of the preliminary injunction hearing in the Connecticut case and accompanying exhibits, and also a copy of the transcript and accompanying exhibits from the hearing in Australia. Please let me know if you want copies of these materials. In that connection, I note that you have not reimbursed my firm for the costs of copying and sending you discovery materials previously. Please send me a check for those expenses.

Gillette's counsel has provided a briefing regarding its sales, revenue and retail pricing for the M3Power razor system. This was done subject to strict agreement on confidentiality. There was no special presentation for California.

We do not have an expert report on the issue of liability or damages. As to what your work was in Los Angeles and whether we used it, we think you know we have not relied on it.

Exchange Place · 53 State Street · Boston, Massachusetts 02109 · (617) 439-3939 · Fax (617) 439-0134

## SHAPIRO HABER & URMY LLP

Taras P. Kick, Esq.
September 27, 2006
Page 2

I am not responding to your editorial comments and the like. Please do not interpret the lack of a response as any agreement to anything you said. I think it is better to eliminate such rhetoric and posturing.

Sincerely yours,

*Tom Shapiro*

Thomas G. Shapiro

TGS:sg
cc:    Ben Barnow, Esq. (via facsimile)
       Robert M. Rothman, Esq. (via facsimile)

# SHAPIRO HABER & URMY LLP

Attorneys at Law

Thomas G. Shapiro
Edward F. Haber
Thomas V. Urmy, Jr.
Michelle H. Blauner
Todd S. Heyman
Theodore M. Hess-Mahan
Matthew L. Tuccillo
Adam M. Stewart
Robert E. Ditzion

*Counsel*

Lawrence D. Shubow
Alfred J. O'Donovan

E-mail:
tshapiro@shulaw.com

## FACSIMILE COVER SHEET

NUMBER OF PAGES TRANSMITTED INCLUDING THIS PAGE:  _3_

FAX NUMBER TRANSMITTED TO:

To:   Taras Kick                   Fax:  (213) 624-1589

To:   Robert Rothman              Fax:  (631) 367-1173

To:   Ben Barnow                  Fax:  (312) 641-5504


From:        Thomas G. Shapiro

Re:          Gillette

Date:        September 27, 2006

COMMENTS:

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT PRIVILEGED, AND
IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING IS STRICTLY
PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE
IMMEDIATELY AT (617) 439-3939 AND RETURN THE ORIGINAL TO US BY UNITED STATES MAIL. IF THE TRANSMISSION IS
INCOMPLETE OR ILLEGIBLE, PLEASE CALL US AT THE ABOVE NUMBER. THANK YOU FOR YOUR COOPERATION.

BARNOW AND ASSOCIATES

COPY

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: 312-621-2000*
*Facsimile: 312-641-5504*

October 9, 2006

**Via Federal Express**

Taras Kick, Esq.
The Kick Law Firm, P.C.
Suite 1800
660 S. Figueroa Street
Los Angeles, CA 90017

Re:   *In re M3Power Razor System Marketing & Sales Practices Litigation,*
      Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Counsel:

      Enclosed is a copy of the executed Settlement Agreement in the above-captioned matter.
Plaintiffs' Memorandum In Support of Motion for Preliminary Approval of Class Action Settlement
and Publishing of Notice, and Setting of Final Fairness Hearing, has been electronically filed (except
for the notice plan exhibit; if you would like a copy, let me know). The matter is set for hearing on
October 18, 2006, at 2:30 p.m.

      You are listed as an attorney in one or more pending cases in the MDL matter. We are
offering named plaintiffs in the individual cases and their counsel of record the opportunity to join
in the settlement. See paragraph 1.11 of the Settlement Agreement. Please review the Settlement
Agreement with your client(s) and, if your client(s) and his (their) counsel of record choose to join,
please send me a writing acknowledging concurrence in and acceptance of the settlement by your
client(s) and his (their) counsel of record. We ask that you do so by October 16, 2006.
Accompanying is a sample form that you may find useful in that regard.

BARNOW ⊗ ASSOCIATES

Taras Kick, Esq.
October 9, 2006
Page 2

If you have any questions, do not hesitate to call me.

Very truly yours,

Ben Barnow

BB/sh
Enclosures

cc (via Federal Express
w/ Settlement Agreement):

Allan Kanner, Esq.

cc (via facsimile w/o
Settlement Agreement):

Anthony Edward Chavez, Esq.

# BARNOW AND ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

Telephone: (312) 621-2000
Facsimile: (312) 641-5504

## FACSIMILE COVER SHEET

TO:        Anthony Chavez          FACSIMILE NUMBER:      (213) 624-1589

DATE:      October 9, 2006         Number of pages *(including cover sheet)*: 2

FROM:      Ben Barnow              RE: *Gillette*

MESSAGE:

Please see accompanying.

## CONFIDENTIALITY NOTICE

The information transmitted in this facsimile message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney/client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any retention, review, use, dissemination, distribution, or copying of this facsimile message and the information contained therein is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the above address via first class mail. We will reimburse postage. Thank you.

BARNOW ⬤ ASSOCIATES

*a professional corporation*

ATTORNEYS AT LAW

BEN BARNOW *
SHARON HARRIS

* *also admitted in New York*

ONE NORTH LASALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: 312-621-2000*
*Facsimile: 312-641-5504*

October 20, 2006

**Via Facsimile**

Allan Kanner, Esq.
Kanner and Whiteley, L.L.C.
701 Camp Street
New Orleans, LA

Taras Kick, Esq.
The Kick Law Firm, P.C.
600 S. Figueroa Street, Suite 1800
Los Angeles, CA 90017

Re:    *In re M3Power Razor System Marketing & Sales Practices Litigation,*
Civil Action No. 05-11177-DPW, MDL No. 1704

Dear Allan and Taras:

In conjunction with preliminary approval, the Court has requested additional briefing, in large part dealing with the need to supply the Court with information which Gillette has treated as Highly Confidential, among other legal issues.

Additionally, the Court has stated that he wants to perform a lodestar check against the proposed fee award. In that regard, Rob and I are asking all named-plaintiffs' counsel to forward to us their detailed time, cost and expense reports for work they believe was reasonably incurred in advancing the litigation. We also ask that you prepare and include a summary of same. A suggested form for the summary accompanies this letter.

Our supplemental brief is due on November 6, 2006. Thus, we ask that you get us the requested documentation (detailed report <u>and</u> summary) by no later than the close of business on October 26, 2006. If you have co-counsel in this matter who may not have received a copy of this letter, please contact them and advise them of this request.

If you have any questions, do not hesitate to call.

Very truly yours,

Ben Barnow

BB/bas
Accomp.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

In re:

M3POWER RAZOR SYSTEM
MARKETING & SALES PRACTICES
LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

MASTER DOCKET
Civil Action No. 05-11177
(Lead Case)

MDL Docket No. 1704

## SUMMARY OF ATTORNEYS' FEES, COSTS, AND EXPENSES FOR
_____ [insert firm name]

| Billing Rate Per Hour | | Hours | Total Fees (Lodestar: hours times billing rate) | Total Fees (Firm) | Costs | Expenses | Total Fees, Costs & Expenses |
|---|---|---|---|---|---|---|---|
| _____ (Lawyer) <br> _____ (Lawyer) <br> _____ (Law Clerk) | | | | | | | |

# BARNOW AND ASSOCIATES

---

*a professional corporation*

ATTORNEYS AT LAW

ONE NORTH LaSALLE STREET
SUITE 4600
CHICAGO, ILLINOIS 60602

*Telephone: (312) 621-2000*
*Facsimile: (312) 641-5504*

## FACSIMILE COVER SHEET

TO:     Allan Kanner
           Taras Kick

FACSIMILE NUMBER:   (504) 524-5763
                                (213) 624-1589

DATE:    October 20, 2006

Number of pages *(including cover sheet)*: 3

FROM:   Ben Barnow

RE: *In re: M3Power Razor System Marketing &*
*Sales Practices Litigation*, MDL Docket No. 1704

MESSAGE:   Please see accompanying.

## CONFIDENTIALITY NOTICE

The information transmitted in this facsimile message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney/client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any retention, review, use, dissemination, distribution, or copying of this facsimile message and the information contained therein is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the above address via first class mail. We will reimburse postage. Thank you.

1   Taras P. Kick (State Bar No. 143379)
    G. James Strenio (State Bar No. 177624)
2   Thomas G. Martin (State Bar No. 195627)
    Anthony E. Chavez (State Bar No. 126623)
3   The Kick Law Firm, APC
    660 South Figueroa Street, Suite 1800
4   Los Angeles, California 90017
    (213) 624-1588; Fax (213) 624-1589
5
    Allan Kanner (State Bar No. 109152)
6   Allan Kanner & Associates, PLLC
    701 Camp Street
7   New Orleans, LA 70130
    (504) 524-5777; Fax (504) 524-5763
8
    Attorneys for Plaintiff,
9   KASEM ADOURE

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12          **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

13  KASEM ADOURE, an individual,          Case No. BC338624

14              Plaintiff,               [Assigned to the Honorable Ernest M.
                                         Hiroshige, Dept. 54]
15          v.
                                         **PLAINTIFF'S APPLICATION FOR A**
16  THE GILLETTE COMPANY, and            **PRELIMINARY INJUNCTION;**
    DOES 1-1000, inclusive,              **MEMORANDUM OF POINTS AND**
17                                       **AUTHORITIES IN SUPPORT THEREOF**
            Defendants.
18                                       DATE:        September 22, 2005
                                         TIME:        8:30 a.m.
19                                       PLACE:       Dept. 54

20

21                                       [Filed concurrently with Request for Judicial
                                         Notice and Declaration of Larry Londre]
22
                                         Complaint Filed:    August 19, 2005
23                                       Trial Date:         None set

24

25

26

27

28

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

AUG 2 5 2005

John A. Clarke, Executive Officer/Clerk

By _____, Deputy
        L. ZULUETA

---

i

1   Taras P. Kick (State Bar No. 143379)
    G. James Strenio (State Bar No. 177624)
2   Thomas G. Martin (State Bar No. 195627)
    Anthony E. Chavez (State Bar No. 126623)
3   The Kick Law Firm, APC
    660 South Figueroa Street, Suite 1800
4   Los Angeles, California 90017
    (213) 624-1588; Fax (213) 624-1589
5
    Allan Kanner (State Bar No. 109152)
6   Allan Kanner & Associates, PLLC
    701 Camp Street
7   New Orleans, LA 70130
    (504) 524-5777; Fax (504) 524-5763
8
    Attorneys for Plaintiff,
9   KASEM ADOURE

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12          **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

13   KASEM ADOURE, an individual,          Case No. BC338624

14              Plaintiff,                 [Assigned to the Honorable Ernest M.
                                           Hiroshige, Dept. 54]
15       v.
                                           **PLAINTIFF'S APPLICATION FOR A**
16   THE GILLETTE COMPANY, and            **PRELIMINARY INJUNCTION;**
     DOES 1-1000, inclusive,              **MEMORANDUM OF POINTS AND**
17                                         **AUTHORITIES IN SUPPORT THEREOF**
                Defendants.
18                                         DATE:        September 22, 2005
                                           TIME:        8:30 a.m.
19                                         PLACE:       Dept. 54

20

21                                         [Filed concurrently with Request for Judicial
                                           Notice and Declaration of Larry Londre]
22
                                           Complaint Filed:    August 19, 2005
23                                         Trial Date:         None set

24

25

26

27

28

                                    i
                **PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

1    Plaintiff Kasem Adoure ("Plaintiff") hereby applies, pursuant to *Civil Procedure Code*

2  §§ 526 and 527 and *California Rules of Court* Rule 359, for a preliminary injunction order:

3    1.    That until the Court holds a final hearing on the permanent injunctive relief

4  requested by Plaintiff, Defendant The Gillette Company ("Gillette"), and all persons acting on its

5  behalf, be restrained from directly or indirectly claiming that the M3 Power makes hair stand "up

6  and away from the skin" so that a closer shave results, or words and/or images that convey the

7  same meaning, in any advertisements in California for the M3 Power and be restrained from

8  making exaggerated claims in its advertisements in California that the M3 Power extends hair.

9    2.    That until the Court holds a final hearing on the permanent injunctive relief

10  requested by Plaintiff, Gillette be required to take corrective action for falsely claiming in its

11  advertisements in California that the M3 Power makes hair stand "up and away from the skin" so

12  that a closer shave results and other words and/or images that convey the same meaning and to

13  take corrective action for making exaggerated claims in its advertisements in California that the

14  M3 Power extends hair;  this preliminary corrective action shall take the form of Gillette placing

15  or causing to be placed a sticker on the M3 Power packages available for sale in California with

16  the following notice: "Notice:  Gillette has been ordered to stop advertising that the M3 Power

17  raises hair up and away from the skin.  Courts have preliminarily found that this advertisement

18  claim is false."

19    The facts of this case are recited in the Complaint and memorandum of points and

20  authorities, with supporting declarations and requests for judicial notice, submitted herewith.

21  These facts demonstrate that Plaintiff is not only likely (as required by the legal standard), but

22  almost certain, to succeed on the merits.  These facts also show that the balance of hardships tips

23  decidedly toward Plaintiff.

24    This Application is made on the ground that (i) Plaintiff is entitled to such injunctive

25  relief under California's Unfair Competition Law, False Advertising Law, and Consumer Legal

26  Remedies Act, (ii) not only a probability (as the legal standard requires), but almost a certainty of

27  Plaintiff prevailing on the merits exists (separate courts in Germany, Australia, and Connecticut

28  already have enjoined Gillette's false advertising regarding its M3 Power razor system regarding

1 these same issues), and (iii) Plaintiff and the general public will be irreparably injured if the

2 requested injunctive relief is not issued because, *inter alia*, California consumers will continue to

3 make their purchasing decisions based on the false impressions generated by Gillette's deceptive

4 advertising, and because Gillette's false advertising is continuing notwithstanding a previous

5 injunction.

6       Plaintiff has not previously applied to any judicial officer for similar relief.

7       This Application is based on this notice, the accompanying memorandum of points and

8 authorities, the evidence attached to the accompanying request for judicial notice, the declaration

9 of Taras Kick attached hereto, the declaration of Larry Londre submitted herewith, all pleadings

10 and other papers filed in this case, and such other evidence and argument as may be presented to

11 the Court at the hearing on this application.

12 Dated: August 25, 2005

13                  By:

                          Taras P. Kick, Esq.

14                           G. James Strenio, Esq.

                          Thomas G. Martin, Esq.

15                           Anthony E. Chavez, Esq.

                          **THE KICK LAW FIRM, APC**

16

17                           Allan Kanner, Esq.

                          **ALLAN KANNER & ASSOCIATES, PLLC**

18                           Attorneys for Plaintiff,

                          KASEM ADOURE

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION**

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2
### I.    THE CORE ISSUE.

3
Between May 17, 2004 and June 20, 2005, Gillette purchased approximately $117 million

4
worth of media advertising to bombard consumers with a supposed "revolutionary" fact about its
latest (and most expensive) shaving system, that being that it "raises" the shaver's facial hair.

5
This blitzkrieg of advertising allowed Gillette to go from a zero market share for the product in
question, to approximately 42% of a $1.1 billion market in a remarkable seven months.

6
The only problem with this success story is that the "hair raising" "revolutionary" fact

7
advertised by Gillette which allowed it to capture nearly $500 million in sales has been found on

8
preliminary injunction by three separates courts to be false, and, recently, has even been
admitted by Gillette to be at least partially false.

9
Specifically, on May 31, 2005, the United States District Court for the District of

10
Connecticut, the Honorable Janet C. Hall presiding, in an action styled *Schick, et al. v. Gillette 3-*

11
*05-CV-174 (JCH)* ("*Schick* Action"), issued a preliminary injunction prohibiting Gillette from
making "hair raising" claims or false "hair extending" claims in its advertising for its M3 Power

12
(the same claims at issue in this lawsuit), concluding that Gillette's "claims regarding angle

13
change and the magnitude and frequency of hair extension portrayed in the animated portion of

14
Gillette's advertisements are both ***literally false*** . . .." (*See* Exhibits "A" and "B" attached to
Request For Judicial Notice ("RJN"), Ruling at 23 (emphasis added).)[1]

15
In Germany, Gillette was ordered to cease its false "hair raising" claims on November 16,

16
2004, which order was affirmed on December 17, 2004, by the Hamburg Regional Court, which

17
stated that Gillette's hair raising claims are "deceptive, because shaving with the M3 Power
shaver as instructed does not cause the facial hairs to stand up straight. (A copy of the German

18
court's injunction is attached to RJN Exhibit ("Exh.") F as Exh. B.)[2]

19

20
[1]It was shortly after Judge Hall's similar June 20, 2005, Order Re Clarification on this ruling

21
that numerous consumer class actions were filed against Gillette nationally, which primarily seek
a refund of the purchase price of the razor system. In a putative consumer class action styled

22
*Corrales v. Gillette*, CV05-4116 (DDP), the same attorneys representing the present plaintiff

23
represent Mr. Corrales, and that action was stayed on August 22, 2005, by the Honorable Dean
Pregerson pending a ruling by the Judicial Panel of Multidistrict Litigation on a motion to transfer.

24
What this means for practical purposes is that, if this Court does not act, there likely will not even
be a forum in which to stop or correct the false advertising by Gillette to California consumers for

25
at least three months.

26
[2]After Gillette revised its advertising in Germany, the German court issued a second

27
injunction on December 28, 2004 because the advertisements, claiming that the M3 Power razor
"stimulates the skin," are misleading by falsely suggesting a causality between the vibrations ("gentle

28
micro-power") and the special closeness of the shave resulting from the use of the M3 Power. (A
copy of this second injunction is attached to RJN Exh. F as Exh. C.)

1

1    In Australia, the Federal Court of Australia issued a preliminary injunction on February
2    25, 2005, finding the evidence "establishes at least a prima facie case that [Gillette's M3 Power]
     micro-pulses do not cause hair to stand up, in the sense of moving to a vertical position, with a
3    change in the angle between hair and face."[3]

4    Thus, unlike in most cases, this Court already has before it the benefit of a well developed
5    body of evidence on this issue, as well as the express findings of falsity by three separate courts
     regarding the same advertising in question before this Court.

6    In fact, not only does this Court have the benefit of this already well developed body of
7    evidence and judicial findings from three other courts, but also unlike in most other cases at the
8    preliminary injunction phase of the case, this Court has available to it admissions under penalty
     of perjury by Gillette's own upper management that essentially admit to the falsity of the
9    advertising, and more than satisfy the probability requirement on this application.

10    Specifically, Dr. Kevin Powell, the Director of Gillette's Advanced Technology Center
11    in Reading, England, has testified that he advised Gillette's in-house counsel and other high-level
      Gillette employees that the pre-launch and launch ad campaign for the M3P were
12    "physiologically incorrect." (*See* RJN Exh. O, *Schick* Action Hearing Tr. 432:4-433:17.)

13    Further, Peter Clay, the Gillette executive in charge of the advertising campaign for the
14    M3P, has testified that Gillette made no effort to verify the accuracy of key elements of the M3
      Power advertising campaign. (*See* RJN Exh. O, *Schick* Action Hearing Tr. 100:18-101:23,
15    109:19-109:22, 112:9-112:11, 114:11-117:22.)

16    Mr. Clay further testified that Gillette lacked substantiation for many of the
17    characteristics of the M3P that were touted in Gillette's advertising and that Gillette considered
      important in convincing consumers to buy the product. (*See* RJN Exh. O, *Schick* Action Hearing
18    Tr. 100:18-101:23, 109:19-109:22, 112:9-112:11, 114:11-117:22.)

19    Therefore, there is little argument that can be mustered against an order that the
20    advertising in California which already has been ordered to be stopped, ought also be so ordered
      by this Court.

21    However, it would not be enough at this time merely to order this false advertising
22    stopped, because as California courts have recognized, "it is only a partial remedy [cessation]
23    since it does not correct the consequences of past conduct. An 'order which commands a party
      only to go and sin no more simply allows every violator a free bite at the apple." (Consumers
24    Union of U.S., Inc. v. Alta-Dena Certified Dairy (1992)  4 Cal.App.4th 963, 972-74.)

25    Rather, to put an immediate stop to Gillette's continued profiteering from false and
26    fraudulent at the expense of California consumers, this Court should order a campaign of

27    _____

28    [3]  A copy of the ruling by the Federal Court of Australia, entered on February 25, 2005, in
      Energizer Australia Pty Ltd. v. Gillette Australia Pty, is attached as Exh. A to Schick's Reply Brief
      filed in support of its motion for a preliminary injunction in the Schick Action (*see* RJN Exh. J).

1  immediate corrective advertising in California as this Court is empowered under both California
2  statutory law and California case law. Anything less will allow Gillette to continue to profit from
3  conduct which three separate judges already have found to be false, and which Gillette itself has
   admitted is "physiologically incorrect."

4  ## II.    THE BACKGROUND FACTS.

5        Gillette sells two types of wet razors: (i) "razor systems," which provide consumers with
   a permanent razor handle and separate refillable blades; and (ii) disposable razors, which are
6  discarded in their entirety when worn out. (RJN Exh. L, Declaration of Michelle Stearns dated
7  January 27, 2005 ("Stearns Decl.") at ¶ 3, p. 2.)[4]

8        Wet shave systems razors are among the fastest growing market segments of the
   consumer products industry. (Id. at ¶ 4, p. 2.) The men's razor systems razor and blade market is
9  worth about $1.1 billion per year in the United States. Gillette holds about 79.9% of that dollar
10 share of that market for razor systems. (RJN Exh. H, at p. 7.)

11       Growth in the market results not from volume increases but with the introduction of high
   price, new premium items. In other words, growth in market share depends heavily on
12 persuading consumers to "trade up" from older shaving products to new, premium-priced and
13 (supposedly) technologically advanced shaving products. (Stearns Decl. at ¶ 4, p. 2.)

14       Advertising is the primary means by which Gillette tries to persuade consumers to trade
   up to new premium products, and it invests heavily in developing advertising claims to convince
15 consumers to do so. (Id. at ¶ 5, p. 2.)

16       Gillette and Schick have been engaged in head-to-head competition in this market. In
17 recent years, Schick has mounted a significant challenge to Gillette's market-share dominance,
   and, in 2003, Schick achieved a technological breakthrough with the introduction of its four-
18 blade Quattro razor system, the world's first four-blade razor system. (Id. at ¶ 6, p. 2.)

19       Gillette, on May 24, 2004, launched the M3 Power in the United States. The M3 Power
20 was a new product with a feature (the use of battery power) that had never before been present in
   wet shavers. In preparation for that launch, Gillette began advertising the M3 Power razor
21 system on May 17, 2004. (RJN Exh. B, Ruling at 5.)

22       Gillette's advertising for the M3 Power centered on the claim that "micropulses raise hair
23 up and away from skin," thus allowing a consumer to achieve a closer shave. This "hair raising"
   or hair extension claim was advertised in various media, including the internet, television, print
24 media, point of sale materials, and product packaging. (RJN Exh. B, Ruling at 5.)

25       Hair raising claims are the cornerstone of Gillette's marketing for the M3 razor
26 system in each of the media in which Gillette advertises.

27
────────────────
28  [4] The Stearns declaration was filed in *Schick Manufacturing, Inc., et al. v. The Gillette Company*, Case No. 3:05-cv-00174-JCH, commenced on January 28, 2005 in the United States District Court for the District of Connecticut (the "*Schick* Action"); a copy of which declaration is attached to the accompanying RJN as Exh. L.

3

1      In a press release announcing the launch, Gillette called the product "revolutionary"
2 because, using an AAA-sized battery in the razor handle, it was said to "deliver[] gentle pulses to
   the shaving cartridge that stimulate hair upward and away from the skin, making it dramatically
3 easier to shave more thoroughly than ever before."[5]
4      In television advertising (representing 85% of Gillette's advertising expenditures),
5 Gillette stated: "Turn on the first micro-power shaving system from Gillette and turn on the
   amazing new power-glide blades. Micro-pulses raise the hair, so you shave closer in one power
6 stroke." The advertisement also included a 1.8 second long-animated dramatization of hairs
7 growing. In the animated cartoon, the oscillation produced by the M3 Power is shown as green
8 waves moving over hairs. In response, the hairs shown extend in length in the direction of
   growth and change angle towards a more vertical position. In another series of ads, Gillette
9 stated "New Gillette M3 Power. Turn it on and micro pulses raise the hair for the closest shave
10 ever." (*See* Exh. I to the Schick Complaint (RJN Exh. F).)
11      On the website, Gillette claims that the M3 Power's "[m]icro-pulses raise the hair up and
   away from the skin so you can shave closer and more thoroughly in one easy power stroke." (*See*
12 Exh. E to the Schick Complaint (RJN Exh. F).)
13      On the retail package, Gillette made similar claims, representing to consumers that
14 "[g]entle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can
   get a closer and more thorough shave. So thorough, there is less need to reshave, which means
15 less irritation." (*See* Exh. F to the Schick Complaint (RJN Exh. F).)
16      In print advertisements, Gillette also featured hair raising claims. A series of print ads
17 states: "Turn on the battery-powered motor. Micro-pulses raise the hair from you skin. So the
   PowerGlide blades can shave closer." (*See* Exh. G to the Schick Complaint (RJN Exh. F).) A
18 separate print advertisement states: "NEW! Gillette M3 Power[.] Micro-Power[.] Stimulates hair
19 up and away from skin so you can get a closer and more thorough shave with less irritation. (*See*
20 Exh. H to the Schick Complaint (RJN Exh. F).)
21      The M3 Power is sold throughout the United States. After its first month on the market,
   the M3 Power had a market share of 30.3% of dollar sales of men's system razors. (*Id.* at ¶ 14, p.
22 4.) By the end of 2004, just over six months after its introduction, M3 Power had a market share
23 of 42.0% of dollar sales of men's system razors. (*Id.* at ¶ 15, p. 4.)

**III.    OVERVIEW OF CALIFORNIA LAW AS IT RELATES TO THESE FACTS .**
24      Pursuant to *Code of Civil Procedure* §§ 526 and 527, *California Rules of Court*, Rules
25 359 and 379, Unfair Competition Law (Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL")), False
26 Advertising Law (Bus. & Prof. Code §§ 17500 *et seq.* (the "FAL")), and California's Consumer
   Legal Remedies Act (Civ. Code §§ 1750 *et seq.* (the "CLRA")), Plaintiff is entitled to injunctive
27

28 _____

   [5] *See* Exh. D to RJN Exhs. F and G, which are the complaint (the "Schick Complaint") in
   the *Schick* Action, a copy of Schick's Amended Complaint, respectively.

4

1   relief, including (i) a preliminary prohibitory injunction precluding Gillette from making "hair

2   raising" claims and exaggerated "hair extending" claims in its advertising material and (ii) a

3   preliminary mandatory injunction requiring Gillette to make corrective advertising. Bus. & Prof.
    Code § 17203;  Bus. & Prof. Code § 17535;  Civil Code 1780(a)(2).

4        Under California law, Plaintiff is entitled to a mandatory injunction requiring Gillette to

5   make corrective advertising to address the continuing false impression of California consumers
    that the M3Power razor causes hairs to be raised.  In Consumers Union of U.S., Inc. v. Alta-Dena

6   Certified Dairy,  4 Cal.App.4th 963, 972-74 (1992), the California Court of Appeal held that a

7   court's authority under the UCL includes the power to order affirmative disclosure and,
    specifically, corrective advertising.

8        The Court of Appeal there affirmed an injunction mandating that the defendant make

9   corrective advertising.  The injunction in that case required the defendant, a dairy, to place a

10  warning on all of its advertisements and products for the next ten years, stating that there is no

11  proof that pasteurization reduces the nutritional value of milk or that the risks of consuming milk
    outweigh any of its alleged health benefits.

12       An injunction simply prohibiting the false advertising is insufficient because it does not

13  correct the consequences of the past false advertising.  As the California Court of Appeal
    explained in Consumers Union:

14
15       "an injunction against future violations might have some deterrent effect, [but] it is only a
         partial remedy since it does not correct the consequences of past conduct. An `order
         which commands a party only to go and sin no more simply allows every violator a free
16       bite at the apple.'" (4 Cal.App.4th at 973 (quoting the leading case on corrective
         advertising, Warner-Lambert Co. v. FTC, 562 F.2d 749, 761-62 (D. C. Cir. 1977).)
17

18       In this case, without corrective advertising, California consumers will continue to make
    their purchasing decisions and purchase the M3 Power razor in reliance on Gillette's false "hair

19  raising" claims and deceptive "hair extending" claims made in its past false advertising, as

20  marketing expert Larry Londre declares:

21       "The more time that elapses before corrective advertising is made, the less likely
         the corrective advertising will cure consumers of the false impression and the
         more extensive and expensive the corrective advertising will need to be to cure
22       consumers of the false impression. The longer time passes, the more embedded
         the false impressions become. And, of course, the longer time elapses before
23       corrective advertising is made, the longer consumers will continue to make their
         purchasing decisions and purchase the M3 Power based on the impression created
24       by the hair raising claims in Gillette' past advertising." (Declaration of Larry
         Steven Londre, ¶ 25.)[6]
25

26       [6] In FTC cases – which are highly persuasive in interpreting the UCL (see, e.g., People ex

27  rel. Mosk v. National Research Co. of California, 201 Cal.App.2d 765, 772-73 (Cal. App. 1962) –
    the courts have frequently approved mandatory or corrective disclosures (see, e.g., Grolier, Inc. v.

28  FTC, 699 F.2d 983, 987 (9th Cir. 1983)). And, in Harcourt Brace Jovanovich Legal & Professional
    Publications v. Multistate Legal Studies, 26 F.3d 948, 949 (9th Cir. 1994), the court noted that the
    district court had entered a temporary restraining order and then a preliminary injunction precluding

1    Plaintiff is also entitled to a preliminary injunction precluding Gillette from making "hair
2 raising" claims and deceptive "hair extending" claims in its advertising for its M3 Power razor
3 system. Under Section 17203 of the UCL, Plaintiff is entitled to injunctive relief based on
  Gillette's past false and deceptive advertising. Although the United States District Court for the
4 District of Connecticut has enjoined Gillette from making these claims in its advertising, a
5 parallel preliminary injunction is appropriate to ensure that Gillette continues to cease from
  making these false claims in the event that, for whatever reason, that preliminary injunction is
6 dissolved or modified. Moreover, Gillette is continuing its false advertising notwithstanding that
7 preliminary injunction, and a prohibitory preliminary injunction is inadequate to correct the
8 persisting false impression created by the past false advertising.

**IV.    STANDARDS GOVERNING A PRELIMINARY INJUNCTION**

9    As this Court of course well knows, in determining whether to issue a preliminary
10 injunction, a court must weigh two "interrelated" factors: (1) the likelihood that the plaintiff will
11 succeed on the merits at trial; and (2) the relative interim harm that the plaintiff will likely suffer
   if an injunction is not issued compared to the likely interim harm to defendant if an injunction is
12 issued. Butt v. State, 4 Cal. 4th 668, 677-78 (1992). Equally, "[T]he greater the plaintiff's
13 showing on one, the less must be shown on the other to support an injunction." Id. at 678.

14    These two alternatives represent extremes of a single continuum, not two separate tests.
   Thus, the greater the probability of success, the less the relative hardship to the plaintiff that must
15 be shown, and *vice-versa*. *See* Common Cause of California v. Board of Supervisors, 49 Cal. 3d
16 432, 447 (1989) ("If the party seeking the injunction can make a sufficiently strong showing of
17 likelihood of success on the merits, the trial court has discretion to issue the injunction
   notwithstanding that party's inability to show that the balance of harm tips in his favor").

18    In this case, as discussed, Gillette has already conceded that its advertising was deceptive,
19 meaning that Plaintiff has a 100% probability of prevailing on the merits. Moreover, while a
20 likelihood of irreparable injury exists, as discussed below, in this case, even a showing of a
   *possibility* of irreparable harm is not necessary because (i) injunctive relief under the CLRA is for
21 the benefit of the general public rather than the party bringing the action (Broughton v. Cigna
22 Healthplans, 21 Cal.4th 1066, 1082 (1999), and (ii) the UCL authorizes injunctive relief solely on
   the basis of past violations of the UCL, as discussed below (Brockey v. Moore, 107 Cal.App.4th
23 86, 103 (2003)).

24 **V.    PLAINTIFF HAS A PROBABILITY OF PREVAILING ON THE MERITS.**

25         **A.    To establish a violation of the UCL or FAL, Plaintiff's burden is much less
                  than Schick's burden;  Plaintiff need prove only that Gillette's advertising
26                was likely to deceive.**

27

28
─────────────
the defendant from using the advertisement and also mandating that the defendant publish a
corrective statement conveying truthful information.

1   "California's consumer protection laws are among the strongest in the country." Wershba
2   v. Apple Computer, 91 Cal.App.4th 224, 242 ( 2000). Two of these consumer protection laws are
3   the UCL and FAL.[7] To establish a violation of either, Plaintiff need prove much less than Schick
    must prove in its pending action against Gillette for violation of the federal Lanham Act (see, e.g.,
4   Brockey, 107 Cal.App.4th at 99), although the claims are substantially congruent.

5       To establish a violation of the UCL or FAL, Plaintiff must prove only that members of the
    public are likely to be deceived (Children's Television, 25 Cal.3d at 211; Blakemore v. Superior
6   Court, 129 Cal.App.4th 36, 49 ( 2005); Pastoria v. Nationwide Ins., 112 Cal.App.4th 1490, 1498-
7   99 (2003)); in other words, Plaintiff need prove only that Gillette's advertising is misleading or
    "has a capacity, likelihood or tendency to deceive or confuse the public." Leoni v. State Bar, 39
8   Cal.3d 609, 626 (1985); Prata v. Superior Court, 91 Cal.App.4th 1128, 1137, 1144 ( 2001); see
9   Chern v. Bank of America, 15 Cal.3d 866, 876 (1976) (Section 17500 "'affords protection against
10  the probability or likelihood as well as the actuality of deception or confusion'"); People v. Dollar
11  Rent-A-Car Systems, Inc., 211 Cal.App.3d 119, 129 (1989) (same).[8] To prove that members of

12  _____

13      [7] Section 17200 of the UCL prohibits "any unlawful, unfair or fraudulent business act or
    practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter
14  1 (commencing with Section 17500) of Part 3 of the Business and Professions Code."
    McCann v. Lucky Money, Inc., 129 Cal.App.4th 1382, 1386-87 ( 2005) (Section 17200 "is written
15  in the disjunctive, it establishes three varieties of unfair competition - acts or practices which are
    unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as 'unfair' or 'deceptive'
16  even if not 'unlawful' and vice versa'"") (citations omitted). Section 17500 of the FAL, in turn,
17  provides, in part, that: "It is unlawful for any person, firm, corporation or association, or any
    employee thereof with intent directly or indirectly . . . to make or disseminate or cause to be made
18  or disseminated . . . any statement . . . . which is untrue or misleading, and which is known, or which
    by the exercise of reasonable care should be known, to be untrue or misleading . . . ." McCann, 129
19  Cal.App.4th at 1388 ("In short, . . . section 17500 'prohibits advertising property or services with
20  untrue or misleading statements . . .'") (quoting Quelimane Co. v. Stewart Title Guaranty Co., 19
    Cal.4th 26, 52 (Cal. 1998)). Any advertising that is unfair, deceptive, untrue, or misleading
21  constitutes unfair competition within the meaning of section 17200. Committee on Children's
    Television, Inc. v. General Foods Corp., 25 Cal.3d 197, 210 (1983); People v. McKale , 25 Cal.3d
22  626, 631-632 (1979).

23      [8] In determining whether advertising is "likely to deceive," courts look to its effect on a
24  "reasonable consumer." In applying this standard, courts look to "'[w]hat a person of ordinary
    intelligence would imply'" from the advertisements. Lavie, 105 Cal.App.4th at 505. A "reasonable
25  consumer" "may be unwary or trusting" (id. at 506) and is not required "to investigate the merits of
    advertising claims (id. at 504). This is consistent with the policies behind consumer protection laws,
26  the "[p]rotection of unwary consumers from being duped by unscrupulous sellers . . . ." Vasquez v.
27  Superior Court, 4 Cal.3d 800, 808 (1971); Rosenbluth International, Inc. v. Superior Court, 101
    Cal.App.4th 1073, 1078 ( 2002); Wilner v. Sunset Life Ins. Co., 78 Cal.App.4th 952, 959 (2000).
28
        To establish that the advertising is likely to deceive, a plaintiff is not required to present
    extrinsic evidence such as a consumer survey to establish that the advertising is likely to deceive.

1    the public are likely to be deceived, Plaintiff need not prove that Gillette's advertising is actually /

2    literally false. Massachusetts Mutual Life Ins. Co. v. Superior Court, 97 Cal.App.4th at 1289;

     Prata, 91 Cal.App.4th at 1137, 1144.[9]

3    Plaintiff also does not need to show reasonable reliance on the advertising (Children's

4    Television, 35 Cal.3d at 211); nor does Plaintiff need to show individualized proof of deception

5    or reliance, as the California courts have repeatedly held (see, e.g., Bank of the West v. Superior

     Court, 2 Cal.4th 1254, 1266-67 (1992); Children's Television, 35 Cal.3d at 211; Fletcher v.

6    Security National Bank, 23 Cal.3d 442, 452-53 (1979); Massachusetts Mutual, 97 Cal.App.4th at

7    1288; Prata, 91 Cal.App.4th at 1137, 1144-46).

8    Finally, Plaintiff does not need to prove that Gillette intentionally made deceptive

     advertisement because the UCL is a strict liability statute. Prata, 91 Cal.App.4th at 1137, 1144.

9    **B.    To establish a violation of the CLRA, Plaintiff need prove only that Gillette
             engaged in an enumerated deceptive practice.**

10

11   The CLRA makes illegal various specified "unfair methods of competition and unfair or

     deceptive acts or practices undertaken by any person in a transaction intended to result or which

12   results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a). The

13   CLRA, inter alia, prohibits:

14       "(5) Representing that goods or services have sponsorship, approval,
         characteristics, ingredients, uses, benefits, or quantities which they do not have or that a

15       person has a sponsorship, approval, status, affiliation, or connection which he or she does
         not have. . . . (7) Representing that goods or services are of a particular standard, quality,

16       or grade, or that goods are of a particular style or model, if they are of another. . . . .
         (9)Advertising goods or services with intent not to sell them as advertised." (California

17       Civil Code § 1770(a).)

18
     ─────────────────────────

19   Consumer Advocates v. EchoStar Satellite Corp., 113 Cal.App.4th 1351, 1361-62 (2003) ("we reject
     defendants' view that a plaintiff must produce a consumer survey or similar extrinsic evidence to

20   prevail on a claim that the public is likely to be misled by a representation. . . . Instead, 'The falsity
     of ... advertising claims may be established by testing, scientific literature, or anecdotal evidence.'

21   [Quoting National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc. (2003) 107
     Cal.App.4th 1336 (2003)] Federal cases holding otherwise do not accurately reflect California law.

22   [Citing Brockey, 107 Cal.App.4th at 99.]").

23   [9] "'Advertisements as a whole may be completely misleading although every sentence

24   separately considered is literally true. This may be because things are omitted that should be said,
     or because advertisements are composed or purposefully printed in such way as to mislead.'" Lavie

25   v. Procter & Gamble Co., 105 Cal.App.4th 496, 509 (2003). "By their breadth, [§§ 17200 and
     17500] encompass not only those advertisements which have deceived or mislead because they are

26   untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or
     deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or

27   deceive the consumer, such as by failure to disclose other relevant information, is actionable under

28   these sections." Day v. AT&T Corp., 63 Cal.App.4th 325, 332-33 (1998); accord Consumer
     Advocates, 113 Cal.App.4th at 1361-62.

1   To establish a violation of the CLRA, Plaintiff must prove only that members of the public
2   are likely to be deceived. <u>Consumer Advocates</u>, 113 Cal.App.4th at 1360 (reasonable consumer
3   standard applies to CLRA). To establish a violation of the CLRA, Plaintiff need not prove that he
    relied on a specific representation, causation can be inferred by the materiality of the
4   misrepresentation. <u>Vasquez</u>, 4 Cal.3d at 814; <u>Occidental Land, Inc. v. Superior Court</u>, 18 Cal.3d
5   355 (1976).

6   **C.    Gillette's advertising regarding the M3Power razor is likely to deceive; in
           fact, Gillette's advertising is false.**

7           **1.    The District Court in the *Schick* action, in ordering a preliminary
                    injunction against Gillette, concluded that Schick has a probability of
8                   prevailing on the merits of its claim because Gillette's advertising
                    regarding the M3Power razor is "literally false."**
9

10  On May 31, 2005, the United States District Court for the District of Connecticut, the
    Honorable Janet C. Hall, presiding in the *Schick* Action, issued a preliminary injunction,
11  prohibiting Gillette from making "hair raising" claims or false "hair extending" claims in its
12  advertising for its M3 Power (RJN Exh. A, the "*Schick* Preliminary Injunction").[10]

13          Pursuant to the *Schick* Preliminary Injunction, Gillette is enjoined, pending final judgment,
    from "stating or communicating, directly or indirectly, by words or visual images, in any
14  advertising, packaging, promotional materials, or promotional activities that: (1) the M3 Power
15  razor or its micro-pulses or oscillations change the angle of hair in relation to the skin; or (2) the
    M3 Power razor or its micro-pulses or oscillations extend or lengthen hair by a magnitude or with
16  a frequency that is not literally or physiologically accurate." [*Schick* Preliminary Injunction, p. 1.]
17  This injunction "applies to all forms of Gillette advertising, such as in television and radio,
18  mailings, the internet, and packaging." [Clarification Ruling, p. 2.][11, 12]

19  _____

20  [10]  As stated, a copy of the Preliminary Injunction Order, dated May 31, 2005, is attached to
    the RJN as Exh. A ("Schick Preliminary Injunction"). Also, a copy of the Ruling Re: Motion For
21  Preliminary Injunction [DKT. NO. 7], Motion For Leave To Amend [DKT. NO. 103], And Various
    Motions In Limine [DKT. NOS. 104, 105, and 111] is attached to the RJN as Exh. B ("Ruling").
22  A copy of the Ruling Re: Motion For Clarification Of Injunction And Adjustment Of Bond Amount
    [DKT. NO. 122], dated June 20, 2005 is attached to the RJN as Exhibit C ("Clarification Ruling").
23  A copy of Schick's Motion For Preliminary Injunction and the Memorandum in Support with
24  exhibits thereto are attached to the RJN, respectively, as Exhibits H and I. A copy of Gillette's
    Opposition to Schick's motion is not attached to the RJN because it was filed under seal.
25

26  [11]  The factual and legal basis for the Schick Preliminary Injunction are detailed in Judge
    Hall's ruling entered on May 31, 2005, which followed four days of hearing on April 12, 13, 22, and
27  May 2, 2005, and Judge Hall's ruling regarding the motion for clarification, entered on June 20,
    2005.
28
    [12]  Further pursuant to the *Schick* Preliminary Injunction, Gillette was ordered to take certain
    corrective action. Specifically, Gillette was ordered to "(1) remove or cover by sticker or all
                                              9

2. **The evidence considered by Judge Hall shows that Gillette's advertising regarding the M3Power razor is likely to deceive; in fact, Gillette's advertising is literally false.**

Evidence considered by Judge Hall shows Gillette's advertising regarding the M3Power razor is likely to deceive; and, in fact, that evidence shows Gillette's advertising is literally false.

Indeed, Gillette has **admitted** that its hair raising claims are literally false. Gillette conceded during the preliminary injunction hearing in Connecticut that the M3 Power's oscillations do not cause hair to change angle on the face. [Ruling at 7.]

There also exist compelling expert evidence that its advertisements depicting such an angle change are both unsubstantiated and inaccurate. As Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine, concludes:

> "In my opinion, as a dermatologic specialist, there is no physiologic or other scientific basis for the claim that the [M3 Power] can cause facial hair to stand up proud in the manner described in Gillette advertising . . .. It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud. My conclusion therefore, as a scientist and based on my personal observations, is that the claims in [Gillette's] advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair."[13, 14]

---

packaging for the M3 Power razor any words or visual images that state or otherwise communicate that the M3 Power razor or its micro-pulses or oscillations: (a) change the angle of hair in relation to the skin; or (b) extend or lengthen hair by a magnitude or with a frequency that is not literally or physiologically accurate; and (2) remove all displays, including in-store displays, that state or otherwise communicate that the M3 Power razor or its micro-pulse of oscillations: (a) change the angle of hair in relation to skin; or (b) extend or lengthen hair by a magnitude or with a frequency that is not literally or physiologically accurate." [*Schick* Preliminary Injunction, pp. 1-2.]

[13] Declaration of David J. Leffell, M.D., dated January 12, 2005, at ¶¶ 23-24; a copy of which is attached as Exh. K to the Schick Complaint (RJN Ex. F).

[14] Gillette has further **admitted** that its hair extension claims in the animated portion of its television advertisement is literally false because it is not physiologically exact insofar as the hairs and skin do not appear as they would at such a level of magnification and the hair extension is "somewhat exaggerated." [Ruling at 7-8.] Judge Hall found that the hair "extension" in the commercial is "greatly exaggerated" [Ruling at 8] and that Gillette's own studies show that the animation is "false" because the animation shows a significantly greater extension than the 8-10% average in Gillette's test, which test was performed in 2003 with only a proto-type and on only four test subjects, calling into question the test's validity [Ruling at 11-12, 20-21]. "Gillette acknowledges that the magnitude of beard hair extension in the animation is false." [Ruling at 22.] Gillette "has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect." [Ruling at 25 n. 10.]

Moreover, Dr. Leffell testified that, based on his clinical and dermatological expertise, he is unaware of any scientific basis for the claim that the oscillations of the M3 Power would result in

10

1    Based on Gillette's own admissions and the evidence presented, including the admissions

2  by Gillette's own upper management set forth for this Court on page 2 of this brief (RJN Exh. O),

3  Judge Hall concluded that Gillette's "claims regarding angle change and the magnitude and

   frequency of hair extension portrayed in the animated portion of Gillette's advertisements are both

4  *literally false* . . .." [Ruling at 23 (emphasis added).][15]

## VI.    THE COURT IS AUTHORIZED TO ISSUE INJUNCTIVE RELIEF.

5          **A.    The Court is authorized to issue preliminary injunctive relief precluding**

6              **Gillette from making "hair raising" claims in its advertising.**

7    Plaintiff is entitled to a injunctive relief precluding Gillette from making "hair raising"

8  claims in its advertising for its M3 Power razor. People v. Toomey, 157 Cal.App.3d 1, 20 (Cal.

   App. 1984) (preliminary injunctions are proper in UCL and FAL actions to restrain false

9  advertising); Hernandez v. Stabach, 145 Cal.App.3d 309, 313 (1983) (court's authority to issue

10  preliminary injunction arises from both its inherent equity power and Sections 17200 and 17203

11  of the UCL); Broughton, 21 Cal. 4th at 1082 (injunctive relief authorized by the CLRA is for the

   benefit of the general public rather than the party bringing the action).

12          **1.    Under the UCL, an injunction is justified based solely on Gillette's past**

13              **false advertising.**

14    The plain language of Section 17203 of the UCL explicitly provides that injunctive relief

   is proper based solely on the defendant's past acts.  Specifically, Section 17203 provides, in

15  relevant part, that "[a]ny person who engages, *has engaged*, or proposes to engage in unfair

16  competition may be enjoined in any court of competent jurisdiction. Cal. Bus. & Prof. Code

17  §17203 (emphasis added).

    The California Supreme Court, in Stop Youth Addiction, Inc. v. Lucky Stores, Inc., 17

18  Cal.4th 553, 570 (1998), explains that, in 1992, the California Legislature amended the UCL to

19  allow for injunctive relief based on past conduct alone:

20  _____

21  hair extension.  In fact, Dr. Leffell stated that Gillette' s hair extension theory is inconsistent with

    his 20 years of experience in dermatology;  there is no scientific foundation for any biological

22  mechanism that would explain the effect described by Gillette in its advertising. Second Declaration

23  of David J. Leffell, M.D., dated March 6, 2005 ("Leffell 2nd Decl.") at ¶¶ 3, 4, and 6, pp. 2-3, a copy

    of which is attached to Schick's Reply Brief as Exh. D.

24

25  [15] In denying Gillette's motion to clarify the Schick Preliminary Injunction so as to limit its

    applicability to claims including the word "raise," Judge Hall clarified that Gillette' use of the term

26  "up and away" in conjunction with the term "stimulates" in its advertising "is literally false as it

    connotes an angle change. `Stimulates' with `up' alone or `away' alone would not, but together state

27  a message that is more than mere extension." [Clarification Ruling, p. 2.] Judge Hall noted that

    "[t]he Court specifically addressed `raises up and away' as literally false in its May 31, 2005 Ruling,

28  at p. 20, n. 5.  The word `stimulates' does not alter the meaning when used in conjunction with `up

    and away.'  Assuming the two words are not redundant, together they must mean more than

    extension of the hair, but also a change in relation to the face, as an angle change." [*Id.* at p. 2 n. 1.]

11

1     "in 1992, the Legislature amended . . . section 17203 to expand the scope of injunctive
relief to encompass *past activity* and out-of-state activity. (See Stats. 1992, ch. 430, § 3, p.

2     1707 [replacing 'person performing or proposing to perform an act of unfair competition
within this state' with 'person who engages, *has engaged*, or proposes to engage in unfair

3     competition'].)" (Emphasis added.)

4     Succinctly stated, "a trial court may issue an injunction where a person has committed a

5 *past* unlawful practice." Brockey, 107 Cal.App.4th at 103 (original emphasis; *citing* Stop
Youth).

6     Therefore, because Gillette has engaged in false advertising, injunctive relief is justified

7 pursuant to Section 17203 regardless of whether Gillette's false advertising will probably recur.

8     **2.    Under the CLRA, an injunction is justified to protect the general
public from Gillette's false advertising.**

9     Section 1780 of the CLRA provides that any consumer may obtain injunctive relief to

10 protect the general public. The "evident purpose of the [CLR"]'s injunctive relief provision . . . is .

11 . . to remedy a public wrong" and to protect "the general public" from "being victimized by the
same deceptive practices as the plaintiff suffered." Broughton, 21 Cal.4th at1080. A plaintiff in a

12 CLRA action is playing the role of a *bona fide* private attorney general. Id.

13     Therefore, because Gillette has engaged in false advertising, injunctive relief also is

14 justified pursuant to Section 1780 of the CLRA regardless of whether Plaintiff will personally
benefit from the cessation of Gillette's false advertising.

15     **3.    An injunction is also justified because the evidence shows that
Gillette's false advertising will probably recur.**

16

17     An injunction is further justified because Gillette's false advertising concerning its
M3Power razor, a product that Gillette continues to sell, will probably recur.

18     First, Gillette refused to cease its false advertising in the United States even though courts

19 in Germany and Australia ordered Gillette to cease its false advertising in those countries.

20     Specifically, Gillette refused to cease its false advertising in the United States even though
Gillette was ordered on November 16, 2004 to cease its false "hair raising" claims in its

21 advertising in Germany, which order was affirmed on December 17, 2004 by the Hamburg

22 Regional Court, which stated that Gillette's hair raising claims are "deceptive, because shaving

23 with the M3 Power Shaver as instructed does not cause the facial hairs to stand up straight." [16]

24     Gillette continued its false advertising in the United States even after the Federal Court of
Australia issued a preliminary injunction on February 25, 2005, finding the evidence "establishes

25

---

26     [16]  A copy of the German court's injunction is attached to the Schick Complaint (RJN Exh.

27 F) as Exh. B. After Gillette revised its advertising in Germany, the German court issued a second
injunction on December 28, 2004 because the advertisements, claiming that the M3 Power razor

28 "stimulates the skin," are misleading by falsely suggesting a causality between the vibrations ("gentle
micro-power") and the special closeness of the shave resulting from the use of the M3 Power. A
copy of this second injunction is attached to the Schick Complaint (RJN Exh. F) as Exh. C.

**PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

1   at least a prima facie case that [Gillette's M3 Power] micro-pulses do not cause hair to stand up,

2   in the sense of moving to a vertical position, with a change in the angle between hair and face."[17]

3       Gillette failed to cease its false advertising in the United States even though, as the
Australian court found, "[i]f the representations are false, then consumers will be mislead into

4   buying a much more expensive product than the March 3 Turbo on a false premise" and "[t]here is

5   evidence . . ,. which I accept, that innovations in razor technology are a strong driver for
commercial sales, and may enable a premium price to be charged for the product." Id. at 13-14.

6       Gillette failed to cease its false advertising in the United States even though Gillette's

7   contention that its false advertising does not harm consumers had been smartly rejected:

8       "I do not accept Gillette's contention that harm to consumers is not demonstrated if the
matters of which [Shick] complains are untrue. The argument that consumers will suffer

9   no harm even if those claims are wrong because (for whatever reason) the razor in fact
shaves closer assumes that to be the case. There is no evidence that the M3 Power razor in

10  fact shaves closer than other razors, hence the argument cannot be sustained. In any event,
it overlooks the evidence that claimed innovations in shaving technology are a strong

11  driver for commercial sales, and at a premium price."[18] Id. at 15.

12      Second, assuming arguendo that Gillette has now ceased its false advertising in the United
States, Gillette did not voluntarily discontinue its false advertising. Instead, Gillette was

13  ordered to cease its false advertising by the United States District Court for the District of

14  Connecticut. [Schick Preliminary Injunction.][19]

15      Third, Gillette has actually not ceased its false advertising. Rather, Gillette has violated
the Schick Preliminary Injunction, as detailed in Schick's Motion For Civil Contempt And For

16

17

18

---

19     [17] A copy of the ruling by the Federal Court of Australia, entered on February 25, 2005, in

20  Energizer Australia Pty Ltd. v. Gillette Australia Pty, is attached as Exh. A to Schick's Reply Brief
filed in support of its motion for a preliminary injunction in the Schick Action (see RJN Exh. J).

21

22     [18] See also FTC v. Pantron I Corp., 33 F.3d 1088, 1103 (9th Cir. 1994) ("the existence of a
money-back guarantee is insufficient reason as a matter of law to preclude a monetary remedy").

23     [19] Gillette may not therefore now defend on the ground that it has voluntarily discontinued

24  the false advertising. See, e.g., Aguilar v. Avis Rent A Car Sys., 21 Cal.4th 121, 133 (Cal. 1999)
("'[M]any courts have rejected arguments against injunctive relief where defendants changed their

25  practices only in response to being sued'"); Feminist Women's Health Center v. Blythe, 32
Cal.App.4th 1641, 1659 (1995) ("it was reasonable for the trial court to conclude that the prohibited

26  conduct would resume unless permanently enjoined. . . . Compliance with a court order is not

27  voluntary discontinuance of prohibited conduct"); Phipps v. Saddleback Valley Unified School Dist.
(1988) 204 Cal. App. 3d 1110, 1118-1119 (1988) (discontinuance of wrongful conduct due to a

28  preliminary injunction does not qualify as good faith discontinuance); see also California Service
Station and Automotive Repair Ass'n v. Union Oil Co. of California, 232 Cal.App.3d 44, 57 (1991)
(affirming injunction despite defendant's statement that it will pursue a lawful policy in the future).

1    Order To Show Cause, filed in the *Schick* Action on August 2, 2005 ("Motion For Contempt").[20]

2    Specifically, (i) Gillette has failed to sticker enjoined claims on retail product packaging,[21] (ii)
     Gillette instructed personnel to sticker only products on the selling floor, not those on overhead

3    racks,[22] and (iii) Gillette has failed to remove enjoined "hair-raising" claims from its website.[23]

4            Based upon Schick's evidentiary showing, the United States District Court for the District
     of Connecticut has recently entered an Order To Show Cause "why [Gillette] should not be held

5    in contempt for failure to obey the Preliminary Injunction Order and the Clarification Order as

6    requested in [Schick's] Motion for Civil Contempt and for Order to Show Cause."[24]

7            Gillette's violation of the *Schick* Preliminary Injunction further evidences that the false
     advertising is occurring and will probably recur. [25]

8
             In short, this Court should enter a parallel preliminary injunction prohibiting Gillette from

9    engaging in false and deceptive advertising. Such an injunction is proper based on Gillette's past

10   false advertising and to ensure the cessation of the false and deceptive advertising in the event

11   that, for whatever reason, the *Schick* Preliminary Injunction is dissolved.

             **B.      The Court is authorized to issue preliminary injunctive relief mandating
12                     Gillette to make corrective advertising.**

13           Plaintiff is entitled to a mandatory injunction requiring Gillette to undertake corrective

14   advertising to address the continuing false impression of California consumers that the M3Power

15   razor causes hairs to be raised and extends hairs greater than even Gillette argues its tests show.

16   _____

17       [20]   *See* Schick's Motion For Civil Contempt And For Order To Show Cause, filed in the
     Schick Action on August 2, 2005 ("Motion For Contempt"), attached to the RJN as Exh. D.

18       [21]   Declaration of Thomas Temelkoff, executed July 26, 2005, at ¶¶ 2, 4-6, 8, explaining that

19   Schick's audit in mid-July 2005 of 720 retail stores that carried M3 Power razors on the shelves
     revealed that only 85 of the retail stores had stickered M3 Power packaging in compliance with the

20   Preliminary Injunction Order; a copy of this declaration is attached to Schick's Motion For Contempt
     (RJN Exh. D).

21
         [22]   Declaration of Nancy Beardsley, executed July 25, 2005, at ¶ 3 and Exh. A thereto; a copy

22   of which declaration is attached to Schick's Motion For Contempt (RJN Exh. D).

23       [23]   Declaration of Monica Y. Youn, dated August 2, 2005, a copy of which is attached to

24   Schick's Motion For Contempt (RJN Exh. D).

25       [24]   Order To Show Cause (RJN Exh. E).

26       [25]   *See, e.g.*, <u>Toomey</u>, 157 Cal.App.3d at 20 (holding that injunctive relief under the UCL was

27   properly granted despite the fact that the defendant had ceased its false advertising; finding
     "significant the fact that [defendant] had failed to comply with the terms of the preliminary

28   injunction, continuing his unlawful business practices in contravention of a court order. Thus, the
     trial court had good reason to feel that [defendant's] misleading and unfair trade practices would
     continue") (citations omitted).

                                                14

1    California law unequivocally affords Plaintiff the right to a preliminary injunction to
2   require Gillette to make corrective advertising.  First, and, again, <u>Consumers Union</u> affords
     Plaintiff the right to corrective advertising under the UCL and FAL.  Second, this right is also
3   consistent with the purpose of the CLRA.   <u>Consumer Advocates</u>, 113 Cal.App.4th at 1360.
4   Third, a preliminary injunction is appropriate to stop a defendant from obtaining funds to which it
5   is not entitled. *See* <u>Mitsui Mfrs. Bank v. Texas Commerce Bank</u>, 159 Cal.App.3d 1051 (1984).

     Gillette is continuing to sell the M3 Power.  An order of restitution to Plaintiff will not
6   provide adequate relief to California consumers.  Corrective advertising is necessary to prevent
7   irreparable injury to class members who continue to purchase the M3 Power razor system
8   influenced by Gillette's past false advertising.

     In this case, without the corrective advertising, consumers will continue to harbor the false
9   impression created by Gillette's false advertising that the M3Power razor causes the hair to raise.
10  As a result of this continuing false impression, thousands of California consumers will continue to
11  purchase the M3Power razor and pay a price for the M3 Power razor that they would not have had
     they known the truth.
12   As marketing expert Larry Londre testifies in his attached declaration, without the
13  corrective advertising, Gillette will continue to profit illicitly by the lingering effects of its false
14  advertising.  He declares that the most effective method to correct the effects of the past false
     advertising, on a preliminary as opposed to a final basis, is to sticker the M3 Power packages
15  available for sale in California with the following notice:  "Notice: Gillette has been ordered to
16  stop advertising that the M3 Power raises hair up and away from the skin. Courts have
17  preliminarily found that this advertisement claim is false."

     In sum, without corrective advertising, Gillette will continue to obtain funds from
18  California consumers to which it is not entitled and California consumers will continue to make
19  purchasing decisions based on the false impression created by Gillette's false advertising.  While
20  enjoining the false advertising does help stop the ongoing wrong, without corrective advertising
     California consumers will continue to enrich Gillette as a result of admittedly ~~false~~ claims.
21
                                     Respectfully submitted,
22  Dated: August 25, 2005            By:
23                                        Taras P. Kick, Esq.
                                          G. James Strenio, Esq.
24                                        Thomas G. Martin, Esq.
                                          Anthony E. Chavez, Esq.
25                                        THE KICK LAW FIRM, APC

26                                        Allan Kanner, Esq.
                                          ALLAN KANNER & ASSOCIATES, PLLC
27
                                          Attorneys for Plaintiff,
28                                        KASEM ADOURE

**PROOF OF SERVICE**

I am employed by the Kick Law Firm, APC, in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 660 South Figueroa Street, Suite 1800, Los Angeles, California 90017.

On August 25, 2005, I served the foregoing document described as **PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** on the interested parties identified below by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

> Kent R. Raygor
> Fred R. Puglisi
> SHEPPARD MULLIN RICHTER & HAMPTON LLP
> 1901 Avenue of the Stars, Suite 1600
> Los Angeles, California 90067-6017
> Telephone: (310) 228-3700
> Facsimile: (310) 228-3701
>
> Allan Kanner
> ALLAN KANNER & ASSOCIATES, P.L.L.C.
> 701 Camp Street
> New Orleans, Louisiana 70130
> Telephone: (504) 524-5777
> Facsimile: (504) 524-5763

\_\_\_\_ **BY PERSONAL SERVICE** – By personally handing to Kent Raygor's messenger.

\_\_\_\_ **BY FEDERAL EXPRESS - NEXT DAY DELIVERY** -- I deposited the sealed envelope in a box or other facility regularly maintained by the express service carrier Federal Express in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be serve.

\_\_\_\_ **FACSIMILE** – I transmitted it to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person on any document which he or she has filed in the cause and served on the party making the service, as indicated below. The facsimile was transmitted from my business address, using the fax machine whose number is 213-624-1589, at approximately    pm The document was transmitted by facsimile transmission and that the transmission was reported as complete and without error.

\_X\_ **BY UNITED STATES MAIL** – I deposited the sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed this August 25, 2005.

_____
Ed Dominguez

**PROOF OF SERVICE**

1  Taras P. Kick (State Bar No. 143379)
   G. James Strenio (State Bar No. 177624)
2  Thomas G. Martin (State Bar No. 195627)
   The Kick Law Firm, APC
3  660 South Figueroa Street, Suite 1800
   Los Angeles, California 90017
4  (213) 624-1588; Fax (213) 624-1589

5  Allan Kanner (State Bar No. 109152)
   Allan Kanner & Associates, PLLC
6  701 Camp Street
   New Orleans, LA 70130
7  (504) 524-5777; Fax (504) 524-5763

8  Attorneys for Plaintiff,
   KASEM ADOURE
9

**FILED**
LOS ANGELES SUPERIOR COURT

AUG 2 5 2005

JOHN A. CLARKE, CLERK

BY L. ZULUETA, DEPUTY

10              **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

11                         **COUNTY OF LOS ANGELES**

| | |
|---|---|
| 12  KASEM ADOURE, individually and on behalf of all others similarly situated, | Case No. Case No. BC338624 |
| 13 | [Assigned to the Honorable Ernest M. Hiroshige, Dept. 54] |
| 14       Plaintiff, | |
| 15       v. | **DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION** |
| 16  THE GILLETTE COMPANY, and DOES 1-1000, inclusive, | |
| 17       Defendants. | |
| 18 | DATE:        September 22, 2005 |
| 19 | TIME:        8:30 a.m. |
| 20 | PLACE:       Dept. 54 |

21

22

23

24

25

26

27

28

1 | Taras P. Kick (State Bar No. 143379)
G. James Strenio (State Bar No. 177624)
2 | Thomas G. Martin (State Bar No. 195627)
The Kick Law Firm, APC
3 | 660 South Figueroa Street, Suite 1800
Los Angeles, California 90017
4 | (213) 624-1588; Fax (213) 624-1589

5 | Allan Kanner (State Bar No. 109152)
Allan Kanner & Associates, PLLC
6 | 701 Camp Street
New Orleans, LA 70130
7 | (504) 524-5777; Fax (504) 524-5763

8 | Attorneys for Plaintiff,
KASEM ADOURE
9

10 | **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

11 | **COUNTY OF LOS ANGELES**

12 |
13 | KASEM ADOURE, individually and on behalf of all others similarly situated,

14 |     Plaintiff,

15 |     v.

16 | THE GILLETTE COMPANY, and DOES 1-1000, inclusive,

17 |     Defendants.

Case No. Case No. BC338624

[Assigned to the Honorable Ernest M. Hiroshige, Dept. 54]

**DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

DATE:     September 22, 2005
TIME:     8:30 a.m.
PLACE:     Dept. 54

18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF PRELIMINARY INJUNCTION

# DECLARATION OF LARRY STEVEN LONDRE

I, Larry Steven Londre, declare as follows:

1.   I have personal knowledge of all of the facts stated herein, except for those stated on information and belief, and as to those facts, I believe them to be true.  If called as a witness to testify to the following, I could competently do so.

2.   I make this declaration in support of Plaintiff's *Ex Parte* Application For A Temporary Restraining Order And An Order To Show Cause Why A Preliminary Injunction Should Not Be Issued And Application For A Preliminary Injunction.

## QUALIFICATIONS

3.   For over 30 years, I have been a strategic marketing and advertising professional. I have worked within companies (DIRECTV, The Music Center of LA, Disney, Security Pacific Bank), advertising agencies (Grey Advertising;  Grey Entertainment & Media;  and Abert, Newhoff and Burr), as vice president, account supervisor, senior account executive and account executive), and as a client (vice president of marketing & communications, vice president of marketing, director of marketing, marketing officer), with several advertising agencies, media buying services, marketing research organizations, design companies, direct marketing and other marketing firms reporting to me.

4.   I have a Masters of Business Administration, with emphasis in Marketing and a Bachelor of Science in Business Administration - Marketing, both from the University of Southern California, Los Angeles.  My ongoing professional development includes:  Claremont Advanced Management Program; USC Advanced Management Program;  USC Modern Marketing Program;  and Town Hall Executive Series, "Leaders Talking To Leaders."  And, from 1975 to the present, I have been a member of the Advertising Club of Los Angeles, and from 1983 to the present, an active board of director of the Advertising Club of Los Angeles, whose largest membership groups are clients, media production, creative and advertising agency executives.

5.   From 2001 to the present, I have been the Managing Partner of Londre Marketing Consultants, LLC, based in Los Angeles, California.  As such, I have acted as an independent

2

1 marketing consultant, providing expertise in marketing campaign strategy, new business
2 development, rollouts, advertising, collateral programs, market penetration, and effectively
3 identifying marketing opportunities for local and national business organizations. My clients
4 have included, among others, GE Capital-ResCom (subsidiary of GE), Alliance Environmental
5 Group, Saturday Night magazine, Getty Museum, USC Annenberg School for Communication,
6 Cedars-Sinai, Brown, Williams and Sorensen, and the Herald Tribune.

7      6.    My professional experience in marketing and advertising is extensive and includes
8 the following: (i) from 1997 to 2001, I was the Marketing Director, Special Markets and
9 Strategic Partnerships, for DIRECTV, based in El Segundo, California; (ii) from 1988 to 1994, I
10 was the Vice President of Marketing & Communications for The Music Center of Los Angeles/
11 Performing Arts Center of Los Angeles (including the Dorothy Chandler Pavilion, Mark Taper
12 Forum, Ahmanson Theatre and Education Division); (iii) from 1975 to 1983 and 1987 to 1988, I
13 was the Vice President – Management Supervisor and the Vice President – Account Supervisor,
14 Account Supervisor, Account Executive for Grey Advertising / Grey Entertainment & Media, a
15 nationally recognized advertising agency based in Los Angeles, California; and (iv) from 1983
16 to 1987, I was the Vice-President - Management Supervisor for Abert, Newhoff and Burr,
17 another nationally recognized advertising agency based in Los Angeles, California.

18      7.    In addition, for 30 years, I have taught graduate and undergraduate students
19 marketing, advertising, promotion, communication and media at the University of Southern
20 California (including the Annenberg School for Communication and Marshall School of
21 Business), California State University, Northridge, Pepperdine University, and Loyola
22 Marymount University. From 1975 to the present, I have been an MBA Senior Instructor /
23 Distinguished Professor – Marketing / Advertising / Promotion at these universities. The classes
24 that I have taught in the graduate and undergraduate programs at these universities include:
25 MBFE 658 and COMM 541 Strategic Marketing / Integrated Media and Communication
26 Strategies; COMM 542 Business Strategies for Entertainment and Communication Companies;
27 JOUR 340 Introduction to Advertising; COMM 599 Global Communications; MKT (Marketing)
28 440 Integrated Marketing Communications; MBAM 659 and 660 Business Strategies

DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF TRO / PRELIMINARY INJUNCTION

1 Development, Execution and Implementation (final, capstone classes in the MBA program at

2 Pepperdine University). I am currently teaching the following classes in the graduate and

3 undergraduate programs at the University of Southern California, CSUN and Pepperdine

4 University: Strategic Marketing; Global Marketing and Communication; Business Strategies

5 for Entertainment and Communication Companies; Integrated Marketing, Media &

6 Communications; Business Strategies Development, Execution and Implementation; Intro to

7 Advertising; Marketing and Advertising.

8      8.      My awards and honors include: Outstanding Citizen Award (1993), Los Angeles

9 City Council; Distinguished Professor (1999) California State University, Northridge; Joseph

10 Roos Community Service Award (1993); Public Relations Society of America Extraordinary

11 Citizen Service Award (1993); Wilshire Chamber of Commerce Awards for Best Community

12 Program (1991 & 1992); Publicity Club Award from California League of Cities (1991);

13 Belding Award (1990), Advertising Club of Los Angeles; and PRSA Award (1990), The Music

14 Center / Performing Arts Center of L.A.

15      9.      My professional affiliations include: Board of Directors - Advertising Club of

16 Los Angeles (1983 to Present); Board of Directors, Executive Board, Advertising Industry

17 Emergency Fund, (2003 to Present); Chairman, Advertising Club of Los Angeles, Summer

18 Internship Program (1983 to Present); Media Captain, Partnership for a Drug Free America; and

19 Advisory Board of Directors, California Special Olympics.

20      10.      I have testified as an expert witness for both plaintiffs and defendants in State and

21 Federal courts in California, including the United States District Court for the Central District of

22 California, in cases involving false advertising claims.

23                **BASIS FOR OPINIONS**

24      11.      Upon the authorization of The Kick Law Firm, APC, and Allan Kanner &

25 Associates, I have reviewed from the case of *Schick, et al. v. The Gillette Company*, U.S.D.C.

26 Case No 05-CV-174(JCH), the following documents: the Docket; Complaint for Injunctive

27 Relief and Damages (with Exhibits A-K, including Declaration of David J. Leffell, MD (Ex. K

28 and K.2); Amended Complaint (and motion for leave to file amended complaint); Motion for

1 Preliminary Injunction;  Memorandum in Support of Motion for Preliminary Injunction;  Reply

2 Brief in support of Motion For Preliminary Injunction (With Exhibits A-E, including the Second

3 Declaration of David J. Leffell, M.D.;  Declaration of Michelle Sterns; Plaintiff's Motion Re

4 Admissibility of PX 111 and 112 and Notice to Clarify Offer of PX 131;  Preliminary Injunction

5 Order;  Ruling Re: Motion for Clarification of Injunction, Motion for Leave to Amend and

6 Various Motions in Limine;  Ruling Re: Motion for Clarification of Injunctive and Adjustment of

7 Bond Amount;  Motion for Civil Contempt and Order to Show Cause;  Order to Show Cause.

8                                              **OPINIONS**

9                                              **Opinion 1**

10       12.     Gillette's claim in its advertising that the M3 Power razor causes hair to raise up

11 and away from the skin was material information for consumers in deciding whether or not to

12 purchase the M3 Power razor system.  Growth in market share in the wet razor market depends

13 heavily on influencing consumers and users to "trade up" from older shaving products to new,

14 technologically advanced shaving products.  Advertising and in store marketing are the primary

15 means by which Gillette tries to influence consumers to trade up to new premium products.

16 Gillette invests heavily in developing new products and advertising claims to convince

17 consumers to purchase its products.

18       13.     This is true for the M3 Power.  Gillette, on May 24, 2004, launched the M3 Power

19 in the United States.  The M3 Power was a new product developed with a feature (the use of

20 battery power) that had never before been present in wet shavers.  The M3 Power includes a

21 number of components, including a handle, a cartridge, guard bar, a lubricating strip, three

22 blades, and a battery-powered feature which causes the razor to oscillate.

23       14.     In preparation for that launch, Gillette began advertising the M3 Power razor

24 system on May 17, 2004. Gillette's advertising for the M3 Power centered on the claim that

25 "micropulses raise hair up and away from skin," thus allowing a consumer to achieve a closer

26 shave. This "hair raising" or hair extension claim was advertised and promoted in various media,

27 including the TV, Internet, print media, point of sale materials, and product packaging.

28 ///

15. In my opinion, for Gillette's M3 Power, its "hair raising" claim is the U.S.P. or Unique Selling Proposition of Gillette's marketing and advertising. This product claim for the M3 Power razor system is included in each of the media in which Gillette advertises and promotes.

16. It is the integration of selling messages (in sales calls by the sales representatives, in consumer and trade advertising, in sales materials, on the web, in mailers, and by using trade shows), which provide impact of the company's selling messages. It is these integrated selling messages to the many target segments and ultimately to the consumer or user, which produce and maximize competitive sales results.

## Opinion 2

17. A preliminary injunction prohibiting Gillette from making false "hair raising," while necessary to protect California consumers, is inadequate. Rather, corrective advertising is necessary.

18. This is because, among other reasons, many consumers remember past advertising, for a variety of reasons and stimuli. For major companies, advertising's impact can last years. Consumers will hear about and see stories in trade publications and in consumer publications long after the advertising has stopped.

19. Without corrective advertising, California consumers will continue to make their purchasing decisions and continue to purchase the M3 Power razor system based on the false impression generated by Gillette's past advertising, including the false notion that the M3 Power raises hair "up and away" from the skin. In many cases, consumers do not forget the impressions of products that they form based on messages conveyed in advertising, and the consumers' impressions from the advertisements of the M3Power are no exception to this rule. In my opinion, Gillette continues to profit illicitly by the lingering effects of Gillette's false and misleading advertising.

20. The remedy of corrective advertising is necessary here, and is not novel: In 2002, for example, the FTC made a claim against Interstate Bakeries, the marketers of Wonder Bread, and its advertising agency Campbell Mithun, LLC for making unsubstantiated claims that

1 Wonder Bread would improve children's mental capacities. The FTC asserted the ad agency
2 knew or should have known that the claims were not substantiated and shared liability for the
3 deceptive claims. When Listerine claimed to prevent or reduce the impact of cold and sore
4 throats, the FTC banned the campaign and required the company to run millions of dollars' worth
5 of corrective ads.

6      21.     Without corrective advertising, California consumers will continue to make their
7 purchasing decisions and continue to purchase the M3 Power razor system based on the false
8 impression generated by Gillette's past advertising, including the false notion that the M3 Power
9 raises hair "up and away" from the skin. Consumers simply do not forget the impressions of
10 products that they form based on messages conveyed in advertising, and the consumers'
11 impressions from the advertisements of the M3Power are no exception to this rule.

12                            **Opinion 3**

13      22.     In my opinion, the most effective method to correct the effects of the past false
14 advertising, on a preliminary as opposed to a final basis, is to sticker the M3 Power packages
15 available for sale in California with the following notice: "Notice: Gillette has been ordered to
16 stop advertising that the M3 Power raises hair up and away from the skin. Courts have
17 preliminarily found that this advertisement claim is false."

18      23.     Although corrective advertising on a final basis would be stated in definitive
19 terms and would be more extensively published, including notices in all the media in which
20 Gillette made the false advertising (including television advertising, printed advertisements, its
21 website, and point of sale displays, in addition to its packaging), on a preliminary basis the
22 proposed corrective sticker is the most effective and targeted approach for protecting California
23 consumers from continuing to buy the M3 Power based on the false impression that the M3
24 Power raises hair up and away from the skin.

25      24.     An available basis to estimate the cost of the corrective sticker is the cost that
26 Gillette has incurred in the sticker ordered by the United States District Court in Connecticut,
27 which in a preliminary injunction ordered Gillette to sticker over the "hair raising" claims on the
28 packaging of all of its M3 Power made available for sale in the United States. Assuming that the

DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF TRO / PRELIMINARY INJUNCTION

1   number of sales of the M3 Power in California is consistent with California's percentage of the

2   population in the United States (12.5%), then the cost of the corrective sticker should be only

3   12.5% of the cost of the sticker that the District Court ordered placed on every M3 Power made

4   available for sale in the United States. If we were to accept Gillette's own estimates for the cost

5   of such a national "stickering" for the 3.2 million of the product already on store shelves of $1.2

6   million as being correct and not exaggerated, and if we equally were to accept Gillette's own

7   estimate for the "stickering" of the 3.3 million units of the product  not yet in stores a cost of

8   $365,000 as being correct and not exaggerated, then 12.5% of that gross number estimated by

9   Gillette itself equals only $196,000 for the California state program.  Of course, it appears the

10  Connecticut federal judge, Judge Hall, did not accept Gillette's cost estimate for the "stickering"

11  program as she required a bond of only $400,000 to be posted by the plaintiff; therefore, if Judge

12  Hall's finding of $400,000 for the cost of this national "stickering" program is the more accurate

13  estimate, then 12.5% of that number (the California estimate), equals only $50,000 for the cost of

14  the preliminary corrective advertisement requested by Plaintiff Carlos Corrales.

15          25.      The more time that elapses before corrective advertising is made, the less likely

16  the corrective advertising will cure consumers of the false impression and the more extensive and

17  expensive the corrective advertising will need to be to cure consumers of the false impression.

18  The longer time passes, the more embedded the false impressions become.  And, of course, the

19  longer time elapses before corrective advertising is made, the longer consumers will continue to

20  make their purchasing decisions and purchase the M3 Power based on the impression created by

21  the hair raising claims in Gillette' past advertising.  This impacts not only the decision of

22  consumers to purchase the M3 Power in the first instance, but also impacts the ongoing brand

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

8

1  decisions of consumers to continue to use the M3 Power and to continue to purchase the

2  replacement blades for the M3 Power.

3      I declare under penalty of perjury under the laws of the State of California and the United

4  States that the foregoing is true and correct.

5      Executed this 24th day of August 2005, at Los Angeles, California.

6

7

8      Larry Steven Londre

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

**DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF TRO / PRELIMINARY INJUNCTION**

# PROOF OF SERVICE

I am employed by the Kick Law Firm, APC, in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 660 South Figueroa Street, Suite 1800, Los Angeles, California 90017.

On August 25, 2005, I served the foregoing document described as **DECLARATION OF LARRY STEVEN LONDRE IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION** on the interested parties identified below by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Kent R. Raygor
Fred R. Puglisi
SHEPPARD MULLIN RICHTER & HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Allan Kanner
ALLAN KANNER & ASSOCIATES, P.L.L.C.
701 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 524-5777
Facsimile: (504) 524-5763

_____ **BY PERSONAL SERVICE** – By personally handing to Kent Raygor's messenger.

_____ **BY FEDERAL EXPRESS - NEXT DAY DELIVERY** -- I deposited the sealed envelope in a box or other facility regularly maintained by the express service carrier Federal Express in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be serve.

_____ **FACSIMILE** – I transmitted it to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person on any document which he or she has filed in the cause and served on the party making the service, as indicated below. The facsimile was transmitted from my business address, using the fax machine whose number is 213-624-1589, at approximately    pm The document was transmitted by facsimile transmission and that the transmission was reported as complete and without error.

__X__ **BY UNITED STATES MAIL** – I deposited the sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed this August 25, 2005.

_____
Ed Dominguez

---

**PROOF OF SERVICE**

1 | Taras P. Kick (State Bar No. 143379)
G. James Strenio (State Bar No. 177624)
2 | Thomas G. Martin (State Bar No. 195627)
Anthony E. Chavez (State Bar No. 126623)
3 | The Kick Law Firm, APC
660 South Figueroa Street, Suite 1800
4 | Los Angeles, California 90017
(213) 624-1588; Fax (213) 624-1589
5 |
Allan Kanner (State Bar No. 109152)
6 | Allan Kanner & Associates, PLLC
701 Camp Street
7 | New Orleans, LA 70130
(504) 524-5777; Fax (504) 524-5763
8 |
Attorneys for Plaintiff,
9 | KASEM ADOURE

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

AUG 2 5 2005

John A. Clarke, Executive Officer/Clerk
By _____,Deputy
L. ZULUETA

10 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 | **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

12 | KASEM ADOURE, an individual,

13 | Plaintiff,

14 | v.

15 | THE GILLETTE COMPANY, and
DOES 1-1000, inclusive,

16 |

17 | Defendants.

Case No. BC338624

[Assigned to the Honorable Ernest M. Hiroshige, Dept. 54]

**·PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR A PRELIMINARY INJUNCTION**

DATE: September 22, 2005
TIME: 8:30 a.m.
PLACE: Dept. 54

1  Taras P. Kick (State Bar No. 143379)
   G. James Strenio (State Bar No. 177624)
2  Thomas G. Martin (State Bar No. 195627)
   Anthony E. Chavez (State Bar No. 126623)
3  The Kick Law Firm, APC
   660 South Figueroa Street, Suite 1800
4  Los Angeles, California 90017
   (213) 624-1588; Fax (213) 624-1589
5
   Allan Kanner (State Bar No. 109152)
6  Allan Kanner & Associates, PLLC
   701 Camp Street
7  New Orleans, LA 70130
   (504) 524-5777; Fax (504) 524-5763
8
   Attorneys for Plaintiff,
9  KASEM ADOURE

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

AUG 2 5 2005

John A. Clarke, Executive Officer/Clerk

By _____,Deputy
        L. ZULUETA

10          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11       **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

12  KASEM ADOURE, an individual,              Case No. BC338624

13                 Plaintiff,                 [Assigned to the Honorable Ernest M.
                                              Hiroshige, Dept. 54]
14         v.
                                             **PLAINTIFF'S REQUEST FOR**
15  THE GILLETTE COMPANY, and                **JUDICIAL NOTICE IN SUPPORT OF**
    DOES 1-1000, inclusive,                  **APPLICATION FOR A PRELIMINARY**
16                                           **INJUNCTION**

17                 Defendants.                DATE:      September 22, 2005
                                              TIME:      8:30 a.m.
18                                            PLACE:     Dept. 54

19

20

21

22

23

24

25

26

27

28

1

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

1  Taras P. Kick (State Bar No. 143379)
   G. James Strenio (State Bar No. 177624)
2  Thomas G. Martin (State Bar No. 195627)
   Anthony E. Chavez (State Bar No. 126623)
3  The Kick Law Firm, APC
   660 South Figueroa Street, Suite 1800
4  Los Angeles, California 90017
   (213) 624-1588; Fax (213) 624-1589
5
   Allan Kanner (State Bar No. 109152)
6  Allan Kanner & Associates, PLLC
   701 Camp Street
7  New Orleans, LA 70130
   (504) 524-5777; Fax (504) 524-5763
8
   Attorneys for Plaintiff,
9  KASEM ADOURE

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11        FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

12  KASEM ADOURE, an individual,          Case No. BC338624

13              Plaintiff,               [Assigned to the Honorable Ernest M.
                                         Hiroshige, Dept. 54]
14       v.
                                         **PLAINTIFF'S REQUEST FOR**
15  THE GILLETTE COMPANY, and           **JUDICIAL NOTICE IN SUPPORT OF**
    DOES 1-1000, inclusive,             **APPLICATION FOR A PRELIMINARY**
16                                       **INJUNCTION**

17              Defendants.
                                         DATE:      September 22, 2005
18                                       TIME:      8:30 a.m.
                                         PLACE:     Dept. 54
19

20

21

22

23

24

25

26

27

28

---

1

### REQUEST FOR JUDICIAL NOTICE
### AND POINTS AND AUTHORITIES

Plaintiff Kasem Adoure hereby respectfully requests that this Court take judicial notice, under Evidence Code Sections 450-460, of certain court orders, pleadings, declarations, and other papers filed in the case of *Schick Manufacturing, Inc. v. The Gillette Company*, Case No. 05-CV-00174, in the United States District Court for the District of Connecticut, true and correct copies of which are attached hereto as Exhibits A-0, and the Complaint filed in the instant case of *Adoure v. The Gillette Company*, a true and correct copy of which is attached hereto as Exhibit P. This Request for Judicial Notice is based upon this written request and points and authorities, the attached Declaration of Counsel and Exhibits thereto.

Section 452(d) of the Evidence Code provides, in pertinent part, as follows: "Judicial notice may be taken of the . . . Records of (1) any court of this state of (2) any court of record of the United States." Thus, this Court may take judicial notice of the pleadings, orders, judgments, and opinions rendered in both state and federal courts.

Additionally, Section 453 of the Evidence Code provides: "The trial court shall take judicial notice of any matter specified in Section 452 if a party requests it and: (a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter." The present request constitutes sufficient notice to the parties for the Court to take judicial notice of the court records attached hereto.

Plaintiff therefore respectfully requests that this Court take judicial notice of the matters submitted herewith.

Dated: August 25, 2005            By:    _____

Taras P. Kick, Esq.
G. James Strenio, Esq.
Thomas G. Martin, Esq.
**THE KICK LAW FIRM, APC**

Allan Kanner, Esq.
**ALLAN KANNER & ASSOCIATES, PLLC**

Attorneys for Plaintiff,
KASEM ADOURE

2

1      <u>**DECLARATION OF THOMAS G. MARTIN**</u>

2      <u>**IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE**</u>

3            I, Thomas G. Martin, hereby declare as follows:

4            1.      I am an attorney licensed to practice in the State of California.  I am an associate

5      with The Kick Law Firm, APC, co-counsel of record for Plaintiff Kasem Adoure in this action.  I

6      make this declaration in support of Plaintiff's Request for Judicial Notice.  I also make this

7      declaration of my own personal knowledge and would and could testify completely to the

8      contents thereof if necessary to do so, except where stated upon information and belief, where I

9      have a good faith belief in the truth of the matter.

10           2.      I respectfully request that this Court take judicial notice of the following court

11     orders, pleadings, declarations, and other papers filed and/or entered in the case of *Schick*

12     *Manufacturing, Inc. v. The Gillette Company*, Case No. 05-CV-00174, in the United States

13     District Court, District of Connecticut:

14                  a.      Attached hereto as **Exhibit A** is a true and correct copy of the Preliminary

15     Injunction Order, entered on May 31, 2005;

16                  b.      Attached hereto as **Exhibit B** is a true and correct copy of the Ruling re:

17     Motion For Preliminary Injunction, Motion for Leave to Amend, and Various Motions in Limine,

18     entered May 31, 2005;

19                  c.      Attached hereto as **Exhibit C** is a true and correct copy of Ruling Re:

20     Motion for Clarification of Injunction and Adjustment of Bond Amount, entered June 20, 2005;

21                  d.      Attached hereto as **Exhibit D** is a true and correct copy of Motion for

22     Civil Contempt and Order To Show Cause, filed August 2, 2005;

23                  e.      Attached hereto as **Exhibit E** is a true and correct copy of Order To Show

24     Cause, entered August 8, 2005;

25                  f.      Attached hereto as **Exhibit F** is a true and correct copy of Complaint for

26     Injunctive Relief and Damages (with Exhibits A - K, including Declaration of David J. Leffell,

27     MD (Ex. K (ex. K.2 is missing)), filed January 28, 2005;

28     / / /

3

1      g.    Attached hereto as **Exhibit G** is a true and correct copy of Amended

2  Complaint, filed April 29, 2005;

3      h.    Attached hereto as **Exhibit H** is a true and correct copy of Motion for

4  Preliminary Injunction, filed January 28, 2005;

5      i.    Attached hereto as **Exhibit I** is a true and correct copy of Memorandum in

6  Support of Motion for Preliminary Injunction, filed January 28, 2005;

7      j.    Attached hereto as **Exhibit J** is a true and correct copy of Motion for

8  Reply Brief, filed March 9, 2005;

9      k.    Attached hereto as **Exhibit K** is a true and correct copy of Corrected Third

10  Declaration of Chris Kohler, filed April 15, 2005;

11      l.    Attached hereto as **Exhibit L** is a true and correct copy of Declaration of

12  Michelle Stearns, filed February 18, 2005;

13      m.    Attached hereto as **Exhibit M** is a true and correct copy of Plaintiff's

14  Motion Re Admissibility of PX 111 and 112 and Notice to Clarify Offer of PX 131, filed May 5,

15  2005;

16      n.    Attached hereto as **Exhibit N** is a true and correct copy of Defendant's

17  Memorandum of Law in Support of Motion for Clarification of Injunction and Adjustment of

18  Bond, filed June 9, 2005;  and

19      o.    Attached collectively hereto as **Exhibit O** is a true and correct copy of

20  excerpts from the certified transcript of the hearing held on April 12, 2005 and the hearing held

21  on April 13, 2005 on Schick's motion for a preliminary injunction.

22      3.    I respectfully request that this Court take judicial notice of the Complaint filed in

23  this Court on August 19, 2005 in the action styled *Adoure v. The Gillette Company*, Case No.

24  BC338624 (the "*Adoure* Complaint").

25  / / /

26  / / /

27  / / /

28  / / /

4

1             p.     Attached hereto as **Exhibit P** is a true and correct copy of the *Adoure*

2    Complaint.

3       I declare under penalty of perjury under the laws of the State of California that the

4    foregoing is true and correct.

5         Executed this 25th day of August 2005, at Los Angeles, California.

6

7                        _____

8                        Thomas G. Martin

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,　　　　:
ET AL　　　　　　　　　　　　　　　:
　　　Plaintiffs　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　CIVIL ACTION NO.
v.　　　　　　　　　　　　　　　　　:　　3-05-cv-174 (JCH)
　　　　　　　　　　　　　　　　　　:
THE GILLETTE COMPANY　　　　　　　:　　MAY 31, 2005
　　　Defendant　　　　　　　　　　　:

**PRELIMINARY INJUNCTION ORDER**

　　　For the reasons set forth in this court's opinion dated May 31, 2005, which grants

in part the motion of plaintiffs Schick Manufacturing, Inc., Eveready Battery Company,

Inc., and Energizer Battery, Inc. for preliminary injunction, it is hereby ORDERED, that

pending final judgment in this action, The Gillette Company, its officers, agents,

servants, employees, representatives, subsidiaries, and affiliates are enjoined from

stating or communicating, directly or indirectly, by words or visual images, in any

advertising packaging, promotional materials or promotional activities that:

　　　(1)　　the M3 Power razor or its micro-pulses or oscillations change the angle of

　　　　　　hair in relation to the skin; or

　　　(2)　　the M3 Power razor or its micro-pulses or oscillations extend or lengthen

　　　　　　hair by a magnitude or with a frequency that is not literally or

　　　　　　physiologically accurate; and

　　　IT IS FURTHER ORDERED, that within 30 days of entry of this ORDER, The

Gillette Company, its officers, agents, servants, employees, representatives,

subsidiaries, and affiliates:

1

(1)     remove or cover by sticker on all packaging for the M3 Power razor any

        words or visual images that state or otherwise communicate that the M3

        Power razor or its micro-pulses or oscillations:

        (a)     change the angle of hair in relation to the skin; or

        (b)     extend or lengthen hair by a magnitude or with a frequency

            that is not literally or physiologically accurate; and

(2)     remove all displays, including in-store displays, that state or otherwise

        communicate that the M3 Power razor or its micro-pulse of oscillations:

        (a)     change the angle of hair in relation to the skin; or

        (b)     extend or lengthen hair by a magnitude or with a frequency

            that is not literally or physiologically accurate; and

    IT IS FURTHER ORDERED that plaintiffs shall file with the Clerk a bond in the

amount of $250,000, with good and sufficient surety, and conditioned as required by

Rule 65 of the Federal Rules of Civil Procedure.

**SO ORDERED**

    Dated at Bridgeport, Connecticut this 31st day of May, 2005.


                /s/ Janet C. Hall
                Janet C. Hall
                United States District Judge

**EXHIBIT  B**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,  :
ET AL                        :
    Plaintiffs               :
                             :          CIVIL ACTION NO.
v.                           :          3-05-cv-174 (JCH)
                             :
THE GILLETTE COMPANY         :          MAY 31, 2005
    Defendant                :

**RULING RE: MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 7],**
**MOTION FOR LEAVE TO AMEND [DKT. NO. 103], and**
**VARIOUS MOTIONS IN LIMINE [DKT. NOS. 104, 105, and 111]**

The plaintiff, Schick Manufacturing Company ("Schick"), seeks a preliminary

injunction enjoining the defendant, The Gillette Company ("Gillette"), from making

certain claims about its M3 Power razor system ("M3 Power").  Schick contends that

Gillette has made various false claims in violation of section 43(a) of the Lanham Act,

15 U.S.C. §1125(a) and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.

Gen. Stat. § 42-110a, et seq.

As a preliminary matter, Schick has filed a Motion for Leave to File and

Amended Complaint [Dkt. No. 103].  Leave to amend "shall be freely given when justice

so requires."  Fed.R.Civ.P. 15(a).  The Second Circuit has held that "'considerations of

undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a

district court's discretionary authority to deny leave to amend.'"  Krumme v. WestPoint

Stevens Inc., 143 F.3d 71, 88 (2nd Cir. 1998) (quoting Barrows v. Forest Laboratories,

742 F.2d 54, 58 (2d Cir. 1984)).  Having considered these factors, as well as the scope

of Schick's proposed amendments, the court concludes that leave to amend is

appropriate.

The court must also address three pending motions in limine. With regard to Plaintiff's Exhibits Nos. 111, 112, 131, the objections of Gillette are overruled. PX 131 is received for the limited purpose offered, to establish the date the Dutch action was filed. With regard to Schick's Motion in Limine to Exclude Untimely Expert Testimony [Dkt. No. 104], the Motion is denied, except with regard to the alternative relief sought. DX 124(d) and (e) are for identification only. They were received on that basis. The Motion is denied to the extent it seeks to strike them as demonstrative evidence. The Motion is also denied to the extent it seeks to strike Dr. Salinger's testimony. However, the court grants Schick's alternative request to file a supplemental Affidavit of Dr. Thornton, which the court has now reviewed. Finally, the Motion to exclude DX 133 and DX 134, Declarations of Dr. Grupen and Dr. Clarke, is denied. With regard to Schick's Motion in Limine to Exclude Third Declaration of Dr. Philpott, it is denied.

The standard regarding the grant of a prohibitory preliminary injunction in the Second Circuit is clear.[1] "To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party of N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004). If Schick proves that irreparable injury may result, the court will then consider the merits of Schick's claim.

The Lanham Act creates a cause of action against any person who,

---

[1]Gillette suggests the relief sought is a mandatory injunction; this court does not agree. Schick seeks to prohibit allegedly false advertising, not to mandate action by Gillette. See Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997) (an injunction is mandatory where "its terms would alter, rather than preserve, the status quo by commanding some positive act").

2

in connection with any goods or services, or any container for goods, uses
in commerce any word, term, name, symbol, or device, or any
combination thereof, or any false designation of origin, false or misleading
description of fact, or false or misleading representation of fact, which . . .
(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another
person's goods, services, or commercial activities

by "any person who believe he or she is or is likely to be damaged by such act." 15

U.S.C. § 1125(a).

In order to succeed on its false advertising claim, Schick must prove five

elements of this claim.  Omega Engineering, Inc. v. Eastman Kodak Co., 30 F.Supp.2d

226, 255 (D.Conn. 1998) (citing various treatises and cases).  These are the following:

(1)  The defendant has made a false or misleading statement of fact.  The

statement must be (a) literally false as a factual matter or (b) likely to deceive or

confuse.  S.C. Johnson & Son, Inc. v. Clorox Company, 241 F.3d 232, 238 (2d

Cir. 2001).

(2)  The statement must result in actual deception or capacity for deception

"Where the advertising claim is shown to be literally false, the court may enjoin

the use of the claim without reference to the advertisement's impact on the

buying public."  Id. (internal quotations omitted).

(3)  The deception must be material.  "[I]n addition to proving falsity, the plaintiff

must also show that the defendants misrepresented an inherent quality or

characteristic of the product."  Id. (internal quotations omitted).

(4)  Schick must demonstrate that it has been injured because of potential

decline in sales.  Where parties are head-to-head competitors, the fact that the

defendant's advertising is misleading presumptively injures the plaintiff.  Coca-

Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982)

(abrogated on other grounds by statute as noted in Johnson & Johnson v. GAC

Int'l, Inc., 862 F.2d 975, 979 (2d Cir.1988)).

(5)  The advertised goods must travel in interstate commerce.

FACTS

The court held a scheduling conference on the preliminary injunction motion on

March 2, 2005.  The court allowed the parties to conduct limited discovery prior to

conducting a hearing on Schick's motion for a preliminary injunction.  The hearing on

the motion was conducted over four days: April 12, 13, 22, and May 2, 2005.  During

the hearing, Schick called five witnesses: Adel Mekhail, Schick's Director of Marketing;

Peter M. Clay, Gillette's Vice-President for Premium Systems; Dr. David J. Leffell,

Professor of Dermatology; Christopher Kohler, Schick Research Technician; and John

Thornton, statistical consultant. Gillette also called five witnesses during the hearing:

Dr. Kevin L. Powell, Gillette's Director of the Advanced Technology Centre; Dr. Michael

A. Salinger, Professor of Economics; Peter M. Clay, Gillette's Vice-President for

Premium Systems; Dr. Ian Saker, Gillette Group Leader at the Advanced Technology

Centre and Dr. Michael P. Philpott, Professor of Cutaneous Biology.

The men's systems razor and blade market is worth about $1.1 billion per year in

the United States.  Gillette holds about 90% of the dollar share of that market, while

Schick holds about 10%.  The parties are engaged in head-to-head competition and the

court credits testimony that growth in the razor systems market results not from volume

increases but "with the introduction of high price, new premium items."  Hr'g Tr. 39:20-

21.

4

Schick launched its Quattro razor system in September of 2003 and expended many millions of dollars in marketing the product. Although Schick had projected $100 million in annual sales for the Quattro, its actual sales fell short by approximately $20 million. From May 2004 to December 2004, Quattro's market share fell from 21% of dollar sales to 13.9% of dollar sales.

Gillette launched the M3 Power in the United States on May 24, 2004. In preparation for that launch, it began advertising that product on May 17, 2004. The M3 Power is sold throughout the United States. The M3 Power includes a number of components including a handle, a cartridge, guard bar, a lubricating strip, three blades, and a battery-powered feature which causes the razor to oscillate. The market share of the M3 Power, launched in May 2004, was 42% of total dollar sales in December 2004.

Gillette's original advertising for the M3 Power centered on the claim that "micro-pulses raise hair up and away from skin," thus allowing a consumer to achieve a closer shave. This "hair-raising" or hair extension claim was advertised in various media, including the internet, television, print media, point of sale materials, and product packaging. For example, Gillette's website asserted that, in order to combat the problem of "[f]acial hair grow[ing] in different directions," the M3 Power's "[m]icro-pulses raise hair up and away from skin . . ." PX 2, Hr'g Tr. 33:25-34:22. Of Gillette's expenditures on advertising, 85% is spent on television advertising. At the time of the launch, the television advertising stated, "turn on the first micro-power shaving system from Gillette and turn on the amazing new power-glide blades. Micro-pulses raise the hair, so you shave closer in one power stroke." PX 14.2(C). The advertisement also included a 1.8 second-long animated dramatization of hairs growing. In the animated

5

cartoon, the oscillation produced by the M3 Power is shown as green waves moving over hairs. In response, the hairs shown extended in length in the direction of growth and changed angle towards a more vertical position.

The court notes that eight months passed between the launch of the M3 Power and the date Schick initiated the instant suit. Schick maintains that there are two factors that excuse this delay. First, Schick invested time in developing a stroke machine and test protocol that would allow it to test the M3 Power with some degree of confidence and effectiveness.[2] Specifically, the development of a machine that would deliver a stroke of consistent pressure to a test subject's face took time. Second, after completing its first tests of Gillette's claims that the M3 Power raises hair in October, Schick chose to pursue its claims in Germany. In November of 2004, Schick sued Gillette in Germany to enjoin it from making claims that the M3 Power raised hairs. In late December of 2004, the Hamburg Regional Court affirmed the lower court's order enjoining Gillette from making such claims in Germany.

While the court finds that it may have been possible to develop testing protocols in a quicker fashion, the court finds the M3 Power was a new product with a feature (the use of battery power) that had never before been present in wet shavers. The court finds the time Schick took to develop testing of and to test the M3 Power is excusable. The court has been presented with no evidence of bad faith or strategic maneuvering behind the timing of the instant lawsuit.

In late January of 2005, Gillette revised its television commercials for the M3

---

[2]The court also notes that time spent by Schick testing Gillette's "angle-change" claim, which claim Gillette abandoned in January of 2005.

Power in the United States. It chose to do so based on both the German litigation as well as conversations between the parties about Schick's discomfort with certain claims made in the advertising. The animated product demonstration in the television commercials was revised so that the hairs in the demonstration no longer changed angle, and some of the hairs are shown to remain static. The voice-over was changed to say, "Turn it on and micropulses raise the hair so the blades can shave closer." PX 14.10C. The product demonstration in the revised advertisements depicts the oscillations to lengthen many hairs significantly. The depiction in the revised advertisements of how much the hair lengthens—the magnitude of the extension—is not consistent with Gillette's own studies regarding the effect of micropulses on hair. The animated product demonstration depicts many hairs extending, in many instances, multiple times the original length. Gillette began broadcasting the revised television commercials on or about January 31, 2005. Schick provided credible evidence, however, that the prior version of the advertisement is still featured on the Internet and on product packaging.

Television advertisements aim to provide consumers a "reason to believe," that is, the reason consumers should buy the advertised product. Because of the expense of television advertising, companies have a very short period of time in which to create a "reason to believe" and are generally forced to pitch only the key qualities and characteristics of the product advertised.

Gillette conceded during the hearing that the M3 Power's oscillations do not cause hair to change angle on the face. Its original advertisements depicting such an angle change are both unsubstantiated and inaccurate. Gillette also concedes that the

7

animated portion of its television advertisement is not physiologically exact insofar as the hairs and skin do not appear as they would at such a level of magnification and the hair extension effect is "somewhat exaggerated." Gillette Co.'s Prop. Findings of Fact [Dkt. No. 114] ¶ 33. The court finds that the hair "extension" in the commercial is greatly exaggerated. Gillette does contend, however, that the M3 Power's oscillations cause beard hairs to be raised out of the skin. Gillette contends that the animated product demonstration showing hair extension in its revised commercials is predicated on its testing showing that oscillations cause "trapped" facial hairs to lengthen from the follicle so that more of these hairs' length is exposed. Gillette propounds two alternative physiological bases for its "hair extension" theory. First, Gillette hypothesizes that a facial hair becomes "bound" within the follicle due to an accumulation of sebum and corneocytes (dead skin cells). Gillette contends that the oscillations could free such a "bound" hair. Second, Gillette hypothesizes that hairs may deviate from their normal paths in the follicle and become "trapped" outside the path until vibrations from the M3 Power restore them to their proper path.

Schick's expert witness, Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine, testified that, based on his clinical and dermatological expertise, he is aware of no scientific basis for the claim that the oscillations of the M3 Power would result in hair extension, as Gillette contends. Dr. Leffell stated that Gillette's "hair extension" theory is inconsistent with his 20 years of experience in dermatology. He testified that he has never seen a hair trapped in a sub-clinical manner, as hypothesized by Gillette. Dr. Leffell testified that, in certain circumstances, trapped hairs will result in clinical symptoms, such as infection or

inflammation. With respect to Gillette's hypothesis that the interaction between sebum and corneocytes trap hairs, however, Dr. Leffell stated, and the court credits, that in non-clinical circumstances, sebum and corneocytes do not accumulate sufficiently to inhibit hair growth. Moreover, everyday activities such as washing or shaving remove accumulations of sebum and corneocytes.

Gillette's expert hair biologist, Dr. Michael Philpott, has studied hair biology for almost twenty years. He testified that, prior to his retention as an expert by Gillette, he had never seen a hair trapped in the manner posited by Gillette. Only after being retained by Gillette did Dr. Philpott first claim to have encountered this hair extension theory. Dr. Philpott acknowledged that neither of Gillette's two hypothesis of hair extension have any support in medical or scientific literature. With regard to Gillette's theory that hair could become bound in the follicle by sebum and corneocytes, Dr. Philpott admitted that no evidence supports that theory. Dr. Leffell testified that erector pili muscles, which cause hairs to stand up in response to various stimuli, as is commonly seen in the case of goosebumps, may also provide a biologicial mechanism for hair extension. Neither Dr. Leffell nor Dr. Philpott, however, testified on the relationship between the application of mechanical energy and the erector pili muscles, and neither party has contended that these muscles play a role in Gillette's hair extension theory.

In addition to positing biological mechanisms that might support the claim that the M3 Power's oscillations raise hairs, Gillette introduced evidence of experiments and testing to support those claims. Gillette provided summaries of said testing which were not prepared contemporaneously with the testing, conducted in the early 1990's, they

9

purport to memorialize. Instead, they were prepared in anticipation of litigation in late 2004.

Gillette performed experiments using oscillating razors in 1990, 1991 and 2003. In 1990 and 1991, Gillette performed studies using prototype oscillating razor handles fitted with razor systems other than the M3 Power, the Atra Plus and Sensor razor cartridge, two other Gillette products. In each of these initial experiments, a circle was drawn on a test subject's face. Twenty beard hairs within the circled region were measured with an imaging stereomicroscope manufactured by the Leica Company. That instrument measures hairs three-dimensionally to a resolution of three to four microns. The test subject then stroked the area using an oscillating razor with blunted blades. Then, twenty beard hairs within the circled region were again measured with a stereomicroscope. The same protocol was followed using a non-oscillating razor with blunted blades, and the changes in hair measurement were compared.

The Atra Plus study was performed in 1990 and included 10 test subjects. The study results show that the panelists' average hair length increased by 83.3 microns after five strokes with the oscillating razor versus 6.3 microns with the non-oscillating razor. The Sensor study was performed from 1990 to 1991 and also involved 10 test subjects. The subjects' mean hair length increased by 27.9 microns versus 12.9 microns with the non-oscillating razor. While both tests provided some evidence of a hair extension effect and the magnitude of that effect, neither test indicated what percentage of hairs were lengthened.

Notably, while Gillette found that use of both the oscillating Atra Plus and Sensor razors resulted in an increase in beard hair length, there was significant difference

10

between the average increase caused by the Atra Plus and that caused by the Sensor. Furthermore, no evidence was presented to the court regarding similarities or differences between the M3 Power razor and the Atra Plus or Sensor. The sample size, ten test subjects per study, was small. The twenty beard hairs measured prior to stroking were not necessarily the same hairs measured after stroking. The test included no efforts to keep constant the variables of pressure on the razor or speed of the shaving stroke. In addition, Gillette's chief scientist, Kevin Powell, testified that the pressure or load applied by consumers co-varies to a statistically significant degree with whether a razor oscillates. All these deficiencies cause this court not to credit the studies' finding that oscillations cause hair lengthening.[3]

   In 2003, Gillette performed a study using a prototype of the M3 Power. In the fall of 2003, Gillette tested a Mach 3 cartridge fitted with an oscillating handle. That prototype was called the "Swan." The Swan prototype's motor, handle, and cartridge differ from those features of the actually-marketed M3 Power. Four test subjects were used.[4] The test protocol was identical to that used in 1990 and 1991 except that, instead of using blunted blades, Gillette removed the blades from the razor. The study results suggest that the oscillating-Swan-prototype produced an average increase in hair length of between 32 and 40 microns while the non-oscillating prototype yielded no

---

[3]In Gillette's testing, no effort was made to control for variables, such as pressure on, or speed of, the razor. Failure to control for variable makes Gillette's "results" unscientific and not supportive of any conclusion.

[4]The sample size of four was chosen because the 2003 study, according to Gillette, was merely "confirmatory." Because the court finds the earlier tests deficient, the 2003 study cannot be "confirmatory."

average increase. That 32 to 40 micron increase represented an average of eight to ten-percent increase in hair length. The test does not indicate what percentage of hairs experience any lengthening as a result of oscillations. The court does not credit Dr. Powell's opinion that the differences between the model used in the test and the marketed product has no impact on the testing. Failure to use the marketed product is critical. The court cites the varied results Gillette reports between the Atra Plus, Sensor, and "Swan" tests as only one reason to conclude that failure to use the market product undercuts the 2003 testing. Further, the test protocol and sample size cause the court to question the validity of these study findings.

In addition to testing oscillating battery-powered razors, Gillette conducted what has been called the Microwatcher study. The Microwatcher is a commercially available product consisting of a miniature camera with an illumination system that channels light into an orifice at the tip of a transparent hemispherical dome. The device allows the user to impart mechanical energy into the top and underlying layers of the skin, which, according to Gillette, replicates the mechanical energy imparted by the oscillating razor.[5] The recorded video images introduced into evidence show individual hairs releasing from just below the skin surface. Gillette did not introduce evidence to describe what the various elements of the photo were. When asked by the court to identify the various elements appearing in the video were, Dr. Philpott could not identify

---

[5]Despite conducting the study on eighteen subjects, Gillette submitted only three short video clips and does not indicate that they are representative of the study results. Further, there is no indication of the length of the manipulation, the amount of pressure applied, or shave preparation. Without more information, the study cannot support the conclusion that the M3 Power extends hair.

12

or explain important skin features. For example, the court pointed to an area surrounding the individual hair, of darker hue than the rest of the skin, on the video, but Dr. Philpott could not explain what that area was or what might explain its coloration. The court further finds that Gillette provides no evidence to suggest the relationship between the amount of mechanical energy imparted by the Microwatcher and that imparted by the M3 Power.

Schick performed its own study which it contends proves the falsity of Gillette's advertising with respect to claims regarding hair extension.[6] Schick's study took place over three days and included 37 test subjects. With respect to each test subject, twenty hairs were measured before and after strokes with an M3 Power razor with blunted blades in both the power-on and power-off modes. The strokes were taken using an automated shaving device developed specially by Schick for the purposes of testing the M3 Power razor and Gillette's claims with respect to it. Images of the hairs were taken before and after the razor strokes using a camera with a plate that flattened hair onto the face. The images were then downloaded to a computer and hair lengths were assessed using ImagePro software. An independent statistician evaluated the data for all three days. Schick argues that its data indicates that there was no statistically significant difference between the change in hair length with power off and the change in hair length with power on.

Again, however, the court finds the test protocol lacking and results questionable. Schick's testing shows that some hairs shrunk even in the absence of

---

[6]Schick first performed tests to determine whether the M3 Power changes the angle of beard hairs.

the use of water, which Gillette's testing has found to result in hair shrinkage. Schick's expert testified that this may have been the result of measurement error, and the court agrees.[7] Furthermore, Gillette provided expert testimony that the glass plate used to flatten hairs so that they could be measured would likely result in distortion, making it difficult to accurately measure hair lengths. Such flaws in Schick's testing cause the court to be skeptical of Schick's test results and the suggestion that these results demonstrate that the M3 Power does not cause hairs to extend.

The flaws in testing conducted by both parties prevent the court from concluding whether, as a matter of fact, the M3 Power raises beard hairs.

II.    ANALYSIS

A.    Irreparable Harm

Schick argues that the M3 Power advertising is causing it irreparable harm. Sales of its premiere razor, the Quattro, have decreased precipitously since Gillette's release of the M3 Power. It is far from clear that all of the decline in Quattro sales is attributable to the allegedly false statements made in the course of M3 Power advertising. It is this difficulty, however, in determining what portion of the decline is so attributable that makes Schick's harm irreparable. "It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement. Too many market variables enter into the advertising-sales equation. Because of these impediments, a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is

---

[7] It may also result from the application of a glass plate meant to flatten the hairs so that they could be measured in two dimensions.

attributable to factors other than a competitor's false advertising." <u>Coca-Cola Co. v.</u>

<u>Trepicana Products, Inc.</u>, 690 F.2d 312, 316 (2d Cir. 1982).

    Gillette argues that Schick's delay in seeking relief, as a factual matter, militates

against a finding of irreparable harm. "Delay is typically relevant to both irreparable

harm and to laches, although the latter doctrine relates only to permanent relief." <u>Tom</u>

<u>Doherty, Inc. v. Saban Entertainment, Inc.</u>, 60 F.3d 27, 39 (2d Cir. 1995) (considering

delay in seeking preliminary injunction in the context of a contract dispute). Depending

on the facts of a particular case, delay may be relevant for other purposes as well. <u>Id.</u>

In a trademark case, where a "high probability of confusion" normally gives rise to a

presumption of irreparable harm for the purposes of obtaining a preliminary injunction,

that presumption is "inoperative if the plaintiff has delayed either bringing suit or in

moving for preliminary injunctive relief." <u>Tough Traveler, Ltd. v. Outbound Products</u>, 60

F.3d 964, 967-68 (2d Cir. 1995). It is important to remember, however, that a finding of

irreparable harm may still be made on the basis of other relevant factors; the

inexcusable delay affects only the <u>presumption</u> of irreparable harm. <u>Id.</u> at 969. In the

instant context, the court considers delay as one of several factors to be considered in

determining whether Schick has established irreparable harm.

    There is no presumption of irreparable harm in this case as such a presumption

arises in the false advertising context only when the challenged advertising mentions a

competitor by name. <u>Castrol, Inc. v. Quaker State Corp.</u>, 977 F.2d 57, 62 (2d Cir.

1992). Furthermore, in the instant case, the reasons for Schick's delay ought to guide

the court's consideration of whether that delay is probative with respect to the question

of irreparable harm. In the trademark context, a delay is excused where "the plaintiff

15

does not know how severe the [trademark] infringement is" or where it is caused by a plaintiff's "good faith efforts to investigate an infringement." Id. A delay is inexcusable where a party was aware of the action it now wishes to enjoin, but the delay evidences that the party determined that the action did not violate its rights. Tom Doherty, Inc., 60 F.3d at 39.

Schick provides two excuses for the time lag between the initial airing of the allegedly-false Gillette advertising. The first is that it needed time to subject the claims made in the contested advertising to scientific testing. While the advertising began to air publicly in late May 2004, Schick did not complete its testing until October 2004. While the testing could have proceeded more quickly, see supra at 5, there are reasons the testing took five months and that period, to the extent that it is deemed "delay," is excused. Schick was engaged in a good faith investigation of its competitor's claims.

The second excuse for delay involves the three month period after Schick's initial testing had been completed. Schick claims that the expense of pursuing litigation in a United States forum led it to test Gillette's claims in other fora in November 2004, before initiating the instant lawsuit. Therefore, upon completing its testing, it initiated lawsuits abroad, prior to initiating the instant suit in late January 2005. Schick argues that its attempts to resolve the issue in alternative fora excuse its delay. The cases it cites, however, either address delay in the context of patent litigation, Whistler Corp. v. Dynascan Corp., 1988 WL 142216, *2 (N.D.Ill. Dec. 28, 1988) (excusing period of delay where plaintiff in patent infringement suit first "adjudicated another lawsuit that would establish a reasonable likelihood of success on the issue of infringement in the pending case"); Amicus, Inc. v. Post-Tension of Texas, Inc., 686 F.Supp. 583, 589 (S.D. Tex.

16

1987) (same), or address arbitration or settlement attempts, not forum-shopping in foreign jurisdictions, see Millennium Imp. Co. v. Sidney Frank Importing Co., 2004 USDistLexis 11871, *33-*34 (Jun. 11, 2004) (refusing to find that delay barred preliminary injunction of false advertising where parties had pursued alternative dispute resolution before the National Advertising Division of the Council of Better Business Bureaus prior to plaintiff filing suit); Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F.Supp.2d 351 (D.N.J. 2000) (finding of irreparable harm in false advertising context not undermined by seven month-delay where plaintiff "notified J & J of its objections, promptly challenged the advertisements with the major networks, obtained the results of [a consumer survey]," and shortly thereafter initiated litigation); Tonka Corp. v. Rose Art Industries, Inc., 836 F.Supp. 200, 219 (D.N.J. 1983) (alleged delay did not support an acquiescence defense where plaintiff had filed an objection to defendant's trademark registration). The process of alternative dispute resolution of a false advertising claim is distinguishable from bringing litigation in a foreign jurisdiction. The parties could not have resolved, in Germany or Australia, a dispute regarding advertising within the United States. The cases that allow pursuit of remedies (through alternative dispute mechanisms) to constitute excusable delay do so because such mechanisms may have, with less expense and consumption of time, achieved a remedy substantially similar to that sought in court, an injunction. The same is not true of Schick's legal actions in foreign jurisdictions, which, even if successful, had no effect on Schick's legal rights in the United States.

     Schick argues that the case law on delay is motivated by the need to notice

parties that a claim for false advertising may lie against them. This purpose, according to Schick, was served by the German litigation as well as non-judicial interactions between the parties prior to initiation of any litigation. However, Schick misunderstands the import of inexcusable delay in the context of an application for a preliminary injunction. As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering. The litigation in Germany and Australia had no legal effect on advertising in the United States and, for the purposes of the instant lawsuit, it is advertising in the United States that, according to Schick, is causing it to suffer irreparable harm.

The court concludes that the three months during which Schick pursued foreign litigation is not inexcusable. See Tom Doherty, Inc., 60 F.3d at 39. Clearly Schick did not think Gillette's advertisements were not violating Schick's rights.

The court, therefore, considers Schick's delay in seeking relief alongside other evidence going to the factual question of irreparable injury. The court concludes that Schick's initiation of testing in May 2004 suggests that Schick believed it was being harmed from the day the M3 Power was launched. The severe decline in Quattro sales supports a finding of harm as does the fact that the parties are head-to-head competitors. Furthermore, the difficulty of determining what percentage of sales is attributable to Gillette's allegedly false advertising, and, therefore, the difficulty of accurately determining what monetary damages will compensate Schick for its harm, support a finding that any such harm is, indeed, irreparable.

      **B.**    **False Advertising**

1. **Literal Falsity.** "Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertising is literally true, it is likely to deceive or confuse customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). "A plaintiff's burden in proving literal falsity thus varies depending on the nature of the challenged advertisement." Castrol, Inc., 977 F.2d at 63. The Second Circuit has found that where an advertisement alleges that tests have established a product's superiority, a plaintiff must demonstrate that the tests or studies did not prove such superiority. "[A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior." Id. In addition, "[i]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden." Id.

Where, however, as here, the accused advertising does not allege that tests or clinical studies have proven a particular fact, the plaintiff's burden to come forward with affirmative evidence of falsity is qualitatively different. "To prove that an advertising claim is literally false, a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." Mc-Neil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991). The plaintiff must prove falsity by a preponderance of the evidence, either using its own scientific testing or that of the defendant. If a plaintiff is to prevail by relying on the defendant's own studies, it cannot do so simply by criticizing the defendant's studies. It must prove either that "such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made" or that the defendant's studies establish that the

19

defendant's claims are false.  Id. at 1549-50.

The challenged advertising consists of two basic components: an animated representation of the effect of the M3 Power razor on hair and skin and a voice-over that describes that effect.  The animation, which lasts approximately 1.8 seconds, shows many hairs growing at a significant rate, many by as much as four times the original length.  During the animation, the voice-over states the following: "Turn it on and micropulses raise the hair so the blades can shave closer."  Schick asserts that this M3 Power advertising is false in three ways: first, it asserts the razor changes the angle of beard hairs; second, it portrays a false amount of extension; and third, it asserts that the razor raises or extends the beard hair.

With regard to the first claim of falsity, if the voiceover means that the razor changes the angle of hairs on the face, the claim is false.  Although Gillette removed the "angle changing" claim from its television advertisements, it is unclear whether it has completely removed all material asserting this angle-change claim.  The court concludes that the current advertising claim of "raising" hair does not unambiguously mean to changes angles.[8]  See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 298 F.3d 578, 587 (3d Cir. 2002) ("only an unambiguous message can be literally false").  Thus, the revised advertising is not literally false on this basis.

With regard to the second asserted basis of falsity, the animation, Gillette concedes that the animation exaggerates the effect that the razor's vibration has on

---

[8] It is the words "up and away" when combined with "raises" that suggest both extension and angle change.

hair. Its own tests show hairs extending approximately 10% on average, when the animation shows a significantly greater extension. The animation is not even a "reasonable approximation," which Gillette claims is the legal standard for non-falsity. See Gillette's Prop. Conclusions of Law at ¶ 32, 37-38 [Dkt. No. 114]. Here, Schick can point to Gillette's own studies to prove that the animation is false. See Mc-Neil-P.C.C., Inc., 938 F.2d at 1549.

Gillette argues that such exaggeration does not constitute falsity. However, case law in this circuit indicates that a defendant cannot argue that a television advertisement is "approximately" correct or, alternatively, simply a representation in order to excuse a television ad or segment thereof that is literally false. S.C. Johnson & Son, Inc., 241 F.3d at 239-40 (finding that depiction of leaking plastic bag was false where rate at which bag leaked in advertisement was faster than rate tests indicated); Coca-Cola Co., 690 F.2d at 318 (finding that advertisement that displaced fresh-squeezed orange juice being poured into a Tropicana carton was false). Indeed, "[the Court of Appeals has] explicitly looked to the visual images in a commercial to assess whether it is literally false." S.C. Johnson, 241 F.3d at 238.[9]

Gillette's argument that the animated portion of its advertisement need not be exact is wrong as a matter of law. Clearly, a cartoon will not exactly depict a real-life situation, here, e.g., the actual uneven surface of a hair or the details of a hair plug. However, a party may not distort an inherent quality of its product in either graphics or

---

[9] At least one other circuit has held that picture depictions can constitute false advertising. Scotts Co. v. United Indus. Corp., 315 F.3d 264 (4th Cir. 2002) (finding that while ambiguous graphic on packaging did not constitute literally false advertising, an unambiguous graphic could do so).

animation.  Gillette acknowledges that the magnitude of beard hair extension in the
animation is false.  The court finds, therefore, that any claims with respect to changes in
angle and the animated portion of Gillette's current advertisement are literally false.

The court does not make such a finding with respect to Schick's third falsity
ground, Gillette's hair extension theory generally.  Gillette claims that the razor's
vibrations raise some hairs trapped under the skin to come out of the skin.  While its
own studies are insufficient to establish the truth of this claim, the burden is on Schick
to prove falsity.  Neither Schick's nor Gillette's testing can support a finding of falsity.

While there can be no finding of literal falsity with respect to Gillette's hair
extension claim at this stage in the instant litigation, the court expresses doubt about
that claim.  As described earlier, Gillette's own testing is suspect.  Furthermore, Schick
introduced expert testimony and elicited evidence from Gillette's expert regarding the
lack of scientific foundation for any biological mechanism that would explain the effect
described by Gillette in its advertising.  Gillette's own expert, Dr. Philpott, testified that
no scientific foundation exists to support Gillette's hypothesis that beard hairs might be
trapped under the skin by sebum and corneocytes and that the application of
mechanical energy might release such hairs.  While Dr. Philpott put forward another
hypothesis--that a hair's curliness might cause it to be trapped--he also conceded that,
prior to his engagement as an expert on Gillette's behalf, in twenty years of studying
hair, he had never come across such a phenomenon.  The court credits the testimony
of Schick's expert, Dr. Leffell, that while certain clinical conditions are characterized by
hairs trapped under the surface of the skin, there is no such non-clinical phenomenon.

Nevertheless, putting forth credible evidence that there is no known biological

mechanism to support Gillette's contention that the M3Power raises hairs is insufficient
to meet Schick's burden. Such evidence is not affirmative evidence of falsity. Further,
while Schick successfully attacked Gillette's testing, that attack did not result in
evidence of falsity. Unlike in McNeil, here Gillette's own tests do not prove hair
extension does not occur. Schick merely proved that Gillette's testing is inadequate to
prove it does occur.

      **2. Actual Deception.** Schick need not prove actual deception if Gillette's
advertising is determined to be literally false. Mc-Neil-P.C.C., Inc., 938 F.2d at 1549
("Where the advertising claim is shown to be literally false, the court may enjoin the use
of the claim without reference to the advertisement's impact on the buying public."
(internal quotation marks and citations omitted)). Because the court finds that claims
regarding angle change and the magnitude and frequency of hair extension portrayed in
the animated portion of Gillette's television advertisement are both literally false, it
presumes that these claims result in actual deception.

      **3. Materiality.** "It is also well-settled that, in addition to proving falsity,
the plaintiff must also show that the defendants misrepresented an inherent quality or
characteristic of the product. This requirement is essentially one of materiality, a term
explicitly used in other circuits." S.C. Johnson & Son, Inc., 241 F.3d at 238 (internal
quotation marks and citations omitted). In determining that certain allegedly false
statements were not material, the Second Circuit considered the relevance of the
statements and the fact that "[t]he inaccuracy in the statements would not influence
customers." Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).

It is clear that whether the M3 Power raises hairs is material.  Gillette's employees testified that television advertising time is too valuable to include things that are "unimportant".  Furthermore, in this case, hair extension is the "reason to believe" that the M3 Power is a worthwhile product.  The magnitude and frequency of that effect are also, therefore, material.  Whether a material element of a product's performance happens very often and how often that element happens are, in themselves, material.

      **4. Injury.**  The court finds that, in light of the advertisement's literal falsity, the fact that the parties are head-to-head competitors, and recent declines in the sale of Schick's premiere wet shave system injury will be presumed.  <u>Coca-Cola Co.</u>, 690 F.2d at 316-317.  While Schick has not submitted consumer surveys or market research, the fact that the parties are head-to-head competitors supports an inference of causation.

      **5. Interstate Commerce.**  The parties do not dispute that this element of the claim has been established.

      Accordingly, the court finds that Schick has established a likelihood of success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and its animation depicting an exaggerated amount of hair extension are literally false.  The court finds that Schick has failed to establish a likelihood of success, or even serious questions going to the merits, on the claim of hair "extension."

**BOND**

      Gillette has requested a bond of $49,579,248.  It contends that this amount represents estimated lost profits on future M3 Power sales, over a twelve-month period, if later found to have been wrongfully enjoined.  Schick submits that a bond of $50,000

to $100,000 is appropriate.

Gillette's calculations assume a precipitous drop in sales as a result of a mandate to correct two admitted falsities in its advertisement.[10]  The court is skeptical that this calculation represents an appropriate bond amount.[11]  Instead, the court imposes a bond of $200,000 on Schick.  Absent a record created by Gillette, the court concludes this amount, generally in the range for false advertising cases, is sufficient to protect Gillette.  Gillette may move to increase the bond amount upon a showing of likely injury.

**CONCLUSION**

For the reasons stated above the Motion for Preliminary Injunction [Dkt. No. 7] is GRANTED in part and DENIED in part.  The injunction is entered as stated in the accompanying order.  Schick's Motion for Leave to Amend [Dkt. No. 103] is GRANTED.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 31st day of May, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[10]While Gillette contends that the animated portion of its advertisement is not literally false as a matter of law, it has conceded that, as a factual matter, the animation represents an exaggerated hair-extension effect.

[11]Does it claim that it cannot sell one M3 Power razor without making false claims regarding angle change or the magnitude of hair extension?  When it ceased television and print advertising with the "angle change," did its sales drop precipitously?

A

**EXHIBIT  C**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,          :
ET AL                                :
     Plaintiffs                      :
                                     :    CIVIL ACTION NO.
v.                                   :    3-05-cv-174 (JCH)
                                     :
THE GILLETTE COMPANY                 :    JUNE 20, 2005
    Defendant                       :

### RULING RE: MOTION FOR CLARIFICATION OF INJUNCTION AND ADJUSTMENT OF BOND AMOUNT [DKT. NO. 122]

The defendant, the Gillette Company ("Gillette"), moves for clarification of this court's Order of May 31, 2005, wherein the court granted in part the plaintiffs' motion for a preliminary injunction. [Dkt. No. 121]. "It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" Paramount Pictures Corp. v. Carol Publishing Group, 25 F.Supp.2d 372, 374 (S.D.N.Y. 1998) (quoting Regal Knitwear Co. v. Nat'l Labor Relations Board, 324 U.S. 9, 15 (1945)).

Gillette asks that the court limit its May 31, 2005 Order such that it does not apply to certain language used by Gillette on packaging. The May 31 Order specifically prohibited use of any language that states, indirectly or directly, "the M3 Power razor or its micro-pulses or oscillations change the angle of hair in relation to the skin." Order [Dkt. No. 121] at 1. It further specifies that any claims made on packaging that "state or otherwise communicate that the M3 Power razor or its micro-pulses or oscillations: (a) change the angle of hair in relation to the skin" must be removed. Id. at 2. Gillette's

1

current packaging asserts that, "Gentle micro-pulses stimulate hair up and away from the skin." It claims that the Order does not prohibit use of such language.

The court does not agree. The use of the term "up and away" in conjunction with the term "stimulates" is literally false as it connotes an angle change.[1] "Stimulates" with "up" alone or "away" alone would not, but together state a message that is more than mere extension. The May 31, 2005 Order, as Schick indicates, applies to all forms of Gillette advertising, such as in television and radio, mailings, the internet, and packaging. Therefore, Gillette must remove such language ("up and away") from packaging of the M3 Power. It must also provide retailers and non-party distributors with stickers with which to re-sticker inventory that is not in Gillette's possession. This requirement imposes very minor hardship on any non-parties. See,e.g., Ladas v. Potpoourri Press, Inc., 846 F.Supp. 221 (E.D.N.Y. 1994) (requiring distribution of labels to retailers); compare Paramount Pictures Corp., 25 F. Supp. 2d at 375 (considering and rejecting proposed injunction prohibiting sale of good by nonparty distributors).

The court's Order was meant to cover packaging. Thus, the "stimulates up and away" wording on the M3 Power packaging in Gillette's possession must be re-stickered. In addition, the court's Order was meant to require Gillette to take all reasonable steps to sticker such language on packaging in the possession and control of third parties, including but not limited to seeking consent from such third parties to

_____

[1]The court specifically addressed "raises up and away" as literally false in its May 31, 2005 Ruling, at p. 20, n. 5. The word "stimulates" does not alter the meaning when used in conjunction with "up and away." Assuming the two words are not redundant, together they must mean more than extension of the hair, but also a change in relation to the face, as an angle change.

restickering, to provide stickers, to offer to sticker the packaging, and to reimburse third parties for their restickering.

The defendant's Motion to Clarify the court's May 31, 2005 Order [Dkt. No. 122] so as to limit its applicability to claims including the word "raise" is DENIED.  The motion for adjustment of bond amount [Dkt. No. 122] is GRANTED in part and DENIED in part without prejudice to renew.  The court increases the bond amount to $400,000.  Plaintiffs shall file with the Clerk a bond in the amount of $400,000, with good and sufficient surety, and conditioned as required by Rule 65 of the Federal Rules of Civil Procedure.  However, the court does not accept that it has been demonstrated that distribution of sufficient stickers to cover and the process of covering packaging in retail outlets will cost $1.2 million, as requested by Gillette.  Gillette may within a week of this Order provide additional support in connection with the restickering of packaging in the control of third parties.

**SO ORDERED**

Dated at Bridgeport, Connecticut this 20th day of June, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

3

BLUEBIRDOnline.com (816) 471-5700

**EXHIBIT  D**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,          :
EVEREADY BATTERY COMPANY, INC.:          CIVIL ACTION NO.:
and ENERGIZER BATTERY, INC.,          :          305 CV 174 (JCH)
                                      :
                Plaintiffs,          :
                                      :
v.                                    :
                                      :
THE GILLETTE COMPANY,                 :
                                      :
                Defendant.           :          AUGUST 2, 2005

MOTION FOR CIVIL CONTEMPT AND FOR ORDER TO SHOW CAUSE

Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc., and

Energizer Battery, Inc. (collectively "Schick") respectfully request that The Gillette

Company ("Gillette") be held in civil contempt for failing to obey this Court's Orders of

May 31, 2005 ("Preliminary Injunction Order") and June 20, 2005 ("Clarification Order"),

and move for the imposition of civil contempt sanctions against Gillette, including a

significant fine and an award to Schick of the reasonable attorneys' fees and costs associated

with this motion.  Schick further moves this Court for an order requiring that Gillette

appear before this Court at such time and place as the Court may fix to show cause why

Gillette should not be held in civil contempt of the Preliminary Injunction Order and

Clarification Order.

In support of this Motion, Schick submits a memorandum of law and the

declarations of Monica Y. Youn, Esq., Thomas Temelkoff, and Nancy Beardsley.

ORAL ARGUMENT REQUESTED

PLAINTIFF – SCHICK MANUFACTURING, INC.,
EVEREADY BATTERY COMPANY, INC. and
ENERGIZER BATTERY, INC.

By  /s/ Derek T. Werner
    Michael J. Donnelly, Esq. (ct07974)
    Derek T. Werner (ct23419)

MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut  06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com
Their Attorneys

Of Counsel:
Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 790-4500
Facsimile:  (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2005, a copy of the foregoing Motion for Civil Contempt and for Order to Show Cause was filed electronically and sent via facsimile to all parties of record. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael A. Bucci, Esq.
Day, Berry & Howard LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

Peter M. Brody, Esq.
Ropes & Gray
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005-3948

_/s/ Derek T. Werner_____
Derek T. Werner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,          :
EVEREADY BATTERY COMPANY, INC.:          CIVIL ACTION NO.
and ENERGIZER BATTERY, INC.,          :          3:05 CV 174 (JCH)
                                     :
                    Plaintiffs,          :
                                     :
v.                                   :
                                     :
THE GILLETTE COMPANY,                :
                                     :
Defendant.                           :

ORDER TO SHOW CAUSE

WHEREAS, the Plaintiffs' Motion for Civil Contempt and for Order to Show Cause

has come before the Court; and

WHEREAS, upon motion of the Plaintiffs, it appears that an order should be issued

directing the Defendant in this action to appear before the Court to show cause why it should

not be held in contempt for failure to obey this Court's Order of May 31, 2005 ("Preliminary

Injunction Order") and June 20, 2005 ("Clarification Order");

It is hereby ORDERED, that the Defendant be summoned to appear before this Court

on _____, ____, at _____ _.m. then and there to show cause why it should not

be held in contempt for failure to obey the Preliminary Injunction Order and the Clarification

Order as requested in the Plaintiffs' Motion for Civil Contempt and for Order to Show Cause.

BY THE COURT

Dated: _____          _____
                                United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC., | : | |
| EVEREADY BATTERY COMPANY, INC.: | | CIVIL ACTION NO. |
| and ENERGIZER BATTERY, INC., | : | 3:05 CV 174 (JCH) |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| THE GILLETTE COMPANY, | : | |
| | : | |
| Defendant. | : | AUGUST 2, 2005 |

MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFFS' MOTION REQUESTING IMPOSITION OF
CIVIL CONTEMPT SANCTIONS

Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc., and

Energizer Battery, Inc. (collectively "Schick") respectfully submit this Memorandum of Law

in support of their Motion for Civil Contempt and for Order to Show Cause on Defendant

The Gillette Company ("Gillette"). More specifically, Schick asks that Gillette be required

to show cause why Gillette should not be held in civil contempt of this Court's Orders of

May 31, 2005 ("Preliminary Injunction Order") and June 20, 2005 ("Clarification Order")

because Gillette has (1) failed to sticker enjoined claims on retail product packaging; (2)

instructed personnel to sticker only products on the selling floor, not those on overhead

racks, and (3) failed to remove enjoined claims from its website.

I.    THE PROCEDURAL AND FACTUAL BACKGROUND

A.    The Procedural History

Schick filed the Complaint in this action and moved simultaneously for a preliminary injunction on January 28, 2005, alleging that Gillette's advertisements for its M3 Power razor system (the "M3 Power") constituted false advertising in violation of the Lanham Act and the Connecticut Unfair Trade Practices Act. On May 31, 2005, following a four-day evidentiary hearing, the Court issued the Preliminary Injunction Order enjoining Gillette and affiliated persons and entities, inter alia, "from stating or communicating, directly or indirectly, by words or visual images, in any advertising, packaging, promotional materials or promotional activities" the claims that "the M3 Power or its micro-pulses or oscillations change the angle of hair in relation to the skin" or that "the M3 Power razor or its micro-pulses or oscillations extend or lengthen hair by a magnitude or with a frequency that is not literally or physiologically accurate" (the "Enjoined Claims") Preliminary Injunction Order (Dkt. No. 121) at 1. By its terms, this portion of the Court's order was effective immediately. Id. The Preliminary Injunction Order further required Gillette, within 30 days of the entry of the order, "to remove or cover by sticker on all packaging for the M3 Power razor any words or visual images that state or otherwise communicate" the Enjoined Claims. Id. at 2.

On June 9, 2005, Gillette filed a Motion for Clarification of Injunction and Adjustment of Bond Amount and to Shorten Time for Plaintiffs' Response. Dkt. No. 122.

In its Memorandum of Law in support of this motion, Gillette stated that as of that date, current in-store stock of M3 Power razors represented between three and four months of inventory. Dkt. No. 123, at 3-4. In further support of the motion, Gillette submitted a sworn Declaration of Deborah Marson, Deputy General Counsel for Gillette, who estimated that 3.2 million M3 Power packages were on retail shelves or in stock at stores as of that date. Dkt. 127-2, at 2.

On June 20, 2005, the Court issued the Clarification Order, stating that "[t]he use of the term 'up and away' in conjunction with the term 'stimulates' is literally false as it connotes an angle change." Dkt. No. 128, at 2. The Court further clarified that the Preliminary Injunction Order required Gillette to remove the enjoined claims from packaging and to "provide retailers and non-party distributors with stickers with which to re-sticker inventory that is not in Gillette's possession." Id. The Court further explained that its Preliminary Injunction Order "was meant to require Gillette to take all reasonable steps to sticker such language on packaging in the possession and control of third parties, including but not limited to seeking consent from such third parties to restickering, to provide stickers, to offer to sticker the packaging, and to reimburse third parties for their restickering." Id., at 2-3.

On July 5, 2005, seeking to increase the bond amount that Schick would be required to post, Gillette submitted supplemental information regarding costs of compliance with the Preliminary Injunction Order, with a supporting declaration from Peter Clay. Clay stated

-3-

that 3.5 million M3 Power packages were on retail shelves or in stock at stores as of that time. Dkt. No. 130-2, at 2.

On July 18, 2005, this Court issued a Supplemental Order re: Bond Amount. Dkt. No. 133. The Court found "troubling" the fact that according to Gillette's own submissions, the number of M3 Power packages bearing the Enjoined Claims in the possession of third-party retailers had significantly increased in the period between June 9, 2005, and July 5, 2005. Id., at 1. The estimate that Peter Clay had given on July 5, 2005 – that 3.5 million M3 Power packages were in the possession of third-party retailers – represented an increase of 300,000 M3 Power packages bearing the Enjoined Claims over the figure that Gillette had submitted the previous month in the Declaration of Deborah Marson, executed June 9, 2005. The Court stated that "[g]iven the injunction ordered on May 31, 2005, the court would have expected the number of offending packages to decrease as a result of sales and restocking from Gillette's warehouses, where restickering should and could have taken place very efficiently." Id., at 1-2.

**B.    Gillette's Failure to Sticker Packaging**

In July 2005, Schick organized an audit to determine whether packaging for the M3 Power razor in retail stores had been stickered to cover the Enjoined Claims, as directed by the Preliminary Injunction Order and the Clarification Order. Declaration of Thomas Temelkoff, executed July 26, 2005 ("Temelkoff Decl." ¶ 2). On July 8, 2005, Schick sent a questionnaire to all of Schick's field sales representatives and third-party retail brokers – a

total of 74 individuals – requesting them each to sample 10 stores in their local market to determine whether M3 Power packages had been stickered in compliance with the Preliminary Injunction Order. Id. ¶¶ 4-6. Of those 74 individuals, 69 returned the questionnaire by July 15, 2005. Id. ¶ 5. The audit sampled 720 retail stores that carried M3 Power razors on the shelves, and only 85 of these 720 stores (11.8%), had stickered M3 Power packaging in compliance with the Preliminary Injunction Order. Id. ¶ 8. Among such mass retail outlets as Wal-Mart, compliance rates were even lower. Of 216 mass retail outlets visited, only 18 stores (8.3%) had stickered the M3 power packages. Id.

C.   Gillette's Instructions Not to Sticker M3 Power Inventory Located in Racks Above the Selling Floor

From one of its retail brokers, Schick received a document titled "M3Power Guarantee Sticker Placement." Declaration of Nancy Beardsley, executed July 25, 2005, at ¶ 3. The second page of this document states, "Do not attempt to sticker any merchandise in the racks above the selling floor and do not ask associates for assistance." Id., Exh. A. This instruction violates the Preliminary Injunction Order, which does not exempt any category of product from stickering. In fact, this Court rejected Gillette's argument that the Preliminary Injunction Order allowed Gillette to sell off and not sticker inventory bearing the Enjoined Claims that was already in the stream of commerce. Dkt. No. 123, at 4. Instead, this Court has made clear that the Preliminary Injunction Order "was meant to require Gillette to take all reasonable steps to sticker such language on packaging in the possession and control of third parties, including but not limited to seeking consent from such third

parties to restickering, to provide stickers, to offer to sticker the packaging, and to reimburse third parties for their restickering." Dkt. No. 128 at 2-3 (emphasis added). Instructions not to sticker certain M3 Power packages fall far short of such steps.

### D. Two Months After This Court's Order, Gillette's Website Still Includes Enjoined Claims

Schick's Complaint in this action identified offending claims on the Gillette website and attached printouts of the relevant web pages – with web addresses appearing at the bottom – as an exhibit. Cplt. ¶ 14 & Exh. E. These same website claims also were identified in, and made exhibits to, Schick's Amended Complaint in this action. Am. Cplt. ¶ 14 & Exh. E. Furthermore, Schick brought these website claims to Gillette's attention at the hearing on the preliminary injunction. PX 2; Hearing Transcript ("Tr.") 32:25-34:23.[1]

The Court's Preliminary Injunction Order made clear that the Enjoined Claims should be removed from Gillette's website immediately. In its memorandum of law in support of its Motion for Clarification, filed on June 9, 2005, Gillette stated that it had revised its website in compliance with the Preliminary Injunction Order. Dkt. No. 123, at 1. However, Schick's opposition brief to Gillette's Motion for Clarification, filed June 16, 2005, noted that, notwithstanding the Preliminary Injunction Order, six different pages on Gillette's website continued to claim that the M3 Power's micro-pulses "raise hair up and away from skin" or "stimulate hair up and away from skin." Dkt. No. 126, at 2. Once again, Schick

---

[1] At the hearing, Gillette's witness Peter Clay responded to Schick's presentation of these website claims by testifying that this language had been changed on Gillette's website, except on some "rogue sites" that Gillette intended to fix. Hearing Tr. 556:1-15. This is still not done.

attached printouts of the relevant web pages -- including web addresses -- to its opposition

papers. Id., Exh. A.

Now, almost two months after the Court's Preliminary Injunction Order, Gillette

inexplicably has not removed the offending claims from its website. Declaration of Monica

Y. Youn, Esq., dated August 2, 2005 ("Youn Decl."), Exh. A.

II.   ARGUMENT

    A.   Gillette Failed to Comply With This Court's Orders and Should Be Held
        in Civil Contempt

Federal courts possess "the inherent power to hold a party in civil contempt 'to

enforce compliance with an order of the court, or to compensate for losses or damages.'"

United States v. Connecticut, 931 F. Supp. 974, 976 (D. Conn. 1996) (quoting Powell v.

Ward, 643 F.2d 924, 931 (2d Cir. 1981)).   A finding of civil contempt is appropriate

where: "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the

proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently

attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, Ltda

v. GE Medical Systems Information Technologies, Inc., 369 F.3d 645, 655 (2d Cir. 2004)

(internal citations omitted).   Because civil contempt sanctions are remedial in nature, the

finding is appropriate even where the contemnor's disobedience is not willful. Id.; see also

Shady Records, Inc. v. Source Enterprises, Inc., 351 F. Supp. 2d 64, 72 (S.D.N.Y. 2004)

(civil contempt appropriate where enjoined songs remained on website for three weeks

following entry of court order, and website operator gave unclear instructions to staff to

remove songs, failed to emphasize importance of compliance with order, and did not monitor site).

Here, all three factors weigh strongly in favor of a civil contempt finding. First, Gillette cannot plausibly assert that the scope or language of the injunction lacks clarity or is in any respect ambiguous. The Preliminary Injunction Order was clear: it required Gillette to "remove or cover by sticker on all packaging for the M3 Power razor any words or visual images that state or otherwise communicate" the Enjoined Claims within 30 days. Gillette moved for clarification, and the Court explained that this Order requires Gillette "to take all reasonable steps to sticker such language on packaging in the possession and control of third parties." Dkt. No. 128, at 2-3. No category of M3 Power product was exempt from these orders. Moreover, the Preliminary Injunction Order makes clear that the claims to be enjoined include those on the Internet (Dkt. No. 128, at 2), as Gillette has expressly acknowledged. Dkt. No. 123, at 2.

With regard to the second factor, there is clear and convincing proof of each of Gillette's three failures of compliance. The results of the compliance audit – more than 88 percent of audited retail stores and 91 percent of audited mass outlets were not compliant – demonstrate non-compliance with an order that requires the removal or stickering on the Enjoined Claims on "all packaging," including that in the possession of third-party retailers and distributors. In ruling on contempt proceedings, courts in this circuit treat evidence from the movant's own monitoring efforts as clear and convincing proof of noncompliance.

-8-

E.g., Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 253 (D.

Conn. 2002) (granting contempt motion based on anecdotal evidence from store visits of

plaintiff's representative); Chere Amie, Inc. v. Windstar Apparel, Corp., 175 F. Supp. 2d

562, 565 (S.D.N.Y. 2001) (granting contempt motion based on results of store visits

conducted by plaintiff's representatives). And the fact that Gillette has instructed its

representatives not to sticker certain M3 Power products at retailers is further evidence of

non-compliance. Finally, the presence of the Enjoined Claims on Gillette's website is

similarly clear-cut proof of non-compliance. See, e.g., Shady Records, Inc., 351 F. Supp.

2d at 72; A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F.Supp.2d 281, 294

n.16 (S.D.N.Y. 2000).

　　　　The third factor inquires whether Gillette attempted to comply in a reasonable

manner, and the multiple violations of the Preliminary Injunction Order demonstrate

Gillette's utter lack of diligence. The Preliminary Injunction Order requires more than token

efforts to withdraw the Enjoined Claims from the marketplace; this Court expressly directed

Gillette to take "all reasonable steps" to ensure that the Enjoined Claims are removed from

all packaging and all advertising media, including the Internet. Having mailed stickers or

instructions to third-parties does not absolve Gillette of responsibility for the fact that nearly

90% of retail outlets and more than 90% of mass outlets sold M3 Power packages bearing

the Enjoined Claims nearly two months after the Preliminary Injunction Order. Mailing

stickers and instructions did not exhaust Gillette's obligations; Gillette was obliged to police

compliance, which it apparently did not do. See Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 5 (2d Cir. 1989) (district court erred in failing to award contempt sanctions given widespread violations and contemnor's failure "to energetically police compliance"); Chere Amie, 175 F. Supp. 2d 562, 565 (contempt was willful where efforts to recall infringing products did not begin until two weeks after issuance of preliminary injunction, and contemnor did not monitor progress of third-party retailer's compliance with recall); United States v. Connecticut, 931 F. Supp. at 983-984 (defendant in contempt for failure to comply with remedial orders where implementation of defendants' compliance plans did not effect desired results of remedial orders).  Further, instructions to sticker only merchandise in racks on selling floors is not a "reasonable step" toward the removal of the Enjoined Claims from product packaging.  Gillette is not entitled to unilaterally modify this Court's orders for its own convenience.  Chere Amie, 175 F. Supp. 2d at 566 (finding clear and convincing evidence of non-compliance with recall order where, inter alia, contemnor had unilaterally fashioned recall procedures that thwarted recall and served no purpose other than contemnor's financial interest).  Finally, Gillette's utter lack of diligence is clear from its failure to remove the claims from its website despite repeated notice from Schick that included copies of the offending website pages.  As the district court stated in Shady Records, Inc.:

> It was incumbent on the [defendants], not merely to instruct that the material be removed, . . . but to ensure that all its employees understood the terms of the order and the importance of complying, and that all reasonable steps would be taken to prevent public dissemination of the material in the present and in the

future.

351 F. Supp. 2d at 72. Given its widespread pattern of non-compliance, Gillette's conduct is contemptuous.

**B.   The Court Should Impose a Significant Fine in its Discretion and Award Schick the Fees and Costs Associated with Filing This Motion**

The remaining question is the nature of the contempt remedy the Court should impose. "[A] sanction imposed on a party held in civil contempt generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance." Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc., 673 F.2d 53, 56-57 (2d Cir. 1982) (citations omitted). Here, Gillette's inexplicable failure to comply with the injunction mandates both coercive and compensatory sanctions. Paramedics Electromedicina Comercial, Ltda, 369 F.3d at 658 ("[a] sanction may . . . be both coercive and compensatory") (citations omitted). "To the extent that a contempt sanction is coercive, the court has broad discretion to design a remedy that will bring about compliance." Id. at 657.

More specifically, in setting the amount of a monetary fine designed to coerce compliance, the Second Circuit has instructed district courts to weigh: "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." Dole Fresh Fruit Co. v. United Banana Co., 821 F.2d 106, 110 (2d Cir. 1987);

-11-

A.V. by Versace, Inc, 87 F. Supp. 2d at 295-96. While the Court should sparingly exercise its power to impose a sanction, "it is nevertheless important to select a sanction which is likely to have some impact." A.V. By Versace, Inc., 279 F. Supp. 2d at 354.

Here, the Court already has determined that dissemination of Gillette's literally false claims for the M3 Power causes Schick irreparable harm. Thus, the harm to Schick from Gillette's contumacy is significant. Second, this Court can fashion a sanction including a significant monetary fine that would compel Gillette to comply with the Court's orders. Finally, even a significant fine would not burden Gillette unreasonably, since Gillette's financial resources are significant. These factors, and Gillette's failure to comply with the injunction, warrant a substantial fine. See, e.g., Chere Amie, Inc., 175 F. Supp. 2d at 568 (defendants' failure to comply with preliminary injunction order requiring recall of infringing product warranted civil contempt sanctions of $25,000 plus $10,000 for each day they failed to carry out recall).

Although a finding of willfulness is not required for the imposition of a civil contempt remedy, where the record supports a finding of willfulness, a court may also award attorneys' fees and costs associated with the filing of a motion for contempt. Vuitton et Fils S.A., 592 F.2d at 130. Courts in this Circuit find a party's non-compliance with a court's order willful where: (1) the party had the capacity to comply with the order, (2) did not act in good faith to comply therewith, and (3) did not move to vacate or modify the order prior to its violation. See, e.g., EEOC v. Local 638, 889 F. Supp 642, 670-71 (S.D.N.Y. 1995);

-12-

Andre Matenciot, Inc. v. David & Dash, Inc., 422 F Supp. 1199, 1211 (S.D.N.Y. 1976); see also A.V. By Versace, Inc., 87 F. Supp. 2d at 296 (finding contemnor's failure to remove enjoined marks from website was willful where contemnor had "sufficient cause to doubt their legality");

Matsushita Electric Corp. v. 212 Copiers Corp., 1995 WL 699802 at *3 (S.D.N.Y. Nov. 27, 1995) (finding contemnor's violations of order willful where alleged efforts at compliance were "woefully deficient").

An award of attorneys' fees would be particularly appropriate here. First, Gillette could have complied: in its multiple submissions to the Court regarding the Preliminary Injunction Order and the appropriate bond amount, Gillette never suggested that it would be unable to sticker the product packaging or remove the Enjoined Claims from its website. See Chere Amie, 175 F. 2d at 567 (finding willful contempt where, inter alia, contemnor was aware of court's order and did not seek to have it modified); Second, Gillette did not act in good faith given the widespread and evident violations in retail locations that Gillette's representatives regularly visit, given Gillette's dissemination of instructions that violate the Preliminary Injunction Order, and given the fact that Schick has provided repeated notice to Gillette of the specific location of the Enjoined Claims on Gillette's website. Id. at 567 (finding willful contempt where court inferred that contemnor had conducted cost benefit analysis and permitted third-party sales of infringing product to continue in violation of recall order). Finally, Gillette's motion to clarify makes its contempt more blatant – the

-13-

Court alleviated any conceivable confusion that Gillette could claim. Accordingly, Gillette's noncompliance is willful, and an award of attorneys' fees and costs on this motion is appropriate.

## CONCLUSION

For the reasons set forth above, the Court should find Gillette in contempt of this Court's Preliminary Injunction Order and Clarification Order, impose a significant fine on Gillette, and award Schick the reasonable attorneys' fees and costs associated with this motion.

PLAINTIFFS – SCHICK MANUFACTURING,
INC., EVEREADY BATTERY COMPANY,
INC. and ENERGIZER BATTERY, INC.


By_____/s/ Derek T. Werner_____
    Michael J. Donnelly (ct07974)
    Derek T. Werner (ct23419)

Murtha Cullina LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
Email:  mdonnelly@murthalaw.com
        dwerner@murthalaw.com

Of Counsel:

Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
Manatt Phelps & Phillips LLP
7 Times Square
New York, NY  10036
Telephone:  (212) 790-4500
Facsimile:  (212) 790-4545
E-mail:  SReich@manatt.com
       RBlum@manatt.com
       JEdelstein@mannatt.com
       MYoun@manatt.com

Attorneys for Plaintiffs Schick
Manufacturing, Inc., Energizer Battery, Inc.
and Eveready Battery Company, Inc.

CERTIFICATE OF SERVICE

     I hereby certify that on August 2, 2005, a copy of the foregoing Memorandum of Law in Support of Plaintiffs' Motion Requesting Imposition of Civil Contempt Sanctions was filed electronically and sent via facsimile to all parties of record. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael A. Bucci, Esq.
Day, Berry & Howard LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

Peter M. Brody, Esq.
Ropes & Gray
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948

                                                 /s/ Derek T. Werner
                                               Derek T. Werner

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.,

       Plaintiffs,

       - v. -

THE GILLETTE COMPANY,

       Defendant.

CIVIL ACTION NO.:  305CV174 JCH

### DECLARATION OF MONICA Y. YOUN, ESQ.

MONICA Y. YOUN, ESQ. states under penalty of perjury:

1.      I am an associate of the law firm of Manatt, Phelps & Phillips, LLP, counsel of record for Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc., and Energizer Battery, Inc. (collectively "Schick") in the above-captioned action.  I make this declaration in connection with Schick's Motion Requesting Imposition of Civil Contempt Sanctions.

2.      On August 2, 2005, I visited the website located at http://www.gillette.com. By clicking through various links, I arrived at a website located at http://www.gillettem3power.com/ask_us/.  Printouts of five pages from this website are attached hereto as Exhibit A.

3.      I hereby certify under penalty of perjury on this 2nd day of August, 2005, that the foregoing is true and correct.

_____
Monica Youn



©2001 - 2004 The Gillette Company. All rights reserved. The copyright is owned by The Gillette Company. Privacy  Legal Terms a



©2001 - 2004 The Gillette Company. All rights reserved. The copyright is owned by The Gillette Company. Privacy  Legal Terms a

Gillette - The Best a Man Can Get

Page 1 of 1



©2001:- 2004 The Gillette Company. All rights reserved. The copyright is owned by The Gillette Company. Privacy  Legal Terms a



©2001 - 2004 The Gillette Company. All rights reserved. The copyright is owned by The Gillette Company. Privacy  Legal Terms a



©2001 – 2004 The Gillette Company. All rights reserved. The copyright is owned by The Gillette Company. Privacy  Legal Terms a

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC.,<br>EVEREADY BATTERY COMPANY, INC.,<br>And ENERGIZER BATTERY, INC., <br><br>Plaintiffs,<br><br>- v. -<br><br>THE GILLETTE COMPANY,<br><br>Defendant. | CIVIL ACTION NO.: 305CV174JCH |

## DECLARATION OF THOMAS TEMELKOFF

THOMAS TEMELKOFF states under penalty of perjury:

1.    I am currently employed by Schick Manufacturing, Inc. (Schick") as Manager of Retail Operations in the United States.   As part of my responsibilities, I coordinate retail activities undertaken by sales associates in various retail outlets throughout the United States.

2.    Both Schick and The Gillette Company ("Gillette") use third party retail brokers to provide various retail services in connection with their products.  Schick uses Acosta, with headquarters located in Jacksonville, Florida.  Gillette uses Advantage Sales and Marketing, LLC, with headquarters in Irvine, California.

3.    In the first week of July I was requested to organize an audit to determine whether packaging for the M3 Power razor in retail stores had been stickered to cover the statement "stimulate hair up and away from skin."

4.    On July 8, 2005  I sent out a questionnaire to members of the internal Schick retail sales organization as well as to the Acosta representatives who visit retail outlets on behalf of Schick. The questionnaire is attached hereto as Exhibit A.  I sent the questionnaire to 81 individuals within Schick and to 28 Acosta representatives.  Of the 81 individuals internal to Schick, 35 were

in administrative or supervisory roles or held headquarter responsibilities and were not in a position to conduct a retail audit. The remaining 46 individuals internal to Schick constitute all of the field sales representatives across the country calling on or actively supporting Schick accounts.

5.      Of the 46 individuals internal to Schick, 41 responded to me with data. Of the 28 Acosta representatives, all 28 responded to me with data.

6.      The questionnaire asks the retail sales associate to determine whether M3 Power packaging found in a store has been stickered with the "new Guarantee statement." The "new Guarantee statement" is a reference to Gillette instructions to its retail sales associates attached hereto as Exhibit B. I understand these instructions were obtained by Schick from a retail sales associate representing Gillette.

7.      I took the audit results I received by the close of business on July 15, 2005, and imported this data into a spreadsheet attached hereto as Exhibit C.

6.      My analysis of the data received indicates the following:

- 794 retail outlets were covered across 34 states including Hawaii
- 90.7% of the stores (720 stores) visited had M3 Power razors on shelf
- Only 85 of these 720 stores, or 11.8%, had M3 Power product with a sticker over the "stimulate hair up and away from skin" language on the packaging.
- For mass retail outlets like Walmart, 216 stores were called on, and of these stores only 8.3% had stickered the M3 Power packaging.

I hereby certify under penalty of perjury on this _26_ day of _July_ , 2005, that the foregoing is true and correct.

_Thomas C. Temelkoff_
Thomas Temelkoff

A

## M3 POWER GUARANTEE STICKER REPLACEMENT INITIATIVE.

| DATE SURVEYED | STORE NAME | STORE ADDRESS CITY, STATE | STORE NUMBER | Was M3 Power Razors in this Store? Y/N | Were the Gillette M3 Power Razors Stickered with new "Guarantee" statement? Y/N | Comments |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |

A

## M3 POWER GUARANTEE STICKER REPLACEMENT INITIATIVE

| DATE SURVEYED | STORE NAME | STORE ADDRESS CITY, STATE | STORE NUMBER | Was M3 Power Razors In this Store? Y/N | Were the Gillette M3 Power Razors Stickered with new "Guarantee" statement? Y/N | Comments |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |

B

# M3Power Guarantee Sticker Placement

> **Nothing Shaves Better.
> We Guarantee It!**
>
> Try M3POWER for 30 days. If you are not completely satisfied, we will send you your money back! Call 1-800-GILLETTE for details. You will need your razor, original cash register receipt and UPC symbol.

## Placement of Guarantee Sticker on Packaging

- Ensure placement of the Gillette M3Power Guarantee sticker on back of each package as shown in the illustration.

- Stickers are to be placed on all packaging for M3Power, M3Power TMR and M3Power Nitro that carry the wording "stimulate hair up and away".

- Packages to be stickered include the African American Special Packs, Max Performance Special Packs and Father's Day Packs.

**PLEASE BE SURE NOT TO COVER UPC BAR CODE. IT IS IMPORTANT THAT THE STICKER COMPLETELY COVERS THE VERBIAGE: STIMULATE HAIR UP AND AWAY.**

### Placement for M3Power, M3Power TMR and M3Power Nitro


M3Power


M3Power TMR


M3Power Nitro



### Placement for Special Packs

Max Performance Special Packs

African American Special Packs

Father's Day Packs

Permission was not given by _____ to sticker product.

Signature _____     Date _____

# M3Power Guarantee
# Sticker Placement

## Club Packs

- **PLEASE BE SURE NOT TO COVER UPC BAR CODE. IT IS IMPORTANT THAT THE STICKER COMPLETELY COVERS THE VERBIAGE: STIMULATE HAIR UP AND AWAY**
- Identify yourself to the Store Manager and explain what you will be doing in his/her store
- Only sticker merchandise on selling floor
- Do not attempt to sticker any merchandise in the racks above the selling floor and do not ask associates for assistance



*Nothing Shaves Better.*
*We Guarantee It!*

Try M3POWER for 30 days. If you are not completely satisfied,
we will send you your money back. Call 1-800-GILLETTE for details.
You will need your razor, original cash register receipt and UPC symbol.

| Colleague Color | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors Stickered with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| | 1 | 7/1/05 | Kroger | 3915 W. Powell Rd. Powell, OH 43065 | 898 | Y | N | |
| | 2 | 7/1/05 | CVS | 933 Bethel Rd Columbus, OH 43214 | 5918 | Y | N | |
| | 3 | 7/1/03 | Walgreens | 9110 Dublin Rd Shawnee Hills, OH 43065 | 6110 | Y | | |
| | 4 | 7/1/05 | Drug Mart | 6865 Sawmill Parkway Powell, OH 43065 | | Y | | |
| | 5 | 7/1/05 | CVS | 7470 Sawmill Rd Dublin, OH 43016 | 6161 | Y | N | |
| | 6 | 7/1/05 | Kroger | 299 W. Bridge St Dublin, OH 43017 | 390 | Y | N | |
| | 7 | 7/1/05 | CVS | 300 W. Bridge St Dublin, OH 43017 | 6150 | Y | | |
| | 8 | 7/1/05 | CVS | 1885 W. Henderson Rd Upper Arlington, OH 43220 | 6149 | Y | N | |
| | 9 | 7/1/05 | Kroger | 7774 Sawmill Rd Dublin, OH 43016 | 916 | Y | N | |
| | 10 | 7/1/05 | Walgreens | 4895 Boulder Hwy Las Vegas Nevada | 2133 | Y | N | |
| Draptito | 11 | 7/2/2005 | Sav-On Drug | 602 El Camino Real San Clemente, CA 92672 | 9370 | Y | N | |
| | 12 | 7/2/2005 | Rite-Aid | 801 El Camino Real San Clemente, CA 92672 | 5740 | Y | N | |
| | 13 | 7/2/2005 | Albertsons | 804 Ave. Pico San Clemente, CA 92672 | 6509 | Y | N | |
| | 14 | 7/2/2005 | Albertsons | San Clemente, CA 92672 Ave. Pico | 6503 | Y | N | |
| | 15 | 7/2/2005 | Wal Mart | 951 Ave. Pico San Clemente, CA 92672 | 2327 | Y | N | |
| | 16 | 7/2/2005 | Vons | 32601 Camino Capistrano San Juan Capistrano, CA | 2091 | Y | N | |
| | 17 | 7/2/2005 | KMart | Camino del Estrella San Clemente, CA 92672 | 7092 | Y | N | |
| | 18 | 7/2/2005 | Stater Brothers | 638 Camino de Estrella San Clemente, CA 92672 | 140 | Y | N | |
| | 19 | 7/2/2005 | Sav-On Drug | 638 Camino de los Mares San Clemente, CA 92672 | 9470 | Y | N | |
| | 20 | 7/2/2005 | Ralphs | 160 Camino de los Mares San Clemente, CA 92672 | 15 | Y | N | |
| Homewood | 21 | 7/26/2005 | A&P Super Foodmart | 1060 W Main St Branford, CT 06405 | NE 0355 | Y | N | |
| | 22 | 7/1/05 | CVS | 24 Short Beach Road Branford, CT 06405 | 0172 | Y | | Sticker was only on 1 of 3 M3Pro razors; It was not on any M3Power razors. |

| | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were B3 Power Razors in this store? Y/N | Were the Gillette B3 Power Razors Stickered with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 23 | 7/8/05 | Wal-Mart | 130 Commercial Parkway Branford, CT 06405 | 2332 | Y | N | |
| | 24 | 7/8/05 | Super Stop & Shop | 370 Bishops Avenue East Haven, CT 06512 | 0692 | Y | N | |
| | 25 | 7/8/05 | Rite Aid | 508 Main Street East Haven, CT 06512 | 4778 | Y | N | |
| | 26 | 7/8/05 | CVS | 189 Main Street East Haven, CT 06512 | 1908 | Y | N | |
| | 27 | 7/8/05 | CVS | 600 Foxon Road East Haven, CT 06513 | 0857 | Y | N | Stickered was only on 2 of 8 Nitro razors; it was not on any MiPower razors. |
| | 28 | 7/8/05 | A&P Super Foodmart | 745 Foxon Road East Haven, CT 06512 | NE 0345 | Y | N | |
| | 29 | 7/8/05 | Wal-Mart | 315 Foxon Road New Haven, CT | 5438 | Y | N | |
| | 30 | 7/8/05 | Walgreens | 418 Foxon Road New Haven, CT 06513 | 8814 | Y | N | |
| Temolkoff | 31 | 7/13/2005 | Walgreens | 540 N. Schmale Rd Carol Stream, Illinois | 3893 | Y | N | |
| | 32 | 7/8/2005 | Walgreens | 324 Roosevelt Rd Glen Ellyn, Illinois | 8327 | Y | N | |
| | 33 | 7/8/2005 | Walgreens | 1601 N. Main St Wheaton, Illinois | 7410 | Y | N | |
| | 34 | 7/14/2005 | CVS | 26W231 Geneva Rd Winfield, Illinois | 5707 | N | | |
| | 35 | 7/14/2005 | Wal-Mart | 314 Army Trail Rd Bloomingdale, Illinois | 1553 | Y | N | |
| | 36 | 7/14/2005 | Dominicks | 560 S. Schmale Carol Stream, Illinois | 1140 | Y | N | Store had up End Cap display with Product Stickered |
| | 37 | 7/14/2005 | Jewel Osco | Geneva Rd Carol Stream, Illinois | 3323 | Y | N | |
| | 38 | 7/14/2005 | Target | 322 Army Trail Rd Bloomingdale, Illinois | 835 | Y | N | |
| Clorks | 39 | 7/14/2005 | Cub Foods | 501 S. County Farm Rd., Wheaton, Illinois | 3161 | Y | N | |
| | - | | | | | | | |
| | 40 | 7/11/2005 | Publix | 5400 Beach Blvd, Jax, Fla. | 805 | Y | N | |

Colleague

Fois

Balling

| NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY, STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors sticks-on/with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|
| 41 | 7/11/2005 | Publix | 11592 N 53RD AVE,TPA/FL | 311 | Y | N | |
| 42 | 7/12/2005 | CVS | 4001 BUSCH BLVD,TPA/FL | 2803 | Y | N | |
| 43 | 7/11/2005 | CVS | 110 BULLARD PKWY,TPA/FL | | Y | [illegible] | |
| 44 | 7/11/2005 | CVS | 9202 N 56TH ST,TPA/FL | 4573 | Y | N | |
| 45 | 7/11/2005 | Walgreens | 4319 ARMENIA AVE | 4328 | Y | N | |
| 46 | 7/12/2005 | hash n Kary | 8837 N 56 TH ST,TPA/FL | 1258 | N | | |
| 47 | 7/12/2005 | hash n Kary | 2739 FOWLER,TPA/FL | 1769 | Y | N | |
| 48 | 7/12/2005 | hash n Kary | 8778 temple terrace highway | 1734 | Y | N | |
| 49 | 7/13/2005 | Albertsons | 4850 Belle Isere Pkwy, Palm Coast/Fl | 4469 | Y | N | |
| 50 | 7/13/2005 | CVS | 5151 belle Terra ,palm coast/Fl | 446 | Y | N | |
| 51 | 7/13/2005 | Winn Dixie | 1200 Palm Coast Pkwy,palm coast/fla | 2247 | Y | N | |
| 52 | 7/13/2005 | Walgreens | 1100 Palm Coast pkwy | 3472 | Y | N | |
| 53 | 7/13/2005 | walmart | 174 Cypress Pt road,palm Coast,fla | 1182 | Y | N | |
| 54 | 7/11/2005 | Albertsons | 820 Collins Rd/Vero Beach,Fla | 4416 | Y | N | |
| 55 | 2/2?/9512. | RH1 | Milford, ct | | Y | N | |
| 56 | 7/11/2005 | WMART | RH1 | | Y | N | |
| 57 | 7/11/2005 | Walmart | RH 1 Stratford, CT | | Y | N | |
| 58 | 7/11/2005 | Walmart | Hubbell Ave Naugatuck, CT | | Y | N | |
| 59 | 7/11/2005 | STOP & SHOP | R1 63 Naugatuck, CT | | Y | N | |
| 60 | 7/11/2005 | CVS | RL 68 Prospect, CT | | Y | N | |
| 61 | 7/10/2005 | Shaws | Brass Mill Center Waterbury, CT | | Y | N | |
| 62 | 7/10/2005 | Walgreens | Putnam Ave, Riverside CT 06878 | | Y | N | |
| 63 | 7/11/2005 | Food Emporium | Riverside Commons, Putnam Ave | | Y | N | |

| Surveyor | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors' Slide&anchr/th new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 64 | 7/13/2005 | Stop & Shop | 3760 Hempstead Tpke Riverside, CT 06878 | | Y | N | |
| | 65 | 7/13/2005 | Target | Levittown, NY | 555 | Y | N | |
| | 66 | 7/13/2005 | Target | Levittown, NY | | | N | |
| | 67 | 7/13/2005 | King Kullen | Hempstead Tpke Levittown, NY | | Y | N | |
| | 68 | 7/13/2005 | Wald | Hempstead Tpke Levittown, NY | | Y | N | |
| Henderson | 69 | 7/13/2005 | Winn Dixie | 9769 Sam Furr Rd Huntersville NC 28078 | 2104 | Y | N | |
| | 70 | 7/13/2005 | Food Lion | 9729 Sam Furr Rd Huntersville NC 28078 | 1260 | Y | N | |
| | 71 | 7/13/2005 | Food Lion | 20125 N. Main St. Cornelius NC 28031 | 1400 | Y | N | |
| | 72 | 7/13/2005 | Harris Teeter | Torrence Chapel Rd Cornelius NC 28031 | 97 | Y | N | |
| | 73 | 7/13/2005 | Harris Teeter | 19915 North Cove Rd. Cornelius NC 28031 | 178 | Y | N | |
| | 74 | 7/13/2005 | Lowes Foods | Kenton Drive Cornelius NC 28031 | 170 | Y | N | |
| | 75 | 7/13/2005 | Harris Teeter | 9325 Rosa Commons Dr. Huntersville NC 28078 | 208 | Y | N | |
| | 76 | 7/13/2005 | Bi-Lo | 9915 Rosa Commons Dr. Huntersville NC 28078 | 99 | Y | N | |
| | 77 | 7/13/2005 | Food Lion | Gilead Rd Huntersville NC 28078 | 207 | Y | N | |
| | 78 | 7/13/2005 | Lowes Foods | 12108 Prosperity Church Rd. Huntersville NC 28078 | 213 | Y | N | |
| | 79 | 7/13/2005 | Harris Teeter | 5910 Prosperity Church Rd. Charlotte NC 28269 | 122 | Y | N | |
| | 80 | 7/13/2005 | Bi-Lo | 5318 Prosperity Church Rd Charlotte NC 28269 | 200 | Y | N | |
| | 81 | 7/13/2005 | Food Lion | 3024 Prosperity Church Rd. Charlotte NC 28269 | 1242 | Y | N | |
| | 82 | 7/13/2005 | Bloom (Food Lion) | 6499 W. Sugar Creek Rd. Charlotte NC 28269 | 2572 | Y | N | |
| Hoover | 83 | 7/13/2005 | Lowes Foods | 9445 Davis Lake Charlotte NC 28269 | 220 | Y | N | |
| | 84 | 7/11/2005 | TARGET | 1717 Olentangy River Road Columbus, OH 43212 | 1650 | Y | N | |
| | 85 | 7/11/2005 | GIANT EAGLE | 1451 West 5th Ave Columbus, OH 43212 | | Y | N | |
| | 86 | 7/11/2005 | KROGER | 1375 Chambers Road Columbus, OH 43212 | 842 | Y | N | |

| NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors Slickered/with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|
| 86 | 7/13/2005 | Community M | 100 Milford Ave Maryville, OH 43040 | 710 | Y | N | |
| 87 | 7/13/2005 | Community M | 309 North Main Street Bellefontaine, OH 43311 | | Y | N | |
| 88 | 7/13/2005 | Navarro | 10141 Pines Blvd. Pembroke Pines, FL | 12 | Y | N | |
| 89 | 7/13/2005 | Navarro | 18801 NW 67 Ave Miami Lakes, FL | 18 | Y | N | |
| 90 | 7/14/2005 | Navarro | 14441 SW. 42 St. Miami, FL | 13 | Y | N | |
| 91 | 7/14/2005 | Navarro | 9700 SW. 40 St. Miami, FL | 4 | Y | N | |
| 92 | 7/14/2005 | Food Lion | Troutman, NC | 701 | Y | N | |
| 93 | 7/14/2005 | Super Target | Mooresville, NC | n/a | Y | N | |
| 94 | 7/14/2005 | Bloom/Food L | Mooresville, NC | n/a | Y | N | |
| 95 | 7/14/2005 | CVS | Mooresville, NC | 35 | Y | Y | |
| 96 | 7/14/2005 | Wal-Mart | Mooresville, NC | n/a | Y | | only M3P gift pack had stickers |
| 97 | 7/14/2005 | Food Lion | Cornelius, NC | n/a | Y | N | |
| 98 | 7/14/2005 | Lowes | Mooresville, NC | 163 | N | | no distribution |
| 99 | 7/14/2005 | Eckerd | Mooresville, NC | 8888 | Y | | |
| 100 | 7/14/2005 | Harris Teeter | Mooresville, NC | 99 | Y | N | |
| 101 | 7/14/2005 | CVS | Cornelius, NC | 2314 | Y | N | |
| 102 | 7/14/2005 | Bilo | Charlotte, NC | 108 | Y | | |
| 103 | 7/14/2005 | Wal-Mart | Charlotte, NC | n/a | Y | | only M3P gift pack had stickers |
| 104 | 7/14/2005 | Eckerd | Charlotte, NC | 3994 | Y | | |
| 105 | 7/11/2005 | Walgreen's | 653 Washington St Middletown, CT 06457 | 2698 | Y | N | heavy on M3P inventory |
| 106 | 7/11/2005 | A&P | 429 Washington St Middletown, CT 06457 | 346 | Y | N | Multiple M3P displays |
| 107 | 7/11/2005 | A&P | 207 Webster Pearland, CT 06457 | 339 | Y | N | heavy on M3P inventory |
| 108 | 7/11/2005 | CVS | 1655 Kensington Ave | 2119 | Y | N | |
| 109 | 7/11/2005 | Brooks | 900 Kensington Ave Kensington, CT 06037 | 387 | Y | N | |

Colleague

Shaw

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors Stickered with new "Unreceived" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Velox | 110 | 7/1/2005 | Target | 2 Universal Drive, North Haven, CT 06473 | 1916 | Y | N | |
| | 111 | 7/1/2005 | BJ's | 550 Universal Drive, North Haven, CT 06473 | 83 | Y | N | |
| | 112 | 7/1/2005 | Xpect Discount | 411 Universal Drive, North Haven, CT 06473 | 18 | Y | N | |
| | 113 | 7/4/2005 | Jewel | 959 NW Highway, Cary, IL 60013 | 3498 | Y | N | |
| | 114 | 7/4/2005 | Jewel | 1250 W Main Street, West Dundee, IL 60118 | 3386 | Y | N | |
| | 115 | 7/4/2005 | Walgreens | 500 NW Highway, Cary, IL 60013 | 4040 | Y | N | |
| | 116 | 7/4/2005 | Walgreens | 810 West Main Street, West Dundee, IL 60118 | 4256 | Y | N | Multiple M3P display w/ Heavy Inventory |
| | 117 | 7/4/2005 | Target | 990 West Main Street, West Dundee, IL 60118 | | Y | N | Heavy on M3P Inventory/Pallet on rack with NO stickers |
| | 118 | 7/4/2005 | CVS | 500 Dundee Avenue, Elgin, IL 60120 | 6628 | Y | N | |
| Yeager | 119 | 7/3/2005 | Wal-Mart NHM | 2000 Citizens Dr, Fayetteville, AR 72703 | 2745 | Y | N | |
| | 120 | 7/3/2005 | Wal-Mart | 3919 N Mall Ave, Fayetteville, AR 72703 | 359 | Y | N | |
| | 121 | 7/3/2005 | Wal-Mart NHM | 1175 Market Square Dr, Springdale, AR 72762 | 2742 | Y | N | |
| | 122 | 7/3/2005 | Wal-Mart | 2004 S Pleasant, Springdale, AR 72764 | 54 | Y | N | |
| | 123 | 7/3/2005 | Wal-Mart | 1819 S 8th St, Rogers, AR 72756 | 3478 | Y | N | |
| | 124 | 7/3/2005 | Wal-Mart | 2110 W Walnut, Rogers, AR 72756 | 1 | Y | N | |
| | 125 | 7/3/2005 | Wal-Mart | 406 S Walton Blvd, Bentonville, AR 72712 | 100 | Y | N | |
| | 126 | 7/3/2005 | Wal-Mart NHM | 1510 SE 14th St, Bentonville, AR 72712 | 2741 | Y | N | |
| | 127 | 7/3/2005 | Target | 3546 N Shiloh Dr, Fayetteville, AR 72703 | 870282 | Y | N | |
| | 128 | 7/3/2005 | Walgreens | 524 E School, Fayetteville, AR 72703 | 7447 | Y | N | |
| ACOSTA | 129 | 7/1/2005 | Wal-Mart | 4210 Highland Ave - Highland, CA | 1814 | Y | N | |
| | 130 | 7/1/2005 | Wal-Mart | 26459 THE OLD RD - Valencia, CA | 2287 | Y | N | |
| | 131 | 7/1/2005 | Wal-Mart | 123 W SHAW AVE - Clovis, CA | 2271 | Y | N | |

Colleague: AGOSTA

| NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors In this store? Y/N | Were the Gillette M3 Power Razors Stickered/with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|
| 132 | 7/11/2005 | Wal Mart | 732 Center Drive - San Marcos, CA | 3484 | Y | N | |
| 133 | 7/11/2005 | Supercenter | 204 W 5th - Douglas, Az | 1640 | Y | N | |
| 134 | 7/11/2005 | Supercenter | 800 W WARNER RD - Chandler, AZ | 1512 | Y | N | |
| 135 | 7/11/2005 | Wal Mart | Tulare, CA | 2535 | Y | N | |
| 136 | 7/11/2005 | Wal Mart | 2750 S Woodland Village - Flagstaff, AZ | 1175 | Y | N | |
| 137 | 7/11/2005 | Wal Mart | Woodburn,OR | 1793 | Y | N | |
| 138 | 7/11/2005 | Wal Mart | 2050 W Redlands Blvd -Redlands, CA | 1693 | Y | N | |
| 139 | 7/11/2005 | Wal Mart | Corona, CA | 2842 | Y | N | |
| 140 | 7/11/2005 | Wal Mart | Rincon Park, CA | 1755 | Y | N | |
| 141 | 7/11/2005 | Wal Mart | Winter,CA | 2553 | Y | N | |
| 142 | 7/11/2005 | Wal Mart | Porterville, CA | 1877 | Y | N | |
| 143 | 7/11/2005 | Wal Mart | Buena Park, Ca | | Y | N | |
| 144 | 7/11/2005 | Wal Mart | Pomona, CA | 2288 | Y | N | |
| 145 | 7/11/2005 | Wal Mart | Chino, CA | 3403 | Y | N | |
| 146 | 7/11/2005 | Walmart | Upland, CA | 1992 | Y | N | |
| 147 | 7/11/2005 | Walmart | National City, Ca | 5023 | Y | N | |
| 148 | 7/11/2005 | WM | Bowling Green, Ky | 299 | Y | N | |
| 149 | 7/11/2005 | WM | Bowling Green, Ky | 8226 | Y | N | |
| 150 | 7/11/2005 | WM | Franklin, Ky | 282 | Y | N | |
| 161 | 7/11/2005 | WM | Russellville, Ky | 736 | Y | N | |
| 152 | 7/11/2005 | WM | Springfield, TN | 304 | Y | N | |
| 153 | 7/11/2005 | WM | Smyrna, TN | 448 | Y | N | |
| 154 | 7/11/2005 | SC # 2808 | Midlothian, VA | 2808 | Y | | |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors Slickered with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| | 156 | 7/1/05 | Wal-Mart SC | Middlothian, VA | 2538 | Y | N | Didn't see any Gillet M3 Power Razors that were slickered |
| | 155 | 7/1/05 | Wal-Mart SC | Chester, VA | 1524 | Y | N | No Razors slickered |
| | 157 | 7/1/05 | Wal-Mart SC | Fredicksburg, VA | 1833 | Y | N | No Razors slickered |
| | 156 | 7/1/05 | Wal-Mart | Fredicksburg, VA | 1925 | Y | N | No Razors slickered |
| | 158 | 7/1/05 | Wal-Mart Div1 | Manassas, VA | | Y | N | No Razors slickered |
| | 159 | 7/1/05 | Wal-Mart Div1 | Manassas, VA | 3773 | Y | N | No Razors slickered |
| | 160 | 7/1/05 | Wal-Mart Div1 | Woodbridge, VA | 1852 | Y | N | No Razors slickered |
| ACOSTA | 161 | 7-14-05 | SC | Lake City, FL | 787 | Y | N | Neither Bonus or Regular Pack was slickered |
| | 162 | 7/12/2005 | SC | Live Oak, FL | 2626 | Y | N | |
| | 163 | 7/12/2005 | SC | Tallahassee | 1223 | Y | N | |
| | 164 | 7/12/2005 | SC | Quincy, FL | 449 | Y | N | |
| | 165 | 7/12/2005 | SC | Marianna, FL | 1375 | Y | N | |
| | 166 | 7/13/2005 | SC | DeFunide Springs, FL | 1134 | Y | N | |
| | 167 | 7/13/2005 | SC | Crestdvw, FL | 944 | Y | N | |
| | 168 | 7/13/2005 | SC | Milton, FL | 990 | Y | N | |
| | 169 | 7/13/2005 | WM | Brewton, AL | 1620 | Y | N | |
| | 170 | 7/13/2005 | WM | Andalusia, AL | 1091 | Y | N | |
| | 171 | 7/13/2005 | Wal-Mart | Ft Myers Fl | SC 887 | Y | N | |
| | 172 | 7/13/2005 | Wal-Mart | Naples FL | SC 5055 | Y | N | |
| | 173 | 7/13/2005 | Wal-Mart | Naples FL | WM 1119 | Y | N | |
| ACOSTA | 174 | 7/11/2005 | WM | Niles,IL | 2818 | Y | N | Neither Bonus or Regular Pack was slickered |
| | 175 | 7/11/2005 | WM | Forest Park | 2264 | Y | N | Neither Bonus or Regular Pack was slickered |
| | 176 | 7/11/2005 | WM | North Lake, IL | 1833 | Y | N | Neither Bonus or Regular Pack was slickered |
| | 177 | 7/12/2005 | WM | Matteson, IL | 1467 | Y | N | |
| | 178 | 7/12/2005 | WM | Orland park, IL | 1650 | Y | N | |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store Y/N | Were this Gillette M3 Power Razors Sticker/switch new "Enterstate" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 178 | 7/12/2005 | WM | Bridgview, IL | 1779 | Y | N | |
| | 188 | 7/12/2005 | SC | Dubuque, IA | 2064 | Y | N | |
| | 181 | 7/12/2005 | WM | Platteville, WI | 858 | Y | N | |
| | 182 | 7/12/2005 | SC | Cedar Falls, IA | 753 | Y | N | Checked vendor log and no Gillette rep had been in any of these stores since End of June |
| | 183 | 7/22/2005 | SC | Waterloo, IA | 1466 | Y | N | |
| | 184 | 7/22/2005 | WM | Waverly, IA | 1605 | Y | N | |
| ACOSTA | 185 | 12-Jul | SC | Myrtle Beach, SC | 5067 | Y | N | |
| | 186 | 12-Jul | SC | Myrtle Beach, SC | 843 | Y | N | |
| | 187 | 12-Jul | WM | Asheboro, NC | 1132 | Y | N | |
| | 188 | 13-Jul | WM | Shelby, NC | 1034 | Y | N | |
| | 189 | 7/13/2005 | WM | Albans Ga | SC1403 | Y | N | |
| | 190 | 7/13/2005 | Walmart | Elldgly Ga | SC 1070 | Y | N | |
| ACOSTA | 191 | 7/13/2005 | Walmart | Kennesaw Ga | SC 537 | Y | N | |
| | 192 | 07/15/2005 | Walmart | Selma Al | SC 700 | Y | N | |
| | 193 | 7-14-05 | Walmart | Oklahoma city, OK | 2878 | Y | N | |
| | 194 | 7/11/2005 | WMSC | Oklahoma city, OK | 1896 | Y | N | |
| | 195 | 7/22/2005 | WM SC 765 | San Antonio TX | 765 | Y | N | |
| | 196 | 7/22/2005 | WM SC 1128 | Boerne TX | 1128 | Y | N | |
| | 197 | 7/22/2005 | WM 1235 | San Antonio TX | 1235 | Y | N | |
| Wilson | 198 | 7-14-05 | CVS | 4040 N. 19 th Ave Phx, Az | 5570 | Y | N | |
| | 199 | 7-14-05 | Walgreens | 5123 Northern Glendale, AZ | 4230 | Y | N | Ask managers if they had had anyone in to sticker product and answer to all stores was NO, haven't heard a thing. |
| | 200 | 7-14-05 | Albertsons Os 5802 W. Olive Glendale, Az | | 1009 | Y | N | |
| | 201 | 7-14-05 | Fry's | 3116 W. Olive Glendale, Az | 20 | Y | N | |

| | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY STATE | STORE NUMBER | Were BiC Power Razors in this store? Y/N | Were the Gillette BiC Power Razors Stickered/sold with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 202 | 7-14-05 | Safeway | 5959 W. Olive Glendale, Az | 2059 | Y | N | |
| | 203 | 7-14-05 | Basha's Market | 7058 W. Thunderbird Peoria, Az | 120 | Y | N | |
| | 204 | 7-14-05 | Target | 83rd Ave & Bell Peoria, Az | 825 | Y | N | |
| | 205 | 7-14-05 | K Mart | 6707 W. Bell Rd Glendale, Az | 7236 | Y | N | |
| | 206 | 7-14-05 | Wal-Mart | 5845 W. Bell Rd Glendale, Az | 1532 | Y | N | |
| | 307 | 7-14-05 | Fry's | 43rd & Bell Phoenix, Az | 26 | Y | N | |
| | 208 | 7-14-05 | Safeway | 43rd & Bell Phoenix, Az | 240 | Y | N | |
| Area | 209 | 7-14-05 | Fry's Market | 28th Ave & Bell Rd Phoenix, Az | 17 | Y | N | |
| | 210 | 7/14/2005 | Target | Florence, KY | | Y | | |
| | 211 | 7/14/2005 | Wal-Mart | Florence, KY | | Y | N | |
| | 212 | 7/14/2005 | Meijer | Florence, KY | | Y | N | |
| | 213 | 7/14/2005 | Kroger | Florence, KY | 386 | Y | N | |
| | 214 | 7/14/2005 | Wal-Mart | Carrollton, KY | | Y | N | |
| | 215 | 7/14/2005 | Kroger | Carrollton, KY | 710 | Y | N | |
| | 216 | 7/14/2005 | Kroger | LaGrange, KY | 364 | Y | N | |
| | 217 | 7/14/2005 | Wal-Mart | LaGrange, KY | | Y | N | |
| | 218 | 7/13/2005 | Hwy 83 | Atlantic, IA | | Y | N | |
| | 219 | 7/14/2005 | Wal Mart | Omaha, NE | 3381 | Y | N | |
| Cracker | 220 | 7/14/2005 | Walgreen's | 5233 135th St. Omaha, NE | | Y | N | |
| | 221 | 7/14/2005 | Baker's | 5233 135th St Omaha, NE | | Y | N | |
| | 222 | 7/14/2005 | HyVee | 144th & Center Omaha, NE | | | | |
| | 223 | 7/14/2005 | Shopko | 144th & Center Omaha, NE | | | N | |
| | 224 | 7/14/2005 | Bag N Save | 144th & Center Omaha, NE | | | | |
| Cracker | 235 | 7/14/2005 | Baker's | 132nd and Center Omaha, NE | | | | |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in the store Y/N | Were the Gillette M3 Power Razors Stickers/notices labeled as "Guaranteed" Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| | 226 | 7/14/2005 | Target | Omaha, NE | | Y | | |
| | 227 | 7/14/2005 | Baker's | 120th & Center, Omaha, NE | | Y | N | |
| Sleep | 228 | 7/14/2005 | Target | Woodruff Rd. | 1182 | Y | N | |
| | 229 | 7/14/2005 | Public | Woodruff Rd. SC | 539 | Y | ▓▓▓ | |
| | 230 | 7/14/2005 | CVS | 1200 Butler Rd. SC | 5475 | Y | N | |
| | 231 | 7/14/2005 | Bi-LO | Woodruff Rd. SC | 273 | Y | N | |
| | 232 | 7/14/2005 | Eckerd | Woodruff Rd. SC | 2409 | Y | N | |
| | 233 | 7/14/2005 | CVS | Laurens Rd. SC | 2246 | Y | N | |
| | 234 | 7/14/2005 | CVS | Woodruff Rd. SC | 2242 | Y | N | |
| | 235 | 7/14/2005 | Bi-LO | Woodruff Rd. SC | 57 | Y | N | |
| | 236 | 7/14/2005 | Public | Woodruff Rd. SC | 35 | Y | ▓▓▓ | |
| | 237 | 7/14/2005 | Walmart | Woodruff Rd. SC | 640 | Y | N | |
| Meadows | 238 | 7/14/2005 | Pathmark | 2693 Durham Rd & Rt 413 SC | 547 | Y | N | |
| | 239 | 7/14/2005 | Giant | 4895 new Falls Rd / Levittown, PA 19056 | 63 | N | N | |
| | 240 | 7/14/2005 | Walmart | 180 Commerce Circle / Bristol, PA 19007 | 5177 | Y | N | |
| | 241 | 7/14/2005 | Super Fresh | Rt 13 & 413 / Bristol, PA 19007 | SF0243 | Y | N | |
| | 242 | 7/14/2005 | Eckerd | 244 Commerce Circle / Bristol, PA 19007 | 6332 | N | N | |
| | 243 | 7/14/2005 | Giant | Oxford Valley & Olds Blvd / Fairless Hills, PA 19030 | 84 | Y | N | |
| | 244 | 7/14/2005 | Walmart | 495 South Oxford Valley Rd / Fairless Hills, PA 19030 | 2088 | Y | N | |
| | 245 | 7/14/2005 | CVS | 339 Oxford Valley Rd / Fairless Hills, PA 19030 | 285 | Y | N | |
| | 246 | 7/14/2005 | Shoprite | Queen Anne Plaza, 547 S. Oxford Valley Rd / Fairless Hills, PA 19030 | 427 | Y | N | |
| | 247 | 7/14/2005 | Kmart | 1778 East Lincoln Highway / Langhorne, PA 19047 | 3187 | Y | N | |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were ME Power Razors in this store? Y/N | Were the Gillette ME Power Razors Stickered/with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| | 248 | 7/16/2005 | Redners Ware | 1361 Lincoln Highway Levittown, PA 19058 | 99 | Y | | |
| Nolan | 249 | 7/4/2005 | Walgreens | 5625 N. Ridge Chicago, IL 60640 | 4542 | Y | N | |
| | 250 | 7/4/2005 | Walgreens | 6125 N. Broadway Chicago, IL 60660- | 807 | Y | N | |
| | 251 | 7/4/2005 | Osco | 6150 N. Broadway Chicago, IL 60660 | 6613 | Y | N | |
| | 252 | 7/4/2005 | Walgreens | 1550 N. Wilson Chicago, IL 60640 | 2640 | Y | N | |
| | 253 | 7/4/2005 | Walgreens | 2301 W. Irving Park Rd. Chicago, IL 60618 | 2588 | Y | N | |
| | 254 | 7/4/2005 | CVS | 3330 N. Western Chicago, IL 60618 | 259 | Y | N | |
| | 255 | 7/4/2005 | Walgreens | 3302 W. Belmont Chicago, IL 60618 | 129 | Y | N | |
| | 256 | 7/4/2005 | CVS | 3411 W. Addison Chicago, IL 60618 | 8795 | Y | N | |
| | 257 | 7/4/2005 | Osco | 3445 N. Southport Chicago, IL 60613 | 5628 | Y | N | |
| | 258 | 7/4/2005 | Osco | 4051 N. Lincoln Chicago, IL 60618 | 6621 | Y | N | |
| Read | 259 | 7/8/2005 | ALBERTSONS | CUSTER & 15TH PLANO,TX | 4123 | Y | N | OVERALL-LOTS OF PRODUCT ON PEGS AND DISPLAYS IN MOST STORES, NO STICKERS FOUND ON SHELF OR DISPLAY STOCK |
| | 260 | 7/8/2005 | WALGREENS | 2001 CUSTER RD PLANO,TX | 3511 | Y | N | |
| | 261 | 7/8/2005 | ALBERTSONS | 3100 CUSTER PLANO,TX | 4281 | Y | N | |
| | 262 | 7/8/2005 | KROGER | CUSTER & PARMER PLANO, TX | 591 | Y | N | |
| | 263 | 7/8/2005 | ALBERTSONS | PRESTON&PARMER PLANO,TX | 4160 | Y | N | |
| | 264 | 7/8/2005 | ALBERTSONS | CUSTER & MCGINNOTT ALLEN, TX | 4166 | Y | N | |
| | 265 | 7/8/2005 | ALBERTSONS | MCGINNOTT & HWY 78 ALLEN,TX | 4175 | Y | N | |
| | 266 | 7/10/2005 | MCGINNOTT & HWY 78 ALLEN, TX | | 1231 | Y | N | |
| | 267 | 7/10/2005 | TARGET | 6951 PRESTON RD FRISCO,TX | 4104 | Y | N | |
| | 268 | 7/10/2005 | KROGER | 7500 PRESTON RD FRISCO,TX | 560 | Y | N | |
| Silva | 269 | 7/11/2005 | PATHMARK | ROUTE 35 NORTH MIDDLETOWN, NJ | 577 | Y | N | |
| | 270 | 7/11/2005 | ECKERD | ROUTE 35 NORTH | 6162 | Y | N | |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY,STATE | STORE NUMBER | Were MJ Power Razors in file store? Y/N | Were the Gillette MJ Power Razors Sticker with new "Guarantee" statement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 271 | 7/1/2005 | TARGET | ROUTE 35 NORTH MIDDLETOWN, NJ | 1192 | Y | N | |
| | 272 | 7/1/2005 | STOP & SHOP | ROUTE 35 NORTH KEYPORT, NJ | 801 | Y | N | |
| | 273 | 7/1/2005 | WALGREENS | 200 WILSON AVE PORT MONMOUTH, NJ | 5111 | Y | N | |
| | 274 | 7/1/2005 | ECKERD | ROUTE 36 & WILSON AVE PORT MONMOUTH, NJ | 3897 | Y | N | |
| | 275 | 7/1/2005 | FOODTOWN | ROUTE 36 SOUTH PORT MONMOUTH, NJ | 255 | Y | N | |
| | 276 | 7/1/2005 | CVS | ROUTE 36 SOUTH HAZLET, NJ | 2031 | Y | N | |
| | 277 | 7/1/2005 | FOODTOWN | @ ROUTE 36 HAZLET, NJ | 17266 | Y | N | There were 5 pc and only 1 had a sticker, |
| | 278 | 7/1/2005 | CVS | 2377 ROUTE 36 NORTH HAVESINK, NJ ATLANTIC HIGHLANDS, NJ | 1214 | Y | N | |
| Tashljon | 279 | 7/14/2005 | Rite Aid | 1900 McLoughlin Oregon City OR 97045 | 5232 | Y | N | |
| | 280 | 7/14/2005 | Albertsons | 1855 Blankenship West Linn OH 87068 | 506 | Y | N | |
| | 281 | 7/14/2005 | Kmart | 19700 SE Johnson Milwaukie OR 87222 | 4406 | Y | N | |
| | 282 | 7/14/2005 | Fred Meyer | 19200 Manhazaul Tualatin OR 97062 | 393 | Y | N | |
| | 283 | 7/14/2005 | Fred Meyer | 14351 SE 82nd Tualatin OR 97062 | 83 | Y | N | |
| | 284 | 7/14/2005 | Safeway | 11055 Market Blvd Clackamas OR 97015 | 3525 | Y | | |
| | 285 | 7/14/2005 | Rite Aid | 5516 S Market Chehalis WA 98532 | 5285 | Y | N | |
| Trabuer | 286 | 7/14/2005 | Walmart | Chehalis WA 98532 | 2249 | Y | N | |
| | 287 | 7/14/2005 | Kmart | 1201 NW Louisiana Chehalis WA 98532 | 7231 | Y | N | |
| | 288 | 7/14/2005 | Bartell Drug | International Blvd (Airport) Seattle WA 98188 | | N | | |
| | 289 | 7/14/2005 | Dominicks | 424 W DIVISION CHICAGO, IL | 2153 | Y | N | # PC at SHELF - NOT TAGGED |
| | 290 | 7/14/2005 | Dominicks | 2550 N CLYBOURN CHICAGO, IL | 2304 | Y | N | Product on shelf and display ALL NOT TAGGED. |
| | 291 | 7/14/2005 | Dominicks | 3350 N. WESTERN AVE CHICAGO, IL | | Y | N | 12pc Nitro w/Hg/1pc on shelf (60°) w/Hg Since APril / 3pc Power/2pc Nitro on shelf red liquid |
| | 292 | 7/14/2005 | Jewel Osco | 3400 N WESTERN AVE CHICAGO, IL | 3501 | Y | N | 4pc MJP - 1pc Nitro on shelf - NONE TAGGED |

| Colleague | NUMBER OF STORE CHECKS | DATE SURVEYED | STORE NAME | STORE ADDRESS CITY/STATE | STORE NUMBER | Were M3 Power Razors in this store? Y/N | Were the Gillette M3 Power Razors Sitaree/with new "Guarantee" Advisement? Y/N | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| Colleague | 293 | 7/14/2005 | Target | 2939 W. ADDISON ST, CHICAGO, IL | 1437 | Y | | 3pc at shelf, only 1 piece tagged |
| | 294 | 7/14/2005 | Jewel Osco | 5533 N CLARK, CHICAGO, IL | 3407 | Y | N | 5pc fillo at shelf - not tagged |
| | 295 | 7/14/2005 | Jewel Osco | 5145 N BROADWAY, CHICAGO, IL | 3443 | Y | N | 7pc at shelf - NONE TAGGED |
| | 296 | 7/14/2005 | Dominicks | 6009 N BROADWAY, CHICAGO, IL | 12 | Y | | all 8pc pc at?? on shelf TAGGED. |
| | 297 | 7/14/2005 | Dominicks | 1763 W HOWARD, CHICAGO, IL | 1608 | Y | N | 15PC ON SHELF - HOT TAGGED |
| | 298 | 7/14/2005 | Dominicks | 6623 N DAMEN AVENUE, CHICAGO, IL | 1128 | Y | N | 15PC ON SHELF - NOT TAGGED / NITRO ENDCAP SINCE APRIL.30PC -NOT TAGGEDE |
| Acosta | 299 | 7/8/2005 | Shopko | Green Bay Rd, Neenah | 150 | Y | N | |
| | 300 | 7/8/2005 | Pick-N-Save | 647 S Green Bay Rd, Neenah, WI 54956 | 7 | Y | N | |
| | 301 | 7/10/2005 | Sam's Club | Appleton, WI | 609321 | Y | N | |
| | 302 | 7/12/2005 | Shopko | Northland R 47, Appleton, WI 54914 | 15 | Y | N | |
| | 303 | 7/12/2005 | Cub Food | 1200 Northland Av, Appleton WI 54914 | 20314 | Y | N | |
| | 304 | 7/12/2005 | Copps | 1533 E Commercial Street, Neenah, WI 54956 | 7 | Y | N | |
| | 305 | 7/11/2005 | Wal-Mart | 1155 Winneconne Ave, Neenah, WI 54956 | 502698 | Y | | N |
| | 306 | 7/11/2005 | | 500 S Commercial, Neenah, WI 54956 | 7 | Y | N | |
| | 307 | 7/11/2005 | Target | Fox River Mall, Appleton, WI 54914 | 238 | Y | N | |
| | 308 | 7/12/2005 | Walgreens | 39?? Eucion Street, Menasha, WI 54952 | 9 6916 9365 | Y | N | |
| Pala | 309 | 7/13/2005 | CVS | Riverside Commons, Putnam Ave, Riverside, CT 06879 | | Y | N | |
| | 310 | 7/13/2005 | Walgreens | Putnam Ave, Riverside CT 06879 | | Y | N | |
| | 311 | 7/13/2005 | Food Emporio/Riverside Commons, Putnam Ave | Riverside, CT 06879 | | Y | N | |
| | 312 | 7/13/2005 | Stop & Shop | 3750 Hampstead Tpke, Riverside, CT 06878 | 555 | Y | N | |
| | 313 | 7/13/2005 | Target | Hampstead Tpke, Levittown, NY | | Y | N | |
| | 314 | 7/13/2005 | King Kullen | Hampstead Tpke, Levittown, NY | | Y | N | |
| | 315 | 7/13/2005 | Valid | Hampstead Tpke, Levittown, NY | | Y | N | |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC.,<br>EVEREADY BATTERY COMPANY, INC.,<br>And ENERGIZER BATTERY, INC.,<br><br>Plaintiffs,<br><br>- v. -<br><br>THE GILLETTE COMPANY,<br><br>Defendant. | CIVIL ACTION NO.: 305CV174JCH |

## DECLARATION OF NANCY BEARDSLEY

NANCY BEARDSLEY states under penalty of perjury:

1.     I am currently employed by Schick Manufacturing, Inc. (Schick") as Retail Manager for mass, club and drug retail channels of trade in the United States.  I have held this position for the last several years.  My primary responsibility is to act as the communication liaison between Schick's third party retail broker and our direct sales force.

2.     Both Schick and The Gillette Company ("Gillette") use third party retail brokers to provide various retail services in connection with their products.  Schick uses Acosta, with headquarters located in Jacksonville, Florida.  Gillette uses Advantage Sales and Marketing, LLC, with headquarters in Irvine, California.

3.     On July 5, 2005, an Acosta sales representative sent me a document entitled "M3Power Guarantee Sticker Placement."  A copy of the document is attached as Exhibit A.  The document was obtained from an Advantage sales representative.

I hereby certify under penalty of perjury on this 25th day of July, 2005, that the foregoing is true to the best of my recollection and belief.

Nancy Beardsley
Nancy Beardsley

A

# M3Power Guarantee Sticker Placement

*Nothing Shaves Better. We Guarantee It!*

Try M3POWER for 30 days... If you are not completely satisfied, we will send your money back. Call 1-800-GILLETTE for details. You will need your name, original cash register receipt and UPC symbol.

## Placement of Guarantee Sticker on Packaging

- Ensure placement of the Gillette M3Power Guarantee sticker on back of each package as shown in the illustration.
- Stickers are to be placed on all packaging for M3Power, M3Power TMR and M3Power Nitro that carry the wording "stimulate hair up and away".
- Packages to be stickered include the African American Special Packs, Max Performance Special Packs and Father's Day Packs.

**PLEASE BE SURE NOT TO COVER UPC BAR CODE. IT IS IMPORTANT THAT THE STICKER COMPLETELY COVERS THE VERBIAGE: STIMULATE HAIR UP AND AWAY.**



Placement for M3Power, M3Power TMR, and M3Power Nitro

M3Power

M3Power TMR

M3Power Nitro

*Nothing Shaves Better. We Guarantee It!*

Placement for Special Packs

Max Performance Special Packs

African American Special Packs

Father's Day Packs

*Nothing Shaves Better. We Guarantee It!*

☐ Permission was not given by _____ to sticker product.

Signature _____    Date _____

# M3Power Guarantee
# Sticker Placement

## Club Packs

- **PLEASE BE SURE NOT TO COVER UPC BAR CODE. IT IS IMPORTANT THAT THE STICKER COMPLETELY COVERS THE VERBIAGE: STIMULATE HAIR UP AND AWAY**
- Identify yourself to the Store Manager and explain what you will be doing in his/her store
- Only sticker merchandise on selling floor
- Do not attempt to sticker any merchandise in the racks above the selling floor and do not ask associates for assistance



Place Sticker Here! →



*Nothing Shaves Better,*
*We Guarantee It!*

Try M3POWER for 30 days. If you are not completely satisfied, we will send you your money back. Call 1-800-GILLETTE for details. You will need your razor, original cash register receipt and UPC symbol.

**EXHIBIT E**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,
ET AL,
    Plaintiffs

    v.

THE GILLETTE COMPANY,
    Defendant.

CIVIL ACTION NO.
3-05-cv-174 (JCH)

AUGUST 8, 2005

**ORDER TO SHOW CAUSE**

    WHEREAS, the Plaintiffs' Motion for Civil Contempt and for Order to Show Cause has come before the Court; and

    WHEREAS, upon motion of the Plaintiffs, it appears that an order should be issued directing the Defendant in this action to show cause why it should not be held in contempt for failure to obey this Court's Order of May 31, 2005 ("Preliminary Injunction Order") and June 20, 2005 ("Clarification Order");

    It is hereby ORDERED, that the Defendant respond in writing by August 31, 2005 to show cause why it should not be held in contempt for failure to obey the Preliminary Injunction Order and the Clarification Order as requested in the Plaintiffs' Motion for Civil Contempt and for Order to Show Cause. If appropriate, the court will then schedule a hearing.

**SO ORDERED**

    Dated at Bridgeport, Connecticut this 8th day of August, 2005.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge

**EXHIBIT  F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC,             :
EVEREADY BATTERY COMPANY, INC.,        :        CIVIL ACTION NO.
and ENERGIZER BATTERY, INC.            :
                                       :
               Plaintiffs,             :
                                       :
                                       :
          v.                           :
                                       :
THE GILLETTE COMPANY,                  :
                                       :
               Defendant.              :        JANUARY 28, 2005

COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

INTRODUCTION

1.    This action arises out of false and misleading advertising and promotion by
Defendant The Gillette Company ("Gillette") designed to stimulate sales of its newest and
highest-priced razor system, the M3 Power (the "M3P"), at the expense of competing
products manufactured by plaintiffs Schick Manufacturing, Inc., Eveready Battery
Company, Inc. and Energizer Battery, Inc. (collectively, "Schick").

2.    Schick is the second largest global manufacturer and marketer of so-called
"wet shave" razors for men and women.  Both Schick and Gillette sell two types of razors:
(1) "razor systems," which provide consumers with a permanent razor handle and separate

refillable blades; and (2) disposable razors, which, when worn out, are discarded in their entirety. There is little dual usage among customers who use razor systems and those who use disposable razors.

3.     Defendant Gillette is the world's market-share leader in wet shave razors. Wet shave systems razor are among the fastest growing market segments of the consumer products industry. Together, Gillette and Schick account for over 95% of men's wet shave systems razors in the United States. Growth in market share depends heavily on persuading consumers to "trade up" from older shaving designs to new, premium-priced and technologically-advanced shaving products that have been introduced in recent years. Advertising is the primary means by which Gillette tries to persuade consumers to trade up to new products and Gillette invests heavily in developing advertising claims to convince consumers to do so.

4.     In recent years, Schick has mounted a significant challenge to Gillette's market-share dominance. In 2003, Schick achieved a technological breakthrough with the introduction of its four-blade Quattro razor system -- the world's first four-blade razor system for men. The Quattro was named one of the 25 best products of the year by Fortune Magazine. Exhibit A. In 2004, Schick followed on the success of Quattro by introducing the Quattro Midnight, which offers four blades and an enhanced handle design for advanced precision and control. These products followed on the heels of other recent Schick innovations: the 2002 introduction of the three-bladed Xtreme 3 razor system and the 2000

2

introduction of the Xtreme 3 disposable razor. Upon information and belief, these breakthroughs by Schick have caused Gillette to make increasingly aggressive advertising claims for its products in an effort to stem Schick's market gains and contain the industry buzz that Schick has generated.

5.      This lawsuit seeks an injunction to stop, and damages for, advertising claims that Gillette is making about its M3 Power razor system that are false and misleading. More particularly, Schick seeks to prevent Gillette from claiming that the M3 Power makes hair stand "up and away from skin" so that a closer shave results. This claim, along with slight variations of it that are made by Gillette in a variety of media, are deceptive. Indeed, a court in Germany recently enjoined Gillette from making these claims after Schick filed litigation challenging them in that country. Exhibits B and C. Despite having dropped the claims in Germany, Gillette continues to make them in the United States and, upon information and belief, will not stop doing so until a U.S. court says that it must.

6..      Suit is brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a, et seq. As the two biggest manufacturers of the wet shave systems razors, Schick and Gillette compete keenly for sales of shaving systems. The advertising of products in this market has been and continues to be a critically important means of persuading consumers to choose one brand over the other. Making claims of the kind at issue here can have a profound impact on a razor system's sales. Therefore, it is critically important that a company's advertising about

3

its products be honest and fair. Because Gillette has violated this fundamental precept, Schick is entitled to injunctive relief and damages.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Gillette does business in this district and has engaged and is engaging in statutory violations and activities that are causing substantial injury to Schick in this district.

## THE PARTIES

9.    Plaintiff Schick Manufacturing, Inc. is a wholly-owned subsidiary of plaintiff Eveready Battery Company, Inc. and is headquartered in Milford, Connecticut. Insofar as relevant to this litigation, Schick Manufacturing, Inc. develops and manufactures Schick razor systems, including the Quattro Midnight and Quattro. Schick has a long history and proud heritage of producing high quality razors and shaving products, tracing its origins to World War I. In March 2003, the worldwide business and assets of Schick were purchased by Energizer Holdings, Inc., a publicly traded company that is not a party to this action.

10.    Plaintiff Eveready Battery Company, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in St. Louis, Missouri. Eveready Battery Company, Inc. is the parent of plaintiffs Schick

4

Manufacturing, Inc. and Energizer Battery, Inc.  Eveready Battery Company, Inc. owns the

trademarks for the Schick products at issue in this case.

11.    Plaintiff Energizer Battery, Inc., also is a wholly-owned subsidiary of plaintiff

Eveready Battery Company, Inc., with its principal place of business in St. Louis, Missouri.

The staff of Energizer Battery, Inc. provides non-technical support for the operations of

plaintiff Schick Manufacturing, Inc., including support for the sales of Schick products.

12.    Defendant Gillette is a corporation organized and existing under the laws of

the State of Delaware, with its principal executive offices located in Boston, Massachusetts.

Gillette has for many years been the nation's and world's largest supplier of shaving

products in terms of dollars and units sold.  Insofar as relevant to this litigation, Gillette

manufactures a razor system under the name "M3 Power."  This product competes directly

in the marketplace with Schick's razor systems.

### GILLETTE'S FALSE AND MISLEADING ADVERTISING AND PROMOTIONAL MATERIALS

13.    · Gillette launched the M3P in North America in May 2004.  Exhibit D.

Gillette called its M3P "revolutionary" because, using a AAA-sized battery in the razor

handle, it was said to "deliver[] gentle pulses to the shaving cartridge that stimulate hair

upward and away from the skin, making it dramatically easier to shave more thoroughly than

ever before."  Exhibit D at 1.  In the remainder of this complaint we refer to these types of

advertising claims by Gillette as "hair raising claims."

14.    Hair raising claims are the cornerstone of Gillette's marketing for the M3P in each of the media in which Gillette advertises.  On its website, Gillette asserts that the M3P's "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more thoroughly in one easy power stroke."  Exhibit E at 1.  Gillette's website also claims that the M3P's "pulsing action stimulates hair upward and away from the skin, making it dramatically easier to shave more thoroughly in one easy power stroke."  Id. at 2.

15.    Similar claims are made by Gillette on the retail package for the M3P.  The package tells consumers that "[g]entle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can get a closer and more thorough shave.  So thorough, there is less need to reshave, which means less irritation."  Exhibit F.

16.    Gillette also has featured hair raising claims in its print advertisements for the M3P.  Exhibit G.  A series of print ads says "Turn on the battery-powered motor.  Micro-pulses raise the hair from your skin.  So the PowerGlide blades can shave closer."  Id.  A separate print advertisement says "NEW! Gillette M3 Power[.]  Micro-Power[.]  Stimulates hair up and away from skin so you can get a closer and more thorough shave with less irritation."  Exhibit H.

17.    Gillette also has been aggressively advertising the M3P on television featuring the same false and misleading hair raising claims discussed above.  Television ads making the deceptive claims have appeared many thousands of times in homes across the country. Photoboards (i.e., still photographs and copy taken from the commercials) of some of these

6

commercials make clear that hair raising claims are the cornerstone of Gillette's efforts to persuade television viewers to buy the M3P. Exhibit I. One series of television ads tells consumers "New Gillette M3 Power. Turn it on and micro pulses raise the hair for the closest shave ever." Id. at 1, 2. A second series of ads (some employing slightly different wording) says "Introducing Gillette M3P. Turn on Gillette's first micro-power shaving system. Micro pulses raise the hair so you shave closer." Id. at 3-9.

18.    Gillette's hair raising claims for the M3P have already had a profound impact on consumer perception. For example, on or about January 20, 2005, the nationally syndicated daily comic strip "Pickles," by Brian Crane -- which on information and belief is published in over 300 newspapers worldwide and is available on the Internet -- made explicit reference to the hair raising claims. Exhibit J. The comic strip parrots the wording of the hair raising claims, stating "The blades gently vibrate, causing the hair to stand on end for a close shave." Id. The comic strip reflects the extent to which the M3P -- and the hair-raising claims -- have already penetrated the national consciousness.

19.    In December 2004, the Hamburg Regional Court in Germany, after briefing and evidentiary submissions by Schick as the applicant and Gillette as the respondent, entered an injunction barring Gillette from making hair raising claims in that country. In support of its request for an injunction, Schick submitted the affidavit of David J. Leffell of the Yale School of Medicine. Dr. Leffell, a renowned dermatologist, averred that he had determined through observation, investigation and testing of the M3P that "there is no

7

physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising . . . . It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud." Dr. Leffell wrote that his "conclusion, therefore, as a scientist and based on my personal observations, is that the claims in [Gillette's] advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair."

20.    After the German court entered its injunction, but prior to filing the instant lawsuit, Schick wrote to Gillette to demand that Gillette agree to cease making hair raising claims for the M3P in the United States, and also to challenge the validity of Gillette's claim that the M3P provides a closer shave than any other razor. Exhibit K. When Gillette refused to stop making hair raising claims for the M3P, this lawsuit followed.

### FIRST CAUSE OF ACTION
#### (Lanham Act Violation)

21.    Schick repeats and realleges each and every allegation contained in paragraphs 1 through 20 as if fully set forth herein.

22.    Gillette sells the M3P in interstate commerce and is engaging in an extensive, nationwide advertising campaign in connection with the marketing of the M3P that employs a variety of media, including television, print publications, product packaging and the Internet.

8

23.    A central message of this advertising campaign is that the M3P causes hair to stand up and away from the skin, thereby providing a closer, smoother shave.  Gillette delivers this message in each medium, using variously worded claims to convince consumers that the M3P causes hair to stand up and thereby provides a better shave than other razors, necessarily including those manufactured by Schick.

24.    The hair raising claims made by Gillette for its M3P are false or misleading and misrepresent the nature, characteristics or qualities of Gillette's product.  Upon information and belief, the claims are likely to deceive or confuse a substantial segment of the buying public and in fact have actually deceived or confused a substantial segment of the buying public.  Moreover, the claims have influenced or are likely to influence the buying public's purchasing decisions.  This deceptive conduct by Gillette is and has been deliberate and has injured and continues to injure consumers.

25.    The M3P razor system does not cause facial hair to "stand up" and Gillette knew or should have known that to be so.  Gillette also knew or should have known that the claims it is making about the M3P are false and misleading.

26.    Gillette's advertising of its M3P razor system, as described above, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

27.    Schick has been and continues to be damaged by Gillette's false advertising of the M3P, including by direct diversion of sales from itself to Gillette and the lessening of

goodwill which Schick's products enjoy among the buying public in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Connecticut Unfair Trade Practices Act)

28.    Schick repeats and realleges each and every allegation contained in paragraphs 1 through 27 as if fully set forth herein.

29.    Gillette's false and misleading claims in its advertising of the M3P razor system, as set forth above, were and are being disseminated in this district.

30.    Gillette knew or should have known that its claims were and are false and misleading. Moreover, Gillette made and continues to make these claims with reckless indifference to the rights of others and/or in intentional and wanton violation of those rights.

31.    Gillette's false claims constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

32.    As set forth above, Gillette's false advertisements for the M3P have caused and are causing substantial injury to Schick through the ascertainable loss of money or property.

33.    Gillette's conduct in the advertisement of the M3P constitutes an unfair trade practice in violation of Conn. Stat. § 42-110b.

## PRAYER FOR RELIEF

WHEREFORE, Schick respectfully requests that the Court enter judgment as follows:

A.     On Count One, an order directing an accounting by Gillette of its profits by reason of its false advertising, awarding Schick damages as allowed by law, and trebling Schick's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

B.     On Count Two, an order directing an accounting by Gillette of its profits by reason of its false advertising and awarding Schick actual and punitive damages pursuant to Conn. Gen. Stat. § 42-110g;

C.     An Order preliminarily enjoining Gillette from making hair raising claims in any advertisements for M3P;

D.     An Order permanently enjoining Gillette from making hair raising claims in advertisements for the M3P;

E.     An Order granting Schick its costs and disbursements in this action, including its reasonable attorneys' fees; and

F.     An Order granting Schick such other and further relief as this Court may deem just and proper.

PLAINTIFFS SCHICK MANUFACTURING, INC., EVEREADY BATTERY COMPANY, INC., and ENERGIZER BATTERY, INC.

_____/s/ Derek T. Werner_____
Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)
MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut 06103-3469
Telephone: (860) 240-6000
Facsimile:  (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com

Of Counsel:

Steven F. Reich, Esq. (pro hac vice pending)
Ronald G. Blum, Esq. (pro hac vice pending)
Jeffrey S. Edelstein, Esq. (pro hac vice pending)
Monica Y. Youn, Esq. (pro hac vice pending)
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 790-4500
Facsimile: (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs



EXHIBIT A



· Try 3 Issues Free
· Magazine Customer Service
· Subscribe to FORTUNE

Search FOR 

· Archive  · Current Issue

**Hey Baltimore!**   Fly on Southwest Airlines for **$39** to **$149** one-way nationwide   **BOOK NOW!**   SOUTHWEST.COM

RANKINGS      Companies | CEOs | Investing | Careers | Technology | Small Business | Downloads

## DESIGN
The 25 Best Products of the Year

**At Home**
**QUATTRO RAZOR** (left)
**Designer** Schick
**Why it's so cool** It's the first razor to incorporate four beard-busting blades. The sleek zinc handle with nonslip insets is comfortable in the hand, and two conditioning strips plus Schick's signature wire-wrapped blades keep skin smooth.
**Who loves it** Every tester FORTUNE enlisted.
**Price** $8.99; drugstores

**K-RING BOTTLE OPENER** (right)
**Designer** Karim Rashid for Copco
**Why it's so cool** "Round means lid, round means bottle, round means air bubbles, round is symbiotic with drinks," says Rashid. All we know is that his opener fits perfectly in the hand, and its candy-colored rim makes it easy to find in the drawer.
**Price** $5.95; tabletools.com



Photographs by David Lazarus

From the December 8, 2003 issue

**FORTUNE FREE TRIAL OFFER**
Get 3 FREE trial Issues of FORTUNE Magazine

Name:                State/Province: ··
Address:             Zip/Postal Code:
City:                E-mail:

Outside U.S. & Canada, click here    **Continue**

**RELATED STORIES**
· Electronics Guide: Gearing Up
· One Perfect Thing
· Look Like a Million Bucks ... for $500 or Less
· Magic Carpet Rides
· Total Cocktail Party Dominance: Design Lexicon

**SPECIAL PACKAGE**
· From Drab to Fab
· Design: 25 Best Products of the Year
· 25 Best Products: How We Picked Them

EXHIBIT B

[coat-of-arms]

[Stamped seals:]
*Landgericht* [Regional Court] of Hamburg

[Rubber-stamp:]
Received
79098 Freiburg
[initials]
10 January 2005
Count von Westphalen
Bappert & Modest

*Landgericht* [Regional Court] of Hamburg

J U D G M E N T

In the Name of the People

<u>Case No:</u>
<u>312 O 1037/04</u>

Published on
17 December 2004

Cisse, Court Officer
Documents Officer of the Court

In the Matter of

Wilkinson Sword GmbH,
represented by its managers,
Thomas Heinen and Wolfgang Althaus,
Schützenstrasse 110, 42659 Solingen

– Petitioner –

represented herein by

Count von Westphalen & Partners,
Attorneys at Law,
Kaiser-Joseph-Strasse 284,
79098 Freiburg,
Ref. No.: 2043/04 RNH/Mbw,

against

Gillette Deutschland GmbH & Co. oHG,
represented by its managing member partner,
Gilette [sic] Berlin Holding GmbH, in turn represented by
its managers, Ross McMullin and Helmut Heidrich,
Frankfurter Strasse 145, 61476 Kronberg/Taunus

– Respondent –

represented herein by

Mayer & Partners,
Attorneys at Law,
Bochenheimer Landstrasse 98-100,
60323 Frankfurt am Main,
Ref. No. 01086-03,

the Regional Court of Hamburg, Civil Section 12,
after oral hearing on 17 December 2004 by
Regional Court Judge Sievers, Presiding,
Regional Court Judge Dr. Kagelmacher,
Regional Court Judge Böttcher,

2

<u>ruled</u>:

The interlocutory injunction dated 16 November 2004 is affirmed.

The respondent must also bear the additional costs of the proceeding.

<div align="center">Statement of Facts:</div>

The parties are competitors in the marketing of wet shavers.

On 17 September 2004, the respondent introduced its new "M3 Power" Peak Shaver (cf. Exhibit Ast 2) on the German market. This shaver has a small, battery-operated motor, which creates gentle vibrations that are transmitted to the skin during shaving.

According to the respondent's advertising for the "M3 Power Shaver," its micro-pulses lift the facial hairs and thereby ensure a closer shave. For details of the respondent's advertising, reference is made to Exhibits Ast 2 to 5.

In the grounds set forth in its petition and in its pleadings dated 15 September 2004, the petitioner maintains that this advertising is inaccurate and deceptive. As evidence thereof, the petitioner produces the video clips, visible in Exhibit Ast 10, of a test commissioned by the petitioner. In the opinion of the petitioner, this test shows that shaving with the "M3 Power Shaver" does not create a situation in which the facial hairs would be lifted by micro-pulses and in this way a closer shave could consequently be achieved.

3

On 16 November 2004 the petitioner obtained a decision, with abstention from the policing measures provided by law, enjoining the respondent from taking the following actions, subject to the penalties provided by law:

1.1. Claiming for purposes of trade competition that during shaving with the M3 Power wet shaver, micro-pulses lift the facial hairs, thereby ensuring a closer shave, particularly if such claims make use of the following wording:

"The revolutionary new feature of the Gillette M3 Power Shaver: The handle of the high tech shaver contains a small motor that causes the blades to pulse gently. The skin is stimulated, and the hairs stand up better than they did with the predecessor MACH3Turbo model. So the blades can grip the hairs closer to the root – and the hairs are removed close down,"

and/or

"The new Power Shaver. So fantastic, so irresistible, that you simply have to have it. New now: the Gillette M3 Power Shaver. The first battery-operated Gillette shaving system with the revolutionary new PowerGlide blades. Switch it on. Micro-pulses lift the hairs to make the Gillette shave even more thorough. Feel the power of the best Gillette shave. For maximum power,"

and/or

"The first Gillette Micro-Power shaving system. Switch on the battery-operated motor. Micro-pulses lift the facial hairs so that the PowerGlide blades can shave even closer,"

4.

and/or

"The first micro-operated Gillette wet shaver: A small motor built into the handle and powered by a Duracell AAA battery creates gentle micro-pulses that stimulate the skin and lift the hairs,"

and/or

"Micro-Power
Gentle micro-pulses lift the hairs. For a thorough and careful shave in a single power application. So thorough that you need less post-shave touch-up. Result: less skin irritation";

1.2. Using for purposes of trade competition for the M3Power wet shaver advertising images showing initially flat beard stubble being lifted by vibrations produced by the shaver, particularly as shown in the advertising spot for the M3 Power shaver seen by the Court on CD-Rom.

In its defense the respondent contended in particular that the content of the contested advertising is appropriate and therefore not objectionable. According to the respondent, the micro-pulses created by the M3 Power Shaver lift the hairs by mechanical action; prior to shaving, the freedom of movement of the hairs was impeded by deposits of sebum and skin cells on the surface of the skin; during the growth process of the hair, this layer of skin cells and sebum

5.

creates an upward tension in the hair, since the hair is unable to project freely from the sub-cutaneous layers; if the layer of skin cells and sebum is removed or broken open, the hairs break through and project by approximately 80 micrometers, whereupon the now freely mobile hair can be cut better and definitely shorter; this effect can generally be achieved by mechanical actions, for example by rubbing with a hand towel (the "toweling effect"); with the "M3 Power Shaver" the micro-pulses ensure that the hair is released from the above-described adhesive situation and can stand up straight, which leads to a definitely closer shave. In the opinion of the respondent, the test carried out by the petitioner is not conclusive, one reason being that the set-up of the experiment anticipates the toweling effect created by rubbing the face with a warm hand towel.

The respondent prays
for overturning of the decision dated 16 November 2004 and for denial of the application dated 11 November 2004 for issuance of an interlocutory injunction.

The petitioner prays
for affirmation of the interlocutory injunction.

In addition to the allegations of the parties, reference is made to their pleadings together with the exhibits.

Grounds for the decision:

The objection is admissible and is without merit.

6

Even after due consideration of the allegations of the parties, the issuance of the interlocutory injunction proves to have been correct.

The subject of the injunction issued by the court is the advertising claims reproduced in paragraph 1.1 of the decision dated 16 November 2004 and the advertising images described in paragraph 1.2. They are unfair and deceptive, because they claim that shaving with the M3 Power Shaver lifts the facial hairs by means of micro-pulses created by said shaver, which has a positive effect on shaving. This statement is deceptive, because shaving with the M3 Power Shaver as instructed does not cause the facial hairs to stand up straight. This can in any case be determined, based on the following circumstances, with the overwhelming probability necessary for an interlocutory injunction proceeding: The M3 Power Shaver is a wet shaver, and according to the instructions its use requires a preparatory application of shaving cream. This shaving cream is customarily applied more or less thoroughly with a shaving brush to the beard area of the face, and is massaged in gently. The intensity of the mechanical effect on the skin may vary depending on the application of the shaving cream. The form in which the shaving cream is available can be particularly significant for this purpose. Independent thereof, however, in normal circumstances wet shaving is prefaced by a preparatory application of shaving cream, which has a mechanical effect on the face, but the intensity of which is not more limited than the intensity of the mechanical micro-pulses of the M3 Power Shaver. In addition, the shaving cream also acts chemically on the sebaceous layer coating the skin surface, according to the generally known cleansing effect of soap. If the layer of sebum and skin cells lying on the surface prior to shaving

7.

actually leads to a situation in which the hairs do not project as far above the skin as they would in the absence of this layer, dissolution of this layer and projection of the hairs do not require the micro-pulses of the M3 Power Shaver. In a normal situation this effect would already be created instead by the chemical and mechanical action on the skin connected with the customary preparatory application of shaving cream.

Aside from this fact, however, even the advertised relevance for shaving quality of the lifting of the hairs does not exist with overwhelming probability in the case of the shavers in question herein. The use of multiple blades leads to a situation in which the first of the multiple blades positioned one behind the other draws the hair slightly out of the hair channel while cutting it, so that the second blade following behind the first can cut the hair closer while again drawing it out a little farther, so that the hair is cut a third time if a third blade is present, as is the case in the products of the parties. This hysteresis effect is most probably not significantly impeded by the sebum and skin-cell layer described by the respondent, so that contrary to what is stated above this layer would not have to be already removed or broken open in connection with the customary preparation for shaving.

The accuracy of the respondent's advertising claims is also not supported by the test conducted by the Stiftung Warentest [Product Testing Foundation], produced by the respondent as Exhibit AG 1. In the context of this test, the M3 Power Shaver was subjected to further testing, and achieved the best result, albeit "out of competition". Whether this was due to the micro-pulses, however,

8.

was expressly left unstated by the Stiftung Warentest. In addition, the test is based solely on the subjective evaluation by the tester, and the Stiftung Warentest generally expressly takes a placebo effect into account for this test (Exhibit AG 1, page 21, bottom right). Obviously this could also have led to the outstanding rating assigned by the tester to the M3 Power Shaver, since many testers experienced the gentle vibrations as pleasant to the skin (Exhibit AG 1, page 23, top right), and since the micro-pulses can also be objectively advantageous with respect to shaving comfort and particularly for the prevent of skin irritations.

The decision as to costs is based on §91 of the Civil Procedure Code.

Sievers                          Dr. Kagelmacher                          Böttcher

Copy issued.
[signature]
Court Officer
Documents Officer of the Court

[Stamped seal:] Regional Court of Hamburg



**ERIKSEN**

ERIKSENINC.COM
TEL 718-802-9010
FAX 718-802-0041

# CERTIFICATE
## OF ACCURACY

STATE OF NEW YORK)

                    SS:

COUNTY OF KINGS)

This is to certify that the translation of the attached document:

**Judgment in the Matter of Wilkinson Sword GmbH, Petitioner, v. Gillette Deutschland GmbH & Co. oHG, Respondent**

is, to the best of my knowledge and belief, a true, complete and accurate translation from German into English.

_Camila Santos_
Camila Santos

Sworn to and subscribed before me

this 13th day of January 2005

_Leah G. Ruggiero_
Notary Public

LEAH G. RUGGIERO
Notary Public, State Of New York
No.01RU6013115
Qualified In Kings County
Commission Expires September 08, 200_6_

Landgericht Hamburg

U R T E I L

Im Namen des Volkes

Verkündet am:
17.12.2004

Cisse, JAe
als Urkundsbeamtin
der Geschäftsstelle

**Geschäfts-Nr.:**
**312 O 1037/04**

In der Sache

Wilkinson Sword GmbH,
vertreten durch ihre Geschäftsführer
Thomas Heinen und Wolfgang Althaus,
Schützenstraße 110, 42659 Solingen

- Antragstellerin -

Prozessbevollmächtigte    Rechtsanwälte Graf von Westphalen pp.,
Kaiser-Joseph-Straße 284,
79098 Freiburg,
Gz.: 2043/04 RNH/Mbw,

gegen

Gillette Deutschland GmbH & Co. oHG,
vertreten durch ihre geschäftsführende Gesellschafterin,
die Gilette Berlin Holding GmbH, diese wiederum vertreten durch
ihre Geschäftsführer Ross McMullin und Helmut Heidrich,
Frankfurter Straße 145, 61476 Kronberg/Taunus

- Antragsgegnerin -

Prozessbevollmächtigte    Rechtsanwälte Mayer pp.,
Bockenheimer Landstraße 98-100,
60323 Frankfurt am Main,
Gz.: 01086-03,

erkennt das Landgericht Hamburg, Zivilkammer 12
auf die mündliche Verhandlung vom 17.12.2004 durch

den Vorsitzenden Richter am Landgericht Sievers
den Richter am Landgericht Dr. Kagelmacher
den Richter am Landgericht Böttcher

2

für Recht:

Die einstweilige Verfügung vom 16.11.2004 wird bestätigt.

Die Antragsgegnerin hat auch die weiteren Kosten des Verfahrens zu tragen.

Tatbestand:

Die Parteien konkurrieren beim Vertrieb von Nassrasierern.

Die Antragsgegnerin führte am 17.9.2004 ihren neuen Spitzenrasierer „M3 Power" (vgl. Anl. Ast 2) auf dem deutschen Markt ein. Dieser Rasierer verfügt über einen kleinen, batteriebetriebenen Motor, der sanfte Schwingungen hervorruft, die beim Rasieren auf die Haut übertragen werden.

Die Antragsgegnerin warb für den „M3 Power" damit, dass dessen Mikroimpulse die Barthaare aufrichten und die Rasur so noch gründlicher machen. Wegen der Einzelheiten der Werbung der Antragsgegnerin wird auf Anl. Ast 2 bis 5 verwiesen.

Die Antragstellerin hält diese Werbung aus den in der Antragsschrift und im Schriftsatz vom 15.9.2004 genannten Gründen für unrichtig und irreführend und legt hierzu insbesondere die aus Anl. Ast 10 ersichtlichen Videoaufnahmen eines von Antragstellerseite veranlassten Tests vor. Aus diesem Test ergibt sich nach Auffassung der Antragstellerin, dass die Rasur mit dem „M3 Power" nicht dazu führt, dass durch Mikroimpulse die Barthaare aufgerichtet würden und so eine noch gründlichere Rasur erreicht werden könnte.

3

Die Antragstellerin erwirkte am 16.11.2004 einen Beschluss, mit welchem der Antragsgegnerin bei Meidung der gesetzlich vorgesehenen Ordnungsmittel verboten wurde

1.1. im geschäftlichen Verkehr zu Zwecken des Wettbewerbs zu behaupten, beim Rasieren mit dem Nassrasierer M3 Power richteten sich durch Micro-Impulse die Barthaare auf, wodurch die Rasur noch gründlicher werde, insbesondere wenn dies durch die folgenden Formulierungen geschieht:

„Das revolutionär Neue des Gillette M3 Power: Im Griff des Hightech-Rasierers befindet sich ein kleiner Motor, der die Klingen sanft pulsieren lässt. Die Haut wird stimuliert und die Haare richten sich noch besser auf als bei der Rasur mit dem Vorgängermodell MACH3Turbo. Dadurch kann die Klinge die Haare tiefer an der Wurzel fassen – und die Haare werden besonders gründlich entfernt.";

und/oder

„Die neue Power. So phantastisch, so unwiderstehlich, dass man sie einfach haben muss. Jetzt neu. Gillette M3 Power. Schalten Sie es ein – das erste batteriebetriebene Rasiersystem von Gillette mit den revolutionären neuen PowerGlide Klingen. Micro-Impulse richten die Haare auf und machen so die Gillette-Rasur noch gründlicher. Fühlen Sie die Power der besten Rasur von Gillette. Für maximale Power.";

und/oder

„Das erste Micro-Power Rasiersystem von Gillette. Schalten Sie den batteriebetriebenen Motor ein. Micro-Impulse richten die Barthaare auf. So können die PowerGlide Klingen noch gründlicher rasieren.";

4

und/oder

„Der erste microangetriebene Nassrasierer von Gillette:
Ein in den Griff integrierter kleiner Motor erzeugt sanfte
Micro-Impulse – angetrieben durch eine Duracell AAA-
Batterie. Diese wirken stimulierend auf die Haut und
richten die Barthaare auf.";

und/oder

„Micro-Power
Sanfte Micro-Impulse richten die Barthaare auf. Für eine
gründliche und sorgfältige Rasur in nur einem Power-Zug.
So sorgfältig, dass man weniger Nachrasieren muss.
Ergebnis: Weniger Hautirritationen.";

1.2  im geschäftlichen Verkehr zu Zwecken des Wettbewerbs für
den Nassrasierer M3 Power mit bildlichen Darstellungen zu
werben, in denen Gesichtshaut mit zunächst flachliegenden
Bartstoppeln gezeigt wird, die sich aufgrund von
Schwingungen, die vom Rasierer ausgehen, aufrichten,
insbesondere wie in dem Werbespot für den M3 Power, wie er
auf CD-Rom dem Gericht vorliegt.

Hiergegen wendet sich die Antragsgegnerin mit ihrem
Widerspruch, zu dessen Begründung sie insbesondere geltend
macht, die streitgegenständliche Werbung sei inhaltlich
zutreffend und daher nicht zu beanstanden. Die von dem M3
Power verursachten Mikroimpulse führen nach Behauptung der
Antragsgegnerseite auf mechanischem Wege zu einer Aufrichtung
der Barthaare, deren Bewegungsfreiheit vor der Rasur durch auf
der Hautoberfläche abgelagerte Hautpartikel sowie durch dort
abgelagerten Talg erschwert würde. Durch die Schicht aus
Hautpartikeln und Talg gerate das Barthaar aufgrund des

— 5

Wuchsprozesses in eine nach oben gerichtete Spannung, da das Barthaar nicht ungehindert aus den unteren Hautschichten heraustreten könne. Werde die Schicht aus Hautpartikeln und Talg beseitigt oder aufgebrochen, so richte sich das Barthaar eruptiv auf, und zwar um bis zu ca. 80 Micrometer. Danach könne das nunmehr frei bewegliche Barthaar besser und deutlich kürzer abgeschnitten werden. Dieser Effekt könne generell durch mechanische Einwirkungen, etwa auch durch Abreiben mit einem Handtuch (sog. „towelingeffect") erreicht werden. Beim „M3 Power" würden die Mikroimpulse dafür sorgen, dass das Barthaar aus der beschriebenen Verklebung gelöst werde und sich aufrichten könne, was zu einer deutlich gründlicheren Rasur führe. Der von Antragstellerseite durchgeführte Test ist nach Auffassung der Antragsgegnerin nicht aussagekräftig, u.a. weil die Versuchsanordnung den towelingeffect durch Abreiben der Gesichtshaut mit einem warmen Handtuch vorweg nehme.

**Die Antragsgegnerin beantragt,**

den Beschluss vom 16.11.2004 aufzuheben und den Antrag auf Erlass einer einstweiligen Verfügung vom 11.11.2004 zurückzuweisen.

**Die Antragstellerin beantragt,**

Bestätigung der einstweiligen Verfügung.

Zur Ergänzung des Vorbringens der Parteien wird auf ihre Schriftsätze nebst Anlagen verwiesen.

**Entscheidungsgründe:**

Der zulässige Widerspruch ist nicht begründet.

6

Die einstweilige Verfügung erweist sich auch unter
Berücksichtigung des Parteivorbringens im
Widerspruchsverfahren als zu Recht ergangen.

Gegenstand des gerichtlichen Verbotes sind die im Beschluss
vom 16.11.2004 zu 1.1. wiedergegebenen Werbeaussagen sowie die
zu 1.2. umschriebene bildliche werbliche Darstellung. Diese
sind unlauter und irreführend, weil sie die Behauptung
enthalten, die Rasur mit dem M3 Power bewirke durch dessen
Mikroimpulse, dass sich die Barthaare aufrichten, was sich für
die Rasur positiv auswirke. Diese Aussage ist irreführend,
weil die Rasur mit dem M3 Power bei bestimmungsgemäßer
Verwendung des Gerätes nicht zu einem Aufrichten der Barthaare
führt. Dies lässt sich aufgrund folgender Umstände jedenfalls
mit der für das Verfahren der einstweiligen Verfügung
erforderlichen überwiegenden Wahrscheinlichkeit feststellen:
Beim M3 Power handelt es sich um einen Nassrasierer, bei
dessen Anwendung der Rasur bestimmungsgemäß eine Vorbereitung
durch das Aufbringen von Rasierschaum vorausgeht. Dieser
Rasierschaum wird üblicherweise mit einem Rasierpinsel mehr
oder minder gründlich auf der Bartwuchszone der Gesichtshaut
verteilt und leicht einmassiert. Dabei mag die Intensität der
mechanischen Einwirkung auf die Gesichtshaut durch das
Aufbringen des Rasierschaums durchaus variieren. Hierfür kann
insbesondere von Bedeutung sein, in welcher Form der
Rasierschaum zur Verfügung steht. Davon unabhängig erfolgt
aber im Normalfall der Nassrasur eine Vorbereitung der Rasur
durch Aufbringen von Rasierschaum, die mit einer mechanischen
Einwirkung auf die Gesichtshaut einhergeht, deren Intensität
jedenfalls nicht geringer ist als die der mechanischen
Mikroimpulse des M3 Power. Hinzukommt, dass der Rasierschaum
auch auf chemischen Wege auf die auf der Hautoberfläche
befindliche Talgschicht einwirkt, entsprechend der allgemein
bekannten reinigenden Wirkung von Seife. Sollte die auf der
Hautoberfläche vor der Rasur befindliche aus Talg und

7

Hautpartikeln bestehende Schicht tatsächlich dazu führen, dass
die Barthaare weniger weit aus der Haut hervortreten, als dies
ohne diese Schicht der Fall wäre, so bedarf es zur Auflösung
dieser Schicht und dem Hervortreten der Barthaare demnach
nicht der Mikroimpulse des M3 Power. Dieser Effekt würde dann
vielmehr jedenfalls im Normalfall bereits durch die chemisch-
mechanische Einwirkung auf die Gesichtshaut im Rahmen der
üblichen Rasurvorbereitung durch das Aufbringen des
Rasierschaums hervorgerufen.

Davon abgesehen ist aber auch die in der Werbung zum Ausdruck
gebrachte Relevanz des Aufrichtens der Barthaare für die
Qualität der Rasur mit überwiegender Wahrscheinlichkeit bei
den hier in Rede stehenden Rasierern mit Mehrfachklingen nicht
gegeben. Der Einsatz von Mehrfachklingen führt dazu, dass von
den mehreren hintereinander angeordneten Klingen die erste
Klinge das Barthaar beim Abschneiden etwas aus dem Haarkanal
herauszieht, so dass die darauf folgende zweite Klinge das
Haar tiefer abschneiden kann. Hierbei wird es noch einmal ein
Stückchen weiter herausgezogen, so dass es ein drittes Mal
gekürzt wird, wenn eine dritte Klinge vorhanden ist, wie dies
bei den Produkten der Parteien der Fall ist. Dieser sog.
Hystereseeffekt wird mit überwiegender Wahrscheinlichkeit
nicht signifikant durch die von Antragsgegnerseite
beschriebene Schicht aus Talg und Hautzellen behindert, soweit
diese - entgegen den oben Ausgeführten - nicht bereits im
Rahmen der üblichen Rasurvorbereitung beseitigt bzw.
aufgebrochen worden sein sollte.

Die Richtigkeit der Werbebehauptungen der Antragsgegnerin wird
auch nicht durch den von Antragsgegnerseite als Anl. AG 1
eingereichten Test der Stiftung Warentest belegt. Im Rahmen
dieses Testes wurde auch der M3 Power nachgetestet und
erzielte dabei - wenn auch „außer Konkurrenz" - das beste
Ergebnis. Ob das an den Mikroimpulsen lag, wurde jedoch von

8

der Stiftung Warentest ausdrücklich dahingestellt. Hinzukommt, dass der Test allein auf der subjektiven Einschätzung der Tester basiert und ein Placeboeffekt von der Stiftung Warentest für diesen Test ganz allgemein ausdrücklich in Rechnung gestellt wird (Anl. AG 1, S. 21 unten rechts). Dies kann nahe liegender Weise auch zu der herausragenden Einschätzung des M3 Power durch die Tester geführt haben, da die leichten Vibrationen auf der Haut von vielen Testern als angenehm empfunden wurden (Anl. AG 1 S. 23 oben rechts) und da die Mikroimpulse hinsichtlich des Komforts der Rasur und insbesondere für die Vermeidung von Hautirritationen auch durchaus objektiv von Vorteil sein mögen.

Die Kostenentscheidung folgt aus § 91 ZPO.

Sievers                Dr. Kagelmacher              Böttcher

EXHIBIT C

# Hamburg Regional Court
## 12th Civil Division

Sievekingplatz 1
20355 Hamburg
Tel.: +49 (0)40 42843 2526
Fax: +49 (0)40 42843 3935
Fax for time-critical submissions:
+49 (0)40 42843 4318 or -19

312 O 1143/04

## ORDER

dated 28 December 2004

In the matter of

**Wilkinson Sword GmbH,**
represented by its managing directors
Thomas Heinen and Wolfgang Althaus,
Schützenstrasse 110, 42659 Solingen

- Applicant -

Counsel:

Law firm of Graf von Westphalen pp.,
Kaiser-Joseph-Strasse 284,
79098 Freiburg
Ref: 2593/04 RNH/MBW

versus

**Gillette Deutschland GmbH & Co. oHG,**
represented by its managing partner
Gillette Berlin Holding GmbH, in turn represented
by its managing directors Ross McMullin and Helmut Heidrich,
Frankfurter Strasse 145, 61476 Kronberg/Taunus

- Respondent -

the Hamburg Regional Court, 12th Civil Division, through

Presiding Judge at the Regional Court Sievers

Judge at the Regional Court Dr. Kagelmacher

Judge at the Regional Court Böttcher

has issued the following order.

I.   By way of an interim injunction – granted without a full hearing owing to the great urgency of the matter – the respondent is

<div align="center">prohibited</div>

from promoting its M3Power wet shaver commercially for the purposes of competition as follows:

> "Turn on the power.
> Gentle micro-power stimulates the skin.
> Your Gillette shave is now even closer.
> Feel the power of the best ever Gillette shave.
> The new M3Power from Gillette."

II.  The respondent will be liable to pay an administrative fine for each instance of violation pursuant to I and, in the event that this cannot be collected, will be liable to imprisonment, or a term of imprisonment of up to six months (fine not exceeding €500,000.00 in an individual case, term of imprisonment maximum two years in total).

III. The respondent is ordered to pay the costs of the proceedings.

IV.  The value of the litigation is set at €350,000.00.

<div align="center">Grounds:</div>

In the prior interim injunction proceedings (312 O 1037/04), the court criticised the respondent's advertising claims for its new M3Power product for being misleading. In the grounds for the judgment dated 17 December 2004, the court stated that the respondent's advertising contained the claim that the micro-pulses generated when shaving with the M3 Power caused the facial hairs to stand up, which had a positive effect on the shave. It went on to say that:

"This advertising is misleading because when the device is used as directed, shaving with the M3 Power does not cause the facial hairs to stand up. This can be established - at least with the overriding probability required for interim injunction proceedings - from the following facts: the M3 Power is a wet razor and when used as directed, the shave is preceded by the application of shaving lather. This lather is usually spread across the part of the face on which beard hair grows, using a shaving brush, and lightly worked in. The thoroughness with which the lather is spread varies, and it is therefore entirely possible that the intensity of the mechanical effect on the facial skin achieved through the application of the shaving lather will vary. In particular, the form of shaving lather used may well be of significance in this respect. Regardless of that, however, a wet shave is normally preceded by the application of the shaving lather, which necessarily entails application of mechanical force to the facial skin. The intensity of this mechanical force is not less than that of the mechanical micro-pulses of the M3 Power."

The respondent's advertising was amended as a result of the court prohibition, but the new advertising is also to be regarded as misleading. It still contains the claim that the pulses generated by the battery and described in the TV advert as "gentle micro-power" are the reason why the shave delivered by the new M3Power is even closer.

At the beginning of the TV advert, mention is made of the patented M3Power glide blades. However, these are specifically associated with "less skin irritation". The sequence that follows, which is contained in the operative part of the judgment, then deals with the innovative aspect of the M3Power, the small battery-powered motor which produces gentle vibrations. The statements "Gentle micro-power stimulates the skin. Your Gillette shave is now even closer." assert that the stimulation of the skin is the reason for the improved closeness. It seems obvious that the respondent's advert will be understood this way – namely an explicit causality between the vibrations and the special closeness – because of the lingering impact of the respondent's extensive advertising campaign, whose original message was that the special closeness is a result of the lifting of the facial hair

Accordingly, the latest application for an interim injunction is allowed. The decision as to costs ensues from section 91 ZPO (German Code of Civil Procedure).


Sievers                Kagelmacher                Böttcher


[stamp]

Engrossed

Clerk of the court



Language Solutions

## C E R T I F I C A T E

I, Rachel Louise Arnold, professional translator to LingServe of 43 Queens Road, Aldershot, Hants

GU11 3JE, being competent to translate from German to English hereby certify that the annexed

translation in the English language, executed by me is, to the best of my professional knowledge and

skill, a true and accurate translation of the German version likewise hereunto annexed.

_____    Date: January 21, 2005

Encl.
1) Beschluss v. d. LG Hamburg 312 O 1143/04
2) Order by Hamburg Regional Court 312 O 1143/04

LingServe Limited, Registered in England & Wales, No. 4845437 Registered office: 43 Queens Road, Aldershot, Hants GU11 3JE
Tel: 01252 356 052    Fax: 01252 330 253    Email: service@lingserve.co.uk
VAT Reg. No: 689 0765 81

# Landgericht Hamburg

Zivilkammer 12

Sievekingplatz 1
20355 Hamburg
Telefon: 040/ 42843 2526
Telefax: 040/ 42843 3935
fristwahrendes Telefax:
040/ 42843 4318 o. -19

312 O 1143/04

B E S C H L U S S

vom 28.12.2004

Eingegangen
79098 Freiburg

-3. Jan. 2005

Graf von Westphalen
Bappert & Modest

In der Sache

Wilkinson Sword GmbH,
vertreten durch ihre Geschäftsführer
Thomas Heinen und Wolfgang Althaus,
Schützenstraße 110, 42659 Solingen

- Antragstellerin -

Prozessbevollmächtigte        Rechtsanwälte Graf von Westphalen pp.,
                              Kaiser-Joseph-Straße 284,
                              79098 Freiburg,
                              Gz.: 2593/04 RNH/MBW,

gegen

Gillette Deutschland GmbH & Co. oHG,
vertreten durch ihre geschäftsführende Gesellschafterin,
die Gilette Berlin Holding GmbH, diese wiederum vertreten durch ihre
Geschäftsführer Ross McMullin und Helmut Heidrich,
Frankfurter Straße 145, 61476 Kronberg im Taunus

- Antragsgegnerin -

beschließt das Landgericht Hamburg, Zivilkammer 12 durch

den Vorsitzenden Richter am Landgericht Sievers

den Richter am Landgericht Dr. Kagelmacher

den Richter am Landgericht Böttcher

2.

I.  Im Wege einer einstweiligen Verfügung – der Dringlichkeit
    wegen ohne mündliche Verhandlung – wird der
    Antragsgegnerin

                    verboten,

    im geschäftlichen Verkehr zu Zwecken des Wettbewerbs
    ihren Nassrasierer M3Power wie folgt zu bewerben:

        „Schalten Sie ein.
        Sanfte Micro-Power stimuliert die Haut.
        Ihre Gillette-Rasur ist jetzt noch gründlicher.
        Fühlen Sie die Power der besten Rasur von Gillette.
        Der neue M3Power von Gillette"

II.  Der Antragsgegnerin wird für jeden Fall der Zuwiderhand-
     lung gegen das Verbot gemäß I. die Verhängung eines Ord-
     nungsgeldes und für den Fall, dass dieses nicht beige-
     trieben werden kann, einer Ordnungshaft oder einer Ord-
     nungshaft bis zu 6 Monaten angedroht (Ordnungsgeld im
     Einzelfall höchstens DM 500.000,--; Ordnungshaft insgesamt
     höchstens 2 Jahre).

III. Die Antragsgegnerin hat die Kosten des Verfahrens zu
     tragen.

IV.  Der Streitwert wird auf € 350.000,-- festgesetzt.

                    Gründe:

Die Kammer hat in dem vorangegangenen einstweiligen Verfü-
gungsverfahren 312 O 1037/04 Werbebehauptungen der Antrags-
gegnerin für ihr neues Produkt M3Power als irreführend bean-
standet. Die Kammer hat in den Gründen des Urteils vom 17.12.
2004 ausgeführt, dass die Werbung der Antragsgegnerin die Be-

3.

hauptung enthalte, die Rasur mit dem M3 Power bewirke durch
dessen Mikroimpulse, dass sich die Barthaare aufrichten, was
sich für die Rasur positiv auswirke. Weiter ist ausgeführt
worden:

> „Diese Werbung ist irreführend, weil die Rasur mit dem
> M3 Power bei bestimmungsgemäßer Verwendung des Gerätes
> nicht zu einem Aufrichten der Barthaare führt. Dies
> lässt sich aufgrund folgender Umstände jedenfalls mit
> der für das Verfahren der einstweiligen Verfügung er-
> forderlichen überwiegenden Wahrscheinlichkeit feststel-
> len: Beim M3 Power handelt es sich um einen Nassrasi-
> rer, bei dessen Anwendung der Rasur bestimmungsgemäß
> eine Vorbereitung durch das Aufbringen von Rasierschaum
> vorausgeht. Dieser Rasierschaum wird üblicherweise mit
> einem Rasierpinsel mehr oder minder gründlich auf der
> Bartwuchszone der Gesichtshaut verteilt und leicht ein-
> massiert. Dabei mag die Intensität der mechanischen
> Einwirkung auf die Gesichtshaut durch das Aufbringen
> des Rasierschaums durchaus variieren. Hierfür kann ins-
> besondere von Bedeutung sein, in welcher Form der Ra-
> sierschaum zur Verfügung steht. Davon unabhängig er-
> folgt aber im Normalfall der Nassrasur eine Vorberei-
> tung der Rasur durch Aufbringen von Rasierschaum, die
> mit einer mechanischen Einwirkung auf die Gesichtshaut
> einhergeht, deren Intensität jedenfalls nicht geringer
> ist als die der mechanischen Mikroimpulse des M3
> Power."

Die auf Grund des gerichtlichen Verbotes geänderte Werbung der
Antragsgegnerin ist ebenfalls als irreführend zu beurteilen.
Sie enthält nach wie vor die Behauptung, dass die durch die
Batterie hervorgerufen, im Werbespot als „Sanfte Micro-
Power" bezeichneten Impulse die Ursache dafür seien, dass die
Rasur mit dem neuen M3Power noch gründlicher ausfalle.

Zu Beginn des Werbespots wird auf die patentierten M3Power-
Gleitklingen hingewiesen. Diese werden jedoch speziell in Be-
ziehung gesetzt zu „Weniger Hautirritationen". Die dann fol-
gende, aus dem Tenor des Beschlusses ersichtliche Sequenz be-
fasst sich sodann mit der Neuerung des M3Power, dem kleinen
batteriebetriebenen Motor, der sanfte Schwingungen hervorruft.
Mit den Aussagen: „Sanfte Micro-Power stimuliert die Haut.

4

Ihre Gillette-Rasur ist jetzt noch gründlicher." kommt zum
Ausdruck, dass die Stimulierung der Haut die Ursache für die
noch größere Gründlichkeit darstelle. Es liegt auch nahe, dass
der Werbespot der Antragsgegnerin in dieser Weise - nämlich
einer ausdrücklichen Kausalität der Schwingungen für die be-
sondere Gründlichkeit - verstanden wird, weil nach der umfang-
reichen Werbeinitiative der Antragsgegnerin die ursprünglich
verbreitete Botschaft der besonderen Gründlichkeit infolge des
Aufrichtens der Barthaare noch nachwirken dürfte.

Demgemäß ist dem neuerlichen Antrag auf Erlass einer einstwei-
ligen Verfügung stattzugeben. Die Kostenentscheidung folgt aus
§ 91 ZPO.

Sievers              Kagelmacher              Böttcher



EXHIBIT D







- NEW PRODUCTS
  WET SHAVING
  DRY SHAVING
  PERSONAL CARE

PRODUCT NEWS

## GILLETTE POWERS UP THE WORLD'S BEST SHAVE WITH NEW M3POWER
### – MACH3 Innovation Shaves More Thoroughly and Closer In One Easy Stroke –

BOSTON, MA, January 15, 2004 – The Gillette Company today launched M3Power, a revolutionary powered wet shaving system for men. M3Power – a MACH3 innovation – combines breakthrough blade and razor technologies with innovative engineering for a totally new shaving experience that delivers the world's best shave.

M3Power outperforms all men's shaving systems, including MACH3Turbo – the world's leading razor – in closeness and comfort, by shaving more hair, closer in one easy power stroke.

The M3Power razor, with Micro-Power™ technology, delivers gentle pulses to the shaving cartridge that stimulate hair upward and away from the skin, making it dramatically easier to shave more thoroughly than ever before. The M3Power razor works synergistically with M3Power's proprietary blades, which incorporate PowerGlide™, the Company's most advanced blade technology, to provide a new level of glide and comfort. The M3Power system operates under 62 patents.

"Building on the tremendous success of the MACH3 franchise, we're powering up the world's best shave and providing a superior shaving experience," said Peter K. Hoffman, President, Blades and Razors, The Gillette Company. "We expect this new system to substantially fuel the value of the blade and razor category, in the same way that MACH3Turbo has driven growth over the past two years."

In addition to its revolutionary powered razor, Gillette M3Power includes other innovations that contribute to a superior shaving performance. The proprietary blades with PowerGlide™ technology are enhanced by a new coating, called "thin uniform telomer," which provides a perceptible improvement in shaving comfort throughout the life of the blade. Other features include an Indicator® LubrastripTM infused with Vitamin E and Aloe, and a superbly engineered handle with strategically placed gripping surfaces that enable men to shave confidently and safely at any angle. M3Power also is shower-safe, so men can shave wherever they prefer.

Consumer testing among hundreds of men confirms that M3Power is the new gold standard in shaving performance. M3Power was significantly preferred over the current best-performing shaving system, MACH3Turbo, which beat Schick Quattro by a 2-to-1 margin.

"The performance of M3Power is unprecedented," said Mr. Hoffman. "Consumer testing, conducted according to the industry's most rigorous standards, concluded that M3Power is preferred overall and on every one of the 68 shaving attributes that were tested, including

closeness, comfort, efficiency, safety and less irritation. M3Power is clearly the world's best shaving system."

Gillette M3Power will be available in North America in May 2004 in food, drug, convenience and mass merchandise stores. M3Power will be supported by an extensive marketing campaign, including print, radio, television and internet advertising, in-store promotions, POS displays and direct mail. The shaving system includes the refillable razor, two cartridges and a AAA Duracell battery and will retail for approximately $14.99. An M3Power 4-pack of refill cartridges will retail $10.99; an 8-pack will retail for approximately $20.99. As always, retail prices are the sole discretion of individual retailers.

Headquartered in Boston, Mass., The Gillette Company is the world leader in male grooming, a category that includes blades, razors and shaving preparations. Gillette also holds the number one position worldwide in selected female grooming products, such as wet shaving products and hair epilation devices. In addition, the Company is the world leader in alkaline batteries, and manual and power toothbrushes.

### #

 

EXHIBIT E

Gillette - The Best a Man Can Get



The Gillette Company | Grooming | Wet Shaving - Men                         Page 1 of 3



Home    Careers    Shop Online    Contact Us    Site Map    Our Sites

COMPANY
INVESTORS
SOCIAL RESPONSIBILITY
PRESS ROOM
PRODUCTS

PRODUCTS OVERVIEW
FEATURED PRODUCT
■ GROOMING
BATTERIES/FLASHLIGHTS
ORAL CARE
PERSONAL CARE
APPLIANCES

### GROOMING

Wet Shaving - Men          

**Gillette M3Power**

 Gillette M3Power -- a MACH3 innovation -- is a groundbreaking, powered wet shaving system for men that delivers a totally new shaving experience resulting in Gillette's best shave ever.

M3Power builds on the heritage of MACH3 and combines Gillette's latest and best razor and blade technologies. M3Power outperforms all other blades and razors in closeness, comfort and safety during and after the shave.

Gillette M3Power features other innovations beyond power: new blades featuring PowerGlide™ -- an enhanced blade coating for incredible glide and maximum comfort, a moisturizing Indicator® Lubrastrip™ and a technologically-advanced handle.

Features and Benefits:
* Gillette M3Power features Micro-Power™, a gentle pulsing action powered by a Duracell AAA battery.
* The pulsing action stimulates hair upward and away from the skin, making it dramatically easier to shave more thoroughly in one easy power stroke.
* The blades are enhanced by a new coating process, called "thin uniform telomer," which provides a perceptible improvement in shaving comfort throughout the life of the blade.
* The blade cartridge features an Indicator® Lubrastrip™ infused with Vitamin E and Aloe for added moisture.
* A new handle features strategically-placed gripping surfaces that enable men to shave confidently and safely at any angle. The power button is centrally located on the handle for maximum control, and the Duracell AAA battery is easy to insert and replace.
* The razor is shower-safe, allowing a man to shave wherever he prefers.

Click Here to Experience the M3Power Website



**Gillette Mach3Turbo**
Gillette Mach3Turbo is the most technologically advanced manual shaving system in the world.

Extensive testing among men has established conclusively that MACH3Turbo is the best-performing manual shaving system ever, significantly outperforming Gillette's own MACH3, the world's leading razor. MACH3Turbo provides men with the best manual razor for the closest and most comfortable shave with less irritation, even when shaving against the grain.

The Mach3Turbo shaving system provides a number of important design features and benefits, including:

- Protected by 45 patents, MACH3Turbo combines several innovations, including Anti-Friction™ blades, an ultra-soft protective skinguard, a patented lubrication system and an improved razor handle.
- Three blades with advanced Anti-Friction™ coating allow MACH3Turbo to remove more of each hair with less irritation.
- The ultra-soft skinguard consists of ten thinner and more flexible microfins that precede the blades and smooth out the skin, gently lifting even stubborn hairs before the first blade cuts them.
- The Indicator® lubricating strip with Vitamin E features a patented lubrication system, which releases even more lubrication over a greater number of shaves, improving razor glide and adding to shaving comfort. The green stripe fades with use to signal when men are no longer getting the optimal MACH3Turbo shave.
- The MACH3Turbo handle features knurled elastomeric crescents and metal grooves that provide better handling and control when shaving, and a sleek, modern design with a titanium-like finish.
- Superior forward-pivoting action, housed in the cartridge itself instead of the blade handle, allows the three blades to glide effortlessly along the surface of the skin while maintaining their progressive alignment.
- Open cartridge architecture makes rinsing and cleaning the MACH3Turbo blades easier than ever; the single-point docking system—loading the cartridge at one point instead of two—makes it virtually impossible for consumers to accidentally load a cartridge upside down.
- Independently moving spring-mounted blades sense and adjust to every contour of the face, adding to the closeness and comfort of the shave.
- The shaving organizer holds both the razor and extra cartridges, stands on end for convenient storage and packs easily for travel.

Click Here to Experience the Mach3Turbo Website

**Gillette Mach3**
The Gillette Mach3, the first triple-blade razor was introduced in 1998 and has become the world's leading razor.

Three independently suspended blades are specially positioned to shave you progressively closer in a single stroke. And each blade comes equipped with DLC™ comfort edges allowing Mach3 to glide effortlessly across your face for a close, comfortable shave.

Other features include:
- Single-point cartridge docking - for easy loading
- Indicator™ lubricating strip - blade stripe fades away to let you know when you're no longer experiencing the optimal Mach3 shave
- Open cartridge architecture - for easy rinsing
- Ergonomic handle design - for improved handling

**Sensor**
After its unveiling in late 1989 to trade and media, the Gillette Sensor shaving system was introduced in January 1990 in 16 countries, marking the Company's first pan-Atlantic product launch. The Sensor system has won many awards (for product innovation, design, advertising excellence) and has been accepted into several museum collections.

The Gillette Company | Grooming | Wet Shaving - Men

The Sensor system features twin blades that are individually mounted on highly responsive springs and that automatically adjust to facial contours.

**SensorExcel**
Introduced in 1993, the SensorExcel twin blade cartridge incorporates a revolutionary skin guard composed of five soft, flexible microfins that deliver — at the time — unprecedented shaving closeness and comfort. It debuted in Western Europe, with a U.S. launch in 1994.

**Atra**
The Atra automatic-adjusting twin blade razor and cartridge were introduced in the U.S. in 1977 and became the best-selling razor in the country that year. It features a pivoting, rather than fixed, twin blade cartridge head. The Atra Plus system— which is the Atra razor, plus the new Lubrasmooth lubricating strip— was introduced in 1985.

**Trac II**
The world's first twin blade shaving system, lightweight and easy to handle, Trac II was introduced in 1971. GII, its international version, was introduced in Germany, its first overseas market, in 1972.

**Custom Plus**
The Custom Plus line of twin blade disposable razors for men and women was introduced in 1994, featuring an improved lubricating strip and longer handle for greater control.

**Good News**
The Good News twin blade men's disposable razor, introduced in 1976, became the top-selling disposable razor in the U.S. that year and has remained number one since then. The line has been improved and broadened several times, including the 1984 launch of Good News Pivot, which features a moving cartridge head that automatically adjusts to facial contours.

A limited selection of products is available for purchase online at theEssentials.com.

EXHIBIT F



Replaceable
AAA Battery
included

Pile AAA
remplaçable
comprise

...meilleur rasage
*Gillette qui soit.*



SHOWER SAFE
PEUT ÊTRE UTILISÉ
DANS LA DOUCHE

## Micro-Pulse™

Gentle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can get a closer and more thorough shave.

So thorough, there is less need to reshave, which means less irritation.

## New PowerGlide™ Blades

Patented blade coating produces Gillette's smoothest blade surface for incredible glide . . . and a level of comfort that only **M³POWER** can give.

## Indicator & Lubrastrip™

with Vitamin E and Aloe.

- Gillette's best shave ever - the **M³POWER** razor plus PowerGlide™ blades.

- For best results use with **M³POWER** cartridges.

- All **MACH3** cartridges fit all **MACH3** razors.

## Micropulsations™

De légères micropulsations stimulent les poils pour les soulever et les éloigner de la peau. En un seul passage puissant, vous pouvez obtenir un rasage de plus près et plus complet.

Le rasage est si complet que vous n'êtes plus obligé de repasser au même endroit, réduisant ainsi l'irritation.

## Nouvelles lames PowerGlide™

Le revêtement breveté assure la surface la plus lisse de toutes les lames Gillette pour un glissement incroyable . . . et un niveau de confort que seul **M³POWER** peut offrir.

## Bande indicatrice Lubrastrip™

enrichie de vitamine E et d'aloès.

- Le meilleur rasage Gillette qui soit - le rasoir **M³POWER** et les lames PowerGlide™.

- Pour des résultats optimaux, utiliser avec les cartouches **M³POWER**.

- Les cartouches **MACH3** conviennent à tous les rasoirs **MACH3**.

© 2004 Distributed by/Distribué par
Gillette Commercial Operations North America
Box 61, Boston, MA 02199
® Registered
Trademark /
® Marque
déposée



Razor handle made in China. Monture de rasoir fabriquée en Chine.
U.S. Patent Nos. / N°s de brevets américains
4,586,255.  4,624,051.  4,726,918.  4,807,401.  4,916,817.  5,263,668.
5,113,585.  5,191,712.  5,295,305.  5,303,539.                5,399,204.
5,701,788.  5,761,814.  5,782,346.  5,784,750.                5,787,586.
5,794,354.  5,800,627.  5,813,293.  5,822,869.                5,855,071.
5,890,296.  5,906,834.  5,918,369.  5,956,848.                5,956,851.
5,998,431.  6,009,624.  6,029,354.  6,035,537.                6,041,926.
6,044,542.  6,046,764.  6,052,903.  6,065,446.                6,185,822.



EXHIBIT G



# THE MIRROR
## doesn't lie.

### FEEL THE POWER OF THE WORLD'S BEST SHAVE.

©2001 The Gillette Company

**Gillette®**

**M³POWER**

A *MACH3®* INNOVATION™

## The First Micro-Power™ Shaving System From Gillette.



Turn on the battery-powered motor.



Micro-pulses raise the hair from your skin.



So the PowerGlide™ blades can shave closer.



**Gillette**

*The Best a Man Can Get*




# SOMEONE
## will change the world today.

**FEEL THE POWER OF
THE WORLD'S BEST SHAVE.**

Gillette®
**M³POWER**

A *MACH3*
INNOVATION™



## The First Micro-Power™
## Shaving System From Gillette.



Turn on the
battery-powered motor.



Micro-pulses raise the
hair from your skin.



So the PowerGlide™
blades can shave closer.

**Gillette**

*The Best a Man Can Get*



# UP BEFORE THE SUN

**before the world knows what bites.**

**FEEL THE POWER OF THE WORLD'S BEST SHAVE.**



Gillette
**M3POWER**
A *MACH3*
INNOVATION™

**The First Micro-Power™ Shaving System From Gillette.**





Turn on the battery-powered motor.



Micro-pulses raise the hair from your skin.



So the PowerGlide™ blades can shave closer.

***Gillette***

*The Best a Man Can Get*

EXHIBIT H

Find it first at **CVS/pharmacy**



# GOOD VIBRATIONS
## For The World's Best Shave!



### NEW!
### Gillette M3 Power
MICRO-POWER
Stimulates hair up and away
from skin so you can get a
closer and more thorough
shave with less irritation.

### Available Today
Tuesday, May 18th

---

### Sale Price $13.99
with ExtraCare® card
*Earn $4.00 Extra Bucks™

### WOW!
It's like getting
the razor for

## $9.99 with
ExtraCare® card

*Your $4.00 Extra Bucks™ will begin to print at the register
2 days after qualifying purchases have been made.

EXHIBIT I



| | |
|---|---|
| PRODUCT  Gillette M3 Power | LENGTH   30 |
| MARKET   Network | STATION  WNYW |
| PROGRAM  Nascar | DATE     05/30/2004 |
| CODE #   040510325 | TIME     06:03 PM |
| TITLE    Young Guns: Green Light From Garage | |



(MUSIC IN) MALE ANNCR: The



Gillette Young Guns.



(MUSIC)



(MUSIC)



MALE (VO): What kind of powers he got in that thing?



MAN #1: Pretty cool, huh? MALE ANNCR: New Gillette M3 Power. Turn it on



and micro pulses raise the hair



for the closest shave ever. (SFX: RACE CAR IN)



MAN #1: You can't keep that power to yourself.



MAN #2: Wait till I show the guys.



ANNCR: M3 Power. The new power



behind the Gillette Young Guns. (SFX/MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T 212 736 2010



VMS

PRODUCT  Gillette M3 Power
MARKET   Network
PROGRAM  Nascar
CODE #   040510348
TITLE    Young Guns: Power Makeover

LENGTH   30
STATION  WNYW
DATE     05/30/2004
TIME     07:07 PM



(SFX: CAR IN & OUT)



(MUSIC IN) MAN #1  This guy needs a



power makeover.



(MUSIC)



MAN #2: Dude, this should be illegal.
MAN #3: Time to move along. (SFX:
MEN WORKING ON CAR IN)



MALE ANNCR: New Gillette M3 Power.
Turn it on



and micro pulses raise the hair for the
closest shave ever.



MAN #4: Wow!



(MUSIC)



MALE (VO): Looks like our work's done
here, guys. (SFX: OUT)



ANNCR: M3 Power  The new power
behind



the Gillette Young Guns. (MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS.

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T  212 736 2010



| | |
|---|---|
| PRODUCT Gillette M3 Power | LENGTH 15 |
| MARKET San Francisco, CA | STATION KTVU |
| PROGRAM Friends | DATE 08/18/2004 |
| CODE # 040806486 | TIME 07:02 PM |
| TITLE A Power So Awesome/ New Models | REV OF # 040505459 |



(MUSIC IN) (SFX: WHOOSH IN) MALE ANNCR: Introducing Gillette M3 Power.



Turn on Gillette's first micro-power shaving system.



Micro pulses raise the hair so you shave closer.



Feel the power



of the world's best shave.



New M3 Power from Gillette. (MUSIC/SFX OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street New York, NY 10036 T 212 736 2010



| | |
|---|---|
| PRODUCT | Gillette M3 Power |
| MARKET | Network |
| PROGRAM | Rock Me Baby |
| CODE # | 040508682 |
| TITLE | A Power So...Irresistable/Drop Date |

| | |
|---|---|
| LENGTH | 30 |
| STATION | WWOR |
| DATE | 05/25/2004 |
| TIME | 09:02 PM |
| REV OF # | 040505459 |



(MUSIC IN) MALE ANNCR: There's a power so awesome.



so irresistible.



you'll do anything to get your hands on it.



Introducing Gillette M3 Power.



Turn on the first micropower shaving system



from Gillette, and turn on the amazing



new PowerGlide blades.



Micropulses raise the hair, so you shave closer



In one power stroke. Feel the power



of the world's best shave.



New M3 Power, a Mach3 innovation from Gillette.



the best a man can get. (MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T  212 736 2010



| | |
|---|---|
| PRODUCT Gillette M3 Power | LENGTH 30 |
| MARKET Network | STATION TBS |
| PROGRAM Everybody Love Raymond | DATE 08/25/2004 |
| CODE # 040808735 | TIME 06:08 PM |
| TITLE A Power So... Irresistible/ Change Battery | REV OF # 040505459 |



(MUSIC IN) (SFX: ERUPTING NOISE)
MALE ANNCR: There's a power



so awesome, so irresistible you'll do
anything



to get your hands on it. (SFX OUT)



Introducing Gillette M3 Power.



Turn on the first battery powered
shaving system from Gillette



and turn on the amazing new power
glide blades.



Micro pulses raise the hair so you shave
closer



in one power stroke. Feel the power



of the world's best shave.



For maximum power, change the
battery



every six months.



New M3 Power from Gillette.
(MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law

330 West 42nd Street, New York, NY 10036  T  212 736 2010



| | |
|---|---|
| PRODUCT Gillette M3 Power | LENGTH 30 |
| MARKET Network | STATION WNYW |
| PROGRAM MLB Playoffs | DATE 10/17/2004 |
| CODE # 041005387 | TIME 04:55 PM |
| TITLE A Power...Irresistible/End Shot | REV OF # 040505459 |



(MUSIC IN) (SFX: EXPLOSIONS IN) MALE ANNCR: There's a power so awesome, so irresistible,



you'll do anything



to get your hands on it.



Introducing Gillette M3 Power.



Turn on the first battery-powered shaving system from Gillette



and turn on the amazing new Power Glide Blade.



Micropulses raise the hair.



so you shave closer in one power stroke.



Feel the power



of the world's best shave.



For maximum power, change the battery every 6 months.



New M3 Power. From Gillette. (MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T  212 736 2010





PRODUCT   Gillette M3 Power
MARKET    Network
PROGRAM   Saturday Night Live
CODE #    040705009
TITLE     A Power So Awesome & Irresistible

LENGTH    15
STATION   NBC
DATE      07/17/2004
TIME      11:53 PM
REV OF #  040505459



(MUSIC IN) MALE ANNCR: Introducing Gillette M3 Power.



Turn on Gillette's first micropower



shaving system.



Micropulses raise the hairs, so you shave closer.



Feel the power of the world's best shave.



New M3 Power. From Gillette. (MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law

330 West 42nd Street, New York, NY 10036  T  212 736 2010



PRODUCT  Gillette M3 Power          LENGTH  30
MARKET   Network                    STATION  MTV
PROGRAM  Videos                     DATE    05/17/2004
CODE #   040505459                  TIME    04:06 PM
TITLE    A Power So Awesome & Irresistable



(MUSIC IN) (SFX· SONIC
EXPLOSIONS IN) MALE ANNCR:
There's a power so awesome, so
irresistible



you'll do anything to get your hands on
it.



Introducing



Gillette M3 Power



Turn on the first micropower shaving
system from Gillette



and turn on the amazing new power
glide blades



Micropulses raise the hair



so you shave closer in one power
stroke.



Feel the power



of the world's best shave.



New M3 Power.



Available everywhere May 24th.
(MUSIC/SFX OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law
350 West 42nd Street, New York, NY 10036  T 212 736 2010



| | |
|---|---|
| PRODUCT Gillette M3 Power | LENGTH 15 |
| MARKET Network | STATION ABC |
| PROGRAM Monday Night Football | DATE 10/18/2004 |
| CODE # 041006001 | TIME 09:29 PM |
| TITLE A Power So Awesome/Battery Powered, End | REV OF # 040505459 |



(MUSIC IN) MALE ANNCR: Introducing Gillette



M3 Power.



Turn on Gillette's first battery-powered shaving system. Micropulses



raise the hair, so you shave closer.



Feel the power of the world's best shave.



New M3 Power. From Gillette. (MUSIC OUT)

VIDEO ALSO AVAILABLE IN ANALOG & DIGITAL FORMATS

Material supplied by VMS may be used for internal review, analysis or research only. Any editing, reproduction, publication, re-broadcasting, public showing or display for profit is forbidden and may violate copyright law.

330 West 42nd Street, New York, NY 10036  T  212 736 2010



**Energizer.**

January 26, 2005

Via Facsimile 617/421-7891

Kevin Loftus, Esq.
Deputy General Counsel
The Gillette Company
Prudential Tower Building
Boston, Massachusetts 02199-8004

                    Re:    Gillette M3 Power

Dear Kevin:

        I write to bring to your attention two separate sets of claims made by Gillette in the U.S.
about its M3 Power razor that Schick's testing shows to be false and misleading. The first is that
the M3 Power raises the hair on a man's face so that a closer shave results (hereinafter the "hair
raising claims"). The second is that the M3 Power shaves closer than any other razor
(hereinafter the "superiority claims"). We discuss below each of these claims, and the steps that
Gillette must take to address Schick's concerns about each.

I.      The Hair Raising Claims

        A central theme of Gillette's advertising for the M3 Power is that it raises hair from the
face, thereby providing a closer shave. The precise wording of the claim varies from
advertisement to advertisement and medium to medium, but includes the assertions that the M3
Power "raise[s] the hair" on a man's face or "stimulates hair up and away from skin" or
"stimulates hair upward and away from the skin" so that a closer shave results. For example, a
television commercial for the M3 Power that is currently airing claims that "micro-pulses raise
the hairs, so you shave closer." Schick's testing and expert analysis show these claims to be
false and misleading, and a court in Germany agreed with Schick when it entered an injunction
barring Gillette from making hair raising claims in that country.

        I am confident that you are familiar with Schick's testing, which was submitted to the
German court in conjunction with Schick's request for injunctive relief. If, for some reason, you
do not have copies, I would be happy to give you our submission. I think you will recognize that
our testing, combined with the expert analysis of David J. Leffell, M.D. of the Yale School of
Medicine, show Gillette's hair raising claims to be false and misleading. Dr. Leffell, one of the
world's leading dermatologists, wrote in his affidavit in the German litigation that "as a scientist
and based on my personal observations . . . the claims in [Gillette's] advertising relating to [the
M3 Power's] ability to raise up hairs do[] not have any scientific basis. The product cannot be
demonstrated to have such an effect on facial hair." Leffell Affidavit at Conclusions ¶ 6. We

2

have also reviewed Gillette's testing and do not believe the hair raising claims to be supported by credible testing. Indeed, the court in Germany reached the same conclusion when it enjoined Gillette from making hair raising claims in that country.

Gillette's false and misleading hair raising claims have injured and continue to injure Schick throughout the United States. Moreover, Gillette has been on notice of the falsity of these claims at least since the pendency of the German litigation. Accordingly, with respect to the hair raising claims, we must insist that, no later than 12 noon Eastern Standard Time on January 28, 2005, Gillette agree to: (a) withdraw all such claims in all media; (b) cancel and withdraw all reclaimable media; and (c) withdraw or sticker all packaging and point of sale material. Finally, Gillette must provide a schedule acceptable to Schick for taking the above steps.

We note that Gillette's December 16, 2004 press release announced the launch in early Spring 2005 of the Venus Vibrance. According to that press release, the Venus Vibrance will deliver "gentle pulses to the shaving cartridge to provide the closest, smoothest Venus shave ever." Please be advised that Schick will object to any hair raising claims for the Venus Vibrance as well.

## II.    The Superiority Claims

The superiority claims made by Gillette for its M3 Power also are false and misleading. In its advertising for the M3 Power, Gillette variously claims that the razor offers "the world's best shave" or "the best shave" or "the closest most comfortable shave" or "the closest shave ever" and that it "outperforms all other blades and razors in closeness." However, Schick has conducted consumer use and instrumental testing showing that the M3 Power is not superior to the Quattro Midnight in the closeness of the shave. Accordingly, Gillette's claims are false and deceptive to consumers.

Schick's independent consumer use testing was conducted at geographically diverse locations throughout the United States and evaluated the Quattro Midnight against the Mach3 Turbo and the Quattro Midnight against the M3 Power. Each study involved more than 500 men who shaved themselves and were questioned about the closeness and smoothness of the shave they received from each razor. The closeness and smoothness of the shave was assessed by three separate groups of evaluators: the study participants; a consumer panel; and a professional panel. These tests revealed no statistically significant differences overall between the Quattro Midnight and the Mach3 Turbo or the Quattro Midnight and the M3 Power. In sum, these tests prove that Gillette's superiority claims for the M3 Power are false.

Schick's independent instrumental testing involved the use of digital imaging and compared the closeness of the shave delivered by the Quattro Midnight, Mach3 Turbo and M3 Power for 27 participants. The study results showed that the Quattro Midnight delivered a closer shave than either the Mach3 Turbo or M3 Power, a result that was statistically significant at greater than the 95% confidence level.

We recognize that Gillette will want the opportunity to perform its own tests to verify these comparisons between the Quattro Midnight and M3 Power. Accordingly, in contrast to our

3

demand with respect to the hair raising claims, we are not asking Gillette to take any action within the next 48 hours with respect to its superiority claims for the M3 Power in the United States. Instead, we will be sending you under separate cover for your testing and analysis 500 Quattro Midnight razors with chromium interlayer blades, which are the only Quattro blades that Schick currently manufactures. These are the blades used in the above-described independent testing. We are prepared to give Gillette two months — through and including March 31, 2005 -- to test the Quattro Midnight against the M3 Power using these blades. We are confident you will conclude that M3 Power is not superior to the Quattro Midnight and that you will be prepared to take the following steps in the United States: (a) withdraw all superiority claims; (b) cancel and withdraw all reclaimable media; and (c) withdraw or sticker all packaging and point of sale material. Finally, Schick will expect Gillette to provide a schedule acceptable to Schick for taking the above steps. Schick's offer to provide Gillette a period for testing is without prejudice to any of its legal rights and is made in good faith solely as an accommodation to Gillette. I intend to have the Quattro Midnight razors shipped directly to you unless, upon receipt of this letter, you provide me with a different address to which you want them shipped.

I look forward to hearing from you no later than 12 noon Eastern Standard Time on January 28, 2005 with regard to the hair raising claims being made for the M3 Power and no later than 5:00 p.m. Eastern Standard Time on April 1, 2005 with regard to the superiority claims for that same razor.

Sincerely,

Gayle G. Stratmann
Vice President and General Counsel

FILED

2005 JAN 28 P 4: 22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT DISTRICT COURT
HARTFORD, CT.

SCHICK MANUFACTURING, INC,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.

       Plaintiffs,

      v.

THE GILLETTE COMPANY,

       Defendant.

CIVIL ACTION NO.

305CV174 CFD

JANUARY 28, 2005

### JURY DEMAND

The Plaintiffs, Schick Manufacturing, Inc., Eveready Battery Company, Inc., and

Energizer Battery, Inc., hereby demand a trial by jury.

PLAINTIFFS SCHICK MANUFACTURING,
INC., EVEREADY BATTERY COMPANY,
INC., and ENERGIZER BATTERY, INC.

Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)
MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com

Of Counsel:

Steven F. Reich, Esq. (pro hac vice pending)
Ronald G. Blum, Esq. (pro hac vice pending)
Jeffrey S. Edelstein, Esq. (pro hac vice pending)
Monica Y. Youn, Esq. (pro hac vice pending)
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 790-4500
Facsimile:  (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC, EVEREADY BATTERY COMPANY, INC., and ENERGIZER BATTERY, INC. | : | CIVIL ACTION NO. |
| | : | |
| Plaintiffs, | : | 305CV174 |
| | : | |
| v. | : | JANUARY __, 2005 |
| | : | |
| THE GILLETTE COMPANY, | : | |
| | : | |
| Defendant. | : | |

DECLARATION OF DAVID J. LEFFELL, MD

DAVID J. LEFFELL, M.D., states under penalty of perjury:

**Background and Experience**

1.   I am a Professor of Dermatology and Surgery and Chief of Dermatologic Surgery at the Yale School of Medicine.  My career has been exclusively in academia within the Department of Dermatology at the Yale School of Medicine, New Haven, CT.

2.   By way of qualifications, I graduated with a Bachelor of Science cum laude with Special Distinction in biology from Yale University in 1977.  I then received a Doctor of Medicine degree from McGill University, Montreal, Canada in 1981.

3.   I joined Yale School of Medicine as an assistant professor in the Department of Dermatology and worked in this capacity until the present time where I hold the rank of Professor.

4.    From 1988 to the present time I have been the founder and Chief of Dermatologic

Surgery in the Department of Dermatology at the Yale School of Medicine.

5.    Attached as Exhibit 1 to this declaration is a copy of my curriculum vitae.

Brief

6.    On or about September 2004, I was contacted by Schick Wilkinson Sword to

discuss expert assistance which I might be able to offer in relation to these proceedings.

7.    I was asked by Joseph Cwirka of Schick Wilkinson Sword to examine and

investigate the functions and operation of the M3 Power razor, which I understood to be

produced by The Gillette Company.

8.    In particular, I was asked to determine through observation and investigations of

samples of these products and testing of the same:

(a)    whether in my opinion there is a sound basis for the claim that the M3

Power product produces "micro pulses";

(b)    whether such "micro pulses" have any effect on hairs on a user's face

while in use, particularly in terms of actually raising hairs up away from the skin as is

claimed in Gillette's advertising for the product and as currently appears on Gillette's

website; and

(c)    what my opinion was of the testing protocol followed by Schick

Manufacturing, Inc. ("Schick") to observe the actual effect of the M3 Power product on

a user's face, in particular, on the facial hair.

9.    As a result of these instructions, I was present at Schick's laboratory in Milford,

Connecticut on October 8, 2004. I then made observations and conducted straightforward

investigations of both the M3 Power product, the apparatus set up, and the testing protocol to

observe the actual effect of the product on facial hair.

Observations

10.    The first point to note is that the M3 Power device utilises a razor head, which

appears identical to the non-battery operated version of the same razor, namely the Mach 3

Turbo, samples of which I had the opportunity to examine. My interest was therefore in the

actual effect the battery-operated mechanism would have while in use, as I could observe no

significant difference.

11.    In relation to the testing protocol adopted, I have reviewed and considered the

protocol. I observed that the testing was conducted in accordance with the protocol and in a

professional manner. Now exhibited to me and marked as Exhibit 2 to this declaration is a true

copy of the testing protocol, in the form of an affidavit of Chris Kohler, one of the technicians

present during the testing conducted in my presence on October 8, 2004.

12.    I noted also that the apparatus consisted of a holder, which held the M3 Power

razor against a test subject's face in such a way as to reasonably replicate the typical angle and

nature of contact of a consumer in use.

13.    I observed that each subject placed his head in a head brace to prevent movement,

and further observed that, while in the process of analysis, the razor was moved against the face

in a consistent manner with even pressure (there being no room for movement of the test subject

whilst in the head brace). Two strokes were made on each test subject, one stroke with the

power off and one stroke with the power on.

14.    A high precision camera monitored the movement of the M3 Power razor over the

skin and associated software as described in Exhibit 2 and footage was recorded in my presence.

Now exhibited to me and attached as Exhibits 3 through 7 to this declaration are true copies of the actual footage for each of the five test subjects. I observed that the relevant patch of skin on the side of the face was in a good clear position for such photography although it should be noted that this location is identical to any other part of the face for the purpose of this test, as location of the facial hair does not affect at all how the same reacts, nor the results, observations, or conclusions of this test.

15.    The attached footage clearly shows (when viewed in slow speed) the effect of the product on the relevant patch of skin, and in particular, on the hairs contained therein.

16.    As one can see from Exhibits 3 through 7 and as I observed on the day in question, there was clearly no effect on the hair that was subject to the M3 Power razor in terms of any effect that would cause the hairs to stand up or stand proud of the skin.

17.    I observed no such hair raising or hair directional change effect in either the on position or the off position. In each case, the hairs remains lying flat against the skin in their original directional pattern with the exception of occasional minimal perturbation which was exclusively lateral in nature and at all times parallel to the skin surface.

18.    I understand the M3 Power product has been applied to further test subjects not in my presence. This additional footage is attached as Exhibit 8 to this declaration. Having reviewed this additional footage taken following the same protocol, I can confirm that this accurately reflects what I personally observed and again clearly shows no hair raising/lifting effect.

## Conclusions

19.    From reviewing the protocol and observing the test in practice, I conclude that this protocol and overall methods of observing and assessing the M3 Power razor's performance,

in relation to its claimed effect, is both valid and accurate. The equipment used, test subjects examined, footage taken and so on, in my opinion as a scientist and skin specialist of many years, are all valid elements required in order to conduct a thorough and reliable investigation of the accuracy of the hair raising/lifting claims.

20.    I should add that one of the key elements in this type of analysis is ensuring a clear image is taken at appropriate magnification. In my opinion, both as a clinical and non-clinical photographer and as a doctor regularly utilising specialized cameras and optical equipment to view the skin in practice, the camera equipment used is of a high standard rendering very accurate images of the skin and, in particular, of the effect on the facial hair.

21.    From my observations, I have concluded that the "micro pulses," (the exact meaning of which is not clear to me as a scientist and clinician), which the respondent claims the product emits, do not have the effect of causing the facial hair to rise up or stand proud of skin. Indeed, the hair continues to remain in the general state and direction that it was in prior to the application of the M3 Power razor (until the moment, of course, that such hairs that are cut are indeed cut as the M3 Power razor passes over them).

22.    In relation to the effects on the skin and the facial hair of these "micro pulses," I think it is worth pointing out that it is not altogether clear what the phrase "micro pulses" means. In my opinion, the device simply appears to be applying a vibration effect through a motor in the handle. Essentially, this vibration is mostly felt in the palm and the entire product vibrates when the motor is switched on.

23.    In my opinion, as a dermatologic specialist, there is no physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising (copies of the same are attached as Exhibit 8 to this

declaration). It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud.

24.     My conclusion therefore, as a scientist and based on my personal observations, is that the claims in the defendant's advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair.

25.     As one can see from the footage taken, the hairs are clearly not responding in any such fashion and are certainly not responding in the way that the respondent is claiming in its advertising.

Executed this 12ᵗʰ day of January, 2005.

David J. Leffell, MD
_____
David J. Leffell, M.D.

80322038.1

EXHIBIT K

08/11/2005 THU 16:08 FAX                                                    ☒006/033

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

SCHICK MANUFACTURING, INC,                    :     CIVIL ACTION NO.
EVEREADY BATTERY COMPANY, INC.,               :
and ENERGIZER BATTERY, INC.                   :
                                              :     305CV174
            Plaintiffs,                       :
                                              :
                                              :
        v.                                    :     JANUARY ___, 2005
                                              :
THE GILLETTE COMPANY,                         :
                                              :
            Defendant.                        :

---

DECLARATION OF DAVID J. LEFFELL, MD

DAVID J. LEFFELL, M.D., states under penalty of perjury:

Background and Experience

1.      I am a Professor of Dermatology and Surgery and Chief of Dermatologic Surgery

at the Yale School of Medicine. My career has been exclusively in academia within the

Department of Dermatology at the Yale School of Medicine, New Haven, CT.

2.      By way of qualifications, I graduated with a Bachelor of Science cum laude with

Special Distinction in biology from Yale University in 1977. I then received a Doctor of

Medicine degree from McGill University, Montreal, Canada in 1981.

3.      I joined Yale School of Medicine as an assistant professor in the Department of

Dermatology and worked in this capacity until the present time where I hold the rank of

Professor.

4.    From 1988 to the present time I have been the founder and Chief of Dermatologic Surgery in the Department of Dermatology at the Yale School of Medicine.

5.    Attached as Exhibit 1 to this declaration is a copy of my curriculum vitae.

Brief

6.    On or about September 2004, I was contacted by Schick Wilkinson Sword to discuss expert assistance which I might be able to offer in relation to these proceedings.

7.    I was asked by Joseph Cwirka of Schick Wilkinson Sword to examine and investigate the functions and operation of the M3 Power razor, which I understood to be produced by The Gillette Company.

8.    In particular, I was asked to determine through observation and investigations of samples of these products and testing of the same:

(a)    whether in my opinion there is a sound basis for the claim that the M3 Power product produces "micro pulses";

(b)    whether such "micro pulses" have any effect on hairs on a user's face while in use, particularly in terms of actually raising hairs up away from the skin as is claimed in Gillette's advertising for the product and as currently appears on Gillette's website; and

(c)    what my opinion was of the testing protocol followed by Schick Manufacturing, Inc. ("Schick") to observe the actual effect of the M3 Power product on a user's face, in particular, on the facial hair.

9.    As a result of these instructions, I was present at Schick's laboratory in Milford, Connecticut on October 8, 2004. I then made observations and conducted straightforward

investigations of both the M3 Power product, the apparatus set up, and the testing protocol to observe the actual effect of the product on facial hair.

Observations

10.    The first point to note is that the M3 Power device utilises a razor head, which appears identical to the non-battery operated version of the same razor, namely the Mach 3 Turbo, samples of which I had the opportunity to examine. My interest was therefore in the actual effect the battery-operated mechanism would have while in use, as I could observe no significant difference.

11.    In relation to the testing protocol adopted, I have reviewed and considered the protocol. I observed that the testing was conducted in accordance with the protocol and in a professional manner. Now exhibited to me and marked as Exhibit 2 to this declaration is a true copy of the testing protocol, in the form of an affidavit of Chris Kohler, one of the technicians present during the testing conducted in my presence on October 8, 2004.

12.    I noted also that the apparatus consisted of a holder, which held the M3 Power razor against a test subject's face in such a way as to reasonably replicate the typical angle and nature of contact of a consumer in use.

13.    I observed that each subject placed his head in a head brace to prevent movement, and further observed that, while in the process of analysis, the razor was moved against the face in a consistent manner with even pressure (there being no room for movement of the test subject whilst in the head brace). Two strokes were made on each test subject, one stroke with the power off and one stroke with the power on.

14.    A high precision camera monitored the movement of the M3 Power razor over the skin and associated software as described in Exhibit 2 and footage was recorded in my presence.

Now exhibited to me and attached as Exhibits 3 through 7 to this declaration are true copies of the actual footage for each of the five test subjects. I observed that the relevant patch of skin on the side of the face was in a good clear position for such photography although it should be noted that this location is identical to any other part of the face for the purpose of this test, as location of the facial hair does not affect at all how the same reacts, nor the results, observations, or conclusions of this test.

15.    The attached footage clearly shows (when viewed in slow speed) the effect of the product on the relevant patch of skin, and in particular, on the hairs contained therein.

16.    As one can see from Exhibits 3 through 7 and as I observed on the day in question, there was clearly no effect on the hair that was subject to the M3 Power razor in terms of any effect that would cause the hairs to stand up or stand proud of the skin.

17.    I observed no such hair raising or hair directional change effect in either the on position or the off position. In each case, the hairs remains lying flat against the skin in their original directional pattern with the exception of occasional minimal perturbation which was exclusively lateral in nature and at all times parallel to the skin surface.

18.    I understand the M3 Power product has been applied to further test subjects not in my presence. This additional footage is attached as Exhibit 8 to this declaration. Having reviewed this additional footage taken following the same protocol, I can confirm that this accurately reflects what I personally observed and again clearly shows no hair raising/lifting effect.

Conclusions

19.    From reviewing the protocol and observing the test in practice, I conclude that this protocol and overall methods of observing and assessing the M3 Power razor's performance,

in relation to its claimed effect, is both valid and accurate. The equipment used, test subjects examined, footage taken and so on, in my opinion as a scientist and skin specialist of many years, are all valid elements required in order to conduct a thorough and reliable investigation of the accuracy of the hair raising/lifting claims.

20.     I should add that one of the key elements in this type of analysis is ensuring a clear image is taken at appropriate magnification. In my opinion, both as a clinical and non-clinical photographer and as a doctor regularly utilising specialized cameras and optical equipment to view the skin in practice, the camera equipment used is of a high standard rendering very accurate images of the skin and, in particular, of the effect on the facial hair.

21.     From my observations, I have concluded that the "micro pulses," (the exact meaning of which is not clear to me as a scientist and clinician), which the respondent claims the product emits, do not have the effect of causing the facial hair to rise up or stand proud of skin. Indeed, the hair continues to remain in the general state and direction that it was in prior to the application of the M3 Power razor (until the moment, of course, that such hairs that are cut are indeed cut as the M3 Power razor passes over them).

22.     In relation to the effects on the skin and the facial hair of these "micro pulses," I think it is worth pointing out that it is not altogether clear what the phrase "micro pulses" means. In my opinion, the device simply appears to be applying a vibration effect through a motor in the handle. Essentially, this vibration is mostly felt in the palm and the entire product vibrates when the motor is switched on.

23.     In my opinion, as a dermatologic specialist, there is no physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising (copies of the same are attached as Exhibit 8 to this

☒013/033

declaration). It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud.

24.    My conclusion therefore, as a scientist and based on my personal observations, is that the claims in the defendant's advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair.

25.    As one can see from the footage taken, the hairs are clearly not responding in any such fashion and are certainly not responding in the way that the respondent is claiming in its advertising.

Executed this 12th day of January, 2005.

David Leffell, MD

David J. Leffell, M.D.

80322058.1

EXHIBIT 1

*Curriculum Vitae*

# DAVID J. LEFFELL, MD

## APPOINTMENTS

Senior Associate Dean for Clinical Affairs, Yale School of Medicine
Director, Yale Medical Group
Professor of Dermatology and Surgery (Plastic and Otolaryngology);
Chief, Section of Dermatologic Surgery and Cutaneous Oncology
Department of Dermatology
Yale University School of Medicine
Yale Dermatologic Surgery
40 Temple Street, 5th Floor, Suite 5A
New Haven, CT 06510

### Contact Information
Telephone:  203-785-7999
Cell phone: 203-675-2935
Home telephone: 203-773-3077
Fax:  203-737-1359
Email: david.leffell@yale.edu

## EDUCATION

1973-1977:  Yale College, New Haven, CT: BS, cum laude; Special Distinction in Biology
1977-1981:  McGill University Faculty of Medicine, Montreal: MD, CM
1999:      Yale University, New Haven, CT: MS, Honorary

## CAREER

1981-1982: **Intern**, internal medicine: Cornell Cooperating Hospitals (Memorial-Sloan Kettering Cancer Center, New York, NY and North Shore University Hospital, Manhasset, NY)
1982-1984: **Resident** in internal medicine: Cornell Cooperating Hospitals, New York, NY
1982-1984: **Clinical Associate** in Medicine, Cornell University Medical College, New York, NY
1984-1986: **Resident** in dermatology, Yale New Haven Hospital, New Haven, CT
1986-1987: **N.I.H. Post-doctoral Research Fellow**, Department of Dermatology, Yale University School of Medicine, New Haven, CT
1986-1987: **Staff dermatologist**, Yale University Health Services
1987-1988: **Fellow**, Mohs and dermatologic surgery, University of Michigan Medical School, Ann Arbor, MI
1987-1988: **Lecturer in Dermatology**, University of Michigan School of Medicine, Ann Arbor, MI
1988-1993: **Assistant Professor** of Dermatology, Yale University School of Medicine, New Haven, CT
          **Director**, Dermatologic Surgery Unit, Yale University School of Medicine, New

|  | Haven, CT |
|---|---|
| 1988- | **Attending dermatologist,** West Haven Veterans Administration Medical Center, West Haven, CT |
| 1988- | **Attending dermatologist,** Yale-New Haven Hospital, New Haven, CT |
|  | **Director,** Dermatologic Surgery Unit, Yale University School of Medicine, New Haven, CT |
| 1988-1998: | **Clinical Director,** Dermatology Practice, Department of Dermatology, Yale University |
|  | School of Medicine, New Haven, CT |
| 1993- | **Associate Professor,** Dermatology, Yale University School of Medicine, New Haven, CT |
| 1994- | **Attending dermatologist (courtesy),** Hospital of St. Raphael, New Haven, CT |
| 1994-1998: | **Associate Professor,** Dermatology, Plastic Surgery and Otolaryngology, Yale University School of Medicine, New Haven, CT |
| 1998- | **Professor,** Dermatology and Surgery (Otolaryngology and Plastic Surgery), Yale University School of Medicine, New Haven, CT |
| 1996-1999: | **Medical Director,** Yale Faculty Practice, Yale University School of Medicine, New Haven, CT |
| 1999- | **Associate Dean for Clinical Affairs,** Yale University School of Medicine, New Haven, CT |
|  | **Director,** Yale Faculty Practice, Yale University School of Medicine, New Haven, CT |
| 2000- | **Senior Associate Dean for Clinical Activities and Strategic Planning (Clinical Affairs),** Yale School of Medicine |

## SPECIALTY CERTIFICATION

American Board of Dermatology, 12/87
American Board of Internal Medicine, 9/12/84 No. 095569
National Board of Medical Examiners, 7/1/82 No. 257001
Medical Council of Canada, 8/30/82 No. 54185
Fellow, American College of Mohs Micrographic Surgery and Cutaneous Oncology, 3/91

## PROFESSIONAL ORGANIZATIONS

American Academy of Dermatology
American Dermatologic Association
American College of Physician Executives
American College of Mohs Micrographic Surgery and Cutaneous Oncology
American Society for Dermatologic Surgery
American Society for Lasers in Medicine and Surgery
Association of Academic Dermatologic Surgeons
Society for Investigative Dermatology
Skin Cancer Foundation
Dermatology Foundation
International Transplant-Skin Cancer Collaborative
Connecticut Dermatology Society
New England Dermatologic Society
Connecticut State Medical Society
New England Cancer Society
American Medical Association

New Haven County Medical Association

## HONORS

1. Young Investigator Award, American Society for Dermatologic Surgery, 1988
2. Yale College, *cum laude* with Special Distinction in Biology, 1977
3. Fellow, Pierson College, Yale University, 1989-
4. Best Doctors in America, 1995-present
5. Best Doctors in America, Castle and Connolly, 1998-present
6. Best Doctors in New York, Castle and Connolly, 2000-present
7. Who's Who in Medicine
8. Who's Who in America
9. Who's Who in Engineering
10. Arts Council of New Haven, for the Yale Faculty Practice ArtPlace Exhibit

## GRANTS

1. NIH: Genetic alterations in basal cell carcinoma development. (Allen Bale, MD, PI) **RO1CA57605**, 3/1/94-2/28/97, 5% effort  $166,139
2. The p53 Tumor Suppressor Gene in Normal Skin. **ACS CN-102**, with D. Brash, PhD, 1994
3. The genetics of basal cell cancer. **Skin Cancer Foundation Research Award** with Dr. Allen Bale, 1990
4. Tumor Suppressor Genes in Basal Cell Carcinoma. **Collaborative Research Award** - Comprehensive Cancer Center with Dr. Alan Bale, 1990
5. **Society for Aesthetic and Plastic Surgery:** The effect of retinoids on dermabrasion wound healing, 1989 (PI)  $5,000
6. Frederic E. Mohs Award, **The Skin Cancer Foundation:** The localization of interleukin-1 mRNA in aggressive growth basal cell carcinoma, 1987 (PI)  $10,000
7. **Dermatology Foundation** Research Grant: The interplay between the thymus and epidermal cytokines in wound healing, 1986, (PI)  $10,000
8. NIH: Novel, Noninvasive Biomarker of Fruit & Vegetable Intake, (Susan Mayne, MD, PI) **R01 CA096838-01A1**, 4/1/03-3/31/06, 10% effort  $300,225
9. NCI: Chemoprevention for nevoid basal cell carcinoma syndrome, (Allen Bale, MD, PI), 2003; 5% effort

## SPONSORED RESEARCH

1. **Chemex Inc.:** A double-blind study of Actinex (CHX 2053) to determine sensitization potential, 1992, (PI) for amount see #9
2. **Chemex, Inc.:** A double-blind study to evaluate the effect of Actinex (CHX 2053) in the treatment of actinic keratoses and pre-malignant keratoses, 1990, (PI) about $100,000
3. **Beiersdorf Inc.:** A paired comparison of the efficiencies of Diprolene topical steroid and Eucerin ointment in the treatment of psoriasis, 1990, (PI)  $5,000
4. **Ascent Pharmaceuticals, Inc.:** The use of topical cromolyn the treatment of early proliferative hemangiomas, 1993, (PI)  $12,000
5. **Biocore, Inc.:** Stimulation of cutaneous wound healing with lyophilized bovine collagen, 1995, (PI)  $15,000
6. **Organogenesis Inc.:** The use of biological skin equivalent (Graftskin) in the repair of fresh surgical wounds, 1994, (PI)  $60,000

3

7. **Organogenesis Inc.:** The use of biological skin equivalent (Graftskin) in the repair of fresh surgical wounds, 1997, (PI)  $75,000
8. **Arthrocare, Inc.:** Phase I, human study of a non-laser device for epidermal and dermal resurfacing, 1997, (PI)  $100,000
9. **Proneuron, Inc.:** Phase I/II, PN105 in wound healing, $100,000
10. **Arthrocare, Inc.:** Phase II, human study of a non-laser device for epidermal and dermal resurfacing, 1998, (PI)  $100,000
11. **Proneuron, Inc.:** Phase I/II, PN106 for the treatment of Actinic Keratoses, 1999 (PI) $100,000
12. Epidemiology and genetic parameters of basal cell cancer in young adults, **Munson Foundation**, 2000.
13. **Wellstat (Proneuron, Inc.):** Phase I/II, PN106 for the treatment of Actinic Keratoses, 2002 (PI)  $100,000

## EDITORSHIPS

1. **Guest Editor**, Journal of Geriatric Dermatology Special Issue: Dermatologic Surgery, 1995
2. **Guest Editor**, Journal of Geriatric Dermatology Special Issue: Cosmetic Dermatologic Surgery, 1995
3. **Associate Editor**, Journal of Geriatric Dermatology, 1995-1998
4. **Editorial Board**, Archives of Dermatology, 1995-
5. **Chair, Surgical Advisory Board**, Archives of Dermatology, 1999-
6. **Contributing Editor**, Journal of Dermatologic Surgery, 1993-1997
7. **Associate Editor**, Medical and Surgical Dermatology, 1994- present
8. **Founder and Editor**, Newsletter of the *Association of Academic Dermatologic Surgeons*, 1990-1993
9. **Founder and Editor**, DermUPDATE, Connecticut State Dermatology Society Newsletter, 1995-1998
10. **Consultant**, Connecticut United for Research Excellence, 1994
11. **Guest Editor**, Seminars in Cutaneous Medicine and Surgery, *Practical Cutaneous Oncology*, 1998
12. **Editorial Board**, Journal of Aesthetic Dermatology and Cosmetic Dermatologic Surgery, 1998-present
13. **Reviewer**, Lasers in Medicine and Surgery
14. **Editorial Board Joint Section Head**, Skin Cancer Section of Faculty of 1000 Medicine, 2003-

## ADMINISTRATIVE
## NATIONAL AND REGIONAL

**Chairman**, NCI RFA CA-93-15 Grant Review, October, 1993
Scientific Advisory Board, Hereditary Hemorrhagic Telangiectasia Foundation, 1991-present
Fair Hearings Committee, ASDS, 1993
Hearing Committee, Evergreen Hospital, Kirkland, WA, 1994
**President**, Connecticut State Dermatology Society, 1997-1999
**Secretary-Treasurer**, Connecticut State Dermatology Society, 1995-1997
**Chairman**, American Society for Dermatologic Surgery Annual Meeting, Planning

Committee, 1994-1996

Chairman, American Society for Dermatologic Surgery Scientific Program Committee, 1997

Chairman, Curriculum Committee, American College of Mohs Micrographic Surgery and Cutaneous Oncology, 1996

Member, Evaluation Committee, American Academy of Dermatology, 1991-1994

Member, NCI Liaison Committee, American Academy of Dermatology, 1992-1995

Member, Grants Committee, American Society for Dermatologic Surgery, 1990-1993

Member, Scientific Program Committee, American College of Mohs Micrographic Surgery and Cutaneous Oncology, 1995

Chairman, Grants Committee, American Society for Dermatologic Surgery, 1996

Chairman, Awards Committee, American Society for Dermatologic Surgery, 1996

Juror, Young Investigator Award, Journal of Dermatologic Surgery and Oncology, 1992

Public Information Committee, American Academy of Dermatology, 1991-1997

Chairman, Educational Technologies Committee, American Society for Dermatologic Surgery, 1997-1999

Member, Skin Cancer Foundation Grants Committee, 1999-present

Member, Fellowship Training Committee, American College of Mohs Micrographic Surgery and Cutaneous Oncology, 1998-present

Member, Task Force on Computers in Education & Research, American Academy of Dermatology, 1998-present

Board of Directors, Healthchoice Insurance Company, 1998-2000

Chairman, Medical Management Committee, Healthchoice Insurance Company, 1998-2000

Co-Chair, Skin Cancer Foundation 16th Annual Mohs Surgery Conference, January, 1999, Costa Rica

Member, Skin Cancer Foundation's Melanoma Committee, 1999-present

Board of Directors, American College of Mohs Micrographic Surgery and Cutaneous Oncology, 1998-2000

Chairman, Membership Committee, ACMMSCO, 1998-99

Board of Directors, American Association of Academic Dermatologic Surgeons, 1998-present

President-Elect, Association of Academic Dermatologic Surgeons, 2000

Board of Directors, Greater New Haven Chamber of Commerce, 1999-2001

Member, Scientific Advisory Board, Cool Laser Optics, Inc., 1999-present

Member, Publications Committee, American Society for Laser Medicine and Surgery, Inc., 2000-present

Member, Journal Committee, American Society for Dermatologic Surgery, 1999-present

Member, Medical and Scientific Committee, Dermatology Foundation, 1999-present

Chairman, Program Committee, Association of Academic Dermatologic Surgeons, 2000-present

Chairman, Financial Task Force, American Dermatologic Association, 2001

President, Association of Academic Dermatologic Surgeons, 2001-2003

Chairman, Association of Academic Dermatologic Surgeons Nominating Committee, 2003 – present

Board of Trustees, Connecticut Public Television, 2001-2004

Treasurer, International Transplant-Skin Cancer Collaborative (ITSCC), 2002-present

## UNIVERSITY & MEDICAL SCHOOL

Director, Yale Skin Cancer Detection Program (founder: 1988)
Editor, Yale Faculty Practice Newsletter (founder) 1991-1995
Member, Search Committee, Chief of Section of Plastic Surgery, 1992
Chair, Clinic Chiefs Committee, Yale Clinic Practice, 1994-1996
Chair, Ambulatory Clinical Information System Committee, Yale School of Medicine and Yale New Haven Hospital, 1995-1997
Member, Yale Telemedicine Advisory Committee, 1995-present
Member, Physician Referral Committee, Yale-New Haven Hospital, 1994-1996
Member, Information Systems Steering Committee, Yale New Haven Hospital, 1995-1999
Founder, *Yale Practice*, Yale Faculty Practice monthly, 1995
Member, Yale New Haven IPA Board of Directors, 1996-2000
Member, Yale New Haven Hospital IPA Credentials Committee, 1995-1999
Member, Yale Clinical Practice Group, Finance Committee, 1997-1998
Member, University Budget Committee, Yale University, 1999-2001
Chair, Yale Clinical Practice Group, Medical Management Committee, 1997-1999
Member, Central Contracting Committee, Yale New Haven Health Systems, 1997-1999
Member, Yale Clinical Practice Group, Transition Committee, 1997-1999
Member, Medical School Council, 1997-1998
Board of Directors, Physician Hospital Organization, Yale New Haven Hospital, 2000-
Search Committee, Chairman, Department of Pediatrics, Yale School of Medicine
Member, Yale New Haven Health System Physician Council, Yale New Haven Hospital, 2000-present
Chairman, search committee for chairman, Department of Ophthalmology, 2002-present
Co-host, China-Yale Advanced University Leadership Program, 2004

## DEPARTMENT

Committee on Appointments and Promotions, Volunteer Faculty

## TEACHING (SELECTED)

| | |
|---|---|
| 1999 | The Science of Skin Cancer, Consensus Conference on Actinic Keratoses, Washington, DC |
| 1991-1996 | Basic Cutaneous Surgery, Co-director, American Academy of Dermatology |
| 1996 | Advanced Facial Reconstruction for The Resident, Yale School of Medicine, Educational Program for Dermatology Residents |
| 1996 | Split Thickness Skin Grafts & Allografts, American Academy of Dermatology, Washington, DC |
| 1995 | *From Bench to Bedside:* Photoaging and Skin, ASDS, Hilton Head, SC |
| 1995 | Topics in Wound Repair, American Academy of Dermatology, Chicago |
| 1994 | Topics in Wound Repair, American Academy of Dermatology, San Francisco |
| 1994 | Intermediate Surgery: Cheek Repair, American Academy of Dermatology |
| 1993 | The Research Grant Process, Association of Academic Dermatologic Surgeons, Chicago |
| 1994 | Reed and Carnrick, Skin Cancer Preceptorship Program, |
| 1991 | Director, Post-graduate course: Soft Tissue Surgery, Yale School of Medicine |
| 1990 | American Academy of Dermatology, Aggressive Growth Basal Cell Carcinoma |

| | |
|---|---|
| 1991 | Principles of Cutaneous Surgery, University of Michigan medical students |
| 1988 | American Academy of Dermatology, Basic Cutaneous Surgery Course. |
| 1987 | Director, Dermatologic Surgery Course, Yale University School of Medicine |
| 1990-1997 | Introduction to Clinical Diagnosis, dermatology, Yale School of Medicine |

## ADVISOR

Freshman Faculty Advisor, Yale College (Pierson): 1989-present

Career Advisory Service, Yale College (Health professions): 1991-present

Yale School of Medicine Senior Thesis Adviser

- Steven A. Kolenik, III, YSM IV: Reconstitution of cellular p53 protein using an exogenous source in human squamous cell carcinoma, with Dr. A. Perkins; Dermatology NIH Training Fellowship, 1994.

- Lauren Rodgers, YSM IV: The role of tenascin in basal cell carcinoma, 1991

- Yating Chen, PhD candidate, Yale School of Epidemiology and Public Health: Epidemiology of skin cancer prevention, 1992-1993

- Jessica Newman, the role of the embryonic fusion place in basal cell carcinoma, 2004

## BIBLIOGRAPHY

### ORIGINAL ARTICLES

1. Leffell DJ, Stetz ML, Milstone LM, Deckelbaum LI: In Vivo Laser Fluorescence of Human Skin: *A potential of photoaging*. Archives of Dermatology, 124(10):1514-8, 1988
2. Leffell DJ, Headington JT, Swanson NA, Wong DS: Aggressive-growth Basal Cell Carcinoma in young adults. Archives of Dermatology, 127(11):1663-7, 1991
3. Leffell DJ: An Educational Device for Mohs Microscopic Surgery of Basal Cell Carcinoma. Journal of Dermatologic Surgery & Oncology, 17(6):498-501, 1991
4. Gailani MR, Bale SJ, Leffell DJ, Bale AE, et al: Developmental Defects in Gorlin Syndrome Related to a Putative Tumor Suppressor Gene on Chromosome 9. Cell 69:1-20, 1992
5. Gailani MR, Bale SJ, Leffell DJ, DiGiovanna JJ, Peck GL, Poliak S, Drum MA, Pastakia B, McBride OW, Kase R: Developmental Defects in Gorlin Syndrome Related to a Putative Tumor Suppressor Gene on Chromosome 9. Cell, 69(1):111-7, 1992
6. Watsky KL, Freije L, Leneveu MC, Wenck HA, Leffell DJ: Water-in-oil Emollients as Steroid-sparing Adjunctive Therapy in the Treatment of Psoriasis. Cutis, 50(5):383-6, 1992
7. Ziegler A, Leffell DJ, Kunala S, Sharma HW, Gailani M, Simon JA, Halperin AJ, Baden HP, Shapiro PE, Bale AE, Brash DE: Two Genetic Steps in Basal Cell Carcinoma Development Can be Caused by Sunlight. Proceeding National Academy of Science USA, 90:4216-4220, 1993
8. Fosko SW, Cuono CB, Leffell DJ: Allograft Skin as an Adjunct in the Repair of Radiation-compromised Wound. Archives of Dermatology, 129(3):293-5, 1993

9. Leffell DJ, Chen Y, Berwick M, Bolognia JL: Interobserver Agreement in a Community Skin Cancer Screening Setting. Journal of the American Academy of Dermatology, 28(6):1003-5, 1993

10. Ziegler A, Leffell DJ, Kunala S, Sharma HW, Gailani M, Simon JA, Halperin AJ, Baden HP, Shapiro PE, Bale AE: Mutation Hotspots Due to Sunlight in the p53 Gene of Nonmelanoma Skin Cancers. Proceedings of the National Academy of Sciences of the United States of American, 90(9):4216-20, 1993

11. Leffell DJ, Berwick M, Bolognia J: The Effect of Pre-education on Patient Compliance with Full-body Examination in a Public Skin Cancer Screening. Journal of Dermatologic Surgery & Oncology, 19(7):660-3, 1993

12. Kolenik SA, Leffell DJ: The Use of Human Cryopreserved Skin for Repair of Mohs Microscopic Surgery Defects. Dermatologic Surgery 21(7): 615-20, 1995

13. Ziegler A, Jonason AS, Leffell DJ, Sharma HW, Simon JA, Kimmelman J, Remington L, Jacks T, Brash DE: Sunburn and p53 in the Onset of Skin Cancer. Nature, 372(6508):773-6, 1994

14. Gailani MR, Stahle-Backdahl M, Leffell DJ, Glynn M, Zaphiropoulos PG, Pressman C, Unden AB, Dean M, Brash DE, Bale AE, Toftgard R: The Role of the Human Homologue of Drosophila Patched in Sporadic Basal Cell Carcinomas. Nature Genetics 14(1):78-81, 1996

15. Jonason AJ, Kunala S, Price GJ, Restifo RJ, Spinelli HM, Persing J, Leffell DJ, Tarone RE, Brash DE: Frequent clones of p53-mutated keratinocytes in normal human skin – Proceedings of the National Academy of Sciences of the United States of American 93(24):14025-9, 1996

16. Leffell DJ, Brash DE: Sunlight and Skin Cancer. Scientific American, 275(1):52-3, 56-9, 1996

17. Wicking C, Hahn H, Zaphiropoulos P, Gailani M, Shanley S, Chidambaram A, Vorechovsky I, Holmberg E, Unden A, Gillies S, Negus K, Smyth I, Pressman C, Leffell DJ, Gerrard B, Goldstein A, Wainwright B, Toftgard R, Chenevix-Trench G, Dean M, Bale A: Mutations of the Human Homolog of Drosophila Patched in the Nevoid Basal Cell Carcinoma Syndrome. Cell, 85(6):841-51, 1996

18. Gailani M, Leffell DJ, Ziegler A, Gross E, Brash DE, Bale AE: Relationship Between Sunlight Exposure and a Key Genetic Alteration in Basal Cell Carcinoma. Journal of the National Cancer Insitute. 88(6): 349-54, 1996

19. Eaglstein WH, Alvarez OM, Auletta M, Leffell DJ, Rogers GS, Zitelli JA, Norris JEC, Thomas I, Irondo M, Fewkes J, Hardin-Young J, Duff, RG, Sabolinski ML: Acute Excisional Wounds Treated with a Tissue-Engineered Skin (Apligraf). Dermatologic Surgery 25:195-201, 1999

20. Olhoffer IH, Davidson D, Longley J, Glusac EJ, Leffell DJ: Facial Bowenoid Papulosis Secondary to Human Papillomavirus Type 16. British Journal of Dermatology, 140(4):761-2, 1999

21. Kolenik SA, McGovern TW, Leffell DJ: Use of a Lyophilized Bovine Collagen Matrix in Postoperative Wound Healing. Dermatologic Surgery, 25(4), 303-307, 1999

22. McGovern TW, Leffell DJ: Mohs Surgery: The Informed View. Archives of Dermatology, 135(10):1255-9, 1999

23. McGovern TW, Bolognia J, Leffell DJ: Flip-top Pigment Transplantation: A Novel Transplantation Procedure for the Treatment of Depigmentation. Archives of Dermatology 135(11):1305-7, 1999

24. McGovern TW, Grossman D, Fitzgerald D, Glusac EJ, Leffell DJ: Status of Residual Tumor in Patients with Squamous Cell Carcinoma Referred for Mohs Micrographic Surgery. Archives of Dermatology, 1999

25. Leffell DJ: The Other Side of the Sun. Lancet. 2000 Aug 26;356(9231):699September 2000

26. McGovern TW, Grossman D, Fitzgerald D, Glusac EJ, Leffell D: Status of residual tumor in patients with squamous cell carcinoma referred for Mohs micrographic surgery. Archives of Dermatology. 1999 Dec;135(12):1557-9

27. Fata F, O'Reilly E, Ilson D, Pfister D, Leffell DJ, Kelsen DP, Schwartz GK, and Casper ES: Paclitaxel in the treatment of patients with angiosarcoma of the scalp or face, Cancer 86(10): 2034-7, 1999

28. Grekin RC, Tope WD, Yarborough JM Jr, Olhoffer IH, Lee PK, Leffell DJ, Zachary CB Electrosurgical facial resurfacing: a prospective multicenter study of efficacy and safety. Archives of Dermatology. 2000 Nov;136(11):1309-16

29. Chen T, Yan W, Wells RG, Rimm DL, McNiff J, Leffell DJ, Reiss M: Novel Inactivating Mutations of Transforming Growth Factor-B Type I Receptor Gene In Head-And-Neck Cancer Metastases.  International Journal of Cancer. 2001 Sep 1;93(5):653-61

30. Olhoffer IH, Lazova R, Leffell DJ: Histopathologic misdiagnoses and their clinical consequences. Arch Dermatol. 2002 Oct;138(10):1381-3

## Clinical Reports

1. Leffell DJ, Braverman IM: Familial Multiple Lipomatosis: Report of a Case and a Review of the Literature. Journal of the American Academy of Dermatology, 15(2 Pt 1):275-9, 1986

2. Leffell DJ, Brown MD, Swanson NA: Laser Vaporization: A Novel Treatment of Botryomycosis. Journal of Dermatologic Surgery & Oncology, 15(7):703-5, 1989

3. Leffell DJ: Minocycline Hydrochloride Hyperpigmentation Complicating Treatment of Venous Ectasia of the Extremities.  Journal of the American Academy of Dermatology, 24(3):501-2, 1991

4. Leffell DJ, Fosko S: Allograft skin as an adjunct in the repair of radiation-compromised wound, Archives of Dermatology 129:293- 295, 1993

5. Leffell DJ, Morganroth GS, Tigelaar RE, Longley BJ, Luck LE,: Targetoid Hemangioma Associated with Pregnancy and the Menstrual Cycle. American Academy Dermatology, 32(2 pt 1):282-4, 1995

6. Leffell DJ, Henner MS, Shapiro PE, Ritter JH, , Wick MR: Solitary Syringoma: Report of Five Cases and Clinicopathologic Comparison with Microcystic Adnexal Carcinoma of the Skin. American Journal of Dermatopathology, 17(5): 465-70, 1995

7. Leffel DJ, Waldorf HA, Kauvar NB, Geronemus RG,: Remote fire with the pulsed dye laser: risk and prevention. Journal of the American Academy of Dermatology. 34(3):503-6, 1996

8. Leffell DJ, Carucci JA,: Intralesional Interferon Alfa for Treatment of Recurrent Lentigo Maligna of the Eyelid in a Patient With Primary Acquired Melanosis.  Arch Derm, 136(11): 2000

9. Leffell DJ, Carucci JA, Kolenik SA 3rd,: Human cadaveric allograft for repair of nasal defects after extirpation of basal cell carcinoma by Mohs micrographic surgery. Dermatologic Surgery. 28(4):340-3, 2002

## Reviews and Book Chapters

1. Leffell DJ, Safai B: Tumor Immunology in: Dermatologic Immunology and Allergy, J. Stone, ed., CV Mosby, Co., St.Louis, 1985

2. Leffell DJ, Edelson RL: The immunology of psoriasis: Implications for pathogenesis. In: Proceedings of the Fourth International Congress on Psoriasis. E. Farber ed. Elsevier Publishing Co., New York, 1987

3. Leffell DJ: Evaluation and Treatment of Non-melanoma Skin Cancers: *Decision Making in Oncology*, P. Schein, ed. B.C. Decker, Inc., Toronto, 1989
4. Leffell DJ: From chicks to skin: Vitamin A and cancer, Skin Cancer Foundation Journal, 1990
5. Leffell DJ: Health care delivery in Canada, *Comment*, Hartford Courant and Times Mirror chain, 1991
6. Leffell DJ, Thompson JT: Lasers in Dermatology and Ophthalmology, Dermatologic Clinics, 10(4):687-700, 1992
7. Morganroth GS, Leffell DJ: Nonexcisional Treatment of Benign and Premalignant Cutaneous Lesions. Clinics in Plastic Surgery, 20(1):91-104, 1993
8. Leffell DJ: Laser Surgery and Excisional Surgery, In: Dermatologic surgery for the dermatologist, R. Geronemus, ed. Assoc Acad Derm Surg, 1992
9. Leffell DJ: Fundamentals of dermatologic surgery: skin grafts, Network for Continuing Medical Education, (NCME #626), VHS, 1992
10. Fosko SW, Leffell DJ: Basal Cell Carcinoma Increases in Young Adults. Skin Cancer Foundation Journal, 1993
11. Leffell DJ, Rachal M: Structure and Function of Skin, in: Cutaneous Surgery, Ronald Wheeland, editor, WB Saunders, Phila., 1993
12. Bale AE, Gailani MR, Leffell DJ: Nevoid Basal Cell Carcinoma Syndrome. Journal of Investigative Dermatology, 103(5 Suppl):126S-130S, November 1994
13. Bale AE, Gailani MR, Leffell DJ: The Gorlin Syndrome Gene: A Tumor Suppressor Active in Basal Cell Carcinogenesis and Embryonic Development. Proceedings of the Association of American Physicians. 107(2): 253-7, July 1995
14. Leffell DJ, Matarasso S: Turning back the lines, J of Geriatr Dermatol, 3:203-205, 1995
15. Swett HA, Holaday L, Leffell DJ, Merrell RC, Morrow JS, Rosser JC, Warshaw J: Telemedicine: Delivering Medical Expertise Across the State and Around the World. Connecticut Medicine, 59(10):593-602, 1995
16. Brash DE, Jonason A, Simon J, Ziegler A, Leffell DJ: Cellular Proofreading and Protection from Skin Cancer. In Biologic Effects of Light 1995, Proceedings of a Symposium. M. Holick, Jung, ed., Atlanta, GA. 1995
17. Leffell DJ: Split Thickness Skin Grafting, in Atlas of Cutaneous Medicine and Surgery, J. Robinson, ed., W. B. Saunders, Phila, 1995
18. Huether M and Leffell DJ: Accept or Reject: Ethical Issues for the Dermatologist. Medical and Surgical Dermatology: 3: 1-3, 1996
19. Leffell DJ: Transposition Flaps in: Local Flaps in Facial Reconstruction, NA Swanson and S Baker, eds, CV Mosby Co., St. Louis, 1995
20. Leffell DJ: Whither "Invasive" Dermatology? Medical and Surgical Dermatology 1:3-7, 1994
21. Bale AE. Gailani MR. Leffell DJ. Nevoid basal cell carcinoma syndrome. [Review] [43 refs] [Journal Article. Review. Review, Tutorial] *Journal of Investigative Dermatology. 103(5 Suppl):126S-130S, 1994 Nov.*
22. Goldman G and Leffell DJ: Skin changes in the aging patient, *in* Aesthetic Surgery of the Aging Face, RW Bernard,ed., Butterworth-Heinemann, Stoneham, MA, 1995
23. Goldman G, Bronin AW, Leffell DJ: The use of tretinoin in the older patient, *in* Aesthetic Surgery of the Aging Face, RW Bernard, ed., Butterworth-Heinemann, Stoneham, MA, 1995
24. Brash DE, Ziegler A, Jonason AS, Simon JA, Kunala S and Leffell DJ: Sunlight and Sunburn in Human Skin Cancer: p53, Apoptosis, and Tumor Promotion. Journal of Investigative Dermatology, Symposium Proceedings, 1:136-142, April 1996
25. Huether M and Leffell DJ: Accept or reject: ethical issues for the dermatologist. Medical and Surgical Dermatology: 3: 1-3, 1996
26. Leffell DJ: Scar Revision, In: Principles of Dermatologic Surgery, R Moy and G Lask, eds, McGraw Hill, NY, 1996

27. Lewis AB, Leffell DJ: Dermatologic Surgery, in *Cutaneous Medicine and Surgery: Self-Assessment and Review*, J Dover, Ed., WB Saunders Co., Phila, 1996

28. Grossman D, Leffell DJ: The molecular basis of non-melanoma skin cancer: New Understanding, Arch Dermatol 133:1263-1270, 1997

29. Duncan KO, Leffell DJ: Preoperative assessment of the elderly patient, *Dermatol Clinics* 15:4:583-593, 1997

30. Goldman G, Leffell DJ: Squamous cell carcinoma, in *Mohs Surgery*, M. Maloney and A. Torres, eds, Blackwell, 1999

31. Leffell DJ, Fitzgerald D: Basal Cell Cancer, in *Dermatology in General Medicine*, T.A. Fitzpatrick, ed., McGraw Hill, New York, 1999

32. Grossman D, Leffell DJ: Molecular basis of non-melanoma skin cancer, in *Malignant Tumors of the Skin*, Chu T and Edelson RE, eds, Chapman and Hall, London, 1999

33. Leffell DJ: Punch Biopsy, *Field Guide to Clinical Dermatology*, Lippincott Williams & Wilkins, 1999

34. Leffell DJ: Shave Biopsy and Shave Excision, *Field Guide to Clinical Dermatology*, Lippincott Williams & Wilkins, 1999

35. Leffell DJ: Cryosurgery, *Field Guide to Clinical Dermatology*, Lippincott Williams & Wilkins, 1999

36. Leffell DJ: The scientific basis of skin cancer. [Review] [6 refs] Journal of the American Academy of Dermatology. 2000 Jan;42(1 Pt 2):18-22

37. Leffell DJ and Carucci JA: Management of Skin Cancer, *Principle & Practices of Oncology*, 6th Edition, Devita, V et al (ed.), Lippincott Williams & Wilkins, 2000

38. Leffell DJ and Carucci JA: Repair of a Defect of the Lower Lip, Dermatol Surg, 28:195-96, 2002

39. Leffell DJ, Arndt KA, Kaminer MS, Dover JS: Forward for Atlas of Cosmetic Surgery, Harcourt Health Sciences, 2002.

40. Aasi SZ and Leffell DJ: Complications in dermatologic surgery: how safe is safe? Comment on: Arch Dermatol.;139(2):143-52, 2003

41. Olhoffel I and Leffell DJ: Wound Closure Materials and Instruments, *Dermatology*, Mosby, 2003

## CD-ROM and Electronic Media

1. Leffell DJ: Virtual Symposium "*The Safety & Efficacy of Photodynamic Therapy Combined with Topical Aminolevulinic Acid for the Treatment of Actinic Keratoses*", Berlex, 2000

2. Leffell DJ: *Color Atlas of Cutaneous Oncology*, in Principles and Practice of Oncology, 6th Edition, DeVita V. et al, eds. 2001

3. Leffell DJ: HCFA Teaching Physician Interactive Web-based Training Program, with Price Waterhouse Coopers, 1999

4. Leffell DJ: Skin Cancer At Time of Diagnosis, Principal Editor, Time Life Medical Video Series, 1995

5. Carucci JC and Leffell DJ: Basal Cell Cancer, in *Dermatology in General Medicine*, T.A. Fitzpatrick et al, eds., McGraw Hill, New York, 2003

6. Duncan K and Leffell DJ: Premalignant Lesions, in *Dermatology in General Medicine*, T.A. Fitzpatrick et al, eds., McGraw Hill, New York, 2003

7. Grossman D and Leffell DJ: Squamous Cell Cancer, in *Dermatology in General Medicine*, T.A. Fitzpatrick, et al eds., McGraw Hill, New York, 2003

## BOOKS

1. Leffell DJ: Total Skin: *The Definitive Guide to Whole Skin Care for Life*, Hyperion, New York, 2000, 464 pages.
2. Leffell DJ and Brown M: Manual of Skin Surgery: *A practical guide to dermatologic procedures,* Wiley-Liss, New York, 1997, 240 pages.

## ABSTRACTS

- Circulating interleukin-1 activity is elevated in patients with pustular psoriasis, Society for Investigative Dermatology, Washington, DC, May, 1986
- Evidence against stimulation of bile flow by Na-K-ATPase, AFCR, Washington, DC, May, 1977
- Tenascin in basal cell carcinoma. DJ Leffell, L Rodgers, K Stenn. American College of Mohs Micrographic Surgery. Scottsdale, AZ, March, 1992
- Silastic gel sheeting in laser wound healing in humans. American Society of Dermatologic Surgery. Scottsdale, AZ, March, 1992 .
- HPV in penile carcinoma. American Society of Dermatologic Surgery. Scottsdale, AZ, March, 1992

## INVITED PRESENTATIONS (SELECTED)

1. New Hampshire Dermatology Society Meeting, "Non-surgical Management of Skin Cancer", October 2004
2. China-Yale Advanced University Leadership Program, "High quality clinical care in an academic medical center", August 2004
3. China-Yale Advanced University Leadership Program, "Human Research – Clinical", August 2004
4. Schick/Wilkinson Sword Innovation Session, "R and D Opportunities in Skin Health", April 2004
5. Yale University School of Medicine Department of Radiation Oncology Grand Round "Management of non-melanoma skin cancer: How Dermatologists see it", February 2004
6. AAD Annual Meeting, "Non-melanoma Skin Cancer", February 2004
7. Young Leaders in Dermatology Symposium, "Incurable Skin Cancer: When Mohs Surgery Fails", November 2003
8. ACMMSCO Annual Meeting, "Controversies in Mohs Surgery – An Interactive Audience Polling Session", October 2003
9. ACMMSCO/ASDS Joint Annual Meeting, "Masters' Panel", October 2003
10. Yale University School of Medicine Department of Plastic Surgery Grand Round "Advances in the Management of Skin Cancer", September 2003
11. Dermatology Advisory Council (in support of fundamental skin care), June 2003
12. American Academy of Dermatology Actinic Keratoses Public Education Campaign Satellite Media Tour (SMT), May 2003
13. Michigan Dermatological Society - The Arthur C. Curtis Lecture, "Lasers in Dermatology: What We Know, What We Claim", March 2003
14. University of Michigan, "Non-Surgical Treatment of Skin Cancer: Opportunities and Mechanisms", March 2003
15. University of Michigan, "Minimally Invasive Reconstruction: Doing More with Less", March 2003

16. Brown Medical School Dermatology Clinical Conference, "Non-surgical Management of Skin Cancer" and "Cool and Classic Approaches to Reconstruction", January 2003
17. Yale University School of Medicine Department of Anesthesiology Grand Rounds, "How to Fix Academic Clinical Practice", December 2002
18. AADS/ASDS Annual Meeting, "What else Besides Surgery?", October 2002 (Chicago, IL)
19. Mass General Mega Rounds, "Non-surgical Management of Skin Cancer: Risks and Rewards", September 2002 (Boston, MA)
20. The Todd Mundt Show, "Rise of skin cancer cases, specifically melanoma among young people", July 2002
21. AAPC Connecticut Chapter, "Skin Cancer Prevention & Treatment", July 2002 (New Haven)
22. Yale University Department of Dermatology Grand Rounds, "Medical Treatments of Non-Melanoma Skin cancer", June 2002 (New Haven)
23. 3M Pharmaceutical, "Clinical Experience in the Non-Surgical Management of Non-melanoma Skin Cancer", May 2002 (Boston, MA)
24. AAD Media Tour, "Actinic Keratoses", May 2002 (New York City)
25. Berlin Organ Transplant Group, "Oncogenes, Apoptosis and Immunosuppression in the Pathogenesis of SCC", January 2002 (Berlin, Germany).
26. Yale University School of Medicine Development Event, "How To Look As Young As You Feel: The Science of Anti-aging", January 2002
27. Derm Update 2001, "New advances in Treating Actinic Keratoses", October 2001
28. Yale University School of Medicine Department of Plastic Surgery Grand Rounds Conference, "Mohs Surgery", June 2001
29. HBA Global Exposition & Educational Conference, "Doctor Dispensing: What Do Patients Want?", June 2001
30. Yale University School of Medicine Department of Surgery Basic Science Lecture, "Evaluation and Management of Cutaneous Malignancies", May 2001
31. Metropolitan Golf Course Superintendents Association, "Early Signs of Skin Cancer", May 2001
32. Healthy Women/Healthy Lives, "Skin Health/Skin Cancer", April 2001.
33. Yale University School of Medicine Development Event, "How to Look Younger Even If You Feel Older: The Science of Anti-Aging", April 2001.
34. American Academy of Dermatology Annual Meeting, "Advanced Surgery Course", March 2001.
35. Downstate Medical Center, "Incurable Skin Cancer: Diagnosis and Management", January 2001
36. Unilever Conference, "Skin Health in the New Millennium", December 2000
37. Women's Health and Fitness Conference, Yale University and Yale-New Haven Hospital, "Total Skin: Ten Top Tips on Skin Health", October 2000
38. Anesthesiology Grand Rounds, Yale University, "The Role of Clinical Medicine at Yale: What are we?" October 2000
39. American Dermatological Association, "The Genetic Basis of Skin Cancer", August, 2000
40. Cancer Center Grand Rounds, Yale University, "Management of Non-melanoma Skin Care: Indications for Mohs Micrographic Surgery", March, 2000
41. Boston University, "Genetic Basis of Skin Cancer", February, 2000
42. British Art Center At Yale, "What the Face Says: A Skin Doctor Looks At Paintings", February, 2000
43. Bridgeport Hospital, "Skin Cancer in the Year 2000", December, 1999
44. Clinical Society of Genitourinary Surgeons, Yale University, "Saving Academic Medicine: Lightning Bolts and Lifeboats", October, 1999
45. Surgery Grand Rounds, Hartford Hospital, "Skin Cancer", March, 1999

46. American Academy of Dermatology/Actinic Keratoses Conference, Washington, DC, January, 1999
47. Surgery Grand Rounds, Bridgeport Hospital, "Skin Cancer Update", June 4, 1998
48. Molecular Carcinogenesis: Clinical Dermatology 2000, Singapore, 1998
49. Complications of Skin Resurfacing: Clinical Dermatology 2000, Singapore, 1998
50. Advances in Oncogenesis: Clinical Dermatology 2000, Singapore, 1998
51. From Pharaoh to DNA: Changing views of cancer, New Haven Medical Association and County Bar Association, 1997
52. From White Coat to Sport Coat: Medical Administration, Association of Academic Dermatologic Surgeons, 1997
53. Visiting Professor, Oregon Health Sciences University, "Molecular carcinogenesis of non-melanoma skin cancer", October, 1997
54. Oregon Dermatology Society, "Advances in wound healing", October, 1997
55. Squamous Cell Carcinoma: The Lurking Danger, Dermatology Foundation Colloquium, Monterey, CA, March, 1996
56. Office Wound Healing: All New and Improved! Dermatology Foundation Colloquium, Monterey, CA, March, 1996
57. From Pharaoh to DNA: Changing views of cancer, Program for the Humanities in Medicine, 1997
58. Pitfalls and Progress in Skin Cancer Management and Research, Yale Comprehensive Cancer Center Grand Rounds, April, 1995
59. Pitfalls in the Management of Non-melanoma Skin Cancer, Yale Plastic Surgery Grand Rounds, November, 1994
60. Laser Update, Yale Plastic Surgery Grand Rounds, January, 1995
61. The First National Congress on Women's Health: Non-melanoma Skin Cancer, Washington, DC, 1993
62. Management of Condyloma, Yale School of Medicine, Urology Section Grand Rounds, 1990
63. Cutaneous Manifestations of Hereditary Hemorrhagic Telangiectasia, Second Annual Conference on HHT, San Francisco, 1993
64. Non-melanoma Skin Cancer. Manchester Hospital Grand Rounds, June, 1993
65. Visiting Professor, University of Rochester, Department of Dermatology, November, 1992
66. Mid-Hudson Teaching Consortium Annual Fall Teaching Day: "Oncogenesis of Ultraviolet Light and Non-melanoma Skin Cancer", November, 1992
67. Anesthesiology Grand Rounds, Yale-New Haven Hospital Grand "Dermatologic Surgery: State of the Art" New Haven, CT, October 1992
68. Plastic Surgery Grand Rounds, Hospital of St. Raphael, "Laser Treatment of Skin Disease", October, 1992
69. Head and Neck Grand Rounds, Memorial-Sloan Kettering Cancer Center, "Mohs Surgery for the Head and Neck Specialist", May, 1992
70. Yale Medical Grand Rounds, "Skin Cancer in the Geriatric Population", New Haven, CT, October, 1992
71. Yale Surgical Grand Rounds, "The Suspicious Skin Lesion: Cut, Laser, Scrape, or Wait". New Haven, CT, May, 1992
72. Association of Academic Dermatologic Surgeons, "Dermatology Foundation Grant Critique", Chicago, IL, September, 1992
73. Lawrence and Memorial Hospital, New London, CT: Otolaryngology Grand Rounds: Mohs Surgery for the Head and Neck Surgeon, 1990
74. New England Dermatological Society Annual Didactic Meeting, "Survival in the 90's". Surgical Pearls Panel. Boston, MA, January, 1991

75. Basal cell carcinoma: The Spectrum of the Disease. Albert Einstein College of Medicine, Dermatology Grand Rounds, Bronx, NY, January, 1991

76. Treatment of Vascular Lesions in Pediatrics. Yale Pediatric Resident Rounds, New Haven, CT, November, 1990

77. Mohs Surgery: An Interdisciplinary Approach to the Treatment of Skin Cancer. The Connecticut State Medical Society: Ear, Nose and Throat Section, North Haven, CT, October, 1990

78. Review of Skin Cancer. Eastern Connecticut Association of Occupational Health Nurses, September, 1990

79. Skin Cancer - Promotion of Skin Health. American Cancer Society 1990 Summer Staff Conference, Interlaken, CT, June, 1990

80. Non-melanoma Skin Cancer. Manchester Hospital Grand Rounds, June, 1990

81. Visiting Professor, Syracuse University, Section of Otolaryngology, 1990

82. Mohs Fresh Tissue Technique for the Treatment of Basal Cell Cancer. Plastic Surgery Grand Rounds, Hospital of St. Raphael, January, 1990

83. Tissue fluorescence as a marker of photoaging. Chesebrough-Ponds Research Group, Trumbull, CT, May, 1990

84. Mohs microscopic surgery update. New York Academy of Medicine, Plastic Surgery Branch, New York, October, 1988

85. Aggressive growth pattern basal cell carcinoma is the predominant histologic subtype in young adults. American College of Mohs Micrographic Surgery, Monterey, CA, April, 1988

86. In vivo laser induced fluorescence of skin: A technique for the evaluation of photoaging. American Society for Dermatologic Surgery, Monterey, CA, April, 1988

87. New Directions in Dermatology, Cooper Life Sciences Laboratories, Mountainview, CA, July, 1988

88. The use of bovine collagen implants for the correction of acne scarring. International Congress of Dermatologic Surgery, Edinburgh, Scotland, September, 1988

89. Tissue fluorescence as a marker of photoaging. Richardson-Vicks, Shelton, CT, October, 1988

90. Mohs surgery: A resource for the head and neck surgeon. Yale University Section of Otolaryngology. November, 1988

91. Blue Cross/Blue Shield, "Treatment of Hemangiomas". North Haven, CT, January, 1993

92. Basal Cell Carcinoma – Diagnosis and Treatment: Otolaryngology Grand Rounds, Syracuse University, NY, November, 1989

## PATENTS

An optical method for the evaluation photoaging, pigmentation and skin cancer. U.S. Patent #4,894,547

Basal cell carcinoma tumor suppressor gene U.S. Patent #6,552,181

## AFFIDAVIT

Now comes Chris M. Kohler, of 350 Totoket Road, Northford, CT  06472, and after being duly sworn deposes and states as follows:

## BACKGROUND

1.      I am presently employed by Schick Wilkinson Sword in Milford, Connecticut.  My current position is Senior Research and Development Technician.  I have been employed by Schick for 15 years.

2.      I hold an Associates Degree in General Studies from the University of Phoenix, Phoenix, Arizona, and am currently working towards a Bachelor of Science, Information Technology.

3.      I am currently employed in the evaluation sciences research department at Schick.  My duties include the testing and evaluation of razors for competitive analysis, product design, product evaluation and other purposes.

4.      As part of my duties, I participated in a study to analyze the effect of the Mach3 Power ("M3P") razor on facial hair, including the design of the videography apparatus used to record the visual images that are a part of this study.  I was also present during the test performed on five subjects in the presence of Dr. David Leffell on October 8, 2004, and operated the testing apparatus described herein.

## HIGH-SPEED VIDEOGRAPHY OF GILLETTE MACH3 POWER RAZOR

1.      The purpose of this study was to investigate the reaction of facial hair and skin when subjected to the "micro-pulses" purported by the Gillette *Mach 3 Power* vibrating razor. The hair is advertised to lift away from the skin. For this study, five male panelists were selected from the general population within the area of the testing facility.  These five subjects were recruited on the basis that they were members of the shave panel regularly used by Schick for research testing, they were not part of a shave test that was ongoing, and they were available on the afternoon of October 8, 2004.

2.      Each subject hydrated the area to be shaven with a warm, moist towelette.  This allows for normal preparation of the skin/hair prior to the experimental stroke.  The absence of shaving cream also mimics the facial appearance as shown on the Gillette cartoon advertisements and website.

3.      Using high-speed digital imaging techniques, two shaving strokes were recorded on video for each panelist. For use as a control, the first stroke was recorded with the M3P switched OFF. The blades of the cartridge used during this "control" stroke were dulled to prevent the cutting of hair during this control stroke, thereby preserving the hair in this area of the test subject's face for reuse during the second, "active" test stroke. The dulled blades make contact with the skin as do the sharpened blades. The point of the experiment is lifting of the hairs from the skin, not cutting of the hair.  After video recording the control stroke, a new cartridge was placed on the same handle held in the test fixture, the M3P power was switched ON and the active (standard blades) test stroke was video recorded. Dr.Leffell, Professor of Dermatology and Director of Dermatological Surgery at Yale University, monitored this process for all five subjects.

4.      With one exception to be discussed below,  the video of the actual strokes for each subject were saved on a CD.  Each CD was signed by Dr. Leffell and dated while he was at Schick facilities on October 8, 2004.  These five CDs were retained in a locked safe under my control in the Schick offices.

5.      An error occurred with respect to the CD for one subject. The test stroke was inadvertently missed during the process of saving the stroke to a CD. It appears that only the skin after the test stroke is reflected in the second half of this CD. This CD is labeled "Adam."

6.    This research was conducted using a Red Lake Motion Pro 500 high-speed video camera system. The video was captured at a rate of 500 frames per second with a shutter speed of 1/1000 second. The camera and its associated lighting are mounted adjacent to a Canfield Scientific head brace, which is used to position and stabilize the subject. The razor, positioned between the camera and the brace, is coupled to a pneumatically operated mechanical slide, allowing full automation and control of the shaving stroke. A pivot in the coupling allows the razor to sit naturally against the face, while a spring provides a consistent, nominal shaving pressure calibrated to 200 grams. Metering valves on the pneumatic slide are used to adjust the stroke speed to within the normal range.

Signed this ___20th___ day of October, 2004.

State of Connecticut

County of New Haven

Subscribed and sworn to before me, this ___20th___ day of October, 2004.

_____

NOTARY PUBLIC

My commission expires: ___10/31___, 20_06_

EXHIBIT 2

**EXHIBIT  G**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC., EVEREADY BATTERY COMPANY, INC., AND ENERGIZER BATTERY, INC., | CIVIL ACTION NO.: 3:05-CV-174 (JCH) |
| Plaintiffs, | |
| v. | |
| THE GILLETTE COMPANY, | |
| Defendant. | APRIL 29, 2005 |

[PROPOSED] AMENDED COMPLAINT
FOR INJUNCTIVE RELIEF AND DAMAGES

INTRODUCTION

1.     This action arises out of false and misleading advertising and promotion by Defendant The Gillette Company ("Gillette") designed to stimulate sales of its newest and highest-priced razor system, the M3 Power (the "M3P"), at the expense of competing products manufactured by plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc. and Energizer Battery, Inc. (collectively, "Schick").

2.     Schick is the second largest global manufacturer and marketer of so-called "wet shave" razors for men and women. Both Schick and Gillette sell two types of razors: (1) "razor systems," which provide consumers with a permanent razor handle and separate refillable blades; and (2) disposable razors, which, when worn out, are discarded in their entirety. There is little dual usage among customers who use razor systems and those who use disposable razors.

3.     Defendant Gillette is the world's market-share leader in wet shave razors. Wet shave systems razor are among the fastest growing market segments of the consumer products industry. Together, Gillette and Schick account for over 95 % of men's wet shave systems razors in the United States. Growth in market share depends heavily on persuading consumers to "trade up" from older shaving designs to new, premium-priced and technologically-advanced shaving products that have been introduced in recent years. Advertising is the primary means by which Gillette tries to persuade consumers to trade up to new products and Gillette invests heavily in developing advertising claims to convince consumers to do so.

4.     In recent years, Schick has mounted a significant challenge to Gillette's market-share dominance. In 2003, Schick achieved a technological breakthrough with the introduction of its four-blade Quattro razor system -- the world's first four-blade razor system for men. The Quattro was named one of the 25 best products of the year by *Fortune Magazine. Exhibit A.* In 2004, Schick followed on the success of Quattro by introducing the Quattro Midnight, which offers four blades and an enhanced handle design for advanced precision and control. These products followed on the heels of other recent Schick innovations: the 2002 introduction of the three-bladed Xtreme 3 razor system and the 2000 introduction of the Xtreme 3 disposable razor. Upon information and belief, these breakthroughs by Schick have caused Gillette to make increasingly aggressive advertising claims for its products in an effort to stem Schick's market gains and contain the industry buzz that Schick has generated.

5.     This lawsuit seeks an injunction to stop, and damages for, advertising claims that Gillette is making about its M3 Power razor system that are false and misleading. More particularly, Schick seeks to prevent Gillette from claiming that the M3 Power makes hair stand "up and away from skin" so that a closer shave results. This claim, along with slight variations of it that are made by Gillette in a variety of media, are deceptive. Indeed, a court in Germany recently enjoined Gillette from making these claims after Schick filed litigation challenging them in that country. *Exhibits B and C.* Despite having dropped the claims in Germany, Gillette continues to make them in the United States and, upon information and belief, will not stop doing so until a U.S. court says that it must.

6.    Suit is brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a, *et seq*. As the two biggest manufacturers of the wet shave systems razors, Schick and Gillette compete keenly for sales of shaving systems. The advertising of products in this market has been and continues to be a critically important means of persuading consumers to choose one brand over the other. Making claims of the kind at issue here can have a profound impact on a razor system's sales. Therefore, it is critically important that a company's advertising about its products be honest and fair. Because Gillette has violated this fundamental precept, Schick is entitled to injunctive relief and damages.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Gillette does business in this district and has engaged and is engaging in statutory violations and activities that are causing substantial injury to Schick in this district.

## THE PARTIES

9.    Plaintiff Schick Manufacturing, Inc. is a wholly-owned subsidiary of plaintiff Eveready Battery Company, Inc. and is headquartered in Milford, Connecticut. Insofar as relevant to this litigation, Schick Manufacturing, Inc. develops and manufactures Schick razor systems, including the Quattro Midnight and Quattro. Schick has a long history and proud heritage of producing high quality razors and shaving products, tracing its origins to World War I. In March 2003, the worldwide business and assets of Schick were purchased by Energizer Holdings, Inc., a publicly traded company that is not a party to this action.

10.    Plaintiff Eveready Battery Company, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in St. Louis, Missouri. Eveready Battery Company, Inc; is the parent of plaintiffs Schick Manufacturing, Inc.

and Energizer Battery, Inc. Eveready Battery Company, Inc. owns the trademarks for the Schick products at issue in this case.

11.    Plaintiff Energizer Battery., Inc., also is a wholly-owned subsidiary of plaintiff Eveready Battery Company, Inc., with its principal place of business in St. Louis, Missouri. The staff of Energizer Battery, Inc. provides non-technical support for the operations of plaintiff Schick Manufacturing, Inc., including support for the sales of Schick products.

12.    Defendant Gillette is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located in Boston, Massachusetts. Gillette has for many years been the nation's and world's largest supplier of shaving products in terms of dollars and units sold. Insofar as relevant to this litigation, Gillette manufactures a razor system under the name "M3 Power." This product competes directly in the marketplace with Schick's razor systems.

### GILLETTE'S FALSE AND MISLEADING
### ADVERTISING AND PROMOTIONAL MATERIALS

13.    Gillette launched the M3P in North America in May 2004. Exhibit D. Gillette called its M3P "revolutionary" because, using a AAA-sized battery in the razor handle, it was said to "deliver [] gentle pulses to the shaving cartridge that stimulate hair upward and away from the skin, making it dramatically easier to shave more thoroughly than ever before." *Exhibit D* at 1. In the remainder of this complaint we refer to these types of advertising claims by Gillette as "hair raising claims."

14.    Hair raising claims are the cornerstone of Gillette's marketing for the M3P in each of the media in which Gillette advertises. On its website, Gillette asserts that the M3P's "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more thoroughly in one easy power stroke. " *Exhibit E at 1*. Gillette's website also claims that the M3P's "pulsing action stimulates hair upward and away from the skin, making it dramatically easier to shave more thoroughly in one easy power stroke." *Id.* at 2.

15.    Similar claims are made by Gillette on the retail package for the M3P. The package tells consumers that "[g]entle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can get a closer and more thorough shave. So thorough, there is less need to reshave, which means less irritation." *Exhibit F.*

16.    Gillette also has featured hair raising claims in its print advertisements for the M3P. Exhibit G. A series of print ads says "Turn on the battery-powered motor. Micro-pulses raise the hair from your skin. So the PowerGlide blades can shave closer." *Id.* A separate print advertisement says "NEW! Gillette M3 Power[.] Micro-Power[.] Stimulates hair up and away from skin so you can get a closer and more thorough shave with less irritation." *Exhibit H.*

17.    Gillette also has been aggressively advertising the M3P on television featuring the same false and misleading hair raising claims discussed above. Television ads making the deceptive claims have appeared many thousands of times in homes across the country. Photoboards (*i.e.,* still photographs and copy taken from the commercials) of some of these commercials make clear that hair raising claims are the cornerstone of Gillette's efforts to persuade television viewers to buy the M3P. *Exhibit I.* One series of television ads tells consumers "New Gillette M3 Power. Turn it on and micro pulses raise the hair for the closest shave ever." *Id.* at 1, 2. A second series of ads (some employing slightly different wording) says "Introducing Gillette M3P. Turn on Gillette's first micro-power shaving system. Micro pulses raise the hair so you shave closer." *Id.* at 3-9.

18.    Upon information and belief, prior to the launch of Gillette's M3P television ad campaign, Gillette scientists advised Gillette executives that the television ad was false. Specifically, Dr. Kevin Powell, the director of Gillette's Advanced Technology Center in Reading, England, informed Gillette's internal counsel and other high-level Gillette officials that the pre-launch and launch television ads for the M3P, which included the hair-raising claims that are the subject of this lawsuit, made claims that were physiologically incorrect. Moreover, Gillette made no effort to verify the accuracy of key elements of the M3 Power advertising campaign, and lacked substantiation for many of the characteristics of the M3P that were touted in Gillette's advertising and that Gillette considered important in convincing consumers to buy

the product. Despite all this, Gillette proceeded with false and misleading television ads for the M3P and continues to air them to this day. Thus, upon information and belief, Gillette is waging its false advertising campaign willfully, with full knowledge of both the false nature of the hair raising claims in its ads and the tendency of such claims to deceive consumers.

19.    Gillette's hair raising claims for the M3P have already had a profound impact on consumer perception. For example, on or about January 20, 2005, the nationally syndicated daily comic strip "Pickles," by Brian Crane -- which on information and belief is published in over 300 newspapers worldwide and is available on the Internet -- made explicit reference to the hair raising claims. *Exhibit J.* The comic strip parrots the wording of the hair raising claims, stating, "The blades gently vibrate, causing the hair to stand on end for a close shave." *Id.* The comic strip reflects the extent to which the M3P -- and the hair raising claims -- have already penetrated the national consciousness.

20.    In December 2004, the Hamburg Regional Court in Germany, after briefing and evidentiary submissions by Schick as the applicant and Gillette as the respondent, entered an injunction barring Gillette from making hair raising claims in that country. In support of its request for an injunction, Schick submitted the affidavit of David J. Leffell of the Yale School of Medicine. Dr. Leffell, a renowned dermatologist, averred that he had determined through observation, investigation and testing of the M3P that "there is no physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising . . . . It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud." Dr. Leffell wrote that his "conclusion, therefore, as a scientist and based on my personal observations, is that the claims in [Gillette's] advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair."

21.    After the German court entered its injunction, but prior to filing the instant lawsuit, Schick wrote to Gillette to demand that Gillette agree to cease making hair raising claims for the M3P in the United States, and also to challenge the validity of Gillette's claim that the M3P

provides a closer shave than any other razor. *Exhibit K.* When Gillette refused to stop making hair raising claims for the M3P, this lawsuit followed.

### FIRST CAUSE OF ACTION
#### (Lanham Act Violation)

22.     Schick repeats and realleges each and every allegation contained in paragraphs 1 through 20 as if fully set forth herein.

23.     Gillette sells the M3P in interstate commerce and is engaging in an extensive, nationwide advertising campaign in connection with the marketing of the M3P that employs a variety of media, including television, print publications, product packaging and the Internet.

24.     A central message of this advertising campaign is that the M3P causes hair to stand up and away from the skin, thereby providing a closer, smoother shave. Gillette delivers this message in each medium, using variously worded claims to convince consumers that the M3P causes hair to stand up and thereby provides a better shave than other razors, necessarily including those manufactured by Schick.

25.     The hair raising claims made by Gillette for its M3P are false and misleading and misrepresent the nature, characteristics or qualities of Gillette's product. Upon information and belief, the claims are likely to deceive or confuse a substantial segment of the buying public and in fact have actually deceived or confused a substantial segment of the buying public. Moreover, the claims have influenced or are likely to influence the buying public's purchasing decisions. This deceptive conduct by Gillette is and has been deliberate and willful and has injured and continues to injure consumers.

26.     The M3P razor system does not cause facial hair to "stand up" and Gillette knew or should have known that to be so. Gillette also knew or should have known that the claims it is making about the M3P are false and misleading.

27.     Gillette's advertising of its M3P razor system, as described above, violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

28.    Schick has been and continues to be damaged by Gillette's false advertising of the M3P, including by direct diversion of sales from itself to Gillette and the lessening of goodwill which Schick's products enjoy among the buying public in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Connecticut Unfair Trade Practices Act)

29.    Schick repeats and realleges each and every allegation contained in paragraphs 1 through 27 as if fully set forth herein.

30.    Gillette's false and misleading claims in its advertising of the M3P razor system, as set forth above, were and are being disseminated in this district.

31.    Gillette knew or should have known that its claims were and are false and misleading. Moreover, Gillette made and continues to make these claims with reckless indifference to the rights of others and/or in intentional and wanton violation of those rights.

32.    Gillette's false claims constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

33.    As set forth above, Gillette's false advertisements for the M3P have caused and are causing substantial injury to Schick through the ascertainable loss of money or property.

34.    Gillette's conduct in the advertisement of the M3P constitutes an unfair trade practice in violation of Conn. Stat. § 42-110b.

## PRAYER FOR RELIEF

WHEREFORE, Schick respectfully requests that the Court enter judgment as follows:

A.    On Count One, an order directing an accounting by Gillette of its profits by reason of its false advertising, awarding Schick damages as allowed by law, and trebling Schick's recovery pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

B.    On Count Two, an order directing an accounting by Gillette of its profits by reason of its false advertising and awarding Schick actual and punitive damages pursuant to Conn. Gen. Stat. § 42-110g;

    C.     An Order preliminarily enjoining Gillette from making hair raising claims in any advertisements for M3P;

    D.     An Order permanently enjoining Gillette from making hair raising claims in advertisements for the M3P;

    E.     An Order granting Schick its costs and disbursements in this action, including its reasonable attorneys' fees; and

    F.     An Order granting Schick such other and further relief as this Court may deem just and proper.

<div align="right">

PLAINTIFFS SCHICK MANUFACTURING, INC., INC., EVEREADY BATTERY COMPANY, INC., and ENERGIZER BATTERY, INC.

_____

Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)
MURTHA CULLINA LLP
185 asylum street, Cityplace I
Hartford, Connecticut 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com

</div>

Of Counsel:

Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 790-4500
Facsimile: (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC.,<br>EVEREADY BATTERY COMPANY, INC.,<br>and ENERGIZER BATTERY, INC.,<br><br>Plaintiffs,<br><br>- v. -<br><br>THE GILLETTE COMPANY,<br><br>Defendant. | CIVIL ACTION NO.:  3:05 CV 174 (JCH)<br><br>APRIL 29, 2005 |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT
## FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc. and Energizer

Battery, Inc. (collectively "Schick"), respectfully submit this memorandum in support of their

motion pursuant to Federal Rule of Civil Procedure 15(a) for leave to file an Amended

Complaint for Injunctive Relief and Damages, attached hereto as Exhibit A.  More

specifically, Schick seeks leave to add specific factual allegations to support the claim that

Gillette has acted willfully and deliberately to violate the Lanham Act and the Connecticut

Unfair Trade Practices Act.  In support of this motion, Schick states that:

1.      Schick's Complaint in this action, filed on January 28, 2005, asserts claims for
false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Connecticut
Unfair Trade Practices Act, Conn. Stat. § 42-110b. Schick's complaint alleges, in part, that
Gillette's advertising campaign for its M3 Power ("M3P") razor "is likely to deceive or
confuse a substantial segment of the buying public" and that "[t]his deceptive conduct by
Gillette is and has been deliberate" because Gillette "knew or should have known that the
claims it is making about the M3P are false and misleading." Cplt. ¶¶ 24, 25. Based on these
allegations, Schick seeks as damages an accounting by Gillette of its profits, all damages as
allowed by law, and trebling of Schick's recovery pursuant to Section 35 of the Lanham Act,
15 U.S.C. § 1117. Cplt. p. 11, ¶ A.

2.      Testimony offered at the preliminary injunction hearing in this matter makes
clear that Gillette has acted deliberately and willfully in violation of the Lanham Act. Dr.
Kevin Powell, the director of Gillette's Advanced Technology Center in Reading, England,
testified that he advised Gillette's in-house counsel and other high-level Gillette employees
that the pre-launch and launch ad campaign for the M3P were "physiologically incorrect."
Hearing Tr. 432:4 – 433:17. Moreover, the Gillette executive in charge of the advertising
campaign for the M3P, Peter Clay, testified that Gillette made no effort to verify the accuracy
of key elements of the M3 Power advertising campaign. Hearing Tr. 100:18-101:23, 109:19-

109:22, 112:9-112:11, 114:11-117:22. Indeed, he testified that Gillette lacked substantiation for many of the characteristics of the M3P that were touted in Gillette's advertising and that Gillette considered important in convincing consumers to buy the product. Hearing Tr. 100:18-101:23, 109:19-109:22, 112:9-112:11, 114:11-117:22. Despite all this, Gillette proceeded with false and misleading television ads for the M3P and continues to air them to this day.

4.      Based on the testimony given by these Gillette officials, Schick now seeks to amend its Complaint to provide more specific factual detail for its claim that Gillette acted deliberately and willfully in violation of the Lanham Act. This motion for leave to amend is timely as it is filed prior to the April 30, 2005 deadline set by the Court. Transcript of Telephonic Status Conference of March 30, 2005, at 27.

5.      Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, amendments of pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In general, courts should not deny leave to amend "unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility." Friedl v. City of New York, 210 F.3d 79, 87 (2d Cir. 2000); see also Commander Oil Corp. v. Barlo Equipment Corp., 215 F.3d 321, 333 (2d Cir. 2000) ("Parties are generally allowed to amend their pleadings absent bad

3

faith or prejudice"). The presumption under Rule 15 in favor of amending pleadings is even stronger where, as here, the amendment does not allege a new cause of action but merely makes allegations "more definite and precise." Siegel v. Converters Transp., Inc., 714 F.2d 213, 216 (2d Cir. 1983). Here, there is no reason to deny Schick's motion to amend its Complaint, particularly given that Schick is not alleging any new claims against Gillette but rather supporting an existing claim with more specific factual allegations.

## CONCLUSION

For the foregoing reasons, the Court should grant Schick's motion for leave to file an Amended Complaint for Injunctive Relief and Damages.

4

Respectfully submitted,

_____

Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)
MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com

Of Counsel:

Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 790-4500
Facsimile: (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs Schick
Manufacturing, Inc., Energizer Battery, Inc.
and Eveready Battery Company, Inc.

5

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2005 a copy of the foregoing Memorandum in

Support of Plaintiff's Motion to Leave to File Amended Complaint for Injunctive Relief and

Damages was filed electronically and served via facsimile to all parties of record. Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

Michael A. Bucci, Esq.
Day, Berry & Howard LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

Peter M. Brody, Esq.
Ropes & Gray
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005-3948

_____
Michael J. Donnelly

**EXHIBIT  H**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,           :
EVEREADY BATTERY COMPANY,             :     CIVIL ACTION
INC., and ENERGIZER BATTERY, INC.     :     NO.:
                                      :
        Plaintiffs,                 :
                                      :
v.                                    :
                                      :
THE GILLETTE COMPANY                  :
                                      :
        Defendant.                  :     JANUARY 28, 2005

<u>MOTION FOR A PRELIMINARY INJUNCTION</u>

    Pursuant to Fed. R. Civ. P. 65(a), the plaintiffs, Schick Manufacturing, Inc.,

Eveready Battery Company, Inc. and Energizer Battery, Inc. (collectively, "Schick"),

having asked for equitable relief in their complaint, respectfully move that the Court issue

the following preliminary injunctive relief:

    1.    That until the Court holds a final hearing on the permanent injunctive relief

requested by Schick, defendant The Gillette Company ("Gillette"), and all persons acting on

its behalf be restrained from directly or indirectly claiming that the M3 Power makes hair

stand "up and away from the skin" so that a closer shave results, or words and/or images

that convey the same meaning, in any advertisements for the M3 Power.

    The facts of this case are recited in the complaint and memorandum of law, with

supporting declarations, submitted herewith. These facts demonstrate that if the Court does

not enter the preliminary injunction requested, Schick will suffer irreparable harm. The

facts further demonstrate that Schick is likely to succeed on the merits or that there are

sufficiently serious questions going to the merits to make them a fair ground for litigation. Finally, the known facts show that the balance of hardships tips decidedly toward Schick.

The facts further demonstrate that good cause exists to issue the requested preliminary injunction without bond.

Dated at Hartford, Connecticut this 28th day of January, 2005.

PLAINTIFFS – SCHICK MANUFACTURING, INC., EVEREADY BATTERY COMPANY, INC. and ENERGIZER BATTERY, INC.


By____/s/ Derek T. Werner
    Michael J. Donnelly (ct07974)
    Derek T. Werner (ct23419)

Murtha Cullina LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
Email:  mdonnelly@murthalaw.com
    dwerner@murthalaw.com

- 2 -

Of Counsel:

Steven F. Reich, Esq. (pro hac vice pending)
Ronald G. Blum, Esq. (pro hac vice pending)
Jeffrey S. Edelstein, Esq. (pro hac vice pending)
Monica Y. Youn, Esq. (pro hac vice pending)
Manatt Phelps & Phillips LLP
7 Times Square
New York, NY  10036
Telephone:  (212) 790-4500
Facsimile:  (212) 790-4545
E-mail:  SReich@manatt.com
        RBlum@manatt.com
        JEdelstein@mannatt.com
        MYoun@manatt.com

Attorneys for Plaintiffs Schick
Manufacturing, Inc., Energizer Battery, Inc.
and Eveready Battery Company, Inc.

**EXHIBIT I**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC., | : | CIVIL ACTION |
| EVEREADY BATTERY COMPANY, | : | NO.: |
| INC., and ENERGIZER BATTERY, INC. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE GILLETTE COMPANY | : | |
| | : | |
| Defendant. | : | JANUARY 28, 2005 |

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc. and

Energizer Battery, Inc. (collectively "Schick") respectfully submit this Memorandum of Law

in Support of their Motion for a Preliminary Injunction.  This same day, Schick has filed

their complaint in this action along with a request for expedited discovery.

PRELIMINARY STATEMENT

Schick brings this motion for injunctive relief to stop Defendant, The Gillette

Company ("Gillette") from continuing to disseminate false and deceptive advertising claims

regarding its new premium-priced razor, the M3 Power ("M3P").  Gillette's advertisements

falsely claim, in a variety of media and in variously worded claims, that the M3P generates

"[m]icro-pulses [that] raise the hair up and away from the skin so you can shave closer and

more thoroughly in one easy power stroke."  However, scientific testing and expert analysis

demonstrate -- and a court in Germany has already ruled -- that the claim is pure fiction and lacks any physiological or scientific basis. Because these false claims have been made by Gillette in advertisements run nationwide, millions of consumers have already been tricked into paying premium prices for a product that does not deliver what is promised, and Schick has seen its hard-won gains in market share erode as a result of this deception.

Schick easily satisfies the standard in this circuit for obtaining a preliminary injunction -- a showing of: (1) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balancing of the hardships that tips in the movant's favor; and (2) irreparable harm. Extensive analysis and testing by a highly-regarded independent expert demonstrates that the M3P's "micro-pulses" do not have any "hair raising" effect that would provide a closer shave. Indeed, based on these very test results, a German court has already enjoined these "hair raising" claims from being made in Germany. Only if Gillette immediately is enjoined from making these false and misleading claims in the United States can the harm to Schick and the buying public be limited.

## I.    STATEMENT OF FACTS

Defendant Gillette is the world's market-share leader in so-called "wet shave" razors for men and women, while Schick is the second largest global manufacturer and marketer of

those products. (Declaration of Michelle Stearns ¶ 3, hereinafter "Stearns Decl.").[1] Both Gillette and Schick sell two types of razors: (1) "razor systems," which provide consumers with a permanent razor handle and separate refillable blades; and (2) disposable razors, which are discarded in their entirety when worn out. (Id.) There is little dual usage among customers who use razor systems and those who use disposable razors. (Id.) Together, Gillette and Schick account for over 95% of the market share of men's "wet-shave" systems razors in the United States, and are engaged in fierce head-to-head competition for consumers. (Id.) Wet shave systems razors are among the fastest growing market segments of the consumer products industry. (Id. ¶ 4) Growth in market share depends heavily on persuading consumers to "trade up" from older shaving products to new, premium-priced and technologically-advanced shaving products that have been introduced in recent years. (Id.) Advertising is the primary means by which Gillette and Schick try to persuade consumers to trade up to new premium products, and both companies invest heavily in developing advertising claims to convince consumers to do so. (Id. ¶ 5)

In recent years, Schick has mounted a significant challenge to Gillette's market-share dominance. In 2003 Schick achieved a technological breakthrough with the introduction of its four-blade Quattro razor system -- the world's first four-blade razor system. (Id. ¶ 6)

---

[1]     Schick has submitted a photocopy of the Stearns Declaration with its Preliminary Injunction papers. Schick will supplement its papers with an original of the Stearns Declaration.

The Quattro was named one of the 25 best products of the year by <u>Fortune Magazine</u>. (Cplt., Ex. A) In August 2004, Schick followed on the success of Quattro by introducing the Quattro Midnight, which offers four blades and an enhanced handle design for improved precision and control.  (Stearns Decl. ¶ 7)  These products followed on the heels of other recent Schick innovations:  the 2002 introduction of the three-bladed Xtreme 3 razor system and the 2000 introduction of the Xtreme 3 disposable razor.  (<u>Id.</u> ¶ 6)  Since these technological breakthroughs by Schick, Gillette has begun to make increasingly aggressive advertising claims for its products in an apparent effort to stem Schick's market gains and contain the industry buzz that Schick has generated.  (<u>Id.</u> ¶ 9)

A.    <u>Gillette's Deceptive Advertising</u>

Gillette launched the M3P in North America in May 2004.  In a press release announcing the launch, Gillette called the product "revolutionary" because, using an AAA-sized battery in the razor handle, it was said to "deliver[] gentle pulses to the shaving cartridge that stimulate hair upward and away from the skin, making it dramatically easier to shave more thoroughly than ever before."  (Cplt., Ex. D at 1)  In the remainder of this memorandum, we refer to Gillette's advertising claims as "hair raising claims."

Hair raising claims are the cornerstone of Gillette's marketing for the M3P in each of the media in which Gillette advertises.  On its website, Gillette asserts that the M3P's "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more thoroughly in one easy power stroke."  (Cplt., Ex. E at 1)  Gillette's website also claims that the M3P's "pulsing action stimulates hair upward and away from the skin, making it

-4-

dramatically easier to shave more thoroughly in one easy power stroke." (Id. at 2)

Similar claims are made by Gillette on the retail package for the M3P. The package tells consumers that "[g]entle micro-pulses stimulate hair up and away from skin. In just one power stroke, you can get a closer and more thorough shave. So thorough, there is less need to reshave, which means less irritation." (Cplt., Ex. F)

Gillette also has featured hair raising claims in its print advertisements for the M3 Power. (Cplt., Ex. G) A series of print ads says "Turn on the battery-powered motor. Micro-pulses raise the hair from your skin. So the PowerGlide blades can shave closer." (Id.) A separate print advertisement says "NEW! Gillette M3 Power[.] Micro-Power[.] Stimulates hair up and away from skin so you can get a closer and more thorough shave with less irritation." (Cplt., Ex. H)

Gillette also has been aggressively advertising the M3P on television featuring the same false and misleading hair raising claims discussed above. (Stearns Decl. ¶ 3) Television ads making the deceptive claims have appeared many thousands of times in homes across the country. (Id. ¶ 10) Photoboards (i.e., still photographs and copy taken from the commercials) of these commercials make clear that hair raising claims are the cornerstone of Gillette's efforts to persuade television viewers to buy the M3P. (Cplt., Ex. I) One series of television ads tells consumers "New Gillette M3 Power. Turn it on and micro pulses raise the hair for the closest shave ever." (Cplt., Ex. I at 1, 2) A second series of ads (some employing slightly different wording) says "Introducing Gillette M3 Power. Turn on

Gillette's first micro-power shaving system.   Micro pulses raise the hair so you shave

closer." (Cplt., Ex. I at 3-9)

Gillette's hair raising claims for the M3P have already had a profound impact on

consumer perception.  For example, on or about January 20, 2005, the nationally syndicated

daily comic strip "Pickles," by Brian Crane -- which is published in over 300 newspapers

worldwide and is available on the Internet -- made explicit reference to the hair raising

claims.  (Cplt., Ex. J)  The comic strip parrots the wording of the hair raising claims,

stating, "The blades gently vibrate, causing the hair to stand on end for a close shave." Id.

The comic strip reflects the extent to which the M3P -- and the hair raising claims -- have

already penetrated the national consciousness.

> **B.**    **The False Advertisements Have Increased Gillette's Market**
> **Share at the Expense of Schick's Market Share**

In the month immediately preceding the introduction of Gillette's M3P, Schick's

Quattro premium men's systems razors had a market share of 21.0% of dollar sales of men's

systems razors.  (Stearns Decl. ¶13)  Gillette launched the M3P on May 18, 2004.  After its

first month on the market, the M3P had a market share of 30.3% of dollar sales of men's

systems razors.  (Id. ¶ 14)  By the end of 2004, just over six months after its introduction,

M3P had a market share of 42.0% of dollar sales of men's systems razors.  (Id. ¶ 15)  In

stark contrast, the market share for Quattro and Quattro Midnight combined for the final

month of 2004 decreased to 13.9% of dollar sales.  (Id. ¶ 16)  Accordingly, Schick's

Quattro products experienced a 7.1 percentage-point drop in market share in the six-month

period after the launch of the M3P and the nationwide "hair raising" advertising campaign. Overall in 2004, dollar sales for Quattro razors decreased 23.3% and fell far short of sales projections. (Id. ¶ 18)

Prior to the launch of the M3P, Gillette had an overall 62.7% market share of men's systems razors, compared to Schick's overall 27.1% market share. (Id. ¶ 19) At the end of 2004, Gillette had an overall 79.9% market share of men's systems razors, compared to an overall market share of 15.7% for Schick. (Id. ¶ 20) Thus, in the six-month period following the M3P launch, Gillette gained 17.2 percentage points in market share while Schick lost 11.4 percentage points. Overall in 2004, Schick's market share of men's systems razors dropped 26.8% in dollar sales. (Id. ¶ 22) Significantly, in 2004, Gillette's market share increased 29.6% in dollar sales. (Id. ¶ 23)

In light of the large dollar share increase for Gillette and the corresponding decrease for Schick over the past year, it is entirely reasonable to conclude that Gillette's M3P advertising has had an adverse impact on the sale of Schick's products and will continue to do so. (Id. ¶ 24) As noted above, Gillette and Schick together account for over 95% of sales of men's systems razors. A customer gained for Gillette almost certainly means a customer lost for Schick. (Id. ¶ 25)

C.    **Schick's M3P Study Demonstrates the Falsity of Gillette's Hair Raising Claims**

To test Gillette's hair raising claims, Schick retained the services of an internationally renowned independent expert, Dr. David Leffell, Professor of Dermatology and Surgery and

Chief of Dermatological Surgery at the Yale University School of Medicine. (Declaration of
David J. Leffell, M.D., dated January 12, 2005 ("Leffell Decl.") ¶ 1)  Dr. Leffell regularly
uses specialized cameras and optical equipment to view the skin in the course of his
dermatological practice. (Id. ¶ 20)  Dr. Leffell was asked to determine whether the
vibrating action of the M3P razor had any effect on the hair on a shaver's face during use.
(Id. ¶ 8)  More particularly, Dr. Leffell was asked to assess Gillette's claim that "micro
pulses" generated by its M3P razor actually raised hair up away from the skin. (Id.)

Accordingly, Dr. Leffell visited Schick's testing laboratory in Milford, Connecticut
to study the effect of the M3P razor on facial hair (hereinafter, the "M3P Study"). (Id. ¶ 9)
Dr. Leffell assessed the protocol of the M3P Study and determined it to be a valid and
accurate method of assessing the M3P's performance. (Id. ¶ 11)  Dr. Leffell actively
monitored and participated in the testing. (Id. ¶ 11)  Five men were selected from Schick's
regular pool of shaving test subjects. (Id., Ex. 2, at ¶ 1)  In preparation for the shave, the
test subjects' faces were moistened with a warm towelette. (Id., Ex. 2, at ¶ 2)  A head
restraint fixed and stabilized the head position of the test subject. (Id., Ex. 2, at ¶ 6)  The
M3P razor was swivel-mounted on an automated, pneumatically-powered holder, which
ensured consistent pressure and stroke speed and reasonably replicated typical consumer use.
(Id., Ex. 2, at ¶ 6)  Two razor strokes, a control stroke and a test stroke, were recorded for
each test subject. (Id., Ex. 2, at ¶ 3)  The control stroke was made with the M3P switched
off and with blunt razor blades, to keep the hair from being cut before the test stroke could

be made. (Id., Ex. 2, at ¶ 3) The test stroke was made with the M3P switched on and using standard razor blades. A special, high-speed digital imaging camera was used to record the two strokes for each test subject. (Id., Ex. 2, at ¶ 6) This camera takes 500 pictures per second and offered a clear and accurate slow-motion rendering of "the effect of the product on the relevant patch of skin, and in particular, on the hairs contained therein." (Id.; Ex. 2, at ¶ 6)

During the M3P Study, Dr. Leffell observed that "there was clearly no effect on the hair that was subject to the Mach 3 Power razor in terms of any effect that would cause the hairs to stand up or stand proud of the skin." (Id. ¶ 16) Dr. Leffell concluded, in his expert opinion, that:

> there is no physiologic or other scientific basis for the claim that the device can cause facial hair to stand up proud in the manner described in the Gillette advertising . . . . It is my strong opinion, as a scientist and as a skin specialist of many years, that the mild vibration effect of this product applied to the skin would not have any effect on the hairs such as to cause them to be raised up or stand proud.

(Id. ¶ 23) Dr. Leffell further opined that his "conclusion, therefore, as a scientist and based on my personal observations, is that the claims in [Gillette's] advertising relating to this product's ability to raise up hairs does not have any scientific basis. The product cannot be demonstrated to have such an effect on facial hair." (Id. ¶ 24)

D.    The German Court Enjoins Gillette's Hair Raising Claims

Based upon the results of the M3P Study, on November 11, 2004, Schick moved in the Hamburg Regional Court in Germany for an interim injunction prohibiting Gillette from

making hair raising claims in that country. Five days later, on November 16, 2004, the German court entered an ex parte interim injunction barring Gillette from making hair raising claims in that country. Gillette filed an objection to the injunction on December 7, 2004 that included supporting affidavits from two expert witnesses. After Schick submitted its reply brief, a hearing before the court was held on December 17, 2004, at which additional testimony and argument were considered. Following the hearing, the German court pronounced its judgment, which was memorialized in a written judgment affirming the interim injunction. (Cplt., Ex. B) In its judgment, the court stated that "[t]his statement is deceptive, because *shaving with the M3 Power Shaver as instructed does not cause the facial hairs to stand up straight*." (Id. at 6 (emphasis added)). Furthermore, the court found that Gillette had not established that -- for multi-blade razors such as the M3P or the Quattro -- the hair raising effect was even relevant to the quality of the shave, since the action of multiple blades pulls the hair out of the hair shaft, making any lifting effect superfluous. (Id. at 7)

Having been barred by the German court from making hair raising claims, Gillette revised the wording of its advertising in Germany (although not in the United States) to say, "Gentle micro-power stimulates the skin. Your Gillette shave is now even closer." (Cplt., Ex. C at 2) On December 22, 2004, Schick moved in Germany for an interim injunction against this revised claim, which the court granted on December 28, 2004. In enjoining the use of this revised claim in that country, the German court found even Gillette's revised

"stimulates the skin" claim to be misleading for the same reason that the original hair raising claim was found to be misleading -- i.e., it suggests "an explicit causality between these vibrations and the special closeness [of the shave]" that is not true. (Id.)

After the German court entered and confirmed its injunction against the hair raising claim, but prior to filing the instant lawsuit, Schick wrote to Gillette to demand that Gillette agree to cease making hair raising claims for the M3P in the United States, and also to challenge the validity of Gillette's claim that the M3P provides a closer shave than any other razor. (Cplt., Ex. K)  When Gillette refused to stop making hair raising claims for the M3P, this lawsuit followed.[2]

## II.    ARGUMENT

### A.    The Standards Applicable to Lanham Act Cases and to Injunctive Relief in Lanham Act Cases are Well-Settled

Section 43(a) of the Lanham Act offers broad protection against a wide range of unfair competition, including false advertising. "The purpose for which this section was enacted was the protection of consumers and competitors from a wide variety of misrepresentations of products and services in commerce." CBS Inc. v. Springboard Intern. Records, 429 F. Supp. 563, 566 (S.D.N.Y. 1977); see also SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc., 906

---

[2]    Schick has agreed to grant Gillette two months to allow Gillette to conduct its own testing of Schick's Quattro Midnight against the M3P.  Accordingly, Schick has not challenged Gillette's superiority claims for the M3P in the present complaint.

F.Supp. 178, 181 (S.D.N.Y. 1995) ("[t]he purpose of the Act is to insure that

advertisements represent truthful claims by a manufacturer and to eliminate any advertising

which proffers a misstatement or misrepresentation by a competitor").

Congress specifically sought to provide a business competitor of an advertiser a

powerful legal tool to prevent consumer deception:

> [p]rotecting consumers from false or misleading advertising . . .
> is an important goal of the statute and a laudable public policy to
> be served . . . . [Competitors] have the greatest interest in
> stopping misleading advertising, and a private cause of action
> under section 43(a) allows those parties with the greatest interest
> in enforcement, and in many situations with the greatest resources
> to devote to a lawsuit, to enforce the statute rigorously.  Public
> policy, therefore, is indeed well served by permitting
> misrepresentation of quality claims to be actionable under section
> 43(a).

Coca-Cola Co. v. Procter & Gamble Co., 822 F.2d 28 (6th Cir. 1987).  Accordingly,

Section 43(a) vindicates a consumer's right to be told the truth, as well as a competitor's

right to fair tactics in the marketplace.  4 J. Thomas McCarthy, McCarthy on Trademarks

and Unfair Competition § 27:25, at 27-43 (4th ed. 2004).

Under well-established Second Circuit law, preliminary injunctive relief is

appropriate in these cases where a plaintiff establishes: (1) either (a) a likelihood of success

on the merits, or (b) sufficiently serious questions going to the merits to make them a fair

ground for litigation plus a balance of hardships tipping decidedly in the plaintiff's favor;

and (2) the likelihood of irreparable injury in the absence of such an injunction.  See, e.g.,

TCPIP Holding Co., Inc. v. Haar Comm., Inc., 244 F.3d 88, 92 (2d Cir. 2001); Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992). Schick easily meets this familiar standard.

    **B.**    <u>Schick is Likely to Succeed on the Merits of its Claims</u>

Given the demonstrated falsity of Gillette's hair raising claims, the likelihood that Schick will succeed on its claims is unusually high. Moreover, the very issues that Schick will prove to this Court have already successfully been proven to the German court.

Section 43(a) of the Lanham Act prohibits any:

> [f]alse or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [the advertiser's] or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B) (1996). The law governing false advertising claims under the Lanham Act is well settled in this Circuit. To establish such a claim, a plaintiff must prove the following five elements:

> (1) The defendant has made a false or misleading statement of fact;
>
> (2) The false or misleading statement of fact in issue has actually deceived a substantial segment of the audience for the advertisement or has the capacity to deceive such segment;
>
> (3) The deception caused by the statement in issue is material because it is likely to influence purchasing decisions;
>
> (4) The plaintiff has been injured as a result of the defendant's false claims because of a potential decline in sales or loss of goodwill; and

(5) The advertised goods traveled in interstate commerce.

Omega Engineering, Inc. v. Eastman Kodak Co., 30 F. Supp. 2d 226, 255 (D. Conn. 1998).

A claim of false advertising does not require proof of intent to deceive.  Procter & Gamble

Co. v. Chesebrough-Pond's Inc., 747 F.2d 114, 118-19 (2d Cir. 1984).

### 1.    The Hair Raising Claims Are False Statements of Fact

To satisfy the first element of the standard set forth above -- proving the falsity of the

hair raising claims -- Schick must establish that the "advertisement is either literally false or

that the advertisement, though literally true, is likely to mislead and confuse consumers."

Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992); see also McNeil-

P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir.1991).

Under the literal falsity theory, a plaintiff must show that a disputed advertisement is

"false on its face or 'explicitly false.'"  Johnson & Johnson Vision Care, Inc. v. Ciba Vision

Corp., No. 04CIV7369 (LTS)(HBP), __ F. Supp. 2d __, 2004 WL 2884412, at *10

(S.D.N.Y. Dec. 13, 2004) (attached hereto at Tab A) .  Where, as here, the challenged

advertisement does not explicitly purport to rely on the results of scientific studies, a plaintiff

proves falsity by adducing evidence that affirmatively shows the claim to be false.  Castrol,

977 F.2d at 62; Glaxo Warner-Lambert OTC G.P. v. Johnson & Johnson Merck Consumer

Pharm. Co., 935 F.Supp. 327, 329 (S.D.N.Y. 1996).

Significantly, where there is persuasive evidence that the challenged advertisement is

literally false, courts in this Circuit have routinely granted injunctions.  See, e.g.,

McNeil-PPC, Inc. v. Pfizer, Inc., No. Civ. 7684 (DC), 2005 WL 23307 at *15 (S.D.N.Y.

Jan. 6, 2005) (attached hereto at Tab B); See also, S.C. Johnson & Son, Inc. v. Clorox Co.,

21 F.3d 232, 239-40 (upholding injunction where advertisements depicting leaking food

storage bags were literally false in light of evidence regarding actual leakage rates); Castrol,

977 F.2d at 62 (affirming grant of preliminary injunction against advertisements claiming

superior protection for engine oil where credible expert testimony established that engine oil

did not provide better protection); Johnson & Johnson Vision Care, 2004 WL 2884412, at

*10 (granting injunction where plaintiff established falsity of defendant's claim regarding

permeability of contact lens); Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437, 453 (D. Conn.

1994) (injunction appropriate where competitor established that manufacturer made literally

false superiority claims regarding its hypertension medication).

Here, Schick's M3P Study constitutes persuasive and reliable evidence demonstrating

the literal falsity of Gillette's hair raising claims. Schick's testing, as confirmed by its

expert, Dr. Leffell, shows that Gillette's hair raising claims are pure fiction. Indeed,

Dr. Leffell observed and testified that the hairs remained in the same position on consumers'

skin before and after application of the M3P razor. (Leffell Decl. ¶ 17) The Court's

confidence in the results of Schick's M3P Study should be heightened by the fact that a court

in Germany reviewed this same evidence, as well as Gillette's response to the M3P Study,

and thereafter enjoined the claims in that country. Schick has carried its crucial burden of

showing the literal falsity of Gillette's claims.

### 2.    Schick is Likely to Succeed on the Remaining Elements of its False Advertising Claim

The remaining elements of Schick's false advertising claim also fall easily into place. Where, as here, an advertisement is false on its face, a plaintiff in the Second Circuit need not adduce evidence of the second element, audience deception, because such deception is presumed. Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312 (2d Cir. 1982); American Home Prods. Corp. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir. 1978). The third element, materiality, is similarly presumed where a challenged advertisement is literally false. Johnson & Johnson Vision Care, 2004 WL 2884412, at *12 ("[o]nce it is determined that a statement is false, it is presumed to be material"); Telebrands Corp. v. E. Mishan & Sons, No. 97 Civ. 1414 (RPP), 1997 WL 232595, at *22 (S.D.N.Y. May 7, 1997) (attached hereto at Tab C) . The fourth element, injury to plaintiff, is satisfied by the inference of harm to be drawn from the fact that Schick and Gillette are head-to-head competitors in a market in which they are the dominant players, and by evidence of Schick's lost sales and declining market share. (See also, infra, Section II C). Finally, the challenged advertisements have been widely disseminated in interstate commerce, satisfying the fifth element of the test for likelihood of success on the merits. Stearns Decl. ¶ 10; see also Johnson & Johnson Vision Care, Inc., 2004 WL 2884412, at *12.

As this discussion makes clear, Schick has demonstrated a clear likelihood of success with respect to each element of its false advertising claim.[3]  We show below that a preliminary injunction should issue because Schick has suffered and will continue to suffer irreparable injury caused by Gillette's false advertising.

C.    Schick Will Suffer Irreparable Harm if Gillette's False
Advertisements Continue, and the Equities Weigh Decidedly
in Favor of Injunctive Relief

In the Second Circuit, a false advertising plaintiff need submit "only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising" to be entitled to injunctive relief.  See, e.g., Johnson & Johnson, 631 F.2d at 190.  Schick easily meets this standard.  Indeed, while Schick has shown lost sales and declining market share following the launch of Gillette's advertising campaign, it need not have done so.  That is because the Second Circuit does not require proof of actual lost sales where, as here, the plaintiff's and defendant's products are in head-to-head competition in the relevant market.  Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 316 (2d Cir. 1982), abrogated on other grounds by Fed.R.Civ.P. 52(a);  Zeneca Inc. v. Eli Lilly & Co.,

---

[3]    Since Schick has established a likelihood of success on the merits of its Lanham Act claim, a likelihood of success on the merits of its Connecticut's Unlawful Trade Practices Act ("CUTPA") claim is established as a matter of law.  Federal courts have uniformly held that a violation of the Lanham Act also establishes liability under CUTPA.  See Nora Beverages, Inc., v. Perrier Group of America, Inc., 164 F.3d 736, 751 (2d Cir.1998); World Championship Wrestling v. Titan Sports, Inc., 46 F.Supp.2d 118, 124 (D. Conn. 1999); Timex Corp. v. Stoller, 961 F.Supp. 374, 381 (D. Conn.1997); see also Jarrow Formulas, Inc. v. International Nutrition Co., 175 F.Supp.2d 296 (D. Conn. 2001).

No. 99 Civ. 1452 (JGK), 1999 WL 509471 at *36 (S.D.N.Y. July 19, 1999) (attached

hereto at Tab D); see also Johnson & Johnson, 631 F.2d at 190 ("The correct standard is

whether it is likely that [defendant's] advertising has caused or will cause a loss of

[plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that

[defendant's] ads actually resulted in some definite loss of sales"). Thus, irreparable injury

is established where: (i) the parties are competitors in a relevant market and (ii) there is "a

logical causal connection between the alleged false advertising and [plaintiff's] own sales

position."); McNeil-PPC, Inc., 2005 WL 23307 at *15.

   Judge Chin's recent decision in McNeil-PPC, 2005 WL 23307, illustrates the rule in

this Circuit. There, McNeill-PPC, the market leader in dental floss, sued Pfizer claiming

that Pfizer's advertisements for its Listerine mouthwash falsely equated the benefits of

rinsing with Listerine to flossing in promoting better dental hygiene. In granting a

preliminary injunction, the court noted that "Pfizer and PPC are in head-to-head competition

for the same market" so that plaintiff "can prove irreparable harm by showing a logical

causal connection between the alleged false advertising and its own sales position." McNeil-

PPC, 2005 WL 23307, at *17 (internal quotation omitted). Because millions of people had

seen the challenged advertisements, the court concluded it was likely that the advertisements

had adversely affected plaintiff's sales. Id. at *18. The court also relied on the fact that

sales of certain categories of McNeil-PPC's flossing products sharply declined after Pfizer

launched its advertising campaign. Finally, the court found it significant that sales of

Listerine increased 10% after Pfizer launched the challenged advertisements. In light of this evidence, the court found a "logical causal connection" between plaintiff's alleged sales position and the alleged false advertising sufficient to establish irreparable injury. Id.

Here, the "logical causal connection" is even more starkly apparent. Gillette is a head-to-head competitor of Schick in the premium razor business, and the two are the unquestioned market-share leaders in the industry. Since Gillette and Schick account for over 95% of the relevant market share, the battle for consumers between the two companies is nearly a zero-sum game, where any gain for Gillette likely results from a loss for Schick. Millions of people have been exposed to Gillette's false hair raising claims as a result of Gillette's nationwide, multimedia advertising campaign. The claims are directed at the same consumers who purchase Schick's premium wet-shave razor systems, and have been successful in helping the M3P capture an astounding 42% of market share within six months of its release. (Stearns Decl. ¶ 15) At the same time, Schick's competing Quattro products have lost 7.1 percentage points in dollar share and Schick's overall market share has dropped 14 percentage points, even at a time when Schick was spending millions of dollars in marketing and advertising to launch its premium product, the Quattro Midnight. (Stearns Decl. ¶¶ 8, 17, 21) Indeed, the comic strip portraying the hair raising claims is persuasive evidence that these false claims have already permeated popular culture. (Cplt., Ex. J) It is beyond dispute that at least some of the consumers who have been deceived by Gillette's false advertisements have come from Schick's core consumer base, and that -- absent an

injunction – Gillette's false advertisements will continue to divert other Schick consumers, causing continued erosion of Schick's market share.  (Stearns Decl. ¶¶ 24-25)

Finally, since Gillette is engaging in false, deceptive and misleading advertisements, the balance of equities falls squarely in Schick's favor. Gillette is engaging in illegal and wrongful conduct to the detriment of Schick and the general consuming public as a whole. The statutes to which Schick has cited are intended to protect consumers and competitors from false and misleading advertising, and Gillette can articulate no reason to be allowed to continue to violate them.  Gillette has no cognizable rights in the dissemination of deceptive falsehoods.  Zeneca, 1999 WL 509471 at *41 (false advertising defendant "can assert no equitable interest in the perpetuation of an advertising campaign that is literally false") (citation omitted).  Therefore, granting the relief requested by Schick will advance the interests that these statutes specifically were enacted to protect.

## CONCLUSION

The Court should grant the relief sought in this motion for a preliminary injunction.

Respectfully submitted,

_____/s/ Derek T. Werner_____
Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)

MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut  06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
mdonnelly@murthalaw.com
dcastricone@murthalaw.com

Of Counsel:

Steven F. Reich, Esq. (pro hac vice pending)
Ronald G. Blum, Esq. (pro hac vice pending)
Jeffrey S. Edelstein, Esq. (pro hac vice pending)
Monica Y. Youn, Esq. (pro hac vice pending)

MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 790-4500
Facsimile:  (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs Schick
Manufacturing, Inc., Energizer Battery, Inc.
and Eveready Battery Company, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SCHICK MANUFACTURING, INC., | : | |
| EVEREADY BATTERY COMPANY, | : | CIVIL ACTION |
| INC., and ENERGIZER BATTERY, INC. | : | NO.: 3:05-CV-174(JCH) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| THE GILLETTE COMPANY | : | |
| | : | |
| Defendant. | : | MARCH 9, 2005 |

REPLY BRIEF

Plaintiffs Schick Manufacturing, Inc., Eveready Battery Company, Inc. and Energizer Battery, Inc. (collectively "Schick") submit this reply to The Gillette Company's ("Gillette") opposition to our motion for a preliminary injunction. As shown in our opening memorandum ("Mem."), a German court has enjoined in Germany the claims also at issue in this case. Since our original submission, Gillette's advertising claims have been preliminarily enjoined in Australia following a full evidentiary hearing before the Federal Court of Australia, New South Wales District Registry. Attachment A. A court in France also recently declined to grant Schick injunctive relief after a hearing but without taking testimony.

I.    GILLETTE ADVERTISING IS LITERALLY FALSE
      (Responding to Gillette's Opp. pp. 17-20, 28, 32-33)

Our complaint recites Gillette's variously worded advertising claims that the M3 Power "raise[s] the hair up and away from skin" or "upward and away from the skin." Complaint ¶¶ 14-17. Gillette does not deny making those claims, but asserts that as used in its advertising "raise" does not mean that hair "raises up" and therefore the claims for the M3 Power are not false. Opp. at 17. Instead, Gillette says that its ads mean that facial hair is "extended." Id. Thus, Gillette's position in this litigation is that the M3 Power does not cause facial hair to raise up, but only to extend. Id.

However, Gillette acknowledges that the original version of the challenged advertising for the M3 Power actually illustrates hairs changing direction and moving into a standing position on the face. Opp. at 18-19. This is consistent with the dictionary definition of "raise," the first of which is "to cause or help to rise to a standing position." Attachment B. In deciding whether Gillette's advertising is literally false, the Court is required to consider the complete content and context of Gillette's promotions, including the plain meaning of "raise" and the visuals employed in the ad. S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001); Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 318 (2d Cir. 1982); McNeil-PPC, Inc. v. Pfizer Inc., 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005); Edmiston v. Jordan, 98 Civ. 3928 (DLC), 1999 WL 1072492, at *9 (S.D.N.Y. Nov. 24, 1999). As the Australian court observed when it enjoined these ads, Gillette's promotions "show facial hairs moving to a vertical position with a distinct change in the angle between hair and face." Attachment A ¶ 36. Thus, Gillette's ads are literally false.[1]

Gillette trumpets the fact that, following Schick's complaints, it changed some elements of its advertising. Opp. at 19-20. The changes do not go far enough. Gillette acknowledges that the voice-over for the new version of the ads continues to claim that the M3 Power "raises" hair (id. at 19-20), thereby preserving the most troublesome element of Gillette's promotional scheme. Moreover, these changes must be viewed in the context of the earlier versions of these same ads. Even if one believed (which we do not) that the newer version of the ads were consistent with the Lanham Act, the question would remain whether such subtle changes are sufficient to correct the false message conveyed to consumers by the original versions. We believe the clear answer to that question is "no," and that the changes touted by Gillette do not abate the injury that Schick is suffering. Finally, even assuming arguendo that the newer version of the ads could be interpreted as making a hair extension claim despite the

---

[1] Although Gillette attempts to downplay the significance of its false visual demonstration as a mere "simplified animation," it admits that the animation is a demonstration of product function. Opp. at 18. However, even simplified or animated product demonstrations cannot be false or exaggerated. Coca-Cola Co., 690 F.2d at 318; see also Reckitt Benckiser, Inc., NAD Report Case # 4262 (Nov. 5, 2004). Copies of all unpublished decisions cited in this brief are attached as Attachment E.

2

"hair-raising" voice-over, Gillette has no substantiation testing on the actually marketed version of the M3Power that shows hair extension (See Section IIIB).

## II.  GILLETTE URGES AN ERRONEOUS LEGAL STANDARD ON THE COURT
(Responding to Gillette's Opp. pp. 23-25)

Gillette incorrectly argues that a higher than normal legal standard applies on this motion because Schick's requested relief constitutes a mandatory injunction. Opp. at 23-25. However, courts in this Circuit consistently have treated as prohibitory -- not mandatory -- a request in a false advertising case to enjoin false promotional claims, and have employed the familiar two-pronged standard for injunctive relief. Mem. at 12. This is true even where the requested preliminary injunction requires modification or discontinuance of existing advertisements. See, e.g., McNeilab, Inc. v. American Home Prods. Corp., 848 F.2d 34, 37 (2d Cir. 1988); McNeil-PPC, Inc, 351 F. Supp. 2d at 256-57; Telebrands Corp. v. Wilton Indus., Inc., 983 F. Supp. 471, 473-74 (S.D.N.Y. 1997); SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co., Inc., 906 F. Supp. 178, 184 (S.D.N.Y. 1995), aff'd, 100 F. 3d 943 (2d Cir. 1996); see also Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437, 460-61 (D. Conn. 1994).

In urging a higher standard on the Court, Gillette ignores the substantial body of false advertising case law in this Circuit, and with one exception relies upon decisions rendered outside the false advertising context.[2] The Court should disregard Gillette's attempt to alter this Circuit's long-established standards on this motion – i.e., that a movant for a preliminary injunction must demonstrate (1) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in the plaintiff's favor; and (2) the likelihood of irreparable injury in the absence of such an injunction. However, even if a "higher" standard

---

[2] The one false advertising case cited by Gillette (Opp. at 24-25) – Borden, Inc. v. Kraft, Inc., No. 84 C 5295, 1984 WL 1458 (N.D. Ill. Sept. 28, 1984) – is a 21-year old unpublished decision that runs contrary to the clearly-established law of this Circuit.

were to apply, we are confident that our evidence in this case would meet that standard because Schick has demonstrated a clear likelihood of success on the merits.

## III.    SCHICK HAS DEMONSTRATED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS
(Responding to Gillette's Opp. pp. 28-33)

A false advertising plaintiff satisfies its burden of demonstrating the literal falsity of a claim by producing evidence that affirmatively shows the claim to be false. L & F Prods., Inc. v. Procter & Gamble Co., 845 F. Supp. 984, 1000 (S.D.N.Y. 1994). Through testing and expert testimony, Schick has established a clear likelihood of success in carrying this burden.[3]

### A.    Gillette's Criticisms Of Schick's Testing Are Unpersuasive
(Responding to Gillette's Opp. pp. 20-23)

As it did unsuccessfully in Australia, Gillette articulates four criticisms of Schick's testing: First, Schick's videos are not three dimensional and Schick made no effort to measure the length of observed hairs. Second, Schick's videos record skin and hair at a point in time after the razor and cartridge have passed over the target area. Third, the cartridges depicted in the Schick videos did not come into significant contact with the skin. And fourth, the videos are too low quality to see evidence of hair raising. Opp. at 20-23.

Each of these criticisms is refuted in the Second Declaration of Chris Kohler, which is Attachment C to this reply. The Kohler Declaration makes clear that:

- Schick's testing was designed to observe whether Gillette's hair raising claims were true. Kohler Decl. ¶ 3. The tests were not designed to examine hair extension or quantify any such hair extension effect because that is not the claim Gillette is making in its ads. Id.

- Schick's testing nonetheless "was capable of recording any perceptible

---

[3] Gillette suggests that the Court should not resolve credibility issues relating to the parties' expert testimony and testing on this motion for preliminary relief. Opp. at 31-32. However, courts in this Circuit routinely weigh competing expert testimony and test reports when granting preliminary injunctions in false advertising cases. See, e.g., Smithkline Beecham Consumer Healthcare, L.P. 906 F. Supp. at 186-88 (S.D.N.Y. 1995). Indeed, even the case on which Gillette principally relies, SQP, Inc. v. Sirrom Sales, Inc., 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001), undermines its position. There, the district court specifically noted that the parties had not requested "an expedited hearing at which expert testimony could be presented" and observed that had such a hearing taken place, the court would have been in a position to assess the credibility of the parties' evidence. Id.

4

movement or extension of the hair occurring as a result of shaving with the M3 Power razor." Kohler Decl. ¶ 5.

• Schick's test razor did come into significant contact with the skin and "was loaded by 200 grams of pressure which is a pressure in the middle of the typical range of pressure applied by men when wet shaving." Kohler Decl. ¶ 16.

• The resolution of the videos was sufficient to capture any hair raising effect. The reason none was captured was that none occurred. Kohler Decl. ¶ 10.

The Australian court found that Schick's evidence "establishes at least a prima facie case that micro-pulses do not cause facial hair to stand up." Attachment A ¶ 35. Gillette's quibbles with Schick's methodology cannot obscure the fact that no test by either side has shown the hair raising effect that Gillette claims in its advertisements for the M3 Power.

**B.    Gillette's Substantiation Of Its Claims Is Deeply Flawed**
    (Responding to Gillette's Opp. pp. 10-20)

Not a single test relied upon by Gillette shows that the M3 Power raises hair "up and away" from the face, a fact that Gillette conceded in the Australian proceeding. Attachment A ¶¶ 28, 35. Moreover, Gillette conducted no testing at all on the actually marketed version of the M3 Power, a fact noted by the Australian court. Id. ¶ 24. Accordingly, Gillette's testing is simply irrelevant to its hair raising claims and should be given no weight. Smithkline Beecham Consumer Healthcare, L.P., 906 F. Supp. at 182.

A brief summary[4] of the shortcomings in Gillette's testing is set forth below:

• Test 1: a study called "Oscillating Razors Shaving Studies" that resulted from tests conducted in 1990-91 on two two-bladed Gillette razors. Opp. at 10-11. The M3 Power was not a part of this study and no hair raising is claimed to have been seen.

• Test 2: a second 1990-91 study entitled "Shaving Studies into the Effects of Shaving Preparation on Skin & Hair" that examined whether washing the skin or applying shaving cream or gel caused hair extension (not hair raising). Opp. at 11. This study did not involve the use of any razor, let alone the M3 Power, and

---

[4] A detailed deconstruction of Gillette's testing appears in the Second Declaration of Dr. David Leffell, Professor of Dermatology and Director of Dermatological Surgery at Yale University, attached hereto as Attachment D.

cannot support Gillette's hair raising claim. In any event, no hair raising was seen.

- Test 3: a 1991 "Microwatcher" study in which a "transparent hemispherical dome" was "pressed to the skin surface near a hair to stress the skin . . . ." Id. at 11 & Powell Decl. ¶¶ 29-33. This study again did not involve the use of any razor, and no hair raising was seen.

- Test 4: a 2003 study with an M3 Power "prototype," i.e., not the version ultimately marketed by Gillette, in which subjects had their faces stroked with the prototype. Opp. at 12 & Powell Decl. ¶¶ 20-26. No hair raising was seen.

- Test 5: a 2003 study with an M3 Power prototype that was designed to show how many hairs could be removed with a single stroke of the prototype. Opp. at 12. This study was not designed to test hair raising (or even hair extension) and contributes nothing on that issue.

As this summary makes clear, Gillette's testing is deeply flawed[5] and does not support the claims being made for the M3 Power.[6]

## IV. GILLETTE'S FALSE CLAIMS ARE PRESUMED TO BE MATERIAL
(Responding to Gillette's Opp. pp. 32-33)

Gillette argues that even if its hair raising claims are false, they would be immaterial to consumers' buying decisions. Opp. at 32-33. However, materiality is presumed where, as here, a challenged advertisement is literally false. Coca-Cola Co., 690 F.2d at 317; Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., 348 F. Supp. 2d 165, 180 (S.D.N.Y. 2004). Even if materiality were not presumed, the hair raising claims at issue clearly involve an "inherent quality or characteristic" of the M3 Power. S.C. Johnson, 241 F.3d at 238. Indeed, hair raising is the centerpiece and raison d'être of Gillette's advertising for the M3 Power, as well as the way that Gillette distinguishes the M3 Power from its competitors.

---

[5] Gillette argues that the Court should defer to judgments made by television networks about whether Gillette's hair raising claims have been adequately supported. Opp. at 16-18. It suffices to note that Congress chose to vest federal judges – not television networks – with jurisdiction to decide Lanham Act claims. Many false advertising decisions have invalidated commercials approved and aired by the networks. See, e.g., McNeil-PPC, Inc. v. Pfizer Inc., 351 F. Supp. 2d 226, 241 (S.D.N.Y. 2005).

[6] Gillette's lengthy discussion (Opp. at 14-16) of its consumer use testing is utterly irrelevant. As the Australian court remarked, "[t]he fact that a study . . . has shown consumer satisfaction with the M3 Power razor in terms of shave closeness, smoothness and comfort is not really to the point if it be shown that the claims which Gillette makes about the new product . . . are unfounded." Attachment A ¶ 44.

6

## V.    SCHICK HAS DEMONSTRATED IRREPARABLE INJURY
(Responding to Gillette's Opp. pp. 27-28)

In arguing that Schick has failed to establish irreparable injury, Gillette once again ignores Second Circuit law. Gillette contends that "Schick has introduced no probative evidence to link Quattro's poor financial performance to Gillette's introduction of M3 Power" and that there are other reasons for Schick's decline in sales. Opp. at 27-28. However, courts in this Circuit do not apply that standard of causation in analyzing irreparable injury at the preliminary injunction stage. Rather:

> To obtain injunctive relief, a Lanham Act plaintiff 'need not even point to an actual loss or diversion of sales.' Instead, the plaintiff must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a 'logical causal connection' between the alleged false advertising and its own sales position.

Zeneca Inc. v. Eli Lilly & Co., No. 99 Civ. 1452 (JGK) 1999 WL 509471, at *36 (S.D.N.Y. July 19, 1999) (quoting Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982)).

As set forth in our opening memorandum, Schick has made this showing and thereby has established irreparable injury sufficient to sustain a grant of injunctive relief. Mem. at 17-20. Indeed, even where a defendant can show that a significant portion of a decline in plaintiff's sales was attributable to other causes, a showing of irreparable harm is not rebutted so long as the threshold showing by plaintiff is made. Johnson & Johnson, 631 F.2d at 191.

## VI.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN SCHICK'S FAVOR
(Responding to Gillette's Opp. pp. 33-34)

Gillette complains that being forced to withdraw its false claims from the marketplace will cause it undue hardship. Opp. at 33-34. However, "the fact that [a defendant] expended a large sum of money on its false advertising is . . . no basis for concluding that the balance of hardship tips in its favor." Johnson & Johnson-Merck Consumer Pharms. Co. v. Procter & Gamble Co., 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003); see also Zeneca, 1999 WL 509471, at *41. Indeed, Gillette can claim no equitable interest in being allowed to continue

7

disseminating false claims about the M3 Power. In contrast, both Schick's interest in fair competition and the public's interest in receiving accurate information about products offered for sale in interstate commerce would be well-served by granting injunctive relief.

Finally, Gillette argues that it would be logistically difficult if it had to "revamp" its advertising for the M3 Power. Opp. at 33-34. This argument left the courts in Australia and Germany unpersuaded and, indeed, Gillette is now required in those nations to do exactly what it claims here would unfairly prejudice it.

## VII. SCHICK DID NOT WAIT TOO LONG TO SEEK RELIEF
(Responding to Gillette's Opp. pp. 25-27)

Gillette argues that Schick waited too long to seek relief. Opp. at 25-27. In making that argument, Gillette mistakenly relies on a two-month rule of thumb that has been applied only in copyright, trademark and related cases. The reason that such a rule applies in those cases is that irreparable injury is presumed in those areas of the law, and unexplained delay is deemed to negate the presumption of irreparable injury. See Tom Doherty Assocs., Inc. v. Saban Entm't Inc., 60 F.3d 27, 39 (2d Cir. 1995). Gillette cites no legal authority -- and there is none -- for applying a talismanic two-month rule of thumb in false advertising cases, where plaintiffs must make a showing of irreparable injury and where defendants' wrongful actions may not be immediately apparent and therefore can require extensive investigation. See, e.g., Zeneca Inc., 1999 WL 509471, at *40. Indeed, contrary to Gillette's contention, in false advertising cases "[b]ecause of the public's overriding interest in preventing misleading advertising, the defense of laches is, sparingly applied;" Zeneca, 1999 WL 509471, at * 40 (quoting American Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568, 590-91 (S.D.N.Y. 1987)).

Courts in this Circuit apply a standard of reasonableness in assessing claims of delay under which only unexcused or unreasonable delay weighs against a grant of preliminary relief. Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 438 (S.D.N.Y. 2004); Zeneca Inc., 1999 WL 509471, at *40. In particular, courts have excused even lengthy delays

in filing suit where such delays are attributable to plaintiff's good faith investigation of defendant's wrongdoing. Tom Doherty Assocs., 60 F.3d at 39; Malletier, 340 F. Supp. 2d at 438 ; Zeneca Inc., 1999 WL 509471, at *40. Additionally, courts have excused delays attributable to plaintiff's efforts to resolve the dispute without resort to full-fledged litigation, either by bringing the matter before an alternative forum or by engaging in settlement negotiations. Mastercard Int'l Inc. v. Sprint Communications Co. L.P., No. 94 Civ. 1051 (JSM), 1994 WL 97097, at *4 (S.D.N.Y. Mar. 23, 1994), aff'd, 23 F.3d 397 (2d Cir. 1994); Clifford Ross Co. v. Nelvana, Ltd., 710 F. Supp. 517, 521 (S.D.N.Y. 1989), aff'd, 833 F.2d 1022 (2d Cir. 1989).

Here, the lapse in time about which Gillette complains is attributable to: (1) Schick's good-faith and diligent efforts to investigate Gillette's unprecedented hair raising claims; and (2) Schick's decision to obtain Gillette's substantiation for its claims in Germany before resorting to expensive litigation in this country. As extensively set forth in the Second Declaration of Chris Kohler, the design and implementation of a testing apparatus and procedure for Gillette's novel hair raising claims occupied a team of Schick testing engineers for almost five of these eight months. Kohler Decl. ¶¶ 20-31.

The remainder of the time was dedicated to obtaining Gillette's substantiation for its claims. If it turned out that Gillette had no substantiation, Schick hoped that Gillette would withdraw the hair raising claims worldwide in light of Schick's demonstration of the falsity of these claims. In November 2004, Schick filed suit challenging the hair raising claims in Germany, where discovery of Gillette's test results could be obtained much more cost-effectively than in the United States. In December 2004, it became clear through the German proceedings that Gillette had no test results or other evidence that could substantiate the claims. In light of the German litigation in January 2005, Schick demanded that Gillette stop making hair raising claims in advertisements in the United States. Complaint Ex. K. When Gillette failed to correct its false advertisements, Schick filed the instant motion on January 28, 2004.

As this discussion makes clear, Schick has in no way slept on its rights, and this Court

should not penalize Schick's diligent and good-faith efforts to test and investigate Gillette's claims before rushing into court in this country and filing suit under the Lanham Act.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in our Opening Memorandum, this Court should grant the relief sought in this motion for a preliminary injunction.

PLAINTIFFS – SCHICK MANUFACTURING, INC., EVEREADY BATTERY COMPANY, INC. and ENERGIZER BATTERY, INC.

By ___/s/_____
    Michael J. Donnelly (ct07974)
    Derek T. Werner (ct23419)

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, CT 06103-3469
Telephone: (860) 240-6000
Facsimile: (860) 240-6150
Email: mdonnelly@murthalaw.com
       dwerner@murthalaw.com

Of Counsel:
Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
Manatt Phelps & Phillips LLP
7 Times Square
New York, NY 10036
Telephone: (212) 790-4500
Facsimile: (212) 790-4545
E-mail: SReich@manatt.com
        RBlum@manatt.com
        JEdelstein@mannatt.com
        MYoun@manatt.com

10

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2005, a copy of Plaintiffs Reply Brief was filed electronically and served by mail to all parties of record.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Michael A. Bucci, Esq.
Day, Berry & Howard LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

Peter M. Brody, Esq.
Ropes & Gray
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005-3948

/s/
Derek T. Werner

# 47

note:
pg 10 of Ex E
is a bad copy,
but is identical
to what is in
the court file

EXHIBIT A

# FEDERAL COURT OF AUSTRALIA

Energizer Australia Pty Ltd v Gillette Australia Pty Ltd [2005] FCA 148

*Trade Practices Act 1974* (Cth) s 52(1)

*Ingersoll-Rand (Aust) Ltd v Industrial Rollformers Pty Ltd* [2000] NSWSC 177
*Thomas A Edison Ltd v Bullock* (1912) 15 CLR 679

ENERGIZER AUSTRALIA PTY LTD v GILLETTE AUSTRALIA PTY LTD
NSD 167 OF 2005

HELY J
25 FEBRUARY 2005
SYDNEY

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA

NEW SOUTH WALES DISTRICT REGISTRY                         NSD 167 OF 2005

BETWEEN:          ENERGIZER AUSTRALIA PTY LTD
                  APPLICANT

AND:              GILLETTE AUSTRALIA PTY LTD
                  RESPONDENT

JUDGE:            HELY J

DATE OF ORDER:    25 FEBRUARY 2005

WHERE MADE:       SYDNEY

THE COURT ORDERS THAT:

1.    The injunction granted on 8 February 2005 be continued until the hearing of these
      proceedings or further order.

2.    The hearing of these proceedings be expedited.

3.    The matter be returned to the Registry for the purpose of allocation to a docket.

4.    Costs be costs in the cause.

5.    These orders be entered by the Registry forthwith.

Note:   Settlement and entry of orders is dealt with in Order 36 of the Federal Court Rules.

GENERAL DISTRIBUTION

IN THE FEDERAL COURT OF AUSTRALIA

NEW SOUTH WALES DISTRICT REGISTRY                    NSD 167 OF 2005

BETWEEN:           ENERGIZER AUSTRALIA PTY LTD
                   APPLICANT

AND:               GILLETTE AUSTRALIA PTY LTD
                   RESPONDENT

JUDGE:             HELY J
DATE:              25 FEBRUARY 2005
PLACE:             SYDNEY

## REASONS FOR JUDGMENT

Gillette (a term used to describe both the respondent and its overseas affiliates) is the world's leading manufacturer of shaving products. It dominates the wet shaving product market both in Australia and internationally. Energizer (a term used to describe both the applicant and its overseas affiliates) distributes Schick branded blades and razors, and is Gillette's main competitor in Australia.

Gillette manufactures a product called the Mach 3 Turbo. In May 2004 Gillette launched a new shaver in the United States of America called the 'M3 Power'. The M3 Power is the first battery operated shaving system marketed by Gillette. The principal difference between the Mach 3 Turbo, and the M3 Power, is the battery operated mechanism. In the second half of 2004 the M3 Power was launched in the United Kingdom, Europe and Japan. The M3 Power razor was launched on the German market on 17 September 2004. Advertising conducted by Gillette in association with that launch claimed that the razor's micro-pulses lifted the facial hair thereby giving a closer shave.

3            Dr Leffell, a professor of dermatology and Director of Dermatological Surgery at Yale University was asked to express an opinion as to whether there was any scientific basis for the claim that the M3 Power razor has the capacity to 'raise the hair' on a man's face, or that the razor emits micro-pulses which have the effect of causing the facial hairs to stand up

- 2 -

('the hair raising claims'). On 8 October 2004 Dr Leffell observed a study conducted by Energizer. The key elements of the study may be summarised as follows:

(a)     five male subjects were selected for the study. Each subject was instructed to prepare for shaving by dabbing a moist warm towellette on the area of his face which had to be shaved. Shaving cream was not used so that the effect of the razor on the facial hair could be observed clearly;

(b)     each subject was positioned and stabilised using a Canfield Scientific head brace, adjacent to which was mounted a high speed video camera and associated lighting. Between the camera and the brace, an M3 Power razor was positioned, coupled to a pneumatically operated mechanical slide. This set up allowed a fully automated and controlled shaving stroke to be performed on the subject's face with the M3 Power razor, and for this to be recorded on the video camera; and

(c)     using a mechanically operated slide, two shaving strokes were performed on each subject and recorded by the video camera. The first stroke was a control stroke and was done with the razor turned off (so it did not vibrate) and the razor blades dulled (so the hair was not cut). The second stroke, referred to as the active stroke, was done with the razor turned on and the razor blades at their normal sharpness.

4       Dr Leffell's conclusions may be summarised as follows:

(a)     he observed no hair raising or hair directional change effect in either the case of the control stroke or the active stroke;

(b)     neither 'micro-pulses' nor any other mechanical or electrical action of the razor has the effect of causing facial hair to stand up; and

(c)     there is no physiologic or other scientific basis for the claim that the razor can cause facial hair to stand up proud in the manner described in Gillette's advertising.

5       Energizer applied to the Hamburg Regional Court in Germany for interlocutory relief in relation to Gillette's hair raising claim. Dr Leffell gave evidence in support of that application. On 17 December 2004 the Court restrained Gillette from claiming commercially that when shaving with the M3 Power razor, micro-pulses cause the facial hairs to stand up, giving an even closer shave. Gillette then changed its advertising for the M3 Power shaver so

- 3 -

as to omit reference to the lifting of the facial hairs. However, the new advertisement explicitly suggested that there was a causality between the vibrations ('gentle micro-power') and the special closeness of the shave resulting from the use of the M3 Power razor. On 28 December 2004 the Hamburg Regional Court granted an ex parte injunction restraining that form of promotion of the razor. These decisions are the subject of an appeal which has not yet been determined.

In about June 2004 Gillette began to make preparations for the launch of the M3 Power razor in Australia. Between October and December 2004 Gillette conducted trade presentations in preparation for the launch. These presentations included the use of semi-trailers bearing the slogan 'Feel the Power' which were parked outside 15 retailers' headquarters for a period of about four hours at a time.

7          On the evidence so far before me, I find that whilst Energizer executives expected in 2004 that Gillette would launch the M3 Power razor in Australia, and that the launch would probably occur in about March 2005, they had no firm intelligence to this effect until about the end of January 2005, nor did they know until about the end of January 2005 what claims would be made by Gillette for the product, particularly in the light of the opinions which had been expressed by Dr Leffell, and the judgments of the Hamburg Regional Court. As late as 12 January 2005 (Exhibit B) an internal email from Energizer's Business Manager for Blades in Australia and New Zealand (Mr Nuich) noted that Energizer was preparing its legal position in preparation for the M3 launch, and that whilst there was a possibility of a 'pre-emptive move' more information was required regarding the launch before any such move could be undertaken.

8          On 28 January 2005 Gillette commenced distribution of the M3 Power razor to distributors and retailers in Australia. Also on 28 January 2005 a motion for preliminary injunction and complaint for injunctive relief was made by Energizer in the United States District Court for Connecticut. On the evidence so far called, I accept that it was not until about this time that Energizer came to learn that Gillette intended to make the hair raising claim in relation to the Australian launch.

9          On 3 February 2005 Mr Nuich received an M3 Power retail pamphlet from Woolworths. That pamphlet had been distributed by Gillette in connection with the launch of

- 4 -

the M3 Power razor and asserted that the launch would be supported with 'an unprecedented $10M media spend and a truly innovative PR campaign'. Among the product benefits listed for the M3 Power razor was the following:

> '... a tiny motor in the handle pulses vibration to the blades, lifting hair to provide a closer cut.'

10    On 4 February 2005 a letter of demand was sent from Energizer's Australian solicitors to Gillette. On 5 February 2005 the M3 Power razor became available in retail stores in Australia. On 8 February 2005 Gillette's Australian solicitors responded to the letter of demand. That letter included the following:

> 'We have been instructed that our client has scientific evidence that establishes that the oscillation of the M3 Power emits a vibration which has the effect of extending the hair up and away from the skin.'

11    On 8 February 2005 I heard an application by Energizer for ex parte injunctive relief. The orders which I made on that occasion included:

> '2.    Up to and including 18 February 2005, the respondent:
>     (a)    whether by itself, its directors, servants or agents or otherwise be restrained from:
>         (i)    further distributing to retail outlets the M3 Power razor packaged in the form of Exhibit A ("the M3 Power razor"); or
>         (ii)    further promotion or advertising of the M3 Power razor to the extent that such conduct would involve the making of any of the representations set out in paragraph 1 of the application;
>     (b)    use its best endeavours to:
>         (i)    withdraw any advertising or other promotional material for the M3 Power razor to the extent that such advertising or other promotional material makes any of the representations set out in paragraph 1 of the application other than instore and point of sale material already distributed to retailers and used for the storage and display of the M3 Power razor or M3 Power razor stock which has already been supplied by the respondent to third party distributors or retailers in Australia.
>
> 3.    It is not the intent of order 2 that the respondent be in contempt for conduct occurring prior to the date of these orders.'

- 5 -

12          Paragraph 1 of the application seeks a declaration that in making the representations described in pars 1(a) to (k) of the application, the respondent has engaged in conduct, in trade or commerce, which is misleading or deceptive or likely to mislead or deceive in contravention of s 52(1) of the *Trade Practices Act 1974* (Cth) ('the TPA').    The representations referred to in pars (a) and (b) are:

> '(a)    *by means other than the cutting action of its blades, the M3 Power Razor (the Razor) stimulates, raises or lifts facial hair up and away from the skin;*
>
> (b)    *the Razor emits "micro-pulses" or vibrations or has a pulsing action which stimulates, raises or lifts facial hair up and away from the skin.'*

The representations in pars (c) to (j) consist of various claims made in relation to the razor (such as, for example, that it gives a closer and/or more thorough shave than all other men's system razors) either because of the matters represented in par (a) or because the razor emits 'micro-pulses' or vibrations or has a pulsing action.    The representation in par (k) is a representation that the respondent had reasonable grounds for making each of the representations set out in pars 1(a) to (j) of the application.

13          On 17, 18 and 21 February I heard an application for a continuation and expansion of the injunctions granted on 8 February.    The expansion sought is that Gillette should use its best endeavours to withdraw all M3 Power razor stock and all point of sale material containing the representations from third party distributors and retailers.

14          Gillette ceased shipping the M3 Power razor pack containing the representations complained of on 8 February 2005 following the making of the interim orders.    Very substantial quantities of the product were shipped prior to that date, and substantial amounts of product that were due to have been shipped since that date have been stopped.

### The advertising campaign

15          The packing in which the M3 Power razor is distributed states, inter alia, that:

> '*Gentle micro-pulses stimulate hair up and away from the skin.    In just one power stroke, you get a remarkably close and more thorough shave.'*

Variants on that theme are to be found in point of sale material, retail pamphlets, a booklet which has been distributed to the trade and on the Gillette website.

- 6 -

16          · The central representation, which Energizer submits is false, is that the razor emits 'micro-pulses' or vibrations or has a pulsing action that stimulates, raises or lifts facial hair up and away from the skin giving a closer and/or more thorough shave than all other men's system razors. In some instances the benefit is not said to be a closer and/or more thorough shave, but (for example) the best shave ever.

17          Gillette has announced an 'unprecedented' proposed media expenditure of $10 million in connection with the launch of the product. The proposed television and print advertising will make the representations which Energizer claims are false. On the materials before me I accept Energizer's submission that looming on the horizon in Australia is a massive media blitz promoting the M3 Power razor, the focus of which will be the representation that Energizer alleges to be false.

18          Consumer research conducted in the USA demonstrates that the message that the M3 Power razor 'raises hair higher to cut', is one which is conveyed by Gillette's advertising, and is one which resonates with consumers.

Hair raising claims

19          As already indicated, Dr Leffell's brief was to provide an opinion as to whether there was any scientific basis for the hair raising claims made in relation to the M3 Power razor. The study conducted on 8 October 2004 was designed to demonstrate whether an oscillating razor could by virtue of its impact on the skin, cause hair to stand up. Shortly stated, Dr Leffell's evidence in these proceedings, as it was in the Hamburg proceedings, is that there is no physiologic or other scientific basis for the claim that an oscillating razor can cause facial hair to stand up proud in the manner shown in Gillette's advertising in Germany and the USA. As a scientist and skin specialist of many years, Dr Leffell was of the opinion that the mild vibrative effect of the razor applied to the skin would not have any effect on the hairs such as to cause them to be raised up, or stand proud. The study clearly showed that the application of the razor to the skin did not cause the facial hairs to be raised up or to stand proud of the skin.

20          Dr Leffell was cross-examined and the methodology of the study which he observed was criticised, in particular by Dr Saker, an engineer and research scientist employed by Gillette. Dr Saker's ultimate conclusion was that the study conducted by Energizer does not

- 7 -

'exhibit the requisite rigour or expertise necessary to determine whether the hair extension effect produced by an oscillating razor that my colleagues and I have recorded at Advanced Technology Centre does not, in fact, occur' (emphasis added). Whether the criticisms levied by Dr Saker are made out, and if so with what result, is a matter for determination at the final hearing.

Hair extension effect

21    But more needs to be said about Gillette's claimed 'hair extension effect', if only because Mr Kohler, who responded to Dr Saker's affidavit, has confirmed that Energizer's tests were designed to observe hair raising, not hair extension. Dr Leffell confirmed that this was so. To Dr Leffell there is a significant difference between the notion of hair 'raising up' or 'lifting' away from the face, and the notion of hair 'extending'. The lifting or raising of hair involves a move of the hair towards a vertical position, with a change in the angle between the hair and the face. Whilst 'hair extension' is not a term with which Dr Leffell is familiar, he understands the term to refer to the hair moving in and out of its follicle, but maintaining the same angle against the face, rather than moving towards a vertical position.

22    In essence the 'hair extension effect' is an alleged increase in the observable length of beard hairs which is said to be triggered by micro-pulses produced by an oscillating razor, such as the M3 Power razor. Dr Powell, an engineer by training who joined Gillette in January 1995 and who is now the Laboratory Director of Gillette Advanced Technology Centre, explained the hair extension effect, and the reason for its occurrence, as follows:

> 'Based upon their examination of this hair extension effect, Gillette scientists have concluded that the extension effect occurs because many facial beard hairs are subtly bound within the hair follicle due to deposits of sebum within the follicle and on the surface of the hair shaft and a build-up of surface level corneocytes which have a tendency to adhere together through a process known as "interdigitation". The growing hair, bound to the sebum deposits and corneocytes, is "bound" within the follicle so that it does not fully release above the skin surface. The hair agitation and surface skin stress produced by an oscillating razor disperses and unbinds the sebum deposits and corneocytes, which allows the hair to move freely within the hair follicle and to reach its full extension above the skin surface... .'

23    Dr Powell has no medical training. He agreed in cross-examination that this expression of opinion is one which requires dermatological expertise which he does not have, but he said that it is 'within the boundaries of my team members'.

- 8 -

24          Many of the studies relied upon by Gillette to sustain the claims made in relation to the M3P razor were conducted before Dr Powell joined Gillette. None of the studies involved the use of the M3 Power razor, although two studies involved the use of a prototype. The studies were conducted by Gillette personnel and are unpublished. There was no peer review. The following table summarises the results of these tests.

| DATE | TEST | RESULT |
|------|------|--------|
| 1990/1991 | KLP1 | An oscillating razor produced an increase in observable hair length. |
| 1990 | KLP2 | Neither the agitation associated with the application of shave preparations, nor any chemical or surfactant effects incidental to preparing the face for shaving triggered the hair extension effect. |
| 1992 | KLP3 | Physical agitation of hair and skin produced a hair extension effect. Once the hairs were extended, the hairs did not appreciably retract afterwards. |
| 2003 | KLP4 | An oscillating cartridge of a M3 Power prototype produced statistically significant hair extension effects comparable to those observed in earlier tests. The observed differential translates into approximately 3 hours of beard hair growth. |
| 2001/2002 | KLP6 | 10 per cent more of the observable hairs were removed with a single stroke of an oscillating razor (the M3 Power prototype) than in the case of the M3 Power prototype in non-oscillating mode. |
| 1991 | KLP8 | Application of a transparent hemispherical dome to the skin and face near a hair revealed individual hairs releasing and extending from the hair follicles in a manner consistent with Gillette's research. |
| 2003 | KLP10 | An oscillating M3 Power razor produced stress waves in the skin surface. |

These studies are relied upon by Dr Powell as supporting the notion that hairs otherwise bound to the skin will 'pop up' above the skin level. If that occurs, the tip of the

- 9 -

hair will be at a greater height by virtue of its having 'popped up' or extended, than it was beforehand.

26    The conclusion which Dr Powell draws from these studies is expressed in his affidavit as follows:

'38.    For the reasons set forth above, I believe that Gillette has demonstrated, to a reasonable degree of scientific certainty, the following:
   (a)    that the hair extension effect occurs;
   (b)    that the micro-pulses produced by an oscillating razor and, in particular, the M3 Power, are sufficient to trigger this effect;
   (c)    that the mechanical and chemical processes attendant to the casual application of shave preparation or pre-shave face washing are not sufficient to trigger this effect;
   (d)    that as a result of this effect, M3 Power delivers a shave that is superior in terms of single stroke closeness efficiency;
   (e)    that average consumers can and have appreciated its superior closeness.'

27    Paragraph (e) appears to be based upon consumer research conducted in the USA in early 2004 which found that randomly selected and geographically diverse groups of adult male wet shavers:

   (a)    preferred the M3 Power razor as an overall superior product to the Mach 3 Turbo shaving system;

   (b)    perceived the M3 Power razor to be superior to the Mach 3 Turbo shaving system in terms of shave closeness, smoothness and comfort by a statistically significant margin;

   (c)    preferred the M3 Power razor as an overall superior product to the Schick Quattro shaving system; and

   (d)    perceived the M3 Power razor to be superior to the Schick Quattro shaving system in terms of shave closeness, smoothness and comfort by a statistically significant margin.

28    Dr Powell does not suggest that any of the studies support the suggestion that the effect of the oscillating razor is to cause the hair to raise itself from the skin at an angle. The studies do not demonstrate any change in hair angle. All they show is hair extension.

- 10 --

29    Evidence has been filed by an expert statistician, Dr Jarrett, which is critical of the Gillette tests, and dismisses them as being more in the nature of preliminary studies, rather than independent scientific studies. Dr Leffell also asserts that the Gillette tests do not provide any significant level of support for Dr Powell's views. Again, the validity and effect of these criticisms is not capable of resolution at the level of an application for an interlocutory injunction.

### Energizer response to 'hair extension effect'

30    Dr Leffell says that in his clinical and teaching experience as a dermatologist he has not encountered the concept of 'hair extension' as presented by Gillette. He is not aware of any scientific basis for Dr Powell's assertion (par 22 above) that facial hair becomes 'bound' within the hair follicle by sebum deposits and corneocytes adhering together, so that it does not fully release above the skin surface. Dr Leffell also states that Dr Powell's assertion is inconsistent with his own observations of facial hair structure and function during more than 20 years of experience. Dr Leffell gives reasons why the claim made by Dr Powell as set out in par 22 above is without scientific merit, and inconsistent with his experience as a dermatologist. Even if that effect did occur, in Dr Leffell's opinion the oscillating action of the M3 Power razor would not have the effect attributed to it by Dr Powell because washing or shaving the face (even with a non-oscillating razor) would be likely to remove the build up of corneocytes.

31    Both Dr Leffell and Mr Kohler have sworn that whilst they were not retained by Energizer to consider whether the M3 Power razor had a 'hair extension' effect, if there were such an effect, and if it were of practical significance, they would have expected to observe it during the course of the study (unless, in the case of Mr Kohler, the hairs were standing at or around 90 degrees to the skin's surface), but did not do so.

32    However, the study of 8 October 2004 did not involve measurements, and Dr Leffell accepted in cross-examination that measurement (as opposed to optics) is the only true way to determine whether hair extension is occurring.

- 11 -

**An undisclosed fact**

33        Energizer is in the course of developing, or at least investigating the development of, its own battery powered oscillating razor to compete with the M3 Power razor. Depending upon the precise facts, that might lead to an inference that Energizer believes that such a razor will provide enhanced shaving performance to users of such a product, although no particular inference can be drawn as to the claims which Energizer would make in relation to that product should it proceed to the stage of commercialisation.

34        This matter was not disclosed on the application for an ex parte injunction. It should have been disclosed: *Thomas A Edison Ltd v Bullock* (1912) 15 CLR 679 at 681-682. It is, however, profitless to consider whether the ex parte order should be set aside on that account, because even if set aside, Energizer could nonetheless move for interlocutory relief as to the future, which in substance, is what has occurred.

**A serious question to be tried?**

35        Energizer has not sought to make out a case in these proceedings that use of the M3 Power razor does not produce a closer shave, but the evidence referred to above establishes at least a prima facie case that micro-pulses do not cause facial hair to stand up, in the sense of moving to a vertical position, with a change in the angle between hair and face. Dr Powell does not suggest that his studies establish that an oscillating razor will produce this effect.

36        Some of the television advertisements used overseas (for example, Exhibit IN5: 'A Power so Awesome') show what appears to be an electronic wave moving over hairs on the face, with the hairs immediately standing up as a result. Whilst the television images are fleeting, they do appear to show facial hairs moving to a vertical position with a distinct change in the angle between hair and face. But another television advertisement used overseas (Exhibit IN5: "M3 Power') appears to be different. As the male voice over states: 'Turn it on and the micro-pulses raise the hair so the blades can shave closer' an image is shown depicting hairs extending at an angle (as if they are growing). The hairs do not appear to be bending towards a perpendicular position but rather continue their extension at the same angle at which they started at the beginning of the image.

- 12 -

37        I was shown three versions of Gillette's proposed Australian television commercial (Confidential Exhibit CJB7). A 15 second version does not display any image of the claimed hair raising effect. My impression of the two 30 second versions is that they depict hairs extending at an angle (as if they are growing) and then bending towards a perpendicular position with the skin.

38        However, my focus in the present application is not on any particular advertisement, but on the more general question of whether Energizer has established that the claims referred to in the application particularly paragraphs 1(a) and (b), are misleading and deceptive, which, in the context, necessarily involves a consideration of whether an oscillating razor produces a hair extension effect, and if so, whether that effect is sufficient to sustain the claims in question.

39        According to Dr Powell, 'hair extension' raises the tip of the hair up and further away from the surface of the skin, leaving more hair available to be cut. The micro-pulses produced by the M3 Power razor are sufficient to trigger this effect. Gillette contends that this is sufficient to sustain the claim that micro-pulses emitted by the M3 Power razor stimulates, raises or lifts facial hair up and away from the skin.

40        However, the evidence of Mr Kohler and Dr Leffell denies that any hair extension effect arises from the use of the M3 Power razor. I do not agree with Gillette's submission that this evidence does not constitute expert evidence of any utility because it fails to set out the reasoning process on which the opinion is based. Dr Leffell relies upon the following matters as justifying his opinion that the vibrations from the M3 Power razor do not produce a hair extension effect:

        (a)    in his clinical and teaching experience as a dermatologist, he has not encountered the concept of hair extension as presented by Gillette;

        (b)    the studies relied upon by Dr Powell as supporting his contrary opinion, either do not support or do not provide any significant level of support for Dr Powell's views when account is taken of the detailed criticisms which Dr Leffell makes of those studies;

        (c)    the theory advanced by Dr Powell as explaining the reason for the hair extension effect (see paragraph 22 above) is without any scientific merit for reasons which Dr Leffell explains, and is inconsistent with Dr Leffell's

- 13 -

observations of facial hair structure and function during his 20 years experience as a dermatologist; and

(d)    Dr Leffell did not observe the claimed effect during the tests which he attended, and although his brief was the examination of hair raising claims, he expects that if there were a hair extension effect and it was of practical significance, he would have observed it.

41        There is thus a serious question to be tried as to whether the vibrations from the M3 Power razor do produce a hair extension effect. If that issue were resolved favourably to Gillette, a further issue would or may arise as to whether a particular advertisement conveys that the M3 Power razor causes hairs to stand up or stand proud of the skin. On the evidence as it currently stands, there is at least a serious question to be tried as to whether such a claim would be sustained by reference to the hair extension effect, if that effect were established.

42        Contrary to the submission put on behalf of Gillette, in my view, it does not matter that Energizer's evidence as to the absence of a hair extension effect arose only in reply. That is simply a reflection of the way in which the application unfolded. Energizer contended that Gillette was making hair raising claims for its product; Gillette responded by denying that it was making those claims and set up the hair extension effect as supporting its product claims; Energizer's riposte was that the micro-pulses emitted by the M3 Power razor do not produce that effect.

43        Both parties made detailed criticisms in final submissions of the other's evidence including assertions of ineffectual cross-examination and failure to cross-examine, which it is not appropriate or necessary for me to deal with in detail at this stage of the proceedings. It is sufficient for present purposes for me to say that on the materials before me there is a serious question to be tried, and Energizer's case cannot be dismissed as a weak one.

Balance of convenience

44        The M3 Power razor is a new product on the Australian market, and the matters of which Energizer complain in these proceedings are to be at the heart of an imminent nationwide advertising campaign of unprecedented scope to launch the product. If the representations are false, then consumers will be misled into buying a much more expensive product than the Mach 3 Turbo on a false premise. The fact that a study undertaken in the

- 14

USA has shown consumer satisfaction with the M3 Power razor in terms of shave closeness, smoothness and comfort is not really to the point if it be shown that the claims which Gillette makes about the new product of which Energizer complains are unfounded. There is evidence from Mr Nuich of Energizer, which I accept, that innovations in razor technology are a strong driver for commercial sales, and may enable a premium price to be charged for the product.

45        Gillette's preparations to launch the product on the Australian market began before the Hamburg proceedings. The evidence does not establish the date upon which Gillette became practically committed to continue with the launch. However, to the extent that Gillette persevered with its launch plans after the Hamburg proceedings, it did so with its 'eyes wide open' to the possibility that Energizer would institute proceedings for injunctive relief in this country as well: *Ingersoll-Rand (Aust) Ltd v Industrial Rollformers Pty Ltd* [2000] NSWSC 177 at [11]. When Gillette commenced the distribution of the M3 Power razor to distributors and retailers in Australia on 28 January 2005, it was aware of the judgments in the Hamburg proceedings. Gillette did not undertake any further testing of the M3 Power razor to support its claims, or give Energizer any notice of its intention to launch in this country.

46        The launch of the M3 Power razor in the United Kingdom, supported by representations similar to those the subject of these proceedings, was highly successful, with the new razor securing a very significant section of the market in a matter of months. A similar result can be expected to occur here if Gillette launches the product in association with its projected media campaign. I accept Energizer's evidence that a similar performance in Australia would have a very serious effect on Energizer's business, and that this effect may well endure even if the advertising ceases as a result of a final hearing. I also accept Energizer's evidence that it is likely to be very difficult, if not impossible, for Energizer to calculate its actual loss if the M3 Power razor is launched using the claims the subject of these proceedings in its advertising campaign.

47        The continuation of the interim injunctions will cause considerable harm to Gillette's commercial interests in terms of wasted expenditure on advertising and promotional material for the M3 Power razor which contains the representations complained of by Energizer. However, the harm which Gillette will suffer in this respect is likely to be quantifiable, and is

- 15 -

covered by Energizer's undertaking as to damages. I also accept Gillette's evidence that a likely consequence of the continuation of the injunction is that the launch may have to be cancelled, and the product re-launched in about three months by which time television advertisement and packaging omitting the matters of which Energizer complains are likely to be available. Again, the harm is likely to be capable of estimation. This is one of those cases in which significant financial loss will be sustained by one party or the other in consequence of either the grant or refusal of interlocutory relief. There may also be some reputation damage to Gillette if interlocutory relief is granted.

48          But, in my view, Energizer has not been guilty of any delay in instituting the proceedings. It moved for an ex parte injunction as soon as it learnt that the M3 Power razor was to be launched in Australia in conjunction with the claim that micro-pulses emitted by the razor stimulate hair up and away from the skin, that being the same claim as was restrained in the Hamburg proceedings. Mr Bruce, Gillette's Business Manager for Grooming conceded in cross-examination that it was feasible for Gillette to have removed the hair raising claims from its advertising materials in late 2004 prior to the Australian launch until the propriety of making these claims had been adjudicated upon by the Hamburg Court. He also agreed that if the claim is in fact false it would be extremely damaging in his opinion for Gillette to continue to make that claim.

49          I do not accept Gillette's contention that harm to consumers is not demonstrated if the matters of which Energizer complains are untrue. The argument that consumers will suffer no harm even if those claims are wrong because (for whatever reason) the razor in fact shaves closer assumes that to be the case. There is no evidence that the M3 Power razor in fact shaves closer than other razors, hence the argument cannot be sustained. In any event, it overlooks the evidence that claimed innovations in shaving technology are a strong driver for commercial sales, and at a premium price.

50          The balance of convenience favours the continuation of the interlocutory injunction until the hearing of these proceedings or further order. The hearing of the proceedings should be expedited. I decline to extend the operation of that injunction in the manner which Energizer seeks because I accept Mr Bruce's evidence as to the time and cost which would be involved in complying with the order as extended, and the likelihood that it would not be productive of material practical benefit.

- 16

Conclusion

51        I order that:

1.    The injunction granted on 8 February 2005 be continued until the hearing of these proceedings or further order.

2.    The hearing of these proceedings be expedited.

3.    The matter be returned to the Registry for the purpose of allocation to a docket.

4.    Costs be costs in the cause.

5.    These orders be entered by the Registry forthwith.

I certify that the preceding fifty-one (51) numbered paragraphs are a true copy of the Reasons for Judgment herein of the Honourable Justice Hely.

Associate: *[signature]*

Dated:        25 February 2005

Counsel for the Applicant:        F M Douglas QC, M J Darke

Solicitor for the Applicant:        Gilbert & Tobin

Counsel for the Respondent:        A J L Bannon SC, C Dimitriadis

Solicitor for the Respondent:        Allens Arthur Robinson

Date of Hearing:        17, 18, 21 February 2005

Date of Judgment:        25 February 2005

EXHIBIT B



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster™* is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1998 by Merriam-Webster, Incorporated

Philippines Copyright 1998 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
     p.    cm.
  Includes index.
  ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe indexed : alk. paper). — ISBN 0-87779-707-2 (laminated cover, unindexed).
     1. English language—Dictionaries.   I. Merriam-Webster, Inc.
PE1628.M36    1998
423—dc21                                                        97-41846
                                                                    CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

2021222324RMcN98

Abbreviati

Case 1:05-cv-11177-DPW     Document 105-43     Filed 11/13/2006     Page 5 of 20



rainbow trout



# THE OXFORD ENGLISH DICTIONARY

## SECOND EDITION

*Prepared by*

J. A. SIMPSON *and* E. S. C. WEINER

### VOLUME XIII

Quemadero–Roaver

CLARENDON PRESS · OXFORD

1989

*Oxford University Press, Walton Street, Oxford OX2 6DP*
*Oxford New York Toronto*
*Delhi Bombay Calcutta Madras Karachi*
*Petaling Jaya Singapore Hong Kong Tokyo*
*Nairobi Dar es Salaam Cape Town*
*Melbourne Auckland*
*and associated companies in*
*Berlin Ibadan*

*Oxford is a trade mark of Oxford University Press*

© *Oxford University Press 1989*

*All rights reserved. No part of this publication may be reproduced,*
*stored in a retrieval system, or transmitted, in any form or by any means,*
*electronic, mechanical, photocopying, recording, or otherwise, without*
*the prior permission of Oxford University Press*

*British Library Cataloguing in Publication Data*
*Oxford English dictionary.—2nd ed.*
*1. English language–Dictionaries*
*I. Simpson, J. A. (John Andrew), 1953–*
*II. Weiner, Edmund S. C., 1950–*
*423*
*ISBN 0-19-861225-7 (vol. XIII)*
*ISBN 0-19-861186-2 (set)*

*Library of Congress Cataloging-in-Publication Data*
*The Oxford English dictionary.—2nd ed.*
*prepared by J. A. Simpson and E. S. C. Weiner*
*Bibliography: p.*
*ISBN 0-19-861225-7 (vol. XIII)*
*ISBN 0-19-861186-2 (set)*
*1. English language—Dictionaries.  I. Simpson, J. A.*
*II. Weiner, E. S. C.  III. Oxford University Press.*
*PE1625.O87 1989*
*423—dc19    88–5330*

*Data capture by ICC, Fort Washington, Pa.*
*Text-processing by Oxford University Press*
*Typesetting by Filmtype Services Ltd., Scarborough, N. Yorks.*
*Manufactured in the United States of America by*
*Rand McNally & Company, Taunton, Mass.*

RAIOID                                    137                                    RAISE

**raioid** ('reiɔid), *a.* and *sb.* [f. RAI-A + -OID.] *a. adj.* Resembling, or related to, the *Raiœ* or rays. *b. sb.* A fish of this type. (In recent Dicts.)

**raion**, var. RAYON[2].

**raip**, north. and Sc. var. ROPE.

**raipe**, obs. Sc. var. REAP.

**rair**, obs. Sc. f. RARE, 'ROAR.

**raird**, var. REIRD.

**rais**, obs. Sc. f. RACE *sb.*[1], RASE *v.*[1]; var. REIS; obs. pa. t. RISE.

**raisable** ('reizəb(ə)l), *a.* Also 9 raiseable. [f. RAISE *v.*[1] + -ABLE.] Capable of being raised.

**raise** (reiz), *sb.*[1] Also 5 reise, 6 rayse. [f. RAISE *v.*[1]]

† 1. A levy. *Obs. rare—1.*

† 2. The act of raising; uplifting, elevation. *Obs.*

3. A rising passage or road. *spec.* in *Mining*, a sloping shaft excavated from the lower end. Cf. RISE *sb.* 10 b.

4. *to make a raise* = RAISE *v.*[1] 27. *U.S.*

5. a. An increase in amount. Also, an increase in the rate, price, or value of a thing. Cf. RISE *sb.* 16 a.

b. An increase of a stake or bet in poker; in Bridge, a higher bid in the same denomination as previous bid by one's partner.

c. An increment in wages or salary. Cf. RISE *sb.* 15 b. Chiefly *U.S.*

**raise** (reiz), *sb.*[2] north. dial. [a. ON. *hreyr* (Norw. *røys*, *rös*, Sw. *rös*), cairn.] A pile of stones, a cairn. (Freq. in place-names in Cumbria.)

† **raise**, *sb.*[3] *Obs.* (See REISE.)

**raise** (reiz), *v.*[1] Forms: 3 reisen, reyssen, 4 reyse(n, 5 -ya, 4-6 reise, reyse, 5 rese, reze, 6 reyze, reaze; *β.* 4 raisin, 4-6 rayse, 4-6 rayse, 4-7 rais, 8 raise, 4- raise; *γ.* 4 rase(n, 4-6 ras, 8 raze. [a. ON. *reisa* (used in most of the main senses of the Eng. word; Sw. *resa*, Da. *rejse*) = Goth. (*ur*)*raizjan*, OE. *ræran* (:—*rairjan*), causative f. *ris—* ablaut-variant of *rīs—* to RISE.

**I.** To set upright; to make to stand up.

**1.** *trans.* To set or place (a person); to lift up one end or side of (a post, stone, etc.) so as to bring into or towards a vertical position; to restore (a fallen thing) to its usual position.

**2.** To raise (a beast or bird) from a lair, retreat, or covert.

**II.** To set or put (paste, crust) without the support of a dish.

**2. a.** To lift (a person or animal) and place in a standing posture; to assist (one) to rise from the ground, etc. (Freq. in *fig.* context.)

**3. a.** To restore (a dead person or animal) to life.

4. To cause (a person or animal) to rise up or get out of bed. † *Obs.*

**a.** To rouse (a person) from sleep; to make (one) waken up or get up in bed. † *Obs.*

**b.** To cause to rise in opposition; to rouse.

**c.** To stir up, incite, instigate (one or some persons) to do something or to some feeling.

**d.** To excite, agitate, provoke, rouse to excitement or anger. Chiefly *Sc.* Also *raised-like*.

**III.** To cause or help (a person) to rise from a seat. (Cf. 3.)

**5. a.** To rouse or stir up (a number of persons, a district, etc.) for the purpose of common action, esp. for attack or defence.

**b.** To consort, accompany.

**6. a.** To rouse up, to give or add vigour to (the mind, spirit, etc.); to animate, stimulate.

**b.** To raise from *death*, *to life*. Cf. 3.

**c.** Hence, *to raise from death*, *to life*. Cf. 3.

**4.** To cause (a person or animal) to rise or stand up.

**b.** To produce a supply of (persons of a certain class); to breed (animals).

†**b.** To encourage, inspire (a person) *with* courage, confidence, hope, etc. *Obs.*

†**c.** To lift up and put in position the parts of (a structure); to construct by piling up, building, or fitting together; *spec.* in *U.S.* to set up the wooden framework of (a house or other building).

**8. a.** To lift up and put in position the parts of (a structure); to construct by piling up, building, or fitting together; *spec.* in *U.S.* to set up the wooden framework of (a house or other building).

**b.** To rear or bring up (animals).

**c.** To cause or promote the growth of (plants), to grow (fruit, vegetables, flowers, etc.).

**d.** Said of the soil producing the plants.

**e.** *transf.* To produce (manure). *rare—1.*

**11.** To cause (a person of specified character) to come into existence or appear: **a.** of God.

**b.** To construct or draw (a figure or line) upon a certain base. *Obs.*

**b.** of persons or impersonal agencies.

**c.** To establish contact with (a person, etc.) by radio or telephone.

**c.** To find, build up, break up (construct a scheme, plan, description, etc.) *? Obs.*

**d.** To form (a small projection or elevation), cause (a blister, etc.) to rise or form.

**12.** To produce, bring into existence or action (various natural phenomena or forces; also *fig.*).

**e.** To form (a small projection or elevation), cause (a blister, etc.) to rise or form.

**e.** *U.S.* To form, appoint (a committee). (Perh. orig. in sense 28.)

**f.** To bring into existence, to produce, beget (offspring). Now *rare*.

**13.** To draw up, frame (a summons, letter, etc.), institute (an action or suit), establish (a use).

**14.** To cause, originate, give rise to, bring about, set going. Used with a variety of objects:

**a.** strife, dissension, or other disturbance (*among* or *between* persons, in a place, etc.). Cf. 16 *a.*

**b.** a report or rumour, slander, etc.

**c.** a feeling, idea, etc.

**c.** To construct or draw (a figure or line) upon a certain base. *Obs.*

**d.** the expression of some feeling.

**15. a.** Law. To draw up (a summons, letter, etc.), institute (an action or suit), establish (a use).

**b.** *fig.* To produce, bring into existence or action (a sound).

**c.** To sing, also, to begin to sing, to strike up.

**10. a.** To foster, rear, bring up (a person). Now chiefly *U.S.*, and commonly in pass. with specification of place.

**b.** To find, build up, break up (construct a scheme, plan, description, etc.) *? Obs.*

**b.** of persons or impersonal agencies.

**b.** To sense 37.

**16.** To bring (a question, point, etc.) to bring or put forward, advance (a claim).

602 A day was appointed for considering the point raised by Crone. 1881 Stubbs *Early Plantag.* iv. (ed. 3) 70 John the Marshall ... raised a claim touching one of the archiepiscopal manors.

**16.** With various constructions:

**a.** To begin, make, institute, direct, etc. *against* a person or thing.

c1300 *Cursor M.* 1971 Allas!.. A-gain abel he raysed striif. 1552 Douglas *Æneis* viii. 2. 98 That mater thou behald The werie rest agane Romanis bald. 1546 *Reg. Privy Council Scot.* I. 19 The cumondounis raisit be the said Lord aganist the said James. 1560 Daus tr. *Sleidane's Comm.* 181 He .. rayssed warre against us, and was taken therein. 1611 Bible *Acts* xiii. 50 The Iewes .. raised persecution against Paul and Barnabas. 1611 Scott *Pirate* Adv. 5 A variety of sham suits, raised against him by Newgate solicitors. 1873 May Müller *Sc. Rel.* 316 The objections which have been raised against this view.

**b.** To bring, send, or direct on or upon one.

c1300 *Cursor M.* 7649 Iuel he sal apon þe rais. 1375 Barbour *Bruce* vi. 576 Fra that had raisit on him the cry. 1388 Wyclif *Jer.* li. 1 Y schal reise on Babiloyne .. as a wynd of pestilence. 1526 Coverdale *Amos* v. 9 He rayseth destruction vpon the mightie people. 1576 Oppres. *Orkney & Shetland* (1859) 40 Gif ane brute or fame that then raisit vpone. 1607 Cotgrave *Intell. Syst.* I. v. 846 This was .. a meer Slander raised vpon Atheists. 1665 *Acct. Execution Dk. Monmouth* 2, I have had a Scandall raised vpon me.

**c.** To draw, obtain, derive (one thing) out of or from another.

1607 Donne *Serm.* v. (1640) 48 Moses third excuse, raised out of a naturall defect. 1751 Pope *Ess. Man.* II. 245 Heav'n's great view.. Virtue's ends from Vanity can raise. 1772 Priestley *Inst. Relig.* (1782) I. Pref. 12 Abstruse speculations.. have been raised from every branch of my speculations.

**III.** To remove to a higher position.

*To lift up by direct effort.*

**17. a.** To lift as a whole, to put or take higher, to elevate. Also, to pull up, hoist (sail, etc.).

c1300 *Cursor M.* 22106 þof he raised vp intil heven, To hell depe ai mot he driuen. c1350 in Horstm. *Altengl. Leg.* (1881) 88/682 Angeles.. raysed hir vp into þe eyre. 1375 Barbour *Bruce* xvi. 628 Thai rasit nakyt but abaid. 1500-20 Dunbar *Poems* lxxii. 72 Him all nakit on the tre Thai raisit on loft. 1590 Spenser *F.Q.* i. i. 18 She .. all attonce her beastly body raisd. 1593 Shaks. 2 *Hen. VI.* I. i. 254 Then will I raise aloft the Milke-white-Rose. 1798 Fox tr. *Dante* viii. 30 Such a bulk as my twelve hands could raise. 1777 Gray *Bonie* 2 The grisely Felon raised His Cave-eyed Gyll. 1895 Scott *Last Minstr.* ii. Concl., He raised the silver cup on high. 1814 —— *Ld. of Isles* ii. xxiii, The train.. Embattl'd, raised sail, and bore away. 1867 Trollope *Chron. Barset* II. 180 He should he try to catch her eye, and then raise his hat? 1888 Froude *Oceana* 256 She could have struck him, and had her arm raised to do it.

**b.** *spec.* To draw or bring up (water, minerals, etc.) to the surface of the ground.

1745 Pococke *Descr. East* II. 1. xvi. 67 The oxen raise the water by a bucket and rope. 1779 B. Martin *Sci. & Mag. Instr.* I. 65 Much Ore has been frequently raised on this Hill. 1837 Buckm. *Mag. Chem.* 639 The coal raised in 1829 was 27,000 tons. 1872 R. B. Smith *Mining Statist.* 44. 15,656 tons of quartz .. raised from depths between 240 and 690 feet.

**c.** In various special uses: (see quots.).

1753 Chambers *Cycl. Supp.*, *Raise* is likewise used for placing a horse's head right, and making him carry well, and hindering him to carry low, or to arm himself. 1775 A. Burnaby *Trav.* 87. When the trees are fallen, they .. drag them along the snow. It is exceedingly difficult to put them first in motion, which they call *raising* them. 1867 Smyth *Sailor's Word-bk.*, *To raise the metal*, to elevate the breech, and depress thereby the muzzle of a gun. *To raise tacks and sheets*, the lifting the clues of the courses, previously to bracing round the yards to tacking or wearing.

**d.** To turn (the eyes or look) upwards.

1599 Wyclif *Pr. cxx.* 1, I reside myn iyen to the hillis. 1590 Spenser *Ho. Man out of Hum.* ii. iii. Grantz friend be merry, raise your lookes out of your bosome. 1793 Rowe *Fair Penit.* i. 1, Wherefore are your Eyes Severely rais'd to Heav'n? 1828 Scott *Rev. Islam* v. viii. Nor spoke .. nor raised his looks to meet The gaze of strangers. 1892 Tennyson *Poems* 187 He raised his eyes of strangers.

**e.** *Fig. phr.*, *to raise the (sugsy) hand*, to make an (unwelcome) appearance; to present itself as a (troublesome) subject for attention. Cf. *rear v.* 1 12 b.

1822 Scott *Peveril* II. i. 27 The ancient superstition .. is raising its head. 1830 Wordsw. *Very Good*, *Jenner!* ix. 230, I am starving on my feet. Well, when I tell you that it's weeks since a bereaved pudding raised its head in this parish. 1894 *Westm. Gaz.* 28 July 1417 The subject of money for the arts raised its head again what *New Releases*.. investigated the facts behind the *Author's Society* recent publication about the stipends of professional writers. 1817 *Wordsworth Amed Oxford Sonnet* xlii. 123 The song which had raised its ugly head was the formidable—you make any king-size—dimensions.

**f.** Other phrases. *to raise one's eyebrows*(s): see *eyebrow* 1 c; *to raise the roof*: see *roof* 1 b. 1 c (*a*).

**18.** *fig.* **a.** To promote or advance (a person, people, etc.) to a higher rank, office or position; to exalt in dignity or power.

c1300 *Cursor M.* 6611 Fort to resseuen als þe best folkehous sob nocessesse. c1300 *Cursor M.* 2328 þat mak þe sone þat es to þi rais he waited þat raisd. c1350 in Horstm. *Altengl. Leg.* (1881) 42/15 in þe kyngte howe scshal þes he lyfte vp and set was þer he es dight. c1350 in þe kyngte howe scshal þes he .. 1400 *Maundeville* (1839) 40 Gif that is in resseruoir reysed. c1440 *Gesta Rom.*, lxi 367 (Harl. MS.) He resede þe poure man fro fildredo .. to sette him among prinsis. 1559 *Mirr. Mag.*, Dk. *Suffolk* xvi. How high, how soone, how woone, she did me raise. 1667 Milton *P.L.* xii. 172 A man whose vertue raisd Reise to be the defender of his people. 1793 Young *Brothers* iv. i. Tney [Bacch]he whilk speculation panes? this marriage To raise his .. blood into his master's throne. 1870 Crabbe

---

Borough iii, Theirs is a gracious bounty, form'd to raise Him whom it aids. 1874 Green *Short Hist.* ii. §6. 90 Charter after charter .. raised the townsmen of boroughs from mere traders .. into customary tenants.

**† b.** *To promote to some privilege. rare*[-1].

c1400 *Gosl. Leg.* i. 11 As sone as money is gevyn þe prayeris þe stynant to þe takyng of þe sacrament.

**c.** To exalt (one's name, state, etc.) *rare*.

c1425 *Cursor M.* 1373 (Trin.) here shal þi name raised be And alle þo heires þet comen of þe. 1303 Shaks. 3 *Hen. VI.* iv. i. 68 It shuts I thy Maiestie To raise my State to Title of a Queene. 1750 Pope *Ep. Bathurst* 220 Of qualities deserving praise, More go to ruin fortunes than to raise. 1800 Scott *Monast.* ix. motto, Farewell each hope of .. raising thy low rank.

**d.** To extol, laud. *rare*.

c1631 Milton *Arcades* 8 Fame that her high worth to raise Seem'd erst so lavish. 1725 Pope *Prol. Sat.* 211 While Wits and Templars ev'ry sentence raise, And wonder with a foolish face of praise.

**19.** *fig.* **b.** To elevate (persons) to a higher moral or mental condition. (In early use perh. from 2.)

c1200 *Ormin* 4773 He teres beshtheende dayg To reyssenn uss off sinne. c1300 *Cursor M.* 16874 Iesu bam bild till pine, þe heghest man ri raise to hele. c1380 Hampole *Psalter* Prol., þei þat resen in to contemplatyf lyf. c1386 A. Scott *Poems* (ed. T.S.) xxxiv. 149 Thir resannis ar to raise your Frs cyones vndir note. 1605 Bacon *Adv. Learning* ii. xxv. I cannot but be raised in this persuasion, that [etc.]. 1678 Hayward *Serm.* xvii. 230 Oh stupid creatures that are not raised with the description of .. his infinite recollection! 1846 R. S. Wilberforce *Doctr. Incarnation* v. 95 The Incarnation of Christ our Lord has raised us .. above the usual anthropology of the Greeks. 1867 Fr. A. Kemble *Resid. in Georgia* I. 230 By doing their best to raise and improve the degraded race.

**b.** To elevate (the thoughts, mind, etc.) to make higher or nobler.

c1340 Hampole's *Wks.* (1895) I. 69 He .. reyues her thoght aboven all erthly thyng. 1590 Spenser *F.Q.* i. Introd. iv, Raise my thoughts, too humble and too vile. 1667 Milton *P.L.* i. 13 What in me is dark Illumine, what is low raise and support. 1798 Burns *Despondency* iii, While meaning and raising this thought to Heav'n on high. 1877 Morley *Voltaire* (1886) 9 Its great glory was to have raised the moral dignity and self-respect of the many to a level which had hitherto been reached only by a few.

**c.** To elevate (a subject, style, diction).

1668 Dryden *Def. Ess. Poesy* Essays 1500 I. 114 He does no raise his matter in that prose, as he render it delightful. 1712 Addison *Spect.* No. 289 P 12 Milton has put in practice this method of raising his language. 1777 Lo. Henry *Memoirs* (1848) II. 361 His words are well chosen, his diction extremely raised.

**d.** *spec.* in relation to consciousness: to heighten (sensitivity or awareness).

1970 N. Millett *Sexual Politics* (1971) i. ii. 38 The hope of seeking liberating radical solutions of their own seems too remote for the majority to dare contemplate and remains so until consciousness on the subject is raised. 1976 *Spare Rib* Dec. 20/2 We're raising consciousness, affirming some concrete issues like age discrimination, putting hoary rag on the agenda too. 1977 *Rolling Stone* 7 Apr. 33/5 My efforts to raise the consciousness of whites who are so against lesbians in the States were bound to be stopped by the FBI sooner or later.

**20.** *Phonetics.* To articulate (a vowel) with the tongue closer to the roof of the mouth. Cf. RAISING *vbl. sb.* 1 d.

1874 H. Sweet *Hist. Eng. Sounds in Trans. Philol. Soc.* 1874 306, To assume that the low-narrow [i] was first widened, and then raised to the mid position, would be to ignore the fundamental laws of short vowel change. 1914 J. C. Wyld *Short Hist. Eng.* 136 Old imer *i* was raised to [i] at least by the end of the first third of the sixteenth century. 1934 C. Daines *Eng. Pronunc.* 5 MS. *i. Wei* newly formed and raised to [£]. 1967 Sc. J. *Linguist. Dec. Pronunc.* 1790-1790 II. 612 The vowel of NEE *f* tended to NEE or be raised supported by the parallel cases of NEE *ë*, which is shown by seventeenth-century evidence to have been raised. 1968 *C. Chomsky & Halle Sound Pattern Eng.* iii. 255 The environments where /i/ and /ü/ are lowered to [6] and [6] are distinct from those where /e/ and /o/ are raised to [i] and [ü].

**† To cause to rise or mount up.**

**21. a.** To cause (a spirit) to appear, esp. by means of incantations.

c1330 in Horstm. *Altengl. Leg.* (1881) 68/152 Experimentes þat ordered be; And raised devils pres plente. 1375 Barbour *Bruce* iv. 243 The euill Feronides moder was Ane nygromancar, & Sathanas Scho rais. 1573 Douglas *Æneis* i. Prol. 212 Like to the spirit of Sammoil; Quhilk the Pythonesses raisit. 1585 *Abp. St. Andrews* 506 in Satir. *Poems Reform.* xlv. 148 The Wiches þe rais incontinent, which the Fiend hes cal'd up. 1671 Milton *P.R.* iv. 430 Grisly Spectres, which the Fiend had rais'd. 1770 *Chatterton Poems* 231 To raise a storme the magician .. raised the one-ešheld ghost of Christmas ambition.

**b.** *to raise the Devil*, *the mischief*; *to make a disagreeable disturbance; to create trouble*, uproar, or confusion. Also, *to raise Cain* (CAIN 1 b); *to raise Ned* (U.S. slang); *to raise hell*: see HELL 2b, 10 n, q; *to raise hob*: see HOB 2b.[1] b.

1795 *Vancouver Conf. v. R.* Sir, give me an Account of my Necklace, or I'll make such a Noise in your House I'll raise the Devil in [ ] 1840, and the spirit of the sprite of Ballyrag's Reform .. to settle into among primula. 1959 *Mirr. Mag., Dk. Suffolk* viii. 43, do not raise Cain [see CAIN 2 b]. 1841 *Larru* O. Onidra Mar 1836 devil.–lsht J. Knickerbocker raise the devil gaic. 2 Tho' a' fair's gaie.

1886 'Mark Twain' *Sketches 1. Mr. Bloke's Item* (1900) 217 The head-setter has been in here raising the mischief and tearing his hair. 1904 J. C. Lincoln *Cap't Eri* II. 28 The boy sort of run loose, as yer might say. Went to school when he had to, and raised Ned when he didn't, one's I, and raised

**22.** To make (the voice) heard. Also *fig.*

1382 Wyclif *Ft.* xcii. 3 The flodis raiseden[ her vois. 1382 (conversorwer) her vois. 1581 Sidney *Apol. Poetrie* (Arb.) 46 Who sometimes rayseth vp his voice to the height of the heauens. 1667 Dryden *Virg. Past.* vi. 43 He rais'd his Voice, and soon a num'rous throng Of tryuing Satyrs crowded to the Song. 1738 Gray *Propertius* iii. 31 The Tyrant Loue permit me raise My feeble voice. 1849 Macaulay *Hist. Eng.* vi. II. 31 Many voices were boldly raised in menace and accusation. 1868 Freeman *Norm. Conq.* (1876) II. v. 450 No voice was raised in opposition. 1921 H. Grant Let. 1 Oct. (1963) 65 It will be time for me to raise my voice in praise of Anderson soon, as his new book .. is on the market.

**23. a.** To cause (dust, vapour, smoke, water, etc.) to ascend or rise; to send up or up, to stir up. See also DUST *sb.*[1] 3, SAND 2b,[1] 7 c.

1525 Hoccleve *Jonathan* 57 Shalde y t nevere smoke now vp reyss. 1581 G. Pettie tr. *Guazzo's Civ. Conv.* i. (1586) 27 b. They doe nothing else but raise a dust. 1646 Sir T. Browne *Pseud. Ep.* vi. xii. (1686) 330 Camels to make the water rapid and raise the mud. 1667 Milton *P.L.* iv. 3. 44 Sublime to raise and up to heaue. 1711 Addison *Spect.* No. 17 P 6 Those Violent motions which raise my Volatile water to the top of the Glass. 1760 Harrel *Lemery's Course Chym.* (ed. 3) 43 Sublime is to raise by Fire ani Volatile matter to the top of the sublimiry Vessel. 1815 Scott *Guy M.* xxv. 270 Whosoever of ye raise ane a white-headed whale .. he shall have this gold coonit. 1890 *Century Mag.* May 216 In October 1872, the ship Hector of New Bedford raised a whale and lowered for it. 1898 Baldwin *Orway & News 1 Before it was morning he raised Lundy Light.

**b.** To reneder (the) volatile. *Obs. rare*[-1].

1686 W. Harris tr. *Lemery's Course Chym.* (ed. 3) 96 To Sublime Tinn is to raise and Volatilize it by means of a Volatile Salt.

**24.** *Naut.* **a.** To come in sight of (another ship, land, a whale, etc.).

1769 *Townshend in Hakluyt Voy.* (1589) 68 At 11. of the clocke wee rayed the Ile of Madera. 1613 J. Tatton *Voy.* 78 We had'd off, North-North-east, but still raised land. 1634 Sir T. Herbert *Trav.* 12 The last of this moneth wee raise Antarctike Pole. 1775 *Romans Hist. Florida* App. 61, I would not come nearer than one to raise the land. 1852 H. Melville *Moby Dick* I. xxxvi. 230 Whosoever of ye raises me a white-headed whale .. he shall have this gold ounce. 1890 *Century Mag.* May 216 In October 1872, the ship Hector of New Bedford raised a whale and lowered for it. 1898 *Baldwin* Orway & News 1 Before it was morning he raised Lundy Light.

**b.** To give a higher appearance to (a ship, etc.) by coming nearer.

1832 Marryat *Newton Foster* xl. (1877) 39 In going up the North, you rise more the Pole, and by the Equinoctial, towards it, as much you are laid to Raise the Pole. 1769 Falconer *Dict. Marine* (1776), *Hausser un vaisseau*, to raise a distant ship by approaching for greater nearness, so that we appear to be stopped by the horizon. 1836 Smollett *Rod. Rand.* (1841) II. 179, I saw a Spanish Frigate coming .. who, when she raised our hull hauled her wind to the eastward.

**25.** To make (a horse) rise in leaping or rearing. **†** *Obs.*

1753 Chambers *Cycl. Supp.*, *Raise*, in the manege, is used for working; thus to raise a horse upon corvets, caprioles, and passades, is to make him work at curvets, caprioles, &c.

**26.** To reach the crest or summit of (a hill, ridge, etc.). *U.S.*

1804 J. Ordway in *Lewis & Ordway Jrnls. Western Explor.* (1916) 168 We raised a Steep bank back of this bottom. 1866 'Mark Twain' *Lett. from Hawaii* (1967) 201 We 'raised' the summit of the mountain and began to career along the edge of the crater. 1872 —— *Roughing It* xli. 287, I named the hill 'overlooking the town. 1923 J. R. Burroughs *Ulia' sdo* Every time I would raise a ridge, I expected to see him, and the tent.[!] on the track.

**†** To levy by lifting; to levy.

**27.** To levy (a tax, etc.); to collect (rents or other charges); hence, to bring together, obtain, procure by means of collecting or in any other way. † Const. *on* (a person).

c1330 R. Brunne *Chron.* (1810) 43 þorgh alle his lond þe Kyng his catel reysed 1530 Palsgr. *Acc.* (1533) 42/242 I rayse a money as the lorde doth his rentes ... Je rays le mony for the alderman and his servus. 1566 in *Foxtolo Wills* 9 Every man's full presse, ... excepti it be hypuldid as a lease .. 1660 T. Andrews *Certain Treat.* II. 3 Empowered to make Laws and raise money on the King's Subjects. 1790 J. C. *Complaint Cottier* (1845) 14 If no Profit can be raised, I see no reason why any Man should Adventure his Money. 1760 C. Johnston *Chrysal* (1821) I. 30, I immediately raised all the money I possibly could. 1821 Byron *Sard.* II. ii. Let not his mood of mirth and merriment be strange. 1828 J. W. Croker *Diary* 20 Jan. (1884) I. 3 He never .. raised a single farthing for money till I had a hardly raise as any for breakfast. 1848 N. Saints' *No Highway* vi. 171, I ... till'd Miss Lestrwd to see if she could raise ₤10 .. vil the Common. 1874 Morley's Carlyle *Beaw Jona .. or .. was Would you please me if you can raise us all & of ...*

b. *transf.* To obtain, procure (advantage, pleasure, praise, etc.).

c. Of articles sold: To bring, fetch (a certain price). *rare⁻¹.*

d. To succeed in producing.

28. To levy, collect, gather, bring together (an army, troops, etc.).

29. a. To put an end to (a siege or blockade) by withdrawing the investing forces.

b. To remove, rescind (a prohibition, etc.).

30. a. To end (a siege, etc.) by compelling the investing forces to desist or remove.

b. To raise (the besieger) to abandon a siege.

31. To set in motion (an army or camp).

**IV. To make higher or greater.**

32. a. To increase in height or bulk; to cause to rise up or swell; to give a higher level to.

b. To make higher or greater.

c. To make up to the height of. *Obs. rare.*

33. In various technical uses:

a. To bring up (the nap of cloth) by carding with teazles, etc.; to make a nap on (cloth).

b. To cause (dough, bread) to expand and become light, as by the use of yeast. Also *absol.*

c. To cause (hides) to increase in thickness.

d. To give (metal) a rounded form.

34. To increase the amount of, to heighten (rent, taxes, prices, etc.). Also *Cards* (orig. *U.S.*), to lay a higher stake than (one's opponent); to increase (a stake or bid); freq. *absol.* and with *partner* as obj. Hence *to raise out,* to cause (a player) to withdraw from a game. Also *fig.* Cf. RAISE *sb.¹* 5 b.

35. To increase the value, price, or rate of. *to raise the market:* to charge a higher price. Also *absol.*

36. To increase the degree, intensity, or force of.

a. To make (the voice or its sound) louder; to raise a higher pitch to.

b. To make keener, to intensify (sensations).

c. To brighten (colours), *esp.* in dyeing.

d. To cause (the pulse) to beat faster; to make (a fire) burn up better; to make hotter; etc.

**V.** 37. *intr.* To rise, in various senses. *Obs. exc. U.S.*

38. *raising* = being raised.

39. *intr. Mining.* To drive a raise (RAISE *sb.¹* 3).

†**raise,** *v.²* *Obs.* Also 5 rays, 6 rayse. [var. of RASE *v.¹*; the spelling may be partly due to association with prec.; cf. RAISED *ppl. a.¹*]

1. *trans.* To raze; to scratch, to cut.

2. To erase (writing).

†**raise,** *v.³* *Obs. rare.* [ad. F. *raiser.*]

**raise,** obs. f. RACE, RISE.

**raised** (rezd), *ppl. a.¹* [f. RAISE *v.¹* + -ED¹.]

EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.,

        Plaintiffs,

      - v. -

THE GILLETTE COMPANY,

        Defendant.

CIVIL ACTION NO.: 305CV174 JCH

## SECOND DECLARATION OF CHRIS KOHLER

CHRIS KOHLER states under penalty of perjury:

1.     This is the second affidavit or declaration of mine that has been submitted in these proceedings. The first appears as Exhibit 2 to the Declaration of David J. Leffell submitted with Schick's opening memorandum in support of its motion for a preliminary injunction.

2.     I have read the Declarations of Ian Saker (the "Saker Declaration") and Kevin Powell (the "Powell Declaration") filed by Gillette in these proceedings.

### Hair Extension and Hair Raising

3.     Both the Saker and Powell Declarations address whether Schick's videos are adequate to capture what they refer to as "hair extension," rather than hair raising or lifting. The tests we carried out were designed to observe hair raising, not hair extension. In that context, I deal below in detail with the specific criticisms made of the Schick videos in both the Powell and Saker Declarations.

2

### Imaging and Methodology of Schick's Test Videos

4.    Paragraphs 43 and 45 of the Powell Declaration and paragraphs 10 and 22-26, 27-28 of the Saker Declaration criticize Schick's videos on two grounds: first, the videos allegedly fail to record images of the beard prior to coming in contact with the cartridge guard; and second, because -- Powell and Saker claim -- the razors allegedly did not appear to make firm contact with the skin. I disagree with both these statements. The tests conducted by Schick were designed so that a control stroke would indicate whether the claimed effect of hair movement was in fact a result of the shaving process rather than the vibrations themselves. This is a scientifically valid form of control. Additional footage of the hair and skin taken prior to the control stroke would not have provided any relevant information.

5.    In paragraph 40 of the Powell Declaration and paragraph 11 of the Saker Declaration the claim is made that Schick's test videos were inadequate to observe any effect of the testing. I do not agree with this assertion. The videos recorded by Schick were not the result of casual observations. Rather, the images were recorded using a test design or protocol that, in my experience, was capable of recording any perceptible movement or extension of the hair occurring as a result of shaving with the M3 Power razor.

### Measurement Capacity of Schick's Test Videos

6.    Both Powell (paragraph 41) and Saker (paragraph 12) claim that the two-dimensional imagery used in Schick's videos made it difficult to assess the length of individual hairs. These criticisms are irrelevant. In my view, the technique employed by Schick was capable of recording angular changes in the position of hairs relative to the skin's surface. If the angle between the base of the hair shaft and the surface of the skin increased, this would generate a number of visual cues capturing that movement and would be perceptible by the viewer and seen on the videos.

3

7.      Similarly, if the M3 Power razor caused an extension of the hair from the surface of the skin, the technique used by Schick should have been capable of capturing such a lengthening of the hair shaft from a top-down view, with the exception of any hairs standing at or around 90 degrees to the skin's surface. However, a number of hairs are visible in the video and most of the hairs in the frame were not perpendicular to the skin's surface. Therefore, in my view, the video tests were capable of capturing any such hair extension claimed by Gillette that arises from use of the M3 Power razor.

8.      The aim of the Schick tests was not to quantify any perceived effect on the hairs, but to observe whether or not the claimed "hair raising" effect occurred at all. I am confident that the Schick technique employed was quite capable of achieving this aim in relation to any hair movement caused by the M3 Power razor.

9.      Paragraph 15 of the Saker Declaration claims that the Reflex technology used by Gillette in its tests is capable of accuracy within three or four microns (depending on the axis of view). In my opinion, movements or extensions of hair from the skin's surface in that order of magnitude of microns (that is 3-4/1000ths of a millimeter) would be imperceptible by consumers. Therefore, there is not necessarily any great advantage to using technology that can measure hair length down to this level of magnitude. In response to paragraphs 15 and 16 of the Saker Declaration and paragraphs 40 and 42 of the Powell Declaration, I again state that the tests designed by Schick were not intended to be conducted as a quantitative analysis of the effects of the M3 Power razor, but rather simply to observe whether the claimed "hair raising" effect occurred at all. I repeat that the technique used by Schick in the tests was capable of achieving this aim.

### Frame Rate and Resolution

10.      The Saker Declaration at paragraph 18 claims that the frame rate (of 500 frames per second) and resolution (of 768 x 768 pixels) were inadequate to capture the

4

desired events. I disagree with this statement. The fundamental frequency of the vibrations generated by the M3 Power razor is in the range of 100 Hertz (100 revolutions per second). Based on this information, my view is that 500 frames per second should be sufficient to capture the desired effect. The failure to observe any effect on the videos is not a result of the technology used by Schick, but rather is simply the result of the test.

11.    I also disagree with Saker's claim (in paragraph 18) that a resolution of 768 x 768 pixels was insufficient to capture the desired effects. This resolution was sufficient to cover the area of interest being observed during the tests. In response to Gillette's claim that the higher resolution of film used by them in their tests was better, I respond that it depends upon the size of the area being viewed and filmed: 1024 x 1024 pixels is not necessarily an improvement in resolution if the area being viewed is larger. The number of pixels is not necessarily a reflection of the quality of the image.

12.    The Saker Declaration at paragraph 18 also says that a low frame rate results in "inherent motion blur." I do not agree with this statement. In my view motion blur can be caused by slow shutter speed, and is not necessarily linked to a low frame rate.

### Focus and Depth of Field

13.    I disagree with Saker's assertion in paragraph 19 and Powell's assertion in paragraph 42 that it is difficult to make any reasonable observations based on Schick's videos because there are focus and depth of field problems. The quality of the majority of test videos produced by Schick is sufficient for the purpose of the study. The absence of any observable effect was simply the test result.

### Magnification

14.    The Saker Declaration at paragraph 20 and the Powell Declaration at paragraph 42 claim that inadequate magnification levels used by Schick were likely to make it impossible to observe hair changes with any degree of certainty. The Schick videos were

5

recorded at a magnification level of 22 times. Saker, in paragraph 20, estimates that one pixel of image on Schick's videos corresponds to 11 microns of length of hair. Even assuming this calculation is correct, however, and that our technique was only capable, as asserted by Saker, of measuring hair movement or extension of 11 microns or greater, in my opinion this is sufficient, given that the diameter of human hair is in the order of 40-120 microns.

15.     Therefore, I strongly disagree with Powell's and Saker's assertions that relatively significant levels of change in hair length would be lost to the observer. Further, in my opinion, and as discussed above, Saker's calculation in paragraph 20 supports my view that the Schick technique was adequate to capture any significant change in hair movement or extension.

### Skin Contact

16.     Paragraph 43 of the Powell Declaration and paragraph 22 of the Saker Declaration claim that Schick's videos show negligible or no contact between the M3 Power blades and the skin's surface, such contact being necessary in order to transmit the physical energy of an oscillating razor to the skin and hair and thus produce the hair extension effect. I deny that the M3 Power cartridge and blades did not come in firm contact with the skin's surface during Schick's tests and I do not agree that the video clips show negligible or no contact between the blades and the skin. The M3 Power razor in each test was loaded by spring at 200 grams of pressure, which is a pressure in the middle of the typical range of pressure applied by men when wet shaving.

### Pre-Agitation Images

17.     The Saker Declaration at paragraph 27 (and to some degree the Powell Declaration at paragraph 45) claims that the basic protocol of incorporating a "control" image of the hairs prior to and after the application of stimulus was not attempted in Schick's test

5

6

videos. I strongly refute this assertion. Schick's tests incorporated a control that is the absence of a stimulus, that stimulus being the vibrations of the M3 Power razor. Saker's and Powell's criticisms of Schick for failing to capture pre-agitation images are invalid. Scientific controls are designed to enable the effect of a single stimulus to be observed in isolation. The controls used by Schick in its tests enabled it to observe the effect of the M3 Power with the oscillations off and then on. An image of the hairs in question prior to the application of the control stroke would not have added any relevant information.

18.     I also disagree with Saker's assertion (paragraph 27) that a more appropriate methodology would have been to conduct the control stroke after the active test stroke on the basis that the control stroke might compromise the performance of the M3 Power during the active test stroke. In the test conducted by Schick, it was not possible to obtain results of a control stroke after an active test stroke given that the active test stroke may have already exerted an irreversible effect on the skin. I also note that Saker's suggestion (paragraph 27) that the control stroke be conducted among half the panellists and then crossed over so that the control stroke occurred second in the other half of the panel was not a methodology adopted by Gillette itself.

19.     The Powell Declaration at paragraph 45 and the Saker Declaration at paragraph 28 suggest that much of the interaction of the skin and hairs with M3 Power razors occurs prior to or during contact with the cartridge guard. I respond that regardless of where and when the effect of the M3 Power takes place, it must be visible prior to being cut by the blade. Therefore, regardless of at what point in time the claimed "hair raising" effect occurred, this should have been captured on the test videos produced by Schick at the end of the active test stroke.

7

## The Development of Schick's Testing of the Hair-Raising Claims

20.    Oscillating or vibrating razors have been manufactured and sold since at least the 1940s, and battery-powered oscillating razors have been sold since the 1970s. In more recent years, Remington, Conair, and the Sharper Image have sold vibrating razors. To the best of my knowledge, however, none of these oscillating or vibrating razors claimed to raise the hair up and away from the skin.

21.    Gillette launched the M3 Power in May 2004. The Evaluation Sciences Research Department at Schick was unable to obtain product samples of the M3 Power razor until after the product was launched.

22.    After the product was launched, Schick decided to test the hair raising claims in Gillette's advertisements for the M3 Power. A team of Schick technicians was assembled to test the hair raising claims. In addition to myself, the team included four others.

23.    Since Gillette's hair raising claims were unprecedented in the industry, Schick had no existing test protocol that could be used or modified in order to test the hair raising claims. Instead, our testing team had to develop a testing procedure from scratch.

24.    When we began testing, we had no appropriate equipment or procedures to test a claim that a razor raised facial hair, so we first attempted to test whether the M3P caused hair raising on a subject's arm. We made this decision because Schick had a bench-type automated stroke machine that could stabilize a subject's arm and perform a single razor stroke on it. After several weeks of testing on subjects' arms, however, we doubted whether any results would be applicable to facial hair. We therefore decided to develop a procedure for testing hair raising claims upon facial hair.

25.    The testing protocol that we eventually developed involved multiple components and procedures that we specifically had to design and manufacture for this project and that were extremely time-consuming to design and manufacture. As further

7

8

detailed below, these components and procedures included: (1) design and development of a head stabilizer to immobilize the subject's head during the testing process; (2) design, development and manufacture of a robot arm capable of performing a single stroke with a razor while maintaining constant pressure; and (3) trial-and-error experimentation with various videography and lighting techniques.

26.    We first designed and developed a head-stabilizing system that would be appropriate for use with an automated stroke machine. We were able to obtain a standard head stabilizer that had been designed for dermatological examinations. This stabilizer, however, required substantial modifications to enable the automated stroke machine to function and to allow clear photographs to be taken of the subject's cheek. This modification process took several weeks.

27.    We also needed to design and develop an automated stroke machine suitable for testing the hair raising claims on facial hair. We created design drawings and specifications for a robot arm-type automated stroke machine with a spring-loaded razor holder that would deliver a constant 200 grams of pressure throughout the razor stroke. After completing the design drawings, we had to have the automated stroke machine custom-manufactured to our specifications. The process of designing the machine and arranging for its manufacture, machining, delivery, and assembly by an outside vendor took well over two months.

28.    We next needed to design and develop videographic techniques that would enable us to view any hair-raising effect of the M3 Power. Using a high-speed video camera, we experimented with various lenses and videography techniques. It also proved particularly difficult to light the test area of the subject's face during the razor stroke. We spent several weeks conducting trial-and-error tests on various levels of lighting, camera speed, and magnification in order to achieve optimal visibility.

8

9

29.    Once we designed and developed the basic components of the testing procedure for the hair-raising claims, we spent several weeks fine-tuning and refining the process.

30.    The design and development of the testing process was not finalized until September 2004. At that time we performed some preliminary testing. Once we had achieved confidence in our testing procedure, Dr. David Leffell of The Yale University School of Medicine was retained as an independent expert to participate in the testing process. The final tests were performed on October 8, 2004.

31.    Testing the hair raising claims was a high-priority project for this team from May through October 2004. I estimate that each team member spent hundreds of hours on this project. We pursued the testing project diligently, and did not allow our efforts to lapse until after the final testing was completed in October 2004.

### Product Features of Gillette's Razors

32.    In addition to its oscillating function, the Gillette M3 Power includes the following features. The M3 Power has three spring-mounted blades, and like other multi-blade razors, creates an effect known as "hysteresis" – i.e., when a hair is cut by the first blade, it is pulled partially out of its follicle, so that the next blade cuts the hair before it retracts. The M3 Power also features flexible fins on the blade guard which stretch the skin prior to contact with the blade. The cartridge also includes a comfort strip that lubricates the skin prior to contact with the blade. The blades also featured a polymer blade coating. The cartridge of the razor featured a pivoting mechanism.

33.    The Mach 3 Turbo, Gillette's non-oscillating premium razor, and the Mach 3, its predecessor, include the other features listed above except for oscillation. However, the Mach 3 Turbo had a different blade coating than the M3 Power, which featured a "Power-Glide" polymer blade coating. Moreover, the M3 Power had a larger handle to accommodate

10

its batteries. The Mach 3, which was released prior to the Mach 3 Turbo, had differently shaped fins than the M3 Power and the M3 Turbo.

34.     Gillette's Sensor – its previous generation of premium razor – featured only two spring-mounted blades and did not include flexible fins on the blade guard (although the Sensor Excel, which was released later than the Sensor, included flexible fins). The blades of the Sensor differed from later generations of Gillette premium razors, since the Sensor did not feature "diamond-like carbon" ("DLC") blade coating or anti-friction blades, as did the Mach 3, the Mach 3 Turbo and the M3 Power. The pivot mechanism for the head of the Sensor also differed from later generations of Gillette premium razors, such as the Mach 3, the Mach 3 Turbo and the M3 Power. The conditioning strip on the Sensor also differed from later Gillette premium razors. Gillette's Atra razor, which preceded the Sensor, also did not include fins. The Atra's blades were fixed, not spring-mounted, and its conditioning strip differed from later generations of Gillette premium razors.

I hereby certify under penalty of perjury on this __7__ day of March, 2005, that the foregoing is true to the best of my recollection and belief.

_____
Chris Kohler

Subscribed and Sworn to before me
this _4th_ day of _March_, _2005_
_Katherine F. Ignatowski_
        Notary Public
Date Commission Expires _May 31 2007_

10

EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCHICK MANUFACTURING, INC.,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.,

        Plaintiffs,

      - v. -

THE GILLETTE COMPANY,

        Defendant.

CIVIL ACTION NO.: 305 CV 174 (JCH)

## SECOND DECLARATION OF DAVID J. LEFFELL, M.D.

Dr. David Leffell, states under penalty of perjury:

1.      This is the second declaration I have submitted in this matter.  The first was submitted in support of Schick's request for a preliminary injunction.  I have now read the Declarations of Kevin Powell (the "Powell Declaration") and Ian Saker (the "Saker Declaration") submitted by Gillette in this case and offer this Second Declaration in response.

### Hair Raising and "Hair Extension"

2.      Having reviewed the Powell and Saker Declarations, and the testing material provided by Gillette, it is my view that nothing in Gillette's testing or account of how the razor works explains the hair raising effect that is claimed.  Rather, the material put forward appears to relate to something Gillette calls "hair extension."  I see a significant difference between the notion of hair "raising up" or "lifting" away from the face and the notion of hair "extending."  The lifting or raising of hair involves a move of the hair toward a vertical position, with a change in the angle between the hair and the

face. I understand "hair extension," although it is not a term or a phenomenon I am familiar with, to refer rather to the hair moving in and out of its follicle, but maintaining the same angle against the face, rather than moving toward a vertical position.

3.      As explained in more detail below, I was not retained by Schick to consider whether the M3 Power razor had a "hair extension" effect and the tests I observed were not specifically directed to that end. Nonetheless, if there were such an effect and it was in fact of practical significance I expect that I would have observed it during the tests to which I referred in my first declaration, and I did not. Further, in my clinical and teaching experience as a dermatologist I have not encountered the concept of hair extension as presented by Gillette.

### The So-Called "Physiological Effect" of Oscillating Razors

4.      The Powell Declaration in paragraph 29 asserts that facial hair becomes "bound" within the hair follicle by sebum deposits and corneocytes adhering together, so that it does not fully release above the skin surface. I am aware of no scientific basis for such an assertion and it is inconsistent with my own observations of facial hair structure and function during more than 20 years of experience as noted above.

5.      For several reasons, I do not consider corneocytes (which are dead skin cells adjacent to the epidermis) or sebum (which is an oil produced by the sebaceous gland associated with the hair follicle) separately or in combination, to have the alleged effect on the movement of facial hair:

(a)      first, I am not aware of deposits of sebum adhering with corneocytes on the human face in the manner and to the effect described by Gillette and I

2

understand no photographs of such deposits are contained within the material (including the Powell or Saker Declarations) which has been submitted by Gillette;

(b)    second, based on my clinical experience, I believe the force of facial hair pushing upward from the hair follicle is greater than the inhibitory pressure of corneocytes (adhering with sebum deposits or not).  If it were otherwise, facial hairs would tend to grow inwards, not outwards;

(c)    third, corneocytes of the stratum corneum are continually being sloughed off the surface of the skin and replaced by new cells from the underlying dividing cells of the epidermis.  In particular, they are removed by everyday activities such as washing or shaving of the face.  In my opinion, it is highly unlikely that there could be, within a period of 24 hours, a build up of corneocytes on a person's face sufficient to restrict the growth or movement of facial hairs and I certainly have never seen such a phenomenon in my years of practice; and

(d)    fourth, sebum deposits are generally dissolved or washed away by processes such as washing or shaving of the face, and in my opinion it is also highly unlikely that, within a period of 24 hours, there could be such a build up of sebum deposits on a person's face that it would restrict the growth or movement of facial hairs.

6.    In paragraph 29 of the Powell Declaration it is further asserted that the hair agitation and surface skin stress produced by the oscillating action of the M3 Power razor "disperses and unbinds the sebum deposits and corneocytes, which allows the hair to move freely within the hair follicle and to reach its full extension above the skin surface."  Again, it is my opinion that this assertion is without any scientific merit and it is inconsistent with my experience as a dermatologist.

3

7.     Even if (which I do not accept) sebum deposits and corneocytes adhere and obstruct the growth or movement of facial hair, I do not consider that shaving with the M3 Power razor would, by reason of the oscillating action of that razor, have the effect attributed to it in the Powell Declaration. That is because, as indicated in paragraph 5(c) above, washing or shaving of the face (even with a non-oscillating razor) would likely remove build up of corneocytes.

8.     In particular, I would expect that, in the course of shaving:

(a)     rubbing of the face with a wet or dry towel, or rubbing shaving cream or shaving gel onto the face, would likely remove corneocytes or sebum deposits obstructing hair growth or movement; and

(b)     something known as the "hysteresis effect" would occur, meaning that the first blade of the razor would pull the facial hairs from their follicles, while the second and third blades would cut those hairs before they could retract back into their follicles. The pulling of the facial hairs from their follicles would also remove corneocytes or sebum deposits obstructing the growth or movement of those hairs.

9.     Exhibit 7 to the Powell Declaration, which is reprinted in Gillette's memorandum in opposition to the motion for a preliminary injunction (Opp. at 13), presents a number of drawings said to illustrate the process of corneocytes and sebum deposits inhibiting the upward movement of facial hairs and agitation disrupting the corneocytes and so freeing the hairs. I offer the following views about those drawings:

(a)     first, in 20 years of diagnosing, treating, writing about and studying skin, I have never seen or read of any part of the process said to be illustrated by the drawings;

4

(b)    second, in particular, although I look at literally hundreds of facial hairs under a microscope almost every day in the course of my facial surgeries, I have never seen a hair impacted in the manner shown in the second drawing, or bent in the way shown in the third drawing, as a result of the presence of corneocytes;

(c)    third, as a result of these first two matters, I am firmly of the view that the drawings simply do not reflect commonly accepted views of the structure and function of hair follicles; and

(d)    fourth, even if (contrary to my own view) the drawings did reflect commonly accepted understanding, I am unable to see any reason why the agitation of the skin illustrated in the fourth drawing would not be just as likely to cause corneocytes to fall into the hair follicle, which would presumably further restrict the movement of the hair, as opposed to moving away from the hair follicle.

<u>Gillette's Testing</u>

10.    I have read the reports of different studies attached to the Powell Declaration (the "Gillette Testing").

11.    I find it difficult to comment on those reports. In particular, so far as the studies on oscillating razors attached to the Powell Declaration (that is, those in Exhibits 1, 4 and 5) and the "Microwatcher Study" (Exhibit 8) are concerned, the reports on those studies omit a piece of information which I consider to be crucial, namely the pressure with which the oscillating razor or Microwatcher was applied to each subject's face. Furthermore, there is no indication that the amount of pressure remained constant in the comparative studies between oscillating and non-oscillating razors.

12.    In the following paragraphs, I comment on each of the reports forming part of the Gillette Testing.

### Oscillating Razors Shaving Studies

13.    I offer the following views with respect to the shaving studies appearing as Exhibit 1 to the Powell Declaration:

(a)    first, the result which the first of those studies apparently revealed appears to be totally implausible. That study suggested that 10 strokes with a blunt oscillating razor produced an 83.3 micron increase in observable hair length. Taking Powell's statement (Powell Decl. ¶ 23) that average beard hair grows approximately 12 microns each hour (which is fair enough as a general statement, although individual rates of beard hair growth vary significantly), this equates to an extra seven hours growth;

(b)    second, the hairs measured in these studies after the oscillating razor had been used were not necessarily the same as those measured after the non-oscillating razor had been used; and

(c)    third, I understand that the Atra and Sensor razors used in the tests are not the same as the M3 Power razor. Accordingly, it does not follow that the results of the test, even if correct, would be repeated with an M3 Power razor.

14.    Accordingly, in my opinion, these studies do not provide any significant level of support for the views expressed in the Powell Declaration.

### Shaving Studies into the Effects of Shaving Preparation on Skin and Hair

15.    The report on studies into the effects of shaving preparation on skin and hair, which is Powell Declaration Exhibit 2, relevantly suggests that water and/or shave preparation can cause slight swelling either of the skin (or, in my view, facial hair shafts)

6

so that facial hair does not extend above the surface of the skin as far as it did before the

application of water and/or shave preparation.  The studies do not suggest that this would

be any different if an oscillating rather than a non-oscillating razor were used for shaving.

It follows that, in my opinion, the studies do not support the views expressed in the

Powell Declaration.

<u>Hair/Skin Agitation Shaving Study</u>

16.     A study on hair/skin agitation appears as Powell Declaration Exhibit 3.  I

have no particular comment on this study.  I am not aware of how, if at all, it is thought to

support the views expressed in the Powell Declaration.

<u>Hair extension Shaving Study with a Prototype M3 Power (without blades)</u>

17.     I offer the following views with respect to the study on hair extension with

a prototype M3 Power, which is Powell Declaration Exhibit 4:

(a)     first, I note that the study was conducted using razor cartridges with

the blades removed.  Even assuming Gillette's views about the effect of corneocytes and

sebum deposits on facial hair to be correct, the hysteresis effect (which would have

occurred if the blades had not been removed from the cartridges, see paragraph 8(b)

above) may have deprived the oscillating action of the razor when it was in the "on"

mode of any utility;

(b)     second, the study does not appear to have followed any standard

protocol, with the subjects using their own normal shave preparation which could have

distorted the results;

(c)     third, it is not clear to me that the study tested the razor in the "on"

and "off" mode in equivalent situations.  The limited data provided indicates that the

7

original (or control) length of the hair for the test of the razor in the "off" mode was 318 microns, whereas it was 386 microns in the "on" mode. This is a difference in starting point of 68 microns, which is in itself higher than the maximum difference found in the test, which was a change of 40 microns; and

(d)    fourth, as noted more generally above, the amount of pressure with which strokes were made with the oscillating and non-oscillating razors is not recorded. Therefore, there is no way to ensure that the same amount of pressure was used for strokes with the oscillating razor as opposed to the non-oscillating razor.

18.    In my opinion, the study does not provide any reliable support for the views expressed in the Powell Declaration.

### Closeness Efficiency Shaving Study with Prototype M3 Power

19.    I offer the following views with respect to the study on closeness efficiency for prototype M3 Power, which is Powell Declaration Exhibit 5:

(a)    first, the study does not disclose anything about the effect of the prototype M3 Power razor used on facial hair in terms of raising it or lifting it up and away from the face or extending it; and

(b)    second, the study does not disclose anything about the closeness with which the M3 Power razor shaves. While the M3 Power razor might have cut more hairs with the oscillation on rather than off, it might have cut hairs more closely in the reverse situation.

20.    Accordingly, in my opinion, this study, like those already discussed, does not provide any support for the views expressed in the Powell Declaration.

## Microwatcher Study and Related Video Files

21.    I offer the following views about the "Microwatcher Study" that is Powell Declaration Exhibit 8, and the related video files in Powell Declaration Exhibit 9:

(a)    first, because the study was conducted without a razor and without any shave preparation, even assuming that Gillette's views about the effect of corneocytes and sebum deposits on hair growth and movement are correct, it is impossible to conclude that the effect of shaving with an M3 Power razor would be the same as that of the Microwatcher dome (see paragraph 6 above);

(b)    second, the first video file I reviewed on Powell Declaration Exhibit 9, titled "Hair Emergence," showed a hemispherical dome being pressed into the skin's surface. I am not aware of any basis on which it could be suggested, as the Powell Declaration does in paragraph 32, that the hair should react to a vibration from a razor in the same way it would react to pressure being applied onto the skin from a non-oscillating hemispherical dome; and

(c)    third, the second video file on Powell Declaration Exhibit 9, titled "Free Hair Movement," is described in Powell Declaration paragraph 35 as showing the free movement of hairs in response to agitation and skin stress, but again, I understand that the images show the skin responding to a mechanical stress such as pressure from the dome. The images do not show hairs moving, lifting or rising up in response to the vibrations of an M3 Power razor.

## Schick's Testing

22.    As noted in paragraph 3 above, Schick did not ask me to consider whether the M3 Power razor had a "hair extension" effect and the tests I observed were not

specifically directed to that end. The imaging and methodology flaws which the Powell and Saker Declarations claim exist in the test videos produced by Schick seem to be based on a misunderstanding about this.

23.     To observe whether facial hairs are raised by the oscillating action of the M3 Power razor, it was not necessary, for example, to measure the length of those hairs or to increase the magnification of the images. It was very clear to me when observing the video tests that the hairs were not being raised.

I hereby certify under penalty of perjury on this _6_ day of March, 2005, that the foregoing is true to the best of my recollection and belief.

_David J. Leffell, M.D._

David J. Leffell, M.D.

80326810.1

10

EXHIBIT E

*Case #4262 (11/05/04)*
RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
*Advertising Agency:*          Euro
*Challenger:*                  *The Procter & Gamble Company*

> - Product testing should be conducted under consumer relevant conditions, using accepted methodology and protocols, and should relate directly to the advertising claims.

> - A product demonstration should be carefully designed to prevent a misleading or exaggerated comparison.

**Basis of Inquiry:** Comparative performance claims and demonstrations for Reckitt Benckiser, Inc.'s Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent appearing on broadcast and cable television were challenged by The Procter & Gamble Company, manufacturer of Cascade® Pure Rinse Formula™ Gel, a competing dishwasher detergent product. The television commercial shows cartoon character George Jetson talking to his robot about dirty dishes washed with Cascade Pure Rinse Gel and later washed with Electrasol 2-in-1 with Jet Dry PowerBall. George Jetson looks disapprovingly at the dish washed with Cascade and then looks approvingly at a dish washed with Electrasol 2-in-1, sparkling brightly, as he can see his reflection in the dish.[1] Concurrently, product demonstrations of Cascade Pure Rinse Gel and Electrasol with Jet Dry PowerBall on the dirty plates are shown, with one stained with pasta and oatmeal ("pasta" and "oatmeal" are referenced near the stains with lines pointing to the stains), with the super stating "vs. Cascade Pure Rinse Gel on pasta and oatmeal." The conversation between George Jetson and the robot included the following statements about the competing product, Cascade:

> "These clean dishes [cleaned with Cascade] are still dirty."

> "What's wrong with the other detergent [Cascade]?"

> "That gel [Cascade] leaves more stuck-on starchy foods than Electrasol. Only Electrasol has Jet-Dry for dishes that are more than washed; they're Power-Washed."

---

[1] The following is the conversation between George Jetson and his robot:

| | |
|---|---|
| George Jetson: | "These clean dishes [cleaned with Cascade] are still dirty." |
| Robot: | "Need Electrasol." |
| George Jetson: | "What's wrong with the other detergent [Cascade]?" |
| Robot: | "That gel [Cascade] leaves more stuck on starch foods than Electrasol. Only Electrasol Has Jet-Dry for dishes that are more than washed; they're Power-Washed." |
| George Jetson: | "Sparkling clean." |
| Robot: | "Electrasol with Jet-Dry PowerBall." |

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 2

Challenger's Position:

The challenger argued that the advertiser cannot support its misleading claims or the product demonstrations because its test protocols are based on non-consumer relevant elements that alter their test results.    The challenger further maintained that the advertiser's comparative performance claims are denigrating, false and misleading and likely to cause it irreparable harm unless they are discontinued and requested that NAD recommend that they be discontinued.[2]

A.    "These clean dishes [cleaned with Cascade] are still dirty"; "What's wrong with the other detergent [Cascade]?"[3]

The challenger argued that although the animated product demonstrations are animated, they must still be truthful and accurate.[4] Procter & Gamble maintained that the performance claims as well as the grossly exaggerated and denigrating product demonstrations falsely convey the message that its own product, Cascade Pure Rinse Gel, is not efficacious as it depicts dishes washed with Cascade remain stained with a large and visible amount of starchy foods (outlined in bright yellow) as opposed to Electrasol which "power-washes" dishes to a "sparkling clean" finish.[5]    The challenger submitted the results of its testing on Cascade Pure Rinse Gel and Electrasol 2-in-1 with Jet Dry PowerBall which concluded that Cascade Pure Rinse Gel cleans at least as well as, or better than (in some cases), than Electrasol 2-in-1 with Jet Dry PowerBall, thereby confirming that the advertiser's claims are false and disparaging.  In further support of its contention, Procter & Gamble stated that it replicated Reckitt Benckiser's demonstration exactly, using the advertiser's protocol (which, it maintained, was fatally flawed as it stressed non-consumer relevant conditions) to show that Reckitt Benckiser grossly exaggerated the actual results via animation in its television commercial.  It noted that the actual soil that remained on the glass plate in the Procter & Gamble testing is not representative of what is depicted in Reckitt Benckiser's animated product demonstration.  Procter & Gamble maintained that the results of the animated product demonstrations cannot be duplicated under laboratory conditions using real dishes, soils or products.  It was unable to replicate the product demonstrations under relevant consumer conditions, noting that the remaining residue appears, at best, faint or hazy.  The challenger contended that experienced graders require special lighting to grade plates based on anticipated faint residue and that they usually rotate the plates (as George Jetson did in the commercial) to see the residue.  In nearly all of its consumer relevant test results, the challenger

---

[2] In its reply, the challenger noted that both it and the advertiser agree that the challenged claims and product demonstrations must be supported by statistically significant, consumer noticeable differences that are generated under consumer relevant conditions.

[3] The challenger noted that while Cascade Pure Rinse Gel is not directly named on the product mockup (product is labeled "Dishwashing Gel"), it maintained that it is clearly intended to be Cascade Pure Rinse Gel.

[4] Reckitt Benckiser, Inc. (Lime-A-Way® Lime, Calcium & Rust Stain Remover), Report #4130, *NAD Case Reports* (December 2003) (stating that "[i]t is well established that a product demonstration in an advertisement must be truthful and accurate"), citing Procter & Gamble (Crest Dual Action Whitening Toothpaste), Report #3874, *NAD Case Reports* (February 2002).

[5] See, *supra* note 1.

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 3

argued that the residue left by either product is neither "consumer significant" [6] (i.e. easily noticed by an average consumer in normal lighting conditions) nor "statistically significant," noting that despite some statistically significant results in favor of Electrasol 2-in-1 Tabs, the differences are hardly noticeable.

The challenger also contended that the comparison in question is also misleading because dissimilar products are being compared. Procter & Gamble's base-tier gel (Cascade Pure Rinse Gel) is compared to Electrasol 2-in-1 with Jet Dry PowerBall, which is the advertiser's top-of-the-line, best performing unit dose automatic dishwashing detergent, a comparison which the advertiser fails to clearly convey, erroneously contending that Electrasol is better than Cascade Gel. The challenger maintained that the advertiser must avoid implying that it does not offer a similar unit-dose product when, in fact, it does: Cascade 2-in-1 Action Pacs™. The challenger noted Cascade 2-in-1 Action Pacs™ are similar, but ultimately superior, to Electrasol 2-in-1 with Jet Dry PowerBall and that Cascade 2-in-1 Action Pacs™ have a completely different performance profile and perform better than Cascade Pure Rinse Gel. It added that it would be impossible to modify the challenged television commercial so as to make it truthful and accurate.

The challenger maintained that the advertising falsely denigrates the challenger's entire Cascade line as the advertiser failed to explicitly reference Cascade Pure Rinse Gel ("What's wrong with the other detergent [Cascade]?") in the product demonstrations and communicates the misleading message that the entire Electrasol product line is superior to the entire Cascade product line. The challenger maintained that the challenged performance claims ("These clean dishes are still dirty," which states that Cascade Gel is not efficacious and will not work to clean starchy soil from dishes; "what's wrong with the other detergent?," which reinforces the claim that Cascade Gel performs at an unacceptable level) and the product demonstrations reinforce that Cascade Gel is not efficacious by showing glass plates cleaned with Cascade Gel have significant residue left on them.

   B.   <u>"That gel [Cascade] leaves more stuck-on starchy foods than Electrasol. Only Electrasol has Jet-Dry for dishes that are more than washed; they're Power-Washed."</u>

The challenger maintained that its test protocols and results are better aligned with actual consumer habits and practices[7] that reflect a more typical consumer experience in a typical

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 4

dishwashing situation. Procter & Gamble's testing illustrates that Electrasol 2-in-1 Tabs (based on the super-script "vs. Cascade Pure Rinse Gel on pasta and oatmeal") do not clean pasta and oatmeal as represented in the challenged television commercial, and conclusively shows that Cascade Pure Rinse Gel cleans at least as well as, if not better than, Electrasol 2-in-1 tabs.

Procter & Gamble maintained that Reckitt Benckiser's test protocol consisted of five, non-consumer relevant elements that significantly distorted the relative performances of the products, namely, 1) soil exposure, 2) ballast soil, 3) dishwasher model, 4) dishwasher setting, and 5) inlet water temperature. In contrast, its own consumer relevant testing protocol[8] is designed to produce results that consumers would experience in their homes, thus when the products are tested using these five consumer relevant elements, Cascade Gel performs at parity with Electrasol 2-in-1 Tabs on spaghetti and is actually statistically superior to Electrasol 2-in-1 Tabs on oatmeal.

### 1.     Soil Exposure

The challenger disagreed with the advertiser's contention that its "stain application process and drying method for the stains[9] simulates typical consumer conditions" because it maintained that consumers do not bake the residue remaining on plates after a meal; rather, they pre-treat soiled plates and place the plates in the dishwasher until the dishwasher is run (usually within 24 hours). It maintained that where consumers encounter baked-on food on a plate, they would typically soak or rinse the plates, which is the more effective pre-treating method, before loading the plates in the dishwasher. As to the advertiser's drying method[10], Procter & Gamble noted

_____

of time (16 percent – Not long, no more than an hour; 18 percent – a couple of hours; 28 percent – about one day; 18 percent – about two days; 10 percent – about three days; 5 percent – about 4-6 days; 1 percent – about a week or more; 3 percent – no answer). The advertiser noted that the cleaning cycles selected reflect the type of soil (egs. light cycle for lightly soiled items; regular cycle for moderately soiled items; and heavy cycle for heavily soiled items), adding that a pre-wash cycle and/or variation of the length of the main wash cycle may be needed depending on the cycle selected and the type of machine used (heavier soils usually need pre-washing and longer wash times). As to the type of dishwasher selected, the advertiser asserted that consumers usually purchase models that fit their budget and have the features that meet their dishwashing needs (e.g. low-tier dishwasher, which only has a standard pre-rinse cycle, vs. a mid-high tier dishwasher which has a pre-rinse cycle and a soil level sensor [signals to dishwasher that dishes should be washed until all of the soil has been removed]).

[8] Procter & Gamble's testing protocol consists of the following: 1) realistic soil exposure prior to washing substrates; 2) a consumer relevant, more comprehensive ballast soil that is based on both USDA Daily Food In-Take Studies and Procter & Gamble's National Soil Load Diary Study; 3) two low-mid tier dishwashers made by two brands, Whirlpool and General Electric, collectively representing approximately 70 percent of the dishwasher installed base; 4) use of the standard features on the two consumer relevant machines without artificially disabling features; and 5) a more consumer relevant inlet water temperature of 120°F that is in compliance with the U.S. Consumer Products Safety Commission (CPSC).

[9] The advertiser's stain application process and drying method consisted of 6 grams of oatmeal and 4 grams of pasta applied to a clear, glass plate (similar to those in RBI's television commercial) and then drying the plates in an oven for one hour at 175°F, with the plates being scraped to remove large food particles after drying and cooling.

[10] Citing the advertiser's statement: "This drying method simulates a consumer-relevant situation wherein a consumer who might heat up pasta or oatmeal on a plate in the microwave and wherein the pasta and oatmeal would

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 5

that heating up pasta or oatmeal for a short time in a microwave is not analogous to heating a plate with a small amount of food (10 grams) at 175°F given that the degree of adhesion from normal heating of food in a microwave is substantially less than that which occurs with lengthy oven heating. The challenger added that its replication of Reckitt Benckiser's test method showed that 10 grams of pasta and oatmeal baked at 175°F rendered the food completely inedible, noting that consumers neither bake pasta and oatmeal residue on their plates in an oven for one hour at 175°F nor microwave it to the point of being inedible. Moreover, the challenger added, the advertiser could have built the microwave heating (if heating the soil for a short time in a microwave might be relevant in some instances) into its protocol since microwaving food is much faster than baking it for one hour. Further, Procter & Gamble maintained that torture test conditions, though appropriate in some circumstances to show a difference between the products, were not depicted in the challenged television commercial, which showed only a normal dishwashing situation thus, other than a short reference to "stuck on starchy foods," consumers would not construe the television commercial as one depicting an extreme cleaning test (food baked on glass plates at 175° for one hour). The challenger averred that its test protocol, which allows soiled dishes to air-dry overnight, is consistent with its Habits and Practices Study data, consumers' soil exposure prior to dishwasher use and with soil preparation protocol described in the widely accepted Association of Home Appliance Manufacturers (AHAM-DW1) method designed to evaluate dishwasher performance.

The challenger also contended that it replicated the advertiser's testing using oven and air drying and noted that air drying shifted the test results dramatically in favor of Cascade Gel (improvement from a cleaning grade of 6.4 [oven drying] for pasta to a cleaning grade of 9.4, and for oatmeal, it improved from a cleaning grade of 3.2 [oven drying] to 7.2).[11] Procter & Gamble maintained that it further confirmed these test results by conducting another set of tests using Reckitt Benckiser's protocol by changing the soil exposure to air drying with an inlet water temperature of 120°F which showed no statistically significant difference for pasta (9.8 [Cascade] v. 9.4 [Electrasol]) whereas for oatmeal, Cascade Gel cleaned the soil at a grade of 7.4 while Electrasol 2-in-1 Tabs cleaned the soil at a grade of 9.2, a non-significant performance difference given that consumers in the Procter & Gamble consumer preference study were unable to differentiate an air-dried plate washed with Electrasol 2-in-1 Tabs and one washed with Cascade Gel. Moreover, consumers in the study[12] were shown the two representative plates in

---

more steadfastly adhere to the plate. Testing the stains under these vigorous conditions later helped to draw out differences between the products."

[11] The Whirlpool Quiet Partner II [DU 960] ("Whirlpool QPII") was used at 130°F and 40 grams of ASTM ballast soil were used. Grading scale for testing is 0-10 (10 = complete soil/residue removal; 0 = no soil/residue removal) and the average grade was based on evaluation by 5 experienced graders. "S" = Statistical Significance at 95% confidence. Statistically significant results were achieved for oven baking (pasta: 6.4 [Cascade] v. 9.4 [Electrasol]; oatmeal: 3.2 [Cascade] v. 9.4 [Electrasol]) and for air drying of oatmeal (7.2 [Cascade] v. 8.9 [Electrasol]).

[12] The challenger stated that its Consumer Preference Study consisted of 28 representative consumers and used the Whirlpool QPII, ASTM ballast soil, an inlet water temperature of 120°F and (most importantly) the soil was air dried using clear, glass plates, similar to those shown in the challenged television commercial. In addition, representative glass plates were chosen and shown to consumers in normal, consumer relevant kitchen lighting

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 6

normal kitchen lighting and then asked, "Which dish is cleaner or are they equal?" Eight chose Cascade Gel, eight chose Electrasol Tabs and 12 had no preference thus, while the test results may be statistically significant on oatmeal, differences in both spaghetti and oatmeal soil removal were not consumer noticeable, and therefore, not consumer relevant.

2.    *Ballast Soil*

The challenger maintained that it used a consumer relevant ballast soil (loose soil in a dishwasher) consistent with its National Soil Load Diary Study and the USDA Daily Food In-Take Studies[13], as opposed to the advertiser's use of a non-consumer relevant ASTM standard ballast soil comprised solely of powdered milk and margarine. Procter & Gamble argued that a consumer relevant amount and composition of a ballast soil are important in ensuring the reliability of dishwasher cleaning data, especially where carbohydrate soils are used in the demonstration tests. The ballast soil exhausts some of the chemistry of the detergent and appropriately stresses the test conditions to demonstrate the robustness of the detergent. In addition, where carbohydrate is the only soil in the advertiser's demonstration, the lack of a representative amount of carbohydrates in the ballast soil gives the advertiser an artificial advantage on carbohydrate cleaning since the nine grams of carbohydrates remaining after

within the Procter & Gamble Consumer Village, which replicates lighting conditions in consumers' homes. The results are as follows:

| Plates | Plate 1A7 – Avg. Expert Grade (Cascade) | Average Test Grade (Cascade) | Plate 1B1 – Avg. Expert Grade (Electrasol) | Average Test Grade (Electrasol) |
|---|---|---|---|---|
| Spaghetti | 9.75 | 9.75 | 9.2 | 9.38 |
| Oatmeal | 7.60 | 7.36 | 9.0 | 9.19 |

*Grading scale for testing is 0-10 where 10=complete soil/residue removal and 0=no soil/residue removal. Average grade based on evaluation by 5 experienced graders. "S" = Statistical Significance at 95% Confidence.

[13] The challenger noted that the USDA Daily Food In-Take Studies for 1995, 1996 and 2001 show that the average consumer consumes approximately 48 percent-63 percent carbohydrates, which is consistent with the Procter & Gamble National Load Diary Study, which found that 43 percent of soils found in consumer dishwashers consisted of carbohydrates. Thus, the ASTM standard ballast soil, which contains only about 10% carbohydrates, is not representative of the composition of consumers' soil.

Comparison of ASTM Standard and P&G ASTM Ballast Soil

| | ASTM Standard Soil Composition | P&G's TMD Soil Composition | P&G Rationale for Soil Composition |
|---|---|---|---|
| Carbohydrates | 10.4% | 43% | In-line w. USDA/ P&G National Studies |
| Proteins | 7.0% | 9% | In-Line w/ ASTM Protein levels |
| Fats | 62.9% | 47% | Balance |

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 7

testing is much less than the 19 grams of carbohydrates found in the US Daily Food In-Take Studies.[14]   The challenger also contended that the ingredients in its ballast soil are more representative than those in the National Soil Load Study and unlike the advertiser, it ensured that the relevant levels of soil types,[15] including carbohydrates, were present in the wash during testing.

### 3.      Dishwasher Model

Procter & Gamble maintained that its own testing, using dishwashers that the majority of consumers purchase (70 percent; Whirlpool 920 (35% of the marketplace) and the GE 500 (approximately 34% of 2002 US sales)) was more inclusive and consumer relevant than that of Reckitt Benckiser, whose testing represents only 35 percent of the marketplace.[16]  The challenger added that the advertiser's testing with one type of machine is insufficient to make broad superiority claims where the challenger's test data show that Cascade Gel is equal to or better than Electrasol 2-in-1 Tabs.

### 4.      Dishwasher Setting

The challenger argued that the advertiser did not select a dishwasher setting appropriate for "hard-to-clean…regular tableware" noting that the advertiser's test sample qualifies as one that is "hard-to-clean" pursuant to the dishwasher's instruction manual.   In addition, Procter & Gamble maintained that Reckitt Benckiser mechanically disabled the machine's soil level sensor that would have allowed the main wash cycle to be extended thereby lowering the effectiveness of the machine to below that of a dishwasher which only has a standard pre-rinse thereby yielding artificial, non-consumer relevant results.[17]  As a result, Procter & Gamble

---

[14] The challenger pointed out that advertiser's nine grams of carbohydrate soil is calculated as follows: the advertiser's protocol uses 10 grams of test soil carbohydrates (4 grams of pasta and 6 grams of oatmeal), nearly half of which is "scraped off" prior to washing which then leaves approximately 5 grams of the test soil carbohydrate that goes in the wash to which is added about 4 grams of carbohydrates from the advertiser's ASTM standard soil (40g x 10.4% = 4.16g), hence the 9 grams of total carbohydrates.  The challenger added that it uses 22.2 grams of carbohydrates in its testing (40g x 43% = 17.2 grams + ~5 grams of test soil = 22.2 grams) and showed the breakdown in carbohydrates for the US Daily Food In-Take Studies [Range: (40g x 63%) = 25.2 grams to (40g x 48%) = 19.2 grams], both amounts falling within the range of carbohydrates recommended in the U.S. Daily Food In-Take Study (19.2 to 25.2 grams) thus are more representative of the amount of carbohydrates a consumer would clean at home.

[15] The challenger's soil ingredients include the following: egg, soft cheese, hard cheese, chili, white bread, corn flakes, mashed potato, corn, spaghetti, spinach, lettuce, cream sauce, chicken nuggets, beef gravy, chicken soup, strawberry jam, model beef fat and margarine.

[16] This figure is based on US dishwashers installed in homes as of 2002 according to a study in the September 2003 edition of *Appliance Magazine*.  The magazine stated that consumers use a variety of dishwashers, with the share percentage of the most common brand of dishwashers divided as follows: Whirlpool – 35 percent; General Electric – 34 percent; Maytag – 16 percent; Kitchen Aid – 15 percent.  In addition, it stated that among these various brands, 26 percent of consumers have a top-tier model, 57 percent own a mid-tier model and 14 percent own a low-tier model.

[17] Reckitt Benckiser used a Whirlpool QPII for its testing which has five wash cycles (Quick Wash, Light Wash, Normal Wash, Heavy Wash and Pots & Pans).  The Whirlpool QPII instructions manual offers the following information for the various wash cycles: normal wash – "Use this cycle for loads with normal amounts of food soil.

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 8

determined, its testing is more consumer relevant because the dishwashers it used are more prevalent in U.S. homes, it used the dishwashers as they were intended (did not mechanically disable any of the features of the dishwashers) and its test results show parity on oatmeal in the GE 500 dishwasher and superiority on oatmeal for Cascade Gel in the Whirlpool 920 dishwasher.

### 5.     Inlet Water Temperature

The challenger maintained that its inlet water testing temperature (120°F) is consistent with recommendations by the U.S. Consumer Products Safety Commission (document # 5098), which urges all users of tap water to lower their water heaters to 120°F to avoid scalding incidence of children and elderly adults, as well as with public housing codes for a number of states.

In conclusion, the challenger contended that its test results, using the five consumer relevant elements, show both products performing at parity on pasta and oatmeal using the GE 500.[18] In addition, testing on oatmeal using the Whirlpool 920 in the same conditions revealed that Cascade Gel has a statistically significant advantage over Electrasol (pasta -- Cascade Gel received a grade of 9.81 soil removal using a 10 point scale, where 10 = complete soil/residue removal and 0 = no soil/residue removal v. Electrasol 2-in-1 Tabs which received a grade of 9.81 soil removal; oatmeal — Cascade Gel received a grade of 7.6 soil removal [s][19] v. Electrasol 2-in-1 Tabs which received a grade of 6.93 soil removal).

Advertiser's Position:

The advertiser maintained that the representations in the television commercial visuals are supported by consumer-relevant testing demonstrating that Electrasol is statistically superior to Cascade based on consumer-noticeable differences between the plates washed with both products.[20] The advertiser also asserted that it has additional claim support in the form of tests

---

(The energy-usage label is based on this cycle)"; heavy wash – "Use this cycle for loads with heavy food soil"; pots & pans – "Use this cycle for heard-to-clean, heavily-soiled pots, pans, casseroles, and regular tableware." The Whirlpool QPII instruction manual also describes the critical functions of the pre-rinse cycle and the soil level sensor: "Use this [pre-rinse] cycle for hard-to-clean, heavily-soiled pots, pans, casseroles, _and regular tableware_....Your electronic dishwasher senses the soil level on your dishes. Soil level determines the length of some cycles, the amount of heat added to a wash or rinse, and the number of washes and rinses in a cycle. Cycle time depends upon the soil on the dishes, and water usage may be higher for larger amounts of soil."

[18] Eights reps. were completed and the grading scale for the test is 0-10 (10 = complete soil/residue removal; 0 = no soil/residue removal). The average grade is based on evaluation by 5 experienced graders. The results were as follows: pasta – Cascade Gel received a grade of 10 soil removal v. Electrasol 2-in-1 Tabs which received a grade of 9.96 soil removal; oatmeal – Cascade Gel received a grade of 8.58 soil removal v. Electrasol 2-in-1 Tabs which received a grade of 8.64 soil removal.

[19] "S" = Statistical Significance at 95% Confidence.

[20] The plates were placed on a black background using a MacBeth Lightbox to simulate normal daylight conditions. The testing was blinded as the plates were coded. A stained (unwashed) dinner plate served as a control. The following questions were asked of the panelists: Is there starch residue remaining on the dinner plate? Yes or No (NOTE: an answer of "No" will be given a rating of 0); If yes, please rate the amount of residue on a scale of 1 to 10 (1 = extremely slight residue; 10 = extremely heavy residue (unwashed control)). After an

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 9

for automatic dishwasher cleaning using the German Industrial Association of the Manufacturers of Toiletries and Detergents (IKW) test methodology, which is widely accepted in the dishwashing industry.

As an initial matter, the advertiser noted there is no uniformly recognized US cleaning test methodology for the automatic dishwashing category thus autodish detergent manufacturers formulate their own standardized, consumer relevant test methodologies to compare dishwashing products.[21] Reckitt Benckiser maintained that its stain application process and drying method for stains simulate consumer conditions.

Reckitt Benckiser argued that its testing protocol is consumer-relevant as neither the water temperature, dishwasher model, ballast soil, soil exposure method nor dishwasher setting, which differ from those in Procter & Gamble' testing, affect the reliability of Reckitt Benckiser's test results. The advertiser also remarked on the parity data generated by the challenger's testing, averring that even if the challenger's test methodology were deemed consumer-relevant, parity results cannot overturn its superiority data resulting from equally acceptable test methodology.[22]

Concerning the water temperature used, the advertiser relied on the water temperature recommended in ASTM method D 3556-85 (130°F (+/- 5)) which it argued is consumer relevant and is consistent with dishwashing manufacturers' recommendations. The advertiser noted that the GE and Whirlpool websites acknowledge that water temperatures greater than 120°F may enter consumers' dishwashers. Reckitt Benckiser argued that using a higher water temperature than that used by the challenger (120°F), if anything, puts Electrasol at a disadvantage since it is an enzyme-based product and would benefit Cascade, which is not an enzyme-based product, noting that higher temperatures (greater than 122°F) would improve Cascade's performance by leaving fewer stains on the plate.[23]

independent evaluation of the oatmeal and pasta stains, the following results, at a 95 percent confidence level, were reported:

|  | Electrasol | | Cascade | |
| --- | --- | --- | --- | --- |
|  | Pasta | Oatmeal | Pasta | Oatmeal |
| Mean Average | 0.04 | 0.05 | 2.59 | 2.84 |

[21] The advertiser noted that there is a widely accepted standard methodology, ASTM Method D 3556-85 (Deposition on Glassware During Mechanical Dishwashing), to test spotting and filming on glassware in the dishwashing category. The advertiser explained that its test protocol uses a readily available Whirlpool dishwasher model in a normal dishwashing cycle, with typical water hardness and detergent dosing as per each product's label instructions. The soils consist of readily available brands of pasta and oatmeal and includes a "ballast soil," that simulates typical dishwashing conditions wherein additional soils are loosened in the dishwasher, adding that it looked to ASTM Method D 3556-85 to create and add the ballast soil.

[22] Citing Bruce Buchanan and Ronald H. Smithies, *Substantiating a Parity Position*, JOURNAL OF ADVERTISING RESEARCH (1989).

[23] The advertiser explained that enzymes are typically not as effective at higher temperatures (greater than 122°F) thus higher temperatures would improve Cascade's performance as it would leave less stains on the plate. It also cited to Procter & Gamble's dishwashing manufacturer partner, Whirlpool, who recommends in its "Dishwasher Shopping Guide" that "[o]ptions that add heat and boost the water temperature in the final rinse or main wash are suggested for added cleaning performance" (emphasis added) and to General Electric, the manufacturer of one of the dishwashers used by Procter & Gamble, who states in its "GE Answer Center" on its website that "[t]he entering water must be at least 120 degrees Fahrenheit and not more than 150 degrees Fahrenheit for the best cleaning...."

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 10

As to the dishwasher models used, the advertiser noted that the challenger used GE 500 and Whirlpool 920 and that it used Whirlpool's Quiet Partner II dishwasher, a mid-priced, readily available model (at national dishwashing retailers, e.g., Sears) which is typical of consumer use. Referring to Procter & Gamble's own data, Reckitt Benckiser stated that Whirlpool is the market leader thus the use of Whirlpool Quiet Partner II is entirely consumer-relevant and does not ____ ___ ____ __ _____ _____ Moreover, it is unclear how much the GE 500 and the

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 11

low or restricted carbohydrate diets and lifestyles which result in decreased carbohydrate intake.[26]  Thus, Reckitt Benckiser averred, its ballast soil mix is likely more consumer-relevant than that of Procter & Gamble.

Concerning soil exposure, the advertiser maintained that its method of drying plates in an oven is no less consumer-relevant and does not constitute a "torture test" given that the food was heated at 175°F, which is substantially below the boiling point of water and that microwaves regularly leave food bubbling and boiling when reheated.  Moreover, it argued that oven baking is part of an internationally accepted protocol in the dishwashing industry, as well as other industry cleaning protocols, that has been used by Reckitt Benckiser for many years to test automatic dishwasher cleaning, a protocol that Procter & Gamble was involved in as part of the working group in Europe, thus it is unclear as to how the reliability of test results would be compromised by adhering to such protocols.[27]  Reckitt Benckiser argued that the challenger's failure to submit the "P&G Consumer Habits and Practices Study," upon which it bases its method of soil exposure (oatmeal and pasta stains were applied to the plates and then air dried overnight), precludes it from addressing the challenger's contention that its "soil exposure" method is more consumer-relevant.[28]  Reckitt Benckiser argued that changing its protocol to air-drying does not give Cascade superiority as Procter & Gamble's test data is not strong enough to defeat Reckitt Benckiser's claim and that the challenger's additional modifications to the advertiser's protocol (reducing the water temperature to 120°F and using the air-drying method only) resulted in parity results (directionally in favor of Electrasol) on pasta and superiority in favor of Electrasol on oatmeal.  In addition, the advertiser contended that its "soil exposure" method may be more consumer-relevant because it simulates a consumer-relevant situation of a consumer heating up pasta (lasagnas), casseroles or oatmeal on a plate in the microwave thereby creating stuck-on starchy stains, a robust testing condition that helps to differentiate between the two products.  The advertiser added that many foods now provide for "reheat and ready" food preparations since consumers use microwaves to prepare and reheat foods on plates which justifies why plates are often labeled "microwave and oven safe" as today's dishware is designed for such purposes.  Thus, the adhesion that a consumer would experience from heating up a plate in the oven simulates heating up a plate in the microwave.  Further, as to the challenger's contention that the advertiser's soil application method rendered the pasta "inedible," the advertiser maintained that

---

[26] Reckitt Benckiser noted that the Center for Nutrition and Policy and Promotion is in the process of accepting public comments on the USDA's Food Guidance System (also known as the Food Guide Pyramid) to update consumers' food intake patterns. (See www.usda.gov/cnpp/pyramid-update.com).

[27] The advertiser noted that two industry standard tests, Scrubber Test for Measuring the Removal of Lime Soap (CSMA DCC-16/Part 2) and Standard Guide for Testing Cleaning Performance of Products Intended for Use on Resilient Flooring and Washable Walls (ASTM D4488-89), use oven-drying as a method to simulate the adherence of typical household stains.  Reckitt Benckiser disputed the challenger's argument that air-drying is more appropriate because it is consistent with the Association of Home Appliance Manufacturers' method, noting that this test is not dispositive as it was designed by dishwasher manufacturers (with no detergent manufacturer participation, unlike the IKW test with which the challenger was involved) to measure the performance of their machines only, independent of the type of detergent used, and was not designed to compare the performance of specific dishwashing detergents.

[28] The advertiser also mentioned that the challenger often co-markets its Cascade products with Whirlpool dishwashers, averring that the challenger would not advertise this partnership if it was not confident that the Quiet Partner series were consumer-relevant as it would be counter-productive to its co-marketing campaign with Whirlpool.

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 12

common household experience proves that residual food is often left on a plate when that food it heated or reheated and that this food film, which is not eaten but must be cleaned off either by hand or in a dishwasher, is exactly the kind of film (along with bits of food stuck to a plate) that dishwashing detergents are designed to remove.

As to the challenger's claim that the advertiser's television commercial denigrates the entire Cascade product line, particularly where George Jetson asks, "What's wrong with the other detergent?," the advertiser contended that this question, along with the conspicuous super ("vs. Cascade Pure Rinse Gel on pasta and oatmeal"), merely set the stage for a comparative advertising claim that is substantiated. It added that the basis of comparison is expressly limited to Cascade Pure Rinse Gel in the packaging "mock-up" (showing the Cascade Pure Rise Formula Gel's bottle shape and color) and the super (featured prominently and displaying the name of the product).[29] It further disagreed with the challenger's contention that "visible chunks of food" were displayed, noting that the residue shown on the plate that was held up by George Jetson is consistent with the pasta and oatmeal residue remaining on a dish washed with Cascade in its testing. The advertiser also defended the comparison of its product versus Cascade Pure Rinse Formula Gel, as opposed to Cascade 2-in-1 Action Pacs™, as consumer relevant given that Cascade Pure Rinse Formula Gel is the challenger's top-selling gel, with 17.9 percent of the automatic dishwashing detergent market while Cascade 2-in-1 Action Pacs™ comprise only 5.7 percent of the same market.

The advertiser also argued that its product demonstration, where the pasta and oatmeal stains are "call[ed] out" is consistent with its testing, in which the actual plates stained with pasta and oatmeal were cleaned with both products the results of which (using daylight conditions and no "rotation" of plates) showed visibly different and consumer-noticeable stain residue on the plates washed with Cascade. Reckitt Benckiser maintained the pictorial is appropriate in consideration of the context of the commercial and the frame complained of, namely a cartoon animation where a computer evaluates stains in a futuristic setting.[30]

*Response to the Challenger's reply*

In response to the challenger's reply, the advertiser maintained that the challenger has submitted additional new data which serve as variations of prior arguments and that it has mostly submitted only parity data to support its argument for removal of the commercial, despite its effort to "tweak" Reckitt Benckiser testing protocol. Reckitt Benckiser averred that regardless of the consumer relevance of Procter & Gamble's test methodology, parity data is insufficient to defeat a superiority claim and overturn superiority data resulting from equally acceptable test

---

[29] Reckitt Benckiser expressed concern for the challenger's product line denigration claim, arguing that the challenger's recent print advertising, claiming "superior cleaning power" while referencing many Cascade products or not clarifying the basis of comparison, advances a superiority line claim (all Cascade products versus all Electrasol products).

[30] The advertiser averred that commercials frequently use "supplementary" methods to illustrate dishwashing results to consumers, citing one of the challenger's Canadian commercials for Cascade's Pure Rinse Formula in which an iodine test was utilized to highlight results after dishwashing.

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 13

methodology. Moreover, much of the challenger's new data, particularly on oatmeal, demonstrates that Electrasol is superior to Cascade, thus it is unclear as to how this data could justify removal of the challenged television commercial.

The advertiser argued that the challenger is "cherry picking" the elements of Reckitt Benckiser's protocol that it knows will work in its favor (e.g., use of the Whirlpool QPII, use of the ballast soil) and disregarding the consumer-relevant elements of the protocol that hinder Cascade's performance, adding that the absence of a consumer preference study paneling plates that were tested using Reckitt Benckiser's protocol indicates that the challenger understands that Reckitt Benckiser's consumer-relevant protocol produces statistically significant and consumer-noticeable results in favor of Electrasol. Reckitt Benckiser maintained that Procter & Gamble's consumer data is seriously misleading for several reasons: 1) Procter & Gamble did not let consumers look at all of the glass plates washed with Cascade and Electrasol, picking two glass plates to show to consumers; 2) The criteria used to select those particular plates was not specified (a proper test would have allowed the consumers to view a variety of plates); 3) "consumer relevant kitchen lighting" is not defined, noting that lighting could also contribute to dramatically different results. Referring to the challenger's photographs of the plates shown to consumers, the advertiser maintained that the visibility of the stains on the photographs is irrelevant because "camera-noticeable" does not equate to "consumer-noticeable" and that the pictures appear to involve substantially different lighting in the before and after photographs, based on the reflection of light off the plates. Moreover, the consumer data is not necessarily valid because Procter & Gamble polled only 28 consumers, and many of the details outlined above are omitted. Moreover, with respect to oatmeal, there is a two-point difference in score between Cascade and Electrasol on oatmeal, a difference which is considered per se consumer-noticeable in the research and development community.[31]

Decision:

    A.   Product Line Denigration: "These clean dishes [cleaned with Cascade] are still dirty"; "What's wrong with the other detergent [Cascade]?"[32]

The challenger argued that the advertiser's commercial denigrates the entire Cascade Line because the advertiser failed to explicitly reference Cascade Pure Rinse Gel in the product demonstrations, thus communicating the misleading message that the entire Electrosol product line is superior to the entire Cascade product line. The advertiser contended that the question, "What's wrong with the other detergent?," along with the conspicuous super ("vs. Cascade Pure Rinse Gel on pasta and oatmeal"), set the stage for a substantiated comparative advertising claim.

[31] Reckitt Benckiser also criticized one of the questions posed in the Procter & Gamble study, "Which dish is cleaner or are they equal?," which it argued naturally leads consumers to the parity response without giving them an option to grade the performance (judge the starch residue) of either product, which is dramatically different from how Reckitt Benckiser posed the question to its panel (paneling all of the plates washed with Cascade and Electrasol and asking the questions: Is there starch residue remaining on the dinner plate? Yes or No. NOTE: an answer of "No" will be given a rating of 0. If yes, please rate the amount of residue on a scale of 1 to 10 (1=extremely slight residue; 10=extremely heavy residue (unwashed control)).
[32] The challenger noted that while Cascade Pure Rinse Gel is not directly named on the product mockup (product is labeled "Dishwashing Gel"), it maintained that Cascade Pure Rinse Gel is the intended object of comparison.

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 14

In analyzing advertising involving product denigration, NAD must carefully balance a company's right to truthfully tout the characteristics of its product in a comparative context against a competitor's right not to have its product falsely disparaged.[33] NAD has consistently held that claims that expressly or implicitly disparage a competing product should be carefully scrutinized to ensure that they are truthful, accurate and narrowly drawn.[34] In determining whether a line claim is communicated in an advertisement, NAD typically looks to several factors including the following: 1) if one variety of product is being featured in the advertisement, whether the audio limits the applicability of the performance claims being made; 2) whether general brand references are being made throughout the commercial that may potentially cause consumer confusion as to the relevance of the claims to the other products in the line; 3) whether the "beauty shot" showing the company's line of products serves to reinforce the extended applicability of at least some of the claims; and 4) whether some of the claims relate to specific product attributes that are also characteristics of the other varieties in the product line.[35]

NAD determined that, absent reliable perception evidence, it could not conclude that the commercial denigrated the *entire* Cascade line of dishwashing detergents. After George Jetson asks, "What's wrong with the other detergent?," the advertiser quickly shows a green bottle that is labeled, "Dishwashing gel." The super attempts to limit the basis of comparison to Cascade Pure Rinse Gel, but NAD noted that the animated nature of the commercial can potentially distract consumer attention away from the super, adding that Cascade Pure Rinse Gel is not the only gel product in the Cascade product line.[36] In order to avoid the potential for consumer confusion, NAD recommended that the advertiser make the basis of the comparison easier to notice and understand. However, NAD did not consider that the entire product line was implicated given that there is no "beauty shot" of the entire Cascade product line,[37] no general brand references are made in the commercial and only general product attributes (i.e., cleaning ability of the product) are referenced. Taken together, NAD determined that a consumer is not likely to interpret the commercial as referencing Cascade's entire line of dishwashing detergents.[38]

B.   Product Performance/Demonstration Claims: "These clean dishes [cleaned with
     Cascade] are still dirty"; "What's wrong with the other detergent [Cascade]?"

---

[33] Wm. Wrigley Jr. Company (Orbit Gum). Report #4102, *NAD Case Reports* (October 2003).
[34] Sherwin-Williams Company (Krylon Paints), Report # 3988, *NAD Case Reports* (December 2002).
[35] Schering-Plough Healthcare (Tinactin Pump Spray Athlete's Foot Treatment), Report #3723, *NAD Case Reports* (January 2001).
[36] Cascade Complete is the other gel product in the Cascade product line.
[37] The other Cascade products are as follows: Cascade Scent Expressions [similarly shaped in red, blue and orange bottles]; Crystal Clear with ShineShield [blue and white bottles not similarly shaped]; Cascade Plastic Booster [red and white tube]; and Cascade 2-in-1 Action Pacs™.
[38] Hardee's Food Systems, Inc. (Hardee's Fried Chicken), Report #3087, *NAD Case Reports* (January 1, 1994) (noting that "[a]n advertiser is entitled to select the target of its comparative advertising provided the target is clearly identified. However, when targeting only one item in a line of products, particularly when there is a more closely resembling product in that line...the advertiser's obligation concerning identification goes further: it must take into consideration the method and placement of that disclosure").

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 15

> "That gel [Cascade] leaves more stuck on starchy foods than Electrasol. Only Electrasol has Jet-Dry for dishes that are more than washed: they're Power-Washed."

In the absence of reliable consumer perception evidence, NAD routinely steps into the shoes of the consumer to determine what messages are reasonably conveyed by the challenged advertising.[39] NAD determined that one reasonable interpretation of the reference to what is "wrong" with Cascade's Pure Rinse Gel is that it is less efficacious than Electrasol 2-in-1 Tabs. This interpretation is supported by the express language of the voice-overs, George Jetson's statement ("these dishes are still dirty") and his question ("What's wrong with the other detergent?") and by the demonstration in the commercial.

Since the demonstration is a key component of the commercial, NAD reviewed it to determine whether it supported this interpretation. NAD has held that a product demonstration is an effective and creative way for advertisers to highlight product differences, and where it depicts how products actually perform, it should be carefully designed to prevent a misleading or exaggerated comparison.[40]

While displaying the dish that was just cleaned by the other detergent, the robot proceeds to draw lines around the remnants of food that were not cleaned off, to "call out," or highlight, the unclean parts of the plate. NAD determined that even though it is clear that the thick yellow highlights are not themselves left-over food stains, this highlighting, where it is difficult for the consumer to see details on the plate, creates the impression that the stains are larger and more visible than they really are. It is unclear whether the entire highlighted area is a solid stain or a cluster of small stains close in proximity, nor is the consistency of the stain readily apparent (lumpy, stuck-on stain or residue film). The consumer only sees the size of the soiled portions of the plate marked by the "call out." As such, a reasonable consumer takeaway is that the referenced "other detergent" is generally less efficacious in cleaning dishes.

Because NAD determined that the commercial conveys an overall "less efficacious cleaning" message vis-à-vis the challenger's product, it then looked to the advertiser's testing to determine if the demonstration accurately depicts the cleaning ability of both products. As always, in an NAD proceeding, an advertiser has the burden of establishing a reasonable basis for its claims and, if it does so, the burden shifts to the challenger to show that it has better data demonstrating

---

[39] Sherwin-Williams (Krylon Paints), supra note 34.

[40] Playtex Products, Inc. (Baby Magic Instant Protection Sunblock), Report #4121, NAD Case Reports (December 2003); see also S.C. Johnson & Son, Inc. (Shout Oxy Power Multi-Purpose Stain Remover), Report #4047, NAD Case Reports (May 2003) (demonstration in a television commercial was presented as visual proof of how the products actually perform, namely a dramatic difference in the ability of the products to remove stains [grape juice stain treated with Oxy Power was shown to totally remove stain whereas grape juice stain treated with OxiClean was still visible]); The Procter & Gamble Company (Bounty Paper Towels), Report #3873, NAD Case Reports (February 2002); The Procter & Gamble Company (Crest® Dual Action Whitening Toothpaste), Report #3874, NAD Case Reports (September 1998) (noting that "[d]emonstrations, by definition invite the viewer to rely on their own perception for actual objective proof of the claim. Such advertising techniques are permissible provided that they accurately reflect how the advertised product works...[and] do not use undisclosed mock-ups or potentially embellishing devices to create in the mind of the consumer attributes that the product does not have").

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 16

a different result or that the advertiser's substantiating evidence is materially flawed.[41] In order to produce meaningful results for the purpose of claim support, product testing should be conducted under consumer relevant conditions, using accepted methodology and protocols, and should relate directly to the advertising claims.[42] Moreover, where, as here, there is no industry standard for the automatic dishwashing category, testing should be reliable, accurate, repeatable and reflect consumer use.[43]

Of the five test elements cited by both parties (soil exposure, ballast soil, dishwasher model, dishwasher setting and inlet water temperature), NAD focused primarily on the most determinative and potentially problematic ones, namely soil exposure and dishwasher setting. These testing components, by focusing on the adherence of the soil to the plates and the degree of cleaning (normal cycle v. heavy duty cycle), directly address product performance especially given the reference to "stuck on starchy foods" in the challenged commercial. NAD assessed these test elements to determine whether they are consumer-relevant and accurately reflect the cleaning situation presented in the commercial or reflective of real world consumer use in general.

The advertiser relied on test methodology of the German Industrial Association of the Manufacturers of Toiletries and Detergents (IKW)[44] as support for its soil exposure method, namely oven heating of the plate for one hour at 175°F. The IKW protocol includes cleaning of various types of soils, such as minced meat, milk, starch mix and porridge. Given that "stuck-on starchy foods" is referenced in the challenged commercial, NAD looked to the IKW's test method for a "starch mix." The protocol states that after the preparation and application of the starch mix on glass plates, the plates were left to dry overnight and then placed in plastic racks and allowed to continue drying for four hours at 80°C (176°F) in a "thermal cabinet" (similar to an oven) after which they were allowed to cool for at least one hour.[45]

NAD acknowledged that the starch solution referenced in the IKW protocol consists of a primarily liquid mixture (.65 percent is actual starch) which necessitated heating for four hours in order to remove the excess water. However, this fact notwithstanding, NAD determined that the advertiser's soil exposure method (oven heating of plates for one hour at 175°F) is not indicative of ordinary consumer use.[46] Although ovens and microwaves may be used to cook or

---

[41] Shell Oil Products, US (Shell Gasoline), Report # 4142, *NAD Case Reports* (February 2004).

[42] Wyeth Consumer Healthcare, Inc. (Caltrate), Report #4153, *NAD Case Reports* (March 2004).

[43] The Hoover Company (Hoover SteamVac Widepath (Upright Deep Cleaner), Report #3848, *NAD Case Reports* (December 2001).

[44] In the introduction to its test protocol, the IKW states that is a "work group of mechanical dishwashing experts…set up…to choose appropriate soiling methods from current practice in order to determine the cleaning performance profile of automatic dishwashing detergents." However, NAD focused on whether the protocol accurately reflects the cleaning situation depicted in the commercial.

[45] The heating for thermal cabinet to dry at 80°C for *at least* one hour, which most closely mirrors the advertiser's protocol, occurs after the *wash* test.

[46] Andersen Corporation (Andersen Patio Doors Campbell), Report #3395, *NAD Case Reports* (July 1997) (noting that "torture tests" can only be used if they illustrate what typical product performance would be in the described circumstance or disclose to consumers that depicted product performance is "atypical"); Blue Coral/Slick 50 (Black Magic Professional Protectant), Report #3346, *NAD Case Reports* (November 1996) (noting that if results of a

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 17

reheat food, foods heat at varying times and degrees of intensity depending on the heating medium (oven or microwave). The advertiser has produced no consumer study to showing that consumers typically *reheat* a plate of food for one hour at a time, even at a (relatively) low heating temperature of 175°F. NAD noted that baking the food onto a plate causes the food to crust onto the plate in a more severe manner than if the food air-dried onto the plate. Moreover, the amount of soil tested directly impacts upon the degree to which the stains bond to the plates, and 10 grams of a starch mixture, even if spread uniformly[47], will leave a thin film on the plate and, together with the lengthy cooking time (one hour), results in a more tenacious, cooked-on soil. It is undisputed that a tough, cooked-on soil is not depicted in the animation of the dirty dish in the commercial, which shows left-over food (presumably from a meal that George Jetson recently ate) that is about to be washed. Accordingly, the advertiser's soil exposure test method is materially flawed and not an accurate reflection of consumer use depicted in the commercial or reflective of real world consumer use in general.

NAD turned to the issue of dishwasher setting, namely whether the advertiser's use of the normal cycle was consumer relevant and, therefore, produced meaningful results.[48] NAD determined that the advertiser's use of the "normal cycle" was not appropriate given that the baking of the soiled plates for one hour at 175° F produces a tough, baked-on soil for which the "hard-to-clean...regular tableware" setting, as described in the Whirlpool dishwasher instruction manual, would be more appropriate.[49] NAD acknowledged the advertiser's Attitude and Usage Study, showing that 69% of consumers questioned choose the "normal" cycle. However, NAD found this study did not address a cleaning situation in which soiled plates were heated as in the advertiser's testing. Thus, this study does not support the advertiser's argument that its use of the normal cycle was appropriate to support the demonstration depicted.

NAD also considered the remaining elements of the advertiser's test methodology (ballast soil, dishwasher model, inlet water temperature) though these elements have less bearing on the appropriateness of the test methodology. NAD had concerns about the consumer relevance of the ballast soil. While NAD is aware of and agreed with the advertiser's account of the low or restricted carbohydrate dietary trend, the advertiser's reliance on this recent dietary trend to justify the significantly lower carbohydrate content in its ballast soil (10.4 percent carbohydrates as compared to the advertiser's 43 percent carbohydrates[50]) is seemingly contradictory in light of

---

[47] "torture test" are used as claim support, it must be made clear that the results are from a torture test and are not typical/average results that consumers can expect to experience).

[47] The advertiser's test protocol advises to apply each soil in an oval shape (same size for each soil) whereas the IKW protocol advises to apply the soil and distribute it "uniformly by swilling it over the inner surface" which would presumably result in a more circular stain thus potentially comprising a larger area of the plate than oval stains.

[48] As to the challenger's contention that the advertiser disabled the sensor function of the dishwasher, though NAD agreed with the challenger that consumers generally do not disable the sensors in their dishwashers, NAD determined that there was no evidence on the record showing that the advertiser, in fact, disabled the sensor on the dishwasher.

[49] NAD noted that the IKW protocol's reference, in the starch mix portion, to the use of the "heavy-duty cycle in a household dishwasher" in the absence of a laboratory dishwasher refers to the pre-washing of dishes. The actual cleaning cycle used was the normal wash cycle.

[50] NAD noted a discrepancy in the advertiser's National Load Diary Study, upon which it relied to formulate its ballast soil, particularly as to carbohydrates. The study, which states that 43 percent of the soiled plates comprised

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 18

its use of carbohydrate-rich stains (pasta and oatmeal) featured in its commercial and the lack of studies illustrating current dietary (particularly carbohydrate) intake. Further, the advertiser's reliance on the ASTM test method (spotting and filming on glassware) is misplaced as it is industry standard protocol, not dietary trends, that dictates the use of a low carbohydrate mixture. Moreover, the ASTM test method does not address a detergent's performance capabilities for cleaning *soiled* glass plates (as shown in the challenged commercial).

NAD was not, however, persuaded by the challenger's argument that the particular dishwasher model used by the advertiser in its testing was material. Neither party presented evidence demonstrating that any one particular dishwasher positively or negatively impacted upon the cleaning performance of the detergents at issue, which is the key issue in this challenge. The dishwashers are models of nationally recognized dishwasher manufacturers, whose market share is similar (Whirlpool – 35 percent; General Electric – 34 percent) and whose products are sold at retailers nationwide. As to the inlet water temperature, NAD determined that the advertiser's use of 130°F was appropriate based on the dishwasher water temperatures recommended by dishwasher manufacturers, adding that neither Whirlpool nor GE states that the water temperature *must* be 120°F.[51] Moreover, the Consumer Product Safety Commission's recommendation to lower water heater temperatures to 120°F relates to cost, safety and energy conservation, not to the cleaning performance of dishwashing detergents at this, or higher, water temperatures.

Based on the methodological flaws in the advertiser's testing, NAD determined that the advertiser had not provided a reasonable basis for its superior performance claims. Consequently, NAD recommended that the advertiser discontinue the statement "What's wrong with the other detergent [Cascade]?" and the accompanying "That gel [Cascade] leaves more stuck on starchy foods than Electrasol. Only Electrasol has Jet-Dry for dishes that are more than washed; they're Power-Washed" to avoid conveying a superior performance message vis-à-vis the challenger's product. For the same reason, NAD also recommended that the advertiser discontinue its comparative demonstration of the soiled plates cleaned by Cascade and Electrasol.

**Summary of Conclusions:**

---

carbohydrates, also references a table that breaks down the soils by category (percentage of protein, moisture, fat, carbohydrate from solids collected from dried wash solutions) which shows that carbohydrates comprised 29 percent of the soil.

[51] The Whirlpool Dishwasher Use & Care Guide states that the although the temperature of the water entering the dishwasher should be 120°F, it notes that the final rinse for light, normal and quick washes is 130°F, 130°F and 140°F, respectively, thus 120°F is not the water temperature throughout the cleaning cycle. Further, GE, in the "correct water dishwasher temperatures" page of its website, states that "[t]he entering water must be *at least* 120 degrees Fahrenheit and not more than 150 degrees Fahrenheit for the best cleaning and to prevent damage to the dishes." Moreover, the Association of Home Appliance Manufacturers' Standard for Safety, Household Dishwashers, to which the challenger refers, states that the water temperature should be "(140 ± 5)°F (60± 3)°C or (120 ± 2)°F for water heating dishwasher."

RECKITT BENCKISER, INC.
Electrasol® 2-in-1 Tabs with Jet-Dry PowerBall Rinse Agent
Page 19

NAD determined that the advertiser's comparative commercial does not extend to the entire Cascade line of dishwashing detergents but is limited to a comparison to Cascade Pure Rinse Gel. However, NAD recommended that the qualifying super be made easier to notice and understand. NAD determined, however, that the advertiser's evidence contained material methodological flaws and thus did not provide a reasonable basis for its superior performance claims. Consequently, NAD recommended that the advertiser discontinue the comparative product demonstration and the claims "What's wrong with the other detergent [Cascade]?" and the accompanying "That gel [Cascade] leaves more stuck on starchy foods than Electrasol. Only Electrasol has Jet-Dry for dishes that are more than washed; they're Power-Washed."

Advertiser's Statement:

Reckitt Benckiser appreciates the time and effort NAD has dedicated to this challenge. While we are disappointed with NAD's decision with regard to the protocol used for this competitive

```
ERROR: ioerror
OFFENDING COMMAND: flushfile

STACK:

-filestream-
-filestream-
-savelevel-
```

Not Reported in F.Supp.2d
1999 WL 1072492 (S.D.N.Y.), 1999-2 Trade Cases P 72,720
(Cite as: 1999 WL 1072492 (S.D.N.Y.))
c

Page  1

Motions, Pleadings and Filings

United States District Court, S.D. New York.
Mark M. EDMISTON, Plaintiff,
v.
Wilma JORDAN and the Jordan Edmiston
Group, Inc., f/k/a The Jordan Group, Inc.,
Defendants.
No. 98 Civ. 3928(DLC).

Nov. 24, 1999.

Mark A. Harmon, Karen S. Baseman, Bondy &
Schloss LLP, New York, NY, for plaintiff.

James E. Brandt, Latham & Watkins, New York,
NY, for defendants.

*OPINION AND ORDER*

COTE, J.

*1 In an effort to prevent The Jordan, Edmiston
Group, Inc. ("JEGI"), a business with which he was
formerly associated, from continuing to use his
surname as part of the firm's name, plaintiff Mark
M. Edmiston ("Edmiston") filed this lawsuit on
June 3, 1998. In an amended complaint dated
January 13, 1999, Edmiston alleges violations of the
Lanham Act, 15 U.S.C. § 1125(a)(1), and state law
against defendants JEGI and its sole owner Wilma
Jordan ("Jordan"). Defendants counterclaimed and
move for summary judgment on all counts of
plaintiff's amended complaint. For the reasons
discussed below, defendants' motion is granted as to
the federal claims.

BACKGROUND
The following facts are undisputed unless otherwise
noted. Edmiston was a high-level executive in the
consumer magazine publishing industry having
been, for example, the President and CEO of
Newsweek, Inc., until he left the industry in 1992 to
join a corporation founded by Jordan that provides
investment banking and advisory services to not
only the publishing industry, but also to the
information and "new media" or internet industries.
Jordan's company is incorporated in Tennessee and
maintains its principal place of business in New
York. Before 1992, the name of Jordan's company
was officially "The Jordan Group of Tennessee,

Inc.," although it was known in the marketplace as
"The Jordan Group, Inc." ("Jordan Group").
Edmiston joined the Jordan Group pursuant to an
agreement dated May 15, 1992 ("May 15
Agreement"). The May 15 Agreement provided that
Edmiston would receive stock in the Jordan Group
and that Jordan and Edmiston would be co-directors
and co-chairpersons. The May 15 Agreement also
vested Jordan with the option of buying back
Edmiston's stock during the month of May 1994,
and contained a covenant not to compete.

Shortly after Edmiston joined the Jordan Group,
and with Edmiston's knowledge and approval, the
company changed its name to JEGI. Although there
is contradictory evidence as to whether Edmiston
realized that the corporation's name was also
officially changed, [FN1] it is undisputed that he
participated in drafting the press release announcing
to the world on May 11, 1992 that "The name of the
company today becomes The Jordan, Edmiston
Group, Inc.", and that he thereafter presented
himself as working for JEGI.

FN1. The name change was effected through an
"Action by Written Consent of Shareholders and
Directors" ("Action by Shareholders") dated May
31, 1992, signed exclusively by Wilma Jordan as
"Sole Shareholder and Sole Director". On November
6, 1992, the State of Tennessee received the
Amended and Restated Charter of the Jordan Group,
changing the company's name to The Jordan,
Edmiston Group, Inc. Edmiston–although unable to
recall reading the Action by Shareholders–retrieved
a copy of the document from his personal home files
during the discovery period in this litigation.

Through a letter agreement dated May 26, 1994
("May 26 Agreement"), Jordan exercised her right
to repurchase Edmiston's stock. Edmiston thereafter
worked as an employee with the title of co-
chairman. The May 26 Agreement made no
reference to any name change by JEGI in
conjunction with Edmiston's change in status, and
Edmiston admits that he consented to JEGI's
continued use of his name despite his lack of
ownership interest in the corporation. The May 26
Agreement was subsequently amended several times
in certain regards; no reference was made in any of
these new agreements to the company's past or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *1 (S.D.N.Y.))

continuing use of Edmiston's name. Indeed, no written agreement exists relating to JEGI's use of Edmiston's name.

*2 In January 1998, Edmiston and Jordan began negotiating the terms of Edmiston's departure from JEGI. Although the parties were able to agree upon most of the terms relating to Edmiston's departure, JEGI's continuing use of Edmiston's name became a major point of contention. In a letter dated April 15, 1998, counsel to Edmiston emphasized that JEGI's "use of Mr. Edmiston's name is without authorization and it must cease."

In June 1998, Edmiston filed this lawsuit, and left JEGI shortly thereafter. In November 1998, Edmiston joined AdMedia Partners, Inc. ("AdMedia"), one of JEGI's main competitors, as a shareholder and managing director. AdMedia sent out a press release, announcement card, and various other promotional materials advertising Edmiston's new employment; Edmiston's departure from JEGI and relocation to AdMedia was widely reported in the industry press.

Characterizing the industry as a "personal services business," Edmiston acknowledges that it "is commonly known" within his area of expertise—the consumer magazine industry—that he is associated with AdMedia. Most of Edmiston's contacts in the industry have telephoned or written to him at AdMedia since his departure from JEGI. Nevertheless, Edmiston contends that JEGI's use of his name is likely to cause confusion and to mislead clients as to a continuing affiliation between Edmiston and JEGI. Edmiston can identify two people who had to go through "several other intermediate steps to find out where [he] was." Further, in the summer of 1999, a CEO of a publishing company who had spoken with Edmiston at AdMedia sent Edmiston a letter in care of JEGI at AdMedia's address. In addition, Edmiston speculates that there may have been business opportunities that he did not receive due to confusion as to where his loyalties lie and what responsibilities he has to JEGI; Edmiston estimates that about ten to fifteen people have asked him since he left JEGI whether he continues to be associated with that firm.

DISCUSSION

Edmiston's amended complaint sets forth thirteen causes of action. Counts seven and eight have been withdrawn. Of the remaining eleven counts, two assert violations of federal law; the remaining claims are based in state law. Defendants have moved for summary judgment on all counts of the amended complaint.

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P.; *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). In deciding whether to grant summary judgment, therefore, this Court must determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the fact in dispute is material based on the substantive law at issue.

*1. Trademark Infringement Under the Lanham Act*

*3 Edmiston asserts that the use of his name by defendants constitutes false representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which

proscribes "false designation of origin" in relation to goods or services.... Its purpose is to prevent consumer confusion regarding a product's source, and to enable those that fashion a product to differentiate it from others on the market.

*Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1220 (2d Cir.1987) (internal citations omitted). Section 43(a) provides a statutory remedy for false designation of origin even where the party claiming injury has not secured a federal registered trademark for the item at issue. *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.,* 79 F.3d 258, 262 (2d Cir.1996). To prevail on a Lanham Act

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *3 (S.D.N.Y.))

infringement claim, a plaintiff must satisfy two elements: it must demonstrate "that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Morningside Group Ltd. v. Morningside Capital Group*, 182 F.3d 133, 137 (2d Cir.1999) (internal quotations omitted).

The validity of plaintiff's mark—which the parties identify as the word "Edmiston"—is not in question for purposes of this motion, as the issue was not raised in defendants' moving papers. Rather, defendants assert that summary judgment on the Lanham Act claims is appropriate because JEGI's name does not cause consumer confusion.

To establish a trademark infringement claim under the Lanham Act, a plaintiff must prove that " 'numerous ordinary prudent purchasers are likely to be misled or confused' " because of the defendant's mark. *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 477-78 (2d Cir.1996) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp .*, 991 F.2d 1072, 1077 (2d Cir.1993)). A finding of infringement must be supported by "a probability of confusion, not a mere possibility." *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir.1998). *See also Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997) ("[I]t is not sufficient if confusion is merely 'possible'."); *Gruner + Jahr USA Publ'g*, 991 F.2d at 1077.

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961), identifies eight non-exhaustive factors relevant to the likelihood of confusion inquiry. No single one of these factors is dispositive. *Morningside Group Ltd.,* 182 F.3d at 139. Further,

the evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused.

*Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 584 (2d Cir.1993) (internal citations omitted). Summary judgment is appropriate where the undisputed evidence would lead only to one conclusion under the *Polaroid* test as to whether confusion is likely. *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996); *Cadbury Beverages, Inc.*, 73 F.3d at 478. A

discussion of the *Polaroid* factors follows.

*a. Strength of plaintiff's mark*

*4 "The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods [or services] sold under it as coming from one particular source." *Streetwise Maps, Inc.*, 159 F.3d at 743.
In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning.
*Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 117 (2d Cir.1999).

In determining a mark's inherent distinctiveness, this Court employs the familiar typology developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976), under which a mark is classified "in one of four categories in increasing order of inherent distinctiveness: generic, descriptive, suggestive, and arbitrary [or fanciful]." *Streetwise Maps, Inc.*, 159 F.3d at 744. Marks that are surnames constitute a subset of descriptive marks. *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 1999 WL 734924, at *6 (2d Cir. Sept. 22, 1999); *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir.1990) ("Personal names used as trademarks are generally treated as descriptive terms...."). A descriptive mark is "entitled to somewhat less protection" than an arbitrary or suggestive mark. *Time, Inc.*, 173 F.3d at 118.

In determining whether a descriptive mark is strong for the purposes of the *Polaroid* inquiry, the Court considers the secondary meaning that the mark has acquired, "because the ultimate issue to be decided is the mark's origin-indicating quality in the eyes of the purchasing public." *Sports Authority, Inc.*, 89 F.3d at 961 (internal quotations omitted). *See also Time, Inc.*, 173 F.3d at 118 ("[T]he stronger the secondary meaning, the stronger the mark for the purpose of the first Polaroid factor."). Marks acquire secondary meaning when " 'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." ' *Pirone*, 894 F.2d at 583 (quoting *Abraham Zion Corp. v. Lebow*, 761 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *4 (S.D.N.Y.))

93, 104 (2d Cir.1985)). *See also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 13:2 (4th ed.1996). Factors that are relevant in determining secondary meaning include advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product or service, sales success, attempts to plagiarize the mark, and length and exclusivity of the mark's use. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n. 4 (2d Cir.1997). Although no single factor is determinative, "these factors serve to focus the inquiry on the perception of the consuming public." *L. & J.G. Stickley, Inc.*, 79 F.3d at 263 (internal quotations omitted). "Importantly, a mark's strength is examined principally in the market in which the mark is used." *Morningside Group Ltd.*, 182 F.3d at 139.

*5 Plaintiff argues that the defendants' desire to incorporate "Edmiston" into the corporate name and their current refusal to discontinue its use demonstrate that "Edmiston's mark, his surname, is firmly established within the consumer magazine publishing industry." Indeed, the only evidence that plaintiff marshals in support of the strength of his mark is the *defendants'* commercial use of his name; Edmiston fails to offer evidence as to the strength of his surname as a mark in its own right and its acquisition of any secondary meaning. Further, Edmiston does not contend that his mark identifies any particular line of products or services, but suggests only that his identity is well-known in the relevant consumer market. These omissions are understandable. Plaintiff is handicapped by the fact that he has never used his surname as a trademark except when working with JEGI. Even today, he is successfully working for a company that makes no use of his surname as a mark. Thus, while it appears that many individuals engaged in the consumer magazine publishing industry know the plaintiff personally or are aware of the name Mark M. Edmiston, recognizing that "the key to the law of trademarks is the use of a word or symbol in such a way that it identifies and distinguishes a *commercial source*," 4 McCarthy, *supra*, § 28:8, at 28-11 (emphasis in original), the Court must conclude that, as a mark, the word Edmiston is weak.

*b. Degree of similarity between the two marks*

To assess the similarity between two marks, the Court considers whether the similarity is likely to cause consumer confusion. *Morningside Group Ltd.*, 182 F.2d at 139-40. The test

"is not whether confusion is possible; nor is it whether confusion is probable among customers who are not knowledgeable. Rather, the test ... is whether confusion is probable among numerous consumers who are ordinarily prudent."

*Id.* at 140 (quoting *Estee Lauder, Inc.*, 108 F.3d at 1511). The Court assesses the "general impression created by the marks," *id.*, and " 'consider [s] the totality of factors that could cause confusion among prospective purchasers." ' *Streetwise Maps, Inc.*, 159 F.3d at 744 (quoting *Gruner + Jahr USA Publ'g*, 991 F.2d at 1078).

Plaintiff asserts that this factor favors him because the mark "Edmiston" is identical to that used in conjunction with JEGI's name. As stated above, however, the general rule is that the similarity of marks is determined by evaluating a mark in its entirety, rather than dissecting it into its component parts. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 395 (2d Cir.1995) ("[S]imilarity 'is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." ') (quoting Restatement of Torts, § 729 cmt. b (1938)). Compared in their entirety, "Edmiston" and "The Jordan, Edmiston Group, Inc." are dissimilar. *See, e.g., id.* at 396 (concluding that defendant's use of a six-digit model number that contained the symbol "T50" was not confusingly similar to plaintiff's use of the mark, "Model T-50"); *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) (finding the marks "Sportstick" and "Right Guard Sport Stick" distinct in part because of the second user's addition of the company name); *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 581-82 (2d Cir.1991) (holding that defendant's use of the name "New Choices for the Best Years" was not confusingly similar to plaintiff's mark, "New Choices Press," based in part on the defendant's inclusion of additional words). Further, while plaintiff correctly states that the similarity determination is to be made by considering not only the written and aural similarity of the marks, but also their presentation in the marketplace, such argument is unavailing since the plaintiff has failed to present any evidence of the actual trademark use of the mark "Edmiston" apart from its incorporation in the mark JEGI.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *5 (S.D.N.Y.))

*c. Proximity of the products (or services) and likelihood that the prior owner will "bridge the gap"*

*6 Under these *Polaroid* factors, the Court considers the nature of the products themselves, whether and to what extent the two products compete with each other, and the structure of the relevant market. *Morningside Group Ltd.*, 182 F.3d at 140. The Court also considers whether a plaintiff is likely to enter defendant's market, or "bridge the gap", recognizing " 'the senior user's interest in preserving avenues of expansion and entering into related fields." ' *Id.* at 141 (quoting *Hormel Foods Corp. v. Jim Henson Productions, Inc.* 73 F.3d 497, 504 (2d Cir.1996)).

As noted above, Edmiston has never and does not currently provide any services directly under his own mark, but instead offers his services in association with AdMedia. There is no dispute, however, that AdMedia is one of JEGI's direct competitors, both companies seeking clients in need of advisory and investment banking services from within the consumer magazine publishing industry. Plaintiff contends that the fact that AdMedia does not include Edmiston's mark as part of its corporate name adds to the likelihood of customer confusion. That argument misses the purpose of this *Polaroid* factor. The inquiry into competitive proximity recognizes the fact that to the extent that the services offered by plaintiff and defendants are similar, "the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 949.

The likelihood of confusion from the overlap in services, however, is reduced given plaintiff's characterization of the relevant market as a "personal services business" in which potential consumers seek out services based on past relationships with specific individuals rather than entire firms. As described by the plaintiff, this is an industry in which consumers are more likely to choose a service provider because they know her personally than because of any association they make between a trade name and the quality of service associated with that trade name.

*d. Evidence of actual confusion*

[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as

to source.

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986). Although the absence of confusion may not be particularly significant when the period of time in which the marks have been competing is short, *see Centaur Communications, Ltd.*, 830 F.2d at 1227 (four months), the lack of actual confusion " 'may under some circumstances be used against the plaintiff." ' *Cadbury Beverages, Inc.*, 73 F.3d at 482 (quoting *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988)).

The evidence of actual confusion that Edmiston has produced consists of two identified individuals who were uncertain where to contact Edmiston but were ultimately able to reach him, an approximated ten to fifteen individuals asking whether he has a continued association with JEGI (of whom Edmiston can name only one), his speculation that there may have been opportunities that he has not received because of confusion over continuing loyalty to JEGI, and evidence of a single fax sent to him at Admedia, but addressed in care of JEGI. While such evidence is undoubtedly relevant to the issue of actual confusion, *see Sports Authority, Inc.*, 89 F.3d at 963-64 (evidence of "extensive" misdirected phone calls reflecting consumer confusion supports plaintiff's contention that defendant's mark will "lead consumers to be confused as to whether [plaintiff] sponsors [defendant's] activities" and creates genuine issue of fact), such evidence of isolated incidents of confusion is insufficient to create a genuine issue of material fact given plaintiff's broader admissions as to a lack of confusion.

*7 Edmiston has conceded that it is "a pretty commonly known fact in the consumer magazine industry" that he is at AdMedia, that he has already had hundreds of contacts at AdMedia, that "almost anybody who is everybody in consumer publishing" has been able to contact him at AdMedia, and that "none of them expressed ... any trouble finding [him.]" In light of plaintiff's statements that "most people" who "want to use the services of Mark Edmiston personally know where to contact [him,]" his contention that as many as fifteen people may have expressed confusion as to the status of his relationship with JEGI does not create a material issue of fact. *Cf. Atlantic Richfield Co. v. Arco Globus Int'l Co.*, 43 U.S.P.Q.2d 1574, 1580

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(S.D.N.Y.1997) ("several phone calls" by unidentified people after the commencement of litigation amount to "isolated incidents of confusion ... insufficient to establish a likelihood of confusion" at trial), *aff'd*, 150 F.3d 189 (2d Cir.1998).

Further, the inquiries as to a possible affiliation or connection between Edmiston and JEGI are, on their face, ambiguous, and are as indicative of the fact that the questioner was aware that a connection might no longer exist as they are of actual confusion. *Cf. Gruner + Jahr USA Publ'g,* 991 F.2d at 1079 (queries regarding a relationship show at most a possibility of confusion). Finally, the dearth of evidence of confusion is particularly relevant here, since any confusion is likely to be greatest closest to the time of Edmiston's departure from JEGI.

### e. Defendant's good faith in adopting its mark

This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product ." *Lang,* 949 F.2d at 583 (internal quotations omitted). Plaintiff's contention that defendants' actions in having "sought out Edmiston and adopted his mark" evidence bad faith is without merit. The propriety of Jordan's corporate name change cannot seriously be attacked given the undisputed evidence that plaintiff supported and promoted defendants' use of the name JEGI for over five years. Nor is it evidence of bad faith that JEGI resists discontinuing the use of its corporate name; defendants have a legitimate interest in maintaining the continuity of their corporate identity.

### f. Quality of defendant's product (or services)

Under this factor the Court examines "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Group Ltd.,* 182 F.2d at 142. The Court must also consider a second way in which the quality of a defendant's services can be relevant: "Products of equal quality may tend to create confusion as to the source because of that very similarity of quality." *Id.*

Plaintiff asserts, without any evidence, that "his reputation already has been tarnished by the Company's continued use of his name." Plaintiff has produced no evidence to suggest that defendants' services are of an inferior quality to those offered either by him or by AdMedia as a corporate entity. Nor has plaintiff articulated that it is the comparable quality of the services at stake that has contributed to any confusion.

### g. Sophistication of the buyers

*8 Likelihood of confusion "must be assessed by examining the level of sophistication of the relevant purchasers of the plaintiff's and defendant's services". *Sports Authority, Inc.,* 89 F.3 at 965. "The greater the value of an article the more careful the typical consumer can be expected to be...." *McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1137 (2d Cir.1979). Further, where the relevant buyer class "is composed solely of professional, or commercial purchasers, it is reasonable to set a higher standard of care than exists for consumers." 3 McCarthy, *supra,* § 23:101, at 23-196. *Cf. Morningside Group Ltd.,* 182 F.3d at 142 (noting that investment bankers, private investors, accountants, attorneys, business owners and managers "[c]learly ... constitute a highly sophisticated market"). Where, however, the products and marks are identical, "the sophistication of the buyers cannot be relied upon to prevent confusion." *McGregor-Doniger, Inc.,* 599 F.2d at 1137.

There is no dispute that the consumers at issue are a highly sophisticated group--businesses seeking investment banking services from within a small industry of service providers. Moreover, in connection with most requests for services, the financial interest at stake is significant and the choice is made with deliberation and care. In these circumstances, this factor weighs strongly in the defendants' favor.

### i. Balancing the Polaroid Factors

Taking these factors together, and focusing on whether consumers are likely to be confused, the Court determines as a matter of law that the plaintiff has failed to offer evidence that creates a material question of fact as to the likelihood of such confusion. Plaintiff's mark, unsupported by evidence of secondary meaning, is weak; taken as a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *8 (S.D.N.Y.))

Page 7

whole, defendants' mark is dissimilar to plaintiff's; the marginal evidence of actual confusion is strongly outweighed by plaintiff's own testimony as to the considerable lack of confusion; defendants acted in good faith (and with plaintiff's consent) in promoting the name JEGI; and the relevant consumer group is highly sophisticated and unlikely to be confused by the defendants' use of the mark JEGI. Plaintiff failed to present evidence suggesting any discernible difference in the quality of services offered by plaintiff and the defendants or to offer evidence or argument that any similarity of quality contributes to the likelihood of confusion. Finally, although the services offered by defendants are highly similar to those provided by the plaintiff, this alone is insufficient to tip the balance in favor of plaintiff. *Cf. Gruner + Jahr USA Publ'g,* 991 F.2d at 1079. Plaintiff has himself described the relevant market as one in which consumer decisions are influenced more by personal relationships than by corporate reputation and has conceded that since he "know[s] pretty much everyone in the industry," most people who are interested in seeking out his services personally know how to contact him.

*9 A final observation is appropriate. This is not a case where the defendants, without the plaintiff's knowledge or permission, began to use his name in order to trade unfairly on any goodwill available through its use. To the contrary, with the plaintiff's approval and assistance, the defendants worked under the mark he now challenges. [FN2] Despite numerous writings negotiated among the parties, the plaintiff never requested that any writing include the provision that the use of his mark be conditioned on either his continued consent or association with the company. [FN3]

FN2. Edmiston asserts that until early 1998, he believed that JEGI was the company's trade name, used only for doing business, and that there was never a legal change of the corporate name. In support of this position, Edmiston submits his W-2 statements from 1992 to 1998 which identify his employer as the "Jordan Group of Tenn". Plaintiff fails to articulate, however, what he believes the legal relevance of this distinction to be. It is clear that Edmiston would oppose JEGI's continued use of his name even if such usage were limited to trade use.

FN3. In light of the sophistication of the parties, the

extensive history of detailed written agreements, and plaintiff's own recognition that "Jordan believes everything important should be in writing," Edmiston's naked assertion that upon Jordan's exercise of the stock buyback option, Edmiston "told Jordan there was no need to stop using JEGI so long as he continued to work for the Company full-time and to hold the title of co-chairman" is insufficient to create a genuine issue of material fact.

*2. False Advertising Under the Lanham Act*

Edmiston asserts that defendants' use of his name in advertising materials, brochures, logos, and letterhead that are distributed in interstate commerce constitutes false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). To establish a false advertising claim under Section 43(a), a plaintiff must demonstrate "that the statement in the challenged advertisement is false." *National Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997).

"Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers."

*Id.* (quoting *Lipton v. Nature Co.,* 71 F.3d 464, 474 (2d Cir.1995)). When a plaintiff relies on a theory of literal falsity, a court may determine, based on its own common sense and logic in interpreting the message, whether or not an advertisement or representation made in a commercial context is literally true or false. *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317-18 (2d Cir.1982); *General Cigar Co., Inc. v. G.D.M., Inc.,* 988 F.Supp. 647, 665-66 (S.D.N.Y.1997); *Hertz Corp. v. Avis Corp.,* 867 F.Supp 208, 212 (S.D.N.Y.1994).

Plaintiff argues that because JEGI has in the past promoted itself as a company in which both Edmiston and Jordan were actively and personally involved, the continued use of Edmiston's name is literally false, since it suggests Edmiston's continuing participation in JEGI. Plaintiff's contention is, in effect, that JEGI's name is a statement that Edmiston is presently involved in the company's operations. Such a contention is without merit.

The parties agree that during the period that Edmiston worked for JEGI, defendants did advertise

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *9 (S.D.N.Y.))

his active association with the company by such methods as including Edmiston's curriculum vitae in promotional brochures. Plaintiff does not suggest that such practices have continued following Edmiston's departure from JEGI, but rather alleges falsity only on the basis of defendants' past representations combined with the continuing use of Edmiston's name. Such evidence cannot support a finding of literal falsity.

It is common knowledge that financial service companies, and indeed many businesses composed of professionals, such as law firms, investment banking firms, and accounting firms, frequently employ surnames in their trade names. *See, e.g., Lane Capital Management,* 1999 WL 734924, at *8 & n. 4. While the use of an individual's name generally may be regarded as conveying the message that such individual has been associated with the company at some point, the mere use of the name is not in itself a representation that such individual retains a continuing association with the company. *See* 3A Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies,* § 21.36, at 280 (4th ed. 1983) ("An individual name ... might properly be regarded as a convenient description of the fact that the named individual *is or was* affiliated with the firm.") (emphasis added); *see also* 6 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations,* § 2428, at 73-75 (1996) (stating that once corporation has "used the personal name of an individual in its corporate name, it is not precluded from the continued use of that name simply because the namesake individual is no longer associated with the corporation"). [FN4]

FN4. Furthermore, to establish a false advertising claim, in addition to proving falsity, a plaintiff must show that the defendant misrepresented an inherent quality or characteristic of the product or services. "This requirement is essentially one of materiality," in that plaintiff must establish that the deception is likely to influence consumer purchasing decisions. *National Basketball Ass'n,* 105 F.3d at 855. Plaintiff here has offered no such evidence of materiality. Finally, plaintiff's argument that, under *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,* 926 F.2d 134 (2d Cir.1991), he is entitled to a presumption that consumers are being deceived is unavailing. Plaintiff has failed to make the requisite showing that "defendant[s] deliberately engaged in a deceptive commercial practice." *Id.*

*10 Correctly analyzed, plaintiff's claim is that the name JEGI misleads consumers by implying the present association of the plaintiff with JEGI. "Where the plaintiff's theory is that the challenged commercial is impliedly false, extrinsic evidence must confirm that the commercial is likely to mislead or confuse." *L & F Products v. Procter & Gamble Co.,* 45 F.3d 709, 711 (2d Cir.1995). Since the pivotal question for evaluating a claim of implied falsity is "what does the public perceive the message to be?", the success of such claim usually turns on the persuasiveness of a consumer survey of public reaction. *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297-98 (2d Cir.1992). Here, plaintiff has provided neither a consumer survey nor any other extrinsic evidence to demonstrate that the "net communicative effect" of the name JEGI is misleading. *Id.* at 298.

Plaintiff having failed to raise a genuine issue of material fact, defendants are entitled to summary judgment as a matter of law on the false advertising claim.

*3. State law claims*

Having determined that the defendants are entitled to summary judgment on plaintiff's federal claims under the Lanham Act, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted with respect to the plaintiff's federal claims under the Lanham Act. Plaintiff's remaining state law claims are dismissed without prejudice for lack of jurisdiction. Since the defendants' counterclaims arise exclusively under state law, they also are dismissed without prejudice. The Clerk of Court shall enter judgment and close the case.

Although the filing of an amended complaint was approved by a stipulation signed by the Court on February 1, 1999, plaintiff has not yet filed the pleading. He shall do so within seven days.

Motions, Pleadings and Filings (Back to top)



© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 1999 WL 1072492, *10 (S.D.N.Y.))

.                    1:98CV03928                (Docket)
(Jun. 03, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
— F.Supp.2d —
(Cite as: 1984 WL 1458 (N.D.Ill.))

United States District Court, N.D. Illinois, Eastern
Division.
BORDEN, INC., Plaintiff,
v.
KRAFT, INC., Defendant.
No. 84 C 5295.

September 28, 1984.

Gerald L. Angst Walter C Carlson SIDLEY &
AUSTIN One First National Plaza 60603, for
plaintiff.

Jerome Gilson Gary M. Ropski Thomas M.
O'Malley WILLIAM BRINKS OLDS HOFFER
GILSON and Lione, Ltd. One IBM Plaza, Suite
4100 60611, for defendant.

MEMORANDUM OF FINDINGS AND
CONCLUSIONS

LEIGHTON, District Judge.

I. Introduction

*1 This is a suit in which the plaintiff seeks to
enjoin and recover damages for certain advertising
which it alleges is false and deceptive. Defendant is
one of plaintiff's competitors; the action is brought
pursuant to Section 43(a) of the Lanham Act, 15
U.S.C. 1125(a) and certain provisions of the Illinois
Uniform Deceptive Trade Practices Act,
Ill.Rev.Stat., ch. 121- 1/2, par. 312.

Before the court is plaintiff's motion for
preliminary injunction, with due notice. The record
consists of the complaint, answer, and a motion for
relief pendente lite. In support of their respective
positions, the parties have submitted affidavits and
supplemental affidavits. The court has heard
testimony of witnesses and has received exhibits in
evidence. Memoranda have been filed
supplementing the oral submissions of counsel.
Thus, the court is fully advised.

At the end of the parties' presentations, this court
made its ruling from the bench and entered an order
denying plaintiff's motion, it being understood that
the denial was to take effect and become appealable
on the filing of this memorandum of findings and
conclusions. Accordingly, and in conformance with
Rule 52(a), Fed.R.Civ.P., the court makes its

findings of fact, reaches its conclusions of law, and
enters a dispositive order.

II. Findings of Fact

1. Plaintiff, Borden, Inc. (Borden), is a
corporation organized and existing under the laws of
the State of New Jersey, and has its principal place
of business in Columbus, Ohio.

2. It is a producer of various food and chemical
products. Among the food products which it
processes, advertises and offers for sale is a line of
singly-wrapped pasteurized process, 'all dairy'
cheese food slices. (Carfora Aff., ¶¶3, 5) Plaintiff
also produces imitation/substitute cheese slices.
(Cmplt, ¶4) One such product is a substitute cheese
slice called CHEEZTWIN. (Carfora Dep., p. 36;
DDX 4) Another substitute cheese product
produced and sold by plaintiff is Lite-Line Low
Cholesterol. (Carfora Dep., pp. 52-52a; DDX 5)

3. Plaintiff is a competitor of defendant Kraft in a
number of categories; both its all-dairy and
imitation/substitute slices are in direct competition
with Kraft's own singly-wrapped pasteurized
process, all-dairy cheese food slices. (Carfora Aff.,
¶3; Blue Aff., ¶¶4, 5)

4. Defendant Kraft, Inc. (Kraft), is incorporated
under the laws of the State of Delaware and has its
principal place of business in Illinois.

5. It is a major manufacturer and marketer of food
products, well-known to the public for its nutritious,
high-quality food and dairy products sold under
such widely recognized brand names as KRAFT,
VELVEETA, SEALTEST, PARKAY, MIRACLE
WHIP, PHILADELPHIA BRAND and BREYERS.
(Blue Aff., Ex. L) Kraft produces, advertises and
sells a line of singly-wrapped pasteurized process
'all dairy' cheese food slices under the brand name
KRAFT Singles (Kraft Singles). (Blue Aff., ¶4;
Woodford Aff., ¶2; Carfora Aff., ¶3)

6. In the process slice category, Kraft is the market
leader. Its Kraft Singles account for of 32% of the
category and private label slices rank second 23%.
Imitation/substitute slices of various brands,
including Borden's, rank at 8% of the market
category. Borden cheese food slices account for 7%

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page  2
(Cite as: 1984 WL 1458, *1 (N.D.Ill.))

and Kraft's Velveeta slices for 5%. (Carfora Aff., ¶ 5)

*2 7.  In early 1983, Kraft decided to implement an advertising campaign for its Kraft Singles in 1984 which would provide the consumer with one or more reasons why the consumer should purchase Kraft Singles over other slices, particularly 'imitation' and 'substitute' slices, such as Borden's CHEEZTWIN sandwich slices, which had enjoyed significant growth in the cheese slice category. (Blue Aff., ¶5)

8.  The recent and expansive growth of the imitation/substitute cheese slice product line is illustrated by Borden's own entries in this line. CHEEZTWIN was introduced in late 1981, and the Lite-line substitute entered the market in the fall of 1982. (Carfora Dep., pp. 44, 52)

9.  It was decided that the advertising campaign would stress Kraft Singles' '5 ounces of milk per slice' and good cheese tast attributes as two reasons to purchase Kraft Singles. (Blue Aff., ¶6; Ex. A)

10.  In October 1983, Kraft conducted a study which indicated that even without any advertising of its '5 ounces' attribute, 59% of the consumers polled believed that Kraft Singles contained more milk than other brands. Sixty-seven percent of the consumers polled thought that Kraft Singles had a better cheese flavor than other brands. (Blue Aff., ¶ 7; Ex. B)

11.  During the weeks of December 12 through December 26, 1983, Kraft produced a video commercial referred to as 'Shopping Dad.' (Blue Aff. ¶¶8, 14; Ex. C) The 'Shopping Dad' commercial was first aired on or about January 16, 1984, and was terminated on or about April 9, 1984. (Blue Aff., ¶8)

12.  This commercial depicts a father-shopper in a supermarket dairy section who queries a lady shopper why she chooses Kraft Singles over the other cheese slices in the dairy case.  The woman responds, first, that Kraft puts five ounces of milk to every slice.  The video then cuts away to a demonstration which shows two empty glasses and a package of Kraft Singles.  Milk is poured into one glass up to a premarked two-ounce level as the voice-over announcer states, 'Some slices use only

this much milk. . . .' Milk is then poured into a second glass up to a premarked five-ounce level, as the voice-over announcer states, '. . . but Kraft puts five full ounces of milk into every delicious slice.' The video then cuts back to the shopping dad and lady shopper.  The lady offers a Kraft slice to Dad, commenting, 'Best of all, taste.' Dad takes a bite of the cheese slice and agrees, 'Great cheese taste.' The thirty-second 'Shopping Dad' commercial finishes with a close-up shot of a glass filled with five ounces of milk alongside a Kraft Singles package.  The voice-over announcer states, 'Kraft Singles.  Five ounces of milk in every delicious slice.' (Blue Aff., Exs. C, E)

13.  The original version of the 'Shopping Dad' commercial contained a 'superscript' (printed words which are superimposed on the video portion of the commercial) which read, 'Milk amounts based on cheese content.' This superscript was displayed during the '5 oz. vs. 2 oz.' demonstration of the commercial. (Blue Aff., Ex. C)

*3 14.  Beginning the week of February 13, 1984, the superscript of the 'Shopping Dad' commercial was modified to include a statement to reflect that the standard of comparison in the 5 ounces vs. 2 ounces demonstration was to 'substitute' cheese slices only. (Blue Aff., ¶¶16, 18; Ex. E) The revised superscript stated: 'Milk comparison based upon cheese substitute slices.' (Blue Aff., ¶¶16, 18; Ex. E) By the week of February 19, 1984, all Kraft Singles commercials on all three networks carried the complete, network-approved superscript explanation. (Blue Aff., ¶19)

15.  Along with the 'Shopping Dad' commercial, the Kraft Singles 1984 television advertising campaign includes four versions of a television commercial known as 'Tell Me When,' I through IV.  (Blue Aff., ¶21) The 'Tell Me When' commercials are all live testimonials in which consumers are asked how much milk goes into one slice of Kraft cheese.  As an interviewer pours milk into a measuring glass, the consumers are asked to tell the interviewer at what level to stop.  In each commercial, the consumer instructs the interviewer to stop at a level of less than 5 ounces.  In two of the commercials, 'Tell Me When' I and IV, the interviewer responds, 'Some slices stop there . . . But Kraft puts 5 ounces of milk into every slice,' as he pours milk into another measuring glass to the 5-



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *3 (N.D.Ill.))

ounce level. In the other two 'Tell Me When' commercials, II and III, the interviewer responds, 'Some imitation slices stop there. But Kraft puts 5 full ounces of milk in each slice.' (emphasis added) In each of the four commercials, the consumers then comment on the 'good', 'creamy', or 'cheesy' taste of Kraft Singles. The voice-over finishes with the comment, 'Kraft Singles. Five ounces of milk in every delicious slice.' (Blue Aff., Exs. G-J; Blue Supp. Aff., ¶5, Ex. D)

16. Each of the 'Tell Me When' commercials has a superscript which is displayed during the pouring demonstration. The two commercials, I and IV, which were run on a rotational basis beginning the second week of April 1984 until June 23, 1984, had a superscript which read: 'Depicted comparison to cheese substitute slices. Milk amount based on cheese content.' (Blue Aff., ¶¶10, 22; Exs. G, J)

17. The other two 'Tell Me When' commercials, II and III, which are scheduled to begin airing July 15, 1984 and will air intermittently until October 13, 1984, have superscripts which read: 'Depicted comparison to imitation cheese slices. Milk amounts based on cheese content.' (Blue Aff. ¶¶10, 26 Exs. H, I)

18. The superscript installed in the 'Tell Me When' commercials is larger and has increased boldness compared with the superscript of the discontinued 'Shopping Dad' commercial.

19. As part of the 5 ounces/good taste advertising campaign, limited print media was utilized in May and June 1984. (Blue Aff., ¶8) The print advertising used the same 'comparison of milk content' concept used in the television commercials. (Blue Aff., ¶20) One print ad, however, which ran only in a limited number of May magazines, did not contain a comparison description akin to that used in the commercials. (Blue Aff., ¶20, Ex. F). New print advertising which will be run in August and September 1984, corresponding with the 'Tell Me When' II and III commercials, will contain a description of the comparison product (imitation slices). (Blue Aff., ¶27).

*4 20.   Throughout the development and production of its advertising, Kraft made every attempt to ensure that the intended message of its advertising was being clearly and accurately stated.

(Blue Aff., ¶12)

21. The above-mentioned superscripts were added to clarify the type of products to which the Kraft Singles were compared. (Blue Aff., ¶12) Such superscripts are a widely-used and well-accepted technique for communicating part of a commercial message. (Beach Aff., ¶3) The size and typeface of the superscripts used in all the Kraft commercials are typical of that used in the advertising business. (Beach Aff., ¶4)

22. The superscripts in all of the Kraft 'five ounces of milk' commercials comply with each of the networks' guidelines. (Blue Supp. Aff., ¶2; Exs. M-1, M-2)

23. The announcer's voice-over of the two 'Tell Me When' commercials, II and III, which have not yet been aired, expressly and specifically states that the '5 ounces vs. 2 ounces' comparison is to some imitation cheese slices. (Blue Aff., ¶¶25, 26; Exs. H, I; Blue Supp. Aff., ¶4, Ex. N)

24. Kraft Singles contain approximately 5 ounces of milk in each slice, and the Kraft claim with respect to the milk content of slices of Kraft Singles is true and accurate. (Carfora Aff., ¶6; Crawford Aff., ¶10; Woodford Aff., ¶5, Ex. D)

25. Laboratory analysis performed by Kraft in December 1983, prior to commencement of the Kraft Singles Advertising Campaign, establishes that Kraft Singles utilize 5.15 ounces of milk to make the cheese portion of each 3/4 oz. slice. (Woodford Aff., ¶5, Ex. D)

26. Plaintiff Borden agrees that it takes about 5 ounces of milk to make the cheese that goes into a single 3/4 oz. slice of process cheese food. (Crawford Aff., ¶10)

27. There are a variety of products similar in appearance, packaging and general taste to Kraft Singles, but which are different in composition. Such slices do not meet a standard of identity and, under the federal nomenclature, must be called 'imitation' or 'substitute.' (Woodford Aff., ¶3) Such imitation/substitute slices compete with Kraft Singles which is considered an 'all-dairy' cheese slice product. (Carfora Aff., ¶5; Blue Aff., ¶4) All of these cheese slices are typically displayed next to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *4 (N.D.Ill.))

each other in the same location in retail stores. (Blue Aff., ¶4; Carfora Dep., pp. 40-41; Blue Supp. Aff., ¶5; Ex. O-1) 28. An 'imitation' cheese slice product is one which is a substitute for and resembles a pasteurized process cheese food slice product but is nutritionally inferior to same. (Nelson Aff., p. 4)

28. An 'imitation' cheese slice product is one which is a substitute for and resembles a pasteurized process cheese food slice product but is nutritionally inferior to same. (Nelson Aff., ¶4)

29. A 'substitute' cheese slice product is one which is a substitute for and resembles a pasteurized process cheese food product and is nutritionally equivalent to same. (Nelson Aff., p. 4)

30. The major difference between a 'pasteurized process cheese food' slice (i.e., Kraft Singles) and an imitation/substitute slice is that all or a portion of the milk used in the former is replaced by vegetable oil in the latter. (Woodford Aff., ¶4; Crawford Aff., ¶13; DDX 4)

*5 31. Examples of better known imitation/ substitute cheese slices are Borden's CHEEZTWIN sandwich slices and FISHER SANDWICH-MATE. (Woodford Aff., ¶ 4, Exs. B, C; DDX 4, 6) Another slice in this category is Borden's Lite-line low cholesterol. (Carfora Dep. pp. 52-52a; DDX 5)

32. In December 1983, prior to commencement of the Kraft Singles Advertising Campaign, Kraft performed technical analyses of the Borden CHEEZTWIN and Fisher SANDWICH-MATE substitute products to determine the amount of cheese in each product and, based upon the amount of cheese, the milk content of each product. (Woodford Aff., ¶5)

33. The Kraft analyses showed that the Borden CHEEZTWIN product contained cheese at a level which utilizes only 0.74 ounces of milk. The Fisher substitute product had only 0.25 ounces of milk. (Woodford Aff., ¶5; Ex. D)

34. An analysis of the Borden Lite-Line low cholesterol substitute has a milk content, based upon the amount of cheese, at a level of 1.53 to 1.81 ounces per 3/4 oz. slice. (Silvio Supp. Aff., ¶2, Ex. B)

35. Plaintiff Borden agrees that the cheese content of imitation/substitute cheese slices represents as little as two ounces or less of milk. (Carfora Aff., ¶ 6; Crawford Aff., ¶16)

36. Kraft requested network clearance for its proposed advertising in October 1983. The networks, as well as the Kraft legal staff, requested substantiation of certain claims, including proof that Kraft Singles have five ounces of milk in every slice and proof that Kraft Singles have great cheese taste. (Blue Aff., ¶12)

37. All questions concerning substantiation were answered, and the original 'Shopping Dad' commercial aired on NBC and CBS during the week of January 9, 1984. (Blue Aff., ¶¶13, 15)

38. The ABC network requested that Kraft modify its 'Shopping Dad' commercial to include a superscript that the standard of comparison in the five ounces vs. two ounces comparison was to substitute cheese slices. (Blue Aff., ¶16) To accommodate the network's request, Kraft installed an expanded superscript explanation of the depicted comparison. (Blue Aff., ¶18)

39. By February 13, 1984, all of the Kraft commercials were approved for broadcast by the three major networks, ABC, NBC and CBS, as in compliance with their respective broadcast standards. (Blue Aff., ¶18; Beach Aff., ¶14; Blue Supp. Aff., ¶2; Exs. M-1 to M-3)

40. As part of routine procedure for Kraft advertising, Kraft conducted qualitative communication checks on the 'Shopping Dad' and 'Tell Me When' I and IV commercials which were aired. This research indicates that Kraft's 'five ounces of milk in every slice' claim is the primary message communicated by the commercials. The research also shows that consumers tend to focus on Kraft Singles' product benefits such as nutrition, taste and creaminess. Consumers do not focus on a comparison of milk content between brands. (Stanek Aff., ¶¶9-10)

41. In noe of the Kraft research was there a single mention of any Borden product by responding consumers. (Stanek Aff., ¶10)

*6 42. Due to the deficiencies of the Borden

 © 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *6 (N.D.Ill.))

market research, Kraft decided to engage the services of an independent expert in the field of market research, Dr. Robert C. Sorensen, to undertake a fair and impartial study of the reaction of viewers to the Kraft 'Tell Me When II' Revised and 'Tell Me When III' Revised television commercials. This study was conducted from July 6 to July 10, 1984 in the same counties in which Borden conducted its initial research, i.e., Levitown and Huntington, Long Island, New York. In an open-ended and non-leading fashion, the study surveyed what purchasers of individually wrapped cheese slices perceive to be the content and implications of the 'Tell Me When' II and III commercials. (Sorensen Rpt., p. 4)

43. Dr. Sorensen concluded as follows based upon the findings in his survey:

a. The Kraft television commercials in question were perceived as introducing a new and unique element of information concerning Kraft Singles cheese slices, to wit: the existence of 5 ounces of milk in or used for each individual slice.

b. The Kraft television commercials reinforce what is already a high-quality image for either the Kraft corporate name or the Kraft cheese brand name, in that people either affirm their respect for Kraft or fail to express any significant criticism of Kraft products or of this commercial's content and techniques. This suggests that consumers bring strong support for Kraft to their viewing of this and other commercials featuring the Kraft brand.

c. The Kraft television commercials clearly communicate a claim for strong comparative superiority for Kraft Singles cheese slices, yet fail to arouse viewers to voluntarily single out competing companies or brands. Even when they are specifically asked, only 1.5% of the total survey respondents cite Borden. The comparison of Kraft with some other brands of slices and/or with imitation cheeses in people's minds almost never provokes viewers of these commercials to identify another company or brand by name. (Sorensen Rpt., p. 20)

44. Dr. Sorensen's study showed that specific companies and specific brands are almost never singled out by people stating what went through their minds with respect to what they saw and heard in the television commercials. In replying to open-ended questions, approximately 2% of the viewers identified another specific brand or company with

respect to the amount of milk per slice; none of them named 'Borden.' Two-thirds of the total survey respondents stated that they agreed that 'Kraft Singles was compared to other individually wrapped slices.' Of those noting the comparison, only 1.5% stated that Borden was the specific brand or company to which the comparison was made. Finally, the overwhelming majority, 96.5% of the people responding, said that they found nothing 'confusing or difficult' to understand in the commercial.' (Sorensen Rpt., pp. 15-19)

45. Accordingly, Dr. Sorensen concluded that no basis exists for the allegation that these television commercials promoting Kraft Singles cheese slices known as the 'Tell Me When II' and 'Tell Me When III' television commercials cause viewers by deception or any other means to deprecate, depreciate or discount cheese slices products carrying Borden as a brand name or source of origin, or to make an invidious comparison between Kraft and Borden individually wrapped cheese slice products. (Sorensen Rpt., p. 21)

*7 46. After receiving the critique by Dr. Robert C. Sorensen of their earlier Rothstein-Tauber studies, Borden obtained the services of Burke Marketing Research in connection with a study whose purpose was 'to measure consumer understanding of a thirty-second television commercial for Kraft Singles.' (Burke Study, p. 1, Intro.) The fact that this study used open-ended questions in place of the leading questions used in the earlier Borden surveys conducted by Rothstein-Tauber is an admission of Borden that the earlier studies may not have been admissible or probative on the issue of whether or not the Kraft television commercials communicated anything about the Borden cheese slices products. In view of this later Burke study, the court gives little weight to the earlier Rothstein-Tauber studies.

47. Among others, the Burke study provided the following information with respect to the Kraft 'Tell Me When' commercials. Of the people surveyed who responded that the commercial made comparative milk statements, 102 out of 253 or 41% of that group (25% of the total respondents) expressly stated that the comparison was between Kraft singles and 'imitation' or 'cheaper/generic/ store brands.' Perhaps more important, of the 151 that viewed the commercial as making a statement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *7 (N.D.Ill.))

between Kraft Singles and 'other brand/companies' or 'other cheese products/slices,' only 21 or 5% of the total respondents mentioned Borden. [Comments relating to 'imitation' and 'cheaper/ generic/store brands' in the context of Borden cheese slices, made by 1.7% of the total respondents, are omitted from this analysis because Borden does not dispute that such comments are accurate.] Thus, Borden's own research demonstrates that very few people mention Borden in the context of a comparison between Kraft Singles and other brands/companies or other cheese products/slices in general. The number that do mention Borden is certainly not substantial.

48. Since beginning to work with J. Walter Thompson (JWT), the advertising agency responsible for producing the Kraft Singles advertising in September 1983, Kraft has spent in excess of $9 million in developing, producing, testing and airing commercials embodying the '5 ounces of milk' and 'good cheese taste' themes of the campaign. (Blue Aff., ¶11)

49. Kraft's 'Shopping Dad' commercial was produced at a cost of approximately $120,000.00, and its 'Tell Me When' commercials cost in excess of $135,000.00. (Blue Aff., ¶¶14, 22)

50. Changes which Kraft has made to the superscripts and voice-overs of the 'Tell Me When' II and III commercials have cost several thousand dollars. These are modifications made at the reequest of Borden. (Blue Aff., ¶¶25, 26; see DFF 45, infra)

51. Kraft has purchased television time and magazine space at a cost of over $4 million for the advertising scheduled to commence July 15, 1984 and continue until October 1984. (Blue Aff., ¶28)

52. Kraft has committed approximately $900,000.00 for special packaging and support materials as part of a major promotion which relies upon the '5 ounces of milk' campaign. (Blue Aff., ¶29)

*8 53. On January 27, 1984, Borden first complained to Kraft about its 'Shopping Dad' commercial and requested that the reference to 'some slices' therein be more 'specifically defined.' (Blue Aff., ¶17; Carfora Aff., Ex. 2)

54. Subsequent to this request, Kraft expanded the superscript to state: 'Milk comparisons based upon cheese content. Depicted comparison to cheese substitute slices.'

55. Despite the installation of the superimposed description of the comparison, Borden continued to protest airing of the 'Shopping Dad' commercial and Kraft agreed to a meeting with Borden representatives on May 17, 1984. (Blue Aff., ¶24; Carfora Aff., ¶4) By this time, the airing of the 'Shopping Dad' commercial had terminated pursuant to its scheduling, and copies of the two 'Tell Me When' commercials, I and IV, which were then airing, were supplied to Borden. (Blue Aff., ¶24)

56. Borden objected to the 'Tell Me When' commercials and demanded three modifications, two of which Kraft agreed to and which will be implemented in the 'Tell Me When' II and III versions to be aired beginning July 15, 1984. In these commercials, Kraft alters the voice-over during the comparison sequence to expressly and specifically state that the comparison is to imitation slices. In addition, the superscript reads that the comparison is to imitation slices rather than substitute. (Blue Aff., ¶15)

57. The third demand, to which Kraft refused to agree, was that Kraft modify the video portion of the 'Tell Me When' commercial by inserting a mock-up package labeled 'Imitation Cheese Slices' during the comparison sequence. Such a modification would be an unlawful tampering with a testimonial ad. (Blue Aff., ¶25)

58. Borden filed suit on June 22, 1984, some five months after learning of the Kraft commercials.

59. Borden is unable at present to measure the impact, if any, which the Kraft advertising has had upon the sales of Borden's pasteurized process cheese food slices. (Corfora Aff., ¶20)

60. During the period that the Kraft Singles '5 ounces of milk' campaign was running, January 1984 to May 24, 1984, the sales of Borden slices has increased a significant 8.3%, and Borden has made a significant market share gain of 1/2 of a market share point. (Blue Aff., ¶34, Ex. K) During this same period, the sales volume of Kraft Singles, the market leader, increased only 2.4%, and its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *8 (N.D.Ill.))

market gain has been only 1/10 of a market share point. (Blue Aff.; ¶34; Ex. K)

61.    Borden's lack of injury or damage is also substantiated by its conduct with respect to its own commercials and those of others involving comparative advertising. Starting this year, Borden has run a television commercial comparing Borden's product, KRYLON spray paint, and an 'other leading national brand.' Borden's spokesman first explains that the KRYLON paint sprays on smoothly and without running or dripping. Then, with the use of 'supers,' Borden explains that the KRYLON spray paint is dry after 12 minutes and an 'other leading national brand' is not dry even after an hour. (Beach Supp. Aff., ¶3, Ex. A) Borden is thus well aware of the unobjectionable use of supers in comparative advertising, even where the name of the compared brand is not mentioned specifically in the commercial, and the comparison could, by implication, refer to various other brands.

*9 62.    In the particular area of cheese products, LAND O LAKES has been running two implicitly comparative television commercials at various times since 1980: one entitled 'Honest Farmer,' and the other entitled 'Milk Pour.' In each of these commercials, the theme emphasized is '4-QUART' cheese, i.e., that '4 qts. of fresh milk go into every pound' of cheese LAND O LAKES sells in association with the phrase '4-QUART.' Cheese is displayed in the commercials in both slices and chunk form. (Beach Supp. Aff., ¶4, Ex. B)

63.    For 3/4 oz. slices, four quarts of milk in every pound translates into 6 ounces of milk per slice, and for 2/3 oz. slices, four quarts of milk in every pound is about 5.3 ounces per slice. Based on this '4-QUART' statement, and to be consistent with the position that Borden has taken with the Kraft commercials, one would have expected Borden to argue that the LAND O LAKES commercials imply that all other brands of cheese, including Borden, use less milk, and in particular, less than about 5 ounces per slice. Even though these commercials were first run about four years ago, and this '4-QUART' theme has been used since then, Borden has not challenged these LAND O LAKES television commercials. (Beach Supp. Aff., ¶4; Carfora Dep., pp. 137-38) This failure to challenge another competitor in the cheese slices area amounts to an acquiescence on behalf of Borden in the type

of advertising that Kraft is using for its Kraft singles television commercials.

64.    A print advertisement comparing the calories and fat percentage of Kraft's LIGHT 'N LIVELY lowfat cottage cheese with those of Borden's regular cottage cheese was run one time only around March 3, 1984 in Best Food Day Week. This print ad was terminated according to a preplanned program and is not scheduled to run again. (Creighton Aff., ¶¶3, 4, Ex. A)

65.    In its 'Tell Me When' II and III commercials, Kraft states that it 'puts 5 full ounces of milk into each slice' of Kraft Singles. These commercials finish with voice-over announcer stating, 'Kraft Singles. Five ounces of milk in every delicious slice.' (Blue Aff., Exs. H, I; Blue Supp. Aff., ¶5, Ex. D)

66.    The majority of Kraft Singles slices, over 60%, are 3/4 oz. in weight. Approximately 75% of the 3/4 oz. slices contain between 5.15 and 5.60 ounces of milk, per slice, based on cheese content. (Blue Supp. Aff., ¶10)

67.    The Kraft Singles product package mock-up displayed in the 'Tell Me When' II and III commercials is intended to and does approximate the size and appearance of the Kraft Singles package of 16 slices which contains the 3/4 oz. slice size. (Blue Supp. Aff., ¶11)

68.    Less than 40% of Kraft Singles are sold in slices of 2/3 oz. in weight. These 2/3 oz. slices contain slightly less milk than the majority 3/4 oz. slices. Based on cheese content alone, the 2/3 oz. slices have between 4.6 and 5.0 ounces of milk. If milk-derived ingredients are considered in determining milk content, the milk content of the Kraft Singles 2/3 oz. slice would equal 5 ounces of milk. (Blue Supp. Aff., ¶10; Carfora Aff., ¶6)

*10 69.    Plaintiff acknowledges and admits that '[e]ach Kraft slice . . . contains approximately 5 ounces of milk as do all of the other brands of 'all-dairy' slices . . . .' (Carfora Aff., ¶6)

70.    All slices of Kraft Singles do contain 5 ounces of milk, based upon cheese content alone, (1) when the range of variations of milk per slice is rounded up from a range of 4.6 to 5.0 or down from a range

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of 5.15 to 5.6 and (2) when the majority of purchases of Kraft Singles is considered, i.e., the 3/4 oz. size, in which there are between 5.15 and 5.6 ounces of milk per slice. (Blue Supp. Aff., ¶11)

71.  The statement that Kraft puts 5 full ounces of milk into each slice of Kraft Singles is true and accurate. (Blue Supp. Aff., ¶11)

### III.  Conclusions of Law

1.  The court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. §§ 1332, 1338(a) and (b) and 15 U.S.C. § 1121. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(c).

2.  Plaintiff's motion for preliminary injunction relates to the two 'Tell Me When' commercials, II and III, which began running on July 15, 1984.  All of the other Kraft Singles commercials based upon the 'five ounces of milk' theme have terminated and are not scheduled to rerun.  Likewise, the complained-of print media advertising has terminated, except for the print advertising which will correspond with the 'Tell Me When' II and III commercials. Inasmuch as the other television commercials and print advertising have ceased and are not likely to rerun, any equitable relief pertaining to such past advertising would be inappropriate. Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 207 (7th Cir. 1982).

3.  It is settled law that the burden of showing a clear right to preliminary injunctive relief is on the plaintiff, Avins v. Widner College, Inc., 421 F. Supp. 858, 860 (D. Del. 1976); and it must satisfy the traditional prerequisites for issuance of such relief. See Calvin v. Conlisk, 520 F.2d 1, 7 (7th Cir. 1975); cf. Roland Machinery Company v. Dresser Industries, nc., No. 84 1509, slip op. at 10-16.

4.  A preliminary injunction is an extraordinary remedy.  F.E.L. Publications, Ltd. v. Nat'l Conference of Catholic Bishops, 466 F. Supp. 1034, 1039 (N.D. Ill. 1978).  The court's power to issue such relief, especially a mandatory injunction such as the one sought here, should be sparingly exercised. United States v. Spectro Foods Corp., 544 F.2d 1175, 1181 (3d Cir. 1976).

5.  The standard for issuance of a preliminary injunction is well established.  Four factors enter into the court's determination whether to grant such extraordinary relief:
(1) whether the plaintiff has at least a reasonable likelihood of success on the merits;
(2) whether the plaintiff has an adequate remedy at law and will be irreparably harmed if the injunction does not issue;
(3) whether the threatened injury to the plaintiff outweights the threat that the injunction may inflict irreparable harm on the defendant; and
*11 (4) whether the granting of a preliminary injunction will disserve the public interest.
Wesley-Jessen Div. of Shering Corp. v. Bausch & Lomb, Inc., 698 F.2d 862, 846 (7th Cir. 1983); Mile High Upholstery Fabric Co. v. General Tire & Rubber Co., 221 U.S.P.Q. 217, 221 (N.D. Ill. 1983) (Marshall, J.); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 123 (N.D. Ill. 1980) (Aspen, J.).

6.  If plaintiff is unable to show a likelihood of success on the merits, its request for a preliminary injunction must be denied. Signode Corp. v. Weld-Loc Systems, Inc., 700 F.2d 1108, 1111 (7th Cir. 1983); Koly v. Board of Education, 576 F.2d 747, 749 (7th Cir. 1978).

7.  This standard of 'reasonable likelihood of success' requires, at the very least, a showing that the plaintiff has a 'good chance' of succeeding on the merits of its claim.  Local Division 519, Amalgamated Transit Union, AFL-CIO v. LaCrosse Municipal Transit Authority, 585 F.2d 1340, 1351 (7th Cir. 1978); Ragold Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 124 (N.D. Ill 1980).

8.  Where a plaintiff has failed to make a strong showing of both irreparable harm and a balance of equities in its favor, as here, the plaintiff must show more than just a 'good chance' of prevailing on the merits. Ragold, supra, 507 F. Supp. at 124. Plaintiff Borden has failed to show even a 'good chance' of success.

9.  It has also failed to demonstrate a reasonable likelihood of success on the merits of its claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  This section 'does not have boundless application as a remedy for unfair trade practices.' Alberto-Culver Co. v. Gillette Co., 194 U.S.P.Q. 84 (N.D. Ill. 1976), quoting Alfred Dunhill Ltd. v.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page  9
(Cite as: 1984 WL 1458, *11 (N.D.Ill.))

Interstate Cigar Co., 499 F.2d 232, 237 (2d Cir. 1974). See John O. Butler v. Oral B. Co., 183 U.S.P.Q. 334 (N.D. Ill. 1974). Not all comparative advertising claims fall within the scope of section 43(a). Bernard Food Industries Inc. v. Dietene Co., 415 F.2d 1279, 1283 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 128 (N.D. Ill. 1980).

10.   To prevail under the section plaintiff must prove that defendant Kraft made false or misleading statements of fact as to its own product.  Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1283-84 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 124 (N.D. Ill. 1980); Dexter-Lawson Products, Ltd. v. R. B. Graphics Equipment, Inc., 209 U.S.P.Q. 308, 309 (N.D. Ill. 1979); Alberto-Culver Co. v. Gillette Co., 194 U.S.P.Q. 84, 86 (N.D. Ill. 1976); Skil Corp. v. Rockwell Int'l Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974). Plaintiff has failed to prove that Kraft's advertising claims with respect to its own product, Kraft Singles, are false, misleading or deceptive.

11.  False advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a). Bernard Food Industries, Inc. v. Dietene Co., 414 F.2d 1279, 1283 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1970); Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 128 (N.D. Ill. 1980). See Vibrant Sales, Inc. v. New Body Boutique, Inc., 652 F.2d 299, 303 n.3 (2d Cir. 1981) (disparagement of another's product is not cognizable under section 43(a)). Even if the Kraft advertising made an express, blatantly false statement with respect to a Borden product (e.g., that Borden's all-dairy cheese slices have 2 ounces or less of milk), this statement would not be covered by section 43(a) because it is a false statement with respect to another's product, not a product put into commerce by the party making the false statement.

*12 12.   In the leading case of Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279 (7th Cir. 1969), cert. denied, 397 U.S. 912 (1976), the Seventh Circuit held that where the defendant, in comparing its food product to plaintiff's, made false representations of fact as to plaintiff's product, a cause of action did not arise under section 43(a). 415 F.2d at 1283-84. Even assuming, as Borden

contends, that the Kraft commercials mislead consumers into believing that all of Borden's cheese slices contain less milk than Kraft Singles, Borden fails to prove a violation of section 43(a). Bernard Food unequivocally holds that '[f]alse advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a).' Id. at 1283.

13.   It is well established that in order to obtain relief under Section 43(a) of the Lanham Act for false comparative advertising, a plaintiff must prove each of the following elements:
(1) Defendant made false statements of fact about its own product;
(2) Those statements actually deceive or have a tendency to deceive a substantial segment of their audience;
(3) Such deception is material, in that it is likely to influence the purchasing decision;
(4) Defendant caused its falsely advertised goods to enter interstate commerce; and
(5) Plaintiff has been or is likely to be injured, stemming either from a decline in sales or a loss in good will.
Ragold, Inc. v. Ferrero, U.S.A., Inc., 506 F. Supp. 117, 124 (N.D. Ill. 1980) (Aspen, J.); Skil Corp. v. Rockwell International Corp., 375 F. Supp. 777, 783 (N.D. Ill. 1974).

14.  Plaintiff has failed to establish that the ??

?? that 3/4 oz. slices are the majority-selling slices with which the consuming public is most familiar. Inasmuch as some of Kraft's 2/3 oz. slices have 5 ounces of milk and all Kraft's 3/4 oz. slices have in excess of 5 ounces of milk, the Kraft advertising statement is true and accurate.

17.   Most importantly, the Kraft '5 ounces' claim must be viewed in the context of the overall advertising statement and comparison made. The Kraft advertising will be read by consumers as representing either or both of the following: (1) that slices of Kraft Singles have significantly more milk than would otherwise be supposed, or (2) that Kraft Singles are superior to imitation cheese slices or have significantly more milk than imitation slices. Neither is an erroneous impression, and therefore there is no violation of Section 43(a). See Toro co. v. Textron, Inc., 499 F. Supp. 241, 252 (S.D.N.Y. 1980).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *12 (N.D.Ill.))

18. The fact that some of Kraft's 2/3 oz. slices have slightly less than 5.0 ounces of milk is not of sufficient substance that the miniscule difference would affect a consumer's purchasing decision. See Toro Co. v. Textron, Inc., 499 F. Supp. 241, 252-53 (S.D.N.Y. 1980). The slight difference between 4.6 oz. and 5.0 oz. is not 'serious enough to constitute a misrepresentation' under Section 43(a). Glenn v. Advertising Publications, Inc., 251 F. Supp. 889, 904 (S.D.N.Y. 1966).

*13 19. Plaintiff has likewise failed to establish that Kraft's advertising violates Subsection 2(5) of the Illinois Uniform Deceptive Trade Practices Act. Ill.Rev.Stat. ch. 121-1/2, § 312(5). Kraft's claim that it puts 5 ounces of milk into every slice of Kraft Singles is neither false nor deceptive.

20. When a challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving the public should be tested by public reaction. Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 317 (2d Cir. 1982); American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir. 1978).

21. Plaintiff offered two market research reports by Rothstein-Tauber in support of its contention that the Kraft advertising is false and misleading; both reports relate to Kraft commercials which have rotated off the air. The reports are, for this reason alone, of little, if any, relevance. This is particularly true in light of the fact that the 'Tell Me When' II and III commercials, which are the subject of this motion for preliminary injunction and are scheduled to air from July 15, 1984 to September 30, 1984, do not rely on a superscript alone to express that the depicted '5 oz. v. 2 oz.' comparison is to substitute/imitation cheese slices. In the 'Tell Me When' II and III commercials, the voice-over announcer expressly states, 'Some imitation slices stop there.' The significant differences between the earlier Kraft commercials, upon which the Borden market research results rely, and the subject commercials, greatly diminish the value of the test reports, even if the methodology employed was not objectionable and biased.

22. A more compelling reason for not giving credence to the two Borden/Rothstein-Tauber surveys is that the methodology employed in them is so flawed as to render them useless. Survey methodology must conform with the following standards which ensure trustworthiness, accuracy, and reliability:

1. A proper universe must be examined and a representative sample chosen;
2. the persons conducting the survey must be experts;
3. the data must be properly gathered and accurately reported;
4. the sample design, the questionnaires and the manner of interviewing must meet the standards of objective surveying and statistical techniques;
5. the survey must be conducted independently of the attorneys involved in the litigation;
6. the interviewers or sample designers must be trained and unaware of the purposes of the survey or the litigation; and
7. the survey respondents must be similarly unaware.

Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736, 754 (D. Col. 1980); see State Wholesale Grocers v. Great Atlantic & P. Tea Co., 154 F. Supp. 471, 497-98 (N.D. Ill. 1957).

23. The value of a survey depends on the manner in which it was conducted— whether the techniques used were slanted or fair. Rhodes Pharmacal Co. v. FTC, 208 F.2d 382, 387 (7th Cir. 1954). The probative value of surveys and reaction tests depend upon the authorship and wording of questions asked interviewees. Sunbeam Corp. v. Sunbeam Furniture Corp., 134 F. Supp. 614, 619 (N.D. Ill. 1955). A survey must be conducted on an objective basis, and the procedures used must be in accordance with accepted standards recognized in the field of statistical surveys. United States v. E. I. DuPont De Nemours, 177 F. Supp. 1, 18 (N.D. Ill. 1959).

*14 24. A survey must be fairly and scientifically conducted by qualified experts and impartial interviewers. James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 278 (7th Cir. 1976).

25. The basis of Borden's Rothstein-Tauber surveys is not objective. The Borden employees involved in the market testing of the Kraft commercials described the objective of both tests as follows: 'The purpose of this test was to determine if consumers who are exposed to the Kraft commercial believe that Borden SWS [singly-wrapped slices] has only two ounces of milk per

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *14 (N.D.Ill.))

Page 11

slice compared to Kraft's five ounces per slice.'
(Pltf's Exs. 5(a), 5(b), 8) The reports of the survey
prepared by the market research firm, Rothstein-
Tauber, express the same objective. (Pltf's Ex. 8—
May 1984 Rpt.; April 1984 Rpt.) The surveys,
therefore, were based on and performed pursuant to
a preconceived notion; as a consequence, they lack
the objectivity required for surveys to be fairly and
impartially conducted.

26. Furthermore, the questionnaires do not meet
the standards of objective surveying and statistical
techniques. The main 'test cell' questionnaire
methodology utilizes a 'forced exposure' method,
i.e., requiring a person to see the Kraft commercial
twice on the spot in the context of what was asked
the respondents both prior to and after the showing
of the commercials. Furthermore, the sole product
use question, put to each respondent in the screening
procedure as the next-to-the-last question prior to
the showing of the Kraft cheese slices commercial,
is one which deals with use of 'individually wrapped
cheese slices.' (Sorensen Aff., ¶14) Given the
forced exposure method plus an undisguised
screening question to sensitize a consumer to such
an unnatural extent, the outcome of the Rothstein-
Tauber surveys was biased. It is unlikely that the
respondents' perceptions about the Kraft Singles
product featured in the commercial and other
competing brands was natural, customary or even
rational.

27. Bias is present in other areas as well. The key
Question No. 6 in the Rothstein-Tauber surveys is
asked only after people have not only been force fed
the Kraft commercial, but also, in earlier questions,
were specifically asked to contrast Kraft with other
brands. Reacting to the obligation to come up with
a conclusion about the number of ounces of milk in
unspecified Borden cheese slices in the wake of the
Kraft commercial being played for them twice, it
would not be surprising if respondents fed back to
their interviewers what their interviewers may have
seemed to been encouraging them to say. In short,
comparisons of Kraft cheese slices with Borden
cheese slices are forced upon survey respondents
with the consequence of stimulating perception that
may deviate substantially from the effect actually
caused by the television commercials in the normal
viewing situation. For these reasons, this court
gives little or no weight to the Rothstein-Tauber
surveys conducted for Borden.

*15 28. In contrast, the Kraft survey conducted by
Dr. Robert C. Sorensen conformed fully to the
standards set forth in the Handbook of
Recommended Procedures For the Trial of
Protracted Cases, 25 F.R.D. 341, 429 (1960), and
also mentioned in such cases as Wuv's International,
Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736,
754 (D. Col. 1980) and State Wholesale Grocers v.
Great Atlantic & Pacific Tea Co., 154 F. Supp.
471, 497-98 (N.D. Ill. 1957). The Sorensen survey
is thus admissible and this court gives great weight
to it, and to the conclusions drawn by Dr. Sorensen.
Based on his results, and to Dr. Sorensen's careful
analysis of them, this court concludes that the Kraft
'Tell Me When II' and 'Tell Me When III'
television commercials do not cause and are not
likely to cause consumers to believe that Borden
cheese slices contain significantly less milk than
KRAFT SINGLES cheese slices.

29. Since only 1.5% of the total respondents in the
Soresen survey referred to Borden in connection
with any comparison between KRAFT SINGLES
cheese slices and any other cheese slices, Borden has
not established that the Kraft advertisements
'actually deceived or have the tendency to deceive a
substantial segment of their audience . . ..' Skil
Corp. v. Rockwell International Corp., 375 F.
Supp. 777, 783 (N.D. Ill. 1974) Borden's own
recent survey conducted by Burke confirms the
insignificance of the number of people that mention
Borded: only 5% of the total respondents, after
subtracting those who accurately refer to the Borden
cheese slices that do have less milk than KRAFT
SINGLES cheese slices.

30. Plaintiff has not demonstrated a reasonable
likelihood of success on the merits of its claims
under § 2(8) of the Illinois Uniform Deceptive
Trade Practices Act. Ill.Rev.Stat. ch. 121 1/2 §
312(8). This section is a codification of the
common law tort of commercial disparagement.
Crinkley v. Dow Jones and Co., 67 Ill.App.3d 869,
876, 385 N.E.2d 714, 719 (1st Dist. 1979); see
Custom Business Systems, Inc. v. Boise Cascade
Corp., 68 Ill. App. 3d 50, 51, 385 N.E.2d 942, 943
(2d Dist. 1979).

31. Plaintiff must prove that the alleged
disparaging statements refer specifically to it. If the
supposedly disparaging statements do not refer to
plaintiff by name, then it must prove that the public

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *15 (N.D.Ill.))

knew the statements referred to the plaintiff. Smith-Victor Corporation v. Sylvania Electric Products, Inc., 242 F. Supp. 302, 307 and 311 (N.D. Ill. 1965).

32. The advertising statement that Kraft puts five ounces of milk into every cheese slice while some imitation cheese slices contain two ounces or less of milk cannot be understood to refer specifically to Borden or its products, as required by the statute. The fact that the vast and overwhelming majority of consumers do not understand the subject commercials to refer to Borden or its products is demonstrated by the credible survey evidence. The Sorensen Survey shows that when the milk content of Kraft Singles is compared with imitation, slices, consumers almost never identify a company or brand by name. Only 27% of the respondents in the Sorensen survey identified a specific brand a company with respect to the amount of milk per slice. Even when specifically asked, only 1.5% of the total survey respondents mentioned Borden. Consumers do not interpret the demonstrated comparison as a Kraft vs. Borden comparison, and do not feel that the commercials depreciate or discount Borden brand products. Likewise, Borden's own Burke Marketing Research Study shows that only 5% of the total respondents even mentioned Burden (after subtracting those who accurately identified those Borden cheese slices that do have less milk than Kraft Singles cheese slices).

*16 33. Another reason plaintiff has failed to demonstrate a reasonable likelihood of success on the merits of its claims under § 2(8) of the Deceptive Trades Practices Act is that it has failed to show that the alleged disparaging statements are false or misleading representations of fact. Ill.Rev.Stat. ch. 121-1/2 § 312(8). The statement that some imitation cheese slices contain two ounces or less of milk is true. Even if Borden were identified, its products in the imitation/substitute category do in fact have less than two ounces of milk. Therefore, the complained-of advertising is not disparagement.

34. Nor has plaintiff demonstrated a reasonable likelihood of success on the merits of its claims under § 2(12) of the Illinois Uniform Deceptive Trade Practices Act. Ill.Rev.Stat. ch. 121-1/2), § 312(12). Plaintiff must show that defendant's statements create a likelihood of confusion or

misunderstanding. Ill.Rev.Stat. ch. 121-1/2, § 312(12). In the context of this statute, 'likelihood of confusion' exists when the accused conduct is likely to confuse or mislead consumers as to the source or origin of a product or services. T. J. Hooker v. Columbia Pictures Industries, 551 F. Supp. 1060, 1064 (N.D. Ill. 1982). 'Likelihood of confusion' has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in trademark infringement cases. Id.

35. The statement that Kraft puts five ounces of milk into every cheese slice while some imitation cheese slices contain two ounces or less of milk certainly does not mislead or confuse consumers as to the source or origin of Kraft singles. Moreover, the Sorensen survey demonstrates that the level of confusion, of any type, is de minimis. Only 3.5% of the respondents found something confusing or difficult to understand in the commercial.

36. Preliminary injunctions are routinely denied in trademark cases if there is laches—an undue delay of even weeks or months in seeking such relief once the plaintiff has or should have knowledge of the wrong. See, e.g., Programmed Tax Systems, Inc. v. Raytheon Co., 419 F. Supp. 1251 (S.D.N.Y. 1976) (four-month delay); Le Cordon Bleu S.a.r.l. v. BPC Publishing Ltd., 327 F. Supp. 267 (S.D.N.Y. 1971) (eight to thirteen-week delay). Such delay speaks volumes about whether a plaintiff is being irreparably injured. Borden's delay clearly indicates that Borden was not being injured at all during Kraft's rapidly increasing commercial broadcasts.

37. Borden was aware of Kraft's television commercials at least as early as January 1984, well over five months ago. (Carfora Aff., ¶4) The parties negotiated from time to time during this period. The previous Kraft commercials were broadcast nationwide without interruption at substantial cost to Kraft. (Blue Aff., ¶11) Although Borden could have filed this action in January, it chose to sit by while Kraft continued to build its consumer franchise with the commercials and sat on its alleged rights for several months, waiting until the objectionable commercials had run their course. Plaintiff's right to preliminary injunctive relief is therefore barred by laches.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *17 (N.D.Ill.))

*17 38. Although the question of irreparable injury need not be addressed if a motion can be disposed of on the issue of probability of success on the merits, Crane Co. v. Harsco Corp., 509 F. Supp. 115, 118 (D. Del. 1981), a failure to demonstrate irreparable harm is of itself fatal to an application for an injunction. See Oburn v. Shapp, 521 F.2d 142, 151 (3d Cir. 1975), cert. denied, 430 U.S 968 (1977).

39. A plaintiff must offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising. Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 316 (2d Cir. 1982); Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 189 (2d Cir. 1980). The plaintiff must submit proof which provides a reasonable basis for that belief. Vidal Sassoon, Inc. v. Bristol-Meyers Co., 661 F.2d 272, 278 (2d Cir. 1981). The likelihood of injury and causation element will not be presumed, but must be demonstrated. Coca-Cola Co. v. Tropicana Products Inc., 690 F.2d 312, 316 (2d Cir. 1982).

40. Irreparable harm must be shown with particularity, and plaintiff must make a clear showing of immediate irreparable injury. See Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980).

41. Plaintiff fails to identify precisely how it would be irreparably harmed if a preliminary injunction is not issued. It merely makes a broad, vague claim of irreparable injury caused by a false impression created in the mind of the consumers. The credible evidence, however, demonstrates no such harm. Since the Kraft commercials started being aired in January, Borden's market share has actually increased due to a substantial sales increase. (Blue Aff., ¶34) The significance of its 8.3 % sales increase is demonstrated by the fact that, during the same period, cheese slice sales volume of Kraft, the market leader, has increased only 2.4%. These facts vividly illustrate that Borden has not and will not be irreparably harmed by Kraft's advertising campaign.

42. Another factor which indicates there is no irreparable harm is Borden's own delay in bringing suit. Borden delayed bringing suit for almost six months, during which time it was not being injured at all by Kraft's commercials. Certainly it cannot now be heard to claim immediate irreparable injury. 'A trademark owner that strongy believed its

customers were being deceived would hardly have remained idle for such an extended period of time.' Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 265 (5th Cir. 1980), cert. denied, 449 U.S 899 (1980).

43. The 'irreparable harm' necessary to warrant the extraordinary remedy of preliminary injunctive relief is that which not only has a great or substantial adverse effect on the movant, but which also cannot be compensated for in damages. American Hospital Association v. Harris, 477 F. Supp. 665, 667 (N.D. Ill. 1979), aff'd, 625 F.2d 1328 (7th Cir. 1980); Merrill Lynch, Pierce, Fenner & Smith, Inv. v. E. F. Hutton & Co., 403 F. Supp. 336, 343 (E.D. Mich. 1975). Not only is defendant Kraft clearly able to respond in damages, but Borden has failed to demonstrate that its claimed injury cannot be compensated for in money damages. To the contrary, Borden has requested money damages to run 'corrective' advertising.

*18 44. In determining whether a preliminary injunction should issue, the court must weigh the 'convenience of the parties and possible injuries to them accordingly as they may be affected by the granting or withholding of the injunction.' Doeskin Products v. United Paper Co., 195 F.2d 356, 358 (7th Cir. 1952), citing Yakus v. United States, 321 U.S. 414, 440 (1944): It is clear that the harm which an injunction will inflict upon defendant Kraft far outweighs any threatened injury to the plaintiff.

45. Plaintiff's failure to pursue legal action for a five-month period during which defendant continued its advertising must be weighed against plaintiff in balancing the equities. See Brennan v. Hawley Products Co., 182 F.2d 945 (7th Cir. 1950), cert. denied, 340 U.S. 865 (1950); Machinery Corp. v. J. D. Adams Mfg. Co., 135 F.2d 617 (7th Cir. 1943)

46. Plaintiff's inability to identify any measurable harm is in marked contrast to the consequences that would flow to Kraft if a preliminary injunction were issued. If this court were to grant Borden's motion, the impact upon Kraft would be devastating. Kraft has already spent over $9 million in the developing, producing, testing and airing the complained-of commercials. (Blue Aff., ¶11) This investment would be lost if the advertising campaign was enjoined at this time. (Blue Aff., ¶33)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1984 WL 1458, *18 (N.D.Ill.))

Page 14

47. If forced to withdraw its ad campaign, Kraft would have to liquidate television time and magazine space now reserved. (Blue Aff., ¶28) The current schedule calls for $4 million in space and time to be spent before the year's end. (Blue Aff., ¶28) Time would not permit production of new advertising, and the Kraft Singles brand would be left without any advertising. (Blue Aff., ¶28) Other injuries and pecuniary losses would result, ranging from forced withdrawal of promotional and incentive programs to injury to business reputation and the Kraft-retailer relationshp.

48. Kraft could not be adequately compensated for its direct losses in the event the injunction were later dissolved or reversed. Customer relations would be disrupted, and Kraft's business reputation would be tarnished.

49. A preliminary injunction is not warranted when such extraordinary expense and injury to defendant would result. Arco Fuel Oil. Co. v. Atlantic Richfield Co., 427 F.2d 517, 519 (2d Cir. 1970).

50. The granting of a preliminary injunction will disserve the public interest. Advertising constitutes protectible commercial speech under the First Amendment to the United States Constitution. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 770 (1975) Comparative advertising is to be encouraged because it helps inform the consuming public.

51. Plaintiff's entire course of action since January 1984 constitutes nothing more than an anticompetitive ploy designed to harass and frustrate its main competitor and market leader. Where a party is simply trying to obtain a commercial advantage, the courts will refuse to grant relief. Proctor & Gamble Co. v. Chesebrough-Pond's Inc., No. 84-0093, slip op. at 26 (S.D.N.Y. 6/11/84).

*19 52. A preliminary injunction must be denied where the application and affidavits reveal that a plaintiff's contentions as to issue of fact and law are seriously disputed. Avins v. Widener College, Inc., 421 F. Supp. 858, 862 (D. Del. 1976). Here, plaintiff's contentions with respect to defendant's advertising, its interpretation as to the application of section 43(a) and the requisites of Illinois law of

disparagement and likelihood of confusion and its survey evidence are all, at the very least, in dispute, if not fully refuted by defendant.

53. With respect to the plaintiff's survey evidence in particular, and especially in light of defendant's own survey evidence, the best that can be said is that there is an ambiguity as to whether or not consumers are misled. Moreover, plaintiff's survey results present too many unresolved issues. In a situation such as this, where the best that can be said is that there is an ambiguity as to whether or not consumers are misled. Moreover, plaintiff's survey results present too many unresolved issues. In a situation such as this, where the best that can be said about plaintiff's case is that ambiguities exist, plaintiff has not sustained its burden of proof. William H. Rover, Inc. v. American Home Products, Inc., No. 83-7808, slip op. at 16-18 (N.D.N.Y. 3/7/84).

## IV. Decision

Based on these principles of law, and the facts thus found, plaintiff's motion for a preliminary injunction must be denied. An appropriate order will be entered.

So ordered.

1984 WL 1458 (N.D.Ill.), 224 U.S.P.Q. 811

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
1999 WL 509471 (S.D.N.Y.), 1999-2 Trade Cases P 72,603
(Cite as: 1999 WL 509471 (S.D.N.Y.))

Page 1

▷

Motions, Pleadings and Filings

United States District Court, S.D. New York.
ZENECA INC., Plaintiff, and
BARR LABORATORIES, INC., Plaintiff-
Intervenor,
v.
ELI LILLY AND COMPANY, Defendant.
No. 99 CIV. 1452(JGK).

July 19, 1999.

Harold P. Weinberger, Esq., Kramer Levin
Naftalis & Frankel LLP, New York, for the
Plaintiff.

Michael K. Atkinson, Esq., Winston & Strawn,
Washington, D.C., Daniel Murdock, Esq., Winston
& Strawn, New York, for the Plaintiff Intervenor.

Nina M. Gussack, Esq., Pepper Hamilton LLP,
Philadelphia, PA, for the Defendant.

OPINION AND ORDER

KOELTL, District J.

*1 The plaintiff, Zeneca Inc. ("Zeneca") [FN1],
and plaintiff-intervenor Barr Laboratories, Inc.
("Barr"), have sued the defendant, Eli Lilly and
Company ("Eli Lilly"), under Section 43(a) of the
Lanham Act, 15 U.S.C. § 1125(a), and under the
common law and statutory law of New York that
prohibits unfair competition and deceptive trade
practices. Zeneca is the manufacturer of the breast
cancer drug tamoxifen citrate (hereinafter
"tamoxifen citrate" or "tamoxifen"), which Zeneca
markets and sells under the name Nolvadex. Barr
distributes generic tamoxifen citrate pursuant to a
licensing agreement with Zeneca. Tamoxifen citrate
has been approved by the Food and Drug
Administration ("FDA") for the reduction of the
incidence of breast cancer in women at high risk of
developing the disease.

FN1. Since this action was filed, Zeneca Inc. has
merged with a pharmaceutical company called Astra.
The merged entity is now called AstraZeneca Inc.
Tr. at 2.

Eli Lilly manufactures and sells the drug raloxifene

hydrochloride (hereinafter "raloxifene") under the
name Evista. Evista has been approved by the FDA
for the prevention of osteoporosis in postmenopausal
women. Zeneca and Barr allege that Eli Lilly is
making three false claims about Evista: 1) that
Evista has been proven to reduce the risk of breast
cancer, 2) that Evista is comparable or superior to
tamoxifen citrate for the prevention of breast cancer,
and 3) that Evista has been indicated or approved by
the FDA for the prevention of breast cancer.
Defendant Eli Lilly argues that it has not made the
second or third claims alleged. As to the first claim,
the defendant argues that such a claim is not false
because Evista has been proven to reduce the risk of
breast cancer.

Zeneca and Barr have moved for a preliminary
injunction. Following extensive expedited
discovery, the Court held a five-day evidentiary
hearing. As explained in detail below in the Court's
Findings of Fact and Conclusions of Law, Eli Lilly
has been promoting Evista with the claim that it has
been established that it reduces the risk of breast
cancer. That claim is based on the results of a
significant clinical trial--the Multiple Outcomes of
Raloxifene Evaluation ("MORE") study--but the
results of that trial do not prove that it has been
established or proven that Evista reduces the risk of
breast cancer. Further research is necessary to
support the claim, and the FDA has specifically
required Eli Lilly to include in the label for Evista,
while discussing the results of the MORE trial, that
"[t]he effectiveness of raloxifene in reducing the risk
of breast cancer has not yet been established."
Def.'s Exh. H (Evista Package Insert Revised as of
Dec. 2, 1998) at 8. Hence, it is literally false for Eli
Lilly to promote Evista with the claim that it has
been established or proven that Evista reduces the
risk of breast cancer. It is important in the public
interest that the results of the MORE trial, as
discussed below, be disseminated so that doctors and
public health professionals can assess and
understand the results of that study. It is also
important, however, that the results of that study be
truthfully disseminated and that false claims not be
made, because false claims will not only hurt
competitors who are marketing a drug that has been
established to reduce the risk of breast cancer, but
such false claims will also harm the public interest
in assuring that truthful information about highly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



significant drugs is disseminated.

*2 As a preliminary matter, during the evidentiary hearing the parties raised a number of hearsay objections. The Court received the evidence, including hearsay evidence such as affidavits, subject to a motion to strike. In reaching the Findings of Fact and Conclusions of Law, the Court has considered the hearsay objections raised by all parties. The Court has concluded that the objections do not warrant exclusion of the evidence. The Court has, however, carefully considered the reliability of all the disputed evidence and will separately discuss the evidence as to which objections were made. The strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction. *See, e.g., Securities and Exch. Comm'n v. Cherif,* 933 F.2d 403, 412 n.8 (7th Cir.1991), *cert. denied,* 502 U.S. 1071 (1992); *Asseo v. Pan American Grain Co.,* 805 F.2d 23, 25-26 (1st Cir.1986); *Commodity Futures Trading Comm'n v. American Metal Exch. Corp.,* 693 F.Supp. 168, 173 (D.N.J.1988); *Delman Fabrics Inc. v. Holland Fabrics, Inc.,* 84 Civ. 2512, 1984 WL 367, at *5 (S.D.N.Y. May 17, 1984). The Court has, nevertheless, applied the Federal Rules of Evidence in determining the weight to be accorded the evidence that was introduced and has also assessed whether the evidence would be admissible under the Federal Rules of Evidence.

The defendant objects first to the admissibility of the "call notes" that were written by Eli Lilly sales representatives about their meetings with and "detailing" of doctors concerning Evista. The defendant argues that the call notes are inadmissible hearsay and do not meet any of the exceptions to the hearsay rule.

As an initial matter, as noted above, the Court may consider hearsay evidence in a preliminary injunction hearing. In any event, the call notes satisfy the business records exception to the hearsay rule. *See* Fed.R.Evid. 803(6). The testimony of Newt Crenshaw, Eli Lilly's Vice President of U.S. Sales, established that sales representatives are required to submit call notes in the course of their duties, that they are trained in how to make call notes, and that the call notes are required to be typed up as soon as possible after each visit with a doctor--usually the same day as the visit itself. Moreover, the call notes are intended to be accurate because sales representatives rely on the call notes

when planning future meetings with doctors. The call notes are also backed up on a central computer system. Tr. at 152-63 (Crenshaw); *see also* Tr. at 852-53, 875-78 (Torres) (indicating that call notes are like a "diary" and that they are used by sales representatives and their partners to record accurate information). It is plain that the notes are made at or near the time of the meeting with the doctors by a sales representative with knowledge of the meeting, that the call notes are kept in the ordinary course of Eli Lilly's business, and that it was the regular practice of Eli Lilly's sales representatives to write and keep call notes. Thus the call notes are admissible under Rule 803(6). *See, e.g., United States v. Goodchild,* 25 F.3d 55, 62 (1st Cir.1994).

*3 The call notes are also admissible as admissions under Federal Rule of Evidence 801(d)(2)(D). To be admitted under Rule 801(d)(2)(D), a party must demonstrate only "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condominium Assoc.,* 963 F.2d 534, 537 (2d Cir.1992). In this case, the plaintiff has demonstrated that an agency relationship existed between the sales representatives and Eli Lilly, that the statements in the call notes were made during the course of that relationship, and that the call notes concerned a matter within the scope of the agency relationship--namely the promotion and detailing of Evista. Thus the call notes are admissible under Rule 801(d)(2)(D).

Moreover, the probative value of the notes is not outweighed by any danger of unfair prejudice. The notes are highly probative of what the representatives said, which is an important issue in the case, they are not inflammatory, and they do not present a situation where the Court is being asked to consider them for an improper purpose. There is no basis for arguing they should be excluded under Federal Rule of Evidence 403.

The defendant next moves to exclude certain FDA documents on hearsay grounds. But hearsay evidence is admissible in a hearing on a preliminary injunction. Further, the documents are not hearsay to the extent that they are not offered for their truth. Here, the plaintiff seeks to admit the FDA documents for the fact of what the FDA said to Eli Lilly about Evista, the results of the MORE study,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



and the meaning of the language in the Evista label. The documents are relevant to Eli Lilly's contention concerning the FDA's interpretation of the MORE study and the meaning of the language on Evista's label stating that "[t]he effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Thus the documents are admissible as non-hearsay.

The FDA documents—in particular the minutes of the January 1999 and May 1999 meetings—are also admissible under the exception to the hearsay rule for public records that set forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(c). The Meeting Minutes sought to be admitted contain factual findings by the FDA concerning Evista's efficacy for breast cancer prevention. The Minutes were the result of a timely review. There is no dispute that the FDA has the authority to and routinely does evaluate clinical data submitted by pharmaceutical companies and that the FDA's Division of Oncology Drug Products specifically performs this function with respect to cancer drugs. Tr. at 428- 29 (Carlson); Tr. at 740-41 (Cummings). Moreover, the FDA's investigators have technical skill and expertise and were unbiased. In addition, other factors confirm the reliability of the documents. For example, Eli Lilly was given the opportunity to review the Meeting Minutes and to correct any errors in them. Tr. at 1117-18 (Dere); Def.'s Exh. K-9 (stating in cover letter to Meeting Minutes from May 11, 1999 that "[t]hese minutes are the official minutes of the meeting. You are responsible for notifying us of any significant differences in understanding you have regarding the meeting outcomes"). Thus the FDA documents, including the Meeting Minutes, are trustworthy and admissible.

*4 The fact that the Minutes are the FDA's non-final factual findings does not render the reports untrustworthy and inadmissible. See Reynolds v. Giuliani, 98 Civ. 8877, 1999 WL 33027, at *2 (S.D.N.Y. Jan. 21, 1999); Meriwether v. Coughlin, 879 F.2d 1037, 1039 (2d Cir.1989) (noting admission of a page of an interim report). The Pullman case cited by the defendant is not to the contrary because it affirmed the exclusion of a non-final report by a government agency not merely

because the report was an "interim" report but also because the report, unlike the FDA minutes, "expressly declined to state a conclusion on the most significant safety question" at issue in that case. See City of New York v. Pullman Inc., 662 F.2d 910, 914-15 (2d Cir.1981). In sum, the defendant has not demonstrated that the FDA Meeting Minutes are untrustworthy and thus the motion to exclude them is denied. The defendant was, of course, permitted to introduce evidence that goes to the weight to be given to the factual conclusions stated in the Meeting Minutes and that evidence has been considered by the Court.

Finally, the Court will consider the doctors' affidavits that have been submitted by the defendant. These affidavits attempt to contradict some of the call notes. Def.'s Exhs. T-4 through R-5. The strict rules of evidence do not apply in a preliminary injunction hearing. However, the Court is mindful of the fact that there is a preference for live testimony when the Court is called on to resolve disputed issues of fact. See, e.g., Davis v. New York City Housing Auth., 166 F.3d 432, 437-38 (2d Cir.1999) ("When a factual issue is disputed, oral testimony is preferable to affidavits."); Fox Broadcasting Co. v. Fox Broadcasting Co., 86-4989, 1986 WL 11445, at *1 (E.D.Pa. Oct. 9, 1986) (determining that the Court would consider affidavits in deciding a motion for a preliminary injunction even though the authors of the affidavits were not available to be cross-examined, but noting that the Court would be aware of that objection "in determining the evidentiary weight of any relevant affidavit"); cf. Securities and Exch. Comm'n v. Petrofunds, Inc., 414 F.Supp. 1191, 1196 (S.D.N.Y.1976) (noting that when district judges are asked to award preliminary relief, they are "not to resolve a factual dispute on affidavits or depositions for then (they are) merely showing a preference for one piece of paper to another") (internal citation omitted) (Weinfeld, J.). Thus although the Court will consider the doctors' affidavits, the affidavits are necessarily of less weight than the live testimony of witnesses who were available and subject to cross-examination at the hearing.

The Court now makes the following findings of fact and reaches the following conclusions of law.

I.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *4 (S.D.N.Y.))

Page 4

## FINDINGS OF FACT

### A. The Parties

1. Plaintiff Zeneca is a Delaware corporation with its principal place of business in Wilmington, Delaware. The company researches, develops, and produces medicines. (Compl. ¶ 6; Ans. ¶ 6.) Zeneca manufactures and sells a breast cancer drug called Nolvadex (tamoxifen citrate). Nolvadex has been approved by the FDA for the reduction of the incidence of breast cancer in women at high risk of developing the disease. Pl.'s Exh. 3 (Nolvadex label) at p. 13.

*5 2. Defendant Eli Lilly is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Eli Lilly is a global pharmaceutical corporation that, like Zeneca, researches, develops, and markets medicines for use in a variety of therapeutic areas. Eli Lilly advertises, distributes, and sells its pharmaceutical products throughout the United States. (Compl. ¶ 7; Ans. ¶ 7.)

3. Plaintiff-intervenor Barr is a New York corporation with its principal place of business in Pomona, New York. Pursuant to a Distribution and Supply Agreement between Barr and Zeneca, Barr purchases from Zeneca and then distributes generic tamoxifen citrate under its own name. Tamoxifen citrate accounts for over 60% of Barr's net sales. Barr also markets two hormone replacement drugs for use in the treatment of osteoporosis, which compete directly with Eli Lilly's osteoporosis drug Evista. (Barr Compl. ¶ 8; Tr. at 548, 552-53 (Sawyer)). [FN2]

> FN2. Barr moved to intervene approximately one month after Zeneca commenced this action. On May 4, 1999, the Court granted Barr's motion pursuant to Federal Rule of Civil Procedure 24(a)(2) and (b)(2). *See* Order dated May 4, 1999. Barr did not participate in expedited discovery but did attend and offer testimony at the hearing on the preliminary injunction.

### B. Zeneca's breast cancer drug Nolvadex

4. In the 1970s, scientists at Zeneca developed a synthetic hormone "antagonist" called tamoxifen citrate, which was shown to have significant "anti-estrogenic" properties. Tamoxifen "antagonizes," or counteracts or neutralizes, the cancer-promoting effects of estrogen in the breast by binding itself to the estrogen receptor in a cancerous cell. The presence of an anti-estrogen such as tamoxifen prevents estrogen from binding to the receptor,

which in turn affects tumor growth. Tamoxifen has since been used, either in addition to or in lieu of more drastic and invasive forms of therapy, to treat both early and advanced-stage breast cancer and to prevent recurrence. Since it was first discovered nearly thirty years ago, tamoxifen has become the most widely prescribed treatment for breast cancer. Tr. at 42, 46-47 (Anson); Tr. at 299-301 (Lewis).

5. Zeneca markets tamoxifen under the brand name Nolvadex. Nolvadex is one of Zeneca's most successful and widely-prescribed products. Nolvadex was originally approved by the FDA for the treatment of advanced breast cancer in 1978. It was later approved for other uses, including early stage adjuvant treatment, this is, treatment after the primary treatment for breast cancer, such as surgery. Tr. at 42, 47 (Anson); Tr. at 299-302 (Lewis).

6. Beginning in 1992, the National Cancer Institute (NCI) sponsored a clinical trial, conducted by the National Surgical Adjuvant Breast and Bowel Project (NSABP), to determine whether the use of tamoxifen could play a role in reducing the incidence of breast cancer in healthy women at high risk of developing the disease. This Breast Cancer Prevention Trial ("BCPT") enrolled more than 13,000 pre- and post-menopausal women at 131 different clinical sites. Tr. at 49 (Anson); Tr. at 306-08 (Lewis); Tr. at 440 (Carlson).

7. All the women recruited for the study were determined to be at high risk for developing breast cancer. Each woman qualifying for the study had to satisfy at least one of the following three enrollment criteria: (i) a history of lobular carcinoma in situ—benign breast tumors which are a known precursor to invasive or metastatic breast cancer, (ii) a score of 1.67 or higher on a breast cancer risk assessment model called the GAIL model, [FN3] and/or (iii) an age of 60 or older. Thirty percent of the patient population in the BCPT qualified based on the age criteria alone. The remainder fell into the other two risk categories. Tr. at 306-10 (Lewis).

> FN3. The GAIL risk assessment model is a mathematical formula used to predict a woman's chances of developing breast cancer based on all known risk factors, including age, family history of breast cancer, age at onset of menstruation, age at first live birth, and number of benign breast biopsies. Tr. at 298-99 (Lewis); Tr. at 417 (Carlson).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *6 (S.D.N.Y.))

Page    5

*6 8. The BCPT study demonstrated that the
ongoing use of tamoxifen citrate by women at high
risk of developing breast cancer reduced the
incidence of invasive breast cancer by 49 percent.
The results were so positive that NCI discontinued
the study in March of 1998 to allow all high-risk
women--including those in the placebo arm of the
study--to benefit from its findings. Tr. at 49- 50
(Anson); Tr. at 310-12 (Lewis).

9. In April 1998 Zeneca submitted a supplemental
New Drug Application ("sDNA") to the FDA
seeking approval of tamoxifen for use in reducing
the incidence of breast cancer. Based upon the
results of the Breast Cancer Prevention Trial, on
October 29, 1998 the FDA, after an expedited
review, approved tamoxifen for the reduction of the
incidence of breast cancer in both pre- and
postmenopausal women at high risk of developing
the disease. Tr. at 47-49 (Anson); Tr. at 314-15
(Lewis); Pl.'s Exh. 3 (Nolvadex Label) at p. 13.

10. In the period between the conclusion of the
BCPT trial and the FDA's approval of tamoxifen
for the reduction of the risk of breast cancer,
Zeneca devoted substantial time, energy, and
resources to developing a marketing plan for
tamoxifen's new indication. According to Lisa
Anson, Zeneca's Business Development Manager
for Oncology, the new indication for tamoxifen
was viewed as a "very significant opportunity" for
Zeneca--a potential "blockbuster drug." Tr. at 51-
52 (Anson). Ms. Anson also highlighted the
difficulties facing Zeneca in marketing tamoxifen
for breast cancer risk reduction because of the fact
that "nobody has ever had a drug in the area of
prevention" and "there [was] no ... market for risk
reduction or prevention." Tr. at 52 (Anson).
Zeneca thus had to create the market from scratch.
Tr. at 51-53, 100 (Anson).

11. Shortly after FDA approval, in early November
1998 Zeneca began promoting tamoxifen for its
new indication for the reduction of the risk of
breast cancer. Tr. at 53 (Anson).

12. Over time, researchers have discovered that
Nolvadex is associated with an increase in the risk
of uterine cancer. This increased risk was not
discovered until about ten years after tamoxifen
was approved in the United States. Tr. at 303-05,
364 (Lewis).

C. Eli Lilly's osteoporosis drug Evista

13. One of Eli Lilly's products in the field of
women's health is an osteoporosis drug called

Evista. Evista, which contains the active ingredient
raloxifene hydrochloride, was first approved by the
FDA in December 1997, solely for the prevention
of osteoporosis in postmenopausal women. Tr. at
54 (Anson); Tr. at 317 (Lewis).

14. Evista is an important product for Eli Lilly. At
least during the period right after launch, however,
sales of Evista were disappointing. Tr. at 855
(Torres). Eli Lilly has since revised its Evista sales
projections downward. Tr. at 856-57 (Torres).

15. While breast cancer is often associated with a
high cumulative exposure to estrogen, osteoporosis
afflicts women at the opposite end of the hormonal
spectrum--those with reduced levels of estrogen.
Estrogen acts on the bone to maintain bone density
and thereby prevent osteoporosis. This may explain
why postmenopausal women, who have less
circulating estrogen, become increasingly
vulnerable to osteoporosis. Tr. at 720 (Cummings);
Tr. at 337-38 (Lewis); Tr. at 456-57 (Carlson).

*7 16. Raloxifene, like tamoxifen, has been shown
to have both estrogenic and anti-estrogenic
properties. Tr. at 317-18 (Lewis). However,
raloxifene is structurally different from tamoxifen.
Tr. at 317-19 (Lewis).

17. In the mid-1990s, Eli Lilly scientists began a
series of ten osteoporosis studies, one of which was
titled "Multiple Outcomes of Raloxifene
Evaluation" or "MORE." There is no dispute that
the results from nine of these studies, even when
combined, did not demonstrate that raloxifene
decreases the incidence of newly diagnosed breast
cancer. Tr. at 655 (Cummings); Tr. at 905-06
(Eckert); Tr. at 1125 (Dere); Lippman Dep. Tr. at
155-56.

18. The MORE study itself was a randomized,
double-blind, placebo-controlled, multicenter
clinical trial. The women in the study were
randomly assigned to be given either raloxifene or
a placebo, and neither they nor their doctors knew
whether they were taking raloxifene or a placebo.
Tr. at 608-09, 622 (Cummings); Pl.'s Ex. 37
(Clinical Study Main Report for the MORE study)
at EV 2718 1545. The MORE study was designed
to examine the outcomes of exposure to raloxifene
and to gather the data necessary to secure an
indication for Evista for the prevention of
postmenopausal osteoporosis. Tr. at 618-19
(Cummings).

19. As discussed below, Eli Lilly has predicated its
claim that Evista has been proven to reduce the
incidence of breast cancer on the results of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *7 (S.D.N.Y.))

MORE study. As of the date the study was terminated in early 1999, a total of forty cases of invasive breast cancer were reported among MORE study participants, 27 for the patients taking placebo and 13 for the nearly twice as many patients taking raloxifene. Tr. at 406-10 (Carlson); Def.'s Exh. L-9 ("The Effect of Raloxifene on Risk of Breast Cancer in Postmenopausal Women," *The Journal of the American Medical Association ("JAMA")*, June 16, 1999) [FN4] at 2192: The results of the MORE study are discussed in greater detail below. Eli Lilly also plans to participate in a five-year comparative trial titled Study of Tamoxifen and Raloxifene ("STAR"), sponsored by NCI/NSABP, which will test the potential efficacy of Evista against the proven efficacy of tamoxifen in reducing the risk of breast cancer in postmenopausal women. Enrollment in STAR has just begun and the study likely will not be completed for at least five years. Tr. at 322 (Lewis); Pl.'s Exh. 34 (NSABP Protocol P-2 Study of Tamoxifen and Raloxifene (STAR) for the Prevention of Breast Cancer) at Z 15096.

FN4. The Journal of the American Medical Association, or "JAMA," is a prestigious medical journal in the United States. Lippman Dep. Tr. at 45.

D. Eli Lilly's promotional claims for Evista
20. Although Evista is an osteoporosis drug, Eli Lilly planned to market Evista for breast cancer prevention. Eli Lilly's market strategy documents and business plans contain numerous references to Evista's long-term "value proposition" and brand strategy that "Evista is the only single agent proven to safely protect women after menopause against three of the most serious threats to their health and independence: osteoporosis, breast cancer, and cardiovascular disease." Pl.'s Exh. 9 at EV 2014-1599; Pl.'s Exhs. 11 & 67. Eli Lilly witnesses have also described Evista's "competitive advantage," at least over the long term, as protecting against the risk of breast cancer. Tr. at 217-19 (Torres).
*8 21. Eli Lilly's internal documents also reflect the company's understanding, based on market research it commissioned, that if Eli Lilly could make a breast cancer prevention claim for Evista, it would have a substantial impact on physicians and differentiate Evista from competitors. Tr. at 217-24 (Torres); Pl.'s Exh. 9 at EV 2014-1582, 1585,

1602.
22. A primary form of advertising for Evista takes place through in-person visits by Eli Lilly sales representatives to physicians. Tr. at 144 (Crenshaw); Tr. 245-47 (Nicholson); Tr. at 857-59 (Torres). Sales representatives are an important source of information for physicians about prescription drugs, and physicians—who are the "gatekeepers" for patients, Tr. at 233-34 (Harenberg)— often rely to some extent on the information they are given by sales representatives in determining what drugs to prescribe. It is thus critical that sales representatives convey accurate and reliable information when detailing drugs to physicians. Tr. at 44-45 (Anson); Tr. at 166-68 (Crenshaw).
23. Eli Lilly has approximately one thousand primary case sales representatives. These representatives receive a base salary as well as a bonus based on the number of prescriptions for Eli Lilly drugs written by physicians they visit. The representatives detail an average of eight doctors per day, which translates into nearly 200 detail visits each month. Tr. at 147-49, 151 (Crenshaw); Tr. at 857 (Torres). The evidence suggests that each detail visit lasts an average of just two to three minutes. During those two to three minutes, representatives must detail several Eli Lilly drugs, not just Evista. Tr. at 798-99 (Torres).
24. Eli Lilly has several measures in place to ensure that its representatives convey authorized and intended messages to physicians and that they follow-up appropriately in subsequent visits. To that end, Eli Lilly provides its sales representatives with selling scripts or "verbatims" that tell them what to say to doctors about Evista either proactively or in response to questions from physicians. Tr. at 801-02 (Torres).
25. In addition, Eli Lilly representatives are trained and required to maintain written notes, prepared as soon as possible after each visit with a physician, encapsulating the visit. The purpose of these "call notes" is to provide an accurate record of what the sales representative and the doctor discussed and to record contemporaneously what the representative believes were the most salient aspects of each visit. Eli Lilly's Vice President of U.S. Sales, Newt Crenshaw, testified that the call notes are "utilized by that sales representative and/or their partner in the ongoing dialogue or promotional efforts with a given physician." Tr. at 154 (Crenshaw); *see also* Tr. at 152-60 (Crenshaw); Tr. at 877-78 (Torres).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *8 (S.D.N.Y.))

As contemporaneous written accounts, they are the best evidence of what the representatives communicated to doctors during their detail visits. *9 26. Eli Lilly also relies on market research to track the messages that its sales representatives are conveying to physicians. Tr. at 168 (Crenshaw). In the case of Evista, Eli Lilly commissioned a series of surveys conducted bimonthly throughout 1998 by a market research firm called Richard Day Research. Under Eli Lilly's guidance and direction, Richard Day periodically surveyed hundreds of physicians who had recently been detailed by an Evista sales representative and asked them among other things to describe the message the Eli Lilly representative had communicated about Evista. Tr. at 234-36 (Harenberg). According to John Ross, the Project Manager at Richard Day who together with Eli Lilly designed and conducted this survey, "one of the goals of the study [was] to get a sense of the message that was being delivered to those doctors from those reps and see if specific messages were being recalled by those doctors or not." Tr. at 519 (Ross).

27. The evidence adduced at the hearing demonstrates that since at least October 1998, Eli Lilly representatives have been communicating to physicians that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen in reducing the risk of breast cancer. This evidence includes the following: (i) Eli Lilly's detail scripts distributed to sales representatives in November and December 1998, (ii) the sales representatives' call notes, (iii) the testimony of Eli Lilly business executives, (iv) eyewitness testimony, and (v) a Richard Day survey conducted in late November and early December 1998.

28. In mid-1998, even before tamoxifen had received an indication from the FDA for breast cancer risk reduction, Zeneca began receiving anecdotal reports that Eli Lilly was promoting Evista for breast cancer prevention. In late May 1998, Zeneca's Chief Executive Officer wrote to Eli Lilly's president asking him to put a halt to any improper breast cancer promotion by the company's sales representatives. See Pl.'s Exh. 1 (Ltr. from T.F.W. McKillop to Sidney Taurel dated May 29, 1998). In June 1998, Eli Lilly's president denied Zeneca's accusations and communicated to Zeneca that any such claims by Eli Lilly sales representatives would be cause for "serious disciplinary action" by the company. His

letter assured Zeneca that

sales representatives have been instructed repeatedly and in no uncertain terms that they cannot promote Evista for the prevention of breast cancer. We regularly check promotional message recall with our customers through controlled market research, and breast cancer prevention has not been mentioned, as you would expect were our representatives promoting Evista for that use.

Pl.'s Exh.-2 (Ltr. from Sidney Taurel to T.F.W. McKillop dated June 3, 1998); Tr. at 54-59 (Anson).

29. Zeneca was reassured by the letter from Eli Lilly's president, concluding that Eli Lilly "took our issues very seriously" and responded "as you would expect them to behave as a major pharmaceutical company." Tr. at 59 (Anson). However, in late 1998, after the launch of the new indication for breast cancer prevention for Nolvadex, Zeneca gradually began to hear more and qualitatively broader anecdotal evidence that Eli Lilly representatives were making the claims in question. Zeneca also commissioned market research as part of its Nolvadex launch, and that research, particularly the studies completed in January 1999, provided more concrete proof that Eli Lilly's representatives were making breast cancer risk reduction claims. Tr. at 62-68 (Anson).

*10 30. As set forth below, it appears that Eli Lilly began communicating two of the claims in question—that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen in reducing the risk of breast cancer—in a systematic way in late 1998, when Eli Lilly issued new verbatim scripts for its sales representatives. However, there is insufficient evidence to conclude that Eli Lilly was communicating the third alleged claim—that Evista is approved or indicated by the FDA for reduction of the risk of breast cancer.

### 1. *The November and December 1998 detailing scripts*

31. Until November 1998, Eli Lilly had in place a verbatim script which stated only that recent data have shown that Evista "may also prevent breast cancer." Pl.'s Exh. 14 (Document re: Sales Representative Verbatim Response to Evista and Breast Cancer Prevention Questions dated May 14, 1998). This was part of a verbatim response that could be given to an unsolicited question by a doctor as to whether Evista prevented breast

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *10 (S.D.N.Y.))

cancer. It was linked to the message that Evista prevented osteoporosis without increasing the risk of breast cancer. Shortly after Zeneca obtained the risk reduction indication for tamoxifen from the FDA, Eli Lilly revised its selling script for its sales representatives. Tr. at 867 (Torres); Pl.'s Exh. 15 (Document re: Questions comparing the ability of Evista and tamoxifen to prevent the incidence of newly diagnosed breast cancers dated Nov. 18, 1998). In an effort to position Evista as a drug that could also be used in the same way as tamoxifen, Eli Lilly told its representatives in November 1998 that in response to unsolicited questions from physicians concerning the comparative efficacy of the two drugs, Eli Lilly representatives should reply as follows:

Dr., Evista is not approved for the prevention of breast cancer. However, let me share with you these data we currently have with regard to Evista reducing the incidence of breast cancer.

Dr., these data come from about 13,000 women age 45–80 enrolled in our osteoporosis prevention and treatment studies. Women who have taken Evista for an average of 29 months had a greater than 50% reduction in the incidence of newly-diagnosed breast cancers compared with the placebo group. While we do not currently have head-to-head trials, *these results are similar to those for tamoxifen in women at high risk of breast cancer.*

Pl.'s Exh. 15 at EV 2609 327-28 (emphasis added). The script went on to promote the purported superior safety profile of Evista over tamoxifen: "Dr., a very distinct difference between Evista and tamoxifen lies in the uterine safety profile. In women, tamoxifen increases endometrial thickness, and increases the risk of polyps, and endometrial cancer. In contrast, Evista, does not increase endometrial thickness or increase the risk of endometrial cancer." *Id.* at 328.

32. As Eli Lilly has acknowledged, without a head to head trial there is no scientific basis for drawing this comparison, particularly the statistical comparison of the efficacy of the two drugs in the same population. Tr. at 180 (Crenshaw); Tr. at 740 (Cummings). Indeed, Eli Lilly's Director of Oncology Business testified that he could think of no situation in which it would be appropriate for an Eli Lilly sales representative to compare tamoxifen to Evista. Tr. at 251 (Nicholson).

*11 33. In December 1998, the FDA approved a change in the safety portion of Evista's label to

include results of the MORE study with respect to breast cancer, which was a secondary endpoint of the MORE study. Tr. at 619 (Cummings); Tr. at 846 (Torres); Tr. at 914-16 (Eckert). The approved language in the new package insert stated that: Among 7017 women randomized to raloxifene, there were 6 cases of invasive breast cancer per 14,605 person-years of follow-up (0.41 per 1000). Among 3368 women randomized to placebo there were 10 cases of invasive breast cancer per 6991 person-years of follow-up (1.43 per 1000). *The effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established.* Def.'s Exh. H (Evista Package Insert Revised as of Dec. 2, 1998) at 8 (emphasis added). [FN5]

FN5. The most recent data from the MORE study have shown 27 cases of invasive breast cancer in those women taking a placebo and 13 cases for those women taking raloxifene.

34. As a result of the label change, Eli Lilly gave its sales representatives a revised detailing script, which was distributed to the Evista sales force in mid-December. That detailing script instructs representatives to deliver the following message: Dr., the FDA has recently approved a label (package insert) change for EVISTA regarding the incidence of newly diagnosed invasive breast cancer....

As you can see [from the package insert] this reflects a greater than 50% reduction in newly diagnosed breast cancer compared to placebo. As a matter of fact, in our clinical trial of over 10,000 women of which 7,017 took EVISTA as compared to 3,368 who took placebo, there was a greater than 50% reduction in the incidence of newly diagnosed breast cancer.

Pl.'s Exh. 21 (Document re: Evista 3-year interim analysis from the Multiple Outcomes of Raloxifene Evaluation (MORE) study regarding fracture data and label change regarding breast cancer dated Dec. 11, 1998) at EV 2218 668. The sales script also provides that in the event physicians ask, "how can EVISTA show prevention of breast cancer with only 16 patients?" the appropriate response is that "10 cases of invasive breast cancer were diagnosed in the placebo group and six were diagnosed in the Evista group" and "[t]his information translates to a greater than 50% reduction in breast cancer risk.". *Id.* at 672; *see also* Pl.'s Exh. 67 at EV 205 77[5] (noting that in "Q4 '98," Eli Lilly "added proactive



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *11 (S.D.N.Y.))

BC information" to its core message).

35. As part of the label change, the FDA required Eli Lilly to place on the label the following statement: "The effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Def.'s Exh. H at 8. The December script instructed that, if representatives are asked what that sentence means, they should respond: "This is somewhat standard language included by the FDA to ensure that physicians understand that studies are ongoing and EVISTA is not indicated for the prevention of breast cancer." Pl.'s Exh. 21 at EV 2218 673. The plain language of the statement contradicts that interpretation.

**2. _Eli Lilly sales representatives' call notes_**

*12 36. In light of these instructions, Eli Lilly sales representatives have repeatedly told physicians that Evista is a proven breast cancer prevention drug and a proven alternative to tamoxifen. Tr. at 230, 874-75 (Torres). From October 1998, when Nolvadex was first approved for breast cancer risk reduction, through March 1, 1999, after this suit was filed, call notes made by Eli Lilly sales representatives contain more than 500 entries in which Eli Lilly representatives report making explicit breast cancer efficacy claims about Evista. Those claims fall into the following two categories and are typified by the statements quoted below.

a. Claims that Evista has been _proven to reduce the risk of breast cancer_

. "I explained evista decreases risk of breast cancer drastically compared to placebo." (10/8/98-844401745)

. "[I] tell him that e reduces the incidence of newly diagnosed breast cancer ranging from 50 to 80%." (10/20/98-210000310)

. "[H]it him with strong evista message...he asked if we have a cancer indication or a treatment indication...told him the indication are coming it's just a matter of time...but the data is there and is strong." (11/4/98- 338007116)

. "Ev: he basically said he doesn't believe the claims Ev has made... w/cancer (breast cancer reductions) ...need to be confident in standing up for Ev and telling him these claims are proven not suspected." (11/16/98-348606679)

. "She mentioned that Evista doesn't reduce the risk of breast cancer [sic]. I sd well doctor that is not true any longer. I then went through the MORE

data and Asco data." (11/17/98-657601659)

. "Promoted breast cancer prevention need to remind her next time." (11/24/98-807602090)

. "Told [Dr.] that all pm pts are right because evista ... has been shown to reduce cancer risk." (12/4/98-615802967)

. "Evista 3 combined benefits for the prevention of all three diseases not just one." (12/4/98-736800257)

. "Told him new data on EV...now shown to reduce risk of newly diagnosed breast cancer vs placebo." (12/15/98-489006635)

. "[H]e asked does that mean you can be used for breast cancer—I said no we do not have breast cancer indication but by the fda allowing us to put this data in our pi they believe there is a defenite [sic] decrease risk." (1/11/99- 848001303)

. "I told him to rest assure and to tell Pt.'s actually reducing the incidence of breast cancer." (1/20/99-848801004)

. "He said Evista will be huge once we can say for sure that it protects women against breast cancer. I said 'with all due respect, Dr. Dejarnatte, that's what the package insert now states with the change that took place in December.' " (1/25/99-761405939)

. "I told him now he can actually say with confidence that Evista actually reduces the incidence of breast cancer..." (1/26/99-848801056)

. "[P]oint out the fact that there's no 'up-in-the-air' w/ evista, because we know it reduces breast cancer, etc." (2/8/99-240003187)

*13 . "[Q]uick reminder evista builds bone, lowers lipids and reduces the risk for breast cancer...." (2/12/99-618492020)

. "Told her that EV is not a BC drug, but the BC prevention is an element of the combined benefits of the drug." (2/25/99-678008612)

. "Bottom line is why give women agent that will make them worry they could get breast cancer when can give an agent that can prevent it." (3/1/99- 740210792)

Pl.'s Exh. 25 (Call Notes of Eli Lilly Representatives).

b. _Claims that Evista is proven equal or superior to Tamoxifen_

. "[E]vista 3 way—wanted to know re breast cancer data—told him the 60-80% reduction—he said what about tamox—said evista's data is better and doesn't

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *13 (S.D.N.Y.))

Page  10

increase risk for endometrium either." (10/5/98-578403397)

. "F [follow up]: Push tamoxifen vs evista-BC data doc needs to hear again and again-why even start pats on tamoxifen?" (10/15/98-623600314)

. "[H]e asked right away about BC, went into MORE and compared w/ Tamoxifen, we agreed that evista is a much better choice...." (11/3/98-244001904)

. "He then wanted to know if I was saying-replace Tamoxifen with Evista. I said well, no FDA approval, but most of the doctors are already doing that, what will you do? He said Tamoxifen rep already came to detail him. I said so far what you have is study on Tamox vs. placebo and Evista vs. placebo, although you can't really compare, Evista looks better and without the endo effects." (11/16/98-422406095)

. "evista-3 way combined benefit given, interested in the STAR study and the breast cancer prevention, mentioned the MORE study and that evista's reduction in incidence of newly diagnosed breast ca was greater than tamoxifen's." (11/23/98-921201870)

. "Asked if [STAR trial] will show Evista is better than Tamox. Told him already better—No endo. cancer." (12/14/98-248000538)

. "Informed him about 63% reduction of breast cancer among women who have high risk of breast cancer compared to [Tamoxifen.] He was pretty pleased with that." (12/17/98-888000151)

. "Shared with him the PI change. He also asked how that compares to Tamoxifen. Explained we are believed to build bone every bit as well, and we don't have the endometrial issues they have. Evista is clearly a better choice for many reasons." (1/8/99-587000147)

. "Evista first line ahead of tamox. for prevention." (1/12/99-281202408)

. "He talked to me about several women that the oncologists were switching from Tamoxifen to Evista. He asked me if this was ok in my opinion. I stressed breast cancer data again about reductions in pervasive type cancer and ert positive cancer. He said he guesses it makes sense but he'd be more comfortable with some studies. I started to tell him the lack of studies didn't slow him down from rxing ERT but I didn't. Maybe next time." (1/21/99-870608719)

. "Nolvadex rep had just left........listened to her give entire tamox detail...............gave all sorts of figures on BC........went right in and asked

him.......... 'Dr Bill, why and where would you ever use Tamox over Evista? ? ? ?' /........ said he wouldn't.........no reason to with the risks of endomet cancer, which of course she DID NOT mention." (2/17/99-360201058)

*14 Pl.'s Exh. 23 (Call Notes of Eli Lilly Representatives).

37. There are some call notes from Eli Lilly sales representatives that suggest that a very small number sales representatives have told doctors that Evista has been approved or indicated by the FDA for the prevention of breast cancer. *See* Pl .'s Ex. 24. However, many other call notes indicate that representatives have informed doctors that Evista is not indicated for the prevention of breast cancer. *See, e.g.,* Pl.'s Ex. 25 (call note from 1/11/99-848001303). Moreover, one of the verbatims that was given to sales representatives specifically instructed them to tell doctors that "Evista is not approved for the prevention of breast cancer." Pl.'s Exh. 15 at EV 2609 327. Thus there is insufficient evidence to conclude that Eli Lilly sales representatives have promoted Evista as approved or indicated by the FDA for the prevention of breast cancer.

38. The entries in which the two claims about Evista were made—that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen for reduction of the risk of breast cancer—were written by more than 170 different representatives, or approximately 17 percent of Eli Lilly's general sales force. In addition to being largely reflective of the Eli Lilly scripts, the fact that representatives recorded these messages in the business records of the company confirm that they were not inadvertent or unauthorized. Indeed, as set forth below, Eli Lilly executives and Eli Lilly's verbatims confirm that the representatives are authorized to convey these messages. [FN6] In fact, at the hearing Eli Lilly conceded that its representatives are authorized to state that raloxifene has been established to reduce the risk of breast cancer. (Tr. dated June 24, 1999 at 69, 74.) The verbatims and testimony of Eli Lilly executives also confirm, however, that Eli Lilly sales representatives have not promoted Evista as having been approved or indicated by the FDA for the reduction of the risk of breast cancer. Thus the evidence establishes that two of the three contested statements have been made by Eli Lilly representatives.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *14 (S.D.N.Y.))

Page 11

FN6. Eli Lilly emphasized at the hearing that the
nearly 600 offending call notes cited by Zeneca are
purportedly just a small portion of the 1.8 million
total call note entries concerning Evista compiled
since January 1998. The only relevant period,
however, is from October 1998 forward, since that is
when Zeneca entered the breast cancer risk reduction
market. In any event, that Zeneca did not offer more
entries does not mean that Eli Lilly representatives
did not make these false claims on other occasions.
In light of the detail scripts the representatives are
required to follow, the testimony of Eli Lilly's
executives, as well as the results of Eli Lilly's
market research (described in more detail below),
these hundreds of entries are appropriately
representative of messages conveyed by Eli Lilly
representatives on other occasions.

3. *Testimony by Eli Lilly's business executives*
39. The entries in the call notes are echoed by the
testimony of three Eli Lilly executives: Denice
Torres, Eli Lilly's Evista Brand leader; Newt
Crenshaw, Eli Lilly's Vice President of Sales and
Operations; and Garry Nicholson, Eli Lilly's
Director of Oncology Business. The testimony of
these executives supports the contention of Zeneca
and Barr that two of the three alleged statements
are being made and supports Eli Lilly's position
that sales representatives have not been telling
physicians that Evista has been approved or
indicated by the FDA for reduction of the risk of
breast cancer.
40. First, Ms. Torres testified that the "key breast
cancer message" that Eli Lilly representatives
should now communicate to physicians in response
to unsolicited questions about Evista and breast
cancer is that "in studies up to three years, Evista
reduces the risk of breast cancer by greater than 50
percent," and that when a physician asks whether
Evista reduces the risk of breast cancer, the
representative should respond that "the data have
shown and studies have shown that Evista reduces
the incidence of breast cancer greater than 50
percent." Tr. at 863 (Torres). She also testified that
the representatives are not directed to disclose any
of the potential flaws in the MORE study or any
other drawbacks which might bear on this
conclusion, except for the fact that Evista is not
indicated for breast cancer risk reduction. Tr. at
863-64 (Torres). Ms. Torres noted that responses
by representatives to unsolicited questions from
physicians are not isolated occurrences, since

physicians are constantly asking a whole variety of
questions depending on their level of interest. Tr.
at 866 (Torres).
*15 41. Ms. Torres likewise testified that if a
physician asks what is meant by the phrase on the
Evista label--"the effectiveness of Evista in
reducing the risk of breast cancer has not yet been
established"--an Eli Lilly rep is supposed to
respond that "while Evista is not indicated for
reduction in the risk of breast cancer there are data
that demonstrate that Evista is effective in clinical
studies in reducing the risk." Tr. at 216-17
(Torres). She also expressed satisfaction that the
messages in question had been delivered by Eli
Lilly representatives and that representatives
continued to deliver them even after this litigation
began. Tr. at 216, 874-75 (Torres).
42. Mr. Crenshaw, who is responsible for
supervising Eli Lilly's primary care sales
representatives, similarly testified that he would not
be troubled if an Eli Lilly sales representative told
a physician that the MORE data shows that
raloxifene is effective in reducing the risk of breast
cancer. Tr. at 186-87 (Crenshaw). Moreover, he
testified that sales representatives are authorized to
present data from the MORE trial without stating
that "the effectiveness of raloxifene in reducing the
risk of breast cancer has not yet been established."
Tr. at 177-78 (Crenshaw).
43. Finally, Mr. Nicholson testified that Eli Lilly
at launch developed a program to detail oncologists
concerning Evista during the first half of 1998. Tr.
at 241-42 (Nicholson). The mere fact that Eli Lilly
was detailing Evista to oncologists is itself telling,
since Evista is not indicated for breast cancer
treatment or prevention. Mr. Nicholson also noted
that oncology representatives continue to respond
to unsolicited questions from oncologists
concerning Evista. Tr. at 262 (Nicholson).
44. Moreover, Mr. Nicholson testified that in their
discussions with oncologists, Eli Lilly's oncology
representatives are not prohibited from telling
oncologists in response to unsolicited questions,
that (i) the MORE study proves that Evista reduces
the risk of breast cancer, (ii) Evista's reduction in
the incidence of breast cancer is greater than
tamoxifen's, (iii) the data on the Evista label
demonstrates that Evista reduces the risk of breast
cancer, and (iv) physicians may tell their patients
that Evista reduces the risk of breast cancer. Tr. at
256-57, 259, 262, 265-66 (Nicholson).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *15 (S.D.N.Y.))

### 4. *Eyewitness testimony*

45. Several Zeneca sales representatives and others have observed Eli Lilly sales representatives telling physicians and oncologists that Evista has been proven to prevent or reduce the incidence of breast cancer. For example, one Zeneca district manager testified that he overheard an Eli Lilly representative inform a physician that "the findings [of MORE] were there was a 77 percent reduction in breast cancer" for patients taking Evista. The Eli Lilly representative went on to note that "you're aware of the dangerous side effect profile of Tamoxifen." Tr. at 118 (McLellan). Another Zeneca representative overheard an Eli Lilly representative, in the presence of an Eli Lilly supervisor, tell a physician that "Evista would reduce the incidents [sic] of breast cancer." Tr. at 123 (Blair).

*16 46. In addition, one Zeneca representative found an Evista patient brochure in a physician's office with a signed note from the Eli Lilly representative, which stated: "*New label* change includes the *Reduction* of Breast Cancer incidence—by 50%!" Tr. at 131-32 (Tirk) & Pl.'s Exh. 7 (emphasis in original). And a registered nurse working in the office of a well-known oncologist testified that an Eli Lilly representative told the nurse and the doctor that the MORE data which was soon to be released would "prove that the effectiveness of Evista had been established in breast cancer patients." Tr. at 272 (Landes). The doctor later told the nurse that the doctor "[didn't] like the way [Evista] was presented to us and I think that has been misleading." Tr. at 278 (Landes).

47. Finally, one Zeneca representative testified that last October in a doctor's office, and again at a physicians' conference in late March 1999—after this lawsuit had been filed—he observed Eli Lilly representatives repeatedly refer to clinical materials to convey the message that Evista has been shown to reduce the risk of breast cancer in women by 50 percent or greater. Tr. at 105-09, 110-11 (Centers).

### 5. *Eli Lilly's market research*

48. Market research commissioned by Eli Lilly likewise confirms that its representatives have been telling physicians that Evista has been proven to reduce the risk of breast cancer. As noted above, Eli Lilly's president acknowledged that, if the representatives were making breast cancer prevention claims, "you would expect" that fact to

be reflected in the company's market research. Pl.'s Exh. 2; *see also* Tr. at 169 (Crenshaw).

49. According to the last Richard Day survey conducted in late November and early December 1998, physicians who were detailed by Eli Lilly representatives reported having received the following "main messages" based on their recent detail visit from an Evista sales representative:
. "prevention of breast cancer and osteoporosis"
. "decrease of breast cancer risk"
. "prevent breast cancer"
. "lowers risk of breast cancer"
. "shown to decrease risk of breast cancer"
. "Osteoporosis prevention and breasxt [sic] cancer prevention"
. "Decreases breast cancer"
. "Very effective prevention of breast cancer"
. "it reduces breast cancer risk"
. "new data has come to show it is effective in fighting breast cancer"
. "new indication of the reduction of bc"
. "the three-year study that's out now from the FDA that says that Evista lowers the risk of breast cancer"; and
. "its [sic] shown to reduce the risk of breast cancer by 50 percent."
Pl.'s Exhs. 63 & 65; Tr. at 522, 524, 528-30 (Ross). Significantly, both the Project Manager for Richard Day and Eli Lilly's executives testified that they were satisfied with the methodology used by Richard Day and believed that the results were reliable. Tr. at 235-36 (Harenberg); Tr. at 526-27, 535 (Ross).

### 6. *Eli Lilly's arguments with respect to two of the three claims*

*17 50. At trial, Eli Lilly did not meaningfully dispute that its sales representatives are making the claim that it has been established that Evista reduces the risk of breast cancer. In fact, counsel for Eli Lilly appeared to agree that Eli Lilly sales representatives have been making that claim. (Tr. dated June 24, 1999 at 69, 74.) Instead, Eli Lilly contended that it is not making claims that Evista has been proven equivalent or superior to tamoxifen for reduction of risk of breast cancer or that Evista is approved by the FDA for the reduction of the risk of breast cancer. With respect to the claim that it has been established that Evista reduces the risk of breast cancer, Eli Lilly contended that, despite the contrary language in the Evista label, the statement is not literally false.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



51. At trial, Eli Lilly attempted to undercut the accuracy of the call notes by relying on declarations from doctors who were detailed by certain of its representatives. The Court has considered these affidavits in light of the fact, as explained above, that the strict rules of evidence do not apply on a motion for a preliminary injunction. Nevertheless, the affidavits do not seriously compromise the persuasive evidence that two of the three contested statements are being made. That these statements are being made is supported by numerous sources in addition to the call notes themselves. Moreover, under the circumstances of this case, in which Zeneca challenges oral statements by Eli Lilly sales representatives, memory and credibility are critical. The absence of any opportunity for cross-examination renders these out-of-court statements of limited value. Eli Lilly had the opportunity to introduce the depositions of any of these doctors but did not. It is unlikely that a doctor would be able to recall what a particular sales representative did or did not say in a two or three minute conversation that took place several months ago. The affidavits do not purport to recount all of the relevant details of what was said in the conversations. Def.'s Exhs. T-4 through R-5. Under the circumstances, the contemporaneous call notes themselves, which fall under the well-recognized business records exception to the hearsay rule, are more persuasive evidence of what was said.

52. It is also significant that Eli Lilly has not made any representation that it will not make at least the claim that it has been established that Evista reduces the risk of breast cancer, nor has it undertaken to instruct its representatives not to make that statement. Indeed, Eli Lilly maintains that its representatives are authorized to state that it has been established that Evista reduces the risk of breast cancer.

53. In sum, for purposes of this preliminary injunction motion, Zeneca has met its burden of proving that Eli Lilly representatives are communicating the claims that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen in reducing the risk of breast cancer.

E. Eli Lilly's claims about Evista are false
*18 54. Eli Lilly's witnesses acknowledge that Evista is not indicated by the FDA for the reduction of the risk of breast cancer, Tr. at 199-

200 (Crenshaw); Tr. at 265 (Nicholson), and thus that if its representatives are making that claim, it is false. However, the Court has found that there is insufficient evidence that Eli Lilly's representatives are making such a claim. Eli Lilly also concedes that Evista has not been tested against, much less proven comparable or superior to, tamoxifen. Tr. at 180, 208-09 (Crenshaw); Tr. at 740, 771, 786 (Cummings). That claim, too, is false and the evidence indicates that Eli Lilly's representatives are making that claim.

55. With respect to the remaining claim, Eli Lilly contended at the hearing that Evista has been proven to reduce the risk of breast cancer. As set forth below, however, the FDA, as well as numerous other experts in the field of clinical oncology, have reviewed the relevant data and reached the nearly unanimous conclusion that, while Eli Lilly's data is promising, it does not prove that Evista reduces the incidence of breast cancer. Given the state of the evidence, and particularly in view of the highly regulated nature of drugs and their indicated uses, at this time there is not sufficient evidence to conclude that raloxifene has been proven to reduce the risk of breast cancer. Thus the claim that raloxifene has been proven to reduce the risk of breast cancer is a false claim in light of current scientific evidence.

1. The conclusions of the FDA
56. By statute, the FDA is the agency that is responsible for determining the safety and efficacy of prescription drugs in this country. See 21 U.S.C. § 393(b). The parties' experts and other witnesses testified, and the Court finds, that the FDA is a recognized authority and has expertise in assessing the results of clinical drug tests. Tr. at 372 (Lewis); Tr. at 427-29 (Carlson); Tr. at 740-41 (Cummings); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84.

57. The FDA has reviewed all the breast cancer data from the MORE trial and has met with Eli Lilly's study investigators and scientists in response to Eli Lilly's request that the FDA evaluate whether the MORE data proves that Evista reduces the risk of breast cancer and would support such an indication for Evista. Based on its review, the FDA has repeatedly determined and communicated to Eli Lilly in Meeting Minutes that the MORE study does not and cannot prove that Evista reduces the risk of breast cancer. The Court finds the FDA's conclusions and reasoning highly persuasive.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



58. One of the basic flaws cited by the FDA concerning Evista and breast cancer prevention is that the MORE study was intended as an osteoporosis study, not a breast cancer trial. To that end, the "primary objective[ ]" set forth in the MORE study protocol was "to establish the effects of long-term treatment ... with raloxifene ... on the rate of new vertebral fractures in osteoporotic postmenopausal women ...." Def.'s Exh. P (Protocol H3S-MC-GGGK(e) [MORE study protocol] ) at EV 013 837. Among the last of many secondary endpoints, the protocol instructed the investigators to gather data on the "risks of breast and endometrial cancer." Id. But the sole purpose of gathering this data was to find out whether long-term use of Evista was safe in the breast and would not increase a woman's risk of developing breast cancer. Tr. at 411-14 (Carlson); Tr. at 618-19, 622-25, 722-23, 728-29 (Cummings). The protocol was not designed, nor was the study intended, to determine if Evista would be efficacious in reducing the risk of breast cancer.

*19 59. Women were not selected for the MORE study based on their risk of developing breast cancer, nor were they randomized between the raloxifene and the placebo arms of the MORE study based on breast cancer risk factors. Tr. at 730 (Cummings); Tr. at 1146-47 (Scott).

60. Months before the Evista launch, Eli Lilly itself anticipated this point and acknowledged the danger of relying on the MORE data to support a breast cancer risk reduction claim. For example, Eli Lilly's internal instructions to its oncology representatives concerning Evista declared: Evista was not associated with an increased risk for breast cancer.... However, it is premature to draw conclusions about Evista as a breast cancer preventive agent. To do so would be a disservice to the millions of women who fear the disease. Pl.'s Exh. 26 at EV 2446 40. Eli Lilly's Director of Oncology Business, Mr. Nicholson, testified that this statement is equally true today. Tr. at 250-51 (Nicholson).

61. The FDA's decision to allow Eli Lilly to include the interim data from MORE in the safety section of Evista's label does not, as Eli Lilly contends, demonstrate the FDA's acceptance of the MORE study as proof that Evista reduces the risk of breast cancer. In August 1997, in response to Eli Lilly's first such inquiry, the FDA advised Eli Lilly that the MORE data did not and probably never would support a breast cancer efficacy claim:

The data provided appear to be grossly insufficient to support a claim that raloxifene reduces breast cancer risk. Despite the summary nature of the information provided, it is unlikely that more information will improve the acceptability of the methodology or the credibility of the data used by the sponsor to conclude that raloxifene reduces the risk for breast cancer.

Pl.'s Exh. 38 (FDA Document--Center for Drug Evaluation and Research Approval Package-- Evista, Medical Officer Consult dated Aug. 6, 1997) at EV 413 411. Among other criticisms, the FDA reviewer noted that the study lacked proper controls and that to support this claim Eli Lilly would need to develop a protocol in which "breast cancer incidence is a primary endpoint." Id.

62. In the fall of 1997, the FDA told Eli Lilly that "it is *not* acceptable to include language in the label that 'there was a statistically significant reduction in the frequency of newly diagnosed breast cancer in raloxifene-treated women compared to placebo' ' because "[a]cceptance of this claim would effectively provide [Eli Lilly] with a second indication for raloxifene...." Pl.'s Exh. 40 (Breast Cancer Statement from FDA) at EV 651 1055; see also Pl.'s Exh. 38. Later, in March of 1998, the FDA indicated that Eli Lilly could apply for a label change to reflect the interim data from the MORE trial. In doing so, however, the FDA's reviewer reiterated "[t]here are questions about the reliability of the [MORE] data"; that "[i]t is expected that it will not be possible to retrospectively obtain sufficient information to justify a claim related to breast cancer prevention"; and that if Eli Lilly were to reference the MORE study, the label would have to state that "[t]he effectiveness of raloxifene in reducing breast cancer has not been established." Pl.'s Exh. 41 (Medical Officer Review of Raloxifene Adjudication Data dated Mar. 2, 1998) at EV 415 2059.

*20 63. In December 1998, the FDA approved a change in the safety section of Evista's label which allowed Eli Lilly to refer to the MORE breast cancer data as part of Evista's safety profile. In approving this limited change, however, the FDA again made clear that Eli Lilly could not use the MORE data to suggest that Evista has been shown to reduce the risk of breast cancer or that the drug has been approved for that purpose. Thus, Eli Lilly was able to report on the label the combined interim data from MORE and its other osteoporosis trials as follows:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *20 (S.D.N.Y.))

Independent review has determined that 16 cases (raloxifene and placebo combined) represented newly-diagnosed invasive breast cancer. Among 7017 women randomized to raloxifene, there were 6 cases of invasive breast cancer per 14,605 person-years of follow-up (0.41 per 1000). Among 3368 women randomized to placebo there were 10 cases of invasive breast cancer per 6991 person-years of follow-up (1.43 per 1000).

But to warn physicians that this data was safety information only, the FDA required Eli Lilly to state expressly in the label that "[t]he effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Def.'s Exh. H at 8.

64. After the label change, in January 1999, Eli Lilly representatives attended a meeting at the FDA in an attempt to persuade the FDA's Oncology Division that more recent breast cancer data from the MORE trial—a total of 27 cases of invasive breast cancer on placebo and a total of 13 cases on raloxifene--proved that Evista reduces the risk of breast cancer and would support a contemplated supplemental new drug application ("sNDA") for an indication for the reduction of the risk of breast cancer. Prior to the meeting, Eli Lilly posed the following question to the FDA: "We believe the data presented in this briefing document provide compelling evidence that raloxifene reduces the incidence of breast cancer in post-menopausal women with osteoporosis.... Does the Agency concur ... ?" The FDA responded as follows: We have concerns about the credibility of the finding (fewer cases on the raloxifene arms compared to the placebo arm). The following issues represent critical problems in the clinical trial design that probably cannot be addressed retrospectively. Pl.'s Exh. 45 (Meeting Minutes for Jan. 28, 1999 Meeting, Questions for Discussion with FDA Response) at EV 2383 55. The FDA then proceeded to identify various flaws in the MORE trial, which went beyond the fact that "[b]reast cancer incidence was not prospectively defined as an endpoint." See id. at EV 2383 55-57.

65. Based on statements made by FDA officials at the January 1999 meeting, Eli Lilly's scientists concluded that "nothing could be done to salvage the MORE Study for a breast cancer indication." Tr. at 956, 959-60 (Eckert); Pl.'s Exh. 46 at EV 2386 1818. Shortly after the FDA issued these findings, Eli Lilly decided to terminate the MORE trial. Tr. at 962 (Eckert); Pl.'s Exh. 46 at EV 386

1818.

*21 66. In response to this termination, the FDA urged Eli Lilly on March 11, 1999 to continue to follow up on the MORE patients, noting that such data "will provide important supportive information in conjunction with the STAR data for a sNDA submission for raloxifene to reduce the incidence of breast cancer." Pl.'s Exh. 46 at EV 2386 1820. Eli Lilly then proposed to the FDA that it would commence a "new" study called "Continuing Outcomes of Raloxifene" or CORE, using as many of the women enrolled in the MORE study who would agree to participate. Like MORE, CORE will continue to have both a raloxifene and a placebo arm and will last four years. Eli Lilly made substantial changes in the way the trial will be conducted. For example, the incidence of breast cancer is now the primary endpoint of the study; new study participants will be given a GAIL risk assessment; the appropriate statistical analysis for the breast cancer data is set forth in the protocol; and the protocol requires annual breast physical examinations. Tr. at 751-53 (Cummings); Tr. at 938-40, 967-68 (Eckert).

67. Nonetheless, the FDA has since determined that MORE—even when coupled with the CORE extension—still will not prove that Evista reduces the risk of breast cancer. In early April, Eli Lilly submitted the CORE protocol to the FDA and posed the following question:
We believe that achievement of statistical significance with the stated endpoints in the enclosed proposed draft CORE protocol will confirm, along with the data provided to date from the 3-year MORE study, that Evista does reduce the incidence of invasive breast cancer after long term treatment in postmenopausal women with osteoporosis. Does the Agency concur with these conclusions?
Pl.'s Exh. 46 at EV 2386 1872. On April 16, 1999 the FDA responded as follows:
No, we do not.
The primary endpoint should be the occurrence of all invasive breast cancer.
Analyses that demonstrate long-term clinically and statistically significant differences between patients treated with raloxifene and placebo in the incidence of breast cancer will provide supportive evidence of efficacy. Data from a prospective randomized trial of raloxifene in which the reduction in the incidence of breast cancer is the primary endpoint will be needed, such as data from the STAR trial.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *21 (S.D.N.Y.))

Pl.'s Exh. 47 (Facsimile from FDA to Eli Lilly dated Apr. 16, 1999) at EV 2736 000003.

68. The FDA recognized that the "CORE study will address some of the problems identified in the MORE study with respect to the breast cancer endpoint, such as poorly documented baseline status, short follow-up, and lack of consistent follow-up." FDA went on to explain, however, that "[d]espite these improvements, it is unlikely that data from [MORE] and CORE will be sufficient" to support an application for a breast cancer risk reduction indication. *Id.* at EV 2736 000002. Accordingly, the FDA told Eli Lilly that based solely on the combined data from MORE and. CORE, it would not support a new drug application submission even for a limited indication "for the reduction in risk of invasive breast cancer in postmenopausal women with osteoporosis." *Id.* at EV 2736 000003-04.

*22 69. Representatives of Eli Lilly met again with the FDA on May 11, 1999. In the minutes of that meeting prepared by the FDA, which Eli Lilly received on June 4, 1999, the FDA reiterated that MORE and CORE cannot prove that Evista reduces the incidence of invasive breast cancer in postmenopausal osteoporotic women and told Eli Lilly once again that it would not support an sNDA based solely on the results of those studies. Specifically, Eli Lilly had asked the FDA:

We believe that achievement of statistical significance with the stated endpoints in the enclosed proposed draft CORE protocol will confirm, along with the data provided to date from the 3-year MORE protocol, that Evista does reduce the incidence of invasive breast cancer after long term treatment in postmenopausal women with osteoporosis. Does the Agency concur with these conclusions?

The FDA responded, consistent with its response on every previous occasion: "No, we do not." Def.'s Exh. K-9 (May 11, 1999 Meeting Minutes) at 3.

70. The FDA suggested several alternatives for Eli Lilly to consider, involving various combinations of MORE/CORE, the STAR trial and an Eli Lilly trial called RUTH, which is currently proposed to determine the cardiovascular effects of raloxifene. Alternatively, if Eli Lilly decided to pursue a "limited indication" for the reduction of the incidence of invasive breast cancer in postmenopausal women, "[i]t is possible that MORE/CORE plus RUTH will be sufficient to demonstrate a reduction in the incidence of invasive breast cancer" but the FDA suggested that Eli Lilly add breast cancer risk reduction as a primary or co-primary endpoint of the RUTH trial. Def.'s Exh. K-9 at EV 2736 000367; Tr. at 979-81 (Eckert). Thus, the FDA has made clear that MORE- even when coupled with the CORE extension--will not suffice as a basis for proving the efficacy of raloxifene in the reduction of risk of breast cancer.

71. None of the Evista trials Eli Lilly plans to conduct or participate in will be completed in the near future. CORE is supposed to last four years. RUTH is expected to last five years. Enrollment in STAR began just last month and the study will not be completed for at least five years. Tr. at 761 (Cummings); Tr. at 982 (Eckert). Thus, while the MORE results may be promising, it has not yet been shown to be sufficient proof that Evista reduces the risk of breast cancer.

### 3. Other experts have agreed that MORE does not *prove that Evista reduces the risk of breast cancer*

72. There is other support for the conclusion that it is premature to find that raloxifene reduces the risk of breast cancer.

73. During the testimony of the experts on both sides in this case, it became clear that the issue of whether the MORE trial has proven the efficacy of raloxifene in reducing the risk of breast cancer has been considered by several well-respected third-party organizations in the field of clinical oncology. Experts on both sides acknowledged that these organizations have determined that it is premature to conclude that Evista reduces the risk of breast cancer. Tr. at 331-34 (Lewis); Tr. at 430-41 (Carlson); Tr. at 668, 702-07 (Cummings).

*23 74. In May of this year, a special committee of the American Society of Clinical Oncology ("ASCO"), issued a report based on its assessment of the propriety of using tamoxifen or raloxifene for reducing the risk of breast cancer. The Committee, comprised of leading experts in several fields, analyzed all research conducted on tamoxifen and raloxifene from 1990 through 1998. In response to the question, "Is there strong or credible evidence to conclude that raloxifene will reduce the risk of developing breast cancer" the Committee responded "it is premature to recommend raloxifene use to lower the risk of developing breast cancer outside of the clinical trial setting." Tr. at 430-33 (Carlson); Tr. at 668, 702 (Cummings).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



75. Significantly, both parties' experts have testified that ASCO is the premier clinical oncology organization in the world. They also agreed that the conclusions of the ASCO committee, like any other ASCO publication, are entitled to great weight. Tr. at 292-93 (Lewis); Tr. at 394-95 (Carlson); Tr. at 705-07 (Cummings); Tr. at 1105 (Dere); Lippman Dep. Tr. at 85-87.

76. Similarly, a committee of the National Comprehensive Cancer Network ("NCCN"), a prestigious consortium of major cancer centers throughout the United States, has recently prepared a draft of breast cancer prevention guidelines. The draft guidelines conclude that "insufficient data are available to make definitive statements regarding the benefit or toxicity of raloxifene." Tr. at 434-35 (Carlson). The parties' experts agree that, like ASCO, NCCN is an expert body in the field of clinical oncology and that its guidelines are authoritative in the field. Tr. at 395-97 (Carlson); Lippman Dep. Tr. at 83-84.

77. At trial, Eli Lilly attempted to downplay the significance of the ASCO and NCCN guidelines--even though Eli Lilly's expert Dr. Steven Cummings served as a member of the ASCO Committee for a period of time, Tr. at 693-94, 697, 701 (Cummings)--because the organizations purportedly did not have the full data from the MORE study, which ran to a median of 40 months, or the recently published article in JAMA, written by doctors and other experts affiliated with the MORE study, which concluded that Evista reduces the risk of breast cancer in postmenopausal osteoporotic women after 40 months of treatment. However, there is no dispute that ASCO and NCCN had data through 33 months from the MORE study, Tr. at 708-09 (Cummings), a significant amount of data. In addition, the ASCO report made clear that the grounds for its conclusion were that "this study was designed as an osteoporosis trial; breast cancer risk was not specifically addressed at entry, nor was breast cancer development a primary outcome measure." The Committee also noted that the MORE finding was based on a small number of events. Tr. at 709 (Cummings). These deficiencies are not cured by an additional seven months of MORE data or by the publication of the JAMA article.

*24 78. As for the NCCN, the expert who testified on behalf of Zeneca, Dr. Robert Carlson, is the Chairman of the Committee charged with drafting those guidelines. As set forth below, he is of the

firm conclusion, even after having reviewed the 40-month data and the JAMA article, that raloxifene has not been proven to reduce the risk of breast cancer.

79. As indicated by the experts' testimony, two other organizations, the NCI and the NSABP--which are jointly sponsoring the upcoming STAR trial--have likewise made clear that the efficacy of raloxifene in reducing the risk of breast cancer has not yet been proven. In the model consent form for the STAR study, which was prepared by scientists and about which both Zeneca and Eli Lilly had the opportunity to comment, participants in STAR are advised that the very purpose of the study is to try to find an answer to the following three questions:
. "Is raloxifene, also known by the trade name Evista, effective in reducing the incidence of breast cancer in women who are at increased risk for developing breast cancer?"
. "If it is effective, how does raloxifene compare to tamoxifen, also known as Nolvadex, in reducing the incidence of breast cancer?" and
. "How do the side effects (good and bad) of raloxifene and tamoxifen compare?"
Tr. at 324-27, 331-34, 357 (Lewis); 436-38 (Carlson); Pl.'s Exh. 34 (NSABP Protocol P-2, Study of Tamoxifen and Raloxifene (STAR) for the Prevention of Breast Cancer) at 51. The model consent form also clearly states that "[t]he FDA and the [Canadian Health Protection Branch] consider the use of raloxifene for reducing the risk of breast cancer to be experimental at this time." Pl.'s Exh. 34 at 51 (emphasis added); Tr. at 333-34 (Lewis).
80. The Court was also persuaded by the testimony of two expert oncologists and one biostatistician offered by Zeneca. These witnesses--whom the Court finds to be both qualified and credible--cited numerous persuasive reasons why the data from the MORE study, though encouraging, do not prove that Evista reduces the risk of breast cancer.
81. Dr. Robert Carlson is a professor of medicine and oncologist at Stanford University with extensive experience and expertise in the area of breast cancer treatment and research as well as the conduct and design of clinical trials. He was a principal investigator for the BCPT and is one of the investigators for the STAR trial. Tr. at 389-93 (Carlson). Having reviewed all of Eli Lilly's breast cancer data, including the results of the nine other osteoporosis studies conducted for Eli Lilly, Dr. Carlson testified that "the data is insufficient to conclude definitively that raloxifene decreases the



incidence of breast cancer." Tr. at 398-402 (Carlson).

82. Dr. Carlson noted, first, the inconsistencies between the MORE results and those in the other nine Eli Lilly raloxifene trials. Dr. Carlson concluded that if the MORE findings had truly established that Evista reduces the risk of breast cancer to the degree claimed by Eli Lilly, one would have expected at least a trend in the same direction, if not a statistically significant difference, in the nine pooled studies of some 3,000 patients. No such trend is evident in the data. Tr. at 402-11 (Carlson).

*25 83. With respect to the MORE study itself, Dr. Carlson identified several flaws, both in the design of the protocol and the analysis of the data. These flaws include the fact that MORE was designed primarily as an osteoporosis study and breast cancer appeared among several other safety-related issues in the seventh secondary endpoint of the study. In addition, the MORE protocol did not articulate a prospectively defined method for collecting and analyzing the breast cancer data in particular. Tr. at 411-14, 452-54 (Carlson). As Eli Lilly acknowledged, the statistical analysis contained in the MORE protocol was a general one specified for all of the safety endpoints in the trial. Tr. at 733 (Cummings); Tr. at 937, 941 (Eckert).

84. Dr. Carlson also explained that in a properly designed breast cancer trial such as the BCPT or STAR, it is crucial to recruit patients with a high risk of breast cancer to ensure a sufficient number of overall breast cancer events. Without an adequate number of cases, he opined, one cannot rule out the possibility that the results are due to chance. To that end, Dr. Carlson observed that a properly designed breast cancer study should assess patients for breast cancer risk prior to entry in the study using the GAIL risk assessment model, and patients should be equally randomized between the two arms of the study with respect to the full array of breast cancer risk factors. MORE failed to follow this procedure. Tr. at 415-19, 455-57, 467-68 (Carlson).

85. Dr. Carlson also identified diagnostic flaws in the protocol that cast doubt on the MORE breast cancer results. Tr. at 650-51, 732 (Cummings); see also Tr. at 111-22 (Dere). Finally, Dr. Carlson observed that women in the MORE study were permitted to take estrogen, which many believe increases the risk of breast cancer and may thus have confounded the results. Tr. at 419-27

(Carlson).

86. Dr. Jerry Lewis, formerly Chief of the Hematology and Oncology Division at the University of California, Davis, and now Zeneca's Senior Medical Director for Oncology, also testified. Dr. Lewis has taught and practiced in the area of clinical oncology and also has extensive experience in the design and analysis of clinical drug trials. Tr. at 290-95 (Lewis); Pl.'s Exh. 77.

87. Dr. Lewis testified convincingly to the same list of criticisms as Dr. Carlson. Tr. at 334-46 (Lewis). He specifically noted that the study population in the MORE trial were women with osteoporosis, who tend to be at low risk for breast cancer. Tr. at 337-38 (Lewis). He also opined that Evista has "not been proven to be efficacious in reducing the incidence of breast cancer." Tr. at 328 (Lewis).

88. Finally, Zeneca offered the expert testimony of Dr. Mark Scott, a biostatistician with extensive experience in the design and analysis of clinical drug trials. Dr. Scott responded to Eli Lilly's argument that the many flaws in the MORE trial may be overlooked because the breast cancer results in MORE were statistically significant at a level of p =.000005. A p value of less than .05 typically is required for a finding of statistical significance in a clinical trial. [FN7]

> FN7. Under typical circumstances, where the variable in question is the primary endpoint of the study, a p value of .05 means that the odds are one in 20 that the result in question is due to chance. On its face, a p value of .000005 means that the odds are five in one million that the results in question are due to chance.

*26 89. Dr. Scott explained that because breast cancer risk reduction was not the primary endpoint of the MORE trial, and there was no pre-specified statistical plan for analyzing breast cancer data, it is inappropriate to use a p value of .05 as a benchmark to assess the statistical significance of the MORE breast cancer data. Rather, to ensure that the results in question were not due to chance, Dr. Scott opined that the appropriate p value should be adjusted to take into account the fact that breast cancer risk reduction was a secondary endpoint and just one of hundreds of statistical tests performed in the MORE trial. Tr. at 1143-45 (Scott).

90. Dr. Scott made that adjustment, using the well-



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *26 (S.D.N.Y.))

established formula, acknowledged by Eli Lilly's witnesses, Tr. at 645 (Cummings), of dividing the p value of .05 by the number of tests conducted. According to the lead MORE investigator, Eli Lilly's expert Dr. Steven Cummings, 400 safety tests alone were conducted in MORE. Tr. at 646 (Cummings). Using that number, which did not even take into account the non-safety statistical analyses performed on the MORE data, Dr. Scott concluded that the appropriate p value to determine statistical significance was .000125. Tr. at 1144-45 (Scott).

91. Although the MORE trial's breast cancer results still achieved statistical significance using that figure, Dr. Scott's testimony illustrated the significance of the fact that the MORE trial had relatively few cases of breast cancer. As previously noted, in MORE there were 40 total cases of invasive breast cancer; this compares with 264 cases in the BCPT. Tr. at 322- 23 (Lewis). Dr. Scott explained that, given the low number of overall breast cancer cases reported to date in the MORE trial, the addition of only five more cases on the raloxifene arm of the study--without a corresponding increase on the placebo arm--would render the result on which Eli Lilly now relies statistically insignificant. Tr. at 1145 (Scott). Dr. Scott testified to a number of hypothetical scenarios under which those five additional cancers on the raloxifene arm could occur. Tr. at 1146-48 (Scott).

92. Dr. Scott's conclusion is that the MORE data "are intriguing but they are not the stuff of proof." Tr. at 1167 (Scott).

93. Under these circumstances, the Court credits Dr. Scott's testimony that, because of the large number of analyses performed by Eli Lilly on the MORE data and the small overall number of breast cancer cases observed in the trial, the p value in the MORE study is insufficient to show that the MORE study proves that raloxifene reduces the risk of breast cancer.

### F. Eli Lilly's rebuttal

94. Eli Lilly maintains that Evista has been proven to reduce the risk of breast cancer. In support of its position, Eli Lilly cites (i) its own interpretation of what the FDA has communicated to Eli Lilly with respect to the MORE data, (ii) the testimony of three witnesses, all of whom are involved with the MORE study, and (iii) the peer-reviewed article about the MORE results recently published in JAMA. As set forth below, these materials fail to

rebut Zeneca's showing on the merits.

### 1. The dialogue between Eli Lilly and FDA

*27 95. First, Eli Lilly maintains that the FDA has declined to approve a breast cancer risk reduction claim on the basis of the MORE data not because it considered the MORE study to be flawed, but merely because the FDA requires two well-controlled clinical trials before approving a drug as safe and effective. In light of the FDA correspondence described above, Eli Lilly's position is not tenable. The approval of a risk reduction indication for tamoxifen on the basis of the BCPT and supporting evidence makes clear that FDA will approve drugs on the basis of one large-scale clinical study with supporting evidence. Tr. at 315-16 (Lewis); Tr. at 1151 (Scott). Indeed, Congress has made clear, and the FDA has acknowledged, that the FDA may base a finding of efficacy on one adequate and well-controlled clinical investigation along with confirmatory evidence. See 21 U.S.C. § 355(d); see also Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products ("Guidance for Industry"), U.S. Dep't of Health & Human Services, Food & Drug Administration, May 1998, at 12-13.

96. Eli Lilly also contends that the statement the FDA required it to put on the label--"[t]he effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established"--is FDA's way of communicating that Evista has been proven efficacious but is not yet indicated for breast cancer risk reduction. Tr. at 216, 850 (Torres); Tr. at 917 (Eckert); 1004-05 (Harenberg). This argument ignores the plain meaning of the word "established" and is also at odds with some of the testimony of Eli Lilly's own witnesses. For example, Dr. Cummings conceded that the statement means, at a minimum, that the efficacy of Evista in reducing the risk of breast cancer has not yet been proven to the satisfaction of the FDA. Tr. at 631-32, 638-39 (Cummings). Moreover, Eli Lilly's interpretation is contrary to the plain meaning of the FDA documents. Eli Lilly's witnesses simply disagree with the FDA or with the statement. Lippman Dep. Tr. at 158; Tr. at 1097-98 (Dere). [FN8]

FN8. One Eli Lilly executive, who has attended meetings of Eli Lilly's Raloxifene Advisory Board, which is composed of Eli Lilly and non-Eli Lilly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *27 (S.D.N.Y.))

scientists, conceded at his deposition that he understood Eli Lilly cannot make a breast cancer risk reduction claim for the drug because "[i]t's not a proven claim." Tr. at 238 (Harenberg). The executive's attempts at trial to explain away his prior deposition testimony were unconvincing, especially since he agreed at trial that Eli Lilly cannot make claims that Evista prevents breast cancer. Tr. at 1004-08 (Harenberg).

97. Eli Lilly also suggests that the dialogue with the FDA is still ongoing and that the findings and opinions set forth in the January 1999 minutes with respect to MORE, and the May 1999 minutes with respect to MORE and CORE, do not reflect the agency's last word on the subject or are an incorrect recitation of the FDA's position. This argument is contradicted by the FDA's repeated statements over a two-year period. And whether or not the dialogue is ongoing, the FDA has made abundantly clear that MORE—either alone or in conjunction with CORE—does not and cannot prove that Evista reduces the risk of breast cancer. That is why Evista's label states that the effectiveness of Evista in reducing the risk of breast cancer has not yet been established and why the FDA will require Eli Lilly to rely on data generated by STAR, RUTH or both in any application for a breast cancer risk reduction indication for Evista.

*2. Eli Lilly's expert witnesses*
*28 98. Eli Lilly also offered the testimony of three distinguished experts, all of whom, however, are directly associated with the MORE study and have an interest in demonstrating its scientific significance: Dr. Marc Lippman, head of the Lombardi Cancer Center at Georgetown University, Dr. Steven Cummings, Professor of Epidemiology and Biostatistics at the University of California, San Francisco, and Dr. Steven Eckert, an Eli Lilly statistician. Their testimony supports the promising nature of the MORE data with respect to breast cancer risk reduction. However, their testimony is insufficient to persuade the Court that Evista has been proven to reduce the risk of breast cancer.

99. Dr. Lippman is a distinguished oncologist who is a member of Eli Lilly's Oncology Advisory Board, a member of the breast cancer adjudication committee for the MORE study, and a coauthor of the recently published JAMA article concerning raloxifene and breast cancer. Lippman Dep. Tr. at

13, 51-52, 54-56; Tr. at 1106-07 (Dere).
100. Dr. Lippman opined only that a median of 40 months of treatment with raloxifene reduces the risk of newly diagnosed breast cancer in postmenopausal women with osteoporosis—a much narrower statement than the blanket risk reduction claim that has been made by Eli Lilly sales representatives and that Zeneca seeks to enjoin. Dr. Lippman conceded that, based on the existing data and given the patient population in the MORE study, one cannot draw the same conclusion with respect to the female population at large. Lippman Dep. Tr. at 74, 76-79. Notably, this testimony was confirmed by Eli Lilly's Dr. Will Dere, who acknowledged that the statement "Evista offers proven reduction of breast cancer" without any qualifiers "would not be right as a single sentence for Eli Lilly to state that." Tr. at 1108-09 (Dere). Dr. Dere also agreed that it would be an "overstatement" to say that Evista decreases breast cancer by 70 percent, without any qualifiers. Tr. at 1109-10 (Dere).
101. Dr. Lippman also candidly acknowledged that although he is convinced that the MORE data is accurate and proves to a reasonable degree of medical certainty that raloxifene reduces the risk of breast cancer among postmenopausal osteoporotic women, other physicians could look at the data from the MORE study and conclude that the data are not sufficient to prove that raloxifene reduces the risk of breast cancer. Lippman Dep. Tr. at 62-63, 168-72. As Dr. Lippman explained:
I believe that it is perfectly appropriate, as happens every single day in the verification of new agents, that some physicians become convinced of something before others do.... I think that right-minded physicians based on data can come to conclusions at a different rate. And I would not--this is important to me. I would not dispute that another physician could look at these data and say they are interesting, but I am not persuaded yet. I would not myself change my practice. I think that's absolutely the way medicine changes over time.
*29 Lippman Dep. Tr. at 62-63.
102. Dr. Cummings is the primary investigator for the MORE trial, as well as a member of Eli Lilly's Raloxifene Advisory Board. Tr. at 598, 682-84, 690-92 (Cummings).
103. Dr. Cummings opined that raloxifene reduces the incidence of breast cancer only in postmenopausal women, a narrower claim than that at issue here. Tr. at 712-13. Dr. Cummings'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



testimony also indicated that the participants in the MORE study may have been at lower risk for breast cancer than the participants in the BCPT trial based on the relative bone density of the two groups. Tr. at 720-21, 739 (Cummings).

104. While Dr. Cummings was plainly convinced of the significance of the results of the MORE study as it relates to the reduction of the risk of breast cancer, he is interested in that conclusion and his views are not shared by the FDA or other disinterested organizations.

105. Eli Lilly also relied on the testimony of Dr. Stephen Eckert, a senior Eli Lilly statistician, who opined that Evista "has clearly been statistically proven in the MORE trial to reduce the incidence of breast cancer." Tr. at 932 (Eckert). He agreed, however, that, given the small number of breast cancer events in the study, a small shift in the number of cases would have an enormous impact on the p value and could undercut the statistical significance of the interim results. Tr. at 975-76 (Eckert).

*3. The JAMA article*

106. Finally, Eli Lilly relies heavily on the fact that a peer-reviewed article concerning the MORE study breast cancer results was published in the June 16, 1999 issue of JAMA. The JAMA article, which is co-authored by Drs. Cummings, Eckert, and Lippman, among others, sets forth the authors' narrow conclusion that "a median of 40 months of treatment with raloxifene decreases the risk of newly diagnosed breast cancer in postmenopausal women who have osteoporosis and who have no prior history of breast cancer." Tr. at 712 (Cummings); Def.'s Exh. L-9 at 2196. Again, this is a narrower claim than the blanket statement being made by Eli Lilly sales representatives.

107. The article does not state that raloxifene has been or even may be proven to reduce the risk of breast cancer in any other segment of the female population. Nor does it definitively conclude that Evista has been proven to reduce the risk of breast cancer in the population that was tested. To the contrary, the authors concede that there is no data that confirms whether the existing results will continue to be seen and that "the MORE trial is continuing to assess the effectiveness and safety of longer term use of raloxifene" in postmenopausal osteoporotic women. Def.'s Exh. L-9 at 2196; Tr. at 664 (Cummings); Lippman Dep. Tr. at 66-67, 75.

108. Given Eli Lilly's reliance on this publication, there was extensive testimony about the significance of the peer review process and whether that process, in and of itself, signifies some form of scientific "proof." It is plain that it does not. Both parties' experts explained that peer reviewers as a rule are given only the manuscript of the article and nothing else. Eli Lilly's own experts conceded that this was true in the case of the JAMA article. Tr. at 393-94 (Carlson); Tr. at 765 (Cummings); Lippman Dep. Tr. at 79-81.

*30 109. The peer reviewers at JAMA were not given the MORE protocol and thus were not in a position to assess the flaws in the MORE study design as a breast cancer trial. Nor were they given the results of the nine other Evista trials which failed to demonstrate that Evista reduces the risk of breast cancer. Finally, the peer reviewers were not given the FDA's comments concerning the inadequacies of the MORE results. Tr. at 765-66 (Cummings); Tr. at 990-91 (Eckert).

110. In any event, the mere fact of publication of a peer-reviewed article does not prove that the claim in question is true. Indeed, the FDA has stated that "[t]here are ... reasons to be skeptical of the conclusions of published reports of studies. Experience has shown that such study reports do not always contain a complete, or entirely accurate, representation of study plans, conduct and outcomes.... [I]ncompleteness, lack of clarity, unmentioned deviation from prospectively planned analyses, or an inadequate description of how critical endpoint judgments or assessments were made are common flaws. Typically, journal article peer reviewers only have access to a limited data set and analyses, do not see the original protocol and amendments, may not know what happened to study subjects that investigators determined to be non-evaluable, and thus may lack sufficient information to detect critical omissions and problems." *Guidance for Industry* at 17.

111. In sum, though the MORE data are promising and may in the future be proven to measure accurately the efficacy of raloxifene in reducing the incidence of breast cancer in some segment of the population, Evista has not yet been proven to reduce the risk of breast cancer. Based on all of the evidence, the two claims that Eli Lilly has been making for Evista—that it has been established that Evista reduces the risk of breast cancer and that Evista has been proven comparable or superior to tamoxifen for reduction of the risk of breast cancer—

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *30 (S.D.N.Y.))

-are literally false.

G. The harm to Zeneca, Barr, and the public
112. Zeneca's witnesses testified to the substantial
negative impact of Eli Lilly's actions on Zeneca.
Ms. Anson testified credibly that "Zeneca has
invested an enormous amount in tamoxifen over the
last 20 years in research and development," and
that this investment has been jeopardized by Eli
Lilly, as has Zeneca's reputation and goodwill with
physicians. Tr. at 68 (Anson). Ms. Anson also
highlighted the fact that because the breast cancer
prevention market is just now being created by
Zeneca, Eli Lilly's actions have had a pernicious
effect on Zeneca's launch and the marketplace
itself, if not immediately then as a long term
matter. Tr. at 100 (Anson). These are, according to
the uncontradicted testimony of Ms. Anson,
damages that Zeneca cannot quantify. Tr. at 70
(Anson).
113. Market research conducted by Reed/Haldy/
McIntosh, a reputable market research firm in the
prescription drug field, likewise highlighted the
effect of Eli Lilly's actions on Zeneca and Barr, the
only two distributors of tamoxifen. The survey
concluded that of the physicians surveyed 11
percent of their prescriptions for Evista are being
written primarily for breast cancer prevention, as
opposed to either for osteoporosis or for
osteoporosis plus breast cancer, and that 35 percent
of physicians have written at least some of their
Evista prescriptions for the primary purpose of
breast cancer prevention. Pl.'s Exh. 72 (Nolvadex
Breast Cancer Prevention: Awareness, Trial and
Usage Study by Reed/Haldy/McIntosh & Assocs.
dated Feb. 15, 1999) at 31, 32; Pl.'s Exh. 80; Tr.
at 477-79, 487-89 (McIntosh). This study does not,
however, indicate that these prescribing patterns of
physicians are the result of statement made by Eli
Lilly, although the study is evidence that Evista
competes with tamoxifen in the marketplace.
*31 114. With respect to the impact of Eli Lilly's
actions on the public at large, Dr. Lewis testified
credibly that Eli Lilly's claims pose "a grave public
health risk." Tr. at 345 (Lewis). Women at high
risk of developing breast cancer may be placed on
raloxifene, which has not yet been proven to reduce
the risk of breast cancer, instead of on tamoxifen.
Indeed, Eli Lilly's own witnesses have conceded
that it would be dangerous if physicians relied on
inaccurate information about prescription drugs
conveyed by sales representatives. Tr. at 246-47

(Nicholson); Tr. at 858-59 (Torres).

## II.
## CONCLUSIONS OF LAW
1.  This Court has jurisdiction over this action
alleging violations of section 43(a) of the Lanham
Act, 15 U.S.C. § 1125(a), pursuant to 15 U.S.C. §
1121(a) and 28 U.S.C. §§ 1331 and 1338(a). [FN9]

> FN9. While the complaint asserted claims under the
> New York common law preventing unfair
> competition and New York General Business Law §§
> 349 and 350 preventing deceptive trade practices,
> those claims are not asserted as a basis for
> preliminary relief.

2.  Venue is proper in this District pursuant to 28
U.S.C. § 1391.

3.  A party seeking a preliminary injunction bears
the burden in Lanham Act cases, as in all others, of
demonstrating (1) that it will suffer irreparable harm
if the preliminary injunction is denied and (2) either
(a) a likelihood of success on the merits, or (b)
serious questions going to the merits to make them a
fair ground for litigation and a balance of the
equities tipping decidedly in the movant's favor. See
Castrol, Inc. v. Quaker State Corp., 977 F.2d 57,
62 (2d Cir.1992). Zeneca and Barr have met this
standard.

### A. Zeneca and Barr are likely to succeed on the
merits
1. *The governing Lanham Act standards*

4.  Section 43(a) of the Lanham Act provides a civil
remedy for those damaged by one who makes a "false
or misleading representation of fact, which ... in
commercial advertising or promotion, misrepresents
the nature, characteristics [or] qualities ... of his or
her or another person's goods; services or
commercial activities." 15 U.S.C. § 1125(a)(1)(B).
Because Section 43(a) is a "remedial statute," it is
"broadly construed." *Gordon & Breach Science
Publishers S.A. v. American Inst. of Physics*, 859
F.Supp. 1521, 1532 (S.D.N.Y.1994).

5.  Courts have consistently held that oral statements
by a company's sales representative concerning a
product constitute "commercial advertising or
promotion" under the Lanham Act. *See, e.g., Abbott
Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *31 (S.D.N.Y.))

Page 23

Cir.1992); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F.Supp. 768, 772, 796 (S.D.N.Y.1997); *Pfizer, Inc. v. Miles, Inc.*, 868 F.Supp. 437, 449 (D.Conn.1994).

6. The burden of proving "literal falsity" varies depending on the nature of the challenged claim. When a defendant makes no mention of scientific tests or studies, the plaintiff must affirmatively prove that the statement is false. *See, e.g., Castrol, Inc.*, 977 F.2d at 63; *Glaxo Warner-Lambert OTC G.P. v. Johnson & Johnson Merck Consumer Pharmaceuticals Co.*, 935 F.Supp. 327, 329 (S.D.N.Y.1996). However, when a defendant's promotion implicitly or explicitly refers to tests or data—a so-called "establishment claim"—a plaintiff can satisfy its burden of proving literal falsity by demonstrating "that such tests are 'not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991) (citation omitted); *see also Castrol, Inc.*, 977 F.2d at 62. This standard of proof applies "[w]hen the ad relies on scientific studies, whether implicitly by making a claim while showing a graph or diagram, or explicitly, by stating, for example, 'that studies show." ' *Glaxo Warner-Lambert OTC G.P.*, 935 F.Supp. at 329; *see also Castrol, Inc.*, 977 F.2d at 63 (when defendant's advertisement "explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited").

*32 7. A Lanham Act plaintiff seeking to enjoin an establishment claim can meet its burden by showing either (i) "that the tests were not sufficiently reliable to permit [the] conclusion" for which they are cited, or (ii) "that the tests, even if reliable, do not establish the proposition asserted by the defendant" and are thus "simply irrelevant." *Castrol, Inc.*, 977 F.2d at 63. Once a plaintiff has exposed a defendant's tests as irrelevant and/or unreliable, "relief may be granted without reference to the advertisements' impact" on consumers. *Pfizer*, 868 F.Supp. at 452 (quoting *Coca Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir.1982)).

2. *Eli Lilly is making two of the claims in question*

8. As set forth in the Court's Findings of Fact, there is abundant evidence that Eli Lilly representatives are systematically making claims that Evista has been proven to reduce the risk of breast cancer and that Evista has been proven comparable or superior to tamoxifen for the reduction of the risk of breast cancer. This evidence includes (i) the November and December sales representative verbatim scripts, (ii) Eli Lilly's call notes, (iii) the testimony of Eli Lilly's executives, (iv) eyewitness testimony, and (v) Eli Lilly's Richard Day research.

9. Although Eli Lilly and its witnesses effectively conceded that the company's representatives are making the claim that Evista has been proven to reduce the risk of breast cancer, Eli Lilly denied that it is making any improper comparisons to tamoxifen. However, as detailed in the Findings of Fact, the credible evidence shows that Eli Lilly is making the comparability claim versus tamoxifen.

10. The doctors' affidavits submitted by Eli Lilly are not sufficient to undermine the substantial evidence that Eli Lilly's sales representatives have been making the two claims in question. As noted in the first section of this Opinion, the affidavits are necessarily of less weight than the testimony of witnesses who were subject to cross-examination. Moreover, the affidavits themselves are ambiguous as to what Eli Lilly's sales representatives actually said to the doctors. Def.'s Exhs. T-4 through R-5.

11. The affidavits are also less reliable than the other evidence such as oral testimony and contemporaneous business records. The affidavits were made months after the fact of the visits and the visits themselves were quite short. Tr. at 798-99 (Torres).

12. The declarations are also narrowly written and ambiguously worded. Some declarations state that no comparison was made to tamoxifen or Nolvadex. *See, e.g.,* Def.'s Exhs. Z-4 (Decl. of Dr. James William Jackson), A-5 (Decl. of Dr. Frank Davis Jones), N-5 (Decl. of Dr. Lawrence Silver), R-5 (Decl. of Dr. John Yacoub). Others state only that no "direct" comparisons were made. *See, e.g.,* Def.'s Exhs. V-4 (Decl. of Dr. Donald Earle Courts), W-4 (Decl. of Dr. P. Timothy English), F-5 (Decl. of Dr. Francisco Munoz), I-5 (Decl. of Dr. P. Scott Pollack), L-5 (Decl. of Dr. Joanne M. Richards).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*33 13. Finally, Eli Lilly could have had these doctors testify at the hearing on the preliminary injunction or taken their depositions, even by telephone, to provide the Court with the benefit of cross-examination. Eli Lilly failed to do so, however, and thus the affidavits of the doctors are entitled to less weight. [FN10]

> FN10. Eli Lilly also maintains that the number of call note entries cited by Zeneca with respect to the tamoxifen comparisons are too small to rise to the level of a Lanham Act violation. However, courts have found that statements by sales representatives on a smaller number of occasions than that cited by Zeneca would violate the Lanham Act if those statements were determined to be false. See, e.g., Pfizer Inc. v. Miles, Inc., 868 F.Supp. 437, 460 (D.Conn.1994).

a. *Admissibility of Richard Day survey evidence*

14. Eli Lilly challenged the admissibility of market research conducted on its behalf by Richard Day. Zeneca offered that evidence, among other reasons, to corroborate the call notes and to prove that raloxifene and tamoxifen are competitors in the market.

15. The survey evidence will not be considered by the Court insofar as it is offered to corroborate the call notes. The defendant admitted at oral argument that its sales representatives were making the "establishment" claim that Evista has been proven to reduce the risk of breast cancer. (Tr. of June 24, 1999 at 69, 74.) That admission, in addition to the call notes, verbatims, and other evidence, make it unnecessary to consider the survey evidence with respect to those claims. In addition, the evidence with respect to the alleged comparative claim that Evista is comparable or superior to tamoxifen for reducing the risk of breast cancer is quite strong based on the evidence detailed in the Findings of Fact, including the call notes and the verbatims. Thus there is no need to consider the survey evidence with respect to those claims. Finally, there is simply insufficient evidence that the defendant has been making the third claim—that Evista is indicated by the FDA for the prevention of breast cancer. The survey evidence in this case does not significantly support this claim by Zeneca and Barr and thus the survey evidence will not be considered with respect to that claim. However, the survey evidence is

relevant to the issue of whether raloxifene and tamoxifen are competitors in the marketplace, as discussed below.

3. Eli Lilly's "establishment claim" that Evista has been proven to reduce the risk of breast cancer is *false*

a. *The claim is false*

16. Based on all the evidence adduced, Zeneca and Barr will likely succeed in proving that the MORE trial is "not sufficiently reliable to permit one to conclude with reasonable certainty that [it] established the proposition for which [it was] cited"--namely, that Evista has been proven to reduce the risk of breast cancer. *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984).

17. The FDA, as well as numerous other experts in the field of clinical oncology, have reviewed the breast cancer data from the MORE trial and reached the nearly unanimous conclusion that it does not prove that Evista reduces the incidence of breast cancer. The reasons for the unanimity of these organizations are described at length in the Findings of Fact. Most notably, the MORE protocol was not designed to determine whether Evista could be efficacious in reducing the risk of breast cancer. Accordingly, women were not selected for enrollment and once enrolled were not randomized between the raloxifene and placebo arms based on their degree of breast cancer risk. The protocol also did not require annual mammograms or breast physical exams, among other diagnostic deficiencies. Because of these and other critical flaws, the risk factors may have been imbalanced, the incidence of breast cancer may have been underdiagnosed and the results may yet turn out--as the CORE extension goes forward—to be a "false positive." Given the small number of invasive breast cancers that were diagnosed, a small number of additional invasive breast cancers in the raloxifene arm would have seriously compromised the results of the study:

*34 18. Courts in this Circuit and elsewhere routinely enjoin claims of proven therapeutic efficacy on the ground that the underlying tests are irrelevant and/or unreliable to support them. See, e.g., Castrol, 977 F.2d at 63-64 (finding that tests

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



"which proved faster oiling time, are irrelevant to [the] claim that [the defendant's] oil protects better" and thus the defendant's claim that tests proved that its product provided superior protection to engines was enjoined); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F.Supp. 753, 783 (E.D.N.Y.1996) (enjoining claim that "testing proves Combat SuperBait kills up to 98%" of household roaches because the tests were not reliable and did not measure what was being claimed because testing did not measure effectiveness of product in consumers' homes); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 906 F.Supp. 178, 182-83 (S.D.N.Y.1995) (enjoining claim that PEPCID AC controls acid "all day," in part because the defendant's studies related to night-time acid relief "[were] not relevant here" and because "[t]here was ... compelling evidence that [the defendant's studies] do not accurately measure acid control"), *aff'd*, 100 F.3d 943 (2d Cir.1996); *Pfizer, Inc.*, 868 F.Supp. at 457 (enjoining claim based on a study that lacked a written protocol and scientific controls and noting that there was no discussion of the experimental methodology and controls or lack thereof).

b. *The FDA's findings are probative*

19. Eli Lilly has attempted to exclude and then to minimize the FDA's views on whether Evista has been proven to reduce the risk of breast cancer. [FN11] The FDA's views are not determinative and Zeneca and Barr are entitled to a preliminary injunction even without the views of the FDA. Nevertheless, it is appropriate to consider the views of the FDA on the highly regulated issue of drug efficacy.

FN11. The Court found in the first section of this Opinion that the FDA documents concerning Evista are admissible.

20. The FDA is the agency responsible for determining the safety and efficacy of prescription drugs in this country. *See* 21 U.S.C. § 393; Tr. at 740-41 (Cummings); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84. Both parties' experts testified that FDA is a recognized authority and has expertise in assessing the results of clinical drug trials. Tr. at 427-29 (Carlson); Tr. at 740 (Cummings); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84. Having

reviewed all of the breast cancer data from the MORE trial and having met repeatedly with Eli Lilly's study investigators and scientists, the FDA found that MORE does not and cannot prove that Evista reduces the risk of breast cancer.

21. The fact that the FDA has not approved raloxifene for breast cancer risk reduction does not conclusively demonstrate that the defendant's claim that raloxifene has been proven to reduce the risk of breast cancer is literally false under the Lanham Act because "a Lanham Act plaintiff must prove that the defendant's efficacy claims are literally false, not simply that they fail to meet current federal licensing standards." *Avon Prods., Inc.*, 984 F.Supp. at 797. However, as a recognized expert in evaluating data from clinical trials, the FDA's conclusion as reflected in the Evista label and various FDA documents that "[t]he effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established" is persuasive evidence that Eli Lilly's claims to the contrary are untrue. Other courts have also found the FDA's expert conclusions to be relevant evidence in determining whether a party violated the Lanham Act. *See, e.g., SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc.*, 95 Civ. 7011, 95 Civ. 7688, 1996 WL 280810, at *13 (S.D .N.Y. May 24, 1996); *see also American Home Prods. v. Procter & Gamble*, 871 F.Supp. 739, 754 (D.N.J.1994) (expert's conclusion concerning efficacy of analgesic is "bolstered by the FDA's formal findings" concerning the product).

4. Eli Lilly's "establishment claim" that Evista has been proven comparable or superior to tamoxifen is *false*

*35 22. The cases and arguments set forth above apply with equal force to the second establishment claim—that Evista has been proven comparable or superior to tamoxifen for reducing the risk of breast cancer. Because Evista has not been proven to reduce the risk of breast cancer, it necessarily has not been proven comparable or superior to tamoxifen in that regard.

23. Even if this Court had concluded that the MORE study was relevant and reliable as support for Eli Lilly's first claim, this comparative claim still would have to be enjoined. The experts at trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *35 (S.D.N.Y.))

agreed that it is a fundamental principle of clinical testing that one cannot infer efficacy comparisons between two products when, as here, those products have not been tested against one another in a well-controlled head-to-head clinical study. Eli Lilly's own witnesses have confirmed this principle. Tr. at 180-81, 207-09 (Crenshaw); Tr. at 740 (Cummings); Lippman Dep. Tr. at 34-36. Other federal courts have previously indicated support for this principle. *See, e.g., Thompson Medical Co. v. Ciba-Geigy Corp.,* 643 F.Supp. 1190, 1195 (S.D.N.Y.1986) (noting that the defendant was previously enjoined from making any comparative efficacy claims "unless and until [it] has at least one adequate and well-controlled comparative clinical study which demonstrates such therapeutic advantage or superiority").

24. Eli Lilly has no data--flawed or otherwise--to "establish" the proposition that Evista has been proven comparable or superior to tamoxifen for the reduction of the risk of breast cancer. As Eli Lilly itself recognizes, that is one of the primary objectives of the upcoming STAR trial. Unless and until the STAR trial has been completed and proves that hypothesis, it is a clear violation of the Lanham Act for Eli Lilly to continue making this comparative establishment claim.

5. There is insufficient evidence that Eli Lilly is making the claim that Evista is indicated for the *prevention of breast cancer*

25. The parties agree that Evista is not indicated or approved by the FDA for reduction of the risk of breast cancer. Indeed, Eli Lilly has not even formally applied for such an indication. Zeneca and Barr argue that Eli Lilly is nevertheless promoting Evista as indicated by the FDA for the reduction of the risk of breast cancer, but there is insufficient evidence to support that allegation. As stated in the Court's Findings of Fact, few sales representatives' call notes provide any evidence that such a claim is being made. Moreover, no eyewitnesses testified that they have heard sales representatives making such a claim, no Eli Lilly verbatims instruct sales representatives to make such a claim, and no Eli Lilly witnesses supported the proposition that such a claim was being made. There is insufficient evidence that this claim is being made. Therefore, the Court cannot conclude that Zeneca and Barr are likely to succeed on this claim.

**B. Zeneca and Barr have been irreparably harmed**
*36 26. As set forth above, Eli Lilly is making both comparative and non-comparative false establishment claims concerning Evista. As to either type of claim, Zeneca and Barr have demonstrated irreparable harm sufficient to warrant an injunction.

27. Once a plaintiff seeking to enjoin a false comparative claim demonstrates a likelihood of prevailing on the merits, irreparable injury is presumed when the defendant's "literally false ... comparative advertisement ... mentions plaintiff's product by name." *Castrol, Inc.,* 977 F.2d at 62. Moreover, when, as here, "the false or misleading advertising claims create a danger to public health, the presumption of irreparable harm is particularly appropriate." *McNeilab, Inc. v. American Home Prods. Corp.,* 675 F.Supp. 819, 826 (S.D.N.Y.1987), *aff'd,* 848 F.2d 34 (2d Cir.1988). Zeneca and Barr have satisfied the irreparable harm requirement with respect to Eli Lilly's false comparative claim that Evista has been proven comparable or superior to tamoxifen.

28. In the case of non-comparative false claims, the Lanham Act requires "only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir.1994) (noting that while a plaintiff in a Lanham Act case under § 1125(a) "must show more than a subjective belief that it will be damaged [by a false advertising claim], it need not demonstrate that it is in direct competition with the defendant or that it has definitely lost sales because of the defendant's advertisements" and that although injury and causation will not be presumed, "the type and quantity of proof required to show injury and causation has varied from one case to another depending on the particular circumstance") (internal quotation marks and citations omitted); *Coca-Cola Co.,* 690 F.2d at 316 (noting that a plaintiff in a Lanham Act case "must ... offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising ... he must submit proof which provides a reasonable basis for that belief") (internal citation omitted). To obtain injunctive relief, a Lanham Act plaintiff "need not even point to an actual loss or diversion of sales." *Coca-Cola Co.,* 690 F.2d at 316

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *36 (S.D.N.Y.))

. Instead the plaintiff must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a "logical causal connection between the alleged false advertising and its own sales position." *Johnson & Johnson*, 631 F.2d at 190-91. Zeneca and Barr have demonstrated both.

### 1. *Zeneca and Barr are competitors of Eli Lilly*

29. Eli Lilly maintains that even if it is making breast cancer reduction claims, it is not in competition with Zeneca or Barr because any Evista prescriptions written as a result of its breast cancer prevention claims are not coming at the expense of Zeneca or Barr; according to Eli Lilly, those prescriptions are likely written primarily for osteoporosis. This argument fails. It is clear that the parties are competitors.

**\*37** 30. First, by making claims that Evista has been proven or shown to reduce the risk of breast cancer, Eli Lilly has injected Evista into the emerging breast cancer prevention market. Since the only other product in that market is tamoxifen, Evista is clearly positioned by Eli Lilly in competition with tamoxifen, which is manufactured by Zeneca and distributed by Zeneca and Barr. *See Avon Prods.*, 984 F.Supp. at 775-78.

31. The call notes underscore this point. The notes show that Eli Lilly is making blanket and categorical claims of breast cancer risk reduction, not merely claims directed to osteoporosis patients or coupled with osteoporosis claims. *See, e.g.*, Pl.'s Exh. 25, Entry 11/11/98-722809052 ("You can be assured Evista will not increase the risk [of breast cancer] and in every study showed there was a decrease[d][sic] risk"); Entry 1/18/99-246801181 ("went into ev b. cancer data, told md he could let his women know they will be greater than 55 rotected against b. cancer with evista"); Entry 1/26/99-848801056 ("I told him now he can actually say with confidence that Evista actually reduces the incidence of breast cancer"); Entry 2/8/99-240003187 ("point out the fact that there's no 'up-in-the-air' w/Evista, because we know it reduces breast cancer").

32. These entries are echoed by the testimony of Denice Torres, who, as noted above, testified that in response to unsolicited questions, Eli Lilly representatives can tell physicians that "Evista[

][has] been demonstrated to reduce the incidence of breast cancer" and that in studies up to three years, Evista reduces the risk of breast cancer by greater than 50 percent. Moreover, Ms. Torres testified that when an Eli Lilly representative states that Evista has been shown to reduce the incidence of breast cancer, the representative need not communicate any drawbacks or limitations, other than that Evista is not indicated for breast cancer risk reduction. Tr. at 217, 225-27, 229, 859-64 (Torres).

33. Second, the call notes show that Eli Lilly representatives are making direct comparisons to tamoxifen and, beyond that, are urging physicians to prescribe Evista instead of tamoxifen, thus squarely putting the two drugs in direct competition for the same prescriptions. *See, e.g.*, Pl.'s Exh. 23, Entry 10/5/98-578403397 ("evista 3 way—wanted to know re breast cancer data—told him the 60-80% reduction—he said what about tamox--said evista's data is better and doesn't increase risk for endometrium either."); Entry 10/12/98- 169801604 ("he actually came over to me to talk about golf outing.....wow..... chatted a bit..... said the main thing that he learned was switching patients from tamoxifen to evista... great....."); Entry 11/03/98-244001904 ("he asked right away about BC, went into MORE and compared with Tamoxifen, we agreed that Evista is a much better choice"); Entry 11/16/98-422406095 ("He then wanted to know if I was saying--replace Tamoxifen with Evista. I said well, no FDA approval, but most of the doctors are already doing that, what will you do? He said Tamoxifen rep already came to detail him. I said, so far what you have is study on Tamox vs. placebo and Evista vs. placebo, although you can't really compare, Evista looks better and without the endo effects"); Entry 1/12/99- 281202408 ("Evista first line ahead of tamox. for prevention"); Entry 2/17/99- 360201058 ("Nolvadex rep had just left......listened to her give entire tamox detail............. went right in and asked him...... 'Dr. Bill, why and where would you ever use Tamox over Evista?' "). These call notes are consistent with Eli Lilly's November 1998 verbatim, which instructed sales representatives to respond to doctors' questions by stating "these results [with respect to Evista's efficacy in reducing the risk of breast cancer] are similar to those for tamoxifen in women at high risk of breast cancer" and to make a favorable comparison to tamoxifen with respect to the safety profile of the drugs. Pl.'s



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *37 (S.D.N.Y.))

Exh. 15 at EV 2609 327-28.

*38 34. Third, and as Eli Lilly's Ms. Torres admitted, several internal Eli Lilly documents identify Zeneca as an Eli Lilly competitor. For example, a December 2, 1998 memorandum prepared by Ms. Torres captioned, "Maximizing the Breast Cancer Label Change," refers to an anticipated "competitive response," which Ms. Torres acknowledged was a reference to Zeneca, and goes on to note that "[w]e proactively and assertively position the P.I. change... not our competition." Pl.'s Exh. 16 at EV 2264 401-02; Tr. at 227-28 (Torres). Ms. Torres similarly wrote in a February 18, 1999 memorandum that "[t]here has been disturbing competitive activity involving misrepresentation of our NOV [notice of violation issued to Eli Lilly by FDA]. We are also planning on sharing competitive NOVs (Zeneca, Wyeth) with the Field to assure them we are also monitoring competitive activity ...." Pl.'s Exh. 49.

35. Fourth, Barr is plainly a competitor of Eli Lilly's. Not only does Barr distribute tamoxifen, with which Evista has been positioned to compete, but Barr also manufactures two products—estradiol and estropipate—that compete against Evista in the osteoporosis market. Tr. at 553 (Sawyer). Barr's products in the osteoporosis market give Barr an additional interest in being protected against false promotion of Evista for breast cancer risk reduction because such false promotion is reasonably likely to influence doctors' choices when prescribing a drug for the prevention of osteoporosis.

2. Zeneca and Barr have shown the requisite "causal connection"

36. Zeneca and Barr have likewise shown the requisite causal connection between Eli Lilly's conduct and resulting harm to Zeneca and Barr.

37. There is no dispute that tamoxifen is the only drug approved for reduction of the risk of breast cancer. Ms. Anson confirmed that Zeneca is the only manufacturer of tamoxifen in the United States and "for every sale of a tamoxifen tablet in the market, Zeneca is therefore a beneficiary ...." Tr. at 53 (Anson). Barr distributes tamoxifen in its generic form. Thus, if doctors believe Eli Lilly's claim that Evista reduces the risk of breast cancer, Zeneca's and Barr's sales necessarily will be affected; any

sale of Evista for breast cancer prevention or risk reduction is a lost sale of Zeneca's and may be a lost sale of Barr's.

38. Although it was not required to do so, Zeneca also presented survey evidence bolstering this point. A market research study conducted by Reed/Haldy/McIntosh, a reputable market research firm in the prescription drug field, concluded that of physicians surveyed, 11 percent of prescriptions for Evista are being written primarily for breast cancer prevention, as opposed to either for osteoporosis or for osteoporosis plus breast cancer, and that 35 percent of physicians have written at least some of their Evista prescriptions primarily for breast cancer prevention. Pl.'s Exhs. 72 & 80; Tr. at 477-79, 487-89 (McIntosh). The study does not prove that these prescriptions are being written because of statements made by Eli Lilly representatives. But since Eli Lilly executives acknowledge that the purpose of detailing these physicians is to persuade them to prescribe Eli Lilly's products, it is reasonable to conclude that at least some of these prescriptions resulted from Eli Lilly's false claims. *See Johnson & Johnson,* 631 F.2d at 190 ("The correct standard is whether it is likely that [defendant's] advertising has caused or will cause a loss of [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence that [defendant's] ads actually resulted in some definite loss of sales.").

*39 39. The unique nature of the market in question is also relevant to the issue of whether Zeneca and Barr have demonstrated a causal connection between Eli Lilly's false claims about Evista and injury to Zeneca and Barr. *See Telebrands Corp. v. Wilton Indus., Inc.,* 983 F.Supp. 471, 475 (S.D.N.Y.1997) (irreparable harm will result from false advertising if "the materiality of the false statement coupled with the unique nature of the product" is likely to influence sales). Ms. Anson testified that there are no other drugs anywhere in the world, let alone in the United States, approved to reduce the incidence of breast cancer. Tr. at 47-49 (Anson). She also described this field as a "new marketplace." Tr. at 68-69 (Anson). Therefore, it would be even more difficult to quantify Zeneca or Barr's potential lost sales, particularly since tamoxifen sales cannot be broken down between the prevention and treatment indications. Tr. at 100 (Anson). In *Novo Nordisk A/S v. Becton Dickinson & Co.,* 997 F.Supp. 470, 473

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *39 (S.D.N.Y.))

Page 29

(S.D.N.Y.1998), the court noted that a new entrant into an established market would have "a particularly difficult time proving money damages." Here, there is not only a new product but a new market itself, an even more complex situation.

### 3. Zeneca's reputation and goodwill are jeopardized

40. Injury to Zeneca's goodwill and reputation also supports the showing of irreparable harm. Courts in this Circuit have long held "[t]he likelihood of customer confusion, impairment of plaintiff's reputation and good will and probable diversion of customers, combined with the difficulty of proving actual monetary damages arising from Lanham Act injuries, justifies a presumption of irreparable injury once the violation has been established." *Upjohn Co. v. American Home Prods.*, 598 F.Supp. 550, 555 (S.D.N .Y.1984). Ms. Anson confirmed that there would be a "certain amount of loss of good will or injury to [Zeneca's] reputation from physicians as a result of [Eli Lilly's actions]." Tr. at 68-69 (Anson).

### 4. Eli Lilly's claim that Zeneca unreasonably delayed *is not meritorious*

41. As a final defense, Eli Lilly asserts that an injunction should not issue because Zeneca purportedly waited nearly nine months to commence this action. The Court rejects this argument.

42. Because of the public's overriding interest in preventing misleading advertising, the defense of laches is "sparingly applied" in Lanham Act cases. *American Home Prods, Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590-91 (S.D.N.Y.1987) . This is particularly true when public health issues are implicated, as they are here. *See American Cyanamid Corp. v. Connaught Labs.*, 800 F.2d 306, 310 (2d Cir.1986) (noting in a trademark infringement case that "the potential consequences of confusion over medicinal products may be far more dire than of confusion over ordinary consumer products"); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir.1996) (noting in a Lanham Act case that "the public's interest is especially significant when health and safety concerns are implicated" and that "public health and safety concerns may well overwhelm other considerations in the application of laches").

*40 43. Here, there is no question that Zeneca has been vigilant in asserting its rights. Zeneca could not have filed this action before early November even if it had had sufficient evidence of Eli Lilly's misconduct by then. The FDA did not allow Zeneca to market tamoxifen for breast cancer risk reduction until late October 1998. It was not until early November, when Zeneca's marketing efforts began in earnest, that Zeneca and Eli Lilly became "competitors" in the breast cancer risk reduction market. Only then did Zeneca first have standing to sue under the Lanham Act. *See Johnson & Johnson*, 631 F.2d at 189 (only competitors, either direct or indirect, have standing to sue for Lanham Act violations).

44. Moreover, when Zeneca first received anecdotal evidence of Eli Lilly's misconduct last May, the Chief Executive Officer of Zeneca wrote to Eli Lilly's President complaining about what the sales representatives were saying about Evista. Pl.'s Exh. 1. Eli Lilly's President assured Zeneca at that time not only that Eli Lilly representatives would not make breast cancer prevention claims, but that any representatives who did so would be punished. Pl.'s Exh. 2. Zeneca cannot be faulted for relying on the word of Eli Lilly's president. Moreover, as Ms. Anson testified, the evidence of false claims began to escalate noticeably in November, after Zeneca was approved for breast cancer risk reduction, and in December, after the Evista label change. Tr. at 63-64 (Anson). Most of Eli Lilly's false statements date from late 1998, when, as the evidence shows, Eli Lilly representatives began to implement the revised November and December detailing scripts. Ms. Anson also explained that Zeneca acted on its suspicions and altered questions in its survey research to try to confirm the anecdotal proof it had gathered. Tr. at 64-65 (Anson). Zeneca obtained the results of the Reed/Haldy/McIntosh survey in January, and then promptly contacted its attorneys and filed this action shortly thereafter in February. Tr. at 65-66, 68 (Anson). *See Warner Lambert v. McCrory's*, 718 F.Supp. 389, 394-95 (D.N.J.1989) ("good faith preparation for litigation," including "commission [of] a study of possible consumer confusion," "should not be used to subsequently bar plaintiff from obtaining injunctive relief"). Thus, Zeneca did not delay unreasonably in bringing the current lawsuit.

45. The cases offered by Eli Lilly on the issue of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *40 (S.D.N.Y.))

delay confirm that delay in filing suit is not a bar to injunctive relief when, as here, "the plaintiff was making good faith efforts to investigate" the basis for its claims. *Krueger Int'l, Inc. v. Nightingale Inc.,* 915 F.Supp. 595, 613 (S.D.N.Y.1996). Unlike a typical false advertising case, where there is no dispute about what a defendant is claiming in television or radio commercials or in print advertisements, Zeneca faced the formidable hurdle of proving what a competitor's sales representatives were saying during in-person detail visits with doctors—a hurdle Zeneca has now cleared. In short, based on both the law and the facts, Zeneca did not unreasonably delay in bringing this action.

*41 46. Moreover, there is no question that Barr did not unreasonably delay in this case. Barr first read in a trade publication that Eli Lilly was making claims that Evista reduces the risk of breast cancer in January 1999. It then learned in February 1999 that Zeneca had filed suit against Eli Lilly. Barr moved in March 1999 to intervene in this action. Tr. at 551-52 (Sawyer). Under these circumstances, there is no credible argument that Barr's claims against Eli Lilly are precluded by the doctrine of laches.

C. The equities weigh decisively in favor of an injunction

47. Since Zeneca and Barr have shown a strong likelihood of prevailing on the merits, it is unnecessary to reach the balance of equities. However, a preliminary injunction would be warranted under this standard also. Zeneca and Barr have plainly raised sufficiently serious questions going to the merits to make them fair ground for litigation. Equally clear, the balance of equities in this case tips decidedly in favor of granting an injunction.

48. As a result of more than two decades of research and testing by Zeneca as well as the investment of millions of dollars in research and development, tamoxifen is the only drug approved in the United States for the reduction of the risk of breast cancer. Tr. at 47-48, 68 (Anson). The evidence demonstrates that Eli Lilly's conduct threatens to erode the sales, goodwill, and physician and consumer confidence that Zeneca has developed over the years.

49. In contrast to the serious injury that will

continue to befall Zeneca and Barr in the absence of an injunction, the comparative harm to Eli Lilly from an injunction is not great. Eli Lilly will merely be relegated to promoting Evista for its only approved use, prevention of osteoporosis. Eli Lilly can "assert no equitable interest in the perpetuation of an advertising campaign that is literally false." *Castrol, Inc. v. Pennzoil Co.,* 799 F.Supp. 424, 440 (D.N.J.1992), *aff'd,* 987 F.2d 939 (3d Cir.1993). Eli Lilly can continue, without violating the Lanham Act, to disseminate truthful information about Evista, including the results of the MORE study, and the existence of ongoing studies, so long as this information is in fact truthful.

50. The public interest also requires that an injunction issue. When an allegedly false claim pertains to a prescription drug, the public interest in receiving truthful information is particularly acute. Dr. Jerry Lewis testified that by telling physicians that Evista has been proven to reduce the risk of breast cancer Eli Lilly has created a "grave public health risk." Tr. at 345- 46 (Lewis). And Eli Lilly's own witnesses have confirmed the obvious: it could be dangerous if a physician prescribes a drug erroneously believing that the drug could prevent cancer. Tr. at 247 (Nicholson). The evidence shows that doctors are prescribing Evista for the reduction of the risk of breast cancer. Although off-label prescribing—prescribing drugs for uses for which they are not indicated by the FDA—is not uncommon among physicians, Ans. ¶ 1, it would be dangerous if physicians off-label prescribed Evista for breast cancer prevention based on false information about whether Evista has been proven to reduce the risk of breast cancer. It is important to the public interest and to the patients involved that truthful information be provided.

D. The relief granted by the Court

*42 51. "[C]ourts retain a great deal of flexibility when fashioning preliminary relief ...." *Abbott Labs.,* 971 F.2d at 23. The Court of Appeals for the Second Circuit has held that "the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Forschner Group, Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir.1997). Thus although "[a] district court has a wide discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," *Forschner Group, Inc.,* 14 F.3d at 406 (internal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *42 (S.D.N.Y.))

quotation marks and citation omitted), the injunction framed by the district court must be "narrowly tailored to fit specific legal violations ... [and] should not impose unnecessary burdens on lawful activity." *Waldman Publ. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir.1994). Finally, a court's order of preliminary injunctive relief should be explicit and clear so that "those who must obey [it] will know what it is enjoined to forbid." *EFS Marketing, Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 493 (2d Cir.1996) (internal citations and quotation marks omitted).

52. Applying the above standards to the Court's Findings of Fact and Conclusions of Law, the Court hereby preliminarily enjoins Eli Lilly from stating in its advertising or promotional activities that (i) Evista has been proven, shown, or demonstrated to reduce the risk of breast cancer, or that (ii) Evista has been proven comparable or superior to tamoxifen for the reduction of the risk of breast cancer. The Court will not enjoin Eli Lilly from stating that Evista has been approved by the FDA for the reduction of the risk of breast cancer because, although the claim is plainly false, there is insufficient evidence for the Court to conclude at this stage that Eli Lilly has been making such a claim and therefore Zeneca and Barr have failed to establish that they are entitled to a preliminary injunction on that claim.

53. The Court will not order the corrective advertising sought by Zeneca and Barr, although the Court recognizes that it has the discretion to order such relief. *See, e.g., Linotype Co. v. Varityper, Inc.*, 89 Civ. 4747, 1989 WL 94338, at *3 (S.D.N.Y. Aug. 4, 1989) (ordering corrective advertising, in non-establishment case, "to counteract the false impression that may have been placed by the [defendant's] ad in consumer's minds") (citation omitted). Such relief would be unnecessarily broad. The false information that Eli Lilly sales representatives have disseminated to physicians concerning raloxifene will be corrected by the revised detailing the sales representatives do after completing the training program ordered below.

54. The Court hereby orders defendant Eli Lilly to design and implement a training program for those Eli Lilly sales representatives who are responsible for detailing physicians about Evista, as well as oncology sales representatives and any other sales representatives who may reasonably be expected to encounter questions from physicians about Evista and its efficacy in reducing the risk of breast cancer. The training program should be designed to ensure that Eli Lilly's sales representatives are made aware of and adhere to this Court's decision and order and do not make claims in the field that tamoxifen has been proven to reduce the risk of breast cancer or that it is comparable or superior to tamoxifen for the reduction of the risk of breast cancer. The training program should also explicitly inform sales representatives about the MORE data, the ongoing CORE and STAR trials, and the package insert statement that "[t]he effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." *See Pfizer*, 808 F.Supp. at 461 (in addition to granting a preliminary injunction, Court ordered Pfizer to hold training sessions with its sales representatives to make them aware of the Court's finding that Pfizer had violated the Lanham Act by making false establishment claims about Pfizer's drug); *Valu Eng'g, Inc. v. Nolu Plastics, Inc.*, 732 F.Supp. 1024, 1026-27 (N.D.Cal.1990) (ordering defendant to send a letter to its sales representatives instructing them to stop making false advertising claims).

Conclusion

*43 At the present time, the evidence before the Court demonstrates that it is literally false for Eli Lilly to claim that raloxifene has been proven to reduce the risk of breast cancer or that raloxifene is comparable or superior to tamoxifen for that purpose. Such statements are false because, although the data from the MORE trial are promising, given the deficiencies in that trial, the MORE data are insufficient to support such claims, thus requiring further study of raloxifene before such claims can be made.

For the reasons explained above, the Court grants the motion of Zeneca and Barr for a preliminary injunction with respect to the establishment and comparative establishment claims and denies it with respect to the indication claim. A separate Order will be issued containing the Preliminary Injunction set out above.

SO ORDERED.

1999 WL 509471 (S.D.N.Y.), 1999-2 Trade Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 1999 WL 509471, *43 (S.D.N.Y.))

P 72,603

    Motions, Pleadings and Filings (Back to top)

              1:99CV01452           (Docket)
(Feb. 25, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
1994 WL 97097 (S.D.N.Y.), 30 U.S.P.Q.2d 1963
(Cite as: 1994 WL 97097 (S.D.N.Y.))

Page   1

Motions, Pleadings and Filings

United States District Court, S.D. New York.
MASTERCARD INTERNATIONAL
INCORPORATED, Plaintiff,
v.
SPRINT·COMMUNICATIONS COMPANY and
World Cup USA 1994, Inc., Defendants.
SPRINT COMMUNICATIONS COMPANY
L.P., Defendant and Third Party Plaintiff,
v.
ISL FOOTBALL A.G. and ISL Marketing A.G.,
Third-Party Defendants.
No. 94 CIV. 1051 (JSM).

March 23, 1994.
Russell Falconer, Brumbaugh, Graves, Donohue &
Raymond, New York City.

John H. Doyle, Anderson Kill Olick & Oshinsky,
P.C., New York City.

Job Taylor, III, Latham & Watkins, New York
City.

Lawrence B. Friedman, CLeary Gottlieb Steen &
Hamilton, New York City.

OPINION

MARTIN, District Judge:

*1 Whether a telephone credit card which lacks a
magnetic stripe so that it cannot be inserted into a
cardreader which would automatically debit the
cardholder's account for a payment amount is
nonetheless a "card-based payment and account
access device" is a question of little overriding legal
significance or importance to the public in general.
Yet apparently, to the parties involved in this
litigation, the answer affects millions of dollars in
promotional value. [FN*]

As a result of an agreement entered into in March
1991, Mastercard obtained from ISL Football AG
the right to be an official sponsor of the 1994 World ·
Cup Soccer Tournament and the exclusive right to
use the World Cup '94 trademarks on
"(1) All card-based payment and account access
devices (including, without limitation, credit cards,

charge cards, travel and entertainment cards, on-
line and off-line point-of-sale debit cards, check
guarantee cards, and cards that combine two or
more of the foregoing functions)"

In May of 1991, ISL entered into a marketing
agreement with World Cup 1994, Inc., the Local
Organizing Committee (LOC) for the 1994 World
Cup games, which gave the LOC the right to
contract with corporations which would serve as
official partners with respect to the games and to
authorize the official partners to use the World Cup
mark on their products.    The agreement between
ISL and the LOC specifically provided "the
OFFICIAL PARTNERS shall not have the right to
use the MARKS on any card-based payment and
account · access devices." The agreement also
provided "LOC shall not grant ... rights to
OFFICIAL · PARTNERS ... which will infringe
upon the rights of OFFICIAL SPONSORS ..."

In May of 1992, the LOC entered into an
agreement with Sprint Communications Company
L.P. pursuant to which Sprint became an official
partner    and    the    exclusive    long-distance
telecommunications carrier of the 1994 World Cup
· and was granted the right to use the logos and marks
of the World Cup in its advertising, marketing and
promotions.

Acting pursuant to what it says were its right under
its agreement with the LOC, Sprint has now issued
over 100,000·cards bearing the World Cup mark.
These cards contain a number which the user either
enters into the phone upon hearing a prompt or
reads to the operator.    The cards lack a magnetic
stripe which would permit them to be scanned by a
cardreader and also·lack any information relating to
the cardholder that could be used for making a credit
purchase from a vendor. ·

Mastercard, having learned of Sprint's activities,
brought this action seeking · a preliminary and
permanent injunction prohibiting Sprint from issuing
such cards or undertaking any other activity which
infringes on the rights granted to Mastercard under
its May 1991 agreement with ISL.

On February 18, 1994, ·Mastercard presented an
Order to · Show Cause seeking a preliminary


© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 97097, *1 (S.D.N.Y.))

injunction. After conferring with the parties, the Court set March 16, 1994 as the date for the hearing on the preliminary injunction and ordered expedited discovery to proceed. Between that date and the date of the hearing, voluminous documents were exchanged by the parties and a number of witnesses were deposed. At the outset of the hearing, the Court suggested to the parties that, given the substantial discovery that had already taken place and the voluminous papers that had been submitted, it might be appropriate to combine the hearing on the preliminary injunction with the trial on the merits. Ultimately, all parties agreed to that procedure.

*2 The basic issue before the Court is one of contract interpretation. Was Mastercard granted by ISL an exclusive license for the World Cup marks which precludes Sprint from using those marks on the payment cards which it has issued and plans to issue in connection with its World Cup promotion?

As with any question of contract interpretation, the first reference should be to the language of the agreements themselves. The Court agrees with Mastercard's contention that the Sprint cards are "card-based payment and account access devices ..." Sprint argues that the cards that it issues need not be used by the purchaser in making a call if the number is either committed to memory or jotted down on some piece of paper. That does not change the fact that the access device, to wit, the number, is imprinted on a card given to the purchaser and the card is, therefore, a card-based access device. Thus, on the basis of the contract language alone, the Court finds that Mastercard's interpretation of the language is correct and Sprint's use of the World Cup marks on its cards is prohibited.

Even if the contract language were ambiguous, the extrinsic evidence demonstrates that both Mastercard and ISL intended that Mastercard should have the exclusive right to use the World Cup marks for telephone calling cards.

At the time it was negotiating with Sprint, the LOC contacted ISL to ask whether it could license Sprint to use the World Cup marks on telephone calling cards. Stephen Dixon, a managing director of ISL, responded in a memorandum dated December 12, 1991.

"I am sorry to say that you cannot allow U.S.

Sprint to use the 1994 World Cup emblem on calling cards in any manner whatsoever. At the time of signature of the Mastercard agreement, we had a long and heated debate over this particular topic and we lost the argument."

Thus, ISL clearly viewed a telephone credit cards as coming within the definition of a card-based payment and account access device.

Similarly, Mastercard consistently took the position that its exclusive rights included telephone credit cards and that it did not wish to sublicense those rights to any other party. For example in August 1993, Mastercard wrote to a Japanese company seeking to use the World Cup logo on a credit card and stated

"ISL has received requests from other sponsors to use paid telephone cards (whether branded or unbranded) as premiums in their promotion. We have steadfastly refused to grant such permission to the other sponsors."

Thus, the intent of the parties as demonstrated by the extrinsic evidence was that Mastercard's right precluded the use of the World Cup marks on any telephone credit card.

Since ISL granted these exclusive rights to Mastercard in March 1991, the LOC could not have obtained those rights from ISL in May 1991, and could not have conveyed them to Sprint in May 1992. Indeed, as noted above, the LOC's contract with ISL specifically exempted card-based payment and account access devices. While Sprint's decision to remove the magnetic stripe from its credit card is imaginative, it cannot be permitted to deprive Mastercard of rights it bargained for in its agreement with ISL. That agreement covered not only the products defined in the above-quoted language but also any products that were "similar to the products for which Mastercard had been granted an exclusive license." This language was used to grant Mastercard broad protection and clearly the Sprint cards fall within that protected area.

*3 Sprint argues that Mastercard has failed to establish a claim for relief under the Lanham Act because there is no evidence that consumers will confuse Mastercard's products with Sprint's. Mastercard does, however state a claim against Sprint for false advertising under § 43 of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 97097, *3 (S.D.N.Y.))

Page  3

Lanham Act, 15 U.S.C. § 1125(a).  The essence of the claim is that Sprint, while making no secret of the fact that it is the origin of its cards, creates a false impression concerning the sponsorship of the World Cup mark by Mastercard, the exclusive user of the mark for "card-based payment and account access devices."  *See Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 646 (6th Cir.1981), *cert. denied,* 459 U.S. 916 1982).

While Mastercard does not own the World Cup mark, § 1125(a) allows suit by "any person who ... is likely to be damaged by ... false description or representation."  There is no question that an exclusive licensee such as Mastercard has standing here.  *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 160 (1st Cir.1977); *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1457 (S.D.N.Y.1987).  In addition, although § 1125 speaks only of false descriptions or representations, a "false sponsorship" claim such as Mastercard's is recognized by the Second Circuit as being encompassed within those terms. *See Warner Bros. v. Gay Toys,* 658 F.2d 76 (2d Cir.1981); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979).

Irreparable harm in this case comes from the loss of Mastercard's exclusive right to issue cards with the World Cup mark.  Mastercard paid a high price for its exclusivity and will be spending additional sums on promoting its exclusive sponsorship of World Cup cards.  The seriousness with which Mastercard takes its position is demonstrated by its earlier decision not to sanction a telephone card from another company bearing the World Cup mark for fear of dilution.    The harm resulting from Mastercard's loss of its exclusive position would be irreparable. *See Frisch's Restaurants,* 670 F.2d at 651.

As the Second Circuit held in *Warner Bros.,* 658 F.2d at 79

Although it is necessary to prove that the buying public was actually deceived in order to recover damages under § 43 of the Lanham Act, only a likelihood of confusion or deception need be shown in order to obtain equitable relief.

Sprint argues that Mastercard has not established a cause of action based on the so-called *Polaroid* factors. *See Polaroid Corp. v. Polarad Electronics*

*Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert denied,* 368 U.S. 820 (1961).  In that case, Polaroid sought to stop a microwave and television equipment company from using the name Polarad.  Judge Friendly enumerated eight factors for use in "determining how far a valid trademark shall be protected with respect to goods other that those to which its owner has applied it...." *Id.* at 495.

**\*4** The issues here are totally different from those presented to the Court in *Polaroid.*  Here, Mastercard and Sprint are not arguing over the right to use marks that are merely similar; Sprint wishes to use the identical mark that Mastercard bargained and paid for and to which Sprint has absolutely no right.    Sprint's argument that Mastercard must show that Sprint's use of the mark will result in confusion as to the source of the competing credit cards rests on a logic that was rejected by the Second Circuit in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema Ltd.,* 604 F.2d 200, 204-205 (2d Cir.1979), where the Court stated Appellant reads the confusion requirement too narrowly.  In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.... (citations omitted)  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies this confusion requirement.

Here, Sprint wishes to use the World Cup marks to convey to the world the false impression that its use of the marks on calling cards is officially sanctioned by the World Cup organization.  Clearly, that is not the case, and Mastercard, which has the exclusive right to use the mark for such purposes, is entitled to enjoin this deceptive use.

Finally, we turn to Sprint's claim that Mastercard's unreasonable delay in commencing this action defeats its right to injunctive relief.  In this regard, Sprint asserts that Mastercard was aware of its plans to issue calling cards as early as May 21, 1993 when it learned of a *Brand Week* article concerning Sprint's cards, learned more about these plans from an August 1993 article in *Forbes* which, according to Sprint, "announced that Sprint's first 'major scheduled foray' in the United States with prepaid calling cards would be the 1994 World Cup games" (Sprint Memorandum of Law, p. 15), and actually received, on August 18, 1993, a Sprint card that had

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 97097, *4 (S.D.N.Y.))

been distributed at a "Soccer Blast."

Sprint contends that Mastercard's delay until February 16, 1994 in commencing this action amounts to laches and demonstrates that Mastercard is not suffering irreparable harm. Since Sprint has now consented to a consolidation of the hearing on a preliminary injunction and the trial on the merits, there is no need to resolve the question of whether Mastercard's delay precludes it from asserting that denial of a preliminary injunction will result in irreparable harm. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985)

In any event, the Court finds no unreasonable delay in Mastercard's filing of this action. The fact that Mastercard may have learned of some of Sprint's plans did not place Mastercard on notice of need to take immediate action to protect its rights since the games themselves were not to commence until June 1994.

Moreover, Mastercard has consistently asserted its right to be the exclusive user of the World Cup marks on credit cards. When it learned of Sprint's use of the marks, it promptly brought the matter to the attention of ISL. Given the relationship among ISL, the LOC, Mastercard, as an Official Sponsor, and Sprint, as an Official Partner in the World Cup Tournament, it was not unreasonable for Mastercard to delay filing a lawsuit in order to give the World Cup organizations an opportunity to settle the matter. Once those efforts failed, Mastercard did not unreasonably delay in the filing of this action. Thus, Sprint has failed to establish either the unreasonable delay or the prejudice to its interests that would justify denying Mastercard an injunction because of laches. *See New Era Publications International v. Henry Holt & Company, Inc.,* 873 F.2d 576, 584–85 (2d Cir.1989); *Tri-Star Pictures, Inc. v. Leisure Time Productions BV,* No. 93-7361, 1994 U.S.App. LEXIS 3052 (2d Cir. Feb. 17, 1994).

*5 For the foregoing reasons Sprint is hereby enjoined from using the World Cup mark on any card issued in connection with the payment for its services or in any other manner that conflicts with the exclusive rights granted to Mastercard. Any party may submit an application for a more detailed injunction on three (3) days notice to the other parties to this action.

Page   4

SO ORDERED.

FN* The parties' assertions as to the importance of this issue may reflect a certain amount of hyperbole. For example, Sprint states: "It is estimated that 32 billion viewers throughout the world will watch the games." This is indeed an extraordinary assertion given the current estimation of a world population of only 5-1/2 billion, Population Reference Bureau, *1990 World Population Data Sheet* (1990), and no reliably verified evidence of interplanetary travel. The Court is persuaded that if the parties had a more realistic view of the importance of the issues involved they would be able to reach a settlement that would serve everyone's interests.

1994 WL 97097 (S.D.N.Y.), 30 U.S.P.Q.2d 1963

Motions, Pleadings and Filings (Back to top)

1:94CV01051          (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



FILED

2005 APR 12 A 11:06

US DIST COURT
BRIDGEPORT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT BRIDGEPORT
4/15 2005
Kevin F. Rowe, Clerk
By _____
Deputy Clerk

SCHICK MANUFACTURING, INC.,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.,

    Plaintiffs,

- v. -

THE GILLETTE COMPANY,

    Defendant.

CIVIL ACTION NO.:  305CV174 JCH

---

### CORRECTED THIRD DECLARATION OF CHRIS KOHLER

CHRIS KOHLER states under penalty of perjury:

1.    This is the third affidavit or declaration of mine that has been submitted in these proceedings. The first appears as Exhibit 2 to the Declaration of David J. Leffell submitted with Schick's opening memorandum in support of its motion for a preliminary injunction. The second appears as Attachment C to Schick's reply memorandum in support of its motion for a preliminary injunction.

2.    As part of my duties, I participated in two studies to analyze the effect of the M3 Power razor on facial hair. The first study – High-Speed Videography of Gillette M3 Power Razor – took place on March 11, 2005, in the presence of Dr. David J. Leffell, Professor of Dermatology and Director of Dermatological Studies at Yale University. The second study – Hair Length Measurement Testing of the M3 Power Razor – took place on March 8, 9, and 17, 2005. The purposes and procedures of these two studies are explained below.

## Study 1: High Speed Videography of Gillette M3 Power Razor

3.      The purpose of this study was to observe whether the M3 Power razor caused facial hair to change angle in relation to the skin; i.e., whether it raised hair upward and away from skin..

4.      I was present during the design of the videography apparatus used to record the visual images that are a part of this study.  I was also present during a test performed on six subjects in the presence of Dr. Leffell on March 11, 2005, and operated the testing apparatus described below.

5.      For this study, six male wet shaver panelists were selected from the general population within the area of the testing facility.  These six subjects were recruited on the basis that they were members of the shave panel regularly used by Schick for research testing, were not part of a shave test that was ongoing, and were available on March 11, 2005.

6.      A warm, moist towellette was held on the left side of the subject's face for 2 minutes to hydrate the skin and hair.

7.      The head was positioned in a customized head positioning fixture.

8.      An M3 Power razor with blades removed was aligned and placed in a single-stroke pneumatic slide set to deliver 200 grams of pressure.

9.      A baseline video was taken of the area of the subject's face that was to receive the test stroke.

10.     Two shaving strokes were recorded on video for each panelist.  For use as a control, the first stroke was recorded with the M3 Power switched OFF.  After video recording this control stroke, the M3 Power razor was switched ON and the test stroke was recorded.

11.    Finally, a post-stroke video was taken of the area of the subject's face that had received the test stroke.

12.    This research was conducted using a Red Lake Motion Pro 500 high-speed video camera system. The video was captured at a rate of 500 frames per second with a shutter speed of 1/1000 seconds. The resolution was set to 1280 X 1024 pixels. The magnification of the image, as viewed on the system monitor, was approximately 50X. The camera and its associated lighting were mounted adjacent to a Canfield Scientific head brace, which was used to position and stabilize the subject. The razor, positioned between the camera and the brace, was coupled to a pneumatically operated mechanical slide, allowing full automation and control of the shaving stroke. A pivot in the coupling allowed the razor to sit naturally against the face, while a spring provided a consistent, nominal shaving pressure calibrated to 200 grams. Metering valves on the pneumatic slide were used to adjust the stroke speed to within the normal range.

13.    Attached as Exhibits 1-6 to this Declaration are true and correct copies of the videos taken of each test subject. Exhibits 2-6 also include still shots of the test area of each subjects' face before and after the stroke with the oscillating M3 Power razor. Exhibit 1 contains a still shot of the test area of the subject's face before the stroke, but the post-stroke still shot was lost due to an error in saving the data.

Study 2: Hair Length Measurement Testing of the M3 Power Razor

14.    The purpose of this study was to observe whether the M3 Power razor caused facial hair extension.

15.    I was present during the tests performed on 37 subjects on March 8, 9, and 17, 2005, and operated the testing apparatus described below.

3

16.     For this study, 37 male wet shaver panelists were recruited from the general population within the area of the testing facility. These 37 subjects were recruited on the basis that they were members of the shave panel regularly used by Schick for research testing, were not part of a shave test that was ongoing, and were available on the respective testing dates.

17.     16 of the test subjects were tested on March 8, 2005 of the test. These testing subjects were subjected to the following protocol steps:  .

a.     The panelist seated himself and positioned himself in a head positioning fixture.

b.     An M3 Power razor with blunted blades mounted in a single-stroke pneumatic slide set at 200 grams of pressure was positioned on the test subject's face.

c.     A dot (black for the right side, blue for the left side) was made on the subject's face in the area to be imaged.

d.     A digital image was taken of that area of the face with a Fuji S-2 Digital Camera, with resolution set at 3024 X 2016 pixels with Canfield ELM Lighting.

e.     A single-stroke with the razor was taken using the pneumatic slide. For 8 of the March 8th participants, the first stroke was taken on the right side of the face. For the other 8 participants, the first stroke was taken on the left side of the face. The first stroke was taken with the power off.

f.     A digital image was taken of the same area of the face.

g.     A side image of the panellist's entire face was taken.

h.     Steps 18(b) through 18(g) were repeated on the other side of the face for each panelist.

18.     16 of the test subjects were tested on March 9, 2005. These testing subjects were subjected to the following protocol steps:

4

a.    A dot (black for the right side, blue for the left side) was made on the subject's face in the area to be imaged.

b.    A digital image was taken of that area of the face with a Fuji S-2 Digital Camera, with resolution set at 3024 X 2016 pixels with Canfield ELM Lighting.

c.    A moist towellette was held against the face for 30 seconds by the panelist without rubbing. Shave cream was applied to the face without rubbing the face. The panelist seated himself and positioned himself in a head positioning fixture.

d.    An M3 Power razor with blunted blades mounted in a single-stroke pneumatic slide set at 200 grams of pressure was positioned on the test subject's face.

e.    A single-stroke with the razor was taken using the pneumatic slide. For 8 of the March 9th participants, the first stroke was taken on the right side of the face. For the other 8 participants, the first stroke was taken on the left side of the face. The first stroke was taken with the power on.

f.    The remaining shave cream was carefully dabbed off with tissue without rubbing.

g.    A digital image was taken of the same area of the face.

h.    A side image of the panelist's entire face was taken.

i.    Steps 19(a) through 19(h) were repeated on the other side of the face for each panelist.

19.    5 of the test subjects were tested on March 17, 2005. These testing subjects were subjected to the following protocol steps:

a.    A dot (black for the right side, blue for the left side) was made on the subject's face in the area to be imaged.

b.    A digital image was taken of that area of the face with a Fuji S-2 Digital Camera, with resolution set at 3024 X 2016 pixels with Canfield ELM Lighting.

c.    A moist towellette was held against the face for 30 seconds by the panelist without rubbing. Shave cream was applied to the face without rubbing the face. The panelist seated himself and positioned himself in a head positioning fixture.

d.    An M3 Power razor with blunted blades mounted in a single-stroke pneumatic slide set at 200 grams of pressure was positioned on the test subject's face.

e.    A single-stroke with the razor was taken using the pneumatic slide. For 3 of the March 17th participants, the first stroke was taken on the right side of the face. For the other 2 participants, the first stroke was taken on the left side of the face.

f.    The remaining shave cream was rinsed off by the panelist and the area was patted dry without rubbing.

g.    A digital image was taken of the same area of the face.

h.    A side view of the panellist's entire face was taken.

i.    Steps 19(a) through 19(h) were repeated on the other side of the face for each panellist.

20.    The images taken of each panelist were captured on a compact flash card, and the images were loaded to hard drive.

21.    Using Image Pro software, a technician identified 20 hairs in the marked area in the pre-stroke image by circling and numbering the hairs. The technician then matched these same 20 hairs to the corresponding images in the post-stroke image. After zooming in on the images, the technician marked the base and tip of each identified hair in each image, and the Image Pro software calculated the length of each hair. On both March 8th and March 9th, the technician was unable to measure the hairs for one of the 16 subjects because of overly long hairs. On March 17th, all 5 subjects tested on that day were able to be measured. The technician

6

performing the measurements was blind to the purpose of the study or to the product being tested.

22.    The data from the Image Pro software was exported to Microsoft Excel spreadsheets. These spreadsheets were sent to Dr. John C. Thornton for statistical analysis.

I hereby certify under penalty of perjury on this 11th day of April, 2005, that the foregoing is true to the best of my recollection and belief.

Chris Kohler

7

#23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2005 FEB 18  A 10 48

SCHICK MANUFACTURING, INC,
EVEREADY BATTERY COMPANY, INC.,
and ENERGIZER BATTERY, INC.

    Plaintiffs,

v.

THE GILLETTE COMPANY,

    Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO. DISTRICT COURT
RIDGEPORT, CT

3:05 CV 174 JCH

JANUARY 27 2005

---

## DECLARATION OF MICHELLE STEARNS

MICHELLE STEARNS states under penalty of perjury:

### Background and Experience

1.    I am currently employed by Schick Manufacturing, Inc. ("Schick") as the Group Brand Director for Men's Systems, a position I have held for two years. I have worked at Schick since February 1996, and have previously held positions there as Director of Innovation and as Global Business Manager. Prior to my employment with Schick, I had worked in brand management for corporations in South Africa.

2.    As Group Brand Director for Men's Systems, I oversee all men's systems razor and blade products manufactured by Schick, including the Quattro and Quattro Midnight. My duties include overseeing financial statements, brand management, sales forecasting, marketing, advertising and promotions.

## The Parties

3.     Defendant Gillette is the world's market-share leader in so-called "wet shave" razors for men and women, while Schick is the second largest global manufacturer and marketer of those products. Both Gillette and Schick sell two types of razors: (1) "razor systems," which provide consumers with a permanent razor handle and separate refillable blades; and (2) disposable razors, which are discarded in their entirety when worn out. There is little dual usage among customers who use razor systems and those who use disposable razors. Together, Gillette and Schick account for over 95% of the market share of "wet shave" men's razor systems (i.e., permanent razor handles) in the United States, and are engaged in fierce head-to-head competition for consumers.

4.     Wet shave systems razors are among the fastest growing market segments of the consumer products industry. Growth in this market segment depends heavily on persuading consumers to "trade up" from older shaving products to new, premium priced and technologically advanced shaving products that have been introduced in recent years.

5.     Advertising is the primary means by which Gillette and Schick try to persuade consumers to trade up to new premium products and both companies invest heavily in developing advertising claims to convince consumers to do so.

6.     In recent years, Schick has mounted a significant challenge to Gillette's market-share dominance. In 2003, Schick achieved a technological breakthrough with the introduction of its four-blade Quattro razor system -- the world's first four-blade razor system. The Quattro was named one of the 25 best products of the year by Fortune Magazine. These products followed on the heels of other recent Schick innovations: the 2002 introduction of the three-bladed Xtreme 3 razor system and the 2000 introduction of the Xtreme 3 disposable razor.

2

7.    In August 2004, Schick followed on the success of Quattro by introducing the Quattro Midnight, which offers four blades and an enhanced handle design for improved precision and control.

8.    The Quattro franchise was Schick's largest project launch ever. Schick has spent many millions of dollars in marketing the Quattro franchise, including advertising and promotions.

9.    Since these technological breakthroughs by Schick, Gillette has begun to make increasingly aggressive advertising claims for its products in an apparent effort to stem Schick's market gains and contain the industry buzz that Schick has generated.

## Gillette's Deceptive Advertising

10.    Data indicate that, as of October 31, 2004, only four months after the launch of the M3P in May 2004, 31.4 million men in Schick's target demographic of men aged 18-34 had viewed M3P commercials, and these men probably viewed the commercials 15 times or more.

11.    Since the launch of the M3P, the market shares of men's systems razors held by Quattro razors and by Schick overall have declined sharply, and sales have fallen far short of Schick's projections. At the same time, the market shares of men's systems razors held by the M3P razors and by Gillette overall have risen sharply.

12.    Monthly dollar shares of men's systems razors for the M3P and the Quattro razors are summarized in the table below, which collects the information from AC Nielsen,[1] the leading marketing information company, for the months since the launch of the M3P.

---

[1] The AC Nielsen data measure retail "Fr:ck" sales (i.e., food, drug and mass merchandiser sales, exclusive of Wal-Mart, which does not make its sales data available). The data do not include refill blade sales.

3

|  | DOLLAR SHARES (in percentages) | |
|---|---|---|
|  | Schick Quattro | Gillette M3 Power |
| 5/15/2004 | 21.0 | 0.0 |
| 6/12/2004 | 44.9 | 30.3 |
| 7/10/2004 | 22.3 | 40.2 |
| 8/7/2004 | 10.1 | 34.9 |
| 9/4/2004 | 10.9 * | 32.9 |
| 10/2/2004 | 14.9 * | 32.7 |
| 10/30/2004 | 16.7 * | 36.2 |
| 11/27/2004 | 14.4 * | 38.1 |
| 12/25/2004 | 13.9 * | 42.0 |

* Includes Quattro Midnight.

13.    As is evident from this table, in the month immediately preceding the introduction of Gillette's M3P, Schick's Quattro premium men's system razors had a market share of 21% of dollar sales of men's systems razors.

14.    Gillette launched the M3P on May 18, 2004. After its first month on the market, the M3P had a market share of 30.3% of dollar sales of men's systems razors.

15.    By the end of 2004, just over six months after its introduction, M3P had a market share of 42.0% of dollar sales of men's systems razors.

16.    In stark contrast, the market share for Quattro and Quattro Midnight combined for the final month of 2004 decreased to 13.9% of dollar sales.

4

17.     Accordingly, Schick's Quattro products experienced a 7.1 percentage point drop in dollar sales of men's systems razors in the six-month period after the launch of the M3P and the nationwide "hair raising" advertising campaign.

18.     Overall in 2004, dollar sales for Quattro razors decreased 23.3% and fell far short of sales projections.

19.     Prior to the launch of the M3P, Gillette had an overall 62.7% market share of men's systems razors, compared to Schick's 27.1% overall market share.

20.     At the end of 2004, Gillette had an overall 79.9% market share of the men's systems razors, compared to a 15.7% overall market share for Schick.

21.     Thus, in the six-month period following the M3P launch, Gillette gained 17.2 percentage points in market share while Schick lost 11.4 percentage points.

22.     Overall in 2004, Schick's market share of men's systems razors dropped 26.8% in dollar sales.

23.     Significantly, in 2004, Gillette's market share increased 29.6% in dollar sales.

24.     In light of the large market share increases for Gillette and the corresponding decreases for Schick over the past year, it is entirely reasonable to conclude that Gillette's M3P advertising has had an adverse impact on the sale of Schick's products and will continue to do so.

25.     As noted above, Gillette and Schick together account for over 95% of sales of men's systems razors. A customer gained for Gillette almost certainly means a customer lost for Schick.

Executed this 27th day of January, 2005.

_____
Michelle Stearns

R0322625.3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCHICK MANUFACTURING, INC., EVEREADY BATTERY COMPANY, INC., and ENERGIZER BATTERY, INC., | CIVIL ACTION NO.: 3:05 CV 174 (JCH) |
| Plaintiffs, | |
| - v. - | |
| THE GILLETTE COMPANY, | May 5, 2005 |
| Defendant. | |

## PLAINTIFFS' MOTION REGARDING THE ADMISSIBILITY OF PX 111 and 112 AND NOTICE TO CLARIFY OFFER OF PX 131

Pursuant to the Court's directive of May 2, 2005, Plaintiffs Schick Manufacturing, Inc.,

Eveready Battery Company, Inc. and Energizer Battery, Inc. (collectively "Schick") hereby file

this motion regarding the admissibility of PX 111 and 112 in response to the formal Objection to

those exhibits filed by The Gillette Company ("Gillette") on May 4, 2005.  Schick further

submits notice to clarify that PX 131 was offered only for a limited purpose.

A.    <u>Motion Regarding Admissibility of PX 111 and PX 112</u>

During the hearing on its preliminary injunction motion, Schick offered PX 111 and 112

in rebuttal to Gillette's affirmative defense that Schick inexcusably had delayed.[1]  <u>See</u> <u>King v.</u>

<u>Allied Vision, Ltd.</u>, 807 F. Supp. 300, 306 (S.D.N.Y. 1992) (analyzing claim of delay as an

affirmative defense).  PX 112 is a letter dated January 11, 2005 from the Vice President, Europe,

of Wilkinson Sword,  Limited ("Wilkinson Sword"), to Gillette Group International, demanding

---

[1] For the Court's convenience, true and accurate copies of  PX 111 and PX 112 are attached to this motion.

ORAL ARGUMENT NOT REQUESTED

that Gillette cease making false hair-raising claims for the M3 Power ("M3P") in Europe. PX 111 is Gillette's response to PX 112 dated January 17, 2005.

On May 4, 2005, following a "meet and confer" session between the parties over these and other issues, Gillette filed a notice of objection to these exhibits on the sole ground that PX 111 and 112 are not relevant to any claim or defense in this case. As we briefly discuss below, Gillette's relevance objection – which at most goes to the weight of the evidence, not its admissibility – is unpersuasive and should not preclude the admission of these exhibits.

Schick obtained an injunction against Gillette's hair-raising claims in Germany on November 16, 2004, which injunction was subsequently affirmed on December 17, 2004. (PX 11) Gillette thereafter revised its M3P advertising campaign, but the German ad remained false. On December 28, 2004, the German Court issued a second injunction against Gillette's revised M3P ads in that country. (PX 116) Following this second injunction, Schick demanded, among other things, that Gillette immediately "[w]ithdraw all such [hair-raising] claims in [European] countries where the M3 Power has already been launched or is currently marketed in at least the same terms as contained in the above mentioned German decision within 5 days from receipt of this letter." (PX 112)

Gillette responded the following week in the letter marked as PX 111. In that letter, Gillette stated that, while disagreeing with the German court's ruling, it would comply in Germany, but would "take [its] own counsel with respect to [its] marketing plans for M3Power" outside of Germany. (PX 111) Shortly after receipt of Gillette's response letter, Schick commenced litigation throughout the world to obtain injunctions against Gillette's M3P hair-raising claims. As summarized in PX 205A, following its receipt of PX 111, Schick filed suit in, among other countries: (1) the United States on January 28, 2005, (2) France on February 3,

2

2005 (PX 26), (3) Australia on February 8, 2005 (PX 13), and (4) the Netherlands on February 11, 2005 (PX 131).

The exhibits that Gillette claims are irrelevant, PX 111 and PX 112, plainly are relevant to rebut Gillette's affirmative defense of delay and corroborate Schick's showing of irreparable harm. These letters demonstrate that Schick's lawsuit in the United States followed closely on the heels of Gillette's refusal to acknowledge that the German injunction would guide Gillette's behavior outside of Germany. Thus, when Gillette made clear that it did not intend to adhere to the ruling outside Germany, Schick promptly commenced litigation in the United States and elsewhere. Gillette's Objection emphasizes that the exhibits refer only to M3P ads in Europe (Notice of Objection at 2), but this argument misses the point. It was Schick's realization that Gillette did not intend to act like a responsible global competitor that triggered suit in this Court. Had Gillette agreed to abide by the German court's ruling on a world-wide basis, suit in the United States would not have been necessary.

Accordingly, PX 111 and 112 should be admitted into evidence over Gillette's relevance objection.

**B.     Notice to Clarify Offer of PX 131**

During the preliminary injunction hearing, Schick offered PX 131 in rebuttal to Gillette's defense of inexcusable delay. (Hearing Tr. 763:14-16)  PX 131 is a certified English translation of the Dutch Complaint in the lawsuit between Wilkinson-Sword B.V. and Gillette Groep Nederland B.V., filed in the District Court of the Hague, Netherlands.

During the parties' "meet and confer" conference regarding the parties' exhibit lists, Gillette requested that Schick clarify the purpose for which Schick offered PX 131 on rebuttal. Accordingly, Schick respectfully notifies the Court that PX 131 is offered for the limited purpose

of establishing that Schick filed its lawsuit against Gillette in the Netherlands on February 11, 2005.

## CONCLUSION

For the foregoing reasons, the Court should grant Schick's motion regarding the admissibility of PX 111 and PX 112.

Respectfully submitted,

 /s/
Michael J. Donnelly, Esq. (ct07974)
Derek T. Werner (ct23419)
MURTHA CULLINA LLP
185 Asylum Street, Cityplace I
Hartford, Connecticut 06103-3469
Telephone:  (860) 240-6000
Facsimile:  (860) 240-6150
mdonnelly@murthalaw.com
dwerner@murthalaw.com

Of Counsel:

Steven F. Reich, Esq.
Ronald G. Blum, Esq.
Jeffrey S. Edelstein, Esq.
Monica Y. Youn, Esq.
MANATT PHELPS & PHILLIPS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 790-4500
Facsimile:  (212) 790-4545
SReich@manatt.com
RBlum@manatt.com
JEdelstein@manatt.com
MYoun@manatt.com

Attorneys for Plaintiffs Schick
Manufacturing, Inc., Energizer Battery, Inc.
and Eveready Battery Company, Inc.

4

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2005, a copy of the foregoing Motion Regarding the

Admissibility of PX 111 and PX 112 and Notice to Clarify Offer of PX 131 was filed

electronically and sent via facsimile to all parties of record. Notice of this filing will be sent by

e-mail to all parties by operation of the Court's electronic filing system. Parties may access this

filing through the Court's system.

Michael A. Bucci, Esq.
Day, Berry & Howard LLP
CityPlace I
185 Asylum Street
Hartford, Connecticut 06103

Peter M. Brody, Esq.
Ropes & Gray
One Metro Center
700 12th Street, NW, Suite 900
Washington, D.C. 20005-3948

/s/
Michael J. Donnelly

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SCHICK MANUFACTURING INC., EVEREADY BATTERY COMPANY, INC., and ENERGIZER BATTERY, INC., )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE GILLETTE COMPANY, )<br><br>Defendant. ) | CIVIL NO. 3:05-cv-00174 JCH<br><br><br><br><br><br>June 9, 2005 |

**DEFENDANT GILLETTE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLARIFICATION OF INJUNCTION AND ADJUSTMENT OF BOND AMOUNT AND TO SHORTEN TIME FOR PLAINTIFF'S RESPONSE**

Upon issuance of the preliminary injunction in this matter, The Gillette Company moved promptly to undertake the steps it believed necessary to comply with the injunction's requirements and to assess the cost of compliance in order to advise the Court in the event the amount of the bond was insufficient. *See* Slip Op. 25. Thus, Gillette has removed the revised animated demonstration of hair extension from its U.S. web site and has discontinued use of the U.S. television commercial containing the revised animated demonstration of hair extension. While the cost of these measures is not trivial, Gillette does not believe these costs will warrant an increase in the amount of the bond.

Neither the packaging nor in-store displays for M3Power features any depiction of hairs changing angle or changing length, nor any verbal statement that Gillette considers to refer to

angle change or the magnitude or frequency of hair extension. Thus, it was Gillette's conclusion that these items required no corrective action and, hence, no adjustment in the bond.[1]

By letter dated June 7, 2005, counsel for Schick has asserted that the injunction does require remedial action with respect to M3Power packaging because the back panel of the packaging features the following claim: "Gentle micro-pulses stimulate hair up and away from skin."[2] Gillette had not understood the injunction this way. As Schick acknowledges, neither the Court's order nor the Court's opinion makes specific reference to that wording; rather, the specific wording considered by the Court was "micro-pulses raise hair up and away from skin." Slip op. 20 & n.8. Although the order proscribes the use of any words that state or communicate that M3Power changes the angle of hairs or extends hairs by a magnitude or frequency that is not physiologically accurate, Gillette does not believe the words "Gentle micro-pulses stimulate hair up and away from skin" do so. Certainly, the record contains no evidence concerning the meaning of this claim, let alone evidence from which the Court could have concluded that consumers necessarily would understand this claim to connote either a change of hair angle or a specific magnitude or frequency of hair extension.[3]

---

[1] Although the Court's opinion suggests that the original animated demonstration is "featured on . . . product packaging," neither the original nor the revised version of the animation has, in fact, ever appeared on any packaging. See Pl. Ex. 9, Def. Ex. 119 (M3Power packaging). We note that, inside some current M3Power packages, and not visible to the purchaser in the store, there are color brochures depicting the operation of the M3Power. The brochures, however, do not include any "before" and "after" graphic sequence showing hairs changing angle or changing length, and the text of the brochures merely states that "micro-pulses raise the hair from the skin." Accordingly, Gillette does not believe that these brochures are implicated by the injunction.

[2] The back panel is the reverse side of the cardboard package insert contained within the blister pack that holds the razor. The claim that "Gentle micro-pulses stimulate hair up and away from skin" does not appear on M3Power cartridge packages.

[3] The dictionary definitions submitted by Schick were of the word "raise" only. In this regard, we note that Schick's counsel did not mention this claim during the hearing when asked by the Court to specify the words that it considered misleading, but rather focused on the words "raises hair": (con't.)

Because the cost of complying with the injunction, and the concomitant amount of the bond, substantially increases if the injunction does apply to the packaging claim "Gentle micro-pulses stimulate hair up and away from skin," Gillette respectfully requests that the Court clarify whether the injunction does so apply, and, if so, Gillette requests an increase in the bond amount. The specific costs associated with eliminating this claim from packaging are as follows:

- Reworking of back panel copy. The cost of modifying the back panel copy to eliminate the claim "Gentle micro-pulses stimulate hair up and away from skin" is approximately $15,000.

- Existing stock of package back panels. Gillette has in stock approximately 2.3 million package back panels already printed with the claim "Gentle micro-pulses stimulate hair up and away from skin" and ready to be inserted in the M3Power blister packs as they come off of the production line. It would cost Gillette approximately $190,000 to "resticker" these back panels to eliminate the claim.

- Existing inventory of packages at distribution centers. In inventory at Gillette's regional distribution centers are approximately 1 million finished M3Power packages containing the back panel featuring the claim "Gentle micro-pulses stimulate hair up and away from skin." These packages are packed in cartons, awaiting shipment to retailers. To resticker these finished packages would cost Gillette an estimated $175,000.

---

THE COURT: All right. What are the words that are the false claim?

MR. REICH: There are two sets of words. The original words raises hair up and away from the skin. That's the first set. They changed the claim after we complained about it and said raises the hair and the sentence went on. That's the part that we find objectionable.

Transcript of Hearing 9:21-10:1.

3

Hence, the cost of eliminating the claim from Gillette's M3Power packaging, when added to the costs associated with changing the web site and television commercial, thus totals approximately $400,000, which exceeds the amount of the bond. If the injunction applies to this claim, the bond therefore should be increased to reflect these costs.

In its June 7 letter to Gillette, Schick also takes the position that the injunction requires remedial action, not only with respect to packaging in Gillette's possession or control, but also with respect to product already on shelves or in stock at retail stores. As Schick knows, however, these packages are the property of the retailers: title legally passes upon shipment from Gillette's distribution centers. The injunction expressly applies to "The Gillette Company, its officers, agents, servants, employees, representatives, subsidiaries, and affiliates"; it does not mention third party retailers.

In analogous cases, federal courts have declined to grant injunctive relief with respect to any inventory of product that is already the property of non-party distributors or retailers who purchased the product in good faith; instead, the courts have permitted that inventory to be sold off in the normal course of business.[4] *See, e.g., Paramount Pictures Corp. v. Carol Publ'g Group, Inc.*, 25 F. Supp. 2d 372, 376 (S.D.N.Y. 1998); *ErgoBilt, Inc. v. Neutral Posture Ergonomics, Inc.*, 2004 WL 1041586, *13 (N.D. Tex. 2004); *Automotive Prods. v. Tilton Eng'g, Inc.*, 1993 WL 660164, *15 (C.D. Cal. 1993); *Philip Morris Inc. v. Allen Distributors, Inc.*, 48 F.Supp.2d 844, 857 (S.D. Ind. 1999); *Ideassociates, Inc. v. Ideatech, Inc.*, 704 F.Supp. 294, 296 (D.D.C. 1989); *see also, e.g., Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 744 (7th Cir.

---

[4] Gillette estimates that current in-store inventory represents 3-4 months' worth. Given Schick's lengthy delay in seeking injunctive relief, this amount of time cannot be deemed to cause Schick significant additional harm. *Cf. W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 872-73 (2d Cir. 1966) (modifying injunction to permit defendant in trademark infringement case to sell existing inventory because of two-and-a-half month delay in plaintiff's filing of preliminary injunction, which indicated that plaintiff was concerned primarily with future damages).

4

2003) ("[I]in determining the appropriate scope of an injunction the judge must give due weight to the injunction's possible effect on innocent third parties."); *CSX Transp., Inc. v. Tennessee State Board of Equalization*, 964 F.2d 548, 550 (6th Cir. 1992) (same); *Country Floors, Inc. v. A Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991) (same).

Moreover, the cost of complying with the injunction unquestionably will increase dramatically if Gillette is required to take remedial action with respect to product already sold, delivered, and in the possession of retailers. Because product in the possession of retailers no longer is the property of Gillette, Gillette would have to secure the permission of its retailers to reclaim product from shelves and stockrooms, resticker the packages (on store premises or, if necessary, off-site), and reshelve the packages. Gillette's data indicate that approximately 3.2 million M3Power packages are currently on retail shelves or in stock at stores. To resticker these unites would entail an additional estimated expenditure of $1.2 million. Thus, if Gillette is obligated to do so, the bond amount should be increased to $1.6 million (the sum of $400,000 and $1.2 million).

\* \* \*

In sum, Gillette respectfully requests that the Court clarify whether the injunction requires corrective action with respect to the packaging claim that "Gentle micro-pulses stimulate hair up and away from skin," and if so, whether the injunction requires remediation of packages at retail stores. In the event that either is the case, Gillette asks that the Court increase the bond to reflect Gillette's costs of compliance in accordance with the estimates set forth above. *See, e.g., McNeil-PPC, Inc. v. Pfizer Inc.*, No. 04 Civ. 7684 (DC) (S.D.N.Y. Jan. 10, 2005) (requiring a $2 million bond as security against estimated costs of compliance with injunction in advertising dispute). Finally, because of the compliance deadline set forth in the injunction, Gillette

5

respectfully requests that the Court shorten the time for Plaintiffs to respond to this motion and

direct Plaintiffs to file their response on or before June 14, 2005.

| | Respectfully submitted, |
| --- | --- |
| Dated: June 9, 2005 | ___/s/___ |
| | James M. Spears (ct25419) |
| | Peter M. Brody (phv0138) |
| | ROPES & GRAY LLP |
| | One Metro Center |
| | 700 12th Street, NW |
| | Washington, DC  20005 |
| | (202) 508-4600 |
| | (202) 508-4650 (fax) |
| | *james.spears@ropesgray.com* |
| | *peter.brody@ropesgray.com* |
| | |
| | Michael A. Bucci (ct15429) |
| | DAY BERRY & HOWARD LLP |
| | City Place I |
| | Hartford, CT 06103 |
| | (860) 275-0100 |
| | (860) 275-0343 (fax) |
| | *mabucci@dbh.com* |
| | |
| | Counsel for Defendant The Gillette Company |

## CERTIFICATION

I hereby certify that on this 9th day of June, 2005, a copy of the foregoing, Defendant The Gillette Company's Motion for Clarification of Judgment and Adjustment of Bond Amount, was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I also hereby certify that on this 17th day of May, 2005, a copy of the foregoing was sent via Federal Express and facsimile to:

> Michael J. Donnelly, Esq.
> Murtha Cullina LLP
> 185 Asylum Street
> Hartford, CT 06103-3469
> (860) 240-6150 (fax)
>
> Ronald G. Blum, Esq.
> Manatt, Phelps & Phillips LLP
> 7 Times Square
> New York, NY 10036
> (212) 790-4545 (fax)

> By /s/ _____
> James M. Spears (ct25419)
> Peter M. Brody  (phv0138)
> Ropes & Gray LLP
> One Metro Center
> 700 12th Street, NW
> Washington, DC 20005
> (202) 508-4600
> (202) 508-4650 (fax)
> *james.spears@ropesgray.com*
> *peter.brody@ropesgray.com*

> Michael A. Bucci (ct#15429)
> Day, Berry & Howard LLP
> CityPlace I, 185 Asylum Street
> Hartford, CT 06103-3499
> (860) 275-0100
> (860) 275-0343 (fax)
> *mabucci@dbh.com*

> Counsel For Defendant The Gillette Company

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

**ORIGINAL**

SCHICK MANUFACTURING, INC. )
ET AL                      )
              Plaintiffs  )   NO: 3:05CV174(JCH)
vs.                        )
                           )
GILLETTE CO.,              )
              Defendant    )

April 12, 2005
915 Lafayette Boulevard
Bridgeport Connecticut
9:13 A.M.

**PRELIMINARY INJUNCTION**

**DAY 1**

B E F O R E:

    THE HONORABLE JANET C. HALL
    UNITED STATES DISTRICT JUDGE

FILED
2005 APR 18 A 10: 43
U.S. DISTRICT COURT
BRIDGEPORT CONN.

A P P E A R A N C E S:

For the Plaintiffs  :        STEVEN REICH, ESQ.
                             RONALD BLUM, ESQ.
                             JEFFREY EDELSTEIN, ESQ.
                             MONICA YOUN, ESQ.
                             Manatt Phelps & Phillips
                             7 Times Square
                             New York, NY  10036

                             MICHAEL DONNELLY, ESQ.
                             Murtha Cullina LLP
                             CityPlace I
                             185 Asylum Street
                             Hartford, CT  06103-3469

              --  Continued  --

2

```
 1    For the Defendant    :        JAMES M. SPEARS, ESQ.
                                    PETER BRODY, ESQ.
 2                                  BRYAN DIEDERICH, ESQ.
                                    Ropes & Gray
 3                                  700 12th NW, Suite 900
                                    Washington, DC  2005

 4                                  MICHAEL A. BUCCI, ESQ.
 5                                  Day, Berry & Howard
                                    CityPlace I
 6                                  Hartford, CT  06103-3499

 7

 8    Court Reporter       :        Terri Fidanza, LSR
 9                                  (203) 910-4567

10

11    Proceedings recorded by mechanical stenography, transcript
12    produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    administer an oath.

2                    P E T E R   C L A Y

3                    having been called as a witness, was

4                    first duly sworn and testified on his

5                    oath as follows:

6                    THE CLERK:  Please be seated.  Can you

7    please state your name and address for the record and

8    spell your last name.

9                    THE WITNESS:  Peter M. Clay.  I live at 14

10   Arbor Street, Wenham, Massachusetts.

11   DIRECT EXAMINATION BY MR. REICH:

12        Q    Good morning, Mr. Clay.  I think it is still

13   morning.

14        A    Morning.

15        Q    You are the vice president for premium systems

16   in the global business management grooming group at

17   Gillette, are you not?

18        A    That's correct.

19        Q    That's a position that you have held since

20   August of 2001, right?

21        A    That's correct.

22        Q    And in your current position, you are

23   responsible for developing advertising and advertising

24   concepts for Gillette's premium shaving products,

25   correct?

100

1   consisted of the letter to the networks?

2           MR. SPEARS:  Objection.  Mischaracterizing

3   the witness' testimony.

4           MR. REICH:  I'm asking a question.

5           THE COURT:  Objection is overruled.  You

6   can answer the question.

7       A   I believe you have the attachment that was the

8   network clearance package for M3Power. I believe in that

9   were again story boards or tape.  I'm not quite sure.

10  There was the C T information.  I believe there were

11  images of the hair extension effect and I think that's

12  about it.  So there was technical information in there.

13      Q   Was there anything in that claim substantiation

14  package that substantiated a claim that the effect of

15  micro pulses is to change the angle of the hair on the

16  face?

17      A   Yes, I believe there was.

18      Q   So it is your recollection that the claim

19  substantiation package that you saw had information

20  relating to a change of angle of hair on the face?

21      A   I didn't say that.  I think what we tried to

22  include was some images that shows there was a hair

23  extension effect.

24      Q   I asked you actually a different question.  My

25  question is whether the package that you reviewed

101

1  contained information substantiating a claim that the

2  M3Power changes the angle of hair in relation to the

3  face?

4        A    I wasn't aware that we made that claim.

5        Q    I'm asking you whether the package contained

6  such information.

7        A    Not that I know of.

8        Q    And so you would agree as a person with

9  experience in the field of marketing and advertising that

10  if Gillette made a claim that the effect of micro pulses

11  was to change the angle of hair in relation to the face,

12  that that claim would be unsubstantiated, correct?

13        A    I didn't believe we were making that claim.

14        Q    Can you read back the question.

15             THE COURT:  If you answer questions, your

16  side is going to have a lot more time to offer evidence.

17  The question was and so you would agree as a person with

18  experience in the field of marketing and advertising that

19  if Gillette made a claim that the effect of micro pulses

20  was to change the angle of hair in relation to the face,

21  that that claim would be unsubstantiated, correct?

22        A    So it is a hypothetical question, yes, I

23  agree.

24        Q    If you can turn in Plaintiff's Exhibit 32 which

25  you have in front of you to the page that's marked page 7,

102

1    if we can bring out that text and if we could highlight

2    the second box.  And the box next to it and the next line

3    hair standing up away from the skin and the box next to

4    it.  Sir, have you seen documents in the format in the

5    claims council where there's a proposed claim presented on

6    the left side and on the right side there's a column for

7    the entry of the support?

8        A    Yes.  I'm familiar with this form.

9        Q    And typically when you see this document, is

10   there support filled in for the claim in the support

11   column?

12       A    As the process evolves.

13       Q    So that would be yes?

14       A    I think they start out blank and hopefully they

15   get filled up.

16       Q    Have you ever seen a version of this document

17   relating to the M3Power where the support was filled in?

18       A    Not that I remember.

19       Q    So the answer is you have never seen one?

20       A    Not that I remember.

21       Q    I want to ask you some questions about the

22   claims that Gillette made for the M3Power at the time of

23   this launch.  At this time you had responsibility for it,

24   correct?

25       A    Starting in early June I took over.

103

Q    It launched May 24, correct?

A    Yup.

Q    First of all, the M3Power is sold in commerce throughout the U. S., is it not?

A    Absolutely.

Q    And Gillette advertises the M3Power nationally, does it not?

A    Yes, we do.

Q    It advertised and sold in M3Power in the state of Connecticut, did it not?

A    Yes, we did.

Q    The M3Power competes in the marketplace with Schick, Quattro and Quattro Midnight, does it not?

A    Yes, it does.

Q    Do you agree that buying advertising time on the networks is expensive?

A    Yes.

Q    You have about 15 or 30 seconds typically to make your pitch to consumers for product, right?

A    That's right.

Q    Do you agree in those 15 or 30 seconds you pitch the key qualities or characteristics of the product that you are advertising?

A    That's our intention.

Q    In other words, you have to pitch the reason to

104

1    the consumer to buy the product in that short time span,

2    correct?

3         A    That's correct.

4         Q    And would you also agree that you wouldn't waste

5    time in a television advertisement touting a quality or

6    characteristic that were unimportant?

7         A    That's correct.

8         Q    I want to talk to you about the modifications

9    that Gillette made to the advertising campaign for the

10   M3Power.  Am I correct in January of 2005, you decided to

11   change Gillette's advertising for the product?

12        A    Yes, we did.

13        Q    And that decision was made in response to

14   complaints that Schick lodged in Germany about the hair

15   raising claim that Gillette was making in this country,

16   correct?

17        A    It weighed in.

18        Q    It was a factor?

19        A    It was a factor.

20        Q    Did you actually read the decision in the German

21   court?

22        A    No.  But I was briefed on it by counsel.

23        Q    Don't tell me what your counsel said.  You

24   actually changed the advertising.  The television

25   advertising for the M3Power starting on January 31, 2005,

105

1    is that right?

2        A    In the U. S., that's correct.

3        Q    In the U. S.  You made the decision to change

4    the advertising earlier in January, did you not?

5        A    That's correct.

6        Q    So it took you a matter of a week from the time

7    you decided to make the change to actually effect the

8    change; is that correct?

9        A    Yeah.

10       Q    Did Gillette actually pull off of the air all of

11   the versions of the ad that predated what you call the

12   rework version?

13       A    I'm not sure.  My recollection is that we were

14   able to get the new ad or the ad with the improved

15   animation on without running the old animation in

16   January.

17       Q    Is your testimony that the old versions to the

18   ad got pulled off the air once the new one started

19   running?

20       A    We instructed our agency to do so.

21       Q    Do you know if it was done?

22       A    I think in the media it was.  Sometime through

23   various media it is difficult to do some of the more

24   diffuse element of media such as some of the cable

25   networks.  It is hard to get the tapes back.  It is a

106

1    trafficking exercise.  By trafficking, how you get the

2    tapes to all the various media outlets.

3        Q    So the best of your recollection that in some

4    instances the old ad continued to run, correct?

5                  MR. SPEARS:  Objection.  Mischaracterizes

6    the response.

7                  THE COURT:  Objection overruled.

8        A    Our intention was to phase in that advertising,

9    that ad commencing on as close to January 31 as possible.

10   In some outlets it probably happened immediately and then

11   it just took our agencies trafficking department a little

12   later maybe to get it out and on the air.

13                  THE COURT:  Is that an I don't know or a

14   yes?

15                  THE WITNESS:  It is an I don't know.

16                  THE COURT:  I will strike your answer and

17   reserve the I don't know.  Next question.

18       Q    Let's talk about the changes that you made to

19   the original ads.  What changes did you make?

20       A    At that time, based on that, it was clear to us

21   that Schick was not happy with elements of the animation

22   and also some of the language.  We thought it would make

23   sense to take a look at that and here's why.  We're in the

24   business to sell blades and razors, not necessarily

25   quarrel with our competitors.  We're not happy when

107

1    somebody is suggesting that we're not fully honest with

2    our consumers.  We went about the exercise of looking at

3    the animation to see if there weren't ways to address the

4    concern Schick had without impairing that piece of

5    animation communication value.

6        Q    So is your testimony that you changed the ad

7    because your primary competitor was unhappy with it?

8        A    That's correct.  It seemed to me to make sense.

9    If it could be a win win.  We address your concerns.  We

10   end up with a piece of advertising we think sells or

11   products, and that just seemed like smart business.

12       Q    Did you think that your original ad was

13   inaccurate?

14       A    Absolutely.

15       Q    Did your original ad show hairs changing angle

16   in relationship to face?

17       A    Yes, it did.

18       Q    Did you tell me earlier that micro pulses

19   changed angle in relation to the face would be

20   unsubstantiated?

21       A    Can you repeat that please.

22       Q    Did you testify earlier that a claim that micro

23   pulses changing the angle of hair in relation to the face

24   would be unsubstantiated?  Didn't you testify to that?

25       A    I said that in that situation when we made that

108

1    claim, we would have to substantiate it.  We weren't

2    making the claim.

3        Q    Didn't you tell me there would be no

4    substantiation for making such a claim?

5        A    I'm sorry.  You are confusing me.  You are

6    parsing words.  If we said that it would make hairs change

7    angle, said in the copy, I think we would have to

8    substantiate that.  We didn't say it.

9        Q    So is your testimony that the ad was not

10   inaccurate because the change of angle was shown in the

11   demo and the text didn't say change angle?

12       A    I think what we're dealing with here is a piece

13   of animation.  As a dramatization of how a product works.

14   Demos are prevalent throughout the advertising industry

15   and I will give you a good example.

16            THE COURT:  No, you won't, sir.  I will

17   strike your answer.  What we're dealing with is a

18   question. It is his question.  He gets to ask his

19   question.  His question was to ask you if he understood

20   your testimony to be that the ad was or would not be

21   inaccurate because the change of angle that was shown in

22   the demo and the text didn't say changing angle.

23       A    That's a hard question.  I believe that -- what

24   we showed in the animation was hair extension and in the

25   original one at the end a little bit of angle change and

109

1  upon further review talking with our technical group, Dr.

2  Powell, the exercise was could we make that animation more

3  true to the hair extension mechanism and in four different

4  ways with changed the animation in that spirit.

5           MR. REICH:  Your Honor, I move to strike.

6           THE COURT:  Can an ad be inaccurate solely

7  through a visual imagine contained in the ad?

8           THE WITNESS:  Can it be inaccurate?  I

9  guess it can be.

10           THE COURT:  You can ask any other question

11  you want.

12      Q    To the extent your animation showed hair

13  changing angle, was it, therefore, inaccurate?

14      A    I don't believe so.

15      Q    Let's talk about the changes that you made.  The

16  first change?

17           THE COURT:  I don't think I'm going to

18  interrupt.  I would like an answer to this question which

19  I don't think we had.  Did Gillette have substantiation to

20  make a claim that their product caused the hair to change

21  angle?

22           THE WITNESS:  No we did not.

23           THE COURT:  Go ahead.

24      Q    In light of the fact that there was no

25  substantiation for a claim that hair changed angle, can

110

1    you tell me why the demo showed hair changing angle?

2        A    I didn't do the original advertising.  I didn't

3    understand.  I'm not aware of the thought process that

4    went into that the original animation correction.

5        Q    Let's talk about the changes that you made, sir.

6    Tell me the changes.

7                MR. SPEARS:  Objection.  Was that a

8    question.

9                THE COURT:  Not really clearly one but I

10   guess now it will be clearly understood to be one.

11       Q    Mr. Clay, can you tell me what changes were made

12   in the reworked version of the ad?

13       A    The four that I remembered clearly, the first

14   was that any hairs that changed angle would no longer

15   change angle.  Secondly, some of the hairs would remain

16   static.  In other words, they wouldn't actually exhibit

17   the hair extension effect.  We added some hairs that

18   started below the skin surface and actually extended up

19   above the skin.  We also had created some follicles that

20   in which the hair did not extend upwards through the skin

21   so we tried to capture the various effects that the micro

22   pulses would have on the hairs.

23       Q    Did you change the voice over?

24       A    No.  Actually I should note that that should be

25   an amendment to my affidavit where the voice over.  In my

111

1    affidavit, I say that we changed the voice over and we

2    shortened it so the blades can shave you closer.  We

3    actually made that change months before in a different

4    piece of advertising.  Upon reflection and talking with my

5    team about my affidavit, they reminded me we had actually

6    made the voice over change prior to the ad with the new

7    animation.

8         Q    So in your affidavit that you submitted in this

9    case, you said that the voice over had changed.  Your

10   testimony now is that, in fact, is incorrect that the

11   change had occurred prior to the reworking of the ad,

12   correct?

13        A    Yes.

14        Q    In both the voice over for the original version

15   and the voice over for the reworked ad, the claim was made

16   that micro pulses raised the hair, correct?

17        A    That's correct.

18        Q    Is it fair to say that but for the complaints

19   that Schick made in Germany, you never would have made

20   those changes?

21        A    I think that's correct.

22        Q    So the action that Schick took in Germany

23   prompted Gillette to change its ad, correct?

24        A    I think it was the action in Germany plus we

25   were informed that Schick expressed their discomfort with

112

1    those claims and asked us not to use them in other markets

2    around the world so.

3         Q    I want to ask you about the hair extension

4    effect that's shown in the reworked ad.  Let's make sure

5    you and I are talking about the same thing.

6              In the reworked ad, hairs are shown extending

7    but not changing direction, correct?

8         A    That's correct.

9         Q    Is there any scale to the amount of extension

10   that's shown in the ad?

11        A    No.  It is a dramatization.

12        Q    So your answer is there's no scale to the ad,

13   correct?

14        A    I would ask you to define what do you mean by

15   scale.

16        Q    What does Gillette's testing show about the

17   magnitude of the hair extension effect?

18        A    I believe you will have to check this with Dr.

19   Powell.  I believe it is in the neighborhood of 35, 40

20   microns.

21        Q    Did you actually see the testing that formed the

22   basis for the hair extension claim?

23        A    I have seen videos.

24        Q    Have you ever seen test summaries?

25        A    Yes, I have.

113

1       Q   Can I have DX 22 please.  Sir, I'm handing you a

2  copy of what's been marked as Defendant's Exhibit 22.  If

3  we can bring out the header on the document in the first

4  paragraph.  Have you seen this document before?

5       A   No.

6       Q   This is not one of the tests you looked at in

7  the past?

8       A   No.  The test that I saw related to those tests

9  that were submitted in the German court.

10      Q   Let me make a representation to you that this

11  test was submitted in the German court.  Does that change

12  at all your recollection whether you have seen this

13  before?

14            MR. SPEARS:  Objection, your Honor.

15  Witness answered the question.

16            THE COURT:  He's trying to refresh his

17  recollection.

18            THE COURT:  Does it refresh your

19  recollection?

20            THE WITNESS:  No.  It doesn't.

21            THE COURT:  That's all we know.

22      A   From our affidavit.

23      Q   We can take that document down.  Do you think --

24  let me ask you this.  When you worked on the reworked

25  version of the ad, did it occur to you to make sure that

1    the degree of hair extension was consistent with what

2    Gillette's testing showed?

3         A    I think that when you are developing an

4    animation to be used as a dramatization in advertising,

5    that the real purpose of that dramatization is to get the

6    core idea of what's going on across.

7              THE COURT:  I guess, Mr. Clay, it is taking

8    you a few more than one or two questions to get the idea

9    you have to answer yes or no for him.  He only wants a yes

10   or no.  If he asks the question properly, he's entitled to

11   it.  The question is When you worked on the reworked

12   version of the ad, did it occur to you to make sure that

13   the degree of hair extension was consistent with what

14   Gillette's testing showed.

15             THE WITNESS:  No.  It did not.

16        Q    Is that because you believe that there's no

17   obligation for the demonstration to be factually

18   consistent with what Gillette's underlying testing is?

19        A    Depends on the facts.

20        Q    How about in this ad?

21        A    I think the animation was to demonstrate that

22   hair extension happens full stop and I thought we

23   accurately portrayed that.

24        Q    Did you think the reworked animation had to be

25   consistent with what Gillette's underlying testing

1    showed?

2        A    Generally.

3        Q    How did you do that if you never considered the

4    magnitude of the hair extension effect showed in

5    Gillette's testing?

6        A    Because we were working on a dramatization.

7        Q    Is your testimony then that you made no

8    effort?

9        A    No.  I think as I told you, we tried to align

10   the imagines and the motion in the animation to be more in

11   line with the overall mechanistic hair extension effect

12   but in the dramatization, what we want to do is get guys

13   to understand that the hairs micro pulses raise the hairs

14   up so the blades can shave them closer.

15       Q    Do you think you were free to show any degree or

16   magnitude of hair extension?

17       A    We were trying to make it clear that the hairs

18   did raise up so that you could get a closer shave.

19                    MR. REICH:  Move to strike, your Honor.

20                    THE COURT:  Granted.

21                    MR. REICH:  May we have the question read

22   back.

23                    THE COURT:  Did you think you were free to

24   show any degree or magnitude of hair extension?

25                    MR. SPEARS:  Your Honor if I may.  There's

218

1
2          Chris Kohler
3              Direct Examination by Mr. Reich          208
4
5
6
7      COURT REPORTER'S TRANSCRIPT CERTIFICATE
8      I hereby certify that the within and foregoing is a true
9      and correct transcript taken from the proceedings in the
10     above-entitled matter.
11                                    _____
12                                    Official Court Reporter
13
14     DATE  4/16/05
15
16
17
18
19
20
21
22
23
24
25

219

UNITED STATES DISTRICT COURT.

DISTRICT OF CONNECTICUT

**ORIGINAL**

```
————————————————————
SCHICK MANUFACTURING, INC. )
ET AL                      )
              Plaintiffs   )   NO: 3:05CV174(JCH)
                           )
vs.                        )
                           )
GILLETTE CO.,              )
               Defendant   )
————————————————————       )
```

April 13, 2005
915 Lafayette Boulevard
Bridgeport Connecticut
9:04 A.M.

**PRELIMINARY INJUNCTION**

**DAY 2**

B E F O R E :

THE HONORABLE JANET C. HALL
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiffs  :          STEVEN REICH, ESQ.
                               RONALD BLUM, ESQ.
                               JEFFREY EDELSTEIN, ESQ.
                               MONICA YOUN, ESQ.
                               Manatt Phelps & Phillips
                               7 Times Square
                               New York, NY  10036

                               MICHAEL DONNELLY, ESQ.
                               Murtha Cullina LLP
                               CityPlace I
                               185 Asylum Street
                               Hartford, CT  06103-3469

-- Continued --

220

```
 1    For the Defendant    :        JAMES M. SPEARS, ESQ.
                                    PETER BRODY, ESQ.
 2                                  BRYAN DIEDERICH, ESQ.
                                    Ropes & Gray
 3                                  700 12th NW, Suite 900
                                    Washington, DC  2005
 4
                                    MICHAEL A. BUCCI, ESQ.
 5                                  Day, Berry & Howard
                                    CityPlace I
 6                                  Hartford, CT  06103-3499
 7

 8
      Court Reporter    :          Terri Fidanza, LSR
 9                                 (203) 910-4567
10

11
      Proceedings recorded by mechanical stenography, transcript
12    produced by computer.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

429

1    Q    So in other words, this is advertising that the

2    company spends millions of dollars on?  This research?

3        A    This research this company has had many, many

4    times has spend many millions of dollars.  I don't think

5    it is a bet.  I think it is well founded based on the

6    research.

7        Q    Have you ever had a failure?

8        A    No, we have not.

9              MR. SPEARS:  Thank you, your Honor.

10             THE COURT:  Cross-examination.

11             MR. REICH:  Your Honor, so I can have a

12    sense of timing.

13             THE COURT:  We don't take a break and we're

14    going to go until four.

15   CROSS-EXAMINATION BY MR. REICH:

16       Q    Dr. Powell, I want to start by asking you some

17   questions near the end that relate to the end of Mr.

18   Spear's questioning of you.  Did I understand you to say

19   that Gillette's launch ad for the M3Power was not

20   physiologically, correct?

21       A    That's correct.

22       Q    And do you agree that one of the respects in

23   which it was not physiologically correct was in the

24   depiction of hairs changing angle in relation to the

25   face?

430

1  A That would certainly be one of them, yes, I

2 would agree.

3  Q Were you in court yesterday when Mr. Clay

4 testified?

5  A I was.

6  Q Were you present when we reviewed documents

7 indicating that the so-called hair stand up claim was one

8 of the reasons consumers should believe in the product?

9  A I was.

10  Q And so when this ad was launched, did you give

11 any consideration to whether it was appropriate for it to

12 be physiologically correct to depict the physiological

13 mechanism of hair changing angle given that hair standing

14 up was a reason to believe?

15    MR. SPEARS:  Objection.  Mr. Rich asked the

16 witness whether he was in the courtroom on a discussion

17 yesterday.  The witness said yes, I was.  So now we

18 basically have Mr. Reich testifying about I'm not sure –

19 what he's testifying to.  When he's asking a question

20 there's more testimony than he knows.  I'm not sure what

21 the question is to the witness.

22    THE COURT:  Objection is overruled.  You

23 can answer the question, sir.

24  A I can't answer that.  There's multiple parts to

25 it.

431

1    Q    You don't know whether you gave consideration to

2    the accuracy of the hair changing angle depiction given

3    that hair standing up is a reason to believe?

4    A    I can't answer the question.  Unless I'm allowed

5    to explain, I can't answer that question.

6    Q    Did you consider the accuracy of that depiction

7    given that it was a reason to believe?

8    A    I certainly considered what that depiction was

9    conveying, absolutely.

10    Q    You considered it and yet it was unimportant to

11    you whether that physiological depiction was accurate or

12    inaccurate?

13    A    I wouldn't say it was unimportant, no.

14    Q    Then why wasn't it accurate in the end?

15    A    Because on balance, what needed to happen was to

16    convey the core message.

17    Q    So from your perspective, it was more important

18    to convey the core message than to have an accurate

19    depiction, correct?

20    A    No.

21    Q    Isn't that what you just said, sir, that the

22    reason you didn't make it accurate because it was

23    important to convey the core message?

24    A    You are making the assumption it was me that

25    basically signed it off.  I was an advisor.  Are you after

432

1   my personal opinion or after what the company did?

2       Q    I'm asking for your frame of mind during that

3   time.

4       A    I certainly expressed where I felt there were

5   deviations from what I understood to be the exact

6   physiological mechanism.

7       Q    When did you express those concerns?

8       A    Certainly prelaunch.  I couldn't give you the

9   exact date.

10      Q    Let me be sure that I understand what you are

11  saying prelaunch.  You expressed concerns to people within

12  Gillette that the physiological mechanism depicted in the

13  launch ad or the prelaunch ad, which is it?

14                  THE COURT:  Do you have an objection?

15                  MR. SPEARS:  Your Honor, we're

16  mischaracterizing the witness' testimony.  Mr. Reich said

17  I have expressed my opinion.  He's turning that to into

18  concerns.  If he want to restate the witness's testimony

19  to incorporate the witnesses response to a question, he

20  can do it accurately.  The point is it a

21  mischaracterization of the witness's testimony.

22                  THE COURT:  The witness can tell him that

23  if it is.  It is cross-examination.  He can answer the

24  question no, if it contains some statement that isn't what

25  he said.

433

1    Q    You said that you expressed concerns within

2    Gillette about the inaccuracy of the physiological

3    mechanism depicted in an advertisement, correct?

4    A    No.

5    Q    You didn't say that?

6    A    Not my concerns.  I expressed where there were

7    differences.

8    Q    Can you say that again?

9    A    I expressed where there were differences from

10   what I had seen.

11   Q    So the differences that you were focused, on

12   were they differences that appear in the prelaunch ad or

13   in the launch ad in the U. S.?

14   A    The differences remain in both ads.  They are

15   both physiologically incorrect.

16   Q    Who did you express your views to?

17   A    Counsel.

18   Q    In-house counsel or outside counsel?

19   A    Gillette.  You mean by in-house Gillette

20   employee counsel?

21                THE COURT:  That's who he means.

22   A    Sorry.  Just want to be sure.

23   Q    The views that you expressed to counsel prior to

24   the launch, were that the mechanism depicted was wrong

25   physiologically, correct?

434

1    A    Incorrect.

2              THE COURT:  If he stands up.

3              THE WITNESS:  I can't see him.

4              THE COURT:  We'll keep going.  You answered

5    the question.  The next question.

6    Q    Are you aware of any physiological mechanism by

7    which an oscillating razor can change the angle of hair on

8    the face?

9    A    Not that I'm aware of.

10   Q    So that when you testified in response to Mr.

11   Spear's questions earlier that Schick's testing during the

12   Leffell one and Leffell two studies was employed you did

13   that with knowledge that the effect Schick was testing for

14   doesn't exist at all, correct?

15   A    I have to say I thought Schick was testing for

16   hair extension.  I learned today they were testing about

17   elevation.

18   Q    Okay.  Well, let me ask you this.  Given your

19   present understanding that the Leffell one and Leffell two

20   studies were about angle change and not hair lengthening,

21   does that effect your opinion regarding the validity of

22   those two tests?

23   A    No.  Those tests are flawed.

24   Q    You said that one of the flaws in the test was

25   that hair length wasn't measured, isn't that one of your

472

1    Redirect Examination by Mr. Reich         289

2    Recross-Examination by Mr. Spears         293

3  John Thornton

4    Direct Examination by Mr. Blum            298

5    Cross-Examination by Mr. Brody            305

6    Redirect Examination by Mr. Blum          331

7    Recross-Examination by Mr. Brody          335

8  Kevin Powell

9    Direct Examination by Mr. Spears          337

10   Cross-Examination by Mr. Reich            429

11

12

13

14  COURT REPORTER'S TRANSCRIPT CERTIFICATE

15  I hereby certify that the within and foregoing is a true

16  and correct transcript taken from the proceedings in the

17  above-entitled matter.

18  _____

19            Official Court Reporter

20

21  DATE _4/10/05_

22

23

24

25

Taras P. Kick (State Bar No. 143379)
G. James Strenio (State Bar No. 177624)
Thomas G. Martin (State Bar No. 195627)
Anthony E. Chavez (State Bar No. 126623)
The Kick Law Firm, APC
660 South Figueroa Street, Suite 1800
Los Angeles, California 90017
(213) 624-1588; Fax (213) 624-1589

Allan Kanner (State Bar No. 109152)
Allan Kanner & Associates, PLLC
701 Camp Street
New Orleans, LA 70130
(504) 524-5777; Fax (504) 524-5763

Attorneys for Plaintiff,
KASEM ADOURE

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

AUG 1 9 2005

John A. Clarke, Executive Officer/Clerk
By_____ Deputy
S. Gabb

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

KASEM ADOURE, an individual,

    Plaintiff,

    v.

THE GILLETTE COMPANY, and
DOES 1-1000, inclusive,

    Defendants.

Case No.

BC 338621

**COMPLAINT FOR:**

**1. Violations of *California Business & Professions Code* §17200, *et seq.***

**2. Violations of *California Business & Professions Code* §17500, *et seq.***

**3. Violations of *California Civil Code* § 1750, *et seq.***

**JURY TRIAL DEMANDED**

1
**COMPLAINT**

<div align="center">

**NATURE OF ACTION**

</div>

1.      This is an action against defendant The Gillette Company ("Gillette") arising out of false and misleading advertising regarding its newest and highest-priced razor, the M3Power razor system (the "M3P" or "M3 Power").

2.      In its advertising, Gillette has claimed and continues to claim that its M3P makes hair stand "up and away from skin" so that a closer shave results. This claim, uniformly made by Gillette in a variety of media, including television and prints ads, is a material representation that is false and deceptive. Growth in the share of the worldwide razor market depends heavily on persuading consumers to "trade up" from older shaving designs to new, premium-priced and technologically-advanced shaving products that have been introduced in recent years. Advertising is the primary means by which Gillette persuades consumers to trade up and Gillette invests heavily in developing advertising claims to convince consumers to do so.

3.      By this lawsuit, Plaintiff seeks restitutionary and injunctive relief, including: (i) a prohibitory injunction precluding Gillette from making in California the false claim that the M3 Power causes hair to stand up and away from the skin; and (ii) a mandatory injunction requiring Gillette to make corrective advertising in California to cure consumers of the false impression that the M3 Power razor causes hair to stand up and away from the skin, which false impression has been caused by Gillette's past false advertising. In *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972-74, the California Court of Appeal held that a court's authority under the UCL includes the power to order affirmative disclosure and, specifically, corrective advertising. The Court of Appeal therefore affirmed an injunction mandating that the defendant make corrective advertising. The injunction in that case required the defendant, a dairy, to place a warning on all of its advertisements and products for the next ten years, stating that there is no proof that pasteurization reduces the nutritional value of milk or that the risks of consuming milk outweigh any of its alleged health benefits.

4.      An injunction simply prohibiting the false advertising is insufficient because it does not correct the consequences of the past false advertising. As the California Court of Appeal explained in *Consumers Union*:

1    "an injunction against future violations might have some deterrent effect, [but] it is only a

2    partial remedy since it does not correct the consequences of past conduct.  An `order

3    which commands a party only to go and sin no more simply allows every violator a free

4    bite at the apple.'" (4 Cal.App.4th at 973 (quoting the leading case on corrective

5    advertising, *Warner-Lambert Co. v. FTC* (D. C. Cir. 1977) 562 F.2d 749, 761-62.)

6                          **PARTIES**

7        5.      Plaintiff Kasem Adoure ("Plaintiff") is and was, at all times herein mentioned, a

8  consumer and resident of Los Angeles County, who, in reliance on Gillette's hair raising

9  advertising claims, purchased a Gillette M3P in the State of California, County of Los Angeles

10  for his own use.

11        6.      Gillette, a Delaware corporation headquartered in Boston, Massachusetts,

12  manufacturers, markets, advertises and/or sells shaving related products, including the M3P.

13  Gillette transacts substantial business in the State of California, County of Los Angeles.

14        7.      The true names and capacities, whether individual, corporate, associate, or

15  otherwise, of the defendants named herein as DOES 1 through 1000, inclusive, are presently

16  unknown to Plaintiff who, therefore, sues these defendants by these fictitious names.  Plaintiff

17  will amend this complaint to allege the true names and capacities of these defendants, together

18  with such other allegations as appropriate, when Plaintiff has ascertained this information.

19        8.      Each of the defendants designated herein as DOE took part in and participated

20  with the Defendant in all matters referred to herein and was in some manner responsible for the

21  injuries and losses suffered.

22        9.      At all material times herein, each defendant named herein, including DOES 1

23  through 1000, acted as the co-conspirator, agent, servant, employee, joint venturer or alter ego of

24  the other defendants with respect to the acts, violations, and common course of conduct alleged

25  herein or is otherwise liable.

26        10.    The acts of Gillette and the DOES 1 through 1000 (collectively referred to herein

27  as "Defendants") alleged herein were authorized, ordered, or done by their officers, agents,

28  / / /

1  employees, or representatives, while actively engaged in the management of the Defendants'

2  businesses or affairs.

3                              **STATEMENT OF FACTS**

4       11.    Gillette launched the M3P in North America in May 2004. Gillette called its M3P

5  "revolutionary" because, using a AAA-sized battery in the razor handle, it was said to "deliver[]

6  gentle pulses to the shaving cartridge that stimulate hair upward and away from the skin, making

7  it dramatically easier to shave more thoroughly than ever before." (These types of advertising

8  claims by Gillette are hereinafter referred to as "hair raising claims.")

9       12.    Hair raising claims are the cornerstone of Gillette's marketing for the M3P in each

10 of the media in which Gillette advertises. On its website, Gillette asserts that the M3P's

11 "[m]icro-pulses raise the hair up and away from skin so you can shave closer and more

12 thoroughly in one easy power stroke." Gillette's website also claims that the M3P's "pulsing

13 action stimulates hair upward and away from the skin, making it dramatically easier to shave

14 more thoroughly in one easy power stroke."

15      13.    Similar claims are made by Gillette on the retail package for the M3P. The

16 package tells consumers that "[g]entle micro-pulses stimulate hair up and away from skin. In just

17 one power stroke, you can get a closer and more thorough shave. So thorough, there is less need

18 to reshave, which means less irritation."

19      14.    Gillette also has featured hair raising claims in its print advertisements for the

20 M3P. A series of print ads says "Turn on the battery-powered motor. Micro-pulses raise the hair

21 from your skin. So the PowerGlide blades can shave closer." A separate print advertisement

22 says "NEW! Gillette M3 Power[.] Micro-Power[.] Stimulates hair up and away from skin so

23 you can get a closer and more thorough shave with less irritation."

24      15.    Gillette also aggressively advertised the M3P on television featuring the same

25 false and misleading hair raising claims. Television ads making the deceptive claims have

26 appeared many thousands of times in homes across the country. One series of television ads tells

27 consumers "New Gillette M3 Power: Turn it on and micro pulses raise the hair for the closest

28 / / /

                                         4
                                  **COMPLAINT**

1  shave ever." A second series of ads says "Introducing Gillette M3P. Turn on Gillette's first
2  micro-power shaving system. Micro pulses raise the hair so you shave closer."

3      16.    Gillette's hair raising claims for the M3P have already had a profound impact on
4  consumer perception. For example, on or about January 20, 2005, the nationally syndicated daily
5  comic strip "Pickles," by Brian Crane -- which on information and belief is published in over 300
6  newspapers worldwide and is available on the Internet -- made explicit reference to the hair
7  raising claims. The comic strip parrots the wording of the hair raising claims, stating "The
8  blades gently vibrate, causing the hair to stand on end for a close shave." The comic strip reflects
9  the extent to which Gillette's hair-raising claims have penetrated the national consciousness.

10     17.    In December 2004, the Hamburg Regional Court in Germany, after briefing and
11 evidentiary submissions by Schick Manufacturing, Inc. ("Schick") as the applicant and Gillette as
12 the respondent, entered an injunction barring Gillette from making hair raising claims in that
13 country. In support of its request for an injunction, Schick submitted the affidavit of David J.
14 Leffell of the Yale School of Medicine. Dr. Leffell, a renowned dermatologist, averred that he
15 had determined through observation, investigation and testing of the M3P that "there is no
16 physiologic or other scientific basis for the claim that the device can cause facial hair to stand up
17 proud in the manner described in the Gillette advertising. . . It is my strong opinion, as a scientist
18 and as a skin specialist of many years, that the mild vibration effect of this product applied to the
19 skin would not have any effect on the hairs such as to cause them to be raised up or stand proud."
20 Dr. Leffell wrote that his "conclusion, therefore, as a scientist and based on my personal
21 observations, is that the claims in [Gillette's] advertising relating to this product's ability to raise
22 up hairs does not have any scientific basis. The product cannot be demonstrated to have such an
23 effect on facial hair."

24     18.    On May 31, 2005, the United States District Court in the District of Connecticut,
25 in the matter of *Schick Manufacturing, Inc. v. The Gillette Company* (Civil Action No.
26 3-05-cv-174 (JCH)), after briefing and evidentiary submissions, issued a preliminary injunction,
27 further barring Gillette from making hair raising claims. In the Court's Ruling Re Preliminary
28 Injunction, U.S. District Judge Janet C. Hall found that "Schick has established a likelihood of

1   success on the merits of its claims insofar as Gillette's claims regarding changes in hair angle and
2   its animation depicting an exaggerated amount of hair extension are literally false" and thereby
3   also "result in actual deception." (*Id.* at 23-24.) In finding that these claims were material, Judge
4   Hall observed: "It is clear that whether the M3 Power raises hairs is material. Gillette's
5   employees testified that television advertising time is too valuable to include things that are
6   'unimportant.' Furthermore, in this case, hair extension is the 'reason to believe' that the M3
7   Power is a worthwhile product." (*Id.* at 24.)

8          19.    A preliminary injunction prohibiting Gillette from making false "hair raising,"
9   while necessary to protect California consumers, is inadequate. Rather, corrective advertising is
10  necessary.

11         20.    This is because, among other reasons, consumers remember past advertising, for a
12  variety of reasons and stimuli. For major companies, advertising's impact can last years.
13  Consumers will hear about and see stories in trade publications and in consumer publications
14  long after the advertising has stopped.

15         21.    Without corrective advertising, California consumers will continue to make their
16  purchasing decisions and continue to purchase the M3 Power razor system based on the false
17  impression generated by Gillette's past advertising, including the false notion that the M3 Power
18  raises hair "up and away" from the skin. In many cases, consumers do not forget the impressions
19  of products that they form based on messages conveyed in advertising, and the consumers'
20  impressions from the advertisements of the M3Power are no exception to this rule. Gillette
21  therefore continues to profit illicitly by the lingering effects of Gillette's false and misleading
22  advertising.

23         22.    The more time that elapses before corrective advertising is made, the less likely
24  the corrective advertising will cure consumers of the false impression and the more extensive and
25  expensive the corrective advertising will need to be to cure consumers of the false impression.
26  The longer time passes, the more embedded the false impressions become. And, of course, the
27  longer time elapses before corrective advertising is made, the longer consumers will continue to
28  make their purchasing decisions and purchase the M3 Power based on the impression created by

1  the hair raising claims in Gillette' past advertising.  This impacts not only the decision of

2  consumers to purchase the M3 Power in the first instance, but also impacts the ongoing brand

3  decisions of consumers to continue to use the M3 Power and to continue to purchase the

4  replacement blades for the M3 Power.

5      23.    The value of the M3P represented in Gillette's advertising is greater than the value

6  of the M3P actually received by Plaintiff.  Had Plaintiff known that the hair raising claims were

7  false, he would not have purchased the M3P or would have paid less.

8                          **JURISDICTION AND VENUE**

9      24.    This Court has jurisdiction over this action pursuant to California Civil Procedure

10  Code Section 410.10.

11      25.    Venue is proper in this Court pursuant to California Civil Procedure Code

12  Sections 395 and 395.5 because Defendants are registered to do business in this State of

13  California and are doing business in the County of Los Angeles.

14                          **FIRST CAUSE OF ACTION**

15      For Violations of *California Business & Professions Code* § 17200, *et seq.*

16                   (Against Gillette and Does 1-1000, inclusive)

17      26.    Plaintiff repeats, realleges, and incorporates by reference each and every

18  allegation contained in each of the preceding paragraphs (1-25) and in each of the succeeding

19  paragraphs (34-48), as though fully incorporated herein, made a part hereof, and set forth herein.

20      27.    California's Unfair Competition Law ("UCL") defines unfair business

21  competition to include any "unlawful," "unfair," or "fraudulent" business act or practice.  (*Cal.*

22  *Bus. & Prof. Code* §17200, *et seq.*)

23      28.    Defendants' acts and practices, as alleged herein, violate the UCL.  By engaging

24  in the above-described acts and practices, including the actions and omissions herein alleged,

25  Defendants have committed one or more acts of unfair competition within the meaning of

26  *Business & Professions Code* § 17200.  Defendants' acts and practices constitute unlawful,

27  unfair, and fraudulent business acts and practices within the meaning of the UCL.

28  / / /

1    29.    Defendants' acts and practices are "unlawful," within the meaning of the UCL,

2  because they, *inter alia*, violate *Business & Professions Code* §17500, *et seq.*, and the Consumer

3  Legal Remedies Act, *Civil Code* § 1770, *et. seq.*

4    30.    Defendants' act and practices are "unfair," within the meaning of the UCL,

5  because they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to

6  consumers.  And, the gravity of the harm to consumers from Defendants' acts and practices

7  outweigh any utility of the acts and practices.

8    31.    Defendants' acts and practices are "fraudulent," within the meaning of the UCL,

9  because their misrepresentations are likely to deceive the public.

10    32.    Plaintiff has suffered injury and has lost money or property as a result of

11  Defendants' violations of the UCL.

12    33.    Such conduct is ongoing and continues to this date.  Plaintiff is entitled to the

13  relief described below.  Even if such conduct were not ongoing and continuing, Plaintiff would

14  still be entitled to prohibitory injunctive relief in addition to mandatory injunctive relief for

15  corrective advertising.  Section 17203 of the UCL explicitly provides that injunctive relief is

16  proper based solely on the defendant's past acts.  Specifically, Section 17203 provides, in

17  relevant part, that "Any person who engages, *has engaged*, or proposes to engage in unfair

18  competition may be enjoined in any court of competent jurisdiction. *Cal. Bus. & Prof. Code* §

19  17203 (emphasis added).  The California Supreme Court, in *Stop Youth Addiction, Inc. v. Lucky*

20  *Stores, Inc.* (1998) 17 Cal.4th 553, 570, explains that, in 1992, the California Legislature

21  amended the UCL to allow for injunctive relief based on past conduct alone:

22    "in 1992, the Legislature amended . . . section 17203 to expand the scope of injunctive

23    relief to encompass *past activity* and out-of-state activity.  (See Stats. 1992, ch. 430, § 3,

24    p. 1707 [replacing `person performing or proposing to perform an act of unfair

25    competition within this state' with `person who engages, *has engaged*, or proposes to

26    engage in unfair competition'].)"  (Emphasis added.)

27  / / /

28  / / /

As the California Court of Appeal succinctly stated, "a trial court may issue an injunction where a person has committed a *past* unlawful practice." (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 103 (emphasis in original; *citing Stop Youth Addiction*, 17 Cal.4th at 570).

## SECOND CAUSE OF ACTION

### For Violations of *California Business & Professions Code* § 17500, *et seq.*

(Against Gillette and Does 1-1000, inclusive)

34.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each of the preceding paragraphs as though fully incorporated herein, made a part hereof, and set forth herein.

35.    As alleged herein, Defendants' advertising falsely and deceptively represents, *inter alia*, the hair raising capabilities of the M3P. The advertising is by its nature, unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of *California Business & Professions Code* §17500 *et seq*. Such advertisements are likely to have deceived, were deceived, and continue to deceive the consuming public, including Plaintiff.

36.    The above-described false, misleading, and deceptive advertising conducted by Defendants continues to have a tendency to deceive the general public in that Defendants have failed to cease such advertising and have failed to make corrective advertising.

37.    The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of, *Business & Professions Code* §17500 *et seq*.

38.    Plaintiff has lost money or property as a result of Defendants' violations of *Business & Professions Code* §17500 *et seq*.

39.    Such conduct is ongoing and continues to this date. Plaintiff is entitled to the relief described below.

/ / /

/ / /

/ / /

**THIRD CAUSE OF ACTION**

For Violations of *California Civil Code* §1750, *et seq.*

(Against Gillette and Does 1-1000, inclusive)

40.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each of the preceding paragraphs as though fully incorporated herein, made a part hereof, and set forth herein.

41.    This cause of action is brought pursuant to California's Consumers Legal Remedies Act, *California Civil Code* §1750, *et seq.* (the "CLRA").

42.    Plaintiff is an individual who sought and acquired, by purchase, a M3P for personal, family, or household purposes.  Plaintiff is therefore a consumer within the meaning of the CLRA, *Civil Code* § 1761(d).

43.    Defendants and each of them are persons within the meaning of the CLRA, *Civil Code* § 1761(c).

44.    Defendants misrepresented to Plaintiff that the M3P or its micro-pulses or oscillations raise hair up and away from the skin, in violation of *Civil Code* § 1770 (a)(5),(7),(9).

45.    As a result of the use or employment by Defendants of the aforementioned unlawful methods, acts and practices, Plaintiff suffered damages.

46.    Plaintiff seeks restitution in the full amount of the overcharge paid for his M3P.

47.    Plaintiff intends to seek compensatory damages and, in light of Gillette's intentional and fraudulent concealment of material facts, Plaintiff also intends to seek an award of punitive damages.  Pursuant to *Civil Code* § 1782(a), Plaintiff will serve Gillette with notice of its alleged violations of the CLRA by certified mail return receipt requested.  If, within 30 days of such notification, Gillette fails to provide appropriate relief for its violation of the CLRA, Plaintiff will amend this Complaint to seek compensatory and punitive damages under the CLRA.

48.    Plaintiff further request this Court to enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged above, pursuant to *Civil Code* § / / /

1  1780(a)(2). Plaintiff further requests this Court to require Defendants to make corrective

2  advertising.

3                           **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiff pray for judgment and relief on all Causes of Action as follows:

5        1.      Full restitution to Plaintiff;

6        2.      A temporary, preliminary, and/or permanent order for injunctive relief enjoining

7  Defendants from pursuing the policies, acts and practices alleged herein, including specifically,

8  inter alia, enjoining Defendants and all persons acting on its behalf, from directly or indirectly

9  claiming that the M3 Power makes hair stand "up and away from the skin" so that a closer shave

10 results, or words and/or images that convey the same meaning, in any advertisements in

11 California for the M3 Power;

12       3.      A temporary, preliminary, and/or permanent order for injunctive relief requiring

13 Defendants to make corrective advertising;

14       4.      Attorneys' fees, as allowed by law, including pursuant to *Civil Procedure Code* §

15 1021.5 and pursuant to *Civil Code* § 1780(d);

16       5.      Costs, as allowed by law;

17       6.      Prejudgment and postjudgment interest at the maximum legal rate; and

18       7.      Such other and further relief as the Court deems proper.

19
Dated: August 19, 2005                          THE KICK LAW FIRM, APC

20                                    By:

21                                          Taras P. Kick, Esq.
                                            G. James Strenio, Esq.
22                                          Thomas G. Martin, Esq.
                                            Attorneys for Plaintiff,
23                                          KASEM ADOURE

24                                          ALLAN KANNER &
                                            ASSOCIATES, PLLC
25                                          Allan Kanner, Esq.
                                            Attorneys for Plaintiff,
26                                          KASEM ADOURE

27

28

                                    11
                             **COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2      Plaintiff hereby demands a trial by jury.

3

Dated: August 19, 2005                          THE KICK LAW FIRM, APC

4                                        By:

5                                                Taras P. Kick, Esq.
                                                 G. James Strenio, Esq.
6                                                Thomas G. Martin, Esq.
                                                 Attorneys for Plaintiff,
7                                                KASEM ADOURE

8                                                ALLAN KANNER &
                                                 ASSOCIATES, PLLC
9                                                Allan Kanner, Esq.
                                                 Attorneys for Plaintiff,
10                                               KASEM ADOURE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

I am employed by the Kick Law Firm, APC, in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 660 South Figueroa Street, Suite 1800, Los Angeles, California 90017.

On August 25, 2005, I served the foregoing document described as **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF APPLICATION FOR A PRELIMINARY INJUNCTION** on the interested parties identified below by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Kent R. Raygor
Fred R. Puglisi
SHEPPARD MULLIN RICHTER & HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
Telephone: (310) 228-3700
Facsimile: (310) 228-3701

Allan Kanner
ALLAN KANNER & ASSOCIATES, P.L.L.C.
701 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 524-5777
Facsimile: (504) 524-5763

\_\_\_\_ **BY PERSONAL SERVICE** – By personally handing it to Kent Raygor's messenger.

\_\_\_\_ **BY FEDERAL EXPRESS - NEXT DAY DELIVERY** -- I deposited the sealed envelope in a box or other facility regularly maintained by the express service carrier Federal Express in an envelope or package designated by the express service carrier with delivery fees paid or provided for, addressed to the person on whom it is to be serve.

\_\_\_\_ **FACSIMILE** – I transmitted it to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person on any document which he or she has filed in the cause and served on the party making the service, as indicated below. The facsimile was transmitted from my business address, using the fax machine whose number is 213-624-1589, at approximately    pm The document was transmitted by facsimile transmission and that the transmission was reported as complete and without error.

\_X\_ **BY UNITED STATES MAIL** – I deposited the sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed this August 25, 2005.

_____
Ed Dominguez

**PROOF OF SERVICE**

# SEALED   DOCUMENT