# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | CIVIL ACTION NO. 05-11177-DPW (LEAD CASE) |
| M3POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | MDL Docket No. 1704 |
| THIS DOCUMENT RELATES TO: | [REDACTED DOCUMENT, THE UNREDACTED DOCUMENT FILED UNDER SEAL] |
| ALL CASES | |

## PLAINTIFF CARLOS CORRALES' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

Plaintiff Carlos Corrales ("Plaintiff") hereby opposes the motion for preliminary

certification of the settlement class and preliminary approval of the settlement, and provides the

Court with his concerns and suggestions:

> "Certain of the suggestions made by Mr. Corrales' counsel have some apparent force here. I want to have the benefit of their fully developed views on this before I move on to deciding whether or not to accept this in the sense of providing preliminary approval."

(Transcript of Penultimate Preliminary Approval Hearing held on October 18, 2006

("Transcript") at 8:12-14 (attached to the Strenio Declaration dated November 13, 2006 ("Strenio

Decl.") as Exhibit A)).

1

## I.   OVERVIEW

The Court should, and, indeed, must deny the settlement proponents' motion for preliminary certification of a settlement class and preliminary approval of the settlement.

Plaintiff, in this "real" brief,[1] will identify and discuss the innumerable deficiencies with the proposed settlement class and the proposed settlement.

Plaintiff does so, however, without the discovery power of Lead Counsel, and with Lead Counsel's refusal to honor its fiduciary obligation to provide Plaintiff with critical information that is still missing.  However, Plaintiff submits this opposition armed, unlike Lead Counsel, with expert witnesses, including an internationally renowned Cambridge, Massachusetts based economists Analysis Group on the issue of the higher retail price paid by California's consumers, media specialist Kathy Kinsella on the issue of the gross dollars spent by Gillette on its false advertising giving rise to this lawsuit,[2] marketing expert Larry Londre on the continuing impact of Gillette's false advertising on consumers, and not without the advantage of speaking with Dr. Loeffler, the Yale Dermatologist who testified and opined in the *Schick* action on the issue of Gillette's false hair raising / extending claims, about potentially serving as Plaintiff's expert in this matter.

---

[1]  At the Court's request, Plaintiff provides this Court with a "real" briefing of the issues, albeit without the opportunity yet to amplify the briefing with "real" discovery.  (Transcript at 10:3-10.)

[2]  On August 24, 2005, Ms. Kinsella advised Plaintiff that TNS Media Intelligence reported that Gillett's advertising campaign for M3 Power and M3 Power Nitro, for the time period May 2004 to June 2005, was $127,677,000, and that it would be generally expected that local exposure to national media would align with population.

Simply put, the settlement class and the settlement are fatally flawed and cannot survive Rule 23 and 23(e) scrutiny. The problems include, but are in no way limited to: (i) a national class that in this case violates the requirements of adequacy of representation, typicality, and predominance by including California in light of California's consumers' greater rights, remedies, and damages, (ii) a national class that improperly includes states whose consumer protection statutes do not allow class actions and one that does not even allow a private cause of action, as well as states whose special notice provisions have not been complied with, (iii) extraordinarily unfair claim requirements that ensure a participation rate of next to zero and ensure that the rebates will be de facto coupons, (iv) inadequate compensation for the release of the class members' claims; and (v) a marketing scheme masquerading as a fluid recovery, which is even worse than reversion because it will allow Gillette to profit from the settlement.

Adequacy of representation has been completely lacking. In fact, the only putative California class representative named in the Amended Consolidated Complaint, Matthew Marr, suffers from a disabling conflict of interest because he is an employee of the law firm acting as his putative class counsel. As such, Mr. Marr cannot satisfy the adequacy of representation required for Rule 23 certification, especially in the context of a class action settlement.

Mr. Marr is not the only class representative named in the Amended Consolidated Complaint who has a disabling conflict of interest, disqualifying himself and his counsel. Adam Kline – one of the two named plaintiffs whose depositions have been taken – also has a disabling conflict of interest, as revealed at his deposition taken on July 11, 2006, which Liaison Counsel failed to provide Plaintiff until the morning of November 14, 2006. Mr. Kline's father is the

3

cousin of Liaison Counsel's wife. (Kline Deposition at 10:8-21, attached as Exhibit CC to

Strenio Decl.) Mr. Kine contacted Mr. Shapiro at the request of his father:

> "My father had met the family, and he had mentioned that there was a case going on with
> Gillette concerning the razor. My father mentioned that I used one and had me contact
> Mr. Shapiro. . . . My father came home, told me there was a case involving Gillette and
> involving the Mach 3 Power Razor. He knew I had used one, and he told me – he didn't
> know what the case was involving because he had not used one, but he had me contact
> Tom, Mr. Shapiro, who then filled me in."

(Kline Depo. at 10:8-21.)[3]

The purpose of the creation of this MDL proceeding was to obtain discovery that could be

used in all of the transferred actions. Indeed, the settlement proponents represented to the JPML

that transfer of all the cases to Boston was proper to achieve economy and efficiency for purposes

of discovery. (*See* Strenio Decl., Exhibits J and K.) Yet, ironically, there has been no real

discovery. And, the only motion practice has been Plaintiffs' motions seeking to compel Lead

Counsel and Liaison Counsel to perform their fiduciary obligations. The reason is, as Plaintiff

believes, the proposed settlement was largely in place at the time plaintiffs aligned with Lead

Counsel filed their motion with the JPML for 1407 transfer, and used the MDL proceeding in an

attempt to control the litigation to cram through their settlement.

The entire process has been tainted and motivated by a reverse auction and lead counsel

that have rushed to settlement, without the benefit of adversary discovery and without any

verification of "confirmatory" discovery.

---

[3] Plaintiff still has not received the transcript of the deposition of Collin McGeary

Incredibly, the settlement is actually worse for consumers and better for Gillette than the original settlement offered by Gillette, which offer was made in response to Plaintiff's demand letter sent pursuant to California's Consumers Legal Remedies Act. Lead Counsel's settlement discussions resulted in an improvement not for class members, but for Gillette and Lead Counsel. Whereas Gillette's original settlement, offering $12 per class member and a $1 coupon had no cap on class members' recovery, Lead Counsel agreed to a settlement containing a $5.05 million cap, and for their efforts received clear-sailing on $1.85 million in attorneys' fees. Mr. Corrales respectfully suggests that this is not adequate representation. Negotiating away an unlimited ceiling for a $5.05 million ceiling is not the picture of zealous advocacy. In fact, the $5.05 million recovery for class members is in fact no recovery at all due to the extraordinarily onerous claim requirements, revealing the settlement to be nothing more than a marketing scheme for Gillette, far worse than reversion because it will allow Gillette to profit from a flood of Fusion razors onto the market and a boom in the highly profitable sales of replacement Fusion blades.

Plaintiff's position is that the settlement class and settlement is so fundamentally flawed that it ought to be rejected in its entirety. However, if the Court disagrees, and wishes to grant preliminary approval conditionally, then Plaintiff, in Section VII. below, outlines those conditions that the Court should impose before granting preliminary approval.

## II.    THE STANDARDS FOR REVIEW OF A CLASS ACTION SETTLEMENT

As the Court recognizes, "this is, of course, an area in which there is an obligation on the part of the Court to provide fairly extensive scrutiny." (Transcript of Penultimate Preliminary Approval Hearing at 8:12-14.)

Indeed, the Court has a fiduciary duty to the putative class to ensure that the proposed

settlement class complies with the strict requirements of Rule 23 of the Federal Rules of Civil

Procedure and to ensure that the proposed settlement complies with Rule 23(e) precluding

approval of a settlement unless the settlement is fair, reasonable, and adequate. In re Lupron(R)

Marketing and Sales Practices Litig., 228 F.R.D. 75, 93 (D. Mass. 2005) ("the court has a

fiduciary duty to absent members of the class in light of the potential for conflicts of interest

among class representatives and class counsel and the absent members. `Rule 23(e) imposes on

the trial judge the duty of protecting absentees"); *accord* Mirfasihi v. Fleet Mortgage Corp., 450

F.3d 745, 748 (7th Cir. 2006).

In addition to the Court's fiduciary duty, prudence counsels in favor of rigorous scrutiny

of the proposed settlement class and settlement at this stage before embarking on an incredibly

expensive notice program that in and of itself is estimated to cost between $2.4 million and $2.5

million[4] – *i.e.*, 1/3rd of the $7.5 million Settlement Fund. The cost of notice would double if a

settlement has to be re-noticed if the Court granted preliminary approval now but not final

approval at the Fairness Hearing. In that event, the extra $2.45 million may factor into Gillette's

decision as to the amount in which it would increase the value of a new settlement.

This settlement is patently not fair, reasonable, or adequate. As discussed below in

excrutiating detail, the settlement is nothing more than a disguised marketing scheme for Gillette

---

[4] Declaration of Andrew Novak (Exhibit J to The Gillette Company's Submission In Support Of Preliminary Approval Of Proposed Settlement ("Gillette Mem.")) (estimating the cost of notice to fall within the range of $2.4 million to $2.5 million); *see also* Settlement Agreement ¶ 2.2 (allocating $2.45 million of the $7.5 million Settlement Fund to the cost of notice and administration).

that is the result of a reverse auction where Lead Counsel has sacrificed the rights of the putative

class members, and especially California class members. All the hallmarks of collusion are

present. The Court should not repeat the mistake made by its sister court and preliminarily

approve this settlement, and instead heed its sister court's warning to other courts:

> "Unfortunately, when this matter first came before the Court from preliminary approval
> in July 2004, the Court was not independently aware (nor did any proponent of the
> settlement bring to the Court's attention) what the parties and the Settlement
> Administrator already knew -- namely, that 'claims made' settlements regularly yield
> response rates of 10 percent or less. . . . Of course, this cap and the parties' expectations
> of a low response rate gives the reverter clause real value for Defendants. Likewise, the
> clear sailing provision, which guarantees that Defendants will not object to Plaintiffs'
> Counsel essentially seeking 30 percent of the entire settlement fund -- regardless of how
> much is disbursed to the class, gives this settlement real value for Plaintiffs' Counsel.
> The Court does not mean to suggest that each of these features (*i.e.*, claims made
> settlements, payout caps based on 100 percent response rates, reverter clauses, or clear
> sailing provisions) is per se unacceptable. However, this case provides a telling example
> of how these features can work in concert to produce a settlement that is unfair,
> inadequate and unreasonable and that in practice yields comparably little value for the
> Class."

Sylvester v. Cigna Corp., 369 F. Supp. 2d 34, 52-53 (D. Me. 2005).

## III.   THE SETTLEMENT CLASS DOES NOT SATISFY THE REQUIREMENTS OF RULE 23 OF THE FEDERAL RULES OF PROCEDURE.

At the hearing held on July 7, 2006, when Plaintiff suggested to the Court that it may be

appropriate at that time to allow him to pursue his putative California class action independently

of Lead Counsel and the Consolidated Complaint since Plaintiff did not see how a 50 state

certification would be possible in this particular case, this Court concluded that the issue of

whether or not the alleged national class satisfied Rule 23 or if California may be included within

the national class was "a little bit premature in the sense that we have class certification coming

up this Fall" and that a motion for class certification would be "the point at which these kinds of

7

concerns will be crystallized." (Transcript of July 7, 2006 hearing at 4:11-21, attached as Exhibit C to Strenio Decl.)

The settlement proponents cannot, through their proposed settlement class side-step the requirements of Rule 23 or the crystallization of the concerns with overbroad putative national (and international!) class. Indeed, as the United States Supreme Court dictates, other than trial manageability concerns, the other specifications of Rule 23

> "– *those designed to protect absentees by blocking unwarranted or overbroad class definitions – **demand undiluted, *even heightened*, attention*** in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold. . . . [P]roposed settlement classes sometimes warrant more, not less caution on the question of certification."

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997); *see* Lupron, 228 F.R.D. at 88 ("'A district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class.' When a settlement class is proposed, it is incumbent on the district court to give heightened scrutiny to the requirements of Rule 23 in order to protect absent class members") and n. 27 ("The heightened scrutiny rule is a byproduct of the controversy of the concept of a settlement class, a litigation device that was initially viewed with deep suspicion by the courts and commentators who feared (not without justification) that it invited collusion between defendants and fee-hungry lawyers").

The Settlement Class does not satisfy the requirements of adequacy of representation, predominance, and typicality due to California consumers' superior rights in this case.

A.    **The putative national class, based on violation of states' consumer protection laws, does not satisfy Rule 23's requirements of adequacy of representation, typicality, and predominance.**

Under the circumstances of this case, a national class action, based on violations of states' consumer protection law, is prohibited as a matter of law due to the variations among the states.[5]

The vast majority of the attorneys representing plaintiffs in this MDL proceeding recognize this fact, including Co-Lead Counsel, Robert Rothman, for Lerach, Coughlin, Stoia, Geller, Rudman, & Robbins, LLP, and Liaison Counsel, Thomas Shapiro, with Shapiro Haber & Urmy LLP, representing **putative class representatives Mark Dearman and Anthony Debiseglia**, who alleged in their complaint only a **Florida** class and a **New York** class, for unjust enrichment, violation of the Florida consumer protection statute, and violation of the New York consumer protection act.

Likewise, of the 18 attorneys representing plaintiffs whose attorneys consented to the settlement prior to the hearing held on October 18, 2006, the vast majority (11) represent plaintiffs alleging only state classes: (1) Marc Ackerman (**California, New Jersey, Texas, Minnesota**, and **Illinois**); (2) Mila Finkelstein Bartos (**Maryland** and **Pennsylvania**); (3) Edward Cochran (**Ohio**); (4) Michael Fistel, co-counsel with Liaison Counsel, representing **putative class representatives Adam Kline and Javier Tuñon (Georgia** and **Massachusetts**); (5) Alan Kovacs (**California, Ohio**, and **Illinois**); (6) James Miller (**Connecticut**); (7) Jason

---

[5] Plaintiff does not mean to suggest that there is a *per se* rule against national class actions brought under state law. Such a class may be proper when, for example, choice of law principles allow the application of one state's laws to consumers in other states, or, when, for example, all consumers have only one cause of action, such as a claim for breach of contract or a claim for negligent misrepresentation, or when the consumers' damages and remedies are all equal. But, this is not the case here.

Rudd (**Texas** and **Tennessee**);  (8) Steven Schwartz (**Pennsylvania**); (9) John Steward (**Mississippi**); (10) Ralph Stone (**California**); and (11) Russell Wood (**Arkansas**).

Of the seven remaining attorneys, three do not allege violation of all the states' consumer protection statutes, but instead abandon those claims and allege a claim for **only unjust enrichment**:  (1) Lance Harke, representing **putative class representative Collin McGeary**; (2) Kenneth Quat;  and (3) Mark Tamblin.

Of the four remaining attorneys, two, while alleging a claim for a consumer protection statute, allege a violation of **only one state's consumer protection statute**:  (1) Larry Drury, along with his co-counsel, Co-Lead Counsel Ben Barnow, representing **putative class representative Greg Besinger** (violation of the Illinois consumer protection statute and unjust enrichment);  and (2) Mark Godino, representing **putative class representative Matthew Marr** (violation of the UCL, unjust enrichment, and negligent misrepresentation).

And the remaining two attorneys, while alleging a national class for violations of all the states' consumer protection statutes as well as for unjust enrichment, are careful to allege **subclasses**, in implicit recognition of the variations of the states' consumer protection laws: (1) Donald Amamgbo;  and (2) Wayne Kreger.

This, of course, is not surprising.  Courts have held that "[s]tate consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."  In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir. 2002);  *accord* Silzone Heart Valve Prods. Liab. Litig. v. St. Jude Med. Inc. (In re St. Jude Med., Inc.), 425 F.3d 1116, 1120 (8th Cir. 2005).

Recognizing the substantial variations among states' laws, courts have often rejected

certification of nationwide consumer classes. *See, e.g.,* <u>Block v. Abbott Laboratories</u>, 2002 U.S.

Dist. LEXIS 5453 (N.D. Ill. 2002) (finding nationwide class certification improper recognizing

"across the country, states have enacted consumer protection statutes which vary on a wide range

of important issues, including subtleties in standards of proof, procedure, and remedies"); <u>Lyon</u>

<u>v. Caterpillar, Inc.</u>, 194 F.R.D. 206 (E.D. Pa. 2000) (rejecting nationwide certification, finding

consumer fraud laws of the various states are not uniform and management problems are likely to

arise from the need to determine and apply the various consumer fraud acts); <u>Lilly v. Ford Motor</u>

<u>Co.</u>, 2002 U.S. Dist. LEXIS 5698 (N.D. Ill. 2002) (finding nationwide class certification was

improper because the laws of unjust enrichment vary from state to state and require

individualized proof of causation and certification of consumer fraud claims is unmanageable);

<u>Tylka v. Gerber Products Co.</u>, 178 F.R.D. 493 (N.D. Ill. 1998) (refusing to certify nationwide

class involving consumer fraud claims because of nuances and differing standards of proof,

procedure, substance, and remedies); *see also* <u>Delahunt v. Cytodyne Techs</u>, 241 F.Supp.2d 827,

840 (S.D. Ohio 2003) ("The Court recognizes that, while each state's unfair trade practices

statute generally prohibits unfair or deceptive practices or acts in connection with consumer

transactions, the statutes may vary in certain procedural or substantive respects. *See* <u>In re</u>

<u>Bridgestone/ Firestone, Inc.</u>, 288 F.3d 1012, 1018 (7th Cir. 2002) (recognizing that `state

consumer-protection laws vary considerably, and courts must respect these differences');

Kimberly C. Cavanaugh, It's a Lorax Kind of Market! But Is It a Sneetches Kind of Solution?, 9

VILL. ENVTL. L.J. 133, 177-78 (1998) (`To help combat deceptive trade practices, most states

have enacted their own versions of the (Federal Trade Commission Act) . . . The medley of state

11

legislation varies both in scope and rigorousness')") ("the variances in the states' laws may later prove to be an insurmountable obstacle to class certification"). Fundamental principles of due process and federalism animate these courts' opinions:

> "Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. *See* [BMW of North America, Inc. v. Gore, 517 U.S. 559, 568-73]; [Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001)] (reversing a nationwide warranty class certification); Spence v. Glock, G.m.b.H., 227 F.3d 308 (5th Cir. 2000) (reversing a nationwide tort class certification); Larry Kramer, Choice of Law in Complex Litigation, 71 N.Y.U. L. Rev. 547, 579 (1996); Linda S. Mullenix, Mass Tort Litigation and the Dilemma of Federalization, 44 DePaul L. Rev. 755, 781 (1995); Robert A. Sedler, The Complex Litigation Project's Proposal for Federally-Mandated Choice of Law in Mass Torts Cases: Another Assault on State Sovereignty, 54 La. L. Rev. 1085 (1994). Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)."

Bridgestone/Firestone, 288 F.3d at 1020-21.

The cases relied upon by the settlement proponents are inapposite.

For example, in Lupron, the civil RICO statute was "the mainstay of the Consolidated Amended Complaint." 228 F.R.D. at 88. Here, in contrast, the mainstay of this action is the states' consumer protection statutes, as evidenced by the original complaints filed prior to the settlement discussions. The discussion in Lupron of the issue of the variation among state consumer protection laws was undeveloped and the entire discussion was relegated to a mere footnote (n. 33). The intervenors did not present the court with the substantial variations among states' laws but instead appear to have made the argument as a throw-away argument "finally not[ing] some differences" in the state consumer protection laws.

And, in <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 529-30 (3rd Cir. 2003), a case centered on antitrust claims resulting in overpayment for prescription drugs, the Court of Appeal for the Third Circuit, reviewing the order granting class certification under an abuse of discretion standard, expressly recognized that, in some cases, certification of a national class action violates Rule 23 because of the differences among the states' laws.

The Court of Appeal correctly concluded that, in some cases, the differences among the states' laws impact Rule 23 requirements other than simply trial manageability and also impacted considerations as to whether or not the allocation scheme of the settlement was fair due to class members' different rights and remedies under state law. As the Court of Appeal was careful to point out:

> "Nonetheless, *we recognize that problems beyond those of just manageability may exist when a district court is asked to certify a single nationwide class action suit, even for settlement purposes, when claims arise under the substantive laws of the fifty states. Although there may be situations where variations in state laws are so significant so as to defeat commonality and predominance even in a settlement class certification, this is not such a case.*" 391 F.3d at 529-30.

The carefully reasoned decisions have reached the same conclusion that, even in, and especially in, the context of a national class action settlement, variations among state laws' rights and remedies do not impact solely trial manageability issues, but also impact the Rule 23 requirements of adequacy of representation and predominance. *See, e.g.*, <u>Grunewald v. Kasperbauer</u>, 235 F.R.D. 599, 606 (D. Pa. 2006); <u>In re Rezulin Prods. Liab. Litig.</u>, 210 F.R.D. 61, 71 (S.D. N.Y. 2002) (explaining that "[t]his of course is another way of saying that the individual issues arising by virtue of the multiplicity of varying state laws predominated over the common issues. So too here").

13

In <u>Warfarin</u>, variations in state law rights and remedies were sufficiently reconciled by the fact that "*any material variations could be considered in the context of calculating damages as well as in assessing the fairness of the settlement*." 391 F.3d at 530.

In this case, because of the differences among the states' laws, sub-classes, at a minimum, must be established to respect and protect the class members' different rights and remedies under their respective laws. This is because "(a) class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." <u>Amchem</u>, 521 U.S. at 625-26.

In response, Lead Counsel makes the startling and novel proposition that "where the class sought to be certified is for settlement purposes only, and standards of due process have been met, there is no need to apply the substantive laws of any particular state, for the parties have voluntarily agreed to forego the boundless uncertainties of litigation and proceed to settle contested claims." (Pltfs' Supp. Mem. at 10.) Of course, Lead Counsel provides no legal authority for this remarkable proposition. Probably the reason for this is that the law is to the contrary.

*First*, the only parties that have "voluntarily agreed" are the parties who are presented by Lead Counsel and the attorneys who supposedly have "consented."[6]

---

[6] In fact, there is no evidence that any of the parties have been informed of the settlement. No party has submitted any declaration. And no party has even signed the settlement or a consent to the settlement; rather, the settlement and consents were signed by the parties' counsel.

These parties cannot agree on behalf of the entire putative class. This is well-established law within the First Circuit: "representative plaintiffs cannot release, on their own initiative, the claims of other class members." Nottingham Partners v. Trans-Lux Corp., 925 F.2d 29, (1st Cir. 1991).

Moreover, as recognized by this Court at the last hearing on October 18, 2006, the consents of the 18 attorneys were procured when the plain language of the settlement contained what on their face at least appeared to be extortionist provisions, barring awards of incentive awards and attorneys' fees to those parties who do not consent to the settlement. (Settlement Agreement ¶¶ 1.11, 1.14, 7.2, 7.3.)[7] Lead Counsel, who crafted or agreed to this scheme of "consent to get your fees" then has the audacity to tout these "consents" in support of the settlement. (Plts. Supp. Mem. at 14-15.) Even today, following the "clarification" elicited by the Court at the October 18, 2006 hearing, no addendum to the settlement has been filed or served on the parties. And, no evidence has been presented that this clarification has been conveyed to plaintiffs' attorneys who were not present at the October 18, 2006 hearing.

*Second*, the law within the First Circuit is that "a court must understand the claims, defenses, relevant facts, *and applicable substantive law* in order to make a meaningful determination of the certification issues." Waste Management Holdings, Inc. v. Mowbray, 208

---

[7] In letters sent to plaintiffs' counsel on October 9, 2006, Lead Counsel offered: "Enclosed is a copy of the executed Settlement Agreement in the above-captioned matter. . . . You are listed as an attorney in one or more pending cases in the MDL matter. We are offering named plaintiffs in the individual cases and their counsel of record the opportunity to join in the settlement. See paragraph 1.11 of the Settlement Agreement. Please review the Settlement Agreement with your client(s) and, if your client(s) and his (their) counsel of record choose to join, please send me a writing acknowledging concurrence in and acceptance of the settlement by your client(s) and his (their) counsel of record. We ask that you do so *by October 16, 2006*." (Strenio Decl., Exhibit W (emphasis added).)

F.3d 288, 295 (1ˢᵗ Cir. 2000). As the Seventh Circuit, in reversing an order granting approval of

a consumer class action settlement, amplified:

> "Here, in evaluating the strength of the information-sharing class's claims, the district
> court reviewed the consumer protection statutes in Illinois, Maryland, Massachusetts, and
> Wisconsin, which were the jurisdictions in which suits have been brought against Fleet.
> ***But it is not clear why the district court limited its analysis to just these four
> jurisdictions in light of the fact that the information-sharing class was not limited to
> residents from these four states. The analysis should have considered, at a minimum,
> the pertinent consumer protection statutes (and other potential bases for claims) in the
> states where the information-sharing class members resided. . . . [A] proper estimate
> of the claims here should include a broader canvass of the potentially applicable law***."

Mirfasihi, 450 F.3d at 749.

> ***Third***, Lead Counsel appears to be arguing that, if a settlement is fair (which it is not in

this case), certification is proper. But, as the United States Supreme Court makes clear:

> "the standards set for the protection of absent class members serve to inhibit appraisals of
> the chancellor's foot kind – class certifications dependent upon the court's gestalt
> judgment or overarching impression of the settlement's fairness. . . . Federal courts, in
> any case, lack authority to substitute for Rule's certification criteria a standard never
> adopted – that if a settlement is `fair,' then certification is proper. . . . The Rule 23(b)(3)
> predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant
> adjudication by representation. The inquiry appropriate under Rule 23(e), on the other
> hand, protects unnamed class members `from unjust or unfair settlements affecting their
> rights when the representatives become fainthearted before the action is adjudicated or are
> able to secure satisfaction of their individual claims by a compromise. But it is not the
> mission of Rule 23(e) to assure the class cohesion that legitimizes representative action in
> the first place."

Amchem, 521 U.S. at 621-22 (citations omitted).

A.　　**In this case , a national class cannot be certified that includes California.**

　　1.　　**Here, California consumers' rights and remedies are superior to the rights and remedies of consumers in other states <u>and</u> California consumers suffered greater damages.**

　　　　a.　　**California consumers' rights and remedies are superior are superior to the rights and remedies of consumers in other states.**

It is acknowledged, "California's consumer protection laws are among the strongest in the country." <u>Wershba v. Apple Computer</u>, 91 Cal.App.4th 224, 242 (Cal. App. 2000).[8] This is not hyperbole.

Rather, California's Consumers Legal Remedies Act (<u>Cal. Civ. Code</u> §§ 1750 *et seq.* (the "CLRA")) affords consumers the remedies of *restitution*, *damages*, *punitive damages* (uncapped other than by *Campbell v. State Farm*), and *attorneys' fees*. <u>Cal. Civil Code</u> §1780(a) and (d). And, a consumer is entitled to a *jury trial* on his/her CLRA claim. *See, e.g.*, <u>Brockey v. Moore</u>, 107 Cal.App.4th 86, 98 (2003). The rights and remedies afforded by the CLRA are so enshrined in California's public policy that California's Legislature expressly provided in the statute that

---

[8] Lead Counsel distorts <u>Wershba</u> by asserting that it "flies in the face of his arguments." It is true that the appellate court in <u>Wershba</u> rejected the objector's argument that the court should have evaluated the settlement against each of the different state's laws. (Pltf's Supp. Mem. at 10.) What Lead Counsel fails to disclose to this Court is that <u>Wershba</u> rejected that argument because the trial court *evaluated the settlement against consumers' rights and remedies under California law*, which are among the strongest in the country. <u>Id</u>. at 241-42. If it could pass scrutiny under the microscope of California consumers' superior rights and remedies, it could pass scrutiny if viewed against the rights and remedies of consumers from other states. Also, the appellate court noted that, *under a choice of law analysis, California's law could be applied to the claims of class members from other states* because California's consumer protection law affords consumers greater protection and because the Defendants' fraud emanated from California. <u>Id</u>. Here, in contrast, choice of law principles would not allow class members from other states to have California law apply to them.

"[a]ny waiver by a consumer of the provisions of [the CLRA] is contrary to public policy and shall be unenforceable and void." Cal. Civ. Code § 1751.

California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* (the "UCL")) and California's False Advertising Statute (Cal. Bus. & Prof. Code §§ 17500 *et seq.* (the "FAL")) afford consumers the remedies of ***restitution***, ***restitutionary disgorgement of profits***, as well as ***fluid recovery*** (*cy pres*) to ensure that a defendant does not retain its illicit profits. Corbett v. Superior Court, 101 Cal.App.4th 649, 655 (Cal. App. 2002).[9]

---

[9] Gillette admits that restitutionary disgorgement of profits is an available remedy under the UCL and FAL. (Gillette Mem. at 25.) Gillette's assertion that nonrestitutionary disgorgement is not an available remedy is irrelevant because the disgorgement in this case would be restitutionary disgorgement of profits to consumers. *See, e.g.,* Colgan v. Leatherman Tool Group, Inc., 135 Cal.App.4th 663, 697-99 (2006) (disgorgement of profits of manufacturer who sold to retailers who then sold to consumers is restitutionary in nature) (reversing restitution award because it was not supported by substantial evidence because the trial court did not rely on the market value or retail price of the tools or similar tools as the basis for the restitution award and because the trial court did not rely on gross profits as an appropriate benchmark; instead, the trial court relied on only expert testimony concerning the causation expert who did not attempt to quantify the dollar value of the consumer impact or the advantage realized by the manufacturer; because the expert testimony was the only basis for the trial court's award, the restitution award was reversed) (the appellate court did not conclude that gross profits or retail prices of similar products could not be relied upon, but only concluded that the expert testimony relied upon by the court was insufficient to support the ruling); Corbett v. Superior Court, 101 Cal.App.4th 649, 655 (2002); *contrast* Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1143, 1144 (2003) (where competitor, not consumer, was seeking disgorgement of profits) ("it is possible that due process concerns would arise if an individual business competitor could recover disgorgement of profits under the UCL. While restitution is limited to restoring money or property to direct victims of an unfair practice, a potentially unlimited number of individual plaintiffs could recover nonrestitutionary disgorgement. Allowing such a remedy would expose defendants to multiple suits and the risk of duplicative liability without the traditional limitations on standing"); Feitelberg v. Credit Suisse First Boston, LLC, 134 Cal.App.4th 997 (2005) (where investors were seeking disgorgement of profits from stock analysts who profited by selling the research reports to investments banks); Madrid v. Perot Systems Corp., 130 Cal.App.4th 440 (2005) (where consumers were seeking disgorgement of profits not from the utility companies who were the sellers of the electricity but from market manipulator who profited from third parties by selling insider information about how to manipulate California's energy market).

Furthermore, California consumers are entitled to a mandatory injunction requiring Gillette to make corrective advertising to address the continuing false impression of California consumers that the M3Power razor causes hairs to be raised.

In <u>Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy</u>, 4 Cal.App.4th 963, 972-74 (1992), the California Court of Appeal held that a court's authority under the UCL includes the power to order affirmative disclosure and, specifically, corrective advertising.

The Court of Appeal there affirmed an injunction mandating that the defendant make corrective advertising. The injunction in that case required the defendant, a dairy, to place a warning on all of its advertisements and products for the next ten years, stating that there is no proof that pasteurization reduces the nutritional value of milk or that the risks of consuming milk outweigh any of its alleged health benefits.

An injunction simply prohibiting the false advertising is insufficient because it does not correct the consequences of the past false advertising. As the California Court of Appeal explained in <u>Consumers Union</u>:

> "an injunction against future violations might have some deterrent effect, [but] it is only a partial remedy since it does not correct the consequences of past conduct. An `order which commands a party only to go and sin no more simply allows every violator a free bite at the apple.'" (4 Cal.App.4th at 973 (quoting the leading case on corrective advertising, <u>Warner-Lambert Co. v. FTC</u>, 562 F.2d 749, 761-62 (D. C. Cir. 1977).)

In this case, without corrective advertising, consumers will continue to make their purchasing decisions and purchase the M3 Power razor in reliance on Gillette's false "hair raising" claims and deceptive "hair extending" claims made in its past false advertising, as marketing expert Larry Londre declares:

"The longer time passes, the more embedded the false impressions become. And, of course, the longer time elapses before corrective advertising is made, the longer consumers will continue to make their purchasing decisions and purchase the M3 Power based on the impression created by the hair raising claims in Gillette' past advertising."

(Declaration of Larry Steven Londre, ¶ 25, attached as Exhibit Z to Strenio Decl.)

In short, California consumers' remedies are superior to those of other states, entitling them to a greater recovery than consumers from other states. California consumers' remedies are even superior to those of Massachusetts consumers. Under the Massachusetts Consumer Protection Act: (i) the plaintiff has no right to a jury trial (*see, e.g.*, Santos v. Sunrise Medical Inc., 351 F.3d 587, 590 n. 2 (1st Cir. 2003); Nei v. Burley, 446 N.E.2d 674, 679 (Mass. 1983)); (ii) punitive damages are not allowed (*see, e.g.*, Prudential Ins. Co. v. Turner & Newall P.L.C., 1998 U.S.Dist.LEXIS 15960, *44-47 (D. Mass. 1998); and (iii) while treble damages are allowed, the court can order double damages instead (Mass. Gen. Laws Ch. 93(A) § 9(3)).[10]

Thus, under California's choice-of-law analysis (or any state's choice-of-law analysis),[11] the Massachusetts Consumer Protection Act cannot be applied to California class members in

---

[10] The vast majority of other states' consumer protection statutes also do not afford the remedy of punitive damages, *e.g.*, Arkansas, Colorado, Florida, Hawaii, Illinois, Indiana, Kansas, Louisiana, Arizona, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

[11] "It is a well established principle that a federal court sitting in diversity must apply the choice-of-law rules of the forum state in determining which state's substantive law to apply in the case. Klaxon v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487 (1941). In the MDL setting, the forum state is usually the state in which the action was initially filed before it was transferred to the court presiding over the MDL proceedings" – which, in the case of Plaintiff Corrales is California. In re Propulsid Prods. Liab. Litig., 208 F.R.D. 133, 140 (E.D. La. 2002); *see also* Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 822-23 (holding that an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action).

20

lieu of California's consumer protection statutes because there is a fundamental conflict with California law and California has a materially greater interest in having its consumer protection acts govern the claims of California class members. *See, e.g.*, Washington Mutual Bank v. Superior Court, 24 Cal.4th 906, 916-17 (2001); America Online, Inc. v. Superior Court, 90 Cal.App.4th 1, 25 (2001).

> **b.    California consumers suffered greater damages than other members of the putative national class.**

Moreover, it appears that California consumers paid substantially more for the M3Power razors and blades than the average price paid by the consumers in other states. Although the settlement proponents claim that Gillette does not maintain any evidence of the state-specific retail sales prices and therefore are not able to provide Plaintiff or this Court with such evidence, Plaintiff has retained a nationally renown economic consulting group headquartered in Cambridge, Massachusetts which estimates that California consumers paid 28.3 percent (28.3%) more for the products which are the subject of this class action than the national average retail price. (Declaration of Mike Nguyen dated November 10, 2006 ¶¶ 3-4 and Exhibit 2 thereto.)

Therefore, on this ground alone it would be inherently unfair to include California consumers in a 50 state class action settlement on the same terms as the national average.

> **2.    Because California consumers' rights and remedies are superior to the rights and remedies of consumers in other states, and because California consumers suffered greater damages in this case, a national class (let alone the proposed international class) cannot satisfy the requirements of adequacy of representation, predominance, and typicality.**

Because California consumers' rights and remedies are superior to the rights and remedies of consumers in other states, and because California consumers suffered greater

damages in this case, a national class (let alone the proposed international class) cannot satisfy the requirements of adequacy of representation, predominance, and typicality. *See, e.g.*, In re Heritage Bond Litig., 2005 U.S.Dist.LEXIS 13555, *37-38 (C.D. Cal. 2005) (reasonableness of settlement depends on whether it allocates "more of the settlement to class members with stronger claims on the merits"); In re Bankamerica Corp. Secs. Litig., 210 F.R.D. 694, 712 (E.D. Mo. 2002) (denying settlement approval because the plan of allocation fails to account for "the strength of [class members'] claims under California law"); In re Oracle Sec. Litig., 1994 U.S.Dist.LEXIS 21593, *3-4 (N.D. Cal. 1994) (reasonable to allocate more of the settlement to class members with stronger claims).

In the instant case, the absence of a California sub-class precludes a finding of adequacy of representation. *Cf.* In re Relafen Antitrust Litig., 231 F.R.D. 52, 76 (D. Mass. 2005) ("In response to this Court's concerns about a nationwide settlement class, class counsel established the Allocation Committee and approached independent counsel for each group of states. This Committee `engaged in intense negotiation for approximately two weeks,' before making its initial recommendations, and reconvened following the October 5, 2004 hearing"). As Judge Young counsels in Relafen:

> "judges have been too quick to approve counsel as adequate to represent sprawling and amorphous classes, and then overeager to accept a settlement – any settlement – that will bring pending litigation to an end. The result all too often has been a virtual collusion between plaintiffs' counsel and corporate interests in buying peace and excluding consumers from access to court. . . . [C]onsider the overeagerness to approve settlement."

231 F.R.D. at 85-86.

The existence of a California citizen as a representative of a putative national class (and now as a putative international class) is insufficient, as a matter of law, to satisfy the requirement of a California sub-class with its own sub-class representative.

As the United States Supreme Court explains in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627-28 (1997):

> "The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, *each served generally as representative for the whole, not for a separate constituency*. In another asbestos class action, the Second Circuit spoke precisely to this point:
>
>> '*Where differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.* The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. *But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.*' In re Joint Eastern and Southern Dist. Asbestos Litigation, 982 F.2d 721, 742-743 (CA2 1992), modified on reh'g sub nom. In re Joint E. & S. Dist. Asbestos Litig., 993 F.2d 7 (CA2 1993).
>
> The Third Circuit found no assurance here – either in the terms of the settlement or in the structure of the negotiations – that the named plaintiffs operated under a proper understanding of their representational responsibilities. *See* 83 F.3d at 630-631. That assessment, we conclude, is on the mark."

Even if the existence of a California resident as a putative national class representative were sufficient (which it is not as a matter of law under Amchem), putative class representative Matthew Marr does not satisfy the adequacy of representation requirement.

First, Matthew Marr is an *employee of the law firm* acting as his putative class counsel, Glancy Binkow & Goldberg LLP, who filed their complaint originally in state court in California. (Strenio Decl., Exhibit P (Answers And Objections Of Plaintiff Matthew Marr To Defendant's First Set Of Interrogatories, p. 8, dated June 26, 2006) and Exhibit Q (Docket of Marr v. Gillette, Case No. 2:05-cv-05024-FMC-RZ, in the United States District Court for the Central District of California).)

Mr. Marr therefore has an indisputable disabling conflict of interest. *See, e.g.,* Apple Computer, Inc. v. Superior Court, 126 Cal.App.4th 1253, 1264 (Cal. App. 2005) (holding that a conflict of interest prohibits a lawyer from serving both as class representative and as counsel for the class) (explaining that "'(T)he majority of courts . . . have refused to permit class attorneys, their relatives, or business associates from acting as the class representative. . . . Since possible recovery of the class representative is far exceeded by potential attorneys' fees, courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members.'" (quoting Susman v. Lincoln American Corp., 561 F.2d 86, 90-91 (7th Cir. 1977) (collecting cases)).

As such, Mr. Marr cannot satisfy the adequacy of representation required for Rule 23 certification, especially in the context of a class action settlement:

> "We are, however, concerned with the fact that where a named representative is also an employee of class counsel, that named representative may be more concerned with maximizing the return and with satisfying the needs of class counsel than he is with the needs of other class members. In answering questions of when to settle and how much to settle for, a named representative who is an employee of class counsel may arrive at answers which benefit not the class, but the class counsel."

Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1375-1376 (11th Cir. 1984) (quoted with approval in Apple Computer).[12]

Second, Mr. Marr, in his complaint, alleged a national class, not a California class. (Marr Class Action Complaint ¶ 1 ("This consumer class action is brought against The Gillette Company (`Gillette' or the `Company') on behalf of all persons or entities who purchased Gillette's M3Power razor shaving system for men (the `M3Power') since May 24, 2004 to the present.")

Third, this putative class representative – who alleged a claim for violation of the UCL and the FAL, unjust enrichment, and negligent misrepresentation – failed to even allege a claim for violation of the California Consumers Legal Remedies Act, one of the two most important consumer protection statutes in California, and the only one that affords consumers the remedy of damages, statutory damages, and punitive damages, and the right to a jury trial. This failure to allege a violation of the CLRA does not exhibit adequacy of representation of California consumers; in fact, in this case, it demonstrates the opposite.

And, even if the consent to the settlement by a California resident, who is a named plaintiff but who is not a putative class representative were sufficient (which it is not as a matter of law under Amchem), the consent in this case is inadequate.

---

[12] This disabling conflict of interest has manifested: this putative class representative (if he is even aware of the settlement) has shown a conflict of interest by agreeing to equal treatment of California consumers in the settlement despite California consumers' superior rights, remedies, and damages; in the meantime, his relative at the law firm will presumably share in attorney fees.

First, the consent of the four California residents was procured at the time when the plain language of the settlement contained extortionist provisions, barring awards of incentive awards and attorneys' fees to those parties who do not consent to the settlement. Even today, following the "clarification" elicited by the Court at the October 18, 2006 hearing, no addendum to the settlement has been filed or served on the parties. And, no evidence has been presented that this clarification has been conveyed to plaintiffs' attorneys who were not present at the October 18, 2006 hearing.

Second, none of these four California residents was championing the rights of California residents. Three of these four alleged in their respective complaints a *national* class, precluding them from satisfying the adequacy of representation requirement for a California sub-class in this case. And, the fourth California resident, Plaintiff David Lipper, while alleging a California class, alleged only a claim for violation of the UCL, abandoning the claim for violation of the CLRA, which, unlike the UCL, provides for remedies of actual damages, compensatory damages, statutory damages, punitive damages, attorneys' fees, and the right to a jury trial.

Third, none of these California citizens or attorneys have submitted any declaration professing their belief that the settlement is fair, reasonable, and adequate. Moreover, these California citizens and their attorneys appear to have been mis-informed of material facts regarding the settlement. (*See* Strenio Decl.)

26

> **B.    Under the circumstances of this case, the national class action fails to satisfy the requirements of typicality, predominance, and adequacy of representation because, not only are California consumers' rights and remedies superior to those of other states, many states do not even allow a private cause of action for violation of the consumer protection statute or allow a violation of the consumer protection statute to be brought as a class action.**

Unlike California, some states do not allow a private cause of action for violation of the consumer protection statute (Iowa),[13] and other states do not allow a claim for a violation of the consumer protection statute to be brought as a class action (Alabama, Alaska, Georgia, Kentucky, Louisiana, Mississippi, and Montana).[14]

As this Court holds in In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 84 (D. Mass. 2005) – a case strikingly omitted by the proponents of the settlement in their briefing -- these states must therefore be excluded from the class, as a matter of law:

> "Providing the Court with a detailed fifty-state survey, which plaintiffs have not contested, defendants point to the following differences among the state consumer protection laws. **Under Iowa law cited by plaintiffs, consumers may not bring claims.** See Molo Oil Co. v River City Ford Truck Sales, Inc., 578 N.W.2d 222, 228 (Iowa 1998).

---

[13]  Iowa R. Civ. P. 1.421(1)f.

[14]  The proponents of the settlement cannot bootstrap a class action for these states with Rule 23 of the Federal Rules of Civil Procedure. See, e.g., Amchem, 521 U.S. at 613 ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right"); In re Relafen Antitrust Litig., 221 F.R.D. 260 (D. Mass. 2004) (holding that the twin aims of the Erie rule, discouraging forum shopping and avoidance of inequitable administration of the laws, are furthered by not allowing Rule 23 to trump a state's statutory ban on class actions; also holding that state statutes barring class actions do not conflict with Erie and therefore must be followed); Leider v. Ralfe, 387 F.Supp.2d 283, 291 (S.D. N.Y. 2005) (same). Moreover, in this case, to permit a class action that would be barred under the state's substantive law would turn CAFA on its head. The only reason these cases are in federal court is due to CAFA. To allow Rule 23 to preempt a state's express statutory bar to a class action would cause CAFA to federalize states' consumer protection laws, expanding Rule 23, a procedural device, to create a federal class action remedy.

27

**Under the laws of Alabama, Alaska, Georgia, Kentucky, Louisiana, Mississippi, and Montana, there is no right to bring a class action to enforce the consumer protection statutes.** *See* <u>Ala. Code</u> § 8-19-10(f); <u>Alaska Stat.</u> § 45.50.531 (b) (repealed provision that had allowed class actions); <u>Ga. Code Ann.</u> § 10-1-399 (a); <u>Arnold v. Microsoft Corp.</u>, No. 00-CI-00123, 2001 WL 193765, at \* 6 (Ky. Cir. Ct. July 21, 2000); <u>La. Rev. Stat. Ann.</u> § 51:1409(A); <u>Miss. Code Ann.</u> § 75-24-15(4); <u>Mont. Code Ann.</u> § 30-14-133(1). *Consumers in these states may be excluded <u>out of hand</u>.*"[15]

Additionally, unlike California and Massachusetts, where the plaintiff in California has complied and the plaintiff in Massachusetts is represented as having complied with the special notice provisions for bringing a claim for violation of the consumer protection act, there is no evidence of compliance with the special notice provisions of the other states (Alabama, Georgia, Indiana, Kansas, Maine, Mississippi, Missouri, New Jersey, Oregon, Texas, Washington, and Wyoming).

Plaintiffs have asked for evidence of compliance with the notice provisions of these states, but no such evidence appears to exist. (Strenio Decl., Exhibit F and H.)[16]

Absent evidence of compliance, these states must also be excluded from the class, as a matter of law, as this Court further holds in <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 230 F.R.D. 61, 84-85 (D. Mass. 2005):

---

[15] Plaintiff is troubled by the failure of the proponents of the settlement to bring to this Court's attention the on-point holding of <u>Pharm. Indust. AWP Litig.</u>, a decision by this Curt decided just last year. This failure is even more striking in light of Lead Counsel's contention that: "Altogether, the inapplicability of Corrales' argument is exemplified by the fact that Plaintiffs' counsel can find no national class action which excludes consumers from Virginia, Iowa, and Alabama from a settlement because of their state laws." (Pltffs' Supp. Mem. at 13.)

[16] In fact, while cases within this MDL proceeding allege a state-class for Arkansas, California, Connecticut, Florida, Georgia, Illinois, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New York, Ohio, Pennsylvania, Tennessee, Texas, and Connecticut, no case within this MDL proceeding even alleges a state-class for Alabama, Indiana, Kansas, Maine, Mississippi, Oregon, Washington, and Wyoming, making it highly improbable that the notice provisions of these states were honored.

"The states of Kansas, Missouri, New Jersey, Oregon, Washington, Alabama, Alaska, California, Georgia, Indiana, Maine, Massachusetts, Mississippi, Texas, and Wyoming possess special notice provisions for bringing consumer protection claims. *See* Kan. Stat. Ann. § 50-634(g); Miss. Code Ann. § 75-24-15(2); Pointer v. Edward L. Kuhs Co., 678 S.W.2d 836, 842 (Mo. Ct. App. 1984); N.J. Stat. Ann. § 56:8-20; Or. Rev. Stat. § 646.638(2); Wash. Rev. Code Ann. § 19.86.095; Ala. Code § 8-19-10(e); Alaska Stat. § 45.50.535(b)(1); Cal. Civ. Code § 1782; Ga. Code Ann. § 10-1-399(b); Ind. Code Ann. § 24-5-0.5-5(a); Me. Rev. Stat. Ann. Tit. 5, § 213(1-A); Mass. Gen. Laws ch. 93A, § 9(3); Tex. Bus. & Com. Code Ann. 17.505, 17.5051; Wyo. Stat. Ann. §§ 40-12-109, 40-12-102(a)(ix). Plaintiffs have not alleged that they have complied with any notice provisions. While most states allow a plaintiff to give notice subsequent to the case being filed, others require dismissal of the complaint. Unless plaintiffs give evidence of compliance with the notice provisions, these states will be excluded."

The reason for the exclusion is the fact that a class that includes consumers within these states fails to satisfy the typicality, predominance, and adequacy requirements of Rule 23. And, a settlement of a class that includes consumers within these states and that treats all consumers equally is not fair, adequate, or reasonable because the consumers within these states are being subsidized by the consumers in states that allow class actions and that have complied with the notice provisions.

The reality is that, although Plaintiff believes this is a case that likely ought to be brought to a jury verdict, if it is not, and if it is instead settled, there is a maximum amount of money which defendant is willing to pay to buy its peace nationally. There is no justification whatsoever to allocate a portion of this money away from California consumers to consumers from states which are never allowed to bring class actions in the first instance, or to consumers from states in which there is a requirement for a notification to be sent before remedies are allowed and with which there has been no compliance.

C.   **The settlement proponents cannot bar the preclusion of a national class action by ignoring the claims for violation of the consumer protection statutes and certifying a national class based on only common law claims.**

The settlement proponents cannot circumvent the bar to certification of a national class by certifying a national class based on only common law claims.

First, the release in the Settlement covers claims for violation of the consumer protection statutes, precluding abandonment of these claims. (Settlement Agreement ¶ 6.1.) If they wanted to try to certify a national class based only on common law claims, for starters they would need to re-write the proposed release to reflect that consumer protection statutes are excluded from the release. It would be surprising were Gillette to agree to this.

Second, abandoning the claims for violation of the consumer protection statutes would preclude certification because it violates the adequacy of representation requirement. As this Court held in In re Relafen Antitrust Litig., 221 F.R.D. 260, 280 and 286 (D. Mass. 2004):

> "'Indeed, named plaintiffs who would intentionally waive or abandon potential claims of absentee plaintiffs have interests antagonistic to those of the class.'"

See Clement v. American Honda Fin. Corp., 176 F.R.D. 15, 23-24 (D. Conn. 1997) (denying certification where, as a condition of class treatment, members were forced to forego their claims for unfair trade practices and statutory damages); see also Janik v. Rudy, Exelrod & Zieff, 199 Cal.App.4th 930 (Cal. App. 2004) (holding that plaintiff stated a claim against class counsel for legal malpractice for omitting a consumer statute claim).

Third, the common law claims of the states, such as the claims for unjust enrichment, also vary, and would need to overcome numerous concerns identified by various courts before class certification could be allowed. See, e.g., Carnegie v. Household Int'l, Inc., 220 F.R.D. 542, 549

(N.D. Ill. 2004) (denying motion to certify national class based on unjust enrichment claim);

Lilly v. Ford Motor Co., 2002 U.S.Dist.LEXIS 5698, *5-6 (N.D. Ill. 2002) ("Even if the law of

consumer fraud or unjust enrichment is similar in all fifty-one jurisdictions, a class action is not

the superior method of adjudicating these claims. Class certification of Plaintiffs' claim of unjust

enrichment would still be unmanageable. *The laws of unjust enrichment vary from state to*

*state and require individualized proof of causation*. Unjust enrichment is an equitable doctrine.

There would be individual questions as to whether a particular class member is subject to

equitable defenses. Moreover, *variances exist in state common laws of unjust enrichment.*

*The actual definition of `unjust enrichment' varies from state to state.* Some states do not

specify the misconduct necessary to proceed, while others require that the misconduct include

dishonesty or fraud. . . . Other states only allow a claim of unjust enrichment when no adequate

legal remedy exists. . . . *The variations in state common laws of unjust enrichment*

*demonstrate that class certification of such a claim would be unmanageable*") (citation and

internal quotation marks omitted); Clay v. Am. Tobacco Co., 188 F.R.D. 483, 500-01 (S.D. Ill.

1999) ("*The laws of unjust enrichment vary from state to state and require individualized*

*proof of causation.* ... `Unjust enrichment is an equitable doctrine that ... *depends upon the*

*analysis of each individual situation.'* *Unjust enrichment requires individualized*

*determinations* similar to those required under the theory of civil conspiracy. The plaintiffs have

not presented evidence to establish that the question of liability is uniform among all members of

the proposed class. ... Thus, *the defendants' liability for unjust enrichment to a particular*

*plaintiff depends on the factual circumstances of the particular purchase at issue.* This

individual inquiry presents more than a simple question of whether a particular plaintiff can

prove damages.  Rather, it bears directly on the question of the defendants' liability for unjust

enrichment to a particular plaintiff").

> **D.**    **The proposed settlement class action fails to satisfy the requirements of typicality, predominance, and adequacy of representation because it attempts to include Canada.**

The proposed settlement class action fails to satisfy the requirements of typicality,

predominance, and adequacy of representation for the additional reason that it includes Canada.


**[REDACTED]**

[REDACTED]

██████████████████████████████████████████████

██████████████████████████Canada would have to be excluded in any event because

the settlement proponents offer no evidence to show why including Canada is fair, reasonable,

and adequate. The settlement proponents fail to provide any information regarding the Canada

action and fail to inform the Court of the different rights and remedies under the different laws of

Canada and its provinces. Also, what is the procedural status and stage of development of the

Canadian action, and what discovery has occurred in that action?

## IV.  THE SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE.

"A district court can approve a class action settlement only if it is fair, adequate and

reasonable." City Partnership Co. v. Atlantic Acquisition Ltd. Partnership, 100 F.3d 1041, 1043-

44 (1st Cir. 1996); see In re Lupron(R) Marketing and Sales Practices Litig., 228 F.R.D. 75 (D.

Mass. 2005) ("Approval is to be given if a settlement is untainted by collusion and is fair,

adequate, and reasonable").

### A.  No presumption of fairness applies because the parties did not bargain at arms-length and insufficient discovery has been provided.

"There is no single test in the First Circuit for determining the fairness, reasonableness

and adequacy of a proposed class action settlement. In making this assessment, other circuits

generally consider the *negotiating process* by which the settlement was reached and the

substantive fairness of the terms of the settlement compared to the result likely to be reached at

trial." In re Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 206 (D. Me. 2003) (emphasis added).

If "the settlement negotiations are biased, or skewed by a conflict of interest, we cannot presume that the attorneys have reached a fair settlement." City, 100 F.3d at 1043-44. "The storm warnings indicative of collusion are a `lack of significant discovery and (an) extremely expedited settlement of questionable value accompanied by an enormous legal fee.'" Lupron, 228 F.R.D. at 94.

In this case, it is not only storm warnings of collusion which abound, but warnings indicating a "perfect storm:"

(1)     Lead Counsel agreed to settle without having propounded any formal discovery. The only discovery (other than the judicially mandated initial disclosures) that has been produced by Gillette is "*confirmatory*" discovery.

(a)     With respect to the initial disclosures, Gillette produced only the discovery Gillette produced to Schick in Connecticut, not the discovery produced *from Schick to Gillette*.

(b)     With respect to "confirmatory" discovery, Lead Counsel has failed to obtain any of the underlying data for the sales, pricing, and profits information shown on GLTE 000001-14, 33-35. Lead Counsel has failed to do so even though Mr. McNamara

[REDACTED]

34

(c)    Discovery in this case has been inadequate and has left Lead

Counsel unarmed.  For example, Lead Counsel has failed to depose anyone at Gillette to counter

Gillette's consumer studies, and Lead Counsel has failed to retain any experts.  Curiously, Lead

Counsel fails to provide the Court with any of the documents that were produced by Gillette,

which would  help begin to educate the Court as to the merits of the class members' claims.

(2)    The result is a settlement that is not meaningfully improved from Gillette's

original settlement offer, and, in some aspects, inferior from Gillette's original settlement offer,

by, *inter alia*, (a) including a ceiling on the amount of recovery for the class, (b) retaining the

claims made settlement and retaining the onerous and cumbersome restrictions on the claims,

designed to result in a virtually zero percent claims participation rate for refunds and rebates

(actually coupons due to the claim restrictions), and (c) instead of a fluid recovery method

designed to prevent Gillette from retaining its illicit profits, creating a ***marketing scheme***

designed to allow Gillette to profit from increased sales of its blades that will result in the flood

of over 700,000 "Settlement Razors" into the market, turning the fluid recovery into a profit

center, making the fluid recovery more egregious than a reverter provision.

(3)    Adding insult to injury, the settlement contains a proposed ***release*** that is overly

broad, releasing Gillette all known and unknown claims, ***not limited to only claims based on***

***false advertising regarding the representations regarding hair raising and hair extension***.

(Settlement Agreement ¶¶ 1.16, 1.25, 6.1.) *See, e.g.*, <u>Browning v. Yahoo! Inc.</u>, 2006 U.S.Dist.

LEXIS 34770, * 8-12 (N.D. Cal. 2006).

(4)    In exchange for this settlement, Gillette agreed to pay $1.85 million in attorneys

with a ***clear-sailing provision***. *See* <u>Weinberger v. Great N. Nekoosa Corp.</u>, 925 F.2d 518 (1st

35

Cir. 1991) (inclusion of a clear sailing agreement, ancillary to a class action settlement, required

heightened judicial oversight).

(5)     To chill and silence criticism of the settlement, Gillette and Lead Counsel

included in the settlement an *extortionist provision*, whose plain language prohibits the award of

attorneys' fees and incentive fees to plaintiffs who do not consent to the settlement. (Settlement

Agreement ¶¶ 1.11, 1.14, 7.2, 7.3.)

(6)     Even today, following the "clarification" compelled by the Court at the October

18, 2006 hearing, where the settlement proponents were forced to agree that the language of the

settlement shall be interpreted to allow plaintiffs who object to the settlement to receive

incentive awards and attorneys' fees (*see* Transcript at 26:2 - 32:23), there is no evidence that

this "clarification" has been communicated to plaintiffs' attorneys who were not present at the

October 18, 2006 hearing. And, no addendum to the settlement setting forth this "clarification"

has been filed or served on the parties. (*See* Transcript at 32:21-23.)

(7)     Gillette used its settlement offer to splinter the plaintiffs and to engage in a

reverse auction. Gillette sent its settlement offer in July 2005 to all of the plaintiffs, but then

engaged in settlement discussions with only the plaintiffs that made the low counter-offers,

which plaintiffs included those within the *Dearman Group* (including Co-Lead Counsel Robert

Rothman and Liaison Counsel Thomas Shapiro). (Strenio Decl., Exhibit I (Letter dated

November 18, 2005 from Ben Barnow to Harvey Wolkoff.)

(8)     Gillette disengaged in settlement discussions with those plaintiffs who had made a

higher counter-offer, which plaintiffs included those within the *McGeary Group* (including Co-

Lead Counsel Ben Barnow), who themselves accused the *Dearman Group* of engaging in a

reverse auction. (*Id.*) But, of course, the *McGeary Group* was also attempting to engage in a

reverse auction, when viewed against the Atkins Group. The *McGeary Group* was competing

against the *Dearman Group* to be the first to obtain a settlement.

(9)     Gillette informed those that did not engage in settlement discussions but instead

sought discovery and to actively prosecute their cases, which plaintiffs included those within the

*Atkins Group* (including Plaintiff Corrales' counsel), that they would be shut out of the

settlement discussions if they did not cooperate with Gillette, with the implicit threat that only

those who achieve a settlement will receive attorneys' fees. (Declaration of Taras Kick dated

February 24, 2006, attached as Exhibit L to Strenio Decl.) Plaintiff's counsel rebuffed Gillette's

illicit offer.

(10)     The *Dearman Group* then sought to gain control of all the cases by first seeking

the creation of an MDL proceeding. The *Dearman Group* filed the Section 1407 transfer motion,

which Gillette supported and Plaintiff opposed. (Strenio Decl., Exhibits J and K.) Those

plaintiffs filed the 1407 transfer motion despite the fact that MDL proceedings are widely viewed

as favoring the defendant, and, in recognition of this fact, CAFA itself precludes the creation of

an MDL proceeding if the majority of the plaintiffs do not consent. *See* Delaventura, 417

F.Supp.2d at 149-57. And, instead of asking that the actions be transferred to the United States

District Court for Connecticut, where Judge Hall entered the preliminary injunction against

Gillette, those plaintiffs asked that the actions be transferred to Boston, where Gillette is

headquartered, and where the *Dearman Group*, including Thomas Shapiro, already had filed

complaints. After the JPML at the hearing on the 1407 transfer motion asked the movants why

were they seeking transfer to Boston instead of Connecticut, but before the JPML granted the

motion and transferred the actions to Boston, the *Dearman Group* filed a class action complaint (*Geis*) in Connecticut to obtain a foothold there in the event that the JPML granted the motion but transferred the actions to Boston.

(11)    The *Dearman Group* then sought to gain control of the litigation of all the cases by seeking to be appointed as Lead Counsel.

(12)    Prior to the hearing on the appointment of Lead Counsel, the *Dearman Group*, under the pretense of arranging a democratic meeting of all plaintiffs' counsel to discuss plaintiffs' counsel structure, organized a meeting to be held in Boston. (Strenio Decl., Exhibit M.) Yet, the *Dearman Group* had already agreed among themselves as to the plaintiffs' counsel structure. (Declaration of Reginal Terrell ("Terrell Decl."), attached as Exhibit N to Strenio Decl.) The *Dearman Group* attempted to limit participating in the meeting by giving short notice of the meeting and by failing to allow telephonic participation in the meeting, and then trying to cover it up by misrepresenting that the hotel where the meeting was held did not have teleconference capabilities. (Kick Declaration ¶¶ 4-6, attached as Exhibit L to Strenio Decl.). And, then, at the meeting, the *Dearman Group* presented their pre-ordained plaintiffs' counsel structure to the few other plaintiffs' attorneys who appeared. (Terrell Decl., attached as Exhibit N to Strenio Decl.)

(13)    The fight over the appointment of Lead Counsel was among the three groups: (1) the *Dearman Group*; (2) the *McGeary Group*; and (3) the *Atkins Group*, who had elected Plaintiffs' Counsel to act as Lead Counsel. (Transcript of March 6, 2006 hearing, attached as Exhibit D to Strenio Decl.) At the hearing on the appointment of Lead Counsel, Gillette represented to the Court that it thought that the attorneys who would not provide adequate

38

representation was Plaintiffs' Counsel. (*Id.*) Instead of appointing Plaintiffs' Counsel to act as Lead Counsel, the Court appointed co-Lead Counsel, Robert Rothman from the *Dearman Group* and Ben Barnow from the *McGeary Group*, and appointed Thomas Shapiro from the *Dearman Group* to act as Liaison Counsel. (Strenio Decl., Exhibit O.)

(14)    Once Co-Lead Counsel (hereinafter referred to as Lead Counsel) was appointed, Lead Counsel did not prosecute the action, but instead continued with settlement discussions.

(15)    In an attempt to shut out all plaintiffs who could pose a threat to the *Dearman Group*'s plan, Liaison Counsel attempted to prevent Plaintiff from obtaining any of the documents that Gillette was forced to produce via the initial disclosures. Liaison Counsel provided those documents to Plaintiff only after being compelled by the Court to do so. (Transcript of July 7, 2006 hearing (Strenio Decl., Exhibit C.)

(16)    In an additional attempt to conceal information from Plaintiff, Lead Counsel failed to inform Plaintiff of the settlement discussions. Lead Counsel provided Plaintiff with some of the sales, pricing, and profit numbers (those they represented they could recall without reference to any notes) that Gillette had orally presented to Lead Counsel in a presentation made on May 25, but only after Plaintiff was forced to move to compel disclosure of the information.

(17)    Yet, even today, Lead Counsel fails to inform Plaintiff of the terms of the demands, offers, or counter-offers, if any, made by any party including Gillette after Gillette made its settlement offer in July 2005, and the dates those demands, offers, and counter-offers were communicated from or to Gillette. (Strenio Decl., Exhibits F and H.)

(18)    According to the settlement proponents, Lead Counsel reached agreement on the material terms of a settlement with Gillette in July 2005, spending the next months documenting the agreement.

(19)    The attorneys' fees represent over 35% of the $5.05 million "value" of the settlement to class members, for a case that Lead Counsel simply piggybacked on the Schick action. Moreover, despite this Court's request for the time entries to evaluate the attorneys' fees request, Lead Counsel fails to submit to this Court (or even to Plaintiff) any time entries, but instead only meaningless general summaries – even though Lead Counsel, on October 20, 2006, asked all plaintiffs' attorneys for their detailed time entries by October 26, 2006 (Strenio Decl., Exhibit X), which Plaintiffs provided to Lead Counsel.

(20)    Despite the settlement proponents' representation that attorneys' fees were negotiated after the agreement was reached on the substantive terms of the settlement, the settlement proponents offer no evidence to support this assertion. They fail to inform the Court of the first date that attorneys' fees were mentioned in settlement discussions.

In short, the settlement bears all the indicia of collusion, not just a "storm warning," but a proverbial Massachusetts "perfect storm." This is not surprising given that it is the result of a reverse auction. Professor John Coffee defines the term "reverse auction" in the class action settlement context as follows:

> "a jurisdictional competition among different teams of plaintiffs' attorneys in different actions that involve the same underlying allegations. The first team to settle with the defendants in effect precludes the others (who may have originated the action and litigated it with sufficient skill and zeal that the defendants were eager to settle with someone else)."

John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev.

1343, 1370 (1995).

A defendant, such as Gillette commences and exploits the reverse auction scenario by

doing exactly what it did in this case, sending a settlement offer to all the plaintiffs in competing

class actions:

> "Even in the absence of bad faith, suspect settlements result in large measure because of
> the defendants' ability to shop for favorable settlement terms, either by contacting
> multiple plaintiffs' attorneys or by inducing them to compete against each other. At its
> worst, this process can develop into *a reverse auction, with the low bidder among the
> plaintiffs' attorneys winning the right to settle with the defendant.* . . . In overview, the
> critical factor essential to collusion is competition among teams of plaintiffs' attorneys
> that the defendants can exploit. . . . The practical impact of this approach is that it allows
> the defendants to pick and choose the plaintiff team with which they will deal. . . . Once
> rival plaintiff teams are in competition with each other, and each is able to agree to a
> binding settlement of a nationwide class action, the `reverse auction' can begin. *No
> explicit agreement among the participants is needed; all that is necessary is that each
> team of plaintiffs' attorneys sees that it can be divested of any participation in the
> action unless it reaches a settlement with the defendants first.* Already, there have been
> indications that such an auction, once unique to the corporate and securities arena, is
> developing in mass tort cases as well."

Id. at 1354-1355, 1371, 1372;  John C. Coffee, Jr., Class Action Accountability: Reconciling

Exit, Voice, and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370, 392 (2000)

("both teams have an incentive to strike an early deal with the defendants, and the defendants can

in turn exploit this leverage and force an auction between these rival teams to see which will

make (or accept) the lowest settlement offer").

This is not merely an academic issue.  In In re Community Bank of N. Va. & Guar. Nat'l

Bank of Tallahassee Second Mortg. Loan Litig., 418 F.3d 277 (3d Cir. 2005), the Third Circuit

Court of Appeal reversed and remanded a district court's settlement approval for failure to

engage in independent Rule 23(a) and (b) inquiry.  The appellate court specifically considered the reverse auction problem:

> "Finally, we cannot avoid consideration of the issue of potential collusion. This court, as well as others, have commented extensively on the collusive dangers inherent in a settlement-only class action. . . . The United States Court of Appeals for the Seventh Circuit has noted the possibility that `the settlement agreement is the product of a 'reverse auction,' the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement within the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.'"

Id. at 308 (citations omitted); cf. Lupron, 228 F.R.D. at 94 ("[t]his would be a persuasive argument if it were true").

And, in Reynolds v. Benefit Nat'l Bank, 288 F.3d 277, 282 (7th Cir. 2002), cited by Community Bank, the order approving the settlement was reversed for possible collusion and reverse auctioning, where the appellate court concluded:

> "Although there is no proof that the settlement was actually collusive in the reverse-auction sense, the circumstances demanded closer scrutiny than the district judge gave it.  He painted with too broad a brush, substituting intuition for the evidence and careful analysis that a case of this magnitude, and a settlement proposal of such questionable antecedents and circumstances, required."

**B.     The settlement is not fair, reasonable, and adequate.**

> **1.     The settlement is not fair, reasonable, and adequate in light of the strength of the class members' case and the amount of the lass members' damages and Gillette's profits.**

The settlement is not fair, reasonable, and adequate in light of the strength of the class members' case and the amount of the class members' damages and Gillette's profits. *See* Lupron, 228 F.R.D. at 93-94 (factors deemed to be appropriate for consideration of whether a settlement is fair include, among others, "the risks of establishing liability," "the risks of establishing damages," "the range of reasonableness of the settlement fund in light of the best

42

possible recovery," and "the range of reasonableness of the settlement fund to a possible recovery

in light of all the attendant risks of litigation"); City of Detroit v. Grinnell Corp., 495 F.2d 448

(2ⁿᵈ Cir. 1974).

"In applying this test of reasonableness, 'the present value of the damages plaintiffs

would likely recover if successful, appropriately discounted for the risk of not prevailing, should

be compared with the amount of the proposed settlement.' Lupron, 228 F.R.D. at 97 (quoting In

re General Motors Trucks, 55 F.3d at 806); Compact Disc, 216 F.R.D. at 207 ("Obviously, the

first and fundamental question is how the value of the settlement compares to the relief the

plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and

expense"). As the Seventh Circuit Court of Appeal recently explained:

> "The 'most important factor relevant to the fairness of a class action settlement' is . . .
> 'the strength of plaintiff's case on the merits balanced against the amount offered in the
> settlement.' In re General Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1132
> (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION § 1.46 at 56 (4th
> ed. 1977)). In conducting this analysis, the district court should begin by 'quantify(ing)
> the net expected value of continued litigation to the class.' [Reynolds v. Beneficial Nat'l
> Bank, 288 F.3d 277, 284-85 (7th Cir. 2002).] To do so, the court should 'estimat(e) the
> range of possible outcomes and ascrib(e) a probability to each point on the range.' Id. at
> 285. Although we have recognized that '(a) high degree of precision cannot be expected
> in valuing a litigation,' the court should nevertheless 'insist() that the parties present
> evidence that would enable () possible outcomes to be estimated,' so that the court can at
> least come up with a 'ballpark valuation.' Id. at 285."

Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7ᵗʰ Cir. 2006); see

Mirfasihi, 450 F.3d 745, 749 (7ᵗʰ Cir. 2006) (the district court's "duty" in a class action

settlement is "to estimate the litigation value of the claims of the class and determine whether the

settlement is a reasonable approximation of that value").

a.   **Virtually no consumer class action case is stronger on the merits than this case, where a United States District Court has issued a preliminary injunction against Gillette, after finding that its advertisements were not only deceptive, but literally false.**

Gillette falsely represented to consumers in its advertising that the M3P razor causes facial hair to raise up (hair raising / extending claims) and away (hair angle changing claims).[17]

Virtually no consumer class action case is stronger on the merits than this case. A United States District Court issued a preliminary injunction against Gillette, not only forcing Gillette to cease the false advertising but also to sticker the false representations made on the packages themselves.

As for the hair angle-changing claims, the evidence is so strong that the hair angle-changing claims were false that Gillette itself "*conceded*" during the four-day preliminary injunction hearing held in April and May, 2005, that "the M3 Power oscillations do not cause hair to change angle on the face," *i.e.*, that the claims are *false*. (Preliminary Injunction Ruling dated May 31, 2005 at 7, attached as Exhibit A to Strenio Decl. (emphasis added).) As Judge Hall concluded, those claims are "*unsubstantiated and inaccurate*." (*Id.* (emphasis added).) In fact, after the court in the Schick action in Germany issued a preliminary injunction, Gillette

---

[17] The underlying facts, including expert witness testimony, are expounded upon in Kasem Adoure's application for a preliminary injunction and the exhibits to the related request for judicial notice, attached as Exhibits Y and AA1-16 to the Strenio Decl., which are incorporated herein by this reference. The facts would be amplified more had Lead Counsel obtained the discovery that Schick produced to Gillette in the Schick actions, and had requested experts perform their own consumer testing, and had obtained all of Gillette's consumer and marketing testing, and had conducted confirmatory discovery, let alone adversarial discovery, regarding Gillette's consumer testing, instead of being content with the discovery Gillette produced to Schick.

ceased the false hair angle-changing claim on television in the United States "based on [t]he German litigation" and Schick's "discomfort" with certain claims in the advertising. (*Id.* at 6-7.) But, even though Gillette knew the hair angle-changing claim was false, Gillette continued to make this claim on the razor packaging and on the Internet. (*Id.* at 7.)

As for the hair raising / extending claims, Gillette simply has no defense. Gillette has no evidence to support the truth of those claims. Schick "***proved*** that Gillette's testing is inadequate to prove [hair raising] does occur." (*Id.* at 8 (emphasis added).)

Moreover, Gillette "***conceded***" that the animated portion of its television advertisements were false because it was not "physiologically exact" as the hairs and skin do not appear as they would at such a level of magnification and "the hair extension effect is, in Gillette's words, `***somewhat exaggerated.***'" (*Id.* at 7-8 (emphasis added).) Judge Hall, however, found that the hair extension effect is "***greatly exaggerated.***" (*Id.* at 8.)

Judge Hall firmly grounded this finding on the testimony of Dr. David Leffell, Professor of Dermatology and Chief of Dermatologic Surgery at the Yale School of Medicine. Dr. Leffell testified that, based on his clinical and dermatological expertise, "he is aware of no scientific basis for the claim that the oscillations of the M3 Power would result in hair extension, as Gillette contends. Dr. Leffell says that Gillette's `hair extension' theory is inconsistent with his 20 years of experience in dermatology." (*Id.* at 8.) The Court rejected as unreliable Gillette's testing performed in the early 1990s that Gillette asserted supported its claim of hair extension; the test sample was small, the test included no efforts to keep constant the variables of pressure on the razor or the speed of the shaving, and the summaries of the testing were purporting to memorialize the testing were prepared in anticipation of litigation in late 2004. (*Id.* at 9-11.)

45

The tests were "suspect." The Court also rejected as unreliable Gillette's "confirmatory" testing of the product on only four test subjects in 2003 using a prototype that was different than the M3Power marketed product. (*Id.* at 11.) "The sample size of four was chosen because the 2003 study, according to Gillette, was merely `confirmatory'" of the early 1990s tests Judge Hall found deficient. (*Id.* at 11 n. 4.)

Furthermore, Gillette *knew* that the advertising exaggerated the extension because "*[i]ts own tests* show hairs extending approximately 10% on average, when the animation shows a significantly greater extension." (*Id.* at 7, 21 (emphasis added).) The animation is not even a "reasonable approximation." (*Id.*) Consumers "can point to Gillette's own studies to prove that the animation is false." (*Id.*) And, Gillette's contention that an animated portion of its advertisement need not be exact is wrong "as a matter of law . . .[;] a party may not distort an inherent quality of its product in either graphics or animation." (*Id.*) "Gillette acknowledges that the magnitude of beard extension in the animation is false." (*Id.*)

Gillette continued the false advertising despite the fact that Dr. Kevin Powell, the Director of Gillette's Advanced Technology Center in Reading, England, advised Gillette's in-house counsel and other high-level Gillette employees that the pre-launch and launch ad campaign for the M3P were "physiologically incorrect." (*See Schick* Hearing Transcript at 432:4-433:17, attached as Exhibit AA15 to Strenio Decl.)

Further, Peter Clay, the Gillette executive in charge of the advertising campaign for the M3P, has testified that Gillette made no effort to verify the accuracy of key elements of the M3 Power advertising campaign. (*See Schick* Hearing Transcript at 100:18-101:23, 109:19-109:22, 112:9-112:11, 114:11-117:22, attached as Exhibit AA15 to Strenio Decl.) Mr. Clay further

46

testified that Gillette lacked substantiation for many of the characteristics of the M3P that were touted in Gillette's advertising and that Gillette considered important in convincing consumers to buy the product. (*See Schick* Hearing Transcript at 100:18-101:23, 109:19-109:22, 112:9-112:11, 114:11-117:22, attached as Exhibit AA15 to Strenio Decl.)

In short, Plaintiffs' claims against Gillette are so strong that Judge Hall found that both Gillette's hair angle-changing claims and Gillette's hair extending / raising claims (in terms of magnitude and frequency) are *"literally false."* (*Id.* at 22, 23 (emphasis added).)[18] And, while Judge Hall did not find at the preliminary injunction stage that Gillette's claim of hair extension (in contrast to the claims of the frequency and magnitude of the hair extension) was false, she did so only because no testing could confirm that, and she expressed "doubt" about the veracity of Gillette's claim. (*Id.* at 22.) *Gillette's own expert admitted that there was no scientific foundation for its claim.* (*Id.*) Yet, Gillette made the claim nonetheless, failing to inform consumers that it had no scientific basis for making the claim.

Gillette's false advertising caused consumers damages because it is indisputable that the false advertising was material. As Judge Hall smartly found:

"Of Gillette's expenditures on advertising, 85% is spent on television advertising. At the time of the launch [of the M3P], the television advertising [contained the hair raising /

---

[18] In denying Gillette's motion to clarify the Preliminary Injunction so as to limit its applicability to claims including the word "raise," Judge Hall clarified that Gillette' use of the term "up and away" in conjunction with the term "stimulates" in its advertising "is literally false as it connotes an angle change. `Stimulates' with `up' alone or `away' alone would not, but together state a message that is more than mere extension." (Clarification Ruling, p. 2.) Judge Hall noted that "[t]he Court specifically addressed `raises up and away' as literally false in its May 31, 2005 Ruling, at p. 20, n. 5. The word `stimulates' does not alter the meaning when used in conjunction with `up and away.' Assuming the two words are not redundant, together they must mean more than extension of the hair, but also a change in relation to the face, as an angle change." (*Id.* at p. 2 n. 1.)

extending claims and the angle-changing claims.] . . . Television advertisements aim to provide consumers a `reason to believe,' that is, the reason consumers should buy the advertised product. Because of the expense of television advertising, companies have a very short period of time in which to create a `reason to believe' and are generally forced to pitch only the key qualities and characteristics of the product advertised. . . . It is clear that whether the M3 Power raises hairs is material. Gillette's employees testified that television advertising time is too valuable to include things that are `unimportant.'' Furthermore, in this case, hair extension is the `reason to believe' that the M3 Power is a worthwhile product. The magnitude and frequency of that effect is also, therefore, material. Whether a material element and frequency of a product's performance happens very often and how often that element happens are, in themselves, material.'' (*Id.* at 5-7, 23.)[19]

The fact that Gillette spent ███████████ during the class period on television advertising in addition to touting these false claims on the razors packaging belies their contention that causation would be difficult to prove.

———————————————

[19] Parenthetically, the Federal Court of Australia, in issuing a preliminary injunction on February 25, 2005, found that, "[i]f the representations are false, then consumers will be mislead into buying a much more expensive product than the March 3 Turbo on a false premise'' and "[t]here is evidence . . ,. which I accept, that innovations in razor technology are a strong driver for commercial sales, and may enable a premium price to be charged for the product.'' (Ruling by the Federal Court of Australia, entered on February 25, 2005, in *Energizer Australia Pty Ltd. v. Gillette Australia Pty*, attached as Exhibit A to Schick's Reply Brief filed in support of its motion for a preliminary injunction in the Schick Action, at 13-14, attached as Exhibit AA10 to Strenio Decl.) As the court continued: "I do not accept Gillette's contention that harm to consumers is not demonstrated if the matters of which [Schick] complains are untrue. The argument that consumers will suffer no harm even if those claims are wrong because (for whatever reason) the razor in fact shaves closer assumes that to be the case. There is no evidence that the M3 Power razor in fact shaves closer than other razors, hence the argument cannot be sustained. In any event, it overlooks the evidence that *claimed innovations in shaving technology are a strong driver for commercial sales, and at a premium price*.'' (*Id.* at 15.)

        **b.**      **The value of the settlement is inadequate in light of the class members' remedies.**

Viewed in the light of the strength of the class members' case, the value of the settlement is woefully inadequate, especially given the class members' remedies, and in light of California class members' remedies of damages, punitive damages, restitution, restitutionary disgorgement of profits, fluid recovery, and corrective advertising.

[REDACTED]

[REDACTED]

[REDACTED]

51

[REDACTED]

52

[REDACTED]

[REDACTED]

[REDACTED]

## 2.    The settlement is not fair, reasonable, and adequate because it is nothing but a marketing scheme for Gillette.

The settlement is not fair, reasonable, and adequate because it is nothing but a marketing scheme.  As explained below, the settlement's provisions are designed to result in virtually no cash distribution to class members in order to trigger the flood of "Settlement Razors" (Fusion manual razors) into the market to enable Gillette to reap the profit from the sale of replacement blades.

[REDACTED]

### a.    The settlement will result in a participation rate of next to zero.

The settlement is a claims made settlement. To receive any distribution from the settlement, the class member must submit a claim. (Settlement Agreement ¶¶ 2.1.) Plaintiff fails to understand Lead Counsel's contention that "[t]his is not a claims made settlement." (Pltfs. Supp. Mem. at 1.) Lead Counsel's contention is even more remarkable in light of the Court's recognition at the Penultimate Preliminary Approval Hearing that: "This is a claims made settlement." (Transcript at 34:16-17.)

The settlement, however, as currently proposed, is intentionally designed to result in a participation rate of next to zero. The settlement proponents know this.

After all, the settlement proponents critically omit informing the Court of their estimate of the participation rates for each of the categories of distribution under the settlement.

This omission speaks volumes given that the Court, at the Penultimate Preliminary Approval Hearing, recognized that this information is vital to assessing the value of the settlement and requested the information from the settlement proponents:

> "THE COURT. Right. But just let me ask this: This is a claims made settlement. I assume that whoever is doing the economics of this for you has thought through what the likelihood of returns is."

(Transcript at 34:16-21.)

In a normal consumer class action settlement, where a consumer must submit only a claim form to receive a cash distribution (without the requirement of returning the product or providing a UPC code from the product's package or a receipt showing purchase of the product), the participation rate is only ten percent (10%) or less. As a sister court within the First Circuit Court of Appeal recognizes, in language as if written for this case:

56

"Unfortunately, when this matter first came before the Court from preliminary approval in July 2004, the Court was not independently aware (nor did any proponent of the settlement bring to the Court's attention) what the parties and the Settlement Administrator already knew -- namely, that *`claims made' settlements regularly yield response rates of 10 percent or less*. . . . Of course, this cap and the parties' expectations of a low response rate gives the reverter clause real value for Defendants. Likewise, the clear sailing provision, which guarantees that Defendants will not object to Plaintiffs' Counsel essentially seeking 30 percent of the entire settlement fund -- regardless of how much is disbursed to the class, gives this settlement real value for Plaintiffs' Counsel. The Court does not mean to suggest that each of these features (*i.e.*, claims made settlements, payout caps based on 100 percent response rates, reverter clauses, or clear sailing provisions) is per se unacceptable. However, this case provides a telling example of how these features can work in concert to produce a settlement that is unfair, inadequate and unreasonable and that in practice yields comparably little value for the Class."

Sylvester v. Cigna Corp., 369 F. Supp. 2d 34, 52-53 (D. Me. 2005).

Here, the participation rate will be even less than 10%, approaching 0%. This is because the settlement places extraordinarily onerous and cumbersome conditions on a class member's ability to receive a cash distribution.

In order to obtain a $13 refund, the class member has to mail in his razor (Settlement Agreement ¶ 2.1(b)(i)), or, in order to obtain a $5 rebate, the class member has to mail in a UPC code from the package or the receipt (Settlement Agreement ¶ 2.1(b)(ii)).

With respect to the $13 refund, only a small amount of the putative class members will go through the hoops of filling out the claim form, then taking the wet M3Power razor from the bathroom counter or cabinet, going to the post office, getting the razor weighed, buying postage, addressing the envelope, mailing it, and then stopping by a store on the way home to purchase a brand new razor and blades at a substantial cost (perhaps, as Gillette hopes, trading up to the even more expensive Fusion Power razor and blades to generate more profit for Gillette). How many class members does lead counsel estimate will do this?

57

With respect to the two $5 rebates, only a small amount of the putative class members will still have the receipt or the package with the UPC code for the M3Power blade or Fusion razor package, let alone two receipts and two packages.

While the settlement proponents suggest that class members may obtain a rebate for future purchases made prior to the end of the Initial Claim Period (60 days following the date notice is published), this then becomes nothing more than a ***coupon settlement***. Rebates are coupons, and, are actually worse for consumers than coupons, because they are a forced short-term loan to the defendant until the consumer receives the rebate back in the mail.

Coupon recoveries for class actions have been widely criticized both by Congress in the CAFA and the courts. As the Seventh Circuit Court of Appeal recently summarized:

> "[C]oupons [are] a method of compensation that has been widely criticized. See, e.g., Christopher R. Leslie, `The Need To Study Coupon Settlements in Class Action Litigation,' 18 GEO. J. LEGAL ETHICS 1395, 1396-97 (2005) (identifying three problems with coupon settlements: (1) it is doubtful that they `provide meaningful compensation to most class members'; (2) they often `fail to disgorge ill-gotten gains from the defendant'; and (3) they may force class members `to do future business with the defendant'); Geoffrey P. Miller & Lori S. Singer, `Nonpecuniary Class Action Settlements,' 60 LAW & CONTEMP. PROBS. 97, 108 (1997) (noting that for many consumers `the right to receive a discount (or coupon) will be worthless'). . . . [W]e note that in [the CAFA] Congress required heightened judicial scrutiny of coupon-based settlements based on its concern that in many cases `counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value.' Pub. L. 109-2, § 2(a)(3)(A), 119 Stat. 4, 4. We recognize that the pre-paid envelopes are not identical to coupons, since they represent an entire product, not just a discount on a proposed purchase. Nonetheless, they are a form of in-kind compensation that shares some characteristics of coupons, including forced future business with the defendant and, especially for heavier users, the likelihood that the full amount of [defendant's] gains will not be disgorged."

Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7ᵗʰ Cir. 2006); *cf.* In the Matter of: Mexico Money Transfer Litigation, 267 F.3d 743, 748 (7ᵗʰ Cir. 2001) ("coupons

serve as a form of advertising for the defendants, and their effect can be offset (in whole or in part) by raising prices during the period before the coupons expire.  Maybe class actions would be prosecuted more vigorously if the class and class counsel had to accept the same coin").

> **b.**    **Because the claims participation rate for refunds or rebates will be minuscule to none, the settlement will result in a flood of 721,428 Fusion manual razors ("Settlement Razors") into the market to enable Gillette to profit from the sale of replacement blades.  Thus, the settlement as currently proposed is little more than a promotion for Gillette.**

Because the claims participation rate for refunds or rebates will be minuscule to none, the settlement will result in a flood of 721,428 Fusion manual razors ("Settlement Razors") into the market to enable Gillette to profit from the sale of replacement blades ($5,050,000 ÷ $7.00 = 721,428).

Such in-kind compensation is unfair in and of itself.  *See* <u>Synfuel</u>, 463 F.3d at 654 ("Our confidence in the fairness of the settlement is further undermined by the agreement's bias toward compensating class members with pre-paid Letter Express envelopes instead of cash.  Pre-paid envelopes, like coupons, are a form of in-kind compensation.  `(C)ompensation in kind is worth less than cash of the same nominal value'").

But, here, this in-kind compensation is especially egregious because it is nothing more than a marketing scheme, designed to cause consumers to "trade up" to the more expensive razor, which is more profitable for Gillette.   Unlike here, at least in the Letter Express settlement there was no self-defined tie-in from the in-kind settlement to future purchases of the defendant's products, yet that settlement still was frowned upon by the court.

To have any value, the consumer must continue to do business with Gillette and must purchase the incredibly expensive replacement blades, turning this fluid recovery into a lucrative marketing scheme for Gillette.

The reason Gillette wants to get 721,428 Fusion Razors into the hands of consumers is because of the profits to be gained by the consumers' purchase of the replacement blades for the razors. As <u>Business Week Online</u> explains:

"Forget about the price of gas. The most dramatic inflation news this summer involves razor blades. Gillette is charging $27.99 for eight of the high-tech cartridges that snap onto its much-hyped, battery-powered Fusion Power, the first razor with five blades (six, if you count the `precision trimmer' on the back). That works out to about $3.50 a cartridge, a level that would have seemed every bit as unimaginable a few years ago as $3-a-gallon unleaded gas. Of course, getting men to spend more money than they ever dreamed possible on razor blades is a specialty at Gillette. Starting with the two-bladed Sensor in 1990, the company has devoted immense scientific and marketing resources to what was once one of the most humble products in the medicine cabinet. And it has raked in unprecedented profits with each increase in price and blade count. In fact, between 1997 (the year before it rolled out Mach3, the first triple-bladed razor) and 2004, Gillette's overall blade and razor sales soared nearly 50%, even though underlying demand barely budged, increasing in line with population. That's a big reason why Procter & Gamble paid a premium price of $57 billion last year to buy the company in the biggest consumer-products deal ever. But now a fierce debate is raging about whether Gillette's venerable business model is finally hitting the wall. The critics, including a number of analysts and some retailers, say they are disappointed with sales of Fusion and argue that it is lagging behind the wildly successful launch of Mach3 eight years ago. They reason that Gillette has finally hit the ceiling on what it can charge for its top-of-the-line razors. `They have pushed the model to its limit,' says Douglas Christopher, an analyst at Crowell, Weeden & Co. . . . One unhappy customer is Shawn Phillips of Chicago. The 25-year-old is just the kind of early adopter Gillette likes to attract. ***He bought a Fusion starter kit for next to nothing soon after the launch in January***. But the customer-service representative has already gone back to his three-bladed Gillette Mach3, largely because ***Mach3 cartridges cost 40% less***. `The Mach3 works just as good as Fusion,' he says. `It's not worth the price difference.' . . . ***Fusion blade prices – at about $3 a cartridge for the manual model – were more than 80% higher than what Gillette charged for the first Mach3 cartridges back in 1998***. Similarly, Fusion Power cartridges were priced around $3.50 apiece, some 30% higher than those for M3Power. . . . As for price cuts, [Peter Hoffman, head of P&G's Global Glooming Division] says that retailers, not P&G, make the decisions about how to price

razors and blades.  CVS (CVS), which claims to sell more blades and razors than anyone except Wal-Mart (WMT), has been especially aggressive in promoting Fusion.  Around Father's Day, for instance, it offered customers buying a Fusion a $6 credit for any other purchase in its stores.  Mike Bloom, senior vice-president of merchandising at CVS, says these promotions were part of their launch plan for Fusion all along.  At this stage, `***pushing handle sales is the key to success***,' he says.  `This has been a very successful launch for us.  We are getting way more than our fair share.'  Nevertheless, Ahneman of American Safety Razor contends Gillette is likely to continue to face pricing resistance on Fusion, which could ultimately force it to reduce prices.  He says his company's research shows that 64% of men look at the price of blades before buying the handle, which undercuts ***Gillette's strategy to offer handle discounts to eventually drive cartridge sales***.  `They are getting to the point where they are pricing themselves out of the market,' he says."

Business Week Online, "Gillette's Lost Edge?;  As P&G's razor unit struggles with the Fusion

launch, critics wonder whether the business model behind the phenomenal Mach3 has gone

dull," August 3, 2006.

[REDACTED]

61

[REDACTED]

62

[REDACTED]

63

[REDACTED]

In short, the settlement is an ingenious marketing scheme. What is truly baseless is Lead

Counsel's naked assertion that "[i]t is baseless for Corrales to claim that this settlement, which

makes Gillette to make cash payments to any Class Member who wants one, is a marketing plan

for Gillette." (Pltfs. Supp. Mem. at 8.)[20,] [FOOTNOTE REDACTED]

Most ironically, despite Lead Counsel's apparent pride in not including a "reverter"

provision in the settlement (Pltfs. Supp. Mem. at 1), a "reverter" provision would actually be an

improvement over the marketing scheme masquerading as "fluid recovery." Instead of a

---

[20] Lead Counsel's statement is especially incredible given that the Settlement Agreement itself acknowledges that the settlement is a marketing scheme. Paragraph 2.4 provides that "All parts of this settlement are separately-funded responses by Gillette to provide the Settlement Class with valuable consideration and are not part of any existing or planned promotion and no future promotions will be reduced to reimburse Gillette for any distribution of refunds, rebates, or razors under this settlement." Of course, all this means is that the settlement will allow Gillette to sell more blades, not the same amount of blades that it would have sold absent the settlement. *See, e.g.,* In re Compact Disc Minimum Advertised Price Litig., 216 F.R.D. 197, 220-21 (D. Me. 2003) ("I have no evidence that the use of the settlement discounts will displace some other more profitable sales (full price or discount) that the music clubs might make. Without that evidence, for all I know this will be just another contribution to their marketing program that will result in more profitable sales than previously, and cost them nothing as a settlement"; "there is no indication that any sales under the settlement program would substitute for more profitable sales").

[REDACTED]

[REDACTED]

In sum, the way Lead Counsel present the proposed settlement to this Court, by Gillette's own public admissions, rather than disgorging Gillette of its illicit profits, the proposed settlement, if allowed to remain by this Court in its current proposed form, is actually most likely to enrich Gillette even further for its already judicially determined false advertising.

### 3.    No legitimate reason exists to transmogrify a settlement in this case into a marketing scheme for Gillette.

No legitimate reason exists to transmogrify a settlement in this case into a marketing scheme for Gillette.

#### a.    No legitimate reason exists for the onerous and cumbersome claim requirements.

The only ostensible reason given by the settlement proponents for the onerous and cumbersome claim restrictions is that the return of the razor or the UPC code or the receipt is necessary to prevent fraud.  (Pltfs. Supp. Mem. at 8 ("there must be some mechanism to ensure that people who are submitting claims are members of the Class");  Gillette Mem. at 15 ("to protect Gillette and legitimate Settlement Class Members against fraudulent claims, some mechanism is necessary to establish membership in the Settlement Class").)

This is a red herring.

[REDACTED]

66

First, the settlement proponents offer no estimate of how many fraudulent claims would be expected to be submitted absent the onerous and cumbersome claim restrictions, making their fear of fraudulent claims nothing more than a boogeyman.

The vast majority of consumer settlements do not require the consumer to return the product or the receipt in order to obtain a recovery. *See, e.g.,* In re Compact Disc Minimum Advertised Price Litig., 216 F.R.D. 197, 213 (D. Me. 2003) ("a single claim per person avoids the worst of possible defrauding activity"; "I have already ruled that the claims process is a reasonable solution, even thought it is conceivable that some spurious claims have crept in").)

Second, even if their were fraudulent claims, the only way these fraudulent claims would deprive class members of recovery is if class members participated in a sufficient amount to compete for the $5.05 million. But, again, the settlement proponents offer no estimate of how many class members would participate.

Third, the settlement itself does not require anything other than a claim form for class members to receive a Settlement Razor under Paragraph ¶ 2.3(b) after the distribution of Settlement Razors to class members who already received a refund (and already own a new razor from buying it on the way home from mailing in the M3P razor) or a rebate:

> "To be eligible to receive a free Settlement Razor, the Settlement Class Member must provide his name and mailing address, and further certify electronically that he (i) purchased or otherwise acquired an M3Power Razor during the Settlement Class Period; and (ii) has not previously submitted a claim under the settlement. Any such information submitted shall be provided by Gillette to the Claims Administrator for determination of the claim. Eligible claims are further limited to one per Person and a maximum of three per household." (*Id.*)

So why does Gillette not care about the supposed possibility of fraudulent claims here?

67

Fourth, Gillette needs no protection against fraudulent claims because the $5.05 million

settlement fund is, by definition, capped.  It is not an open-ended settlement with no cap where

fraudulent claims might be an arguable legitimate concern.  Lead counsel and Gillette are

claiming Gillette will be paying $5.05 million;  so at a minimum, it ought to be actually required

to pay that amount.

In short, to be entitled to a refund, a class member should be required only to submit a

claim form.  Anything else is not fair, reasonable, and adequate.

### b.     No legitimate reason exists for the distribution of Settlement Razors instead of cash.

Additionally, no legitimate reason exists for the distribution of Settlement Razors to class

members instead of cash.  The settlement proponents offer no reason, let alone a valid reason for

this type of distribution.  As discussed above, this distribution is far worse than even a coupon

distribution because it is a marketing scheme that not only attempts to have consumers make a

purchase of the defendant's products, it attempts to have consumers "trade up" to a razor that

creates greater profits in blade sales for Gillette than the M3P blades.

There is also no legitimate reason for the distribution of Settlement Razors as a form of

fluid recovery.  As discussed above, such a distribution is worse than a reversion provision,[21]

---

[21] *See, e.g.*, Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1308 (9th
Cir. 1990) ("[w]hen . . . a statute's objectives include deterrence or disgorgement, it would
contradict these goals to permit the defendant to retain unclaimed funds"); Reynolds v.
Beneficial National Bank, 288 F.3d 277, 287 (7th Cir. 2002) (where the district court disallowed
the reverter provision after a class member objected to the reverter provision); In re Motorsports
Merchandise Antitrust Litig., 160 F.Supp.2d 1392, 1395 (N.D. Ga. 2001) ("In exchange for the
settlement amount, Defendants obtained release from liability with respect to the class members.
. . . Because the defendant has already conceded its potential out-of-pocket exposure for the
entire potential recovery fund as part of the settlement, *the substantive policies underlying the
statutes upon which the plaintiffs sued would dictate a preference for an appropriate cy pres*

68

because the fluid recovery method in this settlement is a profit center for Gillette.

In short, any settlement in this case should contain a fluid recovery provision that distributes the remainder of the settlement fund in cash to the next best use. The fluid recovery provision in this case violates the fundamental principles of the *cy pres* doctrine by not distributing the residue in cash to the next best use.

Of even greater concern to Plaintiff, the settlement's fluid recovery provision violates California law. In <u>State of California v. Levi Strauss & Co.</u>, 41 Cal.3d 460 (Cal. 1986), objectors to a proposed class action settlement appealed the order approving the settlement. In deciding the appeal, the California Supreme Court laid out the following test to determine whether a proposed fluid recovery method:

> "In determining which [fluid recovery] method to employ, courts should consider: (1) the amount of compensation provided to class members, including nonclaiming (or `silent') members; (2) the proportion of class members sharing in the recovery; (3) the extent to which benefits will `spill over' to nonclass members and the degree to which the spillover benefits will effectuate the purposes of the underlying substantive law; and (4) the costs of administration." (41 Cal.3d at 473.)

The fluid recovery in this case flunks the test established by <u>Levi Strauss</u>. Instead of effectuating the purposes of the underlying consumer protection statutes, including the purpose of not allowing the defendant to retain its illicit profits, the fluid recovery in this case does literally the complete opposite, creating a profit center for the defendant. Instead, any settlement in this case must include a fluid recovery provision that provides cash to consumers who have submitted claims or to a charity.

---

*distribution rather than a reversion of undistributed funds to the defendant*, the alleged wrongdoer, despite any particular disclaimer of liability in the settlement") (emphasis added).

**C.     The proposed notice is inadequate.**

Although the Court need not reach the issue because the settlement class and the

settlement fail the requirements of Rule 23, the proposed notice to putative class members is

inadequate.

First, the proposed notice misleadingly refers to the Fairness Hearing as the Final Fairness

Hearing instead of simply the Fairness Hearing.  Doing so improperly envelopes the settlement in

a false aura of judicial approval, chilling objections to the settlement.  *See* Dare v. Knox County,

2006 U.S.Dist.LEXIS 77421 (D. Me. Oct. 24, 2006) ("a judicial determination of `preliminary

fairness' unjustifiably suggests a headwind against objections to the settlement agreement").

Second, the proposed notice is incomplete.  The contemplated press release has not been

submitted for the Court's review and approval.  There is absolutely no reason for the delay in

submitting the press release for the Court's review and approval, other than to avoid Plaintiff's

and judicial scrutiny.  Gillette offers no support for its assertion that press releases are commonly

prepared "after the fact using the same or substantially similar language."

Third, the notice misleads the class by failing to inform them of the following material

facts:  (a) approximately $2.45 million of the $7.5 million settlement fund will be used for the

cost of notice, leaving $5.05 million for the                [REDACTED]

(b) Gillette has agreed to pay $1.85 million in attorneys' fees;[22]  and (c) "[i]n mid-2005, Gillette

---

[22]  Compact Disc, 216 F.R.D. 197 at 204 n. 12 ("I recognize that the National Association
of Consumer Advocates (`NACA') has advocated putting the total maximum fees, how they are
calculated, and where they came from in a plain language short-form notice . . ..  If that can be
accomplished without taking the `short' out of the short-form notice, so much the better").

deleted those misrepresentations from its ads" because a United States District Court ordered Gillette to cease making the representation after finding it to be false.

Without these few extra words, the notice leaves consumers with the impression that $7.5 million constitutes recovery to class members, leaves consumers with no information for them to determine the value of the settlement        [REDACTED]        , leaves consumers with no information to assess the reasonableness of the fees, and leaves consumers with the false impression that Gillette is a responsible citizen that removes false representations from its advertising without having to be compelled by a court. The fact that the long notice contains some of this information is insufficient because the short notice may lull class members into not looking at the long notice and because some of the information (*e.g.*, the number of class members and the preliminary injunction order) is not even contained in the long notice.

## V.    THE ATTORNEYS' FEES OF $1,850,000 DO NOT APPEAR TO BE REASONABLE.

Although the Court need also not reach the issue because the settlement class and the settlement fail the requirements of Rule 23, the proposed notice to putative class members is inadequate, the attorneys' fees of $1,850,000 do not appear to be reasonable.

*First*, this is 36% of the $5.05 million of the Settlement Fund (less the $2.45 million cost of notice). While Plaintiff does not contend that attorneys' fees of 30%, 35%, 40%, or even more in the appropriate case, this is not that case.

Here, in response to Plaintiff's CLRA demand letter served on June 8, 2005 (Cal. Civ. Code § 1782(a)), Gillette sent Plaintiff and all the other plaintiffs a settlement offer on July 7,

2005 – sent with a one-day cushion before the 30-day deadline to respond to Mr. Corrales' CLRA demand letter. (Cal. Civ. Code § 1782(b).)

The settlement entered into by Lead Counsel is actually inferior to the original offer by Gillette. Lead Counsel makes no effort to show the added value. The only real value added to the settlement was for Lead Counsel (a clear-sailing for $1.85 million) and for Gillette (a marketing scheme masquerading as fluid recovery). The absence of any real value added for the benefit of class members is the result of Lead Counsel's inadequacy of representation, including, but not limited to the failure to conduct formal discovery, failure to obtain opinions from experts, and failure to even obtain the discovery produced from Schick to Gillette.

*Second*, due to the next to zero participation rate that would exist for claims for refunds and rebates (for past purchases), the $5.05 million of the Settlement Fund is truly a coupon settlement. The rebates are a coupon because they will be used, if at all, for future purchases, as discussed above. And, the "Settlement Razors" constitute "in-kind" compensation that, in this case, is a *de facto* coupon because the class members would have to purchase the replacement blades for the razors from Gillette. CAFA's limitations on coupon settlements therefore apply. 28 USCS § 1712.

*Third*, Lead Counsel has failed to provide the Court with detailed time entries to enable to Court to determine the fees under either the lodestar approach or the percentage of fund approach using a lodestar cross-check. This omission is surprising given that, for the purported purpose of allowing the Court to perform a lodestar cross-check, Lead Counsel asked all the plaintiffs to provide, by the close of business on October 26, 2006, "detailed time, cost and expense reports for their work" including both a "detailed report and summary." (Strenio Decl.,

72

Exhibit X.)  Lead Counsel, however, has instead submitted to the Court and to Plaintiff only the

summaries of the time – even though Plaintiff provided Lead Counsel, at their request, their

detailed time entries.  Without this information, the Court cannot determine whether the

requested $1.85 million in attorneys' fees is reasonable under either a lodestar approach or a

percentage of fund approach using a lodestar cross-check.  As the Court of Appeal for the First

Circuit explains in  Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 527 (1st Cir.

1991):

> "it is readily evident that appellants' fee application was, as the district court thought,
> woefully deficient.  The application was bereft of contemporaneous time records or any
> other suitable documentation. By making such a barebones proffer, appellants deprived
> the court of the wherewithal it needed to make an intelligent lodestar calculation.  To
> have granted a sizeable fee in such straitened circumstances would have been tantamount
> to `shirking (the court's) responsibility to render a principled decision.' . . . While the
> procedure for calculating the lodestar contemplates that an evidentiary hearing may be
> desirable, . .. [w]hen, as here, the fee-seeker fails to submit the rudimentary information
> essential to a calculation of the lodestar, the district court is under no obligation to
> conduct a hearing before denying the fee application. . . .  The district court will have to
> undertake an independent review of the time records to determine `the reasonableness of
> the hours spent and the hourly rate sought.'"

See In re Thirteen Appeals Arising Out Of The San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d

295, 303 (1st Cir. 1995);  In re Nineteen Appeals Arising Out Of The San Juan Dupont Plaza

Hotel Fire Litig., 982 F.2d 603, 614-15 (1st Cir. 1992).

73

VI.    **THE SETTLEMENT PROPONENTS HAVE FAILED TO SUBMIT TO THE COURT THE MISSING INFORMATION NEEDED TO SUPPORT THE FINDINGS AND CONCLUSIONS REQUIRED FOR PRELIMINARY CERTIFICATION OF THE SETTLEMENT CLASS AND PRELIMINARY APPROVAL OF THE SETTLEMENT.**

At the Penultimate Preliminary Approval Hearing, the Court wisely concluded that the proponents of the settlement failed to provide the Court with an evidentiary basis to support the motion for preliminary approval:

> "I don't have even a speaking affidavit with respect to the circumstances of this case. All I know is that there was an injunction in Connecticut and that the counsel have looked into these matters. But I'm not sure I understand how I'm – in any fashion that I feel comfortable with – able to make judgments about the relative potential for either a successful judgment or the dangers of litigation apart from the cost of litigation in this setting. . . . The short of it is that there is a lot missing. And I think it has to be provided in some sort of supportable way and probably by affidavit. . . . I need to be given a substantial basis to accept this proposed settlement and it has to be factual, I think." (Transcript at 17:4 - 18:14.)

*See* Greenspun v. Bogan, 492 F.2d 375, 378 (1st Cir. 1974) ("the district court must possess sufficient evidentiary facts to show the fairness of the proposed settlement; the burden is placed squarely on the proponents of the settlement to show that it is in the best interests of all those who will be affected by it"); *cf.* Lupron, 228 F.R.D. at 94 n. 35 (D. Mass. 2005) ("One of the concerns with so-called `drive-by' class actions is that the court called upon to certify the class and approve the settlement is presented with a *fait accompli* and has no independent means of verifying the lawyers' representations. Here, several years of hotly contested litigation has educated the court in the factual and legal intricacies of the case and the relative strengths and weaknesses of the parties' respective positions").[23]

---

[23]  Because the settlement is being proposed in the arena of an MDL proceeding, the Court's need for vigilance and evidentiary facts to protect absentee class members is even greater than the normal class action settlement. As Judge Young warns in Delaventura v. Columbia

74

In this case, the recent filings by the proponents of the settlement still falls far short of

supplying the Court with the missing information necessary for this Court to make the findings

and conclusions necessary to grant preliminary certification of a settlement class and preliminary

approval of the settlement.

After digesting the "confirmatory" discovery and the representations made in the

settlement proponents' moving papers, Plaintiff sent Lead Counsel two letters on November 8,

one asking for answers to questions seeking much of this missing information, and one asking for

missing documents. (Strenio Decl., Exhibits F and G.)

---

Acorn Trust, 417 F.Supp.2d 147, 149-57 (D. Mass. 2006): "The MDL process relies on the
`informed discretion of the judiciary.' . . . MDL requires `strong and creative action from
transferee judges.' . . . Though MDL practice does serve a purpose, it is certainly not without
problems. . . . MDL fails to `address the problem of competing class actions in different states,
or in both federal and state courts.' . . . [T]he `settlement culture' for which the federal courts
are so frequently criticized is nowhere more prevalent than in MDL practice. . . . Thus, it is
almost a point of honor among transferee judges acting pursuant to Section 1407(a) that cases so
transferred shall be settled rather than sent back to their home courts for trial. . . . [I]n MDL
practice fact finding generally appears far less important than forging some global settlement. . .
. Fact finding is slow, labor intensive, and precise. It is also just -- as just as any human
endeavor in human history. . . . [A] a major goal of nearly every defendant is to avoid a public
jury trial of the plaintiff's claims. Fact finding is relegated to a subsidiary role, and bargaining
focuses instead on ability to pay, the economic consequences of the litigation, and the terms of
the minimum payout necessary to extinguish the plaintiff's claims. Commentators generally
agree that MDL practice favors the defense. . . . `Defendants generally want centralization;
plaintiffs generally don't.' It is precisely because MDL practice is perceived so clearly to favor
the defense that Congress appears to have lost confidence in a judicial management mechanism
that once had such great promise. The Class Action Fairness Act of 2005, Pub. L. No. 109-2,
119 Stat. 4 (2005), itself thought to be legislation that favors business defendants, see Natale v.
Pfizer, Inc., 379 F. Supp. 2d 161, 164-68 (D. Mass. 2005), contains an unmistakable rebuke to
the Panel on Multi-District Litigation in Section 4, which provides that no class action removed
to federal court under its provisions shall thereafter be transferred to another district pursuant to
Title 28, Section 1407(a) of the U.S. Code without the request of a majority of plaintiffs. [28
U.S.C. § 1332(d) (11) (C) (i).] . . . Current Muti-District Litigation practice is seriously flawed
in that it is perceived to proceed not on neutral principles but in a manner that favors
defendants."

75

Plaintiff was met with silence. Lead Counsel waited to respond to Plaintiff until 2:12 p.m. (PST) on November 13, when, again violating their fiduciary duties to Plaintiff, Lead Counsel affirmatively refused to answer Plaintiffs' questions, but implicitly admitted that Lead Counsel have none of the requested documents. (Strenio Declaration, Exhibit H (Letter from Ben Barnow dated November 13, 2006).) The delay in responding left Plaintiff no time to go in to ask the Court *ex parte* for an order compelling Lead Counsel to provide the answers to the questions asked in the letters. If ,upon receipt of the letters on November 8, 2006, Lead Counsel had informed Plaintiff that was going to refuse Plaintiffs' request for the missing information, Plaintiff would have had time to move the Court to compel this information before filing this opposition to the motion for preliminary approval.

Therefore, Plaintiff hereby moves for an order allowing Plaintiff to undertake discovery of Gillette and Lead Counsel to elicit the missing facts and evidence to properly analyze the settlement class and the settlement. The missing information includes the following:

**A.    Missing information relating to class certification**

1.    What are the putative class members' rights and remedies under their various state laws? What are the differences among the various state law rights and remedies? What are the differences among the these rights and remedies and those afforded under Canadian law and its various provinces?

2.    Of the states that have special notice provisions for prosecuting a claim for violation of the consumer protection statute, which of those notice provisions have been complied with and which have not been complied with?

3.      What are the differences in damages suffered by the consumers in each of

the states?

4.      What confirmatory discovery, if any, did Lead Counsel receive that

Gillette does not have any information regarding wholesale sales, retail sales, revenue, pricing,

profits, or advertising for any of the States (or other geographic unit) in the United States?  The

"confirmatory" discovery shows that

[REDACTED]

These are the only questions on the topic that were asked in the "confirmatory" discovery.

Why? Because it was "confirmatory" discovery, not adversary discovery.

      5.     What is the procedural status and stage of development of the Canadian

action, and what discovery has occurred in that action? The settlement proponents fail to provide

any information regarding the Canada action and fail to inform the Court of the different rights

and remedies under the different laws of Canada and its provinces. Moreover, the settlement

      6.     What is the basis for the close of the class period of September 30, 2005?

The settlement proponents appear to suggest that the close of the class period is based on when

Gillette removed the false advertising by stickering over the false statements on the packages of

the M3P razors in the stores' inventory (which stickering program was ordered by the United

States District Court of Connecticut as part of the preliminary injunction order). But, no

information is given as to when Gillette actually ceased its false advertising by completing the

stickering. Where is the evidence that the stickering ended on September 30, 2005? And, where

is the evidence that corrective advertising occurred to prevent consumers from continuing to

purchase the M3P razors and blades without the false belief in the truth of Gillette's hair-raising

and hair extension claims in its false advertising? As Plaintiff's marketing expert concludes, the

reason corrective advertising is needed is because consumers continue to make purchasing

decisions based on false advertising even if the false advertising has ceased. (Londre Declaration, attached as Exhibit Z to Strenio Decl.)

       7.     What are the facts relating to the putative class representatives? Do they have any conflicts of interest? Do they have a disabling relationship with Plaintiffs' Counsel? Do they understand the settlement? Why do they believe the settlement is fair, reasonable, and adequate? What do the depositions of putative class representatives Collin McGeary and Adam Kline show?

### B.    Missing information relating to collusion

       1.     After Gillette's settlement offer made in July 2005, what were the terms of the demands, offers, or counter-offers, if any, made by any party including Gillette, and what dates were those demands, offers, and counter-offers communicated from or to Gillette?

       2.     Who were the lead negotiators on behalf of Gillette and the putative class during the settlement discussions that occurred after the appointment of Lead Counsel?

       3.     What date were attorneys' fees first discussed during settlement communications?

       4.     For each of the settlement join-ins/consents from various plaintiffs and their counsel that are listed on Exhibit 3 to the Affidavit of Ben Barnow, what is the date Lead Counsel received the join-in/consent or became aware that the plaintiff/counsel joins in and consents to the settlement?

       5.     When did Lead Counsel communicate, if at all, to each of the various plaintiffs and their counsel that are listed on Exhibit 3 to the Affidavit of Ben Barnow the "clarification" made with respect to incentive awards and attorneys' fees made at the hearing

held on October 18, 2006? Has Gillette prepared the addendum to reflect this clarification to the
proposed settlement?

### C.    Missing information relating to liability

1.    Has Lead Counsel taken the deposition of Diane Parus regarding consumer
testing by Gillette? Has Lead Counsel obtained all the documents relating to consumer testing by
Gillette? Has Lead Counsel performed any consumer testing? Has Lead Counsel obtained all
the documents relating to consumer testing M3Power by Schick relating to the M3Power or
advertising for the M3Power? Has Lead Counsel undertaken any consumer testing relating to the
M3Power or advertising for the M3Power?

2.    Has Lead Counsel even obtained the discovery produced by Schick to
Gillette in the Schick actions? Or, has Lead Counsel only obtained the discovery produced by
Gillette to Schick? What does the discovery produced by Schick in the Schick actions show?

3.    Has Lead Counsel retained any expert witnesses? If so, who are they,
what is their area of expertise, and what reports or opinions does Lead Counsel have? On
September 27, 2006, Lead Counsel admitted to Plaintiff that "[w] do not have an expert report on
the issue of liability or damages." (Strenio Decl., Exhibit V.) Has Lead Counsel since retained
any expert witnesses, and, if Lead Counsel has retained any experts, has Lead Counsel received
any reports or opinions from them? What do the reports and opinions show and state?

4.    What discovery has been undertaken to determine whether or not Gillette
knew or should have known that its representations regarding the M3Power razor were
deceptive? What does the information show?

5.    What discovery has been obtained by Lead Counsel relating to the actions in Belgium, France, and the Netherlands?  How does that discovery differ from the discovery obtained by Lead Counsel relating to the action in Connecticut?

**D.    Missing information relating to true value of the settlement, including the putative class members' damages and Gillette's profits**

1.    Has Lead Counsel obtained the back-up data underlying the information relating to sales, profits, and pricing shown on GLTE 000001-4, 33-35?      [REDACTED]

2.    [REDACTED]

3.    What is Lead Counsel's best estimate of the number of class members who would submit a claim for a refund (Settlement Agreement, Paragraph 2.1(b)(i))?  What is the factual and evidentiary basis for that estimate?  What is Gillette's best estimate of the number of class members who would submit a claim for a refund (Settlement Agreement, Paragraph 2.1(b)(i))?  What is the factual and evidentiary basis for that estimate?

4.    What is Lead Counsel's best estimate of the number of class members who would submit a claim for a rebate (Settlement Agreement, Paragraph 2.1(b)(ii))?  What is the

factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of class members who would submit a claim for a rebate (Settlement Agreement, Paragraph 2.1(b)(ii))? What is the factual and evidentiary basis for that estimate?

5.    Of the estimated number of class members who would submit a claim for a rebate (Settlement Agreement, Paragraph 2.1(b)(ii)), what is Lead Counsel's best estimate of the percentage of those class members whose claim for a rebate would be based on a purchase made after publication of the notice of the settlement? What is the factual and evidentiary basis for that estimate? Of the estimated number of class members who would submit a claim for a rebate (Settlement Agreement, Paragraph 2.1(b)(ii)), what is Gillette's best estimate of the percentage of those class members whose claim for a rebate would be based on a purchase made after publication of the notice of the settlement? What is the factual and evidentiary basis for that estimate?

6.    What is Lead Counsel's best estimate of the number of fraudulent claims that would be submitted if class members merely had to certify that they purchased an M3Power razor or blade to be entitled to a rebate? What is the factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of fraudulent claims that would be submitted if class members merely had to certify that they purchased an M3Power razor or blade to be entitled to a rebate? What is the factual and evidentiary basis for that estimate?

7.    What is Lead Counsel's best estimate of the number of class members who would submit a claim via the M3Power Razor webpage (Settlement Agreement, Paragraph 2.3(b))? What is the factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of class members who would submit a claim via the M3Power Razor

82

webpage (Settlement Agreement, Paragraph 2.3(b))? What is the factual and evidentiary basis for that estimate?

8.      What is Lead Counsel's best estimate of the number of fraudulent claims that would be submitted via the M3Power Razor webpage (Settlement Agreement, Paragraph 2.3(b))? What is the factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of fraudulent claims that would be submitted via the M3Power Razor webpage (Settlement Agreement, Paragraph 2.3(b))? What is the factual and evidentiary basis for that estimate?

9.      What is Lead Counsel's best estimate of the number of Fusion razors that would be distributed pursuant to the Settlement? What is the factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of Fusion razors that would be distributed pursuant to the Settlement? What is the factual and evidentiary basis for that estimate?

10.      What is Lead Counsel's best estimate of the number of units of Fusion blades that would be sold by Gillette as a result of the number of Fusion razors that will be distributed pursuant to the Settlement? What is the factual and evidentiary basis for that estimate? What is Gillette's best estimate of the number of units of Fusion blades that would be sold by Gillette as a result of the number of Fusion razors that will be distributed pursuant to the Settlement? What is the factual and evidentiary basis for that estimate?

11.      What is Lead Counsel's best estimate of the number of consumers who, as a result of the Settlement, would own a Fusion razor who, but for the Settlement, would never have owned a Fusion razor? What is the factual and evidentiary basis for that estimate? What is

83

Gillette's best estimate of the number of consumers who, as a result of the Settlement, would own a Fusion razor who, but for the Settlement, would never have owned a Fusion razor? What is the factual and evidentiary basis for that estimate?

12.    When was the oral presentation made by Gillette to Lead Counsel with respect to the sales, revenues, pricing, and profits information? Lead Counsel informed Plaintiff and the Court that it occurred on May 25 (Transcript at 19:3-4), but Lead Counsel's now refers to a July presentation. (Pltfs' Supp. Mem. at 4 n. 4). Were there multiple presentations? If so, what dates were the presentations, what information was presented in each presentation, and how did the information differ between presentations? And, were there presentations made to any of plaintiffs' counsel before Lead Counsel was appointed by the Court? If so, when were those presentations made, and what did those presentations show?

13.    How many units of Gillette razors and blades were cannibalized by the introduction of the M3Power razors and blades? What is Lead Counsel's best estimate of the number of such units? What is the factual and evidentiary basis for this estimate? What is Gillette's best estimate of the number of such units? What is the factual and evidentiary basis for this estimate?

14.    How many units of M3Power razors and blades were cannibalized by the introduction of the Fusion razors and blades? What is Lead Counsel's best estimate of the number of such units? What is the factual and evidentiary basis for this estimate? What is Gillette's best estimate of the number of such units? What is the factual and evidentiary basis for this estimate?

15. How many class members owned a Mach3 Turbo prior to purchasing an M3Power razor? What is Lead Counsel's best estimate of the number of class members? What is the factual and evidentiary basis for this estimate? What is Gillette's best estimate of the number of such class members? What is the factual and evidentiary basis for this estimate?

16. How many households have three class members and therefore need to have three claims per household permitted? What is Lead Counsel's best estimate of this number of households? What is the factual and evidentiary basis for this estimate? What is Gillette's best estimate of this number? What is the factual and evidentiary basis for this estimate?

17. For both M3Power razors and blades and for both Fusion manual and power razors and blades, what are the unit sales, average retail price, profits on retail sales, and advertising costs for October 2005 to the present? And, what is the evidentiary basis for these figures?

18. Of the information contained on the documents that Gillette seeks to maintain as confidential and impounded from public view, what information was provided by Gillette to Schick? What information regarding wholesale sales, retail sales, revenue, pricing, profits, or advertising relating to the M3Power razor or blades has been provided by Gillette to Schick? What information regarding wholesale sales, retail sales, revenue, pricing, profits, or advertising relating to the M3Power razors or blades has Lead Counsel obtained from Schick or any other third-party? How does this information differ from the information provided to Lead Counsel by Gillette?

19.     What is the factual and evidentiary basis for Lead Counsel's statement that the actual postage expense for mailing the razor to the Settlement Administrator is 39¢? (Pltfs' Supp. Mem. at 2 n. 2.)

20.     Why has the group to receive razors under the Settlement Agreement, Paragraph 2.3(c), not been selected by Lead Counsel and Gillette?  What group does each propose?

21.     What is the evidentiary basis for Gillette's statement that approximately 1,700 consumers have requested and received a complete refund?  What are the circumstances in which those consumers requested and received a complete refund?  What are the names of those consumers?  Will those consumers receive direct notice of the Settlement?

### E.     Missing information relating to attorneys' fees

Lead counsel required all attorneys who want to participate in a fee to submit not just a summary of their time records on this matter, but the actual detailed time entries.  However, lead counsel has not provided to the Court any of the detailed records they collected.  What are the detailed time entries for Lead Counsel, Liaison Counsel, and all other attorneys who have provided such entries to Lead Counsel?

## VII.   POSSIBLE SOLUTIONS TO SALVAGE RATHER THAN REJECT OUTRIGHT A SETTLEMENT.

In light of the foregoing, the Court should deny the motion for preliminary certification of the settlement class and the motion for preliminary approval of the settlement.

If the Court is not inclined to reject the settlement (which it should), then it should condition approval of the settlement on at least carving out California and allowing Plaintiff to

86

prosecute his own complaint on behalf of California consumers with his own counsel, who have vigorously prosecuted this action, including preparing a motion for a preliminary injunction and a motion for class certification.

If the Court is not inclined to do the foregoing, then the Court should instead condition approval on allocating the funds for the consumers who cannot prosecute their claims for violation of their states' consumer protection statutes to California class members, and also allocating the funds for Canadian consumers to California consumers, since California class members have greater rights, remedies, and damages in this case than the consumers in the other states, and no citizen from any other state has objected to the inclusion of Canada or the other states. If the Court is not inclined to do that, then the Court should at least allocate those funds to California class members so that their recovery is 28 percent (28 %) higher per class member than the recovery for other class members.[24]

If the Court is not inclined to do the foregoing, then the Court should instead condition approval on the removal of the claim requirement of returning the razor and of submitting a UPC code or receipt in order to receive a cash distribution, and the Court should also require that any

---

[24]Assuming consumers of the M3P razor populate each state in a ratio equal to the population of their respective states, then based on the states' populations according to the U.S. Census Bureau's July 2005 report, excluding Iowa from the settlement class will free $51,000 (rounded to the nearest thousand) of the $5.05 million fund; and, if the cost of notice can be reduced pro rata, then the exclusion of Iowa will free $75,000 of the $7.5 million settlement fund. Excluding Alabama, Georgia, Louisiana, Mississippi, and Montana will free $376,000 of the $5.05 million, or $557,000 of the $7.5 million settlement fund. Excluding Georgia, Indiana, Missouri, New Jersey, Texas, Alabama, Kansas, Maine, Mississippi, Oregon, Washington, and Wyoming, will free $1,274,000 of the $5.05 million settlement for allocation to California, or $1,892,000 of the $7.5 million settlement fund. (*Id.*) Excluding all of the foregoing states from the settlement class will free $1,418,000 of the $5.05 million settlement fund, or $2,105,000 of the $7.5 million settlement fund. (*Id.*) A chart showing these calculations is attached as Exhibit BB to the Strenio Declaration.

residue of the $5.05 million fund be distributed in cash (not razors) to either claimants who submitted claims, or, if the Court does not approve of that, then to a charity.

If the Court is not inclined to do the foregoing, then the Court should enter an order continuing the hearing to allow Plaintiff to undertake discovery to obtain the missing information not provided by the settlement proponents, and continue the hearing on preliminary approval.

Finally, if there is a preliminary approval granted, Mr. Corrales's attorneys respectfully request that the Court enter the Order conditioned on Mr. Corrales's attorneys being treated for purposes of their lodestar fees in a manner at least equal to lead counsels' and liaison counsel's fees.

Dated: November 14, 2006          Respectfully submitted,

By:    /s/ G. James Strenio
       Taras P. Kick
       G. James Strenio
       THE KICK LAW FIRM, APC
       660 South Figueroa Street, Suite 1800
       Los Angeles, California 90017
       (213) 624-1588
       taras@kicklawfirm.com
       james@kicklawfirm.com
       Counsel for Plaintiff
       CARLOS CORRALES

88