## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re: | CIVIL ACTION NO. 05-11177-DPW (LEAD CASE) |
| M3POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | MDL Docket No. 1704 |
| THIS DOCUMENT RELATES TO: **ALL CASES** | [REDACTED DOCUMENT; THE UNREDACTED DOCUMENT FILED UNDER SEAL] |

## DECLARATION OF G. JAMES STRENIO IN SUPPORT OF PLAINTIFF CARLOS CORRALES' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

I, G. James Strenio, hereby declare as follows:

1.      I am an attorney licensed to practice in the State of California, and admitted to practice before the Central District of California. I am an attorney with The Kick Law Firm, A.P.C., who is counsel for Plaintiff Carlos Corrales (in Case No. 05-cv-12332-DPW) in this MDL proceeding (MDL No. 1704, Master File No. 05-cv-11177-DPW). I make this declaration in support of Plaintiff Carlos Corrales' Opposition To Motion For Preliminary Approval. I make this declaration of my own personal knowledge, and would and could testify completely to the contents thereof if necessary to do so.

2.      Attached hereto as Exhibit A is a true and correct copy of the preliminary injunction ruling made in the *Schick* Action: Ruling Re: Motion For Preliminary Injunction [Dkt. No. 7], Motion For Leave To Amend [Dkt. No. 103]. and Various Motions In Limine [Dkt. Nos. 104, 105, and 111], filed on May 31, 2005, in Schick Manufacturing, Inc.. et al. v. the

1

Gillette Company, in the Case No. 3-05-cv-174 (JCH) in the United States District Court for the District of Connecticut (the "*Schick* Action").

3.    Attached hereto as Exhibit B is a true and correct copy of the transcript of the hearing held in this MDL proceeding on October 18, 2006.

4.    Attached hereto as Exhibit C is a true and correct copy of the transcript of the hearing held in this MDL proceeding on July 7, 2006.

5.    Attached hereto as Exhibit D is a true and correct copy of the transcript of the hearing held in this MDL proceeding on March 6, 2006.

6.    Attached hereto as Exhibit E is a true and correct copy of the transcript of the hearing held in this MDL proceeding on January 23, 2006.

7.    Attached hereto as Exhibit F is a true and correct copy of a letter from me to Co-Lead Counsel Ben Barnow dated November 8, 2006 and that I caused to have faxed to Mr. Barnow on that date.  (A copy of this letter will not be attached to the redacted filing of this declaration.)  I have not received any answers to the questions posed in this letter.

8.    Attached hereto as Exhibit G is a true and correct copy of a letter from me to Co-Lead Counsel Ben Barnow dated November 8, 2006 and that I caused to have faxed to Mr. Barnow on that date.  I have not received any documents in response to this letter, other than the transcript of the deposition of Adam Kine. which I received as an attachment to an email from Mr. Shapiro on the morning of November 14, 2006, and the exhibits to the deposition transcript of Adam Kline and the transcript of and exhibits to the deposition of Collin McGeary. which were mailed on November 9, 2006, which I was not aware until November 15, 2006 had had arrived due to an error in the firm's mail routing.

2

9.     Attached hereto as Exhibit H is a true and correct copy of a letter I received from Mr. Barnow dated November 13, 2006.

10.    Attached hereto as Exhibit I is a true and correct copy of a letter from Ben Barnow to Harvey Wolkoff dated November 18, 2005.

11.    Attached hereto as Exhibit J is a true and correct copy of Plaintiff Kevin Windom's Motion For Transfer And Coordination Or Consolidation Under 28 U.S.C. § 1407 and the Memorandum of Law In Support Of Motion For Transfer and Coordination Or Consolidation Under 28 U.S.C. § 1407, dated June 9, 2005, filed with the Judicial Panel on MultiDistrict Litigation in Docket No. 1704.

12.    Attached hereto as Exhibit K is a true and correct copy of Interested Party Carlos Corrales' Response To Motion For Transfer And Coordination Or Consolidation Under 28 U.S.C. § 1407, dated July 11, 2005, filed with the Judicial Panel on MultiDistrict Litigation in Docket No. 1704.

13.    On September 29, 2005, the MDL motion came for hearing and was heard in Asheville, North Carolina, which I attended and argued in opposition to the motion. At the hearing, one of the JPML judges asked the movant why should the actions not be transferred to Connecticut instead of Massachusetts. The movant responded that the actions should be transferred to Massachusetts instead of Connecticut because Gillette is headquartered in Boston, which would facilitate discovery. The JPML granted the motion on or about October 27, 2005.

14.    Attached hereto as Exhibit L is a true and correct copy of Declaration Of Taras Kick In Support Of Taras P. Kick In Support Of The Atkins Group's Response To Dearman

3

Group's Application For Appointment As Class Counsel And McGeary Group's Application For Appointment Of Interim Counsel, dated and filed in this action on February 24, 2006.

15. Attached hereto as Exhibit M is a true and correct copy of a letter from Thomas Shapiro dated November 7, 2005 that I received.

16. Attached hereto as Exhibit N is a true and correct copy of the Declaration Of Reginald Terrell In Support Of The Atkin Group's Response To Dearman Group's Application For Appointment As Class Counsel And McGeary Group's Motion For Appointment Of Interim Counsel, dated and filed in this action on February 24, 2006.

17. Attached hereto as Exhibit O is a true and correct copy of Case Management Order #2, dated and filed in this action on March 17, 2006.

18. Attached hereto as Exhibit P is a true and correct copy of Answers And Objections Of Plaintiff Matthew Marr To Defendant's First Set Of Interrogatories, dated June 26, 2006.

19. Attached hereto as Exhibit Q is a true and correct copy of the docket of *Marr v. Gillette, Co.*, Case No. 2:05-cv-05024-FMC-RZ, in the United States District Court for the Central District of California.

20. Attached hereto as Exhibit R is a true and correct copy of a letter from Taras Kick to Thomas Shapiro dated August 16, 2006.

21. Attached hereto as Exhibit S is a true and correct copy of a letter from Ben Barnow to Taras Kick dated August 23, 2006.

22. Attached hereto as Exhibit T is a true and correct copy of a letter from Graig Woodburn to Donald Amamgbo dated August 23, 2006.

23.    Attached hereto as Exhibit U is a true and correct copy of a letter from Taras Kick to Ben Barnow dated September 10, 2006.

24.    Attached hereto as Exhibit V is a true and correct copy of a letter from Thomas Shapiro to Taras Kick dated September 27, 2006.

25    Attached hereto as Exhibit W is a true and correct copy of a letter from Ben Barnow to Taras Kick dated October 9, 2006.

26    Attached hereto as Exhibit X is a true and correct copy of a letter from Ben Barnow to Allan Kanner and Taras Kick dated October 20, 2006.

27.    Attached hereto as Exhibit Y is a true and correct copy of Plaintiff's Application For A Preliminary Injunction: Memorandum Of Points And Authorities In Support Thereof, dated and filed on August 25, 2005. in *Adoure v. The Gillette Co.*, in Case No. BC338624. in the Superior Court of the State of California for the County of Los Angeles, Central District.

28.    Attached hereto as Exhibit Z is a true and correct copy of the Declaration of Larry Steven Londre In Support Of Plaintiff's Application For A Preliminary Injunction, dated August 24, 2005 and filed on August 25, 2005. in *Adoure v. The Gillette Co.*, in Case No. BC338624, in the Superior Court of the State of California for the County of Los Angeles, Central District.

29.    Attached hereto as Exhibit AA is a true and correct copy of Plaintiff's Request For Judicial Notice In Support Of Application For A Preliminary Injunction, dated and filed August 25, 2005, in *Adoure v. The Gillette Co.*, in Case No. BC338624, in the Superior Court of the State of California for the County of Los Angeles, Central District, including Exhibits A to O of that request, and the *Adoure* complaint filed on August 19. 2005.

30.    Attached hereto as Exhibit BB is a true and correct copy of a chart that shows the population of several states based on the United States Census Bureau's July 2005 report, each of those states' percentage of the United States population, and that percentage multiplied by $5.05 million, and that percentage multiplied by $7.5 million.

31.    Attached hereto as Exhibit CC is a true and correct copy of excerpts of the transcript of Adam Kline taken on July 11, 2006.

32.    On October 16, 2006, late afternoon, I had a telephone conversation with Donald Amamgbo regarding the settlement, during which he told me that Lead Counsel had communicated to him the sales, pricing, and profit information that was represented to Lead Counsel by Gillette at an oral presentation. Mr. Amamgbo told me that

[REDACTED]

/ / /

/ / /

/ / /

/ / /

/ / /

6



I declare under penalty of perjury, pursuant to the laws of California and the United States

of America, that the above is true and correct and that this declaration was executed at Los

Angeles, California on November 16, 2006.

G. JAMES STRENIO

| State | Population (Millions) Rounded to the nearest thousand | Percentage of U.S. Population As a percentage, rounded to the nearest hundredth | Allocation based on $5.05 million Rounded to the nearest thousand | Allocation based on $7.5 million Rounded to the nearest thousand |
|---|---|---|---|---|
| United States | 296.410 | | | |
| | | | | |
| Alabama | 4.558 | 1.54% | $78,000 | $115,000 |
| Georgia | 9.073 | 3.06% | $155,000 | $230,000 |
| Iowa | 2.966 | 1.00% | $51,000 | $75,000 |
| Indiana | 6.272 | 2.12% | $107,000 | $159,000 |
| Kansas | 2.745 | 0.93% | $47,000 | $70,000 |
| Louisiana | 4.524 | 1.53% | $77,000 | $114,000 |
| Maine | 1.322 | 0.45% | $23,000 | $34,000 |
| Mississippi | 2.921 | 0.99% | $50,000 | $74,000 |
| Missouri | 5.800 | 1.96% | $99,000 | $147,000 |
| Montana | 0.936 | 0.32% | $16,000 | $24,000 |
| New Jersey | 8.718 | 2.94% | $148,000 | $221,000 |
| Oregon | 3.641 | 1.23% | $62,000 | $92,000 |
| Texas | 22.860 | 7.71% | $389,000 | $578,000 |
| Washington | 6.288 | 2.12% | $107,000 | $159,000 |
| Wyoming | 0.509 | 0.17% | $9,000 | $13,000 |

GILL2

1

VOLUME:  1
PAGES:  1 through 66

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

****************************
JAVIER TUNON and ADAM KLINE,)
behalf of himself and all   )
others similarly situated,  )
                Plaintiff,  )Civil Action
                            )No. 05-11319-DPW
    VS.                     )
                            )
                            )
THE GILLETTE COMPANY,       )
                Defendant.  )
****************************

DEPOSITION OF ADAM KLINE, a witness called on

behalf of the Defendant, taken pursuant to the

provisions of the Federal Rules of Civil

Procedure, before Lisa W. Starr, a Registered

Professional Reporter/Certified Realtime Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at the offices of Ropes & Gray,

One International Place, Boston, Massachusetts,

on July 11, 2006, commencing at 10:05 a.m.

COPLEY COURT REPORTING, INC.
101 Tremont Street, Suite 500
Boston, Massachusetts 02108
(617) 423-5841

⬜

2

GILL2

```
1      APPEARANCES:

2      FOR THE PLAINTIFF:
          SHAPIRO HABER & URMY, LLP
3          BY:  Thomas Shapiro, Esq.
          53 State Street
4          Boston, Massachusetts  02109

5      FOR THE DEFENDANT:
          ROPES & GRAY
6          BY: Harvey Wolkoff, Esq.
             Mark Szpak, Esq.
7             Michael Howe, Esq.
          One International Place
8          Boston, Massachusetts 02110

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

GILL2

1                         I N D E X

2    Witness          Direct  Cross  Redirect  Recross
     ADAM KLINE
3    (By Mr. Wolkoff)   4
     (By Mr. Shapiro)          58

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

0

                                                    4

1                 P R O C E E D I N G S

GILL2
ADAM KLINE

2

3    of lawful age, being first properly identified

4    and duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, deposes and

6    says as follows in answer to direct

7    interrogatories by Attorney Wolkoff:

8        Q.    would you state your full name for the

9    record?

10        A.    Adam Samuel Kline, K-L-I-N-E.

11        Q.    where is it that you live, Mr. Kline?

12        A.    12 Hunt Street, Reading, Massachusetts

13    01867.

14        Q.    How long have you lived at that

15    particular address?

16        A.    Twenty-five years.  It's my permanent

17    address.

18        Q.    How old are you?

19        A.    Twenty-eight.

20        Q.    what's your date of birth?

21        A.    10/11/77.

22        Q.    what's your social security number?

23            MR. SHAPIRO:    I'm going to object to

24    that and instruct him not to answer with regard

⎡

5

1    to privacy.

2            MR. WOLKOFF:    Don't we have a

3    confidentiality agreement in place in this case?

GILL2

4              MR. SHAPIRO:   Even so, in the
5       absence of some particular need for it --
6              MR. WOLKOFF:   I'm allowed to have
7       his social security number so I can do a check
8       with regard to his finances, his arrest record,
9       any prior bankruptcies, things of that nature.
10      Are you still instructing him not to answer?
11             MR. SHAPIRO:   We'll take it up at
12      the end of the deposition.
13          Q.   Do you live with your parents?
14          A.   I do.
15          Q.   You're not married?
16          A.   Not at the moment.
17          Q.   Have you ever been married?
18          A.   No.
19          Q.   Who else resides in your household
20      besides your parents?
21          A.   Just my parents.
22          Q.   Do you have siblings?
23          A.   I have a younger brother.
24          Q.   What is his name?

                                                    6

1           A.   Zachary.
2           Q.   Where does he reside?
3           A.   Right now he lives in Malden.
4           Q.   Where did he live --

GILL2

8      A.   I could have been, but I was primarily at

9    the pet store.

10     Q.   What was your position at PetSmart?

11     A.   Just sales.

12     Q.   What did you sell?

13     A.   Sales and stocking.  Pet supplies.

14     Q.   Who was your supervisor?

15     A.   Lorenzo Murray.

16     Q.   When was it that you left PetSmart?

17     A.   Three months ago.

18     Q.   Was the PetSmart job a full-time job?

19     A.   It was.

20     Q.   But you're saying that at the same time

21   you worked at PetSmart you simultaneously worked

22   at JRA cycles; is that right?

23     A.   I was putting in some hours.

24     Q.   Whose your supervisor at JRA Cycles?

□

9

1      A.   Brian MacInnis.

2      Q.   At the time that you purportedly

3    purchased a Mach 3 Power Razor, did your younger

4    brother, Zachary, live in your household?

5           MR. SHAPIRO:   Objection to

6    "purportedly".

7      A.   Yes, he did.

8      Q.   Was anybody else living in your household

9    at that time?

Page 8

GILL2

```
10        A.   Just my parents.

11        Q.   What is your father's name?

12        A.   Jeffrey.

13        Q.   And how old is he?

14        A.   Fifty-five.

15        Q.   Your mother's name?

16        A.   Carol.

17        Q.   How old is she?

18        A.   Fifty-six.

19        Q.   Where does your father work?

20        A.   He works for himself out of the house.

21        Q.   What does he do?

22        A.   He works for a Melamine, I believe.  It's

23   dishes and whatnot.

24        Q.   What does he do for them?
```

☐

10

```
1         A.   Designs and does sales.  It's his own

2    company.

3         Q.   Your mother, Carol, does she work?

4         A.   Yes.  She is a teacher.

5         Q.   Where?

6         A.   Lexington, Diamond Middle School in

7    Lexington.

8         Q.   Now, you were in some way related to your

9    attorney, Tom Shapiro; is that correct?

10        A.   Yes.
```

GILL2

11    Q.   How are you related?

12    A.   My father was his wife Emily's cousin, I

13  believe.

14    Q.   And Emily now, unfortunately, is

15  deceased?

16    A.   Yes.

17    Q.   What was the date of her death, do you

18  know?

19    A.   I don't know.

20    Q.   Were Jeffrey and Emily, Mr. Shapiro's

21  wife, first cousins?

22    A.   That I don't know.

23    Q.   Could you describe to me a little bit

24  more the nature of the family relationship?

11

1    A.   I don't believe they were first cousins

2  because I did not meet them very frequently.

3    Q.   At some point you did see Mr. Shapiro; is

4  that correct?

5    A.   Yes.

6    Q.   And was that an occasion at which you

7  were visiting Mr. Shapiro's wife, Emily?

8    A.   I believe it was the entire family

9  gathering, not just the wife.

10    Q.   When was that family gathering?

11    A.   I don't recall exactly.

12    Q.   Approximately when was it?

GILL2

13        A.   Summertime.  The summer just before my

14   grandfather passed away.  '04.

15        Q.   So, it was --

16        A.   '05?  I think it was '04.

17        Q.   Was this family gathering before you

18   bought allegedly the Mach 3 Power Razor?

19        A.   I don't believe so.

20        Q.   Was it after?

21        A.   I believe so.

22        Q.   Well, then you're confused, right, on

23   timing?  You say that you bought the Mach 3 Power

24   Razor in January of 2005 and, yet, you say the

o

12

1    family gathering at which you discussed the

2    Mach 3 Power Razor with Mr. Shapiro, you say, was

3    in the summer of 2004?

4               MR. SHAPIRO:   Objection.  I don't

5    think that's his testimony.  You're confusing

6    different events.

7         A.   That's possible.  I may have been

8    confused.

9         Q.   This family gathering you say occurred in

10   the summer of 2004, did the topic of the M3 Power

11   Razor come up at that time?

12        A.   It did not.

13        Q.   Is that --  strike that.

Page 11

GILL2

14          where was the family event, the family

15    gathering?

16          A.    It was at the Shapiros.

17          Q.    Where is that?

18          A.    In Belmont, I believe.

19          Q.    At some point did you raise -- strike

20    that.

21          And at some point did you have a

22    discussion with Mr. Shapiro concerning the M3

23    Power Razor?

24          A.    Not at that party, no.


0

13


1          Q.    At some point, Mr. Kline, did you have a

2    discussion of the M3 Power Razor with Mr.

3    Shapiro?

4          A.    Yes.

5          Q.    when was that?

6          A.    Months later.  My father had met with the

7    family, and he had mentioned, or Tom may have

8    mentioned that there was a case going on with

9    Gillette concerning that razor.  My father

10    mentioned that I used one and had me contact Mr.

11    Shapiro.

12          Q.    So, at some point in time, you say months

13    after the family gathering in the summer of 2004,

14    your father, Jeffrey, spoke with Tom Shapiro,

15    your lawyer, about the M3 Power Razor; is that

GILL2

16    right?

17        A.    In passing I believe yes, they did.

18        Q.    And what was said at that time?

19        A.    That I do not know.  It was not a

20    discussion between me and Mr. Shapiro.

21        Q.    But your father --  did your father tell

22    you about the discussion?

23        A.    My father came home, told me there was a

24    case involving Gillette and involving the Mach 3

☐

14

1    Power Razor.  He knew I had used one, and he told

2    me --  he didn't know what the case was involving

3    because he had not used one, but he had me

4    contact Tom, Mr. Shapiro, who then filled me in.

5        Q.    And when was it that your father,

6    Jeffrey, told you that Mr. Shapiro had a case

7    concerning the Mach 3 razor?

8        A.    It was later on that day.

9        Q.    But what was the date?

10        A.    I don't recall.

11        Q.    Even approximately?  You don't know if it

12    was 2004 or 2005?

13        A.    It was probably early 2005.  Probably

14    May, June.

15        Q.    May or June of 2005 is your best

16    recollection?

Page 13

GILL2

17    A.  Yes.

18    Q.  Do you have problems with your memory?

19    A.  Excuse me?

20    Q.  Do you have any problems with your

21    memory?

22    A.  I don't know.  I don't remember much,

23    especially dates, unfortunately, but I think my

24    memory is pretty good.

15

1    Q.  You think your memory is pretty good even

2    though you don't remember much?

3    A.  I don't remember dates much, specific

4    dates, I'm sorry.

5    Q.  The fact of the matter is you don't

6    recall when it is that you say you bought the

7    Mach 3 razor, do you, sir?

8         MR. SHAPIRO:  Objection.  Go ahead.

9    A.  I believe it was the first of the year.

10    Q.  Do you have any proof of purchase?

11    A.  I don't.

12    Q.  Where did you buy the razor from?

13    A.  It was most likely in --

14    Q.  I'm not asking you most likely.  Do you

15    remember where you bought the Mach 3 razor from?

16    A.  It was probably at CVS.

17    Q.  I'm not asking you probably.

18         MR. SHAPIRO:  Let him answer the

Page 14

```
                            GILL2
20      A.    Three, four months.

21      Q.    Were you still using the Mach 3 Turbo

22  razor, that is the M3 Power Razor, at the time

23  that you had your conversation with your father,

24  Jeffrey, concerning Mr. Shapiro's lawsuit?
```

17

```
1       A.    Just using a regular Mach 3 at that

2   point.

3       Q.    A manual one?

4       A.    Excuse me?

5       Q.    A manual one?

6       A.    Yeah, just the regular one.

7       Q.    At that point in time when you had that

8   conversation with your father, Jeffrey, about Mr.

9   Shapiro's lawsuit, how long had it been since you

10  had stopped using the M3 Power Razor?

11      A.    I don't believe it had been that long.  A

12  couple of months, three or four months.

13      Q.    Well, again, I'm confused on the time

14  line.  If you bought the M3 Power Razor in or

15  about January of 2005, you used it for three or

16  four months, you said?

17      A.    Yes.

18      Q.    And then you had stopped using it for

19  three or four months when you had the

20  conversation with your father, Jeffrey,

21  concerning the razor; is that right?
```

GILL2

22   A.   Yes.

23        Q.   So, was the conversation with your

24   father, Jeffrey, concerning Mr. Shapiro's

18

1    lawsuit, was that in August of 2005?

2         A.   No, that wouldn't make sense.

3         Q.   So, when was it?

4         A.   It must have been '04, because that would

5    bring us too close to the date, or the present.

6         Q.   What's your educational background?

7         A.   I have a Bachelor's degree from Salem

8    State College.

9         Q.   Where did you graduate from high school?

10        A.   Austin Prep in Reading, Massachusetts.

11        Q.   How long did you attend Austin Prep?

12        A.   I was there for five years.

13        Q.   What grades?

14        A.   Eighth grade through twelfth.

15        Q.   What year did you graduate from Austin

16   Prep?

17        A.   '96.

18        Q.   What year did you get your Bachelor's

19   degree from Salem State?

20        A.   '04, I believe.

21        Q.   Did you go to college for eight years?

22        A.   Seven and a half.

GILL2

20    A.    It's possible.

21    Q.    The answer is yes?

22    A.    Yes.

23    Q.    So, do you know of any economic or

24    monetary damages that you suffered as a result of

☐

38

1    the M3 Power Razor?

2    A.    No.

3    Q.    Now, --

4              MR. WOLKOFF:    Let me have marked at

5    this point in time the Answers and Objections of

6    the Plaintiff, Adam Kline, to Defendant's First

7    Set of Interrogatories, let's mark it as Kline

8    Exhibit 1 for identification, please.

9                         (Answers and Objections

10   were marked as Exhibit No. 1 for identification).

11   Q.    Let me place in front of you what we've

12   marked as Plaintiff's Exhibit 1 for

13   identification.  Can you identify what this

14   document is?

15   A.    These are my answers to the

16   interrogatories.  I've seen this before.

17   Q.    Is that your signature on the very last

18   page, page number 7?

19   A.    That is.

20   Q.    When was it that you signed these Answers

21   to Interrogatories?

Page 36

GILL2

22    A.    I don't recall the date.

23    Q.    At the very bottom there is what I would

24    call a header.  I don't know what you would

☐

39

1    actually describe it as.

2    A.    Oh, yes, sorry, 5/31/06.

3    Q.    Did Mr. Shapiro e-mail you this set of

4    answers by Google?

5    A.    I believe it was e-mailed to me, yes.

6    That would be my e-mail account.

7    Q.    What's your e-mail address?

8    A.    It's adamjra@gmail.

9    Q.    JRA like the bicycle store, right?

10    A.    Yes.

11    Q.    Had you discussed the answers with

12    Mr. Shapiro before getting the document in the

13    e-mail?

14    A.    I gave him my answers, and he e-mailed me

15    to go over them and to sign them as they were

16    correct.

17    Q.    These answers were truthful to your best

18    knowledge; is that right?

19    A.    Except for number 10.

20    Q.    Okay.

21    A.    After further thinking about that, that

22    was my father who brought the question up to me.

Page 37

GILL2

23    It was not at this particular event.

24        Q.   And when did you realize that?

☐

40

1        A.   Just last week at breakfast, actually.

2        Q.   At breakfast with whom?

3        A.   Mr. Shapiro.

4        Q.   So, your response to interrogatory number

5    10 is inaccurate?

6        A.   Yes.

7        Q.   So, in the response to interrogatory

8    number 10, you describe an entire conversation

9    you purportedly had with Mr. Shapiro concerning

10    the Gillette M3 Power Razor; is that right?

11        A.   In this response, yes.

12        Q.   And, in fact, that conversation never

13    occurred; is that right?  You were mistaken?

14        A.   It did occur but not in this context.

15        Q.   Well, you say that you were with your

16    parents on an occasion visiting your father's

17    late cousin, who at the time was the wife of Mr.

18    Shapiro, right?

19        A.   Yes.

20        Q.   You say, during the conversation,

21    Mr. Shapiro mentioned some of the cases he was

22    working on, including a case concerning the

23    Gillette M3 Power Razor, correct?

24        A.   Yes.

GILL2

口

41

    1         Q.    And it says you mentioned that you had an
    2    M3 Power Razor, etcetera, correct?
    3         A.    Yes.
    4         Q.    In fact, that conversation didn't take
    5    place.  You discussed the M3 Power Razor and
    6    Mr. Shapiro's case with your father for the first
    7    time, right?
    8         A.    Yes.
    9         Q.    This answer is wrong; you were confused,
   10    right?
   11         A.    Yes.
   12         Q.    Apart from the one advertisement in Men's
   13    Health, during the course of your use of the M3
   14    Power did you see or hear of any other
   15    advertisements of any kind?
   16         A.    I don't believe so.
   17         Q.    Up to today; that is, even after the time
   18    you stopped using the M3 Power Razor, have you
   19    seen or heard any advertisements for the M3 Power
   20    Razor, other than this one advertisement in Men's
   21    Health?
   22         A.    It's possible that I've seen it.
   23         Q.    Do you remember?
   24         A.    I don't remember.

GILL2

63

```
 1          questions at this time.
 2                              (Whereupon the deposition
 3          concluded at 11:30 a.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

GILL2

64

```
1    COMMONWEALTH OF MASSACHUSETTS    )

2    SUFFOLK COUNTY, SS.                    )

3

4         I, ADAM KLINE, the witness herein, having

5    read the foregoing testimony of the pages of this

6    deposition, do hereby certify it to be a true and

7    correct transcript, subject to the corrections,

8    if any, shown on the attached page.

9                        oOo

10

11

12                    _____

13                    ADAM KLINE,

14

15

16

17   Subscribed and sworn to before me

18   this_____day of_____, 20 __

19   _____.

20

21

22

23

24
```

65

GILL2

```
1    COMMONWEALTH OF MASSACHUSETTS    )

2    SUFFOLK COUNTY, ss.                    )

3        I wish to make the following changes, for the

4    following reasons:

5    PAGE LINE

6    ____ ____        CHANGE: _____

7                REASON: _____

8    ____ ____        CHANGE: _____

9                REASON: _____

10   ____ ____        CHANGE: _____

11               REASON: _____

12   ____ ____        CHANGE: _____

13               REASON: _____

14   ____ ____        CHANGE: _____

15               REASON: _____

16   ____ ____        CHANGE: _____

17               REASON: _____

18   ____ ____        CHANGE: _____

19               REASON: _____

20   ____ ____        CHANGE: _____

21               REASON: _____

22   ____ ____        CHANGE: _____

23               REASON: _____

24
```

⌐

66

GILL2

1                           CERTIFICATE

2    COMMONWEALTH OF MASSACHUSETTS    )
     SUFFOLK COUNTY, ss.              )
3
            I, LISA W. STARR, a Registered
4    Professional Reporter and Notary Public within
     the Commonwealth of Massachusetts, do hereby
5    certify:

6           That ADAM KLINE, the witness whose
     testimony is hereinbefore set forth, was properly
7    identified and duly sworn by me.

8           That the foregoing proceedings were taken
     down by me stenographically and thereafter
9    transcribed under my direction and supervision,
     and that the within transcript is a true record
10   of such proceedings.

11          I further certify that I am not related
     to any of the parties to this action by blood or
12   marriage, and that I am in no way interested in
     the cause or outcome of this action.
13
            IN WITNESS WHEREOF, I have hereunto set
14   my hand this 14th day of July, 2006.

15

16                     _____
                       LISA W. STARR
17                     Registered Professional Reporter
                       Certified Realtime Reporter
18
     My Commission Expires:  May 9, 2008
19
     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
20   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
     ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
21   DIRECTION OF THE CERTIFYING REPORTER.

22

23

24