UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
| M3POWER RAZOR SYSTEM | ) | (LEAD CASE) |
| MARKETING & SALES PRACTICES | ) | |
| LITIGATION | ) | MDL Docket No. 1704 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | <u>DOCUMENT CONTAINS REDACTIONS</u> |
| **ALL CASES** | ) | |

### THE GILLETTE COMPANY'S REPLY IN SUPPORT OF
### PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT

In his Opposition to Motion for Preliminary Approval ("Opposition"), Carlos Corrales

mis-cites authority and ignores those facts and legal precedents that are inconvenient.

Notwithstanding the "excruciating detail" that Corrales puts before the Court, Opp'n at 6, the

proposed settlement is fair, reasonable, and adequate, and should therefore be preliminarily

approved.

## I.    VARIATIONS IN STATE LAW ARE NOT A BAR TO CERTIFYING THE
## PROPOSED SETTLEMENT CLASS.

### A.    The Effect Of Variations In State Law On Manageability Is Not A Concern
### In The Settlement Context.

As set forth in greater detail in Gillette's opening brief ("Gillette's Br."), manageability

concerns arising from variations in state law may preclude certification for *litigation* purposes of

a national class, but do not pose a bar to certification of a national class for *settlement* purposes

only.  Gillette Br. at 20-27.

The cases that Corrales cites serve only to demonstrate this distinction. Opp'n at 10-16. His stream of cases, but for one, deal with the certification of *litigation* classes;[1] in those cases, the courts denied certification because, among other things, variations in state law created manageability issues in the *litigation* context.[2] Corrales faults the proponents of the settlement for not citing *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass. 2005) ("*AWP*"). Opp'n at 27-28 & n.15. However, that case is distinguishable for this very reason. Judge Saris decided whether to certify a national class for *litigation* purposes, where the class asserted claims exclusively under state consumer protection statutes. *AWP*, 230 F.R.D. at 77. In denying the motion for class certification, Judge Saris observed: "'[W]hen dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and *thus those variations are irrelevant with respect to certification of a settlement class*.'" *AWP*, 230 F.R.D. at 84 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004)) (emphasis added).

---

[1] The one exception provides no support for Corrales' arguments. In *Grunewald v. Kasperbauer*, 235 F.R.D. 599, 606 (E.D. Pa. 2006), the court *certified* a settlement class that asserted claims under ERISA including, among other things, claims raising individual questions of reliance.

[2] *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (refusing to certify litigation class in large part due to manageability issues); *Carnegie v. Household Int'l, Inc.*, 220 F.R.D. 542, 548 (N.D. Ill. 2004) (same); *Lilly v. Ford Motor Co.*, No. 00-7372, 2002 U.S. Dist. LEXIS 5698, at *2-4 (N.D. Ill. Apr. 3, 2002) (same); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 70-71 (S.D.N.Y. 2002) (same); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 495-501 (S.D. Ill. 1999) (same); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 497-98 (N.D. Ill. 1998) (same); *see also Block v. Abbott Lab.*, No. 99-7457, 2002 U.S. Dist. LEXIS 5453, *17-18 (N.D. Ill. Mar. 29, 2002) (refusing to certify litigation class); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 219-221 (E.D. Pa. 2000) (same). Other cases cited by Corrales are simply inapposite. *See In re St. Jude Med., Inc., Silzone Heart Valve Prods. Liab. Litig.*, 425 F.3d 1116, 1120-21 (8th Cir. 2005) (deferring certification of a litigation class pending a choice of law analysis); *Delahunt v. Cytodyne Tech.*, 241 F. Supp. 2d 827, 840 (S.D. Ohio 2003) (denying motion to dismiss alleged violations of fifty consumer state laws; class certification not before the court).

**B.    There Is No Basis For Excluding Certain Consumers From The Proposed Settlement Class.**

Corrales' assertion that the proposed settlement should exclude consumers in states whose consumer protection statutes do not create a private right of action or do not permit class actions is without merit. Opp'n at 27. As Gillette previously noted, such class members are properly within the scope of the settlement class because, among other reasons, *all* class members have *common law* claims against Gillette. Gillette Br. at 23. Corrales asserts that a national class would be proper where "all consumers have only one [common] cause of action, such as a claim for breach of contract or a claim for negligent misrepresentation." Opp'n at 9 n.5. Although Corrales declares "this is not the case here," he is incorrect. *Id.* The Amended Consolidated Complaint asserts claims for negligent misrepresentation and breach of express and implied warranty. *See* Am. Compl. Counts I, III, IV. That these counts are coupled with additional claims under state consumer protection statutes is immaterial for purposes of certifying a national settlement class; the consumer protection claims arise from the same core facts and theory of liability and allege the same injury, and the plaintiffs would be entitled at trial to one recovery across all of the counts. *See Grunewald*, 235 F.R.D. at 606 (noting that class treatment might not have been available for a misrepresentation count on its own, but that the presence of other, readily-certifiable counts for the same wrong on the same facts created "a proposed class before the Court that is 'sufficiently cohesive to warrant adjudication by representation'") (quoting *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 308-09 (3d Cir. 2005)).

Indeed, Corrales' argument to the contrary is rather disingenuous since his own attorney recently filed a case alleging a national class under multiple states' consumer protection statutes, as well as common law claims for fraud, negligent misrepresentation, civil conspiracy, and unjust enrichment. *See Cole v. Asurion Corp.*, Civ. No. 06649 (C.D. Cal. Oct. 18, 2006)

(attached as Exhibit A hereto). Indeed, the *Cole* complaint even asserts claims under the

consumer protection statutes of Alabama, Alaska, Georgia, Kentucky, Louisiana, Mississippi,

Montana, and Iowa (I.C.A. § 714.16, mis-labeled as Idaho), *i.e.*, the very states that Corrales

claims must necessarily be *excluded* from the class here because they do not allow class actions

or recognize private causes of action. Opp'n at 27.

### C.    California Consumers Should Not Be Treated Differently.

####     1.    California laws are not superior.

In his opposition, Corrales advances no new arguments to support his assertion that

California class members have superior available remedies. Opp'n at 17-21. As Gillette

previously noted, *see* Gillette Br. at 24-27, California law has been in flux following the passage

of Proposition 64 in November 2004, thereby calling into question the asserted robustness of

California's consumer protection statutes. Corrales, in response, conspicuously fails even to

acknowledge the enactment of Proposition 64, much less confront the cases construing it as

restricting the position he takes.

####     2.    Corrective advertising is not an appropriate remedy here.

In the Connecticut *Schick* litigation, Judge Hall enjoined the "offending" part of Gillette's

M3Power advertising and ordered that the M3Power packages be stickered. In this context,

Corrales' attempt to bolster the claims of California class members by arguing that they

somehow are entitled to corrective advertising is unavailing. Opp'n at 19. Well more than a full

year has passed since consumers could have viewed Gillette's "offending" advertisements and

packaging, which had been on the market for only slightly more than one year. In the only case

that Corrales cites to support corrective advertising, *Consumers Union of U.S., Inc. v. Alta-Dena*

*Certified Dairy*, 6 Cal. Rptr. 2d 193, 194 (Ct. App. 1992), the defendant had been advertising the

purported health benefits of its "raw" milk for decades. It turned out, however, that

unpasteurized milk posed serious health risks, especially for the very consumer groups that the defendant's advertisements targeted (children and the elderly). *Id.* at 195-96. In *those* extraordinary circumstances, involving a long-running set of advertisements and very serious health and safety risks, the court ordered corrective advertising. That is not this case. The advertisements here ran for a relatively brief time, have been stopped for well over a year, and involved no health or safety concerns. Corrales cites no support for his corrective advertising assertions.[3]

      3.      <u>The claims of California consumers are no stronger on the merits.</u>

Corrales provides no support for the notion that California consumers have stronger claims on the merits, or suffered any greater damages than other class members. He cites an "expert" who notes that Californians pay disproportionately higher retail prices for toothpaste and shampoo.[4] Opp'n at 21. However, this expert fails to deal with Plaintiffs' core theory here: that the M3Power is no more effective than the MACH3 Turbo razor, such that the price differential per razor constitutes their damages. The expert does not suggest that the price differential is any greater in California than elsewhere; to the contrary, California retail stores presumably charge their customers higher prices on both products, not just one, so that the differential is the same in California as anywhere else.

---

[3] Notably, Corrales has never applied for a preliminary injunction requiring Gillette to engage in corrective advertising, even though the Court expressly invited Corrales' attorneys, who also represent Kasem Adoure (the only plaintiff to include a request for corrective advertising in his papers), to make such an application. *See* Strenio Decl., Ex. C at 28-31; *id.*, Ex. E at 13.

[4] This "expert" is only a manager, not a principal, in Analysis Group, and his resume lists his specialty as the valuation of businesses, not consumer products. *See* Nguyen Decl., Ex. 1.

**D.    Class Representatives Can Enter Into Settlements That Include A Judicially Approved Release Of Claims.**

Corrales' citation to *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29 (1st Cir. 1991), is yet another example of his ignoring the inconvenient. Opp'n at 15. While *Nottingham Partners* does state that "representative plaintiffs cannot release, on their own initiative, the claims of other class members," the First Circuit goes on to acknowledge, in the very next breath, that representative plaintiffs *can* enter into a settlement that includes a release of other class members' claims "where the release bears the imprimatur of the court." *Nottingham*, 925 F.2d at 33 n.2. Here, by presenting the proposed settlement to the Court for preliminary and ultimately final approval, the Representative Plaintiffs are fully protecting the rights of absent class members whose claims may be released.

In addition, Corrales flatly misstates the scope of the release under the proposed settlement. Corrales asserts that the release is "*not limited to only claims based on false advertising regarding the representations regarding hair raising and hair extension.*" Opp'n at 35 (emphasis in original). In fact, the definition of "Released Claims" expressly limits its scope to any and all claims "based on, relating to, or arising out of the allegations, facts, or circumstances alleged in the Litigation." Settlement Agreement ¶ 1.16. The First Circuit has recognized that such a release is proper. *See City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) (noting that it is "well-settled" that a settlement can include the release of a "claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action") (internal quotation marks and citations omitted); *accord Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 58-59 (1st Cir. 2004) (noting that a court-approved

settlement may be applied against class members, even if they object, and even if the claim was

not or could not have been presented").[5]

## II.  THE PROPOSED SETTLEMENT IS ENTITLED TO A PRESUMPTION OF FAIRNESS BECAUSE IT WAS NEGOTIATED AT ARMS-LENGTH AND DISCOVERY WAS MORE THAN SUFFICIENT.

### A.  The Settlement Was Negotiated At Arms-Length.

Corrales presents no credible suggestion that the negotiations between Co-Lead Counsel

and Gillette were conducted other than at arms-length.[6]  Corrales' focus on what apparently has

been a contentious relationship between his counsel and Co-Lead and Liaison Counsel is beside

the point; those interactions provide no support for Corrales' accusations of collusion between

Co-Lead Counsel and Gillette.[7]  Opp'n at 34.  Corrales complains mightily, for example, that

---

[5] Because the scope of the release is limited to claims arising out of the conduct underlying the complaints filed against Gillette, Corrales' reliance on *Browning v. Yahoo! Inc.*, No. 04-01463, 2006 WL 1390555 (N.D. Cal. May 19, 2006), is misplaced.  In *Browning*, the plaintiffs, who purchased credit repair services from the defendants, sued when the defendants failed to provide them with contracts as required by federal law and also alleged misrepresentation.  In contrast to this case, the *Browning* release was not limited to claims based on the conduct underlying the complaint; rather, the release barred all claims by class members against defendants relating to credit repair.  *Id.* at *2.  For this reason as well, *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001), does not undermine the propriety of the release.  In *Schwartz*, the court invalidated the release because it barred claims beyond those arising out of the facts alleged in the complaint, as well as later claims based on future conduct.  *See id.* at 577-78.

[6] Corrales' own arguments belie his assertion that "Lead Counsel reached agreement on the material terms of a settlement with Gillette in July 2005, spending the next months documenting the agreement."  Opp'n at 40.  Corrales himself acknowledges that Gillette rejected Mr. Barnow's counter-offers as too high.  *Id.* at 36.  That hardly constitutes reaching an agreement on material terms, which in fact was not reached until one year later, in July *2006*, and which thereafter took considerable additional time (and negotiations) to be reduced to an actual agreement.

[7] As other courts have noted in assessing the weight to be given to objections, it is relevant to consider who the objectors and their counsel are.  *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 96 (D. Mass. 2005) (citing *In re Prudential Ins. Litig.*, 148 F.3d 283, 318 (3d Cir. 1998)).  In its citation to *Prudential*, the *Lupron* court described that case

when the cases started being filed in early June of 2005, one plaintiff immediately filed a motion

to consolidate the actions into an MDL, which effort Corrales opposed and lost. Opp'n at 37.

How any inference of "collusion" with Gillette can be drawn from that remains unexplained.

Corrales further complains that various of the plaintiffs' attorneys in the case sought to be

appointed lead counsel, including his own attorneys, but his own attorneys were not successful.

*Id.* at 38-39. Again, how any inference of "collusion" with Gillette can arise from those facts

cannot be discerned. His dissatisfactions in no way cast doubt upon the negotiations of the

proposed settlement, and does not support an inference of collusion.

Corrales' other assertion of collusion between Co-Lead Counsel and Gillette – the charge

that Gillette engaged in a "reverse auction" – is entirely baseless. Opp'n at 36. At the outset,

Gillette openly informed *all* plaintiffs' counsel, including Corrales' counsel, of Gillette's

willingness to consider settlement.[8] Gillette's Br., Ex. I. However, substantive discussions went

forward *only* after consolidation took place, and then *only* with those attorneys appointed by the

court to represent the class. Gillette's Br. at 4. In light of his concerns about a "reverse auction,"

Corrales should take comfort that Gillette had to negotiate with the "highest bidder," since one of

the lawyers appointed as Co-Lead Counsel was Mr. Barnow, whose settlement position had been

rejected by Gillette as *too high*. *See* Strenio Decl., Ex. I.

---

as one where the "most vociferous objectors were persons enlisted by counsel competing with
MDL counsel for control of the litigation." *Id.*

[8] Mr. Kick inaccurately characterizes comments made by Gillette's California local
counsel, Kent Raygor, in the context of a meet and confer regarding Corrales' motion for class
certification, served in California prior to transfer. Opp'n at 37; Strenio Decl., Ex. L. Rather
than trying to exclude Mr. Kick from settlement discussions, Mr. Raygor informed Mr. Kick that
"Gillette's Boston Counsel [is] handling [settlement] discussions," and referred Mr. Kick to
Ropes & Gray if he was interested in discussing settlement. *See* Exhibit B hereto.

The arms-length nature of the settlement negotiations is clear from the proposed settlement's substantial enhancements to Gillette's original offer. Gillette Br. at 11-12. While Corrales asserts that Gillette's original settlement offer did not have a cap, *see* Opp'n at 5, he fails to note that it also had no floor – no guaranteed minimum payment, irrespective of the redemption rate. Indeed, Corrales' contentions are internally consistent: he asserts that Gillette's original offer was better because it had no cap, but he also argues that the redemption rate in the proposed settlement will approach 0% because of the "onerous" claims process. Opp'n at 57. Gillette's original settlement offer, however, included the same claims process. Gillette Br., Ex. I. Under Corrales' reasoning, had Gillette's original settlement offer been accepted, Gillette would have avoided paying a single penny, because virtually no consumers would have redeemed. Thus, Corrales should instead embrace, not criticize, the proposed settlement, precisely because it obligates Gillette to distribute a fixed settlement amount.

**B.      Discovery Was More Than Sufficient.**

Discovery in this case was more than sufficient, involving the production of more than 100,000 pages worth of documents. Contrary to Corrales' assertions that Plaintiffs received no Schick documents, Opp'n at 80, Gillette produced the exhibits that Schick relied upon at the Connecticut preliminary injunction hearing. Furthermore, Corrales – who had access to all of the materials provided by Gillette to Lead Counsel – never identifies what additional Schick materials he arguably needs to assess the merits of Plaintiffs' claims. At root, Corrales' complaint is nothing more than that discovery was not conducted as *he* may have wanted it conducted – however that is.

III.   **THE TERMS AND STRUCTURE OF THE SETTLEMENT ARE FAIR, REASONABLE, AND ADEQUATE.**

A.   **Plaintiffs Are Unlikely To Prevail On The Merits.**

Judge Hall's preliminary injunction order does not cement the consumer case against Gillette. Apart from the preliminary injunction order's lacking preclusive effect, Corrales distorts Judge Hall's order and evidence from the preliminary injunction hearing. Opp'n at 44-47. For example, Judge Hall found *Schick's* testing also to be lacking, and concluded that she could not determine whether Gillette's razor caused hair to raise from the skin or not. Gillette's Br. at 16. Moreover, although Gillette, on its own accord, changed the animated portion of its television to remove any suggestion of angle change, Gillette never conceded at the preliminary injunction hearing (and would not now) that the phrase "up and away," on its own, connotes angle change. The record further does not support Corrales' materiality argument. The studies that Gillette conducted in the year following the launch of the M3Power demonstrated that only about one-third of consumers purchased the M3Power Razor because of "the advertising," GMP070291, and only about 12% of those who saw the advertisements even recalled the statements concerning "raising up and away." GMP070285.

B.   **The Amount Of The Settlement Fund Is Within The Range Of Reasonableness, Corrales' Creative "Accounting" Notwithstanding.**

Corrales' "fun with numbers" attack on the adequacy of the value of the Settlement Fund both undervalues the Settlement Fund and exaggerates the range of likely recovery in this case.

Although settlements typically do not provide for 100% recovery, they nonetheless can be adjudged fair and reasonable; nor must the proposed settlement be rejected because Corrales thinks he somehow could have achieved more. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (D. Del. 2002) ("A settlement is by nature a compromise between the maximum possible recovery and the inherent risks of litigation. The test is whether the settlement is

-10-

adequate and reasonable and not whether a better settlement is conceivable.") (internal quotation marks omitted).

Corrales sets forth two theories of damages. The first is the "benefit of the bargain approach," under which consumers would recover the difference in the retail prices of the M3Power Razor and the MACH3 Turbo razor – a potential claim of approximately ███████ Opp'n at 50. The second remedy is "restitutionary disgorgement," under which Plaintiffs would pursue Gillette's profits earned on the razors sold at retail during the class period – a potential claim of ██████. Opp'n at 51-55 & n.24. According to Corrales' analysis, the Settlement Fund of $7.5 million represents ███ of the "benefit of the bargain" damage claim and ███ of a "restitutionary disgorgement" claim.[9] However, even if accurate, a settlement recovery of ██ to ██ is well within the range of reasonableness. *See, e.g.*, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 210 n.30 (D. Me. 2003) (noting that settlement recovery of 17.5%, excluding attorneys' fees and disbursements, would not be unreasonable).

Moreover, Corrales' various efforts to inflate the value of the likely recovery in this case are without merit. There is no evidence that every consumer who bought an M3Power Razor was unhappy with the product or relied on the advertising at issue; indeed, all the evidence is to the contrary. *See* Gillette Br. at 1-2, 16-20. As a result, there is no basis for multiplying all the

---

[9] While Corrales ignores the value to the class represented by the notice program – the cost of which he does not challenge – courts routinely consider a defendant's payment of the costs of notice and claims administration to be benefits to the class, which should be included when assessing the adequacy of the settlement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 460 (9th Cir. 2000) (affirming district court's approval of settlement as fair, reasonable, and adequate where settlement amount of $1.725 million included costs of administering and distributing settlement fund to class); *In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1251, 1207-71 (D. Kan. 2006) (finding that "benefit conferred on the plaintiff class members" was the "total settlement value," which included costs of notice and settlement administration); *Mangone v. First USA Bank*, 206 F.R.D. 222, 228 (S.D. Ohio 2001) (calculating total settlement value by including notice costs and observing the payment of notice costs was the "biggest monetary benefit" to plaintiffs).

razors sold during the class period by the purported damages figure. Opp'n at 50. Furthermore, there is no basis for adding the difference in price between the M3Power *blades* and MACH3 *blades* to the damages claim. *Id.* Plaintiffs have never challenged any advertising claims made as to the M3Power blades.[10] In fact, it is undisputed that the M3Power blades have additional features that MACH3 blades do not have – the extra value of which has never been challenged, even by Corrales. *See* Gillette Br. at 19-20. Nor is it valid for Corrales to argue that the estimate of the likely recovery in this case must take into account his speculation regarding the award of punitive damages. Opp'n at 50. The case law is clear that, in assessing the reasonableness of a settlement, courts compare the value of the settlement against the expected *single* recovery, and do not take into account the possible award of treble or punitive damages. *See, e.g., County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1324 (2d Cir. 1990) (concluding that "it is inappropriate to measure the adequacy of a settlement amount by comparing it to a possible trebled base recovery figure"); *In re Western Union Money Transfer Litig.*, No. CV-01-0335, 2004 WL 3709932, at *11 (E.D.N.Y. Oct. 19, 2004) (disregarding the possibility of treble damages when considering the reasonableness of a proposed class action settlement); *In re Am. Family Enters.*, 256 B.R. 377, 425 (D.N.J. 2000) (stating that "single damages, not treble or punitive damages, are the appropriate yardstick by which the fairness of a proposed class action settlement should be measured").

Corrales' efforts to exaggerate Gillette's profits similarly fall short. Corrales' accusation that Gillette "manufacture[d] losses for the sale of razors" to understate its profits is entirely

---

10

baseless.[11]  Opp'n at 53.  Corrales' preference for Gillette to ignore GAAP accounting and

amortize its advertising expenses over the life of its products does not mean that Gillette has

understated its profits or that the proposed settlement is unfair.  Gillette, in the ordinary course of

business, recognizes advertising expenses as they are incurred, as reflected in the summary that

Gillette prepared.  *See* Decl. of Kevin McNamara, Ex. B at GLTE00003.  Corrales fails to take

into account that the Fusion razor was launched in January 2006, only a few months after the

close of the class period.[12]

>     **C.**     **The Proposed Settlement Does Not Include A Reverter.**

It is simply incorrect for Corrales to characterize the fluid recovery phase of the proposed

settlement as a "reverter."  Opp'n at 65.  The distribution of Settlement Razors provides real

value to the recipients of the razors.  Courts have approved the distribution of non-cash benefits

and indeed have recognized that non-cash settlements should be valued in terms of the retail

price, constituting the consumers' benefit.  *See e.g., In re Prudential Ins. Co. of Am. Sales

Practices Litig.*, 962 F. Supp. 450, 557 (D.N.J. 1997), *aff'd* 148 F.3d 283 (3d Cir. 1998) ("The

cost of the relief to Prudential is not the measure of class member benefit.  The value of the relief

to the Class, which may be substantial, is what matters."); *see also In re Toys R Us Antitrust

Litig.*, 191 F.R.D. 347, 352 (E.D.N.Y. 2000) (valuing the non-cash portion of the settlement

using "manufacturer's list price at the time of distribution" and the "average retail price at which



TRU initially offered its products in its stores"); *In re Real Estate Title & Settlement Servs. Antitrust Litig.*, MDL No. 633, 1986 WL 6531, at *18 (E.D. Pa. June 10, 1986) (approving proposed settlement that would provide class members with additional $5,000 of title insurance and noting without discussion that "it would cost a class member approximately twenty dollars to purchase the additional coverage"). Indeed a California court recently approved a settlement that provided entirely for a *cy pres* distribution of the defendant's invisible tape product. *See Conroy v. 3M*, No. 00-2810 (N.D. Cal.), Long Form of Notice at 5 (attached as Exhibit C hereto). There was no suggestion by any of the objectors that the settlement included a reverter merely because the defendant's product was distributed.

<div style="margin-left: 2em;">

**D.    Proof Of Purchase In The Form Of A Returned Razor Is An Entirely Appropriate And Necessary Condition Of The Claims Process.**

<div style="margin-left: 2em;">

1.    <u>Requiring class members to return their razors to obtain a refund is not onerous.</u>

</div>
</div>

There is no merit to Corrales' contention that the proposed settlement is unfair because of the purportedly "onerous" requirement that class members return their razor if they want a refund.[13] Opp'n at 57, 66-67. Corrales refuses to acknowledge that the razor return requirement protects legitimate class members – not Gillette – against fraud. *See New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 537 (S.D.N.Y. 1995), *appeal dismissed and judgment aff'd*, 96 F.3d 44 (2d Cir. 1996) (noting high potential for fraudulent claims where "there are no warranty cards and no other reasonable methods of assuring that the products for which a refund is sought were actually purchased during the damage period"). Gillette has to distribute benefits until the entire Settlement Fund is exhausted, no matter what; however, because of the generous cash refund, if

---

[13] From the outset, Gillette has offered to pay the cost of postage for return of the razor, ultimately agreeing in the proposed settlement to pay an additional $2 to claimants. *See* Settlement Agreement ¶ 2.b(i).

only a claim form were required, fraudulent claims could drain the Settlement Fund, at the expense of legitimate class members. As a result, legitimate claimants could be deprived of the settlement if the return of the razors was not required.[14]

### 2.    Concerns about expected participation rates are not relevant.

Concerns about low redemption rates are not relevant where, as here, the defendant is obligated to distribute a fixed amount of settlement benefits. *Cf. Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005) (noting that an expected low claims rate combined with a reverter clause and a clear sailing agreement created an inadequate settlement). In the reverter context, the value of the settlement may be illusory, particularly with a low redemption rate, because the fund will never be distributed. Here, the class will receive $7.5 million in value regardless of the participation rate. Not surprisingly, Gillette's research has not identified a single case in which the issue of the class participation rate has been raised where the settlement did not include a reverter. Just because Corrales would prefer that the Settlement Fund be distributed in cash instead of partially by product does not mean the settlement is unfair.[15] Opp'n at 59.

---

[14] Requiring that claimants submit some form of proof of purchase – *i.e.*, a receipt or the actual product – is simply prudent. *See, e.g., In re Sony BMG CD Techs.*, No. 1:05-cv-09575-NRB (S.D.N.Y.), Long Form of Notice at 4, 5 (attached as Exhibit D hereto) (national consumer class action settlement requiring class members to submit CDs and/or proof of purchase to participate in settlement); *Eallonardo v. Metro-Goldwyn-Mayer Inc.*, Case No. BC 286950 (Cal. Super. Ct.), Notice at ¶ 2A (attached as Exhibit E hereto) (proposed settlement under which class members had right to return "one copy of DVD title manufactured by or on behalf of MGM," for either "(1) a new MGM DVD from a list of 325 titles or (2) a cash refund of $7.10"); *Maskarich v. Monster Cable Prods., Inc.*, Case No. Civ. 437567 (Cal. Super. Ct.). Summary Notice (attached as Exhibit F hereto) (proposed settlement under which "Proof of Purchase Claimants," *i.e.*, consumers with either a receipt or the package of the product at issue, had option of seeking, among other things, cash refund based on retail price paid or manufacturer's suggested retail price, whereas "Affiant Claimants," *i.e.*, consumers who did not have proof of purchase but certified that they made a qualifying purchase, had option of receiving a replacement product or points redeemable for defendant's products generally, but not cash).

[15] At least one commentator has noted that even where settlement checks are mailed directly to class members without a claims submission process, participation rates are "far below

3.      Proof of purchase at the website distribution stage is not required because that phase of the proposed settlement is distinguishable from the refund and rebate portion.

That a proof of purchase requirement is not imposed on the website redemption phase of the proposed settlement does not mean that a similar process should be used for the refund and rebate phase of the settlement. Opp'n at 67. The website phase of the proposed settlement is far less susceptible to fraud because product, not cash, will be distributed. Moreover, the distribution of Settlement Razors based only on submission of a claim form does not risk draining the Settlement Fund at the expense of legitimate class members. The website phase of the proposed settlement goes into effect only *after* refunds and rebates, assuming a balance in the Settlement Fund remains. The only "drain" on the Settlement Fund from the submission of fraudulent claims during the Residual Claim Period would be on the number of Settlement Razors distributed in the fluid recovery portion of the settlement.

**E.      The Rebate Is Not A Coupon.**

Just as the distribution of Settlement Razors does not constitute a "reverter," the rebate is not a "coupon." Opp'n at 58. Here, class members may opt to continue to use their M3Power Razors instead of returning them for a refund, and therefore will be continuing to use M3Power blades. For these class members, the rebate is not for a product that they might not otherwise have purchased.[16] Moreover, *past purchases qualify* for the rebate, as well as future purchases

---

a hundred percent." *FTC Workshop: Protecting Consumer Interests in Class Actions*, 18 Geo. J. Legal Ethics 1223, 1238 (Fall 2005) ("Cash redemption rates aren't a hundred percent. Cash redemption rates are far below a hundred percent. People don't open their mail. This was pointed out earlier. People don't cash these checks.") (comments of panel discussion participant Howard Yellen, CEO of the Settlement Recovery Center).

[16] *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 303 (E.D. Pa. 2003) (approving settlement in which class members received $35 voucher toward oil change, rejecting suggestion that the voucher was a "marketing tool," and distinguishing such a voucher from coupon settlement, because it "does not force unanticipated dealings between the parties" and

(which the class member presumably will be making anyway) up to the end of the Initial Claim Period.[17]  Corrales' characterization of the rebates as "coupons" overlooks these fundamental, distinguishing facts.  To provide even further options, class members who have switched or are switching from the M3Power to Gillette's new Fusion razor are eligible for rebates for that purchase as well.  Again, *past purchases qualify*, as well as purchases through the Initial Claim Period.  Corrales' attempt to pigeonhole the rebates as "coupons" ignores the customized and common sense advantages that the rebates provide to the proposed settlement.

### F.    The Distribution Of Settlement Razors Is Not A Marketing Scheme For Gillette.

Finally, the distribution of Settlement Razors is not a "marketing scheme" for Gillette.  Opp'n at 55, 59.  Where, as here, class members are numerous and difficult to identify, it is not uncommon for cases to be settled entirely on a *cy pres* or fluid recovery basis.  *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997).  In such cases, it is not uncommon that the *cy pres* recovery involve an in-kind distribution of product.  *See, e.g., Conroy v. 3M*, No. 00-2810 (N.D. Cal.), Long Form of Notice at 5 (attached as Exhibit C hereto).  Those persons who receive a Settlement Razor will receive actual value -- a fully functioning Fusion razor with a handle and a blade cartridge, which has a market-based retail value.  *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. at 557 ("The cost of the relief to Prudential is not the measure of class member benefit.  The value of the relief to the Class, which may be substantial, is what matters.").  Recipients of a Settlement Razor are free to do with it as they see fit, but nothing requires them to purchase replacement Fusion blades.  In the event recipients of

---

because all class members would need an oil change at some point and could thus use the voucher).

[17] The rebate option is $10 in total.  It is less than the $13 refund because class members who opt for the rebate are presumably retaining the razor and continuing to use it.

the Settlement Razors do buy replacement cartridges, presumably the reason is because they like the razor; *a fortiori*, the settlement conveyed a benefit that they found valuable.

### G.    Corrales Is Not Entitled To Discovery Simply Because He Would Have Pursued This Case Differently.

In general, objectors like Corrales "do not have an absolute right to discovery." *In re Lupron Mktg. and Sales Practices Litig.*, No. 01-10861, MDL 1430, 2005 WL 613492, at *2 (D. Mass. Mar. 16, 2005). Rather, the Court has discretion to "limit the discovery or presentation of evidence to that which will assist it in determining the fairness and adequacy of the settlement." *Id.* (quoting *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 619 (S.D. Cal. 2005)). Discovery in this case has been more than adequate and puts before the Court sufficient facts "to intelligently approve or disapprove the settlement." *Id.* Corrales has not demonstrated that the *further* discovery he proposes would be minimal or is supported by a showing of need. *See id.* Even if pursued, Corrales' lengthy laundry list of discovery requests would not provide information to assess and understand better the fairness, reasonableness, and adequacy of the proposed settlement. Opp'n at 76-86. Rather, many of his requests call for surmise, speculation, and conjecture. *See, e.g., id.* at 77, question 3; *id.* at 83-84 questions 8, 11.

## Conclusion

For the foregoing reasons, and for the reasons set forth in Gillette's Submission in Support of Preliminary Approval of Proposed Settlement, Gillette respectfully requests that the Court preliminarily approve the Settlement Agreement, certify the Settlement Class for settlement purposes only, approve the proposed notice, and authorize that notice of the proposed settlement be given to the Settlement Class.

Respectfully submitted,

THE GILLETTE COMPANY
By its attorneys

/s/ Harvey J. Wolkoff
/s/ Mark P. Szpak
Harvey J. Wolkoff (BBO #532880)
Mark P. Szpak (BBO #546261)
Emily C. Shanahan (BBO #643456)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated:  November 20, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document, filed through the ECF system, will be served electronically through the ECF System on the registered participants as identified on the Notice of Electronic Filing ("NEF"), and that paper copies of the above document will be sent via first class mail to those identified as non-registered participants on the NEF on November 20, 2006.

/s/ Harvey J. Wolkoff
Harvey J. Wolkoff

# EXHIBIT A

10-19-2006   11:50AM   FROM-DDS LEGAL SUPPORT                    213-620-1596        T-351   P.005/040   F-288



1  Taras P. Kick (State Bar No. 143379)
   Graig R. Woodburn (State Bar No. 134097)
2  G. James Strenio (State Bar No. 177624)
   Thomas A. Segal (State Bar No. 222791)
3  THE KICK LAW FIRM, APC
   900 Wilshire Blvd., Suite 230
4  Los Angeles, California 90017
   (213) 624-1588; Fax (213) 624-1589
5
   Attorneys for Plaintiff,
6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  Wineesa Cole, individually and on      Case No. CV . 06   6649 DDP
    behalf of all others similarly                                      JTLx
11  situated,
                                           CLASS ACTION COMPLAINT
12              Plaintiff,                  FOR:

13        v.                               1. Violations of *California Business
                                           & Professions Code* §17200, et seq.
14  Asurion Corporation a Delaware
    Corporation, T-Mobile USA, Inc. a      2. Violations of *California Business
15  Delaware Corporation, and DOES         & Professions Code* §17500, et seq.
    1 through 500.
16                                         3. Violations of *California Civil Code*
                Defendants.                § 1750 et seq.
17
                                           4. Violations of *Tennessee Consumer
18                                         Protection Act* § 47-18-01 et seq.

19                                         5. Violations of *Washington
                                           Consumer Protection Act RCW 19.86*
20                                         et seq.

21                                         6. Violations Of Other State
                                           Consumer Protection Statutes
22
                                           7. Common Law Fraud
23
                                           8. Negligent Misrepresentation
24
                                           9. Civil Conspiracy
25
                                           10. Unjust Enrichment
26
                                           **JURY TRIAL DEMANDED**
27

28

FILED
2006 OCT 18  PH 4: 03
CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

1
CLASS ACTION COMPLAINT

10-19-2006  11:50AM  FROM-DDS LEGAL SUPPORT                    213-620-1596        T-351  P.006/040  F-288

## NATURE OF ACTION

1.     This is a consumer protection class action brought on behalf of consumers nationwide who purchased cell phone "insurance" offered by Asurion Corporation ("Asurion").

2.     Asurion sells cell phone "insurance" to consumers through exclusive agreements with cell phone carriers including T-Mobile.

3.     Cell phone "insurance" was initially offered by cell phone carriers as a means of assuring customer loyalty and not as a profit center. However, cell phone "insurance" has become an extremely profitable business in its own right. Plaintiff is informed and believes and thereon alleges that Asurion made in excess of $400 million in revenue in 2005 from selling such "insurance."

4.     Consumers who purchase cell phone "insurance" from Asurion are led to believe that it operates just like any other insurance policy. Consumers pay a monthly premium, which appears on their cell phone bill. Consumers are informed that in the event of a loss there will be a "deductible" of anywhere between $40 and $110. However, Plaintiff is informed and believes and thereon alleges that Asurion often changes the applicable deductible without informing consumers that this has been done.

5.     Asurion's "deductible" is not a true deductible as that term is used in the insurance industry and understood by consumers. The common understanding and plain meaning of "deductible" is that it is a predetermined sum that is deducted from a loss payable amount. For example, in a fire insurance policy with a deductible of $1000, the consumer understands that if they incur a loss which is less than $1000, they will not be able to recover anything from the insurance company, and that the insurance company will simply deny the claim. By contrast, Asurion's "deductible" is actually a processing fee charged to consumers who file a claim for a replacement cell phone, *even when the replacement phone is worth less than the deductible.*

6.     Even though Asurion's insurance policies represent to consumers that a lost phone will be replaced with a phone of "like kind, quality and value", Asurion routinely provides consumers with replacement cell phones that are "refurbished" and therefore worth substantially less than the lost phones. In many cases, the phones are worth less than the "deductible" or processing fee paid by consumers. This fact is not disclosed to the consumer. This leads to the anomalous situation where Asurion which is purportedly an insurer can make a profit from processing claims for lost cell phones above and beyond the profit that legitimate insurance companies make from charging premiums to policy holders. Essentially, Asurion is pocketing insurance premiums and deductible payments without actually providing insurance.

## PARTIES

7.     Plaintiff Wineesa Cole, was at all times relevant herein, a resident of Los Angeles County, California. Plaintiff's allegations as to her own dealings with Asurion and T-Mobile are made from personal knowledge.  All other allegations herein are made on information and belief, and either have evidentiary support, or are likely to have evidentiary support after discovery in this matter.

8.     Defendant Asurion Corporation is a Delaware corporation headquartered in Nashville Tennessee and San Mateo California.  Asurion transacts substantial business in the State of California, County of Los Angeles.

9.     Defendant T-Mobile USA ("T-Mobile") is a Delaware corporation headquartered in Bellevue, Washington.

10.    At all material times herein, Asurion and T-Mobile (collectively referred to herein as "Defendants") each acted as the co-conspirator, agent, servant, employee, joint venturer or alter ego of the other with respect to the acts, violations, and common course of conduct alleged herein or is otherwise liable.

11.    The acts of Defendants alleged herein were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively

1  engaged in the management of the Defendants' businesses or affairs.

2  <u>**JURISDICTION AND VENUE**</u>

3  12.  This Court has jurisdiction pursuant to the Class Action Fairness Act,

4  28 U.S.C. §1332(d).  Jurisdiction is proper because (1) the claims of all plaintiffs,

5  aggregated together, exceed $5,000,000 and (2) the plaintiff and the defendants

6  are citizens of different states.  (28 U.S.C. §1332(d)(2) and (6).)  Venue is proper

7  in this court under 28 U.S.C. §1391(b)(1) because at the time of the transaction

8  giving rise to this lawsuit, plaintiff was a resident of Los Angeles County,

9  California and defendants transact substantial business in Los Angeles County,

10  California.

11  <u>**FACTS**</u>

12  **A.    Background.**

13  13.  Asurion, a privately held company with over 2500 employees

14  worldwide, was founded in 1994.  Asurion is headquartered in Nashville

15  Tennessee, and San Mateo California.

16  14.  T-Mobile USA, a publicly owned company with over 25,000

17  employees is headquartered in Bellevue Washington.

18  15.  T-Mobile markets the cell phone "insurance" provided by Asurion to

19  T-Mobile customers.

20  16.  Approximately 17,000,000 people in the United States currently have

21  cell phone insurance  provided by Asurion.

22  **B.    Defendants's Deceptive Marketing Practices**

23  17.  In the advertising and sale of its services, Asurion has represented,

24  expressly or by implication, that consumers who purchase their cell phone

25  "insurance" are purchasing a conventional insurance policy in which they will be

26  compensated for the loss sustained less a deductible.  Asurion fails to adequately

27  disclose that the "deductible" is actually a compulsory processing fee which will

28  in many cases exceed the value of the replacement phone provided.  Asurion also

fails to disclose that Asurion often changes the deductible after the policy has been

1  purchased, so that the consumer ends up being charged a deductible which is

2  higher than the one that they thought they had agreed to. Asurion also represents

3  to consumers that they will receive a replacement phone of "like kind, quality, and

4  value" but fails to disclose that most of the replacement phones provided by

5  Asurion are in fact "refurbished" phones and in many cases are defective phones

6  that were returned by consumers. Such facts would be material to consumers in

7  their purchase or use of Asurion's services. The failure to adequately disclose

8  these facts in light of the representations made was, and is, a deceptive practice. If

9  Plaintiff and the Class Members had understood the true facts regarding Asurion's

10 "insurance", they either would not have  purchased it, or they would have paid less

11 for it.

12      18.    T-Mobile actively markets Asurion's cell phone "insurance" and

13 makes the same representations as Asurion described in Paragraph 17 incorporated

14 by this reference. T-Mobile collects insurance premiums payable to Asurion from

15 its customers.

16      19.    The precise terms and conditions of Asurion's T-Mobile insurance

17 policy are not made available to consumers on Asurion's website, but rather on a

18 website called "PhoneClaim.com" which consumers would ordinarily visit only

19 *after* losing a phone.

20      20.    T-Mobile profits from the unlawful scheme alleged herein because T-

21 Mobile's representations regarding the "insurance" are designed to induce

22 consumers to purchase T-Mobile's products and services. T-Mobile markets the

23 "insurance" as a benefit to its customers, and a feature of its phones and services.

24 If Plaintiff and Class Members had known the true facts, they either would not

25 have purchased T-Mobile's phones and services, or they would have paid less for

26 them.

27      21.    Asurion's website actively promotes the cell phone "insurance" to

28 cell phone carriers as a source of revenue. Asurion's website tells cell phone

carriers that: "Carriers get the added benefit of a new recurring, revenue stream

5

1   from the monthly billing and collection of the handset insurance premium." In

2   other words, T-Mobile and other carriers receive a defacto kickback from Asurion

3   from the insurance premium proceeds. T-Mobile does not disclose to consumers

4   that it profits from the "insurance" program by retaining a share of the premiums.

5

6   **C.    Plaintiff's Experience With Asurion.**

7        22.    In March 2004, Plaintiff became a T-Mobile subscriber, and

8   purchased a T-Mobile phone. Plaintiff purchased Asurion's "insurance" which

9   was marketed by T-Mobile. T-Mobile's marketing materials made the

10  representations and omissions described in Paragraph 17 and incorporated herein

11  by this reference. T-Mobile specifically represented to Plaintiff that her deductible

12  was $40.00. When Plaintiff purchased the insurance, she was not provided with

13  a copy of the actual policy.

14       23.    In or around August 2004, Plaintiff lost her cell phone and submitted

15  a claim to Asurion. Asurion's representative told her that in order to receive a

16  replacement phone she would have to pay a deductible of $110.00 When Plaintiff

17  told Asurion's representative that her deductible was $40.00, Asurion's

18  representative told her that she should have received a letter informing her that her

19  deductible had been raised. Plaintiff, in fact, never received such a letter. When

20  Plaintiff complained to Asurion and T-Mobile, her insurance was cancelled, but

21  her payments were not refunded.

22       24.    Plaintiff spoke to other Asurion customers she knows who also

23  believed that their deductible was $40 but were informed that it was $110.00.

24  Those customers also did not receive a letter informing them that the deductible

25  had been raised to $110.00. If Plaintiff had known that the deductible would be

26  $110.00, she either would not have purchased the insurance or she would have

27  paid much less for it. Similarly, if Plaintiff had known that the insurance program

28  offered to her by T-Mobile required a $110.00 deductible, she either would not

    have purchased T-Mobile's products and services, or she would have paid much

6

1   less for them.

2   **CLASS ACTION ALLEGATIONS**

3       25.    Plaintiff seeks to bring this case as a class action on behalf of herself

4   and all others similarly situated as members of a proposed Class, defined as:

5       **All individuals or entities throughout the United States and its**

6       **territories who purchased cell phone insurance from Asurion**

7       **through T-Mobile USA.**

8       26.    Plaintiff seeks class certification under *Federal Rules of Civil*

9   *Procedure*, Rules 23(a) and 23(b)(1),(2) and/or (3).

10      27.    The members of the Class are so numerous that a joinder of all

11  members would be impracticable. While the exact number of the members of the

12  Class is unknown to Plaintiff at this time and can be determined only by

13  appropriate discovery, Plaintiff believes that the Class is likely to include

14  thousands of members.

15      28.    Membership in the Class is ascertainable. The Class definition

16  identifies a group of unnamed plaintiffs by describing a set of common

17  characteristics sufficient to allow a member of that group to identify himself or

18  herself as having a right to recover based on the description. Specifically, the

19  Class members' contact and billing information is in the possession of Asurion, or

20  can easily be obtained from cell phone carriers who partner with Asurion. The

21  nature of notice to the Class is contemplated to include notice by e-mail, by text

22  messaging, by a notice accompanying the cell phone bills of class members, and

23  notice in regional publications as approved by the Court.

24      29.    A well-defined community of interest in the questions of law or fact

25  involving and affecting all members of the Class exists, and common questions of

26  law or fact are substantially similar and predominate over questions that may

27  affect only individual Class members. The questions of law and/or fact common

28  to Plaintiff and the Class members, *inter alia*, include:

        (i)    Whether Defendants' alleged acts and practices were

                                    7

1     unlawful and therefore violated *California Business &*
2     *Professions Code* § 17200;
3   (ii) Whether Defendants alleged acts and practices were unfair
4     and therefore violated *Business & Professions Code* § 17200;
5   (iii) Whether Defendants' alleged acts and practices were
6     fraudulent and therefore violated *Business & Professions*
7     *Code* § 17200;
8   (iv) Whether Defendants' misrepresentations, omissions and
9     concealment violated *Business & Professions Code* §
10     17500;
11   (v) Whether Defendants' methods, acts and practices violated
12     *California Civil Code* § 1750 *et seq;*
13   (vi) Whether Defendants' misrepresentations, omissions, and
14     concealment violated *Tennessee Consumer Protection*
15     *Act* § 47-18-01 *et seq;*
16   (vii) Whether Defendants' misrepresentations, omissions and
17     concealment violated *Washington Consumer Protection Act*
18     *RCW 19.86 et seq;*
19   (viii) Whether Defendants' conduct violated other state consumer
20     protection statutes;
21   (ix) Whether Defendants' misrepresentations, omissions, and
22     concealment constitute common law fraud;
23   (x) Whether Defendants' misrepresentations, omissions, and
24     concealment constitute negligent misrepresentation;
25   (xi) Whether Defendants conspired to defraud consumers;
26   (xii) Whether Defendants were unjustly enriched at the expense
27     of Plaintiff and Class Members.
28  30. Plaintiff's claims are typical of all of the members of the Class.
 Plaintiff and the Class members are all purchasers of Asurion's cell phone

8

**CLASS ACTION COMPLAINT**

10-19-2006  11:52AM  FROM-DDS LEGAL SUPPORT                    213-620-1596          T-351  P.013/040  F-298

1 "insurance". The evidence and the legal theories regarding Defendants' alleged

2 wrongful conduct are identical for Plaintiff and all Class members.

3 Plaintiff will fairly and adequately protect the interests of the Class members.

4 Plaintiff has retained competent counsel experienced in class action litigation to

5 ensure such protection. Plaintiff and her counsel intend to prosecute this action

6 vigorously.

7     31.    The prosecution of separate actions by individual members of the

8 Class would create a risk of inconsistent or varying adjudications with respect to

9 individual members of the Class which would establish incompatible standards of

10 conduct for Defendants within the meaning of *Fed. R. Civ. P.*, Rule 23(b)(1)(A).

11     32.    Defendants have acted or refused to act on grounds generally

12 applicable to the Class, thereby making appropriate final injunctive relief or

13 corresponding declaratory relief with respect to the Class as a whole within the

14 meaning of Rule 23(b)(2).

15     33.    Questions of law or fact common to the members of the Class

16 predominate over any questions affecting only individual members within the

17 meaning of Rule23(b)(3).

18     34.    The class action is superior to all other available methods for the fair

19 and efficient adjudication of this case or controversy. Because the injury suffered

20 by the Class members may be relatively small, the expense and burden of

21 individual litigation make it virtually impossible for Plaintiff and Class members

22 individually to seek redress for the alleged wrongful conduct. Even if any

23 individual Class members could afford individual litigation, it would be unduly

24 burdensome to the courts in which the individual litigation(s) would proceed. The

25 class action device is preferable to individual litigation(s) because it provides the

26 benefits of unitary adjudication, economies of scale, and comprehensive

27 adjudication by a single court. In contrast, the prosecution of separate actions by

28 individual Class members would create a risk of inconsistent or varying

adjudications with respect to individual  Class members that would establish

1  incompatible standards of conduct for the party (or parties) opposing the Class and
2  would lead to repetitious trials of the numerous common questions of fact and law.
3  Plaintiff knows of no difficulty that will be encountered in the management of this
4  litigation that would preclude its maintenance as a class action. As a result, a class
5  action is superior to other available methods for the fair and efficient adjudication
6  of this controversy. Absent a class action, Plaintiff and Class members will
7  continue to suffer losses, thereby allowing these violations to proceed without
8  remedy and allowing Defendants to retain the proceeds of their ill-gotten gains.

9                              **FIRST CAUSE OF ACTION**

10     **For Violations of *California Business & Professions Code* § 17200, *et seq*.**

11                              (Against Defendants)

12         35.    Plaintiff repeats, realleges, and incorporates by reference each and
13  every allegation contained in each of the preceding paragraphs and in each of the
14  succeeding paragraphs, as though fully incorporated herein, made a part hereof,
15  and set forth herein.

16         36.    California's Unfair Competition Law ("UCL") defines unfair business
17  competition to include any "unlawful," "unfair," or "fraudulent" business act or
18  practice. (*Cal. Bus. & Prof. Code* §17200, *et seq*.)

19         37.    Defendants' acts and practices, as alleged herein, violate the UCL.
20  By engaging in the above-described acts and practices, including the actions and
21  omissions herein alleged, Defendants have committed one or more acts of unfair
22  competition within the meaning of *Business & Professions Code* § 17200.
23  Defendants' acts and practices constitute unlawful, unfair, and fraudulent business
24  acts and practices within the meaning of the UCL.

25         38.    Defendants' acts and practices are "unlawful," within the meaning of
26  the UCL, because they, *inter alia*, violate *Business & Professions Code* §17500, *et*
27  *seq*., *California Insurance Code* §§ 780-781, *California Insurance Code* § 790.03,
28  Section 5(a) of the Federal Trade Commission Act, various state and federal
    insurance regulations, common law prohibitions against fraud, and trade

                                      10

1  association ethical rules and guidelines.

2      39.   Defendants' act and practices are "unfair," within the meaning of the

3  UCL, because they are immoral, unethical, oppressive, unscrupulous, and

4  substantially injurious to consumers. And, the gravity of the harm to consumers

5  from Defendants' acts and practices outweigh any utility of the acts and practices.

6      40.   Defendants' acts and practices are "fraudulent," within the meaning

7  of the UCL, because their misrepresentations are likely to deceive the public.

8      41.   Plaintiff and the members of the Class have suffered injury and have

9  lost money or property as a result of Defendants' violations of the UCL.

10     42.   Such conduct is ongoing and continues to this date. Plaintiff and the

11  Class members are therefore entitled to the relief described below.

12              **SECOND CAUSE OF ACTION**

13  **For Violations of *California Business & Professions Code* § 17500, *et seq.***

14              (Against Defendants)

15     43.   Plaintiff repeats, realleges, and incorporates by reference each and

16  every allegation contained in each of the preceding paragraphs as though fully

17  incorporated herein, made a part hereof, and set forth herein.

18     44.   As alleged herein, in the advertising and sale of its services, Asurion

19  has represented, expressly or by implication, that consumers who purchase its cell

20  phone "insurance" are buying a conventional insurance policy in which they will

21  be compensated for the loss sustained less a deductible. Asurion fails to

22  adequately disclose that the "deductible" is actually a compulsory processing fee

23  which will in many cases exceed the value of the replacement phone provided.

24  Asurion also fails to disclose that Asurion often changes the deductible after the

25  policy has been purchased, so that the consumer ends up being charged a

26  deductible which is higher than the one that they thought they had agreed to.

27  Asurion also represents to consumers that they will receive a replacement phone of

28  "like kind, quality, and value" but fails to disclose that many of the replacement

phones provided by Asurion are in fact "refurbished" phones and in many cases

11

1   are defective phones that were returned by consumers. Such facts would be

2   material to consumers in their purchase or use of Asurion's services. The failure to

3   adequately disclose these facts in light of the representations made was, and is, a

4   deceptive practice.

5       45.   T-Mobile makes the misrepresentations and failures to disclose

6   described in Paragraph 45 incorporated herein by this reference. T-Mobile

7   further fails to disclose that it retains a share of the insurance premium as

8   an inducement to steer its customers toward Asurion's "insurance". Such facts

9   would be material to consumers in their purchase or use of Defendants' services.

10   The failure to adequately disclose these facts in light of the representations made

11   was, and is, a deceptive practice.

12       46.   This advertising is by its nature, unfair competition and unfair,

13   deceptive, untrue, or misleading advertising within the meaning of *California*

14   *Business & Professions Code* §17500 *et seq.* Such advertisements are likely to

15   have deceived, did deceive, and continue to deceive the intended audience.

16       47.   The above-described false, misleading, and deceptive advertising

17   conducted by Defendants continues to have a tendency to deceive the intended

18   audience in that Defendants have failed to cease such advertising.

19       48.   The misrepresentations and non-disclosures by Defendants of the

20   material facts detailed above constitute false and misleading advertising and

21   therefore constitute a violation of, *Business & Professions Code* §17500 *et seq.*

22       49.   Plaintiff and the members of the Class have suffered injury and have

23   lost money or property as a result of Defendants' violations of *Business &*

24   *Professions Code* §17500 *et seq.*

25       50.   Such conduct is ongoing and continues to this date. Plaintiff and the

26   Class Members are therefore entitled to the relief described below.

27   **THIRD CAUSE OF ACTION**

28   For Violations Of *California Civil Code* § 1750 *et seq.*

(Against Defendants)

12

10-19-2006   11:54AM   FROM-DDS LEGAL SUPPORT            213-620-1596        T-351   P.017/040   F-288

1    51.    Plaintiff repeats, realleges, and incorporates by reference each and
2  every allegation contained in each of the preceding paragraphs as though fully
3  incorporated herein, made a part hereof, and set forth herein.

4    52.    This cause of action is brought pursuant to California's Consumers
5  Legal Remedies Act, *California Civil Code* §§ 1750, *et seq.* (the "CLRA").

6    53.    Plaintiff and the Class members are individuals who purchased cell
7  phones, cell phone service, and the purported "insurance" from Defendants for
8  family and house hold purposes.  Plaintiff and the Class members are therefore
9  consumers within the meaning of the CLRA, *California Civil Code* § 1761(d).
10 Defendants are "persons" as defined under the CLRA, *California Civil Code* §
11 1761(c).

12   54.    Defendants violated *inter alia California Civil Code* §§ 1770
13 (a)(5),(6), (7), and(14) by representing that their goods and services provide
14 benefits that they do not provide, by representing that the replacement cell phones
15 are original or new even though they have been reconditioned, by representing that
16 the goods and services are of a particular standard, quality or grade when they are
17 not,  and by representing that the  transactions conferred rights and obligations that
18 they did not confer.

19   55.    As a result of the use and employment by Defendants of the
20 aforementioned unlawful methods, acts and practices, Plaintiff and the Class
21 Members suffered damages.

22   56.    Plaintiff and the Class members seek restitution in the full amount of
23 the insurance premiums and deductibles paid and/or disgorgement of Defendants'
24 profits reasonably attributable to its unjust enrichment as a result of the
25 misconduct alleged herein, and any other relief which the Court deems proper.
26 Plaintiff and the Class members further intend to seek compensatory damages and,
27 in light of Defendants' willful and conscious disregard for the rights of Plaintiff
28 and the Class members and in light of Defendants' intentional and fraudulent
   concealment of material facts, Plaintiff and the members of the Class also intend

1  to seek an award of punitive damages.  Pursuant to Civil Code § 1782(a), Plaintiff

2  will serve Defendants with notice of its alleged violations of the CLRA by

3  certified mail return receipt requested.  If, within 30 days after the date of such

4  notification, Defendants fail to provide appropriate relief for their violation of the

5  CLRA, Plaintiff will amend this Complaint to seek monetary (both compensatory

6  and punitive) damages under the CLRA.

7      57.    Plaintiff and the Class Members request this Court to enjoin

8  Defendants from continuing to employ the deceptive methods, acts and practices

9  alleged above pursuant to Civil Code § 1780 (a)(2).

## FOURTH CAUSE OF ACTION

For Violations Of *Tennessee Consumer Protection Act* § 47-18-01

(Against Defendants)

13      58.    Plaintiff repeats, realleges, and incorporates by reference each and

14  every allegation contained in each of the preceding paragraphs as though fully

15  incorporated herein, made a part hereof, and set forth herein.

16      59.    Plaintiff and the Class Members would not have purchased the

17  "insurance" from Asurion if they had known the true facts, including *inter alia*,

18  that the "deductible" was actually a compulsory processing fee; that the deductible

19  was not a predetermined loss payable amount and that Asurion might increase it at

20  any time; and that it was more likely than not that they would receive a refurbished

21  replacement phone worth less than the deductible.  Defendants'

22  misrepresentations, omissions, and concealment were and are unfair and

23  deceptive.

24      60.    Defendants' actions were and are in violation of *Tennessee Consumer*

25  *Protection Act* § 47-81-01.

## FIFTH CAUSE OF ACTION

For Violations Of *Washington Consumer Protection Act,*

*RCW 19.86 et seq.*

(Against Defendants)

14
**CLASS ACTION COMPLAINT**

1    61.    Plaintiff repeats, realleges, and incorporates by reference each and

2    every allegation contained in each of the preceding paragraphs as though fully

3    incorporated herein, made a part hereof, and set forth herein.

4    62.    Plaintiff and the Class Members would not have purchased the

5    "insurance" from Asurion if they had known the true facts, including *inter alia,*

6    that the "deductible" was actually a compulsory processing fee; that the deductible

7    was not a predetermined loss payable amount and that Asurion might increase it at

8    any time; and that it was more likely than not that they would receive a refurbished

9    replacement phone worth less than the deductible.  Defendants'

10   misrepresentations, omissions, and concealment were and are unfair and

11   deceptive, and occurred and continue to occur in trade and commerce.

12   63.    Defendants' actions affect the public interest in that, *inter alia,* they

13   occur in the course of the Defendants' business, Defendants advertise to the

14   general public and other members of the general public are likely to be injured by

15   their actions, and Defendants are in a superior bargaining position to Plaintiff and

16   the Class Members.

17   64.    Defendants' actions were and are in violation of *Washington*

18   *Consumer Protection Act, RCW 19.86 et seq.*

19   ## SIXTH CAUSE OF ACTION

20   For Violation Of Other State Consumer Protection Laws

21   (Against Defendants)

22   65.    Plaintiff repeats, realleges, and incorporates by reference each and

23   every allegation contained in each of the preceding paragraphs as though fully

24   incorporated herein, made a part hereof, and set forth herein.

25   66.    In addition to the consumer protection laws above, Defendant's

26   conduct also violated, *inter alia,* the Alabama Deceptive Trade Practices Act (Ala.

27   Code 1975 §§ 8-19-1 et seq.);  the Alaska Unfair Trade Practices and Consumer

28   Protection Act (Ak. St. §§ 45.50.471(a) et seq.);  the Arizona Consumer Fraud Act

(A.R.S. §§ 44-1521 et seq.);  the Arkansas Deceptive Trade Practices Act (A.C.A.

15

CLASS ACTION COMPLAINT

1  §§ 4-88-101 et seq.);  the Colorado Consumer Protection Act (C.R.S.A. §§ 6-1-

2  101 et seq.);  the Connecticut Unfair Trade Practices Act (C.G.S.A. §§ 42-110 et

3  seq.);  the Delaware Consumer Fraud Act (6 Del. C. §§ 2511 et seq.);  the District

4  of Columbia Consumer Protection Procedures Act (D.C.S.T. §§ 28-3901 et seq.);

5  the Florida Deceptive and Unfair Trade Practices Act (F.S.A. §§ 501.201 et seq.);

6  the Georgia Fair Business Practices Act (Ga. Code Ann. §§ 10-1-390 et seq.);  the

7  Hawaii Unfair Competition Law (H.R.S. §§ 480 et seq.);  the Idaho Consumer

8  Protection Act (I.C. §§ 48-601 et seq.);  the Illinois Consumer Fraud and

9  Deceptive Business Practices Act (815 I.C.L.S. 505/1 et seq.);  the Indiana

10  Deceptive Consumer Sales Act (I.C. §§ 24-5-0.5-1 et seq);  the Idaho Consumer

11  Fraud Act (I.C.A. § 714.16);  the Kansas Consumer Protection Act (KS ST §§ 50-

12  623 et seq.);  the Kentucky Consumer Protect Act (KRS §§ 367.170 et seq.);  the

13  Louisiana Unfair Trade Practices and Consumer Protection Act (LSA-R.S.

14  51:1401 et seq.);  the Maine Unfair Trade Practices Act (5 M.R.S.A. §§ 205-A et

15  seq.);  the Maryland Consumer Protection Act (MD Code, Commercial Law, §§

16  13-101 et seq);  Massachusetts General Law § 93A;  the Michigan Consumers

17  Protection Act (MCL 445.901 et seq.);  the Minnesota Consumer Fraud Act

18  (M.S.A. § 325F.68-70);  the Mississippi Consumer Protection Act (Miss. Code

19  Ann. §§ 75-24-1 et seq.);  the Missouri Merchandising Practices Act (V.A.M.S. §§

20  407.020 et seq.);  the Montana Consumer Protection Act (MCA §§ 30-14-101 et

21  seq.);  the Nebraska Consumer Protection Act (Neb.Rev.St. §§ 59-1601 et seq.);

22  the Nevada Deceptive Trade Practices Act (N.R.S. §§ 598-0903 et seq.);  the New

23  Hampshire Consumer Protection Act (N.H. Rev. Stat. §§ 358-A:1 et seq.);  the

24  New Jersey Consumer Fraud Act ("CFA") (N.J.S.A. §§ 56:8-1 et seq.);  the New

25  Mexico Unfair Trade Practices Act (N.M.S.A. 1978 §§ 57-12-1 to 24);  the New

26  York Consumer Protection Act (General Business Law § 349);  the North Carolina

27  Unfair and Deceptive Trade Practices Act (N.C.G.S.A. § 75-1.1);  the North

28  Dakota Consumer Fraud Act (N.D. Cent. Code Ch. 51-15);  the North Dakota

Unfair Trade Practices Law (N.D. Cent. Code Ch. 51-10);  the Ohio Consumer

1   Sales Practices Act (R.C. § 1345.01 et seq.); the Oklahoma Unlawful Trade

2   Practice's Act (ORS §§ 646.605-646.656); the Pennsylvania Unfair Trade

3   Practices and Consumer Protection Law (73 P.S. §§ 201-1 to 9.3); the Rhode

4   Island Deceptive Trade Practices Act (G.L. 1956 §§ 6-13.1-1 et seq.); the South

5   Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 3-97-5-10 et seq.); the

6   South Dakota Deceptive Trade Practices Law (S.D.C.L. §§ 37-24-1 et seq.); the

7   Texas Deceptive Trade Practices Act (V.T.C.A., Bus. & C., §§ 17.41 et seq.); the

8   Utah Consumer Sales Practices Act (U.C.A. 1953 §§ 13-11-1 to -23); the

9   Vermont Consumer Fraud Act (9 V.S.A. §§ 2451-2480g); the Virginia Consumer

10   Protection Act (Va. Code Ann. §§ 59.1-196 et seq.); the West Virginia Consumer

11   Credit and Protection Act (W.Va. Code §§ 46A-6-101 et seq.); the Wisconsin

12   Consumer Protection Act (W.S.A. 421.101 et seq.); and the Wyoming Consumer

13   Protection Act (Wyo.Stat. §§ 40-12-101 to -112).

## SEVENTH CAUSE OF ACTION

### For Common Law Fraud

### (Against Defendants)

17      67.   Plaintiff repeats, realleges, and incorporates by reference each and

18   every allegation contained in each of the preceding paragraphs as though fully

19   incorporated herein, made a part hereof, and set forth herein.

20      68.   Defendants represented to Plaintiff and Class Members, expressly or

21   by implication that the insurance policy purchased was a conventional insurance

22   policy, that the "deductible" was a predetermined loss payable amount, and that a

23   lost cell phone would be replaced with a phone of "like kind, quality and value".

24      69.   The representations set forth above were in fact false, and were made

25   by Defendants with knowledge of their falsity.

26      70.   Plaintiff and Class Members could not in the exercise of reasonable

27   diligence have discovered the falsity of the representations set forth above.

28      71.   Plaintiff and Class Members relied upon the representations set forth

  above in their decision to purchase cell phone "insurance" and T-Mobile's

1  products and services.

2      72.   As a proximate result of Defendants' misrepresentations, Plaintiff and

3  the Class Members were damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

For Negligent Misrepresentation

(Against Defendants)

7      73.   Plaintiff repeats, realleges, and incorporates by reference each and

8  every allegation contained in each of the preceding paragraphs as though fully

9  incorporated herein, made a part hereof, and set forth herein.

10      74.   Defendants represented to Plaintiff and Class Members, expressly or

11 by implication that the insurance policy purchased was a conventional insurance

12 policy, that the "deductible" was a predetermined loss payable amount, and that a

13 lost cell phone would be replaced with a phone of "like kind, quality and value".

14      75.   The representations set forth above were in fact false, and at the time

15 that Defendants made them, they knew or should have known that the

16 representations were false.

17      76.   Plaintiff and Class Members could not in the exercise of reasonable

18 diligence have discovered the falsity of the representations set forth above.

19      77.   Plaintiff and Class Members relied upon the representations set forth

20 above in their decision to purchase cell phone "insurance".

21      78.   As a proximate result of Defendants' misrepresentations, Plaintiff and

22 the Class Members were damaged in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

Civil Conspiracy

(Against Defendants)

26      79.   Plaintiff repeats, realleges, and incorporates by reference each and

27 every allegation contained in each of the preceding paragraphs as though fully

28 incorporated herein, made a part hereof, and set forth herein.

80.   On information and belief, Defendants entered into an agreement to

1   defraud consumers in violation of state consumer protection laws, common law,

2   and federal laws against mail and wire fraud by selling "insurance" that was in

3   fact illusory and provided no real benefit to policyholders. The conspiracy to

4   defraud consumers is ongoing.

5       81.   On information and belief, Defendants consciously conspired and

6   deliberately pursued a common plan to commit tortious acts, subjecting each to

7   joint and several liability.

8       82.   Defendants each committed unlawful or wrongful acts in furtherance

9   of the alleged conspiracy including:

10              a) Issuing false advertising and marketing materials that

11              misrepresented the material terms of the insurance policies;

12              b) Drafting insurance policies in a manner calculated to

13              deceive consumers;

14              c) Manufacturing refurbished replacement phones, and representing

15              expressly or by implication to consumers that said phones were

16              of "like kind, quality and value" as the insured phones;

17              d) Receipt of money including premiums and deductibles through

18               the U.S. mail and wires.

19                        **TENNTH CAUSE OF ACTION**

20                            Unjust Enrichment

21                          (Against Defendants)

22      83.   Plaintiff repeats, realleges, and incorporates by reference each and

23   every allegation contained in each of the preceding paragraphs as though fully

24   incorporated herein, made a part hereof, and set forth herein.

25      84.   To the detriment of Plaintiff and Class Members, Defendants have

26   and continue to be unjustly enriched by, *inter alia,* receiving insurance premiums,

27   ,collecting deductibles, and making money by selling phones and cell phone

28   service.

        85.   To the detriment of Plaintiff and Class Members, Defendants have

                                    19

1  and continue to receive benefits by, *inter alia*, receiving insurance premiums,
2  collecting deductibles, and making money by selling phones and cell phone
3  service.

4      86.    Accordingly, Plaintiff and Class Members seek full restitution of
5  Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the
6  unlawful and/or wrongful conduct alleged herein.

7              **TOLLING OF STATUTES OF LIMITATION**

8      87.    Defendants took affirmative steps to conceal the fraudulent scheme
9  alleged herein, and accordingly, all applicable statutes of limitations are thereby
10 tolled.

11                    **PRAYER FOR RELIEF**

12     WHEREFORE, Plaintiff, individually and on behalf of the Class members
13 defined herein, pray for judgment and relief on all Causes of Action as follows:

14     1.    Certification of the Class as a class action, appointment of Plaintiff as
15 a class representative and Plaintiff's counsel of record as Class Counsel, and a
16 declaration of financial responsibility on the part of Defendants for the costs of
17 class notification;

18     2.    Full restitution to Plaintiff and each member of the Class;

19     3.    Disgorgement to Plaintiff and each member of the Class, including
20 disgorgement of all revenues, earnings, profits, compensation, and benefits which
21 Defendants obtained as a result of the conduct alleged in this Complaint;

22     4.    A temporary, preliminary and/or permanent order for injunctive relief
23 enjoining Defendants from pursuing the policies, acts and practices alleged herein;

24     5.    Additional equitable relief, including an order imposing a
25 constructive trust upon Defendants' profits from recurring subscription charges
26 and requiring Defendants to pay Plaintiff and all members of the Class for any act
27 or practice declared by this Court to be unlawful;

28     6.    Additional equitable relief, including *cy pres* (fluid recovery) relief,
in the event that a residue exists in the common fund created for the Class, in order

20

1 | to ensure that Defendants do not retain any illicit profit;

2 |    7.    An award of compensatory and exemplary damages including but not

3 | limited to treble damages, as allowed by applicable law ;

4 |    8.    Attorneys' fees, as allowed by applicable law;

5 |    9.    Costs, as allowed by law;

6 |    10.    Pre- and post- judgment interest at the maximum legal rate; and

7 |    11.    Such other and further relief as the Court deems proper.

8

9

10

11

12

13

14

15 | Dated: October 18, 2006                    THE KICK LAW FIRM, APC

16

17 |                                    By:

18 |                                    Taras P. Kick, Esq.
                                       G. James Strenio, Esq.
19 |                                    Graig R. Woodburn, Esq.
                                       Thomas A. Segal, Esq.
20 |                                    Attorneys for Plaintiff,
                                       Wineesa Cole

21

22

23

24

25

26

27

28

1  DEMAND FOR JURY TRIAL

2      Plaintiff, individually and on behalf of all others similarly situated, hereby

3  demands a trial by jury.

4

5  Dated: October _18_, 2006                    THE KICK LAW FIRM, APC

6

7



8      By: _____

9          Taras P. Kick, Esq.
           Graig Woodburn, Esq.

10         G. James Strenio, Esq.
           Thomas A. Segal, Esq.

11         Attorneys for Plaintiff,
           Wineesa Cole

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B



**SHEPPARD MULLIN**
SHEPPARD MULLIN RICHTER & HAMPTON LLP
A T T O R N E Y S   A T   L A W

Suite 1600 | 1901 Avenue of the Stars | Los Angeles, CA 90067-6017
310-228-3700 *office* | 310-228-3701 *fax* | *www.sheppardmullin.com*

Writer's Direct Line: 310-228-3730
kraygor@sheppardmullin.com

Our File Number: 0221-118075

August 9, 2005

*VIA BY E-MAIL AND FAX*

Taras P. Kick, Esq.
THE KICK LAW FIRM
660 South Figueroa Street, Suite 1800
Los Angeles, California 90017

Re:    Corrales v. The Gillette Company [Case No. CV05-4116 DDP (JTLx)]

Dear Taras:

I passed along your comments about settlement made during our discussion today to Gillette's Boston counsel handling such discussions. Please call Mark P. Szpak at Ropes & Gray in Boston at (617) 951-7606 if you want to continue those discussions.

This letter and its comments, as well as our settlement-related discussions during today's meeting, are privileged communications under FED. R. EVID. 408.

Very truly yours,

Kent R. Raygor

for SHEPPARD MULLIN RICHTER & HAMPTON LLP

70863596.1

cc:    G. James Strenio, Esq.
       Anthony E. Chavez, Esq.
       Thomas G. Martin, Esq.

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
**LEGAL NOTICE**

| **If You Purchased Invisible or Transparent Tape,**<br>**the Settlement of a Class Action Lawsuit May Affect Your Rights.**<br>A Federal Court authorized this notice.  This is not a solicitation from a lawyer.  You are not being sued. |
| --- |

- A Settlement has been proposed in a class action lawsuit to settle claims of those who purchased (for home or office use) invisible and transparent tape manufactured by 3M Company and sold in the United States, such as Scotch® Magic™ tape, Scotch® transparent tape, Highland™ tapes and other invisible and/or transparent tapes.

- If the Settlement is approved, 3M will donate $41 million worth of tape and other consumer products to charities throughout the United States.  The charities will be able to use the products in carrying out their charitable work or distribute them to other organizations that also serve the needy.  The Plaintiffs and 3M agree that it would not be practical to otherwise distribute products to the Class, because of the large size of the Class and because of the small volume of purchases made by most Class Members.

- The Settlement resolves a class action lawsuit in federal court.  It also resolves a number of similar lawsuits in state courts.  Plaintiffs in those lawsuits say that 3M's rebate programs and other sales practices involving its invisible and transparent tape violated antitrust and consumer protection laws and caused Class Members to pay too much for 3M tape.  3M denies that it did anything improper or illegal and denies that its rebate programs and other sales practices led to higher prices.  The courts have not made a final decision about the issues in the lawsuits.

- The lawyers who represent the Plaintiffs will ask the Court for an award of fees and expenses.  The Court will decide what amount of fees and expenses are reasonable, but the award will not be more than $7.5 million.  The attorneys' fees and expenses will be paid by 3M.  They will not reduce the amount of products that 3M will provide to the charities.

- The lawyers who represent the Plaintiffs will also ask the Court to award up to $1,000 each to fifteen of the Plaintiffs who filed the lawsuits, as incentive payments.  If approved by the Court, the incentive payments will be paid by 3M.  They will not reduce the amount of products 3M will provide to the charities.

- Your legal rights will be affected whether you act or don't act.  Please read this notice carefully.

| **Your Legal Rights and Your Options in This Settlement** | | |
| --- | --- | --- |
| **Your Options** | **What They Mean** | **Deadlines** |
| Exclude yourself | You can ask to be left out of the Settlement.  You will keep the right to sue, or continue to sue, 3M or those who purchased invisible or transparent tape from 3M for resale about the claims that are resolved by the Settlement. | Mailed and postmarked on or before March 28, 2006 |
| Object | If you remain part of the Class and you don't like the Settlement, or any part of it, you can write to the Court to explain why. | Mailed and postmarked on or before March 28, 2006 |
| Speak at a hearing on April 21, 2006 | If you remain part of the Class, you can write to the Court and ask to speak at the hearing on April 21, 2006 when the Court considers the fairness of the Settlement. | Mailed and postmarked on or before March 28, 2006 |
| Do nothing | You will be included in the Settlement.  You give up the right to sue, or continue to sue, 3M or those who purchased invisible or transparent tape from 3M for resale about the claims that are resolved by the Settlement. | None |

**If you have questions about this Notice, please read the additional information at**
**www.invisibletapesettlement.com or call 1-800-393-2786.**

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ..............................................................................................**3**
1. Why Has This Notice Been Issued? ...................................................................3
2. What Is This Lawsuit About? ............................................................................3
3. Why Is This Lawsuit A Class Action? ..............................................................3
4. Why Is There A Settlement? .............................................................................3

**WHO IS INCLUDED IN THE SETTLEMENT** ...............................................................**4**
5. How Do I Know If I Am A Class Member? .......................................................4
6. Are There Any Exceptions To Being Included As A Class Member? .................4
7. How Do I Know If the Tape I Bought Is 3M Invisible or Transparent Tape? ......4

**THE SETTLEMENT BENEFITS** .......................................................................................**5**
8. What Does The Settlement Provide? .................................................................5
9. Will Anyone Other Than The Charities Receive Benefits From The Settlement? ..........5
10. Why Are Benefits Being Provided Only To Charities? ......................................5
11. What Am I Giving Up If I Do Nothing And Stay In The Class? ..........................6

**THE LAWYERS REPRESENTING YOU** ...........................................................................**6**
12. Do I Have A Lawyer In The Lawsuit And Settlement? ......................................6
13. Who Pays The Lawyers, And How Much Will They Be Paid? ............................6
14. Should I Get My Own Lawyer? .........................................................................7

**EXCLUDING YOURSELF FROM THE SETTLEMENT** .....................................................**7**
15. What If I Don't Want To Be Part Of The Settlement Class? ..............................7
16. How Do I Exclude Myself From The Settlement? ..............................................7

**OBJECTING TO THE SETTLEMENT** ..............................................................................**8**
17. Can I Tell The Court If I Don't Like The Settlement? .......................................8
18. How Do I Object To The Settlement? ................................................................8
19. Can I Object Without Attending The Hearing? ..................................................9
20. What's The Difference Between Objecting And Excluding Myself? ...................9

**THE COURT'S FINAL APPROVAL HEARING** ...............................................................**9**
21. When And Where Will The Court Decide Whether To Approve The Settlement? ........9
22. Do I Have To Come To The Hearing? ................................................................9
23. Can I Speak At The Hearing? ...........................................................................10

**GETTING MORE INFORMATION** ................................................................................**10**
24. Are There More Details About The Settlement? ...............................................10

If you have questions about this Notice, please read the additional information at
www.invisibletapesettlement.com or call 1-800-393-2786.

# BASIC INFORMATION

## 1. Why Has This Notice Been Issued?

You have a right to know about a proposed Settlement of this class action lawsuit and about your options before the Court decides whether to approve the Settlement. This Notice is for everyone who purchased 3M invisible and/or transparent tape for home or office use from January 1, 1993 to August 5, 2005. This Notice explains the lawsuit, the Settlement, your legal rights, what benefits will be provided and who will receive them.

The name of the lawsuit is *Kathleen Conroy and Sheelagh Crowley* v. *3M Corporation, Staples, Inc., et al.,* Case No. C-00-2810 CW (the "*Conroy* lawsuit"). The Court that is in charge of this case is the United States District Court for the Northern District of California. The judge hearing the *Conroy* lawsuit is the Honorable Claudia Wilken. The people who sued are called the Plaintiffs. The companies they sued, 3M Company and Staples, Inc., are called the Defendants.

## 2. What Is This Lawsuit About?

3M manufactures Scotch® and Highland™ brands of invisible and transparent tape, which are sold by retailers like Staples and by other stores that sell stationery and office supplies. On August 4, 2000, Kathleen Conroy filed a lawsuit in federal court in California, in which she claimed that certain 3M sales and marketing practices violated antitrust and consumer protection laws and caused retailers not to sell competing brands of tape and to charge too much for 3M tape. A number of other lawsuits that make similar claims, which were filed in state courts in a number of states, will be settled along with the *Conroy* lawsuit. Some of those state-court cases were filed nearly five years ago.

The lawsuits claim that 3M tried to use various rebate programs and other sales practices to exclude competing tape products from retail stores. In particular, the lawsuits challenge certain "bundled rebate" programs, which permitted retailers and others who bought 3M products for resale to qualify for discounts based on their purchases of invisible and transparent tape and other 3M consumer products. According to the lawsuits, 3M's rebate programs caused retailers like Staples not to offer competing brands of invisible and transparent tape, in order to receive the rebates offered by 3M. Plaintiffs also claim that these practices caused retailers to charge too much for 3M tape products. 3M denies that it did anything improper or illegal, denies that its sales programs reduced competition or led to higher prices, and denies that it owes any money to purchasers of 3M tape. The courts have not made a final decision about the issues in the lawsuits.

## 3. Why Is This Lawsuit A Class Action?

In a class action lawsuit, one or more plaintiffs bring a lawsuit on behalf of themselves and also, as class representatives, on behalf of other persons who may have similar claims. All of these persons together are called a "Class" or "Class Members." In this Settlement, many of the persons in the Class are individuals, but others are legal entities such as partnerships or corporations.

The decisions of the United States District Court for the Northern District of California in the lawsuit will apply to all of the Class Members, except for those who exclude themselves from the Class.

## 4. Why Is There A Settlement?

Plaintiffs and 3M agreed to settle the lawsuits after extensive negotiations, with the help of a former federal judge who acted as mediator. Plaintiffs' Counsel believe that the proposed Settlement is fair and reasonable and

in the best interest of the Class because the Settlement will provide $41 million worth of products to charities, while avoiding the considerable risks and delays involved in continuing the lawsuits. 3M has agreed to settle the lawsuits to avoid the expense, distraction and uncertainty of continued litigation.

Plaintiffs' Counsel believe the Settlement is fair because, for a number of reasons, they were not certain that the Class would win any of the lawsuits and, even if they did win, they might not get any more than the benefits 3M has agreed to provide to settle the lawsuits. In particular, after investigation of the underlying facts by the parties' lawyers and after a court hearing on April 25, 2003, the Court dismissed the claims in the *Conroy* lawsuit and entered summary judgment in 3M's favor. The Plaintiffs appealed that decision and asked the United States Court of Appeals for the Ninth Circuit to reverse the Court's decision and let the case go forward.

The Court of Appeals has not decided the appeal in favor of either the Plaintiffs or 3M. Even if the decision were reversed, however, Plaintiffs would still have had to prove that 3M's conduct caused the Class Members to pay higher prices for tape than they would otherwise have paid. To win their case, Plaintiffs also would have had to prove the amount of damages, if any, that were caused by 3M's conduct.

3M disputed that its rebate programs or other sales practices reduced competition or led to higher prices for Class Members and also disputed Plaintiffs' ability to demonstrate that Class Members had incurred any damages because of its sales practices. In addition, because the rebate programs that Plaintiffs challenged were discontinued in 1999, 3M argued that Class Members who had purchased tape after 1999 were not injured, while various statutes of limitations would prevent lawsuits by Class Members who purchased tape before 1999.

By agreeing to the Settlement, both sides avoid the expense and uncertainty of litigating these issues in California and elsewhere. They are also able to resolve the *Conroy* lawsuit and the similar state-court lawsuits at the same time.

## WHO IS INCLUDED IN THE SETTLEMENT

**5. How Do I Know If I Am A Class Member?**

You are a Class Member and part of the Settlement if **all** of the following apply to you:

- You purchased 3M invisible and/or transparent tape (such as Scotch® Magic™ tape, Scotch® transparent tape, and Highland™ invisible and/or transparent tape) in the United States or one of its territories during the period from January 1, 1993 to August 5, 2005.
- That tape was not purchased directly from 3M Company.
- That tape was purchased for home or office use, and not for resale.

**6. Are There Any Exceptions To Being Included As A Class Member?**

Yes. You are **not** a Class Member if either of the following applies to you:

- You are an employee, officer or director of 3M.
- You choose to exclude yourself from the Settlement.

**7. How Do I Know If The Tape I Bought Is 3M Invisible Or Transparent Tape?**

Scotch® Magic™ tape, any Scotch® invisible tape or transparent tape, and any Highland™ tape is 3M invisible or transparent tape. Many retail stores sell invisible or transparent tape under their own brand name, or "private

label." If you purchased private label tape, it may be hard for you to tell whether the tape you bought was manufactured by 3M or by a competitor of 3M. If you are not sure if you are included in the Class, there is more information at the Settlement website www.invisibletapesettlement.com. The Settlement website includes further information and pictures of 3M tape products to help you determine if you are included in the Settlement. You may also call the toll-free number 1-800-393-2786.

## THE SETTLEMENT BENEFITS

### 8. What Does The Settlement Provide?

3M has agreed to donate $41 million worth of tape and other consumer products to charitable organizations that serve the United States and its territories. In addition to tape, 3M will provide such products as repositionable notes, flags or page markers, easel pads, bulletin boards, abrasives, sponges, overhead projectors and transparency sheets. The products will be provided over a period of up to four years. 3M has also agreed to pay all costs of notice to the Class and the costs of administering the Settlement.

3M and Plaintiffs' Counsel have selected the charities that are eligible to receive products from the Settlement. They include: American Red Cross, The Salvation Army, Habitat for Humanity International, SHOPA Kids in Need Foundation, Gifts in Kind International and the National Association for the Exchange of Industrial Resources. The charities will use the products in carrying out their charitable work. Some of the charities that receive products from the Settlement will distribute those products to not-for-profit organizations or other charitable organizations that serve the needy throughout the United States and its territories. The Settlement does not provide for products to be otherwise distributed to the Class. None of the charities will receive any cash payments from the Settlement. As part of the $41 million worth of products, the charities will have the option of receiving up to a total of $4.1 million worth of invisible and transparent tape manufactured by companies other than 3M, which will be purchased for them by the Settlement Administrator.

The distribution of products in the Settlement will be in addition to the charitable donations of cash or products that 3M normally makes.

### 9. Will Anyone Other Than The Charities Receive Benefits From The Settlement?

The Settlement will provide $41 million worth of free consumer products to the selected charities for use or distribution in the course of their charitable activities. No products will otherwise be distributed to Class Members. Plaintiffs' Counsel may ask the Court to award incentive payments to fifteen of the Plaintiffs who filed the lawsuits, which will not exceed $1,000 each, up to a total of $15,000.

### 10. Why Are Benefits Being Provided Only To Charities?

The parties to the Settlement believe that a "*cy pres*" program should be used to distribute the benefits of the Settlement. "*Cy pres*" means "as near as possible," and it is a legal concept for dealing with situations where money or goods cannot be returned to their owner or beneficiary. Courts generally find *cy pres* relief proper where it is impossible or impractical to provide compensation directly to those who may have been harmed by an alleged wrong, where there is a strong relationship between the distribution of the product and the class benefited, and where the benefit furthers the public interest. Here, it is not practical or economical to provide benefits directly to individual Class Members because the Class is very large, the amount involved in each transaction is small, and Class Members are spread over a wide geographic area. In addition, most Class Members will not have kept records that confirm their tape purchases or the amount they paid for tape, so that it would be extremely difficult and costly to identify the proper claimants and determine what amount to distribute to them.

For those reasons, the Plaintiffs, Plaintiffs' Counsel and 3M agree that the cost of distributing any kind of benefit directly to Class Members would consume too much of the Settlement benefits. Instead, they believe that providing much-needed products to charitable organizations will indirectly benefit all Class Members. The Plaintiffs, Plaintiffs' Counsel and 3M believe that this is a fair and reasonable way to settle these lawsuits.

## 11. What Am I Giving Up If I Do Nothing And Stay In The Class?

If you do nothing, you will stay in the Class. If the Settlement is approved, Plaintiffs will dismiss the lawsuits. All Class Members will give up their right to sue, or continue to sue, 3M and those who purchased invisible or transparent tape from 3M for resale over any claim that a Class Member paid too much for 3M invisible or transparent tape, or was otherwise injured by such a tape purchase, because of any 3M rebate program or other sales practice involving invisible or transparent tape that was in effect from January 1, 1993 to August 5, 2005. In other words, those claims will be "released." The released claims do not include claims that relate to an alleged product defect, personal injury or breach of contract. The release of claims is a "general release" as that term is used in Section 1542 of the Civil Code of the State of California or similar statutes in other states. The full release is contained in the Settlement Agreement (available on the website described below), and you should review it if you have any questions.

## THE LAWYERS REPRESENTING YOU

## 12. Do I Have A Lawyer In The Lawsuit And Settlement?

Yes. The Court has appointed lawyers to represent you and all the other Class Members. These lawyers are called Plaintiffs' Counsel. You will not be charged for these lawyers. You can contact Plaintiffs' Counsel at the following addresses:

| | | |
|---|---|---|
| Aaron H. Darsky, Esq. | Michele Jackson, Esq. | Kimberly Kralowec, Esq. |
| Schubert & Reed LLP | Lieff Cabraser Heimann & Bernstein LLP | Karen L. Jones, Esq. |
| 3 Embarcadero Center, Suite 1650 | 275 Battery Street, Suite 3000 | The Furth Firm |
| San Francisco, CA 94111 | San Francisco, CA 94111 | 225 Bush Street, 15th Floor |
| adarsky@schubert-reed.com | 3msettlement@lchb.com | San Francisco, CA 94104 |
| | | 3msettlement@furth.com |

A complete listing of Plaintiffs' Counsel is set forth in the Settlement Agreement, which is available at the settlement website, www.invisibletapesettlement.com, or by calling the toll-free number shown below or writing Invisible Tape Settlement Administrator, P.O. Box 274, Faribault, MN 55021.

## 13. Who Pays The Lawyers, And How Much Will They Be Paid?

From the beginning of these lawsuits in 2000 to the present, Plaintiffs' Counsel have not received any payment for their services. They also have not been reimbursed for their out-of-pocket expenses. If the Court approves the proposed Settlement, Plaintiffs' Counsel will ask the Court to award them attorneys' fees and out-of-pocket expenses in the amount of $7.5 million. 3M has agreed not to oppose an award of $7.5 million or less. The Court will decide what amount of fees and expenses to award. 3M will pay Plaintiffs' Counsel the amount of attorneys' fees and expenses awarded by the Court, up to $7.5 million. This payment will not reduce the amount of products that 3M will provide to charities. In addition, Plaintiffs' Counsel will ask the Court to award incentive payments of $1,000 each to fifteen of the Plaintiffs who filed the lawsuits, for their time and effort related to the Litigation. If the Court grants this request, 3M will pay up to a total of $15,000 for incentive payments. This payment will not reduce the amount of products that 3M will provide to charities.

Plaintiffs' Counsel will file their request for attorneys' fees, expenses and incentive payments with the Clerk of the Court on or before April 7, 2006. Any attorneys' fees, expenses, and incentive payments awarded by the Court will be paid separately from, and will not reduce, the benefits provided under the Settlement. Under no circumstances will Class Members be personally liable for any attorneys' fees or expenses of Plaintiffs' Counsel or for incentive payments to the Plaintiffs who filed the lawsuits.

3M has reached an agreement with certain class members who filed cases in state courts shortly after the parties reached agreement on the terms of this Settlement, but before the written Settlement Agreement was signed. The agreement provides for dismissal of those cases, subject to state court approval if required, following the effective date of this Settlement, at which time counsel for those class members will apply separately in state court for approval of an award of legal fees and expenses not to exceed $131,000.

### 14. Should I Get My Own Lawyer?

You don't need to hire your own lawyer because the Court has appointed Plaintiffs' Counsel to represent you. But if you want your own lawyer to advise you or appear in Court on your behalf, you may hire a different lawyer. You will have to pay that lawyer yourself.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

### 15. What If I Don't Want To Be Part Of The Settlement Class?

If you do not want to participate in the Settlement or be a member of the Class, or if you want the right to sue on your own over the claims that are being resolved by the Settlement, you must take steps to get out of the Class. This is called "excluding yourself" or "opting out" of the Settlement. If you exclude yourself, you will not be able to object to the Settlement but you will keep the right to file or continue your own lawsuit over the claims that are being settled in this case.

### 16. How Do I Exclude Myself From The Settlement?

<u>If you are an individual</u>: To exclude yourself from the Settlement, you must send a Request for Exclusion letter that states that you want to be excluded from the lawsuit and the Settlement. Your Request for Exclusion letter must be signed and it must be mailed and postmarked **on or before March 28, 2006**. Your letter should contain all of the following:

- Your name, address and telephone number.
- The name and number of the lawsuit: *Kathleen Conroy and Sheelagh Crowley* v. *3M Corporation, Staples, Inc., et al.*, Case No. C-00-2810 CW.
- A statement that you wish to be excluded from the lawsuit and the Settlement.
- Your signature.

<u>If you are a business or other organization, whether operated as a sole proprietorship, partnership, corporation or otherwise</u>: In addition to the information listed above, you must also include a signed statement that gives the total dollar value of the entity's purchases of 3M invisible and/or transparent tape during the period from January 1, 1993 to August 5, 2005. The value you provide should be the total actual dollar amount that the entity paid for 3M tape during that time period, as reflected in your records. If the exact dollar amount is not readily available, you should provide a good faith, reasonable estimate of the total amount and indicate that the amount is estimated. A Request for Exclusion letter on behalf of a business or organization that does not include a

signed statement of the dollar value of its tape purchases will not be valid; the business or organization will remain in the Class and will not be excluded from the Settlement.

You cannot exclude yourself by phone or email. All Requests for Exclusion letters must be mailed to each of the following **two** places:

| | |
|---|---|
| Clerk of the Court | Invisible Tape Settlement Administrator |
| United States District Court | Rust Consulting, Inc. |
| United States Courthouse | P. O. Box 274 |
| 1301 Clay Street | Faribault, MN  55021 |
| Oakland, CA  94612-5212 | |

**IMPORTANT REMINDER:  THE COURT REQUIRES THAT REQUESTS FOR EXCLUSION BE MAILED AND POSTMARKED BY MARCH 28, 2006.  DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE FOR THIS LAWSUIT.**

## OBJECTING TO THE SETTLEMENT

### 17. Can I Tell The Court If I Don't Like The Settlement?

If you are a Class Member and you don't exclude yourself, you can tell the Court if you don't like the Settlement or some part of it. This is called "objecting to the Settlement." For example, you can object that you don't think the Settlement is fair or adequate, or you can object to the amount of Plaintiffs' Counsel's fees. You can explain why you think the Court should not approve the Settlement. The Court will consider your views.

### 18. How Do I Object To The Settlement?

To object, you must send a letter that states that you want to object to the proposed settlement in *Kathleen Conroy and Sheelagh Crowley* v. *3M Corporation, Staples, Inc., et al.,* Case No. C-00-2810 CW. Your objection must be mailed and postmarked **on or before March 28, 2006**. Your letter should contain **all** of the following:

- Your name, address and telephone number.
- The name and number of the lawsuit:  *Kathleen Conroy and Sheelagh Crowley* v. *3M Corporation, Staples, Inc., et al*., Case No. C-00-2810 CW.
- A statement of the reasons why you object to the Settlement or the attorneys' fees.
- A statement of whether you (or your lawyer) wish to speak at the Court's Final Approval Hearing.
- If you do wish to speak at the hearing, you also need to follow the additional instructions under Question 23.

You cannot object by phone or email. All objections must be mailed to each of the following **two** places:

| | |
|---|---|
| Clerk of the Court | Invisible Tape Settlement Administrator |
| United States District Court | Rust Consulting, Inc. |
| United States Courthouse | P. O. Box 274 |
| 1301 Clay Street | Faribault, MN  55021 |
| Oakland, CA  94612-5212 | |

**IMPORTANT REMINDER:  THE COURT REQUIRES THAT OBJECTIONS BE <u>MAILED AND POSTMARKED BY MARCH 28, 2006.</u>  DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE FOR THIS LAWSUIT.**

### 19. Can I Object Without Attending The Hearing?

Yes.  You can object to the Settlement by sending a letter to the Court, following the instructions in Question 18.  The Court will consider your objection, whether or not you attend the hearing.  If you do want to speak at the hearing, or if you want your lawyer to speak for you, you must file a Notice of Appearance with the Court. The instructions for filing a Notice of Appearance are given in Question 23.

### 20. What's The Difference Between Objecting And Excluding Myself?

Objecting is the way to tell the Court there is something that you don't like about the Settlement.  You can object only if you stay in the Class.

Excluding yourself is the way to tell the Court that you do not want to be a part of the Class and the Settlement. If you exclude yourself, you keep the right to file or continue your own lawsuit.  If you exclude yourself, you cannot object because the Settlement will not affect you.

### THE COURT'S FINAL APPROVAL HEARING

### 21. When And Where Will The Court Decide Whether To Approve The Settlement?

The Court will hold a Final Approval Hearing, also called a "fairness hearing," to decide whether to approve the Settlement.  You do not need to attend the hearing, but you are welcome to attend if you so desire.  The hearing will be held on April 21, 2006, at 10:00 a.m.  The Court is the United States District Court for the Northern District of California.  It is located in the United States Courthouse, Courtroom 2, at 1301 Clay Street, Oakland, CA  94612-5212.

At the hearing, the Court will consider whether to give final approval to the Settlement.  The Court has to decide whether the Settlement is fair, reasonable and adequate and whether it is in the best interests of the Class. The Court will listen to any Class Members who have made a written request to speak at the hearing.

After the hearing, the Court will decide whether to approve the Settlement, how much to pay the Plaintiffs' Counsel, and whether incentive payments will be paid to some of the Plaintiffs.  We do not know when the Court will issue its decisions.

### 22. Do I Have To Come To The Hearing?

No.  You do not have to come to the Final Approval Hearing unless you want to.  Plaintiffs' Counsel will speak on your behalf and they will answer any questions the Court may ask.  But you are welcome to attend, at your own expense.  You may also pay your own lawyer to attend, but it is not necessary.  If you send an objection to the Settlement, you don't have to come to the hearing to talk about it.  The Court will consider your objection if you mail your objection letter by the deadline.

**23. Can I Speak At The Hearing?**

If you stay in the Class and want to speak at the Final Approval Hearing (or have your lawyer speak for you), you must send the Court a paper called a "Notice of Appearance." Your Notice of Appearance must be <u>mailed and postmarked **on or before March 28, 2006**</u>. Your Notice of Appearance should contain **all** of the following:

- Your name, address and telephone number.
- The name and number of the lawsuit: *Kathleen Conroy and Sheelagh Crowley* v. *3M Corporation, Staples, Inc., et al.*, Case No. C-00-2810 CW.
- The words "Notice of Appearance" at the top of the page.
- A statement that you (or your lawyer) wish to speak at the Court's Final Approval Hearing.
- A statement of the position that you (or your lawyer) plan to take on the Settlement and your reasons for that position.
- If you want the Court to consider any written materials that support your position, you must include those materials with your Notice of Appearance.

Your Notice of Appearance, including any written materials that you want the Court to consider, must be mailed to each of the following **two** places:

| | |
|---|---|
| Clerk of the Court | Invisible Tape Settlement Administrator |
| United States District Court | Rust Consulting, Inc. |
| United States Courthouse | P. O. Box 274 |
| 1301 Clay Street | Faribault, MN  55021 |
| Oakland, CA  94612-5212 | |

**IMPORTANT REMINDER:  THE COURT REQUIRES THAT NOTICES OF APPEARANCE BE MAILED AND POSTMARKED BY MARCH 28, 2006.  DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE FOR THIS LAWSUIT.**

## GETTING MORE INFORMATION

**24. Are There More Details About The Settlement?**

Yes.  This Notice summarizes the most important aspects of the Settlement.  More details are in the Settlement Agreement.  You can read the Settlement Agreement and answers to frequently asked questions on the website, www.invisibletapesettlement.com.

You can also call the toll-free number 1-800-393-2786 or write to Invisible Tape Settlement Administrator, Rust Consulting, P. O. Box 274, Faribault, MN  55021, to request additional information.  Please include your name, address and telephone number, the case name, and the case number on any letters, faxes or emails.

You may also read the Settlement Agreement, or any of the other documents filed in this lawsuit, during regular business hours at the office of the Clerk of the Court, United States Courthouse, 1301 Clay Street, Oakland, CA 94612-5212.  (Refer to Case No. 00-2810 (CW).)  If you want copies of any of the documents in the Court's file, you will have to pay for the copies yourself.

PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION ABOUT THIS NOTICE OR ABOUT THE SETTLEMENT.

[THIS PAGE INTENTIONALLY LEFT BLANK.]

Invisible Tape Settlement Administrator
Rust Consulting, Inc.
PO Box 274
Faribault MN  55021

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

SONY BMG CD TECHNOLOGIES LITIGATION                    Case No. 1:05-cv-09575-NRB

## NOTICE OF PROPOSED CLASS ACTION SETTLEMENT, MOTION FOR ATTORNEYS' FEES AND SETTLEMENT FAIRNESS HEARING

TO:  ALL PEOPLE WHO BOUGHT, RECEIVED OR USED A SONY BMG MUSIC ENTERTAINMENT COMPACT DISC WITH CONTENT PROTECTION SOFTWARE

**If you bought, received or used a Sony BMG Music Entertainment compact disc containing either XCP or MediaMax 3.0 or 5.0 content protection software, your rights may be affected by a class action settlement.**

**If you have played a CD on your computer that contains either XCP or MediaMax 5.0 content protection software on it, you need to patch your computer or uninstall the software immediately to lower your risk of security vulnerabilities.  Please visit www.sonybmgcdtechsettlement.com and follow the links to download the patch or uninstaller appropriate to you.**

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- If you bought or have a SONY BMG CD with XCP content protection software, you are eligible to receive among the following benefits:  a replacement CD, a cash payment of $7.50, free downloads of the music on the CD, up to three (3) additional free album downloads, and software updates to fix known security vulnerabilities.  **If you have not done so already, please download the update or uninstaller for XCP immediately at www.sonybmgcdtechsettlement.com.**

- If you bought or have a SONY BMG CD with MediaMax content protection software, you are eligible (depending upon the version of MediaMax on your CD) to receive among the following benefits:  free downloads of the music on the CD, another free album download, and software updates to fix known security vulnerabilities.  **If you have not done so already, please download the update or uninstaller for MediaMax immediately at www.sonybmgcdtechsettlement.com.**

- This settlement requires SONY BMG and others ("the Defendants") to update their content protection software on SONY BMG CDs for security vulnerabilities discovered in the future.  The Defendants also will ensure that, until 2008, any future content protection software will be fully and accurately disclosed, independently tested, and readily uninstalled.

- The settlement resolves class action lawsuits concerning SONY BMG CDs that contain either XCP or MediaMax content protection software.  Content protection software restricts the transfer of music to the hard drive of a personal computer and limits the number of copies a user can burn onto a blank CD.  It also prevents the user from saving the audio files in unprotected formats.  The lawsuits allege that the software can send and receive information between the user's computer and the Defendants, can install hidden files on the user's computer, cannot be easily uninstalled, is subject to an overly restrictive license agreement, and may expose the user's computer to malicious software programs like viruses, Trojan Horses and spyware.  Defendants deny these allegations.

- The settlement resolves claims that the Defendants engaged in deceptive conduct in designing, manufacturing and selling CDs with either XCP or MediaMax content protection software and without adequately disclosing the limitations the software imposes on the use of the CDs and the security vulnerabilities the software creates.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way to qualify for the XCP exchange program, cash and free music download settlement benefits. |
| **EXCLUDE YOURSELF** | Get no XCP exchange program, cash or free music download settlement benefits.  This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims being resolved in this case.  See Question 13 below. |
| **OBJECT** | Write to the Court about why you don't like the settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the settlement. |
| **DO NOTHING** | Get no XCP exchange program, cash or free music download settlement benefits. Give up certain rights. You will retain the right to sue the Defendants for any consequential damage to your computer or network that may have resulted from interactions between XCP software or MediaMax software and other software or hardware installed on your computer or network. |

- These rights and options — **and the deadlines to exercise them** — are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement.

- Settlement benefits will be provided to Settlement Class Members if the Court approves the settlement and after appeals are resolved.  Please be patient.

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ............................................................................................................. 3

1.  Why did I get this notice package?
2.  What is this lawsuit about?
3.  Why is this a class action?
4.  Why is there a settlement?

**WHO IS IN THE SETTLEMENT** ................................................................................................ 3

5.  How do I know if I am part of the settlement?
6.  Are there exceptions to being included?
7.  I'm still not sure if I am included?

**THE SETTLEMENT BENEFITS — WHAT YOU GET** ................................................................ 4

8.  What does the settlement provide?
9.  What can I get from the settlement?

**HOW YOU GET SETTLEMENT BENEFITS — SUBMITTING A CLAIM FORM** ..................... 5

10. How can I get a replacement CD, album downloads or other settlement benefits?
11. When would I get my settlement benefits?
12. What am I giving up in the settlement?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ............................................................ 6

13. How do I get out of the settlement?
14. If I don't exclude myself, can I sue the Defendants for the same thing later?
15. If I exclude myself, can I get benefits from this settlement?

**THE LAWYERS REPRESENTING YOU** ................................................................................. 6

16. Do I have a lawyer in this case?
17. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** ..................................................................................... 7

18. How do I tell the Court that I don't like the settlement?
19. What's the difference between objecting and excluding?

**THE COURT'S SETTLEMENT HEARING** ............................................................................. 7

20. When and where will the Court decide whether to approve the settlement?
21. Do I have to come to the hearing?
22. May I speak at the hearing?

**IF YOU DO NOTHING** ........................................................................................................... 8

23. What happens if I do nothing at all?

**GETTING MORE INFORMATION** ......................................................................................... 8

24. Are there more details about the settlement?
25. How do I get more information?

# BASIC INFORMATION

*1.   Why did I get this notice package?*

You or someone in your family may have bought, received or used a SONY BMG CD with XCP software ("XCP CD") or MediaMax 3.0 or 5.0 software ("MediaMax CD"). You can find lists of the XCP CDs and MediaMax CDs in Exhibits 1, 2 and 3 at the end of this notice.

The Court directed that this notice be sent to you because you have a right to know about a proposed settlement of a class action lawsuit and about all of your options, before the Court decides whether to approve the settlement. If the Court approves the settlement, and after any objections and appeals are resolved, an administrator appointed by the Court will provide the XCP exchange program, cash and free music download settlement benefits that the settlement allows.

This package explains the lawsuit, the settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Southern District of New York, and the case is known as *In re SONY BMG CD Technologies Litigation*, Case No. 1:05-cv-09575-NRB ("the Action"). The people who sued are called Plaintiffs, and the companies they sued, SONY BMG Music Entertainment, Inc., First 4 Internet Ltd., and SunnComm International, Inc., are called the Defendants.

*2.   What is this lawsuit about?*

The lawsuit involves the Defendants' use of content protection software installed on SONY BMG CDs.

*3.   Why is this a class action?*

In a class action, one or more people called Class Representatives (in this case Plaintiffs Edwin Bonner, Ori Edelstein, Joseph Halpin, Robert Hull, Andrew Klewan, John Maletta, James Michaelson, Jeffrey Potter, Tom Ricciuti, Yvonne Ricciuti, Dora Rivas, Mary Schumacher and James Springer), sue on behalf of people who have similar claims. All of these people are "the Class" or "Class Members." One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.

*4.   Why is there a settlement?*

The Court did not decide in favor of the Plaintiffs or the Defendants. Instead, both sides agreed to a settlement. That way, they avoid the risks, delay and cost of a trial, and the people affected will get compensation and other benefits as soon as possible. The Class Representatives and the attorneys think the settlement is best for everyone who bought, received or used XCP CDs or MediaMax CDs.

# WHO IS IN THE SETTLEMENT

To see if you will get benefits from this settlement, you first have to decide if you are a Settlement Class Member.

*5.   How do I know if I am part of the settlement?*

The Court directed, for purposes of this settlement, that everyone who fits the following description is a Settlement Class Member: The named Plaintiffs in the Action and all natural persons or entities in the United States who purchased, received, came into possession of or otherwise used one or more XCP CDs and/or MediaMax CDs prior to the date on which the Judgment in this Action becomes Final.

*6.   Are there exceptions to being included?*

You are not a Settlement Class Member if you are a current or former employee of any of the Defendants, or of any of their direct and indirect parent companies, including, but not limited to, Sony Corporation and Bertelsmann AG, or any of their respective divisions and direct and indirect subsidiaries, affiliates, partners, joint ventures, predecessors and successor corporations and business entities, or of any entity that manufactured, supplied, advertised, marketed distributed or sold MediaMax software, XCP software, MediaMax CDs and/or XCP CDs. Also excluded from the Settlement Class are SONY BMG-authorized resellers or distributors of the XCP CDs and MediaMax CDs; or anyone who has previously executed a release discharging Defendants from liability concerning any or all claims that are the subject of the Action.

*7.   I'm still not sure if I am included?*

If you are still not sure whether you are included, you can ask for free help. You can call (800) 242-7610 or visit **www.sonybmgcdtechsettlement.com** for more information. Or you can fill out and return the attached claim form to see if you qualify.

## THE SETTLEMENT BENEFITS — WHAT YOU GET

*8.    What does the settlement provide?*

**If you have an XCP CD (listed in Exhibit 1 to this notice), you can participate in the XCP Exchange Program.** You can exchange each XCP CD that you have for a replacement CD and an MP3 download of the same album. The replacement CD will not contain content protection software. You can exchange your XCP CDs at participating retail stores or by sending your XCP CDs to SONY BMG at no charge.

For each XCP CD you exchange, you are also entitled to one of the following two incentives:

> *Incentive #1:* A payment of $7.50 (in the form of a check or debit card), and one (1) free album download from the list of albums in Exhibit 4 to this notice.
> *or*
> *Incentive #2:* Three (3) free album downloads from the list of albums in Exhibit 4 to this notice.

**If you bought a Media Max CD with version 5.0 software (listed in Exhibit 2 to this notice), the following settlement benefits are available.** For each CD with MediaMax 5.0 that you bought, you are entitled to receive a free MP3 download of the same album. This download will not be content protected. In addition, you are entitled to one (1) free album download from the list of albums in Exhibit 4 to this notice.

**If you bought a MediaMax CD with version 3.0 software (listed in Exhibit 3 to this notice), the following settlement benefits are available.** For each CD with MediaMax 3.0 that you bought, you are entitled to receive a free MP3 download of the same album without any content protection.

If, in particular instances, SONY BMG cannot within a reasonable time provide a non-content protected replacement for an XCP CD, or MP3 downloads of the music on an XCP CD or a MediaMax CD, then SONY BMG will provide an alternate benefit of equivalent or greater value, in a form acceptable to Class Counsel, and in consultation with the affected class member(s).

If you cannot or do not want to download any of the albums listed in Exhibit 4, you may, after the codes entitling you to these downloads expire, return the codes to the claims administrator and receive a cash payment of $2.00 per unused code.

**The following benefits are available to everyone who bought, owned or used an XCP CD or MediaMax CD without having to submit a claim form or take any other action:**

**XCP and MediaMax Software Updates and Uninstallers.** Utilities that allow you to uninstall the XCP software and the MediaMax software from your computer, or to update the software to fix all known security vulnerabilities, are available. An independent security expert has verified the security and effectiveness of these utilities, which are available at www.sonybmgcdtechsettlement.com.

**Manufacturing and Distribution of Content Protected CDs.** The Defendants will not manufacture more CDs with XCP software or MediaMax 3.0 or 5.0 software and have recalled all XCP CDs.

**Fixes For Security Vulnerabilities.** The Defendants will fix any security vulnerabilities discovered in MediaMax and other content protection software placed on SONY BMG CDs. Experts will verify that any fixes provided through software updates are safe and secure.

**Collection of Personal Information.** SONY BMG has represented that it has not collected and will not collect any personal information about users of XCP CDs or MediaMax CDs through the software, other than artist, album title, and the user's IP address (which address is not aggregated with any other information, and is only logged temporarily). An independent auditor will confirm this and repeat its audits at the end of 2006 and 2007.

**Waiver of Specific Provisions of the Licensing Agreement.** The Defendants will waive certain provisions in the End User License Agreements ("EULAs") used for XCP CDs and MediaMax CDs. A list of the specific provisions that the Defendants will waive appears in Exhibit 5 to this notice.

**Future SONY BMG Content Protection Software.** If SONY BMG manufactures any CDs with content protection software before 2008, SONY BMG will ensure that:

- The CDs include labels that adequately describe the nature and function of the software;
- The software only installs with the consumer's express consent;
- A program to uninstall the software is readily available to consumers;
- Updates and relevant changes in how the software operates are meaningfully disclosed to consumers;
- An independent third party reviews the EULA for the software, and the EULA describes what the software does in understandable terms;
- An independent computer security expert verifies that the software is secure;
- The software does not provide any more information to SONY BMG's Internet servers than is necessary to make the enhanced features on the CDs work, unless the user authorizes SONY BMG to do otherwise;
- If the software is discovered to have security vulnerabilities, it will be fixed with an update, or other appropriate steps will be taken.

*9.  What can I get from the settlement?*

The Defendants' changes in practices and procedures described in Section 8 will benefit all Settlement Class Members even if you do nothing.  Section 8 also describes the additional benefits you can get if you have an XCP CD or a MediaMax CD and submit a Proof of Claim form.

## HOW YOU GET SETTLEMENT BENEFITS — SUBMITTING A CLAIM FORM

*10.  How can I get a replacement CD, album downloads or other settlement benefits?*

The XCP update, XCP uninstaller, MediaMax update and MediaMax uninstaller are and will be available for download at www.sonybmgcdtechsettlement.com.  You can obtain these benefits without submitting a Proof of Claim form.

**Do you have an XCP CD?**
To participate in the XCP Exchange Program and obtain replacement CDs and Incentive #1 or Incentive #2, you must send the XCP CD back to SONY BMG (at SONY BMG's expense) with a Proof of Claim form, or return the XCP CD to the place of purchase and send a receipt showing the return to SONY BMG with a Proof of Claim form.  A Proof of Claim form and the instructions for sending XCP CDs back to SONY BMG are being circulated with this notice.  You may also get a Proof of Claim form at www.sonybmgcdtechsettlement.com.  Read the instructions carefully, fill out the form, and return the claim form by December 31, 2006.

**Do you have a MediaMax CD?**
To receive the MediaMax compensation, you must send in a Proof of Claim form with either proof of purchase of the MediaMax CD, or with the MediaMax CD.  A Proof of Claim form is being circulated with this notice.  You may also get a Proof of Claim form at www.sonybmgcdtechsettlement.com.  Read the instructions carefully, fill out the form, and submit it electronically through the website or by U.S. Mail no later than December 31, 2006.

*11.  When would I get my settlement benefits?*

Defendants are making several of the settlement benefits available immediately.  For example, you may download the XCP update, XCP uninstaller, MediaMax update and MediaMax uninstaller at www.sonybmgcdtechsettlement.com.  You will receive the cash and music download benefits within six to eight weeks after you submit the Proof of Claim form and all required proof.

*12.  What am I giving up in the settlement?*

If the settlement is approved, you will release all "Released Claims" (as defined below) against the "Released Parties" (as defined below).  "Released Claims" means any and all claims, rights, damages, losses, demands, obligations, actions, causes of action, suits, cross-claims, matters, issues, debts, liens, contracts, liabilities, agreements, costs, or expenses, of any nature whatsoever, ascertained or unascertained, suspected or unsuspected, existing or claimed to exist, including Unknown Claims, of any and all Plaintiffs and/or Settlement Class Members arising out of any purchase or use by them of an XCP CD or a MediaMax CD, the XCP Update (as defined in the Settlement Agreement), the XCP Uninstaller (as defined in the Settlement Agreement), the MediaMax Update (as defined in the Settlement Agreement), or the MediaMax Uninstaller (as defined in the Settlement Agreement) or any installation or de-installation of XCP Software or MediaMax Software at any time, to the extent that such claims:  (a) arise out of the Action or the Non-S.D.N.Y. Actions (as defined in the Settlement Agreement); (b) relate to any allegations that either were or could have been asserted in the Action or the Non-S.D.N.Y. Actions; or (c) which might in the future be asserted by any Plaintiff or Settlement Class Member, against any of the Released Parties that would arise out of, or relate to in any manner, directly or indirectly, any acts, facts, transactions, occurrences, conduct, representations or omissions alleged in the Action and the Non-S.D.N.Y. Actions, including, without limitation, claims respecting any disclosure, advertising or other descriptions of, or claims relating to (*i*) the nature, quality, value, and/or functionality of the MediaMax CDs, the XCP CDs, the MediaMax Software, MediaMax Update, MediaMax Uninstaller, XCP Software, XCP Update or XCP Uninstaller; and/or (*ii*) the EULAs, and/or (*iii*) the alleged collection by Defendants of Personal Data or IP addresses.  Released Claims also include claims for abuse of process, malicious prosecution or any other claim arising out of, relating to, or in connection with the defense or resolution of the Action.  For avoidance of doubt, Released Claims include claims relating to (*i*) the asserted costs of removing XCP Software and/or MediaMax Software from a computer or network and (*ii*) damages caused by negligent removal of XCP Software and/or MediaMax Software.  The sole exception to the definition of Released Claims is that such claims do not include claims for consequential damage to a computer or network that may or are alleged to have resulted from interactions between the XCP Software or the MediaMax Software and other software or hardware installed on such computer or network.  (For avoidance of doubt, Released Claims also do not include unalleged copyright, trademark or other claims concerning the ownership of intellectual property rights in the MediaMax Software or the XCP Software, or any uninstallers or updates thereto.)

"Released Parties" means each and all of the Defendants and each and all of Defendants' direct and indirect parent companies including, in the case of SONY BMG and without limitation, Sony Corporation and Bertelsmann AG, and each and all of each of Sony Corporation's,

Bertelsmann AG's and Defendants' respective divisions and direct and indirect subsidiaries, affiliates, partners, joint ventures, predecessors and successor corporations and business entities, and each and all of their past and present officers, directors, servants, licensees, joint ventures, sureties, attorneys, agents, consultants, advisors, contractors, employees, controlling or principal shareholders, general or limited partners or partnerships, divisions, insurers, designated management companies, and each and all of their successors or predecessors in interest, assigns, or legal representatives, and any persons or entities that have designed, developed, programmed, manufactured, supplied, advertised, marketed, distributed or sold MediaMax CDs and/or XCP CDs or software thereon.

If you bought, received or used an XCP CD or a MediaMax CD, you will be a member of the Settlement Class, unless you exclude yourself. All of the Court's orders will apply to you and legally bind you.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want to participate in the settlement and get the XCP exchange program, cash and music download settlement benefits described in Section 8, but you want to keep the right to sue or continue to sue the Defendants on your own about any of the claims that this settlement resolves, then you must take steps to get out. This is called excluding yourself — or is sometimes referred to as "opting out" of the Settlement Class.

### 13.  How do I get out of the settlement?

If you want to exclude yourself from the settlement, you must send a letter by mail clearly indicating your name, address and telephone number and stating that you "request to be excluded from the Settlement Class in the SONY BMG CD Technologies Litigation," and you must sign the letter. You also must state the title of the XCP CD or MediaMax CD that you bought, received or used, and the approximate date of purchase. Lists of XCP CDs and MediaMax CDs appear in Exhibits 1 and 2 to this Notice.

You must mail your exclusion request postmarked no later than **May 1, 2006 — or, if you bought your CD after March 1, 2006, then within 60 days of the date of purchase:**

<div align="center">

SONY BMG CD Technologies Settlement<br>
P.O. Box 1804<br>
Faribault, MN 55021-1804

</div>

You can't exclude yourself on the phone or by e-mail. If you exclude yourself from the Settlement Class, you will not get any of the XCP exchange program, cash and music download settlement benefits described in Section 8, and you cannot object to the settlement. You will not be legally bound by anything that happens in this lawsuit. You may be able to sue (or continue to sue) the Defendants in the future for the claims for consequential damage to a computer or network that may or are alleged to have resulted from interactions between the XCP Software or the MediaMax Software and other software or hardware installed on such computer or network.

### 14.  If I don't exclude myself, can I sue the Defendants for the same thing later?

No. Unless you exclude yourself, you give up any rights to sue the Defendants and the Released Parties for the claims that this settlement resolves. If you have a pending lawsuit bringing claims that this settlement resolves, speak to your lawyer in that case immediately. You must exclude yourself from *this* Settlement Class to continue your own lawsuit. Remember, the exclusion deadline is **May 1, 2006 - or if you bought your CD after March 1, 2006, then within 60 days of the date of purchase.**

### 15.  If I exclude myself, can I get benefits from this settlement?

No. If you exclude yourself, do not send in a claim form to ask for any of the settlement benefits described in Section 8. But, you may sue, continue to sue, or be part of a different lawsuit bringing claims that this settlement resolves against the Released Parties. Note: If you elect to receive any of the XCP exchange program, cash and music download settlement benefits, you cannot also opt out.

## THE LAWYERS REPRESENTING YOU

### 16.  Do I have a lawyer in this case?

The Court ordered that the following lead counsel and their law firms will represent you and the other Settlement Class Members: Daniel C. Girard, Esq., Girard Gibbs De Bartolomeo, LLP, 601 California Street, Suite 1400, San Francisco, CA 94108, Telephone (415) 981-4800; and Scott A. Kamber, Kamber & Associates, LLC, 19 Fulton Street, Suite 400, New York, NY 10038, Telephone (877) 773-5469. These lawyers are called Class Counsel. If you want to be represented by your own lawyer, you may hire one at your own expense.

*17. How will the lawyers be paid?*

Class Counsel and the Defendants may agree on the amount of attorneys' fees and expenses that Plaintiffs' counsel may request for legal work on behalf of the Class. Whether or not they agree, Class Counsel will submit a motion for an award of attorneys' fees and reimbursement of expenses to the Court no later than April 6, 2006. A copy of the motion will be available at www.sonybmgcdtechsettlement.com. The Court will consider the motion at a Settlement Fairness Hearing on May 22, 2006. No matter how these issues are resolved, however, the amount of fees and expenses awarded to Plaintiffs' counsel by the Court will not affect in any way the settlement benefits to which you are entitled.

Class Counsel will also submit an application to Court by April 6, 2006 to award incentive payments in an amount not to exceed $1,000 to each named Plaintiff in this Action and related actions pending in other courts across the country.

## OBJECTING TO THE SETTLEMENT

You can tell the Court that you don't agree with the settlement or some part of it.

*18. How do I tell the Court that I don't like the settlement?*

If you're a Settlement Class Member, you can object to the settlement or the motion for an award of attorneys' fees and reimbursement of expenses, if you wish. You can give reasons why you think the Court should not approve the settlement or award of attorneys' fees and reimbursable expenses. The Court will consider your views. To object, you must send a letter saying that you object to the proposed settlement in the *In re SONY BMG CD Technologies Litigation*. You must include your name, address, telephone number, the title of the XCP CD or MediaMax CD that you bought, received or used, and your signature. You must also state the reasons why you object. Mail the objection to each of the following addresses postmarked no later than **May 1, 2006**:

| **COURT** | **CLASS COUNSEL** | **DEFENSE COUNSEL** |
|---|---|---|
| Clerk of the Court | GIRARD GIBBS & | DEBEVOISE & PLIMPTON LLP |
| United States District Court | De BARTOLOMEO LLP | Jeffrey S. Jacobson |
| Daniel Patrick Moynihan | Daniel C. Girard | 919 Third Avenue |
| United States Courthouse | 601 California Street, Suite 1400 | New York, NY 10022 |
| 500 Pearl Street | San Francisco, CA 94108 | Tel. (212) 909-6000 |
| New York, NY 10007-1312 | Tel. (415) 981-4800 | |
| | | |
| | KAMBER & ASSOCIATES LLC | |
| | Scott A. Kamber | |
| | 19 Fulton Street, Suite 400 | |
| | New York, NY 10038 | |
| | Tel. (877) 773-5469 | |

*19. What's the difference between objecting and excluding?*

Objecting is simply telling the Court that you don't like something about the settlement. You can object only if you stay in the Settlement Class. Excluding yourself is telling the Court that you don't want to be part of the Settlement Class. If you exclude yourself, you cannot object because the case no longer affects you.

## THE COURT'S SETTLEMENT HEARING

*20. When and where will the Court decide whether to approve the settlement?*

Plaintiffs' Counsel will submit a motion for final approval of the settlement to the Court by April 6, 2006. A copy of the motion will be available at www.sonybmgcdtechsettlement.com. The Court will hold a Settlement Fairness Hearing at 9:15 a.m. on May 22, 2006, at the United States District Court, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, Courtroom 21A, New York, New York. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate, and the award of attorneys' fees and reimbursable expenses. If there are objections, the Court will consider them. The Court will listen to people who have asked to speak at the hearing. The Court may also decide how much to pay to Plaintiffs' counsel. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

*21. Do I have to come to the hearing?*

No. Class Counsel will answer questions the Court may have. But, you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

*22. May I speak at the hearing?*

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must include with your objection, described in point 18 above, the statement, "I hereby give notice that I intend to appear at the Fairness Hearing in *In re SONY BMG CD Technologies Litigation*." Be sure to include your name, address, telephone number, the title of the XCP CD or MediaMax CD that you bought, received or used, and your signature. If you intend to have any witnesses testify or to introduce any evidence at the Fairness Hearing, you must list the witnesses and evidence in your objection. Your Notice of Intention to Appear must be postmarked no later than **May 1, 2006**, and be sent to the Clerk of the Court, Class Counsel, and Defense Counsel, at the addresses shown in the answer to question 18. You cannot speak at the hearing if you excluded yourself.

# IF YOU DO NOTHING

*23. What happens if I do nothing at all?*

If you do nothing, and do not submit a Proof of Claim form, you will not be able to receive the XCP exchange program, cash and music download settlement benefits or participate in the XCP Exchange Program described in Section 8. But, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants and the Released Parties about the claims that this settlement resolves, ever again.

# GETTING MORE INFORMATION

*24. Are there more details about the settlement?*

This notice summarizes the proposed settlement. More details are in a Settlement Agreement dated December 28, 2005. You can get a copy of the Settlement Agreement by visiting **www.sonybmgcdtechsettlement.com**.

*25. How do I get more information?*

You can call the Claims Administrator at (800) 242-7610 toll free with questions about submitting a Proof of Claim, or visit the Website at **www.sonybmgcdtechsettlement.com**, where you will find answers to common questions about the settlement, a Proof of Claim form, plus other information to help you determine whether you are a Settlement Class Member and whether you are eligible for certain relief. Any other questions should be directed to Class Counsel identified in paragraph 18 above.

Date: February 10, 2006

## Exhibit 1 - XCP Titles Distributed in the United States

The SONY BMG CDs with XCP software are:

| ARTIST | TITLE | ITEM NUMBER(S) | UPC(S) |
| --- | --- | --- | --- |
| A Static Lullaby | Faso Latido | CK92772 | 827969277225 / D161263 |
| Acceptance | Phantoms | CK89016 | 696989801629 / D161429 |
| Amerie | Touch | CK90763 | 827969076323 / D161365 |
| Art Blakey | Drum Suit | CK93637 | 827969363720 / D162083 |
| The Bad Plus | Suspicious Activity? | CK94740 | 827969474020 |
| Bette Midler | Sings the Peggy Lee Songbook | CK95107 / CK74815 | 827969510728 / 828767481524 |
| Bob Brookmeyer & Friends | Bob Brookmeyer & Friends | CK94292 | 827969429228 / D162087 |
| Buddy Jewell | Times Like These | CK92873 | 827969287323 / D161532 |
| Burt Bacharach | At This Time | CK97734 | 827969773420 |
| Celine Dion | On Ne Change Pas | E2K97736 | 827969773628 |
| Chayanne | Cautivo | LAK96819 / LAK96818 / LAK95886 | 037628981921 / 037628981822 / 037628588626 |
| Chris Botti | To Love Again | CK94823 | 827969482322 |
| The Coral | The Invisible Invasion | CK94747 | 827969474723 |
| Cyndi Lauper | The Body Acoustic | EK94569 | 827969456927 |
| The Dead 60's | The Dead 60's | EK94453 | 827969445327 |
| Deniece Williams | This Is Niecy | CK93814 | 827969381427 |
| Dexter Gordon | Manhattan Symphonie | CK93581 | 827969358122 / D162084 |
| Dion | The Essential Dion | CK92670 | 827969267028 / D161439 |
| Earl Scruggs | I Saw The Light With Some Help From My Friends | CK92793 | 827969279328 / D162399 |
| Elkland | Golden | CK92036 | 827969203620 / D161431 |
| Emma Roberts | Unfabulous And More: Emma Roberts | CK93950 / CK97684 | 827969395028 / 827969768426 |
| Flatt & Scruggs | Foggy Mountain Jamboree | CK92801 | 827969280126 / D162400 |
| G3 | Live In Tokyo | E2K97685 | 827969768525 |
| George Jones | My Very Special Guests | E2K92562 | 827969256220 / D200250 |
| Gerry Mulligan | Jeru | CK65498 | 07464649827 / D162086 |
| Horace Silver | Silver's Blue | CK93856 | 827969835623 / D162082 |
| Jane Monheit | The Season | EK97721 | 827969772126 |
| Jon Randall | Walking Among The Living | EK92083 | 827969208328 |
| Life of Agony | Broken Valley | EK93515 | 827969351529 / D161228 |
| Mary Mary | Mary Mary | CK94812 / CK92948 | 000768353721 / 827969294826 / D162005 |
| Montgomery Gentry | Something To Be Proud Of: The Best of 1999-2005 | CK75324 / CK94982 | 828767532424 / 827969498224 |
| Natasha Bedingfield | Unwritten | EK93988 | 827969398821 / D162095 |
| Neil Diamond | 12 Songs | CK94776 / CK97811 | 827969477625 / 827969781128 |
| Nivea | Complicated | 82876671562 | 828766715620 / D161353 |
| Our Lady Peace | Healthy In Paranoid Times | CK94777 | 827969477724 |
| Patty Loveless | Dreamin' My Dreams | EK94481 | 827969448120 |
| Pete Seeger | The Essential Pete Seeger | CK92835 | 827969283523 / D161441 |
| Ray Charles | Friendship | CK94564 | 827969456422 / D161917 |
| Rosanne Cash | Interiors | CK93655 | 827969365526 |
| Rosanne Cash | King's Record Shop | CK86994 | 696989699427 |
| Rosanne Cash | Seven Year Ache | CK86997 | 696989699724 |
| Shel Silverstein | The Best Of Shel Silverstein | CK94722 | 827969472224 / D162100 |
| Shelly Fairchild | Ride | CK90355 | 827969035528 / D161531 |
| Susie Suh | Susie Suh | EK92443 | 827969244326 / D161094 |
| Switchfoot | Nothing Is Sound | CK96534 / CK96437 / CK94581 | 827969635425 / 827969643723 / 827969458129 |
| Teena Marie | Robbery | EK93817 | 827969381724 |
| Trey Anastasio | Shine | CK96428 | 827969642825 |
| Van Zant | Get Right With The Man | CK93500 | 827969350027 / or D161459 |
| Vivian Green | Vivian | CK90761 | 827969076125 / D161824 |

[1] Three titles —Ricky Martin, "Life"; Peter Gallagher, "7 Days in Memphis"; and a limited number of "Hidden Beach Presents Unwrapped Vol. 4" —were released with a content protection grid on the back of the CD packaging but XCP content protection software was not actually included on the albums.

## Exhibit 2 - MediaMax 5.0 Titles Distributed in the United States

The SONY BMG CDs with MediaMax version 5.0 software are:

| ARTIST | TITLE | SELECTION # | ARTIST | TITLE | SELECTION # |
|---|---|---|---|---|---|
| Alicia Keys | Unplugged | 82876674242 82876731662 D165215 | Santana | All That I Am | 82876597732 D165199 |
| Amici Forever | Defined | 82876688832 D161495 | Sarah McLachlan | Bloom (Remix Album) | 82876697982 D162345 |
| Babyface | Grown & Sexy | 82876705682 D162090 | Stellastarr* | Harmonies for the Haunted | 82876688812 D162194 |
| Black Rebel Motorcycle Club | Howl | 82876671601 D162369 | Syleena Johnson | Chapter 3: The Flesh | 82876610932 D162447 |
| Britney Spears | Hit me – Remix | 82876740622 | T-Pain | Rappa Ternt Sanga | 82876734472 82876732002 |
| Cassidy | I'm A Hustla | 82876687072 82876680732 | Various | So Amazing: An All Star Tribute To Luther Vandross | 82876624722 |
| Chris Brown | Chris Brown | 82876733222 | Various | Songs Brown Hotel | 82876714112 |
| Cook, Dixon & Young | Volume One | 82876673342 D162089 | Wakefield | Which Side Are You On? | 82876685072 82876681352 D161648 |
| David Gray | Life In Slow Motion | 82876710682 D165217 | Charlie Wilson | Charlie, Last Name Wilson | 82876694292 D162168 |
| Dido | Dido Live | 82876658099 | YoungBloodZ | Everybody Know Me | 82876733402 82876731752 |
| Faithless | Forever Faithless/ENH | 82876710142 D162102 | | | |
| Imogen Heap | Speak For Yourself | 82876725322 | | | |
| Judd & Maggie | Subjects | 82876692492 D161949 | | | |
| Leo Kottke/Mike Gordon | Sixty Six Steps | 82876689092 | | | |
| Maroon 5 | Live | 82876709742 82876699522 D200606 | | | |
| My Morning Jacket | Z | 82876710672 | | | |
| Raheem Devaughn | The Love Experience | 82876537232 D161600 | | | |

## Exhibit 3 – MediaMax 3.0 Titles Distributed in the United States

The SONY BMG CDs with MediaMax version 3.0 software are:

| ARTIST | TITLE | SELECTION # |
|---|---|---|
| Anderson, Keith | Three Chord Country | 82876662942 D161674 |
| Backstreet Boys | Never Gone (Walmart) | 82876702442 |
| Backstreet Boys | Never Gone (Target) | 82876705342 |
| Backstreet Boys | Never Gone | 82876696112 D165187 |
| Brickman, Jim | Grace | 82876679792 D161456 |
| Brickman, Jim | Grace (Provident Version) | 82876687952 |
| Citizen Cope | Clarance Greenwood Recordings | 82876521142 D154185 |
| Charlotte Martin | On Your Shore | 82876606762 |
| Chieftains, The | Live From Dublin | 82876671372 D160913 |
| Clay Aiken | Merry Christmas | 82876626222 D161935 |
| Dave Matthews Band | Stand Up | 82876687962 D165167 |
| Dido | "White Flag" W/Enhanced Features (Maxi Single) | |
| Foo Fighters | In Your Honor (Bb Version) | 82876705282 |
| Foo Fighters | In Your Honor | 82876680382 D265002 |
| 40 Below Summer | The Mourning After | 79301828982 |
| Hamilton, Anthoney | Coming From Where I'm From | 82876521072 D150669 |
| J-Kwon | Hood Hop (Edited) | 82876583672 |
| J-Kwon | Hood Hop (Ex) | 82876576132 D152470 |
| Kasabian | Kasabian | 82876664282 D161062 |

| ARTIST | TITLE | SELECTION # |
|---|---|---|
| Kings Of Leon | Aha Shake Heartbreak | 82876645442 D160912 |
| Mclachlan, Sarah | "Fallen" W/Enhanced Features (Maxi Single) | 82876601432 |
| Mclachlan, Sarah | Afterglow Live | 82876644942 D260346 |
| Mclachlan, Sarah | Afterglow Live | 82876645432 |
| Nodesha | Get It While It's Hot (Maxi Single) | 82876566902 |
| Sahara Hotnights | Kiss & Tell | 82876626892 D153473 |
| Silvertide | Show & Tell | 82876644022 |
| Silvertide | Show & Tell (Ex) | 82876600892 D154573 |
| Soundtrack | Xxx: State Of The Union | 82876679222 D161437 |
| Soundtrack | Xxx: State Of The Union | 82876681092 |
| Stone, Angie | Stone Love | 82876562152 D153051 |
| Tha' Rayne | Didn't You Know (Maxi Single) | 82876566882 |
| Velvet Revolver | Contraband (Bb Version) | 82876665102 |
| Velvet Revolver | Contraband (Ed) | 82876605242 |
| Velvet Revolver | Contraband (Ex | 82876597942 D153163 |
| Yung Wun | The Dirtest Thir(Ex | 82876607672 D154246 |
| Yung Wun | The Dirtiest Thirstiest | 82876609492 |
| Various | Relaxation: A Windham Hill Collection | 82876629422 |

## EXHIBIT 4

The albums available for download by Settlement Class Members who purchased one of the SONY BMG CDs with XCP software listed in Exhibit 1 or SONY BMG CDs with MediaMax 5.0 software listed in Exhibit 2 are:

| ARTIST | GENRE | TITLE 1 | Selection | Full Album | TITLE 2 | Selection | Full Album |
|---|---|---|---|---|---|---|---|
| Acceptance | Rock | Phantoms | CK 89016 | YES | | | |
| Alexander, Jessi | Country | Honeysuckle Sweet | CK 90849 | YES | | | |
| Amerie | R&B | All I Have | CK 85959 | YES | Touch | CK 90763 | YES |
| Amos, Tori | Pop | Scarlet' s Walk | EK 86412 | YES | The Beekeeper | EK 92800 | YES |
| Anastacia | Dance | Freak of Nature | EK 86010 | YES | Not That Kind | EK 69948 | YES |
| Annointed | Gospel | Now is the Time | CK 90929 | YES | | | |
| Anthony, Marc | Pop | Mended | CK 85300 | YES | Marc Anthony | CK 69726 | YES |
| Ataris | Rock | So long, Astoria | CK 86184 | YES | | | |
| Babyface | R&B | The Essential: Babyface | EK 89172 | YES | | | |
| Backstreet Boys | Pop | The Hits–Chapter One | 01241417792 | YES | | | |
| Bad Plus | Jazz | Give | CK 90771 | YES | Suspicious Activity | CK 94740 | YES |
| Blakey, Art | Jazz | The Jazz Messengers | CK 65265 | YES | | | |
| Blu Cantrell | Jazz | Bittersweet | 82876527292 | YES | | | |
| Botti, Chris | Jazz | To Love Again, The Duets | CK 677505 | YES | When I Fall In Love | CK 92872 | YES |
| Bow Wow | Rap | Wanted | CK 93505 | YES | | | |
| The Calling | Rock | Two | 82876566122 | YES | Camino Palmero | 7863675852 | YES |
| Carpenter, Mary Chapin | Country | Between Here And Gone | CK 86619 | YES | The Essential: Mary Chapin Carpenter | CK 90772 | YES |
| Carter, Aaron | Pop | Most Requested Hits | 82876555702 | YES | | | |
| Cash, Roseanne | Country | Interiors | CK 677638 | YES | Seven Year Ache | CK 677637 | YES |
| Cassidy | R&B | Split Personality | 82876588962 | YES | | | |
| Cave In | | Antenna | 07863681312 | YES | | | |
| Chaszc, JC | Pop | Schizophrenic | 82876537242 | YES | | | |
| Citizen Cope | | The Clarence Greenwood Recordings | 82876521142 | YES | | | |
| Coe, David Allan | Country | The Essential: David Allan Coe | CK 89073 | YES | | | |
| Coheed and Cambria | Rock | In Keeping Secrets | CK 92686 | YES | Good Apollo | CK 93989 | YES |
| Colvin, Shawn | Pop | Polaroids | CK 93452 | YES | | | |
| Coral | Rock | The Coral | CK 87192 | YES | | | |
| Crossfade | Rock | Crossfade | CK 87148 | YES | | | |
| Crowell, Rodney | Country | The Outsider | CK 94470 | YES | Diamonds & Dirt | CK 61612 | YES |
| Cypress Hill | Rap | III (Temples Of Boom) Edited | CK 67433 | YES | Live At The Fillmore | CK 85273 | YES |
| Da Brat | Rap | Limelite, Luv & Niteclubz | 82876525092 | YES | | | |
| Dead 60' s | Rock | The Dead 60' s | EK 677675 | YES | | | |
| Diamond Rio | Country | Completely | 07863670462 | YES | | | |

## EXHIBIT 4 (continued)

| ARTIST | GENRE | TITLE 1 | Selection | Full Album | TITLE 2 | Selection | Full Album |
|---|---|---|---|---|---|---|---|
| Dimeola, Al | Jazz | The Essence of Al Dimeola | CK 52920 | YES | | | |
| Dion, Celine | Pop | A New Day..Live In Las Vegas | EK 86400 | YES | | | |
| Downey Jr, Robert | Pop | The Futurist | SK 92654 | YES | | | |
| Dr. Hook | Pop | Super Hits | CK 85876 | YES | The Essential Dr. Hook & Medicine Show | CK 86813 | YES |
| Earth Wind and Fire | Pop | Greatest Hits | C2K 86661 | YES | Spirit (expanded) | CK 65739 | YES |
| Ellington, Duke | Jazz | Piano In The Background | CK 87107 | YES | Masterpieces By Ellington | CK 87043 | YES |
| Ellis, Don | Jazz | Electric Bath | CK 65522 | YES | | | |
| Estefan, Gloria | Pop | Unwrapped | EK 86790 | YES | Mi Tierra | EK 53807 | |
| Eve 6 | Eve 6 | | 0786367617{2 | YES | | | |
| Fatty Koo | R&B | House Of Fatty Koo | CK 91256 | YES | | | |
| Fishbone | Rock | Truth And Soul | CK 40891 | YES | The Essential Fishbone | CK 86361 | YES |
| Flatt & Scruggs | Country | Foggy Mountain Jamboree | CK 677627 | YES | | | |
| Fleck, Bela | Jazz | Perpetual Motion | SK 89610 | YES | | | |
| Frankie J | R&B | The One | CK 96432 | YES | | | |
| Fuel | Rock | Something Like Human | EK 90705 | YES | | | |
| Full Scale | Rock | Full Scale | CK 93557 | YES | | | |
| Future Leaders of the World | Rock | LVL IV | EK 89192 | YES | | | |
| Getz, Stan | Jazz | Jazz Moods: Cool | CK 90690 | YES | | | |
| Ginuwine | Rap | The Senior | EK 86960 | YES | | | |
| Good Charlotte | Rock | The Chronicles of Life & Death | EK 92425 | YES | | | |
| Gordon, Dexter | Jazz | Manhattan Symphonie | CK 677633 | YES | | | |
| Gray, Macy | R&B | The Very Best Of Macy Gray | EK 92944 | YES | Macy Gray On How Life Is | EK 61400 | YES |
| Green, Vivian | R&B | Vivian | CK 677881 | YES | A Love Story | CK 86357 | YES |
| Gregory, James | Comedy | It Could Be A Law, I Don' t Know! The Funniest Man In America | EK 46080 | YES | | | |
| Griffin, Eddie | Comedy | Message In The Hat | EK 53806 | YES | | | |
| Griggs, Andy | Country | This I Gotta See | 82876596302 | YES | | | |
| Haggard, Merle | Country | Love Songs | EK 90569 | YES | The Essential Merle Haggard: The Epic Years | EK 90568 | YES |
| Hancock, Herbie | Jazz | The Piano | CK 87083 | YES | | | |
| Heart | Rock | Little Queen | EK 85772 | YES | Bebe Le Strange | EK 85770 | YES |
| Incubus | Rock | A Crow Left Of The Murder | EK 90890 | YES | Morning View | EK 85227 | YES |
| Indigo Girls | Rock | Indigo Girls | EK 85109 | YES | All That We Let In | EK 91003 | YES |
| Indigo Girls | Rock | Rites Of Passage | EK 61576 | YES | | | |
| Jagged Edge | R&B | Hard | CK 87017 | YES | JE Heartbreak | CK 69862 | YES |
| Jennings, Waylon | Country | Highwayman 2 | CK 45240 | YES | | | |

## EXHIBIT 4 (continued)

| ARTIST | GENRE | TITLE 1 | Selection | Full Album | TITLE 2 | Selection | Full Album |
|--------|-------|---------|-----------|------------|---------|-----------|------------|
| Jewell, Buddy | Country | Times Like These | CK 677879 | YES | Buddy Jewell | CK 90131 | YES |
| Jones, George | Country | Love Songs | EK 87151 | YES | | | |
| Kings of Leon | Rock | Aha Shake Heartbreak | 82876645442 | YES | | | |
| Korn | Rock | Greatest Hits, Vol 1 | EK 92700 | YES | Issues | EK 62239 | YES |
| Kristopherson, Kris | Country | Kristofferson | JK 85281 | YES | | | |
| Labelle, Patti | R&B | Love Songs | EK 85290 | YES | | | |
| Lamb of God | Rock | Ashes Of The Wake | EK 90702 | YES | | | |
| Lambert, Miranda | Country | Kerosene | EK 92026 | YES | | | |
| Lauper, Cyndi | Pop | The Body Acoustic | EK 94569 | YES | | | |
| Leadbelly | Blues | King Of The 12-String Guitar | CK 46776 | YES | | | |
| Lewis, Ramsey | Jazz | Love Songs | CK 93568 | YES | | | |
| Lit | Rock | A Place In The Sun | 82876681515 | YES | Atomic | 0786380862 | YES |
| Longwave | Rock | There's A Fire | 82876670352 | YES | The Strangest Things | 0786381792 | YES |
| Lopez, Jennifer | Pop | Rebirth | EK 90622 | YES | | | |
| Loveless, Patty | Country | On Your Way Home | EK 86620 | YES | | | |
| Marie, Teena | R&B | Robbery | EK 677629 | YES | Super Hits | EK 86344 | YES |
| Marsalis, Wynton | Jazz | Hot House Flowers | CK 39530 | YES | Marsalis Plays Monk | CK 67503 | YES |
| Martin, Charlotte | Rock | On Your Shore | 82876606762 | YES | | | |
| Martin, Ricky | Pop | Life | CK 678318 | YES | Ricky Martin | CK 69891 | YES |
| Mary Mary | R&B | Mary Mary | CK 677733 | YES | | | |
| Mathis, Johnny | Pop | Love Songs | CK 87065 | YES | Christmas Music: A Personal Collection | | |
| Mathis, Johnny | Pop | Open Fire, Two Guitars | CK 65862 | YES | Good Night, Dear Lord | CK 64891 | YES |
| McKay, Nellie | Pop | Get Away From Me | C2K 90940 | YES | | | |
| Monk, Thelonious | Jazz | The Essential: Thelonious Monk | CK 89175 | YES | Jazz Moods:<br>'Round Midnight | CK 90692 | YES |
| Monroe, Bill | Country | 16 Gems | CK 53908 | YES | | | |
| Montgomery Gentry | Country | You Do Your Thing | CK 90558 | YES | | | |
| Moore, Mandy | Pop | The Best of Mandy Moore | EK 93458 | YES | | | |
| Mudvayne | Rock | Lost And Found | EK 90784 | YES | | | |
| Mulligan, Gerry | Jazz | Jeru | CK 677634 | YES | | | |
| Nalick, Anna | Pop | Wreck Of The Day | CK 90891 | YES | | | |
| Nas | Rap | God's Son | CK 86985 | YES | | | |
| Nine Days | Rock | The Madding Crowd | BK 63634 | YES | | | |
| O' jays | R&B | The Essential O' Jays | EK 90632 | YES | | | |
| Omarion | R&B | O | EK 92818 | YES | | | |
| Paul, Billy | Pop | Super Hits | EK 86553 | YES | | | |

## EXHIBIT 4 (continued)

| ARTIST | GENRE | TITLE 1 | Selection | Full Album | TITLE 2 | Selection | Full Album |
|---|---|---|---|---|---|---|---|
| Paycheck, Johnny | Country | Johnny Paycheck - 16 Biggest Hits | EK 69968 | YES | | | |
| Phillips, Esther | Jazz | Jazz Moods | EK 93641 | YES | | | |
| Randall, Jon | Country | Walking Among The Living | EK 92083 | YES | | | |
| Raveonettes | | Chain Gang of Love | CK 90353 | YES | | | |
| Raye, Colin | Country | 16 Biggest Hits | EK 86682 | YES | | | |
| Rich, Charlie | Country | 16 Biggest Hits | EK 69740 | YES | | | |
| Rockpile | Rock | Seconds Of Pleasure | CK 63983 | YES | | | |
| Satriani, Joe | Rock | Is There Love In Space? | EK 90832 | YES | Strange Beautiful Music | EK 86294 | YES |
| Savage Garden | Pop | Savage Garden | CK 67954 | YES | | | |
| Scruggs, Earl | Country | I Saw The Light With Some Help From My Friends | CK 92793 | YES | | | |
| Simon, Carly | Pop | Moonlight Serenade | CK 94890 | YES | | | |
| Simpson, Jessica | Pop | In This Skin | CK 92005 | YES | | | |
| Sinatra, Frank | Pop | I've Got A Crush On You | CK 66964 | YES | Sinatra Sings His Greatest Hits | CK 65240 | YES |
| Skaggs, Ricky | Country | Live In London | EK 93546 | YES | | | |
| Stanley Brothers | Country | The Complete Columbia Stanley Brothers | CK 53798 | YES | | | |
| Sweet, Matthew | Pop | Time Capsule: The Best of Matthew Sweet 1990-2000 | 61422311572 | YES | | | |
| Switchfoot | Rock | Nothing Is Sound | CK 94581 | YES | The Beautiful Letdown | CK 86967 | YES |
| Tatum, Art | Jazz | Piano Starts Here | CK 64690 | YES | | | |
| Train | Pop | Alive At Last | CK 92830 | YES | My Private Nation | CK 86593 | YES |
| Tritt, Travis | Country | My Honky Tonk History | CK 92084 | YES | Strong Enough | CK 86660 | YES |
| Tyrell, Steve | Jazz | This Guy's In Love | CK 89238 | YES | This Time Of Year | CK 86638 | YES |
| Vandross, Luther | R&B | This Is Christmas | EK 92701 | YES | The Ultimate Luther Vandross | EK 85991 | YES |
| Vandross, Luther | R&B | Your Secret Love | EK 67553 | YES | The Essential Luther Vandross | E2K 89167 | YES |
| Vaughan, Sarah | Jazz | Love Songs | CK 93570 | YES | Sarah Vaughan In High-Fi | CK 65117 | YES |
| Vendetta Red | Rock | Between the Never and the Now | EK 86415 | YES | | | |
| The Verve Pipe | Pop | Underneath | 07863679962 | YES | | | |
| Watts Jeff Train | Jazz | Citizen Train | CK 69551 | YES | | | |
| White, Peter | Jazz | Confidential | CK 89090 | YES | | | |
| Xscape | Rap | Traces Of My Lipstick | CK 68042 | YES | Off The Hook | CK 67022 | YES |
| Yamagata, Rachael | | Happenstance | 82876505662 | YES | | | |
| ZZ Top | Rock | Mesalero | 82876511682 | YES | | | |

# **EXHIBIT 5**

Upon Final Approval, Defendants agree to waive all of their rights to enforce the following provisions of the XCP EULA and the MediaMax 5.0 EULA (which are identical):

1. **Article 2,** to the extent such provision could be construed as precluding consumers from transferring music they purchased to media players and portable devices that are not "APPROVED MEDIA PLAYERS" and "APPROVED PORTABLE DEVICES" (as those terms are defined in the EULA);

2. **Article 2.3;**

3. **Article 3.1(a),** to the extent such provision could be construed to prevent copying or reproducing the "DIGITAL CONTENT" otherwise permitted by applicable laws;

4. **Article 3.1(b),** to the extent such provision could be construed to prevent resale of the physical CD on which the "DIGITAL CONTENT" is embodied;

5. **Article 3.1(c),** to the extent such provision could be construed as giving Defendants an affirmative right to preclude uninstallation of the XCP Software or MediaMax Software, or other non-negligent efforts to remedy the Security Vulnerabilities allegedly associated with such software;

6. **Article 3.1(f),** to the extent anything in such provision is inconsistent with SONY BMG's waiver of rights under this Paragraph U;

7. **Articles 7 and 8;**

8. **Article 9(1); and**

9. **Article 9.2(ii)-(iii).**

Upon Final Approval, SONY BMG and SunnComm also agree to waive all of their rights to enforce the following provisions of the MediaMax 3.0 EULA:

1. **Paragraph III,** to the extent anything in such provision is inconsistent with SONY BMG's waiver of rights under this Paragraph U;

2. **Article 1.1,** to the extent such provision could be construed as precluding consumers from transferring music they purchased to a media player or portable device that is not a "Digital Content System" (as that term is defined in the MediaMax 3.0 EULA);

3. **Article 1.2;**

4. **Article 1.3,** to the extent such provision could be construed as (*i*) preventing copying or reproducing otherwise permitted by applicable laws, (*ii*) preventing the resale of the physical CD on which the "Digital Content" is embodied, or (*iii*) giving SONY BMG or SunnComm an affirmative right to preclude uninstallation of the MediaMax software, or other non-negligent efforts to remedy the Security Vulnerabilities allegedly associated with such software; and

5. **Article 1.4,** to the extent such provision could be construed to prevent copying or reproducing otherwise permitted by applicable laws.

Defendants agree to waive the limitation of liability provisions (Article 6 of each of the XCP EULA and the MediaMax 5.0 EULA; Article 4.1 of the MediaMax 3.0 EULA), and the New York forum selection clauses (Article 10 of each of the XCP EULA and the MediaMax 5.0 EULA; Article 6.1 of the MediaMax 3.0 EULA) of the EULAs only in cases where a Settlement Class Member alleges non-Released Claims on his or her own behalf only, and not as a putative class action, mass action or private attorney general proceeding.

# EXHIBIT E

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

|  |  |  |
|---|---|---|
| ———————————————— x | Case No. BC 286950 |
| WARREN EALLONARDO and JOSEPH COREY,<br>Individually and on Behalf of all Others Similarly<br>Situated, | : :<br>: | [Assigned for all purposes to the<br>Honorable Peter D. Lichtman] |
| Plaintiffs, | : : | [Complaint filed: December 13, 2002] |
| v. | : | **CLASS ACTION** |
| METRO-GOLDWYN-MAYER INC., METRO-<br>GOLDWYN-MAYER HOME ENTERTAINMENT<br>INC., BLOCKBUSTER, INC., BEST BUY<br>COMPANY, INC., TARGET CORPORATION,<br>COLUMBIA HOUSE HOLDINGS, INC.,<br>AMAZON.COM, INC. AND DOES 1 through 500,<br>inclusive, | :<br>:<br>:<br>:<br>:<br>: | **NOTICE OF CLASS ACTION AND PROPOSED**<br>**SETTLEMENT**<br><br>Date:  December 20, 2004<br>Time:  11:00 a.m.<br>Dept.:  322, Central Civil West |
| Defendants. | : :<br>: | Discovery Cutoff:  Not set<br>Motion Cutoff:  Not set |
| ———————————————— x | Trial Date:  Not set |

**TO:**  ALL CONSUMERS IN THE UNITED STATES WHO OWN MGM WIDESCREEN DVDS IDENTIFIED IN THIS
NOTICE

### IF YOU ARE A MEMBER OF THIS CLASS OF PERSONS, YOU SHOULD

### READ THIS NOTICE CAREFULLY BECAUSE IT WILL AFFECT YOUR RIGHTS.

YOU ARE HEREBY NOTIFIED of a class action lawsuit that is pending in this Court which the parties propose to settle on

a class-wide basis on the terms set forth below.

The Court has scheduled a hearing to determine whether the Settlement should be approved as fair, reasonable and adequate.

The hearing will be held on May 16, 2005, at 10:30 a.m. at the Los Angeles Superior Court located at 600 South Commonwealth

Avenue, Department CCW-322, Los Angeles, California 90005.


## I.     DESCRIPTION OF THE LITIGATION.

On December 13, 2002, Plaintiff Warren Eallonardo filed a class action lawsuit against "Metro-Goldwyn-Mayer Inc." and

"Metro-Goldwyn-Mayer Home Entertainment Inc." ("MGM") and five companies which sell DVDs manufactured by MGM to the

retail market (the "Retail Defendants").  (Plaintiff Joseph Corey became a named Plaintiff on March 18, 2003).  Plaintiffs filed their

First Amended Complaint on March 18, 2003, their Second Amended Complaint on May 14, 2003 and their Third Amended

Complaint on July 10, 2003. Plaintiffs' Third Amended Complaint alleges causes of action against MGM for fraud, false advertising,

unfair competition, violation of the Consumer Legal Remedies Act and breach of the implied warranty of merchantability and causes

1

of action against the Retail Defendants for unfair business practices, violation of the Consumer Legal Remedies Act and breach of the implied warranty of merchantability. The gravamen of Plaintiffs' Complaint is that certain representations on the label and package insert of MGM's widescreen DVDs are false and misleading because MGM's widescreen DVDs for films shot in the 1.85 to 1 aspect ratio have the same image width as MGM's standard screen format DVDs.

MGM has denied and continues to deny that any portion of the packaging on the outside or inside of its widescreen DVDs is misleading. MGM has asserted and continues to assert many defenses to Plaintiffs' Complaint and expressly has denied and continues to deny any wrongdoing or liability whatsoever arising out of any of the conduct, acts or omissions alleged or that could have been alleged in the action. The Retail Defendants have alleged and continue to allege that Plaintiffs' claims against them are defective as a matter of law and have denied and continue to deny any wrongdoing or liability whatsoever arising out of any of the conduct, acts or omissions alleged or that could have been alleged in the action. This Settlement involves a compromise of a disputed claim and does not constitute an admission of liability by Defendants. The Court has made no rulings on the merits of the litigation and has not certified a class in this action. MGM's widescreen DVDs are not defective or lacking in quality in any respect.

## II.     **THE PROPOSED SETTLEMENT.**

The terms of the proposed Settlement are summarized below. The complete terms of the Settlement are on file and may be reviewed at the office of the Clerk of the Los Angeles Superior Court located at 600 South Commonwealth Avenue, Los Angeles, California 90005 where they may be examined and copied during regular business hours.

A.     Class Members have the right to return to the Claims Administrator one copy of each DVD title manufactured by or on behalf of MGM which was created for a film shot in the aspect ratio of 1.85 to 1 or 1.66 to 1 ("Eligible DVD") for either (1) a new MGM DVD from a list of 325 titles or (2) a cash refund of $7.10.

B.     "Settlement Class" means all consumers in the United States who acquired or purchased for their own use and not for resale widescreen DVDs manufactured by or on behalf of MGM which were created for films shot in the aspect ratio of 1.85 to 1 or 1.66 to 1 from December 1998 to September 8, 2003.

C.     In order to determine if you are a member of the Settlement Class who is eligible to participate in the Settlement, please call the Claims Administrator at the following toll-free number: **1-800-285-2168.**

D.     If you are eligible to participate in the Settlement, the Claims Administrator will send you a Proof of Claim Form, a List of MGM DVD Titles and a postage pre-paid mailing label which is sufficient to allow you to return the Proof of Claim Form and each Eligible DVD to the Claims Administrator.

### III.    **WHAT THE SETTLEMENT MEANS.**

The proposed Settlement is intended to settle all claims that the Plaintiffs and the members of the Settlement Class have alleged in the Complaint in this case or which arise out of the conduct alleged in the Complaint. Accordingly, if you do not exclude yourself from the Settlement Class, you will be deemed to have agreed that you will forever refrain from bringing any suit or asserting any claim against each and all of Defendants and their affiliates, parents, subsidiaries, predecessors, successors, and assigns and all of each of their past and present officers, directors, agents, employees, retailers, distributors, resellers, attorneys and insurers, including but not limited to, Metro-Goldwyn-Mayer Inc., Metro-Goldwyn-Mayer Studios Inc., Metro-Goldwyn-Mayer Home Entertainment LLC, Blockbuster, Inc., Best Buy Co., Inc., Target Corporation, Columbia House Holdings, Inc., and Amazon.com, Inc. (collectively, the "Released Parties"), that was or could have been asserted in this action or that arises out of the conduct alleged in the Complaint.

### IV.    **ELECTION BY SETTLEMENT CLASS MEMBERS.**

A.      If you are a member of the Settlement Class defined above, you are entitled to participate in the Settlement. To make a claim, you must complete the Proof of Claim Form and mail it to the Claims Administrator on or before March 31, 2005. See Section VII for the Claims Administrator's contact information.

B.      If you wish to remain in the Settlement Class but enter a separate appearance in this action, you may do so by filing a Motion to Intervene with the Clerk of the Los Angeles Superior Court, located at 600 South Commonwealth Avenue, Los Angeles, California 90005, together with proof of service on counsel for the Plaintiffs and counsel for Defendants whose names and addresses appear below. Such Motion must be filed and served no later than April 11, 2005. You will then continue as a member of the Settlement Class with representation by your own attorney and you will be responsible for any fees and expenses of that attorney.

C.      You may elect to be excluded from the Settlement Class if you wish. Any such election must be made in writing and it must be postmarked no later than March 31, 2005. If you exclude yourself from the Settlement Class, you will not be bound by any decision or judgment in this action, and you will remain free to pursue on your own behalf whatever legal rights you may have. However, persons who exclude themselves from the Settlement Class will not be entitled to share in the benefits of the proposed Settlement and will not be entitled to enforce the terms of the Settlement. If you wish to exclude yourself from the Settlement Class, you must send a written request for exclusion setting forth your name and address to the Claims Administrator for this action listed below:

<div align="center">

MGM DVD Class Action Settlement Administrator<br>
P.O. Box 91146<br>
Seattle, Washington 98111-9246<br>
No.:      (800) 285-2168 (toll free)

</div>

The written request for exclusion should bear the caption of this action and the case number exactly as it appears at the top of this notice. A "Request for Exclusion" form is attached for your convenience.

**IF YOU DO NOT EXCLUDE YOURSELF FROM THE SETTLEMENT CLASS, YOU WILL BE BOUND BY THE TERMS OF THE SETTLEMENT.**

D.     If you do not elect to be excluded from the Settlement Class, and if the Court grants final approval of the Settlement, you will be bound by the terms of the Settlement and by any judgment entered in accordance with the settlement agreement. You will be deemed to have entered into the agreement not to sue Defendants, or any of them, for claims which were asserted or which could have been asserted in the action and will be precluded from bringing such an action or claim in the future.

V.     **SETTLEMENT HEARING.**

A.     The Court will hold a hearing in Department CCW-322 of the Los Angeles Superior Court located at 600 South Commonwealth Avenue, Los Angeles, California 90005 on May 16, 2005 at 10:30 a.m. to determine whether the Settlement should be approved as fair, reasonable and adequate. The hearing may be continued without further notice. It is not necessary for you to appear at the settlement hearing in order to obtain the benefits of the Settlement.

B.     Any member of the Settlement Class who does not exclude himself or herself from the Settlement Class may oppose the proposed Settlement by submitting a Motion to Intervene as set forth in Section IV.B. and a written objection, including a statement of the grounds therefor; and may, in addition, appear at the hearing, individually or through his or her own counsel, if he or she has filed a written Notice of Intention to Appear at the Settlement Hearing. Any such objections, together with all supporting papers and briefs, and proof of membership in the Settlement Class, must be filed with the Clerk of the Los Angeles Superior Court, located at 600 South Commonwealth Avenue, Los Angeles, California 90005, and served on each of the following counsel for the parties no later than April 11, 2005:

| | | |
|---|---|---|
| Clifford H. Pearson, Esq. | Eric N. Landau, Esq. | Patricia L. Glaser, Esq. |
| Gary S. Soter, Esq. | Shawn M. Harpen, Esq. | Alisa Morgenthaler Lever, Esq. |
| Daniel L. Warshaw, Esq. | McDermott Will & Emery LLP | Christensen, Miller, Fink, Jacobs, |
| Wasserman, Comden, Casselman | 18191 Von Karman Ave., Ste. 400 | Glaser, Weil & Shapiro, LLP |
| & Pearson, LLP | Irvine, California 92612 | 10250 Constellation Boulevard, 19th Floor |
| 5567 Reseda Boulevard, Suite 330 | Counsel for Defendants Blockbuster, | Los Angeles, California 90067 |
| Tarzana, California 91357-7033 | Inc., Best Buy Co., Inc., Columbia | Counsel for Defendants |
| Lead Counsel for Plaintiffs and the | House Holdings, Inc. and | Metro-Goldwyn-Mayer Studios Inc. |
| Settlement Class | Amazon.com, Inc. | and Metro-Goldwyn-Mayer |
| | | Home Entertainment LLC |

Thomas Girardi, Esq.
Girardi & Keese
1126 Wilshire Boulevard
Los Angeles, California 90017
Co-Counsel for Plaintiffs and
the Settlement Class

David F. McDowell, Esq.
Morrison & Foerster, LLP
555 West Fifth Street, 35th Floor
Los Angeles, California 90013-1024
Counsel for Defendant
Target Corporation

All papers should bear the caption of the action, including the case number, exactly as it appears at the top of this notice. Except for good cause shown, any objector who has not filed timely written objections will not be heard at the settlement hearing.

C.    The law firms representing the Plaintiffs and the Settlement Class intend to apply to the Court for an award of attorneys' fees and for approval of reimbursement of out-of-pocket litigation costs not to exceed $2,700,000. The Court will decide on the amount of attorneys' fees and costs, if any, which will be paid to counsel for Plaintiffs and the Settlement Class. Any member of the Settlement Class who does not exclude himself or herself from the Settlement Class may object to or otherwise oppose the request for attorneys' fees and costs, in whole or in part, by following the same procedures for filing written objections to the Settlement described in subparagraph (B) above. Under no circumstances shall any payments to Counsel for the Plaintiffs and the Settlement Class reduce or diminish in any manner the benefits provided to the Class Members under the terms of the Settlement.

D.    MGM agrees to pay an enhancement award to Plaintiff Warren Eallonardo in the amount of $7,500 and an enhancement award to Plaintiff Joseph Corey in the amount of $5,000. Counsel for the Plaintiffs and the Settlement Class agree to reduce the amount of their attorneys' fee award in the sum of $12,500 to create a fund for the payment of the enhancement awards.

**VI.    ADDITIONAL INFORMATION.**

Any questions you have concerning the litigation in general or the matters contained in this notice should be directed to:

MGM DVD Class Action Settlement Administrator
P.O. Box 91146
Seattle, Washington 98111-9246
No.:    (800) 285-2168 (toll free)

**PLEASE DO NOT CONTACT THE COURT OR CLERK'S OFFICE FOR INFORMATION.**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**FOR THE COUNTY OF LOS ANGELES**

| | | |
|---|---|---|
| | x | Case No. BC 286950 |
| WARREN EALLONARDO and JOSEPH COREY, Individually and on Behalf of all Others Similarly Situated, | : | [Assigned for all purposes to the Honorable Peter D. Lichtman] |
| Plaintiffs, | : | [Complaint filed:  December 13, 2002] |
| v. | : | **CLASS ACTION** |
| METRO-GOLDWYN-MAYER INC., METRO-GOLDWYN-MAYER HOME ENTERTAINMENT INC., BLOCKBUSTER, INC., BEST BUY COMPANY, INC., TARGET CORPORATION, COLUMBIA HOUSE HOLDINGS, INC., AMAZON.COM, INC. AND DOES 1 through 500, inclusive, | : | **REQUEST FOR EXCLUSION**<br><br>Date:     December 20, 2004<br>Time:     11:00 a.m.<br>Dept.:     322, Central Civil West<br><br>Discovery Cutoff:  Not set |
| Defendants. | : | Motion Cutoff:  Not set<br>Trial Date:  Not set |
| | x | |

**REQUEST FOR EXCLUSION**

(Must Be Postmarked No Later Than March 31, 2005)

TO:    MGM DVD Class Action Settlement Administrator
        P.O. Box 91146
        Seattle, Washington 98111-9246
        No.:     (800) 285-2168 (toll free)

Having reviewed the Notice of Class Action and Proposed Settlement, the undersigned hereby requests timely exclusion from the Settlement Class in the above matter.  The undersigned recognizes that by mailing this form and requesting exclusion, the undersigned will not be bound by the terms of the Settlement.  The undersigned also represents that by mailing this form, he or she shall not be entitled to the benefits of the Settlement or to enforce any of the terms of this Settlement, including the right to exchange an Eligible DVD for a new MGM DVD from a list of 325 titles or $7.10.

Dated: _____        _____
                                                          Name

                                                          _____
                                                          Signature

                                                          _____
                                                          Address

                                                          _____
                                                          City                    State            Zip Code

                                                          _____
                                                          Phone No. (Optional)

# EXHIBIT F

**NOTICE OF CLASS ACTION SETTLEMENT**

# Important Notice to All Purchasers and Owners of Monster "Power Cells" High Capacity Alkaline Batteries

This is an official notice from the Superior Court of the State of California, County of San Mateo and is given pursuant to order of the Court. The purpose of this notice is to inform you of the pendency of this action as a class action and a proposed settlement of the class action.

This notice explains who is covered by the proposed settlement, describes the lawsuit and benefits of the proposed settlement, and tells you that the Superior Court will hold a hearing to decide whether to approve the proposed settlement and decide other related matters. This notice also describes your legal rights in connection with the hearing and this lawsuit. **ALL CLASS MEMBERS WHO DO NOT EXCLUDE THEMSELVES BY THE DEADLINE GIVEN BELOW WILL BE BOUND BY THE RESULTING ORDERS OF THE COURT.**

**1. Notice of Class Action.** A class action lawsuit is pending in the California Superior Court for the County of San Mateo (Case No. CIV437567). Plaintiff alleges that packaging for certain batteries sold by Monster Cable Products Inc. ("Monster") contained false and/or deceptive representations regarding their performance characteristics. Monster denies these allegations. Nonetheless, both sides believe it beneficial to settle this litigation and the parties have reached a tentative settlement agreement to resolve all claims.

If, after August 1, 2002, you purchased in the United States Monster "PowerCells" high capacity alkaline batteries ("PowerCells") in standard battery sizes of D, C, AA, AAA, and nine volt, for personal use and not for resale, you are a member of the proposed settlement class. **PLEASE READ THIS NOTICE CAREFULLY. IT AFFECTS YOUR LEGAL RIGHTS.**

Batteries in the packaging at issue in this litigation, referred to as the "Contested Packaging," were distributed by Monster to retailers from approximately August 1, 2002 through January 31, 2003. The Contested Packaging contains certain representations relating to battery performance, and contains language such as "25% More Power than Standard Alkalines" and "Lasts 25% Longer". Some of the Contested Packaging contains bar-graphs comparing PowerCells' performance characteristics to performance of certain other unnamed battery brands. On approximately February 1, 2003 Monster began shipping PowerCells to retailers containing "Revised Packaging" that does not contain the language quoted above.

Plaintiffs allege that the Contested Packaging contained inaccurate representations regarding the relative performance characteristics of the PowerCells batteries. Plaintiffs do not contend there were any inaccuracies in the Revised Packaging. If you have purchased Monster PowerCells containing the Revised Packaging, you are not entitled to any benefits under this proposed settlement.

**2. Proposed Settlement.** The proposed settlement was reached through formal mediation before an experienced mediator. The proposed settlement offers significant benefits by compensating class members who purchased batteries in the Contested Packaging.

➤ The settlement offers benefits to two categories of claimants - "Proof of Purchase Claimants" and "Affiant Claimants." Proof of Purchase Claimants are those members of the Settlement Class who have a proof of purchase for PowerCells sold in the Contested Packaging. A valid proof of purchase consists of either a receipt for purchase of PowerCells prior to April 1, 2003 or the Contested Packaging itself. Each Proof of Purchase Claimant will be given a choice to select either: (i) full replacement of the Monster PowerCells products purchased, with the cost of shipping of the replacement product paid by Monster; or (ii) cash reimbursement equal to the retail price paid, minus sales tax, with the retail price to be established by the sales price indicated in the receipt constituting proof of purchase, or, in the event the Contested Packaging is presented instead of a receipt, a cash reimbursement will be paid according to Monster's manufacturer's suggested retail price ("MSRP"); or (iii) "Monster Bucks" equivalent to that which would be due as cash reimbursement, which are redeemable on Monster's website toward the purchase of any product that is offered through the Monster Bucks redemption portion of Monster's website.

➤ "Affiant Claimants" are those members of the Settlement Class who do not have proof of purchase, but sign a claim form under penalty of perjury, swearing that they purchased Monster PowerCells containing the Contested Packaging. Each Affiant Claimant will be given the choice to select either: (i) replacement of the product purchased, limited to one package of PowerCells, with shipping costs paid by Monster; or (ii) "Monster Bucks" equivalent to the retail price paid for one package of PowerCells valued at MSRP, redeemable on Monster's website towards the purchase of any product that is offered through the Monster Bucks redemption portion of Monster's website. Affiant Claimants may not submit more than one claim per household.

Subject to Court approval, Monster has agreed to pay Class Counsel, Edward A. Wallace of The Wexler Firm LLP, Shannon P. Cereghino of Finkelstein, Thompson & Loughran, and Mark J. Tamblyn of Kershaw, Cutter, Ratinoff & York, LLP, the sum of $250,000.00 for attorneys' fees and reimbursement of expenses. Class Representative Lisa Maskarich will be paid $5,000. The payments of these amounts will not reduce any benefits to be paid to any claimant.

Settlement Class members will have no personal liability for any attorneys' fees or costs associated with this action.

**3. Options for Class Members:** (1) you may do nothing and you will remain a class member and be entitled to the Class settlement provided above; (2) you may object to the proposed settlement if you follow the procedures described below; or (3) you may opt out of the proposed settlement if you follow the procedures described below. **ALL SETTLEMENT CLASS MEMBERS WHO DO NOT EXCLUDE THEMSELVES BY THE DEADLINE GIVEN BELOW WILL BE BOUND BY THE RESULTING ORDERS OF THE COURT.**

**4. Right to Object or Opt Out.**

(a) Court Hearing. The Court has given preliminary approval to the proposed settlement, has conditionally certified the Settlement Class, and has approved the appointment of the Class Representative and Class Counsel. On August 26, 2004, at 9:00 a.m. PST, the Court will hold a hearing (the "Final Fairness Hearing") on whether to grant final approval of the proposed settlement as fair, reasonable and adequate and whether to approve the application of Class Counsel for an award of attorneys' fees and expenses in the amount of $250,000.00. The hearing will be held before the Honorable Carol L. Mittlesteadt, Hall of Justice, Courtroom 8A, 400 County Center, Redwood City, CA 94063. The Court may continue or adjourn the Final Fairness Hearing without further notice.

(b) Objections. If you wish to object to the proposed settlement you must file an objection with the California Superior Court for the County of San Mateo, 400 County Center, First Floor, Redwood City, CA 94063, Case No. 413148. The objection must be postmarked and filed no later than August 12, 2004. It must state your full name, current address, the date, product description, and price paid for the Monster PowerCells, and must state why you object to the settlement and any reasons supporting your position. A copy must also be simultaneously sent to: (a) Edward A. Wallace, The Wexler Firm LLP, One North LaSalle Street, Suite 2000, Chicago, Illinois 60602 OR Shannon P. Cereghino, Finkelstein, Thompson & Loughran, 235 Pine Street, 15th Floor, San Francisco, California 94104 AND to (b) Luanne Sacks, Gray Cary Ware & Freidenrich, 153 Townsend Street, Suite 800, San Francisco, California, 94107. An objection will not be heard at the Final Fairness Hearing on August 26, 2004 unless it is postmarked and filed timely and satisfies the Court's requirements. Only members of the settlement class may object to the proposed settlement.

If you object to the proposed settlement, you, or an attorney representing you, have the right to attend the Fairness Hearing to voice your objection, but you are not required to do so. If you wish to attend the Fairness Hearing and state your position, you must include in your written objection the following sentence: "I intend to appear at the hearing."

(c) Right to Opt Out. A request to be excluded from the proposed settlement must be signed by you personally. It must state your full name, current address, the date, product description, and price paid for the Monster PowerCells. A copy must also be sent to: (a) Edward A. Wallace, The Wexler Firm LLP, One North LaSalle Street, Suite 2000, Chicago, Illinois 60602 OR Shannon P. Cereghino, Finkelstein Thompson and Loughran, 235 Pine Street, 15th Floor, San Francisco, California 94104 AND (b) Luanne Sacks, Gray Cary Ware & Freidenrich, 153 Townsend Street, Suite 800, San Francisco, California, 94107. It must be postmarked by August 12, 2004. If you serve a timely notice of exclusion, you will not be bound by the settlement or the proposed judgment, but you will have no right to participate in any portion of the settlement. **ALL CLASS MEMBERS WHO DO NOT EXCLUDE THEMSELVES BY AUGUST 12, 2004 WILL BE BOUND BY THE RESULTING ORDER OF THE COURT.**

**5. How to Get Further Information:** Members of the settlement class may request a claim form from Monster either by contacting Monster in writing at:

Monster Cable Products Inc.
Attn: PowerCells Settlement Claims Administrator
455 Valley Drive
Brisbane, California 94005

or by downloading a claim form from www.powercellsettlement.com. To obtain the benefits offered under the settlement, a completed signed claim form must be returned to the Settlement Claims Administrator no later than August 12, 2004. If you have questions about the proposed settlement or your rights, if you want further information about your options or if you want a copy of the settlement agreement, you should contact Class Counsel by phone, mail, or email as follows:

| | |
|---|---|
| Edward A. Wallace | Shannon P. Cereghino |
| The Wexler Firm LLP | Finkelstein Thompson and Loughran |
| One North LaSalle Street, Suite 2000 | 235 Pine Street, 15th Floor |
| Chicago, IL 60602 | San Francisco, CA 94104 |
| Tel: 312-346-2222 | Tel: 415-477-6730 |
| Fax: 312-346-0022 | Fax: 415-477-6710 |

**DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION**