UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re M3 POWER RAZOR SYSTEM MARKETING & SALES PRACTICES LITIGATION | ) ) ) ) | Civil Action No. 05-11177-DPW<br><br>MDL Docket No. 1704 |
| This Document Relates To:<br><br>ALL ACTIONS. | ) ) ) ) ) ) | <u>CLASS ACTION</u><br><br>REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

    A.   The Settlement Class Satisfies Rule 23's Requirements for Certification of a Nationwide Settlement Class ...............................................................................2

    B.   California Consumers Are Not Entitled to a Superior Remedy.............................5

    C.   Access to the Settlement Benefits is Fair and Reasonable ....................................9

    D.   Class Members Receive Fair, Reasonable and Adequate Relief Under the Terms of the Proposed Settlement .......................................................................11

        1.   The Distribution of Settlement Razors Provides Value to Settlement Class Members.........................................................................11

        2.   The Benefits to the Class Encourage Participation Because They Allow Consumers to Choose the Type of Benefit that They Prefer ..........13

    E.   The Proposed Notice Plan Satisfies Federal Requirements...................................17

II.   CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997).................................................................................3

*Block v. Abbott Labs.*,
  No. 99 C 7457 (WRA), 2002 U.S. Dist. LEXIS 5453
  (N.D. Ill. Mar. 28, 2002).........................................................................4

*Daugherty v. American Honda Motor Co.*,
  B186402, 2006 Cal. App. Unpub. LEXIS 9963
  (California Unpublished Opinions 2006)...................................................7

*Daghlian v. DeVry Univ., Inc.*,
  Case No. CV 06-00994 MMM (PJWx), 2006 U.S. Dist. LEXIS 53762
  (C.D. Cal. July 18, 2006) ........................................................................7

*Delahunt v. Cytodyne Techs.*,
  241 F. Supp. 2d 827 (S.D. Ohio 2003) ....................................................4

*Dunk v. Ford Motor Co.*,
  48 Cal. App. 4th 1794 (Cal. Ct. App. 1996) ...........................................2

*Gunnell v. Healthplan Servs.*,
  348 F.3d 417 (4th Cir. 2003) ...................................................................2

*Hines v. Hash*,
  843 S.W.2d 464 (Tex. 1992)....................................................................3

*In re Bridgestone/Firestone Tires Prods. Liab. Litig.*,
  288 F.3d 1012 (7th. Cir. 2002) ...............................................................4

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001).....................................................................13

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  216 F.R.D. 197 (D. Maine 2003) .....................................................9, 10, 18

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  236 F.R.D. 53 (D. Me. 2006)...................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass. 2005).........................................................2, 3, 4

**Page**

*In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*,
    MDL No. 01-1396 (JRT/FLN), 2006 U.S. Dist. LEXIS 74797
    (D. Minn. Oct. 13, 2006) ...................................................................................5

*In re Vitamin Cases*,
    107 Cal. App. 4th 820 (Cal. App. 1 Dist., 2003) .......................................11, 12

*In re W. Union Money Transfer Litig.*,
    CV-01-0335 (CPS) 2004 U.S. Dist. LEXIS 29377
    (E.D.N.Y. Oct. 18, 2004) ................................................................................5

*Lilly v. Ford Motor Co.*,
    Case No. 00 C 7372 (JWD), 2002 U.S. Dist. LEXIS 5698
    (N.D. Ill. Apr. 2, 2002) ....................................................................................4

*Lucas v. Kmart Corp.*,
    Civil Action No. 99-cv-01923-JLK, 2006 U.S. Dist. LEXIS 51439
    (D. Colo. July 27, 2006) ...................................................................................5

*Lyon v. Caterpillar, Inc.*,
    194 F.R.D. 206 (E.D. Pa. 2000) .....................................................................2, 4

*Nottingham Partners v. Trans-Lux Corp.*,
    925 F.2d 29 (1st Cir. 1991) ..............................................................................4

*Odmark v. Mesa Ltd. P'ship*,
    Civil Action No. 3:91-CV-2376-X, 1992 U.S. Dist. LEXIS 16789
    (N.D. Tx. June 8, 1992) ....................................................................................9

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) .....................................................................................9, 19

*Perez-Funez v. District Director, Immigration & Naturalization Service*,
    611 F. Supp. 990 (C.D. Cal. 1984) .................................................................5

*Starr-Gordon v. Mass. Mut. Life Ins. Co.*,
    No. CIV. S-03- 68 LKK/GGH, 2006 U.S. Dist. LEXIS 83110
    (E.D. Cal. Nov. 6, 2006) ..................................................................................6

*State of Calif. v. Levi Strauss & Co.*,
    41 Cal. 3d 460 (Cal. 1986) ..........................................................................11, 12

**Page**

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (E.D.N.Y. 2004) ...................................................................................5

*Synfuel Tech., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) .......................................................................................14

*Tylka v. Gerber Prods. Co.*,
    178 F.R.D. 493 (N.D. Ill. 1998) ...................................................................................4

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (Cal. Ct. App. 2001) ..................................................................2

**STATUTES, RULES AND REGULATIONS**

Cal. Bus. & Prof. Code
    §§17200.......................................................................................................................6

Plaintiffs Mark Dearman, Anthony DeBiseglia, Matthew Marr, Adam Kline, Greg Besinger, Collin L. McGeary, Javier Tunon, and Jean-Sebastien Elie (the "Representative Plaintiffs" or "Plaintiffs"), individually and on behalf of the Settlement Class, by and through Settlement Class Counsel, respectfully submit this Reply Memorandum in further support of their Motion for Preliminary Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing, and in reply to Plaintiff Corrales' Opposition to Motion for Preliminary Approval (hereafter "Corrales Mem.").

## I.     INTRODUCTION

As more fully explained in the Supplemental Memorandum (hereinafter "Supp. Mem.") filed on November 6, 2006, the proposed settlement satisfies all the requirements for preliminary approval. This Reply responds to Plaintiff Corrales' prolix, 88-page opposition (more than four times longer than the maximum length of a brief permitted under this Court's rules). This Reply, coupled with Plaintiffs' previously filed submissions demonstrates the fairness, reasonableness and adequacy of the proposed settlement.

The terms of the proposed settlement are hereby incorporated from Plaintiffs' Supplemental Memorandum (pp. 1-3), from the section entitled "Summary of Plaintiffs' Claims and the Terms of the Settlement."

Stripped of its repetitiveness and personal attacks, Corrales basically lodges five complaints to the proposed settlement: (i) the requirements for class certification have not been met; (ii) California consumers are entitled to a superior remedy; (iii) the claims process is unfair; (iv) Class Members are not receiving adequate consideration; and (v) the notice is inadequate. As demonstrated below, each of those objections is wholly without merit.

### A.   The Settlement Class Satisfies Rule 23's Requirements for Certification of a Nationwide Settlement Class

The proposed settlement class, as more fully described in Plaintiffs' Supp. Mem. (2-3), satisfies the class certification standards set forth under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). Nonetheless, Corrales contends that the Class cannot be certified because it is unmanageable. Corrales attempts to support that argument by relying on cases concerning the manageability of a litigated class, as opposed to the settlement class that is currently before the Court. However, the law is clear that issues relating to the management of a class action that could pose difficulty for certifying a litigation class are not present for the certification of a settlement class. *See Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 244 (Cal. Ct. App. 2001) (*citing Dunk v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1806 (Cal. Ct. App. 1996) (reasoning that "because the case was settling, protracted determinations of other states' laws were unnecessary")); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) (emphasizing the distinction between certifying a litigation class and a settlement class); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000) (same). Thus, the cases cited in Corrales' opposition are inapposite.

Indeed, the issue of manageability centers around whether the case can be tried on a class-wide basis. However, these concerns are no longer present in connection with a settlement such as the one proposed here because there is no trial to manage. *See, e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 236 F.R.D. 53, 56 (D. Me. 2006) (noting that, "Parties can settle claims that they may not succeed in litigating, and a court can certify a settlement class without the trial manageability concerns of a litigating class."); *Gunnell v. Healthplan Servs.*, 348 F.3d 417 (4th Cir. 2003) (recognizing that the manageability of a trial is not relevant to a class action where no trial is contemplated).

- 2 -

In this regard, Corrales' reliance on *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) has no bearing on the case at bar. In *Amchem*, the Court questioned whether class status was suitable ***at all*** in the framework of current or future bodily injury asbestos claims. *Id.* at 628-29. Here, Corrales does not question whether class action status is appropriate ***at all***. Rather, Corrales' opposition is limited to the manageability of a nationwide class in light of purported variations in state laws. Corrales Mem. at 21-29.

To advance this argument, Corrales argues that if the notice requirements of certain states' consumer protection statutes have not been met, citizens from those states should be excluded from the Class. Corrales has no standing to raise a notice provision defense that was created as a protection for defendants. Notably, as support for this argument, Corrales relies on the decision in *Pharm. Indus.* In *Pharm. Indus.*, however, it was the ***defendants*** who asked the Court to exclude from the class citizens of states from which plaintiffs' failed to comply with the applicable notice provisions. Here, Gillette is waiving any such defense that it may have by agreeing to settle the action.[1] Corrales has no basis to now assume or raise the defense on Gillette's behalf.

Moreover, the Court's decision in *Pharm. Indus.* was rendered in response to a motion for litigated class certification, not (as here) approval of a settlement class. The Court in *Pharm. Indus.*, in fact, highlighted the distinction between addressing the issue of divergent state laws at different stages of litigation. The Court specifically stated that "[i]t is true, however, that when dealing with variations in state laws, the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to

---

[1] *See Hines v. Hash*, 843 S.W.2d 464, 468 (Tex. 1992) ("the purpose of the notice requirement, to encourage pre-suit negotiations so as to avoid the expense of litigation, is better served by abating an action filed without notice for the duration of the statutory notice period to allow the parties to negotiate").

certification of a settlement class." 230 F.R.D. at 84 (citation omitted). The Court further illustrated the distinction between litigation and settlement classes by noting that the parties had difficulty citing to a "court in the nation [that] has successfully certified a nationwide consumer class for litigation (*as opposed to settlement*) purposes." *Id.* at 83 (emphasis added).

Corrales further relies on five cases that purportedly support the notion that this Court, at this stage of the litigation, must consider the variations of states' consumer protection laws. Corrales Mem. at 12; *Block v. Abbott Labs.*, No. 99 C 7457 (WRA), 2002 U.S. Dist. LEXIS 5453 (N.D. Ill. Mar. 28, 2002); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D. Pa. 2000); *Lilly v. Ford Motor Co.*, Case No. 00 C 7372 (JWD), 2002 U.S. Dist. LEXIS 5698 (N.D. Ill. Apr. 2, 2002); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493 (N.D. Ill. 1998); *Delahunt v. Cytodyne Techs.*, 241 F. Supp. 2d 827 (S.D. Ohio 2003); *In re Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012 (7th. Cir. 2002). Not one of these five decisions, however, examined the certification of a settlement class. Each case involved the entirely separate standard of certifying a litigation class. The decision in *Lyon*, in fact, like the Court in *Pharm. Indus.,* distinguished litigation and settlement classes and expressly stated that a court confronted with the certification of a settlement class need not make the stringent inquiries posed to a litigation class as there will be no trial. 194 F.R.D at 223.

Clearly, any purported manageability problems are not present when dealing with a settlement class. Therefore, the purported variations in state laws should be a non-factor at this stage of this litigation.[2]

_____

[2] Corrales also completely miscites *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29 (1st Cir. 1991), for the proposition that "representative plaintiffs cannot release . . . the claims of other class members." Corrales Mem. at 15. *Nottingham* said no such thing, and of course the very nature of class actions is that a judgment or settlement binds class members who do not opt out. The First Circuit in *Nottingham* held that a Delaware state court settlement and release was binding on class members who had objected to the settlement, including the release of federal claims over which the

**B.    California Consumers Are Not Entitled to a Superior Remedy**

California consumers are not entitled to superior rights and remedies and any contention to the contrary is not a basis for denying certification of this settlement class. Rather, the interests of all Class Members, including those from California, are considered through the terms of the negotiated settlement between Plaintiffs and Gillette. *See* Supp. Mem. at 9-11.[3]

Despite this showing by Plaintiffs, Corrales argues that nationwide class certification is inappropriate as California consumers are entitled to superior rights and remedies over the citizens of other states. Corrales Mem. at 26-29. Corrales' contention is simply incorrect. First, Corrales ignores the fact that nationwide certification of settlement classes is an acceptable practice. *See, e.g., In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*, MDL No. 01-1396 (JRT/FLN), 2006 U.S. Dist. LEXIS 74797 (D. Minn. Oct. 13, 2006); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67 (E.D.N.Y. 2004); *In re W. Union Money Transfer Litig.*, CV-01-0335 (CPS), 2004 U.S. Dist. LEXIS 29377 (E.D.N.Y. Oct. 18, 2004); *Perez-Funez v. District Director, Immigration & Naturalization Service*, 611 F. Supp. 990 (C.D. Cal. 1984); *see also Lucas v. Kmart Corp.*, Civil Action No. 99-cv-01923-JLK, 2006 U.S. Dist. LEXIS 51439 (D. Colo. July 27, 2006). Second, Corrales' argument is based on a misguided interpretation of the actual value the proposed

---

state court had no jurisdiction. 925 F. 2d at 33-4. Moreover, unlike *Nottingham*, where the objectors did not have the right to opt out of the case (*Id.* at 32), Corrales has the right to opt out of the proposed class and pursue his individual claims.

[3] Corrales contends that California residents are not adequately represented because California consumer protection statutes are not alleged on behalf of the Class Members. Corrales Mem. at 25. A simple reading of the Consolidated Class Action Complaint indicates that the California consumer protection statutes are pleaded as a cause of action.

settlement affords each Class Member.[4]  Third, Corrales' position is unsupported by recent case law. Corrales Mem. at 11; *see also* Supp. Mem. at 10.

Corrales' assertion that California law provides "heightened" protection for its consumers over those in other states is erroneous.  Corrales Mem. at 17-21.  Apart from his sweeping generalities, Corrales fails to demonstrate that California claims or remedies are superior to other states.  Certainly, for example, they are not superior to the Massachusetts consumer protection statute (Chapter 93A).

Moreover, his arguments are based on fading legal concepts.  Corrales' argument concerning the superiority of Californians' right and remedies hinges entirely on case law that pre-dates the passage of Proposition 64 by California voters.  Proposition 64 has, in effect, created considerable limitations on private enforcement of California's consumer protection and false advertising laws (Cal. Bus. & Prof. Code §§17200 and 17500).

For instance, Proposition 64 requires individuals seeking to commence private causes of action pursuant to California's consumer protection laws to show that they have suffered "injury in fact" and have lost "money or property" as a result of the challenged conduct.[5]  As a result, several recent decisions discuss that Proposition 64 has significantly hampered the rights and remedies under the state's consumer protection laws.  *See Starr-Gordon v. Mass. Mut. Life Ins. Co.*, No. CIV. S-03-

---

[4] Contrary to Corrales' calculations, under the proposed settlement, Class members are entitled to approximately four times their estimated damages.  For a more detailed breakdown of Gillette's actual settlement offer versus Corrales' self-serving inaccuracies see, *infra*, Section D.1. and Supp. Mem. at 3.

[5] Since the passage of Proposition 64, interpretation of California's consumer protection statutes are unsettled.  *See, e.g., Pfizer v. Superior Court*, 45 Cal. Rptr. 3d 840, 852-53 (2006) (illustrating the change in California law that now requires the demonstration of actual injury in fact and reliance by each and every class member).  That decision is currently on appeal before the California Supreme Court.

68 LKK/GGH, 2006 U.S. Dist. LEXIS 83110 (E.D. Cal. Nov. 6, 2006) (discussing the increased requirements for class certification after the passage of Proposition 64); *Daugherty v. American Honda Motor Co.*, B186402, 2006 Cal. App. Unpub. LEXIS 9963 (California Unpublished Opinions 2006) (reiterating the new heightened requirements imposed by Proposition 64 and the heavy burden now placed on plaintiffs seeking to bring a private action for an alleged fraudulent business practice); *Daghlian v. DeVry Univ., Inc.*, Case No. CV 06-00994 MMM (PJWx), 2006 U.S. Dist. LEXIS 53762 (C.D. Cal. July 18, 2006) (outlining the heightened requirements established by Proposition 64 and the difficulty the new guidelines present to private California litigants). Rather than address Proposition 64, Corrales simply chooses to ignore it and continues to rely on stale cases in opposing this settlement.

Yet, while Corrales and his counsel have been preaching to this Court about the superiority of California consumer actions and the inappropriateness of a nationwide class due to the inadequacies of the remedies that can be offered by other states as compared to California,[6] they have taken the exact opposite position in front of other district courts. For example, earlier this month, Corrales' counsel filed a complaint seeking a nationwide class for unfair competition law violations and false advertising.[7] Clearly, Corrales' argument is one of convenience and not one he

---

[6] In connection with this argument, Corrales has, once again, raised the argument that the absence of corrective disclosures indicates that California Class Members' interests are not adequately represented. Corrales Mem. at __. Counsel for Corrales has raised this concern on more than one occasion and was invited by this Court to submit briefing on the matter, first at the January 23, 2006 conference with this Court (Hearing Transcript at 10-12) and then again at the July 7, 2006 conference (Hearing Transcript at 9, 26-32). Counsel for Corrales did not accept the Court's invitation to brief the issue – in the form of a preliminary injunction – but allowed the issue to become stale, as Gillette effectively has ceased all advertising for the M3Power Razor. Corrales has now waited until the terms of a settlement was reached and approval is being sought.

[7] *Vitt v. Apple Computer, Inc.*, CV 06-07152GHK (C.D. Ca. Nov. 7, 2006). Copy of the Complaint is attached as Exhibit A.

– or more notably his counsel – truly accepts as true. More disturbingly, the same day that Corrales' counsel stood before this Court vehemently objecting to the certification of a nationwide settlement class (*see*, *e.g.*, Hearing Transcript dated March 6, 2006; and Hearing Transcript dated January 23, 2006, pages 11-14) and raising the problems with the variations between the states' consumer protection law statutes (*see* Hearing Transcript dated October 18, 2006 at 11-13, 16; Hearing Transcript dated January 23, 2006 at 9-10), Corrales' counsel filed a complaint in the Central District of California seeking precisely the sort of relief they refer to here as being improper. *Cole v. Asurion Corp.*, CV 06 6649 DDP (C.D. Ca. Oct. 18, 2006). (A copy of the Complaint is attached as Exhibit B.) In the *Cole* complaint, Corrales' counsel seeks to represent a nationwide class and specifically alleges a cause of action under each of the 50 states' consumer protection statutes, something that he claims is not available in the instant action. The *Cole* complaint even seeks to include citizens of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana, and Virginia in the class and specifically mentions each of those states' deceptive trade practice statutes. Corrales Mem. at 27, 28.[8] The *Cole* and *Vitt* cases demonstrate that Corrales' counsel understands that a nationwide class is entirely appropriate here.[9]

Corrales also argues that California is not adequately represented in the settlement because plaintiff Matthew Marr ("Marr") is an employee of Glancy Binkow & Goldberg LLP. Corrales

---

[8] The *Cole* complaint also seeks relief under the consumer protection statutes that Corrales claims require separate notice for each state, including Kansas, Missouri, New Jersey, Oregon, Washington, Alabama, Alaska, California, Georgia, Indiana, Maine, Massachusetts, Mississippi, Texas and Wyoming. Corrales Mem. at 29.

[9] Taking positions that they know are inaccurate is nothing new to Corrales' counsel. In fact, on August 14, 2006, Corrales' counsel was sanctioned by Judge Real in the Central District of California for filing a complaint when they were in possession of undisputed evidence that their client did not have standing. *Sisley v. Sprint Communications Company*, CV-05-8789 (CD Cal. Aug. 14, 2006) (a copy of which is annexed as Exhibit C).

Mem. at 23-5.  Corrales' argument ignores the fact that named Plaintiffs David Atkins, David Lipper

and Michael Pruitt are also California Class Members.  *See* Supp. Mem. at 15.  In any event, any

relationship of Marr with the Glancy firm counsel does not impact his relationship with Settlement

Class Counsel – Lerach Coughlin Stoia Geller Rudman & Robbins LLP or Barnow and Associates,

P.C.  *See* Supp. Mem. at 15.[10]

### C.    Access to the Settlement Benefits is Fair and Reasonable

The proposed settlement includes basic provisions that ensure that people who submit claims

are members of the Class.  Corrales complains about these basic requirements and asserts that "[t]he

vast majority of consumer settlements do not require the consumers to return the product or receipt

in order to obtain recovery."  Corrales Mem. at 67.  In support of this purported "vast majority,"

Corrales cites to a single case, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216

F.R.D. 197, 213 (D. Maine 2003), which he distorts. Corrales Mem. at 67.

The court in *Compact Disc* addressed related objections: (1) "that it is unfair to allow

recovery without some proof of purchase"; and (2) that non-class members may make claims,

_____

[10] *Odmark v. Mesa Ltd. P'ship*, Civil Action No. 3:91-CV-2376-X, 1992 U.S. Dist. LEXIS 16789
(N.D. Tx. June 8, 1992) (finding the lack of relationship between the plaintiff and any of the firms
acting as class counsel obviates the apparent conflict).

Corrales also questions the adequacy of representative plaintiff Adam Kline, whose father is a cousin
of liaison counsel's wife.  However, the decision in *Odmark* evinces that, contrary to Corrales'
purported argument, Kline does not have a disabling conflict which precludes him from acting as a
plaintiff in this case.  *See* Corrales Mem. at 3.  In *Odmark*, one of the plaintiffs was the father of one
of the class counsel.  Yet, despite the familial relationship, the court concluded that no conflict
existed because: (1) the plaintiff was actually represented by another firm acting as class counsel;
and (2) the relationship was not close enough for the court to view it as a potential conflict where the
plaintiff may be sharing in the fees collected by class counsel (as, for example, a spouse would).
1992 U.S. Dist. LEXIS 16789, at *19-*20.  Clearly, if a father does not give rise to conflict, then
Kline (as liaison counsel's wife's cousin's son) does not possess a conflict disabling him from acting
as plaintiff in this case.

thereby diluting the recovery. *Id.* at 213. Ironically, Corrales is not concerned with the possible dilution of settlement funds from fraudulent claims and instead, focuses his objection on the reverse position, *i.e.*, that receipts and return of product should not be required. Regardless, *Compact Disc* is distinguishable from the instant matter as it concerned the pricing of music compact discs, as opposed to the satisfaction with the compact discs themselves. *Id.* Here, the litigation concerns consumers' unhappiness with the product, as the M3P Razors are alleged to not possess the capabilities that were represented by Gillette in its advertising. Thus, it is not unreasonable to require that a settling Class Member return the product that they are unhappy with in exchange for a full refund.

Also, Corrales' argument that settling Class Members should not have to submit a receipt or UPC code for a rebate is similarly misguided. In *Compact Disc*, the court reasoned that it was unlikely that consumers had receipts. And, the court did not support the use of UPC codes for submission of claims because the parties had determined that the UPC codes could not be used to verify transactions. *Id.* The decision in *Compact Disc* is limited to its facts given the class period at issue in that case. There, the class period went as far back as January 1, 1995, which was more than 8 years prior to final approval, and the class period ended on December 22, 2000, which was more than 2 years prior to the date of final approval. Here, in light of the recent Settlement Class Period (beginning May 1, 2004) and the fact that Class Members can make qualifying purchases after the notice is published, make it likely that Class Members will have receipts to submit for cash payments if they choose not to send back their razors.[11] The Initial Claim Period is defined as the "six months

---

[11] Pursuant to the terms of the settlement agreement, a Settlement Class Member "can elect to receive up to two $5 rebates in a check for any purchases of M3Power blades during the period beginning May 1, 2004, and/or Fusion Razors (manual or battery powered) during the period beginning January 1, 2006, through the end of the Initial Claim Period. To receive such rebate(s), a

from the date of the first publication of notice of the Final Fairness Hearing." Settlement Agreement ¶1.9. Thus, even certain purchases made after a Settlement Class Member had the opportunity to read the notice are eligible for cash payments. Indeed, it is highly likely that any Class Member who continues to use his or her M3P Razor will purchase blades and will benefit from the rebates.

### D. Class Members Receive Fair, Reasonable and Adequate Relief Under the Terms of the Proposed Settlement

#### 1. The Distribution of Settlement Razors Provides Value to Settlement Class Members

Corrales relies on inapplicable cases that address the appropriateness of a reverter (the return of unclaimed settlement funds to a defendant) to support his argument that, in lieu of razors, cash should be distributed to Settlement Class Members. Corrales Mem. at 68, fn 29. There is no reverter to Gillette under the terms of the proposed Settlement Agreement. If the Settlement Fund is not depleted, Settlement Razors will be distributed, through multiple levels of parameters, as provided for in the settlement. This distribution of razors in no way diminishes the amount of the cash payments available to any Class Member who wants to receive cash.

In yet another misrepresentation of case law, as well as a misrepresentation of the settlement terms, Corrales asserts that "[t]he fluid recovery in this case flunks the test established by *Levi Strauss*." Corrales Mem. at 69, (*citing State of Calif. v. Levi Strauss & Co.*, 41 Cal. 3d 460 (Cal. 1986)). *Levi Strauss*, however, does not establish such a test. *See In re Vitamin Cases*, 107 Cal. App. 4th 820, 831-832 (Cal. App. 1 Dist., 2003) ("*Levi Strauss* does not purport to define the

---

Settlement Class Member must provide the UPC code(s) from the package(s) of M3Power blades and/or any Fusion razor (manual or battery powered), or a receipt showing that such package of M3Power blades was purchased during the period beginning May 1, 2004, through the end of the Initial Claim Period, or such Fusion razor was purchased during the period beginning January 1, 2006, through the end of the Initial Claim Period." Settlement Agreement at ¶2.1(b)(ii).

boundaries of the *cy pres* doctrine. . . . [I]t never suggests that it has described the only acceptable [*cy pres*] method."). The *Levi Strauss* opinion "did not specify what should be done with the funds that remained after individual claims were processed." *Id.* at 831. Moreover, the *cy pres* method is used when members of a class cannot reasonably be identified. Here, after first making all of the cash payments, Gillette will distribute settlement razors to all Class Members who submit claims for cash, then to Class Members who submit claims just for razors and only then to a group selected by the parties. This last distribution only occurs if the prior distributions of cash and razors do not exhaust the Settlement Fund. Settlement Agreement at ¶2.3(a-c). It is important to note that in order for any distribution of Settlement Razors to occur, there must be some amount remaining in the Settlement Fund. Thus, by definition, there will be no distribution of Settlement Razors unless each Settlement Class Member who submits a claim receives a cash payment that far exceeds their actual damages. (*See* Supplemental Memo at 8 (explaining that Class Members who elect the $15 cash payment receive 178% of their actual damages and those who elect the $10 cash payment receive 407% of their actual damages).) A further cash payment on top of this is not warranted. Notably, Settlement Class Counsel strenuously argued for such payments in negotiations with Gillette. However, Gillette refused to agree.[12] Class Counsel maximized all benefits in their negotiations.

---

[12] Corrales chides Lead Settlement Counsel for not requesting the actual purchase orders and other transactional level detail concerning Gillette's sale of M3Power Razors. Lead Settlement Counsel requested and received from Gillette reports generated from Gillette's accounting systems that summarize this precise information. There is no allegation that Gillette has cooked its books or that those reports do not accurately depict Gillette's sales or pricing of razors. It is unclear what Corrales would hope to obtain by requiring Gillette to make this voluminous production, other than make work and inefficiency.

>    2.    **The Benefits to the Class Encourage Participation Because They Allow Consumers to Choose the Type of Benefit that They Prefer**

The proposed settlement of this litigation is meant to benefit those individuals who purchased an M3Power razor. In fact, the relief afforded such Class Members have been specifically tailored to their unique position relative to this litigation. These consumers have the option of returning their M3Power razor for a $13 refund, or more if they can show a higher purchase price, and $2 for shipping and handling. For those consumers who are satisfied with their M3Power razor, and wish to keep it, they can receive $10 for past or future purchases of blades for the razor that they decided they want to keep. This relief far exceeds the settlement benefits originally offered by Gillette. (*See* Gillette Mem. at pp. 14-17.)

In his continued assault on the settlement, Corrales contends that no claims will be filed. This argument, however, necessarily ignores the very consumers this settlement is targeted at benefiting – people who shave with razors. To start with, Corrales misconstrues the characterization of a "claims made" settlement. Contrary to his definition that a claims made settlement is one in which "the class member must submit a claim," a true claims made settlement is one that provides for unclaimed funds to revert back to the defendant. *Compare* Corrales Mem. at 56 with *In re Cendant Corp. Litig.*, 264 F.3d 201, 250 (3d Cir. 2001) (defining the settlement there as "a 'claims made' settlement, with unclaimed settlement funds reverting back to Cendant"). The settlement here allows for no such reversion. All of the settlement proceeds will be expended for the benefit of the Class; none of it reverts back to Gillette. *See also, supra,* at 11.

Furthermore, Corrales incorrectly asserts that consumers must go to great lengths to receive a full refund of $15 (or more if they can so prove) for their M3Power razors. Corrales Mem. at 57. The process is placing the razor in an envelope, affixing a single stamp, and dropping it into a mailbox.

- 13 -

With these facts in mind, this is not, as Corrales suggests, "nothing more than a coupon settlement." (Corrales Mem. at 58.) For those individuals who choose to retain their M3Power Razor, the settlement provides them with up to a $10 cash rebate for products they have purchased and they can keep the razor. Both groups of consumers are afforded cash they would not have otherwise received. Contrary to the rationale relied upon by Corrales in *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006), where the Seventh Circuit expressed concern over the use of coupon settlements because they compel consumers to conduct future business with the defendant, no such concern exists here. Class Members have the option of receiving a full refund, thereby eliminating their consumer relationship with Gillette. In the alternative, a Class Member can opt to receive cash payments for past or future purchases from Gillette. The choice is entirely up to the consumer. They can also obtain, if that portion of the settlement is available, the free Fusion razor package from the internet site set up pursuant to the settlement.

As for the number of claims that will be made, any such estimation is entirely speculative, especially at the preliminary approval stage. Nevertheless, irrespective of the number of claims actually made, none of the Settlement Funds revert to Gillette.[13]

The parties have in previous filings set forth and described the settlement terms (*e.g.*, Settlement Agreement, §IV, ¶¶2-3.4; Plaintiffs' Memorandum in Support of Motion for Preliminary

---

[13] Corrales submits the declaration of a purported expert in an effort to show that California residents possibly paid more for the M3Power razor than residents of other states. The submission by Corrales does not support this position. Rather, the purported expert merely opines that the cost of living and cost of health and beauty products in general are higher in California than other parts of the country. The purported expert, however, has not conducted any analysis of the price of M3Power razors in particular. Nor does the purported expert take into account the fact that, without proof of how much they paid, all consumers are receiving in excess of the average nationwide retail price of the M3Power razor, and consumers can receive an even greater amount in the event that they demonstrate that they paid more than $13 for their M3Power razor.

Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness

Hearing, §§III.A, IV, VII; Plaintiffs' Supp. Mem. in Support of Motion for Preliminary Approval of

Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing, §§III.B,

III.E; The Gillette Company's Submission in Support of Preliminary Approval of the Proposed

Settlement, §II) and, respectfully, have shown the settlement to be not only within the range of

reasonableness required for preliminary approval but also fair, reasonable and adequate.  The

settlement is the result of hard fought negotiations and properly takes into account the facts of this

litigation, the applicable law, and the reasonable expectations of Class Members.  The Settlement

Fund provides a significant amount of benefit to the Class, as do the other benefits.  The nature and

amount of damages to the consumer are fairly, adequately and reasonably provided for so that

reasonable consumer expectations are satisfied.

There are many who would read and accept Gillette's version of the case as leaving little

chance of recovery for consumers.  This settlement provides tangible and substantial benefits within

reasonable time periods as opposed to protracted litigation which may well lead nowhere. Indeed, if

a judgment were obtained against Gillette, after likely appeals, there would still be the need for a

claims process, with little likelihood of those costs or notice costs paid for by Gillette, at least to the

degree being employed here, and a real possibility of reverter to Gillette, as opposed to the forward

thinking provisions of this settlement which ensure the delivery of substantial benefits to the Class

directly by cash and related choices and benefits.  Those benefits, with the inclusion of the requested

attorneys' fees, costs and expenses, exceed $9.3 million.

The settlement gives Class Members choices.  In summary, they can take the $15 cash

payment, the $10 rebate cash payments or, as available under the settlement, get the Fusion razor

packet by way of the internet claim. It is only for the first choice that they have to return the razor, a

reasonable requirement in view of the fact that the refund is premised on the claim that the consumer does not like or want the razor as it failed to meet their expectations. And even if they liked it, they can keep it and still access the other benefits of the settlement.

Corrales' counsel's[14] claim that this is a marketing scheme for Gillette is wrong. As shown previously and above, the settlement has multiple options for Class Members to obtain benefits that meet consumer expectations. Should the part of the settlement that provides for distribution of free Fusion razors be triggered, consumers getting a product that they want and choose represents delivery of a benefit and satisfaction of expectation.

Searching for negativity, Corrales' counsel chooses to focus on how Gillette might be benefited. The focus should be and is on the Class and its members. The projection that this settlement is a marketing plan for Gillette is baseless sophistry and necessarily focuses on seeking pain from a defendant rather than value for the Class Member. And even if Corrales' counsel's lens was to be looked through, one should still see that Gillette loses sales for the razors when it gives them away. In any event, if the consumers are of the view that the Fusion razors are indeed better and buy more blades in order to use the razors, they are obtaining the benefit of a free razor that they want to use. Even if down the line Gillette might make profits from selling blades, that does not diminish the benefit of free razors for Class Members.

Finally, but certainly not least importantly, the insulting allegations that Class Counsel have not bargained at arms' length (Corrales Mem. at 33-42) and suggestion of collusion (*id*. at 79) are completely baseless and inaccurate.

---

[14] While two law firms filed appearances on behalf of Plaintiff Corrales, only The Kick Law Firm has appeared on Plaintiff Corrales' last two filings.

First, there was no "reverse auction" (*Id*. at 36). Indeed, very preliminary settlement explorations initiated in response to Gillette' original settlement proposal to all plaintiffs were ceased when it became apparent that there was a leadership contest. Settlement discussions resumed only after the court entered Case Management Order #2, designating Co-Lead Counsel and Liaison Counsel and providing that settlement negotiations with defendant were to be conducted by Co-Lead Counsel as exclusive representative of all plaintiffs.

Second, there was no agreement on material or any other terms of a settlement in July 2005, as alleged by Corrales' counsel (Corrales Mem. at 40).

Third, there was no negotiation of attorneys' fees until after the settlement had been agreed upon.

In fact, contrary to Corrales' unsupported allegations, protracted settlement negotiations occurred that substantially changed and improved the original offer made by Gillette.

### E.    The Proposed Notice Plan Satisfies Federal Requirements

The proposed notice ("Notice Plan") is complete and fully comports with applicable law. The Notice Plan was created by a quality firm highly experienced in the field of class action notices. *See* Declaration of Andrew J. Novak ("Novak Dec.") at ¶¶5, 6. It is expected to reach at least 80% of the Class in both the United States and Canada, and will include a fair and accurate summary of the parties' respective litigation positions, the general terms of the settlement as set forth in the Settlement Agreement, instructions for making a claim, and the date, time, and place of the Fairness Hearing. *Id.* at ¶¶19-25. Additionally, the Notice Plan describes the options available to those eligible to participate in the action, including their right to opt-out of, or object to the action. *Id.* Thus, the Notice Plan is "the best notice practicable under the circumstances."

Both proposed notices, short and long form, comport with applicable law and common practice in all respects. Contrary to Corrales' representations, the long form notice specifically

advises Class Members that: (a) up to $2.45 million of the settlement fund may be used to fund the cost of notice and administration, which are benefits to the class; (b) Gillette has agreed to pay Settlement Class Counsel's reasonable fees, costs and expenses in the amount of $1,850,000; and (c) they may object to the settlement and provides detailed instructions about how to do so.[15]  It will be available at www.m3powersettlement.com and the short form notice clearly sets that forth.  *See* Long Form Notice at Questions 8, 18, 10.

Additionally, the short form notice is proper and fully accomplishes its intended purpose.  In *Compact Disc*, relied upon by Corrales, the court noted that "[t]he very point of a short-form notice is to capture the attention without overwhelming the reader, and permit him/her to obtain more detail if desired, by going to the long form" and that, "trying to put too much detail in the short form [notice] would defeat its very purpose."  *Id.* at 203.  The short form notice provides Class Members with an excellent summary of the settlement and its terms.  And, in at least four different places, the short form notice directs Class Members to the long form notice while explaining how Class Members can get a copy of it.  Thus, the short form notice does an excellent job of accomplishing its intended purpose.  *Compact Disc* is relied upon by Corrales for the ostensible position that short form notices must list attorneys' fees, costs and expenses.  Corrales Mem. at 70 n22.  There, however, the judge held the exact opposite, stating that a notice plan which included a short form notice that did not list attorneys' fees was "the best notice program under the circumstances."  *Compact Disc*, 216 F.R.D. at 204.  Additionally, the Notice Plan approved by the court in that action

---

[15] Plaintiff Corrales' assertion that the notice should reference a court-ordered injunction that caused Gillette to cease publishing the advertisements at issue is without legal support, as it is common practice to exclude preliminary findings from related cases when publishing class action notices.

was prepared by Andrew J. Novak, the same media consultant which prepared the Notice Plan in this action. *See* Novak Dec. at 19.

Corrales' claim that the term "Final Fairness Hearing" makes the Notice Plan misleading is without merit. Corrales Mem. at 70. The terms "Fairness Hearing," and "Final Fairness Hearing" are often used interchangeably in the context of class action settlements, as is demonstrated by Justice Souter's use of the phrase in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). *Id.* at 849 ("certification of a mandatory settlement class, however provisional technically, effectively concludes the proceeding save for the *final fairness hearing*") (emphasis added).

Further, Corrales' claim that the Notice Plan is incomplete because the press release referred to in the notice has not been submitted to the court is without legal support or merit. It is common practice to prepare such materials after submitting the Notice Plan to the court using the same or substantially similar language as is otherwise agreed upon in the long and short form notices, as will occur here.

As demonstrated herein and in Plaintiffs' prior submissions, this proposed settlement provides fair, reasonable and adequate relief to the Class. Recognizing that the settlement meets all of the requirements and that a court should reach this conclusion, Corrales' counsel reveals his true motivation for his efforts in the final sentence of his brief: "Finally, if there is a preliminary approval granted, Mr. Corrales's attorneys respectfully request that the Court enter the Order conditioned on Mr. Corrales's attorneys being treated for purposes of their lodestar fees in a manner at least equal to lead counsels' and liaison counsel's fees." Corrales' counsel's self-motivated greed is no basis for this Court to deny fair, reasonable and adequate relief to the Class.

Every settlement is open to interpretation and, if one searches for it, can be criticized. Here, Plaintiffs have more than adequately shown that negotiations for the instant settlement did not

involve collusion and were based on a thorough analysis of the strengths and weaknesses of the case going forward and that applicable standards have been more than satisfied.

## II.    CONCLUSION

In conclusion, Plaintiffs, individually and on behalf of the proposed Settlement Class, pray that this Honorable Court enter an order:

(a)    provisionally granting class certification of a Settlement Class as requested herein;

(b)    appointing Ben Barnow and Robert M. Rothman as Settlement Class Counsel and appointing plaintiffs Mark Dearman, Anthony DeBiseglia, Matthew Marr, Adam Kline, Greg Besinger, Collin L. McGeary, Javier Tunon, and Jean-Sebastien Elie as Representative Plaintiffs;

(c)    preliminarily finding that the Settlement Agreement is fair, reasonable, and adequate, and in the best interest of the Class;

(d)    authorizing the Notice of class certification and preliminary approval of settlement to the Settlement Class in the manner set forth in the Settlement Agreement and in the forms attached as Exhibits D and E to the Settlement Agreement;

(e)    appointing Complete Claims Solutions, LLC, as the Claims Administrator;

(f)    setting a date for the Final Fairness Hearing to consider entry of a final order approving the Settlement Agreement and the request for attorneys' fees, costs, and expenses and incentive awards; and

(g)    granting such other and additional relief as the Court may deem just and appropriate.

DATED:  November 20, 2006                 Respectfully submitted,


                                          **/s/Theodore M. Hess-Mahan**
                                          Thomas G. Shapiro BBO #454680
                                          Theodore M. Hess-Mahan BBO #557109
                                          SHAPIRO HABER & URMY LLP
                                          53 State Street
                                          Boston, MA  02109
                                          Telephone:  617/439-3939
                                          617/439-0134 (fax)

                                          SAMUEL H. RUDMAN
                                          LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          ROBERT M. ROTHMAN
                                          MARK S. REICH
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)

                                          BEN BARNOW
                                          BARNOW AND ASSOCIATES, P.C.
                                          One North LaSalle Street
                                          Suite 4600
                                          Chicago, IL  60602
                                          Telephone:  312/621-2000

                                          *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE


        I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 20, 2006.

                                          **/s/Theodore M. Hess-Mahan**
                                          Theodore M. Hess-Mahan

1  Henry H. Rossbacher (SBN 060260)
   James S. Cahill (SBN 070353)
2  Talin Khachaturian Tenley (SBN
   217572)
3  **THE ROSSBACHER FIRM**
   811 Wilshire Blvd., Suite 1650
4  Los Angeles, CA 90017-2666
   Telephone: (213) 895-6500
5  Facsimile: (213) 895-6161

6  Kevin P. Roddy (SBN 128283)
   **WILENTZ, GOLDMAN**
7  **& SPITZER, P.A.**
   90 Woodbridge Center Drive, Suite
8  900
   Woodbridge, NJ 07095
9  Telephone: (732) 636-8000
   Facsimile: (732) 726-6686
10
   Taras P. Kick (SBN 143379)
11 **THE KICK LAW FIRM, APC**
   900 Wilshire Blvd., Suite 230
12 Los Angeles, CA 90017
   Telephone: (213) 624-1588
13 Facsimile: (213) 624-1589

14

15 Attorneys for Plaintiff

16          **UNITED STATES DISTRICT COURT**

17          **CENTRAL DISTRICT OF CALIFORNIA**

18 ALAN VITT, Individually and On          ) Case No CV 06 - 0 7 1 5 2 GHK(RC)
   Behalf of All Others Similarly Situated, )
19                                          ) CLASS ACTION
           Plaintiff,                       )
20                                          ) **CLASS ACTION COMPLAINT**
                                            ) **FOR VIOLATIONS OF THE**
21      vs.                                 ) **UNFAIR COMPETITION LAW**
                                            ) **AND FALSE ADVERTISING LAW**
22 APPLE COMPUTER, INC., a                  )
   California corporation,                  ) **JURY TRIAL DEMANDED**
23                                          )
                                            )
24         Defendant,                       )
                                            )
25                                          )
                                            )
26                                          )
                                            )
27

28

Scott R. Shepherd
**SHEPHERD, FINKELMAN, MILLER**
**& SHAH, LLC**
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

#3798988                    0

1

2      Plaintiff, Alan Vitt ("Plaintiff") by counsel and on behalf of himself and all

3   others similarly situated, for his Class Action Complaint ("Complaint") against

4   Defendant, Apple Computer, Inc. ("Apple"), hereby alleges upon personal knowledge

5   and belief as to his own acts, and upon information and belief (based on the

6   investigation of his counsel) as to all other matters, as to which allegations he

7   believes substantial evidentiary support will exist after a reasonable opportunity for

8   further investigation and discovery, as follows:

9                    **I.      NATURE OF CLASS ACTION**

10      1.      This is a class action brought on behalf of all purchasers (consumers) of

11   products called iBook laptop computers in the G4 series (the "iBook G4s"), sold in

12   the United States by Defendant Apple.  During the Class Period, Apple sold these

13   products to consumers utilizing false and misleading advertising, deceptive practices,

14   and false and fraudulent claims.

15      2.      Apple markets and sells the iBook G4s, which are laptop computers.

16   During the Class Period, Apple failed to inform the consuming public that the iBook

17   G4 logic boards fail at abnormally high rates.  Consequently, consumers have bought

18   thousands of iBook G4 laptops and, as a result, have suffered failures of these laptop

19   computers.  The Apple iBook G4s are unfit for regular usage by their owners because

20   the logic boards consistently fail.

21                   **II.     FACTUAL ALLEGATIONS**

22      3.      The iBook G4s are laptop computers manufactured by Apple, which

23   represented and advertised the iBook G4s as a reliable, affordable option to other

24   types of computers.  Plaintiff's experiences, mirroring those of thousands of other

25   iBook G4 purchasers who have recounted their problems with the G4 series,

26   demonstrate that Apple's representations were false and misleading.

27

28

#3798988                                                   1

4.    Contrary to the reputed quality of Apple products, the iBook G4 logic boards are not reliable and do not function properly. These iBook G4s have at least one serious design defect that causes the logic boards to fail.

5.    During the Class Period, Apple was aware, prior to marketing and selling iBook G4s (or at a minimum after Apple had been selling iBook G4s for a few months), that the product's logic boards were inherently defective. After the laptops went on the market, Apple's customer service department received hundreds of complaints regarding the same problem. There is also an online petition disseminated on the Internet documenting the existence of the problem. Despite its knowledge of the problem, Apple continued to manufacture and market the product without any alterations.

6.    Upon information and belief, the iBook G4 laptops use the same logic board as the iBook G3 series laptops. Apple previously instituted a recall program to address the logic board problem in the iBook G3 series laptops but has refused to extend that program to include the iBook G4 series.

7.    Apple has refused, and continues to refuse, to warn consumers about the defects inherent in the iBook G4 logic boards or to effectively remedy the problems and defects inherent in the iBook G4s. Unwilling to admit fault, Apple has sat silently while consumers purchased these defective products and continues to sit silently today as an unacceptable percentage of logic boards fail. Apple consistently denies that the problem exists at all and, at best, replaces failed logic boards with the identical defective boards.

8.    Plaintiff purchased an iBook G4 from Apple in August 2004 in reliance upon Apple's deceptive, fraudulent and false representations alleged in this Complaint that said iBook G4s were of high quality and free from defect, suitable for personal use. Plaintiff was injured thereby because he would not have purchased the iBook G4 had Apple disclosed that its logic board was defective, that Apple would

2

#3798988

1    not repair the defective iBook G4 logic board for free and that the iBook G4 was

2    overpriced due to its defect. The logic board on Plaintiff's iBook G4 completely

3    failed after the Apple warranty on the product had expired.

4          9.      Upon information and belief, at least thousands of consumers have

5    encountered precisely the same logic board failures as the problem experienced by

6    Plaintiff with his iBook G4. The online site, www.petitiononline.com, contains the

7    following petition:

8          **To: Apple Computer**

9          It is our wish that Apple Computer acknowledges that

10        iBook G4s produced between October 2003 and April 2004
(12" 800Mhz, 14" 1Ghz) commonly have a manufacturing

11        or design fault causing the graphics card to fail and
requiring the logic board to be replaced. We ask Apple to

12        extend its logic board repair program for iBook G3s to

13        cover these models.

14

15        The symptoms of the failure are: Scrambled or distorted video

16        Appearance of unexpected lines on the screen

17        Intermittent video image

18        Video freeze

19        Computer starts up to blank screen

20        Sincerely,

21        <u>The Undersigned</u>

22     As of November 1, 2006, the petition contains signatures from 1,273 consumers.

23          10.      Had Plaintiff and other consumers been made aware of the design defect

24    and its result -- the crashing of the logic boards -- they would not have purchased the

25    Apple iBook G4 laptop computers at issue in this case.

26          11.      Apple is one of the world's largest computer manufacturers.

27    Incorporated in 1977 in California, Apple has been an aggressive competitor in the

28    personal computer business for over thirty years. Apple's website states that the

3

#3798988

1   company's mission is "to bring the best personal computing experience to students,

2   educators, creative professionals and consumers around the world through its

3   innovative hardware, software and Internet offerings."

4        12.    More specifically, Apple's website advertising attempts to persuade

5   consumers of the high quality and unique design of the iBook G4 laptops. A typical

6   example is the Company's representation as to the iBook G4 stating:

> The new iBook G4 provides everything a student needs - a
> durable, lightweight, powerful laptop for learning on the go.
> And now with a faster processor, built-in wireless
> networking capabilities, in all models and 512 MB of
> memory, the iBook provides even greater value for schools.
> Every iBook G4 comes equipped with an array of digital
> learning software to ensure students have the tools they
> need to succeed.

13  (http://www.apple.com/ca/education/products/ibook/).  Apple goes on to represent:

> **Simply the best in mobile computing**
> Apple recognized the importance of mobility to education
> and designed the rugged, lightweight, fast and wireless-
> equipped iBook G4 with a long life battery – up to six hours
> on a single charge, making it perfect for education. These
> features have added up to the iBook being the most popular
> notebook for student learning in K-12 schools today.

20  (Emphasis in original.)

21  (http://www.apple.com/ca/education/whyapple/solutions.html).  Apple states that the

22  G4 is "[a] reliable and secure computing environment," that the G4s are "[h]igh

23  performance computers and networking solutions," and that the products provide "[a]

24  platform that provides a low cost of ownership and high value."

25  (http://www.apple.com/ca/education/whyapple/solutions.html).  In an April 19, 2004

26  press release, Philip Schiller, Apple's senior vice president of Worldwide Product

27  Marketing, is quoted as saying:  "The iBookG4 was built from the ground up for

28

4

1   consumers and students living their digital life on the go... The new iBook G4 is an

2   incredible value...." The press release goes on to state that the "new 12- and 14-inch

3   iBooks offer a perfect mix of portability, performance and affordability, with faster

4   PowerPC G4 processors and up to six hours of battery life for all-day mobile use in

5   the classroom or on the road."

6   (http://www.apple.com/pr/library/2004/apr/19ibook.html).

7       13.   Defendant Apple's advertisements and representations constitute

8   deceptive and untruthful advertising and marketing. Apple's scheme of false and

9   misleading advertising and marketing has resulted in thousands of consumers

10  purchasing the iBook G4s based upon the expectation that the iBook G4s have the

11  qualities advertised and will function as represented. Apple's unfair and deceptive

12  course of conduct is common to all purchasers of the iBook G4s. Apple's scheme is

13  ongoing and will victimize more consumers every day until it is halted by judicial

14  intervention. Each purchaser of the iBook G4s was injured through purchasing a

15  defective product at an excessive price because its defects were concealed and

16  because the cost to correct the defect was and is substantial.

17      14.   The scheme to defraud consumers alleged in this Complaint violates the

18  California Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200 *et seq.* and

19  the False Advertising Law, Bus. & Prof. Code § 17500 *et seq.*

20      15.   Consequently, by this Complaint and on behalf of the consumers of the

21  iBook G4s, Plaintiff seeks restitution to compensate Plaintiff and Class members for

22  their monetary losses, disgorgement of all of Defendant Apple's wrongfully earned

23  profits and other gains from the scheme, and an injunction to halt Apple's

24  continuation of its illegal and meretricious conduct.

25              **III.    PARTIES**

26      16.   Plaintiff, Alan Vitt, is an individual who resides in the County of Los

27  Angeles, California. Plaintiff is a consumer who, in August 2004, bought and used

28

5

1  Apple's iBook G4 in reliance upon Apple's deceptive, fraudulent and false

2  representations alleged in this Complaint that said iBook G4s were of high quality

3  and free from defect.  Plaintiff was injured thereby because he would not have

4  purchased the iBook G4 had Apple disclosed that its logic board was defective, that

5  Apple would not repair the iBook G4s logic board for free and that the iBook G4 was

6  overpriced due to its defect.  The logic board on Plaintiff's iBook G4 completely

7  failed.  As a result of Defendant Apple's violations of California law in making said

8  false, fraudulent and deceptive representations, Plaintiff has lost money and property.

9  Plaintiff seeks relief in his individual capacity and on behalf of a Class consisting of

10  all other consumers who purchased Apple's product, the iBook G4, within four years

11  prior to the date when this Complaint is filed.

12       17.    Defendant Apple is a California corporation with its principal place of

13  business located in Cupertino, California, doing business throughout the County of

14  Los Angeles, the State of California, and the United States of America.

15               **IV    JURISDICTION AND VENUE**

16       18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §

17  1332(d), Rule 23 of the Federal Rules of Civil Procedure and the Class Action

18  Fairness Act of 2005.

19       19.    Venue is proper in this Court because many members of the Class,

20  including Plaintiff, reside in this District, many of the acts described in this

21  Complaint occurred in this District, Apple's corporate headquarters are sufficiently

22  close to this District that defending an action here would pose no undue burden, and

23  Defendant conducts substantial business within this County.

24               **V.    CLASS ACTION ALLEGATIONS**

25       20.    This action may properly be maintained as a Class Action pursuant to

26  Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

27

28

#3798988

6

tw:61/cmplnt apple book

1    21.    Plaintiff brings this action as a class action on behalf of all purchasers of

2  iBook G4s who reside in the United States of America.

3    22.    The Class is composed of numerous residents of the State of California

4  and the United States, including Plaintiff, and joinder of everyone is impracticable.

5  Although the exact number of Class members is presently unknown, Plaintiff is

6  informed and believes and thereon alleges that the Class will number in at least

7  thousands of consumers.  The Apple iBook G4s are sold throughout the State of

8  California and the United States in stores, as well as by retailers on the internet.  The

9  members of the Class are so numerous that joinder of all members is impracticable.

10  The disposition of the claims of Plaintiff and other Class members in this action will

11  provide substantial benefits to the parties and the Court.

12    23.    There exists a well-defined community of interest in the questions of law

13  and fact presented by this controversy.  These questions of law and fact common to

14  Plaintiff and other Class members predominate over questions which may affect only

15  individual members, if any, because Defendant Apple has acted on grounds generally

16  applicable to the entire Class, thereby making appropriate final injunctive relief and

17  corresponding declaratory relief with respect to the Class as a whole.  Among the

18  questions of law and fact common to the Class are the following:

19        a)    Whether Defendant Apple's scheme to utilize false and deceptive

20              statements violates the UCL and Section 17500;

21        b)    Whether Defendant Apple made unsubstantiated claims regarding

22              the iBook G4 laptops;

23        c)    Whether Defendant Apple's misrepresentations constitute false

24              and misleading advertising;

25        d)    Whether Defendant Apple should be enjoined from engaging in

26              the scheme to defraud; and

27

28

#3798988

7

1      e)    The amount of restitution that Plaintiff and members of the Class

2            should be awarded.

3      24.   Plaintiff is a member of the Class. Plaintiff's claims are typical of the

4  claims of the other Class members because Plaintiff and all Class members were

5  injured by the same wrongful acts and practices in which Defendant engaged, as

6  alleged herein.

7      25.   Plaintiff will fairly and adequately protect the interests of the Class. The

8  interests of Plaintiff are coincident with, and not antagonistic to, those of the Class

9  members. In addition, Plaintiff has retained attorneys who are experienced and

10  competent in the prosecution of complex and class litigation. Neither Plaintiff nor his

11  attorneys have any conflict in undertaking this representation.

12     26.   A class action is superior to the alternatives, if any, for the fair and

13  efficient adjudication of the controversy alleged herein because such treatment will

14  permit a large number of similarly situated persons to prosecute their common claims

15  in a single forum simultaneously, efficiently, and without duplication of evidence,

16  effort, and expense that numerous individual actions would engender. This action

17  will result in the orderly and expeditious administration of Class claims. Uniformity

18  of decisions will be assured, thereby avoiding the risk of inconsistent and varying

19  determinations.

20     27.   Because the injuries suffered by individual Class members or the amount

21  of restitution or disgorgement to each Class member may be relatively small, the

22  expense and burden of individual litigation make it virtually impossible for the

23  members of the Class effectively to seek redress individually for the Defendant's

24  alleged wrongful conduct.

25     28.   Plaintiff knows of no difficulty that will be encountered in the

26  management of this litigation which would preclude its maintenance as a class action.

27

28

8

#3798988

tw:61/cmplnt apple book                                   CLASS ACTION COMPLAINT

29.   Common questions of law and fact predominate in this case, and a class action is the only appropriate method for the complete adjudication of this controversy for the following reasons, among others:

    a)   The individual amounts of restitution involved, while not insubstantial, are generally so small that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

    b)   The costs of individual suits would unreasonably consume the amounts that would be recovered;

    c)   Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; and

    d)   Individual actions would unnecessarily burden the courts and waste precious judicial resources.

30.   Notice to the members of the Class may be accomplished cheaply, efficiently and in a manner best designed to protect the rights of all Class members.

## VI.  ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

31.   Defendant is estopped from relying on any statutes of limitation by virtue of their acts of fraudulent concealment and by selling the Apple iBook G4s with known latent defects.  Defendant has actively concealed the true nature of the iBook G4, as alleged in this Complaint.

32.   Defendant has systematically denied that their claims, advertising and representations are false or misleading.  Because of Defendant's nondisclosure of the true nature of the iBook G4, Plaintiff and the members of the Class could not reasonably have discovered the wrongdoing alleged above.  Given Defendant's failure to disclose this non-public information about the defective nature of the iBook G4s over which they had exclusive control, and because Plaintiff could not

9

#3798988

1    reasonably have known that the iBook G4s were not as advertised and represented,

2    Defendant is estopped from relying on any statues of limitations that might otherwise

3    be applicable to the claims asserted herein.  Further, any such statutes of limitations

4    have been tolled by Defendant's acts of concealment and misrepresentations.

5    ## VII.  **DEFENDANT'S SCHEME TO DEFRAUD CONSUMERS**

6        33.    Defendant has represented, expressly or by implication, including

7    through advertisements disseminated throughout the County of Los Angeles, the

8    State of California and the United States that:

9            a)    The Apple iBook G4s are of high quality and reliable; and

10           b)    The Apple iBook G4s are appropriate for the uses for which they

11                 are advertised, delivering a high quality computing experience.

12   In fact, Defendant knew that the iBook G4s were defective in design and

13   performance.  These claims and representations made by Defendant are false and

14   misleading.

15       34.    Defendant has marketed the iBook G4s to consumers in the County of

16   Los Angeles, the State of California, and the United States through propagating these

17   false and misleading claims through advertisements and other media in order to

18   induce consumers to buy the iBook G4s without learning the truth that the iBook G4s

19   are defective in design and performance.

20   ### FIRST CAUSE OF ACTION
     ### (Violations of UCL)

21

22       35.    Paragraphs 1 through 34 of this Complaint are realleged and

23   incorporated by reference as if fully set forth herein.  This claim arises under the UCL

24   and is asserted against Defendant.

25       36.    Defendant's actions complained of herein constitute unfair trade

26   practices that have the capacity to and do deceive consumers, in violation of the UCL.

27

28

#3798988

tw:61/cmplnt apple book

1       37.    All of the conduct alleged herein occurs and continues to occur in the

2   ordinary course of Defendant's business. Defendant's wrongful conduct is part of a

3   pattern or generalized course of conduct repeated on thousands of occasions daily.

4   Thus, Defendant's conduct impacts the public interest.

5       38.    Defendant also engages in unlawful business acts in violation of the

6   UCL by violating state law including, but not limited to, Civil Code §§ 1572, 1709,

7   1710 and 1770(a)(5),(7) and (9), as well as Section 17500. Plaintiff reserves the right

8   to amend this Complaint to identify additional violations of California law committed

9   by Defendant as further investigation and discovery warrants.

10      39.    Plaintiff and the members of the Class have all been directly and

11  proximately injured in their business and property by Defendant's wrongful conduct,

12  and such injury includes the purchase of the iBook G4s at excessive prices which

13  they would not have purchased were they truthfully and fully informed of the facts.

14      40.    As a direct and proximate result of the wrongful and illegal acts alleged

15  in this Complaint, Defendant received and continues to hold ill-gotten gains

16  belonging to Plaintiff and the members of the Class. Plaintiff and Class members

17  request that this Court enter such orders or judgments as may be necessary to restore

18  to any person in interest any money which may have been acquired by means of such

19  unfair practices, as provided in Business & Professions Code § 17203 and Civil Code

20  § 3345, and for such other relief and further relief as may be justified as set forth

21  below.

22  **SECOND CAUSE OF ACTION**
**(Violations of Section 17500)**

23

24      41.    Paragraphs 1 through 40 of this Complaint are realleged and

25  incorporated by reference. This claim arises under Bus. & Prof. Code § 17500 *et*

26  *seq.,* and is alleged against Defendant.

27

28

#3798988

11

tw:61/cmplnt apple book

1    42.    At all times relevant hereto, the Defendant was a "person" and a

2  "corporation", as those terms are defined in Bus. & Prof. Code § 17506.

3    43.    Business and Professions Code § 17500 provides that "[i]t is unlawful

4  for any person, firm, corporation or association with intent ... to dispose of ... personal

5  property ... to induce the public to enter into any obligation relating thereto, to make

6  or disseminate or cause to be made or disseminated before the public in this state, ...

7  any statement ... which is untrue or misleading, and which is known, or which by the

8  exercise of reasonable care should be known, to be untrue or misleading..."

9    44.    On the advertisements, brochures, and marketing materials, Defendant

10 represented that the Apple iBook G4s were of high quality and free from defect.

11   45.    Defendant did not disclose, conspicuously or otherwise, on any of these

12 materials that such representations were untrue or misleading.

13   46.    Defendant's acts of untrue and misleading advertising present a

14 continuing threat to members of the public because such advertisements induce

15 consumers to purchase the iBook G4s.

16   47.    As a result of the violations of California law described above,

17 Defendant have been, and will be, unjustly enriched at the expense of Plaintiff and

18 the members of the Class.  Specifically, Defendant has been unjustly enriched by

19 receipt of hundreds of thousands, if not millions, of dollars in monies received from

20 customers who purchased the iBook G4s which were advertised and/or otherwise

21 marketed in this State and this County and the United States, and which are promoted

22 and sold through advertising and marketing materials which materially misrepresent

23 the quality and functions of the product.

24   48.    Pursuant to Bus. & Prof. Code § 17535, Plaintiff requests that this Court

25 make such orders or judgments as may be necessary to prevent the use or

26 employment by Defendant of untrue and misleading advertisements, or which may be

27 necessary to restore to Plaintiff and the members of the Class any money which may

28

#3798988

12

1   have been acquired by Defendant by means of such untrue and misleading
2   advertisements.

### PRAYER FOR RELIEF

4   **WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

5   A.      Certify that this action may be maintained on behalf of a Class, with
6   Plaintiff as the Class Representative, pursuant to Rule 23;

7   B.      Order that all payments made for the Apple iBook G4s be returned to
8   Plaintiff and the members of the Class because Defendant procured them
9   through unfair trade practices and in violation of state law;

10  C.      Award to Plaintiff and each member of the Class restitution;

11  D.      Order that Defendant be enjoined from engaging in unfair and/or
12  deceptive acts or practices, as set forth in this Complaint;

13  E.      Award to Plaintiff and each member of the Class interest on said award,
14  pursuant to Civil Code § 3287;

15  F.      Order that Defendant be enjoined to publish notice of the truth regarding
16  the iBook G4s;

17  G.      Award Plaintiff and the members of the Class the costs of suit and
18  attorneys' fees; and

19  H.      Award all other relief to which Plaintiff and Class members may be
20  entitled at law or in equity.

21  DATED: November 7, 2006             THE ROSSBACHER FIRM

22

23

24  By: _____
                Talin Khachaturian Tenley

26  811 Wilshire Boulevard, Suite 1650
    Los Angeles, CA  90017
27  Telephone: (213) 895-6500

28

13

#3798988

tw:61/cmplnt apple book

CLASS ACTION COMPLAINT

1  Taras P. Kick (State Bar No. 143379)
   Graig R. Woodburn (State Bar No. 134097)
2  G. James Strenio (State Bar No. 177624)
   Thomas A. Segal (State Bar No. 222791)
3  THE KICK LAW FIRM, APC
   900 Wilshire Blvd., Suite 230
4  Los Angeles, California 90017
   (213) 624-1588; Fax (213) 624-1589
5
   Attorneys for Plaintiff,
6

**FILED**

2006 OCT 18 PH 4: 03

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  Wineesa Cole, individually and on behalf of all others similarly situated,<br>11<br>12          Plaintiff,<br>13      v.<br>14  Asurion Corporation a Delaware Corporation, T-Mobile USA, Inc. a Delaware Corporation, and DOES 1 through 500.<br>15<br>16<br>17          Defendants. | Case No. **CV . 06  6649 DDP**  JTLx<br><br>CLASS ACTION COMPLAINT FOR:<br><br>1. Violations of *California Business & Professions Code* §17200, et seq.<br><br>2. Violations of *California Business & Professions Code* §17500, et seq.<br><br>3. Violations of *California Civil Code* § 1750 et seq.<br><br>4. Violations of *Tennessee Consumer Protection Act* § 47-18-01 et seq.<br><br>5. Violations of *Washington Consumer Protection Act RCW 19.86 et seq.*<br><br>6. Violations Of Other State Consumer Protection Statutes<br><br>7. Common Law Fraud<br><br>8. Negligent Misrepresentation<br><br>9. Civil Conspiracy<br><br>10. Unjust Enrichment<br><br>**JURY TRIAL DEMANDED** |

18

19

20

21

22

23

24

25

26

27

28

1

10-19-2006  11:50AM   FROM-DDS LEGAL SUPPORT                    213-620-1596          T-351   P.006/040   F-288

## NATURE OF ACTION

1.     This is a consumer protection class action brought on behalf of consumers nationwide who purchased cell phone "insurance" offered by Asurion Corporation ("Asurion").

2.     Asurion sells cell phone "insurance" to consumers through exclusive agreements with cell phone carriers including  T-Mobile.

3.     Cell phone "insurance" was initially offered by cell phone carriers as a means of assuring customer loyalty and not as a profit center.  However, cell phone "insurance" has become an extremely profitable business in its own right. Plaintiff is informed and believes and thereon alleges that Asurion made in excess of $400 million in revenue in 2005 from selling such "insurance."

4.     Consumers who purchase cell phone "insurance" from Asurion are led to believe that it operates just like any other insurance policy.  Consumers pay a monthly premium, which appears on their cell phone bill.  Consumers are informed that in the event of a loss there will be a "deductible" of anywhere between $40 and $110.  However, Plaintiff is informed and believes and thereon alleges that Asurion often changes the applicable deductible without informing consumers that this has been done.

5.     Asurion's "deductible" is not a true deductible as that term is used in the insurance industry and understood by consumers.  The common understanding and plain meaning of "deductible" is that it is a predetermined sum that is deducted from a loss payable amount.  For example, in a fire insurance policy with a deductible of $1000, the consumer understands that if they incur a loss which is less than $1000, they will not be able to recover anything from the insurance company, and that the insurance company will simply deny the claim. By contrast, Asurion's "deductible" is actually a processing fee charged to consumers who file a claim for a replacement cell phone, *even when the replacement phone is worth less than the deductible.*

1     6.     Even though Asurion's insurance policies represent to consumers that

2  a lost phone will be replaced with a phone of "like kind, quality and value",

3  Asurion routinely provides consumers with replacement cell phones that are

4  "refurbished" and therefore worth substantially less than the lost phones. In many

5  cases, the phones are worth less than the "deductible" or processing fee paid by

6  consumers. This fact is not disclosed to the consumer. This leads to the

7  anomalous situation where Asurion which is purportedly an insurer can make a

8  profit from processing claims for lost cell phones above and beyond the profit that

9  legitimate insurance companies make from charging premiums to policy holders.

10  Essentially, Asurion is pocketing insurance premiums and deductible payments

11  without actually providing insurance.

12                    **PARTIES**

13     7.     Plaintiff Wineesa Cole, was at all times relevant herein, a resident of

14  Los Angeles County, California. Plaintiff's allegations as to her own dealings with

15  Asurion and T-Mobile are made from personal knowledge. All other allegations

16  herein are made on information and belief, and either have evidentiary support, or

17  are likely to have evidentiary support after discovery in this matter.

18     8.     Defendant Asurion Corporation is a Delaware corporation

19  headquartered in Nashville Tennessee and San Mateo California. Asurion

20  transacts substantial business in the State of California, County of Los Angeles.

21     9.     Defendant T-Mobile USA ("T-Mobile") is a Delaware corporation

22  headquartered in Bellevue, Washington.

23     10.   At all material times herein, Asurion and T-Mobile (collectively

24  referred to herein as "Defendants") each acted as the co-conspirator, agent,

25  servant, employee, joint venturer or alter ego of the other with respect to the acts,

26  violations, and common course of conduct alleged herein or is otherwise liable.

27     11.   The acts of Defendants alleged herein were authorized, ordered, or

28  done by their officers, agents, employees, or representatives, while actively

1   engaged in the management of the Defendants' businesses or affairs.

2                    **JURISDICTION AND VENUE**

3        12.   This Court has jurisdiction pursuant to the Class Action Fairness Act,

4   28 U.S.C. §1332(d).  Jurisdiction is proper because (1) the claims of all plaintiffs,

5   aggregated together, exceed $5,000,000 and (2) the plaintiff and the defendants

6   are citizens of different states.  (28 U.S.C. §1332(d)(2) and (6).)  Venue is proper

7   in this court under 28 U.S.C. §1391(b)(1) because at the time of the transaction

8   giving rise to this lawsuit, plaintiff was a resident of Los Angeles County,

9   California and defendants transact substantial business in Los Angeles County,

10  California.

11                          **FACTS**

12  **A.    Background.**

13       13.   Asurion, a privately held company with over 2500 employees

14  worldwide, was founded in 1994.  Asurion is headquartered in Nashville

15  Tennessee, and San Mateo California.

16       14.   T-Mobile USA, a publicly owned company with over 25,000

17  employees is headquartered in Bellevue Washington.

18       15.   T-Mobile markets the cell phone "insurance" provided by Asurion to

19  T-Mobile customers.

20       16.   Approximately 17,000,000 people in the United States currently have

21  cell phone insurance  provided by Asurion.

22  **B.    Defendants's Deceptive Marketing Practices**

23       17.   In the advertising and sale of its services, Asurion has represented,

24  expressly or by implication, that consumers who purchase their cell phone

25  "insurance" are purchasing a conventional insurance policy in which they will be

26  compensated for the loss sustained less a deductible.  Asurion fails to adequately

27  disclose that the "deductible" is actually a compulsory processing fee which will

28  in many cases exceed the value of the replacement phone provided.  Asurion also

fails to disclose that Asurion often changes the deductible after the policy has been

10-19-2006   11:51AM   FROM-DDS LEGAL SUPPORT                    213-620-1596        T-351   P.009/040   F-288

1  purchased, so that the consumer ends up being charged a deductible which is

2  higher than the one that they thought they had agreed to. Asurion also represents

3  to consumers that they will receive a replacement phone of "like kind, quality, and

4  value" but fails to disclose that most of the replacement phones provided by

5  Asurion are in fact "refurbished" phones and in many cases are defective phones

6  that were returned by consumers. Such facts would be material to consumers in

7  their purchase or use of Asurion's services. The failure to adequately disclose

8  these facts in light of the representations made was, and is, a deceptive practice. If

9  Plaintiff and the Class Members had understood the true facts regarding Asurion's

10  "insurance", they either would not have  purchased it, or they would have paid less

11  for it.

12          18.    T-Mobile actively markets Asurion's cell phone "insurance" and

13  makes the same representations as Asurion described in Paragraph 17 incorporated

14  by this reference. T-Mobile collects insurance premiums payable to Asurion from

15  its customers.

16          19.    The precise terms and conditions of Asurion's T-Mobile insurance

17  policy are not made available to consumers on Asurion's website, but rather on a

18  website called "PhoneClaim.com" which consumers would ordinarily visit only

19  *after* losing a phone.

20          20.    T-Mobile profits from the unlawful scheme alleged herein because T-

21  Mobile's representations regarding the "insurance" are designed to induce

22  consumers to purchase T-Mobile's products and services. T-Mobile markets the

23  "insurance" as a benefit to its customers, and a feature of its phones and services.

24  If Plaintiff and Class Members had known the true facts, they either would not

25  have purchased T-Mobile's phones and services, or they would have paid less for

26  them.

27          21.    Asurion's website actively promotes the cell phone "insurance" to

28  cell phone carriers as a source of revenue. Asurion's website tells cell phone

carriers that: "Carriers get the added benefit of a new recurring, revenue stream

1  from the monthly billing and collection of the handset insurance premium." In

2  other words, T-Mobile and other carriers receive a defacto kickback from Asurion

3  from the insurance premium proceeds.  T-Mobile does not disclose to consumers

4  that it profits from the "insurance" program by retaining a share of the premiums.

5

6  **C.    Plaintiff's Experience With Asurion.**

7        22.    In March 2004, Plaintiff became a T-Mobile subscriber, and

8  purchased a T-Mobile phone.  Plaintiff purchased Asurion's "insurance" which

9  was marketed by T-Mobile.  T-Mobile's marketing materials made the

10 representations and omissions described in Paragraph 17 and incorporated herein

11 by this reference.  T-Mobile specifically represented to Plaintiff that her deductible

12 was $40.00.  When Plaintiff purchased the insurance, she was not provided with

13 a copy of the actual policy.

14       23.    In or around August 2004, Plaintiff lost her cell phone and submitted

15 a claim to Asurion.  Asurion's representative told her that in order to receive a

16 replacement phone she would have to pay a deductible of $110.00  When Plaintiff

17 told Asurion's representative that her deductible was $40.00, Asurion's

18 representative told her that she should have received a letter informing her that her

19 deductible had been raised.  Plaintiff, in fact, never received such a letter.  When

20 Plaintiff complained to Asurion and T-Mobile, her insurance was cancelled, but

21 her payments were not refunded.

22       24.    Plaintiff spoke to other Asurion customers she knows who also

23 believed that their deductible was $40 but were informed that it was $110.00.

24 Those customers also did not receive a letter informing them that the deductible

25 had been raised to $110.00.  If Plaintiff had known that the deductible would be

26 $110.00, she either would not have purchased the insurance or she would have

27 paid much less for it.  Similarly, if Plaintiff had known that the insurance program

28 offered to her by T-Mobile required a $110.00 deductible, she either would not

have purchased T-Mobile's products and services, or she would have paid much

6

10-19-2006  11:52AM  FROM-DDS LEGAL SUPPORT          213-620-1596          T-351  P.011/040  F-288

1    less for them.

2                    **CLASS ACTION ALLEGATIONS**

3         25.    Plaintiff seeks to bring this case as a class action on behalf of herself

4    and all others similarly situated as members of a proposed Class, defined as:

5              **All individuals or entities throughout the United States and its**

6              **territories who purchased cell phone insurance from Asurion**

7              **through T-Mobile USA.**

8         26.    Plaintiff seeks class certification under *Federal Rules of Civil*

9    *Procedure*, Rules 23(a) and 23(b)(1),(2) and/or (3).

10        27.    The members of the Class are so numerous that a joinder of all

11   members would be impracticable. While the exact number of the members of the

12   Class is unknown to Plaintiff at this time and can be determined only by

13   appropriate discovery, Plaintiff believes that the Class is likely to include

14   thousands of members.

15        28.    Membership in the Class is ascertainable. The Class definition

16   identifies a group of unnamed plaintiffs by describing a set of common

17   characteristics sufficient to allow a member of that group to identify himself or

18   herself as having a right to recover based on the description. Specifically, the

19   Class members' contact and billing information is in the possession of Asurion, or

20   can easily be obtained from cell phone carriers who partner with Asurion. The

21   nature of notice to the Class is contemplated to include notice by e-mail, by text

22   messaging, by a notice accompanying the cell phone bills of class members, and

23   notice in regional publications as approved by the Court.

24        29.    A well-defined community of interest in the questions of law or fact

25   involving and affecting all members of the Class exists, and common questions of

26   law or fact are substantially similar and predominate over questions that may

27   affect only individual Class members. The questions of law and/or fact common

28   to Plaintiff and the Class members, *inter alia*, include:

              (i)    Whether Defendants' alleged acts and practices were

1    unlawful and therefore violated *California Business &*
2    *Professions Code* § 17200;

3    (ii)  Whether Defendants alleged acts and practices were unfair
4    and therefore violated *Business & Professions Code* § 17200;

5    (iii)  Whether Defendants' alleged acts and practices were
6    fraudulent and therefore violated *Business & Professions*
7    *Code* § 17200;

8    (iv)  Whether Defendants' misrepresentations, omissions and
9    concealment violated *Business & Professions Code* §
10    17500;

11    (v)  Whether Defendants' methods, acts and practices violated
12    *California Civil Code* § 1750 *et seq;*

13    (vi)  Whether Defendants' misrepresentations, omissions, and
14    concealment violated *Tennessee Consumer Protection*
15    *Act* § 47-18-01 *et seq;*

16    (vii)  Whether Defendants' misrepresentations, omissions and
17    concealment violated *Washington Consumer Protection Act*
18    *RCW 19.86 et seq;*

19    (viii)  Whether Defendants' conduct violated other state consumer
20    protection statutes;

21    (ix)  Whether Defendants' misrepresentations, omissions, and
22    concealment constitute common law fraud;

23    (x)  Whether Defendants' misrepresentations, omissions, and
24    concealment constitute negligent misrepresentation;

25    (xi)  Whether Defendants conspired to defraud consumers;

26    (xii)  Whether Defendants were unjustly enriched at the expense
27.    of Plaintiff and Class Members.

28    30.  Plaintiff's claims are typical of all of the members of the Class.
Plaintiff and the Class members are all purchasers of Asurion's cell phone

1  "insurance". The evidence and the legal theories regarding Defendants' alleged

2  wrongful conduct are identical for Plaintiff and all Class members.

3  Plaintiff will fairly and adequately protect the interests of the Class members.

4  Plaintiff has retained competent counsel experienced in class action litigation to

5  ensure such protection. Plaintiff and her counsel intend to prosecute this action

6  vigorously.

7      31.    The prosecution of separate actions by individual members of the

8  Class would create a risk of inconsistent or varying adjudications with respect to

9  individual members of the Class which would establish incompatible standards of

10  conduct for Defendants within the meaning of *Fed. R. Civ. P.*, Rule 23(b)(1)(A).

11      32.    Defendants have acted or refused to act on grounds generally

12  applicable to the Class, thereby making appropriate final injunctive relief or

13  corresponding declaratory relief with respect to the Class as a whole within the

14  meaning of Rule 23(b)(2).

15      33.    Questions of law or fact common to the members of the Class

16  predominate over any questions affecting only individual members within the

17  meaning of Rule23(b)(3).

18      34.    The class action is superior to all other available methods for the fair

19  and efficient adjudication of this case or controversy. Because the injury suffered

20  by the Class members may be relatively small, the expense and burden of

21  individual litigation make it virtually impossible for Plaintiff and Class members

22  individually to seek redress for the alleged wrongful conduct. Even if any

23  individual Class members could afford individual litigation, it would be unduly

24  burdensome to the courts in which the individual litigation(s) would proceed. The

25  class action device is preferable to individual litigation(s) because it provides the

26  benefits of unitary adjudication, economies of scale, and comprehensive

27  adjudication by a single court. In contrast, the prosecution of separate actions by

28  individual Class members would create a risk of inconsistent or varying

adjudications with respect to individual  Class members that would establish

9

**CLASS ACTION COMPLAINT**

1  incompatible standards of conduct for the party (or parties) opposing the Class and
2  would lead to repetitious trials of the numerous common questions of fact and law.
3  Plaintiff knows of no difficulty that will be encountered in the management of this
4  litigation that would preclude its maintenance as a class action. As a result, a class
5  action is superior to other available methods for the fair and efficient adjudication
6  of this controversy. Absent a class action, Plaintiff and Class members will
7  continue to suffer losses, thereby allowing these violations to proceed without
8  remedy and allowing Defendants to retain the proceeds of their ill-gotten gains.

### FIRST CAUSE OF ACTION

10  **For Violations of *California Business & Professions Code* § 17200, *et seq.***
11  (Against Defendants)
12  35.    Plaintiff repeats, realleges, and incorporates by reference each and
13  every allegation contained in each of the preceding paragraphs and in each of the
14  succeeding paragraphs, as though fully incorporated herein, made a part hereof,
15  and set forth herein.
16  36.    California's Unfair Competition Law ("UCL") defines unfair business
17  competition to include any "unlawful," "unfair," or "fraudulent" business act or
18  practice. (*Cal. Bus. & Prof. Code* §17200, *et seq.*)
19  37.    Defendants' acts and practices, as alleged herein, violate the UCL.
20  By engaging in the above-described acts and practices, including the actions and
21  omissions herein alleged, Defendants have committed one or more acts of unfair
22  competition within the meaning of *Business & Professions Code* § 17200.
23  Defendants' acts and practices constitute unlawful, unfair, and fraudulent business
24  acts and practices within the meaning of the UCL.
25  38.    Defendants' acts and practices are "unlawful," within the meaning of
26  the UCL, because they, *inter alia*, violate *Business & Professions Code* §17500, *et*
27  *seq.*, *California Insurance Code* §§ 780-781, *California Insurance Code* § 790.03,
28  Section 5(a) of the Federal Trade Commission Act, various state and federal
   insurance regulations, common law prohibitions against fraud, and trade

10

1   association ethical rules and guidelines.

2       39.   Defendants' act and practices are "unfair," within the meaning of the

3   UCL, because they are immoral, unethical, oppressive, unscrupulous, and

4   substantially injurious to consumers. And, the gravity of the harm to consumers

5   from Defendants' acts and practices outweigh any utility of the acts and practices.

6       40.   Defendants' acts and practices are "fraudulent," within the meaning

7   of the UCL, because their misrepresentations are likely to deceive the public.

8       41.   Plaintiff and the members of the Class have suffered injury and have

9   lost money or property as a result of Defendants' violations of the UCL.

10      42.   Such conduct is ongoing and continues to this date. Plaintiff and the

11  Class members are therefore entitled to the relief described below.

12                        **SECOND CAUSE OF ACTION**

13    **For Violations of *California Business & Professions Code* § 17500, *et seq.***

14                           (Against Defendants)

15      43.   Plaintiff repeats, realleges, and incorporates by reference each and

16  every allegation contained in each of the preceding paragraphs as though fully

17  incorporated herein, made a part hereof, and set forth herein.

18      44.   As alleged herein, in the advertising and sale of its services, Asurion

19  has represented, expressly or by implication, that consumers who purchase its cell

20  phone "insurance" are buying a conventional insurance policy in which they will

21  be compensated for the loss sustained less a deductible. Asurion fails to

22  adequately disclose that the "deductible" is actually a compulsory processing fee

23  which will in many cases exceed the value of the replacement phone provided.

24  Asurion also fails to disclose that Asurion often changes the deductible after the

25  policy has been purchased, so that the consumer ends up being charged a

26  deductible which is higher than the one that they thought they had agreed to.

27  Asurion also represents to consumers that they will receive a replacement phone of

28  "like kind, quality, and value" but fails to disclose that many of the replacement

phones provided by Asurion are in fact "refurbished" phones and in many cases

11

1  are defective phones that were returned by consumers.  Such facts would be

2  material to consumers in their purchase or use of Asurion's services. The failure to

3  adequately disclose these facts in light of the representations made was, and is, a

4  deceptive practice.

5      45.    T-Mobile makes the misrepresentations and failures to disclose

6  described in Paragraph 45 incorporated herein by this reference.  T-Mobile

7  further fails to disclose that it retains a share of the insurance premium as

8  an inducement to steer its customers toward Asurion's "insurance".  Such facts

9  would be material to consumers in their purchase or use of Defendants' services.

10 The failure to adequately disclose these facts in light of the representations made

11 was, and is, a deceptive practice.

12     46.    This advertising is by its nature, unfair competition and unfair,

13 deceptive, untrue, or misleading advertising within the meaning of *California*

14 *Business & Professions Code* §17500 *et seq*.  Such advertisements are likely to

15 have deceived, did deceive, and continue to deceive the intended audience.

16     47.    The above-described false, misleading, and deceptive advertising

17 conducted by Defendants continues to have a tendency to deceive the intended

18 audience in that Defendants have failed to cease such advertising.

19     48.    The misrepresentations and non-disclosures by Defendants of the

20 material facts detailed above constitute false and misleading advertising and

21 therefore constitute a violation of, *Business & Professions Code* §17500 *et seq*.

22     49.    Plaintiff and the members of the Class have suffered injury and have

23 lost money or property as a result of Defendants' violations of *Business &*

24 *Professions Code* §17500 *et seq*.

25     50.    Such conduct is ongoing and continues to this date. Plaintiff and the

26 Class Members are therefore entitled to the relief described below.

27               **THIRD CAUSE OF ACTION**

28          For Violations Of *California Civil Code* § 1750 *et seq*.

                    (Against Defendants)

                          12

51.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each of the preceding paragraphs as though fully incorporated herein, made a part hereof, and set forth herein.

52.    This cause of action is brought pursuant to California's Consumers Legal Remedies Act, *California Civil Code* §§ 1750, *et seq.* (the "CLRA").

53.    Plaintiff and the Class members are individuals who purchased cell phones, cell phone service, and the purported "insurance" from Defendants for family and house hold purposes.  Plaintiff and the Class members are therefore consumers within the meaning of the CLRA, *California Civil Code* § 1761(d). Defendants are "persons" as defined under the CLRA, *California Civil Code* § 1761(c).

54.    Defendants violated *inter alia California Civil Code* §§ 1770 (a)(5),(6), (7), and(14) by representing that their goods and services provide benefits that they do not provide, by representing that the replacement cell phones are original or new even though they have been reconditioned, by representing that the goods and services are of a particular standard, quality or grade when they are not,  and by representing that the  transactions conferred rights and obligations that they did not confer.

55.    As a result of the use and employment by Defendants of the aforementioned unlawful methods, acts and practices, Plaintiff and the Class Members suffered damages.

56.    Plaintiff and the Class members seek restitution in the full amount of the insurance premiums and deductibles paid and/or disgorgement of Defendants' profits reasonably attributable to its unjust enrichment as a result of the misconduct alleged herein, and any other relief which the Court deems proper. Plaintiff and the Class members further intend to seek compensatory damages and, in light of Defendants' willful and conscious disregard for the rights of Plaintiff and the Class members and in light of Defendants' intentional and fraudulent concealment of material facts, Plaintiff and the members of the Class also intend

13

1  to seek an award of punitive damages.  Pursuant to Civil Code § 1782(a), Plaintiff

2  will serve Defendants with notice of its alleged violations of the CLRA by

3  certified mail return receipt requested.  If, within 30 days after the date of such

4  notification, Defendants fail to provide appropriate relief for their violation of the

5  CLRA, Plaintiff will amend this Complaint to seek monetary (both compensatory

6  and punitive) damages under the CLRA.

7      57.    Plaintiff and the Class Members request this Court to enjoin

8  Defendants from continuing to employ the deceptive methods, acts and practices

9  alleged above pursuant to Civil Code § 1780 (a)(2).

## FOURTH CAUSE OF ACTION

### For Violations Of *Tennessee Consumer Protection Act* § 47-18-01

### (Against Defendants)

13     58.    Plaintiff repeats, realleges, and incorporates by reference each and

14  every allegation contained in each of the preceding paragraphs as though fully

15  incorporated herein, made a part hereof, and set forth herein.

16     59.    Plaintiff and the Class Members would not have purchased the

17  "insurance" from Asurion if they had known the true facts, including *inter alia*,

18  that the "deductible" was actually a compulsory processing fee; that the deductible

19  was not a predetermined loss payable amount and that Asurion might increase it at

20  any time; and that it was more likely than not that they would receive a refurbished

21  replacement phone worth less than the deductible.  Defendants'

22  misrepresentations, omissions, and concealment were and are unfair and

23  deceptive.

24     60.    Defendants' actions were and are in violation of *Tennessee Consumer*

25  *Protection Act* § 47-81-01.

## FIFTH CAUSE OF ACTION

### For Violations Of *Washington Consumer Protection Act,*

### *RCW 19.86 et seq.*

### (Against Defendants)

61.  Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each of the preceding paragraphs as though fully incorporated herein, made a part hereof, and set forth herein.

62.  Plaintiff and the Class Members would not have purchased the "insurance" from Asurion if they had known the true facts, including *inter alia,* that the "deductible" was actually a compulsory processing fee; that the deductible was not a predetermined loss payable amount and that Asurion might increase it at any time; and that it was more likely than not that they would receive a refurbished replacement phone worth less than the deductible.  Defendants' misrepresentations, omissions, and concealment were and are unfair and deceptive, and occurred and continue to occur in trade and commerce.

63.  Defendants' actions affect the public interest in that, *inter alia,* they occur in the course of the Defendants' business, Defendants advertise to the general public and other members of the general public are likely to be injured by their actions, and Defendants are in a superior bargaining position to Plaintiff and the Class Members.

64.  Defendants' actions were and are in violation of *Washington Consumer Protection Act, RCW 19.86 et seq.*

### SIXTH CAUSE OF ACTION

For Violation Of Other State Consumer Protection Laws

(Against Defendants)

65.  Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each of the preceding paragraphs as though fully incorporated herein, made a part hereof, and set forth herein.

66.  In addition to the consumer protection laws above, Defendant's conduct also violated, *inter alia,* the Alabama Deceptive Trade Practices Act (Ala. Code 1975 §§ 8-19-1 et seq.);  the Alaska Unfair Trade Practices and Consumer Protection Act (Ak. St. §§ 45.50.471(a) et seq.);  the Arizona Consumer Fraud Act (A.R.S. §§ 44-1521 et seq.);  the Arkansas Deceptive Trade Practices Act (A.C.A.

1 §§ 4-88-101 et seq.);  the Colorado Consumer Protection Act (C.R.S.A. §§ 6-1-

2 101 et seq.);  the Connecticut Unfair Trade Practices Act (C.G.S.A. §§ 42-110 et

3 seq.);  the Delaware Consumer Fraud Act (6 Del. C. §§ 2511 et seq.);  the District

4 of Columbia Consumer Protection Procedures Act (D.C.S.T. §§ 28-3901 et seq.);

5 the Florida Deceptive and Unfair Trade Practices Act (F.S.A. §§ 501.201 et seq.);

6 the Georgia Fair Business Practices Act (Ga. Code Ann. §§ 10-1-390 et seq.);  the

7 Hawaii Unfair Competition Law (H.R.S. §§ 480 et seq.);  the Idaho Consumer

8 Protection Act (I.C. §§ 48-601 et seq.);  the Illinois Consumer Fraud and

9 Deceptive Business Practices Act (815 I.C.L.S. 505/1 et seq.);  the Indiana

10 Deceptive Consumer Sales Act (I.C. §§ 24-5-0.5-1 et seq);  the Idaho Consumer

11 Fraud Act (I.C.A. § 714.16);  the Kansas Consumer Protection Act (KS ST §§ 50-

12 623 et seq.);  the Kentucky Consumer Protect Act (KRS §§ 367.170 et seq.);  the

13 Louisiana Unfair Trade Practices and Consumer Protection Act (LSA-R.S.

14 51:1401 et seq.);  the Maine Unfair Trade Practices Act (5 M.R.S.A. §§ 205-A et

15 seq.);  the Maryland Consumer Protection Act (MD Code, Commercial Law, §§

16 13-101 et seq); Massachusetts General Law § 93A; the Michigan Consumers

17 Protection Act (MCL 445.901 et seq.);  the Minnesota Consumer Fraud Act

18 (M.S.A. § 325F.68-70);  the Mississippi Consumer Protection Act (Miss. Code

19 Ann. §§ 75-24-1 et seq.);  the Missouri Merchandising Practices Act (V.A.M.S. §§

20 407.020 et seq.);  the Montana Consumer Protection Act (MCA §§ 30-14-101 et

21 seq.);  the Nebraska Consumer Protection Act (Neb.Rev.St. §§ 59-1601 et seq.);

22 the Nevada Deceptive Trade Practices Act (N.R.S. §§ 598-0903 et seq.);  the New

23 Hampshire Consumer Protection Act (N.H. Rev. Stat. §§ 358-A:1 et seq.);  the

24 New Jersey Consumer Fraud Act ("CFA") (N.J.S.A. §§ 56:8-1 et seq.);  the New

25 Mexico Unfair Trade Practices Act (N.M.S.A. 1978 §§ 57-12-1 to 24);  the New

26 York Consumer Protection Act (General Business Law § 349);  the North Carolina

27 Unfair and Deceptive Trade Practices Act (N.C.G.S.A. § 75-1.1);  the North

28 Dakota Consumer Fraud Act (N.D. Cent. Code Ch. 51-15);  the North Dakota

Unfair Trade Practices Law (N.D. Cent. Code Ch. 51-10);  the Ohio Consumer

10-19-2006  11:55AM  FROM-DDS LEGAL SUPPORT          213-620-1596        T-351  P.021/040  F-288

1   Sales Practices Act (R.C. § 1345.01 et seq.); the Oklahoma Unlawful Trade

2   Practice's Act (ORS §§ 646.605-646.656); the Pennsylvania Unfair Trade

3   Practices and Consumer Protection Law (73 P.S. §§ 201-1 to 9.3); the Rhode

4   Island Deceptive Trade Practices Act (G.L. 1956 §§ 6-13.1-1 et seq.); the South

5   Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 3-97-5-10 et seq.); the

6   South Dakota Deceptive Trade Practices Law (S.D.C.L. §§ 37-24-1 et seq.); the

7   Texas Deceptive Trade Practices Act (V.T.C.A., Bus. & C., §§ 17.41 et seq.); the

8   Utah Consumer Sales Practices Act (U.C.A. 1953 §§ 13-11-1 to -23); the

9   Vermont Consumer Fraud Act (9 V.S.A. §§ 2451-2480g); the Virginia Consumer

10   Protection Act (Va. Code Ann. §§ 59.1-196 et seq.); the West Virginia Consumer

11   Credit and Protection Act (W.Va. Code §§ 46A-6-101 et seq.); the Wisconsin

12   Consumer Protection Act (W.S.A. 421.101 et seq.); and the Wyoming Consumer

13   Protection Act (Wyo.Stat. §§ 40-12-101 to -112).

## SEVENTH CAUSE OF ACTION

### For Common Law Fraud

### (Against Defendants)

17      67.   Plaintiff repeats, realleges, and incorporates by reference each and

18   every allegation contained in each of the preceding paragraphs as though fully

19   incorporated herein, made a part hereof, and set forth herein.

20      68.   Defendants represented to Plaintiff and Class Members, expressly or

21   by implication that the insurance policy purchased was a conventional insurance

22   policy, that the "deductible" was a predetermined loss payable amount, and that a

23   lost cell phone would be replaced with a phone of "like kind, quality and value".

24      69.   The representations set forth above were in fact false, and were made

25   by Defendants with knowledge of their falsity.

26      70.   Plaintiff and Class Members could not in the exercise of reasonable

27   diligence have discovered the falsity of the representations set forth above.

28      71.   Plaintiff and Class Members relied upon the representations set forth

above in their decision to purchase cell phone "insurance" and T-Mobile's

17

1   products and services.

2       72.    As a proximate result of Defendants' misrepresentations, Plaintiff and

3   the Class Members were damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

For Negligent Misrepresentation

(Against Defendants)

7       73.    Plaintiff repeats, realleges, and incorporates by reference each and

8   every allegation contained in each of the preceding paragraphs as though fully

9   incorporated herein, made a part hereof, and set forth herein.

10      74.    Defendants represented to Plaintiff and Class Members, expressly or

11  by implication that the insurance policy purchased was a conventional insurance

12  policy, that the "deductible" was a predetermined loss payable amount, and that a

13  lost cell phone would be replaced with a phone of "like kind, quality and value".

14      75.    The representations set forth above were in fact false, and at the time

15  that Defendants made them, they knew or should have known that the

16  representations were false.

17      76.    Plaintiff and Class Members could not in the exercise of reasonable

18  diligence have discovered the falsity of the representations set forth above.

19      77.    Plaintiff and Class Members relied upon the representations set forth

20  above in their decision to purchase cell phone "insurance".

21      78.    As a proximate result of Defendants' misrepresentations, Plaintiff and

22  the Class Members were damaged in an amount to be proven at trial.

### NINTH CAUSE OF ACTION

Civil Conspiracy

(Against Defendants)

26      79.    Plaintiff repeats, realleges, and incorporates by reference each and

27  every allegation contained in each of the preceding paragraphs as though fully

28  incorporated herein, made a part hereof, and set forth herein.

    80.    On information and belief, Defendants entered into an agreement to

18

CLASS ACTION COMPLAINT

1    defraud consumers in violation of state consumer protection laws, common law,

2    and federal laws against mail and wire fraud by selling "insurance" that was in

3    fact illusory and provided no real benefit to policyholders. The conspiracy to

4    defraud consumers is ongoing.

5        81.    On information and belief, Defendants consciously conspired and

6    deliberately pursued a common plan to commit tortious acts, subjecting each to

7    joint and several liability.

8        82.    Defendants each committed unlawful or wrongful acts in furtherance

9    of the alleged conspiracy including:

10           a) Issuing false advertising and marketing materials that

11           misrepresented the material terms of the insurance policies;

12           b) Drafting insurance policies in a manner calculated to

13           deceive consumers;

14           c) Manufacturing refurbished replacement phones, and representing

15           expressly or by implication to consumers that said phones were

16           of "like kind, quality and value" as the insured phones;

17           d) Receipt of money including premiums and deductibles through

18           the U.S. mail and wires.

19                **TENNTH CAUSE OF ACTION**

20                    Unjust Enrichment

21                   (Against Defendants)

22       83.    Plaintiff repeats, realleges, and incorporates by reference each and

23   every allegation contained in each of the preceding paragraphs as though fully

24   incorporated herein, made a part hereof, and set forth herein.

25       84.    To the detriment of Plaintiff and Class Members, Defendants have

26   and continue to be unjustly enriched by, *inter alia,* receiving insurance premiums,

27   ,collecting deductibles, and making money by selling phones and cell phone

28   service.

        85.    To the detriment of Plaintiff and Class Members, Defendants have

1   and continue to receive benefits by, *inter alia*, receiving insurance premiums,
2   collecting deductibles, and making money by selling phones and cell phone
3   service.

4       86.    Accordingly, Plaintiff and Class Members seek full restitution of
5   Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the
6   unlawful and/or wrongful conduct alleged herein.

7       **TOLLING OF STATUTES OF LIMITATION**

8       87.    Defendants took affirmative steps to conceal the fraudulent scheme
9   alleged herein, and accordingly, all applicable statutes of limitations are thereby
10  tolled.

11      **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiff, individually and on behalf of the Class members
13  defined herein, pray for judgment and relief on all Causes of Action as follows:

14      1.    Certification of the Class as a class action, appointment of Plaintiff as
15  a class representative and Plaintiff's counsel of record as Class Counsel, and a
16  declaration of financial responsibility on the part of Defendants for the costs of
17  class notification;

18      2.    Full restitution to Plaintiff and each member of the Class;

19      3.    Disgorgement to Plaintiff and each member of the Class, including
20  disgorgement of all revenues, earnings, profits, compensation, and benefits which
21  Defendants obtained as a result of the conduct alleged in this Complaint;

22      4.    A temporary, preliminary and/or permanent order for injunctive relief
23  enjoining Defendants from pursuing the policies, acts and practices alleged herein;

24      5.    Additional equitable relief, including an order imposing a
25  constructive trust upon Defendants' profits from recurring subscription charges
26  and requiring Defendants to pay Plaintiff and all members of the Class for any act
27  or practice declared by this Court to be unlawful;

28      6.    Additional equitable relief, including *cy pres* (fluid recovery) relief,
    in the event that a residue exists in the common fund created for the Class, in order

1    to ensure that Defendants do not retain any illicit profit;

2         7.    An award of compensatory and exemplary damages including but not

3    limited to treble damages, as allowed by applicable law ;

4         8.    Attorneys' fees, as allowed by applicable law;

5         9.    Costs, as allowed by law;

6         10.    Pre- and post- judgment interest at the maximum legal rate; and

7         11.    Such other and further relief as the Court deems proper.

8

9

10

11

12

13

14

15    Dated: October _18_, 2006                    THE KICK LAW FIRM, APC

16

17                                        By: _____

18                                            Taras P. Kick, Esq.
                                             G. James Strenio, Esq.
19                                            Graig R. Woodburn, Esq.
                                             Thomas A. Segal, Esq.
20                                            Attorneys for Plaintiff,
                                             Wineesa Cole

21

22

23

24

25

26

27

28

10-19-2006  11:57AM  FROM-DDS LEGAL SUPPORT          213-620-1596     T-351  P.026/040  F-288

1  DEMAND FOR JURY TRIAL

2     Plaintiff, individually and on behalf of all others similarly situated, hereby

3  demands a trial by jury.

4

5  Dated: October _18_, 2006                    THE KICK LAW FIRM, APC

6

7

8                                        By: 

9                                             Taras P. Kick, Esq.
                                             Graig Woodburn, Esq.
10                                            G. James Strenio, Esq.
                                             Thomas A. Segal, Esq.
11                                            Attorneys for Plaintiff,
                                             Wineesa Cole

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

1  SHEPPARD MULLIN RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
   FRED R. PUGLISI, Cal. Bar No. 121822
3  1901 Avenue of the Stars, Suite 1600
   Los Angeles, California 90067-6017
4  Telephone: 310-228-3700
   Facsimile: 310-228-3701
5  fpuglisi@sheppardmullin.com

6  SHEPPARD MULLIN RICHTER & HAMPTON LLP
      A Limited Liability Partnership
7  Including Professional Corporations
   KELLY L. POPE, Cal. Bar No. 235284
8  333 South Hope Street, 48th Floor
   Los Angeles, California 90071-1448
9  Telephone: 213-620-1780
   Facsimile: 213-620-1398
10 kpope@sheppardmullin.com

11 Attorneys for DEFENDANT SPRINT
   CORPORATION
12

13

14                    UNITED STATES DISTRICT COURT

15                   CENTRAL DISTRICT OF CALIFORNIA

16 CHRISTINE SISLEY, individually, and        Case No. CV-05-8789-R (RCx)
   on behalf of all others similarly situated,
   and on behalf of the general public,       Honorable Manual L. Real

17          Plaintiff,                         [PROPOSED] ORDER GRANTING
                                               DEFENDANT SPRINT
18    v.                                       COMMUNICATIONS COMPANY
                                               L.P.'S MOTION FOR MONETARY
19 SPRINT COMMUNICATIONS                       SANCTIONS AGAINST
   COMPANY L.P., a Delaware limited            PLAINTIFF CHRISTINE SISLEY
20 partnership,                                AND HER COUNSEL THE KICK
                                               LAW FIRM, APC
21          Defendant.
                                               Hearing
22                                             Hearing Date: June 5, 2006
                                               Time:         10:00 a.m.
23                                             Ctrm:         8, Hon. Manual L. Real

24                                             [First Amended Complaint Filed:
                                               March 3, 2006]
25                                             Trial Date:         None Set

26

27 ORIGINAL

28

W02-LA:2KLP1\70941017.1                    -1-        [PROPOSED] ORDER GRANTING MOTION
                                                      FOR SANCTIONS

LODGED

FILED
CLERK U.S. DISTRICT COURT
AUG 14 2006
CENTRAL DISTRICT OF CALIFORNIA
BY                DEPUTY

DOCKETED ON CM
AUG 15 2006
BY

## Order

Defendant Sprint Communications Company L.P.'s ("Sprint Communications") Motion For Monetary Sanctions Against Plaintiff Christine Sisley And Her Counsel The Kick Law Firm, APC In The Amount Of $13,900.00 ("Motion for Sanctions") came on regularly for hearing before this Court on June 5, 2006 at 10:00 a.m. This Court, having considered the papers and arguments submitted in connection with the Motion for Sanctions, and good cause appearing therefor, orders the following:

1.    Sprint Communications' Motion for Sanctions is GRANTED as to the plaintiff Christine Sisley ("Sisley") on the grounds that Sisley was in possession of undisputed evidence prior to filing the First Amended Complaint that she lacked Article III standing to pursue this action, and this Court therefore lacked subject matter jurisdiction over this Action.

2.    Sprint Communications' Motion for Sanctions is GRANTED as to Sisley's counsel The Kick Law Firm, APC on the grounds that Sisley's counsel was in possession of undisputed evidence prior to filing the First Amended Complaint that Sisley lacked Article III standing to pursue this action, and this Court therefore lacked subject matter jurisdiction over this Action.

W02-LA:2KLP1\70941017.1

[PROPOSED] ORDER GRANTING MOTION
FOR SANCTIONS

1    3.  Sisley and her counsel are hereby sanctioned in the amount of

2 $ **8500.00** , and are ordered to pay this amount to Sprint Communications.

3

4    IT IS SO ORDERED.

5

6 Dated: **Aug . 14** , 2006

                 The Honorable Manuel L. Real

              United States District Court Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-LA:2KLP1\70941017.1

[PROPOSED] ORDER GRANTING MOTION
FOR SANCTIONS

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 333 South Hope Street, 48th Floor, Los Angeles, California 90071-1448.

On April 10, 2006, I served the following document(s) described as **[PROPOSED] ORDER GRANTING DEFENDANT SPRINT COMMUNICATIONS COMPANY'S MOTION FOR MONETARY SANCTIONS AGAINST PLAINTIFF CHRISTINE SISLEY AND HER COUNSEL THE KICK LAW FIRM** on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

G. James Strenio, Esquire
The Kick Law Firm APC
660 S. Figueroa St., Suite 1800
Los Angeles, CA 90017

☑ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY OVERNIGHT DELIVERY:** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

☐ **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the office of the addressee(s).

**FEDERAL:** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **April 10, 2006**, at Los Angeles, California.

_Maria Luciano_
Maria Luciano

W02-LA:LMS\70923020.1                    -1-