**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | ) | CIVIL ACTION NO. 05-11177-DPW |
| | ) | (LEAD CASE) |
| M3POWER RAZOR SYSTEM | ) | |
| MARKETING & SALES PRACTICES | ) | MDL Docket No. 1704 |
| LITIGATION | ) | |
| | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| **ALL CASES** | ) | |
| | ) | |

**[CORRECTED] <u>DECLARATION OF TARAS KICK IN SUPPORT OF PLAINTIFF
CARLOS CORRALES' RESPONSE TO SETTLEMENT PROPONENTS' BRIEFING RE
VARIATION OF THE CONSUMER PROTECTION STATUTORY AND COMMON
LAWS OF THE STATES AND CANADIAN PROVINCES</u>**

[CORRECTED TO INCLUDE PAGE TWO INADVERTENTLY OMITTED]

## DECLARATION OF TARAS KICK

I, Taras Kick, hereby declare as follows:

1.      I am an attorney licensed to practice in the State of California, and am counsel of record for Plaintiff Carlos Corrales. I make this declaration in support of Plaintiff Carlos Corrales' Response to Settlement Proponents' Briefing re Variation of the Consumer Protection Statutory and Common Laws. I make this declaration based on my own personal knowledge, and would and could testify completely to the contents thereof if called upon to do so.

2.      Notwithstanding Lead Counsel Lerach Coughlin Stoia Geller Rudman & Robbins LLP's ("Lead Counsel") representations to this Court in its May 28. 2008 to the contrary, it appears from filings made by Lead Counsel before other courts that Lead Counsel recognizes. just as Mr. Corrales's counsel have been saying all along, that California's consumer protection laws are indeed the strongest in the country.

3.      Specifically, attached to this declaration are true and correct copies of legal briefs filed by Lead Counsel in other matters involving class actions, which a licensed attorney in my office retrieved via a Lexis Nexis legal brief search. In these briefs Lead Counsel takes a position which appears to be the opposite of the position represented by them to this Court.

4.      On June 11. 2007 before the California Supreme Court in its Reply to Answer to Petition for Review in *Interinsurance Exchange of the Auto Club v. Superior Court*, Lead Counsel represented the following about California's consumer protection statutes:

"[U]nder Exchange's grudging stance, liberal construction of the complaint, **and the strong bite of California's leading consumer protection statutes, go out the window.** [emphasis added]          . . .
Exchange's supposedly "unanimous" out-of-state cases, then, are actually a mixed bag. Whatever courts elsewhere might conclude, **Exchange itself notes California's proud legacy of protecting consumers. (Ans. 10.) "In fact California's consumer protection laws are among the strongest in the country."** (*Wershba v. Apple*

*Computer, Inc.* (2001), 91 Cal.App.4th 224, 242.) DOI, and even the Court of Appeal, recognized that section 381 is a consumer protection measure. (3 Exs. 564-567; Op. 9.) This is further reason to review a decision that unabashedly favors insurance companies under the statute at the public's direct expense.

*Interinsurance Exch. Of the Auto. Club V. Superior Court of San Diego County*, 2007 CA S. Ct. Briefs 52464, 14 (Cal. June 11, 2007)

A true and correct copy of Plaintiff's Reply to Answer to Petition for Review filed in

*Interinsurance Exchange of the Auto Club v. Superior Court* is attached to this Declaration as

Exhibit A.

     5.    On November 27, 2007, this time before the California Court of Appeals in *Troyk*

*v. Farmer's Group, Inc.* Lead Counsel represented the following in its Respondent's Brief to the

Court:

**The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law"** (*Cel-Tech, supra,* 20 Cal 4th at p 180, internal quotation marks omitted, see also *People v McKale* (1979) 25 Cal 3d 626, 632) This Court emphasizes, moreover, that **the UCL "imposes strict liability It is not necessary to show that the defendant intended to injure anyone "** (*South Bay Chevrolet v G M Acceptance Corp* (1999) 72 Cal App.4th 861, 877, internal quotation marks omitted.)

**Seeking to mute the UCL's protective force, Farmers suggests that "pre-Proposition 64" case law on UCL liability has less precedential weight today (FOB47) Our Supreme Court, however, makes no such distinction In its first decision applying Proposition 64, the high court recently instructed "The measure left entirely unchanged the substantive rules governing business and competitive conduct. Nothing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted."** (*Californians for Disability Rights v Mervyn's, LLC* (2006) 39 Cal 4th 223, 232 *(Mervyn's).)* [empasis added]

                    . . .

Here, there is a contrary purpose and design Just as the DOI concluded (11CT2565-2568), this Court described section 381 not as a dry regulatory provision serving insurers, but a "consumer protection statute " (Auto Club, supra, 148 Cal.App 4th at p 1226) **"In fact California's consumer protection laws are among the strongest in the country."** (Wershba v Apple Computer, Inc (2001) 91 Cal App 4th 224, 242; see also Vasquez v Superior Court (1971) 4 Cal 3d 800, 807-808) **California's robust policy of consumer protection, manifested in both the Insurance Code and the UCL, would be undermined by a dubious interpretation of premium that runs contrary to every pertinent source of authority.** [empasis added]

*Troyk V. Farmers Group*, 2007 CA App. Ct. Briefs 49983, 51 (Cal. App. Nov. 27, 2007)

A true and correct copy of Respondent's Brief filed in *Troyk v. Farmer's Group, Inc.* is attached

to this Declaration as Exhibit B.

6.    Likewise, in another brief concerning *Interinsurance Exchange of the Auto Club v. Superior Court* again before the California Court of Appeal, Lead Counsel represented the following to the Court about California's consumer protection laws:

"Likewise, Sheldon v. American States Preferred Ins. Co. (Wash.Ct.App. 2004) 95 P.3d 391 [**77] does not aid the Exchange. To the contrary, the trial court in that case, agreeing with the state insurance commissioner, concluded that installment fees were premium under Washington law. (Id. at pp. 392-93.) This ruling was not even challenged on appeal. (Id. at p. 393, fn. 10.) On the facts presented, the plaintiff did not dispute there was no harm. (Id. at p. 393.) Going even further, he acknowledged the fees were reasonable and were voluntarily paid. (Ibid.) Citing Allstate, supra, 169 Cal.App.2d 165, the Sheldon court recognized that under California law, such charges are premium. (Id. at p. 393, fn. 10.) **Whatever the law in Washington, "California's consumer protection laws are among the strongest in the [*43] country." (Wershba v. Apple Computer, Inc. (2001) 91 Cal.App.4th 224, 242 [discussing UCL and CLRA as examples].) Foreign precedent does not overcome formidable California law.**" [emphasis added]

*Interinsurance Exch. Of the Auto. Club V. Superior Court of California for San Diego*, 2006 CA App. Ct. Briefs 49257, 43 (Cal. App. Dec. 21, 2006)

A true and correct copy of Lead Counsel's Return to Verified Petition for a Peremptory Writ filed in *Interinsurance Exchange of the Auto Club v. Superior Court* is attached to this Declaration as Exhibit C.

7.    Additionally, Lead Counsel represented the following about the power and breadth of California's consumer protection laws in its Opening Brief in *McKell v. Washinton Mutual Inc.* to the California Court of Appeal:

The UCL proscribes "unfair competition" - that is, any "fraudulent," "unfair" or "unlawful" business act or practice. (Bus. & Prof. Code, § 17200.) **"California courts have consistently interpreted such language broadly." ( People v. McKale (1979) 25 Cal.3d 626, 632.) The Legislature intended by the UCL's "sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur."** [*20] ( Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 181, internal quotation marks and citation omitted (Cel-Tech); accord, Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 111.) As the Supreme Court stated more recently: **"By defining unfair competition to include also any 'unfair or fraudulent business act [**34] or practice' ... the UCL sweeps within its scope acts and practices not specifically proscribed by any other law."** (Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 949, emphasis deleted; see also Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 560; Cel-Tech, supra, 20 Cal.4th at p. 180.) **The UCL is one of many statutes reflecting this state's robust**

**policy of consumer protection. "California's consumer protection laws are among the strongest in the country." ( Wershba v. Apple Computer, Inc. (2001) 91 Cal.App.4th 224, 242.) As this Court has observed: "'Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society.'" ( Wilner v. Sunset Life Ins. Co. (2000) 78 Cal.App.4th 952, 959, quoting Vasquez v. Superior Court (1971) 4 Cal.3d 800, 808.) [emphasis added]**

*Mckell V. Washington Mut., Inc.*, 2004 CA App. Ct. Briefs 176377, 21 (Cal. App. 2d Dist. Feb. 10, 2005)

A true and correct copy of Lead Counsel's Opening Brief filed in *McKell v. Washington Mutual Inc.* is attached to this Affidavit as Exhibit D.

8.    As can be seen from the attached filings with other courts, notwithstanding its

representations to this Court to the contrary, it is clear that Lead Counsel recognizes. just as Mr.

Corrales's counsel have been saying all along, California's consumer protection laws are the

strongest in the country, and substantially such.


I declare under penalty of perjury under the laws of the State of California and the United

States that the foregoing is true and correct.

Executed this 20th day of June 2008. at Los Angeles. California.

Taras Kick

FOCUS - 1 of 7 DOCUMENTS

 Go To California Supreme Court Opinion

View Original Source Image of This Document

INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB, Petitioner, vs. THE
SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent, and TAWNDRA
WILLIAMS et al., Real Parties in Interest.

No. SI52464

SUPREME COURT OF CALIFORNIA

2007 CA S. Ct. Briefs 52464; 2007 CA S. Ct. Briefs LEXIS 854

June 11, 2007

Fourth Appellate District, Division One, No. D049257. Superior Court of San Diego
County. The Honorable Patricia Y. Cowett. Superior Court No. GIC836845.

Petition

**COUNSEL:** [**1] LERACH COUGHLIN STOIA GELLER, RUDMAN & ROBBINS LLP, TIMOTHY G. BLOOD
(149343), KEVIN K. GREEN (180919), LESLIE E. HURST (178432), 655 West Broadway, Suite 1900, San Diego,
CA 92101, Telephone: 619/231-1058, 619/231-7423 (fax).

ROBBINS UMEDA & FINK, LLP, BRIAN J. ROBBINS (190264), 610 West Ash Street, Suite 1800, San Diego, CA
92101, Telephone: 619/525-3990, 619/525-3991 (fax).

Attorneys for Real Parties in Interest.

Service on Attorney General and District Attorney, Required by Bus. & Prof. Code, § 17209, (Cal. Rules of Court, Rule
8.29(b)).

**TITLE: REPLY TO ANSWER TO PETITION FOR REVIEW**

**TEXT:** [*1] **I. INTRODUCTION**

Interinsurance Exchange of the Automobile Club (Exchange) seeks to downplay the Opinion it won from the Court
of Appeal. The reader should sit upright, however, after comparing Exchange's meandering justifications for the result
with the analysis the Opinion adopts. There is virtually no resemblance. The "time value of money" rationale the Court
of Appeal announces must be a threat to consumer protection and a dangerous windfall for insurance companies,
because Exchange's answer nowhere mentions it. Instead, in a myopic quest to preserve its victory, Exchange floats
diversionary arguments.

Exchange does not dispute that [**4] the meaning of "premium" - and whether it includes a charge for paying by
installments - is an "important question of law" in insurance regulation. (Cal. Rules of Court, rule 8.500(b)(1).) In fact,
the issue is of bedrock importance. How this question is answered impacts all lines of insurance in California because
Insurance Code section 381 applies to every insurance policy. n1 The proper understanding of premium is fundamental

to how insurance companies do business, how they deal with consumers, how they are regulated and the breadth and nature of their legal obligations.

n1 Further statutory references are to the Insurance Code unless otherwise specified.

To put the matter in human terms, the meaning of premium, as used in section 381, affects millions of Californians who must obtain insurance policies to provide economic security and peace of mind in their daily lives. Even if the scope is narrowed to auto insurance, the definition of premium affects millions of California drivers who, by legislative command, [**5] must obtain a liability policy for the protection of others on the road. On this [*2] record, the question affects more than one million class members who have auto insurance policies with Exchange.

The Legislature and the voters, through Proposition 103, have long decreed that insurers are to be carefully and comprehensively regulated in their financial transactions with the public. Disregarding this framework, the Opinion creates a judicial loophole in the tight web of regulatory statutes. According to the Court of Appeal, Exchange's "time value of money" fee is not premium. This places it beyond the reach of section 381. (Op. 15-17.) Although the panel rests its holding on an analogy to a loan, Exchange's "interest" charge, stresses the panel, is also not a "premium financing" arrangement. This places it beyond the reach of section 778 et seq. (Op. 15-16 and fn. 8; Op. 20, fn. 13.) Giving short shrift to the primary jurisdiction doctrine, the Opinion blithely disregards the counsel of the California Department of Insurance (DOI) urging a contrary understanding of premium that actually protects consumers. (Op. 22-25.) In short, Exchange slides by without answering to any regulatory [**6] statute. Citing the Opinion as justification, so will other insurance companies levying similar "time value of money" charges separately from, and in addition to, the premium quoted in the insurance policy.

If all of this is California law, this Court should say so. Reflecting the basic importance of the issue, this Court has taken up the meaning of premium in prior cases. Supreme Court precedents state a plain and ordinary definition irreconcilable with the Opinion. (See, e.g., *Groves v. City of Los Angeles* (1953), 40 Cal.2d 751, 761 (*Groves*); *Metropolitan Life Insurance Co. v. State Bd. of Equalization* (1982), 32 Cal.3d 649, 660 (*Metropolitan Life*).) In light of the multifaceted impact, and to restore coherence to California law, this Court needs to revisit the meaning of premium here. Exchange's answer identifies nothing to undermine the conclusion that review is necessary.

[*3] **II. DISCUSSION**

**A. Decades of DOI Pronouncements and California Case Law Reject Exchange's Position on the Meaning of Premium**

Perhaps most notable about the answer, Exchange cannot bring itself to defend what the Court of Appeal actually said [**7] and held. The "time value of money" rationale is so untenable that Exchange, rarely quoting the Opinion, is forced to revive alternative theories advanced in its writ petition below. Most prominently, Exchange says the Opinion is "consistent with longstanding [DOI] practice under which the DOI did not require installment charges to be stated in the policy." (Answer to Petition for Review (Ans.) 5.)

Here, and throughout its answer, Exchange relies heavily on the declaration of its retained "expert," Milo Pearson. He is an obscure former DOI administrator who now provides, in his own words, "full service consulting to the insurance industry." (2 Exhibits for Verified Petition for a Peremptory Writ (Exs.) 483.) Under questioning, Pearson admitted he has no actuarial training and never had authority to set DOI policy. (5 Exs. 1259-1267.) With the law against its position, Exchange persists in relying on Pearson - even after the Court of Appeal declined to do so. (Op. 26, fn. 15.)

Actually relevant to the issues on review, the Opinion is at odds with every official pronouncement DOI has

rendered, going back more than half a century. The Court of Appeal's holding clashes with, among [**8] other things: (1) the 1947 Attorney General opinion rendered at DOI's request; (2) DOI's 1953 bulletin to insurers after *Groves,* in which DOI read section 381 to include service-related charges; (3) DOI's 1996 regulation (Cal. Code Regs., tit. 10, § 2360.0(c)), giving premium a sweeping definition to include such charges; and (4) the 2006 opinion DOI rendered at Exchange's insistence, concluding that "premium" in section 381 includes installment fees. (See Petition for Review (Petn.) 15-17, 26-30.) On how Exchange's installment fee should be classified, the Opinion departs from these sources and stands alone.

   [*4]  Straining to show otherwise, Exchange claims the 2006 DOI ruling recognized "'a body of de facto law'" that somehow tolerates Exchange's systematic failure to comply with section 381. (Ans. 5.) This is a far-fetched spin on what DOI said. DOI actually emphasized that "the Department's past practice, and parties' reliance on it, may or may not be instructive, but it cannot be determinative." (3 Exs. 562.) Exchange never showed that DOI somehow acquiesced to Exchange's legal violations and this conclusion, in any event, would be disfavored. "Mere failure to enforce [**9] the obligation cannot be deemed to constitute such administrative action as would result in modifying, remitting or canceling the obligation, constructively or otherwise." (*Department of Mental Hygiene v. McGilvery* (1958), 50 Cal.2d 742, 752.)

   As for California decisional law on the meaning of premium, Exchange swats aside the many precedents as mere "tax cases." (Ans. 6.) Although taxation is a different subject, Exchange identifies nothing about the so-called tax authorities that should dictate a different understanding of premium in this context. The formidable line of California authority defining premium finds its bearings in the "'law of insurance'" - a point Exchange consistently refuses to acknowledge. (*Metropolitan Life, supra,* 32 Cal.3d at p. 660, quoting *Allstate Insurance Co. v. State Bd. of Equalization* (1959), 169 Cal.App.2d 165, 168 (*Allstate*).) Exchange also declines to grapple with *Allstate.* There, as here, "[t]he option to the insured was whether he wanted to pay in installments. If he did, he was required to pay the installment payment charge. The option was not whether he wished to pay the charge but [**10] in what form he wished to pay the premium, i.e., cash or installments." (*Allstate, supra,* 169 Cal.App.2d at p. 173.) Because "[t]he insured paid the fee as part of the cost of the insurance he wanted," the installment charge was premium. (*Ibid.*)

   This Court appeared to settle the plain and ordinary definition of premium more than 50 years ago in *Groves* (a case not involving taxation). Under that decision, premium is "what was actually given by the insured for  [*5]  his insurance." (*Groves, supra,* 40 Cal.2d at p. 761.) This understanding of premium was reaffirmed in *Metropolitan Life,* where this Court most recently addressed the subject. There, premium was reiterated to mean "'the sum which [the] insured is required to pay.'" (*Metropolitan Life, supra,* 32 Cal.3d at p. 660, quoting *Allstate, supra,* 169 Cal.App.2d at p. 168.) By arbitrarily placing Exchange's "interest" charge outside this Court's all-encompassing understanding of premium, the Court of Appeal creates a conflict with these precedents. Supreme Court review is needed to restore "uniformity of decision." (Cal. Rules of Court, rule 8.500(b)(1).  [**11]  )

   On a related note, Exchange insists the Court of Appeal's disrespect for DOI's views will not affect the agency's regulatory authority. Before the Opinion, however, not even Exchange would have predicted that the Court of Appeal - ignoring Supreme Court precedent already doing so - would announce a new "plain and ordinary" definition of premium. With this as the launching point, the panel expressly excludes from premium a "time value of money" fee levied through the billing statement. (Op. 15-17, 25-26.) The panel does not identify, or even suggest, any limitation on the realms in which this new "plain and ordinary" definition will apply. In light of the Opinion, it is difficult to see, going forward, how DOI may regulate this sizable revenue stream under its Proposition 103 power to police the "premiums" consumers are charged. (See, e.g., §§ 1861.01, 1861.02.) This collateral impact underscores that the meaning of premium is an "important question of law" warranting this Court's attention. (Cal. Rules of Court, rule 8.500(b)(1).)

## B. The Court of Appeal Misconstrued Section 480

   Seeking to bolster the Opinion, Exchange notes the Court of Appeal's effort to derive support from [**12]  section

480. (Ans. 3.) The panel was lulled by Exchange's argument that insurance companies somehow forego a legal right by allowing consumers to pay by installments. According to the Opinion, it is significant that "'[a]n insurer is entitled to payment of the premium as soon as [*6] the subject matter insured is exposed to the peril insured against.'" (Op. 15, quoting § 480.) Citing this statute, the panel reasoned that an insurer may charge consumers more who opt to pay by installments, supposedly for the "time value of money." (Op. 15-16.)

Even assuming arguendo the Court of Appeal's logical leap, section 480 does not fortify the Opinion's grudging application of section 381. Irrespective of when an insurer may demand the premium (section 480), the insurer must nonetheless specify this cost in the policy (section 381 and, for auto insurance policies, section 383.5). These rules are entirely distinct and not in conflict. Even if there were an inconsistency, there is no doubt which statute would trump. Because section 381 is a "special statute dealing with a particular subject" - where the premium must be specified - it "takes precedence over section 480, a general statute [**13] regarding payment of insurance premiums." (*Fujimoto v. Western Pioneer Insurance Co.* (1978), 86 Cal.App.3d 305, 312.)

On the record here, the Opinion's reliance on section 480 suffers from an even more basic flaw. Contrary to Exchange's description, this is not a case where "the insurer gives up its statutory right to require the entire premium up front." (Ans. 4.) Whatever other insurers may do, Exchange deliberately structures its auto insurance policies to remove any risk of non-payment. Taking full advantage of section 480, Exchange will not provide coverage for any period, even under the installment plan, unless payment is made before the period of coverage. This is why, as already explained, there is no loan, credit or financing of any kind provided to the insured. (Petn. 8-9.) Exchange concedes these foundational points by declining to address them.

Rather than grappling with the record, Exchange portrays installment insurance as a matter of insurance industry grace, to be measured against a theoretical norm of all insureds paying by one lump sum. Practically speaking, installment policies have long been an economic necessity for [*7] consumers and, consequently, [**14] a product insurers decline to offer at their competitive peril. The record showed, unsurprisingly, that Exchange offers installment plans in response to other insurers' "competitive practices." (1 Exs. 188.) As one court dryly remarked in a case involving Exchange's installment fees: "One could reasonably assume that had the Automobile Club never offered the installment plan along with its service fee, the number of individuals for whom they write coverage would have been significantly reduced." (*Interinsurance Exchange of the Automobile Club v. State Bd. of Equalization* (1984), 156 Cal.App.3d 606, 614.)

Exchange questions this bright-line requirement and, believing it knows best, urges a different set of rules. The policy judgment, though, is for the Legislature, and the statute is clear.

### C. Exchange's Practices Are Systematically Deceptive, Not a "Hypertechnical" Violation

Exchange calls its conduct a "hypertechnical" violation of section 381 that has not "caused even a single consumer to be misled." (Ans. 1, 9.) To the contrary, the record shows that Exchange's "finance charge" - or "interest," as the Court of Appeal insisted on calling it - is a fraud [**15] upon the policyholders.

Exchange certainly duped Williams. Although it is uncontested that she was not a debtor, Williams paid the installment charge because she "did not want the Exchange to report me to a collection agency." (2 Exs. 307.) She believed she was financing her insurance policy. (1 Exs. 262, 275.) This is exactly how Exchange presented the installment arrangement to her and other members of the certified class. Far from constituting "clear disclosures" (Ans. 1, 15), the effect was to mislead policyholders.

Perhaps unique among California insurers, Exchange dresses up its billing statements with Truth in Lending Act (TILA) boxes. (1 Exs. 170.) The boxes describe the installment arrangement as the "cost of your credit as a yearly rate" and "credit provided to you or on your behalf." (1 Exs. 170.) [*8] Using more loan jargon, Exchange further advises policyholders: "There is no prepayment penalty." (1 Exs. 170.) As even the Court of Appeal recognized, however,

Exchange's installment insurance is not "a loan or other type of debt." (Op. 16, fn. 8.) Exchange does not claim to be subject to TILA. Hence, Exchange certainly made "conspicuous and repeated disclosures," [**16] but these conspicuously and repeatedly misrepresented the nature of the transaction. (Ans. 1.)

Exchange believes none of this matters because Williams agreed to the installment plan. Awareness of Exchange's "interest" charge, however, is not tantamount to knowing it is being collected unlawfully. These are plainly different things. Williams averred that when she first began paying by installments, "I did not know that it was improper for the Exchange to charge me more than the amount specified in the Renewal Declarations of the insurance contract." (2 Exs. 307.) Within a month of learning this practice was illegal, she filed suit. (2 Exs. 307.) "I also do not consent," she underscored, "to the Exchange charging me a fee that it should not charge." (2 Exs. 307.)

Apart from this record, the Insurance Code's protective scope does not depend on a layperson's subjective perceptions of an insurance transaction. Contrary to Exchange's assumption, legislative restrictions on insurers do not hinge on whether a particular insurance policy suits the consumer's "financial needs." (Ans. 2.) These "caveat emptor" notions fundamentally misconceive the Code's role in the insurance market. The Legislature [**17] has recognized that consumers have inferior information and bargaining power, and almost no understanding of the legal ground rules, in such transactions. Thus, insurers cannot point the finger at the public if a statutory requirement is not satisfied. Non-compliance with section 381 is "a failure for which the insurer must bear responsibility." (*Allstate Insurance Co. v. Dean* (1969), 269 Cal.App.2d 1, 4.) Yet, the Court of Appeal here holds that more than one million policyholders [*9] must bear the brunt of Exchange's refusal to specify the entire cost of its installment insurance in the policy.

Exchange's practice is all the more galling because policyholders paying the 18% "finance charge" have already funded the installment program through the premium quoted on the declarations pages of their policy. This is undisputed. (Op. 20.)

To overcome the common-sense inference of "double dipping," Exchange responds that the charge is imposed to compensate for "lost investment income." (Ans. 7.) This is a post hoc rationale contrived for litigation. Exchange never showed where in the current market any investor could net a guaranteed 18% return with no accompanying [**18] risk, as Exchange does with its "finance charge." One of the Court of Appeal justices was rightly dubious at oral argument of this justification. As he told Exchange's counsel: "I'd never heard that expression about lost-investment income. That's the first time I've heard of that." (Lodgment of Transcript of March 15, 2007 Oral Argument in Support of Petitioner's Answer to Petition for Rehearing 34 [lodged 4/17/07].) Even if assumed not to be a duplicative charge, or a charge to cover a cost, the tens of millions of dollars Exchange collects is part of its "loading" and, therefore, premium. This is because "loading" includes not just "administrative costs of the insurer," but also "an element of profit." (*Metropolitan Life, supra,* 32 Cal.3d at p. 660.)

Exchange's reason for imposing the "finance charge" is ultimately beside the point. Williams "paid the fee as part of the cost of the insurance [s]he wanted," thereby making it premium. (*Allstate, supra,* 169 Cal.App.2d at p. 173.) Although Exchange warns against "judicial price regulation," this is a scarecrow argument. (Ans. 14.) The law routinely regulates the manner in which charges are imposed [**19] without venturing into "economic policy." (*McKell v. Washington Mutual, Inc.* (2006), 142 Cal.App.4th 1457, 1474.) Exchange never proved that 18% was the "time value of money" during the [*10] class period. Exchange's representation to the contrary is fraud, not economics.

Indeed, Exchange has been able to get away with an 18% installment fee only due to how the charge is presented. Exchange's use of the billing statement to disclose the charge, framed by TILA boxes familiar to anyone who has a credit card, triggers mental comparisons to credit-card billing statements containing similarly high percentage-based finance charges. (1 Exs. 170.) The critical difference is that a credit card issuer actually assumes a risk of non-payment, often a considerable risk involving considerable sums of money. As even the Court of Appeal acknowledged, there are no debtors here. (Op. 16, fn. 8.) If Exchange were willing to lay its "finance charge" bare in the insurance policy, as section 381 mandates, time would tell whether the market would sustain a double-digit percentage surcharge simply for selecting installment insurance.

2007 CA S. Ct. Briefs 52464, *10; 2007 CA S. Ct. Briefs LEXIS 854, **19

**D. Exchange Cannot Hide Behind Strained Theories** [**20] **of Procedural Default**

To deflect attention from its business practices, Exchange asserts that Williams failed to point out the deceptive nature of Exchange's conduct until she petitioned for rehearing in the Court of Appeal. (Ans. 12.)

This badly mischaracterizes the record. From day one of the litigation, Williams alleged that Exchange's conduct is a fraudulent and unfair business practice in violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). (1 Exs. 7-8.) The UCL is of "'sweeping'" scope in proscribing unfair competition. (*Cel-Tech Communications Co. v. Los Angeles Cellular Telephone Co.* (1999), 20 Cal.4th 163, 180-181.) A fraudulent business practice requires, for instance, that "'members of the public are likely to be deceived.'" (*Korea Supply Co. Lockheed Martin Corp.* (2003), 29 Cal.4th 1134, 1151.) And, a "practice which is deceptive is [*11] necessarily unfair." (*Blakemore v. Superior Court* (2005), 129 Cal.App.4th 36, 49.)

Exchange fails to explain why these settled tenets would not apply to the undisputed factual record. Apart from the UCL, Williams also sought relief from the beginning [**21] under the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.). She alleges that Exchange violates the CLRA by "representing that [the] transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'" (1 Exs. 9.) Exchange also fails to explain what is lacking here.

Contrary to Exchange's description, Williams did not abandon her fraud allegations in the trial court. Rather, she sought summary judgment on one theory - Exchange's violation of section 381 - that, if proved, sufficed for her to prevail on each cause of action. (6 Exs. 1522-1524 [trial court's order ruling in Williams's favor across the board based on this theory].) This was the most efficient means to litigate the case to a conclusion, at least until the Court of Appeal ordered writ review. As Williams explained in her summary judgment motion: "Applying the law to the set of undisputed facts entitles plaintiff and the class to summary judgment or, in the alternative, summary adjudication on each cause of action and affirmative defense." (1 Exs. 68.) Moreover, in opposing Exchange's summary judgment motion, Williams pointed out that Exchange's [**22] "'interest rate disclosure'" was "false and misleading," and what Exchange presented to her and other class members as "financing" was not this at all. (2 Exs. 527-533.)

Exchange cites no relevant authority for the proposition that the efficient approach Williams followed somehow abandoned causes of action unquestionably pled in the complaint from the outset. Under Exchange's grudging stance, liberal construction of the complaint, and the strong bite of California's leading consumer protection statutes, go out the window.

[*12] There is also no basis to conclude that Williams backed away from her fraud allegations in the Court of Appeal. Exchange sought writ relief solely on the meaning of "premium" in section 381. (Verified Petition for a Peremptory Writ 2 [filed 8/24/06].) In her return, Williams pointed out, in any event, the fraudulent nature of Exchange's phony TILA trappings and the issues this presented under "California's most venerable consumer protection laws." (Real Party in Interest's Return to Verified Petition for a Peremptory Writ 2, 5-6, 33 [filed 12/21/06].)

Accordingly, there has not been a waiver in either superior court or the Court of Appeal of the [**23] UCL fraudulent and unfair causes of action or, for that matter, the CLRA claim. Exchange is poorly positioned to urge waiver when its principal objection to Supreme Court review is that Williams supposedly was not misled.

**E. The Out-of-State Precedent Recognizes the Protective Force of California Law**

Because California law does not support the Opinion, Exchange cites a few foreign precedents. The Court of Appeal was explicit that "we do not rely on cases from other jurisdictions in reaching our decision in this case." (Op. 17.) This caution is unsurprising because two decisions acknowledge that California law treats installment charges as premium. Beyond this, Exchange's foreign precedents are either inapposite or unpersuasive.

Urging this Court to march in lockstep with Louisiana law, Exchange points to *Blanchard v. Allstate Insurance Co.*

(La.Ct.App. 2000), 774 So.2d 1002 (*Blanchard*) and *Cacamo v. Liberty Mutual Fire Insurance Co.* (La.Ct.App. 2004) 885 So.2d 1248, which followed *Blanchard.* In *Blanchard,* the appellate court agreed with an administrative ruling by the Louisiana insurance commissioner that the installment fees there [**24] were not premium under Louisiana law. (*Blanchard, supra,* 774 So.2d at p. 1003.) The appellate [*13] opinion thus merely reflects an administrative ruling at odds with DOI's ruling in this case under California law.

*Blanchard* illustrates that even in Louisiana, the judicial view is not unanimous. Three appellate judges in that case agreed with the trial court and dissented. As those judges observed, installment fees "are consideration for the procurement of that insurance as they must be paid if an insured wishes to obtain a policy and pay in installments." (*Blanchard, supra,* 774 So.2d at p. 1007 (dis. opn. of Fogg, J.).) "The average consumer does not possess the specialized knowledge and skill to analyze insurance rates and charges to know how much he is paying for what protection, and the legislative requirement that the 'price' to the consumer must include all charges paid by him is indicative of the legislative concern for his protection in this regard." (*Ibid.*) This analysis is line with the DOI findings that Exchange and other prominent California insurers aggressively coveted, at least before the agency rejected the industry's [**25] position. (3 Exs. 564-567, 576-580, 585-587; 5 Exs. 1179-1189.)

Likewise, *Sheldon v. American States Preferred Insurance Co.* (Wash.Ct.App. 2004) 95 P.3d 391 does not aid Exchange. There, the trial court referred the premium issue to the state insurance commissioner, who determined, just as in the present case, that installment fees are premium. (*Id.* at p. 392.) The trial court adopted this conclusion and it was not even challenged on appeal. (*Id.* at p. 393 and fn. 10.) Citing *Allstate,* the *Sheldon* court recognized that under California law, such charges are premium. (*Id.* at p. 393, fn. 10.) Similarly, *Nakashima v. State Farm Mutual Automobile Insurance Co.* (N.M.Ct.App. 2007) 153 P.3d 664 distinguished DOI's then-recent analysis. (*Id.* at pp. 671-672.) The court there adopted a novel "actuarial definition" of premium that DOI expressly rejected as unsuited for the consumer protection context. (Compare *id.* at p. 672 with 3 Exs. 560.)

[*14] Exchange's supposedly "unanimous" out-of-state cases, then, are actually a mixed bag. Whatever courts elsewhere might [**26] conclude, Exchange itself notes California's proud legacy of protecting consumers. (Ans. 10.) "In fact California's consumer protection laws are among the strongest in the country." (*Wershba v. Apple Computer, Inc.* (2001), 91 Cal.App.4th 224, 242.) DOI, and even the Court of Appeal, recognized that section 381 is a consumer protection measure. (3 Exs. 564-567; Op. 9.) This is further reason to review a decision that unabashedly favors insurance companies under the statute at the public's direct expense.

**III. CONCLUSION**

For the reasons explained here and in her petition for review, Williams respectfully asks this Court to grant review.

DATED: June 8, 2007

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
TIMOTHY G. BLOOD
KEVIN K. GREEN LESLIE E. HURST

/s/ [Signature]
KEVIN K. GREEN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

619/231-7423 (fax)

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Real Parties in Interest

**CERTIFICATE OF COMPLIANCE** [**27]

Counsel of record hereby certifies that pursuant to rule 8.204(c)(1) of the California Rules of Court, the enclosed **REPLY TO ANSWER TO PETITION FOR REVIEW,** is produced using 13-point Roman type, including footnotes, and contains approximately 4,172 words, which is less than the total words permitted by the rules of court. Counsel relies on the word count provided by Microsoft Word word-processing software.

DATED: June 8, 2007

/s/ [Signature]
KEVIN K. GREEN
Attorneys for Real Parties in Interest

**DECLARATION OF SERVICE BY MAIL**

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2. That on June 8, 2007, declarant served the **REPLY TO ANSWER TO PETITION FOR REVIEW** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service [**28]  List.

3. That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this eighth day of June, 2007, at San Diego, California.

/s/ [Signature]
Terree DeVries

**Counsel for Defendants/Petitioner**

Peter H. Klee ***
John T. Brooks
Luce, Forward, Hamilton & Scripps, LLP
600 West Broadway, Suite 2600
San Diego, CA 92101-3391

2007 CA S. Ct. Briefs 52464, *14; 2007 CA S. Ct. Briefs LEXIS 854, **28

619/236-1414
619/232-8311 (Fax)

**Counsel for Plaintiffs/Real Parties in Interest**

Alan K. Konrad
Attorney at Law
1619 Arcadian Tr. NW
Albuquerque, NM 87107
505/345-0467
505/345-7310 (Fax)

David A. Freedman
Freedman Boyd Daniels Hollander & Goldberg,
P.A.
20 First Plaza, N.W., Suite 700
Albuquerque, NM 87102
505/842-9960
505/842-1925 (Fax)

Floyd D. Wilson
McCary, Wilson & Pryor
6707 Academy Road NE
Albuquerque, NM 87109
505/857-0001
505/857-0008 (Fax)

John M. Eaves
Eaves & Mendenhall, P.A.
6565 Americas Parkway, NE, Suite 950
Albuquerque, NM 87110
505/888-4300
505/883-4406(Fax)

Leonard B. Simon
Timothy G. Blood
Kevin K. Green
Lerach Coughlin Stoia Geller Rudman [**29]  &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423(Fax)

Charles R. Peifer
Robert E. Hanson
Peifer, Hanson & Mullins, P.A.
20 First Plaza, Suite 725
P.O. Box 25245
Albuquerque, NM 87125-5245

505/247-4800
505/243-6458 (Fax)

Brian J. Robbins
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
619/525-3990
619/525-3991 (Fax)

**Other Copies**

Ronald A. Reiter
Supervising Deputy Attorney General
Consumer Law Section
Office Of The Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
415/703-5500

Bonnie Dumanis
San Diego District Attorneys Office
330 West Broadway, Suite 1300
San Diego, CA 92101
619/531-4040

FOCUS - 2 of 7 DOCUMENTS

View Original Source Image of This Document

THOMAS E TROYK, Plaintiff/Respondent, vs FARMERS GROUP, INC, et al,
Defendants/Appellants, PREMATIC SERVICE CORPORATION (CALIFORNIA), et al,
Real Parties in Interest/Appellants

No D049983

COURT OF APPEAL OF CALIFORNIA

2007 CA App. Ct. Briefs 49983; 2007 CA App. Ct. Briefs LEXIS 9589

November 27, 2007

Appeal from the Superior Court of the State of California for the County of San Diego.
The Honorable Jay M Bloom. Superior Court No GIC836844.

Initial Brief: Appellee-Respondent

**COUNSEL:** [**1] COUGHLIN STOIA GELLER, RUDMAN & ROBBINS LLP, TIMOTHY G. BLOOD (149343),
PAMELA M PARKER (159479), KEVIN K GREEN (180919), LESLIE E HURST (178432), 655 West Broadway,
Suite 1900, San Diego, CA 92101, Telephone. 619/231-1058, 619/231-7423 (fax).

Attorneys for Plaintiff/Respondent.

**TITLE: RESPONDENT'S BRIEF**

**TEXT: Service on Attorney General and District Attorney Required by Bus. & Prof. Code, § 17209 (Cal. Rules
of Court, rule 8.29(b))**

[*1] **I. INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendants-appellants Farmers Group, Inc (FGI) and Farmers Insurance Exchange (FIE) (collectively, Farmers)
attack a judgment in favor of plaintiff-respondent Thomas Troyk and the large class of Farmers policyholders he
represents Because the judgment and orders on review are factually and legally sound, this Court should affirm

According to Farmers, this case involves "installment service charges" imposed in connection with a monthly
"installment payment plan" (Appellants Farmers Group, Inc and Farmers Insurance Exchange's Opening Brief (FOB) 1)
Farmers' goal is to imply that this insurer, like most others, allows payment [**2] by monthly installments for a
six-month term of auto insurance By providing this option, the reasoning goes, Farmers confers a benefit on consumers
separate from the insurance policy and, therefore, a separate "service charge," not mentioned in the policy, may be
levied consistent with the policy terms and the Insurance Code Farmers' description, however, misstates the record The
evidence showed that the "service charge" is not an installment fee in any sense

As elaborated below in the statement of undisputed material facts, Farmers offers monthly policies, not a monthly
installment payment plan for a term of six months. All class members here purchased insurance policies with a term of

2007 CA App. Ct. Briefs 49983, *1; 2007 CA App. Ct. Briefs LEXIS 9589, **2

one month, which was renewable at the insured's option Although Farmers seeks to gloss over how it works, this occurs by way of endorsement to the policy and thus materially alters the policy terms By Farmers' own design, the policy at issue has a one-month term

The class consists of Farmers insureds in California and Nevada holding the one-month policies within the limitations period Each class member made just one payment for this period of coverage Moreover, Farmers demands payment for the entire [**3] term up front, in full At Farmers, there is no such thing as a six-month auto insurance policy that can be paid for [*2] by monthly installments Policyholders pay a lump sum for one month, always in advance of coverage Contrary to Farmers' description, then, no one is "paying over time " (FOB2) Nonetheless, the disputed "service charge" is imposed Unwilling to do this directly, Farmers collects the charge through the guise of its wholly-owned subsidiary Prematic Service Corporation (California) and related entity Prematic Service Corporation (Nevada) (collectively, Prematic). The fee is only nominally collected by Prematic because FGI actually performs the billing and collection functions on these policies The nature of Farmers' monthly policies - as not involving any payment over time - was litigated and established in *Crawford v Farmers Group, Inc* (1984) 160 Cal App 3d 1164 *(Crawford),* a case discussed further below

It is against this background that Troyk's causes of action must be assessed and understood. The first cause of action is for breach of contract Before coverage will be provided, Farmers, purporting to act through its agent Prematic, demands [**4] more than the premium specified as the price for the one-month policy In a systematic breach of contract, Farmers leverages its superior bargaining power to impose, unilaterally, the "service charge" without any contractual consideration for it Class members are forced to pay this additional amount despite the policy's declarations page promising them coverage at a certain premium already agreed upon Although the price for the policy and the term, one month, are detailed in the policy, Farmers admits that the added fee is not mentioned anywhere in the documents constituting the policy It is imposed even though class members are paying for nothing over time Class members pay the "service charge" because Farmers tells them they must pay it to obtain the renewable monthly policy

On this record, the trial court properly found that Farmers breached its contract with Troyk and other class members by forcing them to pay more than the premium specified for their one-month policies. (13 Clerk's [*3] Transcript (CT) 3005) This conduct, the court also properly found, ran afoul of the Unfair Competition Law (UCL) (Bus & Prof Code, § 17200). (13CT3006) The UCL [**5] was Troyk's second cause of action Of perhaps greatest interest, Farmers committed an "unlawful" business practice by violating Insurance Code sections 381, 383 and 383.5 As discussed further below, these statutes collectively require, under pain of criminal sanctions, all automobile insurance policies to "specify" the "premium" not just anywhere in the policy, but on its declarations page. n1

n1 Statutory references are to the Insurance Code unless otherwise noted

To avoid the conclusion that its "service charge" is "premium" as used in section 381, Farmers tries to shoehorn this case into *Interinsurance Exchange of the Automobile Club v Superior Court* (2007) 148 Cal App 4th 1218 *(Auto Club)* As Farmers tells it, *Auto Club* "rejected virtually identical claims " (FOB2.) To the contrary, there is virtually no similarity between the practice challenged here and that challenged in *Auto Club* Again, fundamentally, no [**6] fee for paying by installments is even at issue here. While *Auto Club* grappled with multiple payments for an annual policy, this case involves a single payment made in advance of coverage for a one-month policy, coupled with an arbitrary surcharge tacked on by the insurer

Even indulging Farmers' strained analogy, *Auto Club* did not paint with a broad brush in interpreting "premium" in section 381. Deciding only the particular case before it, this Court held that "the plain and ordinary meaning of the term 'premium,' as used in section 381, subdivision (f), does not include interest charged for the time value of money" *(Auto Club, supra,* 148 Cal App 4th at p 1230, emphasis deleted) Farmers does not contend that its "service charge" may be

equated with, or even remotely resembles, a charge for the time value of money To the extent *Auto Club* provides more general [*4] instruction, the opinion recognizes that flat monthly fees to recoup administrative costs, as here, are "premium" under section 381. Treating Farmers' fee as premium is consistent not only with *Auto Club,* but also with every relevant source of California authority to confront the meaning [**7] of the term in the context of periodic payments for insurance

Confirming that *Auto Club* is no basis for reversal, Farmers spills a lot of ink on diversionary arguments Questions of "substantial compliance," what Troyk supposedly understood, and the like are red herrings. Seeking to protect drivers obtaining mandatory liability coverage, the Legislature drew bright lines The monetary award - returning all service charges unlawfully collected during the class period - flows logically from the finding of liability Although Farmers bemoans the size of the award, there is another number Farmers does not mention This was a certified class action adjudicating the rights of nearly one million Farmers policyholders in California and Nevada Excluding prejudgment interest, each class member's individual financial stake averages little more than $ 100 per person The collective monetary bulk of the judgment reflects the insurance company's, not the trial court's, excesses Farmers does not establish any abuse of the court's broad discretion to fashion appropriate remedies

For these and other reasons discussed below, Farmers' appeal lacks merit As explained in Troyk's separate motion to dismiss, [**8] non-party Prematic has no standing to appeal because it is not "aggrieved" by the judgment Even if Prematic were a party with appellate standing, Prematic, like its owner Farmers, also fails to demonstrate any basis for reversal n2

n2 To be clear, Troyk does not waive here his objection to Prematic's appellate standing. Prematic's substantive contentions are addressed in this brief only conditionally, pending a ruling on Respondent's Motion to Dismiss Appeal of Non-Parties Prematic Service Corporation (California) and Prematic Service Corporation (Nevada), filed concurrently

## [*5] II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Farmers and Prematic Are Related Entities Operating as a Single Enterprise with Respect to the Monthly Policies

FIE, FGI and Prematic insist they are separate entities that operate independently (Real Parties in Interest's Opening Brief (POB) 5-6, 23-24, FOB39-40.) But the undisputed facts belie this contention

FIE is a reciprocal or interinsurance exchange established [**9] under California law Licensed to sell insurance in both California and Nevada, FIE is owned entirely by its subscribers, or policyholders (9CT1978) FGI is not an insurance company, but is the attorney-in-fact for FIE (9CT1978, 1981) In that capacity, as the trial court found, FGI performs virtually all administrative functions on FIE's behalf, including billing FIE customers, as well as accounting, actuarial, human resources and legal functions (9CT1978, 2102; 13CT3020) n3

n3 The nature of reciprocal insurers under California law is generally explained in *Tran v Farmers Group, Inc* (2002) 104 Cal App.4th 1202, 1210-1211 (*Tran*).

By Prematic's own description, it is "a wholly owned subsidiary of FGI " (POB3, see 4CT871; 5CT935-936, 987)

Prematic's President, Philip Moore, testified that "Prematic's sole business is to handle monthly billing for customers of FIE (and other insurance companies) by agreement with those customers." (9CT1990) Farmers and Prematic specifically contend that the [**10] latter provides billing and collection services on Farmers' behalf in connection with Farmers' EasyPay Plan - the Farmers product at issue here - which allows policyholders to purchase automobile insurance on a month-to-month basis (POB3-4, 22, FOB 5-7; *see post* at §§ II.B and II C)

[*6] In reality, however, as the trial court recognized, virtually every function related to billing and collection is actually performed by FGI itself, not Prematic (13CT3020) FGI carries out the physical operations connected with billing and collection of EasyPay premiums FGI owns and operates the computerized billing system, mainframe computer and customer databases for monthly billing and collection, including technology support and maintenance (4CT878-879; 9CT1991) FGI prepares the bills, designs the format of the bills, prints the bills, stuffs the envelopes with the bills, pays for postage, mails the bills and houses the operation (4CT872-876; 9CT1990-1991) FGI maintains the payment records, including the amount of "service charges" (Prematic's operating revenues) collected. (4CT870-871) For those paying electronically, Farmers collects and maintains the necessary additional information [**11] (7CT1448-1449, 1463-1464) FGI also maintains and operates the website that interacts with policyholders who want to submit their monthly payment online (7CT1467-1468)

FGI further provides and controls the manner and means by which current and potential policyholders learn about the monthly EasyPay Plan For example, FGI runs advertisements, operates and maintains a website that discusses the EasyPay program, and sends out bill stuffers about EasyPay to policyholders using other payment options. (4CT875-876, 883-884,5CT989.) FGI issues marketing and disclosure guidelines for Farmers' agents regarding Prematic and the payment plans, and enforces those guidelines through its compliance department. (4CT852-853, 877.) FGI's corporate communications department handles many of Prematic's communications functions (4CT872-873) Farmers agents promote the EasyPay Plan to prospective and existing policyholders, gather all relevant contact and account [*7] information- which is stored by FGI- and collect the first payment (4CT845-848, 878-879) n4

n4 FGI pays undisclosed, additional commissions to Farmers agents for enrolling policyholders in Farmers' "EasyPay Plan" (4CT853-855) The commissions are called "service allowances," and are based on both the total, stated premium billed and the required "service charge" paid by class members (4CT853, 855, 5CT1005, 1023) This "service allowance" constitutes an improper referral fee in violation of section 754

[**12]

In sum, although Prematic ostensibly acts as FGI's billing and collection agent for the monthly policies, the undisputed evidence shows that FGI is responsible for, and intimately involved with, most of those operations on a daily basis. But that is not the only way in which these entities are inextricably linked All members of Prematic's Board of Directors are officers or employees of FGI. (5CT980, 7CT1465-1466) For example, Prematic's President is also FGI's Vice President (9CT1990.) Prematic "employees" are on FGI's payroll and are paid from FGI's bank account (4CT849-851, 9CT1990)

FGI also handles all of Prematic's legal issues through FGI's legal department, including counseling Prematic on this and related cases. (4CT863-867) Additionally, FGI performs Prematic-related tax and accounting functions, including preparing Prematic's income tax returns (4CT868-870) Prematic is included in FGI's consolidated tax return (5CT992) And finally, FGI also handles all of Prematic's regulatory filings, and includes Prematic's income and expenses in its consolidated financial statements filed with the Securities and Exchange Commission. (4CT870, 5CT985-987)

[*8] **B. Troyk and the [**13] Class Purchased an Auto Insurance Policy with a One-Month Term, Not a Six-Month Policy with a Monthly Payment Plan**

Farmers' basic auto insurance policy is a standard adhesion contract for auto insurance. (See generally 4CT798-813) The policy form states "We agree with you, in return for your premium payment, to insure you subject to all the terms of this policy. We will insure you for the coverages and the limits of liability shown in the Declarations of this policy " (4CT800) The policy makes clear that the declarations page sets forth the policy period or term, the dollar limits of liability and the premium to be paid (4CT800, 809; see also 4CT817 [Troyk's declarations page stating "Premium" of $ 421 60]) Importantly, Farmers' policy is fully integrated. The standard form explains "This policy with the Declarations includes all agreements between you and us relating to this insurance No other change or waiver may be made in this policy except by endorsement, new Declarations or new policy issued by us" (4CT809)

Farmers offers two options for the term of coverage - a policy with a six-month term or a policy with a one-month term If a policyholder elects the former, he or she [**14]  may pay the entire six-month premium in one lump sum by either using a credit card or obtaining a bank loan (4CT845, 893; 9CT1937, 1938-1939.) Alternatively, Farmers offers its "Two-Pay Plan," which permits policyholders to pay the premium in two installments (4CT845, 893, 9CT1937) The typical Farmers declarations page provides for renewal of the six-month policy as follows "The policy may be renewed for an additional policy term of six months each time the Company offers to renew by sending a bill for the required renewal premium, and the insured pays said premium in advance of the respective renewal date " (4CT817.)

Many policyholders, however - including Troyk - find it easier for budgeting or other reasons to pay for automobile insurance on a month-to-month basis (4CT788-791.) For those individuals, Farmers provides the  [*9]  option of purchasing a one-month policy To effectuate a monthly plan, Farmers converts the usual six-month policy into one with a one-month term, by means of an endorsement called the Monthly Payment Agreement, Form E0022 ("Monthly Payment Endorsement"). (4CT817 [Troyk's declarations page with Form E0222 endorsement]; 4CT820 "[t]he policy period [**15]  is amended to one Calendar month"], see also 4CT826, 882) Under this arrangement - the focus of this litigation - customers are required to pay the total premium due for each one-month term in advance (4CT820 [the premium for each successive month period "is due no later than on the expiration date of the then current monthly period"].)

Farmers asserts that its "service charge" is "for the convenience of paying 'premium' over time " (FOB13, see also 5CT1046) The undisputed facts show otherwise First, the premium for each month must be paid in full, and up front, every month At any given time, the monthly policyholder is obligated to pay for only one month's coverage, not six months Simply stated, there are no "installments " Second, these policies are not renewed every six months, but every month The endorsement provides that the policy "shall continue in force for successive monthly periods if the premium is paid when due " (4CT820) And finally, the insured may terminate the one-month policy by not paying the monthly premium when due. (4CT901)

This policy framework has been litigated previously. As Farmers admits, *Crawford* "explain[s]" the "nature of [the] monthly payment [**16]  plan " (FOB44) The First District's holding - that Farmers was not subject to truth in lending laws - hinged on the nature of the plan as not involving "deferred payment of the price of the insurance policy" (*Crawford, supra,* 160 Cal App 3d at p 1170) Then, as now, "[t]he six-month term was used for rating purposes only and did not constitute a term of insurance coverage The 'Monthly Payment Endorsement' attached to and incorporated into the policy expressly amended the policy period to one calendar month " (*Id* at p 1169)  [*10]  In the two decades since, this feature of the monthly policies - nothing is paid over time - has not changed

## C. Farmers Will Not Provide Monthly Coverage Unless the Stated Premium Plus a "Service Charge" Not Specified in the Policy Is Paid Through Prematic

Notwithstanding the express terms of the Monthly Payment Endorsement (4CT820), Farmers does not provide coverage simply upon timely payment of the specified monthly policy premium Sensing a revenue-generating opportunity, Farmers created a procedure whereby monthly policyholders are required to utilize its so-called "EasyPay Plan " Pursuant to this mandatory [**17]  arrangement, policyholders must remit their stated monthly premium - plus an additional "service charge" - through Prematic, FGI's wholly owned subsidiary (4CT791, 880-881, 5CT909)

In an effort to make the coverage appear as cheap as possible, the service charge is not specified on the declarations page of the policy (5CT914, 6CT1158, 1305) Troyk's declarations page, for example, noted his Prematic account number and the "Premium" of $ 421 60, but the "Fees" line was left blank - thereby falsely implying that there were no service charges (4CT817, see also 4CT820 [Monthly Payment Agreement does not mention service charge], 893 [admitting none of its standard form endorsements mentions or refers to service charges], 901-902 [endorsements page that does not mention service charges as basis for increasing premium], 5CT1130 [Troyk renewal offer that does not list service charge])

Farmers readily admits it will not issue the monthly policy and begin coverage until the policyholder has made payment arrangements with Prematic and paid the required premium, in full, plus the added service charge (FOB7, see also 5CT909, 1069) Payment of these amounts through Prematic is nothing less [**18] than a condition precedent to obtaining a monthly policy As Prematic's President testified.

> [*11]  Q Is it correct that if a Farmers insured wants to pay on a monthly basis, Farmers requires that insured to go through Prematic?
>
> MR ALLEN. Objection
>
> THE WITNESS The only method for paying monthly is - of any type of Farmers Insurance Exchange policyholder today would be through Prematic
>
> BY MR BLOOD. Do all Farmers insureds, who pay monthly through Prematic, incur a service charge?
>
> A Yes.

(4CT880-881, see also 5CT909)

Further, the undisputed facts lead inexorably to the conclusion that if the service charge is not paid, Farmers will not provide monthly coverage, even if a policyholder wanted to remit payment directly to Farmers (See, e g, 5CT909) As Farmers acknowledged in the trial court, its "obligation to provide insurance for those paying on a monthly basis does not arise until the policyholder has paid the monthly premium (see Ins Code § 480), which *by necessity* means that Prematic will have had to forward the premium to FIE, and thus, Prematic will have been entitled to take its service charge" (9CT1890, [**19] emphasis added) Prematic has the right to terminate its arrangement with the policyholder if the charge is not paid (5CT1140,1142)

If a policyholder sends Prematic the total specified premium but not the service charge, Prematic will apply that remittance to pay its service charge first, and forward the rest to Farmers (5CT972.) Ultimately, when the premium is insufficient to support coverage, Farmers will cancel the policy (5CT973-974, 10CT2169-2172) Consequently, there is no practical alternative for a monthly policyholder who does not want to pay the service charge The only option is to change the policy back to a six-month policy and pay six months' worth of premium in a lump sum (9CT1886, 1955)

### [*12]  D. Farmers' Treatment of Its "Two-Pay Plan" Installment Fee Indicates that Farmers Views Its Service Charges as Premium

Farmers and Prematic repeatedly characterize the "EasyPay Plan" service charge as a fee for the convenience of paying by installments over time (See, e,g, FOB 1-2 & fn. 1, POB4-5; 9CT1884) Farmers and Prematic justify this charge as necessary to cover the administrative cost of processing the monthly premium payments received and forwarding them to [**20] Farmers (5CT968-969, 6CT1157, 7CT1601-1602; see POB4, 24, FOB1-2) If, as Farmers insists, "EasyPay" were merely an installment payment plan for a six-month policy, then Farmers could be expected to treat the monthly service charges on that plan in the same manner as the installment fee charged in connection with the "Two-Pay Plan," which indisputably is an installment plan. (4CT846, 5CT908 [explaining Two-Pay installment

charge]) But that is not the case

Farmers treats the installment fee levied under its "Two-Pay Plan" - but not its monthly service charges - as "premium" that must be specified in the policy In contrast with the one-month policy, FIE explains the "Two-Pay Plan" installment fee on the policy's declarations page. (5CT920, 1119, 1127, 9CT2116) In addition, FIE includes the "Two-Pay" installment fee as "premium" in tax and regulatory filings, and pays premium tax on the revenue derived from that charge (5CT931-932,954-955,6CT1333,9CT2082-2084, 2117, 10CT2180-2181 [rate application to DOI explains that premium "finance charges" "are treated as written and earned premiums in the same manner as all other income from insurance operations"])

Although Farmers also consistently [**21]  describes the monthly "EasyPay" service charge as an installment fee, no premium tax is paid on those charges (4CT847, 5CT933-934, 943-944) FIE accounting manager Joseph Hammond insisted that even if Farmers administered the monthly policies and collected the monthly service charges itself, it would not have to treat those charges as  [*13]  premium (9CT2094-2095) But Hammond failed to offer any reasoned explanation for why the "installment fee" on the monthly policies - if this is what it really is - should be treated differently than the installment fee under the "Two-Pay Plan "

### III. PROCEDURAL HISTORY

Troyk initiated this suit in October 2004 (1CT1.) In December 2004, he filed the operative First Amended Complaint for Damages and Equitable Relief (simply, complaint). (1CT102.)

Contrary to Farmers' description, Insurance Code section 381 is not the entire "foundation" for this case (FOB13.) From the beginning, the complaint has alleged two causes of action that are analytically independent (1) breach of contract; and (2) unlawful, unfair and fraudulent business practices violating the UCL (1CT109-110.) In fact, as the trial court noted, Troyk [**22]  "has not alleged a direct action for violation of Insurance Code § 381" - a statute, in any event, not providing a private right for its enforcement (3CT423)

### A. Farmers' Demurrer Is Overruled, the Class Is Certified and Farmers Moves to Stay in Favor of the California Department of Insurance

In March 2005, the trial court overruled Farmers' demurrer and required Farmers to answer (3CT422-431) In August 2005, appointing Troyk as class representative, the court certified the following class "All persons who between October 6, 2000 and August 26, 2005 (at midnight, PDT) bought and paid for one or more insurance policies issued by Farmers in California or Nevada on a monthly basis and incurred one or more 'service charges' or similar denominated charges in addition to the premium specified in the Farmers insurance policy " (4CT695) The class definition included consumers "up to the date notice is provided because it appears the conduct is ongoing." (4CT697) There are approximately 975,000 Farmers  [*14]  policyholders in the certified class (13CT3035) Farmers has not challenged class status in this appeal

Also in August 2005, more than ten months after [**23]  suit was filed, Prematic sought leave to intervene (3CT628.) The trial court denied the motion. As the order explained, "the court finds Prematic has delayed in bringing this motion and in its discretion, denies the request to intervene" (7CT1636) The order observed that "Prematic and [Farmers] have at least the same interest in the service charges." (7CT1636) "Moreover, given the relationship between [Farmers] and Prematic, it appears Prematic's interests are being adequately represented by [Farmers]." (7CT1636.) The order denying its motion to intervene was immediately appealable, but Prematic did not appeal it

In September 2005, Troyk and Farmers each sought summary judgment (4CT698, 6CT1366) Shortly after the cross-motions were filed, Farmers changed gears and urged the trial court to stay the proceedings Although Farmers did not include the papers in its clerk's transcript designation, Farmers moved the court to halt further proceedings until the California Department of Insurance (DOI) issued an anticipated decision on whether "premium," as used in section 381,

includes installment-related fees Citing the primary jurisdiction doctrine, Farmers lauded the DOI's expertise [**24] and asserted that irreparable harm would result not just to the insurance industry, but to the DOI itself, if this litigation went forward without the benefit of the DOI's views. Other prominent insurance companies gushed similarly about the DOI's expertise, urging deference to the agency on the meaning of "premium " (11CT2534-2552) Giving Farmers the stay it coveted, the court agreed to stay the case for 90 days, except on specific issues unrelated to the DOI referral This explains the six-month gap between the parties' opening memoranda on summary judgment and the subsequent briefing and evidence (9CT1878, 2005)

   [*15]  The DOI gave the premium issue the extensive vetting the insurers sought The agency heard at length from Farmers and other prominent insurers, and their trade associations. (11CT2555-2556.) The industry's strategic gambit backfired, however In April 2006, the DOI issued a comprehensive opinion concluding that "installment fees are premium under §381, in the private passenger automobile context." (11CT2568)

### B. The Trial Court Rules in Favor of the Class on Summary Judgment

   In June 2006, the trial court granted summary judgment for Troyk and denied Farmers'  [**25]  motion (13CT3003) Citing case law, the court held that "the 'service charge' paid by policyholders to Prematic is a premium under [section] 381(f) and should be disclosed as such on the declarations page." (13CT3005) The court ruled that Farmers, therefore, breached the insurance contract and also violated the UCL. (13CT3005-3006) Seeking to avoid the consequences of its wrongdoing, Farmers asserted that it should not be made to repay the charges because Prematic, which supposedly collected those sums, is a "separate legal corporation " (13CT3006) Firmly rejecting this contention, the court referenced much of the undisputed evidence summarized above (13CT3007-3008)

   Pursuant to the UCL's broad remedial authority, the trial court ordered Farmers to restore to the class "the 'service[] charges' each class member paid in addition to their premiums during the class period" (13CT3006) Alternatively, the court couched its award as damages for the breach of contract, measured as "the premium amounts paid in excess of the premium stated on the declarations page." (13CT3008) By stipulation, the parties agreed that the total amount Farmers collected [**26] through Prematic, and thus the amount subject to the monetary award, was $ 115,556,827 (13CT3051-3054) In August 2006, judgment was entered in favor of Troyk and the certified class. (See Respondent's Motion to  [*16]  Augment Appellate Record with Copy of Completed Judgment [filed 9/5/07, granted by order dated 9/21/07])

   In September 2006, Farmers moved to set aside the judgment (See Appellants' Motion to Augment Record on Appeal, Ex 1 [filed 7/11/07; granted by order dated 7/31/07]) Although it had been denied leave to intervene, and did not appeal that ruling, Prematic also moved to vacate the judgment as a purportedly "aggrieved party" under Code of Civil Procedure section 663 (14CT3155-3175) Opposing both motions, Troyk argued that Prematic was not "aggrieved" by the judgment, and accordingly had no standing, because the judgment neither threatened its business nor exposed it to additional lawsuits by insureds or claims for indemnification by Farmers (14CT3199-3203, see also 14CT3209-3217)

   The trial court denied both motions Reiterating the conclusions reached on summary judgment, the court explained, among other things "The plaintiff class [**27]  suffered damages and injury in fact by paying a service charge in addition to the premium specified in their insurance policies, in violation of California law " (14CT3252, citing §§ 381, 383 and 383 5) "The damages," the court repeated, "are measured by the amount the plaintiff class was required to pay above the amount of the premium specified on the declarations page " (14CT3252) Farmers appealed and Prematic has also attempted to do so (14CT3254-3255, 3258-3259)

## IV. DISCUSSION

### A. Farmers' Imposition of the "Service Charge" on Monthly Policies Is a Breach of Contract

   Insurance companies control the terms and language of virtually all policies, especially for driver liability coverage

2007 CA App. Ct. Briefs 49983, *16; 2007 CA App. Ct. Briefs LEXIS 9589, **27

mandated by law Taking heed of this practical reality, the rules of interpretation governing disputes over a policy favor the consumer with inferior bargaining power. "The law of interpretation of insurance contracts in California is settled. Policies are to be [*17] construed liberally in favor of the insured and most strongly against the insurer " (*Cobb v Home & Auto Insurance Co* (1978) 86 Cal App 3d 673, 678) "In interpreting an insurance policy we apply the [**28] general principle that doubts as to meaning must be resolved against the insurer " (*Gray v Zurich Insurance Co* (1966) 65 Cal 2d 263, 269)

Although these tenets certainly support the trial court, favoritism to the insured is unnecessary to affirm here. Distilled to its simplest essence, this case presents a straightforward breach of contract based on one party using its superior bargaining power to demand additional consideration before it would perform "To be entitled to damages for breach of contract, a plaintiff must plead and prove (1)a contract, (2)plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff " (*Walsh v West Valley Mission Community College District* (1998) 66 Cal App.4th 1532, 1545) The trial court correctly concluded that all these elements were met

As the record showed on summary judgment, Troyk and other class members had contracts for auto insurance with Farmers (4CT775) The insurer represented that the standardized policy consisted of only the policy form, the declarations and any endorsements (4CT809) In Troyk's illustrative case, his policy, as for every class member, contained [**29] the Monthly Payment Endorsement amending the policy to a one-month term (4CT820) Consistent with the Insurance Code's requirements, the policy expressly stated that Farmers will provide coverage in return for the premium specified on the declarations page (4CT800, 809; see, e, g, 4CT817)

Troyk and other policyholders performed their end of the bargain by paying the premium specified on the declarations page supplied by Farmers (4CT775) But Farmers breached the contract by premising its performance on payment of additional "service charges" not revealed on the declarations page, or anywhere else in the policy. (4CT880-881, 5CT1025-1030) Troyk [*18] and the class were damaged by being forced to pay the fee without contractual consideration for the additional amount (See, e, g, 4CT791)

Farmers thus is guilty of "the 'failure, without legal excuse, to perform any promise which forms the whole or part of a contract '"(*Gherman v Colburn* (1977) 72 Cal App 3d 544, 564) In light of Farmers' contractual obligation to provide coverage for a month, Farmers breached the policy agreement by threatening to withhold coverage unless more money was paid. Although Farmers purported [**30] to mandate a separate contract between class members and its collection agent Prematic, this cannot create contractual consideration where there is none (See, e g, *US Ecology, Inc v State of Cal* (2001) 92 Cal App 4th 113, 128; *Auerbach v Great Western Bank* (1999) 74 Cal App 4th 1172, 1185)

A contracting party with manifestly superior bargaining power cannot wield its clout to disregard the arrangement, especially on a central term such as price. (See, e g, *Kashmiri v Regents of Univ of Cal* (Nov 2, 2007, A113662)    Cal App 4th    [2007 Cal App. LEXIS 1803] [University of California liable for damages because it breached contractual promise not to raise fees during plaintiff student's time of enrollment]) But this is what Farmers did and, accordingly, committed a breach of contract

**B. Farmers' Practices Also Violate the UCL**

The trial court was right that Farmers' conduct also runs afoul of the UCL That statute proscribes "unfair competition"- in particular, "fraudulent," "unfair" or "unlawful" business practices (Bus & Prof Code, § 17200) Because the UCL is "'written in the [**31] disjunctive,'" proof of any of the three prongs establishes liability under the statute (*Cel-Tech Communications, Inc v Los Angeles Cellular Telephone Co* (1999) 20 Cal 4th 163, 180 *(Cel-Tech))* UCL liability is assessed independently of the breach of contract just discussed "A cause of action for unfair competition under the UCL may be established independent of any contractual relationship [*19] between the parties " (*McKell v Wash Mutual, Inc* (2006) 142 Cal App 4th 1457, 1473-1471, internal quotation marks omitted)

**1. Fraudulent and Unfair Business Practices**

2007 CA App. Ct. Briefs 49983, *19; 2007 CA App. Ct. Briefs LEXIS 9589, **31

The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law" (*Cel-Tech, supra,* 20 Cal 4th at p 180, internal quotation marks omitted, see also *People v McKale* (1979) 25 Cal 3d 626, 632) This Court emphasizes, moreover, that the UCL "imposes strict liability It is not necessary to show that the defendant intended to injure anyone " (*South Bay Chevrolet v G M Acceptance Corp* (1999) 72 Cal App.4th 861, 877, internal quotation marks omitted.)

Seeking [**32] to mute the UCL's protective force, Farmers suggests that "pre-Proposition 64" case law on UCL liability has less precedential weight today (FOB47) Our Supreme Court, however, makes no such distinction In its first decision applying Proposition 64, the high court recently instructed "The measure left entirely unchanged the substantive rules governing business and competitive conduct. Nothing a business might lawfully do before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted." (*Californians for Disability Rights v Mervyn's, LLC* (2006) 39 Cal 4th 223, 232 *(Mervyn's).)*

Farmers further disregards Supreme Court precedent by arguing that UCL liability requires "actual reliance" and "deception" (FOB47) "Allegations of actual deception, reasonable reliance, and damage are unnecessary " (*Committee on Children's Television, Inc v General Foods Corp* (1983) 35 Cal.3d 197, 211.) Indeed, the Supreme Court has consistently rejected efforts to read common-law fraud into the statutory scheme, on either liability or remedies (See also *Korea Supply Co v Lockheed Martin Corp* (2003) 29 Cal 4th 1134, 1150-1151 *(Korea* [**33] *Supply); Bank of the West v Superior Court* (1992) 2 Cal 4th 1254, 1266-1267 *(Bank of the West), Fletcher* [*20] *v Security Pacific National Bank* (1979) 23 Cal 3d 442, 449-454 *(Fletcher))* As this Court has observed "Importantly, California courts have repeatedly held that relief under the UCL is available without individualized proof of deception, reliance and injury " (*Mass Mutual Life Insurance Co v Superior Court* (2002) 97 Cal App 4th 1282, 1288 *(Mass Mutual),* collecting cases)

A business practice violates the UCL's "fraudulent" prong if the challenged conduct is "likely to deceive a reasonable consumer." (*Linear Technology Corp v Applied Materials, Inc* (2007) 152 Cal App.4th 115, 134) This Court applied the likelihood of deception standard before Proposition 64 (*Mass Mutual, supra,* 97 Cal App 4th at pp 1282, 1289-1291) and, consistent with *Mervyn's,* still applies it now (See, e g, *Lewis v Robinson Ford Sales, Inc* (2007) 156 Cal App 4th 359, 370-371; *Smith v Wells Fargo Bank, N A* (2005) 135 Cal App.4th 1463, 1471, 1488, see also *Aron v U-Haul Co of Cal* (2006) 143 Cal.App.4th 796, 806) [**34] Specifically, a business practice is likely to deceive where "it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled" (*Lavie v Procter & Gamble Co* (2003) 105 Cal App 4th 496, 508 *(Lavie))* Because the liability threshold is likelihood of deception, not actual deception, Troyk's burden of proof on the fraudulent prong is "modest " (*Prata v Superior Court* (2001) 91 CalApp.4th 1128, 1144, see also *Corbett v Superior Court* (2002) 101 Cal.App 4th 649, 670)

Here, it is not just likely to deceive, but inherently misleading, for Farmers to create a wholly owned and controlled subsidiary, Prematic, to demand an additional sum not contractually bargained for in the insurance policy The "service charge" was levied on Troyk despite a blank line for "Fees" on the declarations page, thereby falsely suggesting there was no cost for the policy beyond the specified premium (4CT817) This practice is the type of "'chicanery'" (*Cel-Tech, supra,* 20 Cal 4th at p 181) the UCL [*21] prohibits (See, e g, *People ex rel Lockyer v Fremont Life Insurance Co* (2002) 104 Cal App 4th 508, 518 [**35] *(Fremont)* [fraudulent prong violated where insurer's disputed charge was "'not conspicuously set forth in the policy'"])

Likewise, it is "unfair" business conduct for a large insurance company, taking advantage of its overwhelming bargaining strength, to extract an additional fee from its policyholders beyond what is specified in the policy "A practice which is deceptive is necessarily unfair " (*Blakemore v Superior Court* (2005) 129 Cal App 4th 36, 49)

Farmers responds that what occurred is a "common practice in the insurance industry " (FOB1) Even if this were true, it makes no difference. An insurance company "is not shielded from liability under the UCL even when its conduct" is claimed to be "'consistent with industry standards '" (*Fremont, supra,* 104 Cal App 4th at p 526) Whether

everyday or not, "it is an unfair or fraudulent business practice 'to assert a contractual right that one does not have '"" (*Samura v Kaiser Foundation Health Plan, Inc* (1993) 17 Cal App 4th 1284, 1297.) Here, Farmers does this by demanding the "service charge," through its agent Prematic, despite Farmers' preexisting obligation to provide insurance [**36] for the premium specified in the insurance policy.

Beyond the abusive nature of Farmers' systematic breach of the insurance contract, the tactic of carving out the "service charge" from the specified premium, and levying it through separate documentation, impedes competition in the market for auto insurance As discussed further below, the premium for such policies must be specified on the declarations page Because this has been the law for decades, consumers are conditioned to review the declarations page for the relevant price information By advising policyholders of the cost in multiple documents, Farmers deters the comparison shopping essential to a competitive market This "actual or threatened impact on competition" reinforces the conclusion that Farmers has [*22] engaged in an unfair business practice (*Cel-Tech, supra,* 20 Cal 4th at pp 186-187)

## 2. Unlawful Business Practices

Farmers is also liable under the UCL's "unlawful" prong, which drew the greatest attention in the court below "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes [**37] independently actionable " (*Cel-Tech, supra,* 20 Cal 4th at p. 180, internal quotation marks omitted) "With respect to the unlawful prong, '[v]rtually any state, federal or local law can serve as the predicate for an action' under section 17200" (*Fremont, supra,* 104 Cal App 4th at p 515, emphasis deleted) Although Farmers now vigorously contests UCL liability, its counsel admitted in superior court "Obviously, if Your Honor finds we violated [Insurance Code section] 381, it's pretty hard to argue we haven't also violated the unlawful plank of the UCL " (3 Reporter's Appeal Transcript (RT) 47)

The trial court ruled that Farmers committed an unlawful business practice by violating sections 381, 383 and 383 5. (13CT3004-3006, 14CT3252-3253) This holding is correct

### a. The Insurance Code Requires Auto Insurers to "Specify" All the "Premium" on the Policy's Declarations Page

Insurance is a "highly regulated industry " (*Calfarm Insurance Co v Deukmejian* (1989) 48 Cal 3d 805, 830 *(Calfarm))* Reflecting that "'the business of insurance is affected with a public interest'" *(ibid),* the Legislature has [**38] enacted statutes to protect consumers and ensure uniformity in how insurers interact with the policy-buying public

In 1935, the Legislature adopted a statute instructing that all insurance policies "shall specify" a "statement of the premium," and other basic information concerning the insurance contract (§ 381, subd (f)(1)) The [*23] comprehensive nature of this mandate flows from the plain text To "'specify'" means "'to name or state explicitly or in detail '" (*Moreno v City of King* (2005) 127 Cal App 4th 17, 26) The consequences of noncompliance, a misdemeanor," underscore the cardinal importance of the specification requirement (§ 383, subd (a))

Section 381 is a general statute governing all insurance policies, but it is not the end of the inquiry here In a sister statute, the Legislature specifically regulated "[c]ontracts of motor vehicle insurance " (§ 383 5) Enacted in 1941, section 383 5 works in tandem with section 381 to accord heightened protection to consumers purchasing auto insurance. As relevant here, section 383 5 mandates that for these policies, the declarations page, in particular, must specify the premium charged "Every contract of insurance, [**39] " section 383 5 instructs, "shall be embodied in a document " The term "document" means "a policy or a certificate evidencing insurance," and "also includes the applicable policy form and a subsequently issued declarations page ***conforming to Section 381*** or an endorsement " (*Ibid.,* emphasis added)

In response, Farmers refuses to acknowledge what the legislative framework has long required According to this insurer, it suffices to bury the specified premium ***"somewhere"*** in the documents constituting an auto insurance policy.

(FOB13, 33) Suggesting that the Insurance Code has "gaps," Farmers observes that section 381 "does not specify where, when, or how the 'statement of the premium' must appear on the policy " (FOB 13) This ignores section 383 5 Again, "[c]ontracts of motor vehicle insurance" must include "a subsequently issued declarations page conforming to Section 381" - in other words, a declarations page specifying the premium (§ 383 5) Far from a "hyper-technical" point (FOB4), the Legislature deliberately denied insurance companies the discretion that Farmers urges this Court to read into the statutory scheme. In powerful combination, sections 381, 383 [**40] and 383 5 foreclose any practice of carving out a fee for auto insurance - in reality, [*24] premium - and calling it something else, specified only in another document removed from the declarations page.

It is undisputed that the "service charge" paid by Troyk, and other class members residing in California and Nevada, was not specified anywhere in their insurance policies (much less the declarations page) Consequently, in assessing Farmers' liability under the UCL's unlawful prong, a central question is whether this extraneous fee is "premium" for purposes of section 381, subdivision (f) Wholly apart from, but entirely consistent with, the breach of contract theory discussed above, the answer is yes.

### b. Even if Farmers Offered Installment Payment Plans, Installment-Related Charges Are "Premium"

As an initial matter, it bears repeating that Farmers does not offer monthly installment plans for auto insurance. Troyk proved this in the uncontradicted evidence he presented below. The point, moreover, was litigated and established in *Crawford, supra,* 160 Cal App 3d 1164 Although Farmers currently contends that "EasyPay" policyholders enjoy "the convenience [**41] of paying 'premium' over time," *Crawford* held, at Farmers' express invitation, that the same plan did not involve "deferred payment of the price of the insurance policy " (Compare *id* at p. 1170 with FOB 13; see also 10CT2191-2199 [Farmers' appellate brief in *Crawford* elaborating its position there]) To the extent not foreclosed by *Crawford* and the undisputed contrary evidence in this record, Farmers' turnabout is precluded by judicial estoppel. (See *Jackson v County of Los Angeles* (1997) 60 Cal App 4th 171, 181)

Even if Farmers offered monthly installment payment plans, every California Supreme Court decision, Court of Appeal decision, insurance regulation, Attorney General opinion and DOI pronouncement has held that installment-related charges are "premium " The authority culminated with this Court's recent decision in *Auto Club* In light of this long and consistent [*25] lineage, Farmers' assertion that the trial court adopted a "newly minted" interpretation of premium rings hollow. (FOB49)

### (1) California Attorney General Opinions

Working hand in hand with the state's chief law enforcement officer, the DOI requested [**42] an opinion from the California Attorney General in 1947 on whether installment charges constitute taxable gross premium (9 Ops Cal Atty Gen 257 (1947).) In concluding that they do, the Attorney General emphasized that premium must be viewed from the insured's perspective Such fees are premium because they constitute the "actual amount charged the insured" or, alternatively, "the actual cost of the insurance to the insured" (10CT2239) The "nature" of an installment fee "is not changed by the fact that the policy designates it as an 'assessment'" or, as here, a "service charge " (10CT2240.) "It further follows that the policies issued should correctly state this premium and the records of the insurers should correctly reflect the same." (10CT2240.) For this conclusion, the Attorney General cited section 381. (10CT2240.)

Underscoring the notice to insurance companies, a 1975 Attorney General opinion echoes the 1947 analysis (58 Ops Cal Atty Gen 768 [1975 Cal AG LEXIS 144] (1975)) Among other things, the Attorney General concluded: "[T]he fact that nonpayment of the installment charges leads to cancellation of the policy for nonpayment of premiums is a clear [**43] indication that, from the point of the view of the insured, the installment payment program is an integral part of the relationship between the insured and the insurer" (10CT2188.)

The Attorney General's rationale reflects another statute relevant to the "premium" determination here By legislative command, an insurance policy may be cancelled "only" for "[n]onpayment of premium," and other reasons

not pertinent here (§ 661, subd (a)(1).) There is no authorization to cancel [*26] for failure to pay a service-related fee *(Ibid)* Hence, if the insurer chooses to cancel for such lapses, this is circumstantial proof that even the insurer views the levy to be premium As noted, Farmers cancels monthly policies for failure to pay the "service charge." (See, e g, 5CT972-974, 10CT2169-2172.) Farmers' own recognition of the true nature of its "service charge" is further illustrated by how Farmers treats genuine installment charges for its "Two-Pay Plan " As the Insurance Code mandates, those charges are specified on the declarations page for the "Two-Pay Plan" (5CT920, 1119, 1127) Yet, Farmers refuses to do this for purported installment charges in connection with the "EasyPay" monthly [**44] policies at issue here Farmers' opening brief does not explain the inconsistency

### (2) Supreme Court and Court of Appeal Decisions Preceding *Auto Club*

As the trial court recognized, California appellate courts have held service-related fees to be premium for decades In *Groves v City of Los Angeles* (1953) 40 Cal 2d 751 *(Groves),* the Supreme Court determined that fees an insurance agent levied for soliciting, negotiating and effecting bail bonds are premium Although the receipt given to the bond purchaser did not specify the amount "for services in arranging for the bond," the entire amount paid to obtain the bond was premium. *(Id* at p. 760) The Supreme Court explained "[T]he basic theory is that the amount paid by the insured for insurance is the premium " *(Id* at p 761) Responding to *Groves,* the DOI issued a bulletin advising insurers that "the artificial distinction between premium and service charges heretofore made by bail agents must be eliminated" (10CT2183) "The [DOI] will also expect that the premium shown on the undertaking of bail will be the full amount charged therefor Failure to do so will constitute [**45] a violation of Insurance Code Section 381(f) " (10CT2183.)

[*27] California's seminal "installment fee" decision came in *Allstate Insurance Co v State Bd of Equalization* (1959) 169 Cal App 2d 165 *(Allstate)* There, building on *Groves,* the court concluded "'Premium' in the law of insurance means the amount paid to the company for insurance [Citation] It has been defined as 'the sum which insured is required to pay '" *(Id* at p 168.) Even if Farmers' "EasyPay" plan involved installment payments, associated service charges are premium under *Allstate* As the court there explained. "The option to the insured was whether he wanted to pay in installments If he did, he was required to pay the installment payment charge The option was not whether he wished to pay the charge but in what form he wished to pay the premium, i e, cash or installments The insured paid the fee as part of the cost of the insurance he wanted." *(Id* at p. 173) The installment charge "'was actually given by the insured for his insurance'" and, therefore, was premium *(Id* at p. 171)

As addressed further below, this [**46] Court recently agreed with *Allstate,* thereby fatally undermining Farmers' quest for reversal (See *Auto Club, supra,* 148 Cal App 4th at pp 1232-1235) The Supreme Court too approved of *Allstate's* analysis, and reaffirmed *Groves,* in *Metropolitan Life Insurance Co v State Bd of Equalization* (1982) 32 Cal 3d 649, 659-660 *(Metropolitan Life).* There, premium was reiterated to mean "'the sum which [the] insured is required to pay '" *(Id* at p 660, quoting *Allstate, supra,* 169 Cal App 2d at p 168.) Other appellate decisions involving installment fees also follow *Allstate* (See, e g, *Interinsurance Exchange v State Bd of Equalization* (1984) 156 Cal App 3d 606, 611 *(Interinsurance Exchange)*)

In concluding that installment fees are premium, California courts have drawn on "basic concepts relating to the calculation of insurance premiums " *(Metropolitan Life, supra,* 32 Cal 3d at p 660) Farmers is only half right that a "policyholder pays premium to protect against the risk of loss " (FOB 14, emphasis deleted) The California Supreme Court instructs that premium [*28] [**47] "'ordinarily includes two elements, that is, the net premium and the loading The loading, or the amount arbitrarily added to the net premium, is intended to cover the expenses of the company.'" *(Metropolitan Life, supra,* 32 Cal 3d at p 660, quoting *Allstate, supra,* 169 Cal.App 2d at p 168) Although the net premium reflects the cost to cover the risk insured, "[t]he loading ordinarily is composed of miscellaneous charges, including administrative costs of the insurer, a charge for assuming the risk that claims outlays will exceed the expected level, and an element of profit or dividends " *(Ibid)* The loading thus covers the waterfront of charges, costs and the insurer's profit. (See also *Allstate, supra,* 169 Cal App 2d at p 173; *In re Imperial Insurance Co* (1984) 157 Cal App 3d 290, 295 *(Imperial)*) As the United States Supreme Court has recognized "The premium charged the policyholder consists of two parts, an expense portion, or 'loading,' to cover commissions, administrative expenses, and profit, and a

claims portion " (*United States v Consumer Life Insurance Co* (1977) 430 U.S. 725, 740, fn 20 [**48]  *(Consumer Life).)*

By Farmers' own description, its "service charge" reflects "the administrative services associated with the more frequent billing, collections, and forwarding of premium funds to the insurer (in this case, FIE) " (FOB 15; accord, FOB17 [same concession], see also 5CT968-969, 6CT1157; 7CT1601-1602) This makes the charge premium under California law because the "expense of administering the insurance is a component of premium " (*Allstate, supra,* 169 Cal App 2d at p 173) Nothing about this administrative cost allows it to be treated separately from other routine expenses that are part of an insurer's load. "The expense incident to the installment payment plan does not differ in character from other expenses included in premium " (*Ibid,* accord, *Interinsurance Exchange, supra,* 156 Cal App 3d at p 611)

Hence, Farmers' practice of peeling off its "service charge" from the premium specified on class members' declarations pages, and charging this fee [*29] separately through Prematic, runs contrary to durable California appellate precedent Because the analysis is grounded on the "'law of insurance,'" the guidance from these [**49] cases simply cannot be ignored (*Metropolitan Life, supra,* 32 Cal.3d at p. 660, quoting *Allstate, supra,* 169 Cal App.2d at p 168) Although the meaning of premium was not directly at issue in *Crawford,* the First District, consistent with all the authority above, correctly observed that Farmers' service charge "reflects the total cost of the insurance to the policy-holder " (*Crawford, supra,* 160 Cal App.3d at p. 1171)

**(3) *Auto Club***

All this authority set the backdrop for *Auto Club* Farmers tries to wield *Auto Club* as a sword slashing the judgment, but the decision actually compels affirmance. As relevant here, *Auto Club* followed the well-established precedent that a flat-fee service charge levied to recoup administrative expense is premium

Farmers seems to contend that *Auto Club* stands for the vast proposition that any auto insurance-related "service fee" is not "premium" under section 381 But *Auto Club's* holding, tied carefully to the particular facts presented, is much narrower. There, the "billing statement gave [the insured] the option of paying the $ 986 annual net premium in either one lump [**50] sum or nine monthly installments, subject to additional charges for interest at a rate of 17 99 percent per year and requiring payment of only the first installment of $ 53 60" (*Auto Club, supra,* 148 Cal App 4th at pp 1221-1222; *id* at p. 1222 [same description for subsequent renewal of annual policy]) Faced with this fact scenario, the Court held. "We conclude the fee Exchange charges for making payments of the annual premium in installments is interest for the time value of money and the plain and ordinary meaning of the term 'premium,' as used in section 381, subdivision (f), does not include interest charged for the time value of money " (*Id* at p 1230, emphasis deleted)

[*30] This holding was then repeated, almost verbatim, six times (*Auto Club, supra,* 148 Cal.App 4th at pp 1231-1232, 1237-1238) In light of this singular emphasis, there is no basis to extract the broader generalization Farmers urges

Indeed, the "holding" of a case refers to "a determination of a matter of law that is pivotal to a judicial decision " (Bryan A Garner (2d ed 2001) *A Dictionary of Modern Legal Usage,* p 405.) Pivotal in [**51] *Auto Club* was that the insurer recouped its lost "time value of money" This Court explicitly anchored its fact-bound conclusion to the "circumstances of this case" involving "interest charged by Exchange for use of its installment payment option " (*Auto Club, supra,* 148 Cal App 4th at p 1231) Farmers overlooks that "'the language of an opinion must be construed with reference to the facts presented by the case, and the positive authority of a decision is coextensive only with such facts '" (*Brown v Kelly Broadcasting Co* (1989) 48 Cal 3d 711,734-735; see also *Cuccia v Superior Court* (2007) 153 Cal.App.4th 347, 354.)

Farmers does not contend that its "service charge" is imposed to recoup the lost time value of money This is because the "service charge" is simply a flat monthly fee whose amount, in contrast to *Auto Club,* is not pegged to an

outstanding premium balance In fact, there is no outstanding balance here Farmers will not provide coverage unless it receives the entire premium up front and in full, and, through its agent Prematic, the "service charge " Again, in addition to the record here, these core features were recognized [**52] in *Crawford, supra,* 160 Cal App 3d 1164

More pertinent in *Auto Club* is this Court's discussion of *Allstate, supra,* 169 Cal App 2d 165 Like Judge Bloom (13CT3004), Judge Cowett in *Auto Club* cited *Allstate,* among other authorities, as mandating summary judgment for the insured. (See *Auto Club, supra,* 148 Cal.App.4th at p 1224) Hence, the scope and application of *Allstate* came up in *Auto Club.* This Court [*31] disagreed that *Allstate* governed the percentage-based charge challenged there, explaining *"Allstate* is inapposite to this case because here the installment charges in question are not based on the additional costs incurred by Exchange in offering an installment payment program, but are based solely on the time value of money for use of the option of making payments of premium in installments (i e, interest on the amount of the unpaid premium balance)." (*Id* at p. 1233.) Nonetheless, quoting liberally from *Allstate,* this Court accepted the analytical framework set by that decision (*Id* at pp 1232-1233)

The pertinent question after *Auto Club,* therefore, is [**53] whether an insurer's separate fee for auto insurance, not specified on the declarations page, is closer to the "time value of money" percentage-based charge levied in *Auto Club* (not premium under section 381) or to the "installment payment fee" levied in *Allstate* (premium under that decision and the discussion in *Auto Club)* Although Farmers does not offer installment payment plans for monthly policies, putting this aside, Farmers' "service charge" is more akin to the *Allstate* installment fee In addition to being a flat fee not linked to an outstanding premium balance, as in *Allstate,* Farmers' fee is imposed to cover the administrative cost associated with the insured's selection of monthly policy periods. Cornered by the record, Farmers admits this on appeal (FOB15, 17, see 5CT968-969; 6CT1157, 7CT1601-1602)

To be sure, this Court wrote in *Auto Club* that *"Allstate* is distinguishable because it interpreted the term 'gross premiums' for taxation purposes " (*Auto Club, supra,* 148 Cal App 4th at p 1232) But, in applying section 381, *Auto Club* followed the same line of reasoning in the "tax" line of authorities. To support its holding, [**54] *Auto Club* drew extensively on *Mercury Casualty Co v State Bd of Equalization* (1983) 141 Cal App 3d 43 *(Mercury),* a so-called "tax" opinion By analogizing to *Mercury,* this Court confirmed that cases interpreting "premium" in the context of taxing insurers have persuasive value when factually comparable.

[*32] In *Auto Club,* the *Mercury* decision was deemed "more closely analogous" than *Allstate (Auto Club, supra,* 148 Cal App 4th at p 1234.) *Mercury* bolstered the conclusion that the "time value of money" charge in *Auto Club* was not premium (*Id* at p 1233) But, in the present case involving Farmers' flat-fee "service charge," *Allstate* is the "more closely analogous" precedent, thereby bolstering the conclusion that the fee here is premium *Auto Club* soundly drew on the existing judicial policy, for the *Allstate* line is grounded on the "'law of insurance '" (*Metropolitan Life, supra,* 32 Cal 3d at p 660, quoting *Allstate, supra,* 169 Cal App.2d at p. 168) Moreover, some of the prior cases defining premium as Troyk urges are not "tax" decisions (See *Groves, supra,* 40 Cal 2d at p 760 [**55] [bail bonds]; *Imperial, supra,* 157 Cal App 3d at pp. 295-296 [insurer insolvency]) For all these reasons, *Auto Club,* like the relevant case law preceding it, supports the judgment in favor of the class

To Troyk's knowledge, just one court has been called upon to apply *Auto Club* to a factual situation resembling the one here Denying a motion for judgment on the pleadings, Judge Styn recently ruled that *Auto Club's* holding did not extend to a similar flat-fee "service charge" imposed by State Farm to recoup the administrative expense of processing monthly payments (*Gallagher v State Farm Mutual Automobile Insurance Co* (Super Ct San Diego County, Aug. 1, 2007, JCCP No 4493) 2007 WL 3283108 [copy attached as Ex A, as required by Cal. Rules of Court, rule 8 1115(c)]) As Judge Styn's order summarized, *Auto Club* "is clear that its decision applies only to fees based on 'interest charged for the time value of money ' In fact, the *[Auto Club]* court goes a step further and specifically states its holding does not apply to fees that are based on additional costs incurred by the insurer in offering an installment [**56] payment program " (*Ibid)* The State Farm installment fee litigation is referenced in the clerk's transcript as a related case pending simultaneously with Troyk's in San Diego Superior Court [*33] (11CT2550-2552) Although California trial judges "make no binding precedents," such decisions "are by no means ignored, when collected and readily available for

study," as by electronic means here, "they may be cited for their persuasive value, and are occasionally followed in the absence of controlling higher authority." (*Santa Ana Hospital Medical Center v Belsh* (1997) 56 Cal App 4th 819, 831) n5

> n5 Dissatisfied with Judge Styn's ruling, State Farm sought a writ of mandate from this Court, but the petition was "denied without prejudice to refiling after further proceedings in superior court, if appropriate" *(State Farm Mutual Automobile Insurance Co v Superior Court* (Sept. 7, 2007, D051367) [text available at http //appellatecases courtinfo.ca gov])

**(4) DOI Regulations and Administrative** [**57] **Interpretations**

Because the meaning of "premium" is central to insurance law and practice, it is unsurprising that the DOI has also addressed the question An administrative agency's interpretation of the "meaning and legal effect of a statute is entitled to consideration and respect by the courts " (*Yamaha Corp of America v State Bd of Equalization* (1998) 19 Cal 4th 1, 7 *(Yamaha),* see also *Spanish Speaking Citizens' Foundation, Inc v Low* (2000) 85 Cal App 4th 1179, 1214-1215) Appellate courts thus generally afford weight to the DOI's understanding of the Insurance Code. (See, e g, *State Comp Insurance Fund v Superior Court* (2001) 24 Cal 4th 930, 940, *Foundation for Taxpayer & Consumer Rights v Garamendi* (2005) 132 Cal.App.4th 1354, 1372-1373, *Krumme v Mercury Insurance Co* (2004) 123 Cal App 4th 924, 937, *Donabedian v Mercury Insurance Co* (2004) 116 Cal App 4th 968, 982-983, 990-991)

Recognizing as much, Farmers seeks to invoke, on a selective basis, what the DOI has said or done in the past as grounds to set aside the judgment [*34] here To the extent the DOI's interpretation [**58] of premium is relevant to this appeal, however, this is another factor dictating affirmance

In 1996, the DOI issued a regulation defining "premium" inclusively to mean the "final amount charged to an insured for insurance after applying all applicable rates, factors, modifiers, credits, debits, discounts, surcharges, fees charged by the insurer and all other items which change the amount the insurer charges to the insured." (Cal Code Regs, tit. 10, § 2360 0(c).) The DOI explained that this regulation "was promulgated to make certain that insurance companies charge policyholders the lowest available price for insurance coverage" (11CT2567) As this Court recognized recently, a "formal regulation" receives judicial respect. (*Auto Club, supra,* 148 Cal App 4th at p 1236) Indeed, our Supreme Court has emphasized that regulations "bind this and other courts as firmly as statutes themselves " (*Yamaha, supra,* 19 Cal.4th at p 7)

Consistent with the 1996 regulation, the DOI, accepting a referral under the primary jurisdiction doctrine, concluded last year that "installment fees are premium under §381, in the private passenger automobile context" (11CT2568) [**59] Farmers was heard in that proceeding In fact, Farmers was among the insurers enthusiastically requesting the DOI's insight on the premium issue. (11CT2556) Similar to this Court's analysis in *Auto Club,* the DOI distinguished between "flat-fee installment fees" (treated as premium by the agency) and "interest-based installment fees" (treated as premium or ancillary income, depending on the fee's purpose) (11CT2559.)

In any event, Troyk is aware that *Auto Club,* on the facts of that case, extended "little, if any, deference" to the 2006 DOI opinion (*Auto Club, supra,* 148 Cal App.4th at p 1237) Deference to that ruling is ultimately unnecessary to affirm As shown above, the trial court's finding of liability on this very different record - not involving a charge for the time value of money or even an installment payment plan - is amply supported by established [*35] breach of contract theory and the wealth of California authority defining premium

As a counterweight to the 1996 regulation and 2006 DOI opinion, Farmers now takes the strained position that the agency somehow endorsed Farmers' practices by not taking explicit affirmative steps previously to [**60] condemn

them. (FOB20-23.) The same "de facto law" argument, relying on "the DOI's purported historical enforcement practices," was advanced recently in *Auto Club* but made no headway. (*Auto Club, supra,* 148 Cal App.4th at p. 1237, fn 15) The theory fares no better in this appeal.

As Farmers admits, its "uncontroverted evidence" consists of the hired opinion of Milo Pearson, a former DOI administrator. (FOB20) Farmers seems to contend that for the DOI's understanding of premium, Pearson should control over all other sources. (See, e g., FOB21 [citing Pearson for what "DOI determined," supposedly, during this time there]) But the trial court was underwhelmed by Pearson, and rightly so According to his resume, he now provides "full service consulting to the insurance industry." (6CT1168.) Pearson's deposition revealed he had scant foundation for his partisan opinions He was merely a bureaucratic lieutenant charged with overseeing administration. Under questioning, he admitted he had no actuarial training and never had authority to set DOI policy. (13CT2980-2988) Farmers cites no relevant authority for the flawed notion that a former agency administrator, who never [**61] had authority to speak for the agency, trumps a DOI opinion issued through the official channels To the extent this Court is interested in what the DOI thinks about the Insurance Code issues here, the agency made this abundantly clear in its 2006 opinion. (11CT2563)

More fundamentally, Farmers has not shown that the DOI adjudicates the meaning of the Insurance Code when reviewing DOI rate applications A "rate" is the total aggregate premium an insurer is allowed to collect, bounded by a range of reasonableness, on a given line of insurance in a given period. [*36] In light of this focus, the technical rate-approval process is a procrustean bed for determining the proper scope of sections 381, 383 and 383 5 as applied to Farmers' conduct (See § 1861 05, *Calfarm, supra,* 48 Cal 3d at p 813, *20th Century Insurance Co v Garamendi* (1994) 8 Cal 4th 216, 242-246)

Moreover, Farmers is mistaken that prior DOI action or inaction excuses an insurer's compliance with a legislative command "Mere failure to enforce the obligation cannot be deemed to constitute such administrative action as would result in modifying, remitting or canceling the obligation, [**62] constructively or otherwise " (*Dept of Mental Hygiene v McGilvery* (1958) 50 Cal 2d 742, 752.) As the DOI emphasized in its 2006 opinion, the agency's "past practice, and parties' reliance on it, may or may not be instructive, but it cannot be determinative." (11CT2563)

### C. To the Extent Out-of-State Precedent Is Considered, the Analogous Case Law Supports Affirmance

Farmers cites a few decisions from other jurisdictions When not inapposite, this case law actually favors Troyk

Urging California to march in lockstep with Louisiana, Farmers points to *Blanchard v Allstate Insurance Co* (La Ct.App 2000) 774 So 2d 1002 *(Blanchard)* and a decision following it, *Cacamo v Liberty Mutual Fire Insurance Co* (La Ct App 2004) 885 So.2d 1248 Unlike here, those cases actually involved installment fees Moreover, *Blanchard* illustrates that even in Louisiana, the judicial view on the meaning of "premium" is not unanimous Three appellate judges agreed with the trial court and dissented As the dissent recognized, fees for installment payments "are consideration for the procurement of that insurance as they must be paid if an insured wishes [**63] to obtain a policy and pay in installments " (*Blanchard, supra,* 774 So 2d at p 1007 (dis opn of Fogg, J.))

The law of Louisiana, a state with a unique legal history, also differs in a critical respect There, "[w]hen the insurer defers a part of the premium [*37] payment, it has extended credit " (*State Farm Mutual Automobile Insurance v Ott* (La 1954) 71 So 2d 548, 550) In California, unless there is a statutory "'premium financing'" arrangement, a debtor-creditor relationship generally does not arise (See *Auto Club, supra,* 148 Cal App 4th at pp 1231, fn 8, 1234, fn 13) One appellate court has already held that Farmers' renewable monthly policies do not make the insurer a creditor or the insured a debtor (See *Crawford, supra,* 160 Cal App 3d 1164)

Farmers also cites *Sheldon v American States Preferred Insurance Co* (Wash Ct App 2004) 95 P 3d 391 *(Sheldon),* but this Court recently described that decision as "inapposite " (*Auto Club, supra,* 148 Cal App 4th at p 1232, fn 9) Citing *Allstate,* the *Sheldon* court recognized that under California law, surcharges on installment [**64] payment plans

2007 CA App. Ct. Briefs 49983, *37; 2007 CA App. Ct. Briefs LEXIS 9589, **64

(if Farmers actually offered such plans) are premium (*Sheldon, supra,* 95 P 3d at p 393, fn 10) Extensively cited by other state courts, *Allstate* has animated the law in this area (See, e g., *State Insurance Commissioner v Allstate Insurance Co* (Or. 1960) 351 P 2d 433, overruled on other grounds by *Parr v Department of Revenue* (Or 1976) 553 P 2d 1051; *Liberty Mutual Insurance Co v State Tax Com* (Mass 1974) 312 NE 2d 559)

The recent decision in *Nakashima v State Farm Mutual Automobile Insurance Co* (N M.Ct.App 2007) 153 P 3d 664 *(Nakashima)* also provides Farmers no assistance That case adopted a narrow "actuarial" definition of premium, as including only the "transfer of risk" but not administrative costs (*Id* at pp. 670-672) This definition is at odds with what California courts and the United States Supreme Court have long understood premium to encompass (See, e g, *Metropolitan Life, supra,* 32 Cal 3d at p 660; *Consumer Life, supra,* 430 U.S. at p 740, fn 20) Moreover, the New Mexico Court of Appeals merely held that premium under [**65]  New Mexico law did not include a fee "associated with the privilege of paying a premium in installments " (*Nakashima, supra,* 153 P 3d at p. 670) In the present case, [*38]  there are no installment payments and nothing is paid over time The "privilege" accorded Farmers policyholders is actually an obligation to pay for one month of coverage in advance, along with the arbitrary "service charge" Farmers tacks on through Prematic.

To the extent New Mexico authority is considered, more pertinent is a recent case that the New Mexico Court of Appeals (*Nakashima, supra,* 153 P 3d at pp 672-673) took pains to distinguish In *Nellis v Farmers Insurance Co of Ariz* (N M 2d Jud. Dist. Jan. 28, 2005, No CV-2003-02564) 2005 WL 5902441 *(Nellis),* the insured successfully challenged the same Farmers "service charge" on one-month policies Hence, in contrast to *Nakashima* and Farmers' other foreign precedents, *Nellis* is directly comparable As Farmers' counsel freely acknowledged, *Nellis* is "a mirror action to this case " (2RT43; see, e g, 10CT2128-2132, 2163-2164, 12CT2610-2625 [briefing and witness testimony from *Nellis* made part [**66]  of this record])

Granting summary judgment for the insured, the *Nellis* court agreed with the positions Troyk is asserting in this California action involving the same one-month policy Concluding that the "service charge" was premium, the court explained, among other things "Because Defendant could cancel Plaintiffs' insurance for failure to pay the service charge it would appear that the service charge is consideration for the insurance contract " (8CT1695) The same is true under California law (§ 661, subd (a)(1)) Moreover, the nature of the fee - the lack of any real installment payments - was not lost on the *Nellis* court

> [B]ecause their contract with Defendant is monthly, it is not clear why Plaintiffs are required to pay a service fee This court's understanding of the service fee concept is that the fee is imposed for the added cost to the insurer that occurs when an insured chooses to divide her annual payment into a number of smaller payments That is not the picture that the Endorsement paints It states that the 'policy period is. one Calendar month ' Therefore, by paying the premium due at the time it is due, for each month of insurance that they purchase,  [**67]  Plaintiffs  [*39]  have not taken advantage of (nor been offered) any so-called convenient pay plan.

(8CT1694, see also *Crawford, supra,* 160 Cal App 3d 1164 [similar observations about Farmers' monthly policies])

Thus, to the extent out-of-state authority is considered, the relevant authority, especially *Nellis,* supports affirmance. n6

n6 California courts rely on out-of-state trial court decisions where, as here, the opinion involves analogous circumstances and its reasoning is persuasive. (See, e g., *Lebrilla v Farmers Group, Inc* (2004) 119 Cal.App.4th 1070, 1077-1084 [invoking Pennsylvania trial court decision])

**D. The Arguments Against Liability Miss the Mark**

**1. Farmers Cannot Avoid the Insurance Code by Specifying the "Premium" Only in a Separate Document**

Backed by Farmers, Prematic's theme is that class members supposedly entered into "two bargains" - their insurance policy and "separate agreements with Prematic " (POB1) To be sure, [**68] Farmers forced the Prematic side "agreements" on the policyholders by telling them - Troyk's experience is illustrative - that this was necessary to obtain the "EasyPay" monthly policy In a "gotcha" argument, Farmers and Prematic now treat the existence of the side deal forced on insureds as dispositive of whether Farmers complied with the Insurance Code

The problem with this theory is that it has the tail (what contracts are claimed to exist) wagging the dog (what contracts the law allows) Even Farmers would acknowledge that an insurer cannot contract around the Insurance Code. If, as the trial court found, Farmers' "service charge" is "premium" as used in section 381, then Farmers was required to specify this charge in the "statement of the premium" that is part of every insurance policy More precisely, because this case involves auto insurance, section [*40] 383 5, in tandem with section 381, required Farmers to specify the charge not just anywhere in the policy, but on the declarations page.

In light of these stringent rules, an auto insurer runs afoul of the Insurance Code by specifying the premium *only* in a different document. The type of extraneous paper - whether [**69] a purportedly separate contract, the billing statement or the back of a napkin - is actually immaterial If the extraneous document is the only place the premium at issue is specified, the insurer has violated the Insurance Code

In this case, there is no dispute that the purportedly distinct Prematic agreements are the *only* place the service charge is specified Because Farmers has not complied with the Insurance Code, even if a separate contract with Prematic is assumed, it would be unenforceable. "Whenever a statute is made for the protection of the public a contract in violation of its provisions is void " (*Firpo v Murphy* (1925) 72 Cal App 249, 253; see also *Shortell v Evans-Ferguson Corp* (1929) 98 Cal App 650, 656) Indeed, a side agreement on the premium amount, outside the insurance policy, is not just void, but a misdemeanor (§ 383, subd (a).)

Seeking to overcome this conclusion, Prematic floats a few theories in its defense, but none is persuasive. Prematic seeks to invoke the state contract clause of the California Constitution. This argument, however, is not found in Prematic's papers in superior court (14CT3158, 3222) In any event, [**70] this theory is undermined by Prematic's concession that the state contract clause applies only to a "'valid contract.'" (POB25) As Prematic's cited authority observes, "the contract clause does not protect contracts that are prohibited by law or against public policy " (*White v Davis* (2003) 30 Cal 4th 528, 548, internal citations omitted)

Moreover, as a matter of timing, sections 381 and 383 5 were on the books long before Troyk and other class members paid the "service charges" challenged here Prematic overlooks that "[t]he contract clause prohibits only [*41] statutes impairing existing contracts " (*Oceanside Mobilehome Park Owners' Assn v City of Oceanside* (1984) 157 Cal App 3d 887, 908-909) The repeated assertion that Prematic's "separate agreements" with policyholders must be supreme calls to mind the bygone *Lochner* n7 era, when private contracts were temporarily thought to trump public welfare statutes Now, it is settled that contractual interpretation is guided by applicable laws, not the other way around (See, e g, *City of Torrance v Workers' Comp Appeals Bd* (1982) 32 Cal 3d 371, 378)

n7 *Lochner v New York* (1905) 198 U.S. 45.

[**71]

Farmers and Prematic also ignore principles of contract law undermining the notion that a separate contract, on any issue related to the policy, could even exist As is common, the standard-form policy written by Farmers contains an

2007 CA App. Ct. Briefs 49983, *41; 2007 CA App. Ct. Briefs LEXIS 9589, **71

integration clause expressly disavowing the existence of separate agreements. (4CT809) Extrinsic documents, such as the asserted Prematic agreements, cannot be used to contradict the terms of an integrated writing (See, e g, *In re Estate of Gaines* (1940) 15 Cal 2d 255, 264-265) In addition, Farmers drafted the policy to admonish" "No other change or waiver may be made in this policy except by endorsement, new Declarations or new policy issued by us " (4CT809.) Farmers and Prematic do not contend that the supposedly separate Prematic agreements hewed to any of these methods for changing the policy terms, including the premium specified for a month of coverage

### 2. The Class Did Not Somehow Ratify Farmers' Unlawful Conduct

Farmers and Prematic try to transform this appeal into a trial of what Troyk supposedly understood when he converted his insurance contract into the monthly policy and made payments on it Farmers repeatedly argues [**72] that [*42] Troyk and other class members "voluntarily agreed" to pay the "service charge," so there should be no liability (See, e g, FOB 1, 36)

This extensive effort to point the finger at the policyholders is misguided Paying the charge does not equate with knowing it is being unlawfully collected "Based on representations from Farmers," Troyk averred, "I believed that I had to pay the service charge in order to obtain the month-to-month automobile insurance coverage" (9CT2041) As he elaborated "I did not know that it was improper for Farmers to charge me more than the amount specified in the Declarations pages when I renewed my policy each time prior to the October 14, 2004 to April 14, 2005 policy period " (4CT775) Contrary to Farmers' suggestions, Troyk did not sleep on his rights "Within a few months of learning that it was improper for Farmers to charge more than the amount specified in the Declarations of the policy," Troyk explained, "I filed this suit " (4CT775)

Hence, Farmers is mistaken that Troyk "optionally paid" and "optionally incurred" the fees (FOB32, 35, 36) He paid them by command from the insurer to obtain, and then keep, the renewable one-month policy [**73]

Farmers admits, moreover, that Troyk's economic circumstances compelled him to convert his six-month policy into a one-month policy Like many California drivers, for Troyk, the monthly policy "'was definitely about budgeting '" (FOB 10, quoting his deposition) "I paid my insurance premium monthly because it was easier on my budget to pay in one-month terms than the entire six months at one time" (4CT775.) Whatever his reasons, he emphasized that "I have never intended to waive any of my rights in connection with this lawsuit, have not knowingly done so and do not intend to do so I also do not consent to Farmers charging me a fee that it should not charge" (4CT776)

Although Farmers ignores these parts of the record, the trial court did not As noted in the summary judgment order. "It is undisputed that plaintiff [*43] was not aware the 'service charges' were illegal until just before he filed this lawsuit" (13CT3008) The court further wrote. "The fact that [Troyk] continued to prosecute this lawsuit and pay the 'service fees' in order to maintain his automobile insurance does not show he intended to relinquish his rights or that defendants have relied to their injury." (13CT3008) [**74]

This conclusion is sound The so-called "voluntary payment" doctrine does not apply to the circumstances here. "[I]t is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable " (*American Oil Service v Hope Oil Co* (1961) 194 Cal App 2d 581, 586, citing Restatement, Restitution, § 20, p 92) To the extent Farmers urges a caveat emptor approach to the Insurance Code and the UCL, this gets things backwards "'There is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business.'" (*Lavie, supra*, 105 Cal App 4th at p 509) Indeed, when purchasing auto insurance, most drivers have scant, if any, understanding of the legal ground rules governing the transaction Drivers, like consumers generally, are not experts on the scope of laws enacted to protect them As the trial court aptly told Farmers' counsel below, "you can't expect the average person" to think "'I better look up some cases on premiums and see whether this is okay or not '" (1RT3.)

Noting the significant expense of auto insurance today, the trial court was also correct that "a lot [**75] of people can't afford to pay the whole thing" - a single payment for six months of coverage - "so they're kind of between a rock

2007 CA App. Ct. Briefs 49983, *43; 2007 CA App. Ct. Briefs LEXIS 9589, **75

and a hard place " (1RT4) For basic economic reasons, approximately half of Farmers auto insurance policyholders enter into the renewable monthly policy (1RT8) Again, at issue here is liability coverage mandated by law for a practical necessity of life, the automobile Nearly all adults must drive and, therefore, must obtain this insurance, irrespective of ability to pay Although Farmers portrays its monthly policies as a "privilege" for consumers (FOB 1), without these policies, Farmers would not be competitive in the lucrative  [*44]  market for auto insurance As in another case, "[o]ne could reasonably assume that had" Farmers "never offered the [monthly] plan along with its service fee, the number of individuals for whom they write coverage would have been significantly reduced" (*Interinsurance Exchange, supra,* 156 Cal App 3d at p 614) Like other household names in the insurance business, Farmers has benefited to the tune of "astronomical" revenues, but, as discussed, in violation of the Insurance Code and the policy language.  [**76]  *(Ibid)*

### 3. Farmers' "Incorporation by Reference" and "Substantial Compliance" Theories Fall Short

As a fallback position, Farmers argues that despite the bright-line strictures of sections 381 and 383 5, the purportedly separate Prematic "agreement" was incorporated by reference into Troyk's insurance policy. This theory is hopelessly flawed, both factually and legally.

First, as a factual matter, the argument rests on a single word appearing on the declarations page - "PREMATIC." (4CT817) Of greater interest, there is a line for "Fees," left blank (4CT817) If anything, a reasonable consumer would understand this to mean, consistent with the Insurance Code, that the declarations page is telling all, not omitting a "service charge" tacked on separately

In *Nellis,* the court rejected out of hand the same contention from Farmers There, as here, Farmers asserted that "the fees are incorporated into the policy and that, consequently, the assessment of such fees is not a breach of contract " (8CT1691-1692) "This Court has read the Declarations page and like Plaintiffs, fails to read a service fee into the language on that page or, for that matter, any other page that is part [**77]  of the policy " (8CT1692) A similarly blank "fees" line, "from Plaintiffs' perspective, and this Court's as well, means there are no fees associated with this policy " (8CT1693) There, as here, Farmers contended that "both the 'fee' line and the reference to 'Prematic' 'exist on the Declarations page in the monthly context to "remind"  [*45]  the customer that he/she has chosen the monthly billing method and to refer to those documents for the "total" amounts payable '" (8CT1693.) The *Nellis* court was unimpressed "This is a little too subtle a 'reminder' for this Court and, presumably, most customers " (8CT1693)

As a legal matter, Farmers does not cite a single case in which incorporation by reference was applied to alleviate the uniquely rigorous mandates of sections 381 (all insurance policies must specify the premium) and section 383 5 (for auto insurance policies, the premium must appear on the declarations page). Even if these statutes allowed such incorporation - their nature precludes it - "'the reference must be clear and unequivocal '" (*Shaw v Regents of Univ of Cal* (1997) 58 Cal App 4th 44, 54) Here it is not And, even if this were a close call,  [**78]  "[i]t is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer." (*Continental Casualty Co v Phoenix Construction Co* (1956) 46 Cal 2d 423, 437)

As a corollary to incorporation by reference, Farmers argues that it substantially complied with sections 381 and 383 5 The trial court soundly rejected this argument (13CT3005-3006) As the court noted, Farmers thought so little of this theory that it was not pled as an affirmative defense in the answer (3CT425) Then, in the briefing below, Farmers did not raise the theory until its surreply on summary judgment, when Troyk could not respond (12CT2825)

In any event, Farmers' generous view of "substantial compliance" obliterates the legislative bright lines As with incorporation by reference, Farmers does not cite a single case where this doctrine excused liability under sections 381 and section 383 5, both on the books since the 1940s The absence of authority is unsurprising Because these statutes speak in mandatory terms on an issue central to the relationship between insurer and insured - where the cost for the policy is specified - substantial compliance [**79]   [*46]  does not suffice "A mandatory section is one that is essential to the promotion of the overall statutory design and thus does not permit substantial compliance" (*Robertson v Health*

*Net of California, Inc* (2005) 132 Cal App 4th 1419, 1430 *(Robertson).)*

The closest case to the issue holds that these statutes, in fact, demand strict compliance In *Allstate Insurance Co v Dean* (1969) 269 Cal App.2d 1 *(Dean),* plaintiff Mrs Dean sought automobile insurance from Allstate. As a condition for coverage, the insurer required Mrs Dean to agree to a "Driver Exclusion Agreement," which excluded coverage through a policy endorsement when her husband drove The exclusion agreement recited the policy endorsement verbatim Mrs Dean signed the agreement and returned it to Allstate Upon receiving the agreement, Allstate mailed Mrs Dean the policy, but did not include the endorsement While the policy was in force, Mr. Dean, as fate would have it, was involved in an accident and a claim resulted *(Id.* at pp 2-3) Just like Farmers in the present case, Allstate contended that Mrs Dean assented to the arrangement *(Id* at p 5) [**80]

The appellate court rejected this argument, as Allstate failed to comply with the same Insurance Code provisions at issue here "Section 381 requires every policy to specify the risks insured against Section 383 5 declares that its purpose is to prevent fraud or mistake in connection with insurance of motor vehicles and requires every contract of motor vehicle insurance to be embodied in a document to be delivered to the owner, which document it defines as a policy of insurance conforming to section 381 " *(Dean, supra,* 269 Cal App 2d at p 4) "Patently, these provisions of the Insurance Code were not followed in this case, a failure for which the insurer must bear responsibility " *(Ibid.)* The same is true in Troyk's case.

Other decisions illustrate that a party cannot simultaneously violate, and comply with, a law marking such precise boundaries In *Alan v American Honda Motor Co* (2007) 40 Cal.4th 894, the Supreme Court recently rejected [*47] a "substantial compliance" approach to rule 8.104(a)(1) of the California Rules of Court, governing the time for filing notices of appeal Although some might view the rule's [**81] "notice of entry" strictures as "'hypertechnical,'" the high court held that the rule "requires a single, self-sufficient document satisfying all the rule's conditions " *(Id* at pp 903, 905.) "[T]he rule does not require litigants to glean the required information from multiple documents or to guess, at their peril, whether such documents in combination trigger the duty to file a notice of appeal." *(Id* at p 905) Despite the different context there, the same logic applies to the Insurance Code sections in this case When the Legislature decided to require auto insurers to "specify" the "premium" on the declarations page of all auto insurance policies - without exception for service fees or other costs - it is difficult to imagine how the enacting body could have spoken more precisely (§§ 381, 383 5)

Similarly, in *Malek v Blue Cross of Cal* (2004) 121 Cal App 4th 44 *(Malek),* insurer Blue Cross failed to comply with Health and Safety Code section 1363 1 That statute requires any arbitration clause to be placed in a specific location on the health insurance enrollment form. *(Id* at p. 60-61) [**82] Although Blue Cross's one-page enrollment form contained the arbitration clause, it was in the wrong place on the form *(Id.* at pp 50-51) The Maleks were repeatedly advised of the arbitration requirement through other documents *(Id* at p. 52) Similar to Farmers' argument here, Blue Cross contended it substantially complied with the statutory mandate because the arbitration clause was included on the one-page form, but not in the right spot Just as Farmers says this case involves a "mere technical violation" (FOB31), Blue Cross asserted that its misconduct was "technical and inconsequential." *(Malek, supra,* 121 Cal App 4th at p 72) The appellate court rejected the insurer's position It reasoned that Health and Safety Code section 1363 1 is a disclosure statute with which compliance is "mandatory " *(Ibid.)*

[*48] Troyk's case is a fortiori compared to *Malek* There, the insurer made the required disclosure in the required document but in the wrong place on the page Here, Farmers did not make the required disclosure in the required document at all, but in an entirely different document prepared by [**83] another entity

Even if "substantial compliance" with sections 381 and 383 5 could suffice, Farmers has not established it in this case "[T]he doctrine excuses literal noncompliance only when there has been 'actual compliance in respect to the substance essential to every reasonable objective of the statute '" *(Robertson, supra,* 132 Cal App.4th at p 1430) Section 383 5's express purpose is "to prevent fraud or mistake in connection with insurance of motor vehicles " *(Dean, supra,* 269 Cal App 2d at p 4) Here, Troyk's declarations page implied, through a blank line on the page, that there would be no

"fees" - which of course was false (4CT817) Hence, for multiple reasons, Farmers' belated "substantial compliance" theory must fail

If adopted, Farmers' loose approach to compliance would transform sections 381 and 383 5 into an empty promise for consumers Auto insurers could carve out part of the premium, slap a different label on this amount (here, "service charge") and then simply mention the cost somewhere in other documents given to the insured The extraneous documentation might be attached to the policy or not, at the insurer's apparently unfettered [**84] discretion on what it means to make the documents "'readily available '" (FOB29) Balkanizing cost information in this manner injects complexity and uncertainty on what the policy costs This is the question of ultimate interest to drivers purchasing mandatory liability coverage Taking heed of the insurer's dominant position in such transactions, sections 381 and 383 5 firmly place the burden on the insurer, not the public, to connect the dots by spelling out the premium for auto insurance on the declarations page

[*49] Calling its practices "irrefutably ***pro-consumer***" (FOB43-44), Farmers believes it knows best and urges a different set of rules. The Legislature spoke long ago, however, and the statutory guidelines are clear, not murky Farmers' bold request to "'soften the consequences'" of the Insurance Code should be taken up in Sacramento, not this Court (FOB31)

**4. Relief to Farmers' Policyholders Here Is Consistent with the Rest of the Insurance Code**

In a cursory discussion, Farmers argues that the judgment for the class "creates an improper conflict with several other provisions in the Insurance Code " (FOB24) Just as briefly, Troyk explains why not

Farmers [**85] does not dispute, as the DOI observed, that "the term 'premium' has several different (and sometimes conflicting) meanings depending upon the context in which it is used " (11CT2556) Hence, for example, section 1861.02 concerns "premium" for purposes of the DOI rate-approval process under Proposition 103. This context fundamentally differs from the "consumer protection" function served by the central statute at issue here, section 381. (*Auto Club, supra,* 148 Cal App 4th at p 1226) Farmers' asserted inconsistencies (most of which are not even clearly explained) are contrived, not genuine

Farmers also cites section 480, which provides. "An insurer is entitled to payment of the premium as soon as the subject matter insured is exposed to the peril insured against." In other words, the insurer may (but is not compelled to) demand payment of the entire premium up front As explained, Farmers does precisely this with its one-month policies Farmers takes full advantage of section 480 by compelling a lump-sum payment for the policy term before providing coverage Farmers evidently believes it issues six-month policies, but this ignores the endorsement converting the policy into [**86] renewable one-month terms The endorsement is a legally significant act altering the policy provisions, not a nicety Seeking to avoid the legal [*50] implications of entering into a financing arrangement with its insureds, Farmers so argued, successfully, in a prior appeal that is now precedential (See *Crawford, supra,* 160 Cal App 3d 1164)

**5. The Rule of Lenity Is No Basis for Reversal**

According to Farmers, "premium" in section 381 must be construed favorably to insurers because the statute "may engender criminal liability " (FOB23) Farmers acknowledges, however, that the rule of lenity requires a competing reasonable interpretation of the disputed language As shown above, every relevant source of authority, including *Auto Club,* dictates the conclusion that Farmers' service charge is "premium " There is no competing reasonable interpretation

Contrary to Farmers' assumption, a linguistic ambiguity does not exist merely because there is "[d]isagreement concerning the meaning of a phrase," or because "a word or phrase isolated from its context is susceptible of more than one meaning." (*County of San Diego v Ace Property & Casualty Insurance Co* (2005) 37 Cal 4th 406, 415, [**87] internal quotation marks omitted) The Supreme Court instructs that "although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent" (*People v Avery* (2002) 27 Cal 4th 49, 58)

Here, there is a contrary purpose and design Just as the DOI concluded (11CT2565-2568), this Court described section 381 not as a dry regulatory provision serving insurers, but a "consumer protection statute " (*Auto Club, supra,* 148 Cal.App 4th at p 1226) "In fact California's consumer protection laws are among the strongest in the country." (*Wershba v Apple Computer, Inc* (2001) 91 Cal App 4th 224, 242; see also *Vasquez v Superior Court* (1971) 4 Cal 3d 800, 807-808) California's robust policy of consumer protection, manifested in both the Insurance Code and the UCL, would be undermined by a dubious interpretation of premium that runs contrary to every  [*51]  pertinent source of authority By invoking the rule of lenity as a liability shield, the Exchange seeks to stretch the rule beyond its carefully [**88]  drawn boundaries

### E. The Trial Court Did Not Abuse Its Discretion by Awarding Relief to the Class

Farmers reserves its most charged prose for the judgment's monetary component. The award of restitution and breach of contract damages is called, among other pejorative adjectives, "arbitrary," "irrational" and "grossly excessive " (FOB5.) This bluster must yield to the applicable law confirming that the award is fully within the pale.

#### 1. Proposition 64 Did Not Alter the Standard of Review or the UCL Remedies Available

Farmers goes awry from the outset by disregarding the deference accorded trial courts on questions of remedy and relief "In every appeal, the threshold matter to be determined is the proper standard of review - the prism through which we view the issues presented to us " (*Lazar v Hertz Corp* (1999) 69 Cal App 4th 1494, 1500, citing *Clothesrigger, Inc v GTE Corp* (1987) 191 Cal App 3d 605, 611) Here, the Supreme Court instructs that Business and Professions Code section 17203, the UCL's formidable remedial provision, is "a grant of broad equitable power " (*Cortez v Purolator Air Filtration Products Co* (2000) 23 Cal 4th 163, 180 [**89]  *(Cortez))* This statute "allows trial courts great latitude in protecting the public and making the victims of unfair competition whole" (*Brockey v Moore* (2003) 107 Cal.App 4th 86, 102) Consequently, "the trial court's discretion to award restitution under the UCL is very broad" (*People ex rel Kennedy v Beaumont Investment, Ltd* (2003) 111 Cal App 4th 102, 135, accord, *Consumers Union of US, Inc v Alta-Dena Certified Dairy* (1992) 4 Cal.App 4th 963, 972)

None of this changed with Proposition 64. The initiative did not "eliminate any right to recover. Now, as before, no one may recover damages  [*52]  under the UCL [citation], and now, as before, a private person may recover restitution only of those profits that the defendant has unfairly obtained from such person or in which such person has an ownership interest [citation]" (*Mervyn's, supra,* 39 Cal 4th at p 232) More narrowly, Proposition 64 eliminated the UCL's previously "broad grant of standing" allowing unaffected persons to initiate private enforcement actions (*Id* at p 228)

#### 2. UCL Restitution

The substantive analysis on restitution [**90]  begins, and could easily end, with the relevant statutory text. In a UCL action in which liability is established, "[t]he court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus & Prof Code, § 17203.) The trial court did not hesitate to award restitution of the unlawfully collected "service charges" because a straightforward application of the statute to the facts compelled this result, or at least allowed it within the court's vast discretion The court "restored" to the "person[s] in interest" the "money or property" that "may have been acquired" - in fact, was actually acquired - "by means of" Farmers' acts of "unfair competition " *(Ibid)*

Far from inflicting "crippling liability" on one of the country's largest insurance companies (FOB3 1), the judgment merely returns to policyholders what Farmers reaped from its unlawful conduct The class seeks no windfall. There is [**91]  no request to return the premiums paid for the one-month policies, just the illegally collected "service charges "

Indeed, this appeal strains to contrive grounds to undermine the discretionary decision to award restitution Farmers

argues that the restitution order is flawed because Prematic, not FIE or FGI, interfaced with the policyholders to collect the disputed charges. This contention reprises the [*53] untenable stance, contradicted by the record, that Prematic, a wholly owned subsidiary and self-described collection arm, somehow acts independently in carrying out the collection In fact, the undisputed evidence is that FGI performs virtually all the functions purportedly delegated to Prematic, and that the service charge revenue is then admittedly paid over to FGI in the form of "fees" and "reimbursements" for the services it renders for Prematic. (See § II A, *ante*, POB23, 7CT1603) At a minimum, Prematic is part and parcel of the Farmers group of companies from whom the unlawfully collected amounts are being returned.

The trial court was correct that "[w]hat the agent receives, in legal effect the insurer receives" (13CT3008, citing *Interinsurance Exchange, supra,* 156 Cal App 3d at p 613, [**92] accord, *Groves, supra,* 40 Cal 2d at p 761, see also *Metropolitan Life, supra,* 32 Cal 3d at pp 658-660.) Of course, "a mere bookkeeping method cannot thwart the law " (*Groves, supra,* 40 Cal 2d at p 760) Both factually and legally, the court had it right that "FIE, FGI and Prematic are operating as a single enterprise to transact the business of insurance." (13CT3008) As observed in another case challenging FGI's practices, "'it would be unjust to permit those who control companies to treat them as a single or a unitary enterprise and then assert their . separateness in order to commit frauds and other misdeeds with impunity '" (*Tran, supra,* 104 Cal App 4th at p 1219)

Consistent with these formidable principles of insurance law, Farmers' systematic use of its own corporate pawn to collect the charges from consumers is no basis for avoiding the "cleansing power" of UCL restitution. (*Fletcher, supra,* 23 Cal 3d at p 449) The Supreme Court has not "condition[ed] the recovery of restitution on the plaintiff having made direct payments to a defendant who is alleged to have engaged in unlawful practices [**93] under the UCL" (*Sherster v Superior Court* (2007) 154 Cal App 4th 1491, 1494) Rather, "[t]he only requirements the UCL [*54] impose[s] on such recovery are that the plaintiff must be a 'person in interest' (that is, the plaintiff must have had an ownership interest in the money or property sought to be recovered), and the defendant must have acquired the plaintiff's money or property" through unfair competition (*Ibid*) Farmers' effort to use Prematic to thwart restitution "is contrary to the plain language of the UCL and the Supreme Court's mandate that the UCL be interpreted broadly." (*Id* at p 1500.) Even if restitution were not ordered here, a host of non-restitutionary relief options, such as disgorgement of the ill-gotten gains, would be available because there is a certified class (See generally *Kraus v Trinity Management Services, Inc* (2000) 23 Cal 4th 116 *(Kraus))*

On the equities, Farmers and Prematic suggest the seasoned trial judge failed to weigh them, but this is false. The court did - in its summary judgment order and, once more, when denying the motions to vacate Fully steeped in the record after years [**94] of briefing and hearings, the court simply found Farmers' side of the scale wanting. (13CT3003-3009; 14CT3252-3253) Farmers and Prematic impermissibly ask this Court to "'substitute its opinion and thereby divest the trial court of its discretionary power'" (*Denham v Superior Court* (1970) 2 Cal 3d 557, 566, see also *Shamblin v Brattain* (1988) 44 Cal 3d 474, 478-479.)

Indeed, Farmers and Prematic do not identify anything to call the trial court's exercise of discretion into question The court below recognized that "equitable considerations normally should not lead a trial court to reduce or eliminate a UCL restorative order when it is established that the defendant committed an unlawful practice, but the defendant claims that its violation was unintentional or committed in a good faith belief the action was lawful" (*Cortez, supra,* 23 Cal.4th at p 182 (conc. opn of Werdergar, J)) "Rather, in general, as between a person who is enriched as the result of his or her violation of the law, and a person intended to be protected by the law who is [*55] harmed by its violation, for the violator to retain the benefit would be unjust" [**95] *(Ibid)*

These principles have, if anything, special force in the present context In contrast to some of Farmers' cited authorities, this case does not involve two large commercial entities that entered into a contract. Far from arms-length bargaining, the insurer-insured relationship is "often characterized by unequal bargaining power in which the insured must depend on the good faith and performance of the insurer " (*Vu v Prudential Property & Casualty Insurance Co* (2001) 26 Cal 4th 1142, 1151, citations omitted) As such, violation of sections 381 and 383 5 is, again, "a failure for which the insurer must bear responsibility " (*Dean, supra,* 269 Cal App 2d at p 4)

2007 CA App. Ct. Briefs 49983, *55; 2007 CA App. Ct. Briefs LEXIS 9589, **95

Next, Farmers faults the trial court for fail[ing] to offset the value of the services received by Troyk and the class " (FOB44) The premise for this argument is that class members "'received exactly what they paid for'" and "received the full benefit of their bargain " (FOB45, 50, emphasis deleted) These assertions disregard that policyholders contracted with Farmers and paid for a one-month policy at a specified premium What they "received" from Prematic was a Farmers-driven demand, [**96] without any contractual consideration, to pay the added "service charge" to obtain what was already agreed - auto insurance for one month Farmers admits that it presented no evidence to support any type of "offset " (FOB45.)

Under settled Supreme Court precedent, moreover, UCL restitution is not calculated in this manner. In effectuating Business and Professions Code section 17203, the Supreme Court has consistently defined restitution by reference to the funds wrongfully obtained by the defendant, not any "gains" by the plaintiff "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest " (*Korea Supply, supra,* 29 Cal 4th at p 1149; accord, *Cortez, supra,* 23 Cal 4th at p. 177; *Kraus, supra,* 23 Cal.4th at pp 126-127.) Farmers surely [*56] understands that the intermediate courts "are bound . by our own Supreme Court's broad interpretation of California's UCL" (*Roskind v Morgan Stanley Dean Witter Co* (2000) 80 Cal App 4th 345, 356, fn 8.)

Farmers contends that even if it violated the law, there was no harm [**97] justifying restitution To the contrary, through the statutes it enacted, the Legislature attached great significance to whether the premium for auto insurance is specified on, to use Farmer's cynical phrase, "the wrong piece of paper." (FOB41) For decades in California, specifying the premium on the right document has been of such paramount importance that an insurer's failure to do so triggers criminal penalties "It is a misdemeanor" for "any insurer, or any agent of any insurer, to issue a policy in violation of the requirements of subdivision (f) of section 381 " (§ 383, subd (a)) Especially under these circumstances, it would be remarkable to immunize the wrongdoer by allowing no relief to the group the statute was meant to protect (See *Malek, supra,* 121 Cal.App 4th at p 69 [noting "[1]t would be absurd to impose an administrative penalty" for statutory violation but then allow no relief in court])

Cognizant of this legal backdrop, the trial court succinctly dispensed with Farmers' contention that there was no harm warranting restitution As stated in the summary judgment order "Plaintiff and other class members were required to enter into a contract to pay [**98] these 'service charges' when by law they were only required to pay the amount of premium specified on their policies " (13CT3005) The restitution award flows unremarkably from this finding of liability The trial court was faithful to the principle that "[f]or every wrong there is a remedy." (Civ Code, § 3523) Although Farmers floats abstract criticisms, the insurer does not offer a legally viable method for awarding some amount less than what was awarded (except, of course, zero)

Because California's UCL doctrine provides no basis for reversal, Farmers predictably invokes the United States Supreme Court's recent limits [*57] on punitive damage awards and related constitutional doctrine Punitive damages were not awarded in this case The trial court ordered Farmers to return to policyholders the amounts unlawfully collected from each class member - not a penny more except prejudgment interest unchallenged in this appeal (13CT3006)

California courts, at any rate, do not undertake a punitive damages-type review of UCL remedies. For example, in *Fremont, supra,* 104 Cal App 4th 508, the Second District rejected arguments from an insurer that [**99] parallel Farmers' theories for avoiding restitution The insurer in *Fremont* claimed that a UCL civil penalty violated "federal due process" because it was "grossly excessive in relation to the state's interest in protecting its consumers " (*Id* at p. 520) The insurer's attempt to invoke the federal limits on punitive damage awards, however, was "misplaced " (*Ibid,* see also *id* at pp 526-527, 533) Calling the insurer's other contentions "without merit," the appellate court declined to reduce the monetary relief based on the insurer's assertions that the product in question "'provided real value'" and that consumers "'received additional advice from a source other than the agent'" who misled them (*Id* at p 527) Nor was the panel persuaded by the argument that restitution was an abuse of discretion because the premium charged in that case "may be considered lawful in itself" (*Id* at p 532, emphasis deleted) The problem remained that "the sale of the policy [was] in violation of the UCL " (*Ibid*)

2007 CA App. Ct. Briefs 49983, *57; 2007 CA App. Ct. Briefs LEXIS 9589, **99

Farmers' contention that the judgment is "arbitrary and capricious" is grounded on the false premise that a "newly [**100] minted" interpretation of premium animated the result (FOB49) California's lengthy history of treating installment charges as premium belies this claim of surprise. Although Farmers assumes that a monetarily large judgment must be suspect, the size of the restitution award simply reflects Farmers' gargantuan proceeds What Farmers dismisses as a "small service charge" (FOB3) netted over $ 115 million during the five-year class period (4CT695), or an average of $ 23 [*58] million annually from California and Nevada drivers holding the monthly policies This was actually stipulated by the parties (13CT3054)

Farmers essentially urges that the UCL be selectively applied in an unprincipled manner that would strip the statute of its force in protecting consumers The UCL's central objective has always been "to foreclose retention by the violator of its ill-gotten gains " (*Fletcher, supra*, 23 Cal 3d at p 449.) As the Supreme Court reiterated in another leading precedent, "to permit the [retention of even] a portion of the illicit profits, would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One [**101] requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom." (*Bank of the West, supra*, 2 Cal 4th at p 1267, internal quotation marks omitted) Failure to return a big sum of money wrongfully taken from the public, just because the amount is collectively large, "would encourage corporations to commit grand acts of fraud instead of small ones " (*In re Consolidated Memorex Securities Cases* (N D Cal 1973)61 F R D 88, 101.)

For all these reasons, Farmers fails to demonstrate any abuse of the trial court's "very broad" discretion to fashion appropriate UCL remedies (*Cortez, supra*, 23 Cal 4th at p. 180) Indeed, both Farmers and Prematic overlook that a "judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness " (*In re Marriage of Arceneaux* (1990) 51 Cal 3d 1130, 1133)

Prematic argues that the trial court's denial of its motion to intervene has somehow injuriously affected its rights vis-a-vis the restitution award (POB26-28) However, to borrow from a [**102] case on point, Prematic "was entitled to and should have filed a direct appeal from the court's order denying intervention " (*Bame v City of Del Mar* (2001) 86 Cal App 4th 1346, 1363) "[H]aving failed to do so," Prematic now "is prevented from challenging the [*59] propriety of that order " (*Ibid)* On appeal from a final judgment, an appellate court cannot "review any decision or order from which an appeal might have been taken " (Code Civ Proc, § 906) Thus, wholly apart from Troyk's motion to dismiss Prematic's appeal, Prematic's contentions related to the denial of intervention come too late and should be disregarded

### 3. Damages for Breach of Contract

Alternatively, and providing an independent basis to affirm the monetary award, the trial court also framed its order as damages for Farmers' systematic breach of contract When determining such damages, the goal "'is to put the injured party in as good a position as he would have had if performance had been rendered as promised '" (*Ajaxo, Inc v E*Trade Group, Inc* (2005) 135 Cal App 4th 21, 55-56) Had Farmers performed as promised, class members would have [**103] been covered at the premium specified on the declarations pages of their policies, without having to pay more. Putting class members where they would, and should, have been dictates that the unlawfully collected "service charges" be returned This is all the court below did (13CT3008, 14CT3252)

### F. At a Minimum, Summary Judgment for Farmers Is Inappropriate

This Court has recognized "'Summary judgment is a drastic measure that deprives the losing party of a trial on the merits. It should therefore be used with caution, so that it does not become a substitute for trial The affidavits of the moving party should be strictly construed, and those of the opponent liberally construed Any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion '" (*Cortez v Vogt* (1997) 52 Cal App 4th 917, 925-926, citations omitted, see also *Brantley v Pisaro* (1996) 42 Cal App.4th 1591, 1607.)

Here, even if Troyk somehow was not entitled to summary judgment on his motion, it does not follow that

2007 CA App. Ct. Briefs 49983, *59; 2007 CA App. Ct. Briefs LEXIS 9589, **103

summary judgment should be ordered for  [*60]  the insurer Troyk's action is broader than the issues and contentions [**104]  Farmers raised on summary judgment Farmers thus did not establish it was entitled to summary judgment on all causes of action Troyk asserted

Farmers purported to seek summary judgment on the entire case (6CT1366-1367) Although all doubts go to Troyk, even if read most generously to the party seeking summary judgment, Farmers argued only Troyk's cause of action for breach of contract and the UCL's unlawful prong. (6CT1339-1365) Farmers' summary judgment motion did not discuss the UCL's fraudulent and unfair prongs at all In fact, Farmers did not even cite Business and Professions Code section 17200 Farmers' only specific argument as to the UCL related to remedies (supposed unavailability of one UCL remedy, restitution) (6CT1364-1365) There was no effort to defeat all three prongs of Troyk's UCL claim - even through Troyk pleaded all three prongs in his complaint and the trial court had previously overruled Farmers' demurrer (1CT110, 3CT422-424)

As shown above, the fraudulent and unfair prongs are assessed independently from breach of contract and the UCL's unlawful prong Farmers' business practices can be (in fact, Troyk proved they are) fraudulent and [**105]  unfair even if not a breach of contract or a violation of sections 381 and 383 5 Among other things, Farmers affirmatively misled Troyk and other class members by representing on the declarations page of their insurance policies that there would be no "Fees," when this was false (See *ante* at § IV.B 1)

In any event, in light of Farmers' motion below - seeking a summary resolution only on breach of contract and the UCL's unlawful prong - it would be improper for this Court to order, as Farmers now requests, summary judgment for the insurer on the entire case For a defendant to succeed on summary judgment, it must define all theories of liability reflected in the complaint and challenge each theory of liability (Code Civ Proc, § 437c,  [*61]  subd. (p)(2), see also *Lopez v Superior Court* (1996) 45 Cal App 4th 705, 713-714) This Farmers did not do Accordingly, to the extent Troyk's own summary judgment motion was not properly granted, the proper disposition on this record is to remand for further proceedings

## V. CONCLUSION

On behalf of the large class of Farmers policyholders he represents, Troyk respectfully asks this Court [**106]  to affirm For the reasons elaborated in Troyk's separate motion to dismiss filed concurrently, Prematic's appeal should be dismissed for lack of appellate standing

DATED November 26, 2007

Respectfully submitted,

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
TIMOTHY G BLOOD
PAMELA M PARKER
KEVIN K GREEN
LESLIE E HURST

/s/ [Signature]
KEVIN K GREEN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone 619/231-1058
619/231-7423 (fax)

2007 CA App. Ct. Briefs 49983, *61; 2007 CA App. Ct. Briefs LEXIS 9589, **106

Attorneys for Plaintiff/Respondent

CERTIFICATE OF INTERESTED ENTITIES OR PERSONS (Cal. Rules of Court, rules 14 5, 56(i), 57(c), 58(c) & 59(d))

Use this form for the initial certificate when you file your first document in the Court of Appeal in civil appeals and writs, and for supplemental certificates when you learn of changed or additional information that must be disclosed Also include a copy of the certificate in your principal brief after the cover and before the tables If no entity or person is known that must be listed under rule 14 5(d), write "NONE".

(Check One) INITIAL CERTIFICATE [checkmark]     SUPPLEMENTAL CERTIFICATE [ ]

| Full Name of Interested Person / Entity | Party | Non-Party | Nature of Interest |
|---|---|---|---|
| | (Check One) | | (Explain) |
| Thomas E Troyk | [X] | [ ] | Plaintiff/ Respondent |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |

[**107]

The undersigned certifies that the above listed persons or entities (corporations, partnerships, firms or any other association, but not including government entities or their agencies), have either (i) an ownership interest of 10 percent of more in the party if an entity; or (ii) a financial or other Interest in the outcome of the proceeding that the justices should consider In determining whether to disqualify themselves, as defined in rule 14.5(d)(2).

Attorney Submitting Form

Kevin K Green
(Name)
Coughlin Stoia Geller Rudman & Robbins LLP
(Address) 655 West Broadway, Suite 1900
San Diego, California 92101
(City/State/Zip)
(619) 231-1058
(Telephone number / E-mail address)
/s/ [Signature]
(Signature of Attorney Submitting Form)

Party Represented

Plaintiff/Respondent
(Name)

2007 CA App. Ct. Briefs 49983, *61; 2007 CA App. Ct. Briefs LEXIS 9589, **107

November 26, 2007
(Date)

**CERTIFICATE OF WORD COUNT**

Counsel of record hereby certifies that pursuant to rule 8 204(c)(1) of the California Rules of Court, the enclosed **RESPONDENT'S BRIEF** is produced using 13-point Roman type, including footnotes, and contains approximately 18,630 words. Counsel relies on the word count provided by Microsoft Word word-processing [**108] software. n8

   n8 Respondent's Application for Permission to File Overlength Respondent's Brief is currently pending

DATED. November 26, 2007

/s/ [Signature]
KEVIN K GREEN
Counsel for Plaintiff/Respondent

**DECLARATION OF SERVICE BY MAIL**

I, the undersigned, declare

1 That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action, that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101

2 That on November 26, 2007, declarant served the **RESPONDENT'S BRIEF** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List

3. That there is a regular communication by mail between the place of mailing and the places so addressed

I declare under penalty of perjury that the foregoing is true and correct Executed this twenty-sixth day of November, 2007, at San Diego, California

/s/ [Signature]
Terree DeVries

FOCUS - 5 of 7 DOCUMENTS

Go To California Court of Appeal Opinion

View Original Source Image of This Document

INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB,
Defendant/Cross-Complainant/Petitioner, vs. SUPERIOR COURT OF THE STATE OF
CALIFORNIA FOR THE COUNTY OF SAN DIEGO, Respondent, TAWNDRA
WILLIAMS, On Behalf of Herself, All Others Similarly Situated and the General Public,
Plaintiff/Cross-Defendant/Real Party in Interest.

No. D049257

COURT OF APPEAL OF CALIFORNIA

2006 CA App. Ct. Briefs 49257; 2006 CA App. Ct. Briefs LEXIS 7432

December 21, 2006

Superior Court of the State of California for the County of San Diego. The Honorable
Patricia Y. Cowett. Superior Court No. GIC836845.

Petition

**COUNSEL:** [**1] LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP, LEONARD B. SIMON
(58310), TIMOTHY G. BLOOD (149343), KEVIN K. GREEN (180919), 655 West Broadway, Suite 1900, San Diego,
CA 92101, Telephone: 619/231-1058, 619/231-7423 (fax).

ROBBINS UMEDA & FINK, LLP, BRIAN J. ROBBINS (190264), 610 West Ash Street, Suite 1800, San Diego, CA
92101, Telephone: 619/525-3990, 619/525-3991 (fax).

Attorneys for Real Party in Interest.

**TITLE: REAL PARTY IN INTEREST'S RETURN TO VERIFIED PETITION FOR A PEREMPTORY WRIT**

**TEXT: Service on Attorney General and District Attorney Required by Bus. & Prof. Code, § 17209 (Cal. Rules
of Court, rule 44.5(c))**

[*1] **I. INTRODUCTION**

Three months ago, real party in interest Tawndra Williams submitted a preliminary opposition to the writ petition
filed by Interinsurance Exchange of the Automobile Club (Exchange). She summarized her position on the petition's
substantive contentions, while reserving her right to respond in full if necessary. On November 21, 2006, this Court
issued an order to show cause. Although the order implied that a further response from Williams was not essential, she
files this return to ensure she is fully heard on the merits. (See Cal. Rules of Court, rule 56(h)(1) [**8] .)

Every relevant source of California authority, dating to the 1940s, indicates that installment fees like the
Exchange's are "premium." The opinion recently issued by the California Department of Insurance (DOI) - aggressively
sought by the Exchange in this litigation - is merely the latest in this long line of consistent precedent. The Exchange

2006 CA App. Ct. Briefs 49257, *1; 2006 CA App. Ct. Briefs LEXIS 7432, **8

hopelessly flip-flops on whether the DOI has expertise on what constitutes premium. In any event, in light of the pre-existing authority supporting her position, Williams could have prevailed without the recent DOI opinion. It is icing on the cake, further compelling a ruling in her favor.

In its zeal to undermine the trial court, the Exchange's shotgun-style petition makes diversionary arguments. These contentions all fail because, at bottom, the Exchange's installment fee is "premium" for purposes of Insurance Code section 381 and the insurance contract. Questions of "substantial compliance," what exactly Williams knew or believed as to the policy terms, and the like are red herrings. The proper prism for viewing the case is that the Legislature, to protect consumers from fraud and to prevent uncertainty on the contract [**9] terms, adopted a bright-line rule. To enjoy the privilege of doing business in this state, all insurers must specify the cost for the insurance in one document - the policy. On the nature of this mandate, the Legislature gave insurers no leeway for departures.

 [*2] Consistent with the governing law, the insurance policy here advises the consumer that coverage will be provided in return for payment of the "total premium" specified in the policy. Disregarding the Insurance Code and its own policy language, the Exchange used its superior bargaining power to levy an additional premium on Williams without specifying the additional cost in the policy. The Exchange imposed a whopping surcharge calculated at an annual percentage rate of 18%, simply because Williams paid by installments.

To make the insurance appear as affordable as possible, the Exchange seeks to carve out this additional premium and call it something else. Deceiving the consumer, the Exchange dresses up the additional premium, mentioned only on billing statements, as a "finance charge" framed by wholly unnecessary Truth in Lending Act (TILA) boxes. Although many insurers impose installment charges, to Williams' knowledge [**10] the Exchange's phony TILA trappings are unique among California insurance companies. The Exchange never showed that its installment-based insurance is subject to TILA. The Exchange's practice is a fraud upon its policyholders.

The Exchange's admitted failure to specify the additional premium in the policy is the most material fact in the case, and it is undisputed. As the trial court determined, this compels a finding of liability on all of Williams' causes of action. The Exchange has breached its own contract, run afoul of the Insurance Code and also violated California's most venerable consumer protection laws. The Exchange's various arguments boil down to saying that "it has been common practice among insurers" to violate the Insurance Code and to breach standard-form insurance policies. (Verified Petition for a Peremptory Writ [Petn.] 4.) But, of course, the longstanding existence of an unlawful practice is no defense to liability.

Williams does not contend that a charge for paying by installment is inherently illegal, or that the Exchange cannot charge more for an insurance policy when premiums are paid on a periodic basis. She merely seeks to  [*3]  enforce the policy [**11] as written, and relevant Insurance Code sections as written. Because the Exchange fails to show any error by the court below in granting summary judgment for Williams, the petition should be denied. n1

n1 All further statutory references are to the Insurance Code unless otherwise specified. With respect to the formalities, Williams demurs to the writ petition on the ground that it fails to state a claim upon which relief may be granted. Because Williams disagrees with many of the Exchange's legal and factual characterizations, she responds alternatively by verified answer, without admitting the Exchange's characterizations. (See Cal. Rules of Court, rule 56(h)(1).)

## [*4] II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pertinent Material Facts

2006 CA App. Ct. Briefs 49257, *4; 2006 CA App. Ct. Briefs LEXIS 7432, **11

Lacking a colorable position on the applicable law - especially after the adverse DOI decision fleshing out "premium" - the Exchange bogs down its presentation with factual irrelevancies. The "petition" portion is not an objective [**12] statement of the material facts. (Petn. 5-24.) It is, rather, an argumentative preview of the Exchange's flawed theories for eluding legal accountability. The facts actually material to the issues are summarized below.

**1. The Exchange Levies Additional Premium - the Installment Fee - Not Specified in the Insurance Policy**

In its quest to portray Williams as somehow acquiescing to the Exchange's unlawful conduct, the petition suggests that the terms of her insurance were individually negotiated, with an offer, acceptance and so on. This is a fallacy. The Exchange's auto insurance policies are standard-form adhesion contracts. Indeed, the installment fee levied outside the policy is adhesive in a basic economic sense because many consumers - Williams is illustrative - cannot afford mandatory auto insurance unless they pay on a periodic basis. (2 Exhibits for Verified Petition for a Peremptory Writ [Exs.] 307.) It is unremarkable that Williams paid the installment charge because, as a practical matter and as presented to her, she had no choice if she wanted to keep insurance she needed to drive a car in California. (2 Exs. 307.)

In January 2002, Williams entered into a standardized [**13] policy with the Exchange. Her policy was composed of the "Member's Automobile Policy" (the policy form), the policy declarations and any policy endorsements. (1 Exs. 132.) As an exemplary declarations page told her: "These declarations, together with the contract and the endorsements in effect, complete your policy." (1 Exs. 156; see also 1 Exs. 159, 162, 165, 214, 217, 220, 223 [to same effect].)

[*5] Remarkably, in this litigation over the meaning of language in an insurance policy, the Exchange steers clear of what the policy actually says. In the policy form, the Exchange agreed to "provide the insurance you [the insured] have selected in return for the premium due us and compliance with the policy provisions and endorsements." (1 Exs. 132.) The policy form elaborates that the insured "agree[s] to pay the premium stated in the declarations for the policy period and any additional premium resulting from changes made during the policy period." (1 Exs. 132.) The installment fee is not listed as "additional premium" the consumer must pay. (1 Exs. 132.) In fact, nowhere does the policy mention a further charge - premium - for the insurance except the cost appearing on the [**14] declarations page. Yet, the Exchange levied additional premium, deceptively labeled a "FINANCE CHARGE," merely because Williams paid by installments. (1 Exs. 168,170.)

Williams' circumstances demonstrate what occurs when an Exchange policyholder pays on a periodic basis. Her declarations page for the policy covering January 2002 to January 2003 specified that the "TOTAL PREMIUM" due was $ 1,022. (1 Exs. 156.) She then renewed her coverage, doing so in accordance with the policy form, the endorsements and the renewal declarations. (2 Exs. 306-307.) The Exchange insured Williams for the 2004-2005 period in return for a "Total Annual Premium" of $ 986 specified in the renewal declarations, less a dividend. (1 Exs. 162.) The Exchange then provided Williams with automobile insurance for the 2005-2006 term in return for a "Total Premium" of $ 846 specified in the renewal declarations, less a dividend. (1 Exs. 165.)

For both periods here, she paid by installments. (2 Exs. 306-307.) These numbers, however, were not the "total" amount she was required to pay for the policy. Instead of charging Williams the premium specified in the renewal declarations - as the policy promised would [**15] occur - the Exchange used the billing statement as a vehicle to charge her the "total" premium and [*6] additional premium calculated at an annual percentage rate of 18%. (1 Exs. 168, 170.) For example, for the 2005-2006 policy period, Williams had to pay an additional $ 30.42 in so-called "Finance Charges" - really premium - simply because she paid by installments. (1 Exs. 212; 2 Exs. 307.)

By charging more premium for the insurance than is specified in the policy, the Exchange breaches the insurance contract. In addition to breaching the policy and violating the Insurance Code, the Exchange deceptively glosses the billing statement with TILA-type disclosures to present the installment charge as something other than premium. (1 Exs. 168, 170.) There is no financing of anything, however. Rather, when a consumer pays by installments, as Williams did, the insurance is generally provided on a "pay as you go" basis. Under the Exchange's installment-based insurance, the policyholder pays for a covered period in advance of coverage. If the installment payments are not made, the coverage

2006 CA App. Ct. Briefs 49257, *6; 2006 CA App. Ct. Briefs LEXIS 7432, **15

will be cancelled. (1 Exs. 194.) Thus, money is never loaned and nothing is ever financed in the [**16] way the Exchange persistently seeks to imply. n2

> n2 The record indicates how the Exchange determines the percentage that will be used: "Our rate is 18% annually on outstanding balances of up to $ 1,000 and 12% annually on the portion of outstanding balances beyond $ 1,000." (3 Exs. 610.) Because Williams' balance was just under the $ 1,000 threshold for the relevant policy periods, she was taxed at the higher percentage. (1 Exs. 168, 170.)

## 2. As Its Own Business Records Illustrate, the Exchange Also Considers the Installment Charge to Be Premium

The Exchange takes the position that the installment fee, although not specified in the policy, was supposedly disclosed elsewhere and, moreover, the parties viewed it as something other than "premium." In her declaration, Williams averred that when she first began paying by installments, "I did not know that it was improper for the Exchange to charge me more than the [*7] amount specified in the Renewal Declarations of the insurance contract." (2 Exs. [**17] 307.) Within a month of learning this practice was improper, she filed suit. (2 Exs. 307.) "I also do not consent," she continued, "to the Exchange charging me a fee that it should not charge." (2 Exs. 307.)

Contrary to its current litigation position, the Exchange itself has characterized the fee challenged here as premium. The billing statements invoked by the Exchange undercut its position, not bolster it, for they are an admission against interest. In billing statements, the Exchange touts the installment option in large font: "You may never have to write **monthly auto insurance premium** checks again." (1 Exs. 168, 170, 172-173, emphasis added.) The billing statements reiterate, in smaller font: "You can now take advantage of AAAuto Pay - our convenient new payment plan that allows your **monthly insurance premiums** to be withdrawn automatically from your bank account . . . ." (1 Exs. 168, 170, 172-173, emphasis added.)

Other documents in the record further reflect that the Exchange understands the installment fee to be premium. The Insurance Code allows insurers to cancel coverage when the premium is not paid. (§ 661, subd. (a)(1).) Here, the Exchange advised [**18] Williams that failure to pay the added installment fee would place her insurance in jeopardy. The policy form warns that the policy will be subject to cancellation "for nonpayment of premium, meaning the premium or **premium installment** is not paid when due." (1 Exs. 133, emphasis added.)

Along the same lines is the "Notice of Limits of Future Coverage" provided to all policyholders. The Exchange emphasized that the notice "is part of your policy." (1 Exs. 175.) The notice advises that one of the reasons for "cancellation of a Member's Automobile Policy [is]: (a) nonpayment of premium, meaning the premium or **premium installment** is not paid when due . . . ." (1 Exs. 175, emphasis added.) One of the Exchange's own witnesses testified that the insurer will cancel a policy for failure to pay the [*8] "minimum due" of an installment payment, which consists of the proportionate share specified in the declarations and the installment charge. (1 Exs. 193-194; see also 1 Exs. 168 [one of Williams' billing statements].)

In light of this evidentiary record, the Exchange's current assertion that it views the installment charge to be something other than premium rings [**19] hollow.

### B. Proceedings Below

Williams filed the underlying action against the Exchange in October 2004. (1 Exs. 1.) She seeks relief on behalf of herself and a class of Exchange policyholders who paid for their auto insurance on an installment basis. (1 Exs. 2.) She alleges that the Exchange's conduct violates the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.), the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.) and common law, constituting, among other

things, a breach of contract. (1 Exs. 7-10.)

The meaning of premium has been hotly litigated in this case in multiple forums. In June 2005, this Court summarily denied the Exchange's prior writ petition seeking immediate review of an adverse demurrer ruling on the subject. (*Interinsurance Exchange-Automobile Club v. Williams,* No. D046275.) In August 2005, both parties moved for summary judgment. (1 Exs. 53-57; 2 Exs. 317-318.) In September 2005, before the cross-motions could be fully briefed, the Exchange moved to stay until the DOI completed proceedings addressing whether "premium" under section 381 includes installment fees. (5 Exs. [**20] 1175.)

From the current writ petition, the reader would not know that the Exchange moved, enthusiastically, to stay in favor of the DOI. As the Exchange stated then - little more than a year ago - "the issue here falls squarely within the DOI's expertise. The DOI is charged both with (i) reviewing and approving insurance premiums, and (ii) enforcing Insurance Code § 381(f) and other statutes that use the term 'premium.'" (5 Exs. 1179.) [*9] "The DOI," the Exchange stressed, "is thus uniquely positioned (i) to know what constitutes 'premium' for insurance regulatory purposes, and (ii) to avoid interpretations of Section 381(f) that create conflict with other regulatory provisions and with DOI enforcement practice." (5 Exs. 1179.) The Exchange further argued that the trial court would commit an ***"abuse of discretion"*** if it declined to stay in favor of the DOI. (5 Exs. 1179, 1183, emphasis in original.) According to the Exchange, if the DOI was not allowed to weigh in, the parties would need to "train" and "educate" the court on the premium issue. (5 Exs. 1180, 1185, 1187.)

Giving the Exchange what it asked for, the trial court referred the following [**21] question to the DOI for its consideration in October 2005: "Whether installment fees are premium as that term is used in Insurance Code § 381(f.)." (5 Exs. 1192.) Further summary judgment briefing was suspended until the DOI spoke. (5 Exs. 1192.) In the administrative proceedings, the DOI heard oral argument and received extensive briefing not just from the Exchange, but also from other large insurance companies and trade associations supporting them. (3 Exs. 554-555.)

The Exchange's strategic gambit backfired. In April 2006, after taking the matter under submission for several months, the DOI issued a comprehensive opinion concluding that installment fees, such as the Exchange's, are "premium" for purposes of section 381. (3 Exs. 553-567.) The DOI's rationale - which the Exchange now seeks to avoid after singing the agency's praises - is discussed later at length.

**C. The Summary Judgment Order**

In August 2006, the trial court granted summary judgment for Williams and denied the Exchange's cross-motion. The Exchange mischaracterizes this order. Seeking to sweep the damaging DOI opinion under the carpet, the Exchange argues repeatedly that the trial court [**22] relied "solely on tax authority." (Petn. 4; see also Petn. 22 [ruling supposedly grounded "solely on a single [*10] taxation case"], 28 ["The superior court based its order on a single tax case . . . ."], 41 [asserting that tax law is "sole authority"].) In fact, the court gave the DOI opinion "some deference," while making the ultimate determination whether installment fees are premium for purposes of section 381. (6 Exs. 1522.)

As for the "tax authority," the trial court correctly recognized that "[t]he decided law supports the conclusion that defendant should have included the installment fees in the premium." (6 Exs. 1522.) In terms of case law, this has been apparent since *Allstate Ins. Co. v. State Board of Equalization* (1959) 169 Cal.App.2d 165 (*Allstate*), the seminal appellate precedent cited in the court's order. (6 Exs. 1522-1523.) As appears below, *Allstate* and its progeny point to the same conclusion as the DOI opinion - with no relevant California authority going the other way.

The litigation is currently proceeding in superior court on a classwide basis. In August 2005, the trial court certified the plaintiff class proposed by Williams. [**23] (Petn. 19.) As the Exchange observes, the court below has stayed entry of final judgment pending resolution of the Exchange's related appeal seeking certification of a "cross-defendant" class. (*Williams v. Interinsurance Exchange of the Automobile Club,* No. D048783 [oral argument scheduled for

2006 CA App. Ct. Briefs 49257, *10; 2006 CA App. Ct. Briefs LEXIS 7432, **23

January 8, 2007].) n3

n3 The trial court's summary judgment order also addressed the then-recent opinion in *Pfizer, Inc. v. Superior Court* (2006) 141 Cal.App.4th 290. (6 Exs. 1523.) The writ petition relies on *Pfizer.* (Petn. 64-65.) Review has since been granted in that case, however, so it is irrelevant to the issues here. (*Pfizer, Inc. v. S.C. (Galfano)* (Nov. 1, 2006, S145775) 2006 Cal. LEXIS 13327.)

[*12] **IV. DISCUSSION**

In virtually every state, insurance companies are highly regulated by statutory and administrative enactments. To protect the public and ensure uniformity, the Legislature adopted a statute in 1935 providing that all insurance policies "shall [**24] specify . . . [a] statement of the premium," and other basic information of interest to the consumer. (§ 381, subd. (f)(1).) Accordingly, if a particular cost for coverage is "premium," it must be specified in the policy given to the insured. The bright-line, comprehensive nature of this mandate flows from the plain text. To "'specify,'" of course, means "'to name or state explicitly or in detail.'" (*Moreno v. City of King* (2005) 127 Cal.App.4th 17, 26, quoting Webster's Collegiate Dictionary (10th ed. 1993) p. 1129.) The consequences of noncompliance, a misdemeanor, underscore the importance of this requirement. (§ 383, subd. (a).)

Working in tandem, another Insurance Code section governs "[c]ontracts of motor vehicle insurance." (§ 383.5.) Section 383.5 was adopted in 1941 to provide further protection to these policyholders. The statute limits the documents that constitute an auto insurance policy and, therefore, where the premium may be specified. "Every contract of insurance . . . shall be embodied in a document." (*Ibid.*) The term "document" means "a policy or a certificate evidencing insurance" and "also includes the applicable policy form and a subsequently [**25] issued declarations page conforming to Section 381 or an endorsement." (*Ibid.*) Thus, an auto insurance policy consists of just the policy form, the declarations page and any endorsements - and nothing else. Section 383.5 reiterates the fundamental importance of complying with section 381 by emphasizing that auto insurance policies "shall conform to Section 381." (*Ibid.*)

In powerful combination, then, sections 381 and 383.5 foreclose the practice of carving out a fee for auto insurance - in reality premium - and calling it something else, specified only somewhere else. Far from an [*13] "immaterial technicality" (Petn. 4), the Legislature deliberately denied insurance companies the discretion the Exchange urges this Court to graft onto the statutory scheme.

The Exchange's petition is a futile effort to distract from this legal framework. If the installment fee is "premium," then the Exchange has violated the Insurance Code and breached its contract with Williams. As shown below, the contract language the Exchange chose is the most sweeping that could have been used. In fact, as the trial court noted, liability logically follows on all of Williams' causes of action, including [**26] the UCL and the CLRA. (6 Exs. 1522-1524.) Because every relevant source of authority indicates that the installment charge is premium for the purpose at issue here - consumer protection - the court below did not err. The petition should be denied.

**A. Because the Exchange's Installment Charge Is Part of the "TOTAL PREMIUM," the Exchange Breached the Insurance Contract**

The declarations pages for Williams' policy, while omitting the added installment fee, described the cost variously as the "TOTAL PREMIUM," "NET TOTAL PREMIUM" and "TOTAL ANNUAL PREMIUM." (1 Exs. 156, 159, 162, 165, 214, 217, 220, 223.) The policy has some defined terms, but these particular terms were not defined. (1 Exs. 133.) The absence of a definition requires the courts to supply one. The interpretive touchstone for doing so is familiar: "'The "clear and explicit" meaning of [policy] provisions, interpreted in their "ordinary and popular sense," unless "used by

2006 CA App. Ct. Briefs 49257, *13; 2006 CA App. Ct. Briefs LEXIS 7432, **26

the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation.'" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647-648.) As the Exchange acknowledges, the [**27] "plain meaning" of premium controls. (Petn. 29.)

Despite a long petition, the Exchange makes no serious effort to define premium. The only definition offered is conclusory. Citing nothing, the [*14] Exchange proclaims that "[t]he premium is the cost of the insurance itself" - whatever that means exactly. (Petn. 29.) Even less helpful, the Exchange says that "'premium' means the premium itself." (Petn. 32; see also Petn. 35, 37 [same circular reasoning].)

A dictionary is more illuminating. "When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122.) "Total" is all encompassing, meaning "of or relating to something in its entirety." (Webster's Third New International Dictionary (1981) p. 2412.) "Premium" means "the consideration paid in money or otherwise for a contract of insurance in the form of an initiation fee, an admission fee, an assessment, or a stipulated single or periodic payment according to the nature of the insurance." (*Id.* at p. 1789.) Appellate courts regard this particular definition [**28] of "premium" as authoritative. (See, e.g., *Fidelity Security Life Ins. Co. v. Director of Revenue* (Mo. 2000) 32 S.W.3d 527, 531; *Bibb Distributing Co. v. Stewart* (Ga.App. 1999) 519 S.E.2d 455, 458.) A leading legal dictionary is in accord, defining "premium" as "[t]he periodic payment required to keep an insurance policy in effect." (Black's Law Dictionary (8th ed. 2004) p. 1219.) The Exchange's own billing statements track these definitions by referring to installment payments as "monthly insurance premiums." (1 Exs. 168, 170, 172-173.)

When ascertaining the meaning of words, their synergistic impact is important. In contracts, as in statutes, "a word takes meaning from the company it keeps." (*People v. Drennan* (2000) 84 Cal.App.4th 1349, 1355; see also *Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 471, fn. 3 [discussing rule of *noscitur a sociis,* Latin for "it is known by its associates"].) The Exchange's pairing of "total" with "premium" dictates the broadest possible meaning, one easily including the Exchange's installment fee. To the extent murky, of course, the policy terms are construed [**29] in the [*15] consumer's favor and against the drafter. This has long been the law: "In interpreting an insurance policy we apply the general principle that doubts as to meaning must be resolved against the insurer . . . ." (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 269; accord, *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415.) By charging Williams more than the "total" premium amount specified in the policy, the Exchange breached the contract.

The writ petition treats this case as involving only a statutory issue, with no cause of action for breach of contract emanating from the policy language. (Petn. 52-53.) From the day this case was filed, however, breach of contract was the first cause of action alleged. (1 Exs. 7.) The Exchange's demurrer to this claim failed and now, at the summary judgment stage, the claim has been proved. The Exchange is wrong that Williams received "exactly what she bargained for" and seeks to "avoid her agreement." (Petn. 1.) To the contrary, she seeks to enforce the policy exactly as the Exchange wrote it. After all, a "'breach of contract' is the 'failure, without legal excuse, [**30] to perform any promise which forms the whole or part of a contract.'" (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 564.)

Lacking a viable argument on the policy language, the Exchange declares that the ability to pay by installments is a "privilege." (Petn. 2.) But the benefits (tens of millions of dollars annually) flow to the Exchange. Indeed, the Exchange would demolish its own market share if the installment option were not offered as a way to pay for liability insurance mandated by law. One of the Exchange's own witnesses agreed that the Exchange offers an installment plan due to the "competitive practices" of other insurance companies. (1 Exs. 188.) All major insurers do so because many of their customers, like Williams here, cannot afford a large lump-sum payment. (2 Exs. 307.) And the Exchange is no worse for the wear. More than two decades ago, the Second District noted that the "economic benefit" of the [*16] Exchange's installment plan flows to the Exchange: "One could reasonably assume that had the [Exchange] never offered the instalment plan along with its service fee, the number of individuals for whom they write coverage would have been significantly [**31] reduced. Also, judging by the amount of fees collected by the [Exchange] in one year on service fees alone, the significance of this plan was astronomical." (*Interinsurance Exchange of the Automobile Club v.*

*State Bd. of Equalization* (1984) 156 Cal.App.3d 606, 614 (*Interinsurance Exchange*).) It still is today.

At one point, the Exchange appears to suggest that Williams entered into a separate contract arising from the billing statement, addressed solely to the subject of installment payments. (Petn. 26-28.) This is false. There was only one contract- the policy- where the installment fee was never mentioned. (1 Exs. 131.) For multiple reasons, moreover, there could not be a side agreement on installment payments or, for that matter, any other issue related to the policy. The Exchange included an integration clause admonishing that "the policy contains all of the agreements between you and us." (1 Exs. 133.) In addition, any side agreement on the premium amount, outside the policy, would be a misdemeanor. (§§ 381, 383.) This would be patently unenforceable. "Whenever a statute is made for the protection of the public a contract in violation of its provisions [**32] is void." (*Firpo v. Murphy* (1925) 72 Cal.App. 249, 253 [statutory violation was misdemeanor, as here]; see also *Shortell v. Evans-Ferguson Corp.* (1929) 98 Cal.App. 650, 656 [to same effect].) The Exchange cites no relevant authority to the contrary. (Petn. 62-63.)

The Exchange's breach of the insurance policy is brought into even sharper focus by the governing California law, discussed below, on the meaning of premium. The legal framework emanating from section 381 is part of the insurance contract as if expressly referenced. As our Supreme Court has explained: "Ordinarily, all applicable laws in existence when an [*17] agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." (*City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 378, internal quotation marks omitted.) The policy language alone compelled summary judgment for Williams and, in any event, her causes of action succeed based on the longstanding California law recognizing [**33] that installment service charges are premium.

## B. The Exchange's Installment Charge Is Part of the "Premium" as that Term Is Used in Insurance Code Section 381

Perhaps most striking - and wrong - about the Exchange's petition is the notion that the trial court's ruling is unprecedented in California insurance law. In fact, the court below was faithful to that extensive history. The authority culminated with the recent DOI opinion holding - at the Exchange's strident request - that installment fees are premium for purposes of section 381.

### 1. California Attorney General Opinions

Insurance companies have been on notice for nearly 60 years that installment fees are premium under the statute. In 1947, the California Attorney General addressed whether installment charges constitute taxable gross premium. (Cal. Attorney General Opinion No. 47-99, 9 Ops. Cal. Atty. Gen. 257 (1947).) In determining that they do, the Attorney General emphasized that premium must be viewed from the insured's perspective. Such charges are premium because they constitute the "actual amount charged the insured" or, alternatively, "the actual cost of the insurance [**34] to the insured." (3 Exs. 617.) The label conveniently affixed by the insurer does not control. The "nature" of an installment fee "is not changed by the fact that the policy designates it as an assessment." (3 Exs. 618.) "It further follows that the policies issued should correctly state this premium and the records of the [*18] insurers should correctly reflect the same." (3 Exs. 618.) For this conclusion, the 1947 Attorney General opinion cited section 381. (3 Exs. 618.)

The Exchange brushes this opinion aside on the ground that it was "'advisory only.'" (Petn. 36.) Whether the opinion is binding misses the point. The Exchange claims lack of notice that section 381 would be construed as it was here, by both the DOI and the trial court. This assertion is empty in light of what the state's chief law enforcement officer said about the statute just 12 years after it was adopted. The 1947 opinion, moreover, was rendered at the DOI's request. (3 Exs. 614.) The Attorney General and the DOI were acting hand in hand on the issue.

Underscoring the notice to insurance companies, a more recent Attorney General opinion echoes the 1947 analysis. (Cal. Attorney General Opinion No. CV 75-132, [**35] 58 Ops. Cal. Atty. Gen. 768 [1975 Cal. AG LEXIS 144]

(1975).) Thirty years ago, the Attorney General reiterated that service charges to purchase insurance on installment plans are taxable. The Attorney General explained that "the fact that nonpayment of the installment charges leads to cancellation of the policy for nonpayment of premiums is a clear indication that, from the point of the view of the insured, the installment payment program is an integral part of the relationship between the insured and the insurer." (5 Exs. 1099.)

### 2. *Allstate* **and Its Progeny**

As the trial judge recognized, California appellate courts have held the same for nearly as long. Nearly 50 years ago in *Allstate, supra,* 169 Cal.App.2d 165, the Second District held: "'Premium' in the law of insurance means the amount paid to the company for insurance. [Citation.] It has been defined as 'the sum which insured is required to pay.' [Citation.]" (*Id.* at p. 168.) Accordingly: "'The sum, whether single or periodical, which is payable in consideration of a benefit, is usually called a premium.'" (*Id.* at p. 169.)

[*19]  The *Allstate* [**36] court hit on why it is both reasonable and fair to define premium to include the entire cost of installment-based insurance. Consumers view the installment option not as a discrete service charge but, rather, a feature of the insurance they select. Thus, in *Allstate,* just as in the present case, "[t]he option to the insured was whether he wanted to pay in installments. If he did, he was required to pay the installment payment charge. The option was not whether he wished to pay the charge but in what form he wished to pay the premium, i.e., cash or installments. The insured paid the fee as part of the cost of the insurance he wanted." (*Id.* at p. 173.) Put concisely, the installment charge "was 'actually given by the insured for his insurance'" and, therefore, was premium. (*Ibid.*)

The California Supreme Court has approved of *Allstate's* analysis. (See *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 660 (*Metropolitan Life*).) So did another court in an opinion, more than two decades ago, involving the Exchange's prior failure to treat installment fees as premium. (See *Interinsurance Exchange, supra,* 156 Cal.App.3d at p. 611.) [**37]  Also in 1984, another court defined installment charges as premium, explaining: "The service fee [the insurer] charges reflects the total cost of the insurance to the policy-holder . . . ." (*Crawford v. Farmers Group, Inc.* (1984) 160 Cal.App.3d 1164, 1171.)

California courts have reached this conclusion by applying "basic concepts relating to the calculation of insurance premiums." (*Metropolitan Life, supra,* 32 Cal.3d at p. 660.) "'The gross premium, or the amount charged in a contract of insurance, ordinarily includes two elements, that is, the net premium and the loading. The loading, or the amount arbitrarily added to the net premium, is intended to cover the expenses of the company.'" (*Ibid.,* quoting *Allstate, supra,* 169 Cal.App.2d at p. 168.) Although the net premium reflects the cost to cover the risk insured, "[t]he loading ordinarily is composed of miscellaneous charges, including administrative costs of the  [*20]  insurer . . . ." (*Ibid.;* accord, *Allstate, supra,* 169 Cal.App.2d at p. 173; *In re Imperial Ins. Co.* (1984) 157 Cal.App.3d 290, 295.) The two components together [**38] constitute premium. (See, e.g., *Metropolitan Life, supra,* 32 Cal.3d at p. 660.) Although the Exchange is correct that insurance and tax law serve "different purposes" (Petn. 43), to say these are only "tax" cases is a superficial reading of these decisions. The *Allstate* line draws on "'the law of insurance,'" not tax law. (*Metropolitan Life, supra,* 32 Cal.3d at p. 660, quoting *Allstate, supra,* 169 Cal.App.2d at p. 168.)

Indeed, the writ petition is grounded on a distinction between lump-sum and installment plans that does not withstand scrutiny. Whatever payment mode the consumer elects, the Exchange incurs administrative costs and, either way, those costs are part of the loading. "The expense incident to the installment payment plan does not differ in character from other expenses included in premium." (*Allstate, supra,* 169 Cal.App.2d at p. 173; accord, *Interinsurance Exchange, supra,* 156 Cal.App.3d at p. 611.) Stated more generally: "The expense of administering the insurance is a component of premium." (*Allstate, supra,* 169 Cal.App.2d at p. 173.)

The petition's other efforts [**39] to distinguish the *Allstate* line are unpersuasive. The Exchange says the above decisions are irrelevant because they construe the term "gross premiums," not "premium." (Petn. 28, 42.) But, for the present case, there is no material difference. "Gross" means "overall" or "total." (Miriam Webster's Collegiate

2006 CA App. Ct. Briefs 49257, *20; 2006 CA App. Ct. Briefs LEXIS 7432, **39

Dictionary (11th ed. 2003) p. 551.) "Total," of course, is the word the Exchange used to describe the premium on Williams' declarations pages, although the Exchange charged her more than this amount for the insurance she chose. (See, e.g., 1 Exs. 156.)

The Exchange further contends that in contrast to *Allstate*, the installment fee here is "investment income." (Petn. 43.) But *Mercury Casualty Co. v. State Bd. of Equalization* (1983) 141 Cal.App.3d 43, cited by the Exchange, does not hold that all "interest-based installment charges . . . [*21] constitute a form of investment income." (Petn. 42-43, emphasis deleted.) Much more narrowly, *Mercury* involved "income to [the insurer] from investments" - specifically, interest earned on an "installment note" issued to the insured "for the [premium] balance." (*Id.* at pp. 44-45.) The Exchange [**40] did not show that the additional cost it levies for installment-based insurance remotely approaches the "investment income" at issue in *Mercury*. As discussed further below, "premium financing" plans - which involve an actual loan to pay the entire premium - are governed by a separate statutory scheme not at issue here. (§ 778 et seq.)

Further notice to the Exchange is found in *Groves v. City of Los Angeles* (1953) 40 Cal.2d 751 (*Groves*). There, our Supreme Court held that fees charged by an insurance agent for soliciting, negotiating and effecting bail bonds are premium. "The essence of the matter is that the amount paid by the insured for the bond is the premium and it has been so recognized by the courts." (*Id.* at p. 760.) Although the receipt given to the bond purchaser did not specify the amount "for services in arranging for the bond," the entire amount paid to obtain the bond was premium. (*Ibid.*) Shortly after *Groves*, the DOI issued a bulletin advising insurers that "the artificial distinction between premium and service charges heretofore made by bail agents must be eliminated." (5 Exs. 1102.) "The [DOI] will also expect that [**41] the premium shown on the undertaking of bail will be the full amount charged therefor. Failure to do so will constitute a violation of Insurance Code Section 381(f)." (5 Exs. 1102.)

### 3. Leading Insurance Law Treatises

Secondary sources further demonstrate the consistency of the authority.

According to a prominent deskbook, the concept of premium as including both net premium and loading is the "ordinary usage [of] the word premium in the law of insurance." (Cornblum, California Insurance Law Dictionary and Desk Reference (6th ed.) § 483, p. 686.) Prestigious treatises [*22] concur. "The total premium (net premium plus administrative costs) charged each policyholder/insured is customarily called gross premium." (5 Holmes' Appleman on Insurance 2d (2d ed. 1998) § 24.1, emphasis deleted.) Appleman follows the plain-meaning definition of premium as including installment fees: "[T]he term premium is the general term used to describe the consideration for an insurance contract, whether payable annually, semiannually, monthly, or weekly. [Footnote.]" (*Id.*, § 24.2.) Couch is in line with this analysis: "The premium is the consideration paid an [**42] insurer for undertaking to indemnify the insured against a specified peril. . . . The gross premium consists of two components, the 'net premium,' also called 'pure premium,' and the 'loading rate.'" (Lee R. Russ, Couch on Insurance 3d (3d ed. 1996) § 69.1.)

### 4. The DOI Opinion Sought by the Exchange in This Litigation

All of this authority set the backdrop for the DOI's recent opinion. Although the Exchange tries to spin the 15-page decision as somehow favorable to insurance companies (Petn. 20-21, 34-35), it was a resounding defeat. Applying the expertise enthusiastically cited by the Exchange just last year, the DOI reached the emphatic conclusion that "installment fees are premium under [section] 381." (3 Exs. 567.)

#### a. Although the Exchange Tries to Downplay the Result, the DOI Concluded that Premium Includes Installment Fees

"[O]f all contract terms," the DOI found after an extensive review, "policyholders generally are most concerned about the bottom line: the total amount they must pay to obtain insurance coverage. And since many policyholders do not have the option of paying in full and installment fees may be a significant addition to the cost of an insurance [**43] policy, installment fees represent an integral part of their premium payment." (3 Exs. 566.) The DOI [*23] stressed that

2006 CA App. Ct. Briefs 49257, *23; 2006 CA App. Ct. Briefs LEXIS 7432, **43

to further section 381's salutary goals, premium must be viewed from the insured's perspective: "[P]olicyholders would be less likely to be defrauded or mistaken about the amount of premium if that term is defined in the broadest sense, in the typical way policyholders view their installment payments (i.e., the total price of obtaining coverage, including the installment fee)." (3 Exs: 566.)

The DOI was persuaded by Williams' argument that section 381 is a "consumer protection statute" and, therefore, "consumers need to know with clarity and precision the amount they are required to pay for insurance coverage, which requires insurers to use a uniform definition of premium." (3 Exs. 564-565.) Purported illumination in other documents sent to the insured makes no difference in this inquiry. The DOI firmly rejected the Exchange's notion that there is a "but we specified elsewhere" defense for insurers. (3 Exs. 565-567.) The DOI concluded that related section 383.5 "provides a further disclosure of premium than originally required under" section 381, subdivision [**44] (f). (3 Exs. 561.) "The Commissioner believes this evidences an intent to provide more useful information to insureds about the nature and cost of the policy." (3 Exs. 561.) This is especially critical as to the Exchange because its added installment fee- calculated at annual percentages as high as 18% - is a "significant addition to the cost of an insurance policy." (3 Exs. 566.)

The DOI further noted that its holding was consistent with regulatory law. "Installment fees presumably would be included" in an "expansive definition of premium" in a California regulation, defining the term as the "'final amount charged to an insured for insurance after applying all applicable rates, factors, modifiers, credits, debits, discounts, surcharges, fees charged by the insurer and all other items which change the amount the insurer charges to the insured.'" (3 Exs. 557, quoting Cal. Code Regs., tit. 10, § 2360.0; see also 3 Exs. 566 [further discussion of same].)

[*24] According to the Exchange, the DOI opinion "[a]cknowledges several conflicting meanings of premium," thereby showing an interpretive ambiguity. (Petn. 34.) This is not what the DOI said, [**45] and the difference is material. The DOI actually found that "the term 'premium' has several different (and sometimes conflicting) meanings depending upon the context in which it is used." (3 Exs. 555.) The setting, then, determines the meaning. On the issue here - consumer protection - there is no ambiguity: "For the above reasons the Commissioner concludes that installment fees are premium under §381, in the private passenger automobile context." (3 Exs. 567.)

As the DOI recognized, the Exchange's position, if adopted, would transform sections 381 and 383.5 into an empty promise for consumers. According to the Exchange, insurance companies can carve out part of the premium, slap a different label on this amount (here, "finance charge") and then simply mention the cost somewhere in the various documents sent to the insured. Under this regime, there are no discernable limits on what insurance companies may claim is excluded from "premium" and, consequently, need not be specified in the policy. Under the Exchange's view, any overhead cost could be segregated. A host of services customarily provided to policyholders, and that are part of an insurer's "load" or administrative costs, [**46] would become candidates for a separate fee not mentioned anywhere in the policy. To name a few, these include a separate charge to obtain a list of repair shops or simply to call with a question about a policy. There are many others, depending on how far insurers push the envelope. (5 Exs. 1164-1166 [Arizona DOI listing 40 additional examples].) Balkanizing cost information in this manner creates uncertainty on the question of ultimate interest to the insured - what the insurance policy costs. This is exactly what the Legislature sought to avoid by drawing a sharp line, not a blurry one.

[*25]  **b. The Exchange's Initial Instinct - the DOI Is Entitled to Deference - Was Correct**

Having obtained the administrative referral it aggressively coveted, the Exchange now boldly proclaims that the DOI's opinion "is entitled to no deference." (Petn. 45, capitalization omitted.) This stance turns a blind eye, to put it mildly, to the Exchange's prior litigation positions. These were unequivocal - and diametrically opposite to what the Exchange is saying today.

A more striking turnabout on the DOI's expertise is hard to imagine. Just last year, the Exchange told the trial court that [**47] the DOI was "uniquely positioned (i) to know what constitutes 'premium' for insurance regulatory purposes,

and (ii) to avoid interpretations of Section 381(f) that create conflict with other regulatory provisions and with DOI enforcement practice." (5 Exs. 1179.) The Exchange's stay motion is replete with similar rationales for deferring to the DOI. To quote a few more examples: "The fact that the DOI is well positioned to determine what is and is not 'premium' for regulatory purposes- and to ensure that 'premium' in Section 381(f) is interpreted consistently with other regulatory laws - is beyond dispute. After all, premium regulation is the DOI's job. For that reason alone, the DOI is well-placed to know what does and does not constitute 'premium.'" (5 Exs. 1185-1186, footnote omitted.) "What is important, and what cannot be disputed, is that the DOI has tremendous expertise as to these matters - matters which go [to] the heart of the complex insurance regulatory system established by the Legislature." (5 Exs. 1183, emphasis deleted.)

Under a familiar legal doctrine, the Exchange cannot at this point take the converse stand. "'Judicial estoppel prevents a party from asserting [**48] a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.'" (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181.) The dignity of the courts demands nothing [*26] less: "'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.'" (*Ibid.*)

Even if the Exchange could now sing a different tune, its latest litigation harmony is not compelling. The DOI's interpretation of the Insurance Code- a statutory scheme the agency applies every day- "is entitled to consideration and respect by the courts." (*Yamaha Corp. v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*).) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation." (*Ibid.*) In granting summary judgment for Williams, this is exactly what the trial court did. (6 Exs. 1522-1524.) This measured deference to the DOI is unremarkable. [**49] Examples abound of judicial respect for the DOI's understanding of the Insurance Code. (See, e.g., *State Comp. Ins. Fund v. Superior Court* (2001) 24 Cal.4th 930, 940; *Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1372-1373; *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 937; *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 982-983.)

Although *Yamaha* is perhaps the seminal California case on deference to administrative agencies, other precedents reiterate the point. An agency's interpretation of statutes it administers "'should not be disturbed unless [the construction] fails to bear a reasonable relation to statutory purposes and language'" - certainly not so here. (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 796.) Deference is particularly warranted when the public official brings to bear "'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (*Yamaha, supra,* 19 Cal.4th at p. 14.) It was just this experience and informed judgment that the Exchange [**50] cited to obtain the referral to the DOI. (5 Exs. 1179-1189.) [*27] The Exchange continues to acknowledge this expertise by drawing selectively on the DOI's findings, while ignoring the ultimate conclusion the findings dictate.

*Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842 (*Farmers*) is not to the contrary. There, the court declined to defer to the DOI's assessment expressed in an unsolicited amicus curiae brief. (*Id.* at p. 858.) Here, the Exchange and the trial court affirmatively sought the DOI's interpretation via the primary jurisdiction doctrine. (5 Exs. 1179, 1191-1192.) In addition, the question of statutory interpretation in *Farmers* was fundamentally different - whether Proposition 103 afforded a "private right of action" to enforce the initiative's provisions. (*Farmers, supra,* 137 Cal.App.4th at p. 847.) By contrast, as the Exchange stated, what constitutes premium "falls squarely within the DOI's expertise." (5 Exs. 1179.) The *Farmers* court would agree that deference is appropriate here: "An agency has an interpretive advantage with respect to matters within the agency's expertise and [**51] technical knowledge." (*Farmers, supra,* 137 Cal.App.4th at p. 859.) In the parlance of *Yamaha,* the DOI's opinion is entitled to deference because it has "'contextual merit.'" (*Ibid.,* quoting *Yamaha, supra,* 19 Cal.4th at pp. 1, 12, 14.)

By not defining "premium," the Legislature left a gap in section 381. Just as the Exchange sought, the DOI has authoritatively filled it. This litigation is a textbook example of the primary jurisdiction doctrine at work to ensure the law is correctly applied and agency expertise is respected. (See generally *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377 [explaining how doctrine operates].) The trial court properly gave "some deference" to the DOI's

opinion on the premium issue. (6 Exs. 1522.)

[*28]  **C. The Exchange's Various Diversionary Arguments Miss the Mark**

To distract from the Insurance Code's specific mandates and the DOI opinion agreeing with Williams, the Exchange tosses out red herrings. None have currency.

**1. The DOI Has Not Created "De Facto Law" Endorsing the Exchange's Claimed Understanding of Premium**

Williams' victory at the DOI has driven the [**52]  Exchange to take utterly inconsistent positions on whether the agency is relevant to the inquiry here. The writ petition argues that the DOI over the years has already conveyed its opinion on the meaning of "premium" in section 381 -while also arguing that this presents an "issue of first impression." (Compare Petn. 8-10 with Petn. 20, 34.) The petition contends that the DOI's prior regulatory practices have created "'de facto law'" on the meaning of premium - while also contending that the only DOI opinion addressing the issue receives "no judicial deference." (Compare Petn. 37 with Petn. 47.) In any event, the Exchange is mistaken that the DOI previously gave its blessing to the practice of carving out installment fees and, contrary to the legislative framework, failing to specify them in auto insurance policies.

For this strained proposition, the Exchange cites three purportedly "undisputed facts." (Petn. 37.) These, however, are neither factual nor undisputed. First, the Exchange points to the asserted "concessions of historical practices in the DOI's opinion." (Petn. 37.) At bottom, the DOI did not address the proper interpretation of section 381, concerning installment fees [**53]  in particular, until the referral in this litigation. This question, of course, would not be adjudicated on an ad hoc basis through the procrustean bed of DOI rate applications. To the extent the DOI has not enforced aspects of section 381 in the past, this does not create a safe harbor. As the DOI observed, "'[m]ere failure to enforce the obligation cannot be deemed to  [*29]  constitute such administrative action as would result in modifying, remitting or canceling the obligation, constructively or otherwise.'" (3 Exs. 562, quoting *Department of Mental Hygiene v. McGilvery* (1958) 50 Cal.2d 742, 752.) The DOI's "past practice, and parties' reliance on it, may or may not be instructive, but it cannot be determinative." (3 Exs. 562.)

Second, in support of its "de facto law" argument, the Exchange invokes the declaration of Milo Pearson. (Petn. 37.) Putting a lot of eggs in this basket, the petition relies heavily on Pearson throughout for the grudging definition of premium clung to by the Exchange. Indeed, the Exchange's position is that for the DOI's understanding of premium, Pearson supposedly controls over all other sources. (See, e.g., Petn. 8-13 [citing [**54]  Pearson as purported authority for DOI's "historical practice" and what "DOI determined" during his time there].) Although the trial court considered his declaration, the court evidently attached little probative force to what Pearson had to say, and rightly so. According to his resume, he now provides "full service consulting to the insurance industry." (2 Exs. 483.) As Williams explained, moreover, Pearson's deposition revealed he had scant foundation for his opinions. He was merely a bureaucratic lieutenant charged with overseeing administration. Under questioning, he admitted he has no actuarial training and that he never had authority to set DOI policy. (5 Exs. 1259-1267.) Thus, the trial court should have struck Pearson's declaration, but even if considered, it has no value on the issues here.

More fundamentally, the DOI made its views known through the opinion issued in this litigation- rendered after full due process to the Exchange and at its express request. (3 Exs. 553.) Pearson's subjective perceptions of the DOI's work during his stint at the agency, as an indication of policy, are not in the same league. The Exchange certainly cites no authority for its flawed notion [**55]  that the hired opinion of a former agency  [*30]  official, who never had authority to speak for the agency, can somehow trump an administrative opinion issued through the official channels.

Third, the Exchange cites "evidence of the DOI's historical interactions with the Exchange itself" as supposedly establishing "de facto law." (Petn. 38.) This, however, merely rehashes the first point above -the DOI reviewers never said anything to us, so we must have complied with section 381. Again, silence is not tantamount to acquiescence or

approval, and does not estop the agency from enforcing the law. (See *Department of Mental Hygiene v. McGilvery, supra,* 50 Cal.2d at p. 752.)

Contrary to the Exchange's suggestion, the DOI opinion is not the agency's first pronouncement on the meaning of section 381. As noted, in 1953, responding to the Supreme Court's decision in *Groves* involving bail bonds, the DOI issued a bulletin advising insurers that "the artificial distinction between premium and service charges heretofore made by bail agents must be eliminated." (5 Exs. 1102.) "The [DOI] will also expect that the premium shown on the undertaking of bail will be the full [**56]  amount charged therefor. Failure to do so will constitute a violation of Insurance Code Section 381(f)." (5 Exs. 1102.) The Exchange feigns surprise, but applying these principles to installment fees half a century later is not earth-shattering. Instead of adopting a "new and expansive interpretation of section 381(f)" (Petn. 36), the DOI here has picked up where it left off.

### 2. The DOI's and the Trial Court's Interpretation of Insurance Code Section 381 Does Not Conflict with How Premium Is Understood in Other Settings

The Exchange says the trial court has given section 381 "a unique meaning that conflicts with the Legislature's use of the same term in related Insurance Code statutes," and also as premium is understood in other settings. (Petn. 39.) The rule of construction invoked here - statutes are not read "in isolation"- carries minimal force in this case. (Petn. 39.) As the DOI  [*31]  determined, "the term 'premium' has several different (and sometimes conflicting) meanings depending upon the context in which it is used." (3 Exs. 555.) This reflects a basic reality about the Insurance Code. It is not homogeneous. Rather,  [**57]  it is a diverse amalgam of statutes serving a host of varying purposes. As the DOI recognized, the Exchange's asserted inconsistencies are contrived, not genuine.

#### a. Section 480

First, the Exchange relies on section 480, which provides: "An insurer is entitled to payment of the premium as soon as the subject matter insured is exposed to the peril insured against." According to the Exchange, installment fees cannot be premium because if they are, section 480 "would give insurers the right to demand installment charges at the inception of the policy." (Petn. 39.) But there is no inconsistency. Even when collecting premium in installments, the Exchange collects all amounts due, including installment charges, in advance of the covered period. (1 Exs. 194.)

#### b. Section 383.5

The Exchange next argues that because section 383.5 requires the policy to "segregate the premiums charged for each risk," installment fees not attributable to any particular risk cannot be premium. (Petn. 40.) The DOI soundly rejected this argument: "The Commissioner agrees that the inclusion of installment fees as premium under CIC §381(f) does not preclude them being charged . . . only to policyholders [**58]  who pay via installments." (3 Exs. 561.) "The [Exchange's] argument ignores the basic purpose of §383.5, which is to prevent fraud or mistake." (3 Exs. 561.) As the DOI explained, the intent behind section 383.5 is "to provide more useful information to insureds about the nature and cost of the policy" than that "originally required under CIC §381(f)." (3 Exs. 561.) Contrary to the Exchange's assumption, a risk-based breakdown "is therefore a means to that end, not an end in itself." (3 Exs. 561.)

[*32]  **c. Section 1861.02**

The Exchange further contends that "section 1861.02 similarly uses premium in way [sic] that excludes installment charges." (Petn. 41.) This argument also failed at the DOI. Section 1861.02 is part of Proposition 103. As the DOI noted, the reforms adopted by Proposition 103 concern an entirely different regulatory goal - ensuring that "rates are not excessive, inadequate, or unfairly discriminatory." (3 Exs. 559.) Section 1861.02 has no bearing because, as the DOI explained, "this statute is also addressing the term 'premium' in a narrow actuarial context that is different than the purpose behind 381(f)." (3 Exs. 559.) Because context is paramount [**59]  when defining premium, there is nothing "surprising or problematic" about the different use of premium in section 1861.02. (3 Exs. 560.) The Exchange fails to show any irreconcilable conflict in the various Insurance Code sections.

#### d. "Ancillary Income" Regulation

The Exchange's "ancillary income" argument is another diversion. The Exchange asserts: "By regulation, the DOI expressly defined installment charges as 'not derived from insurance premiums.'" (Petn. 33; see also Petn. 11 [same contention].)

The regulation quoted by the Exchange, however, says no such thing. It actually refers to "[p]remium financing revenues" as part of "ancillary income" and, therefore, "not derived from insurance premiums." (Cal. Code Regs., tit. 10, § 2644.13.) "Premium financing" is a term of art, and a different animal altogether from the installment fees at issue here. (See § 778.) The Exchange does not claim that Williams entered into a "premium finance agreement." (§ 778.1.) This means "a loan contract, note, agreement, or obligation by which an insured agrees to pay to a lender in installments the principal amount advanced by the lender to an insurer [**60] or producer in payment of premium on an insurance contract or contracts, plus charges, with the assignment, as security therefor, of the unearned premiums, accrued dividends, [*33] or loss payments." (*Ibid.*) In fact, the petition emphasizes that a "premium finance company" was an alternative, not what Williams actually did. (Petn. 16, citing § 778.)

In light of this record, the Exchange has no basis to contend that "installment charges are in exchange for the time value of money rather than for underwriting risk." (Petn. 2.) By the Exchange's own description-distinguishing premium finance agreements - the installment fee levied on policyholders such as Williams cannot be an "interest charge." (Petn. 7.) This is hardly surprising because the Exchange is an insurance company, not a bank. Its installment-based insurance is not a loan and the Exchange has never shown that it somehow triggers TILA disclosures. (15 U.S.C. § 1601 et seq.) In fact, TILA applies to insurers only in rare circumstances. (See *Crawford v. Farmers Group, Inc., supra,* 160 Cal.App.3d at pp. 1169-1170.) Thus, the Exchange's TILA trappings on the billing statement [**61] are wholly unnecessary. (1 Exs. 168.)

Even worse, the TILA gloss is deceptive because it falsely implies that the consumer, upon obtaining the insurance, has become a debtor and the Exchange a creditor. As noted above, installment payments are made in advance of the covered period, not afterwards. If the installment payment is not made, the coverage will be cancelled. (1 Exs. 194.) Depending on the timing of cancellation, the consumer might owe a small balance or the Exchange might owe a small refund. Either way, installment-based insurance is presumptively provided on a "pay as you go" basis. (1 Exs. 194-196.) The policy is explicit, moreover, that the consumer may cancel at any time and thereby terminate the relationship. (1 Exs. 132-133.) But the billing statement confuses matters by suggesting that the consumer, upon entering into the policy, is now necessarily in debt to the Exchange. (1 Exs. 168.) The TILA dressing reflects a comprehensive effort to present the installment charge as something other than what it really is - additional premium.

#### [*34]   e. Reporting Requirements in Annual Accounting Statements

The Exchange also contends that equating so-called "finance [**62] charges" with premium would conflict with annual accounting statements filed with the DOI on forms approved by the National Association of Insurance Commissioners (NAIC). According to the Exchange, these forms "require the Exchange to distinguish between 'premiums,' on the one hand, and 'finance and service charges not included in premium' . . . on the other hand." (Petn. 13; see also Petn. 33 [same argument].)

Here again, the DOI identified the flaw in the Exchange's comparison. The NAIC forms concern treatment of premium for accounting purposes, not consumer protection. As the DOI explained, in the accounting context, "some installment fees constitute premium and some do not." (3 Exs. 556.) In any event, accounting principles and practices do not control the proper meaning of section 381. In the DOI's words: "[T]he [NAIC]'s accounting practices generally are made to promote the reliability, solvency, and financial solidity of insurance institutions, rather than to promote the type of transparency covered by §381." (3 Exs. 556-557.)

#### 3. The Exchange's "Substantial Compliance" and "Incorporation by Reference" Theories Are Inapt

2006 CA App. Ct. Briefs 49257, *34; 2006 CA App. Ct. Briefs LEXIS 7432, **62

The Exchange argues that despite its undeniable [**63] failure to comply with the letter of the statute, "the Exchange at least substantially complied with section 381(f)." (Petn. 47, capitalization omitted.) Under the Exchange's generous view of substantial compliance, however, section 381's bright line is wiped away and the statute becomes meaningless. Indeed, the Exchange does not cite a single case where the substantial compliance doctrine excused liability under section 381 - a statute on the books since 1935.

The relevant authority actually rejects the Exchange's proposal to ignore the legislative framework. In *Allstate Ins. Co. v. Dean* (1969) 269 Cal.App.2d 1, [*35] plaintiff Mrs. Dean sought automobile insurance from Allstate. As a condition for coverage, the insurer required Mrs. Dean to agree to a "Driver Exclusion Agreement," which excluded coverage through a policy endorsement when her husband was driving. The exclusion agreement recited the policy endorsement verbatim. Mrs. Dean signed the agreement and returned it to Allstate. Upon receiving the agreement, Allstate mailed Mrs. Dean the policy, but did not include the endorsement. While the policy was in force, Mr. Dean was involved in an accident and [**64] a claim resulted. (*Id.* at pp. 2-3.) Just like the Exchange in the present case, Allstate contended that Mrs. Dean assented to the arrangement. (*Id.* at p. 5.)

The court rejected this argument, as Allstate failed to comply with the same Insurance Code provisions at issue here. "Section 381 requires every policy to specify the risks insured against. Section 383.5 declares that its purpose is to prevent fraud or mistake in connection with insurance of motor vehicles and requires every contract of motor vehicle insurance to be embodied in a document to be delivered to the owner, which document it defines as a policy of insurance conforming to section 381." (*Allstate Ins. Co. v. Dean, supra,* 269 Cal.App.2d at p. 4.) "Patently, these provisions of the Insurance Code were not followed in this case, a failure for which the insurer must bear responsibility." (*Ibid.*) The same is true here.

Recent case authority is in accord. In *Malek v. Blue Cross of California* (2004) 121 Cal.App.4th 44 (*Malek*), insurer Blue Cross failed to comply with Health and Safety Code section 1363.1. That statute [**65] requires any arbitration clause to be placed in a specific location on the health insurance enrollment form. (*Id.* at p. 60-61.) Although Blue Cross's one-page enrollment form contained the arbitration clause, it was in the wrong place on the form. (*Id.* at pp. 50-51.) The Maleks were repeatedly advised of the arbitration requirement through other documents. (*Id.* at p. 52.) Blue Cross argued that it substantially complied with the statutory mandate because the arbitration [*36] clause was included on the one-page form, but just not in the right spot. According to Blue Cross, its violation was "technical and inconsequential, as the Maleks repeatedly received actual notice of their arbitration obligation, making the fact that the signature block is not immediately below the arbitration provision 'of no moment given the prominent placement of that [arbitration] provision on a one page form.'" (*Id.* at p. 72.)

The court rejected these contentions, reasoning that Health and Safety Code section 1363.1 is a disclosure statute with which compliance is "mandatory." (*Malek, supra,* 121 Cal.App.4th at p. 72.) [**66] Williams' case is an easy one compared with *Malek*. There, the insurer made the required disclosure in the required document but in the wrong place on the page. Here, the Exchange did not make the required disclosure in the required document, but rather, if anywhere, in an entirely different document. Hence, if substantial compliance did not carry the day in *Malek,* then it also must fail in this case. The Exchange's request to "'soften the consequences'" of the Insurance Code is for the Legislature. (Petn. 47, 52.)

As a corollary to its substantial compliance argument, the Exchange says actual compliance is established under the "incorporation by reference" doctrine. (Petn. 50.) The Exchange never made anything of this theory in superior court. The Exchange's papers below mentioned incorporation by reference only in passing, supported by no citation to authority. (3 Exs. 677; 5 Exs. 1220.)

Even if not waived, the argument is unavailing. The Exchange relies on the following from the declarations page: "Renewal is contingent upon your payment of at least the Minimum Due before or on the Due Date shown in the enclosed Insurance Billing." (2 Exs. 373.) This sentence (in microscopic-sized [**67] font) merely reminds the insured to pay the premium, whether by installment or in a lump sum. It does not incorporate the billing statement into the

policy. The Exchange's newfound legal authority, to the minimal extent [*37] illuminating, demonstrates that more precision than this is necessary for incorporation by reference. (See, e.g., *Hertz v. Home Ins. Co.* (1993) 14 Cal.App.4th 1071, 1076, 1081-1082 [excess liability policy was "subject to the same definitions, terms, conditions and exclusions as are contained in the Primary Policy" and, as a result, incorporated those terms by reference], emphasis deleted; *Shaw v. Regents of Univ. of Cal.* (1997) 58 Cal.App.4th 44, 54 ["'the reference must be clear and unequivocal'"].) The Exchange certainly cites no decisions applying this doctrine to negate the uniquely rigorous mandates of section 381 (the policy must specify the premium) and section 383.5 (an insurance policy consists of only the policy form, the declarations page and any endorsements).

Taken to its logical end, the Exchange's undisciplined approach to compliance would permit insurance companies to exclude required terms from the [**68] policy altogether - even a central term such as the premium - so long as the policy refers to documents containing the terms. Those documents might be attached to the policy or not, at the insurer's sole discretion on what it means to make the documents "'readily available.'" (Petn. 50.) For instance, the policy might direct the consumer to an Internet website, but not all drivers own computers. For the insured, discerning the policy's cost would become a tedious exercise of connecting the dots. Sections 381 and 383.5 firmly place the burden on the insurance company to connect the dots by spelling out the important terms, including the premium, in one location.

### 4. The Exchange's "Causation" and "No Harm" Theories Are Inapt

Another theme floated by the Exchange is that its legal violations supposedly caused no cognizable harm to anyone. (E.g., Petn. 55-58.) The trial court soundly refuted these arguments. As the summary judgment order explained: "Plaintiffs have demonstrated a breach of the contract - defendant requiring plaintiffs pay more for the insurance than is stated in the insurance [*38] policy. Plaintiffs proved this caused damages - plaintiffs paid more for the [**69] insurance than stated in the policy, damaging each plaintiff in the amount of the installment fee." (6 Exs. 1523.) The Exchange's skewed position on "causation" and "harm" ultimately "misses the point that the harm is the failure to include the amount of the installment fee on the policy." (6 Exs. 1523.) At bottom, the Exchange "was not entitled to take money for insurance in an amount not specified in the policy." (6 Exs. 1524.)

The trial court was right that Williams suffered cognizable harm. "One who commits a breach of contract must make compensation therefor to the injured party. In determining the amount of compensation as the damages to be awarded, the aim in view is to put the injured party in as good a position as he would have had if performance had been rendered as promised." (*Ajaxo, Inc. v. E*Trade Group, Inc.* (2005) 135 Cal.App.4th 21, 55-56 (*Ajaxo*), internal quotation marks omitted.) Again, the Exchange promised to insure Williams if she "pa[id] the premium stated in the declarations for the policy period and any additional premium resulting from changes made during the policy period." (1 Exs. 132.) The premium stated in the declarations page did [**70] not include the additional premium the Exchange levied for paying by installments. (Compare, e.g., 1 Exs. 162 [illustrative declarations page] with 1 Exs. 168 [billing statement].) Putting Williams where she would be "if performance had been rendered as promised" dictates, as the trial court concluded, that the installment fee be returned. (*Ajaxo, supra,* 135 Cal.App.4th at p. 56.)

The analysis leads to the same result if viewed through the lens of restitution, despite the differences between damages and restitution. Primary Supply stated, "'in enforcing restitution, the purpose is to require the wrongdoer to restore what he has received and thus tend to put the injured party in as good a position as that occupied by him before the contract was made.'" (*Ajaxo, supra,* 135 Cal.App.4th at p. 56.) This general rule follows more specifically [*39] under the UCL, as the Supreme Court has held repeatedly. "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149; accord, *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177.) [**71] Restoring Williams to the status quo ante means giving back what was wrongfully taken in violation of law - the installment fee calculated at a whopping 18% annual percentage rate. Although maxims can be trite, they are durable for a reason. Here, the trial court was faithful to a familiar jurisprudential principle: "For every wrong there is a remedy." (Civ. Code, § 3523.)

2006 CA App. Ct. Briefs 49257, *39; 2006 CA App. Ct. Briefs LEXIS 7432, **71

**5. Williams Did Not Somehow Ratify the Exchange's Unlawful Conduct**

In a related theme urged throughout, the Exchange insists that "Williams consented, and invited the alleged 'injury.'" (Petn. 60, capitalization omitted.) This is nonsense. Awareness of the installment fee is not the same thing as knowing it is being unlawfully collected. Williams is not a lawyer and, as the DOI observed, section 381 protects consumers from "fraud and mistake." (3 Exs. 566.) The statute was not enacted to protect insurance companies. To the extent any diligence is required on Williams' part, she has exercised it. She filed suit within a month of learning that the Exchange's practice was improper, and has kept her insurance only because she needs it to drive a car in California. (2 Exs. 307.) These circumstances [**72] hardly make her an accomplice to the Exchange's breach of contract and systematic Insurance Code violations.

"[I]t is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable." (*American Oil Service v. Hope Oil Co.* (1961) 194 Cal.App.2d 581, 586.) The Exchange's attempt to point the finger at Williams does not work because, again, noncompliance with sections 381 and 383.5 [*40] is a "failure for which the insurer must bear responsibility." (*Allstate Ins. Co. v. Dean, supra,* 269 Cal.App.2d at p. 4.)

**6. The Rule of Lenity Does Not Shield the Exchange from Liability**

The Exchange contends that section 381 must be construed in its favor because this statute imposes "penal liability," separately in section 383. (Petn. 31.) The DOI, however, agreed with Williams that section 381 is a "consumer protection statute" whose purpose is "to prevent fraud and mistake by requiring insurers to list the basic terms of the contract." (3 Exs. 564, 566.) Even assuming for sake of argument that section 381 is a penal statute, the Exchange's contention fails.

As the Exchange acknowledges, the rule of lenity is [**73] not triggered unless the statutory language is "'reasonably susceptible of two constructions.'" (Petn. 31.) The Exchange offers no alternative reasonable definition of premium. By contrast, Williams' interpretation is supported by multiple legal sources including the DOI, as discussed above.

Indeed, because the relevant authority is so favorable to Williams, the purpose animating the rule of lenity is not implicated in this case. By the Exchange's own description, the rule ensures "reasonable notice of the conduct that constitutes a crime" and forbids "after-the-fact judicial expansion of an ambiguous statute." (Petn. 32.) Insurance companies have been on notice of the correct interpretation since the Attorney General's 1947 opinion, rendered at the DOI's request, construing section 381 to include installment charges. (3 Exs. 618.) As the trial court observed, the seminal 1959 opinion in *Allstate, supra,* 169 Cal.App.2d 165 further underscored what the law was. (6 Exs. 1523.)

Having failed to offer a reasonable alternative definition of premium, the Exchange seeks to manufacture an ambiguity merely because the parties are at loggerheads on the meaning. But ambiguity [**74] does not exist because there [*41] is "[d]isagreement concerning the meaning of a phrase," or because "a word or phrase isolated from its context is susceptible of more than one meaning." (*County of San Diego v. Ace Property & Casualty Ins. Co., supra,* 37 Cal.4th at p. 415, internal quotation marks omitted.) Recent Supreme Court authority instructs that "although true ambiguities are resolved in a defendant's favor, an appellate court should not strain to interpret a penal statute in defendant's favor if it can fairly discern a contrary legislative intent." (*People v. Avery* (2002) 27 Cal.4th 49, 58.) The DOI discussed the legislative intent supporting Williams' interpretation: "[P]olicyholders would be less likely to be defrauded or mistaken about the amount of premium if that term is defined in the broadest sense, in the typical way policyholders view their installment payments (i.e., the total price of obtaining coverage, including the installment fee)." (3 Exs. 566.) By invoking the rule of lenity as a liability shield, the Exchange seeks to stretch the rule beyond its carefully drawn boundaries.

**7. Foreign Precedent Cannot Trump California [**75] Law**

Unable to prevail under California law, the Exchange relies on a few decisions from other jurisdictions. This case

2006 CA App. Ct. Briefs 49257, *41; 2006 CA App. Ct. Briefs LEXIS 7432, **75

law is either inapposite or unpersuasive.

The Exchange points to *Blanchard v. Allstate Ins. Co.* (La.Ct.App. 2000) 774 So.2d 1002 (*Blanchard*) and *Cacamo v. Liberty Mutual Fire Ins. Co.* (La.Ct.App. 2004) 885 So.2d 1248, which followed *Blanchard.* In *Blanchard,* the appellate court agreed with an administrative ruling by the Louisiana insurance commissioner that the installment fees there were not premium under Louisiana law. (*Blanchard, supra,* 774 So.2d at p. 1003.) The appellate opinion thus merely reflects an administrative ruling that is at odds with the DOI's ruling in this case under California law. *Blanchard's* rationale, moreover, is not compelling. The court wrote: "Although the district court found an insured could not obtain insurance in installments without paying the [*42] installment fees, it did not find that an insured could not obtain insurance without paying them . . . . In the case *sub judice,* payment of the installment fees is not a prerequisite to obtaining coverage." ( [**76] *Id.* at pp. 1005-1006.) This explanation ignores practical realities. Many consumers, including Williams, cannot afford insurance on a lump-sum basis. (2 Exs. 307.) For this sizable group, paying on a periodic basis is the only option available to them.

Indeed, *Blanchard* illustrates that even in Louisiana, the judicial view is far from unanimous. Three appellate judges in that case agreed with the trial court and dissented. As the dissent observed, in the real world, installment fees "are consideration for the procurement of that insurance as they must be paid if an insured wishes to obtain a policy and pay in installments." (*Blanchard, supra,* 774 So.2d at p. 1007 (dis. opn. of Fogg, J.).) "The average consumer does not possess the specialized knowledge and skill to analyze insurance rates and charges to know how much he is paying for what protection, and the legislative requirement that the 'price' to the consumer must include all charges paid by him is indicative of the legislative concern for his protection in this regard." (*Ibid.*) This Court should not march in lockstep with the misguided views of the Louisiana majority.

Likewise, *Sheldon v. American States Preferred Ins. Co.* (Wash.Ct.App. 2004) 95 P.3d 391 [**77] does not aid the Exchange. To the contrary, the trial court in that case, agreeing with the state insurance commissioner, concluded that installment fees were premium under Washington law. (*Id.* at pp. 392-93.) This ruling was not even challenged on appeal. (*Id.* at p. 393, fn. 10.) On the facts presented, the plaintiff did not dispute there was no harm. (*Id.* at p. 393.) Going even further, he acknowledged the fees were reasonable and were voluntarily paid. (*Ibid.*) Citing *Allstate, supra,* 169 Cal.App.2d 165, the *Sheldon* court recognized that under California law, such charges are premium. (*Id.* at p. 393, fn. 10.) Whatever the law in Washington, "California's consumer protection laws are among the strongest in the [*43] country." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 242 [discussing UCL and CLRA as examples].) Foreign precedent does not overcome formidable California law.

Finally, even if out-of-state decisions had bearing, what is sauce for the goose is sauce for the gander. It is easy to locate jurisdictions agreeing with the California's goal of protecting [**78] consumers in this area. (See, e.g., *State Ins. Commissioner v. Allstate Ins. Co.* (Or. 1960) 351 P.2d 433, overruled on other grounds by *Parr v. Department of Revenue* (Or. 1976) 553 P.2d 1051; *Liberty Mutual Ins. Co. v. State Tax Com.* (Mass. 1974) 312 N.E.2d 559.)

**V. CONCLUSION**

The Exchange fails to show any error by the trial court in granting summary judgment for Williams. The writ petition, therefore, should be denied. Consistent with the DOI's recent opinion, this Court should hold that "premium" in section 381 means the entire cost - including the Exchange's installment fee - charged for an insurance policy.

DATED: December 21, 2006

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
LEONARD B. SIMON

2006 CA App. Ct. Briefs 49257, *43; 2006 CA App. Ct. Briefs LEXIS 7432, **78

TIMOTHY G. BLOOD
KEVIN K. GREEN

/s/ [Signature]
KEVIN K. GREEN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

 [*44]  ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)

Attorneys for Real Party in Interest


CERTIFICATE [**79]  OF INTERESTED ENTITIES OR PERSONS

(Cal. Rules of Court, rules 14.5, 56(i), 57(c), 58(c) & 59(d))

Use this form for the initial certificate when you file your first document in the Court of Appeal in civil appeals and writs, and for supplemental certificates when you learn of changed or additional information that must be disclosed. Also include a copy of the certificate in your principal brief after the cover and before the tables. If no entity or person is known that must be listed under rule 14.5(d), write "NONE".

(Check One) INITIAL          SUPPLEMENTAL CERTIFICATE []
CERTIFICATE [X]

| Full Name of Interested Person / Entity | Party | Non-Party | Nature of Interest |
|---|---|---|---|
| | | (Check One) | (Explain) |
| | | | Plaintiff/Cross-Defendant/Real |
| Tawndra Williams | [X] | [] | Party in Interest |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |

**The undersigned certifies that the above listed persons or entities (corporations, partnerships, firms or any other association, but not Including government entities  [**80]   or their agencies), have either (i) an ownership**

2006 CA App. Ct. Briefs 49257, *44; 2006 CA App. Ct. Briefs LEXIS 7432, **80

**interest of 10 percent of more in the party if an entity; or (ii) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 14.5(d)(2).**

**Attorney Submitting Form**

Kevin K. Green
**(Name)**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
**(Address)** 655 West Broadway, Suite 1900
San Diego, California 92101
**(City/State/Zip)**
(619) 231-1058
**(Telephone Number / E-mail address)**
/s/ [Signature]
**(Signature of Attorney Submitting Form)**

**Party Represented**
Plaintiff/Cross-Defendant/Real
Party in Interest Tawndra Williams
**(Name)**

September 12, 2006
(Date)

**III. VERIFICATION**

    I, Kevin K. Green, am a member of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for real party in interest Williams and the certified plaintiff class. I make this verification because I am more familiar with the relevant facts. The facts referred to in this return are true based on my review of the record in this case.

    I declare under penalty of perjury [**81]  under the laws of the State of California that the foregoing is true and correct, and that this verification was executed on December 21, 2006, at San Diego, California.

/s/ [Signature]
KEVIN K. GREEN

        **RULE 14 CERTIFICATE OF COMPLIANCE**

    The undersigned counsel certifies that **REAL PARTY IN INTEREST'S RETURN TO VERIFIED PETITION FOR A PEREMPTORY WRIT** uses a proportionately spaced Times New Roman 13-point typeface, and that the text of this brief comprises 13,046 words according to the word count provided by Microsoft Word word-processing software.

DATED: December 21, 2006

/s/ [Signature]
KEVIN K. GREEN
Counsel for Real Party in Interest

        **DECLARATION OF SERVICE BY MAIL**

2006 CA App. Ct. Briefs 49257, *44; 2006 CA App. Ct. Briefs LEXIS 7432, **81

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2. That on December 21, 2006, declarant served the **REAL PARTY IN INTEREST'S RETURN TO VERIFIED PETITION FOR A PEREMPTORY WRIT** by [**82] depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3. That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this twenty-first day of December, 2006, at San Diego, California.

/s/ [Signature]
Terree DeVries

FOCUS - 7 of 7 DOCUMENTS

Go To California Court of Appeal Opinion

View Original Source Image of This Document

LINDA McKELL, et al., Plaintiffs-Appellants, vs. WASHINGTON MUTUAL, INC. et al., Defendants-Respondents.

No. B176377

COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE

2004 CA App. Ct. Briefs 176377; 2005 CA App. Ct. Briefs LEXIS 579

February 10, 2005

Appeal from the Superior Court of the State of California for the County of Los Angeles. The Honorable Charles W. McCoy. Superior Court No. BC287931.

Initial Brief: Appellant-Petitioner

**COUNSEL:** [**1] LERACH COUGHLIN STOIA GELLER, RUDMAN & ROBBINS LLP, JOHN J. STOIA, JR. (141757), TIMOTHY G. BLOOD (149343), KEVIN K. GREEN (180919), TAMI FALKENSTEIN HENNICK (222542), 401 B Street, Suite 1600, San Diego, CA 92101, Telephone: 619/231-1058, 619/231-7423 (fax), Attorneys for Plaintiffs-Appellants, Service on Attorney General and District Attorney required by Bus. & Prof. Code, § 17209.

Counsel for Defendant(s), Julia B. Strickland, Lisa M. Simonetti, Heather A. McConnell, Stroock & Stroock & Lavan LLP, 2029 Century Park East, Suite 1800, Los Angeles, CA 90067-3086, 310/556-5800, 310/556-5959 (Fax).

Counsel for Plaintiff(s), John J. Stoia, Jr., Timothy G. Blood, Kevin K. Green, Tami Falkenstein Hennick, Lerach Coughlin Stoia Geller, Rudman & Robbins LLP, 401 B Street, Suite 1600, San Diego, CA 92101-4297, 619/231-1058, 619/231-7423 (Fax).

David J. Bershad, Michael Spencer, Susan Greenwood, Milberg Weiss Bershad & Schulman LLP, One Pennsylvania Plaza, New York, NY 10119-1065, 212/594-5300, 212/868-1229 (Fax).

Craig H. Johnson, Lon D. Packard, Joann Shields, Packard, Packard & Johnson, 2795 Cottonwood Parkway, Suite 600, Salt Lake City, UT 84121, 801/428-9000, 801/428-9090 (Fax). [**2]

Cary Patterson, Michael Angelovich, Brady Paddock, Nix Patterson & Roach LLP, 2900 Saint Michael Drive, 5th Floor, Texarkana, TX 75503, 903/223-3999, 903/223-8520 (Fax).

Ronald A. Reiter, Supervising Deputy Attorney General, Office of the Attorney General, Consumer Law Section, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102.

**TITLE: PLAINTIFFS-APPELLANTS' OPENING BRIEF**

2004 CA App. Ct. Briefs 176377, *1; 2005 CA App. Ct. Briefs LEXIS 579, **2

**TEXT:** [*1]  **I. INTRODUCTION**

For California home buyers, "closing costs" are the hefty tab, arbitrarily imposed, that must be paid at the end of escrow for the home purchase to conclude. This lawsuit challenges the business practices of defendants-respondents Washington Mutual, et al. (Washington Mutual) in connection with three closing costs imposed on California consumers. The complaint alleges that the challenged costs are deceptively, indeed unlawfully, imposed on borrowers. Sustaining a demurrer, however, the trial [**9] court dismissed this action at the pleading stage. The court cited the complaint's purported failure to allege the precise nature of the contract between Washington Mutual and plaintiffs-appellants Linda McKell, Scott David Pasnikowski and Susan Nero (plaintiffs), all of whom took out a mortgage with Washington Mutual.

For at least three reasons, this dismissal is erroneous and must be reversed. First, the trial court simply ignored plaintiffs' allegations, in disregard of settled rules governing demurrers. Even a cursory reading of the complaint reveals that plaintiffs' claims are not grounded solely in contract. The scope of this action is broader. Plaintiffs challenge wrongful business practices associated with the challenged costs. The complaint asserts eight diverse causes of action flowing from the factual focus on Washington Mutual's wrongful practices. The claims include not just breach of contract, but also statutory claims under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Consumers Legal Remedies Act (CLRA) [*2] (Civ. Code, § 1750 et seq.). In effect, the court impermissibly narrowed the complaint to make breach of contract the centerpiece [**10] - if not the only piece - when this is not the action that plaintiffs presented.

Second, having mistakenly elevated the contract to the factual and legal *sine qua non* of surviving demurrer (on any cause of action), the trial court compounded its error by mandating particularized pleading. As discussed further below, the court instructed plaintiffs to satisfy an unduly stringent pleading standard, then dismissed the complaint after finding the standard was not met. For pleading purposes, however, plaintiffs' claims are alleged more than sufficiently. The court put plaintiffs to a heightened test of particularized pleading that is wholly at odds with basic principles of fact pleading in this state.

Third, the trial court misapprehended the governing substantive law, particularly on the UCL claims. It made no effort to distinguish the UCL from a claim for breach of contract. Contrary to the court's assumption, a contract is not required to establish a "fraudulent," "unfair" or "unlawful" business practice. (Bus. & Prof. Code, § 17200.) Hence, consumers invoking the UCL cannot be tossed out of court for failing to allege a contract, even if the complaint somehow fell short in this [**11] respect. In fact, it does not. When assessed under a fact-pleading standard and the relevant substantive law, the complaint states a claim for relief on each count, including breach of contract. Washington Mutual's demurrer, therefore, should have been overruled.

[*3]  The trial court's grudging reading of plaintiffs' complaint disregarded "the cornerstone jurisprudential policies that, in furtherance of justice, complaints are to be liberally construed and disputes should be resolved on their merits." ( *CLD Construction, Inc. v. City of San Ramon* (2004) 120 Cal.App.4th 1141, 1149, citations omitted.) The judgment must be reversed.

**II. FACTUAL AND PROCEDURAL BACKGROUND**

### A. The Complaint: In Home Mortgage Closings, Washington Mutual Deceptively Charges Consumers Substantially More than Its Actual Cost for Underwriting, Tax Service Fees and Wire Transfers

The following statement of facts is taken from the second amended complaint, the controlling pleading. (Plaintiffs-Appellants' Appendix [AA] 119-149.)

Washington Mutual is a self-proclaimed leader in the home-mortgage industry. (AA 130-131.) This action focuses

2004 CA App. Ct. Briefs 176377, *3; 2005 CA App. Ct. Briefs LEXIS 579, **11

on three closing costs [**12] that Washington Mutual imposes on consumers in connection with such loans. Specifically, in a home mortgage closing, Washington Mutual requires consumers to pay the cost of underwriting, tax service fees and wire transfers. (AA 123.) In mortgage parlance, these three charges are "pass-through" costs - meaning the charges are merely intended as reimbursements for services provided by another entity. The charges are not among the many associated with the loan on which Washington Mutual and other lenders are entitled to make money. That is, the charges are not interest on the loan, [*4] "points" paid at closing to obtain a lower interest rate, or other money collected by Washington Mutual as consideration for the mortgage itself. (*Ibid.*)

The loan transaction is a contract. It could be little else. As a condition of obtaining a home loan, Washington Mutual requires its borrowers to pay the three pass-through costs. (AA 123.) Washington Mutual imposes this requirement by disclosing on the "HUD-1" settlement statement the purported costs of these fees. (AA 123, 138.) There is no dispute that the loan will not be finalized unless these costs are paid. As evidenced by payment of [**13] these fees, plaintiffs and other Washington Mutual customers agree to pay the cost of these services, as they must do to close the loan. (AA 123.) The payment, thus, is contractual. Washington Mutual's requirement that consumers pay the three costs is simply one element of the borrower's consideration for the mortgage. (AA 141.) The complaint specifically alleges that the deed of trust is an adhesion contract. (*Ibid.*)

The heart of this action, though, is not the precise nature of the contract. To the extent a generalization is necessary, this is a deception case more than a contract case. Plaintiffs allege that the circumstances of the closing misleadingly suggest to consumers that they will be charged only Washington Mutual's actual cost - whatever that amount is - for underwriting, tax services and wire transfers. (AA 123-125, 137-138.) In fact, Washington Mutual charges its customers substantially more than its actual cost for these services, [*5] in violation of not just the contract but also state and federal laws. (AA 120, 123-125, 134-135.). It is this deceptive conduct - implying to consumers that actual cost will be charged but charging much more - that is at the [**14] heart of this action.

With respect to underwriting, Washington Mutual grossly marks up the charge it imposes on consumers, unlawfully pocketing for itself the savings intended for consumers. (AA 120, 124, 134-135.) This is no mere quibble. Mortgage loan underwriting has changed dramatically over the past decade. Before the mid-1990s, the underwriting review was time consuming and expensive because it occurred manually. (AA 124.) Technological advances and the assistance of government agencies, however, have made loan underwriting dirt cheap and virtually risk free. (AA 123-124.) In 1995, the Federal National Mortgage Association (FANNIE MAE) and the Federal Home Loan Mortgage Corporation (FREDDIE MAC) began requiring lenders who intended to sell their loans to one of these agencies to use automated underwriting software. (AA 123.) This software instantly analyzes a borrower's ability to repay a loan and assigns a score reflecting this assessment. (*Ibid.*) Underwriting is complete and a purchase guarantee is issued in less than 20 minutes, rather than the large number of hours previously required. (AA 124.) If the borrower is approved, then FANNIE MAE and FREDDIE MAC guarantee that [**15] they will purchase the loan on the [*6] secondary market, thereby eliminating Washington Mutual's risk in the underwriting process. (AA 123-124.)

Just how cheap is underwriting now? This review costs lenders such as Washington Mutual only $ 20.0 per loan. (AA 124.) FREDDIE MAC estimates that because of the widespread use of this software by loan brokers and lenders, home buyers should be saving between $ 400 and $ 650 in closing costs. (*Ibid.*) But they do not - because lenders such as Washington Mutual pocket the savings. Plaintiffs' experiences are illustrative. Washington Mutual charged McKell $ 400, and Pasnikowski and Nero $ 250, for the $ 20.0 automated underwriting service. (*Ibid.*) On a macro level, such gargantuan markups have a significant impact on potential homebuyers. According to FREDDIE MAC, for every $ 400 reduction in closing costs, approximately 70,000 additional families qualify to buy a house. (AA 122.) Thus, Washington Mutual's conduct has a directly negative impact on home affordability, to the detriment of consumers.

In addition to imposing the inflated underwriting fee, Washington Mutual requires potential borrowers to pay a third-party vendor of [**16] Washington Mutual's choosing to provide information about property taxes on the property. This is the "tax service" fee, the second closing cost at issue here. (AA 125.) The third-party vendors charge Washington Mutual fees to perform these services. (*Ibid.*) Without performing any additional services, Washington

2004 CA App. Ct. Briefs 176377, *6; 2005 CA App. Ct. Briefs LEXIS 579, **16

Mutual then inflates the fee charged to consumers. (*Ibid.*)  [*7]  Because of Washington Mutual's disclosures on the HUD-1 statement, however, consumers understand the fee charged to be Washington Mutual's actual cost. (AA 125, 138.) The same thing occurs with the third closing cost at issue, wire transfer services. Washington Mutual pays a flat fee to wire money from its bank to another bank or title company. (AA 125) Washington Mutual then charges borrowers, including plaintiffs, greatly inflated fees well above the cost for this service, without performing additional work or services. (*Ibid.*) Meanwhile, Washington Mutual fails to disclose this markup, representing through the HUD-1 statement that the cost charged is merely the cost of the wire transfer. (*Ibid.*)

Based on the above facts, plaintiffs brought eight causes of action against Washington Mutual.  [**17]  The second amended complaint asserts statutory claims under both the UCL (unlawful, unfair and fraudulent business practices) and the CLRA. (AA 134-140.) Plaintiffs also assert common-law claims for unjust enrichment, breach of contract, breach of bailment agreement and conversion. (AA 140-143.) They sue on behalf of themselves and the general public and also seek class certification. (AA 120, 125-128.) n1

>    n1 Plaintiffs' complaint proposed to define the class as follows:
>
>    All persons and entities who, on or after January 1, 1999, obtained one or more federally-related home mortgages on property located in the State of California, (1) whose automated underwriting score was "Accept," "Accept-Plus," "Approve-Eligible" or a similar code indicating an acceptable loan for purchase by FANNIE MAE or FREDDIE MAC, (2) to whom Washington Mutual charged a fee for underwriting, (3) to whom Washington Mutual charged a fee for tax services, and (4) to whom Washington Mutual charged a fee for wire transfers.

(AA 125.)

[**18]

## [*8]  B. History Below: Plaintiffs Are Dismissed on Demurrer Based on the Trial Court's Misperception that All Causes of Action Require Proof of a Contract, Which the Court Holds Is Insufficiently Alleged

This action was filed in December 2002. (AA 1.) Early in the case, Washington Mutual recognized that a contract was not required to prevail on each cause of action. In a joint status report filed before the trial court issued any substantive rulings, the parties did not even mention the existence of a contract as a central factual issue to be proved. (AA 38-39.)

### 1. Demurrer to the First Amended Complaint

Likewise, when it later demurred to plaintiffs' first amended complaint (AA 7-34), Washington Mutual did not contend that the entire action somehow failed because a contract was insufficiently alleged. Rather, Washington Mutual asserted only that the breach-of-contract cause of action was inadequately alleged, and also challenged a specific CLRA claim grounded on the existence of a contract. (AA 53, 63-65; see also AA 102-113 [reply in support of demurrer giving breach of contract minimal attention].)  [*9]  Washington Mutual did not argue [**19]  that a contract was required to prove a UCL violation or, except as just explained, to establish any other claim asserted.

In disposing of the demurrer, however, the trial court recast plaintiffs' suit to make the contract the centerpiece. The court gave hints of this erroneous approach at oral argument, leading defense counsel to agree with the approach despite the narrower arguments in Washington Mutual's demurrer papers. (Reporter's Transcript [RT] A3, A9-A12.) In a September 2003 order, the court sustained Washington Mutual's demurrer on all causes of action except the unjust-enrichment claim, which was stayed pending the outcome of a federal action. (AA 114-118.)

2004 CA App. Ct. Briefs 176377, *9; 2005 CA App. Ct. Briefs LEXIS 579, **19

The order reasoned that all "causes of action turn on the alleged existence of an agreement requiring Washington Mutual to charge no more than pass-through costs for underwriting, tax services and wire transfers." (AA 115.) The order cited nothing, in the complaint or elsewhere in the record, to support this narrow characterization of plaintiffs' allegations. Nor did the court cite any authority for its legal assumption that each cause of action - particularly the UCL claims - required proof of a contract for plaintiffs [**20] to prevail.

Having declared that a contract was essential to pass the pleading stage, the trial court then demanded particularized pleading. The September 2003 order explained: "Plaintiffs may amend to include allegations describing the nature of the alleged agreement. The allegations must be detailed. It will not [*10] be enough to allege the general core of the agreement." (AA 115.) Concluding that any agreement to charge only pass-through costs was an implied contract (rather than express), the court continued: "Plaintiffs must explain (1) why the agreement is implied, (2) how the agreement, as implied, is binding on Washington Mutual, and (3) why the agreement definitively requires Washington Mutual to charge pass-through costs." (*Ibid.*) "Each cause of action," the court added, "should be amended to specifically explain Washington Mutual's alleged misconduct in relation to the agreement." (AA 115-116.)

The September 2003 order, then, did two things of significance for this appeal. It established an inflexible contract pleading requirement, even though breach of contract was just one of eight causes of action asserted. It also put plaintiffs to the burden of particularized [**21] pleading under pain of dismissal. The trial court cited no authority for such rigorous pleading standards simply to survive demurrer.

## 2. Demurrer to the Second Amended Complaint

Although disagreeing with the September 2003 order, plaintiffs amended to comply with the trial court's instructions. With respect to underwriting and wire transfer fees, the second amended complaint averred:

> As a condition to obtaining a loan, Washington Mutual requires its borrowers to pay the cost of automatic underwriting and wire transfers. Washington Mutual makes this requirement by disclosing on the HUD-1 Settlement Statement the purported [*11] costs of these fees. As evidenced by payment of these fees, plaintiffs and the Class members agree to pay the cost of underwriting and wire transfers.

(AA 123.) Plaintiffs also specified the nature of the agreement with respect to the third category challenged, tax service fees:

> As a condition to obtaining a loan, pursuant to the deed of trust supplied by Washington Mutual, Washington Mutual also requires its borrowers to pay a tax services fee. The deed of trust states that the "Lender may require Borrower to pay [**22] a one time charge for a real estate tax verification and/or reporting service used by Lender in connection with this loan." This deed of trust is a standardized adhesion contract which was drafted by Washington Mutual and imposed on its borrowers. Borrowers were shown the loan contract prior to closing escrow on their homes. Borrowers were given a choice only of adhering to Washington Mutual's loan contract language or rejecting the loan. As such, the deed of trust is a contract of adhesion.

(*Ibid.*) The breach-of-contract count further elaborated the nature of the contract and the breach. (AA 140-142.)

Washington Mutual again demurred. Embracing the trial court's rationale, Washington Mutual asserted that "plaintiffs have failed to allege the required agreement." (AA 164.) In their opposition to the renewed demurrer, plaintiffs contended that Washington Mutual (and, for that matter, the court) had disregarded the complaint's allegations. Plaintiffs contended that the complaint actually averred three distinct grounds for liability -- in short, Washington Mutual's violation of anti-kickback laws and conduct defrauding class members, as well as breach of contract. Washington [**23] Mutual and the court, in other words, had focused on just one basis for liability. Plaintiffs [*12] argued that, in any event, an agreement was adequately alleged for pleading purposes. (AA 189-192.) On reply,

2004 CA App. Ct. Briefs 176377, *12; 2005 CA App. Ct. Briefs LEXIS 579, **23

Washington Mutual further defended the court's contract pleading requirement. (AA 218.) Although raising other challenges to the complaint, Washington Mutual took the position that plaintiffs' purported failure to aver the contractual details was "reason alone [to] engage in no further analysis of this matter and sustain the Demurrer without leave to amend." (AA 219.)

In disposing of the renewed demurrer, the trial court accepted Washington Mutual's invitation. Citing nothing but its prior order, the court declared: "Plaintiffs' causes of action turn on the existence of an allegedly implied contract." (AA 232.) Concluding that a contract was inadequately alleged despite plaintiffs' revisions to their complaint, the court sustained the demurrer without leave to amend. (*Ibid.*) As the March 2004 order summarized: "Since Plaintiffs do not sufficiently plead an implied requirement [to charge only pass-through costs], Plaintiffs' statutory and common-law claims must fall.  [**24]  " (*Ibid.*) Due to this holding, the court explained, it "need not address Washington Mutual's arguments regarding individual causes of action." (*Ibid.*) Although the order commented that these contentions "appear meritorious," none was addressed at any length. (*Ibid.*)

The entire action was dismissed in a subsequent order. (AA 237-238, 245-246.) Because the case was terminated at the pleading stage, class  [*13]  certification was not addressed. Plaintiffs filed a timely notice of appeal. (AA 239-244.) n2

n2 The notice of appeal contains a file-stamped date of June 16, 2004. (AA 239.) As already explained by plaintiffs' counsel, however, this date is incorrect. The notice of appeal was actually filed on June 8, 2004, and was timely filed. (See Declaration of Kevin K. Green, attached to Civil Case Information Statement [filed in this Court on July 19, 2004].)

## III. DISCUSSION

The propriety of dismissal on demurrer is reviewed de novo. ( *Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 718.) [**25]  The trial court erred in several respects and must be reversed. First, plaintiffs' complaint is much broader than the grudging reading it was given at the trial level. Second, pleading with heightened particularity was unnecessary. Third, the court misapprehended the substantive law. A contract is not required to prevail under the UCL. When assessed under the appropriate standards (both procedural and substantive), the complaint states claims for relief on each cause of action. Washington Mutual's demurrer should have been overruled.

### A. The Trial Court's Contract Pleading Requirement Ignored the Broader Ambit of Plaintiffs' Complaint, in Disregard of Settled Rules Governing Challenges to the Pleadings

The rules that control adjudication of a demurrer are well established. The plaintiff is the master of the complaint. Just as the defendant may not rewrite the plaintiff's pleading, trial judges cannot recast the complaint to state  [*14] claims of a different choosing. Yet that is what the lower court did here. Preoccupied by the precise nature of the contract, the court impermissibly pushed aside the other legal theories raised in the complaint, including claims [**26] under this state's most venerable consumer-protection laws. This cannot stand.

A demurrer "'admits the truth of all material factual allegations in the complaint.'" ( *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213-214 (*Children's Television*).) "[T]he reviewing court must accept as true not only those facts alleged in the complaint but also facts that may be implied or inferred from those expressly alleged." ( *Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403.) The complaint's allegations, moreover, are construed heavily in plaintiffs' favor. Since 1872, a statute has directed: "In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.) Discussing this provision, the Supreme Court has

2004 CA App. Ct. Briefs 176377, *14; 2005 CA App. Ct. Briefs LEXIS 579, **26

emphasized: "A basic rule commands us to construe the allegations of a complaint liberally in favor of the pleader." ( *Skopp v. Weaver* (1976) 16 Cal.3d 432, 438; accord, *Quelimane Co. v. Stewart Title Guarantee Co.* (1998) 19 Cal.4th 26, 43 and fn. 7 [**27] (*Quelimane*).)

This Court's opinions also underscore that the legislative instruction is real. (See, e.g., *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon &* [*15] *Gladstone* (2003) 107 Cal.App.4th 54, 67; *First Western Bank & Trust Co. v. Bookasta* (1968) 267 Cal.App.2d 910, 914.) As this Court observed in applying section 452: "'While orderly procedure demands a reasonable enforcement of the rules of pleading, the basic principle of the code system in this state is that the administration of justice shall not be embarrassed by technicalities, strict rules of construction, or useless forms.'" ( *Ramey v. General Petroleum Corp.* (1959) 173 Cal.App.2d 386, 396, quoting *Buxbom v. Smith* (1944) 23 Cal.2d 535, 542; accord, *Truta v. Avis Rent-A-Car System, Inc.* (1987) 193 Cal.App.3d 802, 815-816.)

These familiar guidelines manifest themselves in numerous ways. Of particular relevance here, "it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory." ( *Aubry v. Tri-City Hospital District* (1992) 2 Cal.4th 962, 967; [**28] accord, *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 331.) Even if plaintiffs' complaint somehow fell short on alleging breach of contract (there is no shortfall, as discussed later), the other causes of action do not, as the trial court held, "fall" with that claim. (AA 232.) This narrow reading is just the sort of strict construction of pleadings that is forbidden. (See *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 837-839 and fn. 3 [UCL claim and contract-based claim analyzed separately].) The court simply brushed aside the broader focus of plaintiffs' complaint, in disregard of the above authority.

### [*16] B. Plaintiffs Were Not Required to Plead With Heightened Particularity to Survive Demurrer

As noted, the trial court commanded plaintiffs to plead each cause of action with heightened particularity. (AA 115-116.) The court then dismissed after this standard supposedly was not satisfied. (AA 232.) This too was error.

California follows fact pleading. The touchstone is "'whether the pleading as a whole apprises the adversary of the factual basis of the claim.'" ( *Lim v. The. TV Corp. International* (2002) 99 Cal.App.4th 684, 690, [**29] citation omitted; accord, *Estate of Archer* (1987) 193 Cal.App.3d 238, 245.) The complaint's function is merely to put the defendant "on notice" of the nature of the plaintiff's claims. ( *Holmes v. California National Guard* (2001) 90 Cal.App.4th 297, 314; *Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1750.) This standard has a deep lineage. (See, e.g., *Leet v. Union Pacific Railway Co.* (1944) 25 Cal.2d 605, 619; *Lewis v. Fahn* (1952) 113 Cal.App.2d 95, 100.) On a general demurrer like Washington Mutual's, greater particularity is unnecessary. Even on a special demurrer, the standard is not taxing. In the Supreme Court's words: "Even as against a special demurrer a plaintiff is required only to set forth the essential facts of his case with reasonable precision and with particularity sufficient to acquaint a defendant with the [*17] nature, source and extent of his cause of action." ( *Youngman v. Nevada Irrigation District* (1969) 70 Cal.2d 240, 245.) n3

n3 "A special demurrer attacks a pleading for uncertainty, while a general demurrer points out substantive pleading defects such as failure to state a cause of action or affirmative defenses (e.g., statute of limitations or waiver)." ( *Ojavan Investors, Inc. v. California Coastal Commission* (1997) 54 Cal.App.4th 373, 384, fn. 8.)

[**30]

Binding precedent, in the form of three Supreme Court decisions, rejects heightened particularity at the pleading stage in UCL cases. In *People v. Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283, the trial judge, as here, "ruled that the complaint did not allege certain matters with sufficient specificity." ( *Id.* at p. 286.) Overturning that order, the Supreme Court rejected a requirement to plead "evidentiary facts" supporting the UCL claim. ( *Id.* at p. 288.) Rather, the complaint suffices if "the acts relied upon ... as constituting the violations are alleged in sufficient detail to apprise

defendants of the basis of the cause of action. If defendants require further specifics in order to prepare their defense, such matters may be the subject of discovery proceedings." (*Ibid.*)

The Supreme Court revisited the appropriate pleading standard for UCL claims a decade later in *Children's Television*. There, the defendants contended that "the complaint fails to describe the alleged deceptive practices with sufficient particularity." (35 Cal.3d at p. 211.) That case involved false [*18] advertising. The complaint, [**31] it was argued, "should not merely describe the substance of the misrepresentations, but should state the specific deceptive language employed, identify the persons making the misrepresentations and those to whom they were made, and indicate the date, time and place of the deception." (*Ibid.*) This proposed threshold resembles the level of pleading the trial court demanded of plaintiffs here. (AA 115-116.)

The Supreme Court rejected such a rigorous benchmark just to pass the pleading stage. *Children's Television* reiterated familiar principles of fact pleading. The complaint "serves to frame and limit the issues and to apprise the defendant of the basis upon which the plaintiff is seeking recovery." (35 Cal.3d at p. 212, citations omitted.) "In fulfilling this function, the complaint should set forth the ultimate facts constituting the cause of action, not the evidence by which plaintiff proposes to prove those facts." (*Ibid.*) The demurrer should be overruled if the "allegations are sufficient to notify the defendants of the claim made against them, and to frame the issues for litigation." ( *Id.* at p. 213.) Of particular interest for this appeal, [**32] *Children's Television* added: "The requirement that fraud be pleaded with specificity ... does not apply to causes of action under the consumer protection statutes." ( *Id.* at p. 212, fn. 11.)

The pleading standard for a UCL cause of action arose again seven years ago in *Quelimane*. In that case, it was argued that "because the potential scope of UCL liability is very broad, particularized fact-pleading should be [*19] required in UCL claims." (19 Cal.4th at p. 46.) The Supreme Court disagreed and reiterated what it said in *Children's Television:* "[T]he well-settled rule is otherwise except in pleading fraud." ( *Id.* at p. 47.) In their opposition to Washington Mutual's demurrer, plaintiffs observed that "fact-specific or particularized pleading is not required to state a [UCL] claim," citing *Quelimane*. (AA 198.) Although demanding heightened pleading, the trial court did not address the Supreme Court authority in either of its dismissal orders. (AA 114-116, 231-234.)

### C. Under a Fact-Pleading Standard and the Relevant Substantive Law, Each Cause of Action Is Adequately Alleged

### 1. UCL Liability  [**33]   Is Broad and Does Not Turn on Proof of a Contract

The dismissal below also cannot be squared with the substantive law - what plaintiffs must show to prevail on their causes of action. First, with respect to the UCL, the trial court's contract pleading requirement disregards the statute's vast scope and important remedial purposes.

The UCL proscribes "unfair competition" - that is, any "fraudulent," "unfair" or "unlawful" business act or practice. (Bus. & Prof. Code, § 17200.) "California courts have consistently interpreted such language broadly." ( *People v. McKale* (1979) 25 Cal.3d 626, 632.) The Legislature intended by the UCL's "sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur." [*20] ( *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181, internal quotation marks and citation omitted (*Cel-Tech*); accord, *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111.) As the Supreme Court stated more recently: "By defining unfair competition to include also any 'unfair or fraudulent business act [**34] or practice' ... the UCL sweeps within its scope acts and practices not specifically proscribed by any other law." ( *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949, emphasis deleted; see also *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 560; *Cel-Tech, supra,* 20 Cal.4th at p. 180.) The UCL is one of many statutes reflecting this state's robust policy of consumer protection. "California's consumer protection laws are among the strongest in the country." ( *Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 242.) As this Court has observed: "'Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary

society.'" ( *Wilner v. Sunset Life Ins. Co.* (2000) 78 Cal.App.4th 952, 959, quoting *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808.)

To protect the public, the UCL focuses on business practices, not merely on contractual relationships between consumers and businesses. The UCL covers the latter, but the statute is not so limited. For decades, our Supreme Court has "sharply distinguished" [**35] between a "cause of action based on plaintiff's contract" and a claim "based on defendant's alleged unfair trade practices." ( *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 449; [*21] see also *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 133-134 [reaffirming *Fletcher's* analysis].) One court has specifically held: "'[T]he question whether a particular business practice is "unfair" within the meaning of section 17200 is independent of any contractual relationship between the parties.'" ( *Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 396.) "[A]n unfair business practice claim under section 17200 is more akin to a tort than a contract claim." (*Ibid.*)

This precedent is faithful to the Legislature's instruction that "the remedies or penalties provided by [the UCL] are cumulative to each other and to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, § 17205; see *Stop Youth Addiction, Inc. v. Lucky Stores, Inc., supra,* 17 Cal.4th at pp. 565-566 [this provision means what it says].) Consistent with [**36] the UCL's protective force, the Supreme Court recently reaffirmed that the same set of facts may support claims for both common-law fraud and breach of contract. ( *Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979 [addressing in context of "economic loss" rule].) The law generally does not force the pleader to choose between contract- and tort-based theories where the same underlying facts, as here, support both. (See *Perry v. Robertson* (1988) 201 Cal.App.3d 333, 340; *Fairchild v. Park* (2001) 90 Cal.App.4th 919, 926 [this Court discussing *Perry*].)

The trial court's contract prerequisite is completely out of step with this authority. Indeed, the court's rigid insistence that a contract be alleged to sue [*22] under the UCL reflects an anachronistic legal outlook. Ever since Cardozo's landmark opinion in *MacPherson v. Buick Motor Co.* (N.Y. 1916) 111 N.E. 1050, courts and legislatures have moved away from the notion that consumer protection hinges on legal formalities and fictions, such as privity of contract. This is certainly true under the UCL. The trial court turned settled UCL doctrine on its [**37] head. n4

n4 Had plaintiffs known in advance how their complaint would be construed, they might have omitted the breach-of-contract count altogether. Analytically, plaintiffs' various causes of action could not "fall" with a claim for breach of contract if no such claim was asserted. (AA 232.) If plaintiffs sued for breach of contract later in a subsequent action, however, that claim would likely be barred by res judicata. Plaintiffs paid a heavy price for, as was their right, asserting multiple legal theories based on the same set of facts.

## 2. The Complaint States Claims for Relief Under the UCL

### a. The Fraudulent Prong

Again, the UCL contains three prongs, any of which alone triggers liability under the statute. (See Bus. & Prof. Code, § 17200; *Wilner v. Sunset Life Ins. Co., supra,* 78 Cal.App.4th at pp. 965-965.) A business practice violates the "fraudulent" prong where the public is "likely to be deceived" by the challenged conduct. ( *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267; [**38] accord, e.g., *Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 670.) The claim does not resemble fraud at common law. "Allegations of actual deception, reasonable reliance, and damage are unnecessary." [*23] ( *Children's Television, supra,* 35 Cal.3d at p. 211; accord, e.g., *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1288 [collecting cases].) Wrongful intent is also unnecessary. The statute imposes strict liability. (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 181; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1137.) Because just one thing needs to be shown - likelihood of

2004 CA App. Ct. Briefs 176377, *23; 2005 CA App. Ct. Briefs LEXIS 579, **38

deception, not actual deception or even harm to individual consumers - plaintiffs' burden on the fraudulent prong is "modest." ( *Prata v. Superior Court, supra,* 91 Cal.App.4th at p. 1145.)

The complaint alleges that the circumstances of the closing, including Washington Mutual's representations on the HUD-1 statement, suggest to consumers, falsely, that they will be charged only Washington Mutual's actual cost for underwriting, tax [**39] service fees and wire transfers. In fact, Washington Mutual charges much more than actual cost, without disclosing this to consumers on the HUD-1 settlement statement or elsewhere. With respect to underwriting, for example, the three borrowers bringing this action were charged fees as high as $ 400 when Washington Mutual's actual cost was just $ 20. (AA 123-125, 137-139.) It is no wonder Washington Mutual does not disclose the markup to its borrowers, but rather seeks to imply there is no markup.

Prior cases recognize that this type of conduct is likely to deceive. *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119 is [*24] analogous. There, Dollar charged its renters who were involved in collisions a "retail cost" of vehicle repairs, even though Dollar received a discount on repairs from body shops and part suppliers. ( *Id.* at p. 125.) Defendants prepared new repair invoices that reflected the higher "retail cost" rather than the actual cost of the repair. (*Ibid.*) Dollar "never informed the customers of this practice, nor did defendants supply customers with an itemized list of the inflated charges. This practice left customers [**40] with the erroneous impression that defendants are passing on only the actual repair charges." (*Ibid.*)

Similar to Washington Mutual in this case, Dollar argued there was no deception because consumers saw the final number and paid it. ( *Id.* at p. 129.) The appellate court disagreed. The problem was Dollar's suggestion, without disclosure to the contrary, that consumers were paying only Dollar's actual cost. "Defendants' practice of charging its customers a higher 'retail repair rate' without explanation or substantiation is a deceptive business practice which falls within the protection of this statute." (*Ibid.*) n5

> n5 Plaintiffs cited *Dollar* in both of their demurrer oppositions. (AA 85-86, 194, 202-203.) Although there was some discussion of *Dollar* at oral argument (RT A4, B7, B9, B12-B15), the trial court did not grapple with *Dollar* in its orders. (AA 114-116, 231-234.) In the end, the court spoke through its statements of decision, which do not address the case. (See *Rental Equipment, Inc. v. McDaniel Builders, Inc.* (2001) 91 Cal.App.4th 445, 450.)

[**41]

It is misleading for Washington Mutual to suggest to consumers that they are getting underwriting, tax services and wire transfers at cost when, in [*25] fact, consumers are blithely lining the lender's pocket with a massive markup. Consumers do not know what these services actually cost and there is no practical option in a home-mortgage closing to avoid paying them. *Dollar* is not the only case to hold that implying one thing to consumers (here, a service at cost) but giving them something else (here, a service whose price has actually been greatly inflated) is likely to deceive. This principle animates many UCL decisions. (See, e.g., *Chern v. Bank of America* (1976) 15 Cal.3d 866, 876; *Prata v. Superior Court, supra,* 91 Cal.App.4th at p. 1145; *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1163-1170 [relying in part on *Dollar*].) The trial court may have thought there was no likelihood of deception (AA 233), but that is not the test. Whether a "business practice violates the UCL is not measured by the perception of the most sophisticated, wary, or expert consumer, but by the likely effect on the normally credulous [**42] consumer." ( *Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 508, emphasis deleted.)

Likelihood of deception, moreover, is unsuited for resolution on demurrer. Our Supreme Court has cautioned that "'[w]hat constitutes "unfair competition" or "unfair or fraudulent business practice" under any given set of circumstances is a question of fact ....'" ( *People v. McKale, supra,* 25 Cal.3d at p. 635, citation omitted; accord, *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.) By its nature, the subject is much more appropriate for summary judgment or trial. As another court stated: "[C]laims of unfair [*26] competition commonly present fact-intensive

2004 CA App. Ct. Briefs 176377, *26; 2005 CA App. Ct. Briefs LEXIS 579, **42

issues... The determination of unfair competition often involves a weighing process that requires a full examination of the relevant facts." ( *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 857.) The trial court here inappropriately undertook this weighing process at the pleading stage and, accordingly, must be reversed.

**b. The Unfair Prong**

In addition to barring fraudulent business practices, the UCL proscribes "unfair" business practices. [**43] (Bus. & Prof. Code, § 17200.) "The independent unfairness prong of the UCL is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud." ( *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1166, internal quotation marks and citation omitted; accord, *People ex rel. Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 515.) Our Supreme Court has emphasized: "'In permitting the restraining of all "unfair" business practices,'" the UCL "'undeniably establishes only a wide standard to guide courts of equity ... [G]iven the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate.'" ( *Cel-Tech, supra,* 20 Cal.4th at p. 181, citation omitted; accord, *Barquis v. Merchants Collection Assn., supra,* 7 Cal.3d at p. 112; see also *Wilner v. Sunset Life Ins. Co., supra,* 78 Cal.App.4th at p. 965.) Consequently, a business practice "may be deemed unfair even if not specifically proscribed by some other law." ( *Cel-Tech, supra,* 20 Cal.4th at p. 180.)

[*27] More specifically, this [**44] Court has explained the unfairness inquiry as follows: "The test of whether a business practice is unfair involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim ...." ( *Wilner v. Sunset Life Ins. Co., supra,* 78 Cal.App.4th at p. 965, internal quotation marks and citation omitted.) "Stated otherwise, a business practice is unfair when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." ( *Ibid,* internal quotation marks and citation omitted.)

Here, the balance weighs heavily against Washington Mutual. Its failure to disclose to consumers the actual cost of underwriting, tax services and wire transfers - while substantially marking up the charge for each - produces no benefit to consumers. Under case law, this is unfair conduct. As the *Dollar* court stated when faced with comparable circumstances: "The absence of any notice that the customers [**45] are liable ... beyond their actual cost is misleading and constitutes an unfair business practice." ( *People v. Dollar Rent-A-Car Systems, Inc., supra,* 211 Cal.App.3d at pp. 129-130.) Better disclosure practices, moreover, would generate competition and likely reduce closing costs. The complaint alleges, and it must be taken as true, that for every $ 400 reduction in closing costs, approximately 70,000 additional [*28] families qualify to buy a house. (AA 122.) As in other settings, then, consumers in this setting would benefit from the lower prices that market forces would generate. This further supports the conclusion that an unfair business practice is alleged. (See *Cel-Tech, supra,* 20 Cal.4th at pp. 186-187 [holding that a "finding of unfairness to competitors under section 17200" may be based on "some actual or threatened impact on competition"].) Indeed, Washington Mutual's conduct frustrates the sound policy behind numerous state and federal laws, regulations and executive orders aimed at promoting home ownership through lower closing costs. (AA 136-137.)

Washington Mutual may believe its practices are justified. However, whether the [**46] challenged conduct is "fair is not a matter that can be decided at the demurrer stage." ( *Saunders v. Superior Court, supra,* 27 Cal.App.4th at p. 841.) As another court explained: "'[U]nfairness' is an equitable concept that cannot be mechanistically determined under the relatively rigid legal rules applicable to the sustaining or overruling of a demurrer." ( *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.) The trial court overlooked that "'[w]hile this process is complicated enough after a hearing in which the defendant has revealed the factors determining the utility of his conduct, it is really quite impossible if only the plaintiff has been heard from, as is the case when it is sought to decide the issue of unfairness [under the UCL] on. demurrer.'" ( *Ibid,* quoting *Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 (Kaus, P.J.).) Where the complaint, as here, "'states a [*29] prima facie case of harm, having its genesis in an apparently unfair business practice, the defendant should be made to present its side of the story.'" ( *Ibid.;* see also *id.* at p. 1170; *Saunders v. Superior Court, supra,* 27 Cal.App.4th at p. 841.) [**47]

2004 CA App. Ct. Briefs 176377, *29; 2005 CA App. Ct. Briefs LEXIS 579, **47

These principles are so compelling that Washington Mutual was forced to acknowledge them at the first oral argument. Its counsel admitted: "If a party has alleged an unfair practice then, of course, the party survives demurrer." (RT A12.) n6

n6 A telling colloquy occurred on the unfair prong at the first oral argument. Recognizing its demurrer would be overruled under the relevant law, Washington Mutual quickly moved past its concession and urged the trial court down the road to reversible error. Counsel's oral comments continued: "But we have a couple of issues here. First we have this issue of whether there really was an agreement to pass through, whether that was specifically agreed to." (RT A12.) These comments summarize the erroneous pleading requirement the trial court announced a few days later in its first dismissal order - a contract, pleaded with great specificity or plaintiffs would be tossed out of court. (AA 115-116.)

### c. The Unlawful Prong

Washington Mutual has also engaged in "unlawful" [**48] business practices. (Bus. & Prof. Code, § 17200.) The unlawful prong is essentially an incorporate-by-reference provision. "By proscribing any unlawful business practice, [section] 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." ( *Cel-Tech, supra,* 20 Cal.4th at p. 180.) Like the unfair prong, [*30] the unlawful prong sweeps wide: "With respect to the unlawful prong, '[v]irtually any state, federal or local law can serve as the predicate for an action' under section 17200." ( *People ex rel. Lockyer v. Fremont Life Ins. Co., supra,* 104 Cal.App.4th at p. 515, citation and emphasis omitted.)

Plaintiffs allege violations of numerous state and federal laws and regulations as predicate violations for the unlawful prong. The state laws include the California Residential Mortgage Lending Act (Fin. Code, § 50000 et seq.), various Civil Code provisions governing fraud and Washington Mutual's violation of the CLRA (also a separate cause of action as discussed further below). (AA 134-135.) The federal laws include the Real Estate Settlement Procedures Act (RESPA) [**49] (12 U.S.C. § 2607), its implementing Regulation X (24 C.F.R. § 3500.1 et seq.) and Department of Housing and Urban Development (HUD) Policy Statements interpreting RESPA. (AA 135.) On the unlawful prong, Washington Mutual focused primarily on RESPA. Plaintiffs adequately allege a RESPA violation, however.

RESPA governs aspects of real estate settlement, including closing costs. (See generally *Washington Mutual Bank, FA v. Superior Court* (1999) 75 Cal.App.4th 773, 779 [discussing statutory scheme].) When it enacted RESPA in 1974, Congress found: "[S]ignificant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement [*31] charges caused by certain abusive practices that have developed in some areas of the country." (12 U.S.C. § 2601, subd. (a).) As a federal court put it more concisely: "Congress passed RESPA in order to reduce the costs consumers pay to settle their real estate transactions." ( *Sosa v. Chase Manhattan Mortgage Corp.* (11th Cir. 2003) 348 F.3d 979, 981.) [**50]

Section 8(b) of RESPA is the relevant provision here. It states: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." (12 U.S.C. § 2607, subd. (b).) The text is not a model of clarity, but it boils down to the following - a lender cannot mark up a charge that is merely a pass-through cost for work performed by another service provider. Unless the lender itself performs some sort of service, Section 8(b) permits the lender to charge cost and no more. (See *Sosa v. Chase Manhattan Mortgage Corp., supra,* 348 F.3d at pp. 982-983; *Kruse v. Wells Fargo Home Mortgage, Inc.* (2d Cir. 2004) 383 F.3d 49, 57-61.) n7

n7 For a contrary reading of Section 8(b), Washington Mutual relied on other federal decisions, including

2004 CA App. Ct. Briefs 176377, *31; 2005 CA App. Ct. Briefs LEXIS 579, **50

*Boulware v. Crossland Mortgage Corp.* (4th Cir. 2002) 291 F.3d 261 and *Krzalic v. Republic Title Co.* (7th Cir. 2002) 314 F.3d 875. The more recent Second and Eleventh Circuit decisions, however, soundly refute the flawed analysis of these other courts. (See *Sosa v. Chase Manhattan Mortgage Corp., supra,* 348 F.3d at pp. 982-983; *Kruse v. Wells Fargo Home Mortgage, Inc., supra,* 383 F.3d at pp. 58-61.) Indeed, decisions such as *Boulware* and *Krzalic* disregard HUD's own interpretation of RESPA, discussed *post* in the text.

[**51]

[*32]  Plaintiffs allege that Washington Mutual marks up the charge for tax services and wire transfers while performing no additional services itself. (AA 125.) This violates Section 8(b) as construed by the above decisions. On this aspect of the unlawful prong, the trial court declared that plaintiffs "could not allege that [Washington Mutual] performed no services." (AA 233.) The complaint, however, avers otherwise. (AA 125.) The allegation, of course, must be taken as true at this stage. ( *Marshall v. Gibson, Dunn & Crutcher, supra,* 37 Cal.App.4th at p. 1403.) The court's disregard of the complaint runs afoul of settled rules governing challenges to the pleadings. The complaint is read in plaintiffs' favor, not Washington Mutual's. (See Code Civ. Proc., § 452; *Skopp v. Weaver, supra,* 16 Cal.3d at p. 438.)

Of great significance here, HUD has long interpreted Section 8(b) to bar markups unless additional work is performed. As HUD noted recently, "HUD guidance and regulations have consistently interpreted Section 8 as prohibiting all unearned fees." (Statement of Policy 2001-1, 66 Fed.Reg. 53052, 53057 (Oct. 18, 2001).) In fact,  [**52] this has been HUD's reading as long as RESPA has been on the books. (*Ibid.*)

[*33]  HUD reaffirmed its understanding of Section 8(b) in the 2001 Policy Statement: "Section 8(b) proscribes the acceptance of any portion or part of a charge other than for services actually performed." ( *Id.* at p. 53058.) HUD's 2001 Policy Statement provides examples of violations of Section 8(b), including examples that parallel Washington Mutual's conduct:

[O]ne settlement service provider marks-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or ... one settlement service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of the goods or facilities provided or the services actually performed.

( *Id.* at p. 53059.) Put more concisely, RESPA is violated "where one settlement service provider" - as Washington Mutual does here - "charges the consumer for third-party services and retains an unearned fee [**53] from the payment received." ( *Id.* at p. 53058.) HUD explained that this "interpretation is consistent with Congress's finding, when enacting RESPA, that consumers need protection from unnecessarily high settlement costs." ( *Id.* at p. 53053.) n8

n8 As discussed in the 2001 Policy Statement, HUD has also illustrated its interpretation through a response to a "frequently asked question" on its Internet website. The question: "Can a lender collect from the borrower an appraisal fee of $ 200, listing the fee as such on the HUD-1, yet pay an independent appraiser $ 175 and collect the $ 25.0 difference?" (66 Fed.Reg. at p. 53058.) Answer: "No, the lender may only collect $ 175 as the actual charge." (*Ibid.*) HUD further noted it had stated this interpretation, at the request of the Los Angeles Superior Court, in prior litigation against Washington Mutual in 1999. (*Ibid.*)

[*34]  Under U.S. Supreme Court case law, HUD's interpretation controls because it is a reasonable [**54] construction of an ambiguous statute. ( *Barnhart v. Thomas* (2003) 540 U.S. 20, 26; see also *Kruse v. Wells Fargo Home Mortgage, Inc., supra,* 383 F.3d at pp. 58-61 [deferring to HUD's interpretation on the issue here].) Congress expressly empowered HUD to interpret RESPA and establish policies and regulations governing mortgage settlement services. (12 U.S.C. § 2617, subd. (a); see also 24 C.F.R. § 3500.4.) This subject matter is squarely within HUD's

2004 CA App. Ct. Briefs 176377, *34; 2005 CA App. Ct. Briefs LEXIS 579, **54

expertise. Moreover, HUD's interpretation is longstanding - as noted, stretching back nearly three decades. It is entitled to deference under these circumstances. (See *Barnhart v. Walton* (2002) 535 U.S. 212, 220-222; *United States v. Mead Corp.* (2001) 533 U.S. 218, 226-227.) Plaintiffs adequately plead violations of the UCL's unlawful prong. n9

n9 To be clear, a RESPA violation establishes a violation of the California Residential Mortgage Lending Act. (Fin. Code, § 50505; see *Washington Mutual Bank, FA v. Superior Court, supra,* 75 Cal.App.4th at p. 786 and fn. 15 [discussing this section].) The latter is one of the predicate state-law violations alleged for the unlawful prong. (AA 134.)

[**55]

### 3. Washington Mutual's Conduct Violates the CLRA

Plaintiffs allege that Washington Mutual's business practices also violate another venerable consumer-protection law, the CLRA. (Civ. Code, § 1750 et seq.) Contrary to the trial court's assumption, the CLRA is available [*35] to plaintiffs irrespective of whether they plead breach of contract. The CLRA's protections, like the UCL's, are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law." (Civ. Code, § 1752; see *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1077 [this provision means what it says].)

Enacted in 1970, the CLRA "identifies as actionable certain deceptive business practices." ( *Broughton v. Cigna Healthplans, supra,* 21 Cal.4th at p. 1077.) The CLRA "established a nonexclusive statutory remedy for 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.'" ( *Gallin v. Superior Court* (1991) 230 Cal.App.3d 541, 545-546, quoting Civ. Code, [**56] § 1770.) The prohibited practices are listed in Civil Code section 1770, subdivision (a). Plaintiffs allege that Washington Mutual violated, and continues to violate, two provisions of subdivision (a): (14) representing that a transaction confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law; and (19) inserting an unconscionable provision in the contract. (AA 139.)

Washington Mutual flouts the first by suggesting that borrowers will pay the actual cost of underwriting, tax services and wire transfers, but instead charging them far more. (AA 123-125.) This is both a misrepresentation and failure to disclose material facts, in violation of the statute as construed by [*36] case law. (See *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 36-37.) Washington Mutual's conduct is also otherwise prohibited by law, as discussed above. On unconscionability, Washington Mutual below made no effort to defend the gargantuan markups it imposes on California home buyers. Instead, Washington Mutual responded that plaintiffs "do not allege the existence of any contract involving the disputed fees. [**57] " (AA 171.) As shown below, however, this simply disregards the complaint. The unconscionability claim is sufficiently averred for pleading purposes. (See *Purdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 924-929; *Truta v. Avis Rent-A-Car System, Inc., supra,* 193 Cal.App.3d at pp. 818-821.)

The Legislature has instructed that the CLRA "shall be liberally construed and applied to promote its underlying purposes." (Civ. Code, § 1760; see *Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 869 [noting importance of this directive].) The statute was adopted "to alleviate social and economic problems stemming from deceptive business practices." ( *Broughton v. Cigna Healthplans, supra,* 21 Cal.4th at p. 1077; see also Civ. Code, § 1760.) Home affordability, especially in California, is a problem of social and economic dimension. Use of the CLRA on the facts here is appropriate.

The trial court lost sight of the basic reality that a demurrer is a pleading motion. The court's grudging reading of plaintiffs' complaint has adverse practical consequences for consumer protection. Our Supreme Court has noted: "[I]f we [**58] apply strict requirements of specificity in pleading as [*37] defendants argue, the result would be to

eliminate the private lawsuit as a practical remedy to redress such past deception or prevent further deception." ( *Children's Television, supra,* 35 Cal.3d at p. 222.) Whether Washington Mutual's conduct in fact violates important statutory rights is for a later stage in the case after discovery. (See *People v. McKale, supra,* 25 Cal.3d at p. 635; *Schnall v. Hertz Corp., supra,* 78 Cal.App.4th at p. 1167.)

### 4. Plaintiffs Plead Breach of Contract

For all the attention given to whether plaintiffs averred a contract, the trial court got it wrong. The elements of breach of contract are well settled: "To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff." ( *Walsh v. West Valley Mission Community College District* (1998) 66 Cal.App.4th 1532, 1545.) The complaint alleges all these elements.

As consideration for the mortgage to close, Washington Mutual [**59] requires its borrowers to pay the cost of underwriting, tax services and wire transfers. This is evidenced by the HUD-1 settlement statement presented to all borrowers in connection with the closing. Plaintiffs agreed to Washington Mutual's condition, and also performed their end of the bargain, by paying these charges. Defendants breached the agreement, and damaged plaintiffs, by charging them far in excess of the actual cost that plaintiffs thought they were paying. In a nutshell, that is the contract. (AA 140-142.)

[*38] Washington Mutual may have a different view of what the contract requires - specifically, whether it allows Washington Mutual to charge more than pass-through cost for the three services at issue. But this cannot be adjudicated on demurrer. For claims based on a contract, the complaint need aver only "a prima facie right to relief." ( *Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 198-199.) Contrary to the trial court's description, moreover, breach-of-contract allegations do not need to be "detailed." (AA 115.) Pleading a contract and lack of performance is usually a simple matter. (See, e.g., *Lim v. The.TV Corp. International, supra,* 99 Cal.App.4th at p. 690; [**60] *Quelimane, supra,* 19 Cal.4th at pp. 56-57.)

Although not a matter for demurrer, there is support for plaintiffs' interpretation that only pass-through cost may be charged under the contract. As discussed above, RESPA forbids lenders from charging more than actual cost unless they provide additional services. Plaintiffs' contract with Washington Mutual must be interpreted consistent with this governing law (apart from the fact issue of the parties' intent and reasonable expectations). "Ordinarily, all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ( *City of Torrance v. Workers' Comp. Appeals Bd.* (1982) 32 Cal.3d 371, 378, internal quotation marks and citation omitted; see also 1 Witkin, Summary of Cal. Law [*39] (9th ed. 1987 and Supp. 2003) Contracts, § 692 [collecting additional cases to this effect].) Plaintiffs' complaint is more than sufficient on breach of contract.

### 5. The Remaining Common-Law Claims [**61] Are Also Sufficiently Alleged

Finally, plaintiffs assert causes of action for unjust enrichment, breach of bailment agreement and conversion. Here too, the complaint is adequate.

The essence of unjust enrichment is money conferred on a party who has no right to it and therefore must return it. (See *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 54.) The complaint alleges that Washington Mutual received and continues to receive, from plaintiffs and other borrowers, millions of dollars due to its misconduct. Washington Mutual has knowledge of this benefit and has voluntarily accepted and retained it. Hence, unjust enrichment is alleged. (AA 140.)

"A bailment is generally defined as 'the delivery of a thing to another for some special object or purpose, on a

contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men.'" ( *Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844, 850, citation omitted; see also *People v. Cohen* (1857) 8 Cal. 42, 43; Civ. Code, § 1814.) The complaint alleges that plaintiffs delivered money to Washington Mutual to hold for the payment [**62] of underwriting, tax services and wire transfers. (AA 142.) Washington Mutual breached the bailment [*40] agreement by profiting from the fees rather than using them solely for the purposes intended - underwriting, tax services and wire transfers. (AA 143.) There is no dispute that Washington Mutual did not return to plaintiffs the excess funds above its actual cost for these services. "Breach of the bailment contract may be asserted by the bailor when there is a failure to return that which was bailed." ( *Gebert v. Yank* (1985) 172 Cal.App.3d 544, 551.) Accordingly, plaintiffs have pleaded breach of bailment agreement.

"Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." ( *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1066.) These elements are adequately averred. (AA 143.) Although perhaps rare, conversion actions against banks do occur. Washington Mutual's demurrer on this claim should also have been overruled. [**63] (See *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 543 [conversion claim against bank adequately alleged].)

## IV. CONCLUSION

The trial court did not heed the "'strong public policy that litigation be disposed of on the merits wherever possible.'" ( *Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 56-57, citation omitted.) The judgment should be reversed with instructions to overrule Washington Mutual's demurrer. To the extent necessary to cure any pleading deficiency identified on appeal, the [*41] trial court should be further instructed to grant plaintiffs leave to amend on remand. ( *Curtis T. v. County of Los Angeles* (2004) 123 Cal.App.4th 1405, 1422-1423.)

DATED: February 9, 2005

Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
TIMOTHY G. BLOOD
KEVIN K. GREEN
TAMI FALKENSTEIN HENNICK

KEVIN K. GREEN

401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs-Appellants

## RULE 14 CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that PLAINTIFFS-APPELLANTS' [**64] OPENING BRIEF uses a proportionately spaced Times New Roman 13-point typeface, and that the text of this brief comprises 9,708 words according to the word count provided by Microsoft Word word-processing software.

2004 CA App. Ct. Briefs 176377, *41; 2005 CA App. Ct. Briefs LEXIS 579, **64

DATED: February 9, 2005

    KEVIN K. GREEN
    Counsel for Plaintiffs-Appellants

**DECLARATION OF SERVICE BY MAIL**

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1600, San Diego, California 92101.

2. That on February 9, 2005, declarant served the **PLAINTIFFS-APPELLANTS' OPENING BRIEF** by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3. That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ninth day of February, [**65]  2005, at San Diego, California.

    Terree DeVries