UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| M3 POWER RAZOR SYSTEM | ) | CIVIL ACTION NO. 05-11177-DPW |
| MARKETING & SALES PRACTICE | ) | (LEAD CASE) |
| LITIGATION | ) | |
| _____ | ) | MDL DOCKET NO. 1704 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| | ) | |

MEMORANDUM AND ORDER
August 6, 2010

This consolidated consumer litigation alleges misrepresentation by the defendant Gillette Company in the marketing of shaving devices.  A motion seeking preliminary review[1] and authorization of notice regarding a North American class[2] action settlement raised the challenging question whether and, if so, how class action certification should be made when the governing substantive law is drawn from various North

---

[1] The motion sought "preliminary approval" of the settlement.  I have declined to adopt the "approval" nomenclature in order to emphasize, as a recent project of the American Law Institute has counseled, that the decision to permit class notice is not approval of the settlement.  *See generally* PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.03, cmt. a (2010) (discussing preliminary review process).  Approval must await "definitive review at the time of the fairness hearing," following notice and an opportunity for any objections.  *Id.*

[2] The settlement class includes not only consumers throughout the United States but also includes Canadian consumers.

American jurisdictions.  Last week, on July 30, 2010, I allowed
that motion in substance through an "Order Authorizing Notice of
Class Settlement and Notice of Final Fairness Hearing."  This
Memorandum provides a more extended narrative of reasons for
doing so.

Only a California plaintiff in one of the consolidated
actions, *Corrales v. Gillette Co.*, Civil Action No. 05-12332-DPW,
submitted objections.  As discussed more fully below, I did not
find those objections concerning California law compelling.[3]

---

[3] I note that counsel for this California plaintiff, who
were unsuccessful in their own efforts to become lead counsel in
this Multidistrict Litigation matter, earlier attempted to open
another front in their battle to avoid consolidated treatment of
the litigation.  In *Adoure v. Gillette Co.*, No. 05-11177-DPW,
which was also consolidated before me as a result of assignment
by the Judicial Panel for Multidistrict Litigation, the same
counsel sought remand to the California state courts.  After I
denied remand, counsel for plaintiff in *Adoure* appealed under 28
U.S.C. § 1453(c)(1), the review provisions of the Class Action
Fairness Act of 2005.  The First Circuit rejected that appeal
noting that "Adoure has consistently argued, both in the district
court and in this court, that this action is not a class action."
*Adoure v. Gillette Co.*, No. 06-8005 (1st Cir. Apr. 24, 2006).
Thereafter, counsel in *Adoure* sought to obtain immediate
appellate review of the otherwise interlocutory appeal of the
denial of the remand request, through a protocol the First
Circuit has adopted, by moving for voluntary dismissal.  *See
generally In re M3Power Razor Sys. Mktg. & Sales Practices
Litig.*, 2007 WL 128846, at **1-2 (D. Mass. Jan. 11, 2007).  I
permitted dismissal on this procedural basis, nevertheless
finding "as a substantive matter [Adoure's] continuing objections
to the denial to remand this action to state court to be without
merit."  *Id.* at *5; *see generally* **2-5.
A month later, counsel for *Adoure* abandoned that appeal.  *In
re M3Power Razor Sys. Mktg. & Sales Practices Litig.*, Civil

Nevertheless, after preliminary *sua sponte* consideration of the law of the other jurisdictions, I required additional submissions before authorizing the publication of notice of settlement.  The proponents of the settlement submitted an extensive analysis of the relevant variations in the governing law to provide a basis sufficient to demonstrate that: (1) questions of law and fact common to the class members predominate; (2) the class representatives align generally with the class as a whole and its constituent parts; (3) there is no unfairness in treating similarly class settlement members drawn from multiple jurisdictions with diverse legal regimes; and (4) the settlement resolution is adequate.

The proponents of the settlement submitted a detailed compendium of the applicable law in the several jurisdictions from which class members are drawn and the parties further briefed the issues.  More recently, the proponents of the settlement amended the settlement agreement to incorporate developments in Gillette's shaving device products and to update accordingly the terms of the settlement agreement to be offered the settlement class.  *In re M3Power Sys. Mktg. & Sales Practices Litig.*, Civil Action No. 05-11177-DPW (D. Mass. Apr. 26, 2010)

---

Action No. 05-11177-DPW (D. Mass. Feb. 12, 2007) (No. 120) ("Notice of Plaintiff Kasem Adoure's Election To Not Pursue An Appeal of the Dismissal of his Action"), thereby closing that separate front in counsel's efforts to contest consolidated treatment of the MDL Litigation.

(No. 147-2).  No separate objection has been asserted as to the amended settlement.

Ultimately, I have been satisfied that where, as here, all the plaintiffs "share[] a single, common claim that g[ives] rise to an identical right to recovery under a single state statute for every member of the class," class certification is appropriate in the absence of "variations in state laws . . . so significant as to defeat commonality and predominance, even in a settlement class." *Sullivan v. DB Invs., Inc.*, --- F.3d ---, 2010 WL 2736947, at *14 n.15 (3d Cir. July 13, 2010) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004)).  Finding no significant variations in other state laws sufficient to defeat the commonality and predominance evident in this case, where all class members have advanced a claim under the Massachusetts Unfair and Deceptive Practices Act, MASS. GEN. LAWS ch. 93A, "on the ground that the allegedly deceptive communications originated from [Gillette's Massachusetts-based] headquarters," *Sullivan,* 2010 WL 2736947, at *14 n.15, I certified a single settlement class and authorized publication of the class notice.

## I. BACKGROUND

This consolidated consumer class action case was assigned to me for pretrial proceedings as the result of an Order of the Judicial Panel for Multidistrict Litigation ("JPMDL"), which transferred a number of related cases to this District, where I

previously had been assigned similarly related Massachusetts cases.  The cases all arise out of Gillette's advertising and marketing for its M3P razor system.

A.    **Factual Background**

Gillette, a Massachusetts-based shaving and cosmetic manufacturer, launched the M3P razor in North America on May 24, 2004.  The M3P is a razor system consisting of a permanent razor handle and separate refillable blades.  The major change between previous products and the M3P was the addition of a battery-operated oscillating head.  Gillette claimed in various advertisements that the MP3 creates micro-pulses that raise hair away from the skin and enable the user to shave more closely and easily.  Gillette advertised the M3P battery-powered oscillating head as "revolutionary" in its ability to raise hair up and away from the skin.  The disputed claims appeared on Gillette's website, on retail packages, in print advertisements, and in television commercials.  Plaintiffs allege that the advertising claims were deceptive and materially misleading because Gillette was aware that the M3P did not actually raise facial hair "up and away" from the skin.  All of the Representative Plaintiffs[4] claim

_____

[4] The "Representative Plaintiffs" (and their jurisdictions of residence) are Mark Dearman (Florida), Anthony DeBiseglia (New York), Matthew Marr (California), Adam Kline (Massachusetts), Greg Besinger (Illinois), Collin L. McGeary (Massachusetts), Javier Tunon (Georgia), and Jean-Sebastien Elie (Canada).

to have based a decision to purchase the razor on the misleading M3P advertising campaign.

### B.  Procedural History

Within several months of the M3P launch, Gillette's primary competitor in the worldwide wet-shave razor market, Schick Manufacturing, Inc. ("Schick"), filed lawsuits in various countries around the world, accusing Gillette of false advertising.  Courts in France, Belgium, and the Netherlands declined to enjoin the disputed advertising, but courts in Germany and Australia issued preliminary injunctions doing so.

On January 28, 2005, Schick filed suit in the United States District Court for the District of Connecticut, alleging Lanham Act violations and seeking a preliminary injunction against the disputed advertising.  *Schick Mfg., Inc. v. Gillette Co.*, No. 05-00174-JCH (D. Conn. Jan. 28, 2005).  After expedited discovery and a hearing, Judge Hall issued a preliminary injunction on May 31, 2005.  *Schick Mfg., Inc. v. Gillette Co.,* 372 F. Supp. 2d 273 (D. Conn. 2005).  Gillette and Schick then engaged in extensive discovery, with Gillette producing more than 100,000 pages of documents relating to liability and damages, before reaching a worldwide settlement agreement in early 2006.  Pursuant to the settlement agreement, all related litigation between the two parties was dismissed.

Following the issuance of the preliminary injunction in the

District of Connecticut, plaintiffs filed consumer class actions based on the same underlying facts in several United States and Canadian jurisdictions.  All actions filed in state courts in the United States were removed to federal court, and all the federal cases in other districts were transferred by the JPMDL to this Court.  I consolidated the cases and resolved contentious disputes among the several plaintiffs' counsel regarding the appointment of Co-Lead and Liaison counsel.

The parties thereafter commenced formal discovery, with Gillette producing all of the documents it had previously produced to Schick, along with hearing transcripts and exhibits from the District of Connecticut proceeding.  Under my case management order of March 17, 2006, Co-Lead Counsel were authorized to conduct settlement negotiations on behalf of plaintiffs in all of the consolidated cases.  After reporting imminent settlement during that summer, the parties executed a Settlement Agreement, and I conducted a hearing to consider the proposed settlement.  The Representative Plaintiffs and Gillette supported publication of notice and class certification for the purposes of settlement, but California Plaintiff Carlos Corrales objected to both.  Because Corrales objected that he had not had adequate time to respond to the Motion for preliminary approval, I permitted additional briefing by all parties and conducted a second hearing to consider the matter further.  Once again, the

Representative Plaintiffs and Gillette supported the proposed settlement, and Corrales opposed it.

As I worked my way through the drafting process for a Memorandum regarding the settlement approval motion, I was inclined to authorize notice of what I found to be a "settlement [that] makes eminent good sense," as I observed to the parties during a 2008 status conference.  Apr. 28, 2008 Tr. at 4:12-13. Nevertheless, as I also explained to counsel at that hearing, I felt obligated to survey the relevant law on a jurisdiction-by-jurisdiction basis to determine whether material differences, as applied to the proposed settlement, might yield unfair and disproportionate advantages or disadvantages for class members from certain jurisdictions.  The proponents responded by submitting a "Joint Submission by the Proponents of the Proposed Settlement Comparing the Relevant Laws of the Applicable Jurisdictions for Settlement Class Certification." (Dkt. No. 135.)  The proponents and the California plaintiff objector separately briefed the issues.

In April of this year, in order to account for developments in Gillette shaving products relevant to settlement, the proponents submitted a "Joint Motion to Amend the Proposed Settlement and for Preliminary Approval of Amended Settlement Agreement."  (Dkt. No. 147.)  No separate objection was submitted as to the Joint Motion to Amend.

-8-

Following the issuance of the Third Circuit's opinion in *Sullivan* on July 13, 2010, I entered a Procedural Order on July 16, 2010, notifying the parties of my intention to authorize notice regarding the proposed settlement on July 30, 2010, and requesting the parties to consult among themselves regarding a precise date for a final fairness hearing; I also solicited revised forms of orders and related documents to further that intention.  The proponents complied and, with the promise that a forthcoming Memorandum of reasons for authorizing notice would issue this week, I entered the "Order Authorizing Notice of Class Settlement and Notice of Final Fairness Hearing" on July 30, 2010.  (Dkt. No. 149.)  This is that promised Memorandum.

## II.   THE PROPOSED SETTLEMENT

### A.   Settlement Terms

The revised proposed Settlement Agreement as Amended obligates Gillette to establish a Settlement Fund of $7.5 million for the distribution of cash and other benefits to class members. Up to $2.45 million of the Settlement Fund is available to provide notice to potential class members.  Any notice costs over this amount, including the potential costs of providing additional notice if the settlement is not approved at the Final Fairness Hearing, will be borne solely by Gillette.

### B.   Initial Claim Period

During an Initial Claim Period (beginning six months from

the date of the first publication of notice of the Final Fairness Hearing), a class member who wishes to participate in the settlement has one, and only one, of two options:  a refund or a rebate.

If a class member opts for a refund, he or she must return the M3P razor (but not the blade(s) or batteries) and certify that it was purchased or otherwise acquired during the class period.  In exchange, the class member will receive a check for $13, plus $2 for postage and handling, for a total of $15. Canadian consumers will receive the approximate Canadian equivalent, or $16.25 Canadian dollars, plus the Canadian dollar equivalent of $2 for postage and handling.  If a class member paid more than $13 (or the Canadian equivalent) for the M3P razor and has adequate documentation of the actual price paid, this documentation may be submitted along with the razor to obtain a refund of the full purchase price, plus $2 for postage and handling.

If a class member opts to keep the M3P razor, or has already disposed of it, he or she can obtain up to two $5 rebates[5] for any purchase of M3P blades (purchased after May 1, 2004), and/or a Gillette Fusion razor or a Fusion ProGlide razor (manual or battery powered) (purchased after January 1, 2006) through the

---

[5] Canadian consumers will receive the equivalent of $5 in Canadian dollars.

end of the Initial Claim Period.  To receive the rebate, a class member must submit either (1) the UPC code from the package of M3P blades, the Fusion razor, or the Fusion ProGlide razor, or (2) a receipt showing the relevant purchase, along with a certification that an M3P razor was purchased or obtained during the relevant time period, and no prior claim has been made for a refund or replacement razor.

If the refunds and rebates claimed in the Initial Claim Period exceed the allocated Settlement Fund, each class member will receive a *pro rata* share of the settlement.

## C.   Distribution After Initial Claim Period

If the Settlement Fund is not exhausted at the end of the Initial Claim Period, the excess amount will be allocated as follows:

First, Gillette will mail a new Fusion manual razor or, by agreement between Gillette and Settlement Class Counsel, a new Fusion ProGlide manual razor ("Settlement Razor") to each class member who submitted an approved claim for a rebate or refund during the Initial Claim Period.[6]  For each Settlement Razor, Gillette will receive a $7 credit against the Settlement Fund. If the Settlement Fund would be exhausted before each prior claimant receives a Fusion razor, a statistically random sample

---

[6] Any Settlement Razor distributed will also include a $4 coupon for Gillette shaving products, the value of which coupon is not debited against the Settlement Fund and is not used in calculating attorneys' fees, costs, or expenses.

of prior claimants will receive a razor until the balance is exhausted.

Next, if Settlement Razors are sent to all prior claimants and the Settlement Fund is still not exhausted, Gillette will place a link on the M3P razor webpage inviting class members who have not previously submitted a claim to do so.  After certifying that he or she purchased or otherwise obtained an M3P razor during the class period, and that this is the first claim submitted under the settlement, the class member will receive a free Fusion ProGlide manual razor, and the Settlement Fund will be debited $7.  This option will remain available for ninety days or until all funds are distributed, whichever comes first.

If money still remains in the Settlement Fund after the ninety-day claim period has ended, Gillette will distribute free Fusion ProGlide manual razors to a group selected by the parties, in proportion to the populations of the various states and Canada, until the Settlement Fund is fully depleted.

The proposed Settlement Agreement contains no reverter clause, and the full $7.5 million, including up to $2.45 million for notice, will be distributed for the benefit of class members. Potential class members have the right to opt out, if written notice is postmarked at least 21 days prior to the date of the Final Fairness Hearing.  In addition to the $7.5 million Settlement Fund, Gillette has agreed to pay up to $1,850,000, subject to Court approval, for attorneys' fees, costs, and

-12-

expenses, as well as incentive awards to the Representative and
named Plaintiffs in amounts of $500 (or the prevailing Canadian
dollar equivalent) to $1,000 each.

## III. CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs class
certification in the federal courts.  Before certifying a class,
"[a] district court must conduct a rigorous analysis of the
prerequisites established by Rule 23. . . ." *Smilow v. S.W. Bell
Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Gen.
Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).  To obtain
class certification, plaintiffs must establish each of the four
elements of Rule 23(a) -- numerosity, commonality, typicality,
and adequacy of representation -- and one of the elements in Rule
23(b).  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,
614 (1997)).  The fact that class certification is requested only
for the purpose of settlement is no barrier to certification.
*Amchem*, 521 U.S. at 619.  However, considerations stemming from
structural concerns about potential collusion and reverse
auctions in settlement class actions make it "incumbent on the
district court to give heightened scrutiny to the requirements of
Rule 23 in order to protect absent class members." *In re Lupron
Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005)
(citing *Amchem*, 521 U.S. at 620).

-13-

**A.   Rule 23(a)**

Rule 23(a) imposes four prerequisites to class

certification:

> (1) the class is so numerous that joinder of all
> members is impracticable, (2) there are questions of
> law or fact common to the class, (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

FED. R. CIV. P. 23(a).  The plaintiffs must demonstrate that each

Rule 23(a) requirement is satisfied for class certification to be

appropriate.  *Smilow*, 323 F.3d at 38.

**1.   Numerosity**

The numerosity requirement is easily satisfied in this case

because Gillette sold over ten million M3P razors across the

United States and Canada in the pertinent time periods.  No

purchaser records were maintained, so there is no possibility of

locating, much less joining individually as plaintiffs, all of

the potential class members.[7]  Given the large number of

potential class members, and the relatively small claim each one

has for damages, individual lawsuits are clearly impracticable,

and Rule 23(a)(1) is satisfied.

---

[7] The Settlement Class is defined as "all Persons in the
United States of America or Canada who purchased or otherwise
acquired for use and not resale an M3Power Razor in the United
States during the period May 1, 2004 through September 30, 2005,
or in Canada during the period May 1, 2004 through October 31,
2005."

2.   Commonality

The threshold for commonality under Rule 23(a)(2) is not high.  *Lupron*, 228 F.R.D. at 88 (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).  Because the Rule 23(a)(2) analysis is "[a]imed in part at 'determining whether there is a need for combined treatment and a benefit to be derived therefrom,' the rule requires only that resolution of the common questions affect all or a substantial number of the class members."  *Id.* (quoting *Jenkins*, 782 F.2d at 472).

Although variations existed in the legal requirements of various state law claims and in the facts necessary to prove such claims, it is beyond dispute that common core questions lie at the heart of this litigation.  Stated in their highest degree of generalties, these include:  whether Gillette misrepresented the capabilities of the M3P razor to the potential class, whether the potential class members sustained ascertainable damages from such conduct, and, if so, in what amount.  These common issues of fact and law are sufficient to meet the threshold of Rule 23(a)(2), and indicate that class certification could be beneficial to the expeditious resolution of this dispute.

3.   Typicality

To establish typicality, the plaintiffs need only demonstrate that "the claims or defenses of the class and the class representative arise from the same event or pattern or

practice and are based on the same legal theory." *Id.* at 89
(quoting *In re Terazosin Hydrochloride Antitrust Litig.*, 220
F.R.D. 672, 686 (S.D. Fla. 2004)).  Here, it is clear that the
claims of the Representative Plaintiffs are based on the same
event (purchase of an M3P razor based on misleading
advertisements) as the potential class members.  The legal
theories of recovery for the Representative Plaintiffs are
typical of those of the class as a whole.  As reflected in the
Amended Consolidated Class Action Complaint, most counts are
based on common law causes of action (negligent
misrepresentation, intentional misrepresentation, breach of
express warranty, breach of implied warranty of fitness of
purpose, and unjust enrichment), which will be substantially
uniform across the class.  The Amended Complaint also alleges
violation of various state consumer protection statutes.
Although the Representative Plaintiffs are not residents of each
of the covered states, the consumer protection statutes in the
states in which they reside (Florida, New York, California,
Massachusetts, Illinois, Georgia and Canada) appear to be typical
of, and generally even more consumer-friendly than, consumer
protection laws in the range of jurisdictions that they
represent.  Consequently, the Representative Plaintiffs satisfy
the typicality requirement of Rule 23(a)(3).

### 4.  Adequate Representation

Rule 23(a)(4) requires that the proposed class

-16-

representatives "fairly and adequately protect the interests of the class."  This requirement has two parts.  The plaintiffs "must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation."  *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

As to the former, the Representative Plaintiffs' interests generally align with the class as a whole, because all parties, named and unnamed, are seeking redress from what is essentially the same injury, the purchase of an M3P razor based on misleading advertisements.  Indeed, all members of the class share a claim under Chapter 93A of the Massachusetts General Laws.  Although some variations exist between potential remedies, depending on the state of residence, these differences do not create the type of intra-class conflicts that often appear in the mass tort context.  *See generally* John C. Coffee, Jr., *Class Wars:  The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343 (1995).  The problem of differing remedies will be discussed in greater detail below.  At this point, it is sufficient to note that the interests of the Representative Plaintiffs and the absent class members are not generally in conflict, and that counsel is adequate.

The latter requirement relating to counsels' qualifications
was established early in the case and has continued to be
satisfied as this case proceeds.  After considering disputes
among plaintiffs' counsel regarding the appropriate appointments,
I appointed - over the objection of the California plaintiff's
counsel who were not appointed - Co-Lead and Liaison counsel that
I found qualified and experienced, and I have no reason to think
the appointed counsel have not been performing competently; to
the contrary, the record shows that they have been.  Indeed, I
find on the basis of the record before me that appointed counsel
have performed in a highly competent and professional manner.
Therefore, representation is fair and adequate, as required by
Rule 23(a)(4).

**B.  Rule 23(b)**

In addition to satisfying the four elements of Rule 23(a),
plaintiffs must demonstrate that at least one subsection of Rule
23(b) applies.  I find Rule 23(b)(3) directly applicable, as this
subsection allows for class certification if "the court finds
that the questions of law or fact common to class members
predominate over any questions affecting only individual members,
and that a class action is superior to other available methods
for fairly and efficiently adjudicating the controversy."  FED.
R. CIV. P. 23(b)(3).  In short, plaintiffs must demonstrate
predominance and superiority.

1.  <u>Predominance</u>

The predominance inquiry overlaps with the commonality requirement of Rule 23(a)(2), but is more demanding.  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  The pertinent legal and factual questions are those that "qualify each class member's case as a genuine controversy," but do not include the fairness or desirability of the proposed settlement in a settlement class action.  *Id.*  The predominance standard can be met even if some individual issues arise in the course of litigation, because "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Smilow,* 323 F.3d at 39.  In this connection, some types of cases are uniquely well-suited to class adjudication, and "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.

In this case, it is clear that the issues common to the class predominate over those that are personal to individual class members.  The dominant common questions include whether Gillette's advertising was false or misleading, whether the company's conduct violated the statutory and/or common law causes of action delineated in the Amended Complaint, and whether the

class members suffered damages as a result of this conduct.  Even
if state consumer statutes or other state causes of action differ
in arguably material ways, common questions, not individual
issues, predominate among and within each state's legal regimes.
Indeed, Chapter 93A of the Massachusetts General Laws provides a
cause of action common to all class members against the
defendant.  In order to develop these findings and conclusions
further and recognizing that subclasses might be used to
accommodate differences in state law or relative advantage or
disadvantage among legal regimes, I will address the problem of
differences in legal theories in Section III.B.3, *infra*.  For
now, I note my finding that the predominance requirement of Rule
23(b)(3) appears to be satisfied.

>    2.  Superiority

Rule 23(b)(3) requires that a class action be "superior to
other available methods for fairly and efficiently adjudicating
the controversy."  Courts must consider:

> (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against
> class members; (C) the desirability or undesirability
> of concentrating the litigation of the claims in the
> particular forum; and (D) the likely difficulties in
> managing a class action.

*Id.*  The predominance and superiority requirements are inherently
interrelated, and were added "to cover cases 'in which a class
action would achieve economies of time, effort, and expense, and

promote . . . uniformity of decision as to persons similarly
situated, without sacrificing procedural fairness or bringing
about other undesirable results.'"  *Amchem*, 521 U.S. at 615
(quoting FED. R. CIV. P. 23 advisory committee's notes (1966)).
"Rule 23 has to be read to authorize class action in some set of
cases where seriatim litigation would promise such modest
recoveries as to be economically impracticable."  *Gintis v.
Bouchard Transp. Co.*, 596 F.3d 64, 66-67 (1st Cir. 2010).

In this case, involving millions of potential plaintiffs
with small individual claims, a class action is the only feasible
mechanism for resolving the dispute efficiently.  Absent class
certification, it is highly unlikely that any individual
aggrieved consumer will seek or obtain redress, because the
transaction costs of filing and prosecuting a lawsuit
individually far exceed the recoverable individual damages, even
under the most generous state consumer protection statutes.  In
short, in the absence of class certification, there would be
nothing for an individual class member to control because a
separate action would not be prosecuted.  There is no other
litigation not consolidated in this forum through which class
members can pursue the controversy.  The forum jurisdiction is
familiar with Chapter 93A, the Massachusetts consumer protection
statute, available to all plaintiffs challenging alleged
misrepresentations made during a North American marketing

campaign by a Massachusetts corporate defendant.  Under the circumstances, a class action pursued on a consolidated basis in the District of Massachusetts is superior to any other mechanism for adjudicating the case, and Rule 23(b)(3) is satisfied.

### C.   Subclassing

Objecting Plaintiff Corrales opposes certification of the class and authorizing notice of the settlement on the ground that the proposed settlement is insufficiently generous to potential California class members.  Corrales argues that the consumer protection statutes in the state of California are so favorable to California consumers, particularly in terms of available remedies, that they should be treated differently from class members of other states.  Assuming for the moment that Corrales' objections are valid, one potential mechanism for dealing with differential state remedies is to certify subclasses within the larger class.  But this decision must not be made lightly because it inherently reduces the efficiency of the class action mechanism and increases transaction costs (particularly for notice).

Close analysis of a California subclass is a useful means to approach the problems presented by differences in legal theories among the several jurisdictions whose case law is involved by the consolidated complaint.  I will consider three related questions to determine whether a California subclass is appropriate.

First, what is the significance of variations in state law for purposes of certifying a nationwide class?  Second, what is the content of California consumer protection law, and how does it compare to the common claim presented by Mass. Gen. Laws ch. 93A or otherwise differ from laws of other jurisdictions?  Third, do any differences rise to a level that would necessitate the certification of a subclass?  I will then address the problems more generally to determine what level of additional analysis is necessary given the common factual and legal issues shared by the plaintiff class members.

> ### 1.   Variations in State Law

When nationwide class actions are based on state law claims, variations in state law create several potential challenges for certification under Rule 23, quite apart from the trial management issues that illustrate the challenges.  State law differences signify "diverse legal standards and a related need for multiple [legal determinations]," and sometimes "multiply the individualized factual determinations" that a court must undertake. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 726 (5th Cir. 2007).  Legal variations also undermine the class's ability to satisfy the commonality requirement of Rule 23(a)(2).  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 742-43 n.15 (5th Cir. 1996).  A related problem raised by state law variations is tension among the plaintiffs:  conflicts of interest and allocation dilemmas

can become evident and disabling during settlement or judgment. The Supreme Court has made it clear that before certifying a class - even in the settlement context - a court must closely examine potential conflicts of interest, as well as inequality in the strength of claims.   *Amchem,* 521 U.S. at 625-26.

Circuits have required a rigorous analysis of state law variation must precede class certification.   *See, e.g., Cole*, 484 F.3d at 724 ("The party seeking [class] certification . . . must . . . provide 'an extensive analysis' of state law variations to reveal whether these pose 'insuperable obstacles.'") (internal quotation marks and citations omitted); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("Because these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable."); *Castano*, 84 F.3d at 743 n.15 ("We find it difficult to fathom how common issues could predominate in this case when variations in state law are thoroughly considered."). The First Circuit has been no less diligent in urging a "rigorous analysis" of the relation between merits claims and the requirements of Rule 23.   *See generally In re New Motor Vehicles Canadian Expert Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008). Courts must remain sensitive, however, to the "common core" of issues among plaintiffs, even if coupled with "disparate legal remedies within the class."   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

-24-

One solution to the problems of state law variation in a nationwide class is to create a subclass of plaintiffs--a group of claimants from a state (or states) whose legal remedies differ substantially from those of other states. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). Certification of subclasses, however, must continue to facilitate the operation of the class action. *Id.* (warning that a court "must be careful not to certify too many groups," otherwise instructing the jury on - or otherwise applying - the relevant law would be an "impossible task").

> 2.   Consumer Protection Law as a Basis
>      for Subclassing

Although the Consolidated Amended Complaint presents a multiplicity of causes of action (Negligent Misrepresentation, Intentional Misrepresentation, Express Warranty, Implied Warranty, Unjust Enrichment and Unfair Practices and Consumer Protection Statutes) from a multiplicity of North American jurisdictions, analysis of the relevant questions regarding class certification can be focused by discussion of the California Consumer Protection provisions relied upon by the California plaintiff objector and the Massachusetts claim under Chapter 93A common to all class members.

### a.   *California*

The relevant portions of California's consumer protection law for this case are found in three statutes:  the Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200 *et seq.*, the False Advertising Law ("FAL"), *id.* at § 17500 *et seq.*, and the Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*  A California state appellate court decision has helpfully catalogued the remedies available under each statute. *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006).

From the remedial perspective, all three statutes authorize injunctive relief, *id.* at 44-45, as well as restitution.  *Id.* at 58 ("There is nothing to suggest that the restitution remedy provided under the CLRA should be treated differently than the restitution remedies provided under the False Advertising or Unfair Competition Laws.").  Damages, however, are available only under the CLRA, and not under the UCL or FAL.  *Id.* at 43 n.7, 59 ("Damages under the CLRA are a legal remedy, intended to compensate those who suffer actual damage.  Damages are not available under the False Advertising and Unfair Competition Laws because restitution is the only available remedy under those statutes." (internal citation omitted)).

As a policy matter, the goal of the California consumer protection statutes is to return ill-gotten gains to consumers,

with a secondary purpose of deterring future violations. *Id.* at
59-61.  The restitutionary remedy is not "intended as a punitive
provision, though it may fortuitously have that sting when
properly applied to restore a victim to wholeness." *Id.* at 61.
Before a court may award restitution, the appropriate amount of
restitution must be shown by "substantial evidence." *Id.* at 63.

In *Colgan*, a California Court of Appeals reversed a lower
court decision to award $13,012,255.50 in total restitution under
the FAL, UCL, and CLRA, finding that the restitution order was
not supported by sufficient evidence.[8] *Id.* at 66.   The
plaintiffs presented evidence regarding the market value and
retail price of the Leatherman tools at issue, and the market
price of similar tools made in China.  *Id.* at 42.   The trial
court refused to consider this evidence, however, finding it
unreliable.  *Id.* at 43-44.  The trial court also refused to
consider Leatherman's gross profits on the items as a measure of
damages, rejecting this approach as "inequitable"; because
"although the purchasers did not receive entirely what they
bargained for . . . these Class members did benefit from the

_____

[8] In stark contrast to the substantial $13,012,255.50
restitution award, the trial court awarded only the $1,000
statutory minimum for damages under CLRA because the court was
unable to determine actual damages with sufficient certainty.
*Colgan v. Leatherman Tool Group, Inc.,* 38 Cal. Rptr. 3d 36, 43
(Cal. Ct. App. 2006) ("The trial court stated: 'If this Court
were able to determine actual damages, this Court would have
awarded more than $1,000. How much more, the Court does not
know.'").

quality, usefulness, and safety of these multi-purpose tools,"
and it would be unfair to return to them the entire purchase
price.  *Id.* at 44.  Expert testimony was introduced on the
advantages Leatherman obtained through false advertising, but the
Court of Appeals rejected this testimony as a basis for a damage
calculation, finding that "the expert did not attempt to quantify
either the dollar value of the consumer impact or the advantage
realized by Leatherman."  *Id.* at 63.

As *Colgan* demonstrates, the evidentiary standard for
awarding restitution and actual damages is demanding in
California state courts.  The case before me has similar
valuation difficulties because Gillette has adduced evidence that
consumers preferred the M3P razor, even if it did not perform
exactly as advertised.  The precise value of having one's hair
raised "up and away" during a shave is inherently speculative.
In this setting, it is not likely that a court applying
California law in a California state class action would award
restitution.  The probability of a large monetary award in the
form of restitution or actual damages is by no means the legal
certainty Corrales suggests.

The CLRA also allows for punitive damages.  Yet, the
plaintiffs in *Colgan* did not pursue this remedy at trial, despite
having a case strong enough to be decided in their favor on
summary adjudication.  *Id.* at 42 n.6.  If California plaintiffs
with such a clear-cut liability case determined that punitive

damages were not worth pursuing, it seems highly unlikely that a court applying California law would award such damages in the instant case, where courts around the world divided, at least on an interlocutory basis, over whether Gillette's conduct was even actionable.

It bears emphasizing that after a 2004 referendum, California's procedural and substantive consumer protection law became less consumer-friendly than it once may have been perceived to be.  Proposition 64, passed by California voters on November 2, 2004 and effective as of the next day, altered the UCL (a) to remove the private attorney general provision that allowed for representative non-class actions and (b) to add an injury-in-fact requirement for standing.  2004 Cal. Legis. Serv. Prop. 64 (West).  Among other things, Proposition 64 altered Section 17203 of the California Business and Professions Code so that "[a]ny person may pursue representative claims or relief on behalf of others *only* if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure. . . ." (emphasis added).  Section 17204 limits standing to a plaintiff "who has suffered injury in fact and has lost money or property as a result of the unfair competition," and Section 382 is the California class action statute.

In the initial wake of Proposition 64, California consumer

protection law was unsettled, particularly in the class action
context.  Courts expressed confusion as to whether the class as a
whole, or only the class representative, needed to show injury in
fact and reliance.  *See, e.g.*, *Pfizer Inc. v. Superior Court*, 45
Cal. Rptr. 840, 844 (Cal. App. Ct. 2006), *superceded by* 146 P.3d
1250 (Cal. 2006), *and cause transferred by* 215 P.3d 1061 (Cal.
2009) (transferring case with directions to vacate its decision
and to reconsider in light of *In re Tobacco II*, 207 P.3d 20 (Cal.
2009)).

The impact of Proposition 64 on UCL class actions has
recently been clarified by the California Supreme Court, which
has held the initiative imposed a procedural standing requirement
on the class representative, but did not enlarge "the substantive
rights [or] the remedies of the class."  *In re Tobacco II*, 207
P.3d 20, 38 (Cal. 2009).  Put simply, the court found that
"[n]othing a business might lawfully do before Proposition 64 is
unlawful now, and nothing earlier forbidden is now permitted."
*Id.* at 30 (quoting *Californians for Disability Rights v.
Mervyn's, LLC*, 138 P.3d 207, 212 (Cal. 2006)).  The standing
requirements in Proposition 64 were deemed applicable only to the
class representatives, not all unnamed class members.  *Id.* at 25.
As for the causation requirement for purposes of establishing
standing, *Tobacco II* concluded that "a *class representative*
proceeding on a claim of misrepresentation as the basis of his or

her UCL action must demonstrate *actual reliance* on the allegedly
deceptive or misleading statements," but is not required "to
plead or prove an unrealistic degree of specificity that the
plaintiff relied on particular advertisements or statements when
the unfair practice is a fraudulent advertising campaign." *Id.*
at 25-26 (emphasis added).  This framework has provided clarity
for lower courts in shaping the parameters of class action suits
under California law.[9]

> b.  *Massachusetts*

The protections for consumers provided by the Massachusetts
Unfair and Deceptive Business Practices Act, MASS. GEN. LAWS ch.
93A § 9, are quite robust and arguably more consumer friendly

---

[9] Applying the teachings of *Tobacco II*, a California Court
of Appeal, upon vacating and reconsidering its decision in
*Pfizer*, 45 Cal. Rptr. 840, 844 (Cal. App. Ct. 2006), for example,
held that "the class certified by the trial court, i.e., all
purchasers of Listerine in California during a six-month period,
is grossly over broad because many class members, if not most,
were never exposed to the alleged misrepresentations and are not
entitled to restitutionary disgorgement." *Pfizer Inc. v.
Superior Court*, 105 Cal. Rptr. 3d 795, 802 (Cal. App. Ct. 2010).
This is in accord with Massachusetts consumer protection law. *See
Kwaak v. Pfizer, Inc.*, 881 N.E.2d 812, 818 (Mass. App. Ct. 2008)
(precluding certification of class that extended to "everyone who
purchased Listerine products during the advertising campaign,
regardless whether a purchaser was exposed to the campaign").
The California Court of Appeal posited that the majority of class
members purchased Listerine during the relevant period because
they were "brand-loyal customers" or for other reasons unrelated
to the contentious advertisements.  *Pfizer Inc. v. Superior
Court*, 105 Cal. Rptr. 3d at 798, 803.  Here, the allegations are
that all the class members were exposed to and relied upon the
allegedly misleading representations by Gillette regarding the
M3P razor system.

than the California consumer protection regime.  Unlike the
California UCL cause of action, Chapter 93A does not require
reliance, rather the applicable standard for determining whether
an act is "deceptive" is whether "it possesses 'a tendency to
deceive.'"  *Leardi v. Brown,* 474 N.E.2d 1094, 1099 (Mass. 1985)
(citation omitted).  The Massachusetts Supreme Judicial Court has
emphasized that "[u]nlike a traditional common law action for
fraud, consumers suing under c. 93A need not prove actual
reliance on a false representation. . . ."  *Dalis v. Buyer
Adver., Inc.*, 636 N.E.2d 212, 216 (Mass. 1994) (citing *Slaney v.
Westwood Auto, Inc., 322* N.E.2d 768, 779 (Mass. 1975)).
Materiality and causation are established by a showing that the
deceptive representation "could reasonably be found to have
caused a person to act differently from the way he [or she]
otherwise would have acted."  *Purity Supreme, Inc. v. Attorney
Gen.*, 407 N.E.2d 297, 307 (Mass. 1980) (citation omitted).

The consumer may recover compensatory damages under Chapter
93A for misrepresentation whether the misrepresentation is
intentional, *GTE Prods. Corp. v. Broadway Elec. Supply Co.*, 676
N.E.2d 1151, 1154 (Mass. App. Ct. 1997) ("benefit of the
bargain"), or unintentional, *Anzalone v. Strand*, 436 N.E.2d 960,
962 (Mass. App. Ct. 1982) ("out of pocket" and reliance damages).
While punitive damages are not available as such, exemplary
multiple damages are available up to three times actual damages

but not less than two times actual damages (or $25, whichever is greater).  MASS. GEN. LAWS ch. 93A § 9(3).  In addition, equitable remedies such as injunctions or rescission can be used by the courts to remedy wrongs under Chapter 93A.  *Id.*  While restitution as a remedy is reserved to actions by the Attorney General under § 4 of Chapter 93A, in the class setting, it bears emphasizing that the aggregate of actual damages afforded by a Chapter 93A consumer class action claim necessarily parallels the restitutionary remedy.

### c.   *Other Jurisdictions*

After extended review of the various legal regimes, I find without reciting the details with particularity, that the Representative Plaintiffs have demonstrated that, although variations in state law exist, they do not overcome the common factual and legal issues shared by the potential class members. The only purported distinctions actually argued by an objector -- those presented by California consumer protection law -- are, to the extent they are significant at all, differences of degree, not of kind, and are not substantial and clear-cut enough to require a subclass.

As is apparent from the text of this Memorandum, I have focused on consumer protection law as dispositive in this litigation.  The various common law and commercial code counts

alleged here do evidence significant differences among
jurisdictions.  Indeed, consumer protection statutes were
developed principally to ease restrictions on consumer claims
that were perceived to be embedded in common law and commercial
law causes of action consumers might have otherwise deployed.
And among consumer protection statutory schemes, the
Massachusetts law under Chapter 93A appears to be in practice as
generous as any available to class members in this litigation.

<u>3.</u>   <u>Necessity for Subclasses</u>

Although differences obviously exist between and among the
various causes of action recognized in the jurisdictions from
which the class members here are drawn, I do not find these
differences rise, as a legal matter, to a level that would
require any settlement subclasses in this case.  Objecting
Plaintiff Corrales makes two additional arguments beyond the
legal differences among causes of action for affording California
consumers more favorable treatment:  first, that California
consumers paid more for their M3P razors; and second, that
differences between California law and that of other
jurisdictions underscore conflicts of interest which require
separate treatment.

As to cost differentials, Corrales presents no reliable
evidence in support of his factual contention on pricing, so this
factor has no bearing on my analysis.  I also observe that any
class member who can provide a receipt showing that a M3Power

razor being returned was purchased for more than the stipulated
refund amount, that class member "shall receive a check . . . for
the actual price paid."

Regarding conflicts of interest, California consumer
protections do not introduce significant difficulties for a
nationwide (indeed international) class.  All plaintiffs have the
motivation to establish the same factual and legal findings and
conclusions regarding Gillette's conduct.  No meaningful
allocation dilemmas are presented by the range of remedies
available once those findings and conclusions are made.
California plaintiffs have available remedies under California
law similar to those available to the rest of the potential class
under the laws of the several jurisdictions and precisely the
same remedies as all class members under Massachusetts consumer
protection law.

The Ninth Circuit decision in *Hanlon v. Chrysler Corp.*, 150
F.3d 1011, is illustrative.  There, one objector to the class
sought to exclude himself and all Georgia residents from the
class action so that they could pursue separate legal recourse in
Georgia state court.  *Id.* at 1019.  The court denied the request,
finding that "the prospects for irreparable conflict of interest
are minimal in this case because of the relatively small
differences in damages and potential remedies."  *Id.* at 1021.
Even if some state law remedies varied, these variations did not

create a "structural conflict of interest," and did not "warrant the creation of subclasses." *Id.* California consumer protection laws present differences that are, in the context of this case, both minimal and speculative.

Ironically, given the contrary arguments by plaintiff Corrales in this case, California courts occasionally have been asked by litigants in other cases not to certify nationwide fraud-based class action claims because California law was *less* favorable than the law of another state. In one such case, *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 17 (N.D. Cal. 1986), objectors argued that pendent common law claims for fraud and negligent misrepresentation should not go forward as a class action based on California law, because it would be unfair under the reasoning of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), to apply potentially less favorable California law to non-California class members. In agreeing to certify the nationwide class, the *Pizza Time* court found that "[t]he relevant laws in all states are far more similar to each other than they are different,"[10] 112 F.R.D. at 21, and considered the nature of

---

[10] The similarity between state consumer protection laws was noted by the California Court of Appeals in a case relied upon by Corrales:

> [e]ven though there may be differences in consumer protection laws from state to state, this is not necessarily fatal to a finding that there is a predominance of common issues among a nationwide class. As the Ninth Circuit has observed, *state consumer protection laws are relatively homogeneous*: "the

the underlying action in concluding that it was "apparent that
each jurisdiction would rather have the injuries of its citizens
litigated and compensated under another state's law than not
litigated or compensated at all."  *Id.* at 20.  Particularly given
the current state of California consumer protection law, Corrales
has failed to demonstrate that California plaintiffs have
materially stronger claims than other potential members of the
class or otherwise are in conflict with other class members.

After comparing the California consumer protection law to
Mass. Gen. Laws ch. 93A, which provides a cause of action common
to all class members, and considering the other causes of action
asserted by the class members, I find the relevant law
applicable to all members in this case sufficiently similar such
that a California subclass is unnecessary and I decline to
authorize one.  Especially given the commonality of the Chapter
93A claim for all class members, there are no particular
advantages or disadvantages applicable to class members in any of
the several jurisdictions and consequently no potential for
conflicts of interest.[11]  I have not received any objections,

---

       idiosyncratic differences between state consumer
       protection laws are not sufficiently substantive to
       predominate over the shared claims" and do not preclude
       certification of a nationwide settlement class.

*Wershba v. Apple Computer, Inc.,* 110 Cal. Rptr. 2d 145, 161 (Cal.
Ct. App. 2001) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,
1022-23 (9th Cir. 1998)) (emphasis added).

       [11] The inclusion of Canadian class members is somewhat
unusual, but I do not find that it presents potential conflicts

other than those of Corrales, which I do not find compelling.  If objectors from other states emerge after notice is made, their concerns will be addressed at the Final Fairness Hearing.

### IV. STANDARDS FOR CLASS ACTION SETTLEMENT APPROVAL

Federal Rule of Civil Procedure 23(e) requires judicial approval of all class action settlements.  Before approving a class action settlement, I must find that it is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2).  When asked to review a class action settlement preliminarily, I examine the proposed settlement for obvious deficiencies before determining whether it is in the range of fair, reasonable, and adequate. *See, e.g.,* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632.  The Advisory Notes to the 2003 Amendments to Rule 23 caution that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." FED. R. CIV. P. 23 advisory committee's note (2003). Ultimately, the more fully informed examination required for final approval will occur in connection with the Final Fairness Hearing, where arguments for and against the proposed settlement

---

within the class.  While the judgment entered by this Court will not be enforceable in Canadian courts under the Full Faith and Credit Clause of the United States Constitution, the Supreme Court of Canada has made clear that a final judgment of this Court would receive essentially the same recognition in Canadian courts as it would in the courts of the United States. *See generally Beals v. Saldanha*, [2003] 3 S.C.R. 416 (Can.). Consequently, the Canadian plaintiffs here - as well as Gillette - will receive in this Court the same benefit from a final judgment as will United States plaintiffs.

will be presented after notice and an opportunity to consider any response provided by the potential class members.

It is inherently difficult to determine the fairness and adequacy of a proposed settlement in the preliminary review context where the parties have advanced a settlement in lieu of litigation.  Courts and commentators, nevertheless, have developed a presumption that the settlement is within the range of reasonableness when certain procedural guidelines have been followed.  *See, e.g., City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement.").  These guidelines include whether: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *Lupron*, 345 F. Supp. 2d at 137 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tanks Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

I am satisfied that the negotiations in this case occurred at arm's length, and that the revised proposed settlement is more favorable to the potential class members than was Gillette's original response to pre-suit demand letters under state consumer protection statutes.  Gillette originally offered to provide a

$12 refund, or the actual amount paid if documented to be higher, to any consumer who purchased an M3P razor on or before July 1, 2005 and wished to return the razor.  Postage was to be reimbursed based on the actual postage cost, and participating consumers would receive a coupon for $1 off a future purchase. The offer was limited to two razors per household, and there was no minimum floor on recovery.[12]

The revised and then amended Settlement Agreement has improved on the original offer in several ways.  First, it establishes a minimum Settlement Fund of $7.5 million, and provides for notice with 80 percent reach to inform consumers of their rights as class members.  Second, the Settlement Class Period was extended from July 1, 2005 to either September 30 or October 31, 2005, depending on the class member's country of residence.  Third, the refund amount was increased from $12 to $13, and the reimbursement for shipping and handling was increased from the actual cost of postage, which necessarily omitted any handling costs, to $2.  Fourth, consumers are no longer required to return the M3P razor to obtain a benefit. Fifth, the Gillette shaving product available for rebate

---

[12] Corrales argues that the original offer contained no ceiling either, but all parties recognize that consumer redemption rates in cases such as this are likely to be low, so it is highly unlikely that the request for refunds under the original offer would come close to the $7.5 million allocated to the proposed settlement.

includes, as a result of the Amended Settlement Agreement, the newest offering in the Gillette product line.  Sixth, the number of permitted claims per household was increased from two to three.  Seventh, assuming money is left over from the Settlement Fund after the Initial Claim Period, members of the class will receive free Settlement Razors, along with coupons valued at $4.

The Objecting Plaintiff Corrales has not offered evidence that the negotiations were not at arm's length or were collusive in any way, and I see no reason to find otherwise.  I appointed Co-Lead and Liaison counsel on the basis of their experience in similar matters, and, despite sniping by other counsel who were unsuccessful in their own efforts to become Lead or Liaison counsel, I have been provided no reason to question their competence or integrity in negotiating the proposed Settlement Agreement.

I am also satisfied that sufficient discovery has been undertaken to provide the parties with adequate information about their respective litigation positions.  Gillette produced over 100,000 pages of documents from the District of Connecticut litigation against Schick, allowing the parties to acquire enough information rapidly to make serious settlement negotiations feasible.  Gillette also produced pertinent financial information as part of confirmatory discovery, and Co-Lead counsel deposed a Gillette representative who was familiar with the relevant

financial information.  Having reviewed this information, I find
it is sufficient to make an informed preliminary review of the
fairness of the proposed settlement.  Finally, the only practical
way to ascertain the overall level of objection to the proposed
settlement is for notice to go forward, and to see how many
potential class members choose to opt out of the settlement class
or object to its terms at the Final Fairness Hearing.

I do impose one additional requirement upon the
Representative Plaintiffs as they proceed with the notice of the
class action.  In the notice to class members on the website
created for this proposed settlement, the "Joint Submission by
the Proponents of the Proposed Settlement Comparing the Relevant
Laws of Applicable Jurisdiction for Settlement Class
Certification" must be posted together with a copy of this
Memorandum and Order alerting class members to the issues
presented by the varying state law causes of action and remedies
available to the class members.  In this way, class members who
may wish to learn more about those alternatives and consider
their implications will have a foundation for doing so.

Preliminary review is necessarily conditional.  *See Lupron*,
345 F. Supp. 2d at 138.  "[A] preliminary approval of a
settlement and a conditional class certification do[] not dispose
of the litigation as significant hurdles must be met and cleared
if a final settlement is to be approved."  *Id*. (citing *Liles v.
Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003)).  If, after notice

-42-

has been sent and the Final Fairness Hearing has been held, it appears that the settlement is not fair, adequate, and reasonable in whole or in part, I may require modifications either in the certification of the class or in the settlement provisions as a condition to approval of the settlement or I may reject settlement.  On the present state of the record, I have found sufficient basis to permit notice of the proposed Settlement Agreement to go forward and to certify a class, without subclasses, solely for the purpose of settlement.

I believe this certification is consistent with the directions provided by the First Circuit, which has taken a practical and common sense approach toward class settlements. Recently, in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 588 F.3d 24 (1st Cir. 2009), the court observed that while Judge Saris, after detailed and rigorous analysis of the diverse legal regimes implicated, had originally excluded nine states from a nationwide *litigation class*, "since their consumer-protection statutes differed," she thereafter expanded the *settlement class* to reincorporate them.  *Id.* at 40-41 (citing *In re Pharm. Preliminary Class Certification*, 230 F.R.D. 61, 83-85 (D. Mass. 2005)).  In affirming the settlement class order, the First Circuit explained that it was "perfectly clear why the district court expanded the settlement class . . . [The defendant] bargained for 'total peace' to resolve all remaining claims against it."  *Id*. at 40-41.

-43-

More recently, the First Circuit has observed that "[a]lthough in class actions there is a preference for individually proved damages," nevertheless, "it is well accepted that in some cases an approximation of damages or a uniform figure for the class is the best that can be done." *Brown v. Colegio de Abogados de Puerto Rico*, --- F.3d ---, 2010 WL 2870694, at *7 (1st Cir. July 23, 2010). After extended reflection, I am satisfied on the basis of the record before me, and subject to reconsideration or refinement in connection with the Final Fairness Hearing, that the proposed settlement represents an acceptable resolution of this dispute.

## V.   CONCLUSION

For the reasons stated more fully above, I have GRANTED class certification for a single Settlement Class; further, I have AUTHORIZED Notice as outlined in ¶ 3.2 of the proposed Settlement Agreement. The Final Fairness Hearing will be held on March 25, 2011 at 2:00 p.m. in Courtroom 1. In order to assist class members in making an informed judgment whether to lodge any objections to final approval of the settlement, the "Joint Submission by the Proponents of the Proposed Settlement Comparing the Relevant Laws of the Applicable Jurisdiction for Settlement Class Certification" and the within "Memorandum and Order" shall

-44-

be posted on the website created under the July 30, 2010 Order Authorizing Notice of the Proposed Settlement.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE